## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, *et al.*,

        Plaintiffs,

   v.

COMPUTER SCIENCES CORPORATION,

        Defendant.

Civil Action No. 05-010-JJF

## APPENDIX TO DEFENDANT'S OPENING BRIEF IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware  19801
(302) 984-6000 (general)
(302) 984-6279 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com

Of counsel:
Larry R. Seegull
Linda M. Boyd
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland  21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

Counsel for Defendant
*Computer Sciences Corporation*

Date:  May 24, 2006

## <u>TABLE OF CONTENTS</u>

Excerpts from Transcript of Deposition of Plaintiff William Sperati_____ A1

Excerpts from Transcript of Deposition of Plaintiff Daniel Rollins_____ A34

Excerpts from Transcript of Deposition of Plaintiff Karen Masino_____ A52

Excerpts from Transcript of Deposition of Plaintiff Robert Peterson_____ A79

Excerpts from Transcript of Deposition of Plaintiff Susan M. Pokoiski_____ A104

Excerpts from Transcript of Deposition of Plaintiff Brian Miller_____ A131

Excerpts from Transcript of Deposition of Plaintiff Kevin Keir_____ A163

Excerpts from Transcript of Deposition of Plaintiff Charles Folwell, Jr._____ A186

Excerpts from Transcript of Deposition of Plaintiff Ashby Lincoln_____ A216

Excerpts from Transcript of Deposition of Plaintiff Hector Calderon_____ A232

Excerpts from Transcript of Deposition of Plaintiff Dawn Hauck_____ A259

Excerpts from Transcript of Deposition of Russell Owen_____ A286

Excerpts from Transcript of Deposition of Susan Eltzroth_____ A305

Excerpts from Transcript of Deposition of Mary Jo Morris_____ A316

Excerpts from Transcript of Deposition of James Styles_____ A329

Chemical Group Employee Total Reward Guide_____ A336

Chemical Group Manager Total Reward Guide_____ A351

Fiscal Year 2003 AMIP Worksheet for Plaintiff Brian Miller_____ A373

June 12, 2003 Email from Gus Siekierka to Russell Owen,
    Mary Jo Morris And Tony Doye Regarding AMIP Realignment_____ A375

July 31, 2003 Email from Gus Siekierka Regarding AMIP Realignment_____ A377

*Seitz v. The Seigfried Group, LLP,*
    2001 Del. Super. LEXIS 364 (Del Super. Oct. 2, 2001)_____ A391

*Ibach v. Dolle's Candyland, Inc.*,
    1991 Del. Ch. LEXIS 12 (Del. Ch. 1991)_____ A398

Excerpts from Transcript of Deposition of John Nicolas Wilkinson_____ A405

Affidavit of Gus Siekierka_____ A410

Affidavit of Sonia Koplowicz_____ A431

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
    Plaintiffs,                 )
                                )
        v.                      )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
    Defendant.                  )

             Deposition of WILLIAM E. SPERATI taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:25 a.m., on Thursday,
January 12, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.


APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
         for the Plaintiffs

        LARRY R. SEEGULL, ESQUIRE
        LINDA M. BOYD, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
          6225 Smith Avenue
          Baltimore, Maryland 21209-3600
          for the Defendant


               WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
             (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL

A 1

13

1    A.    I don't know whether it's a level issue or a

2 job description issue.  I don't know the plan, but my

3 understanding is it was intended for management, and I

4 was not and never have been management.

5    Q.    Management is at what level of the

6 organization, do you know?

7    A.    No.

8    Q.    What was the highest level of the organization

9 that you reached?

10    A.    Level 6.

11    Q.    As a level 6 employee, you were not a manager?

12    A.    I was not a manager as a level 6.

13    Q.    Your claim is that, when they notified you in

14 September of 2003, they notified you that you wouldn't be

15 participating at all for that entire fiscal year?

16    A.    Correct.

17    Q.    And that meant that they were saying that, as

18 of April 1 of 2003, you wouldn't be participating.

19    A.    Correct.

20    Q.    You felt that was a retroactive change?

21    A.    Yes.

22    Q.    That's your claim, that for the period of

23 April 1, 2003, through the time that you were notified in

24 September of 2003, you had been participating, in your

1  mind?

2      A.     Yes.

3      Q.     And that you're entitled to the compensation

4  out of AMIP for that period of time.

5      A.     Yes.

6      Q.     You're not claiming any entitlement to AMIP

7  compensation from September of 2003 on.

8      A.     No.    Because I was notified at that point that

9  my participation had been terminated.

10      Q.     You understand that the company had the right

11  to do that, to tell you that you would no longer be

12  participating in AMIP and they could do that on a

13  going-forward basis?

14      A.     I assumed that they have the legal right to do

15  that.

16      Q.     Because they can change the terms and

17  conditions of your employment.

18      A.     Right.

19      Q.     You were an at-will employee, correct?

20      A.     Yes.

21      Q.     Are you still employed by CSC?

22      A.     Yes.

23      Q.     You remain an at-will employee, correct?

24      A.     I don't know what that means, but yes.    I

William E. Sperati

15

1  remain an employee under the same way I have always been

2  an employee.

3      Q.    At-will means you have no contract of

4  employment, correct?

5      A.    I have no contract.

6      Q.    You understand that the company can change the

7  terms of your employment going forward?

8      A.    Yes.

9      Q.    And that is what you thought they were doing in

10 September of 2003, but you thought they were going to do

11 it from September 2003 going forward.  You didn't think

12 they were going to do it from April through September.

13     A.    I don't think that you can terminate -- you can

14 tell somebody, oh, you weren't -- we're not paying you

15 for that period of time, give us the money back.  I don't

16 know how you can do that.

17     Q.    Let's just be clear, though.  They hadn't yet

18 paid you anything, correct?

19     A.    No.

20     Q.    So they weren't asking you to return any money,

21 correct?

22     A.    No.

23     Q.    Is that correct?

24     A.    It's accrued and prorated.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    Q.    Have you ever declared bankruptcy?

2    A.    No.

3    Q.    Have you ever made a claim for unemployment

4    benefits?

5    A.    Yes.

6    Q.    When was that?

7    A.    1971.

8    Q.    How long have you worked for CSC?

9    A.    Since we transitioned in June of 1997.

10    Q.    You were working with DuPont before that?

11    A.    Yes.

12    Q.    How long had you worked for DuPont?

13    A.    Twenty-seven years.

14    Q.    So you worked for DuPont since 1970?

15    A.    '71.

16    Q.    Since 1971 with DuPont?

17    A.    Yes.

18    Q.    And then from there on out you have been

19    working with CSC?

20    A.    Yes.

21    Q.    Have you ever made a claim for workers'

22    compensation benefits?

23    A.    No.

24    Q.    Do you have any relatives who work for CSC?



WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Spero

32

1    Q.    And earnings per share?

2    A.    In those years that that was the criteria, yes.

3    Q.    So some years it was earnings per share; some

4    years it was other criteria?

5    A.    Yes.

6    Q.    What were the other criteria that might be

7    used?

8    A.    Return on investment, operating income.  All

9    years prior to 2000 -- fiscal 2003, the immediate prior

10   year, a component, I think it was roughly 20 percent, was

11   based on the definition and meeting personal objectives.

12   In other words, I had a specific contribution that, if I

13   did certain specific tasks at a certain level, then I

14   would get X percent of the 20 percent would go into the

15   calculation.

16             The individual component was not part of

17   the calculation for fiscal 2003.  It had been in prior

18   years.  I do not know what the formula was and whether it

19   had a personal contribution component for 2004 or not.

20   Q.    Because you never received a --

21   A.    -- statement of how it was going to be

22   calculated for that year.

23   Q.    Every other year you had received such a

24   statement, but in the fiscal year 2004 --

33

```
1        A.     I did not get it.  Had not received it at the
2   time I was notified that I was not a participant.
3        Q.     So you did not know how it would be calculated
4   for that year.
5        A.     Right.
6        Q.     Do you remember when you first started working
7   for CSC, the day?
8        A.     June 1st, 1997.
9        Q.     What was the position that you assumed at CSC?
10       A.     Programmer/analyst/consultant.  I think the
11  title was computer scientist.
12       Q.     What projects were you working on?
13       A.     I was working on the DuPont SAP project.
14       Q.     What group were you in?
15       A.     The SAP Group.
16       Q.     Were you in the Chemical Group, TMG --
17       A.     Well, okay --
18              MR. WILSON:  Let him finish asking his
19  question.
20  BY MR. SEEGULL:
21       Q.     Were you in the Chemical Group, TMG, CEG, GIS?
22  What was the overall group you were in?
23       A.     At the time it was called Horizon Initiatives.
24  So it was the Horizon Initiatives Group.  It got renamed
```

35

1    A.    Again, it went through names.  It had ended up

2    being called Global Transformation Services, GTS.

3    Q.    But that's the same group that had been called

4    TMG and Chemical?

5    A.    From my view of the world, yes.

6    Q.    Let's call that the Chemical Group.  Who was

7    the head of the Chemical Group when you were told you

8    were no longer going to be participating in the AMIP

9    program?

10    A.    I think it was Nick Wilkerson, but I'm not

11    sure.  I don't have dealings at that level that I really

12    pay attention.  That's one of the names of the people who

13    periodically talked to us.  I'm not sure whether he's at

14    the top or one level down for DuPont.

15    Q.    Was he a vice president, do you know?

16    A.    I don't remember.  I believe so.

17    Q.    You received an AMIP each year you were at CSC?

18    A.    Yes.

19    Q.    Up until that point in September of 2003.

20    A.    Yes.

21    Q.    Let's talk about that.  How much did your AMIP

22    payments range from?

23    A.    The last one was in the $30,000 range.  I think

24    the low was around 20, but I don't remember the number.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 8**

36

1    Q.    You're saying those payments to you were made

2    in May of every year?

3    A.    Yes.

4    Q.    And they were made for the prior fiscal year?

5    A.    Yes.

6    Q.    Why did the payments not get made until May of

7    the year?

8    A.    Because one component of the calculation -- all

9    the components of the calculation are based on the

10   accomplishments through the year, financial or personal.

11   Q.    So it takes a while to reconcile the prior

12   fiscal year?

13   A.    Basically they have to -- you got to close the

14   books to know how much money you made.  If you met those

15   objectives, you have to use those numbers.  And the

16   annual personnel review for your individual

17   accomplishments also happens on that fiscal year-end

18   timing.

19   Q.    There's a number of things that have to finish

20   and wrap up and be analyzed before they can put it into

21   the formula to figure out how much bonus you will get?

22   A.    Right.

23   Q.    Then after that it takes even more time to send

24   out this formula for next year's bonus.

37

```
 1        A.    Right.

 2        Q.    When, generally, did you receive the formula

 3   for the following year's bonus?  Would that sometimes be

 4   October or November, December?

 5        A.    In the August-to-November time frame somewhere.

 6   I don't ever remember it being discussed much before

 7   August, and I remember I think the year before it was

 8   October/November when they finally came through and

 9   said --

10        Q.    Here's how we're going to calculate.

11        A.    -- here's how we're going to do it and, by the

12   way, there won't be an individual component.

13        Q.    That was the first year they said that?

14        A.    Yes.

15        Q.    It changed year to year how they weighted the

16   components and what the components would be?

17        A.    Yes.

18        Q.    That wasn't particular to you; that was across

19   the board?

20        A.    As I understand it.

21        Q.    When you came into the CSC organization, what

22   level were you?

23        A.    Five.  I had been a 5 at DuPont.  CSC didn't

24   have that sublevel distinction, so I became a 5.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 10**

```
1      Q.    What was the title level?

2      A.    I was called a computer scientist.

3      Q.    How long did you stay at that level?

4      A.    I think it was either three or four years.

5      Q.    Then you became an SO 6?

6      A.    Yes.

7      Q.    Do you know what the title is for that level?

8      A.    Senior computer scientist.

9      Q.    Which office were you in?

10     A.    You mean building?

11     Q.    Yes.

12     A.    I started at Barley Mill with DuPont, then we

13   moved into the Christina Corporate Center, moved around

14   there a couple, was on-site with DuPont at J.P. Morgan,

15   and then back at Christina Corporate Center.

16     Q.    Did your salary increase each year?

17     A.    Yes.  There was one year when there was no

18   increase.  I think it was in 2003.

19     Q.    You received a letter when you were transferred

20   from DuPont; is that right?

21     A.    I received an offer of employment for CSC when

22   I left DuPont, yes.

23           MR. SEEGULL:  Mark this as Exhibit 1.

24           (Deposition Exhibit No. 1 was marked for
```



1    identification.)

2    BY MR. SEEGULL:

3        Q.    I'm showing you what's been marked as

4    Exhibit 1.   Why don't you take a moment to look through

5    it.

6                    MR. WILSON:   Was this produced?

7                    MS. BOYD:   Yes.

8                    THE WITNESS:   That number is different.

9    BY MR. SEEGULL:

10       Q.    Have you had a chance to review Exhibit 1?

11       A.    Yep.

12       Q.    Do you recognize this document?

13       A.    Yes.

14       Q.    What is it?

15       A.    This is the offer of employment that I

16   received.

17       Q.    Who is Dorothy Eltzroth?

18       A.    She was HR director when we cut over.   That's

19   what it says.

20       Q.    Do you know her?

21       A.    Not personally, no.

22       Q.    This was trying to lay out how it was going to

23   work when you came over from DuPont, correct?

24       A.    It says this basically is the details of



WILCOX & FETZER LTD.
Registered Professional Reporters

40

1    compensation and benefits that I would start -- that I

2    would get when I started working.

3        Q.    One of the things it refers to is the

4    Management Incentive Program.

5        A.    Yes.

6        Q.    That's in the third full paragraph?

7        A.    Yes.

8        Q.    It says, of course, that you will be included

9    in CSC's Management Incentive Program?

10       A.    Yes.

11       Q.    It talks about the requirement of superior

12   contributions to the performance of Horizon Initiatives?

13       A.    Yes.

14       Q.    As well as achievement of negotiated management

15   objectives.

16       A.    Yes.

17       Q.    Told you that it would run with the fiscal

18   year?

19       A.    Yes.

20       Q.    Then it told you that the award will range up

21   to 30 percent of your adjusted base salary?

22       A.    Yes.

23       Q.    Depending upon your performance.

24       A.    Right.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    So you understood from this letter that you

2   were eligible to participate in the Management Incentive

3   Program?

4    A.    It said I would be included.  Specifically when

5   the manager gave this to me, he mentioned that

6   professionals such as myself were not part -- were not

7   included -- other professionals at CSC were not in the

8   Management Program, that this was done for the

9   professionals who came from DuPont to structure the

10   compensation similarly to the way it was at DuPont.

11                  MR. SEEGULL:  Off the record.

12                  (Discussion off the record.)

13   BY MR. SEEGULL:

14    Q.    When you say "professionals," do you mean that

15   you were a technical professional?

16    A.    Yes.

17    Q.    You were not on the management track.

18    A.    No management or supervisory responsibilities.

19    Q.    So they were making, again, an exception for

20   you because you were --

21    A.    As I understood it, yes.

22    Q.    You also understood that this was not a

23   guarantee that your benefits would never change.

24    A.    Right.



1    Q.    You understood that you were not guaranteed

2  that you would forever be in a Management Incentive

3  Program.

4    A.    I didn't see there would be any reason why I

5  wouldn't.

6    Q.    But you understood it wasn't a guarantee.

7    A.    There's no guarantees.

8    Q.    What do you mean by that?

9    A.    Well, they can say the pension stopped.  They

10  can say we're not, you know, covering this.  As I

11  understand it, the employer can change anything about how

12  you are compensated or your work environment that they

13  want.

14    Q.    Before you were transferred from DuPont to CSC,

15  did DuPont hold any meetings with you about the transfer?

16    A.    Yes, we had meetings.

17    Q.    Other than the communication you've just told

18  me about from your would-be supervisor about the AMIP,

19  any other communications about the bonus plan?

20    A.    They said it was structured differently than

21  DuPont.  They didn't really go into details.

22    Q.    Anything else?

23    A.    Not that I recall.

24    Q.    Did you receive any documents related to the



43

1    bonus plan?

2       A.    No.

3       Q.    Have you ever seen the bonus plan?

4       A.    No.

5       Q.    Have you ever seen anything labeled "AMIP"?

6       A.    E-mail communications around the formula for

7    this year, for the coming year or the actually

8    in-existence year because, like I said, they tended to

9    come through in late summer, early fall.

10      Q.    Other than those communications, have you ever

11   seen any policy or plan labeled "AMIP"?

12      A.    I haven't.

13      Q.    Do you know if there is such a policy or plan?

14      A.    I assume there is.

15      Q.    Why do you assume there is?

16      A.    Because HR documents policies.  They wouldn't

17   talk about it if they didn't have it.  You've got

18   something with a name, I assume it has specific rules and

19   criteria written down in the bowels of CSC's HR

20   organization administration.

21      Q.    Did you ever ask anybody where is my e-mail

22   about the AMIP?

23      A.    No.

24      Q.    Why not?



44

1    A.    Well, because it wasn't October.  Things happen

2  slowly.  I kind of -- I mean, I was kind of wondering,

3  hmmm, I wonder when they're going to start this, because

4  it was September.  I kind of remember things happening in

5  August, but, you know, I'm busy running the army.  When

6  you get the e-mail, you say, oh, okay, better fill this

7  out.

8    Q.    What do you mean fill it out?

9    A.    Well, in the past there were the specific

10  individual objectives.  So I had to write down my piece

11  of what it was for that year that I would be doing.

12    Q.    So for fiscal year 2004, you had not received

13  any e-mail communication about what the criteria would be

14  for the bonus that year.

15    A.    Right.

16    Q.    Did you know whether or not an individual

17  performance objective would be one of the components?

18    A.    No.

19    Q.    It had been a component for sometime in the

20  past, yes?

21    A.    Yes.

22    Q.    But for the immediately preceding year it had

23  not been a component?

24    A.    Correct.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

47

1  something else, and then I assume it's Management

2  Incentive Program.

3     Q.    Am I correct that you can't point to any

4  document that spells out the terms of the AMIP?

5     A.    Not that I have seen.

6     Q.    Year to year the factors and components of the

7  AMIP changed?

8     A.    I believe so, yes.  Definitely they changed the

9  last year because there was no individual piece.

10     Q.    Individual performance component.

11     A.    Right.  The two things -- there was no

12  individual performance component and the earnings per

13  share, the actual high-level corporate earnings per

14  share, was actually a component, but I do not recall

15  being that -- I do not recall being in there other years.

16     Q.    Other changes might have been return on

17  investment?

18     A.    They might have had return on investment one

19  year and not others or equity.  CSC learned different

20  ways of doing accounting and measuring, trying to find

21  quantifiable ways to measure performance.

22     Q.    Do you know what DSO is?

23     A.    Day sales outstanding.  That's their newest

24  buzz word to try to make the balance sheet look good.



WILCOX & FETZER LTD.
Registered Professional Reporters

A 18

48

1    Q.    Is that another component that sometimes was

2    included and sometimes not?

3    A.    I do not ever remember that being a component,

4    but CSC has been hot on that.  It would not surprise me

5    at all that that would have been a component in 2004

6    because that was one of the corporate financial

7    objectives was to reduce the day sales outstanding.

8    Q.    The DSO was not a factor in the prior years'

9    AMIPs, but it might have been a factor in fiscal year

10   2004?

11   A.    Might have.

12   Q.    I'm sorry.  What does DSO stand for?

13   A.    Day sales outstanding.

14   Q.    Which means what?

15   A.    How well CSC bills and manages its receivables.

16   Q.    CSC's fiscal year runs from April 1 of the year

17   through March 31st of the next year.

18   A.    Yes.

19   Q.    So if it's April 1 of 2002 through March 31st

20   of 2003, that would be fiscal year 2003?

21   A.    Correct.

22   Q.    In addition to the components of the AMIP

23   change in year to year, the weightings would also change?

24   A.    I believe so.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

53

1    end of the year?

2        A.    Correct.

3        Q.    So they couldn't calculate your bonus at any

4    one moment in time during the course of the year.

5        A.    Correct.

6        Q.    I'm not a mathematician.  I know you are.  But

7    can you just explain to me why that would be?

8        A.    Well, you don't know how well you've gotten

9    your earnings or your objectives.  You could get -- you

10   could make assumptions to get an estimate, but you don't

11   have the numbers.  You don't know if you met operating

12   income or return on investment or whatever numbers until

13   the end of the period and you've run your numbers, you

14   have your year's worth of sales, etcetera.

15       Q.    So as of the time that you were told you were

16   not going to be participating in AMIP, the company was

17   not in a position to give you a bonus for that period of

18   time of the year that had already passed.  Is that

19   correct?

20       A.    They would probably have -- they would have

21   chosen not to have gone through that exercise because of

22   the way they do goal-setting.

23       Q.    Just answer my question, though.  The company

24   could not have prorated your bonus as of September of

55

1    A.    Correct.

2    Q.    Wait until I complete my question.  It's very

3    difficult for the court reporter.  I don't want to make

4    it too difficult for her.

5          Isn't it true that as of September 2003,

6    any AMIP bonus for you could not have been prorated?

7    Correct?

8    A.    Prorating means that, when it would be awarded,

9    which would be at the close of the fiscal year in 2004,

10   it would be prorated for those months of participation.

11   Q.    So you're saying they could have prorated at

12   the end of the fiscal year, correct?

13   A.    Right.

14   Q.    But they couldn't have prorated at the middle

15   of the fiscal year in September 2003, correct?

16   A.    Correct.

17   Q.    Sitting there in September of 2003, you had no

18   way of knowing how much your bonus would have been at

19   that point in time up until that point in time, correct?

20   A.    Correct.

21   Q.    That is, up until that point in time in

22   September of 2003, you hadn't earned anything.

23          MR. WILSON:  Object to the form.

24   A.    I had participated in the plan by being an

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 21**

67

1  prorata and you think prorata means by time spent in the

2  plan.   It was not done prorata, correct?

3      A.    Correct.

4      Q.    Now, do you know in the fiscal year 2004

5  whether or not an individual performance objective was a

6  component of the plan?

7      A.    I have no idea what the 2004 components were.

8      Q.    You haven't spoken to anybody who was subject

9  to the 2004 AMIP plan?

10     A.    No.

11     Q.    You have never seen a completed worksheet?

12     A.    No.

13     Q.    How did it work at the end of every fiscal year

14  when you would get your bonus?  Did you get a completed

15  worksheet back from the company?

16     A.    I think they would show us a copy of it.

17  Sometimes we would get a hard copy.  I do not recall it

18  coming via e-mail.

19     Q.    Who was it that would show it to you?

20     A.    That would be my supervisor.

21     Q.    Who is that?

22     A.    Debbie Cebula.

23     Q.    How long has Mrs. Cebula been your supervisor?

24     A.    Five or six years.



WILCOX & FETZER LTD.
Registered Professional Reporters

69

1   participating in AMIP or not, correct?

2       A.      I was participating, okay, because I had a

3   letter that said you will be included.

4       Q.      How long after you received the completed

5   worksheet and met with Ms. Cebula did you receive the

6   bonus payment?

7       A.      Hours or days.

8       Q.      Or maybe right at the same time?

9       A.      I mean, I'm trying to think.  It may be a

10  scenario of the payday would be Friday, we would have

11  visibility to our pay stubs on Tuesday, so we would

12  actually know the amount, and on Wednesday or Thursday

13  she would actually talk to us as to how it was

14  calculated.

15      Q.      What were you told in September of 2003 about

16  no longer being a participant in AMIP?

17      A.      The entire communication was in the letter and

18  a statement that something to the effect of it's because

19  now it's only going to managers; they're enforcing that

20  old rule that we had been excepted from in the past.

21      Q.      So am I correct that you had no communications

22  with anybody else about your no longer being a

23  participant in AMIP other than that letter?

24      A.      That was the first time I heard anything about



70

1   it.

2        Q.     Was that the only time you spoke to anybody in

3   the company about it?  I say "spoke."  You didn't speak

4   to anybody.  Was that the only communication you had with

5   anybody about no longer being a participant in AMIP?

6        A.     Basically, yes.  I mean, some of the other

7   people who I believed lost it, we started talking about,

8   boy, this seems pretty unbelievable.

9        Q.     Other than that?

10       A.     No.

11       Q.     No other communications?

12       A.     No.  And then the letter from Bill saying

13   please respond to the letter that you received.

14       Q.     What was your understanding of what it meant

15   when you received the letter?

16       A.     It meant that CSC had on September 11th

17   declared that effective April 1st I was no longer to be

18   participating.

19       Q.     Did you understand that meant that you would no

20   longer receive any AMIP?

21       A.     I suspect that to be the case.

22       Q.     That's what you understood it to mean.

23       A.     Yes.

24       Q.     Did you understand that you were not going to

71

1   get prorated?

2        A.    I was pretty sure because of that use of the

3   April 1st language that they would not recognize the fact

4   that I had participated for those six months.

5        Q.    Did you ever ask anybody about proration?

6        A.    I might have said are we going to at least get

7   money for this -- I suspect that I asked, but I don't

8   remember specifically.

9        Q.    You think you were told no, you're not going to

10  get prorated?

11       A.    Right.

12       Q.    That would have been Debbie Cebula?

13       A.    Yes.

14       Q.    And that would have been in September 2003, as

15  well, that you spoke to her about this?

16       A.    Yes.

17       Q.    So you knew once you spoke to Debbie Cebula

18  that you would not get any AMIP?

19       A.    I expected that, when the AMIP was distributed,

20  I would not -- my participation would not be recognized

21  and, therefore, I would get nothing for that fiscal year.

22       Q.    That's what you understood.

23       A.    Yes.

24                    (Deposition Exhibit No. 2 was marked for

72

1    identification.)

2    BY MR. SEEGULL:

3        Q.    I'm now showing you what's been marked as

4    Exhibit 2.  Do you recognize this?

5        A.    Yes.

6        Q.    This is the letter you received?

7        A.    Yes.

8        Q.    That told you you were no longer a participant

9    in AMIP.

10       A.    Yes.

11       Q.    So you were told as of September 11th, 2003,

12   that you would not get any AMIP.

13       A.    Correct.

14       Q.    You said you were given some explanation, but

15   it's not from this letter?

16       A.    Well, this letter says it has reviewed your

17   eligibility in line with criteria set and you will no

18   longer be eligible.  That's what it says.

19       Q.    So you understood that to be an explanation

20   about we're returning to what we always understood the

21   AMIP to be.

22       A.    That's what I assumed happened, because at any

23   time they could have reviewed and under the rules I

24   would, quote, not have been eligible.



A 26

1     Q.    Were you handed this letter?

2     A.    Yes.

3     Q.    By Debbie Cebula?

4     A.    Yes.

5     Q.    You were told you were eligible for a

6  discretionary bonus.

7     A.    That's what it said.

8     Q.    You were eligible for up to $10,000 in

9  discretionary bonus, correct?

10     A.    That's what it said.

11     Q.    And you would not have been eligible for a

12  discretionary bonus if you had remained in the AMIP.

13     A.    I assume that to be so.

14     Q.    That's what you understood.

15     A.    I don't know that they implemented a

16  discretionary bonus program.  CSC has changed over the

17  years as to whether a person can participate in multiple

18  bonus programs or not.  So I don't know what the current

19  rules as to whether you would be eligible for two

20  bonuses, performance bonuses, or not.  It's likely that

21  with AMIPs I would not have gotten -- have been eligible

22  for any other bonus.

23     Q.    That was your understanding.

24     A.    That is the way it had worked the last couple



WILCOX & FETZER LTD.
Registered Professional Reporters

78

1    Exhibit 4 was sent.

2        Q.    You provided answers to interrogatories in this

3    case.

4        A.    Yes.

5        Q.    One of the questions we asked you in the

6    interrogatories was to provide a statement as to your

7    damages, correct?

8        A.    I believe so.

9        Q.    You identified your damages as being

10    $15,667.86.  Does that number sound familiar?

11        A.    Probably.

12        Q.    Is that yes?

13        A.    Yes.

14        Q.    And that was what, your estimate of what or

15    your statement of what?

16        A.    That's my statement of not knowing the formula

17    for the 2004 AMIP, I used the average that I had gotten

18    over the last couple years, assuming that CSC financials

19    were as good, if not better, than the prior years so that

20    the base for the calculation would be the same, and then

21    applied that percentage to my salary for the time period

22    up through the notification.

23        Q.    So this was an estimate of what you felt was

24    the amount of AMIP bonus that should have been prorated



79

1    for the period of time up until the point that you were

2    notified you were no longer participating.

3         A.    Yes.

4         Q.    And just tell me how you went about coming up

5    with this estimate.

6         A.    As I recall, I took the average percentage for

7    the prior three years --

8         Q.    What do you mean "percentage"?  Percentage of

9    what?

10        A.    Percentage of my salary that my AMIP had

11   represented.

12        Q.    So maybe you took the AMIP that you had

13   received in 2002?

14        A.    Right.

15        Q.    2001?

16        A.    '2 and '3.

17        Q.    The AMIP dollars that you had received in 2002,

18   the AMIP dollars you had received in 2003, and figured

19   out what percentages they were for each year?

20        A.    Yes.

21        Q.    And then what did you do, you averaged those

22   percentages?

23        A.    Then I believe I averaged those percentages and

24   then took that percentage over the salary.

80

```
1        Q.    For fiscal year 2004?

2        A.    For six months of 2004.   Fiscal 2004.

3        Q.    So six months.   Why do you say six months if

4   you were notified in early September?

5        A.    Well, because of the pay-period cycle.

6        Q.    What do you mean?

7        A.    Well, CSC pays on a two-week pay-period cycle.

8   So I used through the end of September as that would be

9   the pay stub that corresponds to the period that this --

10  from when I received the notice.   It could be one pay

11  period less if you want to say that pay was for --

12       Q.    The period after you were notified.

13       A.    That was the pay for the work in the period I

14  was notified.   So I didn't quibble over the three days of

15  pay inside that pay period.

16       Q.    Why did you choose that method of coming up

17  with an estimate?

18       A.    Because it was easy.

19       Q.    There are other methods to estimate, right?

20       A.    Yes.

21       Q.    What are some other ways that you could have

22  estimated how much AMIP --

23       A.    I could have taken the highest amount rather

24  than the average.   I could have looked at some of the
```

81

1    classic CSC performance metrics to see if they were -- I

2    could have pretended to do my own AMIP calculation to see

3    if the formula would have been better this year than

4    other years.

5        Q.    Or worse?

6        A.    Or worse.  But not knowing what the formula

7    was, speculating and doing the arithmetic of finding out

8    earnings per share and some of those calculations, this

9    seemed like a simple and fair way to get there.  Knowing

10   the formula would be better, but I didn't have access to

11   that information.

12       Q.    You have no choice but to estimate.

13       A.    Right.

14       Q.    You also could have averaged your AMIPs over

15   the past three or four years.

16       A.    Yes.

17       Q.    And then prorated it for a period of time.

18       A.    But then you have to adjust it for the

19   increased salary.

20       Q.    There are just different arbitrary ways of

21   calculating a bonus.

22       A.    Well, the AMIP's bonus is a percent of salary.

23       Q.    But these are all arbitrary ways of estimating.

24   One is no better than another.  There are just different

83

1      Q.    Sometimes a company has to make decisions about

2    how to save money?

3      A.    Are you talking about fiscal 2003 or fiscal

4    2004?

5      Q.    I'm talking about fiscal 2003.

6      A.    Okay.

7              MR. WILSON:  Let him finish.

8      Q.    You would agree that sometimes companies have

9    to make tough decisions about how to save money, retain

10   employees, improve the financial performance of the

11   company?

12     A.    Yes.

13     Q.    And that a company has to use its best business

14   judgment to do that.

15     A.    Yes.

16     Q.    And you understand that realigning AMIP with

17   its original intent allowed the company to save a lot of

18   money, correct?

19             MR. WILSON:   Object to the form.

20     A.    Yes, it would allow them to save money.

21     Q.    That's a legitimate objective of the company.

22     A.    Yes.

23     Q.    So you don't have a problem with the idea that

24   people will no longer be subject to the AMIP.   You just

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 12th day of
January, 2006, the deponent herein, WILLIAM E. SPERATI,
who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



            Kimberly A. Hurley
            Certification No. 126-RPR
            (Expires January 31, 2008)



DATED:



WILCOX & FETZER LTD.
Registered Professional Reporters

A 33

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.       )
HAUCK, KEVIN KEIR, ASHBY       )
LINCOLN, KAREN MASINO, ROBERT  )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM    )
SPERATI,                       )
                               )
     Plaintiffs,               )
                               )
        v.                     ) C.A. No. 05-10-JJF
                               )
COMPUTER SCIENCES CORPORATION, )
                               )
        Defendant.             )
```

              Deposition of DANIEL P. ROLLINS taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 8:55 a.m., on Friday,
January 13, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          LINDA M. BOYD, ESQUIRE
             DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant

               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

                                              **A 34**

Daniel P. Rollins

118

1      A.    Computer science, business.

2      Q.    Any other postcollege education?

3      A.    No.

4      Q.    Where did you go to work after Ohio State?

5      A.    DuPont.

6      Q.    Where was that?

7      A.    In Wilmington.

8      Q.    What was your position?

9      A.    I was a systems analyst.

10     Q.    Do you have any other education or training

11  other than your college curriculum?

12     A.    No.

13     Q.    Have you ever received any professional or

14  work-related certifications?

15     A.    No.

16     Q.    Have you ever received any awards or honors?

17     A.    No.

18     Q.    How long did you work at DuPont?

19     A.    Thirteen years.

20     Q.    So until about '96?

21     A.    '97.

22     Q.    Was it until June of '97?

23     A.    Yes.

24     Q.    And then you began working at CSC?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

119

1    A.    Correct.

2    Q.    You came over with everybody else who was

3    outsourced from DuPont?

4    A.    Yes.

5    Q.    What was the highest position you held at

6    DuPont?

7    A.    It was a level 5 was the grade level, and I

8    don't know the position title.

9    Q.    Were you on a management track or the technical

10    track?

11    A.    I started technical, I went over to management,

12    and then I switched back over to technical.

13    Q.    Were you a manager by the time you left DuPont?

14    A.    No.  I was technical when I left DuPont.

15    Q.    Did your salary increase every year that you

16    were at DuPont?

17    A.    Yes.

18    Q.    Did you receive a bonus every year that you

19    were at DuPont?

20    A.    No.  The last three years, I believe.

21    Q.    So you received a bonus in 1995, '96, and '97?

22    A.    Yes, roughly.

23    Q.    How much did you receive in 1995?

24    A.    I think the first bonus was close to $13,000.

Daniel P. Follins

126

1    A.    Parts of it were me and him and parts of it
2    involved Jim Walla I believe was also there.
3    Q.    Three-hour meeting is a pretty long meeting.
4    Tell me what you discussed during that meeting.
5    A.    Just he had presented basically what they were
6    doing with the outsourcing and what would result if the
7    people that chose not to go with the plan and the
8    benefits of going with the plan.
9    Q.    What did he tell you would happen if you didn't
10   transition over to CSC?
11   A.    He said there was a good chance I wouldn't be
12   able to stay in my current assignment, because I was
13   working with a package called SAP.  He said going with
14   DuPont -- and they were outsourcing all the computer
15   portions of that and I'd have to find some other position
16   within DuPont.
17   Q.    What did he say would happen if you did come
18   with the transition?
19   A.    Pretty much that the job would go unchanged and
20   salary and benefits would be as good or better than if I
21   stayed at DuPont.
22   Q.    He never guaranteed you anything, did he?
23   A.    I don't know that he could have guaranteed me
24   anything.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

127

1    Q.    Why is that?

2    A.    I just was listening what he was saying.  I

3 didn't ask him to sign a contract.  That's not something

4 you would do with your manager that comes out to talk to

5 you.

6    Q.    There are no guarantees in life, right?

7    A.    Correct.

8    Q.    Was he telling you what he expected would

9 happen if you came over to CSC?

10    A.    Yes.

11    Q.    He was giving you his best impression of the

12 intent of the company at the time?

13    A.    Correct.

14    Q.    Do you think he was being honest?

15    A.    Yes.

16    Q.    He was trying to describe to you as he

17 understood it the terms of the AMIP plan at that time?

18    A.    Correct.

19    Q.    He never told you that the AMIP plan will never

20 change, did he?

21    A.    I don't think that came up.

22    Q.    He wasn't promising you that the terms of the

23 AMIP plan would never change, correct?

24    A.    Yeah, I don't think that...

Daniel P. Rollins

128

1      Q.    He never said that your salary will never

2  change?

3      A.    No.

4      Q.    You understood that your compensation could

5  change?

6      A.    Yes.  With DuPont, once you made the variable

7  comp. level, we didn't know of anybody that lost it.  So

8  you kind of came to expect that you would get that every

9  year.

10     Q.    But it wasn't a guarantee?

11     A.    No, nothing is a guarantee.

12     Q.    For instance, you could be demoted?

13     A.    Correct.

14     Q.    If you were demoted into a different level,

15  then you wouldn't get it, correct?

16     A.    Correct.

17     Q.    Or they could change the terms of the variable

18  comp. plan to make it only for level 6 and above,

19  correct?

20     A.    Sure.

21     Q.    That's what DuPont could have done?

22     A.    Correct.

23     Q.    And CSC could have done the same thing?

24     A.    Uh-huh.



WILCOX & FETZER LTD.
Registered Professional Reporters

135

1    performance evaluation had been completed and the company

2    had closed its books?

3         A.    Yes, I believe so.

4         Q.    So normally you would get a call, let's say, in

5    May after the fiscal year had closed?

6         A.    Correct.

7         Q.    Just so I'm clear, the fiscal year for CSC runs

8    from April 1 through March 31?

9         A.    Correct.

10        Q.    Just as an example, fiscal year 2003 would run

11   from April 1, 2002, through March 31, 2003.

12        A.    Yes.

13        Q.    And you might not find out that you were going

14   to get your fiscal year 2003 bonus until May of 2003, for

15   instance.

16        A.    Yes.

17        Q.    Up until that point you would have no idea

18   whether or not you were going to receive a bonus or how

19   much it would be?

20        A.    Well, I don't think it was a question of

21   whether you're going to receive it because you received

22   it every year.  So you just expected you were going to

23   receive it until they told you you weren't.

24        Q.    You would assume that you would be getting a



1    you had received one in the prior fiscal year.

2        A.    Correct.

3        Q.    So you would assume that, if it's happening one

4    year, it's going to happen next year.

5        A.    Correct.

6        Q.    When you were hired by CSC, you didn't have a

7    contract of employment, correct?

8        A.    No.

9        Q.    You were an at-will employee?

10       A.    Correct.

11       Q.    You are still an at-will employee?

12       A.    Correct.

13       Q.    I know you don't know the title, but do you

14   know the level position that you were hired at when you

15   came on to CSC?

16       A.    I think it was also a level 5 position.

17       Q.    Are you still a level 5 position?

18       A.    Yes, I believe so.

19       Q.    Do you know if that's a management-level

20   position?

21       A.    I couldn't tell you.

22       Q.    Did you receive an offer letter when you came

23   over to CSC?

24       A.    Yes.



138

1              (Deposition Exhibit No. 7 was marked for

2     identification.)

3     BY MR. SEEGULL:

4          Q.     Mr. Rollins, I'm showing you what's been marked

5     as Exhibit 7.   Do you recognize this?

6          A.     Yes.

7          Q.     What is it?

8          A.     That's the offer letter from CSC.

9          Q.     Is this the one that you signed in March of

10    '97?

11         A.     Yes.

12         Q.     This has some language about the bonus plan.

13    Do you see that?   In the third full paragraph which

14    starts "In addition."

15         A.     Yes.

16         Q.     This has a brief description of the Management

17    Incentive Program, correct?

18         A.     Correct.

19         Q.     You can put that aside.

20                Other than this offer letter, were you

21    provided any documents about the bonus plan at any point

22    in time?

23         A.     I don't recall.

24                MR. SEEGULL:   We have got to call the

148

1              MR. SEEGULL:  I will confer with Mr. Raimo

2    about whether or not that's necessary, and, if so, we

3    will submit a separate cover letter laying all that out.

4              THE COURT:  At the time that you do your

5    mediation statement.

6              MR. SEEGULL:  Yes.

7              THE COURT:  Thank you.

8              MR. SEEGULL:  Thank you, Your Honor.

9              (End of telephone conference.)

10   BY MR. SEEGULL:

11        Q.    What does AMIP stand for?

12        A.    I couldn't tell you.

13        Q.    You just understand it's the bonus plan?

14        A.    Right.

15        Q.    We talked about the fact that at some point in

16   September of 2003 you were told that you would no longer

17   be eligible for receiving the AMIP for that fiscal year.

18        A.    Correct.

19        Q.    That, you think, was on September 11th?

20        A.    Right.

21        Q.    That's when you received the letter?

22        A.    Uh-huh.  Yes.

23        Q.    Did you have any other communications, verbal

24   or written, about this issue other than that letter?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 43**

Daniel P. Rollins

149

1      A.    Yeah.   I think I received a phone call from
2    Alan Kronmiller, my supervisor, and he kind of explained
3    the situation, and he didn't -- kind of indicated he
4    didn't agree with what was going on, but that's what was
5    going on.
6      Q.    Was this conversation with Mr. Kronmiller
7    before or after you received the letter?
8      A.    I believe it was before, but I can't tell you
9    100 percent.
10      Q.    He told you you should expect to receive a
11    letter confirming this?
12      A.    Correct.
13      Q.    How long was this telephone conversation?
14      A.    I don't know.
15      Q.    Was it relatively short?
16      A.    Yeah, most calls with him are short.
17      Q.    At most five to ten minutes?
18      A.    Yes.
19      Q.    What did he tell you about what was going on
20    with the AMIP?
21      A.    He just said they were looking to make some
22    changes and that we may no longer be receiving it.
23      Q.    Did he tell you that the company was looking to
24    change the AMIP plan by realigning it with its original

150

1    intent to make it more of a senior management focus?

2        A.    Yeah.  I can't remember the exact conversation.

3        Q.    But was it words to that effect?

4        A.    I would say so, yes.

5        Q.    You understood that was what the company was

6    trying to do, correct?

7                MR. WILSON:    Object to the form.

8        A.    I can't say I understood it.  I really didn't

9    agree with what he was saying, and he didn't agree with

10   what he was saying.

11       Q.    I understand that you disagreed with the idea

12   that you should be removed.  You thought you shouldn't be

13   removed.

14       A.    Correct.

15       Q.    But you understood that what the company was

16   trying to do was to make the plan more consistent with

17   what its original intent was, which was to make it

18   exclusively a bonus program for senior management.

19                MR. WILSON:    Object to the form.

20       A.    I didn't understand that, what he was saying.

21   I don't remember him saying those words.

22       Q.    Did you know that the original intent of the

23   program was to be a bonus program for senior-level

24   management?



WILCOX & FETZER LTD.
Registered Professional Reporters

A 45

1    bonus?

2        A.    No.

3        Q.    Do you know on what basis they decide who gets

4    it and who doesn't?

5        A.    No.

6        Q.    At the time that you received this letter,

7    Exhibit 8, you understood you would no longer be getting

8    AMIP payments, correct?

9        A.    Correct.

10        Q.    You knew that you were no longer eligible under

11    the AMIP plan?

12        A.    Yes.

13        Q.    You also knew that this discretionary bonus you

14    suddenly became eligible for, correct?

15        A.    Yes.  That's what the letter said.

16        Q.    You had not been eligible for the discretionary

17    bonus before, correct?

18        A.    Correct.

19        Q.    So you understood that, although the company

20    was taking away your eligibility from AMIP, they were

21    giving you something, as well, which is eligibility for

22    the discretionary bonus.

23        A.    Yeah.  That's what was said in the letter, but,

24    like I said, I never saw anything of the discretionary



164

1    A.    I'm not sure I understand.

2    Q.    The company could, for instance, look at the

3 past five years of your AMIP payments and do an estimate.

4    A.    They could, yes.

5    Q.    And they could also take what would have been

6 your AMIP payment for the entire year if they could

7 figure that out and divide that by two to come up with

8 another estimate?

9         MR. WILSON:    Object to form.

10    A.    Okay.

11    Q.    Is that right?

12    A.    They could.

13    Q.    So there are all different ways of coming up

14 with estimates, but you tried to come up with one form of

15 an estimate.

16    A.    Correct.

17    Q.    Why is it that you have to estimate what your

18 actual damages are?

19    A.    I think you were asking me to estimate what the

20 actual damages were.

21    Q.    Is it because you don't know what your actual

22 damages are, you have to estimate them?

23    A.    Correct.

24    Q.    Is that because you don't know what you would



```
 1   have been paid in an AMIP bonus for those six months?

 2        A.    I know approximately what it would have been.

 3        Q.    But you don't know because you never were paid

 4   an AMIP bonus for that year?

 5        A.    Correct.

 6        Q.    The decision to remove you from AMIP

 7   eligibility was not a personal decision about you,

 8   correct?

 9        A.    True.

10        Q.    The company removed all people at a certain

11   salary level, correct?

12        A.    Yeah.  I assume so.  I don't know that.

13        Q.    That's what your understanding is?

14        A.    Yes.

15        Q.    The salary level was salary level 6 and below,

16   correct?

17        A.    Yes.  I believe so.

18        Q.    You would agree that in fiscal year 2003 and

19   starting in fiscal year 2004, it was a tough economic

20   climate for the company at that period of time.

21        A.    Yes, I believe so.

22        Q.    You understood that the company was trying to

23   save money?

24        A.    Correct.
```



Daniel P. Rollins

166

```
1        Q.     One of the ways they were trying to save money

2   was to revisit the bonus plan.

3        A.     Yes.

4        Q.     That's why they were trying to change the

5   eligibility.

6        A.     Correct.

7        Q.     That's a legitimate business reason to change a

8   bonus plan, correct?

9               MR. WILSON:  Object to the form.

10       A.     I assume so, yes.

11       Q.     The company has the right to make decisions to

12  try to save money.

13              MR. WILSON:  Object to the form.

14       A.     Yes.

15       Q.     You don't have a problem with CSC making

16  changes to its plan?

17       A.     I wouldn't say that.

18       Q.     You do have a problem with it or you don't have

19  a problem with it?

20       A.     I have a problem with them making changes that

21  to me we came to expect with DuPont and also with CSC,

22  and it's my choice to continue to work under the program

23  which I did decide to do, but to say I didn't have a

24  problem with it is probably an incorrect statement.
```

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A 49

Daniel P. Rollins

177

```
1   know that as a fact?

2       A.    No, I don't.

3       Q.    Had you ever heard of the discretionary bonus

4   before?

5       A.    This was the first I heard about it.

6             MR. WILSON:  That's all I have.

7   BY MR. SEEGULL:

8       Q.    Mr. Rollins, you don't know how AMIP was

9   calculated year to year, correct?

10      A.    Correct.

11      Q.    You don't know what the factors were that were

12  used in determining how much the AMIP would be for any

13  employee?

14      A.    Correct.

15      Q.    So it's possible that the formula that was used

16  for you changed year to year?

17      A.    It's possible.

18      Q.    You don't know one way or the other?

19      A.    No.

20      Q.    That's correct?

21      A.    Yes.  I believe so.

22      Q.    In the three exhibits that your attorney used,

23  exhibits 10, 11, and 12, those are what you call pay

24  stubs?
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters