## CERTIFICATE OF REPORTER

STATE OF DELAWARE:
                    :

NEW CASTLE COUNTY:


       I, Kimberly A. Hurley, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 13TH day of January, 2006, the deponent herein, DANIEL P. ROLLINS, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that reading and signing of the deposition were waived by the deponent and counsel.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


               Kimberly A. Hurley, RMR
               Certification No. 126-RPR
               (Expires January 31, 2008)


DATED:



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.            )
HAUCK, KEVIN KEIR, ASHBY           )
LINCOLN, KAREN MASINO, ROBERT      )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM        )
SPERATI,                           )
                                   )
     Plaintiffs,                   )
                                   )
     v.                            )  C.A. No. 05-10-JJF
                                   )
COMPUTER SCIENCES CORPORATION, )
                                   )
     Defendant.                    )

          Deposition of KAREN A. MASINO taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 1:00 p.m., on Friday,
January 13, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.


APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          LINDA M. BOYD, ESQUIRE
             DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant

             WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters
ORIGINAL

A 52

Karen A. Masino

192

1    period?

2        A.    Correct.

3        Q.    Which would either be within a week or maybe

4    two weeks of that?

5        A.    Exactly.

6        Q.    You were notified on September 11th, 2003, when

7    you received a letter from the company saying you were no

8    longer eligible for AMIP?

9        A.    I believe it was the 11th.  It may have been

10   the 13th when I actually had my face-to-face meeting.

11       Q.    At the time that you were notified, you knew

12   you would no longer get any AMIP payment, correct?

13       A.    Correct.

14       Q.    What is your Social Security number?

15       A.    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.

16       Q.    What is your date and place of birth?

17       A.    September 1st, 1959.  I was born here in

18   Wilmington, Delaware.

19       Q.    Where do you currently reside?

20       A.    At 420 West 22nd Street.

21       Q.    Do you own or rent your home?

22       A.    I rent.

23       Q.    How long have you been at that address?

24       A.    More than 15 years.



193

1      Q.    Are you married?

2      A.    No.

3      Q.    Have you ever been married?

4      A.    No.

5      Q.    Do you have any children?

6      A.    No.

7      Q.    Have you ever been arrested?

8      A.    No.

9      Q.    Or ever convicted of any felony or misdemeanor?

10     A.    No.

11     Q.    Have you ever served in the military?

12     A.    No.

13     Q.    When did you first contact an attorney to

14  handle your case against CSC?

15     A.    I believe in October of 2003.

16     Q.    Would that have been shortly after you received

17  notice that you were not going to get any AMIP payment?

18     A.    Correct.

19     Q.    Once you knew that you were not entitled to any

20  AMIP payment, that's when you decided you were going to

21  seek counsel?

22     A.    Yes.

23     Q.    Who was the first attorney that you contacted?

24     A.    Jeff Martin.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1      A.      I worked in Harrisburg at a utility services
 2  company.
 3      Q.      For how long did you do that?
 4      A.      About two years.
 5      Q.      Then you started working for DuPont?
 6      A.      Then I was back at DuPont.
 7      Q.      Did you stay at DuPont continuously from there
 8  on out?
 9      A.      Yes.
10      Q.      You stopped working for DuPont when?
11      A.      In May of '97.
12      Q.      Did you come over with a group?
13      A.      I came over with the entire group.
14      Q.      Would that have been in June of '97?
15      A.      Yes.
16      Q.      What positions did you hold at DuPont?
17      A.      When we transitioned?
18      Q.      At all times.
19      A.      At all times?  I was a programmer, a project
20  manager, a team leader, I was a technology manager at
21  transition.
22      Q.      What's a technology manager?
23      A.      We got a subset of technology that was our
24  responsibility to move through the product life cycle and
```

Karen A. Masino

207

1     Q.    Have you ever seen this plan?

2     A.    Yes.

3     Q.    Where have you seen it?

4     A.    It was in the management guide, I believe.

5     Q.    Which management guide, do you know?

6     A.    There's an employee handbook and then a

7 management guide that we got when we were supervising

8 employees or had direct-line responsibility.

9     Q.    Was this in the Chemical Group?

10    A.    Yes.

11    Q.    Which group were you in when you came over to

12 CSC?

13    A.    Which group in CSC?

14    Q.    Yes.

15    A.    In the Chemical Group which was called Horizon

16 Initiatives at the time.

17    Q.    Then it became Chemical Group?

18    A.    It became Chemical and Energy; Chemical, Oil

19 and Gas; then the Chemical Group.  It had a variety of

20 names.

21    Q.    What's the name of it now?

22    A.    Chemical account, I believe.

23    Q.    Is this the same as TMG?

24    A.    It's a part of TMG, which is the Technology

Karen A. Masino

209

```
 1        Q.     Was it the same person that led each session?

 2        A.     I don't remember.

 3        Q.     Do you remember what was said about the AMIP

 4   plan?

 5        A.     Not specifically.

 6        Q.     Were you provided with any documents about the

 7   AMIP plan?

 8        A.     In those sessions?  I don't believe so.

 9        Q.     At the time of transition or around that time.

10        A.     I don't believe I would have received that,

11   since I was not on the bonus program at the time.

12        Q.     You said there was a chemical plan that you

13   received when you became a manager?

14        A.     Yes.

15        Q.     When would that have been?

16        A.     Shortly after transition.

17        Q.     When you say "shortly," what do you mean?

18        A.     Within a year.

19        Q.     Would that have been at the start of fiscal

20   year 2004?

21        A.     1998.

22        Q.     I'm sorry.  At the start of fiscal year 1998?

23        A.     Yes.

24        Q.     So approximately April of '97?
```



Karen A. Masino

210

```
 1        A.    No.   We transitioned in '97.   See how confusing

 2   that fiscal year is?

 3        Q.    You're right.   It does get confusing.   Let me

 4   start again.

 5                   You came over in June of '97.

 6        A.    Correct.

 7        Q.    That would be during fiscal year 1998?

 8        A.    '98, right.

 9        Q.    Would it have been at the start of fiscal year

10   '99 --

11        A.    Correct.

12        Q.    -- that you received the chemical -- that you

13   became a manager?

14        A.    To my recollection, yes.   During that time.

15        Q.    So approximately April of '98?

16        A.    May have been May or June, but in that time

17   frame.

18        Q.    April or June, somewhere in there?

19        A.    Yes.

20        Q.    At some point during that time frame is when

21   you received this management handbook for the chemical

22   account?

23        A.    Correct.

24        Q.    In there, there are some provisions regarding
```

1    AMIP?

2        A.    Correct.

3        Q.    Other than the provisions in that handbook, are

4    you aware of any other written policies about AMIP?

5        A.    No.

6        Q.    What positions have you held while you have

7    been at CSC?

8        A.    I was an operations manager.  I'm sorry.  I was

9    a technology manager first, then an operations manager,

10   then a portfolio manager, and now I'm an account manager.

11       Q.    What salary levels have you been at while at

12   CSC?

13       A.    I transitioned at salary level 4.  I was made a

14   5 within, I think, three months because they had

15   misleveled some folks.  Now I'm a level 6.

16       Q.    When were you made a level 6?

17       A.    I don't specifically recall.  1999 or 2000.  I

18   don't remember.

19       Q.    Would it have been after you were promoted to

20   the chemical account manager's position?

21       A.    It was when I was an operations manager.  I was

22   promoted and put on the AMIP program at the same time.

23       Q.    What time would that have been?

24       A.    What year or what time of year?



Karen A. Masino

215

1    but yes, that's the range.

2        Q.    Some years it was 20 percent?

3        A.    Right.

4        Q.    Some years it might have been 25 percent?

5        A.    No.

6        Q.    And some years it could have been in between?

7        A.    No.   I'm sorry.   I'm not explaining it

8    correctly.   Your eligibility was always preset.   If

9    you're eligible for 20 percent, that's what your target

10   was.

11       Q.    That's for your entire career at CSC?

12       A.    No.   Only for whatever that fiscal year was.

13   So it could have changed the next year to 25 percent.   I

14   have never heard of anybody dropping.

15       Q.    So some years it was 20 percent and then some

16   years it went up to 25 percent?

17       A.    Mine was always 20 percent.

18       Q.    Yours was always 20 percent.   That makes it

19   easy.

20             So that the total AMIP bonus that you

21   could ever receive was 20 percent of your salary?

22       A.    Correct.

23       Q.    How the bonus was calculated, that would change

24   year to year?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    Correct.

2      Q.    There were different factors that were used?

3      A.    Yes.

4      Q.    What were some of the factors that were used in

5   the calculation of the AMIP bonuses?

6      A.    Depending on the year, they were financial

7   goals of the account, financial goals of the company,

8   earnings per share, your specific performance in your job

9   function.

10      Q.    What would be some metrics that the company

11   would measure in terms of financial goals of the account?

12      A.    Again, they measure earnings per share,

13   operating income.  Those kinds of things.

14      Q.    Those are financial goals of the company.

15      A.    Yes.  And they also measured -- the operating

16   income and those financials goals were also measured at

17   the account level.

18      Q.    Those are all different factors that the

19   company used to calculate the AMIP bonus?

20      A.    Correct.

21      Q.    Sometimes those factors were used, sometimes

22   they weren't used, correct?

23      A.    I'm not sure how to answer that.  The factors

24   would change from year to year.



1    Q.    So let's just give an example.  Earnings per

2    share, that might be a factor one year, it might not be a

3    factor another year?

4    A.    Correct.

5    Q.    Or operating income might be a factor one year,

6    it might not be a factor another year?

7    A.    Correct.

8    Q.    Is the same true for the individual performance

9    component, that that might be a factor one year but not a

10   factor another year?

11   A.    I believe so.

12   Q.    How would you find out what the factors were

13   and how they were going to be used?

14   A.    We would get the AMIP worksheet at some period

15   during the year where the factors were described and

16   explained.

17   Q.    Am I correct that you wouldn't receive that

18   AMIP worksheet until later in the year, let's say

19   September, October, November?

20   A.    That's correct.  It did not always come out

21   early in the year.

22   Q.    We have talked about the different factors that

23   might be used, and I'm not asking you for an exhaustive

24   list because there were a lot of different factors that



Karen A. Masino

218

1    were used.  Correct?

2        A.    There were a handful.  Maybe six.  For the most

3    part, they were consistent through the years, so we knew

4    in general what they would be year to year.

5        Q.    But they could change?

6        A.    They could change, but in general, we would

7    know.

8        Q.    In addition to the factors themselves

9    potentially changing, the targets also changed, correct?

10       A.    Correct.

11       Q.    That is, earnings per share might be a factor

12   year after year, but the target for earnings per share

13   would change year to year.

14       A.    Correct.

15       Q.    The same target for operating income would

16   change year to year.

17       A.    Correct.

18       Q.    And the target for individual performance would

19   change year to year.

20       A.    Correct.

21       Q.    Who set the targets?

22       A.    I don't know.

23       Q.    Who set the factors that were going to be

24   considered?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 63**

219

```
1       A.      I don't know.

2       Q.      Did you have any input into the targets or the

3    factors?

4       A.      No.

5       Q.      You said you received worksheets that laid all

6    this out?

7       A.      Yes.

8       Q.      And the worksheets that laid this out you would

9    receive in the September/October/November time frame?

10      A.      I believe so.

11      Q.      How would you receive these worksheets?  Would

12   you receive them in e-mail form or printed form handed to

13   you?

14      A.      Typically they were handed to us.  We did get

15   one in e-mail form.

16      Q.      What year did you get in e-mail form?

17      A.      I don't remember.  2003, maybe.  No, couldn't

18   have been 2003.  2002.

19      Q.      It could have been fiscal year 2003, but during

20   the year 2002; is that right?

21      A.      Yes.

22      Q.      Who would e-mail it to you, and who would hand

23   it to you?

24      A.      Our manager would hand it to us.  At the time
```



1    that was Bob Tattle.  Or Debbie Krakowski.  I believe

2    when it was e-mailed, it was e-mailed right from Human

3    Resources.

4        Q.    What would you do once you had this worksheet

5    handed to you or e-mailed to you?  Did you do anything?

6        A.    There was some discussion about how we were

7    doing with that target with our management and whether we

8    felt we were in line or had to make adjustments for the

9    rest of the year.

10       Q.    Would you have that discussion right when it

11   was sent to you or you might not have those discussions

12   until later in the fiscal year?

13       A.    Yeah, it would be pretty immediate.

14       Q.    Sometimes you might be on target and sometimes

15   you might not be on target?

16       A.    They were mostly on target, from my

17   recollection.

18       Q.    Prior to receiving those worksheets, you would

19   have no way of knowing how the AMIP was going to be

20   calculated for that fiscal year?

21            MR. WILSON:  Object to form.  You can

22   answer.

23       A.    Not specifically, but we would have a general

24   knowledge of what the performance factors would be.



Karen A. Masino

224

1     Q.    What is it?

2     A.    This is my offer ever when I transferred to be

3 a portfolio manager from operations manager.

4     Q.    I could be wrong, but I think by the time you

5 received this letter, you had already received the AMIP

6 for at least one year prior.

7     A.    That's correct, I believe.

8     Q.    I'm not sure that we have that letter.

9     A.    May 2001.

10    Q.    Let me tell you why I think that.  There's a

11 paragraph that starts:  "Your participation in CSC's

12 Management Incentive Program will continue."

13         Do you see that?

14    A.    Yes.  I'm sorry.

15    Q.    That's why I'm figuring you probably had

16 already received the AMIP.

17    A.    Right.

18    Q.    Is it logical to assume that you started

19 receiving the AMIP in the year 2000?

20    A.    I believe that's correct.

21    Q.    You understood that there were no guarantees

22 that you would receive the AMIP forever.

23         MR. WILSON:  Object to the form.

24



BY MR. SEEGULL:

Q.    Correct?

A.    Correct.

Q.    You understood that the company has the right to change the terms and conditions of your employment?

A.    Correct.

        MR. WILSON:    Object to form.

Q.    You're not employed pursuant to any contract of employment, correct?

A.    Correct.

Q.    You're an at-will employee?

A.    Yes.

Q.    You're not disputing that the company has the right to make changes to the eligibility of the AMIP plan?

A.    No, I'm not.

Q.    In the year in which you were told that you were no longer eligible for AMIP, had you received a worksheet by the time that you were told that?

A.    No, I don't believe so.

Q.    What is Horizon?

A.    Horizon Initiatives was the original name of the chemical account.

Q.    What documents do you maintain govern your



234

1     Q.    How were you first notified that you would not

2  be receiving any AMIP payment?

3     A.    Via the letter, whatever exhibit that will be.

4     Q.    We will get you a copy of it right now.

5            (Deposition Exhibit No. 15 was marked for

6  identification.)

7            THE WITNESS:  15, Exhibit 15.

8  BY MR. SEEGULL:

9     Q.    Let's ask that question again.  Was Exhibit 15

10  the first notification you had that you would not be

11  eligible for any AMIP payment?

12     A.    Yes.

13     Q.    Had you heard that this was coming?

14     A.    No.

15     Q.    This came as a surprise to you?

16     A.    Complete surprise.

17     Q.    Did you have any discussion with anybody about

18  this?

19     A.    Yes.

20     Q.    Who did you discuss it with?

21     A.    I talked to Bob Tattle, who was my manager at

22  the time.

23     Q.    Tell me about your conversations with him.

24     A.    I believe he had had notification of this and

235

1   was trying to do what he could to keep us on the program,

2   but he was not getting very far with that.   Then I went

3   and talked to Human Resources.

4       Q.    Let's first talk about your conversations with

5   Bob Tattle.

6       A.    Okay.

7       Q.    Bob Tattle hadn't told you this was coming?

8       A.    No.

9       Q.    After you received this letter, you then went

10  to talk to Bob Tattle?

11      A.    Yes.   Actually, he handed me the letter in

12  person.

13      Q.    What did he say?

14      A.    He said that he had been trying to work with

15  his management to not have this happen, but there was

16  nothing he could do and he was passing this letter along.

17      Q.    Did you say anything to him?

18      A.    I asked him what the rationale was.

19      Q.    What did he say?

20      A.    He said they were attempting to make the AMIP

21  program consistent across CSC and that other

22  organizations in CSC did not have people at our level, at

23  level 6 eligibility, for the program.   You had to be a

24  level 7.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Karen A. Masino

236

1    Q.    So he told you and you understood that the

2    point of the change to the AMIP eligibility was to make

3    it consistent such that it was only for higher-level

4    management people?

5    A.    Correct, and in certain roles, I believe.

6    Q.    Was there any further discussion that you had

7    with Bob Tattle about AMIP removal or eligibility?

8    A.    We had several discussions with him asking me

9    to sign this letter.

10    Q.    You didn't want to sign the letter?

11    A.    I didn't understand whether signing the letter

12    meant I accepted the program or that I had gotten

13    notification.

14    Q.    What did you finally come to understand?

15    A.    That it was a notification letter.

16    Q.    Anything else that you discussed with

17    Bob Tattle about AMIP?

18    A.    He was going to go back and talk to his line

19    management again about moving us to level 7 so that we

20    would still be eligible.

21    Q.    Did he get back to you?

22    A.    He did, and he was not successful at that, as

23    well.

24    Q.    Anything else discussed with Bob Tattle about

244

```
 1        Q.     Did you discuss with anybody else the AMIP
 2   program?
 3        A.     No.
 4        Q.     So just Nick Wilkinson and Jim Styles?
 5        A.     Correct.  And Bob Tattle, obviously.
 6        Q.     You never had any other conversations with
 7   Bob Tattle?
 8        A.     No.
 9        Q.     I'm going to show you now what's been marked as
10   Exhibit 4.  Do you recognize this?
11        A.     Yes.
12        Q.     What is it?
13        A.     It's a letter we received about contacting the
14   attorneys.
15        Q.     Did you help write this?
16        A.     Yes.
17        Q.     Who did you write it with?
18        A.     Brian Miller and Dawn Hauck.
19        Q.     How did you go about writing the letter?
20        A.     Brian drafted the letter and Dawn and I
21   reviewed it.
22        Q.     Did you make changes to the letter?
23        A.     We might have made wording changes.
24        Q.     Do you remember which wording changes you made?
```

Karen A. Masino

245

```
 1        A.    No.

 2        Q.    Who did you send it to?

 3        A.    We sent it to those people we suspected had

 4   been removed from the program.

 5        Q.    How did you get their names?

 6        A.    Well, we were all managers, so we knew most of

 7   the names.

 8        Q.    How did you get their addresses?

 9        A.    Looked them up on the Internet.

10        Q.    Who was responsible for sending these letters

11   out?

12        A.    Brian sent the letters out.

13        Q.    Who paid for the postage?

14        A.    Brian paid for the postage.

15        Q.    Did you reimburse him?

16        A.    No.

17        Q.    How many letters did you send out?

18        A.    I don't know.

19        Q.    Would you agree that your performance reviews

20   don't have anything to do with this case?

21        A.    Yes.

22              (Deposition Exhibit No. 16 was marked for

23   identification.)

24
```

251

1    A.    Correct.

2    Q.    There were two attachments to the e-mail?

3    A.    Yes.

4    Q.    What were the attachments?

5    A.    One is the worksheet for the AMIP's

6    calculation.  One is a spreadsheet.  One's a pdf.  I

7    don't remember what the difference of the two attachments

8    is.  Do you have the attachments?

9    Q.    I'm not sure that we have the pdf.  Is the pdf

10   the worksheet or is the AMIPS-FY03 -- is that the

11   worksheet?

12   A.    My guess is that the pdf is -- what does he say

13   here?  He doesn't tell us either, does he?  I don't know

14   without opening up the attachments.

15   Q.    Look at paragraph 3, it says, "The financial

16   targets will be paid out on an over/under sliding scale

17   achievement against target.  EPS will be paid out in a

18   similar fashion (see attached PP file)."

19         Does that mean PowerPoint?

20   A.    PowerPoint.  Yes.

21   Q.    The first was a PowerPoint file?

22   A.    The second must have been the worksheet.

23   Here's where they added the new measurement of return of

24   investment.

252

 1    Q.    So for fiscal year 2003 you did not receive the

 2  worksheet until December 11th, 2002?

 3    A.    That's correct.

 4    Q.    So prior to December 11th, 2002, you did not

 5  know how AMIP was going to be calculated for fiscal year

 6  2003?

 7    A.    We didn't know the specifics, that's correct.

 8    Q.    What is the PowerPoint that he's attaching

 9  here?

10    A.    It looks like that's the financial target

11  sliding scale description.  But, again, I'd have to open

12  the document to verify that.

13    Q.    Was individual performance still a component

14  for fiscal year 2003 AMIP?

15    A.    I believe so.

16    Q.    The reason I ask that is it says in the second

17  paragraph, it says, "In order to drive the uniformity of

18  our efforts, all ASD AMIP eligible staff will share a

19  100% financially driven AMIP schedule."

20          Do you see that?

21    A.    Yes.

22    Q.    Does that indicate to you that individual

23  performance was not a component in that year's AMIP

24  schedule?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

257

1    the mean?

2                    MR. WILSON:  Object to the form.

3    BY MR. SEEGULL:

4         Q.    Or the median, correct?

5         A.    Also correct.

6         Q.    Why do you have to estimate what your damages

7    are in the first place?  How come you don't know what

8    your actual damages are?

9         A.    Because we would not have known the total

10   percentage of payout until the end of the fiscal year.

11        Q.    But we're now beyond the end of that fiscal

12   year.  What were your actual damages rather than just

13   giving me an estimate?

14        A.    Again, they never -- since we didn't have these

15   worksheets done that year, nothing was completed or

16   filled out in terms of what targets we met.

17        Q.    So there's no way to know exactly what your

18   AMIP would have been for that year or six months of that

19   year other than through an estimate?

20        A.    A pretty good guess through an estimate, yes.

21        Q.    But there's no way to know for sure because the

22   worksheets were never provided.  So we don't know what

23   would have been applicable to you for that year.

24                    MR. WILSON:  Object to the form.



258

1    BY MR. SEEGULL:

2        Q.    Correct?

3        A.    That's correct.

4        Q.    Did you ever speak to anybody who did receive

5    an AMIP for fiscal year 2004 about how their AMIP was

6    calculated?

7        A.    No.

8        Q.    Why not?

9        A.    Not something that people normally talk about.

10       Q.    The decision to remove you from AMIP

11   eligibility was not a personal decision, correct?

12       A.    Correct.

13       Q.    It wasn't about you --

14             MR. WILSON:    Object to the form.

15   BY MR. SEEGULL:

16       Q.    -- in particular?

17       A.    That's correct.

18       Q.    It was an attempt to align the

19   cross-organizations within CSC and provide it for the

20   senior-level managers.

21       A.    Correct.

22             MR. WILSON:    Object to the form.

23       Q.    You knew that it had been a difficult financial

24   year for the company in 2003, correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 76**

259

1    A.    For the overall company, yes.  For our account

2    it had been a good financial year, actually.

3    Q.    The company has the right to use its business

4    judgment to determine the best way to save money and

5    increase profits.

6              MR. WILSON:  Object to the form.

7    A.    That's correct.  They also have a

8    responsibility to notify us in a timely manner.

9    Q.    What to you is a timely manner?  How quickly

10   did they have to notify you after the close of the fiscal

11   year that they were changing the AMIP program?

12   A.    I think they should have notified us either

13   before the fiscal year started or shortly thereafter.

14   Q.    What's shortly thereafter?

15   A.    May/June.

16   Q.    If they had notified you in June of 2003 that

17   you were not going to be eligible for the AMIP program in

18   fiscal year 2004, you wouldn't have had a problem with

19   that?

20   A.    I don't believe I would have had a problem with

21   that.

22   Q.    Why?

23   A.    Because it would have meant they had studied

24   the financials and made a decision around the same time



CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)


          I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 13th day of
January, 2006, the deponent herein, KAREN A. MASINO, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

          I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

          I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



               Kimberly A. Hurley
               Certification No. 126-RPR
               (Expires January 31, 2008)



DATED:



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 78**

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.       )
HAUCK, KEVIN KEIR, ASHBY       )
LINCOLN, KAREN MASINO, ROBERT  )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM    )
SPERATI,                       )
                               )
     Plaintiffs,               )
                               )
        v.                     )  C.A. No. 05-10-JJF
                               )
COMPUTER SCIENCES CORPORATION, )
                               )
        Defendant.             )
```

                    Deposition of ROBERT W. PETERSON taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:00 a.m., on Saturday,
January 28, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

              TIMOTHY J. WILSON, ESQUIRE
              MARGOLIS EDELSTEIN
                 1509 Gilpin Avenue
                 Wilmington, Delaware 19806
                 for the Plaintiffs

              LARRY R. SEEGULL, ESQUIRE
              LINDA M. BOYD, ESQUIRE
                 DLA PIPER RUDNICK GRAY CARY US LLP
                 6225 Smith Avenue
                 Baltimore, Maryland 21209-3600
                 for the Defendant

                    WILCOX & FETZER
         1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL                                          A 79

289

```
 1      A.     Yes.  ACM, Association of Computing Machinery.

 2      Q.     Anything else?

 3      A.     Not that I'm aware of.

 4      Q.     Where did you work immediately prior to working

 5   for CSC?

 6      A.     At DuPont.

 7      Q.     When did you begin working at DuPont?

 8      A.     1989.

 9      Q.     What was your position at DuPont?

10      A.     I was a manager.

11      Q.     What did that job entail?

12      A.     It entailed supervising individuals and

13   managing projects related to software and hardware.

14      Q.     What was your final salary at DuPont?

15      A.     Good question.  I don't know.

16      Q.     Were you in a bonus program?

17      A.     Yes.

18      Q.     For how many years of your employment were you

19   in the bonus program?

20      A.     From 1989 through '97.

21      Q.     So that's throughout your entire employment?

22      A.     Yes.  With DuPont, yes.

23      Q.     What was the bonus program called?

24      A.     I don't remember.
```



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

290

1    Q.    Were there any documents that set forth the

2    bonus program?

3    A.    Yes.

4    Q.    What were those?

5    A.    I don't know if they had a name.  There were

6    management guidelines and compensation descriptions and

7    things like that.

8    Q.    Do you still have any of those documents?

9    A.    No.

10    Q.    How did you learn about this bonus program at

11    DuPont?

12    A.    I learned about it when I was given it the

13    first time.

14    Q.    Did somebody tell you about it?

15    A.    Yes.  They said, "You are now part of our

16    management bonus program and here's your amount."

17    Q.    How were the bonuses calculated?

18    A.    I don't know in DuPont.

19    Q.    Were they awarded annually?

20    A.    Yes.

21    Q.    Were they awarded at the end of the fiscal

22    year?

23    A.    I'm not sure.

24    Q.    Who was eligible at DuPont for the bonus



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

291

1    program?

2        A.    I don't know that there were any set

3    guidelines.  It was at the discretion of management.  You

4    had to be a certain level to be there, to get on the

5    program, though.

6        Q.    How much was the bonus that you received?

7        A.    It was a 30 percent bonus.

8        Q.    Was it 30 percent every year?

9        A.    I don't recall.

10       Q.    Did everyone receive the same percent?

11       A.    No.

12       Q.    And the percentage decided was at the

13   discretion of management?

14       A.    It was decided when you first were put on the

15   program what your percentage would be and then as you got

16   promoted and things like that, that could be changed by

17   management.

18       Q.    When you say "percentage," you mean percentage

19   of your salary?

20       A.    Yes.  Yes.

21       Q.    When did you first start working for CSC?

22       A.    June of '97.

23       Q.    What was your first position at CSC?

24       A.    Trying to think of the name, the title.  Senior

292

1    consultant.

2         Q.    What group were you in?

3         A.    I was in the Chemical Group, chemical -- it was

4    Horizon Initiatives at the time.

5         Q.    When you joined, it was called Horizon

6    Initiatives?

7         A.    Yes.

8         Q.    It's now called Chemical Group?

9         A.    I don't know what it's called now, but we went

10   through some iterations of names.

11        Q.    How did the Horizon Initiatives Group fit into

12   the organizational structure of CSC at the time?

13        A.    I'm not sure I understand what you mean by

14   that.

15        Q.    Was it part of a larger business unit?

16        A.    I'm not sure.  My impression is that it

17   reported to a vice president of some level, a separate

18   group.

19        Q.    Who was your direct supervisor?

20        A.    At the time of transition?

21        Q.    Yes.

22        A.    I think it was Bill Fay.

23        Q.    Do you know who his supervisor was?

24        A.    Frank Cebula.



1      Q.    Who was the ultimate head of the Horizon

2  Initiative Group?

3      A.    I'm not sure.

4      Q.    You're no longer employed at CSC?

5      A.    That's correct.

6      Q.    When did you leave?

7      A.    June of 2004.

8      Q.    Who was your supervisor at the time you left?

9      A.    My direct supervisor was Gary Green.

10     Q.    When you joined CSC, what was your starting

11 salary?

12     A.    I don't recall.

13     Q.    Do you recall your salary level?

14     A.    I was a grade 6.

15     Q.    Did you receive any AMIP bonuses when you

16 joined CSC?

17     A.    Yes.

18     Q.    When did you begin receiving them?

19     A.    The first year I was part of CSC.

20     Q.    In 1997?

21     A.    Yes.

22     Q.    Is that fiscal year 1997?

23     A.    Good question.  We joined in '97, so it would

24 have been fiscal year '98, I believe.

Robert W. Peterson

295

```
 1   BY MS. BOYD:
 2        Q.    I'm handing you what's been marked as
 3   Exhibit 20.  Do you recognize this document?
 4        A.    Yes.
 5        Q.    What is it?
 6        A.    It looks like the offer letter to offer
 7   employment.
 8        Q.    Does this letter say anything about a bonus
 9   program?
10        A.    Yes.
11        Q.    Does it guarantee that you will be eligible to
12   participate in this program for your entire career at
13   CSC?
14        A.    No.
15        Q.    You can hand that back to me.
16              You were an at-will employee at CSC; is
17   that correct?
18        A.    I guess.  I don't know what that means.
19        Q.    You didn't have an employment contract, did
20   you?
21        A.    That's a contract, isn't it?
22        Q.    You believe this is an employment contract?
23        A.    That's what I assumed it to be.  They offered
24   me employment.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 85**

1    their names.

2        Q.    About how many meetings were there?

3        A.    Probably recall two or three.

4        Q.    These meetings were conducted by DuPont HR

5    employees?

6        A.    Yes.  We also met with CSC people during the

7    transition.

8        Q.    Who did you meet with from CSC?

9        A.    I don't remember names.

10        Q.    Who attended the meetings?

11        A.    Most DuPont employees who were affected by the

12    change.

13        Q.    What was the purpose of the meetings?

14        A.    Just to inform people of the benefits and what

15    was going to happen during the transition to inform you

16    whether you wanted to make the transition or not.

17        Q.    You said benefits were discussed.  What was

18    discussed about benefits?

19        A.    What I remember is things like, as in the offer

20    letter, there was some increases in salary to cover

21    things like disability, the differences in the various

22    amounts you'd pay, and what the health benefit

23    differences might be and things like that.

24                What I remember is the overall tone being



Robert W. Peterson

298

1   assuring DuPont employees that whatever benefits you had

2   at DuPont would be carried over to CSC and that

3   adjustments were made to make sure that that would keep

4   you whole.

5        Q.    Were bonus programs discussed?

6        A.    Only on an individual basis.  Not as a whole

7   group of people in a meeting.

8        Q.    They weren't discussed at meetings?

9        A.    I'm sure someone discussed it with me

10  individually.

11       Q.    Do you remember who that was?

12       A.    No.  Probably would have been my manager,

13  but...

14       Q.    What did they tell you?

15       A.    I don't remember.

16       Q.    Were any documents provided at these meetings?

17       A.    Yes.

18       Q.    Do you still have any of them?

19       A.    Possibly.  I don't have them with me.

20       Q.    Did your manager provide you any documents at

21  that individual meeting you referenced?

22       A.    No, I don't recall.

23       Q.    Did you participate in any orientation when you

24  began working at CSC?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A 87

299

1      A.     Yes.

2      Q.     Who conducted that?

3      A.     I don't recall.

4      Q.     When was that?

5      A.     Around the time of transition.  I don't know

6  exact dates.

7      Q.     Were bonuses discussed during the orientation?

8      A.     I don't remember.

9      Q.     What does AMIP stand for?

10      A.     Annual Management Incentive Program.

11      Q.     What is it?

12      A.     What is AMIP?

13      Q.     What is AMIP?

14      A.     It is an incentive program that is distributed

15  annually to people who are on the AMIP list, you might

16  say, that have been designated as earning that amount,

17  that compensation.

18      Q.     How do you get to be on the AMIP list?

19      A.     Couple ways.  One was as a part of the

20  transition, we were kind of grandfathered onto it.  You

21  could also go through a process each year where I know as

22  I went through performance appraisals with my people and

23  my management, we talked about the last phase of that as

24  being who needed to be -- who was justified, perhaps, in

303

1     Q.    How did you receive that?

2     A.    The HR department gave me access to it in the

3 system and I printed out a copy just because I wanted to

4 understand how it worked.

5     Q.    Did you produce that document to CSC?

6     A.    I produced it to my attorney.

7     Q.    What time of year did you receive that

8 worksheet, generally?

9     A.    Generally it was at the time that I was

10 notified of my AMIP check, how much I was going to

11 receive.  So it would have been the May/June time frame.

12     Q.    So you received that and it showed you how your

13 AMIP check that you were getting was calculated?

14     A.    That's correct.  Told me the amounts, what it

15 would be.

16     Q.    What is an AMIP bonus?

17     A.    What is an AMIP bonus.  It's a bonus that's

18 based on various factors, company performance, individual

19 performance, those kind of things, and those things

20 change each year, and it is variable compensation we call

21 it at DuPont where it would change from year to year

22 depending on how those factors played out.

23     Q.    It amounts to a percentage of your salary,

24 correct?



Robert W. Peterson

304

```
 1        A.      Yes.   There's an upper limit.
 2        Q.      You said it's based on a number of different
 3   factors?
 4        A.      Yes.
 5        Q.      That change each year?
 6        A.      They could change.
 7        Q.      They include corporate objectives?
 8        A.      Yes.
 9        Q.      Personal objectives?
10        A.      They could.   Sometimes they did, sometimes they
11   didn't.
12        Q.      Financial factors?
13        A.      Yes.
14        Q.      Or nonfinancial factors?
15        A.      Uh-huh.
16        Q.      Those factors are measured for the entire
17   fiscal year, right?
18        A.      Yes, I guess.
19        Q.      That fiscal year runs from April 1st to
20   March 31st?
21        A.      Yes.   I would say that they are tracked through
22   the year as opposed to being just measured once.
23   Calculated at the end of the year because you don't know
24   what they are till the whole year is over, but you're
```

305

1   watching those numbers throughout the year as much as you

2   have effect on them.  Personal goals, for example, I

3   would track them on my own -- with my management.

4       Q.    So you need to know those factors on the

5   worksheet to calculate your AMIP?

6       A.    Yes.  Actually it was calculated for me.

7       Q.    Did you know of the factors before you received

8   your bonus at the end of the year?

9       A.    Before I received the bonus, yes, usually.

10      Q.    How did you know that?

11      A.    The worksheet was shown to me and said this is

12  what you will be receiving and here's the calculations

13  that made up that.

14      Q.    So the worksheet was shown to you prior to the

15  end of the fiscal year, so you would --

16      A.    No.  It was usually shown to me after the end

17  of the fiscal year because the calculation was made at

18  the end of the fiscal year.

19      Q.    Did you know prior to the end of the fiscal

20  year what you were supposed to be working towards that

21  year?

22      A.    Usually.  And it normally was not until about

23  halfway through it that we actually nailed down some

24  goals, and those goals would change.



WILCOX & FETZER LTD.
Registered Professional Reporters

A 91

Robert W. Peterson

306

1    Q.    How did you receive that information?

2    A.    My manager usually talked to me about it or

3    maybe through an e-mail, these are the group goals that

4    we have established this year.

5    Q.    Did you know what the corporate goals were?

6    A.    Usually about the same time that the group

7    goals were established the corporate goals were.  Not

8    always.

9    Q.    Who sent you the corporate goals?

10   A.    My management usually did.

11   Q.    So somewhere midway through the year you would

12   know the goals or objectives that would factor into your

13   ultimate AMIP bonus?

14   A.    Yeah, and that midway through the year changed

15   different times.  Sometimes my manager and I would

16   discuss my personal goals prior to that or after that.

17   Q.    How do you calculate an AMIP bonus?

18   A.    I didn't calculate it.  It was calculated for

19   me, as I said.  Normally you took multiple factors.  You

20   had an upper limit, say -- in my case it was 30 percent

21   of my salary was a potential.  And then each of the

22   factors were -- say an operating income goal might be

23   10 percent, another goal might be 20 percent.  As those

24   goals were set out, the degree of reaching that goal was

1    calculated in a percentage and a mathematical calculation

2    was made to say you might get, say, 90 percent of your

3    total AMIP.   So it was all calculated out.

4              Also, there was a proration factor that was

5    built in for the number of months that you were on the

6    AMIP.

7         Q.    When you say "built in," what do you mean by

8    that?

9         A.    In the worksheet there is a field that is the

10   number of months for prorating AMIP.   In my case it was

11   12, the sheet that I gave him because I was eligible for

12   the entire year.

13        Q.    The AMIP bonus was designed to incentivize the

14   people on the program to work towards the corporate and

15   individual goals, right?

16        A.    Yes.

17        Q.    Do you know of anyone who received an AMIP

18   bonus but was never told about their goals?

19        A.    I don't recall anyone, no.   I would say none of

20   my people did.   I told them if they were eligible.

21        Q.    How did the people you managed know if they

22   were eligible?

23        A.    I would discuss their goals with them.   And if

24   they were added to the list, then around the May/June



308

1    time frame we informed them that, congratulations, you've

2    been added to the list.  If they were taken off the list,

3    we would say I'm sorry to inform you that you were taken

4    off the list for these reasons.

5        Q.    So you would tell them at the end of the year?

6        A.    I would tell them at the time that they

7    received any salary changes, here's your rating, here's

8    your new raise if you got one, and you're either on the

9    list or not.  If I didn't tell them anything, they were

10   to assume they were still on the AMIP list.

11       Q.    In what fiscal years did you receive AMIP

12   bonuses?

13       A.    Every fiscal year from '97 on to -- yeah, '97

14   to 2004.

15       Q.    What was the amount --

16       A.    Except for the one in question here.

17       Q.    What was the amount of the bonus you received?

18       A.    It varied.  Different amounts in different

19   years.

20       Q.    What was the range?

21       A.    I'm not sure of the exact range.  Sometimes it

22   was 100 percent of the 30 percent of my salary and

23   sometimes it was less.

24       Q.    For each of those years you received an AMIP



Robert W. Peterson

309

1   you had discussed with your manager your goals; is that

2   right?

3      A.    At some point in the year, yes.

4      Q.    You had received the corporate objectives?

5      A.    At some point in the year, yes.

6      Q.    When did you generally receive your AMIP bonus

7   payment?

8      A.    Generally it was in a June or July paycheck, I

9   believe.

10      Q.    So after the close of the fiscal year?

11      A.    Yes.

12      Q.    Why was it after the close of the fiscal year?

13      A.    You had to calculate it first and then put it

14   through the payroll system and also had to go through a

15   performance appraisal for the prior year to see what

16   level you would be compensated for.  You had to also

17   calculate whether you made your goals and whether the

18   company made their goals.

19      Q.    So the company waited till the end of the

20   fiscal year?

21      A.    Yes.  To calculate the operating income goals

22   and things like that because the books weren't closed

23   till then.

24      Q.    When were you notified that you would no longer



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

310

1    be eligible for participation in AMIP?

2        A.    I think the letter was September 11th, 2003.

3    I'm not sure.

4        Q.    Who told you this?

5        A.    I received a letter and also my manager,

6    Val Rowan, told me.

7        Q.    Did you receive a letter in the mail?

8        A.    I don't remember if it came in the mail or it

9    was handed to me personally.

10       Q.    When did Ms. Rowan meet with you?

11       A.    I don't know exactly when.

12       Q.    What did she tell you?

13       A.    She told me I was being taken off of the AMIP

14   list and there will be a letter or she gave me the

15   letter -- I don't remember if I received it in the mail

16   or she gave it to me, saying that I was no longer to

17   receive the AMIP bonus.

18       Q.    That was around September of 2003?

19       A.    Around there, yes.

20       Q.    So you understood at that time that you

21   wouldn't be receiving an AMIP bonus at all?

22       A.    Correct.

23       Q.    You're requesting from CSC a prorated bonus

24   from the beginning of the fiscal year, April 1st, through

314

```
 1        Q.      You never received a completed AMIP worksheet
 2   for fiscal year 2004?
 3        A.      That's correct.
 4        Q.      What are your damages in this case?
 5        A.      The money that I did not receive for the six
 6   months that's in question here, I think.  I have a plane
 7   ticket it took to get me here.  And any attorneys' costs
 8   and those kinds of things.
 9        Q.      How much do you estimate your damages are for
10   those six months?
11        A.      Around $15,000.
12        Q.      How did you get to that number?
13        A.      I took my 30 percent that was eligible and then
14   took the amount of time -- amount in question from April
15   to September and then calculated it from that standpoint.
16   About half.
17        Q.      So you took 30 percent of your salary?
18        A.      Yes.  And half of that.
19        Q.      Took half of that.  That's just an estimate,
20   right?
21        A.      Yes.
22        Q.      Because you didn't have the factors --
23        A.      I don't have the factors, that's correct.
24        Q.      It would be impossible for you to come up with
```



315

1    a final number of what you would have received had you

2    not been removed from AMIP?

3        A.    That's right.

4        Q.    You don't know what metrics or factors were

5    used to calculate the AMIP bonuses in fiscal year 2004?

6        A.    Not exactly, that's right.  I know what was

7    used to calculate prior years, but not that year.

8        Q.    You took 30 percent of your salary to get to

9    your estimate.  There are lots of ways you could have

10   come up with an estimate; is that right?

11       A.    Uh-huh.  Yeah, if I knew the factors, I could

12   have added in there.  If I knew the percentage that CSC

13   paid out, I could have multiplied it times that.  I took

14   a guess that that was 97 percent or something like that.

15       Q.    You didn't always receive 30 percent of your

16   salary?

17       A.    Not always.

18       Q.    You just picked an arbitrary way of calculating

19   what you think your AMIP --

20       A.    It was an estimate.

21            MR. WILSON:  Object to form.

22       Q.    Excuse me?

23       A.    It was an estimate.

24       Q.    You don't know exactly what motivated CSC to



Robert W. Peterson

316

1   remove you from AMIP in fiscal year of 2004, do you?

2     A.    Correct.

3     Q.    It wasn't a personal decision about you, was

4   it?

5     A.    As far as I know, that's true.

6          MR. WILSON:  Object to form.

7     Q.    CSC removed all people at your salary level in

8   your group?

9     A.    I don't know that.  I understand that some

10  people were not removed or put back on.

11     Q.    Who do you know that wasn't removed?

12     A.    I don't know of specific people.  I just heard

13  rumor.

14     Q.    You heard a rumor that some people in your

15  salary level were not removed?

16     A.    Are still on, right.

17     Q.    Who did you hear the rumor from?

18     A.    Don't know.

19     Q.    When did you hear the rumor?

20     A.    Somewhere between the time after the letter and

21  when I left CSC.  I don't recall exact dates.

22     Q.    Fiscal year 2003 was a tough year for CSC,

23  correct?

24     A.    Okay.

317

1     Q.    Is that correct?

2     A.    Yes, as far as I recall.

3     Q.    The company has a right to make decisions to

4 save money, right?

5     A.    That's correct.

6     Q.    And the right to make decisions to increase

7 profits?

8     A.    That's correct.

9     Q.    And the company's entitled to use its business

10 judgment to determine the best way to save money and

11 increase profits, right?

12    A.    That's correct.

13    Q.    Your problem in this lawsuit is that you don't

14 think you should have been removed from AMIP because of

15 your contributions to CSC, correct?

16    A.    That's not correct.

17    Q.    Explain to me, then.

18    A.    My problem is the timing of it.  I don't have

19 an issue with removing me from AMIP when I am informed

20 when the action has happened.  But retroactively is an

21 issue with me.

22    Q.    So then you don't have a problem with CSC

23 removing people from AMIP?

24    A.    No.



**A 100**