331

1     A.     When you say "revision," what do you mean by

2  that?

3     Q.     When you say you were no longer eligible --

4     A.     That's the revision?  Okay.  As far as I

5  remember, yes.

6     Q.     We spoke about the compensation guidelines that

7  you received every fiscal year.

8     A.     Yes.

9     Q.     You said you received them from management?

10    A.     Yes.  I think HR distributed them to managers.

11    Q.     So you received them from HR?

12    A.     Yes.

13    Q.     Do you know who from HR you received them from?

14    A.     Not specifically.  It was an e-mail sent to

15  management.  So I don't remember who sent the e-mail.

16    Q.     You received the document by e-mail?

17    A.     Yes.  It was a pdf attachment.

18    Q.     Was it made available on the Internet?

19    A.     I'm not sure.

20    Q.     Were CSC's policies and procedures generally

21  made available to employees on the Internet?

22    A.     Generally, yes.  Not all employees received the

23  management guidelines for compensation.  There was an

24  employee version and a management version.

332

1     Q.     Were the employee guidelines for compensation
2  available on the Internet?
3     A.     They were available.  I'm not sure if they were
4  on the Internet or not.
5     Q.     How would employees have received those
6  guidelines?
7     A.     They could have gotten them in a mailbox or
8  anything.  I don't know how.  I think it was an
9  electronic document, so it was either e-mailed to them or
10 available to them in, say, Lotus Notes database or on the
11 Internet.
12    Q.     You said that they might have been e-mailed
13 this document.  Who would have e-mailed it to the
14 employees?
15    A.     Probably HR.
16    Q.     Did you ever e-mail the document to anybody?
17    A.     I don't remember.  I might have when they
18 requested it.  If somebody said could I have a copy of
19 that, I said yeah, you could have the copy of the
20 employee manual.
21    Q.     What determined if someone received the
22 employee guidelines or the management guidelines?
23    A.     The employee guidelines, every employee should
24 have received that.  Management guidelines, only managers

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 102**

CERTIFICATE OF REPORTER

STATE OF DELAWARE:
                    :
NEW CASTLE COUNTY:


        I, Kimberly A. Hurley, Registered Merit
Reporter and Notary Public, do hereby certify that there
came before me on the 28th day of January, 2006, the
deponent herein, ROBERT W. PETERSON, who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that reading and signing
of the deposition were waived by the deponent and
counsel.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



                Kimberly A. Hurley, RMR

                Certification No. 126-RPR
                (Expires January 31, 2008)


DATED:




WILCOX & FETZER LTD.
Registered Professional Reporters

A 103

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.           )
HAUCK, KEVIN KEIR, ASHBY           )
LINCOLN, KAREN MASINO, ROBERT      )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM        )
SPERATI,                           )
                                   )
    Plaintiffs,                    )
                                   )
      v.                          )  C.A. No. 05-10-JJF
                                   )
COMPUTER SCIENCES CORPORATION,  )
                                   )
    Defendant.                     )

        Deposition of SUSAN M. POKOISKI taken pursuant to notice at the law offices of Potter Anderson & Corroon, Hercules Plaza, 6th Floor, Wilmington, Delaware, beginning at 9:00 a.m., on Thursday, February 16, 2006, before Kimberly A. Hurley, Registered Merit Reporter and Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiffs

        LARRY R. SEEGULL, ESQUIRE
        LINDA M. BOYD, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
          6225 Smith Avenue
          Baltimore, Maryland 21209-3600
          for the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

A 104

Susan M. Pokoiski

1    that.   In CSC and DuPont.

2         Q.     What were these awards for?

3         A.     Go over and beyond, recognition, team building,

4    things like that.

5         Q.     How many would you estimate you have received,

6    or if you know for sure, then how many?

7         A.     I would say I received about four or five.   I

8    have also gotten them with DuPont.   But you're talking

9    about CSC.   If you transitioned from DuPont to CSC, they

10   would give you an award to make sure things went

11   smoothly.   I'd say I had four or five since '97.

12        Q.     These were all nominal amounts of money?

13        A.     Yes.   American Express gift checks, maybe a

14   dinner, night on the town.   Something like that.

15        Q.     Do you have any memberships in professional

16   associations?

17        A.     No, I do not.

18        Q.     Where did you work immediately prior to working

19   for CSC?

20        A.     DuPont.   And we went to the transition in June

21   of '97.

22        Q.     So your employment at DuPont ended in June of

23   '97?

24        A.     Yes.   I think it was May and then we started in

Susan M. Pokolski

1   June with CSC.  I think that's how it works.

2      Q.   It ended because you transferred to CSC?

3      A.   That's correct.

4      Q.   What was your position at DuPont?

5      A.   I was a team leader for the deployment.  We

6   deployed computers and software and hardware for the

7   company.  That's with DuPont you asked, right?

8      Q.   Yes.  What was your final salary?

9      A.   I don't know.

10     Q.   Approximately.

11     A.   I don't know.  Way too in the past.

12     Q.   Were you in a bonus program at DuPont?

13     A.   No, I was not.

14     Q.   Do you know of a bonus program at DuPont?

15     A.   Was I aware of one at the time?  I can't

16  remember anything like that.

17     Q.   What was your first position at CSC?

18     A.   Supervisor of problem resolution for the

19  desktop techs.  So I had a group of men and women

20  reporting to me to support the DuPont account.

21     Q.   So you were a part of the DuPont account?

22     A.   Yes, I was.

23     Q.   How did the DuPont account fit into the

24  structure of CSC?

1      A.      Actually the IT organization of DuPont went two

2  ways.  It went either to Accenture or to CSC.  I happened

3  to be in the infrastructure part and so we went to CSC.

4  So we were responsible for their servers, their desktops,

5  some of their applications, mainframes, whatever, in that

6  perspective.

7      Q.      You're saying some of the people you worked

8  with at DuPont went to --

9      A.      Accenture.

10     Q.      And your group went to CSC?

11     A.      That's correct.

12     Q.      In June of '97?

13     A.      That's correct.

14     Q.      Were you part of a group called the Chemical

15  Group?

16     A.      Yes, I was.

17     Q.      Was that when you first started or --

18     A.      No.  That was when I first started.

19     Q.      The DuPont account was within Chemical Group?

20     A.      Yes.

21     Q.      Who was your supervisor when you first started?

22     A.      Marion Bowman, B-o-w-m-a-n.

23     Q.      Do you remember who supervised Ms. Bowman?

24     A.      I believe she reported to -- his last name was

Susan M. Pokoiski

1    Lewis.   I forget what his first name was.   Lewis,

2    L-e-w-i-s.

3         Q.    Do you know who was the head of the DuPont

4    account at the time?

5         A.    I want to say it was Russ Owens.

6         Q.    Do you know who was the head of the Chemical

7    Group?

8         A.    Go back.   Head of the DuPont account, I think

9    it was -- well, Russ Owens was a head of the chemical

10   account.   I don't know who the head of the DuPont account

11   would have been.   No, I don't.

12        Q.    What was your starting salary at CSC?

13        A.    I don't know.

14        Q.    Do you know what your level was when you began

15   at CSC?

16        A.    I'm thinking it was either a 3 or 4.   I

17   believe -- one of the two.   I don't know.

18        Q.    Did you receive any bonuses while you were in

19   your first position?

20        A.    No, I did not.

21        Q.    Did you ever switch positions or get promoted?

22        A.    Yes, I did.   I was in that position until

23   about, approximate, 1999, where I went to a service

24   delivery manager position, SDM, and that would have been

1    Q.    Who is your supervisor now?

2    A.    Supervisor would be Charlie Campagna in Managed

3 Hosting Services.

4                (Deposition Exhibit No. 24 was marked for

5 identification.)

6 BY MS. BOYD:

7    Q.    I'm handing you what's been marked as

8 Exhibit 24.   Do you recognize this document?

9    A.    Yes.

10    Q.    What is it?

11    A.    Offer of employment to Computer Sciences

12 Corporation.

13    Q.    You were not made eligible to participate in

14 CSC's Management Incentive Program when you transferred

15 to CSC at this time.

16    A.    That's correct.

17    Q.    When did you first become eligible to

18 participate?

19    A.    When I became the SDM in either '99 or 2000.   I

20 accepted the position from the supervisory position to an

21 SDM, and that organization was under -- what was his

22 name?  Mark -- I forget.   But it was at that time.

23    Q.    Do you have any documentation of when you

24 became part of the program?

1       A.      Right.

2       Q.      April 1st, 1999, which was the beginning of the

3   fiscal year 2000?

4       A.      Right.

5       Q.      When did you say you were notified of your

6   promotion?

7       A.      I think the year was '99 when I got the

8   promotion, and so that would have been -- because I

9   remember getting two AMIPs.  So I want to say February of

10  '99, that's when I was offered the promotion, the new

11  job.

12      Q.      You said you received two AMIPs.  Can you

13  explain that?

14      A.      Two AMIPs.  One I guess in '00 and '01 or '01

15  and '02.

16      Q.      I see.  So you received an AMIP for fiscal year

17  2000?

18      A.      Right.

19      Q.      An AMIP for fiscal year 2001?

20      A.      Right.  I guess it has to be the opposite --

21  I'm a little confused here.  '04 is the one we're talking

22  about, right?  That's the question.  So it would have

23  been '03 and '02 I got the AMIPs.

24      Q.      So you were eligible for AMIP in fiscal year

Susan M. Pokoiski

```
 1    2002, fiscal year 2003?

 2         A.      Right.

 3         Q.      You were promoted sometime in fiscal year 2001,

 4    then, you believe?

 5         A.      Right.

 6         Q.      Before you transferred from DuPont to CSC, did

 7    DuPont hold any meetings about the transfer?

 8         A.      Yes.

 9         Q.      When were those meetings?

10         A.      On a very regular basis.   There was transition

11    meetings and as a team leader, I needed to go to

12    management meetings in regards to roles and

13    responsibilities for tests and things like that.   But I

14    don't have a recollection of how frequent or when they

15    were.

16         Q.      Was the purpose of these meetings for you to

17    transition your work?

18         A.      Probably transition the work, get to know CSC,

19    how to complete the forms, their benefits, things like

20    that.

21         Q.      What was discussed about benefits at these

22    meetings?

23         A.      I can't recall.   Basically I guess medical and

24    health, dental, credit union, things like that.
```

Susan Pokoiski

1    Q.    Were salaries discussed?

2    A.    Not in an open forum, no.

3    Q.    Were bonus programs discussed?

4    A.    Not in an open forum.  Not in the meetings.

5    Q.    Were salaries discussed in a private forum?

6    A.    I don't recall when they were discussed.  I

7    mean, basically you would meet with your supervisor.

8    Obviously we had salary discussions for performance in

9    DuPont, and I guess if you had the opportunity to talk to

10   your supervisor, you talked about salary there.

11   Q.    You spoke to your supervisor at DuPont?

12   A.    Right.  Transitioning over, what that would

13   mean.

14   Q.    Did anything about bonus programs come up in

15   those meetings?

16   A.    No, it did not.

17   Q.    Did you receive any documents at these

18   meetings?

19   A.    Handouts about whatever was routine for CSC

20   transition we received.  I received.  That's about it.

21   Q.    Do you still have any documents from those

22   meetings?

23   A.    If they are, they're home and I don't know

24   where they're at.  I don't have them at work.  From '97,

1    probably not.

2        Q.    What type of documents do you think they would

3    be?

4        A.    Well, if we were getting new healthcare, I

5    think the urgency was you were moving from one company to

6    the next.  I think more people were concerned about

7    healthcare and day-care and those kind of things.  So I

8    remember getting information and how to complete the

9    form.  I do remember a meeting how to complete

10   beneficiary forms, life insurance and things like that.

11       Q.    Have you told me everything you recollect from

12   these meetings that involved the transition from DuPont

13   to CSC?

14            MR. WILSON:  Object to form.

15       A.    Yes.

16            MR. WILSON:  You can answer.

17            THE WITNESS:  Yes.  That I can remember.

18       Q.    Did you participate in any orientation when you

19   first began working with CSC?

20       A.    Yeah.  I remember meetings.

21       Q.    Was that when you first started?

22       A.    Yes.

23       Q.    It would have been June of '97?

24       A.    Right.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokolski

```
 1      A.    Yes.

 2      Q.    It was an Excel spreadsheet?

 3      A.    No.  I think there was something -- an example.

 4  It was in a folder.

 5            (Deposition Exhibit No. 26 was marked for

 6  identification.)

 7  BY MS. BOYD:

 8      Q.    I'm handing you what's been marked as

 9  Exhibit 26.

10      A.    Yes.

11      Q.    That was the receipt you received from

12  Jeannie Maul?

13      A.    Yes.

14      Q.    You received that after the fiscal year had

15  closed?

16      A.    Yes.  I believe that's when we got it.  Yes.

17  They wouldn't do it prior to that.

18      Q.    Why did you receive it after the close of the

19  fiscal year?

20      A.    I'm sure it's a legal item that the books have

21  to be closed.  However -- that's the only way I can think

22  of it.  It's got to be a financial decision, corporate

23  decision.

24      Q.    An AMIP bonus is essentially a percentage of
```

Susan M. Pokoiski

1    your salary, correct?

2        A.    Yes.

3        Q.    And that percentage is based on a number of

4    factors?

5        A.    Yes.

6        Q.    Which these factors could include corporate

7    objectives; is that right?

8        A.    That's correct.

9        Q.    And group objectives?

10       A.    That's correct.

11       Q.    Personal objectives?

12       A.    Right.   That's correct.

13       Q.    So they could be financial or nonfinancial

14   factors?

15       A.    That's correct.

16       Q.    And the factors can change from year to year?

17       A.    I would say they were pretty constant.   The two

18   that I had, it was basically the financial objectives and

19   the measures were the same.   What changed was the

20   personal item that -- I'm going to reference this

21   document.

22       Q.    You're referencing Exhibit 25?

23       A.    25.   That would change, what you were going to

24   work on that year.

Susan M. Pokoiski

1      Q.    Your personal objectives would change from year

2  to year?

3      A.    That's right.

4      Q.    Did the targets for the company for the

5  corporate objectives change from year to year?

6      A.    Earnings per share I know would change.

7      Q.    Would revenue goals change from year to year?

8      A.    Revenue would want to be going up.  So I guess

9  that's a yes.

10     Q.    Would cost budgets change from year to year?

11     A.    Yes.

12     Q.    And operating income margin changed from year

13  to year?

14     A.    Yes.

15     Q.    So these factors are based on CSC's financial

16  performance during the fiscal year, correct?

17     A.    Yes.

18     Q.    I think we have already stated this, but the

19  fiscal year runs from April 1st through March 31st?

20     A.    Yes.

21     Q.    How is the AMIP bonus actually calculated?

22     A.    Well, I know that there was a weighted average

23  and basically would take that average and they would add

24  up to 100 percent, but -- and then based on your salary.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 116**

1    I was always -- it was 10 percent that I was eligible

2    for, maximum bonus potential.

3        Q.    Did those weightings change from year to year?

4        A.    I don't know.

5        Q.    Did the team objectives change from year to

6    year?

7        A.    Customer satisfaction was always there, and,

8    again, the individual would change.

9        Q.    Would the targets for the team goals change?

10       A.    The target -- you mean the obtain 95 percent?

11       Q.    If the goal was customer satisfaction, would it

12   change in terms of what the target was for achieving

13   customer satisfaction?

14       A.    No, I would say those two were consistent in

15   regards to 95 percent and then -- and the weight was

16   divied up between the individual and the team.  So that

17   stayed constant.

18       Q.    So the 95 percent was the same every year you

19   believe?

20       A.    I believe it was.

21       Q.    You received an AMIP worksheet for two years?

22       A.    That's correct.

23            MS. BOYD:  We would like to take a short

24   break.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 117**

Susan M. Pokolski

1   A.    No, I do not.

2   Q.    You said that you received e-mails with some

3   financial information.  Do you remember who you would

4   have received those e-mails from?

5   A.    Well, the only e-mails that I would receive are

6   something from corporate.  Very basic.  I would never

7   receive anything personal and confidential via e-mail.

8   Q.    Who sent the corporate e-mails?

9   A.    Could have been Honeycutt, somebody from Falls

10  Church.  Information that was distributed to everyone

11  that had anything to do in our goals or objectives or the

12  state of the -- I won't say state of the union.  Anything

13  like that.  I never received anything via e-mail that was

14  something like AMIP or salary information.

15  Q.    Do you remember anything in particular that you

16  did receive regarding corporate financial information?

17  A.    No.  Basically, when -- even before I got AMIP

18  at the end of the year, there would be a -- we made our

19  goal and the upcoming year's going to be as challenging.

20  Something like that to that nature.  I do remember

21  e-mails like that.  We still get them today.

22  Q.    You were notified by CSC that you would no

23  longer be eligible for participation in the AMIP program

24  for fiscal year 2004?



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A.    Uh-huh.

2    Q.    When was that?

3    A.    There was a meeting invite from Jeannie to her

4    organization -- and I don't know the specific date.  I

5    believe it was late August or early September -- to

6    attend a meeting.  The subject was not -- there was no

7    indication what the subject matter was about, but to

8    attend a meeting and that's when we were told.

9    Q.    Who attended the meeting?

10    A.    Her direct reports or people that were eligible

11    for AMIP.

12    Q.    Approximately how many people were at the

13    meeting?

14    A.    Well, it was face-to-face or on a conference

15    call.  So I would say there were 15, 20 people.

16    Q.    Were you there face-to-face?

17    A.    I was there face-to-face.

18    Q.    What did Ms. Maul say?

19    A.    Basically that we were not eligible for the

20    AMIP program.

21    Q.    Did she say why?

22    A.    No.  There was not really a clear reason given.

23    Q.    Did she tell you that you may be eligible for a

24    discretionary bonus?

1      A.     Well, actually everybody -- yes, you were told

2  that, but that's just common knowledge that anybody was

3  eligible for the discretionary bonus.

4      Q.     So you believe you could have received an AMIP

5  bonus and a discretionary bonus?

6      A.     No.  What I'm saying is that we were told that

7  we were no longer on the AMIP and that we were eligible

8  for the discretionary bonus, but I believe the

9  discretionary bonus was always out there anyway.  It

10  wasn't like now all of a sudden you're eligible for a

11  discretionary bonus.  It was always available anyway.

12      Q.     Do you know of anyone who ever received an AMIP

13  bonus and a discretionary bonus for the same year?

14      A.     No, I don't know.

15      Q.     Was the meeting with Jeannie Maul the first

16  time you learned you wouldn't be eligible for AMIP --

17      A.     Yes.

18      Q.     -- for fiscal year 2004?

19      A.     Yes.

20      Q.     You understood from that meeting that you

21  wouldn't be receiving any AMIP bonus at all for that

22  year?

23      A.     Yes.

24      Q.     You're claiming that CSC has improperly

Susan M. Pokoiski

1    A.    Right.

2    Q.    But after that point you knew that you would no

3    longer be part of the program?

4    A.    Right.

5    Q.    So then your damages that you would claim are

6    from April 1 until that point of notification?

7    A.    Oh, but we still were working on it.  Yeah, I

8    guess technically I guess the date that we were told in

9    August would have been the end period.

10    Q.    How would you suggest you prorate your AMIP

11    bonus for that period?

12    A.    Well, I guess you would take the two that I had

13    and then take the salary of the third year, divide it by

14    three and then you would add it and divide it by three

15    and then come up with a figure and I guess it would be

16    half of that.

17    Q.    Why would it be half of that?

18    A.    It's not quite six months.  Whatever that five

19    and whatever percentage months.

20    Q.    The way you're estimating it, the way you just

21    described, there's more than one way to do that, correct?

22    A.    Yes.

23    Q.    You have to estimate because you don't have a

24    worksheet to use to calculate how your AMIP bonus would

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 121**

Susan M. Pokoiski

1    have been calculated, correct?

2        A.    That's correct.

3        Q.    You don't know what the weightings would have

4    been on that worksheet?

5        A.    No, but I'm sure that wouldn't be hard to find.

6    That information is probably out there.

7        Q.    You don't know what the targets were for that

8    fiscal year '04, either?

9        A.    No, I don't.

10        Q.    You really have no choice but to estimate one

11    way or the other?

12        A.    That's correct.

13        Q.    Other than the prorated AMIP bonus that you're

14    claiming, are you claiming any other damages in this

15    case?

16        A.    No.

17        Q.    You don't know exactly what motivated CSC to

18    remove you from AMIP in fiscal year '04, do you?

19        A.    No, I don't.

20        Q.    It wasn't a personal decision about you, was

21    it?

22        A.    I hope not.

23        Q.    Do you think it was?

24        A.    No, I don't.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    Q.    CSC removed all people at your level in your

2  group, correct?

3    A.    Well, that's not privy information.  I want to

4  assume that was.  It was below a level 7, but if there's

5  an exception, I would not be aware of that.

6    Q.    So you don't know?

7    A.    No.

8    Q.    But you suspect that probably everyone at your

9  level was removed from AMIP?

10    A.    I'm going to say yes.

11    Q.    Fiscal year 2003 had been a tough year for CSC,

12  hadn't it?

13    A.    Actually what I remember, they all seemed to be

14  tough.  So I don't see 2003 as any tougher than going

15  into this year.

16    Q.    A company has a right to make decisions to save

17  money, correct?

18    A.    That's correct.

19    Q.    And to increase their profits?

20    A.    That's correct.

21    Q.    And the company's entitled to use their

22  business judgment to determine how the best way they

23  should do that is, correct?

24    A.    That's correct.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    You don't have an overall problem with CSC

2    removing people from AMIP, do you?

3    A.    No.

4    Q.    They have the right to do that, correct?

5    A.    Yes.

6    Q.    You know that the company started planning the

7    fiscal year 2004 early in the year, correct?

8    A.    No, I did not know that.

9    Q.    CSC didn't make a hasty decision to remove

10   people from AMIP, did they?

11   A.    I do know that, when you were on the DuPont

12   account, there was a program for even people that were

13   below AMIP to incentivize them.  DuPont account was known

14   as a representable account.  That was taken away, and, in

15   my opinion, it was just the writing on the wall for other

16   things to be taken away.

17               There was a lot of -- it was hard to move

18   people off the DuPont account because there was programs

19   to incentivize people and if they wanted a good person to

20   go to another account, basically it was sort of like I

21   have this, I know I have it, I really don't want to move.

22   I think it annoyed some people from corporate.  So I

23   want -- I think they wanted to make it nobody gets it

24   because nobody else gets it and make it a level playing

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1     A.     No.    I guess the folks -- I would assume that

2     whoever I was working with, they might have gotten

3     knowledge that this exists, but I'm in a different group

4     now and I moved from 400, so I don't see anybody.    I'm

5     not with the same organization.

6     Q.     You don't know of anyone in CSC or otherwise

7     who has personal knowledge?

8     A.     No.

9     Q.     Who have you spoken with regarding your

10    lawsuit?

11    A.     The only person I guess I mentioned this to is

12    my husband that I was involved, but he stays out of that.

13    Q.     Other than your husband, nobody else?

14    A.     No.

15    Q.     No one at CSC?

16    A.     No.

17    Q.     None of the plaintiffs?

18    A.     Actually, again, I don't see them.    I'm in a

19    different -- I'm not on the DuPont account anymore, and

20    some of those folks I never met till that January 27th

21    meeting.

22    Q.     Going back to that meeting with Jeannie Maul,

23    as of the date of that meeting, which I believe you said

24    was early August or late August or early September, as of

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 125**

Susan M. Pokolski

1  that date, you were told that you were no longer eligible

2  for AMIP for fiscal year '04.

3            As of that date, you did not believe that

4  you were receiving any amount of money for an AMIP bonus

5  for fiscal year 2004?

6      A.    When we were told, there was a lot of talk in

7  regards to what does that mean.  We had questions.  But

8  when we were told that we were no longer eligible, I

9  believed that the work that we were doing was not going

10 to reap any kind of AMIP money the coming year, the

11 coming April.

12     Q.    So you believed you were completely off the

13 program at that point?

14     A.    Yes.

15     Q.    And wouldn't receive any AMIP bonus for the

16 year?

17     A.    That's right.

18     Q.    Do you have any debts at the present time?

19     A.    Debts?  Mortgage.

20     Q.    Credit card debts?

21     A.    Yes.

22     Q.    Anything else?

23     A.    Car loan.

24     Q.    Anything else?

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

1    nothing else.

2                    MS. BOYD:   Another short break, please.

3                    (A recess was taken.)

4    BY MS. BOYD:

5         Q.    You were an at-will employee, weren't you,

6    Ms. Pokoiski?

7         A.    Oh, yes.

8         Q.    You didn't have a contract of employment?

9         A.    Yes.

10        Q.    Yes, that's correct?

11        A.    Yes.

12        Q.    You were an at-will employee?

13        A.    Yes.   Sorry.

14        Q.    CSC has an employee handbook; is that correct?

15        A.    Yes.

16        Q.    That is distributed electronically?

17        A.    Yes.

18        Q.    Is it available on the intranet?

19        A.    Yes.

20        Q.    That has various policies and forms within it?

21        A.    Yes.

22        Q.    You can access that from your computer?

23        A.    Yes.

24        Q.    And all CSC employees can access that from

Susan M. Pokoiski

1   their computer?

2      A.     Yes.

3      Q.     Were there any similar policies that were

4   available on the CSC intranet?

5      A.     We have things on the portal in regards to

6   security.

7      Q.     Is there anything you can think of that's

8   available on the intranet?

9      A.     No, nothing comes to mind.

10      Q.     Or anything that's distributed electronically?

11      A.     Stock information.  That's distributed

12   electronically.

13      Q.     Any documents that are distributed

14   electronically?

15      A.     Nothing comes to mind.

16      Q.     You weren't guaranteed an AMIP bonus, were you?

17      A.     Guaranteed.  Nothing is guaranteed.  No, I

18   guess not.

19      Q.     Nothing is guaranteed, right?  You just assumed

20   you'd get it from year to year because you had gotten it

21   the year before, right?

22      A.     Well, you would assume you would get it,

23   especially if you had a personal objective to work on.

24   So that was my go do.  As long as I had this personal

1  objective for the next fiscal year, I assumed that I

2  would get -- I would be eligible for an AMIP.

3      Q.    You assumed, but you weren't guaranteed,

4  correct?

5      A.    That's correct.

6      Q.    Until you actually received the AMIP worksheet

7  at the close of the fiscal year or after the close of the

8  fiscal year, you didn't know exactly how your AMIP would

9  be calculated, correct?

10     A.    There was a meeting I recall with Chris Helme,

11  H-e-l-m-e, where he went into detail around how it would

12  be divied up or how they're expecting to be divied up.  I

13  do remember a meeting.  Don't know the date or the year.

14  So we did have an idea at that point of what was going to

15  happen as we got closer to it, if we were meeting the

16  earnings per share and things like that.  There were a

17  few meetings called.  This is prior to Jeannie Maul.

18     Q.    Prior to Jeannie Maul becoming your supervisor?

19     A.    That's correct.

20     Q.    Were you eligible for AMIP at that point?

21     A.    Yes, I was.

22     Q.    These meetings were to you said divie up --

23     A.    Actually explain where we were at that point to

24  the AMIP program, the weighted average or what the

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)

                              )

NEW CASTLE COUNTY)


       I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 16th day of February, 2006, the deponent herein, SUSAN M. POKOISKI, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


*Kimberly A. Hurley*

Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)


DATED: 3/10/06


**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters


**A 130**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.          )
HAUCK, KEVIN KEIR, ASHBY         )
LINCOLN, KAREN MASINO, ROBERT    )
W. PETERSON, SUSAN M. POKOISKI,  )
DAN P. ROLLINS, and WILLIAM      )
SPERATI,                          )
                                  )
     Plaintiffs,                  )
                                  )
        v.                        )   C.A. No. 05-10-JJF
                                  )
COMPUTER SCIENCES CORPORATION,    )
                                  )
     Defendant.                   )

                    Deposition of BRIAN L. MILLER taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 1:00 p.m., on Thursday,
February 16, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          LINDA M. BOYD, ESQUIRE
             DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

A 131

1      A.      The basis of the lawsuit is we were earning

2   that money through the time that we were told we were no

3   longer eligible for the program.

4      Q.      You're claiming a portion of an AMIP payment

5   from April 1 of 2003 through September 11th, 2003?

6      A.      End of September.  Yes.

7      Q.      Why through the end of September?

8      A.      Because I wasn't really notified -- the letter

9   that I did receive was dated September 11th, I believe,

10  but the discussions and the conversations about it didn't

11  happen until later in September.

12     Q.      So you received the letter on September 11th?

13     A.      No.  I did not receive a letter until I had a

14  meeting with my manager sometime later in September.

15     Q.      Do you know when in September?

16     A.      Exactly I do not know.  It was in the last week

17  or two of September.

18     Q.      What you're claiming is the AMIP for that

19  portion of time, from April 1 through that time of the

20  meetings later in September of 2003?

21     A.      Right.  The six-month period there.  If I did

22  my calculations properly.

23     Q.      Obviously that's an estimate for the amount

24  that you believe you're owed?



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 132**

Burton E. Miller

1    said I did.  I could have said it was a 100 percent of

2    that.  I believe I was being equitable -- of course

3    there's many ways that one could do statistical methods

4    on that, yes.

5         Q.    The reason you have to do an estimate is

6    because you never received a worksheet for that fiscal

7    year, correct?

8         A.    That's correct.

9         Q.    For the fiscal year 2004, you never received an

10   AMIP worksheet to know how it would have been calculated

11   if you had remained eligible?

12        A.    The reason I did the estimate is I was asked to

13   do one for this specific thing.

14        Q.    Right, but the reason you had an estimate is

15   because you didn't have a worksheet to turn to, correct?

16        A.    Yes.  We never received worksheets to do that

17   for.  So I guess yes, to answer your question.

18        Q.    What was the total dollar amount that you

19   estimate you're owed?

20        A.    Approximately.  I don't know exact amount.  I

21   looked at it, but I can't remember.  Twelve thousand six

22   hundred and some change.

23        Q.    Was that something that you placed in your

24   interrogatory answers?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    compensation claims?

2        A.    No.

3        Q.    When did you first contact an attorney to

4    handle your case against CSC?

5        A.    I guess that would be probably in the fall soon

6    after I received the letter, which would have been, I

7    guess -- I'm drawing a blank on years here.  It's been so

8    long.  October 2004?  Yes.

9        Q.    You say soon after you received the letter.

10    What do you mean?

11        A.    The letter talking about the removal from the

12    AMIPs program.

13        Q.    Was it your supervisor that gave you the

14    letter?

15        A.    Yes, my supervisor gave me the letter.  Right.

16        Q.    Is that a he or she?

17        A.    It's a he.

18        Q.    Who is that?

19        A.    Robert Tattle, T-a-t-t-l-e.

20        Q.    Bob Tattle?

21        A.    Bob, yes.

22        Q.    What was his position?

23        A.    His position was director -- application

24    development manager/director on the DuPont account.

1    Q.    He was your supervisor?

2    A.    Correct.

3    Q.    As of September of '03?

4    A.    When we received the letter, right.  Oh, yes.

5    Q.    Is he still your supervisor?

6    A.    No.

7    Q.    What was your position in September of '03?

8    A.    The title was portfolio manager.  My role

9    within CSC was titled senior manager.

10    Q.    Are you still in that position?

11    A.    No, I'm not.

12    Q.    What position are you in now?

13    A.    I'm now a -- it's the next level above that.  I

14    can't remember the title of it.  Computer scientist

15    principal, I believe.

16    Q.    Are you AMIP-eligible now?

17    A.    Yes, I am.

18    Q.    When did you become AMIP-eligible?

19    A.    In September of 2004 I was put back on the

20    program and I received a prorated bonus for fiscal 2005

21    under that program.

22    Q.    That was because you received a promotion?

23    A.    No.  I moved to the new assignment and then my

24    position was reassessed into a new assignment.  Moved to

1    the assignment first, and a couple months I moved to that

2    assignment, month and a half, my position was

3    reevaluated.  I was placed back on the program and

4    received a prorated bonus for approximately that six

5    months of fiscal year 2005.

6         Q.    When did you move to the new assignment?

7         A.    August/September time frame of 2004.

8         Q.    Is it fair to say that you were --

9         A.    I think my correction of when I contacted them

10   would be 2003.  I'm getting confused on dates.  I

11   contacted them whenever the letter came out.

12        Q.    You contacted an attorney?

13        A.    An attorney.

14        Q.    Shortly after you were told you were no longer

15   eligible for AMIP?

16        A.    Correct.

17        Q.    That would have been in September of '03.  So

18   it would have been shortly thereafter?

19        A.    Correct.

20        Q.    You remained ineligible under AMIP until you

21   were placed in the new position in August and then that

22   position was reevaluated in September or October?

23        A.    That's correct.

24        Q.    Of '04?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 136**

1    Q.    Have you discussed with the other plaintiffs
2    how you will split those fees?
3    A.    Not specifically, no.
4    Q.    Do you have any understanding of how you will
5    pay them?  Will you split them evenly?
6    A.    We haven't really discussed that.
7    Q.    What if it's more than a thousand dollars?
8    A.    Then it's more than a thousand dollars.
9    Q.    Have any lawsuits ever been filed against you?
10   A.    No.
11   Q.    Have you ever been a witness in a lawsuit?
12   A.    No.
13   Q.    Other than this case.
14   A.    No.
15   Q.    When you received notice in September 2003 by
16   Bob Tattle that you were not going to be AMIP-eligible,
17   you understood at that point that you would not receive
18   any AMIP payment, correct?
19   A.    I understood the company was telling me that
20   that would be the case.  Not that I agreed with that
21   situation, but I understood what they were trying to tell
22   me, yes.
23   Q.    I understand you disagreed with that result.
24   A.    Correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    But you understood that the result was you were

2    not going to get paid any AMIP payment.

3    A.    I understood that's what they were telling me,

4    yes.

5    Q.    Tell me a little bit about your educational

6    experience.  Where did you go to school?

7    A.    I went to high school in the Harrisburg area,

8    Pennsylvania.  Then I went to Penn State University,

9    earned a Bachelor of Science degree in computer science

10    and math.

11    Q.    When did you graduate?

12    A.    1986.

13    Q.    Did you graduate with honors?

14    A.    Yes.  I had a 3.57 GPA.

15    Q.    Any postgraduate work?

16    A.    No.

17    Q.    I mean education.  Any postgraduate education?

18    A.    No postgraduate formal education, no.  Towards

19    a degree, that is.

20    Q.    Where did you go after school?  Did you start

21    working?

22    A.    I started working at DuPont Corporation in the

23    June time frame of 1986.

24    Q.    Did you ever send out a letter to other

1  employees at CSC seeking to have them join you in a

2  lawsuit?

3      A.     Yes.   Let me clarify that.   Not to join me.   To

4  inform them that they may have some legal rights there

5  and if they were interested in contacting the

6  attorneys -- an attorney, here is one that understands

7  this case.

8      Q.     How did you know who to send it to?

9      A.     Personal information and knowledge about the

10  people who were in the same situation that I was.   I have

11  a lot of colleagues.

12     Q.     So how did you know who to send it to?

13     A.     I came up with a list of names of people who I

14  thought were in a similar situation.   Not 100 percent

15  fact, but I believe they were in a similar situation.

16  And sent the letter.

17     Q.     How did you send it, by e-mail?

18     A.     No.   Via Uncle Sam -- formal mail.

19     Q.     Through the mail?

20     A.     Through the mail.

21     Q.     How did you get their addresses?

22     A.     Public Web sites.   Some places like

23  whitepages.com and other places like that or the phone

24  book.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1      Q.     Who paid for the postage?

2      A.     I did.

3      Q.     Who drafted the letter?

4      A.     I did.

5      Q.     Did you sign it?

6      A.     No.

7      Q.     Why not?

8      A.     Because I didn't think it was necessary for

9   people to understand who it had come from.  I didn't want

10  to bias people with my specific -- knowing that it was

11  me, to have undue influence on what decision they wanted

12  to make.  It was more of an information letter laying out

13  what I believe the facts at the time.

14     Q.     I'm going to show you what's been marked as

15  Deposition Exhibit 4.  Look that over.

16     A.     Okay.

17     Q.     I'm showing you what's been marked Deposition

18  Exhibit 4.  Is this the letter that you sent out?

19     A.     Appears to be, yes.  Appears to be.

20     Q.     You worked for DuPont from the time that you

21  left school until the time that you became a CSC

22  employee?

23     A.     That's correct.

24     Q.     Which positions did you hold?

wrong.

A.    That is correct, because I was informed when I was hired by CSC, my offer letter says I would participate in that program.  Every year I participated in that program, until somebody told me I wasn't participating in that program, I would assume that I was, yes.

Q.    You understood there was no guarantee that you could continue to participate in the program?

A.    I believe that I understand that the program is reviewed and individuals who are not to be in the program are informed that they will no longer participate in the program.  Yes.

Q.    You understood that the company does not guarantee participation in the program.

A.    I do understand they can remove people from the program as they see fit, yes.

Q.    You understand that people can be removed from the program midyear?

A.    Yes, I do.  I also understand that when that's done, they prorate the payments when that happens.

Q.    Are you aware of anybody that's ever had a prorated payment?

A.    Yes, I have.



1    Q.    Do you know if he quit the company or was

2    terminated?

3    A.    I believe he was in part of one of the

4    reduction-of-force programs at CSC.

5    Q.    So he was laid off?

6    A.    So he was laid off, I believe, yes.

7    Q.    Do you know if the company provided prorated

8    payments to people that were laid off, if that was part

9    of the company's practice or policy?

10    A.    I do not know.

11    Q.    There are policies of the company that are

12    published on the Internet, correct?

13    A.    Correct.

14    Q.    Including policies related to the compensation

15    and employee handbooks, correct?

16    A.    Yes, there sure is.

17    Q.    And policies related to the Chemical Group,

18    correct?

19    A.    Yes.

20    Q.    And you had access to all those policies?

21    A.    Yes.

22    Q.    Do you have any of those policies with you

23    today?

24    A.    No, I do not.

1    Q.    When was the last time you reviewed those

2    policies?

3    A.    Possibly in preparation in general for the

4    lawsuit.   There's some stuff around the AMIP's management

5    program.

6    Q.    Some of those policies are on the Internet, but

7    some are distributed in printed form and some are

8    distributed by e-mail and some are distributed via Human

9    Resources?

10   A.    All of the above, yes.

11   Q.    By the way, what position -- maybe you told me

12   this, that you don't know what position Steve held?

13   A.    I don't know.

14   Q.    You said you think he was laid off.  Do you

15   know if he had another position to go to?

16   A.    I do not know.

17   Q.    Do you know how much his AMIP was?

18   A.    I don't know.

19   Q.    How do you know it was prorated?

20   A.    He said he got -- his comment was "I got paid

21   for the time I was there."

22   Q.    Did he say anything about an AMIP?

23   A.    Yes.

24   Q.    What did he say?

1    Q.    You knew that because of your offer letter when
2    you came over from DuPont?
3    A.    That's correct.
4    Q.    The formula for AMIP calculations in this
5    worksheet would change every year, correct?
6    A.    To be clear, the amount that I was eligible
7    for.
8    Q.    The percentage?
9    A.    The percentage that I'm eligible for of my
10   salary would be consistent with what I was told in
11   previous years.
12   Q.    You're saying that was 25 percent?
13   A.    I originally started at 22 percent and was
14   moved to 25 percent somewhere in my career when I got
15   moved to a new position.  I moved from a level 5 position
16   to a level 6 position with CSC to a senior manager
17   position and my AMIP was adjusted at some point to
18   25 percent.  Started out 22 and moved to 25.
19   Q.    When you were a level 5, it was at 22 percent?
20   A.    Yes.
21   Q.    And when you were moved to a level 6 position,
22   it went to 25 percent?
23   A.    Not directly, but sometime after I was a
24   level 6, they adjusted it to 25 percent eligibility.

1    Q.    Not right away, but at some point later on they

2    adjusted it to 25 percent?

3    A.    Right.  Back to your question about --

4    Q.    That percentage, whatever it was, that stayed

5    the same year to year while you were in that level.

6    A.    Right.

7    Q.    Other than that percentage, the remainder of

8    the formula would change year to year?

9    A.    The exact -- which factors are going to have

10   more weight and less weight would change year to year,

11   yes.

12   Q.    First of all, the factors themselves would

13   change, correct?

14   A.    Yes.  They could change.

15   Q.    Some years it might be ROI, meaning return on

16   investment; some years it might be earnings per share?

17   A.    Correct.

18   Q.    Some years it might be revenue?

19   A.    Correct.

20   Q.    Some years it might be operating expenses?

21   A.    Correct.  Generally it was a combination of all

22   those things.  Sometimes a couple things were on and off.

23   Q.    So those factors themselves would change?

24   A.    Yes.

1    Q.    In addition, the targets would change, correct?

2    A.    Yes.

3    Q.    The amount of return on investment or the

4    amount of earnings per share or the amount of operating

5    expenses or the amount of revenue would change?

6    A.    Correct.  That's true.

7    Q.    In addition, the weightings would change?

8    A.    Yes.

9    Q.    That is, the amount of emphasis that was placed

10   on any one particular factor may vary year to year?

11   A.    Yes, that's true.

12   Q.    Those were corporate goals and objectives that

13   were part of the AMIP formula, correct?

14   A.    That's pretty much the corporate section, yes.

15   Q.    In addition to the corporate section, there

16   were also group or division goals and objectives?

17   A.    Some years there were, some years there were

18   not.

19   Q.    Some years, but not all years, it might be the

20   Chemical Division's objectives that were factored into --

21   A.    Correct.

22   Q.    -- the AMIP calculation.

23   A.    Correct.

24   Q.    Again, they may have factors of expenses,

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 146**

1    revenue, income only particular to that Chemical Group.

2    Correct?

3        A.    That's correct.

4        Q.    Again, the targets for those objectives would

5    change year to year?

6        A.    That's correct.

7        Q.    And the weightings for those factors would

8    change year to year?

9        A.    That's correct.

10       Q.    And then in addition to the company objectives

11   and the group objectives, some years, but not all years,

12   I gather, there were also individual performance

13   objectives?

14       A.    Correct.

15       Q.    Do you remember which years had individual

16   performance objectives?

17       A.    Not specifically which years.  Probably about

18   two of the years because they started desiring to try to

19   get to some of those things.  Some years they got to

20   that, some years they did not.

21       Q.    So maybe of the six years that you received the

22   AMIP, two years had individual performance objectives?

23       A.    That's what I was going to say if you had asked

24   me about my recollection, about two years.

1    do some things.

2        Q.    Do you have a specific recollection of any

3    specific individual performance objective?

4        A.    Not off the top of my head, no, I can't

5    remember.

6        Q.    So it might be the rollout of a product or a

7    service or achieving a certain service delivery level.

8        A.    Yes.  Could be -- I think there was some

9    objectives around the group ones around those things

10   which a lot of people had to contribute to.  It's hard

11   because individual service level -- an individual can't

12   specifically impact the service level, but as a group you

13   could.

14              Again, this was targeted at those employees

15   in influential positions that contributed to the

16   corporate, financial, and account health and were leading

17   other people in doing those things.  So it was generally

18   objectives around those types of areas.  I can't remember

19   specific ones in that area.

20       Q.    But they would change person to person and year

21   to year?

22       A.    Yes.

23       Q.    Are you a member of any professional

24   associations?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan D. Miller

1  A.  No.

2  Q.  You would agree that you are an at-will

3 employee, correct?

4  A.  By Delaware law you mean?

5  Q.  Yes.

6  A.  Yes.  In the fact that I should get paid for

7 the contributions I make to my employer, yes.

8  Q.  Maybe you're not familiar with the

9 term"at-will."

10  A.  At-will means I'm employed at-will between

11 myself and the corporation, I believe.  I either can

12 terminate that employment or change the terms of that

13 employment at will.

14     I also believe that the law states that you

15 should be paid for the work that you do while you're in

16 employment for that corporation.

17  Q.  Understood.  You had no contract of employment,

18 though, correct?

19  A.  No.

20  Q.  Is that correct?

21  A.  Not an official contract.  I have this offer

22 letter.

23  Q.  Other than your offer letter, though?

24  A.  No other official contract, no.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 149**

1    not completed, correct?  The formula was laid out, but

2    the metrics were not completed.

3        A.    Right.  We received it in the time frame you

4    mentioned.

5        Q.    October through December.

6        A.    We received okay, we finally settled on exactly

7    how the weighting is going to be.

8        Q.    The formulas?

9        A.    Right.  At the end of the year when you

10   actually got your payout in the years they had the thing,

11   you basically got the same form with the actuals filled

12   in and showed the percentages that were actually paid and

13   tied to me, here's your total amount for me.

14       Q.    Let me just see if I understand this.  You

15   would receive, let's say, not a blank worksheet but an

16   uncompleted worksheet in that October-to-December time

17   frame and then the worksheet would be completed after the

18   close of the fiscal year once the financials and other

19   targets and objectives can be measured.

20       A.    It was filled out to the point that said here's

21   the measure.

22       Q.    Here's the formula?

23       A.    Here's the objective, here's the percent

24   weighting, and here's what that would mean to you if we