Brian B. Miller

1    meet 100 percent of that.  The next couple of columns

2    said here's the actual, here's the actual objective.

3        Q.    Achievement?

4        A.    Achievement.  Here's the percent that equals

5    which could be anywhere technically from 0 to 150 percent

6    of that payment.  Here's what this means to you.  With a

7    total at the bottom.

8        Q.    So the places on the form, the worksheet form,

9    that had actuals and achievements and how that flowed

10   through in terms of the percentage calculation, those

11   were not filled out until the company could actually

12   report its financials and other objectives and otherwise

13   measure its results?

14       A.    Correct.  Or the group could measure theirs,

15   correct.

16       Q.    That was done after the close of the fiscal

17   year?

18       A.    Correct.

19       Q.    And the fiscal year -- I think we all know

20   this -- so everybody is clear is April 1 through

21   March 31?

22       A.    Of the following, yes, correct.

23       Q.    So that just as an example, the fiscal year for

24   2004 ran from April 1, 2003, through March 31, 2004?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1      A.    That would be correct.

2      Q.    So after the close of the fiscal year, it would

3  take some time to fill in that last little bit of the

4  worksheet to measure the objectives versus the actuals?

5      A.    Right.

6      Q.    When was that done?

7      A.    Generally it was done after the close of

8  books -- I believe it takes easily about a month to close

9  the financial year books.  That would usually be done in

10  the May time frame and the payouts usually happened -- it

11  varied between late May and mid-June.  Sometime in that

12  time frame.

13      Q.    You would receive the completed worksheets back

14  to you to show you how the AMIP was calculated, correct?

15      A.    To show you what you would see in your paycheck

16  before it came.  Usually they made it before your

17  paycheck came, not always.

18      Q.    What was the amount of VC you received while at

19  DuPont?  What did it range from?

20      A.    At DuPont -- I can't remember my exact salary.

21  22 percent of my salary is what I was eligible for.

22      Q.    What did that range up to?  Do you remember the

23  highest amount of VC you received?

24      A.    Off the top of my head, I do not remember, no.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 152**

1      Q.      Approximately.

2      A.      I'm guessing $20,000.  That's a complete guess,

3  though, without looking at the numbers.

4      Q.      You received an offer letter when you came over

5  to CSC, correct?

6      A.      Yes.

7      Q.      It's the offer letter that explained to you

8  what benefits and terms and conditions of employment you

9  were going to receive once you came over?

10      A.      That's correct.

11      Q.      That laid out the AMIP bonus?

12      A.      Yes, it laid out what my eligibility would be

13  in the AMIP program.

14      Q.      Other than that offer letter, you did not

15  receive anything else related to AMIP, correct?

16      A.      At the start of my employment with CSC do you

17  mean?

18      Q.      During this transitional time frame.

19      A.      I believe that is correct.

20      Q.      Did you have any discussions about AMIP with

21  anybody?

22      A.      Yes.  There was a number of town hall meetings

23  held by HR on the transition period as CSC usually does

24  when they bring in a new outsourcing arrangement, and

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    you receive anything else regarding AMIP during your

2    employment with CSC and other than the worksheets?

3        A.    No.

4        Q.    Have you ever seen the AMIP plan itself or the

5    AMIP policy?  Are you aware of any AMIP plan or policy

6    other than what you received as a manager?

7        A.    There's something, I believe, online about the

8    AMIP program.  I'm not sure if I actually received a

9    specific here's the full AMIP plan, corporate-type plan.

10   Most of my knowledge comes from the actual plan summary

11   and application to the Chemical Group.

12       Q.    You have been in the Chemical Group the entire

13   time you have been at CSC?

14       A.    No.  I moved out of the Chemical Group when I

15   took this new assignment that we discussed previously.

16       Q.    What group did you move into at that time?

17       A.    I'm currently in the new business organization

18   of Global Infrastructure Services.

19       Q.    That's separate from Chemical?

20       A.    Completely separate from Chemical Group,

21   correct.

22       Q.    So that would be up until August of 2004 you

23   remained in the Chemical Group?

24       A.    Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

A 154

1      Q.    Have you ever seen the discretionary bonus

2   policy?

3      A.    I believe I have, but I couldn't cite it, only

4   because they have always asked if there's anybody -- if

5   you want to do this, this is the process to use.  It's

6   basically the communication we have had from HR.

7            Again, in my manager role it was always a

8   tool I could use for employees who did exceptional things

9   to contribute to the company.

10     Q.    Have you ever awarded a discretionary bonus to

11  anybody?

12     A.    I have not, no.

13     Q.    Did you receive a discretionary bonus at any

14  point in time?

15     A.    No, I did not.

16           (Deposition Exhibit No. 28 was marked for

17  identification.)

18  BY MR. SEEGULL:

19     Q.    I'm now showing you what's been marked as

20  Exhibit 28.  Do you recognize this?

21     A.    It appears to be the offer letter.

22     Q.    This is the offer letter that was given to you

23  when you were transitioned from DuPont to CSC, correct?

24     A.    It looks like it, yes.

1    Q.    You were provided this on March 7th, 1997?

2    A.    That's the date it says there.

3    Q.    You never signed this, did you?

4    A.    Yes, I did.  Sure I did.  I'm sure I did.

5    Q.    Why do you assume that?

6    A.    Because to get employment you had to sign this

7    and turn it in.

8              MR. SEEGULL:  Do you have a signed version

9    of this, Mr. Wilson?

10              MR. WILSON:  All I know is what I have with

11    me, and, no, I don't.  But we may in the file.

12              THE WITNESS:  I can tell you that I know I

13    had to sign this.  To get a paycheck, you had to sign

14    this to accept the offer.

15    BY MR. SEEGULL:

16    Q.    If it's not in your file, that would mean you

17    didn't sign it, correct?

18    A.    I disagree.  I know I signed this and sent it

19    in.

20    Q.    This is the offer letter you were speaking

21    about before, correct?

22    A.    Offer letter to come and work for CSC, yes.

23    Q.    This is the one that you were talking about

24    that referred to the incentive plan?

1    no.

2        Q.    The decision that was made to change

3    eligibility to remove you from eligibility, that was made

4    across the board for certain salary levels.

5        A.    I believe it was.  While we're on the subject,

6    I don't believe it was also done consistently.  I am

7    pretty sure, although not a hundred percent sure, that

8    there was at least one individual in my direct work group

9    at the same level who remained on the program with the

10   same role.

11       Q.    You're speculating?

12       A.    Yes.

13       Q.    You're saying somebody received an AMIP but at

14   a lower level?

15       A.    No.  Somebody remained in the AMIP program at

16   the same role --

17       Q.    And their level was raised?

18       A.    No, I do not believe so.

19       Q.    Who is this that you're talking about?

20       A.    Robert Carden.

21       Q.    Bob Carden?

22       A.    Yes.

23       Q.    What level was he at?

24       A.    Same level I was, level 6 at the time.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1       Q.      You believe that, even though he was a level 6,

2   he was allowed to remain eligible for AMIP?

3       A.      I believe so, yes.

4       Q.      Why was that?

5       A.      I do not know.

6       Q.      Have you ever discussed that with him?

7       A.      Not with him, no.

8       Q.      Who have you discussed it with?

9       A.      When we first talked about this in general,

10  we'd say is everybody going to be out of here, we believe

11  that he was not removed from the program.

12      Q.      Who told you that?

13      A.      It was never specifically told.

14      Q.      This is really just hearsay and gossip?

15      A.      Yes.  But I believe we could find that

16  information out by pulling that record.  Although it's

17  not my personal knowledge to see Bob's financial payment

18  records, but I believe we could find that it would be

19  true.

20      Q.      It's just hearsay and gossip at this point?

21      A.      Yes, at this point that would be true.

22      Q.      And that has no bearing on your case, correct,

23  Bob Carden's --

24      A.      Not specifically.  You asked if it was done

1    equitably and across all roles.  My thing was I don't

2    know that it was.  That's why I answered the way I did.

3         Q.     But the decision was based upon levels,

4    correct?

5         A.     That's what they led us to believe, yes.

6         Q.     That's what you understand happened?

7         A.     That's what I understand happened, yes.

8         Q.     If there was some kind of exception made for an

9    outstanding individual performer, that doesn't mean that

10   the decision was made based upon level, correct?

11        A.     That's probably correct, yes.

12        Q.     You understood that AMIP was reserved for

13   senior-level managers, correct?  That was the intent?

14        A.     I understood that the AMIP program was eligible

15   for senior-level personnel and managers that were

16   contributing to the bottom line of the corporation, yes.

17        Q.     And the intent was to make it consistent across

18   the board, correct?

19        A.     The AMIP program in general?

20        Q.     The change.

21        A.     That's what they said the change was to do,

22   yes.

23        Q.     Explain that.  What did they tell you?  This

24   was Bob Tattle?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1     Q.    You were first notified that you were no longer

2  eligible for AMIP verbally?

3     A.    Well, verbally and with the letter at the same

4  time.

5     Q.    It was at the same time?

6     A.    Yes.

7     Q.    In a meeting?

8     A.    Yes.  In a meeting with myself and Bob Tattle.

9     Q.    Anybody else in that meeting?

10     A.    No.

11     Q.    Tell me everything you remember Bob telling

12  you.

13     A.    Bob told me that the corporation has assessed

14  my eligibility for the AMIP program and I'm no longer

15  eligible and basically asked me to read the letter and he

16  asked me to sign the letter.  And I said, well, I needed

17  some time to think about it, to assess signing the

18  letter.  And that was about the end of the meeting.

19     Q.    Are you saying he really didn't tell you much

20  at all, he just handed you the letter and asked you to

21  read and sign it?

22     A.    He told me that they're trying to balance the

23  program out.  Never specifically said about the Chemical

24  Group, per se.  That's why I said no.  But trying to get

1    the AMIP program changed to put the -- change the level

2    of the things and I would no longer be eligible.

3         Q.    After he did this, did you continue to stay in

4    the same role you were in as you were previously?

5         A.    Yes.

6         Q.    You continued to perform your job duties and

7    responsibilities as you had before?

8         A.    Quite honestly, since I wasn't contributing, I

9    wasn't eligible anymore, I probably did not go the extra

10   mile as I had before to help achieve my part of the bonus

11   because my compensation changed at that point.

12        Q.    So you worked less hard?

13        A.    I guess you could say in certain ways, yes.  I

14   didn't go over and above to help make sure we achieved

15   the financial goals.

16        Q.    Because you no longer considered yourself as

17   having any role to play in achieving company financial

18   goals?

19        A.    I believe now that I was being -- my

20   interpretation of the conversation was I was no longer

21   going to be compensated for work that would contribute to

22   achieving a certain level of compensation and that the

23   work that I did before that time up until that time to

24   contribute towards that goal was no longer necessary for

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 161**

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 16th day of February, 2006, the deponent herein, BRIAN L. MILLER, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

        I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

        I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

*Kimberly A. Hurley*
Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)

DATED: _3/10/06_



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 162**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.          )
HAUCK, KEVIN KEIR, ASHBY          )
LINCOLN, KAREN MASINO, ROBERT     )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM       )
SPERATI,                          )
                                  )
      Plaintiffs,                 )
                                  )
      v.                          )   C.A. No. 05-10-JJF
                                  )
COMPUTER SCIENCES CORPORATION, )
                                  )
      Defendant.                  )

        Deposition of KEVIN R. KEIR taken pursuant
to notice at the law offices of Potter Anderson &
Corroon, Hercules Plaza, 6th Floor, Wilmington, Delaware,
beginning at 3:20 p.m., on Thursday, February 16, 2006,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiffs

        LARRY R. SEEGULL, ESQUIRE
        LINDA M. BOYD, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
          6225 Smith Avenue
          Baltimore, Maryland 21209-3600
          for the Defendant

                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL                                    A 163

Kevin R. Keir

1    Q.    And Canada, the company in Canada?

2    A.    SunWest Systems.

3    Q.    So '93 came to the U.S.; transferred within

4    DuPont?

5    A.    Yes.

6    Q.    And then 1997 you were employed then by CSC?

7    A.    Correct.

8    Q.    Does anyone live with you at your present

9    address?

10   A.    My wife and three kids.

11   Q.    Have you ever been arrested?

12   A.    No.

13   Q.    Any convictions for a felony or misdemeanor?

14   A.    No.

15   Q.    Ever served in the military?

16   A.    No.

17   Q.    U.S. or otherwise?

18   A.    No.

19   Q.    When did you first contact an attorney to

20   handle your case against CSC?

21   A.    I don't remember.

22   Q.    Did anyone contact you?

23   A.    We received a letter in the mail and said if

24   you're interested, contact the attorneys.  And we did.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A.    DuPont Australia, '83.

2    Q.    And then joined DuPont --

3    A.    U.S.

4    Q.    When?

5    A.    '93.

6    Q.    When did your employment end with DuPont?

7    A.    In 1997 when we switched with CSC.

8    Q.    What was your final position at DuPont?

9    A.    I don't remember.  Computer scientist, senior

10   computer scientist.  Whatever the terminology -- I don't

11   actually remember the actual terminology.

12   Q.    Do you know what level that was within DuPont?

13   A.    I believe it was a 5.

14   Q.    What did your job entail as a computer

15   scientist with DuPont?

16   A.    With DuPont?  It did change over the years.

17   When I left, I believe I was doing a job I'm doing now,

18   which is basically a computer specialist in a certain

19   area.

20   Q.    Is it SAP?

21   A.    SAP but a portion of SAP.  I'm a specialist in

22   the data archiving.

23   Q.    Were you in a bonus program in that job?

24   A.    I was in the DuPont bonus --

1    bonus.  You'd meet every year anyway to go over your

2    performance and what was kind of expected over the next

3    year.  Indirectly that was part of the bonus, I guess.

4        Q.    When did you first start working at CSC?

5        A.    Whenever everybody else transitioned over,

6    which I believe it was May '97.

7        Q.    What was your first position with CSC?

8        A.    Pretty much the same.  I just kept -- it was

9    very little change from what I was already doing.

10       Q.    What was your title?

11       A.    Again, computer scientist, I believe, or senior

12   computer scientist.  I think it was just computer

13   scientist.  The terminology, the name was slightly

14   different at DuPont.  I don't recall what it was.

15       Q.    When you joined CSC, what group were you in?

16       A.    They started off -- they changed names over the

17   years so many times.  Horizon Initiatives.

18       Q.    That was the initial group?

19       A.    I believe so.  Basically I was working at

20   DuPont in SAP and continued to do the same job.

21       Q.    How did Horizon Initiatives -- is that what you

22   said?

23       A.    I believe that's the first name they started

24   off with, yes.



Kevin R. Keir

1   CSC, transitioned to CSC?

2       A.      We have been at quite a lot of different

3   locations.  I have been at Barley Mill.  We have been

4   downtown here.  Later on DuPont -- we moved out to

5   Newark, two locations down there.  And mostly Barley

6   Mill.

7       Q.      What was your starting salary at CSC?

8       A.      I don't recall.

9       Q.      Was it the same as when you were at DuPont?

10      A.      I believe there's some adjustments made.  I

11  couldn't tell you the exact number.

12      Q.      Do you know your salary level, your SL number?

13      A.      5.  I don't think that's changed.

14      Q.      Is that what you are now?

15      A.      I believe so, yes.  I'm sorry.  I believe it

16  was the same as now.  I'm a 5 now.

17      Q.      What's your current job function?

18      A.      Pretty much the same.  I'm a specialist in the

19  SAP archiving area.  I have a group of -- it alternates

20  three to four people I'm responsible for.  Most of them

21  are in the same area, SAP archiving.  Like a team lead

22  and also their administrative lead.

23      Q.      When you joined CSC, were you in the AMIP bonus

24  program?

1    hot skills in that market.   After a while those skills

2    cooled down or their competition got caught up and they

3    took the program away.

4                    (Deposition Exhibit No. 33 was marked for

5    identification.)

6    BY MR. RAIMO:

7        Q.    Do you recognize this Exhibit 33?

8        A.    Yes.

9        Q.    What is it?

10       A.    It was the offer letter to me from CSC.

11       Q.    You received this letter when you transferred

12   from DuPont to CSC, correct?

13       A.    Yes.

14       Q.    You understood from this letter that you would

15   be eligible to participate in AMIP, correct?

16       A.    Correct.

17       Q.    This letter did not guarantee you that you

18   would continue to be eligible to participate in AMIP the

19   rest of your career at CSC, correct?

20                   MR. WILSON:   Object to form.   Go ahead.

21       A.    It didn't say either way.

22       Q.    But it didn't guarantee you that you would be

23   eligible to remain in AMIP.

24       A.    Doesn't say either way.   Yes.   It doesn't say

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 168**

1    that.

2        Q.    Do you see where it does guarantee you that you

3    would be --

4        A.    No.

5        Q.    You're currently employed with CSC as an

6    at-will employee, correct?

7        A.    I'm not sure what that means.

8        Q.    Means you don't have an employment contract

9    with CSC, you could terminate your employment with CSC at

10   any time and CSC can terminate your employment at any

11   time.

12       A.    Correct.

13       Q.    Before you transferred from DuPont to CSC, did

14   DuPont hold any meetings about the transfer?

15       A.    Yes.

16       Q.    When?

17       A.    There was numerous meetings.  It was a

18   traumatic time for a lot of people with not knowing what

19   it meant.  There was meetings to discuss what the plan

20   was, whether some people were possibly going to

21   Accenture, some going to CSC, some might have even stayed

22   at DuPont.  So there was various meetings.

23       Q.    Who conducted those meetings?

24       A.    I don't recall them all.  I know Barry Day was



1  qualified.  I believe it was at a certain level.

2      Q.    What were the CSC qualifications at that time,

3  in your understanding?

4      A.    I don't recall.

5      Q.    Do you contend that any of the discussions or

6  communications during this period of time of your

7  transition support your claim that you were entitled to a

8  prorated AMIP bonus for fiscal year '04?

9      A.    The offer letter says they're going to prorate

10  it for the actual joining.

11      Q.    But for fiscal year '04.

12      A.    Not through these letters.

13      Q.    Or communications during your transition from

14  DuPont to CSC.

15      A.    Not that I recall.

16      Q.    So after these meetings, you didn't have a

17  clear understanding of how AMIP worked?

18      A.    In CSC realm?

19      Q.    Right.

20      A.    Probably not, no.

21      Q.    You were told that you would be AMIP-eligible?

22      A.    Yes.

23      Q.    Did you understand that you would receive an

24  AMIP worksheet?

Kevin R. Kelle

1    A.    No.

2    Q.    Did you know how AMIP bonuses would be

3    calculated?

4    A.    Not clearly.  It seemed to change over the

5    years how it was calculated.  The percentage makeup

6    changed over the years.

7    Q.    What do you mean by that, the way your AMIP was

8    calculated would change year to year?

9    A.    The makeup -- I was eligible up to 22 percent.

10   They would come up with a calculation based on a bunch of

11   different factors to say whether payout is going to be

12   hundred percent, 80 percent, 110 percent, whatever.  If

13   it's 100 percent, then I would get 22 percent of my

14   salary.  But the makeup of the breakdown, internal

15   breakdown, of how they came up with what that figure was

16   seemed to change over the years.

17   Q.    According to you, what was the makeup?  What

18   did that consist of?

19   A.    I couldn't tell you directly.  It seemed to be

20   a combination of financial figures.  In the beginning

21   years a portion of it was more directly related to your

22   performance.  In later years it just seemed to be

23   division and CSC as a total.  Some of their financial

24   indicators, earnings per share, I think a return on

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    investment, those kind of things.

2        Q.    You're saying that the AMIP bonus essentially

3    was a percentage of your salary?

4        A.    Yes.  I was eligible up to a certain amount for

5    a percentage of my salary.  Whether I got that percentage

6    was the AMIP's calculation.

7        Q.    And that percentage was based on numerous

8    factors?

9        A.    Correct.  Yes.

10       Q.    As you were saying, those factors could include

11   corporate objectives, group objectives?

12       A.    Correct.

13       Q.    Group objectives?

14       A.    At one stage there was personal objectives,

15   too.

16       Q.    And personal objectives.

17       A.    But it changed.  They changed over the years.

18   They changed the mix.

19       Q.    The AMIP was always changing?

20       A.    The mix of how the AMIP was calculated changed.

21       Q.    But that would have an impact on the AMIP you

22   would receive?

23       A.    Potentially, yes.

24       Q.    Because not only factors would change, but

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A 172

Kevin S. Kelly

1    possibly targets for those factors would change, too?

2        A.    Correct.

3        Q.    And the weight that each of those factors were

4    given would also change, too, over the years.

5        A.    They could.  I believe they did.

6        Q.    They did?  And in addition to the financial

7    factors, the nonfinancial factors could change, also; is

8    that correct?

9        A.    Such as?

10       Q.    Personal objectives.

11       A.    Yes.  I believe the last couple of years there

12   really wasn't personal objectives involved in the

13   calculation.  It was more -- other than a group level.

14       Q.    What would a personal objective entail?

15       A.    I believe in the early years your rating would

16   have to be considered high.  Your manager would have to

17   say yes, this part of it was you met this part.

18       Q.    And group objectives?

19       A.    Again, those were -- appeared to be just

20   financial objectives for the group.

21       Q.    For your case, your SAP group, would you

22   consider you SAP group or --

23       A.    We're a part of a large -- again, it's changed

24   so much over the years, the different groups and

Kevin R. Kelly

1    divisions we have been in.  The SAP group was in

2    something called ASD.  I forget what -- Application

3    Service Delivery.  They have changed over the years so

4    many times.  But I don't believe the SAP group itself was

5    a factor.  It would be part of a larger group.

6        Q.    More of a business unit rather than SAP

7    subgroup?

8        A.    Yes.

9        Q.    Some of the financial factors were placed into

10   an AMIP worksheet; is that correct?

11       A.    Yes.

12       Q.    As you stated, that would be possibly operating

13   income, margin?

14       A.    Without looking at it, I couldn't tell you.  I

15   remember the acronym was ESP at one stage.  I believe ROI

16   was on there.

17       Q.    DSO?

18       A.    I don't recall.  May or may not have.

19       Q.    And these factors are based on CSC's financial

20   performance during the year.

21       A.    I believe so.  Or the group's performance.

22       Q.    CSC's fiscal year runs between April 1st and

23   March 31st; is that correct?

24       A.    I believe that's correct, yes.

1      Q.    So the factors that I just mentioned before

2  could change year to year.

3      A.    Yes.

4      Q.    Do you know what AMIP stands for?

5      A.    Annual Management Incentive Plan, I believe.

6      Q.    How do you know what AMIP is?

7      A.    I recall seeing that somewhere.  It was rarely

8  spelled out like that.  It was just always AMIP.

9      Q.    Can you point to any document where the terms

10  of AMIP are spelled out?

11      A.    No.

12      Q.    Can you point to any document where the

13  eligibility to participate in the AMIP is spelled out?

14      A.    It might be somewhere on the CSC portal, but I

15  don't have --

16      Q.    Do you know what the guiding plan is that

17  controls how CSC implements AMIP?

18      A.    No.

19      Q.    The company distributes its policies regarding

20  compensation electronically, correct, in addition to

21  being on the portal?

22      A.    I believe so.  I don't recall receiving a

23  communication about AMIP other than this.  Sometimes we

24  would receive something in the mail.  We didn't always

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A 175

1   frame?

2       A.    I don't recall.  I believe it was erratic when

3   you would receive it.  It was not a consistent date or

4   time.

5       Q.    So you wouldn't receive the AMIP worksheet

6   until you're well into the fiscal year?

7       A.    I believe one year that was the case.

8               MR. WILSON:  Objection.

9               THE WITNESS:  I believe one year that was

10  the case.  It came quite late.

11      Q.    What year was that?

12      A.    I don't recall.

13      Q.    Do you know when it came?

14      A.    No.  Just that I knew it was well into the

15  year.

16      Q.    There was no scheduled date by which CSC

17  provided a preliminary AMIP worksheet, right?

18      A.    Not that I'm aware of.

19      Q.    You did not expect to receive the worksheet for

20  the fiscal year on the first day of the fiscal year, did

21  you?

22      A.    No.

23      Q.    That never happened even once during all the

24  years you worked at CSC, correct?

Kevin R. Keir

1    A.    I don't believe so.

2    Q.    In all the years you worked at CSC, you also

3    never received your preliminary AMIP worksheet for the

4    fiscal year in the first month of that fiscal year,

5    right?

6    A.    That I don't recall.

7    Q.    What is the earliest you ever received your

8    AMIP worksheet?

9    A.    That I don't recall.  Goes back to '97, so...

10   I think at the time we were so relieved that they were

11   carrying something on from the DuPont played a big part

12   in our compensation, I may not have paid much attention

13   to the AMIP side of it.

14   Q.    Do you know if any employees who are eligible

15   for AMIP in fiscal year 2006 received their preliminary

16   AMIP worksheets?

17   A.    I don't.  I don't know.

18   Q.    Until you received a preliminary worksheet, you

19   didn't know how your AMIP would be calculated, did you?

20   A.    Correct.

21   Q.    Nothing was official as to how your AMIP would

22   be calculated until and unless you received a preliminary

23   worksheet, correct?

24   A.    Well, there were some years we didn't receive

Kevin R. Keir

593

1    Q.    When did you generally receive a worksheet when

2  you did receive one?

3    A.    As I said, it depends if we're talking about

4  the preliminary ones or the final ones.

5    Q.    The final.

6    A.    A couple of times they were right around the

7  time we were paid it out, and I do believe a manager did

8  once sit down and say -- or present it to me, saying we

9  met the objectives, so you're eligible for the

10  22 percent.

11    Q.    When did you generally receive the AMIP bonus?

12    A.    That I don't remember.  It was, I believe, in

13  April-June time frame.

14    Q.    You wouldn't receive it until you were well

15  into the next fiscal year?

16    A.    After the close of the previous year.

17    Q.    Because it took CSC a while to wrap up its

18  prior fiscal year and close the books, correct?

19    A.    I believe so.

20        MR. RAIMO:  Go off the record.

21        (A recess was taken.)

22  BY MR. RAIMO:

23    Q.    Mr. Keir, you were notified by CSC that you

24  were not eligible for participation in the AMIP program

Kevin R. Kell

```
 1   for 2004 fiscal year at some point in September, correct?

 2       A.      Right.

 3       Q.      At what point in September was this

 4   communicated to you?

 5       A.      I believe -- the letter I believe was dated

 6   September 11th.

 7       Q.      How was it sent to you?

 8       A.      I believe through the mail.  I could be wrong.

 9       Q.      The U.S. mail or e-mail?

10       A.      I don't recall, actually.

11       Q.      Is that how you were first notified by CSC that

12   you were no longer eligible for the AMIP?

13       A.      Yes.

14       Q.      You understood from this communication that you

15   would not be receiving any AMIP bonus at all, correct?

16       A.      I understood we weren't eligible for it

17   anymore.

18       Q.      You wouldn't be receiving an AMIP bonus for

19   FY '04?

20       A.      Seemed to indicate that, yes.

21       Q.      You continued to perform your job after you

22   learned you were no longer eligible for AMIP for FY '04,

23   correct?

24       A.      Correct.
```

W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kevin R. Keir

1    A.    Joined in May.

2    Q.    -- from DuPont to CSC.

3          Do you know anyone who was removed from

4    AMIP?

5    A.    No.  Other than leaving the company.

6    Q.    Were you given an explanation as to why you

7    would not receive an AMIP bonus for FY '04?

8    A.    I believe it's in the letter stating they just

9    reevaluated us and the plan.

10   Q.    Anything in addition to the letter?

11   A.    No.

12   Q.    I'd like to discuss all the communications,

13   including the letter.  I'm going to show you that now.

14         (Deposition Exhibit No. 35 was marked for

15   identification.)

16   BY MR. RAIMO:

17   Q.    Do you recognize this document, Mr. Keir?

18   A.    Yes.

19   Q.    Exhibit 35?

20   A.    Correct.

21   Q.    What is it?

22   A.    It's the letter notifying us that we weren't

23   eligible anymore.

24   Q.    For AMIP?

1     A.      For AMIP.

2     Q.      You were told that you were eligible for a

3   discretionary bonus up to $5,000 to $10,000, correct?

4     A.      Yes.

5     Q.      Depending on the circumstances as described in

6   the letter.

7     A.      Correct.

8     Q.      You were also told that you might be eligible

9   for AMIP in the future, correct?

10    A.      Yes.   If you met the CSC guidelines.

11    Q.      I see at the bottom of the letter you had an

12  employee note.  Did you write this note?

13    A.      Yes.

14    Q.      You recognize that the general economic climate

15  had worsened prior to your removal from AMIP, correct, at

16  CSC?

17    A.      There was a general economic downturn in the

18  whole economy, yes, including CSC, yes.

19    Q.      However, it was a bad year for CSC, 2003,

20  correct?

21    A.      As most companies, correct.

22    Q.      You appreciated that CSC needed to take action

23  to address that economic climate, correct?

24    A.      Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kevin R. Kerr

1   Q.    What is this?

2   A.    That was my estimate to our lawyers what I

3   believe the damage was.

4   Q.    This is just an estimate, right?  You can't be

5   accurate or precise as to what exactly your AMIP

6   calculation would be?

7   A.    This is the best we could come up with.  If we

8   learned what the percentage payout from CSC was that

9   year, we could apply that to the 22 percent I was

10  eligible for to get a more accurate one.

11  Q.    But you couldn't because you didn't receive an

12  AMIP worksheet that had --

13  A.    Correct.  I personally don't know what that

14  percentage was.

15  Q.    You didn't know the factors, the weightings,

16  etcetera, that would go into calculating your final AMIP?

17  A.    Correct.

18  Q.    In fact, you could have come up or calculated

19  or estimated your AMIP damages in another way, couldn't

20  you?

21  A.    Like I said, if we found out what the

22  percentage was that was paid to every eligible employee,

23  you could apply that to my 22 percent and that would be a

24  much more accurate one.

Kevin R. Keile

1    Q.    The way you did it here, the way you calculated

2  it here, could have taken a mean, couldn't you, rather

3  than the average or the median?

4             MR. WILSON:   Object to the form.

5  BY MR. RAIMO:

6    Q.    Yes?  No?

7    A.    Yes.  You could do it a number of different

8  ways.

9    Q.    You just picked this arbitrary way of

10 calculating your AMIP damages, but they should have been

11 for fiscal year 2004?

12            MR. WILSON:   Object to the form.

13 BY MR. RAIMO:

14   Q.    CSC can't even estimate what your fiscal year

15 2004 AMIP would have been because they don't have the

16 fiscal year 2004 AMIP worksheet, correct?

17   A.    I don't have it.

18   Q.    CSC doesn't have it, either.

19            MR. WILSON:   Object to the form.

20   A.    I don't know.

21   Q.    Other than the amount of the AMIP bonuses that

22 you claim CSC wrongfully withheld, are you seeking to

23 recover any other damages from CSC?

24   A.    Just the penalty per the Delaware law and the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 183**

Kevin R. Kell

1        A.      I believe it was 5.

2        Q.      The company has a right to make decisions to

3    save money and increase profits, correct?

4        A.      Correct.

5        Q.      And make business judgments in order to carry

6    those out?

7        A.      Correct.

8        Q.      Your problem in this lawsuit is that you don't

9    think that you should have been removed from AMIP because

10   of your contributions to CSC, correct?

11       A.      I'm not against that we were removed

12   necessarily.  I was against that it was done halfway

13   through the year without prorating it.  As I said in the

14   letter there, it seemed to be -- if the assumption was

15   that it was because of a downturn in the economic

16   climate, I thought another way could have been to reduce

17   the percentage for everyone, not just removed you.

18       Q.      When do you think that percentage should have

19   been implemented?

20       A.      It would have been -- if it was an economic

21   downturn, it should have been reflected in the final

22   calculation at the end of the year.

23       Q.      Are you aware that the company started planning

24   the fiscal year 2004 AMIP removal early in the fiscal

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)
              )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 16th day of February, 2006, the deponent herein, KEVIN KEIR, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

        I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

        I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


                *Kimberly A. Hurley*
                Kimberly A. Hurley

                Certification No. 126-RPR
                (Expires January 31, 2008)


DATED:    3/10/06



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 185**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
     v.                         )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
     Defendant.                 )

                Deposition of CHARLES D. FOLWELL, JR.,
taken pursuant to notice at the law offices of Potter
Anderson & Corroon, Hercules Plaza, 6th Floor,
Wilmington, Delaware, beginning at 8:55 a.m., on Friday,
February 17, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiffs

        LARRY R. SEEGULL, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY US LLP
          6225 Smith Avenue
          Baltimore, Maryland 21209-3600
          for the Defendant

                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL                                    A 186

1  first question?

2      A.      To both.

3      Q.      What was the answer?

4      A.      The answer was everybody at level 7 and below

5  was removed.  So that answered the question that I was

6  not singled out, and that answered the question of level

7  8 and above is eligible.  He gave the definition of

8  eligible.

9      Q.      So you understand that the change that was made

10  to the AMIP plan was not directed at you particularly?

11      A.      That's correct.

12      Q.      That it was a company-wide decision that was

13  made to change the eligibility rules?

14      A.      It was a decision not directed at me.  Did that

15  answer the question?

16      Q.      I don't think so.

17              MR. SEEGULL:  Can you read the question

18  back?

19              (The reporter read back as instructed.)

20      A.      I would say I understood it applied to my

21  group.  I did not have any idea what company-wide meant.

22  I don't know what's going on in Europe and other places.

23      Q.      Your group was which group, Chemical?

24      A.      Right.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.                                631

1   payment any one particular year?

2            MR. WILSON:  Object to form.

3      A.    I would say that I believe that's possible.  I

4   would not believe that's probable.

5      Q.    I'm not asking you what you think is likely to

6   happen or unlikely to happen.  I'm not asking you whether

7   or not generally AMIP payments were made, since we know

8   generally AMIP payments were made.  I'm asking you

9   whether there was any guarantee that the company would

10  make any payments.

11           Isn't it true that the company never

12  guaranteed you any AMIP payments or any other employee?

13           MR. WILSON:  Object to form.

14     A.    I don't recall ever hearing the word

15  "guaranteed" used for AMIP payments.

16     Q.    Or "promise" or any words to that effect,

17  correct?

18     A.    Correct.

19     Q.    What is your Social Security number?

20     A.    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.

21     Q.    Where were you born?

22     A.    Newport News, Virginia.

23     Q.    What's the date of your birth?

24     A.    9/25/56.

Charles D. Folwell, Sr.

1    lawsuits?

2        A.    Yes.

3        Q.    When did you first contact an attorney to

4    handle your case against CSC?

5        A.    I would say the best answer I could give is

6    within a month or two after the September letter, but I

7    don't recall an exact date.

8        Q.    How did you know who to contact?

9        A.    I received a letter in the mail.

10       Q.    Do you know who sent you that letter?

11       A.    I do not recall, no.

12       Q.    You don't recall at all who sent that letter?

13       A.    I don't recall whose name was on the envelope

14    at the time.  I believe it was associated with this firm,

15    but this firm has changed names.

16       Q.    You think it was one of the lawyers that sent

17    you the letter?

18       A.    I'm not sure.

19       Q.    It may have been an employee?

20       A.    That's what I think might have been who it was

21    from.

22       Q.    Do you know which employee?

23       A.    No.

24       Q.    Do you have a guess as to which employee?

Charles D. Folwell, Jr.

1    like a bonus.

2         Q.    How much was the bonus?

3         A.    One year I recall it was $800.    Another one I

4    recall was a thousand.    Those are the two I can recall.

5         Q.    Once you received notification that you were no

6    longer eligible for the AMIP program in September of

7    2003, you understood at that time that you would not get

8    an AMIP payment?

9         A.    Ever again.

10        Q.    Is that what you understood?

11        A.    Correct.

12        Q.    Any other awards or honors?

13        A.    Not that I recall.

14        Q.    Tell me about the positions you have held at

15    DuPont.    I understand you were there for 17 years?

16        A.    Correct.

17        Q.    That probably means you held a variety of

18    different positions; is that right?

19        A.    Correct.

20        Q.    Do your best to just tell me the different

21    positions you have held.

22        A.    I supported and taught a language called

23    Mark IV.    Then I supported and taught a language called

24    Focus.    Then I worked on replacing DuPont's 401(k)

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 190**

Charles D. Folwell, Jr.

644

1  system.  We replaced that.  I worked on building what was

2  called a billing information system, some new development

3  for DuPont.

4      Q.    So these are all different projects you worked

5  on?

6      A.    Correct.

7      Q.    What was your position?  Was it computer

8  scientist?

9      A.    Yes.

10     Q.    Computer programmer?

11     A.    Yes.

12     Q.    Are those the same things?

13     A.    Yes.

14     Q.    Did you basically hold the same position

15  throughout your time at DuPont, you just worked on

16  different projects?

17     A.    At one point I was the project leader.  At one

18  point I had some supervisory responsibilities.  There

19  were fluctuations in roles and responsibilities

20  throughout those projects.

21     Q.    How about the final position you held at

22  DuPont, what was that?

23     A.    Final position?  I was the technical leader of

24  the SAP R/2 Basis team.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 191**

Charles D. Folwell, Jr.                                              645

1      Q.     Were you ever subject to DuPont's bonus plan?

2      A.     No.

3      Q.     Do you know if DuPont had a bonus plan?

4      A.     Yes, I know.

5      Q.     It had one?

6      A.     Yes.

7      Q.     What was it called?

8      A.     I don't recall the formal name.

9      Q.     We have heard various names.  We have heard it

10    called incentive compensation.  We have heard it called

11    variable compensation.

12    A.     Yes.

13    Q.     Which one rings a bell to you?

14    A.     Both.

15    Q.     But you never received any bonus while you were

16    at DuPont?

17    A.     Not through that program.

18    Q.     Through another program?

19    A.     I recall getting bonuses for like at the end of

20    the project, the project was successful, you'd get a

21    check.

22    Q.     What you call spot bonuses?

23    A.     They would be part of a reward program of some

24    name.  So you would be nominated for an award because you

Charles D. Folwell, Jr.

646

1   did some outstanding work.

2       Q.    At some point you were transitioned over to

3   CSC.

4       A.    Correct.

5       Q.    And that was in July of '97?

6       A.    Correct.

7       Q.    That was along with all the other DuPont

8   employees that were in this group.

9       A.    I believe it was with the majority.  I don't

10  know what happened to everybody.

11      Q.    Because you were not subject to the DuPont

12  bonus plan, were you told anything about whether CSC had

13  a bonus plan?

14      A.    Yes.

15      Q.    Tell me about those conversations.

16      A.    The conversation I recall is my manager telling

17  me he was going to put me on CSC's bonus program after

18  being transitioned.

19      Q.    Who was that?

20      A.    Bill -- I'll recall his name eventually.  I

21  don't recall it at the moment.

22      Q.    This was your first manager after you started

23  with CSC?

24      A.    He was my manager on the day we transitioned.

Charles D. Folwell, Jr.

648

1    Q.    During this 1997 period.

2    A.    Anybody else.  I don't recall a conversation

3    with anybody else.

4    Q.    Your offer letter set forth the terms and

5    conditions of your employment with CSC?

6    A.    Okay.

7    Q.    Is that right?

8    A.    Was that a question?

9    Q.    Yes.

10   A.    That's my understanding.

11   Q.    The offer letter didn't say anything about a

12   bonus plan, correct?

13   A.    I do not recall anything mentioned about that.

14   Q.    So that is correct?

15   A.    It could have said you are not eligible for the

16   bonus plan.  I don't recall it saying anything.

17         (Deposition Exhibit No. 39 was marked for

18   identification.)

19   BY MR. SEEGULL:

20   Q.    Mr. Folwell, I'm now showing you what has been

21   marked as Exhibit 39.  Is this the offer letter you

22   received for transitioning from DuPont to CSC?

23   A.    It appears to be.

24   Q.    You received this in March of '97?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 194**

1    A.    Okay.

2    Q.    Is that right?

3    A.    I don't know what day it arrived in my hand.  I

4  see the date at the top of the page.

5    Q.    You signed it on March 27th, 1997, correct?

6    A.    Okay.

7    Q.    Is that right?

8    A.    That's my signature.

9    Q.    That's the date you signed it?

10   A.    Correct.

11   Q.    You did receive it in March of '97?

12   A.    They could have handed me this in February.

13  All I can tell you is that's my signature on March 27th.

14   Q.    That's the day you signed it?

15   A.    That's correct.  I don't know the day I

16  received it.

17   Q.    Do you have any reason to believe it was not in

18  March of '97?

19   A.    No.

20   Q.    Just to review the letter and tell me, does it

21  say anything about any bonus plan at CSC?

22   A.    I don't see anything that says anything about a

23  bonus program.

24   Q.    Do you have any documentation that you would

Charles D. Folwell, Jr.

1   AMIP plan?

2       A.    I think I also once saw -- the sheet I referred

3   to earlier was the one that had my name at the top that

4   said here's how my bonus was calculated.  I also recall

5   seeing a generic page that said here's how everybody's

6   AMIPs will be calculated this year, the weightings of

7   different categories.

8       Q.    You saw a completed worksheet for yourself?

9       A.    Correct.

10      Q.    You think it was in the year 2001.  And you saw

11  a generic worksheet for which year was that?

12      A.    I do not know.

13      Q.    What's your best estimate?

14      A.    2002.

15      Q.    Again, you think you only saw one of those?

16      A.    That's what I recall.

17      Q.    Are you aware of any other documents or have

18  you seen any other documents that refer or relate to

19  AMIP?

20      A.    Not that I recall.

21      Q.    The reason you think you're entitled to an AMIP

22  payment for that period of time in 2003 that we have

23  talked about is because you had received prior AMIP

24  payments since you came over to CSC.

Charles D. Folwell, Jr.                                    658

1    A.    Correct.

2    Q.    That is, you assumed you would continue to

3    remain eligible for any AMIP payment because nobody had

4    told you otherwise.

5    A.    Correct.

6    Q.    You assumed that, if you were no longer

7    eligible, somebody would tell you you're no longer

8    eligible.

9    A.    Correct.

10   Q.    We have been talking about the word "AMIP."

11   AMIP is the bonus plan that we're talking about, correct?

12   A.    Correct.

13   Q.    Do you know what the letters of AMIP stand for?

14   A.    I believe it stands for Annual Management

15   Incentive Program, but I'm not sure.

16   Q.    Tell me how AMIP works.

17   A.    You mean the last time I received it how it

18   worked?

19   Q.    Yes.

20   A.    Because I don't know how it works today.

21   Q.    Right.   During the period that you received it,

22   tell me how AMIP worked.

23   A.    It worked differently different years.

24   Q.    Explain that to me.



Charles D. Folwell, Jr.                           659

1          A.      My recollection is that first the program

2     worked on a combination of corporate or group goals and

3     personal objectives.  And I can recall having personal

4     objectives and that was on the worksheet I received.  My

5     personal objectives were listed with weights next to them

6     and how much they count towards the bonus.  That's how I

7     believe it started for me.

8                  The last year I received it there were no

9     personal objectives anymore.  So it was all corporate or

10    group goals.

11         Q.      If I understand you correctly, what you're

12    saying is the AMIP was a formula each year for how the

13    bonus would be calculated?

14         A.      Yes.

15         Q.      It wasn't a straight percentage, it was a

16    percentage that was calculated based upon different

17    factors?

18         A.      My total was the same, but the weightings

19    within that total would change.

20         Q.      When you say your total, you mean your total

21    maximum bonus percentage?

22         A.      I'm not sure that the word "maximum" would

23    apply because the formulas allowed for you to receive

24    more than that.  So you might call it a target number.

Charles D. Folwell, Jr.                                                660

 1        Q.    Your target percentage bonus stayed the same

 2    year to year?

 3        A.    No.

 4        Q.    That changed over time?

 5        A.    I started at one number and was promoted and

 6    raised to another number.

 7        Q.    What number did you start at?

 8        A.    I started at 10 percent and then I went to

 9    22 percent.

10        Q.    When did you go from 10 percent to 22 percent?

11        A.    I will have to guess around 2000.

12        Q.    Why did you go up in percentage?

13        A.    Because my manager told me you are now being

14    promoted to this level and this percentage.

15        Q.    What was the level you were being promoted to?

16        A.    I went from a level 5 to a level 6.

17        Q.    So your target changed in terms of your target

18    percentage, correct?

19        A.    Correct.

20        Q.    In addition to the target changing, the factors

21    of the bonus would change year to year?

22        A.    Correct.

23        Q.    I guess there were three categories of factors.

24    One category was corporate objectives?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 199**

1     A.    Could I hear all three --

2     Q.    Was that one category of factors, corporate

3 objectives?

4     A.    Okay.

5     Q.    Yes?

6     A.    I don't know that they're called corporate

7 objectives.

8     Q.    What did you call --

9     A.    Have objectives based on different levels of

10 the organization.  Whether one of them applied to the

11 whole corporation or not, I don't recall.

12     Q.    Weren't some of these things like earnings per

13 share?

14     A.    Yes.

15     Q.    Doesn't that apply to the whole corporation?

16     A.    Again, I don't know what happens in Europe and

17 Asia and Africa, whether that's another corporation.  I

18 don't know that.

19     Q.    CSC has an earnings-per-share figure.  You're

20 aware of that, right?

21     A.    Okay.

22     Q.    You're aware of that, correct?

23     A.    No, I'm not aware of that.

24     Q.    You know CSC has a stock price?