1      A.      Yes.

2      Q.      You've reviewed that stock price periodically?

3      A.      Yes.

4      Q.      You understand that that stock price is used to

5   calculate a figure called earnings per share, correct?

6      A.      Okay.

7      Q.      Am I correct or incorrect in that?

8      A.      I do not claim expertise in how these numbers

9   are calculated.  So I can't tell you that you're correct

10  or incorrect.

11     Q.      You don't know how earnings per share is

12  calculated?

13     A.      I do not know exactly how that's calculated.

14     Q.      Do you know generally how it's calculated?

15     A.      Yes.

16     Q.      Take the earnings and you divide it by the

17  number of shares, right, generally?

18     A.      Yes.

19     Q.      That's a corporate objective, right?

20     A.      Yes.  I would call that a corporate objective.

21     Q.      Fair enough.  So that's one category, corporate

22  objectives, right?

23     A.      Right.

24     Q.      Second category might be group objectives?

1    A.    Right.

2    Q.    That group might be for the Chemical Group?

3    A.    Correct.

4    Q.    And then there's a third category, at least for

5 some years, personal objectives, correct?

6    A.    Correct.

7    Q.    Some years there might not be personal

8 objectives, some years there would be personal

9 objectives.

10    A.    It was more like from 1997 till some point

11 there were personal objectives and then after that there

12 weren't any.  It wasn't a year-to-year.  The policy was

13 that and now the policy is this.

14    Q.    When you say "policy," you haven't told me that

15 you have seen any policy.

16    A.    I have seen the sheets that I have told you I

17 saw that showed how the numbers are calculated.

18    Q.    For you, you only saw one sheet is what you

19 said.

20    A.    Correct.

21    Q.    Maybe this is all speculation since you don't

22 know how it was calculated in the other years.  Is that

23 right?

24    A.    I know what my management has told me and that

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.                        664

1   is what they told me.

2       Q.      They told you that some years personal

3   objectives were included, some years they were not

4   included?

5       A.      Correct.

6       Q.      Within each of these categories different

7   factors are used?

8       A.      Yes.

9       Q.      Just as an example, in the corporate

10  objectives, some years earnings per share might be a

11  factor?

12      A.      Yes.

13      Q.      Some years the earnings per share might not be

14  a factor?

15      A.      Could be.

16      Q.      And some years operating income could be a

17  factor?

18      A.      Okay.  I don't know what that is.

19      Q.      Or revenue could be a factor?

20      A.      Okay.

21      Q.      Is that right?

22      A.      Yes.  I have seen these words.

23      Q.      And some years operating expenses could be a

24  factor.

Charles D. Folwell, Jr.                                    665

 1       A.    I don't recall that.

 2       Q.    Or return on investment, that could be a

 3   factor.

 4       A.    I definitely recall seeing the letters ROI.

 5       Q.    What are some of the other factors from a

 6   corporate-objective standpoint that you're aware of?

 7       A.    From a corporate standpoint?  I cannot give you

 8   any others.

 9       Q.    So those factors might change year to year.

10       A.    Yes.

11       Q.    In the group targets, what were some of the

12   group targets, and how did they change year to year?

13       A.    Group objectives would look like we want to

14   achieve CMM level 3.  So as an organization, we want to

15   get certified that we meet these criteria.  There would

16   be some mention of we want to have some measure of

17   business.

18       Q.    Revenue?

19       A.    Revenue.

20       Q.    Market share?

21       A.    No.  It would be more like revenue.  I don't

22   recall anything that looked like market share.

23       Q.    So the group objectives could change year to

24   year?

1    A.    Yes.

2    Q.    Some years group revenue might be a factor,

3  some years group revenue might not be a factor?

4    A.    Yes.

5    Q.    And then what were some of the personal

6  objectives year to year for you?

7    A.    Do you want type or examples?

8    Q.    Yes, examples.

9    A.    One example was that I would document a

10  procedure and install it in the knowledge repository.  So

11  this is an example where I would demonstrate that I have

12  learned how to do something or developed a procedure for

13  how to do something, and I would document it and make

14  that documentation available to everybody.

15    Q.    Give me some other examples.

16    A.    I have had objectives that look like I will

17  teach so many courses.  Objectives that read things like

18  I will serve as a mentor to younger employees.  Those are

19  some examples of what I recall.

20    Q.    Those objectives are consistent with your job

21  duties and responsibilities?

22    A.    Yes.

23    Q.    In addition to the objectives changing year to

24  year, I gather the targets would also change; that is,

Charles D. Folwell, Jr.

1   even if revenue was the same factor that was used in 1999

2   as in 2000, the target for revenue one year would be

3   different than the target for revenue the next year.

4       A.    The target would be different each year.

5       Q.    That would be true for all of the factors that

6   were used, whether it be earnings per share, revenue,

7   expenses?

8       A.    Yes.

9       Q.    And then, in addition to the targets changing,

10  the weightings would also change, right?

11      A.    Yes.

12      Q.    How much each of these factors was valued in

13  terms of the overall calculation to achieve the AMIP

14  bonus was changing?

15      A.    Yes.

16      Q.    So sometimes revenue might be worth 10 percent

17  towards the total calculation, other years it might be

18  25 percent.

19      A.    I would say yes, but I wouldn't agree that the

20  numbers would vary that much.

21      Q.    Might be 10 percent or 15 percent?

22      A.    More like 10 versus 11.

23      Q.    Some years personal objectives might be

24  15 percent of the overall calculation, other years they

Charles D. Folwell, Jr.                                    675

1          Q.     And the year that you were removed from AMIP in

2     fiscal year '04, you never received a worksheet that

3     year, correct?

4          A.     I don't recall seeing any sheets.

5          Q.     By the way, are you aware of anybody ever

6     receiving a prorata AMIP bonus?

7          A.     I am not aware of a specific person.  I seem to

8     recall people telling me that that happens.

9          Q.     Who told you that?

10         A.     I don't recall.

11         Q.     I may have asked you this, but what is your

12    current position?

13         A.     I program.

14         Q.     Who is your supervisor currently?

15         A.     My staff manager is still Debbie Cebula.

16         Q.     What does that mean, staff manager?

17         A.     That means the manager responsible for subjects

18    like compensation, but she doesn't get involved in the

19    day-to-day work.

20         Q.     Did you receive salary increases each year you

21    have been with CSC?

22         A.     I think so.  I know there's been years where I

23    didn't get a pay increase, but I'm thinking that was back

24    during DuPont.  So I don't recall exactly which year.

Charles D. Folwell, Jr.

676

```
 1        Q.      The first notification you had that you were no
 2   longer eligible for AMIP came in this September 11th,
 3   2003, letter, correct?
 4        A.      No.
 5        Q.      When did the first notification?
 6        A.      I got a phone call from Debbie Cebula.
 7        Q.      Tell me about that conversation.
 8        A.      She said that I was being removed from the AMIP
 9   program.
10        Q.      She called you?
11        A.      She called me.
12        Q.      Where is your work location?
13        A.      At Barley Mill Plaza.
14        Q.      Is that where Debbie is?
15        A.      No.
16        Q.      Where is she?
17        A.      She's in -- I think she sits over in New Jersey
18   now.
19        Q.      When did she call you?
20        A.      I would say a day or two before I got the
21   letter.
22        Q.      Did she tell you why you were being removed?
23        A.      Her comment was that everyone below level 8 was
24   being removed.
```

Charles D. Folwell, Jr.

677

1      Q.    Did she say she was being removed, too?

2      A.    She did not say those words.

3      Q.    Did she tell you anything else?

4      A.    On this subject?

5      Q.    During that conversation.

6      A.    I don't recall anything else being discussed.

7      Q.    Did you say anything to her?

8      A.    Yes.

9      Q.    What did you say?

10     A.    I probably expressed an opinion of

11   disappointment of some type.  I don't recall --

12     Q.    Do you recall what you said?

13     A.    I don't recall the exact words.

14     Q.    But you were clearly disappointed?

15     A.    Yes.

16     Q.    You said this is wrong or I'm disappointed?

17     A.    Yes.

18     Q.    Something to that effect.

19     A.    Yes.

20     Q.    She said what?

21     A.    I don't recall.

22     Q.    Do you recall anything else about the

23   conversation?

24     A.    No.

Charles D. Folwell, Jr.

678

1    Q.    Did she say you will be getting a letter

2    confirming this?

3    A.    I recall her saying something will follow, yes.

4    Q.    Then shortly thereafter, maybe a day or two,

5    you received a letter?

6    A.    Yes.

7    (Deposition Exhibit No. 40 was marked for

8    identification.)

9    BY MR. SEEGULL:

10    Q.    I'm now showing you what's been marked

11    Exhibit 40.  Do you recognize this?

12    A.    Yes.

13    Q.    This is the letter that we have been talking

14    about?

15    A.    Yes.

16    Q.    This is the letter that was given to you on or

17    about September 11th, 2003, telling you that you were no

18    longer eligible for AMIP, correct?

19    A.    Yes.

20    Q.    Do you know who gave this to you?

21    A.    I don't recall.

22    Q.    Did you receive it in person or through the

23    mail?

24    A.    I don't recall.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 210**

Charles D. Folwell, Jr.

679

1    Q.    You understood from this letter that your AMIP

2    eligibility was terminated as of that moment?

3    A.    I understood that I would not be receiving a

4    check at the end of that fiscal year.

5    Q.    You also were told that you would now be

6    eligible for a discretionary bonus, correct?

7    A.    That's what this letter says.

8    Q.    That's what you understood.

9    A.    I understood that that's what this letter says.

10         MR. SEEGULL:  Can you repeat the question?

11         (The reporter read back as instructed.)

12         THE WITNESS:  Correct.  The letter says

13   that.

14   BY MR. SEEGULL:

15   Q.    That's what you understood, that you would now

16   be eligible --

17   A.    I did not understand that.  I read that.

18   Q.    Were you confused by what the letter said?

19   A.    Correct.

20   Q.    Why were you confused?

21   A.    The letter does not tell me how, when, the

22   criteria for how this bonus will be distributed.

23   Q.    The discretionary bonus?

24   A.    Correct.

Charles D. Folwell, Jr.

690

1      Q.     How much is that in total damages?

2      A.     I don't know.

3      Q.     Put aside any penalties or interest or fees.

4 Just how much are you claiming you're owed in terms of an

5 AMIP bonus?

6      A.     Twenty-two percent of my salary at the time,

7 which was about $112,000 divided by two.

8      Q.     So is it fair to say 11 percent of your salary?

9      A.     Yes.

10     Q.     Your salary at the time you said was how much?

11     A.     I think it was around $112,000.  I have to go

12 back and look.

13     Q.     What's 11 percent of $112,000?

14     A.     Ten percent would be $11,000.  So it's about

15 12 and a half thousand dollars.

16     Q.     In your interrogatory answer you said that you

17 estimate your damages at $12,298.23.  Does that sound

18 correct?

19     A.     That sounds correct.

20     Q.     That is the amount that you claim you're

21 entitled to be paid for the AMIP bonus for April 1, 2003,

22 through September 11th, 2003?

23     A.     Correct.

24     Q.     That's just an estimate?

Charles D. Folwell, Jr.

691

1    A.    Correct.

2    Q.    And the reason you have to estimate is because

3    you don't know exactly how much the AMIP would have been?

4    A.    Correct.

5    Q.    You can't know that because you were never

6    provided a worksheet for that year?

7    A.    Correct.

8    Q.    There are other ways you could have estimated

9    the amount of your AMIP bonus, correct?

10    A.    Yes.

11    Q.    You could have taken the average of your AMIP

12    bonuses for prior years.

13    A.    I could have.

14    Q.    Why didn't you do that?

15    A.    I believe I was providing an estimate and the

16    proper thing to do is to find out what the number was and

17    use that.

18    Q.    In your calculation of your damages, you're

19    assuming that the full bonus was paid out, correct?

20    A.    I'm providing an estimate, and I recognize that

21    at the end of the fiscal year the actual number would be

22    known.

23    Q.    But in your estimate you are assuming that the

24    full bonus was paid out?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 213**

Charles D. Folwell, Jr.

692

1    A.    Since the bonus can be more than 22 percent, I

2    don't know the definition of "full."

3    Q.    The full target.

4    A.    The full target, correct.  As an estimate.

5    Q.    Was paid out?

6    A.    Correct.

7    Q.    You would agree that the company is entitled to

8    use its business judgment to determine the best way to

9    save money and increase profits?

10    A.    Generally, yes.

11    Q.    You would agree that the company has the right

12    to make sufficient decisions to save money, including

13    reducing people's bonuses?

14            MR. WILSON:  Object to form.

15    A.    Yes.

16    Q.    You just don't think that you should have been

17    removed from AMIP, correct?

18    A.    I disagree.

19    Q.    You think you should have been removed from

20    AMIP?

21    A.    I think I should have been removed from AMIP in

22    a different way.

23    Q.    You don't have a problem with the company

24    removing you from AMIP.  You have a problem that they

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)

               )

NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 17th day of February, 2006, the deponent herein, CHARLES D. FOLWELL, JR., who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

        I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

        I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


*Kimberly A. Hurley*

Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)


DATED: _____3/15/06_____


**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 215**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
    Plaintiffs,                 )
                                )
        v.                      )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
        Defendant.              )

        Deposition of ASHBY A. LINCOLN, III, taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 12:55 p.m., on Friday,
February 17, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

       TIMOTHY J. WILSON, ESQUIRE
       MARGOLIS EDELSTEIN
         1509 Gilpin Avenue
         Wilmington, Delaware 19806
         for the Plaintiffs

       LARRY R. SEEGULL, ESQUIRE
       DLA PIPER RUDNICK GRAY CARY US LLP
         6225 Smith Avenue
         Baltimore, Maryland 21209-3600
         for the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

A 216

Ashby A. Lincoln, III

1      Q.      They wouldn't have the information?

2      A.      That's correct.

3      Q.      Let's go back to talking about this as a

4   preliminary worksheet.  We were just talking about the

5   actual worksheet completed.

6              I know you mentioned before that you said

7   you saw this last saved on your computer I believe in

8   January of 2003.

9      A.      Correct.

10     Q.      Do you know when you received this document,

11  the preliminary worksheet, Exhibit 45?

12     A.      I don't recall exactly when I would have

13  received this document, but memory serves me that we

14  would do this exercise in October or early November.

15     Q.      In this case it would have been October or

16  November calendar year 2001 for fiscal year 2002.

17     A.      Correct.

18     Q.      You stated that your supervisor had given you

19  this document.

20     A.      That is correct.

21     Q.      Was it hand-delivered to you, was it mailed to

22  you, or was it e-mailed to you?

23     A.      No.  We met.  The top part of the form, the

24  financial objectives, were already on the form.  The

1    comments below under "Team and Individual Objectives"

2    would have been created by he and I.   Primarily me with

3    his concurrence.   That essentially was the same each

4    year.

5        Q.    The team and individual objectives?

6        A.    Yes.

7        Q.    Focusing on team and individual objectives like

8    you just said, what was the name of your team?

9        A.    Network Engineering Services.

10       Q.    That was every year, when you said every year?

11       A.    Every year.   Then it was called Network

12   Engineering Services.   Today it's called Managed Network

13   Services and it's the same.   Both names mean the same

14   thing.

15       Q.    Your overall objectives could have had the same

16   theme to it, but could they have also changed each year

17   about your objectives?

18       A.    Some could, but they would be along the lines

19   of I'm working on project A this year and next year I'm

20   working on project B.   We would have completed the

21   project with whatever the goals for the year were in

22   terms of what the projects were for DuPont.   One of the

23   years would have said complete refresher DuPont network.

24   Another one would have said remote access services for

1    Q.    I see that under "Individual" for "Customer

2  satisfaction to the highest degree possible."

3    A.    That is correct.

4    Q.    That's something that may not change all the

5  time.  But, for instance, No. 1 that says under "Team,"

6  "Provide New Technical Statement of Direction on a

7  monthly basis."  I'm not sure what the "new" means, but

8  it may be a new project that you're working on?

9    A.    That would mean that we were looking at

10  industry offerings, we were analyzing what the industry

11  had to offer, new service offerings, new tools, new

12  capabilities, new functionality, and we were charged with

13  doing that research and giving a report to DuPont monthly

14  on what we had seen and what we would recommend be

15  deployed to their environment.  And they could say yes or

16  no to that or thank you very much.

17    Q.    How about the weighting of these averages here?

18  I'm still under "Team and Individual Objectives."  Could

19  that have changed?

20    A.    Yes, that could have changed.

21    Q.    Going up to the financial objectives, "EPS,"

22  "Cost Budget," and "Cost Budget," it looks like under

23  "Measure," could those also have changed?

24    A.    Yes.  What you're looking at there, the

1    that the Attorneys would find that the removal/reduction

2    of the AMIP participation was in violation of our letters

3    of employment, they indicated to us that Delaware's

4    Employment at Will provisions strongly favor a

5    corporation's right to set salary, bonus, etc. at any

6    time to remain competitive."

7         A.    That's what it says.

8         Q.    The letter simply argues that CSC can't change

9    employee salaries and bonuses retroactively, correct?

10        A.    That's what it says, correct.

11        Q.    You're an at-will employee at CSC, correct?

12        A.    That's correct.

13        Q.    You're not claiming that CSC didn't have the

14   right to change your AMIP bonus at any time, correct?

15             MR. WILSON:  Object to form.  You can

16   answer.

17        A.    At any time?  I'm sure that they could change

18   the terms of the AMIP plan.  I'm not convinced that they

19   can change it retroactively.  I do believe they have a

20   right to run their business and change the plan

21   accordingly, but I do believe there's an obligation to

22   inform the participants that that change is taking place

23   currently, not retroactively.  And I do believe the bonus

24   is earned based on my participation and putting the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 220**

1  figures in the budgets and my experience in dealing with

2  people who got bonuses and when they were taken off.

3  This is different.  This was handled totally differently.

4  It was retroactive.

5       Q.    So you're saying your claim only entails the

6  beginning of the fiscal year, April 1st, 2003, through

7  September of 2003.  Some period of time you were notified

8  of the change in 2003.  That time frame of bonus prorated

9  bonus, that's what your claim is about?

10      A.    Yes.

11      Q.    But you do understand that CSC has the right to

12  make a change to its AMIP bonus as a business judgment in

13  order to remain competitive in the marketplace, seek

14  revenue to make profit?

15      A.    Absolutely.

16      Q.    Your annual performance reviews have nothing to

17  do with this case, do they?

18      A.    Not directly they don't.  However, if I had

19  been rated a 4, I would not have been eligible for the

20  bonus, period.  I would have gotten zero.  It does have a

21  play.

22      Q.    How do you know that?  How do you know if you

23  were rated a 4, you wouldn't have been eligible?

24      A.    Because I participated in people -- I had that

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 221**

1    going to be.

2        Q.    Was that on an annual basis?

3        A.    Yes.

4        Q.    After the end of, say, their fiscal year?

5        A.    Which was December 31st.  Bankers, they

6    actually did the bonus in November because they knew what

7    the numbers were going to be by that time.  They had

8    already calculated the numbers.

9        Q.    Before the end of their fiscal year?

10       A.    Yes.

11       Q.    They must have estimated --

12       A.    They knew what the numbers were going to be.

13   Only six weeks left in the year.  In the insurance

14   industry, you pretty much know what your revenue is going

15   to be.  You can reserve what you think your liability is

16   going to be and you can go from there.

17       Q.    Because of premiums being paid into the

18   insurance company?

19       A.    That's correct.  You knew what they were going

20   to be.

21       Q.    Doesn't work like a normal operating company?

22       A.    That's right.

23       Q.    A little different.

24             Mr. Lincoln, when did you start working at

Ashby A. Lincoln, III

1    CSC?

2        A.    October '98.

3        Q.    How did you get the position at CSC?

4        A.    When I had been in the insurance industry, we

5    used Continuum Company software packages and I knew

6    people at CSC, so I called one, told him I was looking

7    for a job.   That's how I got it.

8        Q.    Where was this?

9        A.    Austin, Texas.

10       Q.    What were you doing?

11       A.    Senior manager, property and casualty

12   insurance.

13       Q.    What business unit was that?

14       A.    Financial Services Group.

15       Q.    FSG?

16       A.    FSG.

17       Q.    You mentioned you were a senior manager there?

18       A.    Yes.

19       Q.    What were your duties there?

20       A.    Installing property and casualty systems for

21   insurance companies.

22       Q.    Who was your supervisor?

23       A.    John McCormick.

24       Q.    What was your SO level there as a senior

1    manager?

2        A.     6.   06.

3        Q.     What was your starting salary?

4        A.     Eighty-five thousand, I believe.

5               (Deposition Exhibit No. 46 was marked for

6    identification.)

7    BY MR. RAIMO:

8        Q.     Mr. Lincoln, the court reporter just handed you

9    Exhibit 46.  Do you recognize this document?

10       A.     Yes.

11       Q.     What is it?

12       A.     It's the offer letter dated September the 18th

13   from John McCormick, Computer Scientist.

14       Q.     The letter offers you a specific salary, right?

15       A.     Yes.

16       Q.     You were not made eligible to participate in

17   CSC's Management Incentive Program in this letter,

18   correct?

19       A.     That is correct.

20       Q.     When did you first become eligible to

21   participate in AMIP?

22       A.     When I went to the DuPont account.

23       Q.     When was that?

24       A.     August or September of 2000.  I believe it was

1   2000.   That's about right.

2       Q.    Was that an assignment or a transfer to the

3   DuPont account from your FSG position?

4       A.    That was a transfer.

5       Q.    Was that transfer originated by you or was it

6   done by CSC?

7       A.    Done by me.

8       Q.    Why did you transfer?

9       A.    Wanted to get back on the East Coast.   I don't

10   like Austin, Texas.

11       Q.    When you transferred to Newark, Delaware, who

12   was your supervisor?

13       A.    Carlos Rodriguez.

14       Q.    Do you know why you were not eligible for AMIP

15   when you were at FSG?

16       A.    It was never discussed when I interviewed for

17   the job, so I never knew of the bonus then.

18       Q.    Did you ever ask?

19       A.    No.

20           (Deposition Exhibit No. 47 was marked for

21   identification.)

22   BY MR. RAIMO:

23       Q.    Mr. Lincoln, the court reporter has handed you

24   Exhibit 47.   Do you recognize this document?

1     Q.    Interactive phone call or just a recording?

2     A.    It was an interactive phone call.

3     Q.    Were AMIP bonuses discussed?

4     A.    No.  It was just an orientation of CSC policies

5 and procedures, tell you CSC sources.  They gave you

6 direction on how to interact with HR, it would explain

7 the medical benefits, that kind of thing.  But it didn't

8 go into any of the customization-type things that would

9 have been outside of that umbrella.

10    Q.    You were rehired in January of 2004, correct?

11    A.    Correct.

12    Q.    During your orientation nothing was discussed

13 regarding AMIP bonuses?

14    A.    No.

15    Q.    You're currently in the AMIP bonus program now?

16    A.    No.

17    Q.    You're not?

18    A.    It's a different bonus program.

19    Q.    What is that?

20    A.    It's referenced in the letter that I have

21 taking me off AMIP bonus, it mentions in that letter that

22 you can be eligible for a $10,000 or $5,000 bonus at the

23 discretion of somebody.  And I am currently receiving

24 that bonus, but I did not receive that bonus the last

Ashby A. Lincoln, III

763

1    year I was at DuPont.

2        Q.      CSC you mean?

3        A.      Yes.   The gentleman that gave me the letter,

4    Tom Saienni, apparently had the option of giving me the

5    bonus, a new bonus, that's outlined in the letter which

6    does not cover the specifics, but he did not do that.

7        Q.      Is that a discretionary bonus, the new bonus?

8        A.      Right.

9        Q.      You were notified that you were no longer

10   eligible for the AMIP bonus in September of 2003,

11   correct?

12       A.      Yes.

13       Q.      Could you say the person's name again?

14       A.      Tom Saienni.

15       Q.      How do you spell that?

16       A.      S-a-i-e-n-n-i.   Something like that.

17       Q.      You continued to perform your job after you

18   learned you were not eligible for an AMIP bonus in

19   FY '04, correct?

20       A.      Right.

21       Q.      You continued to fulfill your job expectations

22   and duties, right?

23       A.      Yes.   Those didn't change.

24               (Deposition Exhibit No. 48 was marked for

1    identification.)

2    BY MR. RAIMO:

3        Q.    Mr. Lincoln, the court reporter has provided

4    you with what's been marked Exhibit 48.  Could you tell

5    me what this document is?

6        A.    That is the letter that I received from

7    Tom Saienni that explained to me that I was no longer

8    eligible for the AMIP program retroactive back through

9    April the 1st.

10        Q.    But you were told in this letter also that you

11    were eligible to earn a discretionary bonus.

12        A.    That is correct.

13        Q.    That's what you mentioned before, the same

14    discretionary bonus we talked about a minute ago.

15        A.    That is correct.  In fact, when I got this

16    letter from Tom, he told me I would be getting that

17    bonus, and I didn't get it, so I called Tom and he said,

18    "Oh, no, I didn't recommend that bonus for anybody."

19        Q.    So you didn't receive any discretionary bonus

20    as of that year?

21        A.    No.  I expected to get that one, as well,

22    because he did tell me I was going to get it.

23            MR. RAIMO:  Could we go off the record?

24            (Discussion off the record.)

1    that it had to be paid.  I believe it probably still

2    exists.

3         Q.    Is it a 3 percent salary increase or 3 percent

4    bonus?

5         A.    Bonus on the salary.

6         Q.    So it's not AMIP?

7         A.    It is not AMIP.  It's not an AMIP bonus.  I

8    don't recall what it was called.

9              MR. WILSON:  You're going to have to wait

10   until he finishes his questions.  It gets hard for her to

11   take it down if you're both talking at the same time.

12             THE WITNESS:  Okay.

13        Q.    Mr. Lincoln, if I could direct your attention

14   to Exhibit 48.

15        A.    Okay.

16        Q.    After you received this letter, you knew you

17   were not going to get an AMIP bonus, correct?

18        A.    Correct.

19        Q.    Mr. Lincoln, I want to talk about your damages

20   in this case.  What are your damages?

21        A.    Monetarily?

22        Q.    Yes.

23        A.    Approximately $10,000.

24        Q.    That's it?

1      Q.     This was an estimate, correct?

2      A.     That was an estimate.

3      Q.     The reason you had to estimate it is because

4  you never received an AMIP worksheet for FY '04?

5      A.     Correct.

6      Q.     You don't know what metrics or factors were

7  used in FY '04 to calculate the AMIP bonus?

8      A.     No.

9      Q.     When I say "FY '04," fiscal year '04.

10             There are lots of different ways you could

11 have calculated your AMIP bonus for fiscal year '04,

12 correct?

13     A.     Correct.  If I had the criteria and it were

14 different than the criteria had been in the past, I would

15 have been able to have a different factor.  Since the

16 bonus had always been 20 percent or close to 20 percent,

17 there was no reason for me to use any other factors.

18 There was no reason for me to assume anything else.  If I

19 had that information today, then I could factor it and I

20 suspect I would come up with the same.

21     Q.     Every year you received the same AMIP bonus

22 number amount?

23     A.     Yes.  If memory serves me correctly, I received

24 20 percent.  I'm pretty sure it was 20 percent because --

CERTIFICATE OF REPORTER

STATE OF DELAWARE)

                    )

NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 17th day of
February, 2006, the deponent herein, ASHBY A. LINCOLN,
III, who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                    _Kimberly A. Hurley_
                    Kimberly A. Hurley

                    Certification No. 126-RPR
                    (Expires January 31, 2008)


DATED: _____3/15/06_____

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 231**

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.       )
HAUCK, KEVIN KEIR, ASHBY       )
LINCOLN, KAREN MASINO, ROBERT  )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM    )
SPERATI,                       )
                               )
      Plaintiffs,              )
                               )
        v.                     )  C.A. No. 05-10-JJF
                               )
COMPUTER SCIENCES CORPORATION, )
                               )
        Defendant.             )
              Deposition of HECTOR L. CALDERON taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:40 a.m., on Thursday,
March 2, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

              TIMOTHY J. WILSON, ESQUIRE
              MARGOLIS EDELSTEIN
                1509 Gilpin Avenue
                Wilmington, Delaware 19806
                for the Plaintiffs

              LARRY R. SEEGULL, ESQUIRE
              DLA PIPER RUDNICK GRAY CARY US LLP
                6225 Smith Avenue
                Baltimore, Maryland 21209-3600
                for the Defendant


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters
ORIGINAL

A 232

Hector L. Calderon

793

1    September 11th, 2003 --

2        A.    Yes.

3        Q.    -- that you were no longer eligible for an AMIP

4    bonus.

5        A.    Yes.

6        Q.    So as of September 11th of 2003, you knew you

7    would not get an AMIP bonus payment at all, correct?

8        A.    After that point, after they told me.

9        Q.    At the point that they told you?

10       A.    Yes.

11       Q.    You knew that you would not be eligible or

12   receive any AMIP bonus.

13       A.    Going forward.

14       Q.    Going forward.

15       A.    Correct.

16       Q.    You also knew that they were not going to be

17   giving you an AMIP bonus for the period of time going

18   backwards.

19       A.    No, I didn't know that.  No.

20       Q.    The letter told you that it was effective as of

21   April 1.

22       A.    The way I understood the letter was that I

23   would not be eligible for future payments.  That's the

24   way I understood it.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 233**

794

1     Q.    At some point you learned that's not what the

2   letter meant.   You have not received --

3     A.    I did not get the checks, so yes.

4     Q.    At what point did you realize that what the

5   letter meant was you were not going to get any AMIP bonus

6   even for a period of time going backwards?

7     A.    Shortly after.   After discussions and asking

8   questions what's going to happen.   That's how I learned.

9     Q.    So maybe sometime within a couple of weeks

10  after September 11th, 2003, you understood you wouldn't

11  even get an AMIP bonus payment for any period of time for

12  fiscal year 2004.

13    A.    Right.   Correct.

14    Q.    By the way, just so we get this out of the way

15  early, when I refer to a fiscal year, you would agree

16  that the fiscal year runs from April 1 through the

17  following March 31?

18    A.    Correct.

19    Q.    So as an example, fiscal year 2004 would be

20  April 1, 2003, through March 31, 2004.

21    A.    Yes.   Correct.

22    Q.    You understood that, at least by the end of

23  September, maybe not the first day that you received the

24  letter, but by the end of September, you understood by



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 234**

1    the end of September 2004 that you would not receive any

2    AMIP bonus for any of fiscal year 2004.

3        A.    Yes.

4        Q.    What you are calculating now is $10,000, and

5    you're saying that's based upon taking 21 percent times

6    your fiscal year 2004 salary and then dividing it by two?

7        A.    Yes.

8        Q.    So essentially your fiscal year 2004 salary was

9    about $100,000?

10       A.    $98,000.

11       Q.    So really it should be a little bit less than

12   $10,000, right?

13       A.    Yeah, a little bit less.

14       Q.    Do you know how much less?

15       A.    No, I don't.

16       Q.    But to be precise, the way you would calculate

17   your damages if you were doing it down to the penny, it

18   would be to take your annual salary in your mind of

19   $98,000, multiply that by 21 percent, and then divide

20   that by two.

21       A.    Yes.

22       Q.    I haven't done the numbers, so I don't know

23   what that equals.  You don't know what that equals,

24   either?



WILCOX & FETZER LTD.
Registered Professional Reporters

806

1    A.    In 1985.

2    Q.    After you graduated, where did you go to work?

3    A.    I went back to Puerto Rico where I lived and I

4    worked for the government of Puerto Rico for one year,

5    Social Services Department, as a computer programmer.

6    Exactly after a year working there the

7    DuPont Company hired me as a systems analyst and I spent

8    nine years working for DuPont in Puerto Rico until they

9    relocated me to Wilmington.

10    Q.    So that was for what period of time that you

11    would have worked for them?

12    A.    So from 1986 to 1995, December 1995.

13    Q.    What did you do for DuPont during that period

14    of time?

15    A.    I was first a systems analyst and then I was

16    supervisor and I was then a consultant.  That's how I got

17    into SAP.  And I traveled for a year and a half between

18    the U.S. and Puerto Rico and Mexico, South America.  I

19    was basically traveling around the world, actually, and

20    when they figured that it -- I asked for it.  They would

21    relocate me.

22    Q.    To Wilmington?

23    A.    Yes.

24    Q.    During the time that you were at DuPont, did



Hector L. Calderon

807

1    you ever get any kind of bonus?

2        A.    In DuPont, the way it works is that, when you

3    reach a certain level, they recognize you with a variable

4    compensation bonus.  It's not only a bonus, several

5    components to variable comp.  So when I reached level 5

6    in DuPont, they gave me -- not 5, I'm sorry.  It was

7    level 4.  They told me I was going to get variable

8    compensation and I started the program.

9        Q.    Did you get that every year at that point?

10       A.    Yes.  In DuPont, unless you do something really

11   bad, you were in that program and you always earn it.

12       Q.    What year did you start to earn variable

13   compensation?

14       A.    It was in my last year in Puerto Rico.  So it

15   must have been -- I can't recall real well, but it must

16   have been the beginning of 1995, the end of 1994.

17       Q.    Would that have just been one year, because you

18   stopped working for DuPont at the end of '95.

19       A.    Well, no.  DuPont Puerto Rico was a subsidiary.

20   So I transferred to U.S.  For all intents and purposes,

21   it was still DuPont, but it was E.I. du Pont.  It was a

22   different company in legal terms.  But my variable comp.

23   transferred just like my seniority did.

24       Q.    So after December of '95 you continued to work



808

1   for DuPont?

2       A.    Correct.

3       Q.    In Wilmington?

4       A.    Correct.

5       Q.    Prior to that you had just been traveling

6   around?

7       A.    Yes.

8       Q.    And then starting what, January of 1996 --

9       A.    Yes.

10      Q.    -- you worked for DuPont in Wilmington?

11      A.    Yes.

12      Q.    You continued to receive the annual variable

13  compensation bonus?

14      A.    Yes.

15      Q.    You stayed with DuPont until when?

16      A.    I stayed with DuPont until the outsourcing deal

17  happened, which was the summer of 1997.

18      Q.    You would have received variable compensation

19  for the calendar year 1995 and the calendar year 1996 and

20  that's it, correct?

21      A.    Correct.  I'm sorry.  In 1997, before the

22  outsourcing deal happened, I did receive something,

23  because DuPont variable compensation and bonuses happened

24  between March -- I don't know now, but it used to be



A 238

811

```
 1        Q.     They were the administrator?

 2        A.     Yeah, the administrator of the variable comp.

 3   plan, because DuPont, most of the variable comp. went in

 4   stocks, so they gave you the stocks and put it in what

 5   they call a blueprint account.  So Merrill Lynch managed

 6   that.  So I remember receiving documentation from Merrill

 7   Lynch saying you have a variable comp. program and this

 8   is how much you're getting and the way they were managing

 9   it, managing the stocks and what my rights were, and

10   that's all I remember seeing.

11        Q.     Tell me about how you transitioned over to CSC.

12   Tell me about that.

13        A.     I learned through people talking about the deal

14   that some of us were going to go to Accenture and some of

15   us were going to go to Computer Sciences Corporation.

16   Because I knew many people in IT for so many years, I

17   think I could have asked to go to either.  But I was

18   offered to go to CSC.  I was told hey, you're going to

19   CSC.  And that's when I received the letter that I have

20   with me and you also have.

21        Q.     Yes.

22        A.     It was a great deal for me because I was --

23   right away I was going to make more money.

24        Q.     Because it was a higher salary?
```



WILCOX & FETZER LTD.
Registered Professional Reporters

812

```
1      A.    Yes.  Yes, exactly.

2      Q.    The letter, of course, references the AMIP

3 plan?

4      A.    Correct.

5      Q.    Other than the letter, were you provided any

6 other documents about the AMIP plan during the

7 transition?

8      A.    No.  I never saw any.

9      Q.    Other than the letter you received which we

10 will show you -- let me do that now.

11            (Deposition Exhibit No. 50 was marked for

12 identification.)

13 BY MR. SEEGULL:

14     Q.    Mr. Calderon, what we're now showing you as

15 Exhibit 50, do you recognize this?

16     A.    Yes.

17     Q.    What is this?

18     A.    This is the letter offering employment with CSC

19 and telling me the benefits -- not all the benefits, but

20 the information regarding AMIP, which was the most

21 important thing here to me, and other benefits, 401(k)

22 and compensation.  So this was not all of the benefits

23 that I was getting, but these were very important to me

24 at the time.
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Hector L. Calderon

820

1  details -- and that was it.  Nothing else.  You would not

2  know my performance.

3      Q.    She was not your manager?

4      A.    No.

5      Q.    So she was like an administrative person?

6      A.    It was called my manager, though.  I would

7  report through her.

8      Q.    You did?

9      A.    Yes.

10     Q.    During these conversations with Mary, she would

11 tell you, well, the categories are changing this year, or

12 you didn't discuss categories?

13     A.    We did, and the categories were always the

14 same.  The categories -- and I was looking at that last

15 night because I do have at least two -- it was the same

16 paper every year, same categories, customer satisfaction,

17 business ethics.  There were two of them, but there were

18 five or six.  So the categories would always be the same.

19 Now, how much weight they would give to each one, that

20 would change every year.

21     Q.    But some years different corporate financial

22 objectives were measured, correct?

23     A.    Correct.  And that was one category, financial

24 objective.  That was one category.



821

1      Q.     The category, that's what you mean by category.

2      A.     In the discussion we would say, hey, we don't

3  have any control over that, just keep doing what you're

4  doing, we don't have nothing to do with that.  If the

5  company as a whole met, then we get 100 percent.  If the

6  company did not meet that, then we get 85 percent of the

7  total, you know, weight of that category.

8      Q.     Within the category of financial performance,

9  there might be different factors that were used.  Some

10  years return on investment was used?

11      A.     I have no idea what went into that formula.

12      Q.     So you don't know the details of how the

13  formula was calculated at all for any of the years?

14      A.     No idea.

15      Q.     Do you know that the factors changed year to

16  year?

17      A.     Yes.

18      Q.     But you just don't know what the factors were?

19      A.     Correct.

20      Q.     That's on the category of financial

21  performance.  There were other categories of individual

22  performance, I gather?

23      A.     Yes.  And those would be --

24      Q.     Or group performance?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 242**

824

1    Q.    You're talking about the return on investment?

2    A.    Yes, but there were also customer satisfaction,

3    a category for customer satisfaction and another category

4    for business ethics, and I can't remember the other

5    categories, but there were specific categories that had

6    nothing to do with the other.

7    Q.    Did you get that in writing?

8    A.    Sure.

9    Q.    You would get that at the end of the year or

10   the middle part of the year?

11   A.    Both.

12   Q.    Your manager Mary would give you a written

13   document sometime in this October-to-December time frame

14   with written AMIP objectives.

15   A.    Yes.

16   Q.    And that was every year you would get that?

17   A.    Every year.

18   Q.    Those were specific objectives to AMIP you're

19   saying?

20   A.    Yes.

21   Q.    Apart and on top of your normal objectives?

22   A.    Yes.

23   Q.    And that would be for the fiscal year that you

24   were already in and you would have to work towards those



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 243**

Hector L. Calderon

825

1    in order to be eligible for the AMIP?

2        A.    Correct, yes.

3        Q.    I think it's clear, but I want to make sure.

4    The actual payment of the AMIP bonus would occur in what,

5    the June time frame?

6        A.    Yes.

7        Q.    And that would be the June following the close

8    of the fiscal year?

9        A.    Yes -- no.  It would be the same time period,

10   April through March.  It was just that I would get it

11   late.  We would get it a couple months late.

12       Q.    A couple months after the close of the fiscal

13   year?

14       A.    Yes.

15       Q.    Just as an example, you might receive a payment

16   in June 2003 or May 2003 and that payment would be for

17   the AMIP bonus for the prior fiscal year?

18       A.    Yes.

19       Q.    If you receive a payment in May of 2003, that's

20   for the AMIP period of April 1, 2002, through March 31,

21   2003?

22       A.    Yes.

23       Q.    That would be because the company would need

24   time to calculate whether or not it had achieved and



**WILCOX & FETZER LTD.**
Registered Professional Reporters

826

1    whether or not you had achieved and your group had

2    achieved all the objectives within the AMIP plan?

3        A.    That's what I thought.

4        Q.    It would take time to calculate it and the

5    books would have to close in the company before they

6    could evaluate and analyze the AMIP?

7        A.    Yes.  That's what I thought.

8        Q.    When they paid the AMIP to you, did you receive

9    a completed worksheet showing how it was calculated?

10       A.    Not how it was calculated.  We were told and

11   the document -- same table that we discussed, the same

12   table would have the percentage that was awarded to each

13   category.

14              So, for example, in the category of return

15   on investment, it would be 85 percent.  That's it.

16   That's all we saw on that table, the percentage, and then

17   the header of that document would have my specific

18   information, my salary, my percentage, my previous, my

19   current, my future salary based on my salary plus the

20   AMIP bonus.

21              It was personal information.  No.  That's

22   not it.

23              MR. SEEGULL:  Let's have this marked.

24              (Deposition Exhibit No. 51 was marked for



831

1    only showed you what the goals were.

2        A.    Yes.

3        Q.    Then in May they would come back with the same

4    table basically showing what had been achieved?

5        A.    Yes.

6        Q.    And then showing the total amount for the AMIP

7    that you were going to get?

8        A.    Yes, correct.

9        Q.    You got that each year you're saying?

10       A.    Yes.

11       Q.    In fiscal year 2004 you didn't get one of

12   those, correct?

13       A.    I'm thinking.  I can't remember.

14       Q.    By the way, the targets for each of these goals

15   changed every year.

16       A.    Yes.

17       Q.    That is, return on investment and operating

18   margins and revenue?

19       A.    Yes.

20       Q.    And customer satisfaction targets, all of those

21   changed each year.

22       A.    Yes.

23       Q.    You said that the weightings also changed each

24   year.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

832

```
 1        A.      Yes.  But I would not know the weightings.

 2        Q.      That was not something that you knew right

 3   away.

 4        A.      Correct, yes.

 5        Q.      Did you do anything differently as a result of

 6   having these discussions or did you just work as hard as

 7   you always worked and you didn't change how you worked at

 8   all?

 9        A.      That's a good question because I -- I was -- at

10   the time I wasn't too excited about my work, so I had

11   interviews with another company.

12        Q.      When is this?

13        A.      In 2004.  Fiscal year 2003.

14        Q.      Do you remember when you had interviews?

15        A.      I can't remember exactly what month, and I

16   tried to find that information, but I can't find it.

17        Q.      How many interviews did you go on?

18        A.      Two -- three.  Two phone and one in person.

19        Q.      This was in the year 2003 you're saying?

20        A.      Yes.

21        Q.      Why do you bring up these interviews?

22        A.      It is important because you asked what I did

23   different, and what I did different was that I did not go

24   to any other company -- to the other company because they
```

834

1   positions have you held?

2      A.   I came to CSC as a -- trying to think.  A

3   computer -- just a scientist, level 4-A.  And then I --

4   after a year in CSC I got a promotion to computer

5   scientist and I have stayed at that level ever since.

6   I'm at the top of that level.  I can't go any more at

7   that level.

8      Q.   What group are you in?

9      A.   In the SAP group.

10      Q.   Is that within the Chemical Group?

11      A.   That's within the Chemical Group.  Now has a

12   different name.  Now I think it's GIS.

13      Q.   Keeps changing names, but it's always the same

14   Chemical Group?

15      A.   Yes.

16      Q.   Who was the head of the Chemical Group in

17   fiscal year 2004?

18      A.   The head of the Chemical Group is

19   Nick Wilkinson.  That would be someone that I would never

20   really see or care about.

21      Q.   You have spoken to Nick Wilkinson about the

22   AMIP program?

23      A.   No.

24      Q.   By the way, other than the conversations you



837

1    e-mails.    Trying to prove that I received it.

2         Q.      So you didn't need to sign it you're saying?

3         A.      Correct.

4         Q.      You received an AMIP bonus each year you were

5    at CSC?

6         A.      Yes.

7         Q.      Up until fiscal year 2004?

8         A.      Yes.

9         Q.      Your salary you said increased each year --

10        A.      Yes.

11        Q.      -- while you were at CSC?

12        A.      Yes.    Less the cost of living, yes.    But, then

13   again, with the AMIP I would be happy.

14        Q.      What was your position at the time that you

15   were notified in September of 2003 that you were not

16   eligible for AMIP?

17        A.      Same as now, computer scientist.

18        Q.      What functional position were you in?

19        A.      Same as now, consultant.

20        Q.      In the SAP group?

21        A.      Yes.

22        Q.      Doing what kind of work?

23        A.      SAP consulting, it's the kind of work that you

24   learn the system that is used internationally, you help



Hector L. Calderon

838

1    your clients to install it, learn how to use it and

2    maintain it.  So I have done that in many different ways

3    from consulting in terms of helping people manage their

4    project and the past -- well, past few years, maintaining

5    it and also coming up with new solutions to problems.

6        Q.    You understand that CSC had the right to change

7    your eligibility for AMIP, correct?

8        A.    Yes.

9        Q.    You understood that there was no guarantee that

10   you could continue to receive AMIP, correct?

11       A.    Well, totally honest, I never --

12       Q.    You never considered it?

13       A.    Exactly, never considered it.

14       Q.    You never considered whether or not the company

15   had the right to terminate.

16       A.    Yes.

17       Q.    But you understand now that the company did not

18   guarantee that you could continue to receive AMIP every

19   year?

20       A.    I do understand that.

21       Q.    And you understand that the company has the

22   right to make changes to the AMIP program.

23       A.    Yes.

24       Q.    You also understand that you were an at-will



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters