839

1  employee, correct?

2      A.    Yes.

3      Q.    That means that the company could terminate

4  your employment at any time and you can terminate your

5  employment at any time.

6      A.    Yes.

7      Q.    Does the company have an intranet?

8      A.    Yes.

9      Q.    That's where they post various policies and

10  procedures related to compensation and other policies of

11  the company?

12      A.    Yes.

13      Q.    You've seen those various policies and

14  procedures related to compensation and other matters of

15  the company?

16      A.    When it matters to me and when they're

17  important to look at, I look at it.  It's a mess in

18  there.  There's thousands of documents and so I don't

19  look at any unless I need to look at anything.

20      Q.    Have you looked at any of the policies or

21  programs related to compensation?

22      A.    Yes.

23      Q.    That are posted on the intranet?

24      A.    Yes.



A 251

Hestor L. Calderon

846

BY MR. SEEGULL:

Q.    I'm now showing you what's been marked as Exhibit No. 52.  Am I correct that this is the letter that you received notifying you that you would not be eligible for the AMIP bonus for fiscal year 2004?

A.    Yes.

Q.    This was handed to you or sent to you?

A.    Sent to me.

Q.    You had said it was sent to you by Mr. Cummings, but I now look at it and it says Jay Smith?

A.    Cummings.

Q.    I'm sorry.  Mr. Cummings sent it to you?

A.    Yes.

Q.    How do you know he sent it to you?

A.    E-mail.

Q.    He e-mailed it to you.  Yes?

A.    Yes.

Q.    Did it say anything in the cover e-mail?

A.    This is it.

Q.    All it was was an e-mail address from him to you, the date, and this letter?

A.    Yes.

Q.    And the letter was an attachment?



```
 1        A.    I don't remember.
 2        Q.    But there was nothing beyond what was in this
 3   letter?
 4        A.    No.
 5        Q.    Correct?
 6        A.    Correct.
 7        Q.    Through this letter you were told that you·
 8   might be eligible --
 9        A.    You know, I'm sorry.  I have to go back,
10   because there were notes from -- there were notes from
11   Cummings on that e-mail.  I'm not sure I have it.  I
12   don't think I have it.
13        Q.    Do you remember what the notes said?
14        A.    He said something about I know this is
15   difficult times, I know these are difficult -- something
16   about the effect of this is a difficult time and a
17   difficult subject and something else and then this
18   followed.
19        Q.    That was all in the same e-mail?
20        A.    I can't recall.  I don't remember.
21        Q.    Do you remember him saying anything else in his
22   e-mail?
23        A.    I don't remember the rest of what he said.
24        Q.    You understood from this letter that you might
```



Hector L. Calderon

848

1    be eligible for AMIP in the future.

2        A.    I didn't understand it.

3        Q.    If you look on the letter, it says, "If at some

4    future date you should assume a role that is AMIP

5    eligible, your AMIP will be commensurate with the scope

6    of that assignment."

7        A.    Like I said before, it says that there, but

8    because -- you know what, before I said something wasn't

9    totally correct.

10       Q.    Okay.

11       A.    Because before Bill Cummings sent that e-mail,

12   this letter, this specific letter was handed to me by

13   Alan Kronmiller and that's when we had the discussion

14   around this paragraph.

15       Q.    About the discretionary bonus?  Is that about

16   the discretionary bonus?

17       A.    Yes.

18       Q.    So Alan Kronmiller handed you the letter,

19   Exhibit 52, and he told you that you're not getting the

20   AMIP.  I'm not getting the AMIP, either, I guess he said

21   to you?

22       A.    Correct.

23       Q.    And then he said but it says we're going to be

24   eligible for the discretionary bonus, but I don't think

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A 254**

850

1    A.    Correct.

2    Q.    Mr. Cummings told you in that e-mail that I

3    understand this is difficult times.

4    A.    Yes.

5    Q.    And you don't remember anything else that he

6    said?

7    A.    I don't remember.

8    Q.    Any other conversations about your removal from

9    AMIP eligibility?

10    A.    The next one -- the only other one was when I

11    did not return this because I was never asked to return

12    this.  I received another note from Bill Cummings again

13    saying how sorry he was and difficult times it was but he

14    needed -- HR needed this and if I wasn't going to sign

15    it, I was supposed to explain why.  That was all I got.

16    Q.    You never responded to that e-mail?

17    A.    No.

18    Q.    Correct?

19    A.    Correct.

20    Q.    By the way, the reason you have to estimate

21    your AMIP bonus for that period of time from April 1,

22    2003, through September 11th, 2003, was because you don't

23    know exactly how the AMIP would have been calculated for

24    that period of time.



851

1      A.      Correct.

2      Q.      You would agree that a company has the right to

3   make decisions to save money and increase profits?

4      A.      Yes.

5      Q.      And a company can use its business judgment to

6   decide what the best way is to do that?

7      A.      Yes.

8      Q.      And you would agree that fiscal year 2003 was a

9   very difficult year for the company financially.

10      A.      I don't have the numbers in front of me to be

11   able to respond to that, so I don't know.

12      Q.      Do you remember at all how the company did in

13   2003?

14      A.      I don't remember.

15      Q.      Do you know how long it took the company to

16   determine whether or not the AMIP program should be

17   changed or how it should be changed?

18      A.      I don't know that.  I don't have that

19   information.

20      Q.      Would you agree that directors have greater

21   responsibilities than senior managers and managers?

22      A.      Yes.

23      Q.      And that directors typically receive higher

24   compensation than senior managers and managers?



852

1       A.    Yes.

2       Q.    Would you agree that AMIP bonuses can't be

3   calculated midyear; you have to wait until the close of

4   the fiscal year to figure out whether or not the company

5   achieved its objectives?

6       A.    Yes.

7       Q.    Have you told me about all the people who have

8   personal knowledge about this case, as far as you know?

9       A.    Yes.

10      Q.    Do you have any debts at the present time?

11      A.    No.

12      Q.    Have you now told me everything that you know

13  or remember that forms the basis of your case?

14      A.    Yes.

15            MR. WILSON:  Object to the form.

16      Q.    Is there anyone else you have not mentioned who

17  can support your claims?

18            MR. WILSON:  Object to the form.

19      A.    No.  I mentioned all the names I know.

20      Q.    Is there any other information which you have

21  not mentioned which is relevant to supporting your

22  claims?

23            MR. WILSON:  Object to the form.

24      A.    I don't have any other -- no.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

       I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 2nd day of March, 2006, the deponent herein, HECTOR CALDERON, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


                Kimberly A. Hurley
                Certification No. 126-RPR
                (Expires January 31, 2008)


DATED:



WILCOX & FETZER LTD.
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
     v.                         )    C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
     Defendant.                 )

          Deposition of DAWN M. HAUCK taken pursuant
to notice at the law offices of Potter Anderson &
Corroon, Hercules Plaza, 6th Floor, Wilmington, Delaware,
beginning at 11:30 a.m., on Thursday,
March 2, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant


               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A 259

874

```
1       A.      I reviewed what was provided to my attorney
2   which would have been AMIP management guides, pay stubs,
3   and program-related communications.
4       Q.      So the AMIP program-related communications, are
5   those policy statements that the company publishes on
6   compensation for the Chemical Group?
7       A.      Somewhere what I would call policy statement,
8   the program, actual program guide.  Other was, for
9   example, this is what you will receive as a payout and
10  how it was broken down for the financial objectives that
11  were met for the course of the year.
12      Q.      Is that a worksheet?
13      A.      Yes.
14      Q.      Is this the kind of thing that you're talking
15  about?
16      A.      Yes.
17              MR. SEEGULL:  Let's have this marked as an
18  exhibit.
19              (Deposition Exhibit No. 53 was marked for
20  identification.)
21  BY MR. SEEGULL:
22      Q.      I'm now showing you what's been marked
23  Exhibit 53, and the title of the document is "Chemical
24  Group Compensation Programs North America Employee's
```



1    Guide April 1, 2001 - March 31, 2002," and it's Bates

2    labeled D-10462 through D-10484.

3                You said this was one of the guides that

4    you reviewed in preparation for the deposition?

5        A.    Yes.   The other was specifically the AMIP which

6    is a subset of this.

7        Q.    Let's only focus on Exhibit 53 for a moment.

8    We're not going through the details of this, but

9    Exhibit 53 was a document that you were provided by

10   e-mail or it was on the intranet?   Do you remember how

11   they distributed it?

12       A.    I was provided this guide when I was a managing

13   supervisor for the Chemical Group.

14       Q.    Just so you're clear, this is the employee's

15   guide.   There was also a version for managers?

16       A.    Absolutely.

17       Q.    The manager's guide was provided to you as a

18   manager?

19       A.    Yes.

20       Q.    And the employee's guide was distributed to

21   employees or available on the intranet?

22       A.    It was available to employees.   I personally

23   never received an employee's guide as an employee.   I

24   received the manager's guide and the employee's guide



Dawn M. Hauck

876

1   when I was a supervising manager.

2        Q.    But how did you receive it?

3        A.    I received it in a hard copy.

4        Q.    Just distributed to you by interoffice mail?

5        A.    I don't recall how it was distributed.  I

6   received it in a binder that said the title of what the

7   documents were.  They were tabbed as to where the

8   documents were, whether it was the manager's guide or the

9   employee's guide.

10       Q.    That's how you received Exhibit 53, correct?

11       A.    Correct.

12             (Deposition Exhibit No. 54 was marked for

13  identification.)

14  BY MR. SEEGULL:

15       Q.    I'm now showing you what's been marked as

16  Exhibit 54.  This is a document that's Bates numbered

17  D-10370 through D-10386.  This is another guide for

18  employees.  This is for the following fiscal year of

19  April 1, 2002, through March 31, 2003.  Correct?

20       A.    That's correct.

21       Q.    You would have also received this guide.  Would

22  you have received it by e-mail?

23       A.    I don't recall receiving this guide.

24       Q.    You know you received the guide for 2002?




1      A.    It did not include premium skills because it

2   was, again, specifically -- did not include PSPP.  But it

3   also then went into -- again, these were guidelines

4   around the current-year program and the future-year

5   program.  So it also discussed how the program was broken

6   out with the financial objectives.

7      Q.    You're talking about the worksheet now?

8      A.    No.  I'm talking about the program guide.

9      Q.    Is that a guide that you still have?

10     A.    I have a hard copy of it, yes.

11     Q.    You have the AMIP guide?

12     A.    Yes, I do.

13          MR. SEEGULL:  Tim, is that a document

14   that's been produced to us?

15          MR. WILSON:  I would imagine so, but I

16   can't say for sure.  If she's given it to us, I'm sure it

17   has been.

18          MR. SEEGULL:  I do not believe that we have

19   a separate guide for AMIP.

20   BY MR. SEEGULL:

21     Q.    Was it just one page?

22     A.    Again, as I said, it was approximately maybe

23   six pages.  It went through the program itself, the

24   background of the program.  It went through how



880

1  eligibility is determined.  It explained how every year

2  the program was an annual program, it was reviewed at the

3  beginning of each fiscal year each participant's

4  eligibility.

5      Q.    You still have a copy of that?

6      A.    I have a copy of that, yes, I do.

7      Q.    Do you have a copy of that with you?

8            MR. WILSON:  Is this what you're talking

9  about?

10           THE WITNESS: No.

11  BY MR. SEEGULL:

12      Q.    Do you have a copy of that with you, Ms. Hauck?

13      A.    No, I don't.

14           MR. SEEGULL:  What was the Bates number of

15  the thing you showed her?

16           MR. WILSON:  There is no Bates number on

17  this.  I'll verify that this has been produced because it

18  concerns me that there is no Bates number on this.

19      Q.    Do you know what the date of this AMIP guide

20  was?

21      A.    Again, I received them in fiscal year '99,

22  fiscal year 2000, and fiscal year 2001.  They were very

23  similar each year.

24           MR. SEEGULL:  Tim, do you know what she's



885

1    achievement numbers in them.

2        A.    That's correct.

3        Q.    You would receive these preliminary worksheets

4    in sometime between October and December of each year?

5        A.    We would receive them somewhere during the

6    course of the fiscal year.

7        Q.    Do you know when you would receive them?

8        A.    It was never a set time.  We didn't receive

9    them October 1st of every year.  We received them

10   somewhere during the course of the fiscal year with the

11   goals and objectives that we were working toward as a

12   corporation to achieve our bonuses.

13       Q.    Those preliminary worksheets would have the

14   corporate fiscal goals?

15       A.    For the program, yes.

16       Q.    As well as group goals and individual goals?

17       A.    If they pertained to that fiscal year.

18       Q.    Somewhere you might have had personal goals,

19   some years you might not have --

20       A.    Early years we had group goals or what I guess

21   you're referring to as a personal goal.  The later years

22   they were purely financial.

23       Q.    But if a particular year had personal goals or

24   group goals associated with them, they would appear on



886

```
1    that preliminary worksheet?

2         A.    We would add them to the preliminary worksheet.

3    The worksheet would come down from corporate, if you

4    will.  Our group would then determine what our group's

5    goals were, and they may or may not be on the worksheet

6    at the time.  It would depend on whether or not we needed

7    to add anything additional to that worksheet.

8         Q.    Once they were distributed to employees, they

9    would have all of the personal, group, and corporate

10   goals.

11        A.    Correct.

12        Q.    Because these worksheets were given to

13   employees, correct?

14        A.    They were given to us so that we knew what we

15   were working towards for -- for the current financial

16   goals.

17        Q.    By the way, are you speaking now as an employee

18   or when you were a manager?

19        A.    As an employee.  I never personally managed

20   employees on this program.

21        Q.    On AMIP?

22        A.    Correct.

23        Q.    Is it correct that the goals changed year to

24   year?
```



887

1      A.      The targets changed year to year.  There may

2  have been a return-on-investment goal in multiple years

3  of an AMIP program, but the targets certainly changed

4  year to year.

5      Q.      So some years return on investment was a

6  factor, some years was no.

7      A.      Some years return on the investment, the target

8  may have been higher or lower than previous or future

9  years.

10     Q.      But some years return on investment wasn't even

11  a factor?

12     A.      It may not have even been a factor, that's

13  correct.

14     Q.      Same with operating income, some years that

15  might have been a factor, some years not?

16     A.      That's correct.

17     Q.      Or earnings per share?

18     A.      That's correct.

19     Q.      And even if it was a factor year to year, the

20  target for those factors would change?

21     A.      May have changed, correct.

22     Q.      I'm not tying you into these numbers by any

23  stretch of the imagination.  Let's say the target for

24  revenue was $100 million one year.  The next year it



888

1  might be $110 million.

2      A.    It could be.

3      Q.    I'm not trying to tie you to those numbers in

4  any way.  I'm just giving you as an example.  Is that

5  correct?

6      A.    Yes.  They changed the percentages on operating

7  income or return on investment.  They changed what their

8  goals were depending upon the corporation's goals.

9      Q.    In addition to changing the targets, they also

10  changed the weightings for each of those goals, correct,

11  how much value the company was placing on each of those

12  goals in any one particular year towards the calculation

13  of the AMIP?

14      A.    They could have changed, as well.

15      Q.    Some years return on investment might have been

16  worth 10 percent.  Other years that might have been worth

17  12 percent towards the AMIP bonus.

18      A.    That's correct.

19      Q.    The same would be true for the personal goals

20  when they were included, that would change the

21  weightings, as well.

22      A.    That could change, as well, depending upon the

23  types of goals that were added by your management.

24      Q.    Give me some examples of different personal



WILCOX & FETZER LTD.
Registered Professional Reporters

A 268

889

1  goals or group goals over the years.

2      A.    It may have been client satisfaction.  Those of

3  us that were in client-facing jobs.

4      Q.    What else?

5      A.    Client satisfaction is a big one.  Again, those

6  of us that are in client-facing jobs, we do several types

7  of surveys.  One is corporation-wide for our client, and

8  that's the one that really sticks in my mind as that.

9      Q.    Those targets could change, as well.  Some

10 years it might be 75 percent client satisfaction.  Maybe

11 other years it may be 82 percent client satisfaction.

12     A.    It could be.  I don't recall as to how they

13 changed the particular personal goals.  As I had

14 mentioned earlier, personal goals, just like the

15 corporation goals, may or may not have changed depending

16 upon what the business unit was driving towards.

17     Q.    The same thing would be true with group goals.

18     A.    Correct.

19     Q.    You were in the Chemical Group?

20     A.    I was in the Chemical Group.

21     Q.    You have been in the Chemical Group the whole

22 time?

23     A.    I have been in the Chemical Group the whole

24 time.  I have been on different accounts within the



890

1   Chemical Group.

2       Q.     Not just DuPont?

3       A.     Not just DuPont.

4       Q.     Who was the head of the Chemical Group during

5   the time that you were in the Chemical Group?

6       A.     The first head of the Chemical Group was

7   Michael Beebe.

8       Q.     How about Nick --

9       A.     Nick Wilkinson.

10      Q.     Have you ever discussed with Mr. Wilkinson

11  anything related to AMIP?

12      A.     We had a discussion with Nick sometime early

13  November when the program was modified for us or we were

14  removed from the program.

15      Q.     Tell me about your conversation with him.  Who

16  was there, and what was discussed?

17      A.     It was the what I will call portfolio managers

18  or application delivery managers, my peers, we had

19  scheduled time to meet with him to better understand the

20  reasons for the program being -- we being removed from

21  the program.

22             The course of the discussion was more along

23  the lines of he didn't necessarily agree with what had

24  been done, it was corporate policy, he had done what he



1    Q.    How long were you married during that marriage?

2    A.    Twelve years.

3    Q.    Any children through that marriage?

4    A.    No.

5    Q.    Have you ever been arrested?

6    A.    No.

7    Q.    Ever convicted of any crime, felony or

8    misdemeanor?

9    A.    No.

10    Q.    Have you ever served in the military?

11    A.    No.

12    Q.    When did you first contact an attorney to

13    handle your case against CSC?

14    A.    It would have been in the fall of 2003.

15    Fall/winter.

16    Q.    How did you go about contacting an attorney?

17    How did you know who to contact?  Did you call them?

18    A.    I did not call them.  Again, Karen, Brian, and

19    I had spoken when we heard -- we all were notified and

20    decided to seek counsel to just, again, seek counsel to

21    see what our options were.

22    Q.    Who did that?  Who sought counsel?

23    A.    I don't recall if --

24    Q.    It was not you?



900

1    nonmonetary.

2        Q.    Could be simply a certificate of sorts?

3        A.    Correct.

4        Q.    Or a plaque?

5        A.    Certificate.

6        Q.    Any other awards or honors or any other

7    recognition that you have ever received?

8        A.    Similar type of recognition while I was also a

9    DuPont employee.

10       Q.    Anything else?

11       A.    No.

12       Q.    By the way, when you received the notification

13   that you were no longer eligible for AMIP in September of

14   2003, you knew as of that point in time you would not get

15   any AMIP bonus for fiscal year 2004?

16       A.    That's what the letter read.

17       Q.    That's what you understood?

18       A.    That's what I understood.

19       Q.    That's what happened.  You did not receive any

20   AMIP bonus for that fiscal year, correct?

21       A.    We understood that the program was being

22   retroactively removed dated back to April 1st, which was

23   the beginning of the fiscal year.

24       Q.    Just as you understood, you did not receive any



906

1      A.      That I don't know.

2      Q.      -- to calculate the annual bonus?  You don't

3   know?

4      A.      That I don't know.

5      Q.      For CSC there are formulas that are used to

6   calculate AMIP.

7      A.      We received a worksheet.

8      Q.      That translates into a formula.

9      A.      Correct.

10     Q.      By the way, at CSC is it also true that the

11  bonus is paid out after the close of the fiscal year?

12     A.      That's correct.  So they know what earnings or

13  operating income or the measures we achieved.

14     Q.      Against the goals?

15     A.      Correct.

16     Q.      You have to measure the performance against the

17  goals to see whether or not the targets were achieved

18  under the bonus plan?

19     A.      Prior to calculating payment for your

20  performance.

21     Q.      That would take a couple of months after the

22  close of the fiscal year to do those calculations?

23     A.      It was specified in whether it be an offer

24  letter or a program guide that typically within 45 days



Dawn M. Hauck

907

1    of the close of the fiscal year.

2        Q.    Is that typically how it worked?

3        A.    To the best of my knowledge.  I received my

4    payouts usually in mid to end of May which would have

5    been roughly 45 days after the close of the fiscal year.

6        Q.    By the way, are you familiar with anybody at

7    CSC who ever received a prorated AMIP bonus?

8        A.    Yes.

9        Q.    Who is that?

10       A.    Myself when I came into the corporation.  I

11   came in on June 1st, several months after the start of

12   the fiscal year.  And Brian Miller when he was included

13   back onto the program when he changed roles and he was

14   prorated based on the time that he was there for that

15   period in the fiscal year through the close of the fiscal

16   year after his new job changed.

17       Q.    Anybody else that you know that has ever

18   received a prorated AMIP bonus?

19       A.    No.

20       Q.    I just want to have you explain that.  For

21   yourself you received a prorated AMIP bonus for the

22   period of time you were at CSC during fiscal year 1998?

23       A.    Correct.

24       Q.    And Brian Miller, what year did he receive a



```
1   prorated AMIP bonus?

2       A.      I believe it was last year's.  So it would be

3   fiscal year '05 when he transitioned into a -- he

4   transitioned into a new job, and I don't recall if it was

5   an '05 or '04 fiscal year.

6       Q.      How do you know that he received a prorated

7   AMIP bonus?

8       A.      He told me.  Quite honestly, I asked him.

9       Q.      Why did you ask him?

10      A.      Because of what was going on.

11      Q.      What specifically did you ask him?

12      A.      I specifically asked him if he received --

13  knowing what his current level was and the role that he

14  was going into, I asked him if he was admitted back to

15  the program and if he received a prorated bonus.

16      Q.      You were hired by CSC you said in -- you

17  started in June of '97?

18      A.      Correct.

19      Q.      When you started, you were given an offer

20  letter?

21      A.      Yes.

22      Q.      That offer letter had language in it about

23  AMIP?

24      A.      Yes, it did.
```



909

1    Q.    Were there also orientation sessions?

2    A.    Yes, there were.

3    Q.    Do you recall anything being said about AMIP

4  during those orientation sessions?

5    A.    I don't recall specifics.  I know they

6  discussed in our orientation sessions when CSC was

7  working with DuPont, they were looking to make our

8  compensation comparable to what we were receiving in

9  DuPont in several areas.

10         So those orientation sessions covered if

11 you were on variable compensation, you would be

12 participating in the AMIP plan.  There were several

13 uplifts that they provided to us because the compensation

14 wasn't exactly the same, whether it be disability

15 insurance, healthcare, even participation in the 401(k)

16 plan.

17         So there were several things discussed

18 during those orientation sessions, with AMIP being geared

19 only towards those participating in variable

20 compensation.

21    Q.    Do you remember that orientation session where

22 AMIP was discussed?

23    A.    No.

24    Q.    Do you remember anything specific being



**WILCOX & FETZER LTD.**
Registered Professional Reporters

910

1    discussed about the AMIP program?

2        A.    That those of us that were on the variable

3    compensation program would be admitted to the CSC AMIP

4    program which was similar to the DuPont variable

5    compensation program in that it was an annual program, it

6    ran for the fiscal year based on corporate objectives.

7    That's the $50,000 view of what I remember on that

8    discussion.

9        Q.    Were you provided any documents related to AMIP

10   at that time?

11       A.    Not that I recall, no, other than what was in

12   our offer letter which was a very small paragraph that

13   said the program ran concurrent with the fiscal year,

14   April 1st through March 31st, that it was paid out at the

15   end of the fiscal year based on, again, after the fiscal

16   year closed out roughly 45 days after.

17            (Deposition Exhibit No. 55 was marked for

18   identification.)

19   BY MR. SEEGULL:

20       Q.    I'm now showing you what has been marked as

21   Exhibit 55.  Is this the offer letter that you received?

22       A.    Yes, it is.

23       Q.    This is the one we have been speaking about?

24       A.    That's correct.



912

1          From there I came back to the DuPont

2    account for a very brief period of time.  I did some work

3    on one of our government accounts just to help get them

4    up and running and started.  They needed to have several

5    hundred employees interviewed, and after two to three

6    months there, I went into the application environment as

7    a portfolio manager or an application delivery manager.

8    I held that role for several years.  The organizations

9    changed, the name changed, still the same job, but couple

10   different titles for it.

11          From there I went into the role I'm

12   currently in which is an account manager.

13        Q.    Did you receive an AMIP bonus for every year up

14   until fiscal year 2004?

15        A.    Yes.

16        Q.    How much were your AMIP bonuses each year?

17   Range, if you don't know specifics.

18        A.    My AMIP bonuses were -- I can tell you what my

19   eligibility was for the different years.

20        Q.    Okay.

21        A.    I was eligible for 20 percent of my salary, my

22   base salary, until 2000 -- until fiscal year -- up

23   through fiscal year 2000.  Fiscal year 2001 to present, I

24   was eligible for 25 percent of my base salary.



WILCOX & FETZER LTD.
Registered Professional Reporters

A 278

916

1     Q.    You were employed as an at-will employee?

2     A.    Yes.

3     Q.    Meaning that you could terminate your

4 employment at any time or CSC could terminate your

5 employment at any time?

6     A.    Yes.

7     Q.    Do you know how long it took the company to

8 determine whether to change AMIP eligibility and how to

9 change it?

10    A.    I have no idea.

11    Q.    You understand that the changes that were made

12 to AMIP were not particular to you.  They were changes

13 that were made across the board at your level.

14    A.    I understand that the changes were made across

15 the board, evaluating the various levels that were

16 participating in the program.

17    Q.    It wasn't just you that was removed?

18    A.    That's correct.

19    Q.    Anybody at your level that was removed.

20    A.    It wasn't anyone that was at my level because

21 there were individuals at my level that were still

22 receiving AMIP.

23    Q.    Who's that?

24    A.    Bob Carden.



A 279

921

1    A.    Not that I recall.

2    Q.    After sending this e-mail and receiving a

3    response, did you then receive written confirmation that,

4    in fact, you were removed from AMIP?

5    A.    We received a request to meet with Bob

6    regarding the AMIP program.

7    Q.    And Bob who?

8    A.    Tattle.

9    Q.    That was via e-mail that you received that

10   request?

11   A.    We received it via e-mail from his admin.

12   requesting that we make ourselves available to meet with

13   him, and it was at that point in time -- and I met with

14   him the end of September.  It was at that point in time

15   that I was given the letter saying I was being removed

16   from the program.

17   Q.    Did he tell you anything at that point in time

18   or did he just hand you the letter?

19   A.    I don't recall exactly what we discussed.  We

20   may have discussed some of what was already in the e-mail

21   because, again, we sent him that e-mail prior to us

22   receiving the letter.

23   Q.    But you don't remember what was discussed?

24   A.    No, I don't.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

922

1    Q.    After receiving the letter notifying you that

2  you were no longer eligible, did you have any

3  conversations with anybody else about the changes made to

4  the AMIP program?

5    A.    We then followed up -- we received the letter

6  from Bob.  We then followed that up with a meeting with

7  Nick Wilkinson.

8    Q.    That's the conversation we already talked

9  about?

10    A.    Yes.

11    Q.    Other than that, were there any other

12  conversations with anybody about changes to the AMIP

13  program?

14    A.    Not that I recall.

15         (Deposition Exhibit No. 57 was marked for

16  identification.)

17  BY MR. SEEGULL:

18    Q.    I'm now showing you what's been marked as

19  Exhibit 57.  Is this the letter that you received from

20  Bob Tattle?

21    A.    Yes, it is.

22    Q.    This is the one that tells you that you're no

23  longer eligible for AMIP for fiscal year 2004?

24    A.    Yes.



924

1    year objectives and KRAs will be set accordingly to

2    reflect the signer's resized total compensation package.

3    In addition, it is requested that written criteria be

4    forwarded to the signer for both the AMIP program and for

5    the new discretionary bonus program so that future

6    eligibility for either program is clearly understood."

7       Q.    What is following that?

8       A.    My initials.  I initialed that.

9       Q.    You understood there was no guarantee that you

10   would continue to receive AMIP, correct?

11                 MR. WILSON:  Object to the form.

12      A.    Correct.

13      Q.    You understood that CSC has the right to make

14   business decisions as to how to save money?

15      A.    Correct.

16      Q.    And that it can use its own business judgment

17   about the proper ways to make those decisions?

18      A.    Correct.

19      Q.    You never received a worksheet in fiscal year

20   2004, correct?

21      A.    Correct.

22      Q.    What are your damages in this case?

23      A.    The damages that I calculated were $10,510.

24      Q.    How do you arrive at that?



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A 282**

1    all objectives were achieved and payout would have been

2    at the 25 percent.

3        Q.    So if I understand you correctly, what you're

4    saying is you took the $22,800 and said what's been the

5    average payout against the maximum payout over the past

6    six years?

7        A.    Correct.

8        Q.    And that average payout was 92 percent.  You

9    multiplied the 92 percent by the $22,800?

10       A.    Correct.

11       Q.    Came up with $21,021.41?

12       A.    Correct.

13       Q.    Then you said I'm not entitled to all of that,

14   I'm only entitled to half of that for the April 1, 2003,

15   through the end of September of 2003.

16       A.    Again, this is what I considered to be my loss

17   over the six-month proration.  Not to include any other

18   additional legal allowances that may be allotted with

19   this case.

20       Q.    These are your damages?

21       A.    Correct.

22       Q.    The reason you have to estimate this is because

23   you didn't have a worksheet for fiscal year 2004,

24   correct?



927

1    A.    That I can't tell.

2    Q.    You don't know what was paid out in fiscal year

3  2004?

4    A.    No.

5    Q.    Correct?

6    A.    That's correct.

7    Q.    You would agree that fiscal year 2003 was a

8  tough financial fiscal year for CSC, correct?

9              MR. WILSON:  Object to the form.

10   A.    I would agree with that.

11   Q.    You don't have a problem with CSC removing

12  people from AMIP eligibility, do you?

13             MR. WILSON:  Object to the form.

14   A.    I don't have a problem with CSC modifying their

15  program or evaluating the criteria on an annual basis,

16  removing people or adding people as they see fit.

17   Q.    Has that been a trend at the company, to limit

18  the number of people that are eligible for AMIP?

19   A.    In the time that I have been with CSC, I have

20  not -- I have not heard of people being removed.  I have

21  heard of people being added.  It's not to say that they

22  did not remove people.  It's only been my experience that

23  I have heard of people being added to the program.

24   Q.    Would you agree that directors have greater



CERTIFICATE OF REPORTER

STATE OF DELAWARE)

               )

NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 2nd day of March, 2006, the deponent herein, DAWN M. HAUCK, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

      I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

      I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

                  Kimberly A. Hurley
                  Certification No. 126-RPR
                  (Expires January 31, 2008)

DATED:



WILCOX & FETZER LTD.
Registered Professional Reporters

A 285

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT  )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
     v.                         ) C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION, )
                                )
     Defendant.                 )

           Telephonic deposition of RUSSELL H. OWEN
taken pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:00 a.m., on Monday, May 8, 2006, before
Kimberly A. Hurley, Registered Merit Reporter and Notary
Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware 19806
            for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE (via telephone)
          DLA PIPER RUDNICK GRAY CARY US LLP
            6225 Smith Avenue
            Baltimore, Maryland 21209-3600
            for the Defendant

                    WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

**A 286**

Russell H. Owen                                10

1        Q.      What is your job title?

2        A.      Group President and Account Executive for BAE

3    Systems.

4        Q.      What's BAE Systems?

5        A.      That's the name of a company I support.  It

6    used to be formerly known as British Aerospace and

7    Marconi and they go by the name capital B, capital A,

8    capital E Space Systems.

9        Q.      What does that group do?

10       A.      The company itself is a defense electronics and

11   weapons system company similar to Lockheed or General

12   Dynamics, and I'm running the outsourcing engagement we

13   have with them worldwide, and their U.S. headquarters is

14   in Rockville, Maryland, and their U.K. headquarters is in

15   London.

16       Q.      Is this a subsidiary of CSC or is it CSC?

17       A.      BAE Systems is not CSC.  They're a client of

18   CSC's and I'm the account exec. that runs the piece of

19   our business that supports them and does business with

20   them.

21       Q.      I see.  How long have you held this title?

22       A.      A little over a year.

23       Q.      What did you do before that?

24       A.      I was the group president of Global

**A 287**

Russell H. Owen                          11

1   Infrastructure Services for CSC.

2       Q.    Can you tell me what Global Infrastructure

3   does?

4       A.    Global Infrastructure Services provides the

5   services that are resold to each of our clients through

6   account teams like the one I run presently.  And so the

7   people who do what we categorize as infrastructure

8   services, which would be networks, desktop, data center

9   work, midrange systems architectures, all of the

10  infrastructure-related nonapplication services, those

11  employees report to Global Infrastructure Services and

12  are assigned to account teams, and our job is to ensure

13  that they have the tools and the training and the

14  technology they need.  And we run all of what we call

15  leveraged facilities, data centers, help desks, things

16  like that, that are used by multiple clients.  So we are

17  a supplier to the account executives to provide services

18  to our client base.

19      Q.    How long did you hold that position?

20      A.    Three years, roughly.

21      Q.    What did you do before that?

22      A.    I was the president of the Chemical Group.

23      Q.    That's with CSC, as well?

24      A.    That's correct.  At the time it was a separate

**A 288**

Russell H. Owen                          12

1    division of CSC in Wilmington, Delaware, that supported

2    all of our chemical and energy accounts.

3         Q.    What do you mean by "supported"?

4         A.    It's the business unit that provides services

5    to those clients.

6         Q.    How long were you in that position?

7         A.    I was two years as the president of the

8    Chemical Group and before that I was in a similar

9    position as the account executive for the DuPont account

10   as a vice president.

11        Q.    When you say vice president for the DuPont

12   account, would there have been an interrelationship with

13   that with the employees that came from DuPont and began

14   working for CSC?

15        A.    The original contract was signed just prior to

16   my coming on board, and Mike Beebe was the president

17   responsible for that at the time.  I joined the account

18   and took it over a year after we signed and brought all

19   the employees over, and I ran it for two years, reporting

20   to Mike Beebe, who was the president of the Chemical

21   Group, and then I replaced him two years later.

22        Q.    So that would have been in about 1998?

23        A.    Roughly, yes.  I'm afraid I'd have to go back

24   and do the math.  That's about right.

**A 289**

Russell H. Owen                                16

1       A.      No.  To explain my position --

2               MR. SEEGULL:  You don't need to do that.

3    Wait for the next question.

4               THE WITNESS:  Okay.

5       Q.      Are you familiar with the AMIP program?

6       A.      Yes.

7       Q.      Do you have an understanding as to how it

8    works?

9       A.      I believe so, yes.

10      Q.      Could you explain that to me?

11      A.      Well, we have an annual incentive program for a

12   select number of top employees and it's designed to

13   incentivize employees who are in a position to really

14   uniquely further or contribute to our corporate

15   performance.  It's an incentive program set up around

16   defined objectives, and some of those are directed

17   individually at the employees, some of them are

18   corporate.

19              It's a program that runs through the course

20   of the year.  It's calculated and determined at the end

21   of the year, generally in the May time frame, after we

22   have closed our fiscal year and settled our financials

23   and reported to the street.  It's a compensation program

24   based on a percentage of their salary and a determination

Russell H. Owen                          17

1    of achievement of their performance against goals at the

2    end of the year.

3        Q.    So am I correct in understanding that, if you

4    meet certain goals, then you get a certain monetary

5    award?

6        A.    If you meet the goals and you are on the

7    payroll at the end of the fiscal year, assuming you are

8    correctly enrolled into the program, yes.

9        Q.    Do you know how long CSC's had the AMIP bonus

10   program?

11       A.    Honestly, no, I don't.  I joined CSC in 1992.

12       Q.    It was in place when you joined?

13       A.    That's correct.

14       Q.    This program follows the CSC fiscal year,

15   correct?

16       A.    Yes.

17       Q.    And that is from roughly April 1st through

18   March 31st, correct?

19       A.    That's correct.

20       Q.    The individuals participating in the program

21   have to be in that program at some point during the

22   fiscal year; is that correct?

23       A.    I'm sorry.  Would you reask your question?

24       Q.    Yes.  An individual has to be in the program

**A 291**

Russell H. Owen                    26

1      think he's referring to AMIP.

2                      THE WITNESS:  That would be my assumption,

3      yes.

4          Q.    Does this change your answer regarding whether

5      it's an entitlement?

6          A.    No.

7          Q.    Why not?

8          A.    I think the policy has always been clear and

9      it's a long-standing practice in CSC that this is not an

10     entitlement, that it's earned at the end of the year when

11     objectives are met that you have agreed with your

12     supervisor.  And we have always consistently maintained

13     that we can change the program and put people on and off

14     it throughout the period of time that I have been with

15     CSC.

16         Q.    Does this indicate to you that there may have

17     been some confusion among the CSC employees as to whether

18     it was an entitlement or not?

19         A.    My guess is that Bill misspoke, but I couldn't

20     speak for him.

21         Q.    Have you ever communicated with anybody else at

22     CSC that thought this was an entitlement program?

23         A.    No.

24         Q.    What about salary, is the AMIP bonus program a

**A 292**

Russell H. Owen                                29

1      Q.    Does this indicate to you that there may have

2    been some confusion at CSC as to whether the AMIP program

3    was salary?

4      A.    No.

5      Q.    Have you talked to anybody who has indicated

6    that the AMIP is part of salary?

7      A.    No, sir.

8      Q.    Is an individual's AMIP bonus earned by the

9    individual over the course of the fiscal year?

10     A.    No.  It's earned based on the results at the

11   end of the year and based on the calculation that's

12   approved in the spreadsheet.  The employee will take

13   action to ensure that those objectives are achieved at

14   the end of the year presumably throughout the year.

15     Q.    So actions that are taken during the course of

16   the year contribute to the final numbers in the final

17   calculation, correct?

18     A.    I would say they're necessary but not

19   sufficient.

20     Q.    What do you mean by "not sufficient"?

21     A.    You can't have earned your AMIP until the

22   calculation and the numbers come together at the end of

23   the year with the formulas in the spreadsheet.

24     Q.    Right.  But actions that these individuals do

Russell H. Owen                               30

1    during the course of the fiscal year contribute to that,

2    correct?

3        A.    It's assumed that they will be doing actions to

4    earn it throughout the year.

5        Q.    Assumed by whom?

6        A.    Well, by the leadership.  The purpose of it is

7    to incentivize them to hit that target at the end of the

8    year.

9        Q.    Without regard to when it's earned, would you

10   agree that it is a bonus that is earned?

11              MR. SEEGULL:  Objection.  Hypothetical,

12   calls for speculation, vague and ambiguous.

13              MR. WILSON:  You can answer, sir.

14       A.    I believe it's earned, yes.  I would believe it

15   is a bonus that is a reward for the performance that's

16   laid out on the spreadsheet, yes.

17       Q.    Are you eligible for the AMIP?

18       A.    Yes.

19       Q.    How long have you been eligible for it?

20       A.    I have been in the program since I joined CSC

21   in 1992.

22       Q.    Have you been informed every year that you're

23   eligible to participate?

24       A.    I have had a worksheet to sign off every year

Russell H. Owen                                31

1    since I have been in the program.  Yes.

2        Q.    Does this worksheet come out at the end of the

3    year?

4        A.    No.  The worksheet generally comes in the late

5    summer.

6        Q.    Was there ever a year that you didn't get the

7    worksheet?

8        A.    No.

9        Q.    Do you have employees that work for you that

10   are eligible for this program?

11       A.    Yes, I do.

12       Q.    Do you give them the worksheet every year?

13       A.    Yes, I do.

14       Q.    Is that generally in late summer?

15       A.    Yes.

16       Q.    Has there ever been an employee of yours that

17   you haven't given the worksheet to?

18       A.    Not to my knowledge, no.

19       Q.    From the beginning of the fiscal year until you

20   are given that worksheet, do you think you're still

21   participating in that program?

22       A.    I'm not exactly sure what you mean.  If I don't

23   have a worksheet, I don't have my objectives yet, so I

24   guess I would anticipate it, but I would become

Russell H. Owen                          32

1    increasingly concerned if I didn't have objectives set on

2    a worksheet to know what I was shooting for.

3        Q.    Has there ever been a year that you did not

4    receive an AMIP bonus?

5        A.    No.

6        Q.    To your knowledge, were any of the plaintiffs

7    in this lawsuit given notice of their ineligibility for

8    the AMIP program prior to September 2003?

9        A.    I don't know, honestly.

10       Q.    You were aware prior to September 11th, 2003,

11   that some individuals were going to be removed from the

12   AMIP program, correct?

13       A.    That's correct.

14       Q.    When did you first become aware of this?

15       A.    I don't clearly recall.  We started an effort I

16   remember, I think it was in the May -- April/May time

17   frame to review of the changes and some of the budget

18   pressures during that year, and I believe the activity

19   started in the May time frame.

20       Q.    You said "we."  Who is "we"?

21       A.    I was responsible for Global Infrastructure

22   Services at the time, the North American region, which

23   would include Global Infrastructure Services, Technology

24   Management Group, and what was called ASD at the time,

**A 296**

Russell H. Owen                                    35

1    Services Division.  Tony Doye is the president of TMG.

2         Q.    And the first line of this e-mail says, "I have

3    spoken with each of you about the need to restructure the

4    AMIP program for FY04 for budget reasons."

5         A.    Right.

6         Q.    Can you explain what that conversation was

7    about, what he said?

8         A.    In fiscal year '04 we had a rather severe

9    budget challenge in terms of decline in revenue from our

10   clients and we had to do cost-cutting.  We were in some

11   rather protracted discussions around layoffs and were

12   working on a number of cost-reduction initiatives that

13   impacted people, mostly around reducing force.

14               And the restructuring of the AMIP program

15   as we were going through many of those discussions, my

16   recollection on my staff was that the anomaly of the AMIP

17   program being applied nonuniformly across North America

18   was a problem area that we felt if we could fix that, we

19   wouldn't need to let as many people go.

20        Q.    The date on this e-mail is June 12, 2003,

21   correct?

22        A.    Correct.

23        Q.    So there had been no decision made as of

24   June 12, 2003, correct?

**A 297**

Russell H. Owen                    50

1    individuals in September of 2003 with the effective date

2    being April 1st, 2003, violated the ethics policy?

3        A.    No, I do not.

4        Q.    Can you explain why you believe that's an

5    ethical course of action to take?

6        A.    Well, I believe that the process that was

7    followed was fair and unbiased and used a lot of input

8    from affected management.  I believe it was in the

9    context of an array of very difficult actions, and from

10   my way of looking at it, it was a very humane balance

11   between spreading pain across the organization and

12   helping the organization to survive.

13               In my experience with CSC since 1992,

14   there's such a behavioral or a cultural understanding of

15   how this program is run, people will time their

16   retirements, will time their job and assignment changes

17   to occur after the end of the fiscal year because of the

18   eligibility rules around AMIP.  And I think that most

19   people wait for their bonus payments before they retire.

20   Most people wait for their bonus payments before they

21   change jobs.  And there was not any intent to communicate

22   to the employees that this was a pay-as-you-go type of a

23   program.

24               Some of our employees come from other

**A 298**

Russell H. Owen                                    51

1    employment background such as DuPont or General Dynamics

2    or others and I think sometimes they transpose the rules

3    from their prior engagements to their current ones.

4                    But from our perspective, CSC, for all the

5    years I have been a manager at CSC, from director up

6    through group president, we have always understood that,

7    until we have an executed plan and targets to shoot for,

8    we're not in the program and we must be on the payroll

9    and have that plan agreed at the end of the year to get

10   paid.

11                   And I would go so far as to say it's my

12   understanding that it's almost entirely discretionary and

13   my boss can alter my compensation based on factors that

14   may or may not be in the plan.

15                   So from my perspective, I didn't see this

16   as being unethical in any way.

17        Q.    You said that you're not in the plan until you

18   get your worksheet and your objectives.  Is that correct?

19        A.    And you have executed them.  Yes.

20        Q.    Was this communicated to your employees?

21        A.    I wouldn't know.  I don't know.  I know that we

22   have always had the practice of communicating the

23   worksheets and getting them signed off.  And the reason I

24   know that is that that's also the vehicle on which

Russell H. Owen                    63

1      A.      I believe so, because I saw it in the -- I saw

2   it in some of the earlier discussion.

3              MR. WILSON:  That's all I have for you

4   right now, Mr. Owen.  I appreciate you taking the time.

5              MR. SEEGULL:  Tim, let him finish his

6   answer.

7              THE WITNESS:  Let me just clarify.  I was

8   making a suggestion to the team to do this fairly.  When

9   you said this was implemented, I didn't mean to imply

10  that they ran a RACI test on every application and every

11  job title.  I made that a suggestion that they use that

12  in addition to assessing the job title.

13             MR. WILSON:  Okay.  That's all I have for

14  right now.  Mr. Seegull or Mr. Raimo may have some

15  questions for you.

16  BY MR. SEEGULL:

17     Q.      I have got a few questions.

18             Mr. Owen, I think it's clear from your

19  testimony, but I want to make sure that it is.  There was

20  some question about how do you know when AMIP is earned,

21  and you had mentioned something about being on the

22  payroll at the end of the year, assuming you were on the

23  payroll at the end of the year.

24             What did you mean by all of that?

**A 300**