Russell H. Owen                    64

1      A.    Well, you execute a worksheet that says that

2    you and your supervisor have agreed to the objectives

3    that you will hit, the things you will do to go earn your

4    AMIP, and that has to be executed and you're in the

5    program.  Given that you're in the program at the end of

6    the year, that's when the calculation is actually done.

7    And the reason for that is there are many factors that

8    involve the accomplishment or not of the AMIP that are

9    really unknown until the end of the year, and you really

10   need to have all the information at the end, generally in

11   the May time frame, to know whether an objective has been

12   hit.

13      Q.    You had said you have to be on the payroll at

14   the end of the year.  Did you mean you have to be on the

15   AMIP plan at the end of the year, as well?

16      A.    It's both.  You have to have an active plan and

17   be in the employ of the company, and this is why I

18   mentioned that many people alter their behavior to their

19   kinds of job changes, retirements, or resigning after the

20   AMIP payout in May.

21      Q.    Does that mean that AMIP is not earned -- let's

22   say somebody is removed during the middle of the year.

23   Is AMIP earned at that point in time?

24      A.    It is my belief that it is not.

**A 301**

Russell H. Owen                              65

1      Q.    Why is that?

2      A.    Again, there are usually factors at the end of

3   the year, for example, to calculate your financials.  The

4   performance throughout the year is not -- even a good

5   quarter is not an indication of the year.  There are many

6   things that have to be done and completed to do the

7   calculation at the end of the year, and there's really no

8   logical way -- you could make inferences on some

9   variables, but there's no concrete, logical way that you

10  could wind up having accomplished it with a proration

11  methodology.

12     Q.    Is the reason that AMIP is not an entitlement

13  because it's a bonus that depends upon performance at the

14  end of the year?

15     A.    I believe that's correct, yes.  To me the word

16  "bonus" implies discretionary to me.  It may not to all

17  people, but I believe it does.  And it is not earned

18  until the end of the year and it's a way -- if the

19  corporation at the end of the year does well, it's a way

20  that success is shared with the key contributors.

21     Q.    One moment, please.

22           MR. SEEGULL:  I have nothing further.

23  BY MR. WILSON:

24     Q.    I just have a couple very quick follow-ups.

**A 302**

Russell H. Owen                          66

1              You just testified that it would be

2    difficult to make inferences for the proration

3    methodology to give the bonus to somebody who was not a

4    participant at the close of the fiscal year.

5              My question to you is:  Then how is it done

6    for those who join the AMIP program in mid-year and are

7    members of the program at the end of the year?

8         A.    Well, I think there's an algorithm that's used

9    where, if the employee joins in the middle of the year

10   and finishes out the year, they will be there to meet the

11   two tests.  And there's not a proration of

12   accomplishment.  There's a proration of their salary

13   that's available for the test to be applied to.

14        Q.    But couldn't the same thing be done for

15   somebody removed midyear?

16        A.    Theoretically, except they didn't pass the test

17   of being in the program and I guess they didn't pass the

18   two tests.

19        Q.    Are you aware of anybody who was removed from

20   the AMIP program in midyear and continued to work for CSC

21   and still received their AMIP bonus at the end of that

22   fiscal year?

23        A.    No, I'm not.

24              MR. WILSON:  I have nothing further.

A 303

70

CERTIFICATE OF REPORTER


STATE OF DELAWARE)

                 )

NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 8th day of May,
2006, the deponent herein, RUSSELL H. OWEN, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Kimberly A. Hurley

        Certification No. 126-RPR
        (Expires January 31, 2008)


DATED:

**A 304**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.          )
HAUCK, KEVIN KEIR, ASHBY          )
LINCOLN, KAREN MASINO, ROBERT     )
W. PETERSON, SUSAN M. POKOISKI,   )
DAN P. ROLLINS, and WILLIAM       )
SPERATI,                          )
                                  )
      Plaintiffs,                 )
                                  )
      v.                          ) C.A. No. 05-10-JJF
                                  )
COMPUTER SCIENCES CORPORATION,    )
                                  )
      Defendant.                  )

                    Deposition of SUSAN J. ELTZROTH taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:05 p.m., on Friday, March 31, 2006, before
Kimberly A. Hurley, Registered Merit Reporter and Notary
Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware 19806
            for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
            6225 Smith Avenue
            Baltimore, Maryland 21209-3600
            for the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Dorothy J. Eltzroth                                    6

1        Q.      What's your job title?

2        A.      Director Human Resources, Shared Services,

3    Employee Relations, and Affirmative Action.

4        Q.      That's a long one.

5        A.      That's a long title.

6        Q.      How long have you held that title?

7        A.      Since 2002.

8        Q.      What did you do before that?

9        A.      I was HR director for the Chemical Group.

10        Q.      How long were you in that position?

11        A.      Since 1997.

12        Q.      How long have you worked for CSC altogether?

13        A.      Since 1991.

14        Q.      What did you do to prepare for today's

15    deposition, if anything?

16        A.      I met with counsel, Larry Seegull, for a few

17    hours.

18        Q.      When was that?

19        A.      Wednesday of this week.

20        Q.      When you say "a few hours," do you mean two,

21    three?

22        A.      I think it was about three hours.   Three or

23    four hours.

24        Q.      Did you review any documents?

**A 306**

Dorothy J. Eltzroth                    10

1    Q.    Do you have an understanding as to how the AMIP

2    program works?

3    A.    Yes.

4    Q.    Can you briefly explain how it works?

5    A.    Yes.   The program is generally reserved for

6    participation by senior-level individuals, meaning people

7    in senior-level titles.   There are financial, as well as

8    individual, objectives.   The program is for -- I should

9    say based on a fiscal -- CSC's fiscal year, and the

10   objectives are measured at the end of the year, and the

11   individual is eligible for potential award based on the

12   achievements of those objectives.

13   Q.    When you say "fiscal year," can you identify

14   what the fiscal year is at CSC?

15   A.    That's April 1 through March 31st.

16   Q.    Is the performance of the individual evaluated

17   throughout the fiscal year in the AMIP program in order

18   to receive his AMIP bonus?

19   A.    No.   The achievement of the objectives is

20   measured at the end of the year.

21   Q.    Those objectives,are they contributed to during

22   the fiscal year, the entire fiscal year?

23   A.    They could be.   Depending upon the objectives

24   and the individual participation.

**A 307**

Dorothy J. Eltzroth                    15

1    DuPont pension plan and, second, as if they continued to

2    be part of the CSC pension plan, and those eligible

3    individuals would then receive the higher of the two

4    payments.

5        Q.    Do you know how long CSC has had the AMIP bonus

6    program?

7        A.    No.

8        Q.    Is it fair to say that the AMIP program is an

9    incentive program?

10       A.    Yes.

11       Q.    Can you tell me what it's based on?

12       A.    I can describe the program as I have

13   participated in it and what it was based on.

14             It's based on financial objectives for the

15   corporation and it's based on financial objectives that I

16   personally have responsibility for, as well as

17   nonfinancial objectives that I agree with with my

18   manager.

19       Q.    Would those be characterized as corporate

20   objectives?

21       A.    The financial objectives are corporate

22   objectives, yes.

23       Q.    Are there group objectives?

24       A.    There could be, yes.

Dorothy J. Eltzroth                    16

1      Q.    What are group objectives?

2      A.    Group objectives are generally financial

3    objectives, in my experience.

4      Q.    When you say "financial objectives," what do

5    you mean by that?

6      A.    For example, revenue, operating income, margin,

7    day sales outstanding, perhaps return on investment.

8      Q.    So these different categories, revenue,

9    operating income, are these categories that are

10   contributed to by the business throughout the fiscal

11   year?

12     A.    I think that's a fair characterization.  All of

13   the business units' financials roll up into the corporate

14   financials, yes.

15     Q.    In order to be eligible to receive an AMIP

16   bonus, you would have to be participating in the program

17   during the fiscal year, correct?

18          MR. SEEGULL:  Objection.  Go ahead, you can

19   answer.

20     A.    You'd have to be eligible to participate and

21   you would have to continue to be eligible to participate

22   and be employed with CSC at the time the bonus payouts

23   are calculated and earned and then, in fact, paid out.

24     Q.    So is it your testimony that, if you're removed

**A 309**

Dorothy J. Eltzroth                          17

1    from the program prior to the payout, you're not eligible

2    to receive the AMIP bonus?

3        A.    Yes.

4        Q.    For any portion of the year?

5        A.    Yes.

6        Q.    People who are added to the AMIP program during

7    the fiscal year, are they eligible for the AMIP bonus?

8        A.    If they follow the same conditions.  If they

9    continue to be eligible and they're employed at the time

10   the bonus payouts are calculated and then paid out.

11       Q.    If they're only in the program for six months

12   out of the fiscal year, do they get a full AMIP bonus?

13       A.    No.

14       Q.    Or is it prorated?

15       A.    It would be prorated for the time that they

16   joined the program.

17       Q.    But you don't prorate it for people who are

18   removed?

19       A.    No.  Not that I'm aware of.

20       Q.    The AMIP bonuses are prorated based upon the

21   number of months that you're in the program, correct, if

22   it's prorated at all?

23       A.    In my experience, when someone joined and was

24   eligible to participate for a portion of the year, then

**A 310**

Dorothy J. Eltzroth                    20

1    BY MR. WILSON:

2        Q.    In your experience at CSC, when people have

3    been removed, have they been told within a reasonable

4    time?

5                MR. SEEGULL:  Objection.  Lack of

6    foundation.

7    BY MR. WILSON:

8        Q.    Have people been removed from the AMIP program

9    during the fiscal year?

10       A.    Yes.

11       Q.    When these people have been removed, have they

12   been told within a reasonable time that they have been

13   removed from the program?

14       A.    Yes.

15       Q.    Once you're deemed eligible, once an employee

16   is deemed eligible for the AMIP bonus, his or her

17   participation continues until they're notified that they

18   are no longer eligible to participate, correct?

19               MR. SEEGULL:  Objection.

20       A.    No.

21       Q.    Why is that?

22       A.    First of all, the program is based on a fiscal

23   year.  So at any given point in time, if you're eligible

24   to participate and you're aware that you're eligible to

Dorothy J. Eltzroth                    21

1    participate by agreement with your manager, then the

2    understanding is that it's based on that fiscal year

3    objectives.  So there is no opportunity, nor is it

4    reasonable, to think that, if you were a participant in

5    one year, you would continue being a participant in

6    subsequent years.

7        Q.    In general, do the managers go to their

8    employees at the beginning of the fiscal year and say

9    listen, you're in this year or you're not in this year?

10       A.    Yes.

11       Q.    That typically happens?

12       A.    Yes.

13       Q.    At the beginning of the fiscal year?

14       A.    That has been my experience.

15       Q.    Do you believe that the AMIP bonus is an

16   entitlement?

17       A.    No.

18       Q.    Who's William Bancroft?

19       A.    That is a name of a vice president within CSC.

20       Q.    If Mr. Bancroft characterized the AMIP as an

21   entitlement, would that change your mind?

22       A.    No.

23       Q.    Would Mr. Bancroft be in a position to

24   understand the AMIP program and whether or not it was an

1      A.    No.

2      Q.    Do you know if Gary Lewis held a position at

3  CSC higher on the corporate ladder than yours?

4            MR. SEEGULL:  Objection.  Asked and

5  answered.

6            MR. WILSON:  I don't think she did answer.

7            MR. SEEGULL:  I thought she said she did

8  not know his position.

9            MR. WILSON:  She could know whether he's

10 higher up than her.

11           MR. SEEGULL:  If you know the answer, you

12 can answer.

13     A.    I don't know.

14     Q.    Are the AMIP bonuses earned by the participants

15 over the course of the fiscal year?

16     A.    No.

17           MR. WILSON:  I'd like to have that marked.

18           (Eltzroth Deposition Exhibit No. 1 was

19 marked for identification.)

20 BY MR. WILSON:

21     Q.    Take your time and look over that document, if

22 you would.  I'm not going to ask you about the entire

23 document, just several pieces of it.

24           Have you ever seen this document before?

Dorothy J. Eltzroth                          26

1    with the statement in this CSC document.

2                    MR. SEEGULL:  I don't know what that means,

3    agrees with a statement in a document that was drafted in

4    1983.  She wasn't involved at all in drafting the

5    document.

6                    If you understand the question, you can

7    answer.

8    A.    The fiscal year is the measurement period for

9    measuring and assessing performance.

10   Q.    And the performance of the eligible

11   participants is evaluated throughout the course of the

12   fiscal year, correct?

13   A.    No.  It's evaluated at the end of the fiscal

14   year.

15   Q.    It's evaluated at the end of the fiscal year,

16   but the performance throughout the fiscal year is what is

17   evaluated.

18                    MR. SEEGULL:  Objection.  Asked and

19   answered numerous times now.

20                    MR. WILSON:  I don't think it has been.

21                    MR. SEEGULL:  I don't think you like the

22   answer, but you have asked it numerous times.  She's

23   answered it.

24                    MR. WILSON:  You can answer the question.

**A 314**

38

CERTIFICATE OF REPORTER

STATE OF DELAWARE)

)

NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 31st day of March, 2006, the deponent herein, DOROTHY J. ELTZROTH, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

      I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

      I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

      Kimberly A. Hurley

      Certification No. 126-RPR
      (Expires January 31, 2008)

DATED:

**A 315**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.         )
HAUCK, KEVIN KEIR, ASHBY         )
LINCOLN, KAREN MASINO, ROBERT  )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM      )
SPERATI,                         )
                                 )
     Plaintiffs,                 )
                                 )
     v.                          ) C.A. No. 05-10-JJF
                                 )
COMPUTER SCIENCES CORPORATION, )
                                 )
     Defendant.                  )

              Telephonic deposition of MARY JO MORRIS
taken pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 2:10 p.m., on Monday, May 8, 2006, before
Kimberly A. Hurley, Registered Merit Reporter and Notary
Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware 19806
            for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE (via telephone)
          DLA PIPER RUDNICK GRAY CARY US LLP
            6225 Smith Avenue
            Baltimore, Maryland 21209-3600
            for the Defendant

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

**A 316**

Mary Jo Morris                                    8

1    A.    Two years.

2    Q.    So freshman and sophomore year.  No degree from

3    there?

4    A.    No.

5    Q.    Are you presently employed by CSC?

6    A.    Yes, I am.

7    Q.    What is your present job title?

8    A.    President, Global Transformation Solutions.

9    Q.    What do you do in that position?

10   A.    I run a business unit for the corporation that

11   specializes in application-related services.

12   Q.    How long have you held that position?

13   A.    Since May 2003.

14   Q.    Did you work for CSC prior to that?

15   A.    Yes.

16   Q.    What position did you hold then?

17   A.    A variety of positions.  I've worked for CSC

18   since 1991.

19   Q.    What was the most recent to the president of

20   Global --

21   A.    Transformation Solutions?

22   Q.    Yes.  Let's just go back in time.

23   A.    Prior to that I was the executive in charge of

24   our relationship with AT&T Corporation, and prior to that

**A 317**

Mary Jo Morris                              9

1    I was president of our Technology Management Group.

2         Q.    What years were you the executive in charge of

3    AT&T?

4         A.    That was just a year prior to this assignment.

5    So I think it was from like June or July.  That would

6    have been July 2002 until May 2003.

7         Q.    And the position previous to that?

8         A.    Was president of the Technology Management

9    Group.

10        Q.    What were the years you were in that position?

11        A.    I believe it was March 2001 until July 2002.

12        Q.    What about the position prior to that?

13        A.    Prior to that I was president of the

14   Application Services Division.

15        Q.    And the years?

16        A.    You're testing me now.  I think it was -- I

17   think it was 19 -- 1999 or 2000.  I'd have to look at my

18   records.  I'm not absolutely sure.

19        Q.    Were you working for CSC in 1997?

20        A.    Yes, I was.

21        Q.    Do you know what you were doing that year?

22        A.    I was working in some capacity related to

23   application services for CSC.  I was a vice president.

24   I'm sure of that.  And I was, I think, working to help

Mary Jo Morris                          30

1    no end date, but that evaluation period really can occur

2    any time over the following year, but generally it occurs

3    within the first, I don't know, four, five, six months.

4        Q.    Are managers or directors supposed to have a

5    conversation with their employees as to their eligibility

6    for the program?

7        A.    Yes.  And there should be a signed document,

8    actually, that confirms that eligibility.

9        Q.    When does that take place?

10       A.    As I said before, it's sometime after the start

11   of the new fiscal year and, in my experience, has

12   extended as far out usually four to six months after.

13       Q.    During those four to six months, how are the

14   employees supposed to know they're eligible?

15       A.    I guess they can, say, talk with their

16   management if they have concerns about that to understand

17   exactly what's going on with the program.

18       Q.    If someone's added to the program, are they

19   notified immediately?

20            MR. SEEGULL:  Objection to the phrase

21   "immediately."

22   BY MR. WILSON:

23       Q.    Within a short period of time, in your

24   experience, Ms. Morris?

**A 319**

Mary Jo Morris                                    32

1    A.    Again, I think it depends.  In most cases we --

2    I guess it depends, but in most cases we obviously try to

3    get the timing down so it coincides with the assignment

4    for which they're now AMIP-eligible.

5    Q.    Are you aware of any instance, any specific

6    instance, where a person was notified that he was

7    eligible and his eligibility went back in time?

8    A.    Yeah, I can probably think of some

9    circumstances --

10   Q.    Okay.

11   A.    -- where they were notified four months into

12   the fiscal year and eligibility went back to the start of

13   the fiscal year.

14   Q.    Okay.  Can you name them?

15   A.    Not off the top of my head.

16   Q.    Once an individual is deemed eligible for the

17   AMIP bonus, his or her participation continues until

18   they're notified that they're no longer entitled to

19   participate, correct?

20        MR. SEEGULL:  Objection.  Mischaracterizes

21   the record.

22        MR. WILSON:  You can answer, ma'am.

23   A.    I'd say that is not my understanding of the

24   program; that, in fact, eligibility is reviewed from year

**A 320**

Mary Jo Morris                              33

1   to year.  So you really can't make an assumption that,

2   because you are in it one year, you are in it the next

3   year.

4        Q.    Are you eligible for the AMIP program?

5        A.    Yes, sir, I am.

6        Q.    At the beginning of the fiscal year prior to

7   getting your worksheet, does it ever cross your mind

8   whether you're going to remain AMIP-eligible?

9        A.    No, not generally.

10       Q.    Why not?

11       A.    ·I guess I keep in contact with my boss enough

12  that I would understand early on if there were going to

13  be changes to the program or changes in my eligibility,

14  but I think I just communicate enough between corporate

15  HR and my boss that I have pretty good visibility to

16  what's going on with the program, and so from year to

17  year I don't expect a lot of changes from a special

18  standpoint.

19       Q.    Absent that expectation, you would just assume

20  that you're going to remain eligible, correct?

21            MR. SEEGULL:  Objection.

22       A.    I think I'm not so naive to think that I'm

23  entitled to it from year to year, but certainly I have an

24  expectation that, as long as I'm performing, I will be

**A 321**

Mary Jo Morris                          34

1    part of the plan.

2                I also understand that, at any given point

3    in time, the company could completely change the whole

4    program and, in fact, could do away with it at any

5    particular time to take it to an extreme and that the

6    program is basically at their pleasure.

7                So while, yes, I have an expectation around

8    that, I also understand that I am serving the company at

9    their pleasure and they could change it at any time and

10   that would be the way it was.

11        Q.    Do you view the AMIP bonus as part of your

12   salary?

13        A.    No, sir.  It's not part of my base pay.

14        Q.    Do you view it as part of your compensation?

15        A.    Yes, sir, it is part of my total compensation.

16                MR. SEEGULL:  Tim, do you have a lot more?

17                MR. WILSON:  I have a little bit.

18                MR. SEEGULL:  Maybe we should just take a

19   break.  It's been about an hour.

20                MR. WILSON:  Okay.  Ten minutes good?

21                MR. SEEGULL:  That sounds good.

22                (A recess was taken.)

23   BY MR. WILSON:

24        Q.    You ready to start, Ms. Morris?

Mary Jo Morris                               39

1          A.     Are you referencing the third bullet or the

2     total document?

3          Q.     No, the third bullet.

4          A.     I would assume it was just a reminder to

5     employees that their participation in this program is at

6     the discretion of the company.

7          Q.     Was there any concern that employees may not be

8     aware that the participation is reviewed each year and

9     that they may have assumed there was a guarantee of

10    continued participation?

11         A.     I don't remember having any specific concern

12    about that.

13         Q.     When did you first become aware that people

14    were considering removing some of these employees from

15    the AMIP program?

16         A.     Well, when I took the job in May 2003, it was

17    shortly after that that I became aware that there had

18    been a broader discussion around the eligibility of

19    employees in the AMIP program, and now that I was in the

20    position, it was appropriate for me to get involved in

21    that.  So we were trying hard to have consistency across

22    the three major business lines that operate North

23    America.  So we had a number of discussions to that

24    effect to make sure that we did have consistency in how

Mary Jo Morris                    40

1    we went about making these changes and communicating

2    them.

3        Q.    How did you first become aware that this was a

4    consideration?

5        A.    You know, I don't remember exactly.  I can

6    guess that the Human Resources Department began to speak

7    to me about it.

8        Q.    Who made the final decision as to move forward

9    with this?

10       A.    It was a joint decision.

11       Q.    Between whom?

12       A.    It would have been myself and Russell and

13   Tony Doye.

14       Q.    Who is Russell?

15       A.    Russ Owen.

16             MR. SEEGULL:  There's no S on end of his

17   name.

18             MR. WILSON:  So I hear.  At least I said

19   Tony Doye, though.

20             THE WITNESS:  Gus Siekierka was also a --

21   would have been the principal of HR.

22   BY MR. WILSON:

23       Q.    Did you raise any issues regarding any concerns

24   you had over this proposed action?

Mary Jo Morris                              43

1          Ms. Morris, that's all I have at this time.

2    I appreciate you making yourself available.  Mr. Seegull

3    or Mr. Raimo may have some questions for you at this

4    time.

5    BY MR. SEEGULL:

6        Q.    Just a few questions.

7          Ms. Morris, are you aware of any employee

8    by name who was ever given a prorata payment after being

9    removed from the AMIP plan midyear?

10       A.    No, I can't think of one.

11       Q.    You said you could think of some examples of

12   employees not getting AMIP at the end of the year when

13   they were removed during the course of the year.  Is that

14   right?

15       A.    Yeah, I'm aware of circumstances.

16       Q.    Can you tell me some circumstances where that's

17   occurred?

18       A.    I can't think of any specific examples at this

19   time.  I think I'm just generally aware that that has

20   occurred.  I can't think of a specific example.

21       Q.    Even though you can't think of names, can you

22   think of situations, whether it's a demotion,

23   termination, a transition to a different position?

24       A.    Certainly a termination is a good example of

**A 325**