

# Line Directors (S07)

- Cap Directors at 30% max entitlement ( 9 over 30%)

The following chart should be used as a guideline in determining each Director's entitlement unless contractual commitment dictates otherwise:

| ANNUAL P&L BUDGET | AMIP % |
|---|---|
| <$20MM | 0% |
| $20MM to $40MM | 10% |
| $40MM to $60MM | 15% |
| $60MM to $80MM | 20% |
| $80MM to $100MM | 25% |
| $100MM + | 30% |

- Remove all 21 non-Directors (i.e., Principal Computer Scientist, Member Executive Staff) from plan
- All those taken out of AMIP would be eligible for a discretionary bonus of up to $10,000

CSC Proprietary  3/24/2005 12:03:41 PM 008_P2_fmt_wht  4

D-10124
CONFIDENTIAL

A 385



## Staff Directors (S07)

- Directors with no financial responsibility assessed on individual basis depending on scope of role. Consider scope, complexity, geographical focus, people responsibility, and technical aspects of current role. Examples of staff directors are:
  - HR
  - F&A
  - New business support

- Standard range of 10%-30% should be utilized

CSC Proprietary 3/24/2005 12:03:41 PM 008_P2_fmt_wht 5

D-10125
CONFIDENTIAL

A 386



- **Senior Managers (S06)**
  - Take all 197 staff out of AMIP
  - All Senior Managers are eligible for a discretionary bonus of up to $10,000 regardless of past participation in AMIP

- **Managers (S05) and below**
  - Take all 97 staff out of the AMIP
  - All Managers are eligible for a discretionary bonus of up to $5,000 regardless of past participation in AMIP

CSC Proprietary   3/24/2005 12:03:41 PM 008_P2_fmt_wht   6

D-10126
CONFIDENTIAL

A 387



# Discretionary Bonus Plan

- Based on achieving KRAs (key result areas) in GPARS set at the beginning of the fiscal year
- Paid during same timeframe as AMIPs
- Limit for S07 and S06 is $10K
- Limit for S05 is $5K

CSC Proprietary  3/24/2005 12:03:41 PM 008_P2_fmt_wht 7

D -10127
CONFIDENTIAL

A 388



# Reward and Recognition

- Also known as spot bonuses
- Eligibility for cash awards
  - Non-management S06 and S05 (i.e., Senior Computer Scientist, Computer Scientist)
  - S04 and below
  - All non-exempt grades
- Eligibility for company store items
  - Everyone
- If nominating manager is not the manager of employee receiving the cash award, then the employee's manager must also approve

CSC Proprietary   3/24/2005 12:03:41 PM 008_P2_fmt_wht 8

D-10128
CONFIDENTIAL

A 389



CSC Proprietary 3/24/2005 12:03:41 PM 008_P2_fmt_wht 9

## Summary

- AMIP redesign results in substantial cost savings
- Consistency within and among TMG, GIS and GTS
- Consistency with other North American business units such as Federal Sector
- AMIP components and weighting to follow shortly
  – Better alignment among TMG, GIS and GTS to be achieved
- Pay for performance plan addressing the larger population will be proposed in the future

D -10129
CONFIDENTIAL

A 390

LEXSEE 2001 DEL. SUPER. LEXIS 364

PAUL C. SEITZ, Plaintiff, v. THE SIEGFRIED GROUP, LLP, SIEGFRIED & SCHIEFFER, LLP, SIEGFRIED CONSULTING, LLP, and SIEGFRIED RESOURCES, LLP, Defendants.

C.A. No. 99C-12-025-CHT

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2001 Del. Super. LEXIS 364

March 15, 2001, Submitted
October 2, 2001, Decided

**DISPOSITION:** [*1]

Motion for Partial Summary Judgment on the Complaint and Motion for Summary Judgment on the Partnerships' Counterclaim denied. Partnerships' Motion for Summary Judgment on Their Counterclaim granted in part and denied in part.

**COUNSEL:** David H. Williams, Esquire and Elizabeth A. Brown, Esquire, MORRIS JAMES, HITCHENS & WILLIAMS LLP, Wilmington, DE, Attorneys for the Plaintiff.

Jeffrey M. Weiner, Esquire, Wilmington, DE, Attorney for the Defendants.

**JUDGES:** TOLIVER, JUDGE.

**OPINIONBY:** TOLIVER

**OPINION:**

**OPINION AND ORDER**

**On the Defendants' Motions**

**for Partial Summary Judgment**

**and**

**On the Plaintiff's Motion**

**for Partial Summary Judgment.**

**TOLIVER, JUDGE**

**FACTS**

The Plaintiff, Paul C. Seitz, is an accountant and the Defendants n1 are providers of accounting services to various persons and/or entities. On July 1, 1993, the parties entered into an agreement ("Employment Agreement") whereby Seitz would be employed to act as an accountant on behalf of present and future clients of the Partnerships. He was to receive compensation based upon those efforts as defined in that agreement. It was also contemplated that clients previously served by Seitz or whose interests he would subsequently [*2] be retained to represent would become part of the clientele of Partnerships.

   n1 The Siegfried Group, Siegfried & Schieffer, Siegfried Consulting and Siegfried Resources were, at all times relevant to this action, limited liability partnerships registered in the State of Delaware. They shall hereinafter be referred to as the "Partnerships".

On January 4, 1996, Seitz and the Partnerships entered into a series of contracts which altered the manner in which Seitz was to receive compensation for his efforts on behalf of the Partnerships. Also affected were the terms and conditions relating to any termination of the relationship between Seitz and the Partnerships as well as the nature and the consequences of any professional contact between Seitz and clients of the Partnerships following a termination.

Of primary consequence among the aforementioned agreements were the Incentive Compensation Agreement ("ICA") and the Tactical Component Agreement ("TCA"). The ICA provided Seitz with the opportunity to earn compensation [*3] by attaining certain short-term goals and objectives deemed mutually beneficial to both parties as opposed to longer-term business objectives. The TCA, specifically Paragraph 4, defined the mechanism by which the computation of Seitz' compensation would be achieved. It also set out the criteria to be used

in evaluating his performance. They included sales, client service and a scoring component, including, but not limited to, new business development, corporate citizenship and other factors as determined by the Partnerships.

There was a limitation, however, on the amount of incentive compensation that Seitz could receive or be paid, as opposed to earn, in any one year. The TCA also defined the maximum amount payable and what became of the amount of incentive compensation earned in excess of that amount. The agreement stated that any monies owed to Seitz, including incentive compensation, but not yet payable, would be deferred and added to the tactical component in future years during which Seitz would be subject to the TCA. n2 In the event that the professional relationship between the parties was terminated, the excess so earned but not paid would be added to a promissory note (the [*4] "Seitz Note") and repaid according to the terms and conditions stated therein. n3

n2 TCA at P4(f).

n3 The Seitz Note was created as a result of an amendment to the Employment Agreement that was entered into by the parties on January 4, 1996. The relevant terms and conditions of the Seitz Note are provided for in P6 of that agreement.

For reasons that are not altogether clear, Seitz tendered his resignation from the Partnerships in a letter dated August 7, 1997. According to Seitz, the final date of their association was to be mutually determined later. On August 8, the resignation was accepted by Robert L. Siegfried, President of the Partnerships, who nominated September 7 as the date when the separation would be effective. However, during the interim, the Partnerships terminated Seitz's employment as of August 11, 1997. n4

n4 Letter from Siegfried to Seitz of August 11, 1997; see Defs.' Answer and Countercl. at Ex. N.

[*5]

At least during the month of August, 1997, the record reflects that the parties were attempting to calculate the incentive compensation due Seitz for the Partnerships' fiscal year 1996. n5 Although the final amount due for that period remains in dispute, it appears that Seitz had earned an amount in excess of that to which he could be paid under the TCA. n6 In any event, no further action on this issue was taken prior to the termination of the relationship between the parties.

n5 The reference to the Partnership fiscal years shall hereinafter be designated "FY ___ ".

n6 On August 5, 1997, a draft of a document purportedly from Robert Siegfried was directed to Seitz and calculated total incentive compensation for FY 1996 at $ 461, 461. If that were the case, pursuant to the TCA, the maximum incentive compensation payable would be $ 206,250. The balance, or $ 255,211, would have to be deferred and placed into the Seitz Note. However, while the Partnerships deny that this was the final figure for that year, it does not appear that they dispute that some incentive compensation was to be deferred and added to the Seitz note.

[*6]

On November 19, 1997, Seitz directed correspondence to the Partnerships demanding payment of the Seitz Note. The payments of principal and interest were to begin on May 19, 1999. n7 Nothing else of note transpired until April 9, 1998. On that date, Seitz requested that the Partnerships calculate his incentive compensation for the portion of FY 1997 up to the effective date of his termination. On December 7, 1998, the Partnerships informed Seitz that his incentive compensation FY 1997 prior to his termination was a negative $ 12,758. It was also at that time that Seitz was informed that he was due a total of $ 199,788 as opposed to the $ 461,461 figure referred to in the August 5, 1997 memo, which had not been given final approval. n8

n7 According to P3(b) of the Seitz Note:

The first such installment (of the Seitz Note) shall be due and payable: . . . (ii) eighteen (18) months after the date on which Borrower receives Lender's demand for repayment, where Lender (x) is less than 52 years of age at the time Lender demands repayment hereunder, and Lender has voluntarily terminated his employment, or (y) is less than 52 years of age at the time Lender demands repayment hereunder, and Borrower has terminated Lender's employment for cause. . .

.

See compl. at Ex. F.

[*7]

> n8 Letter from Partnerships' counsel to counsel for Seitz of December 7, 1998; see compl. at Ex. G.

No payments were made on the indebtedness due under the Seitz Note following the November 19, 1997 demand for payment. It appears that compensation related to various aspects of his employment relationship with the Partnerships had been advanced to Seitz prior to his termination. The amount of that compensation was unilaterally determined by the Partnerships who began to deduct it monthly following Seitz' termination and the subsequent demand for repayment of the note by Seitz. Although there was no agreement concerning the Partnerships' calculation of this "negative compensation", Seitz did not dispute the right of the Partnerships to offset whatever that amount was determined to be against the deferred incentive compensation.

On December 27, 1999, the Partnerships informed Seitz that they had made what was later determined to be a contribution of $ 9,747.34 to Seitz' 401(k) plan as of September 12, 1997. The contribution was not authorized by Seitz and was credited against the deferred [*8] incentive compensation for 1997. n9

> n9 It is not completely clear from the correspondence between the parties that the deduction and subsequent contribution was for FY 1997. However, it is apparent that Seitz did not affirmatively authorize the contribution at the time it was made. In addition, Seitz alleges that the contribution was subject to a forty percent (40%) forfeiture rate and therefore a loss to Seitz of $ 3,898.94. The basis for this claim is not set out in the pleadings but is presumably a reference to 26 U.S. c. § *401 of the Internal Revenue Code.*

Seitz instituted this litigation on December 3, 1999. His complaint, as it presently exists, n10 generally alleges that the monies the Partnerships refused to pay him as outlined above constituted "wages" within the meaning of the Delaware Wage Payment and Collection Act, specifically *19 Del. C. § 1101(a)(2)*. The refusal, he contends violates that law, making the Partnerships liable for damages, including the deferred [*9] incentive compensation, interest, penalties, costs and attorney's fees. Seitz also seeks the return of the "negative compensation" that was incorrectly charged against his incentive compensation for FY 1997 as well as the monies which he forfeited because of what he claims was the unauthorized 401(k) contribution.

> n10 The complaint was amended on January 27, 2000, prior to the filing of answer by the Partnerships pursuant to Superior Court Civil Rule 15(a).

The Partnerships have denied the allegations made by Seitz. In addition, they have raised certain affirmative defenses, which, they allege will bar Seitz from any relief to which he might be entitled even if they acted improperly. Lastly, the Partnerships have filed certain counterclaims alleging that Seitz is in fact liable to them for breaches of the agreements executed by the parties during the course of their professional relationship.

On December 20, 2000, the Partnerships filed two motions seeking the entry of partial summary judgment on their behalf [*10] pursuant to Superior Court Civil Rule 56. The first sought a determination that Seitz was not entitled to any relief under the Delaware Wage Payment and Collection Act and that he failed to state a claim for relief as to the amount of incentive compensation claimed or insofar as the 401(k) contribution was concerned. The second motion requests a ruling from the Court on their counterclaim which sought damages based on the alleged solicitation and/or performance of professional services by Seitz for clients of the Partnerships.

Seitz has opposed those motions and seeks entry of judgment in his favor, also pursuant to Rule 56, as to Counts II thru IV and VI of the Partnerships' counterclaim and the damage claim arising out of the solicitation of two entities claimed as clients of the Partnerships. Specifically, Seitz claims that the aforementioned counts must be submitted to arbitration pursuant to one of the agreements ("Partners' Agreement") entered into by the parties at the start of their relationship. As to the two entities allegedly solicited, Seitz contends that solicitation alone, without engaging in any services for them is not enough to impose liability for damages on him. [*11] For those reasons, he argues that he is entitled to the relief sought.

Oral arguments on the motions were held on March 7, 2001 and March 15, 2001. All briefing having been completed and reviewed, that which follows is the Court's resolution of the issues so presented.

DISCUSSION

As indicated above, both parties have filed motions seeking partial summary judgment pursuant to Rule 56. The law is well settled in this area. "Summary judgment may be granted only where, considering the facts in a

light most favorable to the non-moving party, there is no material issue of fact and the moving party is entitled to judgment as a matter of law." *Pullman, Inc. v. Phoenix Steel Corp., Del. Super., 304 A.2d 334, 334 (1973).* If, after viewing the evidence, the court finds that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances, then the court may not grant the motion for summary judgment. *Guy v. Judicial Nominating Comm'n., Del. Super., 659 A.2d 777 (1995);* and *Wilson v. Triangle Oil Co., Del. Super., 566 A.2d 1016 (1989).* [*12] It is the movant's burden to demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Borish v. Graham, Del. Super., 655 A.2d 831 (1994).* The party opposing that motion must be afforded the opportunity to come forward with evidence showing the existence of a dispute as to an issue of material fact. *Phillips v. Del. Power and Light, Del. Supr., 59 Del. 179, 216 A.2d 281 (1966).* It is with these standards in mind that the Court must review the motions filed by the parties.

**Partnerships' Motion for Partial Summary Judgment on Seitz' Complaint**

**Whether Compensation Deferred Constitutes "Wages"**

The Partnerships' first contention in its motion is that the deferred incentive compensation sought by Seitz is not "wages" for purposes of the Delaware Wage Payment and Collection Act. While the Partnerships do not dispute that any amounts due and payable to Seitz up to the maximum amount permissible under the ICA and the TCA during each of the partnership fiscal years in question here were wages, the Partnerships argue that incentive compensation which was deferred [*13] to be paid in future years, or in the case of termination, to be added to the Seitz Note, did not fall within that term. As a result, Seitz has failed to state a claim upon which relief can be granted under the aforementioned statute as to those monies which he had earned but had not been paid.

In support of this argument, the Partnerships cite *Dep't of Labor Ex Rel. Commons v. Green Giant Co., Del. Super., 394 A.2d 753 (1978).* That case held that wages are funds "ordinarily paid at the end of each period of a certain number of workdays." *Id. at 755.* The argument that is suggested is that because the funds were not subject to payment at the end of a period of a certain number of work days, they are not wages. Defs.' Mot. for Partial Summ. J. Upon Pl.'s Comp. at P3. Seitz responds that this argument is flawed because the amount in question was a year-end bonus or commission based upon Seitz' performance on behalf of the Partnerships and therefore constituted wages according to *SOCA Indus.,* *Inc. v. Bracken, Del. Supr., 374 A.2d 263 (1977).* The Court agrees.

The Delaware Wage Payment and Collection Act defines wages as, "compensation for [*14] labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." *19 Del. C. § 1101(a)(2).* Clearly this definition of wages does not limit wages to those amounts included in an employee's normal paycheck. The courts in both Green Giant and SOCA Industries recognized that year-end bonuses or amounts earned on commission *are* considered wages. Green Giant at 756; and SOCA Indus. at 264. The ICA and TCA provide little assistance in determining whether the amount of incentive compensation that is to be deferred falls within the definition of wages for purposes of the statute in question. However, Paragraph 4(f)(iii) of the TCA makes it abundantly clear that any such excess amount is deemed to have been "earned" by Seitz. These monies are without doubt based upon services Seitz rendered to the Partnerships. As a consequence, the Court finds as a matter of law that the monies in question are wages because they are either a year-end bonus based upon his performance, a commission based upon his performance, or a combination of both.

The finding that Seitz' [*15] deferred incentive compensation constituted "wages", leads the Court to the Partnerships' alternative argument, i.e., that Seitz' claims are barred by the one-year statute of limitations applicable to wage claims set forth in *10 Del. C. § 8111.* Because Seitz was terminated on August 11, 1997, the Partnerships contend that the limitations period expired on August 11, 1998. As a result, Seitz' complaint was not timely when it was filed over a year later. Seitz responds that this cause of action did not arise and the limitations period did not begin to run until he received notice on December 7, 1998 of the Partnerships' calculation of the amount of incentive compensation which had been deferred for FY 1996 and 1997.

*10 Del. C. § 8111* holds:

> No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with [*16] any such action, shall be brought after the expiration of one *year from the accruing of the cause of action*

on which such action is based. (emphasis added).

In a case very similar to the case sub judice, the United States District Court of the District of Delaware held that the plaintiff's cause of action did not arise until he had actual notice of the amount of his bonus. The Court made this finding despite a provision in the employment agreement that stated that the bonus was due at the closing of a merger. It reasoned that the cause of action did not mature until the bonus check was tendered to the plaintiff, which put him on notice that the amount was in dispute. *Compass v. American Mirrex Corp., D. Del., 72 F. Supp. 2d 462, 468 (1999).*

In this case, Seitz' cause of action did not arise until December 7, 1998, the date the Partnerships provided Seitz with the amount of deferred incentive compensation which they calculated was due him Seitz under the terms of the ICA and TCA. See Pl.'s Resp. at Ex. 7. As such, the limitations period did not begin to run until that date and would not have been tolled until one year later, on December 7, 1999. Stated [*17] differently, it had not expired when Seitz filed his complaint on December 3, 1999, and the Partnerships' motion in this regard must be denied.

### Calculation of Incentive Compensation

The Partnerships also seek the entry of judgment on their behalf concerning the mechanism used to calculate the incentive compensation for their 1996 fiscal year. To be specific, the Partnerships contend that Seitz erroneously uses a 4.2 scoring component to calculate the amount due for that period of time Seitz 1996 incentive compensation. The factor that should have been used, it is argued, would be adjusted by factoring in aspects of Seitz' performance more fully set out in the TCA. n11 The result would be a scoring component of 3.68. As might be expected, Seitz is equally adamant that the factor he used is correct based upon the agreements between the parties. Moreover, it is consistent with the factor used without by the Partnerships in pre-litigation calculations.

> n11 TCA at P4(d).

Viewed in a light most favorable [*18] to the non-moving party, the Court is unable to conclude that the Partnerships are entitled to summary judgement as a matter of law on this issue. There are material facts in dispute and the application of the law to the facts given would not be appropriate at this stage of the proceedings. Guy at 780. Indeed, given the aforementioned disputes of fact and the use of language readily susceptible of differing interpretations, it does not seem likely that this issue can be resolved summarily and short of a trial on the merits.

### Section 401(k) Contribution

Finally, the Partnerships move for summary judgment on Seitz' claim to the funds that were withheld for his 401(k) plan. The Partnerships argue that participation in the plan was mandatory for Seitz and that he is not entitled to the contributions about which he complains as a result. Seitz responds that the Partnerships characterize the amount in question as a profit-sharing contribution they made on his behalf, but that they also subtracted that figure from his deferred incentive compensation calculation for 1997. He argues that it is a breach of the underlying employment agreements to calculate or use it both ways. The [*19] contribution is either a profit-sharing contribution or an employee contribution, but not both.

In this case, it does appear that there is a material dispute of fact concerning whether the Partnerships have categorized and treated these funds as a mandatory 401(k) contribution by Seitz or by the Partnerships on his behalf. Also, there is the legal impact of whatever designation that is deemed to apply, which from the record as it presently stands, is unclear. Further proceedings are therefore necessary to clarify the application of the facts to the law before this issue can be resolved.

In sum, the motion of the Partnerships seeking summary judgment on the Seitz' complaint must denied in all respects

### Seitz' Motion on the Partnerships' Counterclaim

#### Arbitration of Counts II - IV & VI

Succinctly stated, Seitz argues that the claims set forth in Counts II, III, IV and VI of the Partnerships' counterclaim arise out of the Partners' Agreement and must be submitted to arbitration pursuant Paragraph 15 of that document. The Partnerships counter that the aforementioned claims do not arise out of the Partners' Agreement. More specifically, They contend that the Partners' [*20] Agreement concerns Class A Units of partnership interest and the redemption of those interests, but does not concern the terms and conditions of the partnerships. These issues are dealt within the separately executed limited liability partnership agreements, n12 the Employment Agreement or the common law. As a result, the Partnerships argue that the arbitration clause in the Partners' Agreement does not apply. The Court agrees.

> n12 On the same date that the Partners' Agreement was executed, January 4, 1996, three separate limited liability partnership agreements were also executed for Siegfried Schieffer &

Seitz, SSS Strategic Resources and Siegfried Consulting.

Counts II and IV allege breaches of fiduciary duties and contract while Counts III and VI set forth allegations of fraud/misrepresentation. As stated above, the Partners' Agreement deals specifically with the issuance and the redemption of the Class A Units of partnership stock. It does not, in any way, deal with the rights and/or obligations between [*21] Seitz and the Partnerships. The liability partnership agreements on the other hand do in fact define and/or address those relationships. n13 The Court must agree as a result that Counts II, III, IV and VI do not arise from the Partners' Agreement and need not be submitted to arbitration pursuant to the provisions of Paragraph 15 of that agreement.

> n13 See Def.'s Resp. to Pl.'s Mot., Ex. A., Siegfried Schieffer & Seitz, LLP Limited Liability Partnership Agreement at PP 1, 11; Ex. B., SSS Strategic Resources, LLP Limited Liability Partnership Agreement at PP 1, 11; and Ex. C., Siegfried Consulting, LLP Limited Liability Partnership Agreement at PP 1, 11.

**Damages for Solicitation of Clients**

The second contention raised by Seitz is that the Partnerships' claims for damages relating to his alleged solicitation of business from the DuPont Company and the Elzufon law firm must be dismissed. He argues that even if one were to assume that he solicited business from those two entities, the Employment Agreement [*22] requires that services be performed for those to whom the solicitation was directed. Since the Partnerships allege mere solicitation and not that he provided services, those claims must be dismissed because they do not state a cause of action upon which relief can be granted under the terms of the Employment Agreement.

The Partnerships admit that Paragraph V(C)(3)(b) of the Employment Agreement upon which Seitz relies, relates to the timing of the damages payments should Seitz *provide services* to a client of the Partnerships and that it is silent in that regard where there had been solicitation only. However, they argue that the failure to do so is not fatal to this aspect of their claims because the agreement clearly states that Seitz is prohibited from soliciting Siegfried clients and subjects him to liquidated damages if he violates that restriction.

A review of the Employment Agreement reveals that when read as a whole, it holds Seitz liable for damages for any solicitation without further qualification. Notwithstanding the provision upon which Seitz relies, Paragraph V(C)(3)(a) states in relevant part:

> In addition, in the event of any breach by Employee of the covenants [*23] contained in subparagraph (V)(D)(1) n14 of this Agreement, Employee shall pay to Employer, with respect to each client of Employer whom Employee solicits or for whom Employee provides Accounting Services, and amount equal to one hundred fifty percent (150%) of the amount of Employer's twelve months average billings to the client . . . .

This paragraph clearly demonstrates the parties' intentions that should Seitz solicit a Partnerships client, he would be liable for the specified amount of damages to the Partnerships. That measure of damages is based on the billings from the Partnerships to the client solicited and/or for whom work was performed. Consequently, to be activated, no work need be performed by Seitz and his motion in this regard is without merit.

> n14 Paragraph V(C)(1) includes the covenant to not solicit clients.

In light of these conclusions, Seitz' motion seeking summary judgment as to certain counts contained in the counterclaim filed by the Partnerships and as to the solicitation claim [*24] as described above, is denied in its entirety.

**The Partnerships' Motion on Their Counterclaim**

**Solicitation of Clients of the Partnerships**

The Partnerships have moved for summary judgement on the issue of Seitz' liability for soliciting and/or performing services for certain partnership clients in violation of the Employment Agreement. The clients were identified as the DuPont Company and the law firms of Elzufon & Austin; Richards, Layton & Finger and Richard R. Wier, Jr., P.A. In support of this claim, the Partnerships cites to evidence that Seitz met with and actively pursued those entities for purposes of soliciting or entering into a business relationship with them. In the case of the Richards and Wier firms, services were actually provided.

Seitz does not deny that he solicited DuPont and Elzufon but argues that since he did not perform any services for them, he did not violate the Employment Agreement. For the reasons discussed in addressing

Seitz' motion for partial summary judgment, n15 the Court disagrees. Again, the Employment Agreement, specifically Paragraph V(C)(1), prohibits solicitation of clients of the Partnerships and that is what the record [*25] reveals Seitz did. Therefore, the Partnerships are entitled a judgment as a matter of law insofar as the issue of whether the solicitation by Seitz, without more, constitutes a breach of the Employment Agreement, and their motion must be granted as it applies to DuPont and Elzufon. n16

n15 See supra pp. 21-23.

n16 Given the tangential reference by the parties to the subject, the Court has not decided what, if any, damages might flow from the violation of the prohibition against solicitation contained in Paragraph V(C)(1) or whether the measures of damages provision in Paragraph V(C)(3)(a)(ii) applies and/or is enforceable. Resolution of those issues will require more discussion than that presented thus far.

A different result obtains relative to Richards and Weir. Seitz contends that they were not clients of the Partnerships. n17 Those firms retained his services on behalf of individuals and/or entities who were represented by the firms in legal matters. The services were provided by the Partnerships [*26] to those individuals and/or entities. No relationship involving the provision of services between the Partnerships and the law firms was established while Seitz was professionally associated with the Partnerships. As a result, he could not have violated the Employment Agreement by performing work for either firm.

n17 Reference is initially made to the Elzufon firm by Seitz in this regard but no further mention is made relative to that entity on the issue. Accordingly, the Court will view it as an inadvertent typographical error. See Seitz' Resp. to Defs.' Mot. Partial Summ. J. on Their Countercl. at 2.

There is no legal authority cited by Seitz in support this contention and there does not appear to be no controlling law in this jurisdiction on this issue. However, even if such authority existed, the Court would still be unable grant summary judgment on this issue in light of the status of the record relative to this issue. Simply put, the factual circumstances surrounding the contacts between Seitz and the law firms in question, as well as the purpose of those meetings, is not altogether clear. Therefore, this is a case where summary judgment is inappropriate because an inquiry into the facts and circumstances of Seitz' contacts with these parties is in order to clarify the application of the law to the circumstances. It would not, as a result, be appropriate to grant summary judgment as requested. [*27]

Given the foregoing discussion, the Partnerships' motion must be granted in part and denied in part as to the issue of the solicitation of clients.

## CONCLUSION

For the reason set for above, the Partnerships' Motion for Partial Summary Judgment on the Complaint and the Seitz' Motion for Summary Judgment on the Partnerships' Counterclaim must be, and hereby are, **denied**. In addition and also as described above, the Partnerships' Motion for Summary Judgment on Their Counterclaim is **granted in part** and **denied in part**.

IT IS SO ORDERED.

Toliver, Judge

LEXSEE 1991 DEL. CH. LEXIS 12

THOMAS IBACH, Plaintiff, v. DOLLE'S CANDYLAND, INC., a Delaware corporation, Defendants

Civil Action No. 1425

Court of Chancery of Delaware, Sussex

*1991 Del. Ch. LEXIS 12*

January 16, 1991, Submitted
January 23, 1991, Decided

**COUNSEL:** [*1]

Melvyn I. Monzack, Esquire, and Brian J. McLaughlin, Esquire, of WALSH AND MONZACK, P.A., Wilmington, Delaware, Attorneys for Plaintiff.

Edward B. Maxwell, 2nd, Esquire, Richard A. Levine, Esquire, and Teresa C. Fariss, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware, Attorneys for Defendant Dolle's Candyland, Inc.

**JUDGES:**

Chandler, Vice Chancellor.

**OPINIONBY:**

CHANDLER

**OPINION:**

MEMORANDUM OPINION

Pending are cross motions for summary judgment filed by plaintiff Thomas Ibach ("Tom Ibach" or "Ibach") and defendant Dolle's Candyland, Inc. ("Dolle's"). The initial complaint in this action, filed on January 17, 1990, seeks: (1) specific performance of an alleged obligation of Dolle's to apply for a building permit; (2) a declaration that once the permit is obtained, Ibach has the right to exercise a purchase option for the candy business of Dolle's; and (3) an accounting for certain allegedly wrongful deductions from Ibach's bonus payments. Dolle's answered and counterclaimed that Ibach had breached a certain management and option agreement and that such agreement should be declared terminated. The Court approved a scheduling order and set trial for mid-November unless a case dispositive [*2] motion was filed by October 4, 1990, in which event argument on that motion would be held on November 13, with trial rescheduled to January 1991.

On October 22, 1990, Dolle's terminated Ibach's employment. The next day Ibach filed a motion for a temporary restraining order seeking reinstatement. This Court heard and denied that motion, finding that Ibach was not at risk of suffering irreparable harm. The parties then amended the complaint and the answer to reflect Ibach's discharge and continued briefing their respective motions for summary judgment.

I. FACTS

Dolle's is a family-owned and family-operated business located in Rehoboth Beach, Delaware, that produces and sells salt water taffy, caramel popcorn and other candies. The candy business was originally operated as a partnership between Thomas Pachides and Rudolph Dolle, Sr. Dolle's is now a Delaware corporation owned in equal shares by Thomas Pachides' three daughters: Constance P. Brinkley ("Brinkley"); Alexandra P. Ibach ("Alexandra Ibach"); and Helen P. Holmgren ("Holmgren"). Tom Ibach, the plaintiff in the present suit, is Alexandra Ibach's son.

Dolle's Rehoboth Beach store has been operated by the Pachides family since its [*3] establishment in 1927. In 1959, Thomas Pachides purchased Rudolph Dolle's interest in the Rehoboth store. Thomas Pachides, in turn, transferred a portion of the stock to his wife. As Mr. and Mrs. Pachides grew older, they began distributing their stock in Dolle's to their three daughters. Regardless of his transferring legal control to his daughters, Thomas Pachides evidently continued to control the business until his death in January 1984. By that time, Brinkley and Holmgren were, and had been, working full time at

Dolle's. Alexandra Ibach was not actively involved with the business.

After Thomas Pachides' death, Brinkley, Holmgren, Mrs. Pachides and Robert Faw (the Pachides' long-time financial adviser) met to determine the future of Dolle's. Mrs. Pachides evidently wanted her grandson, Tom Ibach, the only male descendent, to become involved in the operation and ultimately to acquire Dolle's so that it would continue in the Pachides family. One can also surmise that Mrs. Pachides was well aware that her daughters were in their mid-sixties and would not be running Dolle's forever.

Tom Ibach had worked at Dolle's during several summer vacations. He worked most recently, before being [*4] hired in 1984, from April 1977 until October or November 1977. According to defendants, at that time Tom Ibach asked his grandfather, Mr. Pachides, whether there would be any opportunity for him to operate the business. Mr. Pachides allegedly suggested that he look for work elsewhere. After leaving Dolle's in 1977, Ibach practiced income tax accounting for H & R Block and then went to work for Durkee Foods as a cost accountant.

After Mrs. Pachides and her daughters decided to bring Tom Ibach into the business, Robert Faw ("Faw") was given the task of attempting to work out the arrangements so that Tom Ibach would be brought into the business and provided with the opportunity to acquire and continue the business in the Pachides family. The parties are in agreement that only Faw met with and negotiated the agreement with Tom Ibach. Ibach met with Faw on at least two occasions to negotiate the details of his contract with Dolle's.

The final form of the agreement and option to purchase was executed on March 2, 1984. It included an outline of Ibach's duties and obligations, including certain contractual financial goals regarding gross sales, gross profit margins and gross payroll costs [*5] which were required to be met. The term of the agreement was ten years. The contract also set forth the terms of Ibach's salary, benefits and bonus. Ibach was given an option to purchase the candy business (not the real estate or other property) for the formula price of "the gross cost of depreciable equipment as carried upon the corporate books." The option may be exercised on December 31, 1993, unless, prior to that time, either Dolle's has obtained a permit for the substantial rebuilding of the Boardwalk property or Dolle's gives notice of its intent to sell the business to a third party. In all events, however, Ibach must still be employed by Dolle's and have fulfilled all his contractual financial obligations. Notice of intent to exercise the option must be given by certified mail, return receipt requested, not less than 30 nor more than 90 days prior to the exercise. Defendants maintain that no such notice has been sent.

During the course of the agreement there appears to have been some acrimony between Tom Ibach and Holmgren, Brinkley and his grandmother, Mrs. Pachides. Defendants allege that Ibach did not allow his grandmother to visit the store and tried to make his aunts [*6] feel uncomfortable whenever they visited. Both parties evidently complained to Mr. Faw.

Regardless of the apparent acrimony, Holmgren and Brinkley continued to take an active role in Dolle's. Defendants maintain that the sisters continued to take care of the accounting records and reports for the business, to arrange for repairs to the property, to personally provide on-site security for the premises, to provide consultation for Ibach when the need arose and to generally oversee the business. In addition, Holmgren, Brinkley and Alexandra Ibach (Tom Ibach's mother) had an active role in the management of Dolle's due to their position as directors and shareholders. Dolle's practice is to hold at least one formal meeting of the board of directors and of the shareholders each spring. At each meeting, since 1984, Ibach has presented an annual "operation review" outlining Dolle's accomplishments and suggesting future changes.

In addition to his ideas and suggestions outlined in his year-end operation reviews, Ibach presented, during the entire period of the agreement, various plans to the board of directors for the rebuilding of Dolle's. It is uncontested that such plans were either not [*7] considered or were rejected by the board.

Most recently, during a meeting with the board of directors, Ibach was asked to conduct a feasibility study for the renovation of Dolle's. The study was discussed at a March 18, 1989, board meeting. According to Ibach, the plan that involved moving the taffy production to the Dolle's warehouse, reducing the size of the arcade and dividing the current Dolle's store into three units was the most desirable to the board. Ibach, in fact, went so far as to make various inquiries concerning the feasibility of the plan, including contacting the Fire Marshall's office. The board, on September 6, 1989, however, informed Ibach that they did not want to go forward with the proposed renovations. At her deposition, Brinkley testified that the reason she and her sister did not want to go forward with the renovations was their fear of debt.

According to Ibach, he next attempted to open a dialogue, concerning the option, by directing a letter to Holmgren and Brinkley indicating his willingness to assume the cost of rebuilding, despite the fact that the agreement does not impose such a duty. Ibach received a letter from Dolle's attorney rejecting his offer. [*8]

A 399

Next, Ibach filed his initial complaint seeking: (1) specific performance of Dolle's alleged obligation to apply for a building permit; (2) a declaration that once the permit is obtained, Ibach has a right to exercise the purchase option for Dolle's; and (3) an accounting for certain allegedly wrongful deductions from Ibach's bonus. On about February 14, 1990, the board of directors enacted rules for the purpose of governing the candy business (the "new rules"). A copy of these new rules was forwarded to Ibach through his counsel by counsel for Dolle's.

The new rules established minimum hours for Dolle's, directed that all business records be kept at the store, directed that all mail related to the business be directed to Dolle's, mandated that the manager (Ibach) shall consult with and receive the approval of the board prior to the adjustment of wages and, among other things, required the manager to receive board approval before making purchases in excess of $ 1,000. By letter dated March 1, 1990, Ibach's attorney took issue with the validity of the new rules. In general, Ibach's attorney maintained that the new rules were in conflict with Ibach's authority under the agreement and [*9] option to purchase. As a result of this communication and his understanding of his authority under the agreement, Ibach claims to have believed that the parties would proceed in accordance with their prior course of conduct.

Counsel for Dolle's, on July 5, 1990, next wrote counsel for Ibach raising several matters including the assertion that Ibach had failed to obtain approval for the purchase of certain materials in excess of $ 1,000 and that Ibach had left the store when production operations were taking place. Counsel for Ibach took issue with these allegations and suggested that if there was a continuing dispute that it be submitted to a court for resolution. Again, Ibach maintains that he believed the parties would continue to act in accordance with their prior course of conduct.

On October 22, 1990, counsel for Ibach received a letter from counsel for Dolle's stating that Ibach had violated both the management agreement and the new rules and advising that the agreement (including Ibach's employment) was terminated effective immediately.

II. MOTIONS

The standard for summary judgment is well-settled in this state. Summary judgment may be granted if, on undisputed facts, the [*10] moving party establishes that he or she is entitled to judgment as a matter of law. A motion must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inference to be drawn therefrom. *Bershad v. Curtiss-Wright Corp.*, Del. Supr., 535 A.2d 840, 844 (1987) (quoting *Vanaman v. Milford Memorial Hospital, Inc.*, Del. Supr., 272 A.2d 718, 720 (1970)).

Dolle's makes several arguments in support of its motion for summary judgment. First, Dolle's argues that the termination of Ibach's employment as Dolle's manager has also terminated his right to purchase the Dolle's candy operation and has rendered his option related claims moot. Ibach answers that the termination of the agreement is invalid because his discharge was without cause or justification. Second, Dolle's argues that Ibach's claim for specific enforcement of the option to purchase is barred by a complete failure of proof concerning Dolle's alleged duty to seek a permit for the substantial rebuilding of the Boardwalk property. Ibach answers that he is entitled to summary judgment on his claim for specific [*11] enforcement of the option to purchase. Third, Dolle's argues that Ibach's bonus claims are barred by the statute of limitations and are substantively meritless. Ibach insists, again, that he is entitled to summary judgment on his bonus claims. Fourth, Dolle's argues that this Court lacks subject matter jurisdiction over the option claim because Ibach has not yet determined to exercise it. Ibach maintains that he has expressed his intention to exercise his option to purchase. Finally, Dolle's argues that Ibach has breached his own duty of good faith and fair dealing and that the contract should be declared terminated as a matter of law. Ibach, of course, hotly contests this assertion.

III. CLAIMS

A. Termination Claim

Dolle's first argument is that the termination of Ibach's employment as Dolle's manager has also terminated his right to purchase Dolle's candy operation and has rendered his option related claims moot. In making this argument, defendants first point to the fact that Ibach's right to exercise his option to purchase Dolle's candy operation is expressly contingent upon his continued employment. Next, defendants state that Ibach's employment is terminable for cause and [*12] that, in their opinion, his employment with Dolle's was in fact terminated for cause. If Ibach's termination is justified, the argument concludes, a condition of his right to exercise his option will never be met thereby making any related claims moot. Whether Ibach's termination was justified, i.e., for cause, is therefore the first inquiry. More specifically, the question is whether Ibach's wrongful discharge claim can be disposed of at this stage in the proceedings. Of note is that Ibach's wrongful discharge claim appears to seek only money damages and not equitable relief such as reinstatement.

Defendants argue that Ibach was discharged for his willful refusal to follow several reasonable rules implemented by the board to govern the operation of Dolle's

A 400