candy business. Defendants further argue that under Delaware law an employee is obligated to obey the reasonable rules of his employer and that the deliberate and knowing violation of such rules is just cause for discharge as a matter of law. See *Barisa v. Charitable Research Foundation, Inc.*, Del. Super., 287 A.2d 679, 681 (1972). For the following reasons, I find disputed issues of fact as to whether [*13] Ibach deliberately and knowingly violated the rules and whether the rules themselves can be considered reasonable in light of the circumstances. I therefore cannot rule as a matter of law that Ibach's discharge was justified.

The purported violations by Ibach relate specifically to conduct allegedly governed by paragraphs A, G and H of the new rules and section 6 of the management agreement. Paragraph H and section 6 are the so-called "pre-approval" provisions. Section 6 of the agreement states:

Without the written consent of Dolle's, Ibach shall not enter into contracts for materials or equipment in excess of One Thousand Dollars ($ 1,000.00) nor shall any payment be made except upon the Dolle's corporate account -- unless it is necessary to make a payment during an emergency situation.

Paragraph H of the new rules state:

The Manager shall not enter into any contracts, orders or commitments for the purchase of (i) materials, including, without limitation, materials constituting inventory or merchandise for the manufacture of candy, or (ii) equipment to be used in the business, in excess of $ 1,000 without the advance written consent of the Board. In this regard, the Manager [*14] shall submit a written request regarding any such materials or equipment to the Board with a statement of the justification.

Ibach argues that he did not deliberately and knowingly violate the pre-approval provisions of the agreement and new rules for several reasons. Concerning section 6 of the agreement, Ibach claims that he has in fact adhered to the board's wishes. Ibach points out that section 3(c) of the agreement provides that the manager shall have the responsibility for ordering sufficient inventory and merchandise for the operation of the business. Paragraph 3(f) of the agreement goes on to state that the manager need only obtain approval of Dolle's for the purchase of capital equipment. Section 6, however, provides that the manager shall not enter into contracts for materials or equipment in excess of $ 1,000 without the written consent of Dolle's. Evidently, shortly after Ibach took over the management of Dolle's he discovered that many of the day-to-day recurrent purchases exceeded $ 1,000. Ibach alleges that he sought clarification from Robert Faw concerning whether the pre-approval provisions included recurrent day-to-day purchases. Ibach has testified at deposition [*15] and asserted in an affidavit that Faw told him that the provision did not apply to such items. Faw has denied making such a statement, yet at deposition indicated that he could not recall one way or another.

The conduct of the parties, at least until the initiation of the law suit, supports Ibach's testimony as to his understanding that pre-approval for recurrent day-to-day purchases over $ 1,000 was not necessary. Indeed, Ibach alleges that he has always made day-to-day purchases of recurrent items without pre-approval. In addition, Ibach further alleges that at no time prior to the initiation of this action was he informed that he needed prior written permission for the type of orders now at issue.

After the promulgation of the new rules, including paragraph H, which appears to be a more specific statement of the agreement's pre-approval provisions, Ibach again sought clarification through a letter sent by his attorney. The letter states Ibach's position that some of the new rules are in conflict with the agreement. In any event, as a result of his communication with the board as well as his understanding of his authority under the agreement, Ibach claims to have believed that the [*16] parties would proceed in accordance with their prior course of conduct.

During the summer of 1990, counsel for Dolle's wrote counsel for Ibach asserting, among other things, that Ibach had failed to obtain approval for purchase of certain materials in excess of $ 1,000. Ibach responded, through his counsel, that he viewed the board's action as an invalid attempt to revoke or modify his powers under the agreement. Ibach's counsel suggested that if the dispute continued that the parties should submit it to a court for resolution. Again, Ibach alleges that he believed the parties would continue to act in accordance with their prior course of conduct. Indeed, after the enactment of the new rules Ibach placed at least fifty-seven separate orders in excess of $ 1,000, all of a recurring nature and necessary for every day manufacture and sale. Ibach further points out that, consistent with his interpretation and understanding of his authority, he always sought the approval of Dolle's prior to the purchase of any equipment in excess of $ 1,000.

Ibach's termination also allegedly stems from his violation of paragraphs A and G of the new rules. Paragraph A provides that Dolle's shall remain [*17] open for business during the hours when any competitor of Dolle's is open for business. Paragraph G provides that the manager shall consult with and receive the approval of the board prior to any adjustment of wages or payment of bonuses for employees.

Concerning paragraph A, Ibach raises several issues of fact that also cannot properly be resolved at this stage of the proceedings. In addition to raising the question whether paragraph A is in conflict with the agreement, Ibach argues that paragraph A is vague and thereby impossible to follow even if it were valid. Specifically, Ibach points out that paragraph A does not define the word "competitor."

Paragraph G, concerning adjustment of wages or payment of bonuses, Ibach argues, is again in direct conflict with his authority under the agreement. In addition, Ibach alleges that he has consistently set the starting salaries of employees and on occasion has raised the wages of Dolle's employees and that at no time prior to the initiation of this action did Dolle's attempt to claim that such authority was not within his power.

Ibach, in my opinion, has adequately demonstrated that there are several disputed issues of fact concerning whether [*18] he deliberately and knowingly violated Dolle's rules concerning pre-approval of certain transactions, the setting of store hours as well as adjustment of wages and the payment of bonuses for employees. Concerning each alleged violation, there are disputed material issues of fact concerning course of conduct alone. In addition, I am troubled by the fact that Dolle's waited until October 22, 1990, after the summer season, to terminate Ibach for violations that had allegedly been occurring all summer. While I am aware that an employer does not have a duty to discharge an employee sooner rather than later, the circumstances do raise questions unanswerable on the present record. For these same reasons defendants' cross-claim that Ibach has breached his duty of good faith and fair dealing in relation to the agreement also raises issues of fact unresolvable on the present record.

B. Option Claim

Next, Dolle's argues that Ibach's prayer for specific enforcement of his option to purchase is barred by a complete failure of proof concerning Dolle's alleged duty to seek a permit for the substantial rebuilding of the Boardwalk property. Ibach's cross-motion insists that he is entitled to summary [*19] judgment on his specific enforcement claim. The pertinent section of the agreement is as follows:

Ibach shall have the right to exercise his option to purchase the business upon the happening of the earlier of the three following occurrences:

A. A permit from the city of Rehoboth Beach for the substantial rebuilding of the Dolle's property located on the Boardwalk and Rehoboth Avenue.

or

B. December 31, 1993.

or

C. Notice by Dolle's of their intent to sell the business to a third-party.

Ibach's prayer for specific enforcement of Dolle's alleged obligation to apply for a building permit (to trigger his option to purchase) is based on his theory that Dolle's has some type of duty to secure a permit and undertake the substantial rebuilding of the Boardwalk and Rehoboth Avenue property. The nature of this duty, however, is not entirely clear. Ibach's argument seems to involve the duty of good faith and fair dealing that is part of every contractual undertaking. The argument, as I understand it, is that Dolle's has breached its duty of good faith and fair dealing by not securing a building permit which is an express term of the agreement. Dolle's breach, the argument goes, constitutes [*20] a purposeful and intentional frustration of Ibach's ability to purchase Dolle's candy business. In addition, or as part of his central argument, Ibach claims that Dolle's impliedly promised to seek a permit for the substantial rebuilding of its Boardwalk property.

Dolle's argues that it did not and does not have a duty to secure a building permit for the substantial rebuilding of its Boardwalk property. Acquiring such a permit, Dolle's maintains, is not a duty but a condition precedent to Ibach's ability to purchase Dolle's candy business. Citing several treaties, Dolle's points out that whereas a promise can give rise to a duty, a condition is a mere limiting or modifying factor. Dolle's characterizes Ibach's prayer for specific enforcement as an attempt to rewrite the agreement to create a duty on the part of Dolle's to secure a permit. In addition, Dolle's contends that there is no evidence that they impliedly promised to seek a permit for the substantial rebuilding of the Boardwalk property.

Delaware follows the modern view of contract interpretation in that it looks to surrounding circumstance in interpreting an integrated agreement. *Klair v. Reese, Del. Supr., 531 A.2d 219, 223 (1987).* [*21] Under this view, "the Court must consider the statements of the parties concerning the meaning of the writing as well as evidence such as trade usage or course of dealing." Id. (citing *Restatement (Second) of Contracts § 212* comment c (1981); 3A Corbin, Corbin on Contracts § 543 (1960)). While the Court is not free to exclude extrinsic evidence, it may rely on a contract's "plain meaning" when its language has a general prevailing meaning and there is no evidence that the parties intended the language to have any other meaning. Id.

After careful review of the record, including Ibach's deposition, it is clear that the agreement's provision concerning the acquisition of a permit for the substantial rebuilding of Dolle's Boardwalk property is one of three condition precedents to Ibach's exercising his option to purchase and not a duty on the part of Dolle's. The agreement states that Ibach's right to exercise his option "shall come about upon the happening of the earlier of the following occurrences." The option may be exercised on December 31, 1993, unless prior to that time, either Dolle's has obtained a permit for the substantial rebuilding of the Boardwalk property [*22] or Dolle's gives notice of its intent to sell the business to a third party provided, however, in all cases, that Ibach is still employed by Dolle's and has fulfilled all his contractual financial obligations. Nowhere does the agreement contain promissory language in connection with Dolle's obtaining a permit for the substantial rebuilding of the Boardwalk property. The language is therefore not a promise creating a right or duty but a mere limiting or modifying factor. See 3A Corbin, Corbin on Contracts § 633 (1960).

There is also no evidence that at the time the agreement was entered, Dolle's impliedly promised to seek a permit for the substantial rebuilding of the Boardwalk property. In fact, at deposition Ibach seemed clearly to understand that the agreement was for a term of ten years. If anything, Robert Faw (who negotiated the agreement with Ibach) may have represented to Ibach that the agreement could be modified in the future. Faw may have also represented to Ibach that substantial renovations of the Boardwalk property were likely. In addition, Faw appears to have continually encouraged Ibach to submit his ideas and plans for the rebuilding of Dolle's to the board [*23] of directors. Indeed, it is uncontested that Faw was, at the time the contract was negotiated and thereafter, a strong proponent of such renovations. What is completely absent from the record, however, is any evidence that Dolle's itself, or through Faw, promised or impliedly promised to make substantial renovations to the Boardwalk property before the expiration of the ten-year agreement.

Ibach further argues that even if the disputed provision is a condition rather than an obligation, there remains an implied duty to render the cooperation necessary to enable another's performance under the contract and that one has a duty to make a good faith effort to perform a condition precedent. The case cited by Ibach for this proposition, *Washington Trust Bank v. Circle K Corp.*, Wash. App., 546 P.2d 1249 (1976), is distinguishable. The condition in the Washington Trust Bank case was found to be promissory in nature, unlike the present condition. Dolle's concedes that if the present circumstances indicated that the parties considered the condition precedent to be promissory in nature, then the promisor would have a duty to make a good faith effort to perform the condition. [*24] Since the present condition is a "mere fact or event" and not "an expression of intention or an assurance" it is not promissory in nature nor does any duty or obligation arise from it. See 3A. Corbin, Corbin on Contracts, § 633 (1960). Finding no duty on the part of Dolle's to seek a permit for the substantial rebuilding of the Boardwalk property, I deny Ibach's prayer for an order of judgment directing Dolle's to execute all documents necessary for the acquisition of a building permit for the substantial renovation of Dolle's Boardwalk property. In addition, I deny Ibach's prayer for a declaration that he has a valid right to exercise his option upon the acquisition of a building permit.

The dismissal of Ibach's prayer for specific enforcement of his option to purchase allows me to pass over defendants' argument that the Court lacks jurisdiction over the claim because Ibach has not yet determined to exercise his option.

C. Bonus Claim

Next, Dolle's moves for summary judgment on Ibach's request for an accounting. Dolle's argues that these claims are barred by the statute of limitations and are substantively meritless. Ibach's claim seeks an order directing Dolle's to account [*25] to Ibach for the depreciation, apartment expenses and excessive salaries allegedly wrongfully deducted from his bonus. The management agreement states that Ibach's bonus is to be 20% of the operating profit of the business. "Operating profit" is defined as total pre-tax income less interest earned or rental income received. Dolle's operating profit would therefore be lower or higher depending on what the directors/shareholders decided to pay themselves through salary or dividends as well as other payments or deductions.

Dolle's argues that Ibach's bonus claim is purely a question of interpreting the management agreement which the Court can do by simply looking at the agreement. Concerning Ibach's claim that depreciation should not be deducted from the number from which his bonus was calculated, Dolle's states that Ibach has been aware of such deductions and has said nothing in the past. While this may be true it is not in and of itself proof that such conduct is proper under the agreement. The present record, in fact, is no help in determining whether Dolle's properly deducted depreciation from gross profits.

Concerning the deduction of officers' salaries, Ibach merely claims that [*26] such salaries were excessive, not that the deductions themselves were improper. Ibach argues that he was lead to believe that officers' salaries would be much lower thereby making his bonus much higher. The validity of Ibach's belief as well as questions

concerning the alleged excessiveness of certain salaries are questions of fact that cannot be determined at this stage.

Plaintiff finally argues that apartment expenses (for the apartment above the store used as an office and living quarters) should not have been deducted from Dolle's gross income. Again, the record is insufficient to allow me to determine this issue as a matter of law.

The parties dispute how Ibach's bonus claim should be characterized. Ibach characterizes his claim as one for an accounting in equity. Dolle's, on the other hand, argues that Ibach is making a mere wage claim that is legal in nature. How Ibach's bonus claim is characterized is important only to the extent it bears on Dolle's statute of limitation and laches argument.

While it is clear that this Court has original jurisdiction to compel an accounting where a fiduciary relationship exists, Ibach does not claim, nor can he claim, to be in such a relationship [*27] with Dolle's. Ibach does appear to argue that the relationship between parties to a business agreement, as well as between employee and employer, has been held to involve such trust and confidence as to entitle parties to an accounting in equity. Ibach's authority for this proposition, *1 Am.Jur.2d, Accounts and Accounting, § 52*, is, however, wholly distinguishable from the present situation.

That Ibach's authority is distinguishable is illustrated by examining the case law underlying that authority. In the first case supporting the proposition that an accounting could be had in equity concerning the relationship of employer and employee, the court found a fiduciary relationship, unlike the present situation. See *Cyranoski v. Keenan, Mich. Supr., 109 N.W.2d 815, 817 (1961)*. The remaining two cases are also distinguishable in that they involved agreements to share profits, unlike Ibach's contractually determined bonus. See *Legum v. Campbell, Md. Ct. App., 131 A. 147, 148 (1925); Gauthier v. Dickerson, Wash. Supr., 249 P.2d 370, 371 (1952)*. Ibach's authority is therefore factually distinguishable.

Historically, this Court [*28] has directed accountings for non-fiduciaries only when the accounts were so complex that the legal remedy was likely to prove inadequate. *McMahon v. New Castle Associates, Del. Ch., 532 A.2d 601, 605 (1987)* (citing Pomeroy's Equity Jurisprudence § 1421 (1941)). Evidently, the historical basis for this position involved the fact that discovery in civil litigation was originally available in equity but not in the law courts. Id. Due to the development of the discovery rules in law courts, this Court has held that "it now seems likely that equity shall rarely, if ever, have to be resorted to in order to determine the state of accounts in a purely commercial relationship." Id. No one has argued that the accounts in the present case are complex. Ibach's bonus claim, however characterized, is therefore legal in nature.

The final question concerning Ibach's bonus recalculation claim is whether an applicable statute of limitations or the doctrine of laches should be invoked to bar plaintiff's claim as to certain years. Because Ibach's claim is legal in nature, the applicable statute of limitations should be applied. *Bokat v. Getty Oil Company, Del. Supr., 262 A.2d 246, 251 (1970)*. [*29] The applicable statute of limitations is the one-year statute of limitation found in *10 Del. C. § 8111* governing wage claims in employee-employer relationships. See *Goldman v. Braunstein's, Inc., Del. Supr., 240 A.2d 577, 578 (1968)*. For this reason, only Ibach's bonus claims for 1988 and 1989 may be raised at trial.

IV. CONCLUSION

In light of the dismissal of Ibach's prayer for specific enforcement and the legal nature of his prayer for a recalculation of his bonus, the Court's jurisdiction is in question. Indeed, Ibach's prayer for specific enforcement and for an accounting establish his equitable jurisdiction. What remains is Ibach's claim for wrongful discharge, his bonus claim (which is legal in nature) as well as defendants' cross-claim that Ibach has breached his duty of good faith and fair dealing in relation to the agreement. Although the remaining legal claims could properly be transferred to a court of law, this Court also has the power to retain jurisdiction, once properly obtained, "in those circumstances when the equitable claim dissipates." *Sannini v. Casscells, Del. Supr., 401 A.2d 927, 932 (1979)*. In the present situation [*30] it is clear that this Court should retain jurisdiction and decide what is left of the entire controversy. Transferring the present action, at this stage, would cause hardship to the parties and would put an unneeded strain on the courts.

For these reasons, plaintiffs wrongful termination claim, defendants' cross-claim that plaintiff breached his duty of good faith and fair dealing in relation to the management agreement as well as plaintiff's bonus claim will go to trial. Plaintiff's claim for specific enforcement of his option to purchase Dolle's candy business is dismissed.

IT IS SO ORDERED.



**WILCOX & FETZER LTD.**

In the Matter Of:

# Miller, et al.
## v.
# Computer Sciences Corporation

C.A. # 04C-12-127 SCD

---

Transcript of:

Nick Wilkinson

May 19, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 7

```
 1    A.   It's based in Milton Keynes in the U.K., but
 2   it's a distance learning college.
 3    Q.   How long are you lived in the United States?
 4    A.   Since December 19 -- 1999.
 5    Q.   What prompted your move to the United States?
 6    A.   I made a company transfer for a new position
 7   with CSC.
 8    Q.   Are you presently working for CSC?
 9    A.   Yes.
10    Q.   What is your job title?
11    A.   It recently changed, and it was on the card
12   that I gave to the lady here.  I can basically -- it
13   is Vice-President Chemicals, Energy, and Natural
14   Resources.
15    Q.   You say that changed recently?
16    A.   It changed from the effect of our -- from
17   April, yes.  Prior to that it was Vice-President and
18   Global Account Executive for Chemicals and Energy.  So
19   it didn't change a lot, but it added natural
20   resources.
21    Q.   And how long did you hold that position?
22    A.   Since July of 2002.
23    Q.   In total how long have you worked for CSC?
24    A.   Since the 2nd of October 1989.  So that's what?
```

A 406

1  BY MR. WILSON:

2  Q.   But to your recollection, there is no set time
3  where they are supposed to be set?

4           MR. SEEGULL:  Objection.  Asked and
5  answered.  Go ahead.  Answer again.

6  A.   No.

7  Q.   And the AMIP program follows CSC's fiscal year,
8  correct?

9  A.   That's correct, yes.

10 Q.   And is that from approximately April 1st
11 through March 31st?

12 A.   It was from exactly April 1st to March 31st.

13 Q.   Can you tell me how AMIP bonuses are
14 calculated?

15          MR. SEEGULL:  Objection, vague and
16 ambiguous.  Go ahead.  You can answer.

17 A.   How they are calculated?  It's a mathematical
18 process in the form of an Excel spread sheet.

19 Q.   Are numbers for different things such as
20 earnings accumulated throughout the year and added up
21 to see if you achieve the goals?

22 A.   No.  It's an annual target.

23 Q.   What do you mean by an annual target?

24 A.   What I mean by an annual target is there an

1    Q.    If someone is to be added to the program, are
2    they notified immediately?  For instance, if the
3    person comes in half way through the year?
4    A.    If they are a new recruit, then they are
5    notified as part of their joining activity.
6    Q.    If someone is removed --
7    A.    If they were a promotee, then they'll get told
8    that as part of their paperwork to be promoted.
9    Q.    If someone is removed, are they to be notified
10   immediately?
11   A.    If someone had previously been notified that
12   they were in and now are being told that they're out,
13   yes, they should be notified immediately.
14   Q.    Once you're deemed eligible for AMIP, does your
15   participation continue until you're notified that
16   you're no longer eligible?
17   A.    No.  It's an annual scheme.
18   Q.    People who are not going to be participating
19   for the fiscal year, should they be notified in the
20   same way that the people that are notified that they
21   are going to be participating?
22            MR. SEEGULL:  Objection.  Vague.
23   Ambiguous, speculation.
24   A.    I don't understand your question.

Case 1:05-cv-00010-JJF   Document 98-13   Filed 05/24/2006   Page 9 of 13

Page 36

State of Delaware   )
                    )
New Castle County   )


## CERTIFICATE OF REPORTER


I, Ann M. Calligan, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 19th day of May, 2006, the deponent herein, NICK WILKINSON, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


                    Ann M. Calligan, RMR
                 (Certification No. 186-RPR)
                 (Expires January 31, 2008)


DATED: May 23, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, *et al.*,

        Plaintiffs,

v.

COMPUTER SCIENCES CORPORATION,

        Defendant.

Civil Action No. 05-010-JJF

## AFFIDAVIT OF GUS SIEKIERKA

I, Gus Siekierka, do hereby depose and swear as follows:

1. I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2. I am employed as the Corporate Vice President of Human Resources for Computer Sciences Corporation ("CSC" or "the Company"). Previously, I was the Vice President of Human Resources for three CSC business units: Global Infrastructure Systems, Technology Management Group and Global Transformation Solutions.

3. CSC is an information technology ("IT") services company that provides outsourcing of IT services to clients worldwide. Outsourcing is the practice of turning over operational and management responsibilities for a business' IT systems to an outside firm. Often, outsourcing is accomplished by transitioning the IT employees from the client company to CSC.

4. In 1983, CSC created an incentive compensation program known as the Annual Management Incentive Program ("AMIP"). Under the program, AMIP participants are eligible

A 410

to receive up to a specified percent of their base salary as a bonus after the close of the fiscal year. The percent actually received by each participant, if any, is based upon achieving a combination of various corporate, business unit, group and/or individual performance objectives set for each fiscal year. CSC measures the degree to which these objectives have been met at the close of the fiscal year. CSC's fiscal year runs from April 1 through March 31. For example, Fiscal Year 2004 ("FY04") ran from April 1, 2003 through March 31, 2004.

5. If all AMIP objectives are achieved, an AMIP participant generally receives the specified potential percent of his or her base salary as an AMIP bonus. Greater or lesser achievement of objectives results in a scaled percentage of the targeted AMIP bonus.

6. AMIP is intended to incentivize and reward upper-level management with year-end bonuses. Upper level management has traditionally included Presidents (Salary Level 09 – "S09"), Vice Presidents (Salary Level 08 – "S08") and some Directors (Salary Level 07 – "S07").

7. Over time, however, AMIP participation expanded beyond CSC's original intent. This expansion resulted from CSC's absorption of large groups of new employees from clients in connection with outsourcing deals. As a result, the application of AMIP became inconsistent across the company; some Managers (Salary Level 05 – "S05") and Senior Managers (Salary Level 06 – "S06") were allowed to participate in AMIP while others were not. Consequently, the ever increasing AMIP pool no longer reflected CSC's original intent for the AMIP program as many lower level management and non-management employees were sporadically admitted to the program. Regardless of whether employees became AMIP participants as upper-level management or lower-level management, however, CSC never promised or guaranteed ongoing participation in AMIP. Indeed, all incentive/variable compensation programs are reviewed

annually and may be modified or discontinued based on CSC's financial capability and business requirements.

8.  Because CSC's needs and goals change each year, CSC built substantial flexibility into the administration of the AMIP program: Participation in AMIP endures for only one fiscal year. CSC reviews AMIP each year and expressly reserves the right to modify or completely discontinue the program based on financial and business requirements. Additionally, after the close of each fiscal year, CSC reviews employee participation in AMIP and removes employees as appropriate. CSC regularly removes employees from AMIP for business reasons.

9.  AMIP bonuses are based on achievement of a combination of various corporate, business unit, group and/or individual performance objectives set for each AMIP participant for each fiscal year. High level objectives and targets are set by Corporate and the Presidents of major business units, while team and individual goals may be set by other management as appropriate. The objectives for a given year might include such metrics as revenue, operating income, earnings per share, and returns on investment, as well as individual financial and non-financial objectives. Each of these objectives is assigned a specific target number or similar goal towards which the employee is to strive. Likewise, each objective is weighted to reflect the employee's ability to impact certain objectives, and the achievement of the objectives is measured at the end of the fiscal year. The objectives, as well as their targets and weightings change from year to year and from employee to employee.

10. Because AMIP is based entirely on year-long objectives, CSC assesses whether an employee has achieved his or her designated objectives after the close of the fiscal year. Once the fiscal year ends, CSC spends several weeks determining how the company performed against the various objectives set forth on all AMIP worksheets. After these calculations are complete,

AMIP bonuses for the now-past fiscal year are awarded as appropriate, typically in May or June of the new fiscal year.

11. CSC's policy and practice does not treat AMIP bonuses as earned if an AMIP participant is no longer eligible for the program at the end of the fiscal year. For instance, if an AMIP participant is terminated midyear or transfers midyear to a position where AMIP participation is not available, that employee will not receive an AMIP bonus in any amount. In very limited circumstances, such as the midyear retirement of a AMIP participant after a lengthy service with CSC, the Company has made exceptions to the above practice by paying out a prorated AMIP bonus.

12. After performance for a recently concluded fiscal year has been measured and AMIP bonuses awarded, CSC then begins to set AMIP objectives, targets and weightings for the new fiscal year. These objectives, targets and weightings are communicated to employees at some point during the fiscal year, although there is no set timeframe for this communication. Typically, the objectives, targets and weightings are communicated anywhere from August through October of the fiscal year. Importantly, the communication of these objectives, targets and weightings serves to notify employees that they are eligible for AMIP. Accordingly, employees who are not provided the AMIP criteria and payout methodology cannot assume that they are eligible for AMIP for the fiscal year.

13. CSC's compensation policies are available to employees on the corporate Internet and are distributed in printed form and via email.

14. Fiscal Year 2003 ("FY03") was a difficult and disappointing year for CSC, as the Company missed many of its financial targets. As a result, CSC implemented a number of substantial cost-saving measures consistent with its general operating model. Shortly after the