IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIAN MILLER; HECTOR CALDERON; | : |
| CHARLES FOLWELL; ROLLAND GREEN; | : |
| DAWN M. HAUCK; KEVIN KEIR; | : |
| ASHBY LINCOLN; KAREN MASINO; | : |
| ROBERT W. PETERSON; SUSAN M. POKOISKI; | : |
| DAN P. ROLLINS; and WILLIAM SPERATI, | : C.A. No. 05-010-JJF |
| | : |
| **Plaintiffs,** | : |
| | : |
| v. | : |
| | : |
| COMPUTER SCIENCES CORPORATION, | : |
| a Delaware Corporation, | : |
| | : |
| **Defendant.** | : |

PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated: June 8, 2006

Timothy J. Wilson, Esquire (DE #4323)
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
Attorney for Plaintiffs

## TABLE OF CONTENTS

TABLE OF CITATIONS ………………………………………………………..iii

NATURE AND STAGE OF PROCEEDINGS …………………………...........................1

SUMMARY OF ARGUMENT …………………………………………………...…..2

STATEMENT OF FACTS …………………………………………….…………4

ARGUMENT …………………………………………………………………….7

I.    STANDARD OF REVIEW ……………………………………………7

II.   PLAINTIFFS' CLAIMS ARE NOT BARRED
      BY THE ONE-YEAR STATUTE OF LIMITATIONS……………..….8

      a.    CSC Waived Any Right To Assert a Statute of
            Limitations Defense By Not Including Such
            Defense in Its Responsive Pleading or Raising
            It at a Pragmatically Sufficient Time……………………….…..8

      b.    Plaintiff's Cause of Action Did Not Accrue
            Until the Wages Became Due and Payable………………………9

III   MATERIAL ISSUES OF FACT EXIST REGARDING
      PLAINTIFFS' EARNING OF THEIR BONUSES
      FROM APRIL 1, 2004 THROUGH SEPTEMBER 11, 2004
      THAT PRECLUES SUMMARY JUDGMENT…………………………13

      a.    Despite the Provision in the CSC Policy Manual
            that Employees be Informed as to their Eligibility
            for the AMIP Program Annually, CSC Failed
            to Follow this Mandate and Business Practice
            Became that Employees Remained in the
            Program Until Affirmatively Removed…………………………13

      b.    Material issues of fact remain as to whether
            or not Plaintiffs were in fact earning their AMIP
            bonus from April 2003 through September 2003
            and such issues of material fact preclude
            granting summary judgment in CSC's behalf………………….14

c.      Material Issues of fact remain as to whether
        or not CSC considered the Plaintiffs to be
        participating in the AMIP program from
        April 2003 through September 2003................................16

d.      CSC's failure to provide Plaintiffs the
        payout criteria is not dispositive on the
        issue of whether or not Plaintiffs earned
        their AMIP bonus from April 2003 through
        September 2003......................................................19

e.      Issues of fact remain as to whether an
        individual who is not in the AMIP program
        at the end of the fiscal year receives an AMIP bonus..............20

CONCLUSION ...........................................................................22

**Unreported Cases**                                                    **Tab No.**

Balter v. United States,
2006 U.S. App. LEXIS 3568, 4-5 (3d Cir. 2006)............................................A

Hassler v. Valk Mfg. Co.,
1983 Del. Super. LEXIS 667 (Del. Super. 1983)............................................B

Roos v. Delaware Valley Radiology, P.A.,
1989 U.S. Dist. LEXIS 4023 (D. Del. 1989)............................................C

Seitz v. The Siegfried Group, LLP,
2001 Del. Super. LEXIS 364 (Del. Super. 2001)............................................D

# TABLE OF CITATIONS

Cases                                                                    Page No.

Adickes v. S.H. Kress & Co.,
398 U.S. 144, 157 (1970)……………………………………………………..……8

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986)………………………………………………………7, 8

Balter v. United States,
2006 U.S. App. LEXIS 3568, 4-5 (3d Cir. 2006)…………………………………………9

Compass v. American Mirrex Corp.,
72 F.Supp. 2d 462 (D. Del. 1999)……………………………………………..…11

Fassett v. Delta Kappa Epsilon (New York),
807 F.2d 1150, 1167 (3d Cir. 1986)……………………………………………..…8

Ford v. Temple Hospital,
790 F.2d 342, 348 (3d Cir. 1986)…………………………………………………8

Gen. Comm. of Adjustment, United Transp. Union, W. Maryland R.R. Co. v.
CSX Railroad Corp., 893 F.2d 584, 591 – 592 (3d Cir. 1990)……………………..…14

Hassler v. Valk Mfg. Co.,
1983 Del. Super. LEXIS 667 (Del. Super. 1983)……………………………..……10

Horowitz v. Fed. Kemper Life Assurance Co.,
57 F.3d 300, 302 n.1 (3d Cir. 1995)……………………………………………..…7

Logan v. Commerical Un. Ins. Co.,
96 F.3d 971, 978 (7th Cir. 1996)………………………………………………..…7

MacDonald v. Delta Air Lines, Inc.,
94 F.3d 1437, 1440 (10th Cir.
1996)………………………………………………………………………7

McIntosh v. Arabian American Oil Co.,
633 F.Supp. 942 (D. Del. 1999)………………………………………….……12

Pa. Coal Ass'n v. Babbitt,
63 F.3d 231, 236 (3d Cir. 1995)……………………………………..……..8

**Cases**                                                      **Page No.**

Plant v. Catalytic Constr. Co.,
287 A.2d 682, 684 (Del. Super. 1972)……………………………………………………9

Rodgers v. Monumental Life Ins. Co.,
289 F.3d 442, 448 (6th Cir. 2002)……………………………………………….……..7

Roos v. Delaware Valley Radiology, P.A.,
1989 U.S. Dist. LEXIS 4023 (D. Del. 1989)……………………………………….9, 10

SCOA Indus., Inc., v. Bracken,
374 A.2d, 263 (D. Del.)…………………………………………………………....……..12

Seitz v. The Siegfried Group, LLP,
2001 Del. Super. LEXIS 364 (Del. Super. 2001)………………………………..……13

Troy Chemical Corp. v. Teamsters Union Local No. 408,
37 F.3d 123, 126 (3d Cir. 1994)……………………………………………….……..7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **BRIAN MILLER; HECTOR CALDERON;** | : |
| **CHARLES FOLWELL; ROLLAND GREEN;** | : |
| **DAWN M. HAUCK; KEVIN KEIR;** | : |
| **ASHBY LINCOLN; KAREN MASINO;** | : |
| **ROBERT W. PETERSON; SUSAN M. POKOISKI;** | : |
| **DAN P. ROLLINS; and WILLIAM SPERATI,** | : C.A. No. 05-010-JJF |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **COMPUTER SCIENCES CORPORATION,** | : |
| **a Delaware Corporation,** | : |
| | : |
| **Defendant.** | : |

## CERTIFICATE OF SERVICE

I, Timothy J. Wilson, hereby certify that on June 8, 2006 one copy of the ***Plaintiff's***

***Answering Brief In Opposition To Defendant's Motion For Summary Judgment*** was

delivered via U.S. Mail, postage prepaid, to the following:

| | |
|---|---|
| Larry R. Seegull | Sarah E. DiLuzio |
| DLA PIPER RUDNICK | POTTER ANDERSON & CORROON LLP |
| GRAY CARY US LLP | 1313 North Market Street 6th Floor, |
| 6225 Smith Avenue | P. O. Box 951 |
| Baltimore, Maryland 21209 | Wilmington, Delaware  19801 |

MARGOLIS EDELSTEIN

Timothy J. Wilson, Esquire (DE #4323)
1509 Gilpin Avenue
Wilmington, DE  19806
(302) 777-4680
Attorney for Plaintiffs

vi

## **NATURE AND STAGE OF THE PROCEEDINGS**

The Plaintiffs in this case, are all current or former employees of the Defendant Computer Sciences Corporation ("Defendant" or "CSC"). The lawsuit was filed on December 13, 2004 in the Superior Court for the State of Delaware in and for New Castle County. CSC removed the case to this Court on January 18, 2005 and filed its answer. All discovery is now complete.

CSC filed its Opening Brief in support of its Motion for Summary Judgment on May 24, 2006. That which follows is Plaintiffs' Answering Brief.

## SUMMARY OF ARGUMENT

1.    CSC waived its right to assert a statute of limitations defense because it did not assert that affirmative defense in its responsive pleading or raise that defense at a pragmatically sufficient time. To permit CSC to proceed under this theory at this time will result in extreme prejudice to Plaintiffs.

2.    Plaintiffs' Complaint was timely filed because their cause of action did not accrue, and therefore the statute of limitations did not begin to run until the wages became due and payable.

3.    CSC failed to adhere to its Policy Manual's mandate that it inform employees at the beginning of the fiscal year on their eligibility for the AMIP program. As a consequence, it became standard business practice at CSC that once employees were enrolled in the AMIP program, they remained in the program until they were informed of their removal. Therefore, Plaintiffs remained in the program through September 2003.

4.    Material issues of fact remain as to whether or not Plaintiffs were in fact "earning" their AMIP bonus from April 2003 through September 2003 and such issues of material fact preclude granting summary judgment in CSC's behalf.

5.    Material issues of fact remain as to whether or not CSC considered the Plaintiffs to be participating in the AMIP program from April 2003 through September 2003 and such issues of material face preclude summary judgment in CSC's behalf.

6.    CSC's failure to provide Plaintiffs the payout criteria is not dispositive on the issue of whether or not Plaintiffs earned their AMIP bonus from April 2003 through September 2003.

7.   Issues of fact remain as to whether an individual who removed from the AMIP program prior to the end of the fiscal year is entitled to his or her AMIP bonus, and such issues of material fact preclude summary judgment in CSC's behalf.

## STATEMENT OF MATERIAL FACTS

This action is brought by eleven former or current employees of CSC who are each individually seeking recovery of a bonus entitled the "Annual Management Incentive Program" ("AMIP"). This bonus was retroactively removed from each of the Plaintiffs compensation packages by their employer, CSC on September 11, 2003. (B-1273 – B-1282). The Plaintiffs are: Brian Miller, Hector Calderon, Charles Folwell, Dawn M. Hauck, Kevin Keir, Ashby Lincoln, Karen Masino, Robert W. Peterson, Susan M. Pokoiski, Dan P. Rollins, and William Sperati (collectively "Plaintiffs").

In 1997, the majority of the Plaintiffs were transitioned from working directly for DuPont to working for CSC on the DuPont account. When this happened, each was put on the AMIP program to compensate them for a similar bonus which they earned while employed by DuPont. (B-1171-1172). This bonus was provided to them to entice them to make the move to CSC and for their compensation to remain equal to, or better than it was at DuPont (B-1170, B-0983 – B-0985). Each Plaintiffs' AMIP bonus would provide a substantial portion of his or her annual earned compensation.

The AMIP bonus program is a program that awards employees for their contributions to various business aspects throughout CSC's fiscal year ("FY"), which runs from April 1 through March 31. It is an earned bonus (B-0988, B-1048, B-1109, B-1232). The AMIP payout is calculated at the end of the fiscal year and the payout made shortly thereafter (B-1000 - B-1001, B-1174, B-1215). Employees who are not a part of the program for the entire fiscal year earn an AMIP bonus that is pro-rated based upon the number of months that they contribute to the program objectives ( B-0989 – B-0990, B-1044 – B-1045, B-1101 – B-1102, B-1175, B-1182 – B-1183, B-1306).

4

At the beginning of each year, under the terms of the AMIP program, some form of communication to the AMIP participants is required to inform them as to whether or not they will continue in the AMIP program for the upcoming fiscal year. (B-1045, B-1104 – B-1105, B- 1184 – B-1185, B-1230 – B-1231). The course and practice of CSC was however, in direct contravention of this policy. Namely, such communication was made only to employees who were being removed at the beginning of the fiscal year and rarely, if ever made to participants if their continuing participation. (B-1104 – B-1105). In other words, it became standard business practice at CSC for employees who are not instructed that they have been eliminated from the program at the beginning of the fiscal year to remain in the AMIP program for that fiscal year (B-1104 – B-1105).

Each of the Plaintiffs had been participating in the AMIP program for a number of years – most since they began their employment at CSC. Each also participated in the AMIP program for FY '03, and each received an AMIP bonus for that entire fiscal year. Each year during Plaintiffs' participation, CSC failed to indicate to the Plaintiffs at the beginning of the fiscal year whether or not they were going to continue in the program. (B-407 – B-408) Because they did remain in the program from year to year in the absence of such communication, it became a standard belief at CSC that non-communication regarding AMIP equated to continued participation. (B-835)

At the beginning of FY '04, just like every other year, there was no communication made to the Plaintiffs that they were being removed from the program. (B-0101 – B-0102, B-0419 – B-0421, B-0942 – B-0943). As a result, each Plaintiff continued to give their best efforts and go above and beyond their normal job functions because they knew that by doing so, they would be rewarded with the AMIP bonus at the

end of the year. (B-0104, B-0354 – B-0355). This continued through August and into September, 2003, when suddenly, each Plaintiff received a letter notifying them that they would no longer be eligible for participation in the AMIP program. (B-1273 – B-1282). Not only did their sudden removal from the program come as a shock to the Plaintiffs, the removal was being made *retroactive* to April 1, 2003; the beginning of the fiscal year. (B-1273 – B-1282). The Plaintiffs had been working for, and indeed *earning*, their bonuses for the previous five plus months of the fiscal year, and now CSC was claiming that they were going to take it away from them. (B-0101 – B-0102, B-0191, B-0717, B-0957)

AMIP bonuses were paid to none of the Plaintiffs at the conclusion of the FY '04. Further, no other bonuses were paid out to any of Plaintiff that would have compensated the Plaintiffs for their wrongfully withheld AMIP bonuses. (B-0280, B-0363, B-0966 – B-0967)

## ARGUMENT

### I.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it might affect the outcome under the governing substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Material facts are those that could alter the outcome of the case, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995). A fact is only material if the "establishment thereof might affect the outcome of the lawsuit under governing substantive law." Rodgers v. Monumental Life Ins. Co., 289 F.3d 442, 448 (6th Cir. 2002); see also Logan v. Commercial Un. Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) ("The nonmovant must do more . . . than demonstrate some factual disagreement between the parties; the issue must be 'material.' Irrelevant or unnecessary facts do not preclude summary judgment even when they are not in dispute.").

A material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1440 (10th Cir. 1996); see also Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d 123, 126 (3d Cir. 1994)(holding that factual issues are not

"genuine" unless a reasonable jury could return a verdict for nonmovant based on nonmovant's submissions). A dispute over a material fact must be "genuine," i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." Id.

The court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). In meeting its burden of showing an absence of a genuine issue as to any material fact, "the material [the movant] lodge[s] must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[E]vidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

This case will involve drawing inference from fact. Drawing inferences from fact is a duty reserved for a jury at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).


## II.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ONE-YEAR STATUTE OF LIMITATIONS

### a.   CSC Waived Any Right to Assert a Statute of Limitations Defense By Not Including Such Defense in Its Responsive Pleading or Raising it at a Pragmatically Sufficient Time

Federal Rule of Civil Procedure 8(c) holds that statute of limitations defense is "an affirmative defense that is waived if not pleaded or otherwise properly raised." Ford v. Temple Hospital, 790 F.2d 342, 348 (3d Cir. 1986) (quoting, 2A Moore's Federal Practice para. 8.27[4] at 8-203 (2d ed. 1985)); see also Fassett v. Delta Kappa Epsilon,

807 F.2d 1150, 1167 (3d Cir. 1986). Affirmative defenses, including the statute of limitations, are waived unless affirmatively pled or raised "at a pragmatically sufficient time with no prejudice to the plaintiff." <u>Balter v. United States</u>, 2006 U.S. App. LEXIS 3568, 4-5 (3d Cir. 2006)(attached at Tab A).

Here, CSC did not raise the statute of limitations in its Answer (B-1257 – B-1258). CSC did not move to amend its Answer to include this defense. Nor has CSC *ever* given any indication that it would raise this issue. CSC'S failure to raise this defense until this point in the litigation bars its raising this issue now as it did not raise it at a pragmatically sufficient time.

Further, CSC's waiting to raise this defense at this time prohibits Plaintiffs from pursuing any form of discovery related to this issue. Simply put, Plaintiffs will suffer extreme prejudice if CSC is permitted to assert its affirmative defense of statute of limitations for the first time in its motion for summary judgment. Moreover, because discovery is now closed, Plaintiffs will likewise suffer extreme prejudice if CSC is permitted to amend its Answer at this point to include such a defense.

Therefore, any argument based upon statute of limitations must be denied.

b.    <u>Plaintiffs' Cause of Action Did Not Accrue Until the Wages Became Due and Payable.</u>

The statute of limitations begins to run (i.e., the cause of action accrues) in Delaware when *proper parties are in existence capable of suing and being sued*, and a *cause of action exists capable of being sued on forthwith.* <u>Roos v. Delaware Valley Radiology, P.A.</u>, 1989 U.S. Dist. LEXIS 4023 (D. Del. 1989)(emphasis added)(attached at Tab C)(quoting <u>Plant v. Catalytic Constr. Co.</u>, 287 A.2d 682, 684 (Del. Super. 1972)). "In any claim for wages or commissions, the cause of action accrues when an employee

*receives* his compensation, in whatever form, and through the exercise of reasonable diligence, *discovers* that he or she *has not been paid* the agreed-upon amount." Hassler v. Valk Mfg. Co., 1983 Del. Super. LEXIS 667 (Del. Super. 1983)(emphasis added)(attached as Tab B).

As the above rules of law apply in the present context, the statute of limitations did not begin to run until mid-2004; whenever the FY 2004 bonuses were calculated and distributed. The reason for this is evident in the italicized language in the rule of law cited above from Roos v. Delaware Valley Radiology. CSC was incapable of being sued on September 11, 2003 because they had not yet failed to pay the wages. Therefore, the Plaintiffs' claim was not ripe.

Secondly, the plain language of the Wage Payment and Collection Act holds that no cause of action arises until 30 days after the wages are due and payable.

> [a]ny employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amount or amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made . . . .

19 Del. C. § 1109(a). In other words, the employer has until 30 days after the wages are due and payable to satisfy its obligation without repercussion. Once that 30 days lapse, then the employee's *cause of action exists and is capable of being sued on forthwith.* Roos, supra. Here, the wages were not yet due and payable in September of 2003. This is because wages paid under the AMIP bonus program are not due and payable until after the close of the fiscal year.

Additionally, no cause of action existed that Plaintiffs could have sued upon in September 2003 because, at its own election, CSC could have reinstated Plaintiffs to the

AMIP program, or decided to pay them the pro-rated share for the months that they were in the program (April – September) at the end of the fiscal year. By doing so, it could have simply avoided this lawsuit. Because the AMIP bonus payments were not due and payable until the close of FY '04, there was no cause of action until that time (B-0999, B-1028, B-1173 – B-1174, B-1216). Consequently, the Complaint in this case was timely filed in December 2004.

In addition, Plaintiffs could not have discovered through reasonable diligence that they had not been paid the wages until the close of the fiscal year. This is because the calculations as to whether or not the objectives have been achieved are not done until the close of the fiscal year (B-1037, B-1099, B-1173 – B-1174, B-1216).Therefore, no diligence on the part of Plaintiffs could have enabled them to discover that they were not paid the amounts due until it was determined that amounts were in fact due to *any* participant in the program.

CSC sets forth the proposition that "the statute of limitations accrues when an actionable dispute between known parties becomes clear." (Op. Br. at 15). That is not an accurate and complete statement of the law. Cf. Roos, supra. It then goes on to cite a string of cases that it purports to be serve as support for this proposition. However, each of those cases is somehow distinguishable or inapplicable in the present context.

In Compass v. American Mirrex Corp., 72 F.Supp. 2d 462 (D. Del. 1999), an executive for Mirrex was due to be paid a bonus if and when a merger that included Mirrex was consummated. The merger closing occurred on March 14, 1997. *Id*. at 467. Therefore, the bonus was *due and payable* on that date. The Court noted however, that the facts to calculate the bonus were not yet known at the time of closing. *Id* at 468.

Therefore, the bonus could not have been paid and the statute of limitations did not begin to run.

Nevertheless, the executive objected to two calculations of that bonus that were supplied to him on April 9, 1997 and August 29, 1997. *Id*. at 465. Finally, Mirrex tendered payment to the executive on October 10, 1997, stating that cashing the check would constitute a release by him of all claims against Mirrex. *Id.*

The Court held that October 10 was the date that the executive's claim matured and the statute of limitations began to run. *Id*. at 468. In other words, it was not until the bonus was due, the actual payment was tendered (or withheld as the case may be), that an employee's claim for unpaid wages matures.

Similarly, just as the executive's claim did not mature until Mirrex failed to pay him what was due, the Plaintiffs' claims did not mature until CSC failed to pay them what was due – *at the end of the fiscal year*. Simply put, the cause of action did not arise until the time for payment of the bonus occurred and CSC failed to pay that bonus.

McIntosh v. Arabian American Oil Co., 633 F.Supp. 942 (D. Del. 1999) is wholly inapplicable in that it is a breach of contract action and not a wage action.

SCOA Indus., Inc., v. Bracken, 374 A.2d, 263 (D. Del.) is distinguishable in that it is a case of discharge – not a case of disqualification from a bonus program. In a discharge situation, an employee's claim for unpaid wages accrues at the time of discharge. See Roos, supra. (generally, discharge cases are distinguishable from other wage claims where the employee remains employed because the employer's obligation to compensate does not become fixed until the employment relationship ends). As this is not a case where the employees were discharged, SCOA is likewise inapplicable.

The final case cited by CSC is <u>Seitz v. The Siegfried Group, LLP</u>, 2001 Del. Super. LEXIS 364 (Del. Super. 2001)(attached at Tab D).  In this case, plaintiff was terminated on August 11, 1997 and he filed suit over on unpaid bonus over two years later, on December 3, 1999.  Court held that the statute of limitations did not begin to accrue until December 7, 1998 because that was the date upon which the employer made the final calculation on the amount of the bonus and it was due and payable and the employer failed to pay the total amount due. <u>Id</u>. at 16.  Again, the key is that the bonus was *due and payable*.

### III.    MATERIAL ISSUES OF FACT EXIST REGARDING PLAINTIFFS' EARNING OF THEIR BONUSES FROM APRIL 1, 2004 THROUGH SEPTEMBER 11, 2004 THAT PRECLUDES SUMMARY JUDGMENT.

   a.    <u>Despite the Provision in the CSC Policy Manual that Employees be Informed as to their Eligibility for the AMIP Program Annually, CSC Failed to Follow this Mandate and CSC's Standard Business Practice was to Retain Employees in the Program Until they were Affirmatively Removed.</u>

The policy manual instructs that participation in the AMIP program for each employee is to be reviewed annually and that decision be communicated to each employee on an annual basis. (B-1272).    Importantly, this provision is to be communicated to each employee at the beginning of each fiscal year (B-1049).  Despite this provision, CSC has consistently failed to adhere to this provision (B-0339, B-0443, B-0542, B-0607 – B-0608). Instead, the normal course of business and procedure at CSC was: *once an employee was deemed eligible for the AMIP program, he or she continued to participate until he or she was informed otherwise* (B-0542, B-1046)*.*  As Russ Owen, CSC Group President and Account Executive admitted, "[g]enerally, people who get

enrolled in the program stay on it … It's a rare circumstance when they're removed." (B-1103).

It is well-established rule in the employment context that the employer's "practice, usage and custom" is very significant in interpreting an agreement, especially as it demonstrates a mutual understanding between the parties on a particular issue. Gen. Comm. of Adjustment United Transp. Union, W. Maryland R.R. Co. v. CSX Railroad Corp., 893 F.2d 584, 591 – 592 (3d Cir. 1990). As applied in this case, and according to CSC's own witnesses, despite the fact that such communication was to occur at the beginning of the fiscal year, (B-1049), the only communications made at that time occurred either when an employee was to be removed or added at that time (B-0992, B-1045). Rare, if ever was the case when a communication was made regarding continued participation – and such communication regarding continued participation was *never* made to Plaintiffs at the beginning of the fiscal year. (B-0339, B-0443, B-0542)

Furthermore, if a participant was to be removed, he or she must have been notified *immediately* (B-0992, B-1189). Therefore, Plaintiffs, relying on CSC's normal course of practice, rightfully continued their participation in the AMIP program from April 2003 through September 2003, when they were notified that they would no longer participate in the program. In the very least, there remain material issues of fact on this issue. (B-1045, B-1104 – B-1105)

     b.    Material Issues of Fact Remain as to Whether or Not Plaintiffs Were In Fact Earning Their AMIP Bonus From April 2003 Through September 2003 and Such Issues of Material Fact Preclude Granting Summary Judgment in CSC's favor.

CSC contends that Plaintiffs were not earning the AMIP bonus during the period April 2003 through September 2003. This contention is in direct contravention of the

evidence and the testimony elicited from the witnesses in this case – witnesses for both for Plaintiffs and for CSC.

The contradiction resides in the fact that the AMIP bonus program is predicated upon goals and objectives to be attained throughout the *entire fiscal year*. (B-0066, B-0493, B-1042 – B-1043, B-1099) Yet at the same time, CSC contends that an employee cannot "earn" the bonus without knowledge of the goals and objectives. (Op. Br. at 17). Curiously, the testimony in this case, establishes that the goals and objectives are not distributed until much later in the fiscal year, and at times not until the fiscal year was over. (B-0047, B-0105, B-0145 – B-0146, B-0229, B-0318, B-0408, B-0484 – B-0485, B-0603, B-0687, B-0754, B-0837 – B-0838, B-0905, B-1216). Therefore, if one were to accept CSC's theory, *no CSC employee* would be eligible for an AMIP bonus for the entire fiscal year. Instead that bonus *for every CSC employee* would necessarily have to be prorated for the months that the employee actually had knowledge of the goals and objectives.

Obviously, since employees do receive their AMIP bonuses for the entire fiscal year, this is not what happens. Employees who are in the AMIP program during a previous fiscal year and who are then given their objectives later in the subsequent fiscal year, do receive an AMIP bonus for the *entire* subsequent fiscal year – despite the fact that they did not have their goals and objectives for the entire fiscal year. (B-0491, B-0603 – B-0604) In other words, these employees are *earning* their AMIP bonus from the commencement of the fiscal year, despite the fact that CSC does not supply them with goals and objectives until much later in that fiscal year, if at all.

The same is true with the Plaintiffs. In prior years, when they did not get their goals and objectives until much later in the fiscal year, they nevertheless *earned* their AMIP bonus for the time period for which they were not aware of these specific goals and objectives. (B-0230 – B-0232, B-0318, B-0491, B-0603 – B-0604) Consequently, Plaintiffs were in fact *earning* their AMIP bonus for the period April 2006 through September 2006, even though they had not been informed of their specific goals and objectives.

In fact, an employee does not need to have the goals and objectives given to him in order to continue to earn the AMIP bonus. This is because the goals and objectives are for the most part consistent from year to year and only deviate in the weightings given to them, or they may deviate slightly for individual objectives, which are only a small percentage of the overall AMIP bonus. (B-0409, B-0546 – B-0547, B-0839, B-1226 – B-1227). Hence, all AMIP-eligible CSC employees, including the Plaintiffs knew generally what they must accomplish to earn the bonus for FY '04 – even without the goals and objectives sitting in front of them. In essence, all knew that they had to work hard to earn the most value for the corporation to achieve good financial results. (B-0546). The employees operated in this manner, without the goals and objectives, knowing that if they achieved a good financial performance throughout the year, they would meet the specific objectives, whatever they were. (B-0546). As a consequence, issues of fact remain as to the Plaintiffs "earning" their AMIP bonuses from April 2003 – September 2003 that preclude summary judgment.

      c.     <u>Material Issues of Fact Remain as to Whether or Not CSC Considered the Plaintiffs to be Participating in the AMIP Program from April 2003 Through September 2003.</u>

CSC asserts that each employee eligible for the AMIP program is not carried over from year to year; that it is only when they are notified of their goals that they are considered "in" the program. (Op. Br. at 18 – 20). However, looking the situation as it existed from a logical standpoint, if things operated the way CSC purports, then why was it even necessary for CSC to give these Plaintiffs the letter informing them that they would no longer be participating in the program? After all, if everybody's out of the program, the only people who need to be notified are the people who are in the program. The answer to the above rhetorical question is: the letter was given to the Plaintiffs because they *were still participating in the* program – not only in their own eyes, but in the eyes of CSC as well. Simply stated, if the Plaintiffs were never in the AMIP program from the commencement of FY '04, there was no need for the letter *at all*.

Furthermore, there is ample evidence adduced during discover from FY '04 that supports the fact that CSC considered the Plaintiffs' continued participation. For example, in a July 8, 2003 email from Gus Siekierka to Henry Leidemer, William Bankroft and John Walker (all CSC executives), Siekierka writes in the present tense:

> We have 117 Directors and 21 Director equivalents … on AMIP's. We *will*:
> a. *drop* the 21 Director equivalents from the program as this is a management program.
>
> …
>
> a. *drop* all 197 from the program.
>
> …
>
> a. *drop* all 97 from the program.

(B-1289 – B1290)(emphasis added). Significant in the above italicized language is that it is styled in the future tense; meaning that in the very least Siekierka considered the Plaintiffs, at this point, to still be in the program. Again, if they were not in the program

as of the beginning of FY '04, then there would be no need to discuss the "removal" of these individuals from the AMIP program.

In another email, this one from William Bancroft to Siekierka dated June 24, 2003, almost three months after FY '04 began, Bancroft writes regarding the AMIP program:

> Each individual's AMIP *needs to be* reviewed once/year for validation of fiscal responsibility and approval to participate on an AMIP. It is no longer an entitlement.

(B-1303)(emphasis added). Also included in that email is a table with suggestions from CSC senior management on the AMIP topic. Gary Lewis wrote, "[t]hese are the people who must be energized in order to meet out targets and *we will* significantly demotivate them if we reduce their salaries in this manner." (B-1305)(emphasis added).

Again, the italicized language above indicates that senior level management at CSC believed that these individuals were still participating in the program, and indeed, they were debating whether or not to remove them, deep into FY '04.

Furthermore, as it applies to Plaintiffs' argument in III(a) above, it is clear that Mr. Bancroft considered participation in AMIP an entitlement. Therefore this is further evidence of Plaintiffs continued participation.

The above is an issue that should be left to the jury to decide. A jury must be permitted the opportunity to draw inferences that by virtue of CSC sending the September 11 letter, and discussing the removal of the Plaintiffs from the program during FY '04, that the Plaintiffs were in fact still participating in the program, both in the eyes of the Plaintiffs but also in the eyes of CSC.

      d.     <u>CSC's Failure to Provide Plaintiffs the Payout Criteria is not Dispositive on the Issue of Whether or Not Plaintiffs Earned Their AMIP Bonus From April 2003 Through September 2003</u>

In its Opening Brief, CSC sets forth the illogical proposition that because it failed to provide the Plaintiffs with a detailed explanation of how the bonus was to be calculated, the Plaintiffs are therefore are entitled to nothing for their work. (Op. Br. at 22). To illustrate this proposition, but in simpler terms, an analogous statement would be, "you worked for me all week, but in order to pay you, you are required to have me give you an account of the hours you worked. I am now refusing to give you this account. Therefore, you are not entitled to payment." In an attempt to interject common sense into the practice of law, an employer cannot claim that an employee is not entitled to payment for wages earned simply because the *employer* failed to do something.

Again, in previous years, the normal course and practice of CSC was to make no communications to the Plaintiffs regarding their calculations until late in the year, or after the close of the fiscal year, if at all. (B-0047, B-0105, B-0145 – B-0146, B-0229, B-0318, B-0408, B-0484 – B-0485, B-0603, B-0687, B-0837 – B-0838, B-0905). Therefore, up until they were informed that they were being removed from the program, Plaintiffs had no reason to think that they would not ultimately receive such calculations. (B-0485) Hence, they continued to perform their duties in the manner that they had in previous years when they did receive the AMIP bonus, and in fact, performed these duties under the assumption that they were earning their AMIP bonus. (B-0101 – B-0102, B-0485)

This is another issue that must be left to the jury – again, whether or not CSC's failure to inform Plaintiffs of their non-participation at the beginning of the fiscal year, in

conjunction with the course of dealing/course of practice precludes them retroactively denying Plaintiffs their earned AMIP bonus.

      e.    <u>Issues of Fact Remain as to Whether an Individual Who is Not in the AMIP Program at the End of the Fiscal Year Receives an AMIP bonus.</u>

CSC's final argument is that Plaintiffs cannot possibly be entitled to an AMIP bonus because they were not in the program at the close of the fiscal year. (Op. Br. at 24 – 25). They offer the testimony of Jim Styles who speculates that he will not receive an AMIP bonus for FY '06 because he terminated his employment with CSC prior to the close of FY '06.

Mr. Styles speculation is not indicative of Plaintiffs' situation. Mainly, Mr. Styles terminated his own employment. (B-1017 – B-1018). Plaintiffs' employment was not terminated and they remained on CSC's payroll. Moreover, their removal from the program is attributable to no fault of their own.

Furthermore, there have been CSC employees in the past who were not participating in the program at the close of the fiscal year that did, in fact, receive a prorated bonus for that fiscal year. (B-0486). According to the original AMIP policy, if an employee's employment was terminated through no fault of their own during the fiscal year, the employee's AMIP was prorated – despite the fact that the employee was not enrolled in the program at the end of the fiscal year. (B-1285). Moreover, the policy for eligibility in the program states:

> the employee *will receive the pro-rated portion of payout* at the time of award payment, based on months of participation.
> • Employees terminated for cause will not receive payout.
>      …

20

(B-1300)(emphasis added). While the Plaintiffs' employment was not terminated, clearly the AMIP program contemplated a prorated bonus if an employee was removed from the AMIP program during the fiscal year. Furthermore, there can be no mistake that the AMIP bonuses are to be prorated based upon the number of months that the employee is participating in the program. (B-0060, B-0546, B-1306)

Consequently, viewing this evidence in a light most favorable to Plaintiffs, summary judgment cannot be granted on this issue.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that CSC's Motion for

Summary Judgment be denied.

MARGOLIS EDELSTEIN

Timothy J. Wilson, Esq. (4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

DATED:  June 8, 2006.

22

# TAB A

LEXSEE 2006 U.S. APP. LEXIS 3568

**RICHARD BALTER, Appellant v. UNITED STATES OF AMERICA; FEDERAL BUREAU OF PRISONS; JAE H. SHIM, Clinical Director, Health Services Unit; MAXIMO R. VALESCO, Medical Officer, Health Services Unit; DANIEL O. ROMERO, Medical Officer, Health Services Unit; ARNOLD T. REYES, Health Services Administrator**

**NO. 04-3687**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 3568*

**January 6, 2006, Submitted Under Third Circuit LAR 34.1(a)
February 15, 2006, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the Middle District of Pennsylvania. (D.C. Civ. No. 01-cv-01944). District Judge: Honorable Judge James M. Munley.

**COUNSEL:** RICHARD BALTER, Appellant, Pro se, White Deer, PA.

For UNITED STATES OF AMERICA, FED BUR PRISONS, JAE H. SHIM, Clinical Director, Health Services Unit, MAXIMO R. VALESCO, Medical Officer, Health Services Unit, DANIEL ROMERO, Medical Officer, Health Services Unit, ARNOLD T. REYES, Health Services Administrator, Appellees: Joseph J. Terz, Office of United States Attorney, Harrisburg, PA.

**JUDGES:** BEFORE: ROTH, RENDELL and AMBRO, CIRCUIT JUDGES.

**OPINION:** PER CURIAM

Appellant, Richard Balter, appeals from an order entered by the United States District Court for the Middle District of Pennsylvania dismissing his complaint. The facts and procedural history of this case are well known to the parties. It is thus not necessary for us to restate them in great detail here. Balter, a federal prisoner, filed the underlying complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcot-*

*ics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971),* [*2] and the Federal Tort Claims Act ("FTCA"), *28 U.S.C. § 2671, et seq.*, against the following defendants: the United States of America; the Federal Bureau of Prisons; Jae H. Shim, Clinical Director of the Health Services Unit; Maximo R. Valesco, Medical Officer; Daniel O. Romero, Medical Officer; and Arnold T. Reyes, Health Services Administrator. Balter essentially asserts that the defendants failed to provide him with timely and adequate medical treatment for an eye condition, and that the delayed treatment which he did receive resulted in the loss of vision in his right eye.

We have jurisdiction over the instant appeal pursuant to *28 U.S.C. § 1291*, and exercise plenary review over a District Court's order granting defendants' motion to dismiss the complaint and for summary judgment. See *Debiec v. Cabot Corp., 352 F.3d 117, 128 n.3 (3d Cir. 2003); Broselow v. Fisher, 319 F.3d 605, 607 (3d Cir. 2003)*. After careful review of the record, we find that dismissal was proper and we will thus affirm the judgment of the District Court.

The District Court properly granted defendants' motion to dismiss with [*3] respect to defendant Reyes because Reyes had no direct involvement in Balter's medical treatment. See *Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000)*(citing cases holding that respondeat superior is not a viable theory of Bivens liability); cf. *Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)* (no respondeat superior liability in § 1983 cases). As for Balter's *Eighth Amendment* claim against the remaining defendants, summary judgment was appropriate insofar as Balter failed to demonstrate that the defendants were deliberately indifferent to his eye condition. See *Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*. In fact, a review of the record shows that Balter

was seen on numerous occasions by prison doctors, outside ophthalmologists, and a variety of specialists. As the District Court concluded, Balter's disagreement with the prison doctors regarding the type of treatment he should have been given does not amount to an *Eighth Amendment* violation. See *White v. Napoleon, 897 F.2d 103 (3d Cir. 1990)*. Summary judgment was thus properly granted with respect to the merits of Balter's *Eighth Amendment* [*4] claim and, we would note, Balter does not take issue with the District Court's disposition of this claim on appeal.

Finally, we agree with the District Court that Balter's FTCA claim was barred by the statute of limitations. Initially, we reject appellant's argument that the District Court committed reversible error in considering defendants' argument regarding the timeliness of his FTCA claim since it was not raised in their initial motion to dismiss the complaint and for summary judgment. As we have noted in the past, affirmative defenses (including the statute of limitations) are not waived if raised at a "pragmatically sufficient time" with no prejudice to the plaintiff. See *Eddy v. VI Water & Power Authority, 256 F.3d 204, 209 (3d Cir.2001)*, citing *Charpentier v. Godsil, 937 F.2d 859, 864 (3d Cir. 1991)*. Here, defendants raised the statute of limitations defense in their objections to the Magistrate Judge's first Report and Recommendation, and again on remand from the District Court in their answer and second motion to dismiss and for summary judgment. Balter was afforded an opportunity

to meet that defense and to present his arguments to both [*5] the Magistrate Judge and the District Court. Given these circumstances, we cannot agree with appellant's contention that the District Court erred in considering the limitations defense.

That having been said, Balter was required to file an administrative claim with the appropriate federal agency within two years after his claim accrued. See *28 U.S.C. § 2401(b)*. The District Court correctly concluded that Balter knew of both the existence and the probable cause of his injury in August 1997 because, at that time, two eye specialists had allegedly told him that the delay in seeking treatment had adversely affected his prognosis. In his complaint, Balter claimed the delay was caused by the prison medical staff at USP-Lewisburg. Moreover, in his September 26, 2000 administrative complaint Balter listed the "incident date" as August 29, 1997. While Balter argues that the incident was ongoing, we agree with the District Court that the events which occurred subsequent to August 1997 did not allow him to delay in bringing suit until after his treatment was complete. See *Tyminski v. United States, 481 F.2d 257 (3d Cir. 1973)*. Balter thus had until [*6] August 1999 to file his administrative tort claim. The claim he filed on September 26, 2000 was clearly untimely.

Accordingly, for the reasons stated, we will affirm the District Court's judgment.

# TAB B

LEXSEE 1983 DEL. SUPER. LEXIS 667

## Paul C. Hassler v. Valk Manufacturing Company

### Civil Action No. 80C-JA-130

### Superior Court of Delaware

### *1983 Del. Super. LEXIS 667*

### November 17, 1983, Decided

**COUNSEL:** [*1]

Paul H. Spiller, Esq., Kimmel & Spiller, P.A., 401 Market Tower Building, 901 Market Street, Wilmington,DE 19801; John E. Babiarz, Jr., Esq., Morris, Nichols, Arsht & Tunnell, Twelfth and Market Streets, P.O. Box 1347, Wilmington, DE 19899

**OPINIONBY:**

BIFFERATO

**OPINION:**

VINCENT A. BIFFERATO, JUDGE

UNREPORTED OPINION

This matter is before the Court on defendant Valk Manufacturing Company's (Valk) motion for summary judgment based on a statute of limitations defense pursuant to *10 Del.C. § 8111.* The underlying cause of action involves a dispute over certain sales commissions allegedly due the plaintiff from the defendant. The defendant seeks summary judgment on all claims for commissions allegedly earned prior to January 28, 1979, which is one year prior to the date this action was commenced. The plaintiff argues that Valk's repeated acknowledgments of these claims serve to estop any assertion of the statute of limitations.

As this is a motion for summary judgment, the record will be viewed in a light most favorable to the non-moving party and all unrebutted statements of fact will be deemed true. *Shultz v. Delaware Trust Company, Del.Super., 360 A.2d 576 (1976).* If [*2] the record indicates the existence of a material issue of fact, summary judgment will be denied. *Pullman, Incorporated v. Phoenix Steel Corporation, Del.Super., 304 A.2d 334 (1973).*

The following facts form the basis of the plaintiff's claim. The plaintiff, Mr. Hassler, began as a salesman for Valk on or about November 10, 1976. His employment contract provided for payment of commissions on sales of certain items manufactured by Valk, and specified an "initial territory" which included "Washington, D.C., Maryland, Delaware, Pennsylvania, New Jersey, New York, and all New England States." At some point in 1977, the plaintiff alleges that Valk failed to pay the agreed commissions for certain sales he procured. The plaintiff also alleges that he made a contemporaneous demand for those commissions and was subsequently assured by Richard Valk, the president of Valk Manufacturing Company, that he would be paid all the commissions he was owed. The plaintiff further testified at his deposition that he would examine his commission sheet every month and that whenever there was a discrepancy, he would complain to the company treasurer, Ross Rolles, and, whenever available, [*3] he would also complain to Mr. Valk. The plaintiff states that Mr. Valk repeatedly assured him that he should not worry because he would be paid all that was owed to him. This pattern allegedly continued from min-1977 until the fall of 1979, at which time the plaintiff was terminated by Valk.

There is no dispute that this action is governed by *10 Del.C. § 8111* which provides:

"No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with any such action, shall be brought after the expiration of one year from the accruing of the cause of action on which such action is based."

subsisting debt and recognition of an obligation to pay it. *267 A.2d at 606.*

As to the defendant's argument regarding the unreasonableness of the plaintiff's reliance on the defendant's promises, the Court is not persuaded. The relationship between an employer and employee, if profitable to both, is often something all parties will work diligently to preserve. In this case, the plaintiff obviously felt that there was substantial income to be made as a salesman for the defendant. If, in fact, Valk was paying some of the commissions due during the period in question, a trier of fact could certainly find plaintiff's reliance justified in the light of his expectation of future financial gain with the company. Reasonableness or unreasonableness is certainly [*9] the type of question best left to the trier of fact.

For the reasons stated herein, the defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

# TAB C

LEXSEE 1989 U.S. DIST. LEXIS 4023

**EUGENE H. ROOS, D. O., Plaintiff, v. DELAWARE VALLEY RADIOLOGY, P.A., Defendant**

**Civil Action 88-85 - CMW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1989 U.S. Dist. LEXIS 4023; 29 Wage & Hour Cas. (BNA) 417*

**April 3, 1989, Decided**

**COUNSEL:** [*1]

Jeffrey P. Wasserman, Esquire of Ciconte & Roseman, Wilmington, Delaware. OF COUNSEL: Kenneth F. Carobus, Esquire of Morris & Adelman, Philadelphia, Pennsylvania. Attorneys for Plaintiff.

Robert Meyer, Esquire and Charlene D. Davis, Esquire of Bayard, Handelman & Murdoch, Wilmington, Delaware. Attorneys for Defendant.

**OPINIONBY:**

WRIGHT

**OPINION:**

OPINION

CALEB M. WRIGHT, SENIOR UNITED STATES DISTRICT JUDGE

Plaintiff Eugene H. Roos ("Dr. Roos"), a doctor of osteopathy, brought this action for payment of employment compensation and for reimbursement for the cost of certain medical malpractice insurance on October 29, 1987, against Defendant Delaware Valley Radiology, P.A. ("DVR").

Pursuant to a written employment agreement, Dr. Roos worked for DVR as a radiologist for nearly 17 months during 1985 and 1986. He was notified of his termination on September 17, 1986, and his last day of work was December 15, 1986. Dr. Roos does not challenge the propriety of his termination. Rather, in Counts I and II of his Complaint, he seeks money to which he was allegedly entitled under his employment agreement but which he was never paid. In Count III, Dr. Roos seeks reimbursement for the cost of certain medical malprac-

tice [*2] insurance premiums that he alleges were the obligation of DVR under his employment contract.

DVR moved for summary judgment on January 20, 1989. It argues that plaintiff's claims in Counts I and II are barred by the applicable Delaware statute of limitations, and that plaintiff's claim in Count III is not supported by the unambiguous language of the employment agreement. This Court has jurisdiction pursuant to *28 U.S.C. § 1332* and § *1404.* For the reasons stated herein, DVR's motion is granted in part and denied in part.

*I. BACKGROUND*

*A. Facts and Procedural History*

*DVR hired Dr. Roos as a radiologist on April 16, 1985. The terms of Dr. Roos' employment with DVR were contained in a written employment agreement that he and DVR president Dr. Ronald D. Petrocelli ("Dr. Petrocelli") signed on April 16, 1985.*

*The agreement stated that Dr. Roos was to begin work for DVR on July 1, 1985. The initial term of employment was described as continuing until May 31, 1986, a date that coincided with the DVR fiscal and pension plan years. Thereafter, employment was to continue from year to year except in the event of termination.*

*Under the terms of the agreement, n1 Dr. Roos was to be* [*3] *paid a first-year salary of $ 67,000 and was to receive a pension plan contribution equivalent to 25% of the salary amount ($ 16,750). During his second year of employment, Dr. Roos was to receive a salary of $ 100,000. The parties dispute whether the $ 100,000 figure for the second year was intended to include the contribution to retirement benefits of 25% of salary.*

Case 1:05-cv-00010-JJF    Document 99    Filed 06/08/2006    Page 37 of 49

Page 2

1989 U.S. Dist. LEXIS 4023, *; 29 Wage & Hour Cas. (BNA) 417

n1 *The employment agreement stated:*

*The compensation of employee in the first two years of employment shall be a specified salary. The first year salary shall be sixty-seven thousand dollars ($ 67,000). In addition, (A) the corporation will contribute to the employees account twenty-five (25%) of his compensation for retirement benefits. Malpractice insurance premiums will be provided. A maximum of three thousand dollars ($ 3,000) will be provided for educational benefits described in Section 8. The second year salary shall be one hundred thousand dollars ($ 100,000) . . . . [sic]*

*Employment Agreement at 3.*

In addition to establishing salary and pension benefits, the agreement stated that DVR would provide "[m]alpractice insurance premiums". Additionally, the employment agreement provided that:

*Employee is responsible* [*4] *for securing malpractice insurance providing coverage equivalent to the coverage on the other physicians employed by the corporation with such coverage meeting the requirements of St. Francis Hospital. Said malpractice insurance must be provided by the same insurer as covers the corporation, which is currently PHICO [PHICO Insurance Company]. Employee will provide the corporation with evidence of such malpractice insurance coverage.*

After the contract was executed but prior to Dr. Roos' beginning work, Dr. Petrocelli wrote a letter to Dr. Roos. In that letter, dated June 26, 1985, Dr. Petrocelli attempted to clarify the provisions of the agreement that related to salary. The letter stated as follows:

*I would like to clarify a point raised by our accountant in regard to your first year salary. The salary stated in the contract is intended to be for a twelve month period. Your anniversary date for pay purposes will be July First and any pay adjustments will be made at that time.*

*I believe that we discussed this point earlier but I wanted to be sure that there was no misunderstanding as you begin work. Your monthly salary will be $ 5583.33 before deductions. For the eleven month period* [*5] *ending 31 May 1986, this totals $ 61416.66. There is in addition approximately 25% pension plan contribution which you may elect to take as pension or additional salary.*

Dr. Roos began work on July 1, 1985. He obtained primary and excess physician's professional liability insurance from PHICO equivalent to the coverage for other DVR physicians. The policies covered claims made against Dr. Roos beginning July 1, 1985. DVR paid the premiums for Dr. Roos' insurance coverage from July 1, 1985, through December 15, 1986, his last day of work.

Pursuant to Dr. Petrocelli's letter of June 26, 1985, Dr. Roos elected to receive his 25% pension plan contribution as additional salary, thus resulting in a gross income of $ 6,980 per month. Dr. Roos received this amount monthly up to and including June 30, 1986.

On July 17, 1986, Dr. Roos and Dr. Petrocelli met to discuss Dr. Roos' performance during his first year of employment. The two discussed problems with Dr. Roos' interaction with co-workers, punctuality and effort. They discussed the possibility that Dr. Roos' employment with DU might be terminated and the fact that Dr. Petrocelli would be monitoring his performance. [*6]

Acting on the advice [*6] of DVR's accountant, Charles H. Elter, Dr. Petrocelli, in June or July of 1986, discontinued the practice of paying Dr. Roos the 25% pension plan contribution in the form of additional monthly salary payments. This decision was apparently based on the fact that the terms of the DVR money purchase pension plan obligated DVR to contribute 25% of the annual salary for only those employees who remained with DVR on May 31, 1987, the last day of the pension year.

On July 1, 1986, Dr. Roos began his second year of employment with DVR. His second-year salary was $ 80,000, which resulted in a gross monthly pay of $ 6,667. Dr. Roos was paid a gross salary of $ 6,667 on July 30, 1986; September 2, 1986; September 26, 1986; October 28, 1986; and November 28, 1986.

On September 17, 1986, Dr. Petrocelli wrote to Dr. Roos notifying him of his termination. By letter dated September 23, 1986, Dr. Petrocelli accepted Dr. Roos' resignation, effective September 15, 1986, and stated that Dr. Roos' last day of work would be December 15, 1986.

Dr. Roos' last day of work for DVR was December 15, 1986. His primary and excess professional liability insurance coverage terminated on that date. Under the terms [*7] of his original policy, Dr. Roos could require PHICO, for an additional fee, to issue a retroactive reporting policy. A retroactive reporting policy covers incidents occurring during the original policy period but not reported as claims until after the termination of the original policy coverage. DVR did not pay PHICO or Dr. Roos for retroactive reporting coverage or for any other insurance coverage obtained by Dr. Roos after his termination. Dr. Roos paid PHICO a $ 13,375 premium for retroactive reporting coverage.

Dr. Roos, a Pennsylvania resident, filed suit against DVR, a Delaware professional association, on October 29, 1987, in the United States District Court for the

Case 1:05-cv-00010-JJF    Document 99    Filed 06/08/2006    Page 38 of 49

Page 3

1989 U.S. Dist. LEXIS 4023, *; 29 Wage & Hour Cas. (BNA) 417

*Eastern District of Pennsylvania. On January 14, 1988, that court entered an Order transferring the case to the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 1404(a).*

*B. Summary Judgment Standard*

*A moving party is entitled to summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Wilmington Housing Auth. v. Pan Builders, Inc., 665 F.Supp. 351, 353 (D.Del. 1987). The Court [\*8] must view all the facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment. Id.*

*The burden of proving that no genuine issues of material fact exist rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985). Conversely, to defeat a motion for summary judgment, the non-moving party must produce specific evidence showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 323; Jersey Central Power & Light Co. v. Township of Lacey, 772 F.2d 1103, 1109-10 (3d Cir. 1985).*

*However, not every factual ambiguity necessitates a trial. By its very terms, the standard of Rule 56(c) provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).*

*For a party to prevail on summary judgment in a contract action, the Court must be convinced that the contractual terms present only a question of law. [\*9] Alexandria Coca-Cola Bottling Co. v. Coca-Cola Co., 637 F.Supp. 1220, 1225 (D.Del. 1984) (holding that ambiguity in meaning of contractual phrase precluded summary judgment). That is, the Court must determine whether the language "is so clear that it can be read only one way." Id. at 1226 (quoting Landtect Corp. v. State Mutual Assurance Co. of America, 605 F.2d 75, 80 (3d Cir. 1979)). If the non-moving party presents a reasonable reading of the contract that varies from the interpretation offered by the movant, then a question of fact exists which can only be resolved through trial. 637 F.Supp. at 1226.*

*II. ANALYSIS*

*A. Applicable Statute of Limitations*

*The employment agreement states that it is to be "interpreted, construed and governed according to the laws of the State of Delaware." While the parties do not dispute that Delaware law applies to this employment agreement, they do disagree as to which Delaware statute of limitations is applicable and when plaintiff's causes of action accrued. DVA argues for application of 10 Del.C. § 8111, n2 Delaware's one-year statute of limitations governing actions for recovery on claims for work, labor or personal [\*10] services. Plaintiff asserts that this is more than a mere claim to recover wages, and that 10 Del.C. § 8106, n3 Delaware's three-year statute of limitations governing contract actions (actions "based on a promise"), should apply.*

n2 *10 Del.C. § 8111 provides:*

*No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with any such action, shall be brought after the expiration of one year from the accruing of the cause of action on which such action is based.*

n3 *10 Del.C. § 8106 provides:*

*No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject, however, to the provisions of § § 8108-8110, 8119 and 8127 of this title.*

[\*11]

*This is not the first time that a court has had occasion to consider the overlap of these two statutes. Employment litigation in Delaware often implicates both sections because nearly every claim for wages is based on an underlying promise, express or implied, to pay the wages. See Wilmington Housing Authority v. Rocky Marciano Construction Co., 407 F.Supp. 228, 232 (D.Del. 1976). Courts are thus often able to construe a plaintiff's claim as either a breach of contract action or as an attempt to recover employment benefits. See, e.g.,*

*McIntosh v. Arabian American Oil Co., 633 F.Supp. 942, 946 (D.Del. 1986).*

The Supreme Court of Delaware reconciled these overlapping statutes of limitations in *Goldman v. Braunstein's Inc.,* 240 A.2d 577 (Del. 1968). There the court distinguished between an action for wages for services already performed, to which Section 8111 is relevant, and an action based on a contract for its breach prior to performance, of which Section 8106 is controlling. *See id.* at 578. *Goldman* involved an action for future services not performed and an allegation that the plaintiff was wrong fully discharged. *Id.* The court focused on the fact that [*12] the claim did not arise from services performed, and held the longer statute of limitations applicable. *Id.*

This distinction between the coverage of Sections 8106 and 8111 was reiterated in *Brown v. Colonial Chevrolet,* 249 A.2d 439 (Del.Super.Ct. 1968). *Brown* was an action by a terminated employee to recover his unpaid year-end bonus. *Id.* at 440. Analogizing to *Goldman,* the court noted that the plaintiff's employment was terminated before the services, in return for which compensation was promised, could be completed, and that the plaintiff's claim was thus based on services to be performed. *Id.* at 441. In other words, the suit was for what would have been earned had the employment continued, rather than for something already earned. *Id.* The *Brown* court thus held that the claim was an action "based upon a promise" and that the three-year statute of limitations applied. *Id.*

In reaching this conclusion, the court summarized the teaching of *Goldman:*

The one-year statute applies to claims based on work or services that have been completed, even though the work may have originally been undertaken on the strength of a promise. Since the services have [*13] been completed, the action is based upon the service performed rather than on the original promise. The three-year statute applies to claims based on work or services not yet completed as to which a promise has been made. Since the work remains uncompleted, an action with respect to such work is necessarily based upon the underlying promise.

249 A.2d at 441; *see also Creamer v. General Teamsters Local Union 326,* 579 F.Supp. 1284, 1290 (D.Del. 1984) (§ 8111 applies only where services have been performed; § 8106 covers actions for recovery of wages where breach of contract prevented performance of called-for services).

Contrary to plaintiff's assertion, Section 8111 is not limited to claims for wages. The section governs actions for employment benefits, not just wages. *See*

*McIntosh,* 633 F.Supp. at 946-47. The legislative intent of Section 8111 was "to bar all claims arising out of the employer-employee relationship." *Sorensen v. Overland Corp.,* 142 F.Supp. 354, 360 (D.Del. 1956), *aff'd,* 242 F.2d 70 (3d Cir. 1957). "The word 'benefits' is embracing and covers all advantages growing out of employment." *Id.; see also McIntosh,* 633 F.Supp. at 947

The fact that [*14] the Court must interpret a contract here does not dictate application of the longer statute of limitations. Rather, the fact that Dr. Roos is seeking to recover employment benefits for services already performed is controlling. Importantly, Dr. Roos is not suing to recover employment benefits to which he would have been entitled had the employment relationship continued. Because Dr. Roos has alleged that he failed to receive the monthly compensation and benefit payments to which he was entitled for services previously performed under the terms of his employment agreement, the Court finds the one-year statute of limitations in Section 8111 applicable. n4

> n4 The Court notes the general rule in Delaware that, if there is doubt as to which of two statutes of limitations applies, that doubt should be resolved in favor of the longer period. *Sonne v. Sacks,* 314 A.2d 194, 196 (Del. 1973). However, Delaware law has by long tradition given no weight to considerations of hardship or "fair play" in the application of statutes of limitations. *Nose v. Rementer,* 610 F.Supp. 191, 193 (D.Del. 1985) (citing *Rash v. C. & M. Corp.,* 59 Del. 257, 218 A.2d 670, 672 (1966)). Because the Court finds that the Delaware courts have clearly delineated between § 8111 and § 8106, application of the general rule favoring the longer statute of limitations is unnecessary.

[*15]

**B. Accrual of Causes of Action**

Application of the one-year statute of limitations bars Dr. Roos' claims in Counts I and II if they accrued more than one year prior to October 29, 1987, the date of the Complaint. Relying on Delaware's Wage Payment and Collection Act, 19 Del.C. § 1101 et seq., n5 DVR argues that an employee's right to bring suit for wages accrues the day after the regular designated payday on which he or she allegedly was not paid or was underpaid, and that an employee's right to bring suit for benefits or wage supplements, as distinguished from wages, accrues 30 days after such payments were required by an employment agreement. Plaintiff answers by asserting that a cause of action for employment compensation does not accrue until the employment relationship ends.

Case 1:05-cv-00010-JJF    Document 99    Filed 06/08/2006    Page 40 of 49

Page 5

1989 U.S. Dist. LEXIS 4023, *; 29 Wage & Hour Cas. (BNA) 417

n5 *Section 1102 of the Act requires that "[e]very employer shall pay all wages due to his employees on regular paydays designated in advance by the employer, which shall be at least once during each calendar month, and in lawful money of the United States or checks. . . ." 19 Del.C. § 1102(a). Wages are defined as "compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." 19 Del.C. § 1101(a)(2).*

*The Act further requires that "[a]ny employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amount or amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made . . . ." 19 Del.C. § 1109(a). "Benefits or wage supplements" means compensation for employment other than wages. 19 Del.C. § 1109(b). Because the Act provides that an employee may bring a civil action to recover unpaid wages, see 19 Del.C. § 1113(a), DVR argues that the wage payment obligations of the statute effectively establish the accrual date for such a cause of action.*

[*16]

Plaintiff cites a number of cases in support of his contention that a cause of action for employment compensation does not accrue until the employment relationship terminates. See *Sperinq v. Sullivan, 361 F.Supp. 282 (D.Del. 1973)* (action based on attorney-client relationship of independent contractor); *Plant v. Catalytic Constr. Co., 287 A.2d 682 (Del.Super.Ct. 1972)* (action for wages pursuant to collective bargaining agreement that required mediation); *Commons v. Green Giant Co., 394 A.2d 753 (Del.Super.Ct. 1978)* (action for severance pay). None of these cases mandate the broad rule urged by plaintiff. Each involved particular facts in which, either because of the specific employer-employee relationship or the nature of the compensation, the employer's obligation to compensate did not become fixed until the employment relationship ended.

No such special facts exist here. When plaintiff did not receive the full pay to which he allegedly was entitled on his monthly paydays, he had notice that DVR did not intend to pay him more, and he could have sued promptly. There is nothing in the employment agreement to reasonably suggest to the plaintiff that he would be further compensated [*17] at the end of the employment relationship.

*The statute of limitations begins to run (i.e., the cause of action accrues) in Delaware when proper parties are in existence capable of suing and being sued, and a cause of action exists capable of being sued on forthwith. Plant v. Catalytic Constr. Co., 287 A.2d 682, 684 (Del.Super.Ct. 1972).* In light of Delaware's Wage Payment and Collection Act, plaintiff's causes of action for underpayments accrued, at the latest, 30 days after each payday. At that time the parties were identifiable and the plaintiff had claims capable of being sued upon.

All of the claims of Count I are therefore barred. Count I demands judgment for salary and pension plan contributions for the period from July 1, 1985, through May 31, 1986. Because the last payday during this time was May 27, 1986, the latest possible cause of action accrued on June 26, 1986. Plaintiff's Complaint was not filed until more than one year after the accrual of the claims in Count I.

Count II of the complaint demands judgment for salary and pension plan contributions from June 1, 1986, through the end of plaintiff's employment on December 15, 1986. Because the Complaint was not filed [*18] until October 29, 1987, any claims accruing prior to October 29, 1986, are barred. Plaintiff's claims of underpayment in connection with the paydays of July 30, 1986; September 2, 1986; and September 26, 1986, are barred by the statute of limitations because each claim accrued prior to October 29, 1986. Therefore, plaintiff's only remaining, viable claims in Count II are those in connection with the paydays of October 28, 1986, and November 28, 1986.

### C. Contract Interpretation

The issue on Count III is whether the provisions of the employment agreement regarding malpractice insurance obligated DVR to pay Dr. Roos for money expended to obtain retroactive reporting coverage. As detailed above, the agreement stated only that DVR would provide "[m]alpractice insurance premiums" for "coverage equivalent to the coverage on tee other physicians employed by the corporation . . . ." The agreement did not define what constituted equivalent coverage. Dr. Roos contends that summary judgment is inappropriate on Count III because an issue of material fact exists regarding whether DVR provided other physicians with retroactive reporting coverage.

If a writing is plain or clear on its face, [*19] there is no room for interpretation, construction or a search for the intent of the parties. See, e.g., *Myers v. Myers, 408 A.2d 279, 280 (Del. 1979); Nepa v. Marta, 415 A.2d 470, 473 (Del. 1980).* However, the court is not free to exclude or disregard extrinsic evidence; for the meaning of words used in an agreement can only be known through an appreciation of the context and cir-

Case 1:05-cv-00010-JJF    Document 99    Filed 06/08/2006    Page 41 of 49

Page 6

1989 U.S. Dist. LEXIS 4023, *; 29 Wage & Hour Cas. (BNA) 417

cumstances in which they were used. *Klair v. Reese, 531 A.2d 219, 223 (Del. 1987).* When the court is aware of ambiguity in the meaning and application of agreed language, it can consider extrinsic evidence that bears on the issue. *See id.*

The provisions of the employment agreement between Dr. Roos and DVR are ambiguous to the extent that they do not define the equivalent coverage to be provided Dr. Roos. The Court thus looks outside the four corners of the document to interpret this phrase. The controlling, extrinsic evidence here is an uncontroverted affidavit of Dr. Petrocelli in which he states that DVR "has never paid a premium for a professional liability retroactive reporting policy affording coverage to a physician after his/her employment with DVR has terminated." Dr. Roos has [*20]  come forward with no evi-

dence to suggest that the equivalent coverage for which DVR pledged to pay included retroactive reporting coverage. Summary judgment in favor of DVR is thus appropriate on this issue.

### III. CONCLUSION

For the foregoing reasons, DVR's motion for summary judgment is granted in part and denied in part. Summary judgment is granted on Counts I and III. As to Count II, summary judgment is granted as to all claims except those stemming from the alleged underpayments on October 28, 1986, November 28, 1986, and any dates thereafter.

The Court will enter an Order in accordance with this Opinion.

# TAB D

LEXSEE 2001 DEL. SUPER. LEXIS 364

**PAUL C. SEITZ, Plaintiff, v. THE SIEGFRIED GROUP, LLP, SIEGFRIED & SCHIEFFER, LLP, SIEGFRIED CONSULTING, LLP, and SIEGFRIED RESOURCES, LLP, Defendants.**

**C.A. No. 99C-12-025-CHT**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2001 Del. Super. LEXIS 364*

**March 15, 2001, Submitted**
**October 2, 2001, Decided**

**DISPOSITION:** [*1]

Motion for Partial Summary Judgment on the Complaint and Motion for Summary Judgment on the Partnerships' Counterclaim denied. Partnerships' Motion for Summary Judgment on Their Counterclaim granted in part and denied in part.

**COUNSEL:** David H. Williams, Esquire and Elizabeth A. Brown, Esquire, MORRIS JAMES, HITCHENS & WILLIAMS LLP, Wilmington, DE, Attorneys for the Plaintiff.

Jeffrey M. Weiner, Esquire, Wilmington, DE, Attorney for the Defendants.

**JUDGES:** TOLIVER, JUDGE.

**OPINIONBY:** TOLIVER

**OPINION:**

**OPINION AND ORDER**

**On the Defendants' Motions**

**for Partial Summary Judgment**

**and**

**On the Plaintiff's Motion**

**for Partial Summary Judgment.**

**TOLIVER, JUDGE**

**FACTS**

The Plaintiff, Paul C. Seitz, is an accountant and the Defendants n1 are providers of accounting services to various persons and/or entities. On July 1, 1993, the par-

ties entered into an agreement ("Employment Agreement") whereby Seitz would be employed to act as an accountant on behalf of present and future clients of the Partnerships. He was to receive compensation based upon those efforts as defined in that agreement. It was also contemplated that clients previously served by Seitz or whose interests he would subsequently [*2] be retained to represent would become part of the clientele of Partnerships.

> n1 The Siegfried Group, Siegfried & Schieffer, Siegfried Consulting and Siegfried Resources were, at all times relevant to this action, limited liability partnerships registered in the State of Delaware. They shall hereinafter be referred to as the "Partnerships".

On January 4, 1996, Seitz and the Partnerships entered into a series of contracts which altered the manner in which Seitz was to receive compensation for his efforts on behalf of the Partnerships. Also affected were the terms and conditions relating to any termination of the relationship between Seitz and the Partnerships as well as the nature and the consequences of any professional contact between Seitz and clients of the Partnerships following a termination.

Of primary consequence among the aforementioned agreements were the Incentive Compensation Agreement ("ICA") and the Tactical Component Agreement ("TCA"). The ICA provided Seitz with the opportunity to earn compensation [*3] by attaining certain short-term goals and objectives deemed mutually beneficial to both parties as opposed to longer-term business objectives. The TCA, specifically Paragraph 4, defined the mechanism by which the computation of Seitz' compensation would be achieved. It also set out the criteria to be used

in evaluating his performance. They included sales, client service and a scoring component, including, but not limited to, new business development, corporate citizenship and other factors as determined by the Partnerships.

There was a limitation, however, on the amount of incentive compensation that Seitz could receive or be paid, as opposed to earn, in any one year. The TCA also defined the maximum amount payable and what became of the amount of incentive compensation earned in excess of that amount. The agreement stated that any monies owed to Seitz, including incentive compensation, but not yet payable, would be deferred and added to the tactical component in future years during which Seitz would be subject to the TCA. n2 In the event that the professional relationship between the parties was terminated, the excess so earned but not paid would be added to a promissory note (the [*4] "Seitz Note") and repaid according to the terms and conditions stated therein. n3

n2 TCA at P4(f).

n3 The Seitz Note was created as a result of an amendment to the Employment Agreement that was entered into by the parties on January 4, 1996. The relevant terms and conditions of the Seitz Note are provided for in P6 of that agreement.

For reasons that are not altogether clear, Seitz tendered his resignation from the Partnerships in a letter dated August 7, 1997. According to Seitz, the final date of their association was to be mutually determined later. On August 8, the resignation was accepted by Robert L. Siegfried, President of the Partnerships, who nominated September 7 as the date when the separation would be effective. However, during the interim, the Partnerships terminated Seitz's employment as of August 11, 1997. n4

n4 Letter from Siegfried to Seitz of August 11, 1997; see Defs.' Answer and Countercl. at Ex. N.

[*5]

At least during the month of August, 1997, the record reflects that the parties were attempting to calculate the incentive compensation due Seitz for the Partnerships' fiscal year 1996. n5 Although the final amount due for that period remains in dispute, it appears that Seitz had earned an amount in excess of that to which he could be paid under the TCA. n6 In any event, no further action on this issue was taken prior to the termination of the relationship between the parties.

n5 The reference to the Partnership fiscal years shall hereinafter be designated "FY ___ ".

n6 On August 5, 1997, a draft of a document purportedly from Robert Siegfried was directed to Seitz and calculated total incentive compensation for FY 1996 at $ 461, 461. If that were the case, pursuant to the TCA, the maximum incentive compensation payable would be $ 206,250. The balance, or $ 255,211, would have to be deferred and placed into the Seitz Note. However, while the Partnerships deny that this was the final figure for that year, it does not appear that they dispute that some incentive compensation was to be deferred and added to the Seitz note.

[*6]

On November 19, 1997, Seitz directed correspondence to the Partnerships demanding payment of the Seitz Note. The payments of principal and interest were to begin on May 19, 1999. n7 Nothing else of note transpired until April 9, 1998. On that date, Seitz requested that the Partnerships calculate his incentive compensation for the portion of FY 1997 up to the effective date of his termination. On December 7, 1998, the Partnerships informed Seitz that his incentive compensation FY 1997 prior to his termination was a negative $ 12,758. It was also at that time that Seitz was informed that he was due a total of $ 199,788 as opposed to the $ 461,461 figure referred to in the August 5, 1997 memo, which had not been given final approval. n8

n7 According to P3(b) of the Seitz Note:

The first such installment (of the Seitz Note) shall be due and payable: . . . (ii) eighteen (18) months after the date on which Borrower receives Lender's demand for repayment, where Lender (x) is less than 52 years of age at the time Lender demands repayment hereunder, and Lender has voluntarily terminated his employment, or (y) is less than 52 years of age at the time Lender demands repayment hereunder, and Borrower has terminated Lender's employment for cause. . .

See compl. at Ex. F.

[*7]

n8 Letter from Partnerships' counsel to counsel for Seitz of December 7, 1998; see compl. at Ex. G.

No payments were made on the indebtedness due under the Seitz Note following the November 19, 1997 demand for payment. It appears that compensation related to various aspects of his employment relationship with the Partnerships had been advanced to Seitz prior to his termination. The amount of that compensation was unilaterally determined by the Partnerships who began to deduct it monthly following Seitz' termination and the subsequent demand for repayment of the note by Seitz. Although there was no agreement concerning the Partnerships' calculation of this "negative compensation", Seitz did not dispute the right of the Partnerships to offset whatever that amount was determined to be against the deferred incentive compensation.

On December 27, 1999, the Partnerships informed Seitz that they had made what was later determined to be a contribution of $ 9,747.34 to Seitz' 401(k) plan as of September 12, 1997. The contribution was not authorized by Seitz and was credited against the deferred [*8] incentive compensation for 1997. n9

n9 It is not completely clear from the correspondence between the parties that the deduction and subsequent contribution was for FY 1997. However, it is apparent that Seitz did not affirmatively authorize the contribution at the time it was made. In addition, Seitz alleges that the contribution was subject to a forty percent (40%) forfeiture rate and therefore a loss to Seitz of $ 3,898.94. The basis for this claim is not set out in the pleadings but is presumably a reference to 26 U.S. c. § 401 of the Internal Revenue Code.

Seitz instituted this litigation on December 3, 1999. His complaint, as it presently exists, n10 generally alleges that the monies the Partnerships refused to pay him as outlined above constituted "wages" within the meaning of the Delaware Wage Payment and Collection Act, specifically 19 Del. C. § 1101(a)(2). The refusal, he contends violates that law, making the Partnerships liable for damages, including the deferred [*9] incentive compensation, interest, penalties, costs and attorney's fees. Seitz also seeks the return of the "negative compensation" that was incorrectly charged against his incentive compensation for FY 1997 as well as the monies which

he forfeited because of what he claims was the unauthorized 401(k) contribution.

n10 The complaint was amended on January 27, 2000, prior to the filing of answer by the Partnerships pursuant to Superior Court Civil Rule 15(a).

The Partnerships have denied the allegations made by Seitz. In addition, they have raised certain affirmative defenses, which, they allege will bar Seitz from any relief to which he might be entitled even if they acted improperly. Lastly, the Partnerships have filed certain counterclaims alleging that Seitz is in fact liable to them for breaches of the agreements executed by the parties during the course of their professional relationship.

On December 20, 2000, the Partnerships filed two motions seeking the entry of partial summary judgment on their behalf [*10] pursuant to Superior Court Civil Rule 56. The first sought a determination that Seitz was not entitled to any relief under the Delaware Wage Payment and Collection Act and that he failed to state a claim for relief as to the amount of incentive compensation claimed or insofar as the 401(k) contribution was concerned. The second motion requests a ruling from the Court on their counterclaim which sought damages based on the alleged solicitation and/or performance of professional services by Seitz for clients of the Partnerships.

Seitz has opposed those motions and seeks entry of judgment in his favor, also pursuant to Rule 56, as to Counts II thru IV and VI of the Partnerships' counterclaim and the damage claim arising out of the solicitation of two entities claimed as clients of the Partnerships. Specifically, Seitz claims that the aforementioned counts must be submitted to arbitration pursuant to one of the agreements ("Partners' Agreement") entered into by the parties at the start of their relationship. As to the two entities allegedly solicited, Seitz contends that solicitation alone, without engaging in any services for them is not enough to impose liability for damages on him. [*11] For those reasons, he argues that he is entitled to the relief sought.

Oral arguments on the motions were held on March 7, 2001 and March 15, 2001. All briefing having been completed and reviewed, that which follows is the Court's resolution of the issues so presented.

## DISCUSSION

As indicated above, both parties have filed motions seeking partial summary judgment pursuant to Rule 56. The law is well settled in this area. "Summary judgment may be granted only where, considering the facts in a

light most favorable to the non-moving party, there is no material issue of fact and the moving party is entitled to judgment as a matter of law." *Pullman, Inc. v. Phoenix Steel Corp., Del. Super., 304 A.2d 334, 334 (1973).* If, after viewing the evidence, the court finds that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances, then the court may not grant the motion for summary judgment. *Guy v. Judicial Nominating Comm'n., Del. Super., 659 A.2d 777 (1995);* and *Wilson v. Triangle Oil Co., Del. Super., 566 A.2d 1016 (1989).* [*12] It is the movant's burden to demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Borish v. Graham, Del. Super., 655 A.2d 831 (1994).* The party opposing that motion must be afforded the opportunity to come forward with evidence showing the existence of a dispute as to an issue of material fact. *Phillips v. Del. Power and Light, Del. Supr., 59 Del. 179, 216 A.2d 281 (1966).* It is with these standards in mind that the Court must review the motions filed by the parties.

## Partnerships' Motion for Partial Summary Judgment on Seitz' Complaint

### Whether Compensation Deferred Constitutes "Wages"

The Partnerships' first contention in its motion is that the deferred incentive compensation sought by Seitz is not "wages " for purposes of the Delaware Wage Payment and Collection Act. While the Partnerships do not dispute that any amounts due and payable to Seitz up to the maximum amount permissible under the ICA and the TCA during each of the partnership fiscal years in question here were wages, the Partnerships argue that incentive compensation which was deferred [*13] to be paid in future years, or in the case of termination, to be added to the Seitz Note, did not fall within that term. As a result, Seitz has failed to state a claim upon which relief can be granted under the aforementioned statute as to those monies which he had earned but had not been paid.

In support of this argument, the Partnerships cite *Dep't of Labor Ex Rel. Commons v. Green Giant Co., Del. Super., 394 A.2d 753 (1978).* That case held that wages are funds "ordinarily paid at the end of each period of a certain number of workdays." *Id. at 755.* The argument that is suggested is that because the funds were not subject to payment at the end of a period of a certain number of work days, they are not wages. Defs.' Mot. for Partial Summ. J. Upon Pl.'s Comp. at P3. Seitz responds that this argument is flawed because the amount in question was a year-end bonus or commission based upon Seitz' performance on behalf of the Partnerships and therefore constituted wages according to *SOCA Indus.,*

*Inc. v. Bracken, Del. Supr., 374 A.2d 263 (1977).* The Court agrees.

The Delaware Wage Payment and Collection Act defines wages as, "compensation for [*14] labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." *19 Del. C. § 1101(a)(2).* Clearly this definition of wages does not limit wages to those amounts included in an employee's normal paycheck. The courts in both Green Giant and SOCA Industries recognized that year-end bonuses or amounts earned on commission *are* considered wages. Green Giant at 756; and SOCA Indus. at 264. The ICA and TCA provide little assistance in determining whether the amount of incentive compensation that is to be deferred falls within the definition of wages for purposes of the statute in question. However, Paragraph 4(f)(iii) of the TCA makes it abundantly clear that any such excess amount is deemed to have been "earned" by Seitz. These monies are without doubt based upon services Seitz rendered to the Partnerships. As a consequence, the Court finds as a matter of law that the monies in question are wages because they are either a year-end bonus based upon his performance, a commission based upon his performance, or a combination of both.

The finding that Seitz' [*15] deferred incentive compensation constituted "wages", leads the Court to the Partnerships' alternative argument, i.e., that Seitz' claims are barred by the one-year statute of limitations applicable to wage claims set forth in *10 Del. C. § 8111.* Because Seitz was terminated on August 11, 1997, the Partnerships contend that the limitations period expired on August 11, 1998. As a result, Seitz' complaint was not timely when it was filed over a year later. Seitz responds that this cause of action did not arise and the limitations period did not begin to run until he received notice on December 7, 1998 of the Partnerships' calculation of the amount of incentive compensation which had been deferred for FY 1996 and 1997.

*10 Del. C. § 8111* holds:

> No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with [*16] any such action, shall be brought after the expiration of one *year from the accruing of the cause of action*

2001 Del. Super. LEXIS 364, *

on which such action is based. (emphasis added).

In a case very similar to the case sub judice, the United States District Court of the District of Delaware held that the plaintiff's cause of action did not arise until he had actual notice of the amount of his bonus. The Court made this finding despite a provision in the employment agreement that stated that the bonus was due at the closing of a merger. It reasoned that the cause of action did not mature until the bonus check was tendered to the plaintiff, which put him on notice that the amount was in dispute. *Compass v. American Mirrex Corp., D. Del., 72 F. Supp. 2d 462, 468 (1999).*

In this case, Seitz' cause of action did not arise until December 7, 1998, the date the Partnerships provided Seitz with the amount of deferred incentive compensation which they calculated was due him Seitz under the terms of the ICA and TCA. See Pl.'s Resp. at Ex. 7. As such, the limitations period did not begin to run until that date and would not have been tolled until one year later, on December 7, 1999. Stated [*17] differently, it had not expired when Seitz filed his complaint on December 3, 1999, and the Partnerships' motion in this regard must be denied.

**Calculation of Incentive Compensation**

The Partnerships also seek the entry of judgment on their behalf concerning the mechanism used to calculate the incentive compensation for their 1996 fiscal year. To be specific, the Partnerships contend that Seitz erroneously uses a 4.2 scoring component to calculate the amount due for that period of time Seitz 1996 incentive compensation. The factor that should have been used, it is argued, would be adjusted by factoring in aspects of Seitz' performance more fully set out in the TCA. n11 The result would be a scoring component of 3.68. As might be expected, Seitz is equally adamant that the factor he used is correct based upon the agreements between the parties. Moreover, it is consistent with the factor used without by the Partnerships in pre-litigation calculations.

n11 TCA at P4(d).

Viewed in a light most favorable [*18] to the non-moving party, the Court is unable to conclude that the Partnerships are entitled to summary judgement as a matter of law on this issue. There are material facts in dispute and the application of the law to the facts given would not be appropriate at this stage of the proceedings. Guy at 780. Indeed, given the aforementioned disputes of fact and the use of language readily susceptible of differing interpretations, it does not seem likely that this issue can be resolved summarily and short of a trial on the merits.

**Section 401(k) Contribution**

Finally, the Partnerships move for summary judgment on Seitz' claim to the funds that were withheld for his 401(k) plan. The Partnerships argue that participation in the plan was mandatory for Seitz and that he is not entitled to the contributions about which he complains as a result. Seitz responds that the Partnerships characterize the amount in question as a profit-sharing contribution they made on his behalf, but that they also subtracted that figure from his deferred incentive compensation calculation for 1997. He argues that it is a breach of the underlying employment agreement to calculate or use it both ways. The [*19] contribution is either a profit-sharing contribution or an employee contribution, but not both.

In this case, it does appear that there is a material dispute of fact concerning whether the Partnerships have categorized and treated these funds as a mandatory 401(k) contribution by Seitz or by the Partnerships on his behalf. Also, there is the legal impact of whatever designation that is deemed to apply, which from the record as it presently stands, is unclear. Further proceedings are therefore necessary to clarify the application of the facts to the law before this issue can be resolved.

In sum, the motion of the Partnerships seeking summary judgment on the Seitz' complaint must denied in all respects

**Seitz' Motion on the Partnerships' Counterclaim**

**Arbitration of Counts II - IV & VI**

Succinctly stated, Seitz argues that the claims set forth in Counts II, III, IV and VI of the Partnerships' counterclaim arise out of the Partners' Agreement and must be submitted to arbitration pursuant Paragraph 15 of that document. The Partnerships counter that the aforementioned claims do not arise out of the Partners' Agreement. More specifically, They contend that the Partners' [*20] Agreement concerns Class A Units of partnership interest and the redemption of those interests, but does not concern the terms and conditions of the partnerships. These issues are dealt within the separately executed limited liability partnership agreements, n12 Employment Agreement or the common law. As a result, the Partnerships argue that the arbitration clause in the Partners' Agreement does not apply. The Court agrees.

n12 On the same date that the Partners' Agreement was executed, January 4, 1996, three separate limited liability partnership agreements were also executed for Siegfried Schieffer &

Seitz, SSS Strategic Resources and Siegfried Consulting.

Counts II and IV allege breaches of fiduciary duties and contract while Counts III and VI set forth allegations of fraud/misrepresentation. As stated above, the Partners' Agreement deals specifically with the issuance and the redemption of the Class A Units of partnership stock. It does not, in any way, deal with the rights and/or obligations between [*21] Seitz and the Partnerships. The liability partnership agreements on the other hand do in fact define and/or address those relationships. n13 The Court must agree as a result that Counts II, III, IV and VI do not arise from the Partners' Agreement and need not be submitted to arbitration pursuant to the provisions of Paragraph 15 of that agreement.

> n13 See Def.'s Resp. to Pl.'s Mot., Ex. A., Siegfried Schieffer & Seitz, LLP Limited Liability Partnership Agreement at PP 1, 11; Ex. B., SSS Strategic Resources, LLP Limited Liability Partnership Agreement at PP 1, 11; and Ex. C., Siegfried Consulting, LLP Limited Liability Partnership Agreement at PP 1, 11.

#### Damages for Solicitation of Clients

The second contention raised by Seitz is that the Partnerships' claims for damages relating to his alleged solicitation of business from the DuPont Company and the Elzufon law firm must be dismissed. He argues that even if one were to assume that he solicited business from those two entities, the Employment Agreement [*22] requires that services be performed for those to whom the solicitation was directed. Since the Partnerships allege mere solicitation and not that he provided services, those claims must be dismissed because they do not state a cause of action upon which relief can be granted under the terms of the Employment Agreement.

The Partnerships admit that Paragraph V(C)(3)(b) of the Employment Agreement upon which Seitz relies, relates to the timing of the damages payments should Seitz *provide services* to a client of the Partnerships and that it is silent in that regard where there had been solicitation only. However, they argue that the failure to do so is not fatal to this aspect of their claims because the agreement clearly states that Seitz is prohibited from soliciting Siegfried clients and subjects him to liquidated damages if he violates that restriction.

A review of the Employment Agreement reveals that when read as a whole, it holds Seitz liable for damages for any solicitation without further qualification. Not-

withstanding the provision upon which Seitz relies, Paragraph V(C)(3)(a) states in relevant part:

> In addition, in the event of any breach by Employee of the covenants [*23] contained in subparagraph (V)(D)(1) n14 of this Agreement, Employee shall pay to Employer, with respect to each client of Employer whom Employee solicits or for whom Employee provides Accounting Services, and amount equal to one hundred fifty percent (150%) of the amount of Employer's twelve months average billings to the client . . . .

This paragraph clearly demonstrates the parties' intentions that should Seitz solicit a Partnerships client, he would be liable for the specified amount of damages to the Partnerships. That measure of damages is based on the billings from the Partnerships to the client solicited and/or for whom work was performed. Consequently, to be activated, no work need be performed by Seitz and his motion in this regard is without merit.

> n14 Paragraph V(C)(1) includes the covenant to not solicit clients.

In light of these conclusions, Seitz' motion seeking summary judgment as to certain counts contained in the counterclaim filed by the Partnerships and as to the solicitation claim [*24] as described above, is denied in its entirety.

### The Partnerships' Motion on Their Counterclaim

#### Solicitation of Clients of the Partnerships

The Partnerships have moved for summary judgement on the issue of Seitz' liability for soliciting and/or performing services for certain partnership clients in violation of the Employment Agreement. The clients were identified as the DuPont Company and the law firms of Elzufon & Austin; Richards, Layton & Finger and Richard R. Wier, Jr., P.A. In support of this claim, the Partnerships cites to evidence that Seitz met with and actively pursued those entities for purposes of soliciting or entering into a business relationship with them. In the case of the Richards and Wier firms, services were actually provided.

Seitz does not deny that he solicited DuPont and Elzufon but argues that since he did not perform any services for them, he did not violate the Employment Agreement. For the reasons discussed in addressing

Seitz' motion for partial summary judgment, n15 the Court disagrees. Again, the Employment Agreement, specifically Paragraph V(C)(1), prohibits solicitation of clients of the Partnerships and that is what the record [*25] reveals Seitz did. Therefore, the Partnerships are entitled a judgment as a matter of law insofar as the issue of whether the solicitation by Seitz, without more, constitutes a breach of the Employment Agreement, and their motion must be granted as it applies to DuPont and Elzufon. n16

n15 See supra pp. 21-23.

n16 Given the tangential reference by the parties to the subject, the Court has not decided what, if any, damages might flow from the violation of the prohibition against solicitation contained in Paragraph V(C)(1) or whether the measures of damages provision in Paragraph V(C)(3)(a)(ii) applies and/or is enforceable. Resolution of those issues will require more discussion than that presented thus far.

A different result obtains relative to Richards and Weir. Seitz contends that they were not clients of the Partnerships. n17 Those firms retained his services on behalf of individuals and/or entities who were represented by the firms in legal matters. The services were provided by the Partnerships [*26] to those individuals and/or entities. No relationship involving the provision of services between the Partnerships and the law firms was established while Seitz was professionally associated with the Partnerships. As a result, he could not have violated the Employment Agreement by performing work for either firm.

n17 Reference is initially made to the Elzufon firm by Seitz in this regard but no further mention is made relative to that entity on the issue. Accordingly, the Court will view it as an inadvertent typographical error. See Seitz' Resp. to Defs.' Mot. Partial Summ. J. on Their Countercl. at 2.

There is no legal authority cited by Seitz in support this contention and there does not appear to be no controlling law in this jurisdiction on this issue. However, even if such authority existed, the Court would still be unable grant summary judgment on this issue in light of the status of the record relative to this issue. Simply put, the factual circumstances surrounding the contacts between Seitz and the law firms in question, as well as the purpose of those meetings, is not altogether clear. Therefore, this is a case where summary judgment is inappropriate because an inquiry into the facts and circumstances of Seitz' contacts with these parties is in order to clarify the application of the law to the circumstances. It would not, as a result, be appropriate to grant summary judgment as requested. [*27]

Given the foregoing discussion, the Partnerships' motion must be granted in part and denied in part as to the issue of the solicitation of clients.

## CONCLUSION

For the reason set for above, the Partnerships' Motion for Partial Summary Judgment on the Complaint and the Seitz' Motion for Summary Judgment on the Partnerships' Counterclaim must be, and hereby are, **denied**. In addition and also as described above, the Partnerships' Motion for Summary Judgment on Their Counterclaim is **granted in part** and **denied in part**.

**IT IS SO ORDERED.**

**Toliver, Judge**