IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER; HECTOR CALDERON;  :
CHARLES FOLWELL; ROLLAND GREEN; :
DAWN M. HAUCK; KEVIN KEIR;   :
ASHBY LINCOLN; KAREN MASINO;  :
ROBERT W. PETERSON; SUSAN M. POKOISKI; :
DAN P. ROLLINS; and WILLIAM SPERATI, : C.A. No. 05-010-JJF
           :
  Plaintiffs,      :
           :
  v.         :
           :
COMPUTER SCIENCES CORPORATION,  :
a Delaware Corporation,     :
           :
  Defendant.      :

---

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 1 of 3

---

Dated: June 8, 2006     Timothy J. Wilson, Esquire (DE #4323)
          MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, DE  19806
          (302) 777-4680
          Attorney for Plaintiffs

## TABLE OF CONTENTS

**Document**                                                   **Page No.**

Complaint…..………………………………………………………….B-0001 – B-0009

Transcript of William E. Sperati dated January 12, 2006...……………….B-0010 – B-0114

Transcript of Daniel P. Rollins dated January 13, 2006……………....…B-0115 – B-0195

Transcript of  Karen A. Masino dated January 13, 2006……...…………B-0196 – B-0290

Transcript of Robert W. Peterson dated January 28, 2006………………B-0291 – B-0366

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)

COUNTY:   New Castle  _X_  Kent County ___ Sussex ___

CIVIL ACTION NUMBER:
*C4C-12-127 SCD*

CIVIL CASE CODE:  __CDBT__

CIVIL CASE TYPE:  Debt/Breach of Contract

(SEE PAGE TWO FOR CIVIL CASE CODE & CIVIL CASE TYPE)

| | |
|---|---|
| CAPTION:<br>Brian Miller; Hector Calderon; Charles Folwell; Rolland Green; Dawn M. Hauck; Kevin Keir; Ashby Lincoln; Karen Masino; Robert W. Peterson; Susan M. Pokoisi; Dan P. Rollins and William Sperati,<br><br>Plaintiffs,<br><br>v.<br><br>Computer Sciences Corporation,<br>Defendant. | NAME AND STATUS OF PARTY FILING DOCUMENT:<br>Miller, et al., Plaintiffs<br><br>DOCUMENT TYPE: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>Complaint<br><br>NON-ARBITRATION    X          EFILE   X<br>(CERTIFICATE OF VALUE MAY BE REQUIRED)<br><br>ARBITRATION ____ MEDIATION ___ NEUTRAL ASSESSMENT ___<br>DEFENDANT (CIRCLE ONE)   ACCEPT      REJECT<br>JURY DEMAND   __X__  YES _____ NO<br><br>TRACK ASSIGNMENT REQUESTED: (CIRCLE ONE)<br>EXPEDITED   (STANDARD)   COMPLEX |
| ATTORNEY NAME(S):<br>Timothy J. Wilson, Esquire<br><br>ATTORNEY ID(S):<br>DE 4323<br><br>FIRM NAME:<br>Margolis Edelstein<br><br>ADDRESS:<br>1509 Gilpin Avenue<br>Wilmington, DE  19806<br><br>TELEPHONE NUMBER:<br>(302) 777-4680<br><br>FAX NUMBER:<br>(302) 777-4682<br><br>E-MAIL ADDRESS:<br>twilson@margolisedelstein.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS<br><br><br>EXPLAIN THE RELATIONSHIP(S):<br><br><br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>B-0001<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR THE COUNTY OF NEW CASTLE

|  |  |  |
|---|---|---|
| BRIAN MILLER; HECTOR CALDERON; CHARLES FOLWELL; ROLLAND GREEN; DAWN M. HAUCK; KEVIN KEIR; ASHBY LINCOLN; KAREN MASINO; ROBERT W. PETERSON; SUSAN M. POKOISKI; DAN P. ROLLINS; and WILLIAM SPERATI; | : : : : : : : : : | C.A. No. *04C—12-127 SCD* |
| **Plaintiffs,** | : : : | **JURY TRIAL DEMANDED** |
| **v.** | : : : | |
| COMPUTER SCIENCES CORPORATION, a Delaware Corporation, | : : : | |
| **Defendant.** | : : | |

## PRAECIPE

TO:    Prothonotary
        Superior Court of the State of Delaware
        New Castle County Courthouse
        500 N. King Street
        Wilmington, Delaware 19801

PLEASE ISSUE SUMMONS and COMPLAINT to the Sheriff of New Castle County to make service upon the registered agent for Computer Sciences Corporation by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Timothy J. Wilson, Esquire (#4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
Attorney for Plaintiffs

Dated: December 13, 2004

B-0002

**IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE**
**IN AND FOR THE COUNTY OF NEW CASTLE**

| | |
|---|---|
| BRIAN MILLER; HECTOR CALDERON; | : |
| CHARLES FOLWELL;ROLLAND GREEN; | : |
| DAWN M. HAUCK; KEVIN KEIR; ASHBY LINCOLN; | : |
| KAREN MASINO; ROBERT W. PETERSON; | : |
| SUSAN M. POKOISKI; DAN P. ROLLINS; and | : C.A. No. |
| WILLIAM SPERATI; | : |
| | : JURY TRIAL DEMANDED |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| COMPUTER SCIENCES CORPORATION, | : |
| a Delaware Corporation, | : |
| | : |
| Defendant. | : |

## SUMMONS

**THE STATE OF DELAWARE,**
**TO THE SHERIFF OF NEW CASTLE COUNTY:**
**YOU ARE COMMANDED:**

To summon the above-named Defendants so that, within twenty (20) days after service hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon Jeffrey K. Martin, Esquire, Plaintiff's attorney, whose address is 1509 Gilpin Avenue, Wilmington, Delaware 19806, an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense). To serve upon Defendant(s) a copy hereof and of the Complaint (and of the affidavit of demand if any has been filed by Plaintiff).

Dated: _____        _____
                                        Prothonotary

                                        _____
                                        Per Deputy

**TO THE ABOVE-NAMED DEFENDANTS:**

In case of your failure, within twenty (20) days after you receive this Summons, excluding the day you receive it, you must file an Answer to the attached Complaint if you want to deny the allegations. The original of your Answer must be filed with the Office of the Prothonotary of the Superior Court of the State of Delaware, New Castle County Courthouse, 500 North King Street, Wilmington, Delaware 19801 and must include proof that a copy of the Answer was served on the plaintiff or his attorney who is named above.

Failure to file an Answer denying the allegations will result in a judgment against you and action may be taken by the plaintiff or his attorney to satisfy the judgment.

Dated: _____        _____
                                        Prothonotary

                                        _____
                                        Per Deputy

B-0003

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR THE COUNTY OF NEW CASTLE

BRIAN MILLER; HECTOR CALDERON;                    :
CHARLES FOLWELL;ROLLAND GREEN;                    :
DAWN M. HAUCK; KEVIN KEIR;                        :   C.A. No. 04 C - 12 - 127 SCD
ASHBY LINCOLN; KAREN MASINO;                      :
ROBERT W. PETERSON;SUSAN M. POKOISKI;             :
DAN P. ROLLINS; and WILLIAM SPERATI,             :
                                                  :   JURY TRIAL DEMANDED
                    Plaintiffs,                   :
                                                  :
              v.                                  :
                                                  :
COMPUTER SCIENCES CORPORATION,                    :
a Delaware Corporation,                           :
                                                  :
                    Defendant.                    :

## COMPLAINT

## INTRODUCTION

1.      This is an action by twelve former or current employees of Computer Sciences Corporation who are each individually seeking recovery of a bonus entitled the "Annual Management Incentive Program" that was retroactively eliminated from each of their compensation packages by their employer, Computer Sciences Corporation.

## PARTIES

2.      Plaintiff Brian Miller, resides in Wilmington, Delaware. At all times relevant to this action, he was employed as a Senior Manager for Computer Sciences Corporation.

3.      Plaintiff, Hector Calderon, resides in Bear, Delaware. At all times relevant to this action, he was employed as a Computer Scientist for Computer Sciences Corporation.

4.      Plaintiff, Charles Folwell, resides in Wilmington, Delaware. At all times relevant to this action, he was employed as a Senior Computer Scientist (Level 6) for Computer Sciences Corporation.

5.      Plaintiff, Rolland Green, resides in Lincoln University, Pennsylvania. At all times relevant to this action, he was employed as a Computer Scientist, Work Effort Leader for Computer Sciences Corporation.

6.      Plaintiff, Dawn M. Hauck, resides in Bear, Delaware. At all times relevant to this action, she was employed as a Senior Manager for Computer Sciences Corporation.

7.      Plaintiff, Kevin Keir, resides in Wilmington, Delaware. At all times relevant to this action, he was employed as a Computer Scientist for Computer Sciences Corporation.

8.      Plaintiff, Ashby Lincoln, resides in Newark, Delaware. At all times relevant to this action, he was employed as a Senior Manager for Computer Sciences Corporation.

9.      Plaintiff, Karen Masino, resides in Wilmington, Delaware. At all times relevant to this action, she was employed as a Senior Manager for Computer Sciences Corporation.

10.     Plaintiff, Robert W. Peterson, resides in Edmond, Oklahoma. At all times relevant to this action, he was employed as a Delivery Manager for Computer Sciences Corporation.

11.     Plaintiff, Susan M. Pokoiski, resides in Smyrna, Delaware. At all times relevant to this action, she was employed as a Service Delivery Manager for Computer Sciences Corporation.

12.     Plaintiff, Dan P. Rollins, resides in Cross Lanes, West Virginia. At all times relevant to this action, he was employed as a Consultant for Computer Sciences Corporation.

13.     Plaintiff, William Sperati, resides in Wilmington, Delaware. At all times relevant to this action, he was employed as a Senior Computer Scientist for Computer Sciences Corporation.

14.     Defendant, Computer Sciences Corporation (hereinafter, "CSC"), is, and at all times relevant to this action was, a Delaware corporation duly organized and existing under the laws of the State of Delaware, whose registered agent for the service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## FACTUAL BACKGROUND

15.     All of the Plaintiffs were employed in management positions for CSC on April 1, 2003 and through a subsequent period.

16.     Prior to April 1, 2003, the date of the beginning of the fiscal year, Plaintiffs were each eligible for, and received the Annual Management Incentive Program (hereinafter "AMIP"), wherein such eligibility was communicated to each Plaintiff in writing and relied upon by each Plaintiff as part of his or her salary.

17.     The AMIP bonus provided at least ten percent (10%) of each Plaintiff's annual compensation.

18.     This AMIP bonus was compensation earned by each of the Plaintiffs.

19.     During the 2003 fiscal year each Plaintiff continued to perform his or her duties in accordance with the criteria required to receive his or her AMIP bonus.

20.    At some point in September of 2003, each Plaintiff was notified by CSC that he or she would no longer be eligible for participation in the AMIP program for the fiscal year, *retroactive* to April 1, 2003.  Each Plaintiff was informed that he or she *may* be eligible for an alternative bonus.

21.    Prior to the September AMIP termination announcement, CSC advised no Plaintiff of his or her ineligibility for, or that he or she would no be receiving his or her yearly AMIP bonus.

22.    The elimination of the AMIP bonuses from the Plaintiffs employees was an improper withholding of earned income from the Plaintiffs.

23.    Throughout 2003, up until the September AMIP termination announcement, each Plaintiff planned on receiving and relied upon their AMIP compensation to provide a substantial portion of his or her annual compensation.

24.    By letter dated January 16, 2004, a copy attached hereto as Exhibit "A", the undersigned counsel for Plaintiffs advised CSC's General Counsel and Secretary, that the law prohibits the withdrawal of an earned bonus.

25.    CSC's General Counsel and Secretary were also notified that Delaware law allows for the doubling of earned income that is improperly withheld by the employer, as well as the imposition of attorneys' fees and costs.

26.    AMIP bonuses were paid to none of the Plaintiffs at the conclusion of the fiscal year on March 31, 2004.  Furthermore, there were no other bonuses paid out to any of the Plaintiff that would have compensated the Plaintiff's for their withheld AMIP bonuses.

### Violation of Delaware Wage Payment and Collection Act

27.    Paragraphs 1-26 are incorporated as if fully set forth herein.

28.    The Delaware Wage Payment and Collection Act allows for the doubling of earned income that is improperly withheld by the employer. 19 *Del. C.* § 1113.

29.    This statute also permits the recovery of attorneys' fees and costs to employees whose income has been improperly withheld.

30.    CSC has improperly withheld the earned AMIP bonus of each of the Plaintiffs for the period of time from April 1, 2003 through and including the time of CSC's notice to each Plaintiff in September of 2003.

**WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment against Defendant CSC in his or her favor in the an amount equal to double the total of each Plaintiff's earned AMIP bonus, pursuant to the Delaware Wage Payment and Collection Act, for the period April 1, 2003 through September 30, 2003 and award reasonable attorneys fees and costs, together with pre- and post-judgment interest and such other relief as the Court deems just and fair.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Timothy J. Wilson, Esquire (#4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
Attorneys for Plaintiffs

Dated: December 13, 2004

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR THE COUNTY OF NEW CASTLE

| | | |
|---|---|---|
| BRIAN MILLER; HECTOR CALDERON; | : | |
| CHARLES FOLWELL; ROLLAND GREEN; | : | |
| DAWN M. HAUCK; KEVIN KEIR; ASHBY LINCOLN; | : | |
| KAREN MASINO; ROBERT W. PETERSON; | : | |
| SUSAN M. POKOISKI; DAN P. ROLLINS; and | : | C.A. No. |
| WILLIAM SPERATI; | : | |
| | : | JURY TRIAL DEMANDED |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COMPUTER SCIENCES CORPORATION, | : | |
| a Delaware Corporation, | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF VALUE

I, Timothy J. Wilson, Esquire, of Margolis Edelstein, attorney for plaintiffs,

hereby certify in good faith at this time in my opinion that the sum of plaintiffs' damages

is in excess of $100,000.00 exclusive of costs and interest.


MARGOLIS EDELSTEIN


By: Timothy J. Wilson, Esquire
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
DE. Attorney ID #4323
ATTORNEY FOR PLAINTIFFS


Dated: December 13, 2004

B-0009

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.         )
HAUCK, KEVIN KEIR, ASHBY         )
LINCOLN, KAREN MASINO, ROBERT    )
W. PETERSON, SUSAN M. POKOISKI,  )
DAN P. ROLLINS, and WILLIAM      )
SPERATI,                         )
                                 )
     Plaintiffs,                 )
                                 )
     v.                          ) C.A. No. 05-10-JJF
                                 )
COMPUTER SCIENCES CORPORATION,   )
                                 )
     Defendant.                  )

          Deposition of WILLIAM E. SPERATI taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:25 a.m., on Thursday,
January 12, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
           for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          LINDA M. BOYD, ESQUIRE
             DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant

               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters
COPY

B-0010



**WILCOX & FETZER LTD.**
Registered Professional Reporters

2

1        WILLIAM E. SPERATI,

2            the witness herein, having first been

3            duly sworn on oath, was examined and

4            testified as follows:

5            MR. SEEGULL:  Off the record Mr. Wilson

6    and I have agreed that the each plaintiff will have their

7    own separate transcript for the deposition but that we

8    will number the pages consecutively as we go along and

9    for the plaintiffs' depositions such as that each

10   plaintiff will begin where the last plaintiff left off in

11   terms of page numbers, but they will be in separate

12   volumes.

13            As far as the exhibits go, we're going to

14   be using one set of exhibits for all of the depositions

15   and so we will just label them Exhibit 1, Exhibit 3,

16   etcetera, rather than having separate copies for each

17   plaintiff.

18            In addition, Mr. Wilson and I have agreed

19   that we will jointly request from Magistrate Judge on

20   Friday to extend the time for us to submit our mediation

21   statements from Tuesday next week until Thursday.

22            MR. WILSON:  Can we go off the record?

23            (Discussion off the record.)

24            MR. SEEGULL:  Off the record Mr. Wilson

William E. Sperati

3

1   informed me that the depositions tomorrow will be

2   Mr. Rollins in the morning because he is in from out of

3   state in Delaware already, and we will do Ms. Masino in

4   the afternoon.  We previously scheduled Mr. Folwell to be

5   in the morning.  We will have to reschedule his

6   deposition to another date and time.  The parties have

7   been working cooperatively to reschedule those

8   depositions.

9   BY MR. SEEGULL:

10      Q.    Mr. Sperati, my name is Larry Seegull.  As you

11   know and you probably have seen my name, I'm an attorney

12   for Computer Sciences Corporation.  With me today is

13   Linda Boyd who is also an attorney from my office

14   representing Computer Sciences Corporation.

15               By the way, when I refer to "CSC," you

16   know I'm referring to Computer Sciences Corporation?

17      A.    Yes.

18      Q.    Of course the purpose of today is to inquire

19   about allegations forming the basis for your lawsuit

20   against CSC.

21               Can you please state your full name for

22   the record?

23      A.    William Eller Sperati.

24      Q.    Have you ever been deposed before?



WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

4

1   A.   No.

2   Q.   Let me just go over some instructions so you

3   will understand the procedure.

4           I will be asking you questions to find out

5   what you know about the facts giving rise to your

6   lawsuit.  Obviously the court reporter can't take down

7   head nods or other body language.  Everything has to be

8   verbal.  There can't be any uh-uhs, uh-huhs, any head

9   nods.  It's got to be verbalized.

10          Of course you're expected to answer

11  truthfully and completely.  You're testifying today just

12  as if you were testifying in court.

13          If you do not hear a question, say so and

14  I will repeat it.  If you don't understand a question,

15  say so.  If at any point you realize that an earlier

16  answer you gave was incomplete or inaccurate in any way,

17  you will be allowed to correct or supplement the record

18  at any point in time.

19          If you need to stop to use the restroom or

20  to take a drink, that's fine.

21          If you do not know or do not remember

22  information, just say so.  You're not expected to know or

23  remember everything.

24          And you cannot talk to your attorney



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0014

William E. Sperati

5

1    during the deposition except to inquire about questions

2    of privilege, as your attorney may have said to you

3    already.

4                    If you answer the question, I will assume

5    that you have heard it and understood it and given me

6    your best recollection.

7                    Do you understand the instructions I have

8    just given you?

9         A.    Yes.

10        Q.    Are you taking any medication that could impair

11   your ability to testify today?

12        A.    No.

13        Q.    What did you do to prepare for the deposition

14   today?

15        A.    We discussed a little bit about what

16   depositions were and just reviewed the documents that you

17   had and an e-mail and looked at a copy of the offer of

18   employment that we got which specifically addressed the

19   management incentive program.

20        Q.    Who did you speak to in advance of today's

21   deposition?

22        A.    Tim.

23        Q.    Mr. Wilson?

24        A.    Mr. Wilson.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

6

1          MR. WILSON:  That's attorney/client

2     privilege.

3          MR. SEEGULL:  I understand.  I'm not going

4     to ask you what you discussed with him.

5     Q.     How long did you meet with Mr. Wilson?

6     A.     Twenty minutes.

7     Q.     Was that today?

8     A.     Yes.

9     Q.     You said you reviewed some documents in advance

10    of the deposition?

11    A.     Yes.

12    Q.     Let me finish my questions and then you can

13    answer because it's very difficult for the court reporter

14    to take two people talking at the same time.

15          I see you have a folder in front of you.

16    Those are the documents that you reviewed?

17          MR. WILSON:  Actually those are the

18    documents that you produced and we looked at some of

19    those documents.

20    BY MR. SEEGULL:

21    Q.     Is that right, Mr. Sperati?

22    A.     Yes.

23    Q.     The documents you reviewed are in this folder?

24    A.     Yes.

William E. Sperati

7

Q.    Did you review any documents that are not in this folder?

A.    Yes.

Q.    Which documents did you review that are not in the folder?

A.    A copy of one of the other plaintiff's offer of employment that was a form letter, to the best of my remembrance, is the same as my offer of employment.

Q.    Whose offer letter did you look at?

A.    Kevin Keir's.

MR. SEEGULL:  Is that a document that's been produced in discovery?

MR. WILSON:  Yes.

MR. SEEGULL:  Do you have that document with you today?

MR. WILSON:  Yes.

MR. SEEGULL:  We will look and see if we have it.

BY MR. SEEGULL:

Q.    Are you saying that you don't have an offer of employment, but you think you received one that's the same as Kevin Keir's?

A.    I did not retain that from seven years ago in my files.  Reading Kevin's, it's the same as I remember

William E. Sperati

8

1   mine.

2       Q.    So you believe you got one that was the same

3   as --

4       A.    I know I got an offer, and I believe it's the

5   same as Kevin's.

6       Q.    Which documents out of this folder did you

7   review in advance of the deposition?  Let's just go

8   through it.  You can tell me.

9       A.    I looked to see what was in here.  I

10  specifically reviewed the e-mail that I had sent.

11              MR. WILSON:  I have some notes in there.

12  Let me take the notes out first.  This wasn't in there.

13  This was one of the documents I pulled from your

14  production that I was going to use as an exhibit.  The

15  original is in there.  Those are just my copies.

16              MR. SEEGULL:  What is it?  It's copies

17  of --

18              MR. WILSON:  It's a W-2 wage and tax

19  statement for 2003.  And there's the original.

20              MR. SEEGULL:  Okay.

21  BY MR. SEEGULL:

22      Q.    Why don't we go through this rather quickly and

23  look.

24              So one is the e-mail that was sent to you



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

9

1    by Bill Cummings and your response to him?

2        A.    Right.

3        Q.    That's one document you reviewed.

4              What else did you review?

5        A.    The calculation form for the previous years'

6    AMIP.  Again, I looked at the e-mail I sent to Cindy.  I

7    just went through and saw that the rest was just pay

8    stubs and financial records, and I didn't look at

9    anything in detail.

10       Q.    So the rest of the documents you really didn't

11   look at?

12       A.    No.

13       Q.    How about the letter saying that you had been

14   removed from the AMIP?

15       A.    I looked and saw that it was in there.  I

16   didn't reread the whole thing.

17       Q.    Other than your attorney, did you speak to

18   anybody else about the deposition?

19       A.    No.

20       Q.    Have you spoken to the other plaintiffs about

21   this case?

22       A.    Only very casually and it was going on and

23   that, you know, it was happening and nothing -- nothing

24   else of note.

William E. Sperati

10

1    Q.    Did you speak substantively about the case to

2    them?

3    A.    I don't think -- I'm not sure what you mean by

4    that word, but no.

5    Q.    Did you discuss the substance of the case with

6    them, what the case was about, what you were going to

7    testify to, what you expected to be deposed about?

8    A.    No.

9    Q.    None of that?

10   A.    None of that.

11   Q.    Describe for me what your claim is.

12   A.    The claim is that in September we were notified

13   that a portion of our compensation which we had been

14   earning since April wasn't going to be given to us for

15   reasons of some interpretation of corporate policy.

16   Q.    We're talking about the year 2003?

17   A.    We're talking about -- I was notified in

18   September 2003 about a retroactive termination of this

19   compensation to be effective April 1st.

20   Q.    What we're talking about is the AMIP plan?

21   A.    Yes.

22   Q.    You were told as of September of 2003 you were

23   no longer eligible for AMIP?

24   A.    That I was not going to be participating.    I



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0020

William E. Sperati

11

1    was never eligible.

2        Q.    What do you mean you were never eligible?  You

3    had received AMIP in the past?

4        A.    I had received AMIP in the past.

5        Q.    So you were eligible in the past?

6        A.    The offer of employment said I would be a

7    participant, but eligibility means meets the rules and

8    criteria, and I never met the rules and criteria.  There

9    was just an understanding in the offer that I would be a

10   participant.

11       Q.    I think I understand what you're saying, but I

12   want --

13       A.    The AMIP program --

14       Q.    Let me just finish, Mr. Sperati.  I know you're

15   anxious, but let me just see if I can understand what

16   you're saying.

17              What you're saying is there was an AMIP

18   plan, correct?

19       A.    Yes.

20       Q.    And that AMIP plan existed before you ever came

21   to CSC?

22       A.    Yes.

23       Q.    Under the terms of that AMIP plan you're saying

24   there were certain eligibility rules.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

12

1  A.  As I understand it, yes.

2  Q.  And once you were hired by CSC, you were not,

3 according to those rules, eligible for AMIP.   Is that

4 correct?

5  A.  Correct.

6  Q.  But that when CSC hired you, they made an

7 exception for you, correct?

8  A.  Yes.

9  Q.  And allowed you to participate in the plan.

10  A.  That's my understanding.

11  Q.  During the entire time that you were at CSC,

12 you were never, according to the rules, eligible for

13 participation in the plan?

14  A.  As I understand the plan, yes.

15  Q.  But that you continued to participate in the

16 plan until September of 2003 --

17  A.  Yes.

18  Q.  -- when you were notified that you would not be

19 participating for that fiscal year?

20  A.  Right.

21  Q.  Am I correct that the reason you were not

22 eligible, even though you had been participating, is

23 because your level within the company was not high

24 enough?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

13

1    A.    I don't know whether it's a level issue or a

2 job description issue.  I don't know the plan, but my

3 understanding is it was intended for management, and I

4 was not and never have been management.

5    Q.    Management is at what level of the

6 organization, do you know?

7    A.    No.

8    Q.    What was the highest level of the organization

9 that you reached?

10    A.    Level 6.

11    Q.    As a level 6 employee, you were not a manager?

12    A.    I was not a manager as a level 6.

13    Q.    Your claim is that, when they notified you in

14 September of 2003, they notified you that you wouldn't be

15 participating at all for that entire fiscal year?

16    A.    Correct.

17    Q.    And that meant that they were saying that, as

18 of April 1 of 2003, you wouldn't be participating.

19    A.    Correct.

20    Q.    You felt that was a retroactive change?

21    A.    Yes.

22    Q.    That's your claim, that for the period of

23 April 1, 2003, through the time that you were notified in

24 September of 2003, you had been participating, in your



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

14

1    mind?

2       A.    Yes.

3       Q.    And that you're entitled to the compensation

4    out of AMIP for that period of time.

5       A.    Yes.

6       Q.    You're not claiming any entitlement to AMIP

7    compensation from September of 2003 on.

8       A.    No.    Because I was notified at that point that

9    my participation had been terminated.

10      Q.    You understand that the company had the right

11   to do that, to tell you that you would no longer be

12   participating in AMIP and they could do that on a

13   going-forward basis?

14      A.    I assumed that they have the legal right to do

15   that.

16      Q.    Because they can change the terms and

17   conditions of your employment.

18      A.    Right.

19      Q.    You were an at-will employee, correct?

20      A.    Yes.

21      Q.    Are you still employed by CSC?

22      A.    Yes.

23      Q.    You remain an at-will employee, correct?

24      A.    I don't know what that means, but yes.    I



William E. Sperati

15

1  remain an employee under the same way I have always been

2  an employee.

3      Q.    At-will means you have no contract of

4  employment, correct?

5      A.    I have no contract.

6      Q.    You understand that the company can change the

7  terms of your employment going forward?

8      A.    Yes.

9      Q.    And that is what you thought they were doing in

10  September of 2003, but you thought they were going to do

11  it from September 2003 going forward.  You didn't think

12  they were going to do it from April through September.

13      A.    I don't think that you can terminate -- you can

14  tell somebody, oh, you weren't -- we're not paying you

15  for that period of time, give us the money back.  I don't

16  know how you can do that.

17      Q.    Let's just be clear, though.  They hadn't yet

18  paid you anything, correct?

19      A.    No.

20      Q.    So they weren't asking you to return any money,

21  correct?

22      A.    No.

23      Q.    Is that correct?

24      A.    It's accrued and prorated.

William E. Sperati

16

1    Q.    Is that correct, that they weren't asking --

2    A.    No, they did not.

3    Q.    Let me finish my question.  They were not

4  asking you to return any money, correct?

5    A.    No.

6    Q.    Is that correct?

7    A.    That is correct.

8    Q.    You said it was accrued?

9    A.    That's the term I would use.

10    Q.    How much had accrued up until that point?

11    A.    Six months' worth of what it would have been.

12  April through September.

13    Q.    How much was that?  If you say it accrued, how

14  much had accrued?

15    A.    Approximately $18,000.  Somewhere in that

16  range.  The exact rates are determined based on

17  profitability and all sorts of other things in the

18  formula.

19    Q.    We will get to how you calculate that in a

20  little while.

21        What is your Social Security number?

22    A.    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.

23    Q.    What is your date and place of birth?

24    A.    November 24th, 1949, Jersey City, New Jersey.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0026

William E. Sperati

17

| | | |
|---|---|---|
| 1 | Q. | Where do you live? |
| 2 | A. | 107 Wayland Road, Wilmington, Delaware. |
| 3 | Q. | How long have you lived there? |
| 4 | A. | Fifty years. |
| 5 | Q. | Do you own or rent? |
| 6 | A. | Own. |
| 7 | Q. | Are you married? |
| 8 | A. | Yes. |
| 9 | Q. | How long have you been married? |
| 10 | A. | Twenty-three years. |
| 11 | Q. | Any children? |
| 12 | A. | Three. |
| 13 | Q. | Have you ever been arrested? |
| 14 | A. | No. |
| 15 | Q. | Have you ever been convicted of a felony or |
| 16 | | misdemeanor? |
| 17 | A. | No. |
| 18 | Q. | Have you ever served in the military? |
| 19 | A. | No. |
| 20 | Q. | When did you first contact an attorney to |
| 21 | | handle your case against CSC? |
| 22 | A. | The attorney contacted me. |
| 23 | Q. | When was that? |
| 24 | A. | I don't remember.  My guess is fall -- late |

William E. Sperati

18

1    fall of 2003.  I don't really remember when it was.

2        Q.    Who was it that contacted you?

3        A.    Tim Wilson's law firm.

4        Q.    Was it Tim Wilson that contacted you?

5        A.    I don't remember.

6        Q.    Or was it Jeff Martin?

7        A.    I don't remember.

8        Q.    What is the arrangement you have with your

9    attorney in terms of paying fees?

10       A.    That we have to pay him the fees and it's going

11   to be split by all of us who are participating in the

12   lawsuit.

13       Q.    Are you being charged on an hourly basis?

14       A.    I don't remember.

15       Q.    Or is it a contingency arrangement, that you

16   only pay the attorney based upon whether or not you

17   receive anything?

18       A.    I would have to go back and look at the

19   document.

20       Q.    "The document" being a retainer agreement?

21       A.    Some kind of a legal document that says he's

22   going to do work for us and we're going ahead with this

23   lawsuit.

24       Q.    Do you have a copy of that document?



William E. Sperati

19

```
1        A.      Probably.

2                MR. SEEGULL:  I think we have asked for

3    that to be produced.  I would ask you to produce that.

4                MR. WILSON:  They haven't been produced?

5                MR. SEEGULL:  I don't think so.

6                MR. WILSON:  I can represent it's a

7    contingent agreement.

8                MR. SEEGULL:  But I'd still like to see

9    the production of that document.

10               MR. WILSON:  Sure.  No problem.

11   BY MR. SEEGULL:

12       Q.      Have you paid anything yet to your attorneys?

13       A.      No.

14       Q.      Have you been represented by any counsel other

15   than Mr. Wilson and Mr. Martin and their firm?

16       A.      No.

17       Q.      Have any lawsuits ever been filed against you?

18       A.      No.

19       Q.      Have you ever filed any other lawsuit besides

20   this one?

21       A.      No.

22       Q.      Have you ever been a witness in another

23   lawsuit?

24       A.      No.
```

William E. Sperati

20

1   Q.   Have you ever declared bankruptcy?

2   A.   No.

3   Q.   Have you ever made a claim for unemployment

4   benefits?

5   A.   Yes.

6   Q.   When was that?

7   A.   1971.

8   Q.   How long have you worked for CSC?

9   A.   Since we transitioned in June of 1997.

10  Q.   You were working with DuPont before that?

11  A.   Yes.

12  Q.   How long had you worked for DuPont?

13  A.   Twenty-seven years.

14  Q.   So you worked for DuPont since 1970?

15  A.   '71.

16  Q.   Since 1971 with DuPont?

17  A.   Yes.

18  Q.   And then from there on out you have been

19  working with CSC?

20  A.   Yes.

21  Q.   Have you ever made a claim for workers'

22  compensation benefits?

23  A.   No.

24  Q.   Do you have any relatives who work for CSC?

William E. Sperati

21

1       A.      No.

2       Q.      Did you go to college?

3       A.      Yes.

4       Q.      Where did you go to college?

5       A.      Penn State.

6       Q.      When did you graduate?

7       A.      '71.

8       Q.      What was your degree in?

9       A.      Mathematics.

10      Q.      Did you graduate with honors?

11      A.      Yes.

12      Q.      High honors, summa cum laude, magna cum laude?

13      A.      I think it was just honors.

14      Q.      What does it take to graduate with honors?

15      A.      I think it was 3.6, but I don't remember.  Been

16  a long time.

17      Q.      Any other education or training since then?

18      A.      Various courses that my employer sent me to.

19      Q.      That your employer sent you to?

20      A.      Yes.  No academic training, nothing more than,

21  you know, typically a long weekend or a one-week

22  training.  Professional training.

23      Q.      Have you ever received any work-related

24  certifications?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

22

1    A.    No.

2    Q.    Have you ever received any awards or honors

3    other than what you spoke about already?

4    A.    I have certainly gotten bonuses for specific

5    accomplishments for projects and things that I have been

6    involved with.

7    Q.    How many times have you received a bonus of

8    some sort?

9    A.    I don't know.  Maybe a half dozen with DuPont.

10    With CSC there was a number of special bonus programs

11    that I participated in and received in addition to AMIPs.

12    Probably most notably they had what they called a Hot

13    Skills Bonus where they gave extra compensation for

14    having a specific skill as a special short-term salary

15    adjustment because of the competitive market in that

16    skill area.

17            And there was also a retention bonus that

18    they had for -- they were losing a lot of people and for

19    staying in the organization for a year, then six months

20    later there was a bonus.

21    Q.    So how many bonuses in total do you think

22    you've received while you've been at CSC?

23    A.    I'm going to say four or five, something in

24    that range.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

23

1    Q.    You think those were the skills bonuses and the

2  retention bonus?

3    A.    The skills bonus, retention bonus.  I got a

4  special check one time because they drew my name out of a

5  hat for participating in something.  I don't know what

6  you call that.  But it was extra money, but it wasn't

7  related to any accomplishment.

8    Q.    Anything else?

9    A.    Not that I can recall.

10    Q.    Any other awards or honors?

11    A.    Not that I can recall at CSC.

12    Q.    Are you a member of any professional

13  associations?

14    A.    No.

15    Q.    Any awards or honors outside of CSC other than

16  the ones you spoke about at DuPont?

17    A.    At DuPont, while I was at DuPont, I was the

18  chairman of a group of -- SIP users group, and I got

19  recognition for that, for that year's service and having

20  led that task group.

21    Q.    Anything else?

22    A.    Not that I can recall.

23    Q.    You were hired by CSC along with other DuPont

24  employees?



William E. Sperati

24

1    A.    Yes.

2    Q.    And that was in the summer of 1997?

3    A.    Right.

4    Q.    Tell me about the bonus program that was in

5    place at DuPont before you left.

6    A.    DuPont had a bonus program which had gone

7    through a number of different names, but the final name

8    when we left was it was called -- I think it was called

9    the Incentive Compensation Program, and it was

10   administered to all professionals.    Exempt personnel were

11   technically eligible.

12            The way it was administered, it typically

13   went down to level -- a few level 4s might get it, most

14   level 5s, and as you started to get above that, there

15   were actually management audits as to why is this person

16   at this level if they're not receiving the bonus.

17            It was administered very differently than

18   CSC.    Again, not having been management, I never was

19   directly involved in the process, though I certainly had

20   talked to some of the programmers who wrote the software

21   to help administer it.    CSC was a very strict X percent

22   is for X accomplishment, Y percent is for Y.    And very

23   much tied to organizational financials.

24   Q.    That's CSC or DuPont?

William E. Sperati

25

    A.    That's CSC's.  DuPont's was based on corporate

financials and organizational financials in terms of how

big the pot was and then it was management that made

their own judgment for distributing the pot.

    Q.    So if I understand you correctly, what you're

saying is, in your mind, the DuPont plan was more

discretionary amongst management as to how to distribute

the money?

              MR. WILSON:  Object to the form.  You can

answer.

    A.    I mean, I'll say yes.  It was a different

program, somewhat different in, I'll say, intent as

DuPont's clearly was for all personnel contributing, and

as CSC defined it, theirs was a management incentive.

    Q.    So you're saying the intent of DuPont's was to

be more generous in a way than the AMIP plan at CSC?

    A.    It was to -- I don't say more generous.  DuPont

felt that all employees contributed to performance and

that a portion of that pay as you moved up through the

organization should be based -- should be at risk and

based on the performance of the individual in the

organization.

              CSC looks to me like that only

management's pay is appropriately at risk because of

William E. Sperati

26

1    their contribution to the organization.

2        Q.    So, in your mind, the AMIP plan is intended to

3    be more focused on management and the DuPont plan was

4    intended to be broader in scope and provide bonus

5    incentives lower down in the organization.

6        A.    Yes.

7        Q.    Had you received a bonus every year while you

8    were at DuPont?

9        A.    I had received a bonus -- every year DuPont

10   gave bonuses.  After the first year I had received a

11   bonus.  In other words, when I was a low-level employee,

12   I had not, but one year I was informed that I had gotten

13   it and every year subsequent to that I got it.  I'm

14   pretty sure I got it every year.  I know there was a year

15   that DuPont did not give bonuses at all to anyone, but

16   that year I believe was prior to my receiving it for the

17   first time.

18       Q.    When did you become eligible for the DuPont

19   bonus?

20       A.    Again, as I understand it, all exempt employees

21   are technically eligible.

22       Q.    When did you start getting a DuPont bonus?

23       A.    I think it was 1981 or '82.

24       Q.    What was the range of bonuses you received at



William E. Sperati

27

1  DuPont?

2      A.    You mean dollar amount?

3      Q.    Yes.   Approximately.

4      A.    I don't even remember.   The minimum was in the

5  thousands and I believe it was in the

6  eight-to-ten-thousand range when I finally left DuPont,

7  but I don't remember for sure.

8      Q.    But approximately that amount?

9      A.    I think that's what it was.   Part of the issue

10  is DuPont's bonus was not all cash.

11      Q.    What do you mean by that?

12      A.    What DuPont did is the compensation was roughly

13  one-third stock, one-third cash, one-third taxes.

14      Q.    So you say stock in DuPont?

15      A.    Yes.

16      Q.    Could you sell that stock?

17      A.    Yes.

18      Q.    It was unrestricted?

19      A.    Yes.

20      Q.    Is that what you generally did or did you keep

21  the stock?

22      A.    I still got it.

23      Q.    That's different than the AMIP plan which is an

24  all-cash bonus?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0037

William E. Sperati

28

1    A.    Yes.

2    Q.    Am I correct that there was no formula for

3    calculating a bonus while you were at DuPont?

4    A.    As far as I know, there wasn't, but, again, I

5    never was in the detailed administration of it.

6    Q.    Does the word "Horizon" mean anything to you in

7    connection with a bonus?

8    A.    The Horizon Initiative was the name they gave

9    to the DuPont people being outsourced as a group.

10   Q.    To CSC?

11   A.    To CSC.

12   Q.    When were the bonuses awarded at DuPont?

13   A.    February.  Typically like second week in

14   February.

15   Q.    That's in every year?

16   A.    Yes.

17   Q.    Would that be for the January-through-December

18   time frame?

19   A.    For the prior.  It varies much like where CSC

20   comes out in mid-May because their fiscal ends

21   March 31st.  CSC's came out -- DuPont's came out in

22   mid-February because their fiscal year ends

23   December 31st.

24   Q.    Did you hear anything about the bonus amounts

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0038

William E. Sperati

29

1    or how it would be distributed or calculated during the

2    course of the year or would you only find out at the end

3    of the year?

4        A.    At CSC --

5        Q.    At DuPont.

6        A.    At DuPont it was a magical meeting on that

7    magical day.

8        Q.    In February?

9        A.    In February.

10       Q.    Up until that point you really wouldn't have

11   any notion of what was going to happen in terms of

12   bonuses?

13       A.    No.  Only, you know, the general understanding

14   of the rules and knowing how well the organization did

15   and how well DuPont earnings did.  Again, the size of the

16   pot is actually documented in the DuPont bylaws, I

17   believe, as to how much total bonus money will be given

18   out under this plan for the prior fiscal year.

19       Q.    But as to how much you might receive, no notion

20   of that?

21       A.    No.

22       Q.    Did that differ than CSC?

23       A.    Yes.

24       Q.    How did it differ?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0039

William E. Sperati

30

1    A.    Well, again, CSC had a very strict formula,

2    documented formula, for deriving the bonus percentage and

3    your percentage of the percentage.

4    Q.    Are you talking about the worksheets?

5    A.    Yes.  Ultimately it ended up in a worksheet.

6    Q.    What does that mean, a worksheet?  What would

7    the worksheet look like, and what was the point of the

8    worksheet?

9    A.    The point of the worksheet was to document how

10    your bonus was calculated.

11    Q.    How your bonus was calculated, meaning how it

12    had been calculated or how it would be calculated?

13    A.    Each year there were discussions and at some

14    point during the year there would be -- they would

15    document what percent and what formula they were going to

16    use that year for calculating the bonus.

17    Q.    So at some point during the course of the year

18    you would receive a worksheet.

19    A.    You would receive -- it wouldn't be -- it would

20    just be more like an e-mail that said 20 percent will be

21    based on operating income and 20 percent will be based on

22    shareholder price per share, and 20 percent -- they

23    wouldn't actually -- the worksheet was filled out after

24    the end of the year when they knew what percentage of

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0040

William E. Sperati

31

1    those objectives had been met.

2        Q.    Weren't you given the worksheets not filled out

3    during the course of the year and then given them again

4    filled out at the end of the fiscal year?

5        A.    I don't remember getting a worksheet not filled

6    out.

7        Q.    Maybe we're talking about different terms,

8    "filled out" and "not filled out."

9            As I understand it, all employees were

10   given a worksheet with the percentages as to how their

11   bonus would be calculated at the end of the year, but

12   they weren't filled out as to whether or not the company

13   or the individuals had achieved those metrics until the

14   end of the year.

15       A.    We got --

16       Q.    Those are worksheets.

17       A.    Okay, it's a worksheet.  To me a worksheet is

18   something you can put a number into and get a

19   calculation.  This was more a text document that said

20   these are the percentages that will be used.

21       Q.    Were the factors listed in this text document?

22       A.    Yes.

23       Q.    Return on investment?

24       A.    Yes.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0041

William E. Sperati

32

1   Q.   And earnings per share?

2   A.   In those years that that was the criteria, yes.

3   Q.   So some years it was earnings per share; some

4   years it was other criteria?

5   A.   Yes.

6   Q.   What were the other criteria that might be

7   used?

8   A.   Return on investment, operating income.  All

9   years prior to 2000 -- fiscal 2003, the immediate prior

10  year, a component, I think it was roughly 20 percent, was

11  based on the definition and meeting personal objectives.

12  In other words, I had a specific contribution that, if I

13  did certain specific tasks at a certain level, then I

14  would get X percent of the 20 percent would go into the

15  calculation.

16          The individual component was not part of

17  the calculation for fiscal 2003.  It had been in prior

18  years.  I do not know what the formula was and whether it

19  had a personal contribution component for 2004 or not.

20  Q.   Because you never received a --

21  A.   -- statement of how it was going to be

22  calculated for that year.

23  Q.   Every other year you had received such a

24  statement, but in the fiscal year 2004 --

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

33

1     A.    I did not get it.  Had not received it at the

2   time I was notified that I was not a participant.

3     Q.    So you did not know how it would be calculated

4   for that year.

5     A.    Right.

6     Q.    Do you remember when you first started working

7   for CSC, the day?

8     A.    June 1st, 1997.

9     Q.    What was the position that you assumed at CSC?

10    A.    Programmer/analyst/consultant.  I think the

11  title was computer scientist.

12    Q.    What projects were you working on?

13    A.    I was working on the DuPont SAP project.

14    Q.    What group were you in?

15    A.    The SAP Group.

16    Q.    Were you in the Chemical Group, TMG --

17    A.    Well, okay --

18          MR. WILSON:  Let him finish asking his

19  question.

20  BY MR. SEEGULL:

21    Q.    Were you in the Chemical Group, TMG, CEG, GIS?

22  What was the overall group you were in?

23    A.    At the time it was called Horizon Initiatives.

24  So it was the Horizon Initiatives Group.  It got renamed



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0043

William E. Sperati

34

1    Chemical Oil and Gas Group.  It got renamed Chemical and

2    Energy Group.  It got renamed Technology Management

3    Group.  It got renamed -- it's gone through a number of

4    naming transformations, but at that time it was called

5    Horizon Initiatives.

6        Q.    Who was your supervisor?

7        A.    I believe it was -- I can't even think of his

8    last name.  Bill.  I can't think of his name offhand.

9        Q.    Who was the head of the group?

10       A.    I think the head of the group -- the SAP Group,

11   I think it was Joe MacElrone.

12       Q.    I don't mean SAP Group.  I mean the Horizon

13   Initiatives Group.

14       A.    I can't remember his name.  He's still around.

15       Q.    Who is the head of your group?  What group are

16   you in now?

17       A.    Right now I'm in the Defense Group.

18       Q.    How long have you been in that group?

19       A.    We officially moved to Defense roughly June 1

20   of this year.

21       Q.    Of '05?

22       A.    Of '05.

23       Q.    Prior to being in the Defense Group what group

24   were you in?

William E. Sperati

35

1      A.      Again, it went through names.  It had ended up

2  being called Global Transformation Services, GTS.

3      Q.      But that's the same group that had been called

4  TMG and Chemical?

5      A.      From my view of the world, yes.

6      Q.      Let's call that the Chemical Group.  Who was

7  the head of the Chemical Group when you were told you

8  were no longer going to be participating in the AMIP

9  program?

10     A.      I think it was Nick Wilkerson, but I'm not

11  sure.  I don't have dealings at that level that I really

12  pay attention.  That's one of the names of the people who

13  periodically talked to us.  I'm not sure whether he's at

14  the top or one level down for DuPont.

15     Q.      Was he a vice president, do you know?

16     A.      I don't remember.  I believe so.

17     Q.      You received an AMIP each year you were at CSC?

18     A.      Yes.

19     Q.      Up until that point in September of 2003.

20     A.      Yes.

21     Q.      Let's talk about that.  How much did your AMIP

22  payments range from?

23     A.      The last one was in the $30,000 range.  I think

24  the low was around 20, but I don't remember the number.

William E. Sperati

36

1    Q.    You're saying those payments to you were made

2    in May of every year?

3    A.    Yes.

4    Q.    And they were made for the prior fiscal year?

5    A.    Yes.

6    Q.    Why did the payments not get made until May of

7    the year?

8    A.    Because one component of the calculation -- all

9    the components of the calculation are based on the

10   accomplishments through the year, financial or personal.

11   Q.    So it takes a while to reconcile the prior

12   fiscal year?

13   A.    Basically they have to -- you got to close the

14   books to know how much money you made.  If you met those

15   objectives, you have to use those numbers.  And the

16   annual personnel review for your individual

17   accomplishments also happens on that fiscal year-end

18   timing.

19   Q.    There's a number of things that have to finish

20   and wrap up and be analyzed before they can put it into

21   the formula to figure out how much bonus you will get?

22   A.    Right.

23   Q.    Then after that it takes even more time to send

24   out this formula for next year's bonus.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

37

1      A.      Right.

2      Q.      When, generally, did you receive the formula

3  for the following year's bonus?  Would that sometimes be

4  October or November, December?

5      A.      In the August-to-November time frame somewhere.

6  I don't ever remember it being discussed much before

7  August, and I remember I think the year before it was

8  October/November when they finally came through and

9  said --

10     Q.      Here's how we're going to calculate.

11     A.      -- here's how we're going to do it and, by the

12 way, there won't be an individual component.

13     Q.      That was the first year they said that?

14     A.      Yes.

15     Q.      It changed year to year how they weighted the

16 components and what the components would be?

17     A.      Yes.

18     Q.      That wasn't particular to you; that was across

19 the board?

20     A.      As I understand it.

21     Q.      When you came into the CSC organization, what

22 level were you?

23     A.      Five.  I had been a 5 at DuPont.  CSC didn't

24 have that sublevel distinction, so I became a 5.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0047

William E. Sperati

38

1    Q.    What was the title level?

2    A.    I was called a computer scientist.

3    Q.    How long did you stay at that level?

4    A.    I think it was either three or four years.

5    Q.    Then you became an SO 6?

6    A.    Yes.

7    Q.    Do you know what the title is for that level?

8    A.    Senior computer scientist.

9    Q.    Which office were you in?

10    A.    You mean building?

11    Q.    Yes.

12    A.    I started at Barley Mill with DuPont, then we

13 moved into the Christina Corporate Center, moved around

14 there a couple, was on-site with DuPont at J.P. Morgan,

15 and then back at Christina Corporate Center.

16    Q.    Did your salary increase each year?

17    A.    Yes.  There was one year when there was no

18 increase.  I think it was in 2003.

19    Q.    You received a letter when you were transferred

20 from DuPont; is that right?

21    A.    I received an offer of employment for CSC when

22 I left DuPont, yes.

23            MR. SEEGULL:  Mark this as Exhibit 1.

24            (Deposition Exhibit No. 1 was marked for

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

William E. Sperati

39

1    identification.)

2    BY MR. SEEGULL:

3        Q.    I'm showing you what's been marked as

4    Exhibit 1.  Why don't you take a moment to look through

5    it.

6                MR. WILSON:  Was this produced?

7                MS. BOYD:  Yes.

8                THE WITNESS:  That number is different.

9    BY MR. SEEGULL:

10       Q.    Have you had a chance to review Exhibit 1?

11       A.    Yep.

12       Q.    Do you recognize this document?

13       A.    Yes.

14       Q.    What is it?

15       A.    This is the offer of employment that I

16   received.

17       Q.    Who is Dorothy Eltzroth?

18       A.    She was HR director when we cut over.  That's

19   what it says.

20       Q.    Do you know her?

21       A.    Not personally, no.

22       Q.    This was trying to lay out how it was going to

23   work when you came over from DuPont, correct?

24       A.    It says this basically is the details of

William E. Sperati

40

1    compensation and benefits that I would start -- that I

2    would get when I started working.

3         Q.    One of the things it refers to is the

4    Management Incentive Program.

5         A.    Yes.

6         Q.    That's in the third full paragraph?

7         A.    Yes.

8         Q.    It says, of course, that you will be included

9    in CSC's Management Incentive Program?

10        A.    Yes.

11        Q.    It talks about the requirement of superior

12   contributions to the performance of Horizon Initiatives?

13        A.    Yes.

14        Q.    As well as achievement of negotiated management

15   objectives.

16        A.    Yes.

17        Q.    Told you that it would run with the fiscal

18   year?

19        A.    Yes.

20        Q.    Then it told you that the award will range up

21   to 30 percent of your adjusted base salary?

22        A.    Yes.

23        Q.    Depending upon your performance.

24        A.    Right.



William E. Sperati

41

1    Q.    So you understood from this letter that you

2    were eligible to participate in the Management Incentive

3    Program?

4    A.    It said I would be included.    Specifically when

5    the manager gave this to me, he mentioned that

6    professionals such as myself were not part -- were not

7    included -- other professionals at CSC were not in the

8    Management Program, that this was done for the

9    professionals who came from DuPont to structure the

10   compensation similarly to the way it was at DuPont.

11            MR. SEEGULL:    Off the record.

12            (Discussion off the record.)

13   BY MR. SEEGULL:

14   Q.    When you say "professionals," do you mean that

15   you were a technical professional?

16   A.    Yes.

17   Q.    You were not on the management track.

18   A.    No management or supervisory responsibilities.

19   Q.    So they were making, again, an exception for

20   you because you were --

21   A.    As I understood it, yes.

22   Q.    You also understood that this was not a

23   guarantee that your benefits would never change.

24   A.    Right.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

William E. Sperati

42

1    Q.    You understood that you were not guaranteed

2  that you would forever be in a Management Incentive

3  Program.

4    A.    I didn't see there would be any reason why I

5  wouldn't.

6    Q.    But you understood it wasn't a guarantee.

7    A.    There's no guarantees.

8    Q.    What do you mean by that?

9    A.    Well, they can say the pension stopped.  They

10  can say we're not, you know, covering this.  As I

11  understand it, the employer can change anything about how

12  you are compensated or your work environment that they

13  want.

14    Q.    Before you were transferred from DuPont to CSC,

15  did DuPont hold any meetings with you about the transfer?

16    A.    Yes, we had meetings.

17    Q.    Other than the communication you've just told

18  me about from your would-be supervisor about the AMIP,

19  any other communications about the bonus plan?

20    A.    They said it was structured differently than

21  DuPont.  They didn't really go into details.

22    Q.    Anything else?

23    A.    Not that I recall.

24    Q.    Did you receive any documents related to the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

43

1    bonus plan?

2        A.     No.

3        Q.     Have you ever seen the bonus plan?

4        A.     No.

5        Q.     Have you ever seen anything labeled "AMIP"?

6        A.     E-mail communications around the formula for

7    this year, for the coming year or the actually

8    in-existence year because, like I said, they tended to

9    come through in late summer, early fall.

10       Q.     Other than those communications, have you ever

11   seen any policy or plan labeled "AMIP"?

12       A.     I haven't.

13       Q.     Do you know if there is such a policy or plan?

14       A.     I assume there is.

15       Q.     Why do you assume there is?

16       A.     Because HR documents policies.  They wouldn't

17   talk about it if they didn't have it.  You've got

18   something with a name, I assume it has specific rules and

19   criteria written down in the bowels of CSC's HR

20   organization administration.

21       Q.     Did you ever ask anybody where is my e-mail

22   about the AMIP?

23       A.     No.

24       Q.     Why not?



William E. Sperati

44

1      A.    Well, because it wasn't October.   Things happen

2  slowly.  I kind of -- I mean, I was kind of wondering,

3  hmmm, I wonder when they're going to start this, because

4  it was September.  I kind of remember things happening in

5  August, but, you know, I'm busy running the army.  When

6  you get the e-mail, you say, oh, okay, better fill this

7  out.

8      Q.    What do you mean fill it out?

9      A.    Well, in the past there were the specific

10  individual objectives.  So I had to write down my piece

11  of what it was for that year that I would be doing.

12      Q.    So for fiscal year 2004, you had not received

13  any e-mail communication about what the criteria would be

14  for the bonus that year.

15      A.    Right.

16      Q.    Did you know whether or not an individual

17  performance objective would be one of the components?

18      A.    No.

19      Q.    It had been a component for sometime in the

20  past, yes?

21      A.    Yes.

22      Q.    But for the immediately preceding year it had

23  not been a component?

24      A.    Correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

45

1    Q.    You didn't know whether for fiscal year 2004

2    they were going to reinstate it as a component or not?

3    A.    Right.  Without that as a component, there's

4    almost no communication about it.

5    Q.    You mean if individual performance is not a

6    component and it's just corporate objectives --

7    A.    Then at some point they will just tell you the

8    formula.

9    Q.    And that might be even later than October or

10   November.  That might be December.

11   A.    Might have been.

12   Q.    In fact, isn't that what happened in the prior

13   fiscal years, that it had been December that they told

14   you?

15   A.    I really don't remember the date that they told

16   us.

17   Q.    But you knew it was later in the year?

18   A.    I recall it being later.  We haven't done

19   objectives and then it's like, oh, they aren't going to.

20   Q.    You mean you haven't done personal objectives?

21   A.    Right.

22   Q.    What kind of personal objectives in the years

23   where that was a component would you have listed for

24   yourself?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

William E. Sperati

46

1    A.    Most of them were relatively canned verbiage

2  about meet corporate policies, do my time entry every

3  day, respect other fellow employees, support management

4  objectives, and then there might be something because of

5  the nature of what I do, keep the system running and help

6  my fellow employees do a better job.

7    Q.    Once you became a CSC employee, were there any

8  orientations held to describe the AMIP plan?

9    A.    No.

10    Q.    Again, did it just start off that the first

11  year you were there, at some point objectives were

12  distributed?

13    A.    I mean, there was an e-mail that says in order

14  to something like administer the plan, the way the plan

15  works is we have objectives.  There was some kind of a

16  communication.  I'm sure it was not a meeting that talked

17  about how they do it through percentages and individual

18  pieces and that you need to fill out that part and get it

19  back to your supervisor or HR, whatever it was.

20    Q.    That was the same as every year.

21    A.    Every year worked that same way, yes.

22    Q.    What does AMIP stand for?

23    A.    I'm not sure.  I assume, I'm guessing, that the

24  A is like America's, differentiated with Europe or



William E. Sperati

47

1    something else, and then I assume it's Management

2    Incentive Program.

3        Q.    Am I correct that you can't point to any

4    document that spells out the terms of the AMIP?

5        A.    Not that I have seen.

6        Q.    Year to year the factors and components of the

7    AMIP changed?

8        A.    I believe so, yes.  Definitely they changed the

9    last year because there was no individual piece.

10       Q.    Individual performance component.

11       A.    Right.  The two things -- there was no

12   individual performance component and the earnings per

13   share, the actual high-level corporate earnings per

14   share, was actually a component, but I do not recall

15   being that -- I do not recall being in there other years.

16       Q.    Other changes might have been return on

17   investment?

18       A.    They might have had return on investment one

19   year and not others or equity.  CSC learned different

20   ways of doing accounting and measuring, trying to find

21   quantifiable ways to measure performance.

22       Q.    Do you know what DSO is?

23       A.    Day sales outstanding.  That's their newest

24   buzz word to try to make the balance sheet look good.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

William E. Sperati

48

1    Q.    Is that another component that sometimes was

2    included and sometimes not?

3    A.    I do not ever remember that being a component,

4    but CSC has been hot on that.  It would not surprise me

5    at all that that would have been a component in 2004

6    because that was one of the corporate financial

7    objectives was to reduce the day sales outstanding.

8    Q.    The DSO was not a factor in the prior years'

9    AMIPs, but it might have been a factor in fiscal year

10   2004?

11   A.    Might have.

12   Q.    I'm sorry.  What does DSO stand for?

13   A.    Day sales outstanding.

14   Q.    Which means what?

15   A.    How well CSC bills and manages its receivables.

16   Q.    CSC's fiscal year runs from April 1 of the year

17   through March 31st of the next year.

18   A.    Yes.

19   Q.    So if it's April 1 of 2002 through March 31st

20   of 2003, that would be fiscal year 2003?

21   A.    Correct.

22   Q.    In addition to the components of the AMIP

23   change in year to year, the weightings would also change?

24   A.    I believe so.