William E. Sperati

49

1    Q.    Some years' return on investment might be worth

2    20 percent of your overall bonus.    Other years it might

3    be worth 15 percent.

4    A.    Correct.

5    Q.    Just as an example.

6    A.    Yes.

7    Q.    And the weightings might change for all of the

8    factors?

9    A.    Yes.

10    Q.    In fact, your personal performance component,

11    the weightings for that might also change?

12    A.    Yes.

13    Q.    This formula that we're describing, that could

14    be different for each employee.

15    A.    I don't think so.    It seems from the nature of

16    the communication that -- certainly in an organization

17    like Chemical Group, everyone there would see the same

18    formula, I believe.    It's likely that at some higher

19    levels of management the formula and the weightings

20    change.    And particularly the Chemical Group earnings

21    specifically would not be a component of someone who ran

22    the Chemical Group and some other group; that theirs

23    would be for the whole of what they would be responsible

24    for.

**W&F**

William E. Sperati

50

1    Q.    Are you aware of anybody that received a

2    prorated AMIP bonus?

3    A.    I did the first year.

4    Q.    Other than that first year, are you aware of

5    anybody that received it?

6    A.    No, though prorating bonuses is clearly CSC's

7    policy.

8    Q.    Why do you say that?

9    A.    Well, because in the recently filed financial

10   documents for the contract for the CEO, they talked about

11   how his bonus would be prorated.  They recently changed

12   his terms because of the pending buyout to make sure that

13   if we were bought out, it clearly states that he would

14   get prorated for the portion of the year that we were

15   CSC.

16          So at the highest levels they explicitly

17   state that in the wording of the CEO's contract, and they

18   prorated it when we came in, and our DuPont bonus which

19   it's similar to was prorated for the year that we had

20   left, that February.  The one year following we received

21   it for the five months we worked at DuPont.

22          Again, never having seen the words, I

23   assumed that it's prorated, and when I retire, it's very

24   likely to get prorated for that component of the year



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  that I worked.

2      Q.    You're no longer a participant in AMIP.

3      A.    Right.  But the assumption that it would be

4  prorated I had assumed would carry over to retirement as

5  an example of -- normally prorating is not something that

6  you think about because it's only at termination of

7  employment that it becomes an issue.  At inception and

8  termination.

9      Q.    On this point about the CEO, do you know if

10  it's an AMIP that was prorated?

11      A.    I don't believe -- my guess is he has his own

12  bonus structure.

13      Q.    So he's not subject to the AMIP.  That's a

14  different plan.

15      A.    I suspect so.

16      Q.    Let's only talk about the AMIP for a moment.

17  Are you aware of anybody that received a prorated AMIP

18  when they were removed from the plan midyear?

19      A.    I'm not aware of anyone being removed from the

20  plan midyear other than through retirement.

21      Q.    You certainly know of other people that were

22  removed from the plan midyear because some of them are

23  your fellow plaintiffs.

24      A.    Yes.  But I don't know whether they received --



William E. Sperati

52

1   I assume because they are plaintiffs they did not receive

2   prorated.

3       Q.    Let me ask you very simply:   Are you aware of

4   anybody that's ever received a prorated AMIP other than

5   when you first came into the plan?

6       A.    No.

7       Q.    What was the maximum percentage of your salary

8   that you could receive as far as an AMIP?

9       A.    Thirty percent.

10      Q.    Did you ever receive that?

11      A.    I don't believe so.

12      Q.    What's the maximum that you received?

13      A.    I really don't remember.  I think it was like

14  26 and a half or 27 and a half, some odd number like

15  that.

16      Q.    When you would receive the formula for how the

17  AMIP would be calculated, and you said sometimes that

18  would come in the August-to-November time frame, that

19  wasn't a guarantee as to what you would receive at the

20  end.  That was a statement as to how it would be

21  calculated.  Correct?

22      A.    Correct.

23      Q.    In fact, they couldn't fill out that form

24  because they were waiting on the financial figures at the

William E. Sperati

53

1    end of the year?

2        A.    Correct.

3        Q.    So they couldn't calculate your bonus at any

4    one moment in time during the course of the year.

5        A.    Correct.

6        Q.    I'm not a mathematician.   I know you are.   But

7    can you just explain to me why that would be?

8        A.    Well, you don't know how well you've gotten

9    your earnings or your objectives.   You could get -- you

10   could make assumptions to get an estimate, but you don't

11   have the numbers.   You don't know if you met operating

12   income or return on investment or whatever numbers until

13   the end of the period and you've run your numbers, you

14   have your year's worth of sales, etcetera.

15       Q.    So as of the time that you were told you were

16   not going to be participating in AMIP, the company was

17   not in a position to give you a bonus for that period of

18   time of the year that had already passed.   Is that

19   correct?

20       A.    They would probably have -- they would have

21   chosen not to have gone through that exercise because of

22   the way they do goal-setting.

23       Q.    Just answer my question, though.   The company

24   could not have prorated your bonus as of September of

William E. Sperati

54

1  2003 because the financial objectives were not being

2  measured at that point in time.  They were being measured

3  at the close of the fiscal year.

4      A.    Yes.

5      Q.    Correct?

6      A.    That's why you prorate.

7      Q.    But they couldn't have prorated as of that

8  period of time, correct?

9      A.    The point is --

10     Q.    Just answer my question.  Is that correct?

11     A.    They could have.

12     Q.    They could have made up a number.  I understand

13 they could have made up a number.

14     A.    Right.

15     Q.    But as of September of 2003, first of all,

16 there was no formula at that point in time to follow,

17 correct?

18     A.    I don't know.

19     Q.    As far as you know, there was no formula to

20 follow as of that point in time, correct?

21     A.    Correct.

22     Q.    Even apart from that, the metrics that they

23 would formally measure had not yet been completed to

24 assess whether or not any formula had been met --



WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

55

1    A.    Correct.

2    Q.    Wait until I complete my question.  It's very

3  difficult for the court reporter.  I don't want to make

4  it too difficult for her.

5              Isn't it true that as of September 2003,

6  any AMIP bonus for you could not have been prorated?

7  Correct?

8    A.    Prorating means that, when it would be awarded,

9  which would be at the close of the fiscal year in 2004,

10 it would be prorated for those months of participation.

11   Q.    So you're saying they could have prorated at

12 the end of the fiscal year, correct?

13   A.    Right.

14   Q.    But they couldn't have prorated at the middle

15 of the fiscal year in September 2003, correct?

16   A.    Correct.

17   Q.    Sitting there in September of 2003, you had no

18 way of knowing how much your bonus would have been at

19 that point in time up until that point in time, correct?

20   A.    Correct.

21   Q.    That is, up until that point in time in

22 September of 2003, you hadn't earned anything.

23              MR. WILSON:  Object to the form.

24   A.    I had participated in the plan by being an

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0065

William E. Sperati

56

1  employee, and those months of participating in the plan

2  contributed to meeting what the objectives would have

3  been.

4      Q.    But you hadn't earned any bonus as of that

5  point in time?

6               MR. WILSON:  Object to form.

7      A.    I earned it as much as being a participant in

8  the plan and causing financials to be positive earns a

9  bonus.  So I had earned it.

10      Q.    How much had you earned as of that point in

11  time?  The answer is you didn't know.

12               MR. WILSON:  Object to the form.

13      A.    I had earned half of what it would be

14  determined to be at the end of the year.  That's what

15  prorating is about.

16      Q.    There are lots of ways to prorate, right?

17      A.    No.

18      Q.    You could prorate based upon time.  Is that

19  what you're assuming?

20      A.    Time or dollars, yes.

21      Q.    But there are other ways to prorate, right?

22  You could prorate based upon efforts?  Let me give you an

23  example.  Let's say most of the revenue that is generated

24  during the course of the fiscal year 2004 is generated in

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

57

1    the fourth quarter of 2004 and the first quarter of 2005.

2    A.    Okay.

3    Q.    Maybe let's say instead of half of the revenue

4    being generated for the year, maybe 75 percent of the

5    revenue is generated during that portion of the year and

6    maybe only 25 percent of the revenue was generated during

7    the first six months of that fiscal year.

8    A.    Correct.

9    Q.    So one way to prorate would be to say we will

10    prorate based upon the amount of revenue that was

11    generated per quarter, correct?

12    A.    Possibly.  Given the nature of the formulas,

13    some of them don't have that component.

14    Q.    Which component, revenue?

15    A.    Well, don't have -- some are just ending

16    numbers.

17    Q.    Like earnings per share.

18    A.    Uh-huh.

19    Q.    Correct?

20    A.    Yes.

21    Q.    So earnings per share is a final number, right?

22    A.    Yes.

23    Q.    It's not measured until the end of the year.

24    A.    Right.

William E. Sperati

58

1     Q.    So how do you know to what extent, if anything,

2  you contributed to earnings per share during the first

3  six months?

4     A.    You prorate it.  That's the whole point.

5     Q.    I didn't ask you if you prorate it.  I'm

6  asking:  You don't know whether or not you contributed to

7  the earnings per share or not.  It could be that the

8  efforts during the first six months of the year had a

9  negative impact on earnings per share, but the efforts

10  during the latter six months of the fiscal year had a

11  positive impact and overcame the first six months.

12          MR. WILSON:  Object to the form.

13  BY MR. SEEGULL:

14     Q.    Is that right?

15     A.    I guess.

16     Q.    You could have a lousy first six months but a

17  fantastic latter six months.

18     A.    Yes.

19          MR. WILSON:  Object to the form.

20     Q.    In some sense it would be silly to reward

21  people by prorating for the first six months, giving them

22  half of the bonus, when they contributed to the lousy six

23  months.

24          MR. WILSON:  Object to the form.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

59

1    BY MR. SEEGULL:

2        Q.    Is that right?  I'm not saying that's what

3    happened.  I'm just asking you.

4        A.    Not really, because they're contributing.

5        Q.    They contributed to the lousy six months.

6        A.    If they hadn't contributed, it may have been

7    even worse.

8        Q.    That's hypothetical, right?

9        A.    But this is hypothetical to say how you --

10       Q.    Prorate?

11       A.    -- prorate the participation, that we're

12   prorating the participation, not prorating the components

13   of the calculation.

14       Q.    You think it should be prorated based upon days

15   in the plan, correct?

16       A.    Yes.

17       Q.    There are other ways to prorate, correct?

18       A.    No.

19       Q.    We just discussed other ways.

20       A.    I don't believe they are prorating your

21   participation.

22       Q.    Of course they're prorating.

23       A.    No, they're not.

24       Q.    They're prorating a bonus --

William E. Sperati

60

1    A.    They're changing the calculation of the bonus,

2  not prorating the calculated bonus.

3    Q.    What's the difference?

4    A.    Well, one is you've calculated -- calculate a

5  bonus based on the rules and then you decide what portion

6  of that bonus is to be given.

7    Q.    You could say 25 percent of that bonus should

8  be given to the people that were here six months and

9  contributed 25 percent of the effort and 75 percent of

10  the bonus should go to the people that were here in the

11  latter six months and contributed 75 percent of the

12  efforts.

13             MR. WILSON:  Object to form.

14  BY MR. SEEGULL:

15    Q.    That's a form of prorating, correct?

16    A.    An inequitable form.  Prorating --

17    Q.    I understand you don't like that way of

18  calculating the bonus.  Am I correct about that?

19    A.    It's not a matter of like.  It's a matter of I

20  don't think that fits a definition of prorating.

21    Q.    In your mind, there's only one way to prorate.

22  Is that really what you're saying?  You're a

23  mathematician.  Is that really what you're saying?

24    A.    I'm saying it should be --



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

61

    Q.    Prorating is a portion.

    A.    A portion.

    Q.    You're not saying that the only way to
apportion a bonus is based on days or time.  There are
other ways to apportion a bonus, correct?

              MR. WILSON:  Object to the form.  Larry,
could you let him answer the question before you
interrupt him?

              MR. SEEGULL:  I'm trying to get him to
answer my question, not answer what he wants to answer.

              MR. WILSON:  You're not giving him an
opportunity to.

              MR. SEEGULL:  If you answer my question,
that's fine.  If you're going to answer something else I
haven't asked you, it's not going to be productive.

BY MR. SEEGULL:

    Q.    We will get to why you think it's unfair, and I
understand you think it's unfair.

    A.    I think prorating is apportioning a calculated
bonus based on the key factor that is determining
eligibility.  So those factors either would be the
salary, so that if there was an increase, you might take
the salary for the portion he was in because these are
salary-based, or you could apportion it based on the

William E. Sperati

62

1  amount of time participating.   The relative contribution

2  goes into the determination of the formula for what the

3  unprorated bonus would be.

4      Q.    There are different ways to apportion a bonus,

5  correct?  This is not a trick question.   I don't know why

6  you're having difficulty with this.   Maybe you just don't

7  want to answer it.   I'm just trying --

8      A.    Apportioning based on participation is the only

9  way that makes sense to me, okay, for apportioning a

10  bonus where there's partial participation.

11      Q.    In your mind, the only fair way to do this will

12  be based upon time in the plan.

13      A.    Yes.

14      Q.    But that doesn't mean it's the only way to do

15  it.  In your mind, that's the only fair way to do it,

16  correct?

17      A.    I cannot see how there are other calculations

18  that are really possible, given the components that go

19  into determining the bonus.

20      Q.    I just gave you a calculation that's possible.

21      A.    You didn't, because you were making --

22      Q.    Let me finish.   I gave you a calculation as to

23  how it's possible.

24      A.    No.

William E. Sperati

63

1      Q.    You think it's not a fair way.  You think it's

2  not maybe mathematically a smart thing to do, but it is a

3  way to do it.

4      A.    I don't think --

5      Q.    If that's your testimony, that's fine.

6      A.    I don't think it is possible, given the

7  components of the bonus, to prorate them with some other

8  algorithm.  I really don't.

9      Q.    Well, it's possible.  Of course it's possible.

10  You could say --

11             MR. WILSON:  Object on the form.  He just

12  said it wasn't possible.

13  BY MR. SEEGULL:

14      Q.    Of course it's possible, Mr. Sperati.  You're

15  not claiming that somebody at the end of the year

16  couldn't say Mr. Sperati was here the first six months of

17  the year, but I think his contributions really were only

18  worth 35 percent towards our goals and I'm going to give

19  him 35 percent of what he otherwise would have earned in

20  the bonus.  That's a possible way of doing it.

21             MR. WILSON:  Object to the form.

22  BY MR. SEEGULL:

23      Q.    Correct?  Or are you even denying that?  Look,

24  if that's your testimony, if you want to stick to that --



William E. Sperati

64

1   let me finish.   I don't want to change your testimony.

2   If that's your testimony that that is impossible, then we

3   will live with that and that will be your testimony.   I

4   want to understand what you're saying under oath is

5   possible.

6             So you just tell me, Mr. Sperati, is that

7   possible or not?   Just yes or no.

8       A.    An arbitrary determination of percentage to

9   prorate is something that is possible, but my testimony

10  is that arbitrary determinations of percentages does not

11  meet what I believe the definition of the word "prorate"

12  is because prorate means from the ratio.   It's calculated

13  from a ratio of something.

14      Q.    Right --

15      A.    It's calculated, not arbitrarily determined.

16      Q.    It can be calculated based upon efforts or

17  revenue or sales.   It can be calculated based upon

18  billings.   It can be calculated upon a lot of different

19  things, correct?

20      A.    But as an individual, I don't have those lots

21  of things.

22      Q.    Well, maybe you do, maybe you don't.   We could

23  come up with a lot of different things that you do have.

24  But I'm just asking you if it's possible.   If you want to

William E. Sperati

65

```
 1   tell me it's not possible, that's fine.  If you want to

 2   say it's mathematically impossible, that's fine.  I

 3   understand you don't think it's a fair way of doing it,

 4   but I'm surprised to hear you say it's not possible.  If

 5   that's your testimony, that's what we will present as

 6   your testimony.  Your testimony being it's impossible.

 7        A.    Given my understanding of the CSC accounting

 8   systems, I do not believe it's possible.

 9        Q.    Okay.  I don't know what you mean by "CSC

10   accounting systems."  Do you work with the accounting

11   systems?

12        A.    Only peripherally.

13        Q.    Have you ever touched an accounting system,

14   Mr. Sperati?

15        A.    Time reporting, yes.

16        Q.    You enter your time?

17        A.    Yes.

18        Q.    That's what you mean by the accounting system?

19        A.    No.

20        Q.    Have you ever touched an accounting system?

21        A.    An accounting system?

22        Q.    CSC accounting system.

23        A.    I have touched the system that CSC uses for

24   accounting, yes.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

66

1    Q.    Have you ever entered data into the accounting

2    system?

3    A.    No.

4    Q.    So you don't know what the accounting system

5    allows and doesn't allow, do you?

6    A.    At fundamental levels, yes, I do.

7    Q.    What does it allow?

8    A.    They use SAP.  I know how SAP does accruals and

9    calculates financials and how U.S. corporations do their

10   books.

11   Q.    How do they do the books with respect to the

12   AMIP?

13   A.    How do they do their books with respect to the

14   AMIPs?  They look at the objective numbers that they have

15   defined and they do the calculations based on what they

16   have in their financial entries to see how they come up

17   with the numbers that they have defined.

18   Q.    But the accounting system doesn't do prorata,

19   right, calculations?

20   A.    No.  That's the point.

21   Q.    So you understand that the accounting system

22   doesn't permit prorata calculations.

23   A.    I'll say yes.

24   Q.    I understand you think it should have been done

William E. Sperati

67

1    prorata and you think prorata means by time spent in the

2    plan.  It was not done prorata, correct?

3        A.    Correct.

4        Q.    Now, do you know in the fiscal year 2004

5    whether or not an individual performance objective was a

6    component of the plan?

7        A.    I have no idea what the 2004 components were.

8        Q.    You haven't spoken to anybody who was subject

9    to the 2004 AMIP plan?

10       A.    No.

11       Q.    You have never seen a completed worksheet?

12       A.    No.

13       Q.    How did it work at the end of every fiscal year

14   when you would get your bonus?  Did you get a completed

15   worksheet back from the company?

16       A.    I think they would show us a copy of it.

17   Sometimes we would get a hard copy.  I do not recall it

18   coming via e-mail.

19       Q.    Who was it that would show it to you?

20       A.    That would be my supervisor.

21       Q.    Who is that?

22       A.    Debbie Cebula.

23       Q.    How long has Mrs. Cebula been your supervisor?

24       A.    Five or six years.



William E. Sperati

68

1    Q.    She would show it to you every year just in

2    hard-copy form?

3    A.    Uh-huh.  Yes.

4    Q.    You would generally receive that in the May

5    following the fiscal year-end?

6    A.    Yes.

7    Q.    Did you meet with Ms. Cebula to discuss the

8    completed worksheet?

9            MR. WILSON:  What time are you talking

10   about here?

11           MR. SEEGULL:  At any point in time.

12   A.    She would have it there and say this is the

13   worksheet, this is how we did the calculation.  A brief

14   discussion.

15   Q.    Did you ever have any input as to what factors

16   should be included in the calculation of the AMIP?

17   A.    No.

18   Q.    Or what weightings to be given to each of the

19   factors?

20   A.    No.

21   Q.    Or what the maximum AMIP payout should be?

22   A.    No.

23   Q.    Until you received the factors and their

24   weightings, you wouldn't know whether or not you would be

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

William E. Sperati

69

1   participating in AMIP or not, correct?

2        A.    I was participating, okay, because I had a

3   letter that said you will be included.

4        Q.    How long after you received the completed

5   worksheet and met with Ms. Cebula did you receive the

6   bonus payment?

7        A.    Hours or days.

8        Q.    Or maybe right at the same time?

9        A.    I mean, I'm trying to think.  It may be a

10  scenario of the payday would be Friday, we would have

11  visibility to our pay stubs on Tuesday, so we would

12  actually know the amount, and on Wednesday or Thursday

13  she would actually talk to us as to how it was

14  calculated.

15       Q.    What were you told in September of 2003 about

16  no longer being a participant in AMIP?

17       A.    The entire communication was in the letter and

18  a statement that something to the effect of it's because

19  now it's only going to managers; they're enforcing that

20  old rule that we had been excepted from in the past.

21       Q.    So am I correct that you had no communications

22  with anybody else about your no longer being a

23  participant in AMIP other than that letter?

24       A.    That was the first time I heard anything about

William E. Sperati

70

1    it.

2        Q.    Was that the only time you spoke to anybody in

3    the company about it?  I say "spoke."  You didn't speak

4    to anybody.  Was that the only communication you had with

5    anybody about no longer being a participant in AMIP?

6        A.    Basically, yes.  I mean, some of the other

7    people who I believed lost it, we started talking about,

8    boy, this seems pretty unbelievable.

9        Q.    Other than that?

10       A.    No.

11       Q.    No other communications?

12       A.    No.  And then the letter from Bill saying

13   please respond to the letter that you received.

14       Q.    What was your understanding of what it meant

15   when you received the letter?

16       A.    It meant that CSC had on September 11th

17   declared that effective April 1st I was no longer to be

18   participating.

19       Q.    Did you understand that meant that you would no

20   longer receive any AMIP?

21       A.    I suspect that to be the case.

22       Q.    That's what you understood it to mean.

23       A.    Yes.

24       Q.    Did you understand that you were not going to



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

71

1   get prorated?

2       A.    I was pretty sure because of that use of the

3   April 1st language that they would not recognize the fact

4   that I had participated for those six months.

5       Q.    Did you ever ask anybody about proration?

6       A.    I might have said are we going to at least get

7   money for this -- I suspect that I asked, but I don't

8   remember specifically.

9       Q.    You think you were told no, you're not going to

10  get prorated?

11      A.    Right.

12      Q.    That would have been Debbie Cebula?

13      A.    Yes.

14      Q.    And that would have been in September 2003, as

15  well, that you spoke to her about this?

16      A.    Yes.

17      Q.    So you knew once you spoke to Debbie Cebula

18  that you would not get any AMIP?

19      A.    I expected that, when the AMIP was distributed,

20  I would not -- my participation would not be recognized

21  and, therefore, I would get nothing for that fiscal year.

22      Q.    That's what you understood.

23      A.    Yes.

24              (Deposition Exhibit No. 2 was marked for

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0081

William E. Sperati

72

1    identification.)

2    BY MR. SEEGULL:

3        Q.    I'm now showing you what's been marked as

4    Exhibit 2.  Do you recognize this?

5        A.    Yes.

6        Q.    This is the letter you received?

7        A.    Yes.

8        Q.    That told you you were no longer a participant

9    in AMIP.

10       A.    Yes.

11       Q.    So you were told as of September 11th, 2003,

12   that you would not get any AMIP.

13       A.    Correct.

14       Q.    You said you were given some explanation, but

15   it's not from this letter?

16       A.    Well, this letter says it has reviewed your

17   eligibility in line with criteria set and you will no

18   longer be eligible.  That's what it says.

19       Q.    So you understood that to be an explanation

20   about we're returning to what we always understood the

21   AMIP to be.

22       A.    That's what I assumed happened, because at any

23   time they could have reviewed and under the rules I

24   would, quote, not have been eligible.





**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0082

William E. Sperati

73

```
1      Q.     Were you handed this letter?

2      A.     Yes.

3      Q.     By Debbie Cebula?

4      A.     Yes.

5      Q.     You were told you were eligible for a

6   discretionary bonus.

7      A.     That's what it said.

8      Q.     You were eligible for up to $10,000 in

9   discretionary bonus, correct?

10     A.     That's what it said.

11     Q.     And you would not have been eligible for a

12  discretionary bonus if you had remained in the AMIP.

13     A.     I assume that to be so.

14     Q.     That's what you understood.

15     A.     I don't know that they implemented a

16  discretionary bonus program.  CSC has changed over the

17  years as to whether a person can participate in multiple

18  bonus programs or not.  So I don't know what the current

19  rules as to whether you would be eligible for two

20  bonuses, performance bonuses, or not.  It's likely that

21  with AMIPs I would not have gotten -- have been eligible

22  for any other bonus.

23     Q.     That was your understanding.

24     A.     That is the way it had worked the last couple
```



William E. Sperati

74

1    of years.

2        Q.    So they were making you eligible for the

3    discretionary bonus because you were no longer eligible

4    for participating in the AMIP.

5        A.    Yes.

6                (Deposition Exhibit No. 3 was marked for

7    identification.)

8    BY MR. SEEGULL:

9        Q.    I'm now showing you what's been marked as

10   Exhibit 3.  Do you recognize this?

11       A.    Yes, I do.

12       Q.    What is it?

13       A.    This is my response and Bill Cummings's request

14   for me to return the signed letter or why I did not plan

15   to return the signed letter.

16       Q.    Turning to Exhibit 2 for a moment.  The letter

17   that you refused to sign is Exhibit 2, correct?

18       A.    Well, you know, my only thing is I thought that

19   it said to return it.  I thought it had somewhere return

20   it.

21       Q.    On the bottom it says "Employee

22   Acknowledgment"?

23       A.    Yes.  Anyhow, this is the letter I did not

24   sign, yes.



William E. Sperati

75

1    Q.    That's the one you were refusing to sign.

2    A.    Yes.

3    Q.    Exhibit 2.

4    A.    Yes, Exhibit 2.

5    Q.    What was the reason that you refused to sign

6    it?

7    A.    Well, CSC has a very strong business ethics

8    program and policy, and one of those is employee conduct

9    basically must reflect the highest standards of honesty,

10   integrity, and fairness.  And this clearly does not meet

11   the highest standards of fairness, and I was afraid that,

12   conceivably, if I signed this grossly unfair document,

13   that I might be terminated for violating the business

14   ethics policy.

15   Q.    That's what you told Mr. Cummings?

16   A.    Yes.

17          (Deposition Exhibit No. 4 was marked for

18   identification.)

19   BY MR. SEEGULL:

20   Q.    I'm now showing you what's been marked

21   Exhibit 4.  Do you recognize this document?

22   A.    Yes.

23   Q.    Did you write it?

24   A.    No.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

William E. Sperati

76

1     Q.    Who wrote it?

2     A.    I assume the attorneys or somebody like that.

3  I don't know.  Some fellow CSC employee.  I do not know

4  who -- I do not know who "we" was in this.  "We have

5  sent."  "We, a small group."  I don't know who those

6  individuals were that got this moving.

7     Q.    When did you see this?

8     A.    Probably December 5th or 6th.  I got it in the

9  mail.

10     Q.    You got it in your CSC mail?

11     A.    No.  Home mail, I believe.

12     Q.    Had anybody talked to you about this letter

13  before you received it?

14     A.    I don't think so.

15     Q.    Or had anybody talked to you about the bonus

16  issue before you received this letter?

17     A.    Other than just grumbling, no.

18     Q.    Had anybody talked to you about joining a

19  lawsuit?

20     A.    As I recall, this was the first I knew there

21  was a lawsuit.  Trying to think if anybody talked about

22  it.  I don't remember any discussions about a lawsuit.

23     Q.    Am I correct that your annual performance

24  reviews don't have anything to do with this case?



William E. Sperati

77

1    A.    I would say that's true.

2              MR. WILSON:  Do you mind if we took a

3    quick break?

4              MR. SEEGULL:  Not at all.

5              (A recess was taken.)

6              (Deposition Exhibit No. 5 was marked for

7    identification.)

8    BY MR. SEEGULL:

9    Q.    Mr. Sperati, I'm now showing you what's been

10   marked as Exhibit 5.  Do you recognize this?

11   A.    It is an e-mail to me from Charlie.  Doesn't

12   say anything more.

13   Q.    The subject line says, "AMIP Changes Potential

14   Lawsuit."

15   A.    Yes.

16   Q.    What was the substance of the e-mail?

17   A.    I really don't remember.

18   Q.    You don't remember at all?

19   A.    I really don't remember.  It had something to

20   do with the lawsuit.  What it was, I'd have to look at

21   it.  I don't remember.  It might have been asking if we

22   were participating.  I really don't remember.

23              Again, as you can see from the date, it

24   came out just a couple days after the mail was sent,

William E. Sperati

78

1    Exhibit 4 was sent.

2        Q.    You provided answers to interrogatories in this

3    case.

4        A.    Yes.

5        Q.    One of the questions we asked you in the

6    interrogatories was to provide a statement as to your

7    damages, correct?

8        A.    I believe so.

9        Q.    You identified your damages as being

10   $15,667.86.  Does that number sound familiar?

11       A.    Probably.

12       Q.    Is that yes?

13       A.    Yes.

14       Q.    And that was what, your estimate of what or

15   your statement of what?

16       A.    That's my statement of not knowing the formula

17   for the 2004 AMIP, I used the average that I had gotten

18   over the last couple years, assuming that CSC financials

19   were as good, if not better, than the prior years so that

20   the base for the calculation would be the same, and then

21   applied that percentage to my salary for the time period

22   up through the notification.

23       Q.    So this was an estimate of what you felt was

24   the amount of AMIP bonus that should have been prorated



WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

79

1   for the period of time up until the point that you were

2   notified you were no longer participating.

3       A.   Yes.

4       Q.   And just tell me how you went about coming up

5   with this estimate.

6       A.   As I recall, I took the average percentage for

7   the prior three years --

8       Q.   What do you mean "percentage"?   Percentage of

9   what?

10      A.   Percentage of my salary that my AMIP had

11  represented.

12      Q.   So maybe you took the AMIP that you had

13  received in 2002?

14      A.   Right.

15      Q.   2001?

16      A.   '2 and '3.

17      Q.   The AMIP dollars that you had received in 2002,

18  the AMIP dollars you had received in 2003, and figured

19  out what percentages they were for each year?

20      A.   Yes.

21      Q.   And then what did you do, you averaged those

22  percentages?

23      A.   Then I believe I averaged those percentages and

24  then took that percentage over the salary.

William E. Sperati

80

1    Q.    For fiscal year 2004?

2    A.    For six months of 2004.  Fiscal 2004.

3    Q.    So six months.  Why do you say six months if

4 you were notified in early September?

5    A.    Well, because of the pay-period cycle.

6    Q.    What do you mean?

7    A.    Well, CSC pays on a two-week pay-period cycle.

8 So I used through the end of September as that would be

9 the pay stub that corresponds to the period that this --

10 from when I received the notice.  It could be one pay

11 period less if you want to say that pay was for --

12    Q.    The period after you were notified.

13    A.    That was the pay for the work in the period I

14 was notified.  So I didn't quibble over the three days of

15 pay inside that pay period.

16    Q.    Why did you choose that method of coming up

17 with an estimate?

18    A.    Because it was easy.

19    Q.    There are other methods to estimate, right?

20    A.    Yes.

21    Q.    What are some other ways that you could have

22 estimated how much AMIP --

23    A.    I could have taken the highest amount rather

24 than the average.  I could have looked at some of the

William E. Sperati

81

1    classic CSC performance metrics to see if they were -- I

2    could have pretended to do my own AMIP calculation to see

3    if the formula would have been better this year than

4    other years.

5        Q.    Or worse?

6        A.    Or worse.  But not knowing what the formula

7    was, speculating and doing the arithmetic of finding out

8    earnings per share and some of those calculations, this

9    seemed like a simple and fair way to get there.  Knowing

10   the formula would be better, but I didn't have access to

11   that information.

12       Q.    You have no choice but to estimate.

13       A.    Right.

14       Q.    You also could have averaged your AMIPs over

15   the past three or four years.

16       A.    Yes.

17       Q.    And then prorated it for a period of time.

18       A.    But then you have to adjust it for the

19   increased salary.

20       Q.    There are just different arbitrary ways of

21   calculating a bonus.

22       A.    Well, the AMIP's bonus is a percent of salary.

23       Q.    But these are all arbitrary ways of estimating.

24   One is no better than another.  There are just different

William E. Sperati

82

1    ways.

2        A.    Fine.    There are different ways.    I think some

3    are better than others.

4        Q.    The decision to remove you from the AMIP plan,

5    that wasn't a personal decision, correct?

6        A.    I do not believe so.

7        Q.    That wasn't about you.    That was a class of

8    people that were eliminated.

9        A.    I believe it was a class of people.    I believe

10   that at some point there was a recognition that people

11   were in AMIPs that had come from DuPont that did not meet

12   their classic definition.    I do not know whether they

13   redefined eligibility or whether they just reviewed and

14   did not consider the fact that we had been granted an

15   exception to the rules.

16       Q.    Is it your understanding that CSC removed all

17   people at a certain level, salary level, from the AMIP?

18       A.    My understanding is that they removed all

19   people who were not managers.    I do not know whether

20   there are any people at a manager's salary level who are

21   not managers who continue to retain the bonus.

22       Q.    You would agree that fiscal year 2003 was a

23   difficult financial year for the company.

24       A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

83

1    Q.    Sometimes a company has to make decisions about

2  how to save money?

3    A.    Are you talking about fiscal 2003 or fiscal

4  2004?

5    Q.    I'm talking about fiscal 2003.

6    A.    Okay.

7              MR. WILSON:  Let him finish.

8    Q.    You would agree that sometimes companies have

9  to make tough decisions about how to save money, retain

10  employees, improve the financial performance of the

11  company?

12    A.    Yes.

13    Q.    And that a company has to use its best business

14  judgment to do that.

15    A.    Yes.

16    Q.    And you understand that realigning AMIP with

17  its original intent allowed the company to save a lot of

18  money, correct?

19              MR. WILSON:  Object to the form.

20    A.    Yes, it would allow them to save money.

21    Q.    That's a legitimate objective of the company.

22    A.    Yes.

23    Q.    So you don't have a problem with the idea that

24  people will no longer be subject to the AMIP.  You just



William E. Sperati

84

1    think that you should have been continuing to

2    participate.

3                    MR. WILSON:   Object to the form.   You can

4    answer.

5        A.    I have no problem at all with CSC saying we

6    want to keep AMIP purely for management.   However,

7    because of their business policy of fairness, that they

8    should have, therefore, translated that component on some

9    algorithm into my base salary.

10                   So I know, for example, there are

11   individuals who were receiving the AMIP bonus who

12   transferred into a different organization within CSC that

13   did not grant the exception.   When they moved internally

14   within CSC to an organization that strictly enforced the

15   AMIP rules, they received an uplift so that their

16   compensation would be fair.

17                   So terminating the AMIP bonus to enforce a

18   policy does not mean that the compensation shouldn't go

19   up to retain fairness to the employee.

20       Q.    You think your salary should have been

21   increased?

22       A.    I think if they don't want a portion of my

23   compensation to be variable, that they should have given

24   some kind of salary increase to make up for it to be



William E. Sperati

85

1    fair.

2        Q.    But if the goal is to save money, how does

3    increasing your salary achieve that goal?

4        A.    The goal wasn't -- the stated goal was to

5    review AMIP eligibility.  All I know is they were

6    reviewing AMIP eligibility.  They were not trying to save

7    money or decrease people's salaries.  I don't know what

8    the true intent was, but the goal -- I was informed that

9    I was losing it because I was not eligible, not because

10   they want to save money by cutting salaries by

11   20 some percent.

12       Q.    If the goal had been in part to save money, you

13   wouldn't have a problem if they eliminated you from AMIP

14   and didn't increase your salary.  If that's the goal.

15       A.    Basically, yes.  I agree with that.

16       Q.    Because the company has to eliminate people

17   from AMIP and can't increase their salary if the goal is

18   to save money.

19       A.    Right.

20       Q.    Isn't it true that the reason they reevaluated

21   eligibility was to make sure that they weren't

22   overpaying?

23       A.    I have no idea why they reviewed eligibility.

24       Q.    Do you know when the company started planning



WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

86

```
1    the fiscal year 2004 AMIP review?

2        A.    No.

3        Q.    Or how long it took them to effectuate the

4    decisions?

5        A.    No.

6        Q.    Do you think it was a hasty decision?

7        A.    No.

8        Q.    Isn't it true that fiscal year 2004 was not the

9    first time that CSC had decided to review eligibility and

10   remove people from eligibility from AMIP?

11       A.    I'm not aware of them removing people in the

12   past.

13       Q.    Did you ever receive a discretionary bonus?

14       A.    You mean the 10,000 thing?

15       Q.    It doesn't have to be 10,000.  That's up to

16   10,000.

17       A.    I have not received any bonuses since I

18   received the letter.

19       Q.    Who do you contend has personal knowledge about

20   this case or the facts giving rise to your claims?

21       A.    I'd have to look at the organization chart.  I

22   believe there are managers in the CSC organization who

23   know how this process went about, what the decisions

24   were.
```



William E. Sperati

87

1    Q.    Just tell me who you know has knowledge of this

2 case or the facts giving rise to this case.

3    A.    I don't know anybody.  I just know --

4    Q.    You know yourself.

5    A.    I know myself.

6    Q.    Anybody else that has knowledge of the facts in

7 this case?

8    A.    I believe Bill Cummings does as the one who

9 sent the letter and he was a manager and I understand he

10 was involved in some of the discussions around it.

11    Q.    Anybody else?

12    A.    His boss.

13    Q.    Who's that?

14    A.    I don't know.  I don't remember.

15    Q.    Anybody else?

16    A.    Not that I know.

17    Q.    Do you have any debts at the present time?

18    A.    Credit card.

19    Q.    How much do you have in credit card debt?

20         MR. WILSON:  Object to the form.

21    A.    Ask my wife.

22    Q.    Approximately.

23    A.    I would guess 4,000.

24    Q.    Have you now told me everything that you know

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

88

1    or remember that forms the basis for your case?

2            MR. WILSON:  Object to the form.

3        A.    I think so, yes.

4        Q.    Is there any information that you have not

5    mentioned which you think is relevant to this case?

6            MR. WILSON:  Object to the form.

7        A.    No.

8            MR. SEEGULL:  Why don't you give me a

9    couple of minutes to make sure I have gotten everything

10   and then we will be done.

11            (A recess was taken.)

12            MR. SEEGULL:  Mr. Sperati, I don't have

13   any further questions for you at this time.  Your counsel

14   may have questions, so I will let him ask any if he does.

15   BY MR. WILSON:

16       Q.    Mr. Sperati, just a reminder the same rules

17   apply as Mr. Seegull outlined.  Wait for me to finish and

18   I will try to do the same.  You have to give audible

19   responses.  I don't think I'll be too long here.

20            You stated that when you worked at DuPont

21   there was a bonus structure built into your compensation;

22   is that correct?

23       A.    Yes.

24       Q.    When you transferred to CSC, you were also

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

William E. Sperati

89

1   given the AMIP bonus as a part of your compensation,

2   correct?

3              MR. SEEGULL:  Objection.  Leading.

4              MR. WILSON:  You can answer.

5       A.    Yes.  The letter said I will be a participant

6   in that program.

7       Q.    Can you tell us your understanding as to why

8   you were given the AMIP bonus?

9              MR. SEEGULL:  Objection.  Go ahead, you

10  can answer.

11      A.     My understanding is that in the negotiations to

12  transfer the service to CSC and to the other outsourcing

13  partners, DuPont wanted to ensure that their former

14  employees were treated fairly and that we had comparable

15  compensation in the new company.

16             CSC chose to retain my compensation as the

17  salary-plus-a-bonus compensation rather than taking some

18  component of the bonus and rolling it into the base

19  salary which other people, other companies that were

20  outsourced at the same time did.

21             So this was CSC's response to what my

22  total compensation was, is to retain the two components.

23      Q.    Was your compensation at CSC essentially the

24  same as it was at DuPont?



William E. Sperati

90

1      A.      Essentially the same as it stated in that there
2  was some uplifts to make up for pieces for benefits that
3  DuPont had that CSC did not cover.
4      Q.      When you were in the process of switching over
5  to CSC, did you talk to anybody about the bonus
6  structure?
7      A.      Only in the briefest of terms, that it was a
8  management bonus and it didn't work the way DuPont's did.
9  How it worked really wasn't discussed.
10      Q.      Who was this person?
11      A.      I'm thinking it was Joe MacElrone.  Again, the
12  manager.  Whoever the manager at the time was.  Again,
13  very brief.  The compensation has the bonus, but it's
14  managed differently.
15      Q.      Did he make any sort of statement to the effect
16  that under normal circumstances at CSC bonuses were
17  strictly for management?
18      A.      He mentioned that something to the effect of he
19  was actually a little surprised they were giving us it as
20  bonus because CSC's management bonus plan had been just
21  for managers and we were the first nonmanagers to be
22  participating, as he understood it.
23              Again, he was a DuPont employee.  He was
24  also transitioning.  So I don't know if he had a lot of

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

91

1    details about how it worked in detail.

2        Q.    Was it your understanding that CSC understood

3    that this was an exception?

4        A.    Absolutely.

5                MR. SEEGULL:    Objection.   Form.

6        Q.    Was the AMIP bonus intended to be part of your

7    compensation?

8        A.    Yes.

9        Q.    Was the AMIP bonus an earned bonus?

10               MR. SEEGULL:   Objection.

11       A.    Yes.

12       Q.    I'd like to refer you to Exhibit 2, the

13   September 11th letter.

14       A.    Yes.

15       Q.    Prior to receiving this letter, had you heard

16   any rumors or anything that would lead you to believe

17   that the AMIP bonus was going to be taken away?

18       A.    No.

19       Q.    Were any meetings held to explain why this was

20   being done, either prior to the letter or after the

21   letter?

22       A.    No.

23       Q.    Up until this date did you believe that you

24   were working to earn your bonus?



William E. Sperati

92

1    A.    Yes.

2              MR. SEEGULL:  Objection.

3    Q.    You believe CSC owes you this money?

4              MR. SEEGULL:  Objection.

5    A.    Yes.

6    Q.    A little earlier Mr. Seegull was talking to you

7    about the amount of bonus that you calculated that you

8    earned.  Do you believe this is a fair estimation?

9    A.    Yes.

10              MR. SEEGULL:  Objection.

11    Q.    Is it on the high side?

12              MR. SEEGULL:  Objection.

13    A.    I doubt it.

14    Q.    Is it on the low side?

15    A.    I think it's fair.  With what I had, I tried to

16    be fair -- fair and honest in the calculation.

17    Q.    Since you calculated that, roughly, $15,000

18    bonus, have you calculated the bonus again?

19    A.    No.

20    Q.    Did you do it this morning?

21              MR. SEEGULL:  Objection.

22    A.    Yes.

23    Q.    Did you come up with 15,000?

24    A.    No.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

93

1              MR. SEEGULL:  Objection.

2        Q.    What was that calculation?

3        A.    Eighteen thousand.

4              MR. SEEGULL:  Better leave that out.

5        Q.    But even though your calculation this morning

6   was 18,000, you're still willing to accept that roughly

7   15,000 is fair?

8        A.    Yes.  Because one of the assumptions I made

9   this morning was inaccurate.

10       Q.    I'd like to refer you to the November 25th

11  e-mail.  It's Exhibit 3.  I'm sorry.

12              Why did you put four possible responses at

13  the bottom?

14       A.    Well, in September or early October we had gone

15  through business ethics training at CSC.  It's an annual

16  review process.  And the business ethics training is

17  always expressed in terms of here's a situation, here's

18  possible actions that can be taken, which of these is

19  ethical according to the policy.  And I thought that that

20  would be an appropriate way to enforce that what CSC had

21  done did not meet their ethical standards.

22       Q.    As part of your testimony when Mr. Seegull was

23  asking you questions, you stated my understanding that

24  they can change anything they want.  Does this statement

William E. Sperati

94

1    include retroactive actions?

2            MR. SEEGULL:   Objection.

3       A.   I don't think so.  I mean, I kind of looked --

4    you can't change the rules after the play is over.

5       Q.   Did you rely on the statement in Exhibit 1 that

6    you would receive the AMIP bonus?

7            MR. SEEGULL:   Objection.

8       A.   I don't understand the question.

9       Q.   In other words, when you were working for CSC

10   in the years that followed your first year, did you rely

11   on that statement in there that you would continue to

12   receive the AMIP bonus?

13           MR. SEEGULL:   Objection.

14      A.   I knew that I was a participant and my actions

15   and behavior caused me to work in such a way that I would

16   continue to achieve it and that the goals associated with

17   that would be met.

18      Q.   Did you view this clause and this offer of

19   employment as a promise to pay you the AMIP bonus?

20      A.   It's a promise that I was a participant in

21   it --

22           MR. SEEGULL:   Objection.

23           THE WITNESS:   -- and would be compensated

24   based on its formula.



William E. Sperati

95

1    Q.    Mr. Seegull also asked you a lot of questions

2  about the different criteria that the AMIP bonus would be

3  based on.  Specifically in 2004 you stated that you

4  didn't know what the criteria would be.

5              Did you have a pretty good idea of what

6  the criteria would be?

7                   MR. SEEGULL:  Objection.

8                   MR. WILSON:  Strike that.

9  BY MR. WILSON:

10    Q.    Were the criteria similar from year to year?

11    A.    Yes.  There were a number of pieces in the

12  calculation that were essentially the same.  The specific

13  target number for the objective changed, but that there

14  would be an objective around operating income, for

15  example, was one of the things that you would expect to

16  see.

17    Q.    So even though you didn't know the specific

18  objectives from April 1st, 2003, until September of 2004,

19  were you performing your job in a manner that would lead

20  itself to earning the AMIP bonus?

21                   MR. SEEGULL:  Objection.

22    A.    As much as my actions influence those

23  financials, absolutely.

24    Q.    Mr. Seegull also asked you if you could point



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

96

1    out a document that spells out the terms of the AMIP, and

2    you said that you couldn't.  What about this Exhibit 1,

3    the offer of employment, would that roughly spell out the

4    terms of the AMIP bonus?

5        A.    In the broadest of descriptions, it's an

6    incentive program for which you have objectives and when

7    it will be awarded and that it's performance-based.  The

8    detail of who is eligible, etcetera, and who reviews, you

9    know, the data and the calculations, etcetera, is not

10   here, and I don't know any of those specifics.

11       Q.    You also testified that when a CSC employee

12   left in the middle of the year, that you never heard of

13   them getting a prorated bonus.  Did you ever hear of

14   somebody not getting a prorated bonus?

15       A.    No.  I had no discussions with anybody who's

16   left CSC for retirement or other reasons around their

17   AMIP compensation.

18       Q.    There was also some discussion about figuring

19   out your bonus as of September 2003.  Could that bonus

20   for that fiscal year 2003 have been figured out at the

21   end of the fiscal year?

22       A.    For fiscal 2004 you mean?

23       Q.    Yes.  I'm sorry.

24       A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

97

1    Q.    He also asked you some hypothetical questions

2  about revenue being generated in the fourth quarter and

3  prorating on that basis.

4            If the bonuses were figured on a quarterly

5  basis, could you prorate your bonuses then effectively

6  based on quarters?

7    A.    I believe you could have if that was the nature

8  of the formulas in the program that it was not.

9    Q.    But CSC's was done --

10   A.    CSC's, it was on a fiscal-year basis.

11   Q.    So would any work that was done during that

12 fiscal year contribute to the total earnings for the

13 fiscal year?

14            MR. SEEGULL:  Objection.

15   A.    All work done influences those year-end

16 metrics.

17   Q.    The September 11th letter, Exhibit 2, mentions

18 a discretionary bonus.  You may have already testified to

19 this, but did you ever get any part of that discretionary

20 bonus?

21   A.    No.

22   Q.    Do you know of anybody that ever did?

23   A.    No.

24            MR. WILSON:  That's all I have.



William E. Sperati

98

1    BY MR. SEEGULL:

2        Q.    You would agree that sometimes ethics is a

3    matter of opinion, correct?

4        A.    Yes.

5        Q.    It's not always clear what's ethical, and

6    people can have different views on that, correct?

7        A.    Yes.

8        Q.    Some might say that your filing this lawsuit is

9    unethical, that you're trying to claim something you're

10   not entitled to and that's unethical?

11       A.    Perhaps.

12             MR. WILSON:   Object to form.

13       Q.    You said you did an estimate this morning of

14   your damages?

15       A.    Yes.

16       Q.    Can I see that estimate?

17       A.    Yes.

18       Q.    You're going to have to help me.   We have got a

19   single sheet of paper here and there are some numbers

20   scrawled on it.   We will make this an exhibit.

21             (Deposition Exhibit No. 6 was marked for

22   identification.)

23   BY MR. SEEGULL:

24       Q.    Why don't you tell me what the numbers are on



William E. Sperati

99

1    Exhibit 6 and what they mean.

2        A.    Basically I pulled off of one of the statements

3    my annual salary.

4        Q.    Which is what?

5        A.    Which was that one.

6        Q.    121,795.

7        A.    I divide it by two because I quickly said

8    April, May, June, July, August, September, that's six

9    months.  That's half a year.  So I divided by two.  I

10    took that number --

11        Q.    Hold on.  After you divided by 2, you got

12    60,899.

13        A.    97.

14        Q.    60,897.

15        A.    Right.

16        Q.    And you did what with that?

17        A.    I multiplied times 30 percent because that was

18    the number from one of the other worksheets that had been

19    the bonus percentage.  And I just used it as a quick

20    number for ballpark.

21        Q.    And the number you came up with was 18,000?

22        A.    Yeah.  Because I only multiplied the first

23    digit.  Close enough for quick -- the reason it's high is

24    because the actual percentage that I had earned and they

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William E. Sperati

100

1    used in the filing was more in the neighborhood of 23,

2    24.  That would bring that number down.

3        Q.    You're not claiming that you're entitled to

4    $18,000 in damages?

5        A.    No.  The claim was in the statement where I --

6        Q.    In the interrogatory answers?

7        A.    In the interrogatory answer where I had taken

8    time to do the arithmetic and the salary calculation,

9    etcetera.

10       Q.    That was the $15,000 number that we talked

11   about before?

12       A.    Yes.

13       Q.    When you calculated 121,795 for your salary,

14   what year was that?

15       A.    That was salary that I saw on one of the CSC

16   salary summary sheets, and that was my annual salary

17   starting -- I believe I picked the one starting June 1,

18   2003.  Or July 1.  Whatever it was.

19              MR. SEEGULL:  I have no further questions.

20              Any further questions?

21              MR. WILSON:  No.

22              MR. SEEGULL:  You want to advise your

23   client about reading and signing?

24              MR. WILSON:  You can read and sign.  You

William E. Sperati

101

1   can read for errors or you can waive the reading and

2   signing.  It's up to you.

3                   THE WITNESS:  It was effective 3 July,

4   '04.

5                   MR. WILSON:  Would you like to read and

6   sign the transcript before it goes into final for any

7   possible errors, or do you want to waive that?

8                   MR. SEEGULL:  What he means by errors is

9   that she didn't transcribe it correctly.

10                  THE WITNESS:  I understand.  I think I

11  want to read and sign.

12                  (Deposition concluded at 12:05 p.m.)

13              -   -   -   -   -

14

15

16

17

18

19

20

21

22

23

24

1          T E S T I M O N Y

2

3    DEPONENT:  WILLIAM E. SPERATI                    PAGE

4

5    BY MR. WILSON................................ 88

6    BY MR. SEEGULL............................... 98

7

8              E X H I B I T S

9

10   DEPOSITION EXHIBIT NO.                         MARKED

11

12   1 - A copy of a letter dated March 7,

     1997, to William E. Sperati from Dorothy

13   Eltzroth..................................... 38

14   2 - A copy of a letter dated September 11,

     2003, to William Sperati from Jay Smith....... 71

15

     3 - A  copy of two pages of e-mail

16   printouts.................................... 74

17   4 - A copy of a two-page letter dated

     December 5, 2003............................. 75

18

     5 - A copy of an e-mail printout dated

19   12/9/2003.................................... 77

20   6 - A document with handwritten numbers....... 98

21

22   ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 103

23

24   CERTIFICATE OF REPORTER                  PAGE 104



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0112

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 12th day of
January, 2006, the deponent herein, WILLIAM E. SPERATI,
who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



                Kimberly A. Hurley
                Certification No. 126-RPR
                (Expires January 31, 2008)



DATED:




WILCOX & FETZER LTD.
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
    Plaintiffs,                 )
                                )
        v.                      )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
        Defendant.              )

                    Deposition of DANIEL P. ROLLINS taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 8:55 a.m., on Friday,
January 13, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
                1509 Gilpin Avenue
                Wilmington, Delaware 19806
                for the Plaintiffs

            LARRY R. SEEGULL, ESQUIRE
            LINDA M. BOYD, ESQUIRE
                DLA PIPER RUDNICK GRAY CARY US LLP
                6225 Smith Avenue
                Baltimore, Maryland 21209-3600
                for the Defendant

                WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

B-0115



**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1   ALSO PRESENT:

 2           TYLER B. RAIMO

     COMPUTER SCIENCES CORPORATION

 3   Corporate Counsel

 4             - - - - -

 5

 6           DANIEL P. ROLLINS,

 7       the witness herein, having first been

 8       duly sworn on oath, was examined and

 9       testified as follows:

10   BY MR. SEEGULL:

11       Q.    Good morning, Mr. Rollins.  You and I met off

12   the record.  My name is Larry Seegull.  I'm an attorney

13   for Computer Sciences Corporation.  And with me today is

14   Linda Boyd, an associate from my office, as well as

15   Tyler Raimo who is now also an attorney for Computer

16   Sciences Corporation.

17           During the course of the deposition I will

18   be referring to Computer Sciences Corporation as CSC.

19   You understand that?

20       A.    Yes.

21       Q.    Have you ever been deposed before?

22       A.    No.

23       Q.    Let me give you some instructions for the

24   deposition, which is what we're doing.
```

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel F. Rollins

107

1          I'm going to be asking you questions about

2    the facts that form the basis for your lawsuit.

3    Obviously all of your answers have to be verbal because

4    the court reporter can't take down head nods or other

5    body language.

6          You have to answer questions truthfully

7    and completely just as if you were testifying in court.

8          And if you do not hear a question or do

9    not understand a question, just say so and I will repeat

10   it or explain it.

11         If at any point in time you realize that

12   an earlier answer you gave was incomplete or inaccurate

13   in any way, you will be allowed to correct or supplement

14   the record.

15         If at any point in time you need to stop

16   to use the restroom or to take a break to get a drink, we

17   have water here, just say so and you will be allowed to

18   do so.

19         Of course, if you don't remember

20   information or just don't know information, that's fine,

21   just say so.

22         You cannot talk to your attorney during

23   the deposition or during breaks unless it relates to a

24   question of privilege.  I'll try not to ask you questions

