Daniel P. Rollins

108

1    about communications you've had with your attorney.

2        A.    Okay.

3        Q.    If you answer the question, I will assume that

4    you have heard it and understood it and have given me

5    your best recollection.

6              Do you understand the instructions I have

7    just given you?

8        A.    Yes.

9        Q.    Are you taking any medication today that could

10   impair your ability to testify?

11       A.    No.

12       Q.    What did you do to prepare for today's

13   deposition?

14       A.    I met with Tim and basically that was it.

15       Q.    How long did you meet with him?

16       A.    Half an hour.

17       Q.    Was that this morning?

18       A.    Yesterday.

19       Q.    What time yesterday?

20       A.    3:30.

21       Q.    To 4 o'clock?

22       A.    Yes.

23       Q.    Approximately?

24       A.    Right.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Daniel F. Rollins

109

1    Q.    Did you review any documents in preparation for

2    the deposition?

3    A.    Yes.

4    Q.    Which documents did you review?

5    A.    Just the pay stubs over the last three years.

6    Q.    Do you have those with you?

7    A.    No.

8    Q.    What documents do you have with you today?

9    A.    I just wrote some notes just on the AMIP

10   payouts for the last three years.

11   Q.    Can I see those notes?

12   A.    Sure.

13   Q.    We will probably end up making this as an

14   exhibit.

15              What is it that you wrote on the back

16   of --

17   A.    Just something I was working on at work.

18   Q.    Nothing having to do with this case?

19   A.    No.

20   Q.    We may just make this back page of your notes

21   an exhibit, but we will save that until we get to that

22   line of questioning.

23              So you reviewed pay stubs over the last

24   several years?

Daniel P. Rollins

110

1    A.    Yes.

2    Q.    Did you review anything also having anything to

3 do with AMIP?

4    A.    No.

5    Q.    Other than your attorney, have you spoken to

6 anybody about the deposition?

7    A.    No.

8    Q.    How about other plaintiffs in the case?

9    A.    I have spoken with Hector Calderon about the

10 case, but that's the only person.

11    Q.    Tell me what you discussed with Mr. Calderon.

12    A.    Just about what he was planning on doing,

13 because I'm remote and all the rest of the plaintiffs are

14 local.  So I don't get much information.

15    Q.    What did he tell you?  What did Hector Calderon

16 tell you he was planning on doing?

17    A.    He said he was going forward with the case.

18    Q.    When was the last time you spoke to him?

19    A.    Two days ago.

20    Q.    Tell me about that conversation.

21    A.    I just basically told him that I was scheduled

22 for the deposition and he said, "Tell me how it goes."

23    Q.    Did you tell him what you would testify to?

24    A.    No.

Daniel P. Rollins

111

1      Q.    Did he tell you what you should testify to?

2      A.    No.

3      Q.    Was there any discussion about what your

4   testimony would be?

5      A.    No.

6      Q.    As I understand your claim, you claim that CSC

7   violated the Delaware Wage Payment Act.    Correct?

8      A.    Yes.

9      Q.    Your claim is that CSC owes you a certain

10  amount of a bonus payment for a certain period of fiscal

11  year 2004, correct?

12     A.    Yes.

13     Q.    That would be from the period of April 1 of

14  2004 until the time that you were notified that you were

15  not eligible for an AMIP payment in fiscal year 2004?

16     A.    Correct.

17     Q.    You were notified in September 2004?

18     A.    Yes.

19     Q.    Do you remember the exact date that you were

20  notified?

21     A.    I think it was September 11th.

22     Q.    You're not claiming any portion of any AMIP

23  payment from the date that you were notified forward,

24  correct?

Daniel P. Rollins

112

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | What is your Social Security number? |
| 3 | A. | 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. |
| 4 | Q. | What is the date and place of your birth? |
| 5 | A. | 12/2/60, Columbus, Ohio, Franklin County. |
| 6 | Q. | Where do you live? |
| 7 | A. | In Charleston, West Virginia. |
| 8 | Q. | How long have you lived there? |
| 9 | A. | Fifteen, sixteen years. |
| 10 | Q. | Do you own or rent? |
| 11 | A. | Own. |
| 12 | Q. | Are you married? |
| 13 | A. | Yes. |
| 14 | Q. | Do you have any children? |
| 15 | A. | Yes. |
| 16 | Q. | How long have you been married? |
| 17 | A. | Twenty years. |
| 18 | Q. | Have you ever been arrested? |
| 19 | A. | No. |
| 20 | Q. | Have you ever been convicted of a felony or |
| 21 | misdemeanor? |
| 22 | A. | No. |
| 23 | Q. | Have you ever served in the military? |
| 24 | A. | No. |

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0123

Daniel P. Rollins

113

1    Q.    When did you first contact an attorney to

2  handle your case against CSC?

3    A.    I didn't contact an attorney.  I received

4  information in the mail asking if I wanted to be a part

5  of a lawsuit.

6    Q.    When you say you received it in the mail, was

7  it something sent to your home address?

8    A.    Yes, I believe so.

9    Q.    What did you do once you received it?

10    A.    I think I signed the papers and sent it back.

11    Q.    I'm now showing you what's been marked as

12  Exhibit 4.  Is that the document that you received in the

13  mail?

14    A.    Yes.  I think this is the first communication I

15  received.

16    Q.    Do you know who sent that to you?

17    A.    No, I don't.

18    Q.    Do you have any idea who you think might have

19  sent it to you?

20    A.    I received it in the mail and I didn't really

21  think about where it came from.

22    Q.    You say you signed papers.  What papers did you

23  sign?

24    A.    I probably notified -- I mean, I followed

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Daniel P. Rollins

114

1    through on the letter and I probably notified the

2    attorneys' questions in the letter and I think they sent

3    me papers asking if I was interested again and then I

4    signed something and sent it back.

5        Q.    When do you think you called the attorneys?

6    Would it be shortly after you received this letter?

7        A.    Yes.

8        Q.    Had you known that there was this potential

9    lawsuit that was being considered prior to receiving this

10   letter?

11       A.    No.

12       Q.    What is the arrangement you have with your

13   attorneys regarding the payment of your attorneys' fees?

14       A.    I don't even know.  I read a letter that stated

15   that out and it seemed normal, so...

16       Q.    Do you know how much your attorneys are going

17   to be paid for handling this case?

18       A.    I think it was written in the letter, but I

19   don't remember what it was.

20       Q.    Do you know if it's an hourly rate that they're

21   being paid or are your attorneys just getting a

22   contingency fee, meaning only you recover if they

23   recover?

24       A.    I think it's a contingency fee.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

115

```
 1        Q.     Do you know what the percentage is?

 2        A.     I can't remember.

 3        Q.     Is it 30 percent, or one-third?

 4        A.     I think 30 percent sounds correct.

 5        Q.     Have you paid your attorney anything?

 6        A.     No.

 7        Q.     Do you know if anybody else has paid your

 8   attorney anything?

 9        A.     No, I don't know.

10        Q.     Have any lawsuits ever been filed against you?

11        A.     No.

12        Q.     Have you ever filed any other lawsuits?

13        A.     No, not personally.

14        Q.     What do you mean "not personally"?

15        A.     I think I was involved in another lawsuit where

16   they sent information in the mail and I filled out

17   information and sent it back.

18        Q.     Did that involve CSC?

19        A.     I think one did, yes.

20        Q.     Was that a class-action case?

21        A.     Yes, I believe so.

22        Q.     Did that relate to overtime wages?

23        A.     Yes.

24        Q.     Do you know how much you received as a result
```



WILCOX & FETZER LTD.
Registered Professional Reporters

Daniel P. Rollins

116

1    of that case?

2         A.    I believe 1,400, but I'm not exactly sure.

3         Q.    $1,400?

4         A.    Yes.

5         Q.    Were there other cases that you were involved

6    in not personally but more as a class action?

7         A.    Yeah.  Like stock losses.

8         Q.    How many other cases are we talking about?

9         A.    I think I filled out the papers on one of them.

10   I think they sent three in the mail.

11        Q.    Which other cases are they?

12        A.    I think it was like AOL had something and

13   Ariba.  It's part of the stock -- major stock losses.

14        Q.    AOL and Ariba had class-action cases against

15   them?

16        A.    Yes.

17        Q.    You received something as a result of those

18   cases?

19        A.    No.

20        Q.    So what paperwork did you fill out, or are the

21   cases still ongoing?

22        A.    I assume they're ongoing.

23        Q.    Any other cases that you're involved with or

24   have been involved with?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel F. Rollins

117

1    A.    No.

2    Q.    Have you ever been a witness in a lawsuit?

3    A.    No.

4    Q.    Have you ever declared bankruptcy?

5    A.    No.

6    Q.    Have you ever made a claim for unemployment

7    benefits?

8    A.    No.

9    Q.    Have you ever made a claim for workers'

10   compensation benefits?

11   A.    No.

12   Q.    Do you have any relatives that work for CSC?

13   A.    No.

14   Q.    Do you have any college education?

15   A.    Yes.

16   Q.    Where did you go to college?

17   A.    Ohio State University.

18   Q.    Buckeyes?

19   A.    Yes.

20   Q.    When did you graduate?

21   A.    '83.

22   Q.    Did you grow up in Ohio?

23   A.    Yes.

24   Q.    What did you study in college?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

118

1    A.    Computer science, business.

2    Q.    Any other postcollege education?

3    A.    No.

4    Q.    Where did you go to work after Ohio State?

5    A.    DuPont.

6    Q.    Where was that?

7    A.    In Wilmington.

8    Q.    What was your position?

9    A.    I was a systems analyst.

10    Q.    Do you have any other education or training

11   other than your college curriculum?

12    A.    No.

13    Q.    Have you ever received any professional or

14   work-related certifications?

15    A.    No.

16    Q.    Have you ever received any awards or honors?

17    A.    No.

18    Q.    How long did you work at DuPont?

19    A.    Thirteen years.

20    Q.    So until about '96?

21    A.    '97.

22    Q.    Was it until June of '97?

23    A.    Yes.

24    Q.    And then you began working at CSC?



Daniel P. Rollins

119

1    A.    Correct.

2    Q.    You came over with everybody else who was

3    outsourced from DuPont?

4    A.    Yes.

5    Q.    What was the highest position you held at

6    DuPont?

7    A.    It was a level 5 was the grade level, and I

8    don't know the position title.

9    Q.    Were you on a management track or the technical

10   track?

11   A.    I started technical, I went over to management,

12   and then I switched back over to technical.

13   Q.    Were you a manager by the time you left DuPont?

14   A.    No.  I was technical when I left DuPont.

15   Q.    Did your salary increase every year that you

16   were at DuPont?

17   A.    Yes.

18   Q.    Did you receive a bonus every year that you

19   were at DuPont?

20   A.    No.  The last three years, I believe.

21   Q.    So you received a bonus in 1995, '96, and '97?

22   A.    Yes, roughly.

23   Q.    How much did you receive in 1995?

24   A.    I think the first bonus was close to $13,000.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0130

Daniel F. Rollins

120

1      Q.      How about in '96, or the second bonus?

2      A.      They were between 13 to 15 thousand dollars, I

3   think.

4      Q.      And the same for the third bonus?

5      A.      Yes.

6      Q.      You say you started work for DuPont in

7   Wilmington.  When did you end up moving to West Virginia?

8      A.      '89, I believe.

9      Q.      How did that come about?

10     A.      I worked in Wilmington four years, I was

11  transferred to California for two years, and then got

12  transferred to West Virginia for the rest of the time.

13     Q.      Are you from West Virginia?

14     A.      No.  I'm from Columbus.

15     Q.      Were there other DuPont employees that worked

16  in West Virginia?

17     A.      Yes.  I worked at a DuPont manufacturing plant

18  in Belle, West Virginia.

19     Q.      What was the name of the DuPont bonus plan that

20  you were receiving bonuses under?

21     A.      It was a variable compensation program.

22     Q.      Was it called Horizon?

23     A.      I don't remember that name.

24     Q.      That name doesn't ring a bell to you at all?



1       A.      No.

2       Q.      How was the DuPont variable compensation

3   program administered?

4       A.      For the most part, I think you had to be like

5   level 4-A to get this bonus, but it was more at level 5.

6   I think when I got to level 5, that's when they told me I

7   was eligible for the bonus.

8       Q.      How was the amount of the bonus determined?

9       A.      I couldn't tell you.  I think to some extent

10  tied to business results.

11      Q.      But you don't know the details of that?

12      A.      No.

13      Q.      Was there also an individual performance

14  component?

15      A.      I don't know.

16      Q.      When would you find out that you had received a

17  bonus?

18      A.      I think they would call each year somewhere

19  around September, and I believe the bonus was paid in

20  January.

21      Q.      So the bonus was paid in January of each year

22  for the prior year?

23      A.      Correct.

24      Q.      And DuPont's fiscal year was January through



122

1    December?

2        A.    Correct.

3        Q.    What do you mean they would call in September?

4        A.    The performance reviews I think were in July.

5    There was a process they went through.  And they would

6    let us know.  I think I was working for somebody in

7    Wilmington at the time, so instead of meeting

8    face-to-face, they would do it through the phone.

9        Q.    When you say "do it through the phone," you

10   mean do the performance review?

11       A.    Not the performance review, just the

12   communication after the fact.

13       Q.    The communication about how you did on your

14   performance review?

15       A.    Yes.  And the bonus information, salary

16   increases.

17       Q.    So you're thinking that in September they would

18   tell you whether or not you were going to get a salary

19   increase the following year?

20       A.    Yes.  I'm not certain exactly the months, but

21   it was something to that effect.

22       Q.    Would it have been during the year that you

23   would have been told about whether or not you were going

24   to get a bonus for that year, or would it have been after



WILCOX & FETZER LTD.
Registered Professional Reporters

Daniel F. Rollins

123

1    the year was completed you were told whether or not you

2    were going to get a bonus for the prior year?

3        A.    I think in September they would tell us whether

4    we were getting the bonus and that would be payable in

5    January.

6        Q.    In September would they tell you how much the

7    bonus would be or just that you would get a bonus?

8        A.    I think they told us how much it would be.

9        Q.    Did they tell you how it was calculated or did

10   they just tell you an amount?

11       A.    Just an amount.

12       Q.    It was your supervisor that communicated this

13   to you?

14       A.    Yes.

15       Q.    Who was your supervisor for the last three

16   years that you were at DuPont?

17       A.    I believe it was Jim Walla.

18       Q.    How do you spell his last name?

19       A.    W-a-l-l-a.

20       Q.    Did you ever see a bonus plan at DuPont?

21       A.    Nothing in writing, no.

22       Q.    You never saw what the terms and conditions of

23   the plan were?

24       A.    No.



Daniel F. Rollins

124

1    Q.    Do you know what the eligibility factors were?

2    A.    Just I know it was mostly for salary grade

3    level 5 people.

4    Q.    You don't know what it depended upon whether or

5    not or how much your bonus was going to be?

6    A.    No.

7    Q.    Did you ask questions about it?  Did you ask

8    your supervisor how was this calculated, how could I get

9    more of a bonus?

10   A.    No, I didn't.

11   Q.    Why not?

12   A.    Well, I mean, I reached a certain point in my

13   career and I considered going to other companies and they

14   were giving me this bonus and I wasn't going to ask too

15   many questions about what it was.  I just accepted it and

16   did my job.

17   Q.    What was your final salary at DuPont?

18   A.    I'm not sure I could tell you.

19   Q.    How did you find out about the transition to

20   CSC?

21   A.    There were a lot of discussions about

22   outsourcing over that last year or so, and the person

23   from Wilmington, Art Chisolm I believe came out to the

24   Belle site and he basically told me that they were

looking to do this, they wanted everyone to be on board, and he presented the pros and cons and basically asked me give me a reason why you wouldn't want to do this. And part of that plan was the AMIP package that replaced DuPont's variable compensation package.

Q. Tell me what he described to you or what he discussed with you about the bonus plan.

A. He had basically said, "I understand you're getting this variable comp. package in DuPont. It's a significant portion of your salary, and you won't lose that with CSC. They will replace it with what's called the AMIP plan and it will be comparable or better than what the DuPont package was."

Q. Who is Art Chisolm?

A. He was the IT manager for the Ag Products Division.

Q. He met with you personally?

A. Yes.

Q. When did he meet with you?

A. I couldn't give you an exact date. It was somewhere before June of '97.

Q. How long was your meeting?

A. It was like a three-hour meeting.

Q. It was just you and him?

Daniel F. Rollins

126

1    A.    Parts of it were me and him and parts of it

2    involved Jim Walla I believe was also there.

3    Q.    Three-hour meeting is a pretty long meeting.

4    Tell me what you discussed during that meeting.

5    A.    Just he had presented basically what they were

6    doing with the outsourcing and what would result if the

7    people that chose not to go with the plan and the

8    benefits of going with the plan.

9    Q.    What did he tell you would happen if you didn't

10   transition over to CSC?

11   A.    He said there was a good chance I wouldn't be

12   able to stay in my current assignment, because I was

13   working with a package called SAP.  He said going with

14   DuPont -- and they were outsourcing all the computer

15   portions of that and I'd have to find some other position

16   within DuPont.

17   Q.    What did he say would happen if you did come

18   with the transition?

19   A.    Pretty much that the job would go unchanged and

20   salary and benefits would be as good or better than if I

21   stayed at DuPont.

22   Q.    He never guaranteed you anything, did he?

23   A.    I don't know that he could have guaranteed me

24   anything.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel F. Rollins

127

```
 1        Q.    Why is that?

 2        A.    I just was listening what he was saying.  I

 3   didn't ask him to sign a contract.  That's not something

 4   you would do with your manager that comes out to talk to

 5   you.

 6        Q.    There are no guarantees in life, right?

 7        A.    Correct.

 8        Q.    Was he telling you what he expected would

 9   happen if you came over to CSC?

10        A.    Yes.

11        Q.    He was giving you his best impression of the

12   intent of the company at the time?

13        A.    Correct.

14        Q.    Do you think he was being honest?

15        A.    Yes.

16        Q.    He was trying to describe to you as he

17   understood it the terms of the AMIP plan at that time?

18        A.    Correct.

19        Q.    He never told you that the AMIP plan will never

20   change, did he?

21        A.    I don't think that came up.

22        Q.    He wasn't promising you that the terms of the

23   AMIP plan would never change, correct?

24        A.    Yeah, I don't think that...
```



128

1      Q.    He never said that your salary will never

2    change?

3      A.    No.

4      Q.    You understood that your compensation could

5    change?

6      A.    Yes.   With DuPont, once you made the variable

7    comp. level, we didn't know of anybody that lost it.   So

8    you kind of came to expect that you would get that every

9    year.

10     Q.    But it wasn't a guarantee?

11     A.    No, nothing is a guarantee.

12     Q.    For instance, you could be demoted?

13     A.    Correct.

14     Q.    If you were demoted into a different level,

15   then you wouldn't get it, correct?

16     A.    Correct.

17     Q.    Or they could change the terms of the variable

18   comp. plan to make it only for level 6 and above,

19   correct?

20     A.    Sure.

21     Q.    That's what DuPont could have done?

22     A.    Correct.

23     Q.    And CSC could have done the same thing?

24     A.    Uh-huh.

129

1      Q.    Yes?

2      A.    Yes.

3      Q.    Did Mr. Chisolm describe in detail what the

4   AMIP plan was?

5      A.    He basically described that it was a comparable

6   package to what DuPont had and that you wouldn't be

7   losing anything is all I remember the conversation.

8      Q.    Did he describe how it was administered?

9      A.    I don't think we got into that, no.

10     Q.    Was there any discussion about whether or not

11  there was an individual performance component in the

12  plan?

13     A.    I don't know that that was discussed.

14     Q.    Was there any discussion about whether or not

15  there were financial components tied to the performance

16  of the company in the plan?

17     A.    Yeah, I don't know.

18     Q.    Other than this conversation you had with

19  Mr. Chisolm about the bonus plan, did you have any

20  conversations with anybody else about the bonus plan?

21     A.    No.

22     Q.    Did he show you or have you ever seen any AMIP

23  documents or plans?

24     A.    I don't remember any.



130

1    Q.    You've never seen an AMIP plan or policy?

2    A.    No.

3    Q.    What was the first position you held at CSC?

4    A.    I'm not sure what the title was.  I know I

5    continued to do the exact same work I did with DuPont.

6    So I'm sure I was like a computer specialist.

7    Q.    Working on SAP?

8    A.    Yes.

9    Q.    SAP is a computer database project?

10    A.    It's a large business integration software.

11    Q.    Are you still working on that same project?

12    A.    Yes.  It's the same software, but they have

13    different projects.

14    Q.    Has SAP been rolled out at this point?

15    A.    That's what we continue to do for different

16    businesses throughout DuPont in different regions of the

17    world.

18    Q.    So why did you come over to CSC?

19    A.    I came over to CSC because I enjoyed working

20    with the software SAP and I wanted to continue that.

21    Q.    Were you afraid you would have lost your job if

22    you had stayed with DuPont?

23    A.    No, I didn't think I would lose my job, but I

24    knew I would get a different job that I didn't know that



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0141

Daniel F. Rollins

131

1    I would enjoy.

2        Q.    Did you continue to work in West Virginia the

3    entire time you were with CSC?

4        A.    I was based out of West Virginia, but I

5    traveled significantly.

6        Q.    You're still with CSC?

7        A.    Correct.

8        Q.    You're still based in West Virginia?

9        A.    Correct.

10        Q.    You still travel?

11        A.    Yes.

12        Q.    What was your salary when you began with CSC?

13        A.    I don't know the exact numbers.  I would guess

14    it was somewhere around 85,000.

15        Q.    What's your current salary?

16        A.    Right now around 97,000.

17        Q.    Obviously, for fiscal year 2004, you did not

18    receive an AMIP bonus, correct?

19        A.    Correct.

20        Q.    You haven't received one since, correct?

21        A.    Correct.

22        Q.    Tell me about all of the AMIP bonuses you

23    received while at CSC.

24        A.    I think there were three years when I received

Daniel P. Rollins

132

```
 1   the AMIP bonuses immediately after leaving DuPont for the

 2   next three years, and they were all in the $17,000 range.

 3        Q.    So you think you received an AMIP bonus of

 4   approximately $17,000 for fiscal year '98?

 5        A.    Yes.

 6        Q.    And for fiscal year '99?

 7        A.    Up until the time they stopped it.  I guess it

 8   was more than three years.

 9        Q.    You received an AMIP bonus for fiscal year '98?

10        A.    Uh-huh.

11        Q.    Yes?

12        A.    Yes.

13        Q.    And '99?

14        A.    Yes.

15        Q.    And the year 2000?

16        A.    Yes.

17        Q.    And 2001?

18        A.    Yes.

19        Q.    2002?

20        A.    Yes.

21        Q.    Fiscal year 2003?

22        A.    Correct.

23        Q.    That was the last AMIP bonus you received?

24        A.    Correct.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

133

1    Q.    Was it approximately $17,000 for each of those

2    years?

3    A.    At least the last three.   That's all I was able

4    to look up.

5    Q.    The AMIP bonus wasn't the exact same dollar

6    amount each year?

7    A.    No.

8    Q.    That varied year to year.

9    A.    Correct.

10   Q.    Why did that vary year to year?

11   A.    I don't know.

12   Q.    Do you know how AMIP bonuses were calculated?

13   A.    No, I don't.

14   Q.    Are you familiar with the fact that there are

15   formulas that are used to calculate AMIP bonuses?

16   A.    I believe so, but I didn't get into all that.

17   Q.    When you say you didn't get into all that, do

18   you mean that you have never familiarized yourself with

19   any aspects of how the AMIP was calculated?

20   A.    No, I didn't.

21   Q.    Have you ever seen any of the worksheets or

22   formulas that are used to calculate the AMIP?

23   A.    I may have seen them, but I didn't study them.

24   Q.    You don't remember what they were?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     A.     I couldn't tell you what they were.

2     Q.     Do you remember any of the factors that were

3  used to calculate an AMIP?  Even if you don't remember

4  the exact formula, do you remember any of the factors

5  that were used?

6     A.     No.

7     Q.     For instance, do you remember whether or not

8  earnings per share was ever a factor or return on

9  investment?

10    A.     I didn't pay that much attention to it.  I just

11 knew I got it every year.

12    Q.     So it was your basic philosophy I'll let the

13 company figure out what the AMIP bonus is and whatever it

14 is, it is.

15    A.     Correct.

16           MR. WILSON:   Object to form.  If I

17 object, you can still answer.

18    Q.     When would you find out that you were going to

19 receive an AMIP bonus while you were at CSC?

20    A.     They would call me on the phone, similar to

21 DuPont, and they would tell me that this is what you're

22 going to receive for the next year.

23    Q.     When would they call you on the phone?  Was

24 that after the close of the fiscal year, after your



**WILCOX & FETZER LTD.**
Registered Professional Reporters

135

1    performance evaluation had been completed and the company

2    had closed its books?

3        A.    Yes, I believe so.

4        Q.    So normally you would get a call, let's say, in

5    May after the fiscal year had closed?

6        A.    Correct.

7        Q.    Just so I'm clear, the fiscal year for CSC runs

8    from April 1 through March 31?

9        A.    Correct.

10       Q.    Just as an example, fiscal year 2003 would run

11   from April 1, 2002, through March 31, 2003.

12       A.    Yes.

13       Q.    And you might not find out that you were going

14   to get your fiscal year 2003 bonus until May of 2003, for

15   instance.

16       A.    Yes.

17       Q.    Up until that point you would have no idea

18   whether or not you were going to receive a bonus or how

19   much it would be?

20       A.    Well, I don't think it was a question of

21   whether you're going to receive it because you received

22   it every year.  So you just expected you were going to

23   receive it until they told you you weren't.

24       Q.    You would assume that you would be getting a



**WILCOX & FETZER LTD.**
Registered Professional Reporters

136

1    bonus, correct?

2        A.    Correct.

3        Q.    But you had no idea what it would be based upon

4    or how much it would be until you received that call in

5    May following the close of the fiscal year?

6        A.    Right.

7        Q.    Did you ever receive e-mails or worksheets

8    during the course of the fiscal year about the AMIP

9    bonus?

10       A.    Like I said, if I did I didn't pay attention to

11   them.

12       Q.    You don't know whether you did or didn't?

13       A.    Correct.

14       Q.    Who was it that would call you to tell you

15   about the fact that you were going to receive an AMIP

16   bonus?

17       A.    The last several years it's been

18   Alan Kronmiller, who's my current supervisor.

19       Q.    What's his position?

20       A.    I don't know the exact title.  He's an IT

21   manager of some sort.

22       Q.    Even though you don't remember receiving any

23   communications during the fiscal year, each fiscal year

24   you assumed you were going to get the AMIP bonus because



137

1    you had received one in the prior fiscal year.

2        A.    Correct.

3        Q.    So you would assume that, if it's happening one

4    year, it's going to happen next year.

5        A.    Correct.

6        Q.    When you were hired by CSC, you didn't have a

7    contract of employment, correct?

8        A.    No.

9        Q.    You were an at-will employee?

10       A.    Correct.

11       Q.    You are still an at-will employee?

12       A.    Correct.

13       Q.    I know you don't know the title, but do you

14   know the level position that you were hired at when you

15   came on to CSC?

16       A.    I think it was also a level 5 position.

17       Q.    Are you still a level 5 position?

18       A.    Yes, I believe so.

19       Q.    Do you know if that's a management-level

20   position?

21       A.    I couldn't tell you.

22       Q.    Did you receive an offer letter when you came

23   over to CSC?

24       A.    Yes.



138

1                (Deposition Exhibit No. 7 was marked for

2    identification.)

3    BY MR. SEEGULL:

4        Q.    Mr. Rollins, I'm showing you what's been marked

5    as Exhibit 7.  Do you recognize this?

6        A.    Yes.

7        Q.    What is it?

8        A.    That's the offer letter from CSC.

9        Q.    Is this the one that you signed in March of

10   '97?

11       A.    Yes.

12       Q.    This has some language about the bonus plan.

13   Do you see that?  In the third full paragraph which

14   starts "In addition."

15       A.    Yes.

16       Q.    This has a brief description of the Management

17   Incentive Program, correct?

18       A.    Correct.

19       Q.    You can put that aside.

20              Other than this offer letter, were you

21   provided any documents about the bonus plan at any point

22   in time?

23       A.    I don't recall.

24              MR. SEEGULL:  We have got to call the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

139

1  Judge.

2              (A recess was taken.)

3              (A telephone conference with The Honorable

4  Mary Pat Thynge was had as follows:)

5              MR. WILSON:   This is Tim Wilson.

6              THE COURT:   Who's on the line that we have

7  for the defense.

8              MR. SEEGULL:   This is Larry Seegull, and I

9  have my associate, Linda Boyd, here, as well as in-house

10  counsel, Tyler Raimo.   But Larry Seegull, I will be

11  speaking.

12              THE COURT:   Where we had left off was that

13  we were having this mediation for January 27th.   It was

14  involving multiples of plaintiffs in this case.   Two of

15  the plaintiffs are out of state that we're aware of and

16  asked to participate by phone.

17              This issue causes some pause for the

18  defense, particularly since the defense does not have the

19  opportunity to depose these gentlemen and make an

20  in-person deposition of them rather than by phone to kind

21  of judge or evaluate them as witnesses, etcetera.

22              What has been proposed with the last one

23  was that we could go forward with mediation on

24  January 27th and maybe the depositions could be done on



Daniel Rollins

140

1    January 28th so that the plaintiffs, these two

2    individuals, will only have to make one trip out to

3    Delaware for the purpose of the mediation and depositions

4    rather than two trips.

5              I think that's where we left it at the

6    time that we last talked and I was trying to figure out

7    what we're going to do mechanically to handle this

8    deposition just from the shear number of people.  I mean,

9    this mediation, just from the shear number of people,

10   it's my preference always to have the parties here and

11   everybody goes through the same and equal pain.  This is

12   not a class-action suit.  Each plaintiff would be

13   settling separately from the other.  It's a lot of people

14   in one day.  I think there are something like 11?

15             MR. SEEGULL:  That's correct, Your Honor.

16             THE COURT:  We're going to do casual

17   dress.  So my thought was when going forward with this

18   mediation, that we are probably going to meet each

19   plaintiff to some degree individually, but it's going to

20   be much shorter and abbreviated than what I normally do.

21   And my understanding is this is really a fair wage claim

22   under state law versus federal law.

23             MR. SEEGULL:  That's correct, Your Honor.

24             THE COURT:  Delaware law would be the law



**WILCOX & FETZER LTD.**
Registered Professional Reporters

141

1   that would apply to all these individuals?

2                   MR. SEEGULL:  That's correct, Your Honor.

3   They have all brought claims under the Wage Act under

4   Delaware.

5                   THE COURT:  So where are we left, Counsel?

6                   MR. SEEGULL:  This is Larry Seegull, and I

7   conferred with my boss.  I think we all know who that is.

8   And I cannot do an afternoon deposition on that Saturday

9   following the mediation, but I can do a deposition in the

10  morning following the mediation.  So that takes care of

11  one of the out-of-state plaintiffs.  We have already

12  scheduled that particular plaintiff.

13                  THE COURT:  Which plaintiff was that?  Who

14  was that?

15                  MR. SEEGULL:  That's Mr. Peterson.

16                  THE COURT:  So Peterson's going to come

17  out from Oklahoma, right?

18                  MR. SEEGULL:  Yes.  The second

19  out-of-state plaintiff is Mr. Rollins, and it just so

20  happens that Mr. Rollins was in town this week and so we

21  arranged to have his deposition taken today and, in fact,

22  he's being deposed this morning.

23                  THE COURT:  Mr. Rollins who's a witness?

24                  MR. SEEGULL:  That's correct.  So we were



**WILCOX & FETZER LTD.**

Registered Professional Reporters

142

```
 1   able to coordinate it such that Mr. Rollins didn't have

 2   to make a special trip for his deposition.

 3                MR. WILSON:   And Mr. Rollins has also

 4   agreed to come out for the mediation, Your Honor.

 5                THE COURT:  So everything's resolved.

 6                MR. SEEGULL:  That's correct.

 7                THE COURT:  Good.  Everybody knows it's

 8   casual dress.  So people don't have to lug out good

 9   clothes and everything else.

10                MR. SEEGULL:  Right.

11                THE COURT:  All right.  So we're going to

12   go forward, then, on January 27th, and I'll expect to see

13   your submissions whatever date I provided for in the

14   order.  I can't remember offhand.

15                MR. SEEGULL:  Your Honor provided the date

16   of this upcoming Tuesday.  Plaintiffs' counsel and I have

17   conferred, and if Your Honor doesn't have a problem with

18   this, we would ask that we move that date by two or three

19   days just because we are tied up in deposition, and that

20   would still give Your Honor at least a week to consider

21   our submissions.

22                THE COURT:  More importantly is I always

23   need a weekend.  I need a weekend.  When I get done with

24   mediation all day, I do go home and read the statements,
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

143

1    but the absorption rate becomes very questionable.

2             MR. SEEGULL:  I can tell you this from a

3    defense standpoint, I think our submission is going to be

4    very simple.  Although there are 11 cases, I think --

5             THE COURT:  I have a feeling that it's

6    probably going to be relatively simple.  I have a feeling

7    plaintiffs' is going to be relatively simple.  It is

8    having the names of the individuals, associating the time

9    frames in which they were employed, and there may be nits

10   or uniqueness for some of them.  I really don't think

11   it's going to be all that complicated.

12            MR. SEEGULL:  Just so Your Honor

13   understands the framework of the case, all the plaintiffs

14   are seeking a prorata share of the same year's bonus.

15   All the plaintiffs were subject to the same change to the

16   bonus plan.  There may be some nits, like you say, for

17   each individual plaintiff, but I think that the decision

18   that was made for each of these plaintiffs was made not

19   personally based upon their individual situation but the

20   decisions were based upon a class of individuals; namely,

21   the level of employee they were.

22            THE COURT:  Okay.

23            MR. SEEGULL:  That's why I say I think

24   it's really just one decision that we're analyzing and

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0154

144

```
 1    whether that decision was legal or not.

 2              THE COURT:  It's really more a legal

 3    argument than anything else.

 4              MR. SEEGULL:  I think so.

 5              THE COURT:  Do you have any disagreement

 6    with that, Tim?

 7              MR. WILSON:  No.

 8              THE COURT:  Fine.  Good.  All right.  Why

 9    don't you do your submissions, then, by January 20th.

10    That's a Friday.

11              MR. WILSON:  Thank you.

12              THE COURT:  As you know, though, the

13    submissions are not to be dropped off at my chambers

14    which means that they're dropped off down at the clerk's

15    office.  They are not filed, though.  The clerks won't

16    file them.  They will put them in my in-box.  You must

17    have them there by no later than 4:30 because the clerk's

18    office closes at 4:30.

19              MR. SEEGULL:  Not a problem.

20              THE COURT:  The reason why I started doing

21    that was I was waiting here in my chambers waiting till

22    9 o'clock for certain submissions.  I said I'm being

23    abused and I'm not going to let anybody abuse me anymore.

24    That was the basis for that.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

145

1          I will make a note on my calendar that

2     your due date is the 20th for this so my secretary won't

3     start calling you on the 18th because they're not in on

4     the 17th.

5          Thank you, all, and I look forward to

6     seeing your group, respective groups, then, on the 27th.

7          MR. SEEGULL:  Thank you very much, Your

8     Honor.  I should say one other thing, Your Honor.  From

9     the defense perspective, I think the only corporate

10    representative we expect to have there is Tyler Raimo,

11    who's sitting next to me right now.  He's the in-house

12    labor counsel for the company, and he will come with

13    authority to settle.

14          So unless Your Honor feels it necessary

15    for us to bring a human resources person or another

16    corporate representative --

17          THE COURT:  My order is broadly written,

18    to a large extent, because one-size-fits-all order.  What

19    I need is to have the individual or individuals there who

20    have the ability to negotiate a settlement which means

21    that it's not just limited, hopefully, by standpoint

22    authority which that particular term can suggest, but a

23    mediation just like a trial has its own living, breathing

24    dynamic to it, and if things change, then I would expect

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0156

Daniel P. Rollins

146

1   that Mr. Raimo would be able to continue negotiations,

2   and, if need be, if it's beyond what his expectation or

3   what was thought of for a settlement for CSC, he will

4   still be able to negotiate and have the authority to bind

5   the company and do that.

6          MR. SEEGULL:  Yes, that's correct,

7   Your Honor.

8          THE COURT:  All right.  Also, Counsel, I

9   caution you on another point.  As you know, you're not

10  allowed to bring electronic devices in this building.  My

11  order does provide that, if you want to bring them in,

12  then under separate cover at the time you file for the

13  mediation statement to me, you list the names of the

14  individuals who need to bring in these electronic devices

15  and per individual what electronic device they want to

16  bring in.  Most commonly it is a cell phone.

17          I will tell you that I just don't allow

18  counsel to bring cell phones for convenience reasons.

19  Part of that is, again, that's another thing that gets

20  abused.  If it's going to help in the mediation process

21  and to allow a party or parties access to individuals

22  that they need to talk to, then I will allow the cell

23  phones to be bought in.  But I do need the names and do

24  need to know the names and what electronic device they

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel F. Rollins

147

1    want under separate cover.

2            Do not incorporate it in the mediation

3    statement because I will miss it.  I will just fly right

4    over it when I read.  We have to have a separate list so

5    we can give it to the CSO downstairs because the morning

6    crew changes from the afternoon crew.  The morning crew

7    does not talk to the afternoon crew.

8            MR. SEEGULL:  Okay.

9            THE COURT:  Communication skills are

10   lacking.  That's the reason why.

11           And, also, unless you get permission from

12   me to do it and they have got it in writing, you're not

13   going to get an electronic device in this building.

14           MR. SEEGULL:  That's my experience.  I

15   have obviously been before Your Honor before and been in

16   the court many times, and my experience has been I don't

17   even expect to bring a phone in.

18           THE COURT:  I'm not encouraging it.  I'm

19   just saying that sometimes I know, for example, I'm

20   thinking of Mr. Tyler who may need to make a call,

21   sometimes it's more easily accessible because on your

22   cell phone you have all your telephone numbers.  But I'm

23   certainly not encouraging electronic devices to be

24   brought in.

Daniel F. Rollins

148

1    MR. SEEGULL:  I will confer with Mr. Raimo

2  about whether or not that's necessary, and, if so, we

3  will submit a separate cover letter laying all that out.

4    THE COURT:  At the time that you do your

5  mediation statement.

6    MR. SEEGULL:  Yes.

7    THE COURT:  Thank you.

8    MR. SEEGULL:  Thank you, Your Honor.

9    (End of telephone conference.)

10  BY MR. SEEGULL:

11    Q.    What does AMIP stand for?

12    A.    I couldn't tell you.

13    Q.    You just understand it's the bonus plan?

14    A.    Right.

15    Q.    We talked about the fact that at some point in

16  September of 2003 you were told that you would no longer

17  be eligible for receiving the AMIP for that fiscal year.

18    A.    Correct.

19    Q.    That, you think, was on September 11th?

20    A.    Right.

21    Q.    That's when you received the letter?

22    A.    Uh-huh.  Yes.

23    Q.    Did you have any other communications, verbal

24  or written, about this issue other than that letter?

Daniel F. Rollins

149

1    A.   Yeah.  I think I received a phone call from

2 Alan Kronmiller, my supervisor, and he kind of explained

3 the situation, and he didn't -- kind of indicated he

4 didn't agree with what was going on, but that's what was

5 going on.

6    Q.   Was this conversation with Mr. Kronmiller

7 before or after you received the letter?

8    A.   I believe it was before, but I can't tell you

9 100 percent.

10    Q.   He told you you should expect to receive a

11 letter confirming this?

12    A.   Correct.

13    Q.   How long was this telephone conversation?

14    A.   I don't know.

15    Q.   Was it relatively short?

16    A.   Yeah, most calls with him are short.

17    Q.   At most five to ten minutes?

18    A.   Yes.

19    Q.   What did he tell you about what was going on

20 with the AMIP?

21    A.   He just said they were looking to make some

22 changes and that we may no longer be receiving it.

23    Q.   Did he tell you that the company was looking to

24 change the AMIP plan by realigning it with its original



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

150

1    intent to make it more of a senior management focus?

2        A.    Yeah.  I can't remember the exact conversation.

3        Q.    But was it words to that effect?

4        A.    I would say so, yes.

5        Q.    You understood that was what the company was

6    trying to do, correct?

7                MR. WILSON:    Object to the form.

8        A.    I can't say I understood it.  I really didn't

9    agree with what he was saying, and he didn't agree with

10   what he was saying.

11       Q.    I understand that you disagreed with the idea

12   that you should be removed.  You thought you shouldn't be

13   removed.

14       A.    Correct.

15       Q.    But you understood that what the company was

16   trying to do was to make the plan more consistent with

17   what its original intent was, which was to make it

18   exclusively a bonus program for senior management.

19               MR. WILSON:    Object to the form.

20       A.    I didn't understand that, what he was saying.

21   I don't remember him saying those words.

22       Q.    Did you know that the original intent of the

23   program was to be a bonus program for senior-level

24   management?

Daniel F. Kohns

151

1    A.    No, I didn't.

2    Q.    Had you ever heard that the bonuses were

3  supposed to be for senior-level managers?

4    A.    No.

5    Q.    Is there anything wrong if the company wants to

6  have a bonus program that's exclusively for senior

7  management?

8    A.    In my opinion, when we received this at DuPont,

9  they weren't taken away and we kind of expected it --

10  they told us when we went over to CSC this would be a

11  comparable program.  So to have it taken away to me was

12  wrong, but I don't think that's the issue in the lawsuit.

13    Q.    What do you mean?

14    A.    I think the issue in the lawsuit is how the

15  timing of how they took it away.

16    Q.    You mean if they had taken it away at the

17  beginning of the year, you wouldn't have a problem with

18  this?

19    A.    You don't like things that happen, but you

20  accept them.

21    Q.    You would accept the fact that they had taken

22  it away at the beginning of the year?

23    A.    Yeah.  I don't think we're suing for future

24  damages.  I think it's the way it was handled.

152

1    Q.    How early in the beginning of the year would it

2    have to be taken away for the company to do what it did?

3    A.    I would think at the beginning.

4    Q.    If it was two days into the year, would that be

5    okay or not okay?

6    A.    I think that would be probably acceptable.

7    Q.    If it was two weeks into the year, would that

8    be acceptable?

9              MR. WILSON:    Object to the form.

10   A.    It's a gray area.

11   Q.    What do you mean "it's a gray area"?

12   A.    The earlier the better in anything like that.

13   Q.    In your mind, at some point the earlier the

14   better, you wouldn't have a problem if the company

15   eliminated the program, eliminated you from the program,

16   but at some point if it gets later, then you have got a

17   problem?

18   A.    Correct.

19   Q.    Do you know at what point you have a problem

20   with them eliminating you from the program during the

21   course of the year?

22             MR. WILSON:    Object to form

23   BY MR. SEEGULL:

24   Q.    Two or three months into the program?



Daniel P. Rollins

153

1    A.    I would say two weeks may be okay, but six

2  months, no.

3    Q.    Would you have done anything differently in

4  terms of the performance of your job if you had known you

5  were not a part of the bonus plan?

6    A.    No.

7    Q.    Other than the communication from

8  Mr. Kronmiller over the phone and the September 11th

9  letter, did you have any other conversations with anybody

10 else about your no longer being eligible for the AMIP?

11   A.    No.

12   Q.    You understood when Mr. Kronmiller called you

13 and when you received the letter that you would not get

14 any further AMIP payments.

15   A.    I think there was something in the letter that

16 said up to 5,000 could be still paid out.

17              (Deposition Exhibit No. 8 was marked for

18 identification.)

19 BY MR. SEEGULL:

20   Q.    Mr. Rollins, I'm now showing you what's been

21 marked as Exhibit 8.  Do you recognize this?

22   A.    Yes.

23   Q.    What is it?

24   A.    This is the letter that they had asked me to

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

154

1  sign acknowledging that I knew what was going on with the

2  bonus plan.

3      Q.    This is the September 11th letter that we have

4  been speaking about?

5      A.    Correct.

6      Q.    It says that you signed it on December 1, but

7  you think you received this on September 11th?

8      A.    Yeah.  I believe I received it in e-mail and I

9  don't know whether -- I read it and I didn't sign it

10  right away.  And a couple months went by and they

11  basically called and said, "You need to sign this and

12  send it back."

13      Q.    That's when you did that?

14      A.    Correct.

15      Q.    Let's talk about the letter for a moment.  If

16  you look at the third paragraph down, it talks about "you

17  will have the opportunity to earn a discretionary bonus

18  of up to $5,000 per annum."  Correct?

19      A.    Correct.

20      Q.    You understood that was a discretionary bonus.

21      A.    Yes.

22      Q.    That was different than AMIP?

23      A.    Yes.

24      Q.    Have you ever received that discretionary



155

1    bonus?

2        A.    No.

3        Q.    Do you know on what basis they decide who gets

4    it and who doesn't?

5        A.    No.

6        Q.    At the time that you received this letter,

7    Exhibit 8, you understood you would no longer be getting

8    AMIP payments, correct?

9        A.    Correct.

10       Q.    You knew that you were no longer eligible under

11   the AMIP plan?

12       A.    Yes.

13       Q.    You also knew that this discretionary bonus you

14   suddenly became eligible for, correct?

15       A.    Yes.  That's what the letter said.

16       Q.    You had not been eligible for the discretionary

17   bonus before, correct?

18       A.    Correct.

19       Q.    So you understood that, although the company

20   was taking away your eligibility from AMIP, they were

21   giving you something, as well, which is eligibility for

22   the discretionary bonus.

23       A.    Yeah.  That's what was said in the letter, but,

24   like I said, I never saw anything of the discretionary

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Daniel P. Rollins

156

1    bonus.

2        Q.    You never received any discretionary bonus.

3        A.    Correct.

4        Q.    But you understood you couldn't get both.  You

5    can't get the AMIP bonus and the discretionary bonus?

6        A.    Yes.

7        Q.    When the company terminated you from the AMIP

8    plan in September of 2003, there would be no way for them

9    to give you a bonus at that point in time for the first

10   six months of the year, correct?

11                MR. WILSON:    Object to the form.

12       A.    You mean actually pay it out?

13       Q.    Yes.

14       A.    I think they paid it out once a year.

15       Q.    But they couldn't even figure out how much to

16   pay you in September 2003 if they wanted to because the

17   year had not been concluded, correct?

18       A.    I think it would have been prorated.

19       Q.    But they can't prorate it until they know what

20   the company's performance is, correct?

21       A.    Correct.

22       Q.    And the company's performance isn't measured

23   until the end of the year, correct?

24       A.    Sure.

Daniel Pierro

157

1     Q.    So at that point in time of September of 2003,

2    they could not do a prorata bonus, correct?

3     A.    Correct.

4     Q.    When the fiscal year is concluded, you're

5    saying you're entitled to six months, is that what you're

6    saying --

7     A.    Yes.

8     Q.    -- of bonus?  Or are you saying a bonus from

9    April 1 until September 11th?

10     A.    That would be the six months.

11     Q.    That's not quite six months.  It's maybe five

12    and a half months.

13     A.    Yes.

14     Q.    Which are you claiming?  Are you claiming

15    April 1 to September 11 or from April 1 until the end of

16    September?

17     A.    The April 1 till September 11th.

18     Q.    There are lots of different ways to prorate a

19    bonus, right?  You could prorate based upon performance

20    or you could prorate it based upon time in the plan.

21    Correct?

22     A.    Correct.

23          MR. WILSON:  Object to form.

24     Q.    Or you could prorate it based upon the amount

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0168

1    of revenue generated during that period of time?

2              MR. WILSON:  Object to form.

3        A.    Yes.

4        Q.    Each of those are different and equally viable

5    ways to prorate a bonus, correct?

6        A.    Correct.

7        Q.    Are you aware of anybody who has ever had their

8    bonus prorated?

9        A.    No.

10              MR. SEEGULL:  Off the record.

11              (Discussion off the record.)

12              (Deposition Exhibit No. 9 was marked for

13    identification.)

14    BY MR. SEEGULL:

15        Q.    Mr. Rollins, as I understand it, you've done an

16    estimate of what your damages are?

17        A.    Yes.

18        Q.    Is that estimate what's now been marked as

19    Exhibit 9?

20        A.    That's just the amounts of the AMIP for the

21    last three years based on the pay stubs.

22        Q.    This is the total amount of your AMIP?

23        A.    Yes.

24        Q.    Is this how you're estimating what your damages



Daniel T. Rollins

159

1    are?

2        A.    Correct.

3        Q.    If you can explain to me what the numbers mean.

4    At the top here you say, "Met with Tim"?

5        A.    Yes.

6        Q.    That means a meeting with your lawyer.

7        A.    Yes.

8        Q.    Tim Wilson.

9        A.    Correct.

10       Q.    And then you write June of '97?

11       A.    Yes.    That was the date we transferred to CSC,

12   and these are the names of the people that were involved.

13   Jim Walla was my immediate supervisor, Art Chisolm was

14   the IT manager over top of Jim, and Alan Kronmiller is my

15   current supervisor.

16       Q.    Then what did you write, "letter"?

17       A.    Yeah.    This was the letter that I received from

18   September 11th.

19       Q.    So far everything you have just told us are

20   just notes to help you recall what happened?

21       A.    Correct.

22       Q.    Then what does it say next?

23       A.    Estimated damage.    I think also I think we were

24   claiming two times the amount of AMIP and that's where I



1    wrote two times this.  Then if you take the six months,

2    then it would actually be the two times half of that.  So

3    it would be close to the 17,000.

4        Q.    Let's just go through this slower.  Next line

5    you write estimated damages of 33,000 for three years?

6        A.    Yeah.  That doesn't all go -- I just had three

7    years of what I had as the AMIP payments.

8        Q.    The three years doesn't apply to the estimated

9    damages?

10       A.    No.

11       Q.    You wrote estimated damages of $33,000?

12       A.    Yes.  That's what I was just trying to think of

13   how much it was, but then I got more details as I'm just

14   writing my notes.

15       Q.    Obviously what I'm trying to understand is what

16   you're claiming is damages in this case just so we have a

17   sense for what you believe you are owed by the company.

18   That's what you were trying to do, correct?

19       A.    Correct.

20       Q.    You were trying to come up with a number for

21   what you believe the company owes you?

22       A.    Correct.

23       Q.    You tried to do this in good faith?

24       A.    Yes.



161

1    Q.    You wrote April to September earned.  And the

2    next thing you wrote was 17,488, 5/2001?

3    A.    Correct.

4    Q.    I don't want to put words in your mouth.  You

5    tell me if this is what you meant.  You meant you

6    received an AMIP bonus of $17,488 in May 2001.

7    A.    Yes.

8    Q.    Next line, again, I don't want to put words in

9    your mouth.  You tell me if this is right, that you

10   received a $17,188 bonus in May of 2002?

11   A.    Yes.

12   Q.    And then, lastly, you wrote that you received a

13   $17,847 bonus in May of 2003.

14   A.    Correct.

15   Q.    Those were your total bonuses for each of those

16   fiscal years, correct?

17   A.    Those are the total AMIP bonuses.  I received

18   additional bonuses that are not included in these

19   numbers.

20   Q.    Let's talk about that for a moment.  What were

21   the additional bonuses you received?

22   A.    There was a premium skills bonus and a

23   retention -- employee retention bonus.  The total of the

24   three bonuses were close to $33,000 a year.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

162

1    Q.    Those bonuses, retention bonus and skills

2    bonus, they have nothing to do with this case, correct?

3    A.    Correct.

4    Q.    So the total AMIP bonus you received for fiscal

5    year 2001 was $17,488, the total AMIP bonus you received

6    for fiscal year 2002 was 17,188, and the total AMIP bonus

7    you received for fiscal year 2003 was 17,847.

8    A.    Yes.

9    Q.    Based upon these numbers, you have an estimate

10    of what you believe the company owes you for the April

11    through September 11th, 2003, time frame for AMIP?

12    A.    Correct.

13    Q.    What's your estimate of that?

14    A.    I would say $17,500, which is two times the

15    six-month period.

16    Q.    Why do you say "two times"?

17    A.    Just when you go through all this effort to

18    claim something, typically you ask for more than the

19    six-month period.

20    Q.    Let's just talk about what your actual damages

21    are.

22    A.    The actual damages would be if you went from

23    April to September 11th and multiply that percentage

24    times the 17,000, I'm using 17,500, whatever the average

163

1  of that would be.

2      Q.    Let's assume that the average of these three

3  fiscal year AMIP bonus amounts is about $17,500.

4      A.    Correct.

5      Q.    Half of $17,500 is what, 8,750?

6      A.    Correct.

7      Q.    So is it your belief that your actual damages

8  for the April 1 through September 11th, 2003, time frame

9  is approximately $8,750?

10      A.    Yes.

11      Q.    That's what you're claiming in this lawsuit?

12      A.    Correct.

13      Q.    I understand you'd like to have more.  Correct?

14      A.    Right.

15      Q.    But that's what your actual damages are.

16      A.    Yes.

17              MR. SEEGULL:  Off the record.

18              (Discussion off the record.)

19  BY MR. SEEGULL:

20      Q.    You've based your estimate of your actual

21  damages on prior year AMIPs, correct?

22      A.    Yes.

23      Q.    But there would be other ways to do estimates

24  of your actual damages, correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

164

1     A.     I'm not sure I understand.

2     Q.     The company could, for instance, look at the

3  past five years of your AMIP payments and do an estimate.

4     A.     They could, yes.

5     Q.     And they could also take what would have been

6  your AMIP payment for the entire year if they could

7  figure that out and divide that by two to come up with

8  another estimate?

9              MR. WILSON:  Object to form.

10     A.     Okay.

11     Q.     Is that right?

12     A.     They could.

13     Q.     So there are all different ways of coming up

14  with estimates, but you tried to come up with one form of

15  an estimate.

16     A.     Correct.

17     Q.     Why is it that you have to estimate what your

18  actual damages are?

19     A.     I think you were asking me to estimate what the

20  actual damages were.

21     Q.     Is it because you don't know what your actual

22  damages are, you have to estimate them?

23     A.     Correct.

24     Q.     Is that because you don't know what you would



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0175

Daniel P. Rollins

165

1    have been paid in an AMIP bonus for those six months?

2        A.    I know approximately what it would have been.

3        Q.    But you don't know because you never were paid

4    an AMIP bonus for that year?

5        A.    Correct.

6        Q.    The decision to remove you from AMIP

7    eligibility was not a personal decision about you,

8    correct?

9        A.    True.

10       Q.    The company removed all people at a certain

11   salary level, correct?

12       A.    Yeah.  I assume so.  I don't know that.

13       Q.    That's what your understanding is?

14       A.    Yes.

15       Q.    The salary level was salary level 6 and below,

16   correct?

17       A.    Yes.  I believe so.

18       Q.    You would agree that in fiscal year 2003 and

19   starting in fiscal year 2004, it was a tough economic

20   climate for the company at that period of time.

21       A.    Yes, I believe so.

22       Q.    You understood that the company was trying to

23   save money?

24       A.    Correct.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    One of the ways they were trying to save money

2  was to revisit the bonus plan.

3    A.    Yes.

4    Q.    That's why they were trying to change the

5  eligibility.

6    A.    Correct.

7    Q.    That's a legitimate business reason to change a

8  bonus plan, correct?

9              MR. WILSON:  Object to the form.

10   A.    I assume so, yes.

11   Q.    The company has the right to make decisions to

12  try to save money.

13              MR. WILSON:  Object to the form.

14   A.    Yes.

15   Q.    You don't have a problem with CSC making

16  changes to its plan?

17   A.    I wouldn't say that.

18   Q.    You do have a problem with it or you don't have

19  a problem with it?

20   A.    I have a problem with them making changes that

21  to me we came to expect with DuPont and also with CSC,

22  and it's my choice to continue to work under the program

23  which I did decide to do, but to say I didn't have a

24  problem with it is probably an incorrect statement.

1    Q.    You would agree that the company didn't make a

2    hasty decision when it changed the eligibility under the

3    AMIP plan?

4              MR. WILSON:  Object to the form.

5    A.    I don't know that.

6    Q.    Are you aware of how long it took the company

7    to make the decision?

8    A.    I wasn't involved in that decision process, so

9    no, I don't.

10   Q.    You also know that there were other people that

11   were eliminated from the AMIP eligibility, correct?

12   A.    Correct.

13   Q.    That wasn't just for fiscal year 2004, that was

14   also for fiscal year 2003.

15   A.    Yeah, I didn't know that.

16   Q.    When you came over from DuPont, did you assume

17   that the AMIP bonus was going to continue every year?

18   A.    Yes.

19   Q.    Who has knowledge about the facts of this bonus

20   change or that would have knowledge that would be

21   relevant to this lawsuit?

22   A.    I'm not sure I follow you.

23   Q.    Who would be an appropriate witness in this

24   case who would have knowledge about this lawsuit and the

