168

1    facts that would be relevant in this lawsuit?

2        A.    I would think Alan Kronmiller.

3        Q.    Have you spoken to him about this case at all?

4        A.    No, I haven't.

5        Q.    Is he still with the company?

6        A.    Yes, he is.  He's still my supervisor.

7        Q.    Anybody else?

8        A.    I don't know who all in CSC would have

9    knowledge of that.  He's the only one I talked to on a

10   regular basis.

11       Q.    Anybody else that you have spoken to that you

12   think would have knowledge that would be relevant to this

13   case?

14       A.    I don't know most of the people that make the

15   decisions.

16       Q.    Do you know anybody that made the decisions?

17       A.    I think the letter I got, and I'm not even

18   sure, that was from Bill Cullen, the acknowledgment

19   letter.

20       Q.    Do you know him?

21       A.    I know the name.

22       Q.    Anybody else that you think might have

23   knowledge relevant to this case?

24       A.    I can't think of anybody.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    Do you have any debts at this time?

2    A.    No.

3    Q.    Any credit card debts?

4    A.    No.  I pay off every month.

5    Q.    Have you spoken to anybody about being a

6    witness in this case?

7    A.    No.

8    Q.    Have you asked anybody to be a witness in this

9    case?

10    A.    I don't believe so.

11    Q.    Have you talked to anybody about the case?

12    A.    Other than Hector Calderon who I work with and

13    he's involved, that was all.

14    Q.    Have you told me everything that you know or

15    remember that forms the basis for your case?

16    A.    Yes, I did.

17            MR. WILSON:  Object to form.

18    Q.    Is there any other information that you

19    consider to be relevant or that would support your claims

20    that you haven't told me about?

21            MR. WILSON:  Object to the form.

22    A.    No.

23            MR. SEEGULL:  Why don't we take a short

24    break and I'll see if I missed anything.



WILCOX & FETZER LTD.
Registered Professional Reporters

1          (A recess was taken.)

2          MR. SEEGULL:  Mr. Rollins, I have no

3   further questions for you at this time.  Your attorney

4   may have questions for you and then I may have some

5   follow-up depending upon what your attorney asks you.

6   BY MR. WILSON:

7      Q.    Mr. Rollins, same rules apply as Mr. Seegull

8   explained to you.  I just have a couple questions here.

9          Can you explain how your compensation

10  package was set up at CSC in relation to how your

11  compensation package was set up at DuPont?

12     A.    Yes.  They explained to us that some of the

13  benefits with CSC were not as good as what DuPont had, so

14  they increased our salary that they said would take up

15  the slack in that.

16          And they also -- DuPont had the variable

17  compensation program that we reached after a certain

18  level, and they had said that the AMIP program would take

19  the place of that.  And that the whole idea was we would

20  either be better or the same as we were with DuPont.

21     Q.    So was the AMIP bonus program supposed to be

22  part of your total compensation package?

23          MR. SEEGULL:  Objection.  Leading.

24     A.    Yes, I believe so.



WILCOX & FETZER LTD.
Registered Professional Reporters

171

1    Q.    Was that part of the deal to entice you to come

2    to CSC?

3              MR. SEEGULL:  Objection.

4    A.    Yes, it was.

5    Q.    Was the AMIP bonus an earned AMIP?

6              MR. SEEGULL:  Objection.  Form.

7    A.    According to the pay stub that says it's

8    included in the total earnings.

9    Q.    I'd like to show you this document.

10              MR. SEEGULL:  You want to mark this as an

11   exhibit?

12              (Deposition Exhibit No. 10 was marked for

13   identification.)

14   BY MR. WILSON:

15   Q.    Let me know when you have looked at that.

16   A.    Okay.

17   Q.    In the left-hand column there's an area that

18   says "Bonus," correct?

19   A.    Yes.

20   Q.    To the right of that is there a number?

21   A.    Yes.

22   Q.    What is that number?

23   A.    The 23,710?

24   Q.    No, the one in the column "Current."

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

172

1      A.      17,458.

2      Q.      Yes.  Does that represent your AMIP bonus?

3      A.      Yes, it does.

4      Q.      Down below there's a line that says "Total

5    Earn."  What does total earned mean?

6      A.      The amount of money I made.

7      Q.      Total earnings?

8      A.      Total earnings, yes.

9      Q.      For the year?

10      A.      Correct.

11      Q.      Is the AMIP bonus included in that total

12    earnings?

13      A.      Yes, it is.

14              (Deposition Exhibit No. 11 was marked for

15    identification.)

16    BY MR. WILSON:

17      Q.      What was the date on that?  Was it Exhibit 10?

18      A.      The pay date was 5/18/2001.

19      Q.      I'd like you to look at what's been marked

20    Exhibit 11.  What's the pay date on that?

21      A.      5/30/2003.

22      Q.      Is your AMIP bonus included anywhere on this

23    sheet?

24      A.      Yes.  To the right of the bonus.



1    Q.    How much is it?

2    A.    $17,847.

3    Q.    Is this amount included in your total earnings

4    for the year?

5    A.    Yes, it is.

6    Q.    I skipped over one.

7              (Deposition Exhibit No. 12 was marked for

8    identification.)

9    BY MR. WILSON:

10   Q.    I'd like you to look at what's been marked

11   Exhibit 12.

12   A.    Okay.

13   Q.    Is your AMIP bonus reflected on this sheet?

14   A.    Yes, it is.

15   Q.    How much was that?

16   A.    $17,188.

17   Q.    Is that AMIP bonus reflected in your total

18   earnings for the year?

19   A.    Yes, it is.

20   Q.    What's the date on this?

21   A.    This is 5/31/2002.

22   Q.    Just a couple more questions.

23              You talked a little earlier about the

24   bonus plan at DuPont.  When you came to CSC, was the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

174

```
 1   bonus plan at CSC set up similar to that which you got at

 2   DuPont?

 3       A.    Yes.   The total amount was similar.   I don't

 4   know about the makeup of the -- I didn't pay much

 5   attention to that.   Mostly what I was concerned about was

 6   the amount.

 7       Q.    Was the intent that the amount be similar?

 8             MR. SEEGULL:   Objection.

 9       A.    Yes.   That's what they told us, that it would

10   be comparable or better than the DuPont program.

11       Q.    In terms of goals you had to meet or things you

12   had to do to earn the AMIP bonus, did they change from

13   year to year?

14       A.    In my case, no, because I stayed in the same

15   assignment.

16       Q.    You gave some testimony earlier saying that if

17   you had been notified two days after the fiscal year

18   began that your AMIP bonus would be taken away, that that

19   would be okay.   Why would that be okay?

20       A.    Companies have the right to take stuff away,

21   but they need to let you know about it upfront, and I

22   wouldn't have been happy and I might have gone somewhere

23   else to work, but at least I would have known about it

24   instead of finding out six months later.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0185

175

1    Q.    If they had taken it away two days after the

2   fiscal year started, would you have felt that they still

3   owed you for those two days of AMIP bonus?

4    A.    Yes.    They would have owed.    Would it have been

5   worth going after?    No.

6    Q.    You also testified that you would not have done

7   anything differently in your job if you had not known

8   that you were part of the -- or if you had known that you

9   were not part of the AMIP bonus program.    Why is that?

10    A.    I try and keep them separate.    I have a job to

11   do and I do it the best I can regardless of the

12   compensation.    The compensation would affect future

13   decisions whether you want to keep doing that job or not,

14   but it's not going to affect how you do that job.

15    Q.    Are the accomplishments that you have to meet

16   or the goals that you have to meet built into your job

17   description?    Let me ask it again.

18          The goals that you have to meet to get

19   your AMIP bonus, are they built into your job

20   description?

21          MR. SEEGULL:    Objection.    Lack of

22   foundation.

23    A.    We have a document that we review each year

24   that has objectives in it.    As far as I know, I have met



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    those objectives each year.

2        Q.    The September 11th letter, you didn't sign that

3    until December.   Why didn't you sign it right away?

4        A.    Well, I didn't agree with it, for one, and I

5    didn't know what the timing was to sign it and I didn't

6    feel a need to rush into it.   And then when I was called,

7    I assume it was December, they said, "You need to fill

8    this out within the next day and fax it to us."  So I

9    did.   At that point I figured I had no choice and I

10   completed the form.

11       Q.    When you say you had no choice, what do you

12   mean by that?

13       A.    Well, when you have somebody from upper

14   management telling you, hey, we have to have this form

15   tomorrow, fill it out, I didn't know what the retribution

16   would be of not doing it.

17       Q.    Were you concerned that you might lose your

18   job?

19       A.    I certainly was not going to help my standing

20   with the company to ignore a directive of an

21   upper-management person.

22       Q.    With regard to the discretionary bonus that was

23   discussed in this September 11th letter, you stated that

24   you had not been previously eligible for this.   Do you



1    know that as a fact?

2         A.    No, I don't.

3         Q.    Had you ever heard of the discretionary bonus

4    before?

5         A.    This was the first I heard about it.

6                    MR. WILSON:  That's all I have.

7    BY MR. SEEGULL:

8         Q.    Mr. Rollins, you don't know how AMIP was

9    calculated year to year, correct?

10        A.    Correct.

11        Q.    You don't know what the factors were that were

12   used in determining how much the AMIP would be for any

13   employee?

14        A.    Correct.

15        Q.    So it's possible that the formula that was used

16   for you changed year to year?

17        A.    It's possible.

18        Q.    You don't know one way or the other?

19        A.    No.

20        Q.    That's correct?

21        A.    Yes.  I believe so.

22        Q.    In the three exhibits that your attorney used,

23   exhibits 10, 11, and 12, those are what you call pay

24   stubs?



178

1     A.    Yes.

2     Q.    Those are the pay stubs for a particular pay

3  date in each of the years, correct?

4     A.    Correct.

5     Q.    Those are pay stubs for the pay date of

6  May 18th, 2001; pay stub for May 30th, 2003; and a pay

7  stub for May 31st, 2002.  Correct?

8     A.    Correct.

9     Q.    This reflects pay not just for that particular

10 pay period but for a year-to-date period, correct?

11    A.    Yes.

12    Q.    So the year-to-date column, you see the

13 year-to-date column in each of these pay stubs?

14    A.    Yes.

15    Q.    That refers to the calendar year, correct?

16    A.    Correct.

17    Q.    That is, where it says total earnings for the

18 year-to-date, let's say on Exhibit 10, you see the total

19 earnings for year-to-date is $55,771.11?

20    A.    Yes.

21    Q.    That's total earnings for the period of

22 January 1, 2001, through May 11th, 2001, correct?

23    A.    Correct.

24    Q.    And for Exhibit 11, total earnings of



179

1    $62,856.09.  Do you see that?

2        A.    Yes.

3        Q.    That's total earnings for the period of

4    January 1, 2003, through May 23rd, 2003.

5        A.    Yes.

6        Q.    And then for Exhibit 12, you see total earnings

7    of $67,208.99?

8        A.    Yes.

9        Q.    That reflects total earnings for the period of

10   January 1, 2002, through May 24 of 2002.

11       A.    Correct.

12       Q.    You said that each of these pay stubs have an

13   AMIP payment associated with them.

14       A.    Correct.

15       Q.    And they each reflect an AMIP payment which

16   reflects earnings for that particular pay period,

17   correct?

18       A.    Yes.

19       Q.    They don't reflect earnings for prior calendar

20   years, they reflect earnings for the calendar years of

21   the pay stubs that we're looking at?

22             MR. WILSON:  Object to the form.

23       A.    Yes.

24       Q.    In fact, as of September 11th of 2003, at that



**WILCOX & FETZER LTD.**
Registered Professional Reporters

180

1    point in time you had not earned any AMIP for fiscal year

2    2003, correct?

3                MR. WILSON:  Object to form.

4        A.    Yeah, I had not been paid any AMIP at that

5    point.

6        Q.    And you had not earned any AMIP as of that

7    point?

8                MR. WILSON:  Object to the form.

9        A.    Yeah, I think that's one of the issues at hand.

10       Q.    You hadn't earned it as of that point.  You're

11   maintaining that at the end of the year when the AMIP is

12   calculated, a portion should be set aside for you,

13   correct?

14       A.    Correct.

15       Q.    But as of September 11th, 2003, you had not

16   earned any AMIP for that period of time, correct?

17               MR. WILSON:  Object to the form.

18       A.    The work was done during that; therefore, I

19   think the pay was earned.  It just was not paid out.

20       Q.    How much pay had been earned at that point, and

21   how much AMIP pay had been earned at that point if AMIP

22   hadn't even been calculated?

23       A.    I think the estimate would be a portion of what

24   you received over the last three years or some portion of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

181

1  that.  You can't come up with exact figures, but you can

2  get in the ballpark.

3      Q.    But they don't pay AMIP on a periodic basis, do

4  they?

5      A.    No.

6      Q.    They don't pay AMIP month to month.

7      A.    Correct.

8      Q.    You don't earn it month to month, do you?

9              MR. WILSON:  Object to form.

10  BY MR. SEEGULL:

11      Q.    You earn it at the end of the year, correct?

12              MR. WILSON:  Object to form.

13      A.    I think you earn it all year long.  They pay it

14  out at the end of the year.

15      Q.    Don't these pay stubs show that you only earn

16  it at the end of the year when it's paid?  Correct?

17              MR. WILSON:  Object to the form.

18      A.    That's what the pay stub showed.

19              MR. SEEGULL:  I have no further questions.

20  BY MR. WILSON:

21      Q.    I have a couple follow-up.

22              Mr. Rollins, the work that's done

23  throughout the year, does that contribute to the total

24  amount that is awarded as your AMIP bonus at the end of

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

182

1    the fiscal year?

2                    MR. SEEGULL:  Objection.

3      A.     Yes.

4                    MR. WILSON:  I have nothing further.

5                    MR. WILSON:  We waive.

6                    (Deposition concluded at 10:50 a.m.)

7                       -   -   -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
1                        T E S T I M O N Y

2

3    DEPONENT:  DANIEL P. ROLLINS              PAGE

4    BY MR. SEEGULL...................................... 106

5    BY MR. WILSON....................................... 170

6    BY MR. SEEGULL......................................177

7    BY MR. WILSON.......................................188

8

9                        E X H I B I T S

10

11   DEPOSITION EXHIBIT NO.                     MARKED

12

13   7 - A letter dated March 7, 1997, to

     Daniel P. Rollins from Dorothy Eltzroth...... 138

14

     8 - A letter dated September 11, 2003,

15   to Daniel Rollins from Jay Smith............. 153

16   9 - A paper with handwritten notes........... 158

17   10 - A document Bates numbered D-10739....... 171

18   11 - A document Bates numbered D-10794....... 172

19   12 - A document Bates numbered D-10767....... 173

20

21   CERTIFICATE OF REPORTER             PAGE 184

22

23

24
```



WILCOX & FETZER LTD.
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE:

                      :

NEW CASTLE COUNTY:

        I, Kimberly A. Hurley, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 13TH day of January, 2006, the deponent herein, DANIEL P. ROLLINS, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

        I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

        I further certify that reading and signing of the deposition were waived by the deponent and counsel.

        I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

                Kimberly A. Hurley, RMR
                Certification No. 126-RPR
                (Expires January 31, 2008)

DATED:



**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE
BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.       )
HAUCK, KEVIN KEIR, ASHBY       )
LINCOLN, KAREN MASINO, ROBERT  )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM    )
SPERATI,                       )
                               )
     Plaintiffs,               )
                               )
        v.                     )  C.A. No. 05-10-JJF
                               )
COMPUTER SCIENCES CORPORATION, )
                               )
     Defendant.                )
```

            Deposition of KAREN A. MASINO taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 1:00 p.m., on Friday,
January 13, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware 19806
              for the Plaintiffs

            LARRY R. SEEGULL, ESQUIRE
            LINDA M. BOYD, ESQUIRE
              DLA PIPER RUDNICK GRAY CARY US LLP
              6225 Smith Avenue
              Baltimore, Maryland 21209-3600
              for the Defendant

              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

          B-0196

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1   ALSO PRESENT:

 2              TYLER B. RAIMO

             COMPUTER SCIENCES CORPORATION

 3           Corporate Counsel

                        - - - - -

 4

 5              KAREN A. MASINO,

 6       the witness herein, having first been

 7          duly sworn on oath, was examined and

 8          testified as follows:

 9   BY MR. SEEGULL:

10       Q.    Ms. Masino, my name is Larry Seegull.  As you

11   know, I'm an attorney representing Computer Sciences

12   Corporation.  With me today is Linda Boyd, who is an

13   associate from my office, as well as Tyler Raimo, who is

14   in-house counsel with Computer Sciences Corporation.

15              During the course of this deposition I'll

16   be referring to Computer Sciences and CSC.  Do you

17   understand what that means?

18       A.    Yes.

19       Q.    Have you ever been deposed before?

20       A.    No.

21       Q.    Let me give you sort of the instructions that

22   you should abide by during the course of this deposition.

23              First of all, I'll be asking you questions

24   about the formation and facts of this lawsuit and why you
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    bring this lawsuit and what the lawsuit is about.

2    Obviously all of your answers have to be verbal because

3    the court reporter cannot take down head nods or other

4    body language that in normal communication are fine but

5    in the context of a deposition they just don't show up on

6    the transcript.

7              You have to answer the questions

8    truthfully and completely just as if you were testifying

9    in court, and if you do not hear a question or don't

10   understand a question, just say so and I will repeat it.

11             If at any point you realize that an

12   earlier answer you gave was inaccurate or incomplete in

13   any way, you will be allowed to correct and supplement

14   the record.

15             If you need to stop to use the restroom or

16   to get a drink of water or just to take a short break,

17   that's fine.

18             Of course, if you don't know information

19   or the answer to a question or don't remember the

20   information, that's fine.  Just say so.  That's a

21   perfectly acceptable answer.

22             You cannot talk to your attorney during

23   the course of the deposition except if it relates to a

24   question of privilege, meaning communications you had

188

```
 1   with your attorney, and I'll try not to ask you about

 2   your communications with your attorney which are

 3   privileged.

 4             If you answer the question, I will assume

 5   that you have heard it and understood it and have given

 6   me your best recollection.

 7             Do you understand the instructions I have

 8   just given you?

 9       A.    Yes.

10       Q.    Are you taking any medication that could

11   possibly impair your ability to testify today?

12       A.    No.

13       Q.    What did you do to prepare for today's

14   deposition, if anything?

15       A.    I met with Tim yesterday and we went over my

16   documents and the process, the deposition process.

17       Q.    By "Tim," you mean Tim Wilson, your attorney?

18       A.    Yes.  Sorry.

19       Q.    How long did you meet with him?

20       A.    An hour.

21       Q.    When was that?

22       A.    Yesterday afternoon at 3:30.

23       Q.    Was anybody else in the room when you were

24   meeting with him?
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Yes.  I don't know the gentleman's name.  Dan.

2    Q.    Rollins?

3    A.    Rollins.

4    Q.    Anybody else?

5    A.    No.

6    Q.    You said you went over some documents?

7    A.    Yes.

8    Q.    Which documents did you go over?

9    A.    The documents that I had provided.

10    Q.    Do you remember which documents they were?

11    A.    Not offhand.  It was mostly the letter and

12 salary information, as well as the information you had

13 provided which were the salary sheets and the AMIP bonus

14 sheets.  I believe.

15    Q.    By "AMIP bonus sheets," do you mean the

16 worksheets?

17    A.    Yes, the worksheets.

18    Q.    You went over the worksheets that we had

19 provided related to your AMIP bonus?

20    A.    Yes.

21    Q.    For which years?  Do you remember which years?

22    A.    I believe it was 2001 and '2.

23    Q.    You went over the offer letter that you had

24 received when you came from DuPont?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.     Yes.

2      Q.     I'm sorry.   Were there any other documents that

3   you went over?

4      A.     Just the salary sheets, the payroll stubs.

5      Q.     Do you remember what years or what periods of

6   time you went over payroll stubs?

7      A.     I believe they were the same, 2001, 2002.

8      Q.     Have you spoken to anybody else about the

9   deposition?

10     A.     No.

11     Q.     Have you spoken to coworkers or other

12  plaintiffs in the case?

13     A.     No.

14     Q.     Have you spoken to any family members about

15  your deposition or your testimony?

16     A.     No.   They don't even know I'm doing this today.

17     Q.     Why haven't you told them?

18     A.     Well, my immediate family isn't local, so this

19  got rescheduled or not scheduled for a while.   It just

20  hasn't come up.

21     Q.     That's fine.

22            As I understand your claim, you're

23  claiming that the company, CSC, owes you money for the

24  period of April 1 of 2003 through September 11, 2003,



WILCOX & FETZER LTD.
Registered Professional Reporters

1  based upon what you believe to be a prorata portion of

2  the AMIP bonus for that fiscal year.

3      A.    Correct.

4      Q.    You claim that you are entitled to this under

5  the Delaware Wage Payment Act.

6      A.    Correct.

7      Q.    You're not claiming that the company doesn't

8  have the right to change the AMIP bonus, correct?

9      A.    Correct.

10      Q.    That is, that you understand and agree that the

11  company has the right to change the terms of eligibility

12  and participation in the AMIP bonus plan?

13      A.    Yes.

14      Q.    Your position is that, once you were notified

15  on September 11th, 2003, from that point forward you're

16  not entitled to AMIP bonus, correct?

17      A.    Correct.  Although I don't know what

18  September 11th falls on in terms of the payroll.  We get

19  paid every two weeks, but it's a week in arrears.

20  Wherever that week falls, normally we would get

21  compensated through the end of that pay period.

22      Q.    So from your perspective, you're entitled to

23  the AMIP payment for the period of April 1, 2003, through

24  either September 11th, 2003, or the end of that payroll



**WILCOX & FETZER LTD.**
Registered Professional Reporters

192

```
 1    period?
 2         A.      Correct.
 3         Q.      Which would either be within a week or maybe
 4    two weeks of that?
 5         A.      Exactly.
 6         Q.      You were notified on September 11th, 2003, when
 7    you received a letter from the company saying you were no
 8    longer eligible for AMIP?
 9         A.      I believe it was the 11th.  It may have been
10    the 13th when I actually had my face-to-face meeting.
11         Q.      At the time that you were notified, you knew
12    you would no longer get any AMIP payment, correct?
13         A.      Correct.
14         Q.      What is your Social Security number?
15         A.      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.
16         Q.      What is your date and place of birth?
17         A.      September 1st, 1959.  I was born here in
18    Wilmington, Delaware.
19         Q.      Where do you currently reside?
20         A.      At 420 West 22nd Street.
21         Q.      Do you own or rent your home?
22         A.      I rent.
23         Q.      How long have you been at that address?
24         A.      More than 15 years.
```



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    Q.    Are you married?

2    A.    No.

3    Q.    Have you ever been married?

4    A.    No.

5    Q.    Do you have any children?

6    A.    No.

7    Q.    Have you ever been arrested?

8    A.    No.

9    Q.    Or ever convicted of any felony or misdemeanor?

10   A.    No.

11   Q.    Have you ever served in the military?

12   A.    No.

13   Q.    When did you first contact an attorney to

14   handle your case against CSC?

15   A.    I believe in October of 2003.

16   Q.    Would that have been shortly after you received

17   notice that you were not going to get any AMIP payment?

18   A.    Correct.

19   Q.    Once you knew that you were not entitled to any

20   AMIP payment, that's when you decided you were going to

21   seek counsel?

22   A.    Yes.

23   Q.    Who was the first attorney that you contacted?

24   A.    Jeff Martin.



1    Q.    Jeff Martin and his firm?

2    A.    And his firm, yes.

3    Q.    How did you come upon Jeff Martin?  How did you

4    know Jeff Martin?

5    A.    We got a referral from someone else who had

6    done an employee issue.  I don't remember, actually.

7    Q.    Was it another CSC employee?

8    A.    Yes.

9    Q.    Was it Diane Poland?

10    A.    No.  I don't know.  Brian Miller is the one

11    that actually contacted Jeff Martin, and that's how I

12    knew.

13    Q.    Did you ever speak to Jeff Martin early on or

14    you let that go through Brian Miller?

15    A.    No.  Brian and I and Dawn Hauck all met with

16    Jeff Martin.  Our first meeting was together.

17    Q.    But the name came through Brian?

18    A.    Yes.

19    Q.    How he got the name you're not sure?

20    A.    I don't know.

21    Q.    But you think it was through another CSC

22    employee?

23    A.    I don't know whether it was a CSC employee or

24    another person who had another labor issue.  I'm not



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   sure.

2       Q.    What is the agreement you have with your

3   attorneys about the payment of attorneys' fees?

4       A.    The agreement is they receive one-third, I

5   believe, or 33.3 percent of any payment.

6       Q.    Meaning if you recover anything, they will be

7   paid out of that recovery one-third of whatever your

8   recovery is?

9       A.    Correct.

10      Q.    That relates to attorneys' fees, but there are

11  also things called costs.  Do you have any agreement

12  regarding costs?

13      A.    I don't believe so.  I don't remember.

14      Q.    For instance, there's a cost to receiving the

15  transcript today.  Do you have any agreement about the

16  cost of that transcript?

17      A.    I don't know.

18      Q.    Did you sign an agreement with your counsel?

19      A.    Yes.  I'm sure it's in there.

20      Q.    I'm sure it is.  Do you still have a copy of

21  that agreement?

22      A.    I do.

23      Q.    You will produce a copy of that agreement for

24  us?



1      A.    I can.

2      Q.    That would be great.  Do you have it with you?

3            MR. WILSON:  Was that requested in the

4  request for production?

5            MR. SEEGULL:  It was.

6            MR. WILSON:  We will produce a copy for

7  you.

8            MR. SEEGULL:  We can do it at a break.  I

9  don't have a problem if we do it at a break.  But I'd

10 rather not have to re-call her as long as we're here.

11 BY MR. SEEGULL:

12     Q.    Have any lawsuits ever been filed against you?

13     A.    No.

14     Q.    Have you ever filed any other lawsuits other

15 than this case?

16     A.    No.

17     Q.    Have you ever been a witness in a case other

18 than this case?

19     A.    No.

20     Q.    Have you ever declared bankruptcy?

21     A.    No.

22     Q.    Have you ever made a claim for unemployment

23 benefits?

24     A.    No.



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    Have you ever made a claim for workers'

2    compensation benefits?

3    A.    No.

4    Q.    Do you have any relatives that work for or have

5    worked for CSC?

6    A.    No.

7    Q.    What's the highest level of education you

8    received?

9    A.    I have a Bachelor's of Arts and a Bachelor's of

10   Science.

11   Q.    From where?

12   A.    University of Delaware.

13   Q.    When did you graduate?

14   A.    1981.    December of '81.

15   Q.    What was your degree in?

16   A.    I have a degree in computer science and one in

17   operations management.

18   Q.    Have you ever received any awards or honors?

19   A.    From CSC?

20   Q.    At any point in time.

21   A.    Yes.

22   Q.    What awards and honors have you received?

23   A.    They give recognition awards.

24   Q.    What kind of recognition awards?



198

1      A.      For either project work or particular efforts.

2 There's a recognition award process that CSC has.

3      Q.      Is that called a spot bonus?

4      A.      I don't believe it's called spot bonus.

5      Q.      What is it called?

6      A.      They also have discretionary bonuses, as well.

7      Q.      Why don't you tell me about each of the awards

8 and honors you have received, if you remember them.

9      A.      I'm not going to remember them all, but I

10 recently got a night on the town award.

11      Q.      From CSC?

12      A.      From CSC.  For working through a proposal

13 process with our client.  I have gotten several of those.

14              I have gotten cash payments, gift

15 certificates to the company store.  Things like that.

16      Q.      Would you characterize these as small awards

17 that the company gave you, recognizing small project

18 performances that you have given?

19      A.      Yes.

20      Q.      Anything else that you would characterize as an

21 award or honor?

22      A.      Not that I recall at the moment.

23      Q.      Any other education or training that you have

24 received?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    I have received training classes at CSC.  Is
2  that what you're referring to?

3      Q.    What kind of training?

4      A.    Management training, sales training.  Those
5  kinds of things.

6      Q.    Anything else?

7      A.    Technical training back in the day.

8      Q.    What do you mean "back in the day"?

9      A.    When I did technical work, I would receive
10 technical training on various product sets.

11     Q.    Anything else?

12     A.    No.

13     Q.    Have you ever received any professional or
14 work-related certification?

15     A.    I don't believe so.

16     Q.    Where did you work prior to CSC?

17     A.    DuPont.

18     Q.    How long had you worked at DuPont?

19     A.    Fifteen years.

20     Q.    Is that since you graduated from college?

21     A.    Pretty much.  I had left DuPont twice, but -- I
22 didn't work for DuPont right out of college, but I worked
23 during college at DuPont.

24     Q.    Right after college where did you work?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

200

1      A.      I worked in Harrisburg at a utility services

2   company.

3      Q.      For how long did you do that?

4      A.      About two years.

5      Q.      Then you started working for DuPont?

6      A.      Then I was back at DuPont.

7      Q.      Did you stay at DuPont continuously from there

8   on out?

9      A.      Yes.

10      Q.      You stopped working for DuPont when?

11      A.      In May of '97.

12      Q.      Did you come over with a group?

13      A.      I came over with the entire group.

14      Q.      Would that have been in June of '97?

15      A.      Yes.

16      Q.      What positions did you hold at DuPont?

17      A.      When we transitioned?

18      Q.      At all times.

19      A.      At all times?  I was a programmer, a project

20   manager, a team leader, I was a technology manager at

21   transition.

22      Q.      What's a technology manager?

23      A.      We got a subset of technology that was our

24   responsibility to move through the product life cycle and



**WILCOX & FETZER LTD.**
Registered Professional Reporters

201

1    make sure it was applied consistently across DuPont.

2        Q.    Did your salary increase each year you were at

3    DuPont?

4        A.    Yes.

5        Q.    Did you receive bonuses for certain years that

6    you were at DuPont?

7        A.    No.

8        Q.    Did you ever receive a bonus at DuPont?

9        A.    Received project bonuses, but I was not on

10   their bonus program.

11       Q.    When you were hired by CSC, were you told

12   anything about the bonus program at CSC?

13       A.    Yes.  We were told that they had a comparable

14   bonus program to DuPont's.

15       Q.    Did you know anything about DuPont's bonus

16   program?

17       A.    Yes.

18       Q.    How did you know about the bonus program if you

19   weren't eligible for it?

20       A.    Because there was discussions about my

21   eligibility for that program.

22       Q.    While you were at DuPont?

23       A.    While I was at DuPont.

24       Q.    What did you know about DuPont's bonus program

202

1  while you were there?

2      A.    That it was considered variable compensation

3  payable on an annual basis.   There were certain

4  objectives that you met throughout the year.

5      Q.    Was it an objective measure?   Were there

6  subjective factors?

7      A.    At DuPont?

8      Q.    Yes.

9      A.    I believe it was mostly objective, but having

10  not been on it, I can't verify that.

11      Q.    Do you know what the factors were that the

12  company considered when they were deciding whether to

13  award a bonus and how much to award?

14      A.    Not specifically, no.

15      Q.    Do you know what level of employee was eligible

16  for awards under the DuPont bonus plan?

17      A.    Yes.   They were eligible -- some people were on

18  the programs at level 4, 4-A, 5, 5-A, and above.

19      Q.    What was your level?

20      A.    Before transition?

21      Q.    Yes.

22      A.    I believe I was a 4-A.

23      Q.    So why were you not getting the bonus plan if

24  other 4-A employees were?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

B-0214

203

1      A.      That's a good question.  That was part of the

2  discussion.

3      Q.      You had this discussion with your supervisor?

4      A.      Yes.

5      Q.      Who was your supervisor?

6      A.      At the time it was Frank Cebula.

7      Q.      What did Mr. Cebula say?

8      A.      He said that since we were in transition, that

9  we would address it when we moved to CSC.

10     Q.      What did you understand that to mean?

11     A.      I understood that to mean they would do what

12 they could to put me on the program once we were CSC

13 employees.

14     Q.      Did that happen?

15     A.      Yes, actually.

16     Q.      Immediately?

17     A.      No.  I believe a year after.

18     Q.      Was that consistent with what he had expected

19 to happen?

20     A.      I believe it was slightly delayed from what he

21 expected, but, however, I did eventually get it.

22     Q.      Did that seem fair to you?

23              MR. WILSON:  Object to the form.  You can

24 answer.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

204

1    A.    Not particularly.

2    Q.    Why not?

3    A.    Because, as you said, other people at that

4    level were already on the bonus program.  So my coworkers

5    were already on the plan that I was not on or eligible

6    for at the time.

7    Q.    What were you told about the CSC bonus plan

8    when you were being transitioned?

9    A.    Again, I was told that they had a similar

10   program to what DuPont had and that they had an annual

11   payout, as well.

12   Q.    Were you told about how the bonus plan was

13   administered?

14   A.    In what terms?

15   Q.    Who administered it, how it was calculated,

16   when it was paid.

17   A.    Not specifically.  I had general knowledge of

18   it since I was a manager at the time.

19   Q.    What was your general knowledge of the CSC

20   bonus plan?

21   A.    That depending on your level, the percentage of

22   the calculation changed, that there were specific

23   objectives, at the time both quantitative and

24   qualitative, and that it was paid out at the end of our

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

205

1    fiscal year.

2        Q.    What do you mean by payout at the end of the

3    fiscal year?  What do you mean by that?

4        A.    That the payout that you would receive for the

5    previous fiscal year -- it gets a little confusing at

6    CSC -- that you would receive at the end.  So after -- at

7    the end of March, then the payment would come in April or

8    May.

9        Q.    At CSC the fiscal year went from April 1 of the

10   year until March 31st of the next year.

11       A.    Correct.

12       Q.    As an example, the 2003 fiscal year is April 1

13   of 2002 through March 31 of 2003?

14       A.    Correct.

15       Q.    You're saying the AMIP payout for fiscal year

16   2003 might not occur until May of 2003?

17       A.    Correct.

18       Q.    That was true year after year?

19       A.    Yes.

20       Q.    That you would never receive an AMIP payout

21   during the fiscal year.  It was always after the

22   conclusion of the fiscal year.

23       A.    That's true.  Whether you came onto the program

24   during the year or left in the middle of the year, you



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    would still receive the payment at the end of the fiscal

2    year.

3        Q.    What was the fiscal year for DuPont?

4        A.    January 1 through December 31st.

5        Q.    When would the bonus payments be made in the

6    DuPont system?

7        A.    I believe they were in January.

8        Q.    I know you didn't receive any bonus payments

9    while you were at DuPont, but do you know if people were

10   notified during the fiscal year as to what their bonus

11   payments would be?

12       A.    I don't know.

13       Q.    Do you know if they knew how bonus payments

14   were calculated?

15       A.    I don't know.

16       Q.    When you first came over to CSC in 1997, you

17   were not on the CSC bonus plan, correct?

18       A.    Correct.

19       Q.    By the way, the CSC bonus plan is called the

20   AMIP plan?

21       A.    Correct.

22       Q.    What does AMIP stand for?

23       A.    Account Management Incentive Program, I

24   believe.



WILCOX & FETZER LTD.
Registered Professional Reporters

207

```
 1        Q.    Have you ever seen this plan?

 2        A.    Yes.

 3        Q.    Where have you seen it?

 4        A.    It was in the management guide, I believe.

 5        Q.    Which management guide, do you know?

 6        A.    There's an employee handbook and then a

 7   management guide that we got when we were supervising

 8   employees or had direct-line responsibility.

 9        Q.    Was this in the Chemical Group?

10        A.    Yes.

11        Q.    Which group were you in when you came over to

12   CSC?

13        A.    Which group in CSC?

14        Q.    Yes.

15        A.    In the Chemical Group which was called Horizon

16   Initiatives at the time.

17        Q.    Then it became Chemical Group?

18        A.    It became Chemical and Energy; Chemical, Oil

19   and Gas; then the Chemical Group.  It had a variety of

20   names.

21        Q.    What's the name of it now?

22        A.    Chemical account, I believe.

23        Q.    Is this the same as TMG?

24        A.    It's a part of TMG, which is the Technology
```



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1  Management Group.

2      Q.    Who was the head of the chemical account?

3      A.    At transition?

4      Q.    Yes.

5      A.    That might have been Mike Beebe.

6      Q.    Who told you about the AMIP plan when you were

7  coming over to CSC?

8      A.    I don't recall specifically.  We had sessions

9  with Human Resources and CSC folks where they laid out

10  all the differences between the DuPont compensation in

11  total and the CSC compensation in total.

12      Q.    They also went through various benefit plans?

13      A.    All the benefit plans and then where our

14  salaries were adjusted for the differences between the

15  two plans.

16      Q.    You don't know who led that session?

17      A.    I don't recall.  It was somebody from CSC I had

18  not met before.

19      Q.    Does the name Dot Eltzroth ring a bell?

20      A.    Could have been Dot.

21      Q.    But you're not sure?

22      A.    Not sure.

23      Q.    Was it just one session?

24      A.    No.  There were several sessions.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

209

1    Q.    Was it the same person that led each session?

2    A.    I don't remember.

3    Q.    Do you remember what was said about the AMIP

4    plan?

5    A.    Not specifically.

6    Q.    Were you provided with any documents about the

7    AMIP plan?

8    A.    In those sessions?  I don't believe so.

9    Q.    At the time of transition or around that time.

10    A.    I don't believe I would have received that,

11    since I was not on the bonus program at the time.

12    Q.    You said there was a chemical plan that you

13    received when you became a manager?

14    A.    Yes.

15    Q.    When would that have been?

16    A.    Shortly after transition.

17    Q.    When you say "shortly," what do you mean?

18    A.    Within a year.

19    Q.    Would that have been at the start of fiscal

20    year 2004?

21    A.    1998.

22    Q.    I'm sorry.  At the start of fiscal year 1998?

23    A.    Yes.

24    Q.    So approximately April of '97?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

210

1    A.    No.  We transitioned in '97.  See how confusing

2  that fiscal year is?

3    Q.    You're right.  It does get confusing.  Let me

4  start again.

5              You came over in June of '97.

6    A.    Correct.

7    Q.    That would be during fiscal year 1998?

8    A.    '98, right.

9    Q.    Would it have been at the start of fiscal year

10  '99 --

11    A.    Correct.

12    Q.    -- that you received the chemical -- that you

13  became a manager?

14    A.    To my recollection, yes.  During that time.

15    Q.    So approximately April of '98?

16    A.    May have been May or June, but in that time

17  frame.

18    Q.    April or June, somewhere in there?

19    A.    Yes.

20    Q.    At some point during that time frame is when

21  you received this management handbook for the chemical

22  account?

23    A.    Correct.

24    Q.    In there, there are some provisions regarding



1    AMIP?

2        A.    Correct.

3        Q.    Other than the provisions in that handbook, are

4    you aware of any other written policies about AMIP?

5        A.    No.

6        Q.    What positions have you held while you have

7    been at CSC?

8        A.    I was an operations manager.  I'm sorry.  I was

9    a technology manager first, then an operations manager,

10   then a portfolio manager, and now I'm an account manager.

11       Q.    What salary levels have you been at while at

12   CSC?

13       A.    I transitioned at salary level 4.  I was made a

14   5 within, I think, three months because they had

15   misleveled some folks.  Now I'm a level 6.

16       Q.    When were you made a level 6?

17       A.    I don't specifically recall.  1999 or 2000.  I

18   don't remember.

19       Q.    Would it have been after you were promoted to

20   the chemical account manager's position?

21       A.    It was when I was an operations manager.  I was

22   promoted and put on the AMIP program at the same time.

23       Q.    What time would that have been?

24       A.    What year or what time of year?



Karen A. Mesino

212

1    Q.    Both.

2    A.    It would have been in June.  May or June.

3    Q.    Of '99?

4    A.    Either '99 or 2000.  I have to look at my

5    records to see.

6    Q.    What were you told about the AMIP plan?

7    A.    I was told I was eligible for 20 to 25 percent

8    of my salary based on certain objectives that were

9    normally set sometime during that fiscal year.

10    Q.    Is it true that your understanding of the AMIP

11    plan is that the calculations change year to year?

12    A.    The calculation for what's included in the AMIP

13    plan?

14    Q.    How the AMIP bonus gets calculated changes year

15    to year.

16    A.    How it gets calculated changes year to year.

17    Normally the percentage does not change that frequently.

18    Q.    Let's just see if we understand our terms.

19    A.    Percentage of eligibility.

20    Q.    How is AMIP calculated?

21    A.    It was calculated based on certain performance

22    factors and certain percentages given to performance

23    factors that totaled 100 percent of your eligible

24    quantity percentage.  So if I was eligible for

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

213

```
 1    20 percent, those factors would have added up to

 2    100 percent of that 20 percent.

 3        Q.    So the 20 percent in the example you just gave

 4    is the total possible bonus you could receive?

 5        A.    Correct.

 6        Q.    That is, if every objective is met at

 7    100 percent, then you could receive up to 20 percent of

 8    your salary?

 9        A.    Correct.

10        Q.    That percentage changes year to year or it

11    doesn't?

12        A.    The first few years it didn't change at all.

13    It was always -- we had always met all the objectives and

14    we got 100 percent of that for the first couple of the

15    years.

16        Q.    What was that percentage for the first couple

17    of years?

18        A.    You mean --

19        Q.    The total percentage of your salary that you

20    could get.

21        A.    Twenty percent.

22        Q.    That's called the bonus potential, right?

23        A.    I'm not sure what its name is.

24        Q.    It's 20 percent of your salary?
```



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

214

```
1       A.      Yes.

2       Q.      That's your potential, your total potential

3  bonus.

4       A.      It's one of the potential bonuses that you were

5  eligible for.  We used to also get an account bonus and

6  certain people got premium skills pay.  There were other

7  bonus programs, in other words.

8       Q.      Let's see if we can make sure that I understand

9  you, because the skills bonus or premium skills bonus or

10  retention bonus or other kinds of account bonuses, do

11  they have anything to do with this case?

12      A.      No.

13      Q.      This case is only about the AMIP bonus,

14  correct?

15      A.      Correct.

16      Q.      So let's make sure when we're talking about

17  bonus, we're only talking about the AMIP bonus, correct?

18      A.      Correct.

19      Q.      When I talk about a total bonus, I'm talking

20  about the total AMIP bonus.

21      A.      Okay.

22      Q.      And the total potential AMIP bonus was that

23  percentage you're identifying, 20 percent?

24      A.      Right.  It could move from 20 to 25 percent,
```

215

1    but yes, that's the range.

2        Q.    Some years it was 20 percent?

3        A.    Right.

4        Q.    Some years it might have been 25 percent?

5        A.    No.

6        Q.    And some years it could have been in between?

7        A.    No.  I'm sorry.  I'm not explaining it

8    correctly.  Your eligibility was always preset.  If

9    you're eligible for 20 percent, that's what your target

10   was.

11       Q.    That's for your entire career at CSC?

12       A.    No.  Only for whatever that fiscal year was.

13   So it could have changed the next year to 25 percent.  I

14   have never heard of anybody dropping.

15       Q.    So some years it was 20 percent and then some

16   years it went up to 25 percent?

17       A.    Mine was always 20 percent.

18       Q.    Yours was always 20 percent.  That makes it

19   easy.

20             So that the total AMIP bonus that you

21   could ever receive was 20 percent of your salary?

22       A.    Correct.

23       Q.    How the bonus was calculated, that would change

24   year to year?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0227

1       A.      Correct.

2       Q.      There were different factors that were used?

3       A.      Yes.

4       Q.      What were some of the factors that were used in

5   the calculation of the AMIP bonuses?

6       A.      Depending on the year, they were financial

7   goals of the account, financial goals of the company,

8   earnings per share, your specific performance in your job

9   function.

10      Q.      What would be some metrics that the company

11  would measure in terms of financial goals of the account?

12      A.      Again, they measure earnings per share,

13  operating income.  Those kinds of things.

14      Q.      Those are financial goals of the company.

15      A.      Yes.  And they also measured -- the operating

16  income and those financials goals were also measured at

17  the account level.

18      Q.      Those are all different factors that the

19  company used to calculate the AMIP bonus?

20      A.      Correct.

21      Q.      Sometimes those factors were used, sometimes

22  they weren't used, correct?

23      A.      I'm not sure how to answer that.  The factors

24  would change from year to year.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

217

1     Q.    So let's just give an example.  Earnings per

2   share, that might be a factor one year, it might not be a

3   factor another year?

4     A.    Correct.

5     Q.    Or operating income might be a factor one year,

6   it might not be a factor another year?

7     A.    Correct.

8     Q.    Is the same true for the individual performance

9   component, that that might be a factor one year but not a

10  factor another year?

11    A.    I believe so.

12    Q.    How would you find out what the factors were

13  and how they were going to be used?

14    A.    We would get the AMIP worksheet at some period

15  during the year where the factors were described and

16  explained.

17    Q.    Am I correct that you wouldn't receive that

18  AMIP worksheet until later in the year, let's say

19  September, October, November?

20    A.    That's correct.  It did not always come out

21  early in the year.

22    Q.    We have talked about the different factors that

23  might be used, and I'm not asking you for an exhaustive

24  list because there were a lot of different factors that



218

1    were used.   Correct?

2        A.    There were a handful.   Maybe six.   For the most

3    part, they were consistent through the years, so we knew

4    in general what they would be year to year.

5        Q.    But they could change?

6        A.    They could change, but in general, we would

7    know.

8        Q.    In addition to the factors themselves

9    potentially changing, the targets also changed, correct?

10       A.    Correct.

11       Q.    That is, earnings per share might be a factor

12   year after year, but the target for earnings per share

13   would change year to year.

14       A.    Correct.

15       Q.    The same target for operating income would

16   change year to year.

17       A.    Correct.

18       Q.    And the target for individual performance would

19   change year to year.

20       A.    Correct.

21       Q.    Who set the targets?

22       A.    I don't know.

23       Q.    Who set the factors that were going to be

24   considered?

1      A.      I don't know.

2      Q.      Did you have any input into the targets or the

3  factors?

4      A.      No.

5      Q.      You said you received worksheets that laid all

6  this out?

7      A.      Yes.

8      Q.      And the worksheets that laid this out you would

9  receive in the September/October/November time frame?

10     A.      I believe so.

11     Q.      How would you receive these worksheets?  Would

12  you receive them in e-mail form or printed form handed to

13  you?

14     A.      Typically they were handed to us.  We did get

15  one in e-mail form.

16     Q.      What year did you get in e-mail form?

17     A.      I don't remember.  2003, maybe.  No, couldn't

18  have been 2003.  2002.

19     Q.      It could have been fiscal year 2003, but during

20  the year 2002; is that right?

21     A.      Yes.

22     Q.      Who would e-mail it to you, and who would hand

23  it to you?

24     A.      Our manager would hand it to us.  At the time

220

1    that was Bob Tattle.   Or Debbie Krakowski.   I believe

2    when it was e-mailed, it was e-mailed right from Human

3    Resources.

4        Q.    What would you do once you had this worksheet

5    handed to you or e-mailed to you?   Did you do anything?

6        A.    There was some discussion about how we were

7    doing with that target with our management and whether we

8    felt we were in line or had to make adjustments for the

9    rest of the year.

10       Q.    Would you have that discussion right when it

11   was sent to you or you might not have those discussions

12   until later in the fiscal year?

13       A.    Yeah, it would be pretty immediate.

14       Q.    Sometimes you might be on target and sometimes

15   you might not be on target?

16       A.    They were mostly on target, from my

17   recollection.

18       Q.    Prior to receiving those worksheets, you would

19   have no way of knowing how the AMIP was going to be

20   calculated for that fiscal year?

21            MR. WILSON:   Object to form.   You can

22   answer.

23       A.    Not specifically, but we would have a general

24   knowledge of what the performance factors would be.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

221

1     Q.    You would assume that the performance factors

2   and company financial factors would remain the same year

3   to year?

4     A.    Yes.

5     Q.    But you didn't know for sure.

6     A.    Correct.

7     Q.    For instance, you might assume that operating

8   income would be included in one year, but it might not

9   be.

10            MR. WILSON:   Object to form.

11    A.    Correct.

12    Q.    You would assume that your performance might be

13   an individual component of the AMIP calculation, but it

14   might not be.

15            MR. WILSON:   Object to form.   You can

16   answer.

17    A.    Correct.

18    Q.    Who was in charge of calculating the bonuses?

19    A.    I don't know.

20    Q.    You told me that bonuses were not paid until

21   after the fiscal year ended.

22    A.    That's correct.

23    Q.    Why is that?

24    A.    You mean why didn't they do a semiannual

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0233

Karen A. Masino

222

1    payout?

2        Q.    Or a monthly bonus payout or quarterly.

3        A.    I don't know.

4        Q.    Do you know who was eligible for the bonus?

5        A.    CSC's plan you mean?

6        Q.    Yes.

7        A.    Typically you would know -- if you were

8    managing people, you would know who on your staff was

9    eligible for the bonus.

10        Q.    What was the threshold for eligibility?

11        A.    At level 5 you were eligible for 5 to

12    10 percent; level 6, 20 to 25 percent, and it went up

13    from there.

14        Q.    Did your salary increase every year that you

15    were at CSC?

16        A.    My salary increased.  My total compensation has

17    not.

18        Q.    I'm not asking about that.  I'm asking about

19    your salary.

20        A.    Yes.

21        Q.    Your salary increased every year you have been

22    at CSC?

23        A.    Yes.

24        Q.    The reason you're saying your total

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    compensation did not increase every year was because you

2    have not received an AMIP bonus for the past two years?

3         A.    Correct.  And other management incentives that

4    were also -- we also don't get anymore.

5         Q.    Such as?

6         A.    There was an account bonus and an incentive

7    compensation bonus that we used to get we don't get

8    anymore.

9                    (Deposition Exhibit No. 13 was marked for

10   identification.)

11   BY MR. SEEGULL:

12        Q.    I'm now showing you what's been marked as

13   Exhibit 13.  Do you recognize this, Ms. Masino?

14        A.    Yes.

15        Q.    What is it?

16        A.    This is my offer letter from CSC.

17        Q.    You signed this on March 18th, 1997?

18        A.    Correct.

19                    (Deposition Exhibit No. 14 was marked for

20   identification.)

21   BY MR. SEEGULL:

22        Q.    I'm now showing you what's been marked as

23   Exhibit 14.  Do you recognize this?

24        A.    Yes.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

224

1    Q.    What is it?

2    A.    This is my offer ever when I transferred to be

3 a portfolio manager from operations manager.

4    Q.    I could be wrong, but I think by the time you

5 received this letter, you had already received the AMIP

6 for at least one year prior.

7    A.    That's correct, I believe.

8    Q.    I'm not sure that we have that letter.

9    A.    May 2001.

10    Q.    Let me tell you why I think that.  There's a

11 paragraph that starts:  "Your participation in CSC's

12 Management Incentive Program will continue."

13          Do you see that?

14    A.    Yes.  I'm sorry.

15    Q.    That's why I'm figuring you probably had

16 already received the AMIP.

17    A.    Right.

18    Q.    Is it logical to assume that you started

19 receiving the AMIP in the year 2000?

20    A.    I believe that's correct.

21    Q.    You understood that there were no guarantees

22 that you would receive the AMIP forever.

23         MR. WILSON:  Object to the form.

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

225

BY MR. SEEGULL:

Q.    Correct?

A.    Correct.

Q.    You understood that the company has the right to change the terms and conditions of your employment?

A.    Correct.

MR. WILSON:  Object to form.

Q.    You're not employed pursuant to any contract of employment, correct?

A.    Correct.

Q.    You're an at-will employee?

A.    Yes.

Q.    You're not disputing that the company has the right to make changes to the eligibility of the AMIP plan?

A.    No, I'm not.

Q.    In the year in which you were told that you were no longer eligible for AMIP, had you received a worksheet by the time that you were told that?

A.    No, I don't believe so.

Q.    What is Horizon?

A.    Horizon Initiatives was the original name of the chemical account.

Q.    What documents do you maintain govern your



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    right to receive the AMIP?

2                    MR. WILSON:  Object to the form.

3        A.    I'm not sure I understand that question.

4        Q.    Do you maintain that there's any document or

5    policy that says you have a right to receive the AMIP?

6        A.    Well, I believe each offer letter that I have

7    that states that I am still eligible for the program

8    leads me to believe I'm still in the program.

9        Q.    You're still in the program until you're told

10   you're no longer in the program.

11       A.    Correct, but up until that point I would be

12   earning that bonus.

13       Q.    I understand that during the year 2003, fiscal

14   year 2004, you were not told that you were ineligible for

15   the AMIP until approximately September 11th, 2003.

16                    But at the point in which you were told

17   that, you had not earned any AMIP up until that point,

18   correct?

19                    MR. WILSON:  Object to the form.

20       A.    No, I don't believe that's correct at all.  I

21   believe I did earn -- AMIP is not earned once a year.

22   It's earned throughout the year for the entire year's

23   performance.

24       Q.    What is DSO?



**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters