227

1  A.  I'm sorry?

2  Q.  DSO.

3  A.  I don't know.

4  Q.  Is that day sales outstanding?

5  A.  I don't know.  We don't use that term.  I

6 haven't heard that term.

7  Q.  Am I right that the only document that you're

8 pointing to that says you are entitled to AMIP is the

9 transition letter that is at Exhibit 14?

10     MR. WILSON:  Object to the form.

11  A.  Yes.  That's the document I'm pointing to.

12  Q.  There's no other document that you maintain

13 gives you a right to AMIP?

14     MR. WILSON:  Object to the form.

15  A.  I don't know that there's any other document I

16 have that speaks specifically to AMIP.

17  Q.  Or any other document that you know of.

18  A.  I would assume that my management would have a

19 document --

20     MR. WILSON:  Object to the form.

21     THE WITNESS:  -- that states who's

22 eligible for the program at a certain point in time.

23  Q.  I'm asking you about any document that you know

24 of, though.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0239

228

1    A.    No.

2    Q.    There's no other document that you know of,

3  correct?

4    A.    Correct.

5    Q.    What were the personal objectives that were

6  sometimes included in calculating the AMIP?

7    A.    They were things like how much new business we

8  had won in our particular portfolio.  Things like that.

9  I believe there was one around client satisfaction.

10    Q.    Who gets to determine whether or not those

11  objectives were met?

12    A.    Our manager.

13    Q.    Which was who, or did that change?

14    A.    It changed.

15    Q.    Who was it to begin with, and who did it change

16  to?

17    A.    It was Frank Cebula and Tim Cholvat.  Then

18  there were a couple in between there.  Charlie somebody.

19  And then Bob Tattle.  I believe Debbie Krakowski was in

20  there, as well, in between.

21    Q.    Would you have changed the way you did your job

22  in any way if you had known from the beginning of fiscal

23  year 2004 that you were not eligible for AMIP?

24             MR. WILSON:  Object to the form.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0240

229

1      A.    I believe I would have, and did subsequent to

2  September 11th.

3      Q.    How would you have changed your performance?

4      A.    I think there's above-and-beyond things that

5  you do with respect to earning that bonus that I don't

6  believe I necessarily do now.

7      Q.    Such as?

8      A.    Such as working additional hours, volunteering

9  for extra programs.

10     Q.    Now you don't volunteer for extra programs?

11     A.    Not as much as I did before.

12     Q.    You don't work extra hours?

13     A.    Again, not as much as I did before.  I still

14  work extra hours.

15     Q.    Is it fair to say you no longer give

16  100 percent to your job?

17          MR. WILSON:  Object to the form.

18     A.    No.  It's fair to say I don't give 150 percent

19  to my job.  I still give more than 100 percent.

20     Q.    There are things that you're capable of doing

21  for your job that you're not willing to do, correct?

22     A.    There are things that I'm capable of doing that

23  I'm not compensated to do.

24     Q.    So if they asked for a volunteer for a project,



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0241

230

1    you won't volunteer?

2              MR. WILSON:   Object to the form.

3    A.    It depends on the project.

4    Q.    You said you changed your performance after you

5    found out you were no longer eligible for AMIP?

6    A.    I believe I did.

7    Q.    What projects did you not volunteer for

8    specifically that your manager wanted you to volunteer

9    for that you could have done?

10   A.    I don't know that I have a specific example for

11   you.

12   Q.    You don't remember any change that you made

13   specifically?

14   A.    Well, they asked for volunteers to pick up

15   additional accounts, things like that.

16   Q.    Who asked for that?

17   A.    My current manager.

18   Q.    Who is that?

19   A.    Christine Lewis.

20   Q.    When did she ask for that?

21   A.    Maybe two years ago.

22   Q.    What did she say?

23   A.    Subsequent.

24   Q.    So subsequent to you finding out you were no



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1  longer eligible for AMIP, your manager asked for

2  additional volunteers for what exactly?

3      A.    They asked you to pick up additional accounts

4  or business units.

5      Q.    You were capable of doing that?

6      A.    I think it would have been a stretch to do

7  that.

8      Q.    So you were not capable of doing it?

9      A.    I think it would have been a stretch to do

10  that.

11      Q.    What does that mean, "a stretch"?

12      A.    I think it would have required additional work.

13      Q.    You could have done the additional work?

14      A.    Possibly.

15      Q.    You didn't volunteer to do it?

16      A.    No.

17      Q.    The reason you didn't volunteer to do it is

18  because you didn't get an AMIP bonus?

19      A.    Because I didn't feel I was compensated for

20  taking on additional work.

21      Q.    Did you tell anybody that?

22      A.    Yes.

23      Q.    Who did you tell that to?

24      A.    My manager.



WILCOX & FETZER LTD.
Registered Professional Reporters

Karen A. Masino

232

1     Q.    Which was?

2     A.    Christine Lewis.

3     Q.    What did she say?

4     A.    She understood.

5     Q.    Do you know how much you received in AMIP bonus

6 each year prior to you being notified you were not

7 eligible?

8     A.    I have a record of what I received each year.

9     Q.    Do you remember how much it was?

10    A.    Specific amounts, no.

11    Q.    Even a range.

12    A.    It's in the 18-to-20-thousand-dollar range.

13    Q.    So between approximately the year 2000 and the

14 year 2003, let's say, May, you received AMIP bonuses

15 ranging from 18 to 20 thousand dollars, approximately?

16    A.    Correct.

17    Q.    Do you know the reason that the company would

18 wait until October or November of a year to send out the

19 worksheets?

20    A.    I have no idea.

21    Q.    Did it have to do with the fact that it took

22 the company time to develop plans and budgets for that

23 fiscal year?

24             MR. WILSON:  Object to the form.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

233

1          MR. SEEGULL:  If you know.

2     A.    I don't know.  The budgets were done way before

3  that time frame, however.  I'm not sure that would be a

4  reason.

5     Q.    After the fiscal year closed and the company

6  went about calculating your AMIP bonus, did they complete

7  the worksheet and hand it back to you?

8     A.    Sometimes.

9     Q.    And sometimes they did not?

10     A.    Sometimes they didn't hand it back to you.

11  They would just tell you the amount.

12     Q.    If they told you the amount, would you know how

13  it was calculated?

14     A.    Not necessarily.

15     Q.    What do you mean "not necessarily"?  You mean

16  you might know how it was calculated?

17     A.    They would tell you 97.3 percent, but I don't

18  know specifically how each factor -- I wouldn't know how

19  each factor was calculated.

20     Q.    How many times did you get back a completed

21  worksheet if you remember getting back a completed

22  worksheet?

23     A.    I believe I have one or two completed

24  worksheets.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

234

1      Q.     How were you first notified that you would not

2  be receiving any AMIP payment?

3      A.     Via the letter, whatever exhibit that will be.

4      Q.     We will get you a copy of it right now.

5             (Deposition Exhibit No. 15 was marked for

6  identification.)

7             THE WITNESS:  15, Exhibit 15.

8  BY MR. SEEGULL:

9      Q.     Let's ask that question again.  Was Exhibit 15

10  the first notification you had that you would not be

11  eligible for any AMIP payment?

12     A.     Yes.

13     Q.     Had you heard that this was coming?

14     A.     No.

15     Q.     This came as a surprise to you?

16     A.     Complete surprise.

17     Q.     Did you have any discussion with anybody about

18  this?

19     A.     Yes.

20     Q.     Who did you discuss it with?

21     A.     I talked to Bob Tattle, who was my manager at

22  the time.

23     Q.     Tell me about your conversations with him.

24     A.     I believe he had had notification of this and



235

```
1    was trying to do what he could to keep us on the program,

2    but he was not getting very far with that.  Then I went

3    and talked to Human Resources.

4         Q.    Let's first talk about your conversations with

5    Bob Tattle.

6         A.    Okay.

7         Q.    Bob Tattle hadn't told you this was coming?

8         A.    No.

9         Q.    After you received this letter, you then went

10   to talk to Bob Tattle?

11        A.    Yes.  Actually, he handed me the letter in

12   person.

13        Q.    What did he say?

14        A.    He said that he had been trying to work with

15   his management to not have this happen, but there was

16   nothing he could do and he was passing this letter along.

17        Q.    Did you say anything to him?

18        A.    I asked him what the rationale was.

19        Q.    What did he say?

20        A.    He said they were attempting to make the AMIP

21   program consistent across CSC and that other

22   organizations in CSC did not have people at our level, at

23   level 6 eligibility, for the program.  You had to be a

24   level 7.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

236

1      Q.    So he told you and you understood that the

2   point of the change to the AMIP eligibility was to make

3   it consistent such that it was only for higher-level

4   management people?

5      A.    Correct, and in certain roles, I believe.

6      Q.    Was there any further discussion that you had

7   with Bob Tattle about AMIP removal or eligibility?

8      A.    We had several discussions with him asking me

9   to sign this letter.

10     Q.    You didn't want to sign the letter?

11     A.    I didn't understand whether signing the letter

12  meant I accepted the program or that I had gotten

13  notification.

14     Q.    What did you finally come to understand?

15     A.    That it was a notification letter.

16     Q.    Anything else that you discussed with

17  Bob Tattle about AMIP?

18     A.    He was going to go back and talk to his line

19  management again about moving us to level 7 so that we

20  would still be eligible.

21     Q.    Did he get back to you?

22     A.    He did, and he was not successful at that, as

23  well.

24     Q.    Anything else discussed with Bob Tattle about

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    AMIP?

2        A.    I don't believe so.

3        Q.    You wrote something on the bottom here.

4    "Appropriate modification of signer's Objectives & KRA's

5    will be made commensurate with adjusted total

6    compensation package."

7                What did you mean by that?

8        A.    Again, we set objectives in key result areas

9    for the year, and they needed to be, in my mind,

10   commensurate with my compensation package.

11       Q.    What do you mean?

12       A.    So previously those objectives included

13   compensation that included the bonus program which I was

14   no longer eligible.

15       Q.    Were you saying that you should have new

16   objectives?

17       A.    I was saying I should have modified objectives.

18       Q.    Lesser objectives?

19       A.    Commensurate with my compensation, yes.

20       Q.    Which objectives did you want to have reduced?

21       A.    I don't believe we ever did this process.

22       Q.    Did you ever suggest any particular objectives

23   should be changed?

24       A.    I don't believe so.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

238

1    Q.    Then you wrote:  "In addition, it is requested

2  that written criteria be forwarded to the signer for both

3  the new discretionary bonus and AMIP program so that

4  future eligibility for either program is clearly

5  understood."

6              What did you mean by that?

7    A.    Well, this letter states that a discretionary

8  bonus, that we would be eligible for up to $10,000 per

9  annum, and there was no criteria given for what -- how

10  you would receive or not receive that discretionary

11  bonus.

12    Q.    Meaning it was discretionary.

13    A.    Completely discretionary.

14    Q.    By the way, did you ever receive a

15  discretionary bonus?

16    A.    I have received a discretionary bonus.

17    Q.    How many times?

18    A.    Twice, I guess.

19    Q.    You understood that you could not receive the

20  discretionary bonus if you were eligible for AMIP.

21    A.    I did not understand that, actually.

22    Q.    Do you know of anybody that ever received a

23  discretionary bonus and an AMIP?

24    A.    I don't know.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     Q.     Do you know of anybody that's eligible for

2     both?

3     A.     I don't know.  But, again, discretionary bonus

4     is discretionary.  Anybody could get it is my

5     understanding.

6     Q.     There was a discretionary bonus plan, correct?

7     A.     Correct.

8     Q.     It set limits, correct?

9     A.     I don't know.  This is the only notification I

10    got about the discretionary bonus.

11    Q.     According to this, there's a limit.

12    A.     For me there's a limit up to $10,000 per year.

13    Again, I don't know if that's specific to a certain level

14    or not.

15    Q.     Had you ever received a discretionary bonus

16    prior to receiving this letter?

17    A.     Yes.

18    Q.     How much had you received in a discretionary

19    bonus prior to receiving this letter?

20    A.     Five thousand dollars.

21    Q.     Was that before you were eligible for AMIP?

22    A.     It might have been the same year that I was put

23    on AMIP.

24    Q.     Do you know?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Karen A. Masino

240

1    A.    I don't know off the top of my head.

2    Q.    What did you mean by the second half of your

3    last sentence about the AMIP program?

4    A.    Well, the AMIP program still exists, to my

5    knowledge, so I wanted to know what the criteria for

6    eligibility would be at what level, what job functions,

7    etcetera.

8    Q.    Didn't you know that the criteria was that you

9    had to be a level 7 employee?

10    A.    It was level 7 plus position.  I believe it had

11    specific positions.

12    Q.    Did you ever find out what positions?

13    A.    No.

14    Q.    Do you know today what positions are eligible?

15    A.    No.

16    Q.    You just know that you're not eligible?

17    A.    I know I'm not eligible.

18    Q.    You said that you went to Human Resources to

19    discuss this?

20    A.    Yes.

21    Q.    Who did you go to at Human Resources?

22    A.    Jim Styles.

23    Q.    Tell me about your conversations with

24    Jim Styles.  When was this, and how many conversations?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0252

241

1    A.    I believe just once.  One conversation

2  subsequent to this.  He suggested talking to the head of

3  our accounts, Nick Wilkinson, which we did as a group.

4    Q.    First of all, did you speak with Jim Styles

5  alone?

6    A.    Yes.

7    Q.    How long was your conversation with him?

8    A.    Forty minutes, maybe.

9    Q.    Where did you speak to him?

10    A.    In Christiana Corporate Center.

11    Q.    In the HR office?

12    A.    In the HR.

13    Q.    Tell me about your conversation with him.

14    A.    Conversation was around eligibility for the

15  program, if there were things we could do to stay on the

16  program, those kinds of things.

17    Q.    Do you remember anything that he said during

18  this conversation?

19    A.    Not specifically.

20    Q.    Do you remember anything he said generally?

21    A.    Generally he said that he understood my concern

22  and encouraged me to go talk to, again, our account vice

23  president.

24    Q.    What did you explain to him was your concern?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Karen A. Masino

242

1    A.    That the compensation wasn't commensurate with

2    our job positions and responsibilities.

3    Q.    You told him that?

4    A.    Yes.

5    Q.    Did you tell him anything else?

6    A.    I don't believe so.

7    Q.    Anything else that you can recall being

8    discussed between you and Jim Styles?

9              MR. WILSON:  Object to the form.

10   A.    No.

11   Q.    You said that you next had a conversation with

12   Nick Wilkinson?

13   A.    Yes.

14   Q.    That wasn't you alone?

15   A.    No.  That was the team of us.  All the

16   portfolio managers.

17   Q.    Who was that?

18   A.    That would have been Bob Carden,

19   Laura Van Winkle, Brian Miller, Dawn Hauck, Dave McHenry,

20   couple other folks.

21   Q.    You don't remember the other names?

22   A.    I don't remember specifically.

23   Q.    When was this conversation?

24   A.    Would have been shortly after this time period.

243

```
 1    So maybe November.  October/November.  Pretty quick.

 2    Right after we signed these letters, I believe.

 3         Q.    How long was the conversation with

 4    Mr. Wilkinson?

 5         A.    We met with him for an hour.

 6         Q.    Who was Mr. Wilkinson?

 7         A.    He's the vice president of the Chemical Group.

 8         Q.    Tell me about your conversation.

 9         A.    Again, we expressed concern of being removed

10    from the program based on our level of responsibility.

11         Q.    It's the same concern you expressed before

12    which is that you felt your compensation wasn't

13    comparable to your skill set and job duties?

14         A.    Correct.

15         Q.    What else was discussed?

16         A.    I don't believe anything else was discussed.

17    It was strictly around this program.

18         Q.    Do you remember anything else being said about

19    this program?

20         A.    No.  He said that he was continuing to have

21    discussions and that he would let us know if anything

22    changed.

23         Q.    Do you remember anything else being discussed?

24         A.    No.
```



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

244

1    Q.    Did you discuss with anybody else the AMIP

2    program?

3    A.    No.

4    Q.    So just Nick Wilkinson and Jim Styles?

5    A.    Correct.  And Bob Tattle, obviously.

6    Q.    You never had any other conversations with

7    Bob Tattle?

8    A.    No.

9    Q.    I'm going to show you now what's been marked as

10    Exhibit 4.  Do you recognize this?

11    A.    Yes.

12    Q.    What is it?

13    A.    It's a letter we received about contacting the

14    attorneys.

15    Q.    Did you help write this?

16    A.    Yes.

17    Q.    Who did you write it with?

18    A.    Brian Miller and Dawn Hauck.

19    Q.    How did you go about writing the letter?

20    A.    Brian drafted the letter and Dawn and I

21    reviewed it.

22    Q.    Did you make changes to the letter?

23    A.    We might have made wording changes.

24    Q.    Do you remember which wording changes you made?

Karen A. Masino

245

1    A.    No.

2    Q.    Who did you send it to?

3    A.    We sent it to those people we suspected had

4    been removed from the program.

5    Q.    How did you get their names?

6    A.    Well, we were all managers, so we knew most of

7    the names.

8    Q.    How did you get their addresses?

9    A.    Looked them up on the Internet.

10   Q.    Who was responsible for sending these letters

11   out?

12   A.    Brian sent the letters out.

13   Q.    Who paid for the postage?

14   A.    Brian paid for the postage.

15   Q.    Did you reimburse him?

16   A.    No.

17   Q.    How many letters did you send out?

18   A.    I don't know.

19   Q.    Would you agree that your performance reviews

20   don't have anything to do with this case?

21   A.    Yes.

22          (Deposition Exhibit No. 16 was marked for

23   identification.)

24



WILCOX & FETZER LTD.
Registered Professional Reporters

Karen A. Masino

246

BY MR. SEEGULL:

    Q.    I'm now showing you what's been marked Exhibit 16.  Do you recognize this?

    A.    Yes.

    Q.    What is it?

    A.    This is the e-mail, again, that the portfolio managers drafted to our boss at the time, Bob Tattle, and his response.

    Q.    Did you help draft this e-mail?

    A.    We all helped draft this e-mail.

    Q.    What was the point of the e-mail?

    A.    It was basically summarizing our opinion on being removed from this incentive plan.

    Q.    You sent this e-mail before you had received the September 11th letter, correct?

    A.    It looks like it was sent before September 11th.  On the 9th.

    Q.    You knew that this was going to be a change that was going to be made.

    A.    Probably that week.

    Q.    When you received the letter, it wasn't a surprise.

    A.    Well, I think the letter was still a surprise.

    Q.    Why do you say that?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

247

```
 1        A.     I didn't expect a formal notification mid-year.

 2  Nor do I believe we knew timing at this point.  I don't

 3  believe we knew the timing of the program at this point.

 4        Q.     You knew it was a heavily rumored action?

 5               MR. WILSON:  Object to the form.

 6  BY MR. SEEGULL:

 7        Q.     Correct?

 8        A.     Somebody must have been rumored, yes.

 9        Q.     You expected that there were rumors that this

10  was about to take place, correct?

11               MR. WILSON:  Object to form.

12        A.     Correct.

13        Q.     When you received the letter confirming the

14  change, you weren't surprised at the letter?

15        A.     I'd say we were still surprised because I

16  don't -- a rumor is a rumor.  So I was still surprised.

17        Q.     You were surprised that what you were hearing

18  was going to happen actually happened?

19        A.     Yes.

20        Q.     The point of this e-mail was to try to convince

21  management that they should not remove you from the AMIP.

22        A.     Correct.

23        Q.     You were making an argument as to why you

24  should still be eligible?
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

248

1      A.    Yes.

2      Q.    You understood that CSC had the right to make a

3   legitimate business decision to remove you from the AMIP?

4              MR. WILSON:   Object to the form.

5      A.    Yes.

6      Q.    You knew that the decision that CSC was making

7   was based on cost from a long-term perspective of the

8   company.

9              MR. WILSON:   Object to the form.

10     A.    Actually they did not tell us it was based on

11   cost.

12     Q.    Did you understand that it was based upon cost?

13     A.    I can make an assumption it was based on cost.

14     Q.    Didn't you write we understand that CSC is

15   looking to reduce costs due to current business

16   conditions?

17     A.    Uh-huh.

18     Q.    Yes?

19     A.    Yes.

20     Q.    You knew that the reason they were making this

21   change was because of cost?

22              MR. WILSON:   Object to the form.

23     A.    The reason they gave us for making the change,

24   again, in the letter subsequent was because they were

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1   trying to level everyone across the company.  It didn't

2   talk about cost.

3       Q.    But you understood that it was because of cost.

4               MR. WILSON:  Object to the form.

5       A.    Yes.

6       Q.    You understood that there was a cost reduction

7   by doing this.

8       A.    Yes.

9       Q.    You had had numerous discussions with the

10  people on this list of portfolio managers --

11              MR. WILSON:  Object to the form.

12  BY MR. SEEGULL:

13      Q.    -- about these changes?

14      A.    We had had one discussion around crafting this

15  letter.

16      Q.    But a lot of discussions about the fact of the

17  change in the AMIP plan.

18              MR. WILSON:  Object to the form.

19      A.    I don't remember more than the one phone call

20  that we did one evening to craft this response.

21      Q.    In your e-mail you never stated that removing

22  anybody from the AMIP was illegal, did you?

23      A.    No.

24      Q.    Mr. Tattle was sympathetic to your concerns?

250

1       A.      Yes.

2       Q.      Did he ever get back to you?

3       A.      I don't believe so.

4       Q.      Did you have any other communications about

5  this e-mail?

6       A.      Not to my knowledge.

7       Q.      Have you told me about every conversation you

8  had with Robert Tattle about AMIP?

9       A.      I believe so.

10      Q.      Am I correct that just because employees

11  disagree with a company's decision, that doesn't make the

12  decision illegal?

13              MR. WILSON:   Object to the form.

14      A.      That's correct.

15      Q.      Have you told me about every conversation you

16  had with Nick Wilkinson about AMIP?

17      A.      Yes.

18              (Deposition Exhibit No. 17 was marked for

19  identification.)

20  BY MR. SEEGULL:

21      Q.      I'm now showing you what's been marked as

22  Exhibit 17.   Who is Van Athanas?

23      A.      I believe he's an HR representative in TMG.

24      Q.      He sent you this e-mail on December 11th, 2002?



1    A.    Correct.

2    Q.    There were two attachments to the e-mail?

3    A.    Yes.

4    Q.    What were the attachments?

5    A.    One is the worksheet for the AMIP's

6    calculation.  One is a spreadsheet.  One's a pdf.  I

7    don't remember what the difference of the two attachments

8    is.  Do you have the attachments?

9    Q.    I'm not sure that we have the pdf.  Is the pdf

10    the worksheet or is the AMIPS-FY03 -- is that the

11    worksheet?

12    A.    My guess is that the pdf is -- what does he say

13    here?  He doesn't tell us either, does he?  I don't know

14    without opening up the attachments.

15    Q.    Look at paragraph 3, it says, "The financial

16    targets will be paid out on an over/under sliding scale

17    achievement against target.  EPS will be paid out in a

18    similar fashion (see attached PP file)."

19          Does that mean PowerPoint?

20    A.    PowerPoint.  Yes.

21    Q.    The first was a PowerPoint file?

22    A.    The second must have been the worksheet.

23    Here's where they added the new measurement of return of

24    investment.

252

1      Q.      So for fiscal year 2003 you did not receive the

2    worksheet until December 11th, 2002?

3      A.      That's correct.

4      Q.      So prior to December 11th, 2002, you did not

5    know how AMIP was going to be calculated for fiscal year

6    2003?

7      A.      We didn't know the specifics, that's correct.

8      Q.      What is the PowerPoint that he's attaching

9    here?

10      A.      It looks like that's the financial target

11    sliding scale description.  But, again, I'd have to open

12    the document to verify that.

13      Q.      Was individual performance still a component

14    for fiscal year 2003 AMIP?

15      A.      I believe so.

16      Q.      The reason I ask that is it says in the second

17    paragraph, it says, "In order to drive the uniformity of

18    our efforts, all ASD AMIP eligible staff will share a

19    100% financially driven AMIP schedule."

20              Do you see that?

21      A.      Yes.

22      Q.      Does that indicate to you that individual

23    performance was not a component in that year's AMIP

24    schedule?

**W&F**

Karen A. Mason

253

1    A.    We had financial targets, individual financial

2  targets.  Again, I don't know whether that was part of it

3  or not.

4    Q.    But any nonfinancial objectives were taken out

5  of the AMIP calculation for fiscal year 2003?

6    A.    And this was the first year they did that.

7    Q.    Is that correct?

8    A.    Yes.

9    Q.    The reason the company made these changes to

10  the calculation formula for the fiscal year 2003 AMIP was

11  because of business climate and challenges?

12    A.    As stated here, yes.

13    Q.    You never had a problem with CSC making these

14  changes, did you?

15          MR. WILSON:  Object to the form.

16    A.    I believe we questioned this because it was so

17  late in the year to create financial targets which might

18  have been difficult to obtain.

19    Q.    Did you obtain the targets?

20    A.    Not 100 percent.

21    Q.    So you did or did not have a problem with them

22  adjusting the AMIP formula this way?

23          MR. WILSON:  Object to the form.

24    A.    I had concerns about them changing it this late

254

```
 1    in the fiscal year.
 2         Q.    But there was nothing illegal about it?
 3              MR. WILSON:  Object to the form.
 4         A.    Nothing I could have done about it, correct.
 5         Q.    Nothing illegal about it?
 6              MR. WILSON:  Object to the form.
 7         A.    I don't know.
 8         Q.    How much are you claiming as damages in this
 9    case?
10         A.    I believe it's $12,000 something.
11         Q.    How do you go about calculating your damages in
12    this case?
13         A.    Took the average AMIP payout over the last
14    three years and took half of that for the time period
15    April 1 through September 11th.
16         Q.    April 1 through September 11th, technically
17    speaking, isn't six months.  It's just short of six
18    months.  Correct?
19         A.    Right, but I believe there's a pay period
20    differential in there.
21         Q.    You just think it's basically close enough to
22    six months?
23         A.    To be that pay period.
24         Q.    To round up, basically.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

255

```
 1        A.     Right.

 2        Q.     The estimate that you used was based upon an

 3   average of the AMIP payouts for the prior three years?

 4        A.     Correct.

 5        Q.     That's one method of estimating, correct?

 6        A.     Yes.

 7        Q.     What are some other methods of estimating?

 8               MR. WILSON:  Object to the form.

 9               MR. SEEGULL:  What's the nature of your

10   objection?

11               MR. WILSON:  We don't have speaking

12   objections in Delaware.  I can object to the form of the

13   question.

14               MR. SEEGULL:  What's the problem with the

15   question?

16               MR. WILSON:  All we do in Delaware is

17   object to the form of the question.

18               MR. SEEGULL:  You can tell me your concern

19   with the question and, if you like, I can rephrase it.

20               MR. WILSON:  If you want to ask her a

21   question, don't ask her an open-ended question about

22   something that she may have no knowledge.  That has

23   nothing to do with this case.

24               MR. SEEGULL:  How she goes about
```



WILCOX & FETZER LTD.
Registered Professional Reporters

256

1    estimating?

2                    MR. WILSON:  She told you how she went

3    about estimating.

4                    MR. SEEGULL:  Can you read the question

5    again?

6                    (The reporter read back as instructed.)

7                    MR. SEEGULL:  Go ahead.  You can answer.

8         A.    I don't know another way of estimating what my

9    calculation would have been.

10        Q.    You could take the past year and base it on

11   just one year's prior AMIP, correct?

12                   MR. WILSON:  Object to the form.

13        A.    You could, but I didn't think that was

14   representative of my history of AMIP payouts.

15        Q.    That's one other way --

16                   MR. WILSON:  Object to the form.

17   BY MR. SEEGULL:

18        Q.    -- correct?

19        A.    Correct.

20        Q.    You could take two years and estimate based

21   upon that.

22                   MR. WILSON:  Object to the form.

23        A.    Correct.

24        Q.    Instead of taking the average, you could take



WILCOX & FETZER LTD.
Registered Professional Reporters

257

1    the mean?

2                    MR. WILSON:   Object to the form.

3    BY MR. SEEGULL:

4        Q.    Or the median, correct?

5        A.    Also correct.

6        Q.    Why do you have to estimate what your damages

7    are in the first place?  How come you don't know what

8    your actual damages are?

9        A.    Because we would not have known the total

10   percentage of payout until the end of the fiscal year.

11       Q.    But we're now beyond the end of that fiscal

12   year.  What were your actual damages rather than just

13   giving me an estimate?

14       A.    Again, they never -- since we didn't have these

15   worksheets done that year, nothing was completed or

16   filled out in terms of what targets we met.

17       Q.    So there's no way to know exactly what your

18   AMIP would have been for that year or six months of that

19   year other than through an estimate?

20       A.    A pretty good guess through an estimate, yes.

21       Q.    But there's no way to know for sure because the

22   worksheets were never provided.  So we don't know what

23   would have been applicable to you for that year.

24                    MR. WILSON:   Object to the form.



BY MR. SEEGULL:

    Q.    Correct?

    A.    That's correct.

    Q.    Did you ever speak to anybody who did receive an AMIP for fiscal year 2004 about how their AMIP was calculated?

    A.    No.

    Q.    Why not?

    A.    Not something that people normally talk about.

    Q.    The decision to remove you from AMIP eligibility was not a personal decision, correct?

    A.    Correct.

    Q.    It wasn't about you --

         MR. WILSON:  Object to the form.

BY MR. SEEGULL:

    Q.    -- in particular?

    A.    That's correct.

    Q.    It was an attempt to align the cross-organizations within CSC and provide it for the senior-level managers.

    A.    Correct.

         MR. WILSON:  Object to the form.

    Q.    You knew that it had been a difficult financial year for the company in 2003, correct?



259

1      A.      For the overall company, yes.  For our account

2   it had been a good financial year, actually.

3      Q.      The company has the right to use its business

4   judgment to determine the best way to save money and

5   increase profits.

6                      MR. WILSON:  Object to the form.

7      A.      That's correct.  They also have a

8   responsibility to notify us in a timely manner.

9      Q.      What to you is a timely manner?  How quickly

10  did they have to notify you after the close of the fiscal

11  year that they were changing the AMIP program?

12     A.      I think they should have notified us either

13  before the fiscal year started or shortly thereafter.

14     Q.      What's shortly thereafter?

15     A.      May/June.

16     Q.      If they had notified you in June of 2003 that

17  you were not going to be eligible for the AMIP program in

18  fiscal year 2004, you wouldn't have had a problem with

19  that?

20     A.      I don't believe I would have had a problem with

21  that.

22     Q.      Why?

23     A.      Because it would have meant they had studied

24  the financials and made a decision around the same time

1    period that those things are normally discussed before

2    objectives are set for the year which we normally do

3    around the May/June time frame.  We set all of our

4    objectives for that fiscal year.

5         Q.    What if it took them three months, four months

6    to figure out whether or not they could keep people on

7    the AMIP?

8         A.    Then they should have paid us what bonus we had

9    earned.

10        Q.    What if they were trying to keep people on the

11   AMIP and they were trying to look at different ways of

12   doing that, but it took them sometime to realize they

13   weren't going to be able to do that?

14                 MR. WILSON:  Object to the form.

15        A.    Is that a question?

16        Q.    Would you have a problem if they had waited

17   three or four months while they were trying to figure out

18   if they could keep people on the AMIP?

19                 MR. WILSON:  Object to the form.

20        A.    If they had communicated that that's what they

21   were trying to do, I probably wouldn't have had a

22   problem.

23        Q.    You're seeking your AMIP to be prorated for the

24   year, correct?



1    A.    Yes.

2    Q.    You're seeking for it to be prorated based upon

3    the time you spent during the fiscal year prior to being

4    notified?

5    A.    Yes.

6    Q.    There were other ways to prorate the AMIP

7    bonus, right?  They could have prorated based upon

8    contribution to the overall financial targets.

9                    MR. WILSON:  Object to the form.

10    A.    Yes.

11    Q.    Do you know of anybody that's ever had their

12    AMIP prorated?

13    A.    Yes.

14    Q.    Who?

15    A.    I know someone who left CSC midyear and got

16    their prorated AMIP for that portion of time the

17    subsequent year.

18    Q.    Who was that?

19    A.    Steve Quinn.

20    Q.    What group was he in?

21    A.    He was in F & A, financial and something in the

22    chemical account.

23    Q.    Financial and administration?

24    A.    Administration, yes.  I think that's what it

Karen A. Masino

262

1    is.

2        Q.    Financial and accounting?

3        A.    Yes.  I don't know.  Financial and something.

4        Q.    When did he leave the company?

5        A.    I don't remember what year.  When they were

6    still paying out, I assume.

7        Q.    What level employee was he?

8        A.    5.

9        Q.    This was while he was still part of AMIP?

10        A.    Yes.

11        Q.    He left the company and went where?

12        A.    Went to a teaching position, I believe.

13        Q.    He left during the middle of a fiscal year?

14        A.    Yes.

15        Q.    And then he received an AMIP after the close of

16    the fiscal year?

17        A.    Correct.

18        Q.    It was prorated?

19        A.    Prorated.

20        Q.    How much did he receive?

21        A.    I believe he's received four months of the

22    prorated amount for four months of the fiscal year.

23        Q.    How did they figure out how much to pay him?

24    How did they prorate it?  How did they do that?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0274

263

```
 1      A.    They do it by number of days, I believe, or

 2  number of weeks.

 3      Q.    Do you know?

 4      A.    No, not specifically.

 5      Q.    Do you know how much money he was paid?

 6      A.    No.

 7      Q.    How do you know he was prorated?

 8      A.    Because he told me.

 9      Q.    When did he tell you this?

10      A.    When he received the check the subsequent year.

11      Q.    When was the last time you spoke to him?

12      A.    About this or about anything?

13      Q.    Anything.

14      A.    Last week.

15      Q.    What did you speak to him about last week?

16      A.    Social events.

17      Q.    When was the last time you spoke to him about

18  AMIP?

19      A.    When he received that check.

20      Q.    That would have been the year 2003?

21      A.    I think it was 2002 or 2003.  I'm not sure.

22      Q.    Might have been in the year 2003 or fiscal year

23  2002?

24      A.    Right.
```

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    Anybody else that you know of that received a

2    prorated AMIP bonus?

3    A.    I believe Brian has received a prorated AMIP

4    bonus.  Brian Miller.

5    Q.    Tell me about how he received a prorated AMIP

6    bonus.

7    A.    He was put on the program subsequent to this,

8    back on the program midyear, and received a prorated

9    bonus this year for last year.

10    Q.    So Brian Miller is now part of the AMIP

11    program?

12    A.    Yes.

13    Q.    For the period of time that he was part of the

14    AMIP program he received a prorated bonus?

15    A.    To my knowledge, yes.

16    Q.    How much was it prorated?

17    A.    I don't know.

18    Q.    Anybody else that you know of that received a

19    prorated bonus?

20    A.    No.

21    Q.    Fiscal year 2004 was not the first time that

22    the company tried to eliminate people from AMIP, correct?

23    A.    I didn't know that.

24    Q.    Did you know that other people had been



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0276

1  eliminated from the program in fiscal year 2003?

2      A.    No.

3                  MR. WILSON:   Object to the form.

4      Q.    Who has knowledge of the facts about this case

5  or about AMIP that would be relevant to this lawsuit?

6      A.    In CSC?

7      Q.    Or outside of CSC.

8      A.    I believe we gave a list of names in CSC that

9  we thought were relevant.

10     Q.    Who do you think is relevant?

11     A.    I think Bob Tattle is relevant.  I think

12 Jim Styles is relevant, Nick Wilkinson.

13     Q.    Anybody else?

14     A.    Dot Eltzroth I would assume.

15     Q.    Anybody else?

16     A.    No.

17     Q.    Have you spoken to anybody else about this

18 lawsuit?

19     A.    No.

20     Q.    You have spoken to other plaintiffs?

21     A.    Yes.

22     Q.    Which plaintiffs have you spoken to?

23     A.    Brian Miller, Dawn Hauck.

24     Q.    What have you discussed with them?

1    A.    Just the timing of depositions and mediation.

2    Q.    Anything else?

3    A.    No.

4    Q.    Have you discussed what each of you would

5    testify to?

6    A.    No.

7    Q.    Have you discussed whether or not you're going

8    to win this case?

9    A.    No.

10    Q.    You haven't discussed that at all?

11    A.    No. I don't think anybody has any

12    expectations.

13    Q.    What do you mean?

14    A.    We believe we have a case and that's why we're

15    here.

16    Q.    Have you been involved in any other cases

17    against CSC?

18    A.    No. I'm sorry. Yes. Not involved. The class

19    action, yes.

20    Q.    Tell me what happened there, as far as you

21    know.

22    A.    I think someone in California sued for overtime

23    payment, people at a certain level, and I was that level

24    for three months during one of the years.



WILCOX & FETZER LTD.
Registered Professional Reporters

267

1       Q.    How much did you get?

2       A.    One hundred twenty-three dollars or something

3    before taxes.

4       Q.    Have you asked anybody to be a witness in this

5    case?

6       A.    No.

7                   MR. SEEGULL:  Why don't we take a quick

8    break.

9                   (A recess was taken.)

10   BY MR. SEEGULL:

11      Q.    Just a couple more questions.

12                  Did Steve Quinn retire?

13      A.    No.

14      Q.    Do you know for sure whether or not he did?

15      A.    I don't believe he retired.

16      Q.    How old is he?

17      A.    He's 40 something.  Forty-two maybe.

18      Q.    The $10,000 discretionary bonus that you

19   received, you received that for fiscal year 2004?

20      A.    Correct.

21      Q.    You received that sometime in May of 2004?

22      A.    May of 2004.

23      Q.    Correct?

24      A.    Yes.



B-0279

1    Q.    Did you receive a discretionary bonus for

2  fiscal year 2005?

3    A.    Yes.

4    Q.    How much was that?

5    A.    Ten thousand dollars,000.

6    Q.    You said you also received a discretionary

7  bonus of $5,000 at some point.

8    A.    Right.

9    Q.    Was that just once or multiple times?

10    A.    Once.

11    Q.    Do you know what year that was for?

12    A.    Would have been '98 or '99.

13    Q.    Fiscal year '98 or '99?

14    A.    Correct.

15        MR. SEEGULL:  I have no further questions.

16        (Deposition Exhibit No. 18 was marked for

17  identification.)

18  BY MR. WILSON:

19    Q.    Karen, can you look at what's been marked

20  Exhibit 18?

21    A.    Yes.

22    Q.    Can you explain what these are?

23    A.    These are pay stubs, essentially, for the

24  period of April 28 through May 11th of 2001 and a similar



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  period for 2002 and '3.  Yes.

2      Q.    Just for clarity, can you tell us what the pay

3  date is on each of these three sheets?

4      A.    Pay date is 5/18 of 2001, 5/31 of 2002, and

5  5/30 of 2003.

6      Q.    Is your AMIP bonus reflected on these sheets?

7      A.    Yes.  It's reflected in the bonus line.

8      Q.    What was your AMIP bonus for 2001?

9      A.    $19,426.78.

10     Q.    What about for 2002, which I guess would be

11  fiscal year --

12     A.    '02.  Is $19,497.

13     Q.    What about '03?

14     A.    $18,158.

15     Q.    Looking at these sheets, are these AMIP bonuses

16  included in your total earnings --

17     A.    Yes.

18     Q.    -- for the year?

19     A.    Yes.

20     Q.    You gave some testimony that there were times

21  when your specific objectives that you had to meet in

22  order to get your AMIP bonus didn't come out at the

23  beginning of the fiscal year.  In the interim, between

24  the beginning of the fiscal year and when those

270

1    objectives did come out, did you have a fairly good idea

2    of what those objectives would be?

3        A.    Yes.    They were typically somewhat based on the

4    previous year.    So we had a pretty good idea of what they

5    were.

6        Q.    You also gave some testimony about discussions

7    you had with Bob Tattle.    Did he give any indication of

8    whether or not he thought that it was fair that they were

9    taking this AMIP bonus away from you at this time?

10        A.    He shared his disappointment that it was being

11    taken away, but I don't believe he used the word "fair"

12    or "unfair."

13        Q.    Was he affected by this?

14        A.    No.

15        Q.    Did he give any indication that he thought you

16    had earned this money?

17               MR. SEEGULL:    Objection.

18        A.    I can answer the question?

19        Q.    Yes.

20        A.    No, he did not give any indication.

21        Q.    The discretionary bonus, I got a little

22    confused there.    Were you eligible for the discretionary

23    bonus prior to September 11th, 2003?

24        A.    Yes.



271

1      Q.    Mr. Seegull asked you some questions, some

2  hypothetical questions, about, if they had informed you,

3  say, in June that they were taking the AMIP bonus away,

4  would you have had a problem with it.  In your opinion,

5  if that had happened, would they have still owed the

6  money to you?

7      A.    I believe ethically, yes, they would have owed

8  us the money.

9                MR. WILSON:  That's all I have.

10 BY MR. SEEGULL:

11     Q.    On Exhibit 18, the pay stubs, you said the

12 total earnings for the year included the AMIP bonus,

13 correct?

14     A.    Yes.

15     Q.    This refers to the calendar year, not the

16 fiscal year, when it says year to date?

17     A.    No -- yes.

18     Q.    So that on the first page of Exhibit 18 where

19 it says year to date total earnings of $56,785.98 and

20 that includes the AMIP payment?

21     A.    Correct.

22     Q.    That shows AMIP being earned as total earnings

23 in the year 2001, correct?

24     A.    It was paid in the year 2001.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

272

Q.    It showed it as earnings in the year 2001?

A.    It shows it as earnings in 2001.

Q.    If you go to the second page where you received an AMIP bonus on May 31, 2002, that shows it as being earned in the year 2002, correct?

        MR. WILSON:   Object to the form.

A.    Again, it's paid as earnings in the year 2002.

Q.    But it shows it as being earned in the year 2002, correct?

        MR. WILSON:   Object to the form.

A.    Correct.

Q.    If we go to the last page, there's an AMIP payment you said of $18,158.   That's an AMIP payment that was shown as earned in the year 2003, correct?

        MR. WILSON:   Object to the form.

A.    Yes.

Q.    You said you were eligible for a discretionary bonus prior to September 11th, 2003, correct?

A.    Yes.

Q.    But you were only eligible prior to September 11th, 2003, when you weren't eligible for AMIP, correct?

A.    I don't know that those were distinct things, but the way I was paid out was I got the discretionary



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0284

1    bonus when I did not get the AMIP bonus.

2        Q.    You got the AMIP when you did not get the

3    discretionary bonus, correct?

4        A.    Correct.

5        Q.    So in your experience, you would either get the

6    discretionary bonus or the AMIP bonus, but you never get

7    both for the same year, correct?

8        A.    I don't know that to be the case because I

9    don't believe there are equivalent bonus structures.

10   That's my experience.

11       Q.    I'm asking about your experience.  Let me just

12   ask it again.  Or I can have the court reporter repeat

13   it.  Let me see if I can ask it again.

14            In your experience, you would either get

15   the discretionary bonus or the AMIP bonus, but you would

16   never get both for the same year, correct?

17       A.    That was my experience.

18       Q.    Correct?

19       A.    Correct.

20            MR. SEEGULL:  I have no further questions.

21            MR. WILSON:  That's it, then.

22            MR. SEEGULL:  I need to see the retention

23   agreement.  Do you still have that?

24            MR. WILSON:  The fee agreement.  I want to



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    make sure that we make that an exhibit.

2                THE WITNESS:  Can you help me with which

3    one it is?

4                MR. WILSON:  I don't think she has it.  It

5    would be on Jeffrey K. Martin letterhead.

6                THE WITNESS:  Is it on legal paper?

7                MR. WILSON:  It would be on letterhead

8    that says "Jeffrey K. Martin."  Not on Margolis

9    letterhead.

10                THE WITNESS:  I'm sorry.  I'm usually more

11    organized than this.

12                MR. WILSON:  That could be it.  That's on

13    the old letterhead.  No.  It would have been before that.

14                THE WITNESS:  I don't know that I have it.

15                MR. WILSON:  That's it right there.

16                MR. SEEGULL:  What is that that you're

17    taking off?

18                MR. WILSON:  That's something she sent us.

19                MR. SEEGULL:  What is it?

20                MR. WILSON:  It was prepared in

21    anticipation of litigation.

22                MR. SEEGULL:  Just give me a moment.

23    BY MR. SEEGULL:

24        Q.    Have you paid anything towards your attorney at



WILCOX & FETZER LTD.
Registered Professional Reporters

Karen A. Masino

275

1    this point?

2        A.     No.

3        Q.     Do you know if any of the plaintiffs have paid

4    anything to the attorney?

5        A.     Not to my knowledge.

6        Q.     I'll get you a copy of this and we will make

7    this an exhibit.  We will call this Exhibit 19.

8               For the record, this is the letter that

9    was sent to you by Jeff Martin, your attorney, and it

10   still controls the terms of your representation?

11       A.     Correct.

12       Q.     You signed this on?

13       A.     January 31st of 2004.

14              MR. WILSON:  This was requested in the

15   document --

16              MR. SEEGULL:  I believe so, yes.  We will

17   make a copy of this.

18              Thank you.

19              (Deposition Exhibit No. 19 was marked for

20   identification.)

21              (Deposition concluded at 3:00 p.m.)

22                 -   -   -   -   -

23

24

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1          T E S T I M O N Y

2

3    DEPONENT:   KAREN A. MASINO                    PAGE

4

5    BY MR. SEEGULL............................. 186

6    BY MR. WILSON.............................. 268

7    BY MR. SEEGULL............................. 271

8

9              E X H I B I T S

10

11   DEPOSITION EXHIBIT NO.                     MARKED

12

13   13 - A letter dated March 7, 1997, to
     Karen A. Masino from Dorothy Eltzroth......... 223

14

     14 - A letter dated May 10, 2001, to
15   Karen A. Masino from Marianne Kane........... 223

16   15 - A letter dated September 11, 2003,
     to Karen Masino from Robert Tattle........... 234

17

     16 - A three-page printout of an e-mail
18   dated 9/9/03................................. 245

19   17 - A printout of an e-mail dated 12/11/02... 250

20   18 - Three documents Bates stamped D-10903,
     D-10931, and D-10958........................ 268

21

     19 - A three-page letter dated January 16,
22   2004, to Karen Masino from Jeffrey K. Martin,
     P.A......................................... 275

23   ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 277

24   CERTIFICATE OF REPORTER                PAGE 278



**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)

                             )

NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 13th day of January, 2006, the deponent herein, KAREN A. MASINO, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

        I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

        I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

                      Kimberly A. Hurley
                      Certification No. 126-RPR
                      (Expires January 31, 2008)

DATED:



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
        v.                      )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
        Defendant.              )
```

          Deposition of ROBERT W. PETERSON taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:00 a.m., on Saturday,
January 28, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware 19806
               for the Plaintiffs

            LARRY R. SEEGULL, ESQUIRE
            LINDA M. BOYD, ESQUIRE
               DLA PIPER RUDNICK GRAY CARY US LLP
               6225 Smith Avenue
               Baltimore, Maryland 21209-3600
               for the Defendant

                WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

COPY

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1                    ROBERT W. PETERSON,

 2            the witness herein, having first been

 3            duly sworn on oath, was examined and

 4            testified as follows:

 5   BY MS. BOYD:

 6       Q.    Mr. Peterson, as I told you before we went on

 7   the record, my name is Linda Boyd.  I'm an attorney

 8   representing Computer Sciences Corporation in this

 9   matter.  Throughout this deposition I'll refer to

10   Computer Sciences Corporation as CSC.  Will you

11   understand what I mean?

12       A.    Yes, absolutely.

13       Q.    With me is Larry Seegull, who's also an

14   attorney representing CSC in this matter.

15            Could you please state your full name for

16   the record?

17       A.    Robert Walter Peterson.

18       Q.    Have you ever been deposed before?

19       A.    No.

20       Q.    I'm going to ask you some questions to find out

21   what you know about the facts giving rise to your claims.

22   I'd like to take you through some instructions for this

23   deposition.

24            Obviously all of your answers must be
```

Robert W. Peterson

281

1  verbal, since the court reporter cannot take down head

2  nods or other body language.

3          You have to answer the questions truthfully

4  and completely.  You must provide testimony just as if

5  you were in court today testifying under oath.

6          If you do not hear a question, just let me

7  know and I'll repeat it.  If you don't understand a

8  question, just say so and I'll rephrase it.  If you

9  realize that an earlier answer you gave was inaccurate or

10  incomplete, just say that you want to correct or

11  supplement your earlier answer and you will be allowed to

12  do so.

13          If you want to stop to use the restroom or

14  stretch or get a drink, just say so and we can take a

15  short break.

16          If you don't know or remember the answer to

17  a question I'm asking, just say that.

18          You cannot talk to your attorney during the

19  deposition or discuss your testimony until the deposition

20  is concluded.  You cannot seek advice from your attorney

21  during the deposition unless it relates to a question of

22  privilege.

23          If you answer the question, I will assume

24  that you have heard it and understood it and have given



282

1    me your best recollection and answer.

2            Do you understand all the instructions I

3    have just given you?

4        A.    Yes, I do.

5        Q.    Are you taking any medication that could

6    possibly impair your ability to understand or answer

7    these questions?

8        A.    No.

9        Q.    What did you do to prepare for this deposition?

10        A.    Mostly just looked over some information that I

11    had, and, other than that, I didn't prepare much.    Talked

12    to some folks that had already been deposed.

13        Q.    Who did you talk to?

14        A.    Karen Masino and that's it.

15        Q.    Did you talk to your attorney?

16        A.    Yes.

17        Q.    Did you meet with him?

18        A.    This morning, yes.

19        Q.    For how long did you meet?

20        A.    Half an hour.

21        Q.    You said you reviewed some information.    What

22    information did you review?

23        A.    Just reviewed the documents that I had sent to

24    my attorney.    In particular, a couple documents.

Robert W. Peterson

283

1      Q.      Are those the documents that have been produced
2   to CSC?
3      A.      Yes.
4      Q.      Was anyone else present when you met with
5   Mr. Wilson?
6      A.      No.
7      Q.      Did you bring any documents with you today?
8      A.      Yes.
9      Q.      Are those the documents that have been produced
10  to --
11     A.      Yes.
12     Q.      Please let me finish my question before you
13  answer.
14     A.      Okay.
15     Q.      It makes it easier for the court reporter to
16  get everything down.
17     A.      All right.
18     Q.      Your only claim in this dispute is that CSC
19  violated the Delaware Wage Payment Act; is that correct?
20     A.      As I understand it, yes.
21     Q.      Let's go through some background.  What's your
22  Social Security number?
23     A.      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.
24     Q.      Where were you born?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0296

Robert W. Peterson

284

1     A.     Brockton, Massachusetts.

2     Q.     When was that?

3     A.     January 23rd, 1954.

4     Q.     What's your current address?

5     A.     2817 West Lexington Way, in Edmond, Oklahoma.

6     Q.     How long have you lived there?

7     A.     Two years.

8     Q.     Do you rent or own?

9     A.     Own.

10    Q.     Does anyone else live there with you?

11    A.     My wife.

12    Q.     How long have you been married?

13    A.     Twenty-eight years.

14    Q.     Where did you live before your present address?

15    A.     I lived briefly in Newark, Delaware, 17-A --

16    it's an apartment.  King Circle.  We also lived at

17    5 Meadow Wood Lane in Landenberg, Pennsylvania, before

18    that.

19    Q.     Do you have any children?

20    A.     Two, yes.

21    Q.     Have you ever been arrested?

22    A.     No.  Yes.  Once.  For speeding.

23    Q.     When was that?

24    A.     That was in 1977.  Somewhere in there.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

285

1      Q.    Have you ever pled guilty to a charge or felony

2   or misdemeanor?

3      A.    No.

4      Q.    Were you ever in the military?

5      A.    No.

6      Q.    When did you first contact an attorney to

7   handle this case against CSC?

8      A.    I don't exactly remember.  It was probably six

9   months or so after the item in question or the situation

10  in question.

11     Q.    So approximately when would that have been?

12     A.    January/February, somewhere in there, of 2004.

13     Q.    Who did you contact?

14     A.    Who did I contact?  Margolis Edelstein.

15     Q.    How did you choose them?

16     A.    As part of other people who were choosing them.

17  So I joined them.

18     Q.    How did you know other people were choosing

19  them?

20     A.    Received a letter asking me if I wanted to be a

21  part of it.

22     Q.    Who sent you the letter?

23     A.    The attorney.  I think.  I don't remember.

24     Q.    What is your fee relationship with your present



WILCOX & FETZER LTD.
Registered Professional Reporters