1    attorney?

2       A.    I don't know exactly.  We have a written

3    agreement.

4       Q.    Have you produced that agreement to CSC?

5       A.    I have not personally, no.

6       Q.    Can you produce that, please?

7             MR. WILSON:  If you ask for it, we will

8    give it to you.

9             MR. SEEGULL:  I think we have asked for it

10   before.

11            MR. WILSON:  I'll have to go back and look.

12            MR. SEEGULL:  Let's make sure we get that

13   produced.  Obviously it's going to be the same agreement,

14   I presume, for each plaintiff?

15            MR. WILSON:  Yes.

16            MR. SEEGULL:  Let's just get it produced so

17   we don't have to go through this every time.

18            MR. WILSON:  Okay.

19            MR. SEEGULL:  Thanks.

20   BY MS. BOYD:

21      Q.    Have you paid anything to your attorney yet?

22      A.    No.

23      Q.    Have any lawsuits ever been filed against you?

24      A.    No.

1     Q.     Have you ever filed any other lawsuits?

2     A.     Not that I recall, no.

3     Q.     Have you ever declared bankruptcy?

4     A.     No.

5     Q.     Have you ever made a claim for unemployment

6     benefits or insurance?

7     A.     No.

8     Q.     Have you ever made a claim for workers'

9     compensation benefits or insurance?

10     A.     No.

11     Q.     Did you go to college, Mr. Peterson?

12     A.     Yes.

13     Q.     Where did you go?

14     A.     Oklahoma Christian University.

15     Q.     When did you graduate?

16     A.     1976.

17     Q.     What was your degree in?

18     A.     Mathematics.

19     Q.     Did you go to graduate school?

20     A.     No.

21     Q.     Have you attended any other education,

22     training, or specialty courses?

23     A.     Training as part of my business, yes.  Part of

24     my work, like management training, those kinds of things



Robert W Pederson

288

1    at DuPont and CSC.

2        Q.    That training was through the company you

3    worked for?

4        A.    Yes.

5        Q.    So you have gone through training with both

6    DuPont and with CSC?

7        A.    Yes.

8        Q.    Have you ever received any professional or

9    work-related certifications?

10        A.    Yes.  I was certified with Lotus -- what was it

11    called?  Lotus specialist, I believe.

12        Q.    Have you ever received any awards or honors?

13        A.    Yes.  As part of my job, yes.

14        Q.    What type of --

15        A.    Trying to remember.  Just awards around -- just

16    performance-related awards, training awards, those kinds

17    of things.

18        Q.    Related to specific jobs that you were involved

19    in?

20        A.    Yes.

21        Q.    Specific projects?

22        A.    Yes.

23        Q.    Do you have any memberships in professional

24    associations?



289

```
 1       A.    Yes.   ACM, Association of Computing Machinery.

 2       Q.    Anything else?

 3       A.    Not that I'm aware of.

 4       Q.    Where did you work immediately prior to working

 5  for CSC?

 6       A.    At DuPont.

 7       Q.    When did you begin working at DuPont?

 8       A.    1989.

 9       Q.    What was your position at DuPont?

10       A.    I was a manager.

11       Q.    What did that job entail?

12       A.    It entailed supervising individuals and

13  managing projects related to software and hardware.

14       Q.    What was your final salary at DuPont?

15       A.    Good question.   I don't know.

16       Q.    Were you in a bonus program?

17       A.    Yes.

18       Q.    For how many years of your employment were you

19  in the bonus program?

20       A.    From 1989 through '97.

21       Q.    So that's throughout your entire employment?

22       A.    Yes.   With DuPont, yes.

23       Q.    What was the bonus program called?

24       A.    I don't remember.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0302

Robert W. Peterson

290

```
 1        Q.      Were there any documents that set forth the

 2   bonus program?

 3        A.      Yes.

 4        Q.      What were those?

 5        A.      I don't know if they had a name.  There were

 6   management guidelines and compensation descriptions and

 7   things like that.

 8        Q.      Do you still have any of those documents?

 9        A.      No.

10        Q.      How did you learn about this bonus program at

11   DuPont?

12        A.      I learned about it when I was given it the

13   first time.

14        Q.      Did somebody tell you about it?

15        A.      Yes.  They said, "You are now part of our

16   management bonus program and here's your amount."

17        Q.      How were the bonuses calculated?

18        A.      I don't know in DuPont.

19        Q.      Were they awarded annually?

20        A.      Yes.

21        Q.      Were they awarded at the end of the fiscal

22   year?

23        A.      I'm not sure.

24        Q.      Who was eligible at DuPont for the bonus
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

291

1    program?

2        A.    I don't know that there were any set

3    guidelines.  It was at the discretion of management.  You

4    had to be a certain level to be there, to get on the

5    program, though.

6        Q.    How much was the bonus that you received?

7        A.    It was a 30 percent bonus.

8        Q.    Was it 30 percent every year?

9        A.    I don't recall.

10       Q.    Did everyone receive the same percent?

11       A.    No.

12       Q.    And the percentage decided was at the

13   discretion of management?

14       A.    It was decided when you first were put on the

15   program what your percentage would be and then as you got

16   promoted and things like that, that could be changed by

17   management.

18       Q.    When you say "percentage," you mean percentage

19   of your salary?

20       A.    Yes.  Yes.

21       Q.    When did you first start working for CSC?

22       A.    June of '97.

23       Q.    What was your first position at CSC?

24       A.    Trying to think of the name, the title.  Senior



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0304

292

1    consultant.

2        Q.      What group were you in?

3        A.      I was in the Chemical Group, chemical -- it was

4    Horizon Initiatives at the time.

5        Q.      When you joined, it was called Horizon

6    Initiatives?

7        A.      Yes.

8        Q.      It's now called Chemical Group?

9        A.      I don't know what it's called now, but we went

10   through some iterations of names.

11       Q.      How did the Horizon Initiatives Group fit into

12   the organizational structure of CSC at the time?

13       A.      I'm not sure I understand what you mean by

14   that.

15       Q.      Was it part of a larger business unit?

16       A.      I'm not sure.  My impression is that it

17   reported to a vice president of some level, a separate

18   group.

19       Q.      Who was your direct supervisor?

20       A.      At the time of transition?

21       Q.      Yes.

22       A.      I think it was Bill Fay.

23       Q.      Do you know who his supervisor was?

24       A.      Frank Cebula.



WILCOX & FETZER LTD.
Registered Professional Reporters

1 Q. Who was the ultimate head of the Horizon

2 Initiative Group?

3 A. I'm not sure.

4 Q. You're no longer employed at CSC?

5 A. That's correct.

6 Q. When did you leave?

7 A. June of 2004.

8 Q. Who was your supervisor at the time you left?

9 A. My direct supervisor was Gary Green.

10 Q. When you joined CSC, what was your starting

11 salary?

12 A. I don't recall.

13 Q. Do you recall your salary level?

14 A. I was a grade 6.

15 Q. Did you receive any AMIP bonuses when you

16 joined CSC?

17 A. Yes.

18 Q. When did you begin receiving them?

19 A. The first year I was part of CSC.

20 Q. In 1997?

21 A. Yes.

22 Q. Is that fiscal year 1997?

23 A. Good question.  We joined in '97, so it would

24 have been fiscal year '98, I believe.



WILCOX & FETZER LTD.
Registered Professional Reporters

294

```
 1        Q.      Did you receive any other types of bonuses at

 2   CSC?

 3        A.      I don't remember.

 4        Q.      What was your last position at CSC?

 5        A.      A manager.

 6        Q.      Who was your manager in fiscal year 2003?

 7        A.      I'm not sure.  It could have been either

 8   Val Rowan or John Barraclough.

 9        Q.      They were your managers throughout that year?

10        A.      As far as I know, yes.

11        Q.      What about fiscal year 2004?

12        A.      Gary Green became my manager after Val retired.

13   So somewhere in there Gary was probably -- I don't know

14   if he was the whole year or not.

15        Q.      What was your final salary at CSC?

16        A.      About 102,000.

17        Q.      When you transferred from DuPont to CSC, did

18   you receive any correspondence or documentation?

19        A.      Yes.

20        Q.      What did you receive?

21        A.      An offer letter with information about my

22   offer.

23                (Deposition Exhibit No. 20 was marked for

24   identification.)
```



1    BY MS. BOYD:

2        Q.    I'm handing you what's been marked as

3    Exhibit 20.  Do you recognize this document?

4        A.    Yes.

5        Q.    What is it?

6        A.    It looks like the offer letter to offer

7    employment.

8        Q.    Does this letter say anything about a bonus

9    program?

10        A.    Yes.

11        Q.    Does it guarantee that you will be eligible to

12    participate in this program for your entire career at

13    CSC?

14        A.    No.

15        Q.    You can hand that back to me.

16                You were an at-will employee at CSC; is

17    that correct?

18        A.    I guess.  I don't know what that means.

19        Q.    You didn't have an employment contract, did

20    you?

21        A.    That's a contract, isn't it?

22        Q.    You believe this is an employment contract?

23        A.    That's what I assumed it to be.  They offered

24    me employment.



WILCOX & FETZER LTD.
Registered Professional Reporters

296

1    Q.    Do you have any other contracts?

2    A.    No.

3    Q.    When you worked at CSC, you could quit your job

4    at any time; is that correct?

5    A.    That's correct.

6    Q.    And CSC could terminate you at any time; is

7    that right?

8    A.    I would assume for cause, yes.

9    Q.    Could they terminate you for any reason?

10    A.    I don't know.

11    Q.    CSC could change the terms and conditions of

12    your employment for any reason; is that right?

13    A.    What do you mean by "any reason"?  I guess I

14    need to understand what that means.  I would assume there

15    would be a valid reason for doing that.

16    Q.    Before you transferred from DuPont to CSC, did

17    DuPont hold any meetings about the transfer?

18    A.    Yes.

19    Q.    When was that?

20    A.    Many meetings prior to the transition, the

21    actual transition, to inform employees of what was going

22    to happen.

23    Q.    Who presented at these meetings?

24    A.    I remember some HR people.  I don't remember

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0309

Robert W. Peterson

297

```
 1    their names.
 2         Q.    About how many meetings were there?
 3         A.    Probably recall two or three.
 4         Q.    These meetings were conducted by DuPont HR
 5    employees?
 6         A.    Yes.  We also met with CSC people during the
 7    transition.
 8         Q.    Who did you meet with from CSC?
 9         A.    I don't remember names.
10         Q.    Who attended the meetings?
11         A.    Most DuPont employees who were affected by the
12    change.
13         Q.    What was the purpose of the meetings?
14         A.    Just to inform people of the benefits and what
15    was going to happen during the transition to inform you
16    whether you wanted to make the transition or not.
17         Q.    You said benefits were discussed.  What was
18    discussed about benefits?
19         A.    What I remember is things like, as in the offer
20    letter, there was some increases in salary to cover
21    things like disability, the differences in the various
22    amounts you'd pay, and what the health benefit
23    differences might be and things like that.
24               What I remember is the overall tone being
```



298

```
 1   assuring DuPont employees that whatever benefits you had

 2   at DuPont would be carried over to CSC and that

 3   adjustments were made to make sure that that would keep

 4   you whole.

 5        Q.    Were bonus programs discussed?

 6        A.    Only on an individual basis.  Not as a whole

 7   group of people in a meeting.

 8        Q.    They weren't discussed at meetings?

 9        A.    I'm sure someone discussed it with me

10   individually.

11        Q.    Do you remember who that was?

12        A.    No.  Probably would have been my manager,

13   but...

14        Q.    What did they tell you?

15        A.    I don't remember.

16        Q.    Were any documents provided at these meetings?

17        A.    Yes.

18        Q.    Do you still have any of them?

19        A.    Possibly.  I don't have them with me.

20        Q.    Did your manager provide you any documents at

21   that individual meeting you referenced?

22        A.    No, I don't recall.

23        Q.    Did you participate in any orientation when you

24   began working at CSC?
```

Robert W. Peterson

1    A.    Yes.

2    Q.    Who conducted that?

3    A.    I don't recall.

4    Q.    When was that?

5    A.    Around the time of transition.  I don't know

6    exact dates.

7    Q.    Were bonuses discussed during the orientation?

8    A.    I don't remember.

9    Q.    What does AMIP stand for?

10    A.    Annual Management Incentive Program.

11    Q.    What is it?

12    A.    What is AMIP?

13    Q.    What is AMIP?

14    A.    It is an incentive program that is distributed

15    annually to people who are on the AMIP list, you might

16    say, that have been designated as earning that amount,

17    that compensation.

18    Q.    How do you get to be on the AMIP list?

19    A.    Couple ways.  One was as a part of the

20    transition, we were kind of grandfathered onto it.  You

21    could also go through a process each year where I know as

22    I went through performance appraisals with my people and

23    my management, we talked about the last phase of that as

24    being who needed to be -- who was justified, perhaps, in

300

1    being added to the AMIP list and receiving it and who may

2    need to be taken off.

3            So what I normally did was write up a

4    justification for an employee if I felt that they

5    deserved being put on the Management Incentive Program.

6    And then my management then took it to his management and

7    discussed whether or not that person should be added to

8    the list or not, depending on budget guidelines and what

9    was available in the budget.

10    Q.    So you had a role in deciding who was placed on

11    the AMIP?

12    A.    Yes.  I made recommendations.

13    Q.    For the people that you managed?

14    A.    Yes.

15    Q.    How many people did you manage?

16    A.    Anywhere from five to forty.  At different

17    times.

18    Q.    What is the plan that controls how AMIP is

19    implemented?

20    A.    There's a management -- there is a compensation

21    plan that is published.

22    Q.    Who publishes it?

23    A.    CSC.

24    Q.    How do you receive that?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0313

1    A.    If you're a manager and you have authority over

2    deciding raises and promotions, then you get a copy.

3    Q.    So are these documents, this management

4    document you're referring to, is that Chemical Group

5    management guidelines?

6    A.    I'm not sure if it's just Chemical Group only

7    or CSC as a whole.

8    Q.    Who did you receive those from?

9    A.    My management.  HR department I think would

10    e-mail them to managers because we needed them to

11    understand the guidelines for raises and promotions each

12    year.

13    Q.    So you received a new copy of this each year?

14    A.    Uh-huh.

15    Q.    Is that for each fiscal year?

16    A.    Yes.  Most years.  I wouldn't say every year.

17    I would say -- I can recall a couple years the last two

18    years I was with CSC definitely receiving them.

19    Q.    You said these were compensation guidelines?

20    A.    Yes.

21    Q.    Did they cover compensation in addition to the

22    AMIP program?

23    A.    Yes.

24    Q.    What else did they cover?



302

1      A.    Different salary grade levels, what the ranges

2 were for each one, the midpoint and all those kind of

3 things and how you decided what percentages each person

4 might be eligible for for annual raises, merit raises.

5      Q.    So you relied on these guidelines when you were

6 figuring out how to determine AMIP for the people you

7 managed?

8      A.    Yes.  Actually, I had nobody reporting to me

9 who got AMIP.

10      Q.    These guidelines were used to determine your

11 AMIP bonus, as well?

12      A.    Yes.  General guidelines, yes.

13      Q.    In addition to that document, can you point to

14 any other documents where the terms of AMIP were spelled

15 out?

16      A.    Yes.  Each year we received information about

17 our AMIP when I received mine, for example, and I have

18 one document that I showed Tim this morning that we

19 can -- you can see the criteria and the percentages for

20 each criteria and my percentage and those kind of things.

21 It was a calculation document.

22      Q.    Is this an AMIP worksheet that you're referring

23 to?

24      A.    Yes.  It was an online worksheet.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    How did you receive that?

2    A.    The HR department gave me access to it in the

3    system and I printed out a copy just because I wanted to

4    understand how it worked.

5    Q.    Did you produce that document to CSC?

6    A.    I produced it to my attorney.

7    Q.    What time of year did you receive that

8    worksheet, generally?

9    A.    Generally it was at the time that I was

10   notified of my AMIP check, how much I was going to

11   receive.  So it would have been the May/June time frame.

12   Q.    So you received that and it showed you how your

13   AMIP check that you were getting was calculated?

14   A.    That's correct.  Told me the amounts, what it

15   would be.

16   Q.    What is an AMIP bonus?

17   A.    What is an AMIP bonus.  It's a bonus that's

18   based on various factors, company performance, individual

19   performance, those kind of things, and those things

20   change each year, and it is variable compensation we call

21   it at DuPont where it would change from year to year

22   depending on how those factors played out.

23   Q.    It amounts to a percentage of your salary,

24   correct?



Robert W. Peterson

304

1          A.     Yes.   There's an upper limit.

2          Q.     You said it's based on a number of different

3    factors?

4          A.     Yes.

5          Q.     That change each year?

6          A.     They could change.

7          Q.     They include corporate objectives?

8          A.     Yes.

9          Q.     Personal objectives?

10         A.     They could.  Sometimes they did, sometimes they

11   didn't.

12         Q.     Financial factors?

13         A.     Yes.

14         Q.     Or nonfinancial factors?

15         A.     Uh-huh.

16         Q.     Those factors are measured for the entire

17   fiscal year, right?

18         A.     Yes, I guess.

19         Q.     That fiscal year runs from April 1st to

20   March 31st?

21         A.     Yes.  I would say that they are tracked through

22   the year as opposed to being just measured once.

23   Calculated at the end of the year because you don't know

24   what they are till the whole year is over, but you're

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0317

305

1   watching those numbers throughout the year as much as you

2   have effect on them.  Personal goals, for example, I

3   would track them on my own -- with my management.

4       Q.    So you need to know those factors on the

5   worksheet to calculate your AMIP?

6       A.    Yes.  Actually it was calculated for me.

7       Q.    Did you know of the factors before you received

8   your bonus at the end of the year?

9       A.    Before I received the bonus, yes, usually.

10      Q.    How did you know that?

11      A.    The worksheet was shown to me and said this is

12  what you will be receiving and here's the calculations

13  that made up that.

14      Q.    So the worksheet was shown to you prior to the

15  end of the fiscal year, so you would --

16      A.    No.  It was usually shown to me after the end

17  of the fiscal year because the calculation was made at

18  the end of the fiscal year.

19      Q.    Did you know prior to the end of the fiscal

20  year what you were supposed to be working towards that

21  year?

22      A.    Usually.  And it normally was not until about

23  halfway through it that we actually nailed down some

24  goals, and those goals would change.



WILCOX & FETZER LTD.
Registered Professional Reporters

Robert W Peterson

306

1      Q.    How did you receive that information?

2      A.    My manager usually talked to me about it or

3 maybe through an e-mail, these are the group goals that

4 we have established this year.

5      Q.    Did you know what the corporate goals were?

6      A.    Usually about the same time that the group

7 goals were established the corporate goals were.  Not

8 always.

9      Q.    Who sent you the corporate goals?

10     A.    My management usually did.

11     Q.    So somewhere midway through the year you would

12 know the goals or objectives that would factor into your

13 ultimate AMIP bonus?

14     A.    Yeah, and that midway through the year changed

15 different times.  Sometimes my manager and I would

16 discuss my personal goals prior to that or after that.

17     Q.    How do you calculate an AMIP bonus?

18     A.    I didn't calculate it.  It was calculated for

19 me, as I said.  Normally you took multiple factors.  You

20 had an upper limit, say -- in my case it was 30 percent

21 of my salary was a potential.  And then each of the

22 factors were -- say an operating income goal might be

23 10 percent, another goal might be 20 percent.  As those

24 goals were set out, the degree of reaching that goal was

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0319

1    calculated in a percentage and a mathematical calculation

2    was made to say you might get, say, 90 percent of your

3    total AMIP.  So it was all calculated out.

4                    Also, there was a proration factor that was

5    built in for the number of months that you were on the

6    AMIP.

7        Q.    When you say "built in," what do you mean by

8    that?

9        A.    In the worksheet there is a field that is the

10   number of months for prorating AMIP.  In my case it was

11   12, the sheet that I gave him because I was eligible for

12   the entire year.

13       Q.    The AMIP bonus was designed to incentivize the

14   people on the program to work towards the corporate and

15   individual goals, right?

16       A.    Yes.

17       Q.    Do you know of anyone who received an AMIP

18   bonus but was never told about their goals?

19       A.    I don't recall anyone, no.  I would say none of

20   my people did.  I told them if they were eligible.

21       Q.    How did the people you managed know if they

22   were eligible?

23       A.    I would discuss their goals with them.  And if

24   they were added to the list, then around the May/June



1    time frame we informed them that, congratulations, you've

2    been added to the list.  If they were taken off the list,

3    we would say I'm sorry to inform you that you were taken

4    off the list for these reasons.

5        Q.    So you would tell them at the end of the year?

6        A.    I would tell them at the time that they

7    received any salary changes, here's your rating, here's

8    your new raise if you got one, and you're either on the

9    list or not.  If I didn't tell them anything, they were

10   to assume they were still on the AMIP list.

11       Q.    In what fiscal years did you receive AMIP

12   bonuses?

13       A.    Every fiscal year from '97 on to -- yeah, '97

14   to 2004.

15       Q.    What was the amount --

16       A.    Except for the one in question here.

17       Q.    What was the amount of the bonus you received?

18       A.    It varied.  Different amounts in different

19   years.

20       Q.    What was the range?

21       A.    I'm not sure of the exact range.  Sometimes it

22   was 100 percent of the 30 percent of my salary and

23   sometimes it was less.

24       Q.    For each of those years you received an AMIP



**WILCOX & FETZER LTD.**
Registered Professional Reporters

309

1    you had discussed with your manager your goals; is that

2    right?

3        A.    At some point in the year, yes.

4        Q.    You had received the corporate objectives?

5        A.    At some point in the year, yes.

6        Q.    When did you generally receive your AMIP bonus

7    payment?

8        A.    Generally it was in a June or July paycheck, I

9    believe.

10       Q.    So after the close of the fiscal year?

11       A.    Yes.

12       Q.    Why was it after the close of the fiscal year?

13       A.    You had to calculate it first and then put it

14   through the payroll system and also had to go through a

15   performance appraisal for the prior year to see what

16   level you would be compensated for.  You had to also

17   calculate whether you made your goals and whether the

18   company made their goals.

19       Q.    So the company waited till the end of the

20   fiscal year?

21       A.    Yes.  To calculate the operating income goals

22   and things like that because the books weren't closed

23   till then.

24       Q.    When were you notified that you would no longer



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0322

310

1    be eligible for participation in AMIP?

2        A.    I think the letter was September 11th, 2003.

3    I'm not sure.

4        Q.    Who told you this?

5        A.    I received a letter and also my manager,

6    Val Rowan, told me.

7        Q.    Did you receive a letter in the mail?

8        A.    I don't remember if it came in the mail or it

9    was handed to me personally.

10       Q.    When did Ms. Rowan meet with you?

11       A.    I don't know exactly when.

12       Q.    What did she tell you?

13       A.    She told me I was being taken off of the AMIP

14   list and there will be a letter or she gave me the

15   letter -- I don't remember if I received it in the mail

16   or she gave it to me, saying that I was no longer to

17   receive the AMIP bonus.

18       Q.    That was around September of 2003?

19       A.    Around there, yes.

20       Q.    So you understood at that time that you

21   wouldn't be receiving an AMIP bonus at all?

22       A.    Correct.

23       Q.    You're requesting from CSC a prorated bonus

24   from the beginning of the fiscal year, April 1st, through

Robert W. Peterson

311

1    the time that you were notified?

2        A.    Yes.

3        Q.    And you estimate that that's sometime in

4    September 2003 that you were notified you were no longer

5    on the AMIP bonus?

6        A.    Around September 11th, yes.  Whenever the date

7    on the letter was.

8                (Deposition Exhibit No. 21 was marked for

9    identification.)

10   BY MS. BOYD:

11       Q.    You just received Exhibit 21.  Do you recognize

12   that document?

13       A.    Yes.

14       Q.    What is it?

15       A.    It's the letter that we were just talking

16   about.

17       Q.    The September 11th, 2003, letter?

18       A.    Yes.

19       Q.    You were told that you were eligible for a

20   discretionary bonus?

21       A.    Yes.  Yes.

22       Q.    You were also told that you might be eligible

23   for AMIP in the future, right?

24       A.    That's true.

312

1    Q.    I'm handing you what has previously been marked

2  Exhibit 4.    Earlier you told me that you received a

3  letter that caused you to contact Margolis Edelstein?

4    A.    Yes.

5    Q.    Is that the letter you were referring to?

6    A.    It looks like it, yes.

7    Q.    You say that you did not know who wrote that

8  letter?

9    A.    That's correct.

10    Q.    You didn't have anything to do with

11  distributing this letter?

12    A.    No.

13    Q.    Your performance reviews don't have anything to

14  do with this dispute, do they?

15    A.    No.

16    Q.    Other than the letter and your conversation

17  with Val Rowan, were there any other communications you

18  had with CSC about your removal from AMIP?

19    A.    I can't recall anything specific.

20    Q.    Did you receive any documents about that

21  removal other than this letter?

22    A.    Not that I know of.

23    Q.    Prior to your conversation with Val Rowan and

24  receiving this letter, did you receive the corporate



**WILCOX & FETZER LTD.**
Registered Professional Reporters

313

1   objectives for fiscal year 2004?

2       A.    I don't remember.

3       Q.    Did you receive any objectives for fiscal year

4   2004?

5       A.    I don't recall that, either.   I believe that I

6   discussed them with Val, but I don't know exactly when

7   that was.

8       Q.    You don't remember if it was before or after

9   this letter?

10      A.    I do not, no.

11      Q.    Even though you were removed from AMIP, you

12  still performed your job according to CSC's expectations?

13      A.    Yes.

14      Q.    You didn't change your job performance just

15  because you didn't receive an AMIP bonus, right?

16      A.    No.   I would say that I probably -- I like to

17  work hard and do a good job.   Probably maybe some extra

18  effort because I was not being compensated for that.

19  Probably didn't work as many hours, those kinds of

20  things, but it wasn't conscious to say I'm going to stop

21  working for CSC.

22      Q.    You still did everything that was expected of

23  you?

24      A.    Yes.



B-0326

314

```
 1        Q.      You never received a completed AMIP worksheet

 2   for fiscal year 2004?

 3        A.      That's correct.

 4        Q.      What are your damages in this case?

 5        A.      The money that I did not receive for the six

 6   months that's in question here, I think.  I have a plane

 7   ticket it took to get me here.  And any attorneys' costs

 8   and those kinds of things.

 9        Q.      How much do you estimate your damages are for

10   those six months?

11        A.      Around $15,000.

12        Q.      How did you get to that number?

13        A.      I took my 30 percent that was eligible and then

14   took the amount of time -- amount in question from April

15   to September and then calculated it from that standpoint.

16   About half.

17        Q.      So you took 30 percent of your salary?

18        A.      Yes.  And half of that.

19        Q.      Took half of that.  That's just an estimate,

20   right?

21        A.      Yes.

22        Q.      Because you didn't have the factors --

23        A.      I don't have the factors, that's correct.

24        Q.      It would be impossible for you to come up with
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1   a final number of what you would have received had you

2   not been removed from AMIP?

3       A.      That's right.

4       Q.      You don't know what metrics or factors were

5   used to calculate the AMIP bonuses in fiscal year 2004?

6       A.      Not exactly, that's right.  I know what was

7   used to calculate prior years, but not that year.

8       Q.      You took 30 percent of your salary to get to

9   your estimate.  There are lots of ways you could have

10  come up with an estimate; is that right?

11      A.      Uh-huh.  Yeah, if I knew the factors, I could

12  have added in there.  If I knew the percentage that CSC

13  paid out, I could have multiplied it times that.  I took

14  a guess that that was 97 percent or something like that.

15      Q.      You didn't always receive 30 percent of your

16  salary?

17      A.      Not always.

18      Q.      You just picked an arbitrary way of calculating

19  what you think your AMIP --

20      A.      It was an estimate.

21              MR. WILSON:  Object to form.

22      Q.      Excuse me?

23      A.      It was an estimate.

24      Q.      You don't know exactly what motivated CSC to



316

```
 1   remove you from AMIP in fiscal year of 2004, do you?

 2        A.    Correct.

 3        Q.    It wasn't a personal decision about you, was

 4   it?

 5        A.    As far as I know, that's true.

 6              MR. WILSON:  Object to form.

 7        Q.    CSC removed all people at your salary level in

 8   your group?

 9        A.    I don't know that.  I understand that some

10   people were not removed or put back on.

11        Q.    Who do you know that wasn't removed?

12        A.    I don't know of specific people.  I just heard

13   rumor.

14        Q.    You heard a rumor that some people in your

15   salary level were not removed?

16        A.    Are still on, right.

17        Q.    Who did you hear the rumor from?

18        A.    Don't know.

19        Q.    When did you hear the rumor?

20        A.    Somewhere between the time after the letter and

21   when I left CSC.  I don't recall exact dates.

22        Q.    Fiscal year 2003 was a tough year for CSC,

23   correct?

24        A.    Okay.
```



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0329

317

1    Q.    Is that correct?

2    A.    Yes, as far as I recall.

3    Q.    The company has a right to make decisions to

4    save money, right?

5    A.    That's correct.

6    Q.    And the right to make decisions to increase

7    profits?

8    A.    That's correct.

9    Q.    And the company's entitled to use its business

10   judgment to determine the best way to save money and

11   increase profits, right?

12   A.    That's correct.

13   Q.    Your problem in this lawsuit is that you don't

14   think you should have been removed from AMIP because of

15   your contributions to CSC, correct?

16   A.    That's not correct.

17   Q.    Explain to me, then.

18   A.    My problem is the timing of it.  I don't have

19   an issue with removing me from AMIP when I am informed

20   when the action has happened.  But retroactively is an

21   issue with me.

22   Q.    So then you don't have a problem with CSC

23   removing people from AMIP?

24   A.    No.



WILCOX & FETZER LTD.
Registered Professional Reporters

318

1    Q.    The company started planning and discussing

2  removing people from AMIP early in that fiscal year,

3  right?

4    A.    I have no knowledge of that.

5    Q.    CSC didn't make a hasty decision to remove

6  people from AMIP?

7    A.    I don't know that, either.

8            MR. WILSON:  Object to form.

9    Q.    AMIP was originally intended to reward upper

10  management for direct contributions to the company,

11  right?

12    A.    Correct.  I guess.  I don't know what AMIP was

13  originally intended for at CSC.

14    Q.    Did you speak to anyone at CSC about your

15  removal from the AMIP program?

16    A.    My management.

17    Q.    Who was that?

18    A.    Val Rowan.  I probably talked to

19  John Barraclough about it.

20    Q.    Who is John Barraclough?

21    A.    He's Val's -- trying to remember if he was

22  Val's manager or not.  Depends.  Lots of things changed

23  in there as to who reported to who.  He was my manager at

24  one point and Val and I all reported to John at one point

Robert W. Peterson

319

1    in time.

2        Q.    When did you speak to John Barraclough?

3        A.    I don't know exactly when.

4        Q.    What did you speak to him about?

5        A.    Don't know exactly what the conversation was,

6    either.

7        Q.    Was it about your removal from AMIP?

8        A.    Probably a question about why did this happen.

9        Q.    Did you speak to anyone in addition to

10   Mr. Barraclough and Ms. Rowan?

11       A.    Don't remember.

12       Q.    Did you speak to any of the plaintiffs?

13       A.    At the time, no.  I didn't know who the

14   plaintiffs were.

15       Q.    Did you speak to anyone in Human Resources?

16       A.    I did not.

17             MS. BOYD:  Why don't we take a brief break.

18             THE WITNESS:  Okay.

19             (A recess was taken.)

20   BY MS. BOYD:

21       Q.    I just want to ask you a few follow-up

22   questions.

23             You said you were arrested for speeding.

24       A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

320

1     Q.    Could you tell me a little more about that?

2     A.    Sure.  I was actually a camp counselor, church

3  camp counselor, before I graduated from college and was

4  on a day off with some friends, and there was a bunch of

5  little roads that kind of fed into a four-lane, six-lane

6  highway, and I didn't know what the speed limit was.

7  This was back a long time ago.

8           Basically I didn't know what speed limit

9  was.  I was going too fast.  A cop had followed us and I

10  was going over the speed limit.  So I was an out-of-state

11  driver.  I was in Maine and I was enough over the speed

12  limit that he said he has to take me in.  Bailed out.  I

13  went to the judge and paid the fine.

14     Q.    Earlier we talked about what documents you

15  reviewed in preparation for this deposition.  Could you

16  tell me again exactly which documents you reviewed?

17     A.    The only one we looked at -- that I looked at

18  in the last few days was a document that calculated my

19  AMIP for fiscal year 2003, I believe.

20     Q.    You said you reviewed a few documents in

21  particular.  Which documents were those?

22     A.    The only one I looked at recently was that one

23  document.  So I amend my comments to that.

24     Q.    So the only documents you reviewed in

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0333

321

1    preparation for this deposition were the documents for

2    your fiscal year 2003 AMIP worksheet?

3        A.    Correct.

4        Q.    You mentioned that you had received some

5    awards.

6        A.    Uh-huh.

7        Q.    Could you tell me a little more about your

8    awards?

9        A.    Man, it was a while back.  I remember receiving

10   some when I first came to DuPont, mainly for -- I think

11   there were peer awards that were given out.  People gave

12   each other awards, those kind of things.  Minimal

13   compensation.  You might get a gift certificate to a

14   restaurant or something like that.  We did some diversity

15   programs and some things like that where I was

16   participating in those and got some awards for that.  I

17   can't recall anything exact.

18       Q.    Did you receive any awards at CSC?

19       A.    I can't remember.

20       Q.    What was your level at DuPont at the time you

21   transferred?

22       A.    A level 6.

23       Q.    You said earlier that the DuPont bonus plan was

24   discretionary.  Is that correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

322

1      A.    It was given to people at management

2   discretion, whatever that meant.  It meant criteria and

3   given it, yes.  When I came to DuPont, I was not promised

4   any kind of bonus, but I was given one after the first

5   year.

6      Q.    That was purely based on management's decision?

7      A.    And my performance and what they thought I

8   deserved.

9      Q.    How did they calculate whether or not you

10  deserved the bonus?

11     A.    I have no idea.

12     Q.    I understand that you said that, at the time

13  you received your AMIP bonus payout, you received an AMIP

14  worksheet that showed how the bonus was calculated.  Is

15  that correct?

16     A.    Sometimes, yes.  Not every year.

17     Q.    When didn't you receive it?

18     A.    I don't know any particular years.  I know I

19  have a copy of it for fiscal year 2003, I believe.

20     Q.    You don't know if you received it for any other

21  year?

22     A.    Right.

23     Q.    If you didn't receive the AMIP worksheet, how

24  did you know how your AMIP was calculated?



WILCOX & FETZER LTD.
Registered Professional Reporters

323

1      A.    We discussed it with management.   It was a

2  generic discussion.   We didn't necessarily go into all

3  the details of the calculation.   I remember receiving the

4  2003 one, thinking this is the first time I have seen the

5  actual numbers, each component.

6      Q.    You said you were given access to that online?

7      A.    Yes.

8      Q.    Earlier in the year, before you received your

9  completed AMIP worksheet, you said your manager would

10 come and talk to you about your goals and objectives for

11 the year.

12     A.    I would normally produce goals that we agreed

13 upon to as a part of doing your job.

14     Q.    Your manager would lay out the factors that

15 would be used to calculate your AMIP bonus?

16     A.    Sometimes it was for AMIP, sometimes it was

17 just general goals which I was expected to meet, yes.

18     Q.    Did you know from that conversation how your

19 AMIP bonus would be calculated?

20     A.    No, not from that conversation.

21     Q.    How did you know?   How did you know what your

22 goals were in order to obtain an AMIP bonus?

23     A.    They were usually given to us because most of

24 the time they weren't personal goals.   They were



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

324

1    corporate goals or group goals.  They were given to us to

2    make certain objectives sometime in the year.  Usually

3    September/October time frame.

4        Q.    Who gave that to you?

5        A.    My manager.  We discussed them in a meeting.

6        Q.    And for fiscal year 2004, your manager was

7    Val Rowan?

8        A.    Yes, right.

9        Q.    Did you receive those objectives from Ms. Rowan

10   for --

11       A.    I don't recall that I did.

12       Q.    Those are the factors that would be used to

13   calculate your AMIP, correct?

14       A.    If I didn't receive them, I don't know if they

15   were or not.

16       Q.    So when you spoke to your manager at that point

17   earlier in the year, that was how you knew what you were

18   working towards for your AMIP bonus, correct?

19       A.    I guess I would clarify and say that my

20   managers and I -- usually they would initiate or I would

21   initiate I wanted goals to work toward, so I would work

22   with them to do goals.

23             Whether they were specifically for AMIP or

24   not wasn't always discussed.  Usually we were given the

1    goals after six months or so around AMIP that were the

2    corporate goals or the group goals, and that wasn't

3    decided by our upper management until then.   And we never

4    knew when we were going to have the exact goals that the

5    AMIP was calculated on.   They changed sometimes.

6       Q.    Before you had that conversation with your

7    manager or received the corporate information about the

8    corporate AMIP objectives, did you know what to work for

9    to receive an AMIP?

10      A.    I knew that, if I did a good job, I would

11   receive AMIP.

12      Q.    AMIP is based on specific factors, as we

13   discussed about earlier, right?

14      A.    Uh-huh.

15            MR. SEEGULL:  He's got to answer yes or no.

16   She can't take down head nods.

17            THE WITNESS:  I'm sorry.  Yes, as far as I

18   know.

19      Q.    AMIP is based on specific factors?

20      A.    Yes.

21      Q.    You testified earlier that those factors can

22   change from year to year?

23      A.    Yes.

24      Q.    And the weightings of those factors can change



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    from year to year?

2        A.    Absolutely.

3        Q.    The actual targets can change from year to

4    year, as well?

5        A.    Yes.

6        Q.    Those factors are used to actually calculated

7    the AMIP?

8        A.    Right.

9        Q.    That's a pretty specific calculation, isn't it?

10       A.    Yes.

11       Q.    You're testifying that, if you just did a good

12   job, you received an AMIP?

13       A.    We did not receive the calculations in most

14   cases until right before the compensation was given out.

15   I mean, we had an idea that there were some goals and

16   objectives, and in many cases we weren't sure exactly

17   what it was until February/March time frame, if that.

18   There was not a set time every year when those goals were

19   given to us.

20       Q.    You testified earlier that you did receive the

21   corporate objectives from management, correct?

22       A.    I guess I did, yes.

23       Q.    We discussed earlier that you would sometimes

24   speak to your management about recommending people you

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

327

1    managed for participation in AMIP?

2         A.    Yes.

3         Q.    And you also would speak to them about removing

4    people from AMIP?

5         A.    If that was necessary, yes.

6         Q.    Who did you speak to?

7         A.    Who did I speak to?  Generally it was either

8    John Barraclough, who was my manager for a while, or

9    Cindy Baker, who was my manager prior to John.

10        Q.    Who was removed?

11        A.    I never removed anybody that I remember on my

12   team.

13        Q.    Did you ever add anyone to AMIP on your team?

14        A.    I attempted to, and we were not successful.

15   And the reason given was budgetary constraints.  We only

16   could add so many people.

17        Q.    So you never had anyone added or removed to

18   AMIP from the people you managed?

19        A.    Not that I recall.

20        Q.    Who had authority to put people onto the AMIP

21   program?

22        A.    I'm not sure, but it wasn't me.  It was my

23   manager or the manager above that, and I'm sure they went

24   through a process at the vice president level or



WILCOX & FETZER LTD.
Registered Professional Reporters

1  something like that to add people.

2      Q.    Had you been successful, when would someone

3  have been added to the AMIP program?

4      A.    They would have been added about -- at the same

5  time that their merit increase would have been given.  So

6  it would have been a June/July-type addition.

7      Q.    If someone had been removed, when would they

8  have been --

9      A.    That same time period.

10      Q.    In June or July?

11      A.    Yeah, depending on how -- whenever the merit

12  raises were given out, usually you would say, okay,

13  you're eligible for AMIP at this time or not.

14      Q.    Do you know anyone who has been removed from

15  AMIP outside of the fiscal-year-2004 people?

16      A.    I can't recall anybody.  I know we discussed

17  people, but I don't recall specific names.

18      Q.    You say you discussed people?

19      A.    Yes.  After the performance appraisal at that

20  time of year, April/May time frame, we would discuss if

21  we felt somebody should be added or taken off the AMIP

22  program.  And then my manager would take those

23  recommendations to their management.

24      Q.    But you don't know if anybody was ever actually



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0341

329

1    removed?

2        A.    If someone was, I can't recall who it was and

3    when it was and what year.  I know we discussed that and

4    made recommendations.  Whether they were ever taken off,

5    I don't know.  They didn't report to me.

6        Q.    Do you know anyone who received a prorated

7    AMIP?

8        A.    Everybody that came from DuPont who was on AMIP

9    received a prorated AMIP.

10       Q.    Do you know if anyone received a prorated AMIP

11   after that?

12       A.    I can't say personal knowledge, no.  I know the

13   proration was part of the calculation.

14       Q.    Am I correct that the AMIP plan was in lieu of

15   the DuPont bonus plan?

16             MR. WILSON:  Object to the form.  "In lieu

17   of."

18   BY MS. BOYD:

19       Q.    I'll rephrase.  Am I correct that the AMIP plan

20   was designed to compensate DuPont employees for the

21   DuPont bonus plan?

22       A.    I would say yes.

23       Q.    And it was meant to be the same type of bonus

24   plan, correct?



330

1    A.    Yes.  It was to be an equal compensation.

2    Q.    And it was meant to be the same sort of

3  calculations in terms of the bonus?

4    A.    As far as I understand, yes.

5    Q.    Have we talked about all communications that

6  occurred about the DuPont transition to CSC?

7    A.    No.

8    Q.    All communications.  Have we talked about all

9  communications that you were a part of about the DuPont

10  transition to CSC?

11    A.    Not specifically.  I can't recall them all that

12  I was a part of.

13    Q.    Have we spoken about every communication that

14  you recall?

15    A.    That I recall, yes.

16    Q.    Have we talked about all the communications you

17  recall about the fiscal year 2004 AMIP revision?

18    A.    As far as I recall.

19    Q.    Have we discussed all the documents that you

20  received related to the fiscal year 2004 revision?

21    A.    Not all documents.

22    Q.    What other documents?  Are there any documents

23  that we haven't discussed related to the fiscal year 2004

24  revision that you received?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

331

1    A.    When you say "revision," what do you mean by

2    that?

3    Q.    When you say you were no longer eligible --

4    A.    That's the revision?  Okay.  As far as I

5    remember, yes.

6    Q.    We spoke about the compensation guidelines that

7    you received every fiscal year.

8    A.    Yes.

9    Q.    You said you received them from management?

10   A.    Yes.  I think HR distributed them to managers.

11   Q.    So you received them from HR?

12   A.    Yes.

13   Q.    Do you know who from HR you received them from?

14   A.    Not specifically.  It was an e-mail sent to

15   management.  So I don't remember who sent the e-mail.

16   Q.    You received the document by e-mail?

17   A.    Yes.  It was a pdf attachment.

18   Q.    Was it made available on the Internet?

19   A.    I'm not sure.

20   Q.    Were CSC's policies and procedures generally

21   made available to employees on the Internet?

22   A.    Generally, yes.  Not all employees received the

23   management guidelines for compensation.  There was an

24   employee version and a management version.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

332

1    Q.    Were the employee guidelines for compensation

2  available on the Internet?

3    A.    They were available.  I'm not sure if they were

4  on the Internet or not.

5    Q.    How would employees have received those

6  guidelines?

7    A.    They could have gotten them in a mailbox or

8  anything.  I don't know how.  I think it was an

9  electronic document, so it was either e-mailed to them or

10 available to them in, say, Lotus Notes database or on the

11 Internet.

12   Q.    You said that they might have been e-mailed

13 this document.  Who would have e-mailed it to the

14 employees?

15   A.    Probably HR.

16   Q.    Did you ever e-mail the document to anybody?

17   A.    I don't remember.  I might have when they

18 requested it.  If somebody said could I have a copy of

19 that, I said yeah, you could have the copy of the

20 employee manual.

21   Q.    What determined if someone received the

22 employee guidelines or the management guidelines?

23   A.    The employee guidelines, every employee should

24 have received that.  Management guidelines, only managers

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0345

Robert W. Peterson

333

1    who administered salary and needed access to the SALMAN

2    system and things like that would have received that.

3          Q.    You believe every employee would have received

4    the employee guidelines either by e-mail --

5          A.    Or at least had access to it, yes.

6          Q.    Every employee had access to the employee

7    guidelines?

8          A.    I would say no.  If not given to them on

9    request, they could get a copy.

10          Q.    And these employee guidelines we're talking

11    about, these are related to compensation; is that

12    correct?

13          A.    I believe so, yes.

14          Q.    What was the difference between the employee

15    guidelines and the management guidelines?

16          A.    The management guidelines -- I don't know

17    exactly.  Compare the documents.  But had some

18.    information about how to administer salaries that every

19    employee didn't need to know because they didn't do that

20    function.

21          Q.    Who do you believe has personal knowledge of

22    any matter concerning or relating to your allegations in

23    this lawsuit?

24          A.    My attorney and the people in the lawsuit with



W&F

WILCOX & FETZER LTD.

Registered Professional Reporters

334

1    me.  My wife.

2        Q.    Anyone else?

3        A.    No.  I probably have mentioned it why I'm here

4    to some friends, but in general terms, not any specifics.

5        Q.    Who exactly have you spoken to about this

6    lawsuit?

7        A.    Again, my attorney and the other plaintiffs.

8        Q.    What have you discussed with the other

9    plaintiffs?

10        A.    How things are going, what we feel about it.

11        Q.    Have you discussed what you would testify about

12    today?

13        A.    No.

14        Q.    Do you have any debts at the present time?

15        A.    Debts?

16        Q.    Debts.

17        A.    No.  Well, credit card debts and things like

18    that.  A home and a car.  Everything else I paid off.

19        Q.    So credit card debt, your home debt, and your

20    car debt and nothing else?

21        A.    Yeah.

22        Q.    You were involved in a CSC class-action

23    lawsuit; is that correct?

24        A.    Correct, I think.  If I know what you're

335

1    talking about, yes.

2        Q.    Gianetto v. CSC?

3        A.    Yes.

4        Q.    What was that lawsuit about?

5        A.    It had to do with overtime compensation.  I

6    know very little about it.

7        Q.    Did you receive any money as a result of the

8    lawsuit?

9        A.    A little bit, yes.

10        Q.    Other than what we have already discussed, have

11    there been any written, oral, or recorded statements

12    given by anyone in connection with this lawsuit?

13        A.    Not that I'm aware of.

14        Q.    Have you now told me everything you know or

15    remember that forms the basis of your case?

16        A.    Within the guidelines of the questions you

17    asked me, yes.

18        Q.    Is there any other information which you have

19    not mentioned which is relevant to supporting your

20    claims?

21        A.    That I have mentioned?  I don't think so.

22        Q.    Information that you have not mentioned.

23        A.    Or that I have not mentioned.

24            MR. WILSON:  Object to the form.



336

```
 1        Q.     Let me restate the question.
 2               Is there any information that you have not
 3   mentioned which is relevant to supporting your claims in
 4   this lawsuit?
 5               MR. WILSON:  Object to the form.  You can
 6   answer.
 7        A.     I don't think so.
 8        Q.     You believe you have told me everything that
 9   supports your claim in the lawsuit?
10               MR. WILSON:  Object to form.  You can
11   answer.
12        A.     I think so, yes.
13               MS. BOYD:  Nothing further.
14   BY MR. WILSON:
15        Q.     Mr. Peterson, I would like you to look at what
16   was marked as Exhibit 20.  You stated that's an offer
17   letter you received from CSC for employment?
18        A.     Yes.
19        Q.     Does the letter mention prorating of the AMIP
20   bonus?
21        A.     It does not.  Yes, it does.  Okay.  Prorated
22   for the current fiscal year, yes.
23        Q.     Can you tell us what it says about the
24   prorating in general terms?  You don't have to read it.
```

337

1    A.    General terms, it means that since I did not

2  join CSC at the beginning of the fiscal year, that, for

3  the time that I was employed with CSC, I would be

4  eligible for that percentage of the year for the AMIP.

5    Q.    Have you had any other experiences with CSC

6  regarding the prorating of the AMIP bonus?

7    A.    I have not.

8    Q.    Have you seen any documentation that mentions

9  prorating of the AMIP bonus other than Exhibit 20?

10   A.    Yes.    Calculation worksheet.

11           (Deposition Exhibit No. 22 was marked for

12  identification.)

13  BY MR. WILSON:

14   Q.    Mr. Peterson, can you tell us what Exhibit 22

15  is?

16   A.    This was my AMIP calculation for fiscal year

17  2003.  Mine in particular.  It shows my base salary, my

18  bonus potential, and the different weightings and how the

19  calculation was made.

20   Q.    You mentioned that this document mentions

21  prorating?

22   A.    Yes.

23   Q.    Where is that?

24   A.    Second column, next-to-last line there, it



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0350

338

1    says, "Proration by Eligible Months," and in my case it

2    was 12.

3          Q.    What is this indicative of to you?  Let me

4    rephrase that.

5                Does this indicate to you that AMIP ia

6    prorated by months?

7                MS. BOYD:  Objection.

8          A.    Yes.

9          Q.    You can answer.

10         A.    Yes.  It was built into the calculation.

11         Q.    So if you had not been on the AMIP program for

12   the full 12 months, would there have been another number

13   in this box?

14               MS. BOYD:  Objection.  Leading.

15               MR. WILSON:  You can answer.

16         A.    I would assume that that number meant the

17   number of months that I was on the AMIP program and that

18   the calculation would be affected by that number.

19         Q.    Looking at Exhibit 20 again, this is the offer

20   letter.  It mentions the AMIP program.  Was the AMIP

21   bonus part of your compensation package --

22         A.    Yes.

23         Q.    -- according to this letter?

24         A.    Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

Robert W. Peterson

339

1    Q.    Was the AMIP bonus program part of the deal

2   that you based your decision on to switch from DuPont to

3   CSC?

4    A.    Yes.

5          MS. BOYD:  Objection.  Leading.

6    Q.    Was the AMIP bonus an earned bonus?

7    A.    Yes.

8          MR. SEEGULL:  Objection.

9          MR. WILSON:  Who's objecting?

10         MS. BOYD:  Objection.

11  BY MR. WILSON:

12   Q.    Do you have to do certain things to earn this

13  bonus?

14   A.    Yes.

15   Q.    Can you tell me what those things were?

16   A.    They changed every year, but normally they had

17  to do with financial and personal performance goals.

18   Q.    You say "they changed every year."  How

19  drastically did they change?

20   A.    That's a judgment call, I guess.  I didn't

21  think they changed drastically.  It had to do with what

22  was important for the company that year.  So those kinds

23  of goals were set differently each year.

24   Q.    Were many of the goals the same?



WILCOX & FETZER LTD.
Registered Professional Reporters

340

1    A.    Yes.  Or similar at least.  Same types of

2  goals.

3    Q.    I'd like to refer you to Exhibit 21.  That's

4  the September 11th, 2003, letter informing you that you

5  would no longer be eligible for AMIP, correct?

6    A.    Right.

7    Q.    That's the first time that you learned that you

8  would not be eligible for the bonus?

9    A.    As I recall, yes.  Personally that I would

10 specifically not be eligible, yes.

11   Q.    Had you heard any rumors?

12   A.    We had talked about it -- I don't know exactly

13 when -- but in management that a letter like this might

14 be forthcoming.

15   Q.    Were there any meetings held to explain why the

16 AMIP program was being taken away from you?

17   A.    If you define a meeting as a group of people,

18 probably not.  As an individual discussion with my

19 manager, yes.

20   Q.    What was discussed at the discussion with your

21 manager?

22   A.    I don't exactly recall.

23   Q.    Who was your manager?

24   A.    Val Rowan.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

341

1    Q.    Do you recall the substance of what she told

2  you?

3    A.    The substance was the contents of the letter

4  and that I would need to sign it and return it, and

5  that -- that's it, I guess.

6    Q.    Did she give you an explanation as to why this

7  was happening?

8    A.    Trying to remember.  Probably had to do with

9  the hard time that CSC was having.  Financial reasons.

10    Q.    You stated earlier that part of what you would

11  do to ensure that you got your AMIP bonus was work extra

12  hours and things of that nature.

13            Up until September 11th --

14            MS. BOYD:  Objection.  Characterization.

15            MR. WILSON:  That's what he testified to.

16            MR. SEEGULL:  Just ask the question.

17            MR. WILSON:  In Delaware we just object to

18  the form.

19  BY MR. WILSON:

20    Q.    Did you believe up until September 11th that

21  you were working to earn your bonus?  Were you working

22  those extra hours?

23    A.    Yes.

24            MS. BOYD:  Objection.



WILCOX & FETZER LTD.
Registered Professional Reporters

Robert W. Peterson

342

1    Q.    Were you doing that to earn your AMIP bonus?

2            MS. BOYD:  Objection.  Leading.

3    A.    I would say yes.  Part of my incentive was to

4    believe that I was getting this compensation.

5            MR. WILSON:  Could we go off the record?

6            (Discussion off the record.)

7            (Deposition Exhibit No. 23 was marked for

8    identification.)

9    BY MR. WILSON:

10   Q.    Mr. Peterson, you have been given what's marked

11   as Exhibit 23.  Can you take some time to look at this

12   and let me know when you're done?

13           Can you tell us what this exhibit is?

14   A.    These look like pay stubs for three different

15   pay periods, 2001, 2002, 2003.

16   Q.    Just so we're clear, the first page, what's the

17   pay date on that?

18   A.    Pay date is May 18th, 2001.

19   Q.    And the second page?

20   A.    It is May 31st, 2002.

21   Q.    And the third page?

22   A.    Would be May 30th, 2003.

23   Q.    Is there a bonus indicated on these sheets?

24   A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Robert W. Peterson

343

1    Q.    For the May 18th, 2001, sheet, what is the

2  bonus?

3    A.    The amount?

4    Q.    The amount, yes.

5    A.    Is $30,612.82.

6    Q.    What about for the May 31st, 2002?

7    A.    $30,612.82.

8    Q.    And for May 30th, 2003?

9    A.    $27,113, no cents.

10   Q.    Is this bonus included in your total earnings?

11        MS. BOYD:  Objection.  Leading.

12   A.    Yes, it is.

13   Q.    The bonus that's indicated on these sheets, is

14  that indicative of the bonus that you earned for that

15  particular calendar year?

16        MS. BOYD:  Objection.  Leading.

17   A.    The calendar year, it was for -- this calendar

18  year and the prior calendar year.

19   Q.    Can you explain that?

20   A.    The fiscal year was different from the calendar

21  year.  It was from April to March.  And so the bonuses

22  that were given were based on, actually, the prior

23  calendar year plus three months' worth of the current

24  calendar year.

1    Q.    On the first page, the 30,612.82, was that

2    entire amount earned in 2001?

3    A.    No.  Some of it was earned in 2000.

4    Q.    On page 2, 30,612.82, was that entire amount

5    earned in 2002?

6    A.    Some of it was earned in 2001.

7    Q.    And on the third page, the bonus 27,113, was

8    that earned in 2003?

9    A.    No.  Some of it was earned in 2002.

10    Q.    You testified earlier that your last position

11    at CSC was as a manager?

12    A.    Yes.

13    Q.    Referring to Exhibit 20 again, your offer

14    letter, you said earlier that you viewed this as an

15    employment contract?

16    A.    Yes.

17    Q.    Did you rely upon this when making your

18    decision to go to CSC?

19    A.    Absolutely.

20    Q.    In paragraph 3 of the offer letter or anywhere

21    in this letter does it say that you can be removed from

22    the AMIP program at any time?

23         MS. BOYD:  Objection.  Leading.

24    A.    It does not specifically state that.



Robert W. Peterson

345

1       Q.      When you received this letter, did you believe

2   that you would be on the AMIP program indefinitely?

3       A.      Yes.    I would say I could be taken off for

4   different reasons, but my removal would be for cause and

5   told to me at the time of my removal.

6       Q.      There was some discussion about the "A" meaning

7   annual in AMIP.  Was it your understanding that the "A"

8   for annual meant the calendar year?

9       A.      No.

10      Q.      What did annual mean?

11      A.      Annual, in my opinion, meant that it was

12  distributed annually and that it was done on a

13  fiscal-year basis.

14      Q.      You said there were guidelines given to you for

15  AMIP and that some years you didn't get the guidelines.

16      A.      Correct.

17      Q.      The years that you didn't get the guidelines,

18  did you have an understanding as to what your guidelines

19  would be?

20      A.      There was an understanding that the guidelines

21  would be based on performance either of me, of the

22  corporation, and that at the time the compensation

23  percentage I received would be based on some set of

24  guidelines.



**WILCOX & FETZER LTD.**

Registered Professional Reporters