## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRIAN MILLER; HECTOR CALDERON;    :
CHARLES FOLWELL; ROLLAND GREEN;  :
DAWN M. HAUCK; KEVIN KEIR;     :
ASHBY LINCOLN; KAREN MASINO;    :
ROBERT W. PETERSON; SUSAN M. POKOISKI; :
DAN P. ROLLINS; and WILLIAM SPERATI,  : C.A. No. 05-010-JJF
                          :
        Plaintiffs,       :
                          :
        v.           :
                          :
COMPUTER SCIENCES CORPORATION,   :
a Delaware Corporation,       :
                          :
        Defendant.      :

---

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 2 of 3

---

Dated: June 8, 2006                Timothy J. Wilson, Esquire (DE #4323)
                                      MARGOLIS EDELSTEIN
                                      1509 Gilpin Avenue
                                      Wilmington, DE 19806
                                      (302) 777-4680
                                      Attorney for Plaintiffs

## TABLE OF CONTENTS

**Document**                                                              **Page No.**

Transcript of Susan M. Pokoiski dated February 16, 2006……………...….B-0367 – B-0456

Transcript of Brian L. Miller dated February 16, 2006……………….…….B-0457 – B-0562

Transcript of Kevin R. Keir dated February 16, 2006………………...…….B-0563 – B-0632

Transcript of Charles D. Folwell, Jr. dated February 17, 2006………….B-0633 – B-0729

Transcript of Ashby A. Lincoln, III dated February 17, 2006…………...B-0730 – B-0806

Transcript of Hector L. Calderon dated March 2, 2006 …………..……….B-0807 – B-0888

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.         )
HAUCK, KEVIN KEIR, ASHBY         )
LINCOLN, KAREN MASINO, ROBERT    )
W. PETERSON, SUSAN M. POKOISKI,  )
DAN P. ROLLINS, and WILLIAM      )
SPERATI,                         )
                                 )
     Plaintiffs,                 )
                                 )
     v.                          )  C.A. No. 05-10-JJF
                                 )
COMPUTER SCIENCES CORPORATION,   )
                                 )
     Defendant.                  )

             Deposition of SUSAN M. POKOISKI taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:00 a.m., on Thursday,
February 16, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware 19806
            for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          LINDA M. BOYD, ESQUIRE
            DLA PIPER RUDNICK GRAY CARY US LLP
            6225 Smith Avenue
            Baltimore, Maryland 21209-3600
            for the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



B-0367



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   APPEARANCES (cont'd):

2           TYLER B. RAIMO, ESQUIRE
        COMPUTER SCIENCES CORPORATION
3           3170 Fairview Park Drive
            Falls Church, Virginia 22042
4           for the Defendant

5                   - - - - -

6

7               SUSAN M. POKOISKI,

8       the witness herein, having first been

9       duly sworn on oath, was examined and

10      testified as follows:

11  BY MS. BOYD:

12      Q.    As I said to you before we went on the record,

13  my name is Linda Boyd.  With me today is Larry Seegull

14  and Tyler Raimo, both attorneys representing Computer

15  Sciences Corporation.

16              I'm going to refer to Computer Sciences

17  Corporation as CSC throughout this deposition.  Will you

18  understand what I'm referring to?

19      A.    Yes.

20      Q.    Could you please state your full name for the

21  record?

22      A.    Susan M. Pokoiski.

23      Q.    The purpose of this deposition is to inquire

24  about allegations forming the basis of your lawsuit.  I'm

Susan M. Pokoiski

1    going to ask you some questions to find out what you know

2    about facts giving rise to the claims.   I'd like to go

3    through some instructions with you.

4              Have you ever been deposed before?

5        A.    No, I haven't.

6        Q.    We will need all of your answers to be verbal,

7    since the court reporter can't take down head nods or

8    other body language or uh-huh or uh-uh.

9              You must answer the questions truthfully

10   and completely.   You must provide testimony today just as

11   if you were testifying in court.

12             If you don't hear a question, just say so

13   and I'll repeat it.   If you don't understand a question,

14   just say so and I'll rephrase it.   If you realize that an

15   earlier answer that you gave was inaccurate or

16   incomplete, just let me know, and if you want to correct

17   or supplement your earlier answer, you will be allowed to

18   do so.

19             If you want to stop to use the restroom or

20   take a break or stretch, just let us know and we will

21   take a short break.

22             If you don't know or remember the

23   information necessary to answer a question, just say so.

24             You can't talk to your attorney during the



WILCOX & FETZER LTD.
Registered Professional Reporters

Susan M. Pokoiski

1  deposition or discuss your testimony until the deposition

2  is concluded, and you can't seek advice from your

3  attorney during the deposition unless it relates to a

4  question of privilege.

5          If you answer a question, I'll assume that

6  you have heard it and understood it and have given me

7  your best recollection.

8          Do you understand the instructions that I

9  have given you?

10     A.    Yes.

11     Q.    Are you taking any medication that could

12  possibly impair your ability to understand or answer

13  these questions?

14     A.    No.

15     Q.    What did you do to prepare for this deposition?

16     A.    Actually I got a letter to attend and that's

17  basically it.  I asked Tim what a deposition was, what to

18  expect.

19     Q.    When you say "Tim," you're referring to your

20  attorney, Mr. Tim Wilson?

21     A.    That's correct.

22     Q.    Did you meet with Mr. Wilson prior to this?

23     A.    Briefly.  I spoke with Mia.  I also called

24  there for directions and things like that, but I did meet

Susan M. Pokoiski
358

1    with Tim.

2        Q.    You spoke to Mia Murphy, Tim Wilson's

3    paralegal?

4        A.    Right.

5        Q.    When did you speak to her?

6        A.    I guess when I got the letter, I guess what the

7    expectation is and where the building was, directions.

8    Actually I thought it was close to the Federal Building,

9    so I'm glad I called.  I'd have been sitting down there.

10        Q.    When did you speak to Mr. Wilson?

11        A.    Obviously I have spoken to him today.

12    Yesterday.  I spoke to him yesterday, also.

13        Q.    Did you review any documents to prepare for

14    this deposition?

15        A.    Yes.  I guess we went through some of the

16    information that I forwarded to Tim.

17        Q.    What information was that?

18        A.    Anything I had on file or anything that I

19    had -- which wasn't much, but anything that I had from

20    2003, 2004.

21        Q.    Have all those documents been produced to --

22        A.    Everything that I had was given to Mia and Tim.

23        Q.    Have they been produced to CSC?

24        A.    I assume so.  I don't know.  Whatever I had I

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

```
 1    sent to Tim, to the law firm.

 2        Q.    Other than your attorney and Ms. Murphy, have

 3    you spoken to anyone else about the testimony you will

 4    give at this deposition?

 5        A.    No.

 6        Q.    Have you spoken to any of the other plaintiffs?

 7        A.    No.   Well, I saw the plaintiffs on

 8    January 27th.   That's the last time I saw them.

 9        Q.    At the mediation?

10        A.    Right.

11        Q.    Did you speak to them about your deposition

12    testimony at that point?

13        A.    No, I did not.

14        Q.    Did you speak to them about any of their

15    deposition testimony?

16        A.    No, I did not.

17        Q.    Have you ever been known by any other name?

18        A.    Sue.

19        Q.    Any other last name?

20        A.    No.

21        Q.    What's your Social Security number?

22        A.    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.

23        Q.    Where were you born?

24        A.    In Wilmington.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

360

| | | |
|---|---|---|
| 1 | Q. | In Wilmington, Delaware? |
| 2 | A. | Yes. |
| 3 | Q. | When was that? |
| 4 | A. | May 22nd, 1955. |
| 5 | Q. | Where do you live currently? |
| 6 | A. | Smyrna, Delaware. |
| 7 | Q. | What's your phone number? |
| 8 | A. | 302-653-7948. |
| 9 | Q. | Does anyone live at your present address with |
| 10 | | you? |
| 11 | A. | My husband and my two children. |
| 12 | Q. | How long have you lived there? |
| 13 | A. | Since '79, November of '79. |
| 14 | Q. | How long have you been married? |
| 15 | A. | Since September 27th, 1975. |
| 16 | Q. | You said you had two children.  How old are |
| 17 | | they? |
| 18 | A. | My daughter Stephanie is 19, will be 20 in |
| 19 | | April.  And my son Kurt is 16, going to be 17 in May. |
| 20 | Q. | Have you ever been arrested? |
| 21 | A. | No, I haven't. |
| 22 | Q. | Any conviction for a felony or misdemeanor? |
| 23 | A. | No, none. |
| 24 | Q. | Have you ever served in the military? |

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0374

Susan M. Pokoiski

```
 1        A.    No.

 2        Q.    When did you first contact an attorney to

 3   handle this case against CSC?

 4        A.    I did not contact an attorney.  Well, I take

 5   that back.  I received a letter in the mail indicating

 6   that I may be -- I wouldn't say may be.  That the AMIP

 7   that we used to get might be -- I don't know how I'm

 8   going to phrase this.

 9              I received a letter in the mail indicating

10   that there was -- Jeff Martin was available to discuss or

11   look at documents or information that you have around

12   your AMIP that you usually got.  So that's how I was

13   contacted.  And basically I called Jeff Martin and gave

14   him my name.

15        Q.    Was the letter from Jeff Martin?

16        A.    No, it wasn't.

17        Q.    Do you know who the letter was from?

18        A.    No.  There was no name on there.

19        Q.    I'm showing you what's been premarked as

20   Exhibit 4.  Do you recognize that letter?

21        A.    Yes, I do.  This is it.

22        Q.    You think that is the letter you received?

23        A.    Yes, I think it is.

24        Q.    This is the letter that caused you to
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

362

1    contact --

2        A.    Yes.    Jeff Martin.

3        Q.    Were you involved at all in the distribution of

4    this letter?

5        A.    No, I was not.

6        Q.    Did you give it to anyone else who you thought

7    might be interested?

8        A.    No, I did not.

9        Q.    What is the fee relationship you have with your

10   present attorney?

11       A.    My relationship?

12       Q.    Your fee relationship.    How are you paying him?

13       A.    Actually I believe that we are liable for costs

14   and things like that if we aren't successful or we don't

15   have a good case.    I really didn't get in.

16       Q.    You don't know the details of the agreement?

17       A.    I don't know the details.

18       Q.    Is there a written agreement?

19       A.    Not to my knowledge.    I don't remember.

20            MS. BOYD:    The same agreement?

21            THE WITNESS:    I don't remember anything

22   like that.

23       Q.    Have any lawsuits ever been filed against you?

24       A.    No.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

1     Q.    Have you ever filed any other lawsuits?

2     A.    There was an overtime civil lawsuit that was

3  settled in the July or August time frame with CSC, and

4  that's the only one that I have --

5     Q.    You personally filed that lawsuit against CSC?

6  What was the nature of the lawsuit?

7     A.    Overtime, not paid for overtime.  Not over a

8  time period, but overtime that -- and actually I don't

9  know how many people were there.  I think it was a

10  $24 million lawsuit.

11     Q.    Did you receive any money as a result?

12     A.    Yes.

13     Q.    How much did you receive?

14     A.    $250.  Nothing substantial.

15     Q.    Have you ever been a witness in a lawsuit?

16     A.    No, I have not.

17     Q.    An arbitration?

18     A.    No.

19     Q.    Any type of hearing?

20     A.    No.  A hearing?  I have gone to jury duty.  Is

21  that what you're talking about?  No?  Okay, no.

22     Q.    Have you ever declared bankruptcy?

23     A.    No.

24     Q.    Have you ever made a claim for unemployment

Susan M. Pokolski

1    benefits or insurance?

2        A.    No.

3        Q.    Have you ever made a claim for workers'

4    compensation benefits?

5        A.    No.

6        Q.    Have you ever been interviewed by an attorney

7    in connection with any other matter than this lawsuit?

8        A.    No.

9        Q.    Do you have any relatives who work for CSC?

10       A.    No.

11       Q.    Or have worked for CSC?

12       A.    No.

13       Q.    Did you go to college?

14       A.    Yes, I did.

15       Q.    Where did you go?

16       A.    Goldey-Beacom.

17       Q.    When did you graduate?

18       A.    I guess '79, '78.

19       Q.    What was your degree in?

20       A.    Secretarial studies.

21       Q.    Did you go to graduate school?

22       A.    No, I did not.

23       Q.    Have you had any other education, training, or

24    courses?

Susan M. Pokoiski

1        A.      Actually I'm going to school to be a nurse

2    right now.

3        Q.      Where are you going to school?

4        A.      DelTech.

5        Q.      When did you start that?

6        A.      I would say -- I want to say September of last

7    year.  September '05.  Yes, September of '05.

8        Q.      Are you going to night school?

9        A.      No.  Yes, I am going to night school.  It would

10   be September '04.  Sorry.  It will be two years.

11       Q.      When do you expect to graduate?

12       A.      Actually I'm just taking one course at a time

13   since I am working.

14       Q.      Have you ever received any professional or

15   work-related certification?

16       A.      Certifications?  Yes.  SIX Sigma, Green Belt

17   and champion training.

18       Q.      What are those?

19       A.      What are SIX Sigma?  Basically it's looking at

20   quality opportunities to save my money, costs.  So you

21   get a project and you're assigned a project and you look

22   for different ways -- like this year we had to reduce

23   Sev 1's, and the idea was to look at your clients who had

24   a -- the five highest clients and see if there was a

Susan M. Pokoiski

1    common thread and basically they had old hardware and

2    software that calls these Sev 1's.  So that was my

3    project this year.

4        Q.    You're saying Sev 1?

5        A.    Severity 1 tickets.  They're the highest

6    tickets in our space.

7        Q.    What does that mean?

8        A.    Basically a Sev 1 is an outage time, their Web

9    site would be going down for whatever reason, and the

10   goal of the project was to find ways or ideas how to

11   reduce those Sev 1's.  Sev 1's cost a lot of money.

12   People have to be expended, there's outages, there's a

13   pager, service restoration needs to be involved.

14       Q.    You said your other certification was champion

15   training?

16       A.    Champion was only like identifying projects

17   that should be studied.  SIX Sigma Green Belt would be

18   actually the person doing the work.  It's not as good as

19   a Black Belt.  Just certification.

20       Q.    Is it received through CSC?

21       A.    Yes, it was.

22       Q.    Have you ever received any awards or honors?

23       A.    In-house in regards to like kudos or special

24   awards.  Nominal money.  $100 or gift check.  Things like

1    that.   In CSC and DuPont.

2         Q.    What were these awards for?

3         A.    Go over and beyond, recognition, team building,

4    things like that.

5         Q.    How many would you estimate you have received,

6    or if you know for sure, then how many?

7         A.    I would say I received about four or five.   I

8    have also gotten them with DuPont.   But you're talking

9    about CSC.   If you transitioned from DuPont to CSC, they

10   would give you an award to make sure things went

11   smoothly.   I'd say I had four or five since '97.

12        Q.    These were all nominal amounts of money?

13        A.    Yes.   American Express gift checks, maybe a

14   dinner, night on the town.   Something like that.

15        Q.    Do you have any memberships in professional

16   associations?

17        A.    No, I do not.

18        Q.    Where did you work immediately prior to working

19   for CSC?

20        A.    DuPont.   And we went to the transition in June

21   of '97.

22        Q.    So your employment at DuPont ended in June of

23   '97?

24        A.    Yes.   I think it was May and then we started in

Susan M. Pokoiski

1    June with CSC.  I think that's how it works.

2        Q.    It ended because you transferred to CSC?

3        A.    That's correct.

4        Q.    What was your position at DuPont?

5        A.    I was a team leader for the deployment.  We

6    deployed computers and software and hardware for the

7    company.  That's with DuPont you asked, right?

8        Q.    Yes.  What was your final salary?

9        A.    I don't know.

10       Q.    Approximately.

11       A.    I don't know.  Way too in the past.

12       Q.    Were you in a bonus program at DuPont?

13       A.    No, I was not.

14       Q.    Do you know of a bonus program at DuPont?

15       A.    Was I aware of one at the time?  I can't

16   remember anything like that.

17       Q.    What was your first position at CSC?

18       A.    Supervisor of problem resolution for the

19   desktop techs.  So I had a group of men and women

20   reporting to me to support the DuPont account.

21       Q.    So you were a part of the DuPont account?

22       A.    Yes, I was.

23       Q.    How did the DuPont account fit into the

24   structure of CSC?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

1    A.    Actually the IT organization of DuPont went two

2  ways.  It went either to Accenture or to CSC.  I happened

3  to be in the infrastructure part and so we went to CSC.

4  So we were responsible for their servers, their desktops,

5  some of their applications, mainframes, whatever, in that

6  perspective.

7    Q.    You're saying some of the people you worked

8  with at DuPont went to --

9    A.    Accenture.

10   Q.    And your group went to CSC?

11   A.    That's correct.

12   Q.    In June of '97?

13   A.    That's correct.

14   Q.    Were you part of a group called the Chemical

15  Group?

16   A.    Yes, I was.

17   Q.    Was that when you first started or --

18   A.    No.  That was when I first started.

19   Q.    The DuPont account was within Chemical Group?

20   A.    Yes.

21   Q.    Who was your supervisor when you first started?

22   A.    Marion Bowman, B-o-w-m-a-n.

23   Q.    Do you remember who supervised Ms. Bowman?

24   A.    I believe she reported to -- his last name was

1    Lewis.  I forget what his first name was.  Lewis,

2    L-e-w-i-s.

3         Q.    Do you know who was the head of the DuPont

4    account at the time?

5         A.    I want to say it was Russ Owens.

6         Q.    Do you know who was the head of the Chemical

7    Group?

8         A.    Go back.  Head of the DuPont account, I think

9    it was -- well, Russ Owens was a head of the chemical

10   account.  I don't know who the head of the DuPont account

11   would have been.  No, I don't.

12        Q.    What was your starting salary at CSC?

13        A.    I don't know.

14        Q.    Do you know what your level was when you began

15   at CSC?

16        A.    I'm thinking it was either a 3 or 4.  I

17   believe -- one of the two.  I don't know.

18        Q.    Did you receive any bonuses while you were in

19   your first position?

20        A.    No, I did not.

21        Q.    Did you ever switch positions or get promoted?

22        A.    Yes, I did.  I was in that position until

23   about, approximate, 1999, where I went to a service

24   delivery manager position, SDM, and that would have been

Susan M. Pokoiski

1   in '99 or 2000, something like that.

2        Q.    Did you switch positions after that?

3        A.    No.  Well, I have been -- I have always been a

4   service delivery manager, but I got off the DuPont

5   account.  It would have been September -- it was a year

6   in September '05.  So September '04 I went to Web

7   hosting.

8        Q.    So September of '04 you switched out of the

9   DuPont account --

10       A.    Right.

11       Q.    -- and switched to a new group?

12       A.    Yes.

13       Q.    What was the name of it?

14       A.    Managed Hosting Services.  It had a different

15  acronym.  It was Managed Services Hosting.  It's Managed

16  Hosting Services now.  It had a different acronym,

17  abbreviation before.

18       Q.    Did your duties change in that position?

19       A.    No.  I'm still service delivery manager, but my

20  clients are different.  Carrier Corporation.  It's not

21  the DuPont account anymore.

22       Q.    What does the service delivery manager do?

23       A.    We ensure end-to-end service for the lines of

24  service.  For example, you have your UNIX and Intel and

Susan M. Pokoiski

```
1    your applications and middleware.  The clients sign up

2    for that.  So you have weekly meetings and you go over

3    tickets and you just ensure that you're delivering the

4    service to your client.

5              I'm an escalation point for the client and

6    I'm also a focal point to go up the chain of command to

7    make sure things are done and we're meeting our SLAs.

8    Service level agreements.  Sorry.

9        Q.    So you were an SDM at the time that you were

10   notified that you were not eligible for AMIP; is that

11   correct?

12       A.    That's correct.

13       Q.    Who was your supervisor at that time?

14       A.    We were reporting -- the SDMs were reporting to

15   Jeannie Maul, M-a-u-l.  We might have had another -- a

16   director that we worked closely with, and I don't know if

17   it was Dom DiRamio  Jeannie Maul would have been the VP

18   at that time.

19       Q.    You were still part of the DuPont account at

20   that time?

21       A.    That's correct.

22       Q.    You received a letter when you transferred from

23   DuPont to CSC, correct?

24       A.    Yes.
```



WILCOX & FETZER LTD.

Registered Professional Reporters

Susan M. Pokoiski

1    Q.    Who is your supervisor now?

2    A.    Supervisor would be Charlie Campagna in Managed

3  Hosting Services.

4              (Deposition Exhibit No. 24 was marked for

5  identification.)

6  BY MS. BOYD:

7    Q.    I'm handing you what's been marked as

8  Exhibit 24.  Do you recognize this document?

9    A.    Yes.

10   Q.    What is it?

11   A.    Offer of employment to Computer Sciences

12  Corporation.

13   Q.    You were not made eligible to participate in

14  CSC's Management Incentive Program when you transferred

15  to CSC at this time.

16   A.    That's correct.

17   Q.    When did you first become eligible to

18  participate?

19   A.    When I became the SDM in either '99 or 2000.  I

20  accepted the position from the supervisory position to an

21  SDM, and that organization was under -- what was his

22  name?  Mark -- I forget.  But it was at that time.

23   Q.    Do you have any documentation of when you

24  became part of the program?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

374

1      A.    No.  It was a verbal discussion in the

2  conference room or the office.

3      Q.    Who was the discussion with?

4      A.    It was with Mark, and I forget his last name.

5  Sorry.

6      Q.    That's okay.  Was anyone else present at the

7  meeting?

8      A.    No.

9      Q.    That made you eligible for the Annual

10  Management Incentive Program?

11      A.    That's correct.

12      Q.    I'll refer to that as AMIP.

13             For what year did that make you eligible?

14      A.    Well, I believe my promotion was in the

15  February time frame.  February or March.  So obviously I

16  was not eligible for that year.  So it would have to be

17  the following year.  So if it was February -- it would be

18  '99 would be 2000.  2000 would be '01, right?  We were

19  always one above.

20      Q.    So you became eligible at the beginning --

21      A.    April of '99 I guess I would be eligible.

22      Q.    April 1st, '99?

23      A.    Right.

24      Q.    The beginning of the fiscal year 1999?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

1    A.    Right.

2    Q.    April 1st, 1999, which was the beginning of the

3    fiscal year 2000?

4    A.    Right.

5    Q.    When did you say you were notified of your

6    promotion?

7    A.    I think the year was '99 when I got the

8    promotion, and so that would have been -- because I

9    remember getting two AMIPs.  So I want to say February of

10    '99, that's when I was offered the promotion, the new

11    job.

12    Q.    You said you received two AMIPs.  Can you

13    explain that?

14    A.    Two AMIPs.  One I guess in '00 and '01 or '01

15    and '02.

16    Q.    I see.  So you received an AMIP for fiscal year

17    2000?

18    A.    Right.

19    Q.    An AMIP for fiscal year 2001?

20    A.    Right.  I guess it has to be the opposite --

21    I'm a little confused here.  '04 is the one we're talking

22    about, right?  That's the question.  So it would have

23    been '03 and '02 I got the AMIPs.

24    Q.    So you were eligible for AMIP in fiscal year

Susan M. Pokoiski

1   2002, fiscal year 2003?

2       A.    Right.

3       Q.    You were promoted sometime in fiscal year 2001,

4   then, you believe?

5       A.    Right.

6       Q.    Before you transferred from DuPont to CSC, did

7   DuPont hold any meetings about the transfer?

8       A.    Yes.

9       Q.    When were those meetings?

10      A.    On a very regular basis.  There was transition

11  meetings and as a team leader, I needed to go to

12  management meetings in regards to roles and

13  responsibilities for tests and things like that.  But I

14  don't have a recollection of how frequent or when they

15  were.

16      Q.    Was the purpose of these meetings for you to

17  transition your work?

18      A.    Probably transition the work, get to know CSC,

19  how to complete the forms, their benefits, things like

20  that.

21      Q.    What was discussed about benefits at these

22  meetings?

23      A.    I can't recall.  Basically I guess medical and

24  health, dental, credit union, things like that.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

1    Q.    Were salaries discussed?

2    A.    Not in an open forum, no.

3    Q.    Were bonus programs discussed?

4    A.    Not in an open forum.  Not in the meetings.

5    Q.    Were salaries discussed in a private forum?

6    A.    I don't recall when they were discussed.  I

7  mean, basically you would meet with your supervisor.

8  Obviously we had salary discussions for performance in

9  DuPont, and I guess if you had the opportunity to talk to

10  your supervisor, you talked about salary there.

11    Q.    You spoke to your supervisor at DuPont?

12    A.    Right.  Transitioning over, what that would

13  mean.

14    Q.    Did anything about bonus programs come up in

15  those meetings?

16    A.    No, it did not.

17    Q.    Did you receive any documents at these

18  meetings?

19    A.    Handouts about whatever was routine for CSC

20  transition we received.  I received.  That's about it.

21    Q.    Do you still have any documents from those

22  meetings?

23    A.    If they are, they're home and I don't know

24  where they're at.  I don't have them at work.  From '97,

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

1    probably not.

2        Q.    What type of documents do you think they would

3    be?

4        A.    Well, if we were getting new healthcare, I

5    think the urgency was you were moving from one company to

6    the next.    I think more people were concerned about

7    healthcare and day-care and those kind of things.    So I

8    remember getting information and how to complete the

9    form.    I do remember a meeting how to complete

10   beneficiary forms, life insurance and things like that.

11       Q.    Have you told me everything you recollect from

12   these meetings that involved the transition from DuPont

13   to CSC?

14               MR. WILSON:   Object to form.

15       A.    Yes.

16               MR. WILSON:   You can answer.

17               THE WITNESS: Yes.   That I can remember.

18       Q.    Did you participate in any orientation when you

19   first began working with CSC?

20       A.    Yeah.   I remember meetings.

21       Q.    Was that when you first started?

22       A.    Yes.

23       Q.    It would have been June of '97?

24       A.    Right.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

1      Q.    Do you remember who conducted the orientation

2  meetings?

3      A.    No, I do not.

4      Q.    Was it one meeting or several meetings?

5      A.    When we moved over from DuPont to CSC, I guess

6  the initial question was how are we going to fit into the

7  new role, reporting order, the structure, where we're

8  going to locate.  The big thing was where are we going to

9  sit.  We're on DuPont property.  Do we have to find our

10  own buildings.  Things like that.  More like housekeeping

11  and day-to-day operational stuff since I had an

12  operations team where people were concerned.  Some people

13  had to sit in Wilmington, Barley Mill, other places.  Sit

14  with the client.  Things like that.

15      Q.    Were benefits discussed at any of these

16  meetings?

17      A.    What I remember is more operational

18  discussions.

19      Q.    So benefits were not discussed?

20      A.    No.

21      Q.    Were bonuses ever discussed?

22      A.    Not that I recall.

23      Q.    Have you told me everything you remember about

24  the orientation discussions when you first came to CSC?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

380

```
 1              MR. WILSON:  Object to the form.

 2       A.    Yes.

 3       Q.    What does AMIP stand for?

 4       A.    Annual Management Incentive Program.

 5       Q.    What is it?

 6       A.    Well, it was described to me when I was

 7  eligible that it was a way for myself -- I was part of

 8  the account team and our goal was to -- the goal was to

 9  incentify me to find revenue opportunities or to reduce

10  costs for the DuPont account.

11       Q.    How did you know what AMIP was?

12       A.    Well, I asked questions and basically I was

13  asked how do I deliver or what's the expectation of me to

14  incentivize.  If I could get additional money, I wanted

15  to know how I could do that.

16       Q.    Who did you ask questions to?

17       A.    Mark Kasab, K-a-s-a-b.

18       Q.    He was your supervisor at the time?

19       A.    Well, actually he was more of a VP, but we --

20  service delivery reported under him, yes.

21       Q.    You spoke to him about the AMIP program?

22       A.    That's correct.

23       Q.    That was prior to you becoming eligible for the

24  AMIP program?
```



Susan M. Pokoiski                                                381

1      A.      No.  He talked to me when I was eligible.

2      Q.      Did you know about the program before then?

3      A.      Yes, I did.

4      Q.      How did you know about it?

5      A.      Well, because I knew it was part of the

6    account -- the account team worked for it and basically

7    when I was applying for the job, I interviewed and I

8    asked about it and they said what the program was about.

9    So I knew that it existed.

10     Q.      When you were applying for which job?

11     A.      Service delivery job.

12     Q.      I'm sorry.  What was your job before then?

13     A.      I was a supervisor of the techs, desktop techs.

14     Q.      You interviewed with Mark Kasab to receive that

15   job?

16     A.      I don't remember who I interviewed with.  I

17   remember interviewing with the account manager that I

18   would be working with, Jim Walla.

19     Q.      In your interviews you inquired about how the

20   AMIP program worked?

21     A.      That's correct.

22     Q.      And whether you would be eligible for AMIP?

23     A.      That's correct.

24     Q.      Were you shown any documents about AMIP?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0395

Susan M. Pokoiski

382

1    A.    No, I did not.  I didn't see any.

2    Q.    Is there a plan that controls how CSC

3  implements AMIP?

4    A.    I'm sure there is, but the problem was it was

5  held very close to the chest.  I won't say loosey-goosey,

6  but you were told you were on it and basically unless you

7  were told you were off it, you worked.  You had a goal, a

8  personal goal or objective, and you worked your project

9  and whatever you had at the beginning of the fiscal year.

10    Q.    So you believe there was a plan but that you

11  have never seen it?

12    A.    That's correct.

13    Q.    You understood AMIP through word of mouth?

14    A.    Well, no.  Actually the example that I have --

15  the last AMIP that I worked on, since I was a service

16  delivery manager, every January you would meet in a

17  conference room early in the year and you would discuss

18  ways to improve the organization, and so you had that

19  meeting in January.  We discussed how we would break up

20  in teams, you would have a leader and a coleader, and

21  basically you would go off in January and February, come

22  up with a charter, and then you would have that charter

23  blessed and you would kick off before April 1.

24          Because when April 1 started, you had your



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski                                              383

1    team in place and you had some of the deliverables and

2    you were going to be asked every month, if not weekly,

3    your progress on your personal objective or your project

4    for your AMIP.  That's what I did.

5          Q.    Who attended the meetings in January?

6          A.    Everybody under Jeannie Maul.  We had to have a

7    brainstorming session of what we wanted to do for the

8    upcoming year.

9          Q.    So at these meetings you brainstormed to come

10   up with objectives for the following fiscal year?

11         A.    That's correct.

12                (Deposition Exhibit No. 25 was marked for

13   identification.)

14   BY MS. BOYD:

15         Q.    I'm handing you what's been marked Exhibit 25.

16   Do you recognize this document?

17         A.    Yes, I do.

18         Q.    What is it?

19         A.    Actually it's the objectives -- we had an

20   initial list developed on January 8th, and basically

21   No. 10 would have been my objective and my personal AMIP

22   item, and it was to develop and document business plans.

23         Q.    Who are all the other people on this list?

24         A.    Actually these are folks that were in

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Jeannie Maul's organization.

2        Q.    Was this a list of objectives that you were

3    talking about that was compiled in the January meeting?

4        A.    That's correct.

5        Q.    So are you saying this is a list that was

6    compiled as a result of brainstorming at that meeting?

7        A.    That's correct.

8        Q.    You were given this one objective No. 10?

9        A.    That's correct.

10        Q.    What is the writing beneath your objectives,

11    beneath line No. 10?

12        A.    I believe looking back at this we wanted to --

13    SDMs wanted to get the voice of the customer.  We wanted

14    to do documented strategy around new business and expand

15    scope.  So basically a lot of times we work day-to-day

16    and we weren't proactive or we didn't know what was

17    coming down the pike.

18            So what we wanted to do here is work with

19    our businesses and see if we could come up with a list of

20    new opportunities that were coming our way.  So we would

21    have a bench, we would have project managers available to

22    do things.

23            We also wanted to look at the voice of the

24    customer.  We got rated annually, if not -- there was I

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski                                    385

1   want to say a customer service report, and basically we

2   wanted -- APARS  I don't know what it stood for, but

3   obviously they were color-coded.  If they were red,

4   obviously you were in trouble.  So we wanted to find out

5   what those red items were and fix them.  Overall we

6   wanted a good report back from the client.

7        Q.    Can you describe to me generally what APARS

8   are?

9        A.    Actually it was the account -- GPARS and APARS.

10  They were more like the businesses would get an e-mail or

11  a checklist and they would rank us for different things,

12  customer service or accuracy and things like that, and

13  the goal was to get I don't want to say 100 percent, but

14  as close to perfect.  In a lot of cases we were red

15  and -- we wanted to get -- the SDMs wanted to work closer

16  with the account team to see if we can improve that.

17       Q.    Are these your handwritten notes?

18       A.    Yes, they're my handwritten notes.  So

19  basically this is the information here on the second page

20  what we wanted to do.  I'm just seeing if we had anything

21  on here that would help me with the definitions.

22       Q.    Was this document created in March of 2004?

23       A.    Yes.

24       Q.    This is listing your accomplishments?

**W&F**

Susan M. Pokoiski

1    A.    That's correct.

2    Q.    For fiscal year 2004?

3    A.    That's correct.

4    Q.    Did you create this document?

5    A.    Yes, I did.  I was the team lead.  So basically

6    my goal was to present the information not only to staff

7    but to make sure it was accurate within the group.

8    Q.    Were the people in the team all listed on this

9    first page?

10    A.    Actually 1 to 10, I would be the lead and my

11    backup was Linda Boone.  So these were other objectives.

12    So the column "Lead" was the team leader.

13    Q.    Were all the people on this list eligible for

14    AMIP?

15    A.    Yes.

16    Q.    Turning to the fourth page, it looks like a

17    spreadsheet.  What is this document?

18    A.    All right.  So we had our meeting with -- in

19    January, and basically the idea was to have -- the idea

20    was that we weren't just kicking it off and meeting for

21    the first time April 1.  So Linda and I worked on this

22    prior to April 1.  So these were some of the high-level

23    tasks or things that we wanted to produce during the

24    year.  And, of course, the last column didn't come out.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

387

1   Whether it was broken down or the owners would be on the

2   next page.

3       Q.    Did the "Start" and "Finish" column show when

4   each task began and was completed?

5       A.    Yes.  That's what we wanted to do because we

6   were reporting back to Jeannie in our staff meeting at

7   least once a month, if not sooner, or if we had a meeting

8   set up with the account managers or business, we wanted

9   to make sure that we had something in writing we were all

10  looking at the same document.  So the start date and the

11  finish date is pretty accurate.

12      Q.    Were the start date and finish dates actual

13  dates or were they dates that you hoped to achieve?

14      A.    No.  They're pretty -- they were actual.

15      Q.    When you created this document, you already

16  knew when things had started and finished?

17      A.    Yes.  We started before April 1.  I started

18  before April 1.

19      Q.    Or April 1 of 2003?

20      A.    Yes.

21      Q.    Some of these tasks weren't completed until

22  March of 2004; is that correct?

23      A.    Actually -- that's correct.

24      Q.    So this document was created after March of

Susan M. Pokoiski
388

1    2004?

2        A.    No.    This was created -- this document was

3    created in January or February of '03.

4        Q.    So the dates were prospective dates that you

5    hoped to achieve?

6        A.    You mean for the finish date?

7        Q.    Exactly.

8        A.    Yes.    But the "Work Complete" column indicates

9    where we were at that point.

10       Q.    At the point in January '03?

11       A.    Well, I don't have a date on here, but that was

12   the last update that I had printed out.  So I can't

13   indicate what date this was.

14       Q.    The goals on here and the goals on the first

15   page remained the team's goals throughout the entire

16   fiscal year '04?

17       A.    Actually, I remember -- I know there's a

18   document here of December 2nd, '03.  We have a proposed

19   agenda.  And I don't have any records, but it's either at

20   the end of September -- sometime in October or September

21   we gathered as a team and took a vote whether we should

22   move forward.  I want to say it was in the October time

23   frame.  But I don't have any data to prove that.

24       Q.    Are you looking at page 3 of this exhibit?

Susan M. Pokoiski

389

1      A.     Yes, I am.  Proposed agenda.

2      Q.     This was the agenda for a meeting that was held

3  in October of 2003?

4      A.     No.  This is the agenda for a meeting that was

5  held on September 4th at 1:30.

6      Q.     I'm sorry.  Could you tell me again what the

7  purpose of this meeting was?

8      A.     To follow through on our project plan.  This

9  was the subject.  We were going to look at whether we

10  were going to do pioneer training and update around that.

11  We broke up the items on the project plan by different

12  folks.  So if somebody had the pioneer training, somebody

13  had to report back on that, our metrics, GPARS.  There it

14  is again.  I'll be darned if I remember what it was.  We

15  want to improve our ratings and try to get more kudos

16  from the clients and produce that.

17          So each person had a responsibility to

18  report back on that.

19      Q.     So you were checking in on the objectives that

20  had earlier been assigned?

21      A.     Actually one of -- if you look, I think I had

22  scheduled meetings -- one there was to schedule meetings

23  for the rest of the year.  I did that.  So meetings were

24  already established between April 1 through April -- oh,

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Susan M. Pokoiski

390

1    that was how many days it would take me to do it.   One of

2    my goals was to schedule biweekly meetings for the fiscal

3    year on this project.

4        Q.    Now you're looking at page 4?

5        A.    I'm looking at the first page of the project

6    planning.   If you look at schedule biweekly meetings, one

7    of the milestones that I had to do was schedule meetings

8    and I did that.   That's why it's 100 percent.

9        Q.    So this was one of those meetings?

10        A.    That's correct.

11        Q.    This September 4th, 2003, meeting was one of

12    the biweekly meetings?

13        A.    That's correct.

14        Q.    These meetings were to check in on the progress

15    of the objectives for the team?

16        A.    Yes.

17        Q.    Did the team continue to progress to achieve

18    these objectives throughout the fiscal year?

19        A.    Yes.   This is my charter.   This is the charter.

20        Q.    What is your charter?

21        A.    This was after we had our meeting in January,

22    this is the document that we came up with that we

23    represented -- or we presented to Jeannie Maul's staff.

24    She had a core team.   What we were going to do, our

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski                                    391

1    objectives, our scope, our deliverables, when we were

2    going to kick it off, initial kickoff meeting with the

3    rest of the team.  So page -- this and this is the

4    document.

5         Q.    You're looking at Miller 397?

6         A.    That's correct.  And 398.

7         Q.    This was created after the January meeting?

8         A.    Yes, it was.

9         Q.    Specifically for you?

10        A.    Actually it was probably created in the

11   February time frame because we had to have it blessed

12   before March.

13        Q.    Who blessed it?

14        A.    It was a core team.  Let's see.  I don't

15   remember who was in the room.  Obviously Jeannie couldn't

16   be at every meeting, so she had maybe the directors or

17   the senior managers in the room to decide.  Obviously all

18   10 objectives -- you work on things that gave you more

19   bang for the buck.  So ours was blessed to proceed.  That

20   was the charter to proceed.

21        Q.    So Jeannie Maul or somebody who worked for her

22   gave you the go-ahead on this charter?

23        A.    Yes.

24        Q.    And that was before March of 2003?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

1      A.      Yes.

2      Q.      The company distributed its policies on

3  compensation by e-mail and the Internet, right?

4      A.      Policies?  What do you mean by "policies"?

5      Q.      Did you receive any documents that described

6  compensation from the company?

7      A.      If I had received compensation -- usually that

8  was a discussion that was in a room with your supervisor.

9  They will say you will be having a meeting with your

10  supervisor.  But actually, if there's anything about

11  compensation or things of that nature, it was probably

12  brought up at the staff meeting that this is coming.

13      Q.      What type of issues would be discussed at the

14  staff meeting?

15      A.      The staff meeting?  Finance.  Every week we

16  would know how the account was doing, things that we were

17  having problems with.  We tried to throw some good things

18  in there, too, things -- projects that were working very

19  well.

20      Q.      Would salaries be discussed?

21      A.      No.

22      Q.      Bonuses?

23      A.      No.

24      Q.      Did you ever receive any type of e-mails or

Susan M. Pokoiski                                                    393

1   documents that spoke about various different types of

2   compensation that were available to you?

3       A.    No.  I don't remember that.

4       Q.    Do you know of anything that was available on

5   the Internet of that nature?

6       A.    No.

7       Q.    Have you ever seen any policies related to

8   AMIP?

9       A.    Not that I can remember, no.

10      Q.    Do you have any e-mails or letters or other

11  types of documentation that shows you're eligible --

12      A.    No, I don't.  I don't have anything.

13      Q.    You don't have any documentation that shows

14  you're eligible for AMIP ever?

15      A.    Ever?  The only thing I got was a receipt that

16  I got one and in some cases -- I only remember getting

17  one from Jeannie Maul.  After the fact.  After the fiscal

18  year.  And I was about to get the money and the paycheck.

19  I never received anything prior to that.

20      Q.    When you say "a receipt," what do you mean?

21      A.    Well, the form that shows the bonus for the

22  year.  It was broken down in percentages, what was for

23  maybe customer service or earnings per share.

24      Q.    An AMIP worksheet, is that what you mean?

Susan M. Pokoiski

1       A.     Yes.

2       Q.     It was an Excel spreadsheet?

3       A.     No.   I think there was something -- an example.

4    It was in a folder.

5              (Deposition Exhibit No. 26 was marked for

6    identification.)

7    BY MS. BOYD:

8       Q.     I'm handing you what's been marked as

9    Exhibit 26.

10      A.     Yes.

11      Q.     That was the receipt you received from

12   Jeannie Maul?

13      A.     Yes.

14      Q.     You received that after the fiscal year had

15   closed?

16      A.     Yes.   I believe that's when we got it.   Yes.

17   They wouldn't do it prior to that.

18      Q.     Why did you receive it after the close of the

19   fiscal year?

20      A.     I'm sure it's a legal item that the books have

21   to be closed.   However -- that's the only way I can think

22   of it.   It's got to be a financial decision, corporate

23   decision.

24      Q.     An AMIP bonus is essentially a percentage of

1  your salary, correct?

2      A.    Yes.

3      Q.    And that percentage is based on a number of

4  factors?

5      A.    Yes.

6      Q.    Which these factors could include corporate

7  objectives; is that right?

8      A.    That's correct.

9      Q.    And group objectives?

10     A.    That's correct.

11     Q.    Personal objectives?

12     A.    Right.  That's correct.

13     Q.    So they could be financial or nonfinancial

14  factors?

15     A.    That's correct.

16     Q.    And the factors can change from year to year?

17     A.    I would say they were pretty constant.  The two

18  that I had, it was basically the financial objectives and

19  the measures were the same.  What changed was the

20  personal item that -- I'm going to reference this

21  document.

22     Q.    You're referencing Exhibit 25?

23     A.    25.  That would change, what you were going to

24  work on that year.

Susan M. Pokoiski

396

1  Q.  Your personal objectives would change from year

2 to year?

3  A.  That's right.

4  Q.  Did the targets for the company for the

5 corporate objectives change from year to year?

6  A.  Earnings per share I know would change.

7  Q.  Would revenue goals change from year to year?

8  A.  Revenue would want to be going up.  So I guess

9 that's a yes.

10  Q.  Would cost budgets change from year to year?

11  A.  Yes.

12  Q.  And operating income margin changed from year

13 to year?

14  A.  Yes.

15  Q.  So these factors are based on CSC's financial

16 performance during the fiscal year, correct?

17  A.  Yes.

18  Q.  I think we have already stated this, but the

19 fiscal year runs from April 1st through March 31st?

20  A.  Yes.

21  Q.  How is the AMIP bonus actually calculated?

22  A.  Well, I know that there was a weighted average

23 and basically would take that average and they would add

24 up to 100 percent, but -- and then based on your salary.

Susan M. Pokoiski

397

```
 1    I was always -- it was 10 percent that I was eligible

 2    for, maximum bonus potential.

 3         Q.    Did those weightings change from year to year?

 4         A.    I don't know.

 5         Q.    Did the team objectives change from year to

 6    year?

 7         A.    Customer satisfaction was always there, and,

 8    again, the individual would change.

 9         Q.    Would the targets for the team goals change?

10         A.    The target -- you mean the obtain 95 percent?

11         Q.    If the goal was customer satisfaction, would it

12    change in terms of what the target was for achieving

13    customer satisfaction?

14         A.    No, I would say those two were consistent in

15    regards to 95 percent and then -- and the weight was

16    divied up between the individual and the team.  So that

17    stayed constant.

18         Q.    So the 95 percent was the same every year you

19    believe?

20         A.    I believe it was.

21         Q.    You received an AMIP worksheet for two years?

22         A.    That's correct.

23                MS. BOYD:  We would like to take a short

24    break.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0411

1              (A recess was taken.)

2  BY MS. BOYD:

3      Q.    I wanted to go back to Exhibit 26 for just a

4  minute.  When did you receive information about the

5  corporate financial objectives?

6      A.    Each week -- well, we reviewed finance at the

7  financial part of the DuPont account on a weekly basis at

8  Jeannie's staff.  Now, we didn't review AMIP or anything

9  like that.  So we actually knew what the account was

10  doing on a weekly basis.

11              So are you looking for like something that

12  I received in regards to the account or in regards to

13  AMIP?

14      Q.    Were you ever given information about what

15  these corporate goals were for the fiscal year?

16      A.    It was probably announced at staff what the

17  goals were.  It came from corporate and filtered down at

18  the weekly meetings.

19      Q.    When would that have been announced?

20      A.    I'm sure that the kick-off meeting beginning of

21  the fiscal year what the goals were and basically at

22  least monthly meetings where we stood around the account.

23  So we always had an idea of where we were on a monthly

24  basis, if not biweekly.  So that's how we got information

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

399

1  around the account.

2      Q.    These overall financial targets for the fiscal

3  year, those couldn't have been told to you in January

4  before the fiscal year, could they, for the new fiscal

5  year?

6      A.    No, I really don't know.  I can't answer that

7  what happened or what was announced.  I guess we were

8  always working on the current year, but basically we were

9  told -- are you trying to imply that I'd be working on

10  something not knowing what my objective was for the

11  finance?

12      Q.    I'm just trying to find out when you learned of

13  what these corporate goals were, these corporate targets

14  and goals.

15      A.    Not sure how to answer that.

16      Q.    So you don't know?

17      A.    I don't know.  I don't know when we were told.

18      Q.    But you were told at some point?

19      A.    Yes.

20      Q.    You don't have any idea of the time frame for

21  when you would have been told?

22      A.    No.  Bob Hyland was our financial

23  representative on Jeannie's account for the SDM.  He had

24  at least a monthly presentation of where we were for the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0413

Susan M. Pokoiski

400

1    previous year and where we would be going for the next

2    year.  So unless we went back to every meeting and the

3    agenda, I can't say.

4        Q.    You said his name was Mr. Hyland?

5        A.    Bob Hyland.

6        Q.    His monthly presentation, was that about where

7    your team was going?

8        A.    Yes.  It represents Jeannie Maul's organization

9    and Jeannie would share anything that she heard in

10   regards to corporate.

11       Q.    What was Jeannie Maul's organization?

12       A.    It would be service delivery.

13       Q.    Which was part of GIS?

14       A.    That's correct.

15       Q.    Do these monthly meetings report on financials

16   for the entire company as a whole?

17       A.    Basically she would bring any information that

18   she could share with her team in regards to the finance

19   and corporate.

20       Q.    Do you remember if you were told of the

21   corporate objectives for fiscal year 2004?

22       A.    Actually Russ Owens or whoever was leading

23   would have objectives.  I know they would meet down in

24   Falls Church and that would deliver -- we would have to

Susan M. Pokoiski                                                    401

1    take their objectives and break it down into objectives

2    for our team.

3              So if it was at this level, you can't see

4    my hand, but if it was at a higher level, we would take

5    those same objectives and see if we could break it down

6    to meet or produce a deliverable in our organization.  So

7    I do know that we did hear information from corporate.

8         Q.    Was it this type of information, these types of

9    targets and goals?

10        A.    Yes.

11        Q.    So you do remember getting this information

12   that described budget, achievements, weightings?

13        A.    Some of the information maybe came by e-mail

14   overall what we were going to do for the next fiscal

15   year.  Some of the information was probably drilled down

16   in the meeting.  I can't respond in regards to accurate

17   numbers or percentages, but I do know that we did get

18   information.

19        Q.    So you at least got general information?

20        A.    That's correct.

21        Q.    But you're not sure that you got this specific

22   information?

23        A.    I'm not sure.

24        Q.    Is that for fiscal year 2004 that we're

Susan M. Pokoiski

1  speaking of?

2      A.    Well, actually we received this kind of

3  information -- as long as I was a service delivery

4  manager, I knew it was on the agenda to receive what was

5  going on in corporate and how we could incorporate it.

6  Whenever I took that position as an SDM and I attended

7  weekly meetings, if it wasn't on a monthly basis, it was

8  on a biweekly basis that we got information.  And as the

9  year progressed, the first six months we always had to

10  see where we were for the target.  So...

11      Q.    Getting back to the actual objectives on this

12  sheet, you believe you received an AMIP payment for

13  fiscal year '03 and fiscal year '02; is that correct?

14      A.    Yeah.  So this is '03 that I received -- yeah,

15  '03 and '02.

16      Q.    So you only have seen these sheets for fiscal

17  year '03 and fiscal year '02; is that correct?

18      A.    Actually, I don't remember getting one from

19  Mark Kasab when Chris Helme took his job.  So I don't

20  remember getting one from either one of them.  I do

21  remember Jeannie Maul was handing these out.  For

22  whatever reason, I did not get one from these two

23  individuals.

24      Q.    You only had seen an AMIP worksheet for fiscal

Susan M. Pokoiski

403

1   year '03?

2       A.    Yes.

3       Q.    The weightings could have changed from year to

4   year, then, correct?

5       A.    Yes.

6       Q.    They could have been different in years that

7   you didn't see the worksheet, correct?

8       A.    That's correct.

9       Q.    Or years that you didn't receive an AMIP?

10      A.    That's correct.

11      Q.    Do you know anyone who's received a prorated

12  AMIP bonus?

13      A.    No, I do not.  Actually you really shouldn't

14  discuss this.  So it was something either you had it and

15  kept it under your belt.  So no, I don't.

16      Q.    People didn't discuss their AMIP bonuses?

17      A.    No.

18      Q.    Do you know anyone who was removed from AMIP?

19      A.    Besides me?  Well, actually, if we had -- it

20  was the SDMs.  So anybody that was working with me at the

21  time, we were all in the same pot.  So yeah, from my

22  previous job, all those folks would have been removed.

23      Q.    Do you know anyone who was removed from AMIP

24  prior to fiscal year '04?

Susan M. Pokoiski

1      A.      No, I do not.

2      Q.      You said that you received e-mails with some

3    financial information.  Do you remember who you would

4    have received those e-mails from?

5      A.      Well, the only e-mails that I would receive are

6    something from corporate.  Very basic.  I would never

7    receive anything personal and confidential via e-mail.

8      Q.      Who sent the corporate e-mails?

9      A.      Could have been Honeycutt, somebody from Falls

10   Church.  Information that was distributed to everyone

11   that had anything to do in our goals or objectives or the

12   state of the -- I won't say state of the union.  Anything

13   like that.  I never received anything via e-mail that was

14   something like AMIP or salary information.

15     Q.      Do you remember anything in particular that you

16   did receive regarding corporate financial information?

17     A.      No.  Basically, when -- even before I got AMIP

18   at the end of the year, there would be a -- we made our

19   goal and the upcoming year's going to be as challenging.

20   Something like that to that nature.  I do remember

21   e-mails like that.  We still get them today.

22     Q.      You were notified by CSC that you would no

23   longer be eligible for participation in the AMIP program

24   for fiscal year 2004?

Susan M. Pokoiski

405

1       A.      Uh-huh.

2       Q.      When was that?

3       A.      There was a meeting invite from Jeannie to her

4    organization -- and I don't know the specific date.  I

5    believe it was late August or early September -- to

6    attend a meeting.  The subject was not -- there was no

7    indication what the subject matter was about, but to

8    attend a meeting and that's when we were told.

9       Q.      Who attended the meeting?

10      A.      Her direct reports or people that were eligible

11   for AMIP.

12      Q.      Approximately how many people were at the

13   meeting?

14      A.      Well, it was face-to-face or on a conference

15   call.  So I would say there were 15, 20 people.

16      Q.      Were you there face-to-face?

17      A.      I was there face-to-face.

18      Q.      What did Ms. Maul say?

19      A.      Basically that we were not eligible for the

20   AMIP program.

21      Q.      Did she say why?

22      A.      No.  There was not really a clear reason given.

23      Q.      Did she tell you that you may be eligible for a

24   discretionary bonus?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0419

1    A.    Well, actually everybody -- yes, you were told

2    that, but that's just common knowledge that anybody was

3    eligible for the discretionary bonus.

4    Q.    So you believe you could have received an AMIP

5    bonus and a discretionary bonus?

6    A.    No.  What I'm saying is that we were told that

7    we were no longer on the AMIP and that we were eligible

8    for the discretionary bonus, but I believe the

9    discretionary bonus was always out there anyway.  It

10   wasn't like now all of a sudden you're eligible for a

11   discretionary bonus.  It was always available anyway.

12   Q.    Do you know of anyone who ever received an AMIP

13   bonus and a discretionary bonus for the same year?

14   A.    No, I don't know.

15   Q.    Was the meeting with Jeannie Maul the first

16   time you learned you wouldn't be eligible for AMIP --

17   A.    Yes.

18   Q.    -- for fiscal year 2004?

19   A.    Yes.

20   Q.    You understood from that meeting that you

21   wouldn't be receiving any AMIP bonus at all for that

22   year?

23   A.    Yes.

24   Q.    You're claiming that CSC has improperly

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0420

Susan M. Pokoiski

407

1    withheld your AMIP bonus for the period of time from the

2    beginning of that fiscal year through that notification

3    from Jeannie Maul; is that correct?

4        A.    Repeat what you just said.

5        Q.    What is the period of time for which you think

6    you are owed a prorated AMIP?

7        A.    Well, I know the fiscal year starts from

8    April 1 to March 31, but I clearly started before that.

9    So basically I worked from at least February through

10   September or October on this objective.    I don't know --

11   so yeah, I believe that I put some effort and so did my

12   team.

13       Q.    You're saying the period is from April 1, 2003,

14   through the time of notification by Jeannie Maul?

15       A.    Yes.

16       Q.    Which you believe was late August --

17       A.    I don't get any credit for the time I did in

18   February and March?    But yeah, I definitely say that it's

19   definitely April.

20       Q.    Are you contending it should have started in

21   February?

22       A.    Well, let's put it this way:    If I wasn't ready

23   to kick off by April 1 and have all this, my head would

24   have been in a knot.    I would not have been an SDM.    They

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0421

Susan M. Pokoiski

1    gave me this assignment to kick it off.  So I think I

2    have a valid point.  Jeannie is a tough cookie and I

3    respect her a lot, but I just couldn't start at April 1st

4    and have hemming and hawing.  I need to show some

5    progress.  You don't finish it March 31st.  You finish it

6    before that.

7         Q.    Referring back to Exhibit 25, it does say

8    fiscal year '04 objectives on that list, correct?

9         A.    That's correct.

10        Q.    Those were objectives for fiscal year '04?

11        A.    That's correct.

12        Q.    Even though you're saying they were developed

13   earlier?

14        A.    Obviously we had this list.  It wasn't just me.

15   It was everybody on this list that you had to produce and

16   have something before the kick-off, April 1.

17        Q.    So you're saying that the period does start at

18   April 1, 2003?

19        A.    Yeah.

20        Q.    Did you receive a letter informing you of your

21   removal from fiscal year '04?

22        A.    I don't remember that.  I just remember the

23   meeting.

24        Q.    You don't remember receiving any letter?


**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

409

1    A.    No, I don't remember.

2    Q.    After that meeting with Jeannie Maul, did your

3 objectives change for fiscal year '04?

4    A.    No.  Some of these items remained on the list.

5    Q.    You continued to have the same goals?

6    A.    Yes.

7    Q.    You continued to work towards those objectives?

8    A.    Yes.

9    Q.    These objectives, they were part of your job

10 description, is that correct, referring back to

11 Exhibit 25?

12   A.    No. 10 -- actually this was over and beyond my

13 day-to-day work.  The work that I was doing, managing

14 this team, being the team -- this was over and beyond

15 what I was expected to do from day-to-day.

16   Q.    These were objectives on top of your job

17 description; is that what you're saying?

18   A.    That's correct.

19   Q.    But yet you were expected to fulfill these

20 objectives?

21   A.    That's correct.

22   Q.    So in that sense, they became part of your job

23 description?

24   A.    Until the end of the year, yes.  Until I

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  delivered them.  If I got finished before March 31st,

2  that's even better.

3      Q.    As we said earlier, some of these tasks were

4  finished at the end of fiscal year '04 and some of them

5  were finished earlier.  Correct?

6      A.    That's correct.

7      Q.    You received performance appraisals every year;

8  is that right?

9      A.    That's correct.

10     Q.    They don't have anything to do with this

11 lawsuit, do they?

12     A.    No.

13     Q.    Other than the meeting with Jeannie Maul, were

14 there any other communications you had of any nature

15 regarding the change to --

16     A.    No.

17     Q.    -- regarding the change to fiscal year '04 AMIP

18 eligibility?

19     A.    No.

20     Q.    You didn't receive any e-mails?

21     A.    No.

22     Q.    Did you have any telephone calls, meetings?

23     A.    No, I didn't.

24     Q.    Did you discuss the change with anyone?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters