Susan M. Pokoiski                                411

1       A.      I think there was some grumbling in the aisle,

2    but after a week or so, we just kind of went back to

3    doing our work.  There was no discussion.  We weren't

4    happy, but...

5       Q.      Everyone just went back to performing their

6    job?

7       A.      Yes.

8       Q.      As if nothing had changed?

9       A.      As if nothing had changed.

10       Q.      So you have now told me about all the

11    communications regarding the change to fiscal year '04

12    AMIP eligibility?

13       A.      Yes.

14       Q.      What do you contend are your damages in this

15    case?

16       A.      Well, I guess looking back, it would have been

17    nice if we were told sooner and not to go through this

18    exercise, but I believe that the damages is the work that

19    I did between, you know, I guess, April 1 and October or

20    November when we stopped the effort.

21       Q.      I thought you had told me that the meeting

22    where you first learned that you wouldn't be part of AMIP

23    anymore was in late August or early September.  Is that

24    correct?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

1        A.      Right.

2        Q.      But after that point you knew that you would no

3    longer be part of the program?

4        A.      Right.

5        Q.      So then your damages that you would claim are

6    from April 1 until that point of notification?

7        A.      Oh, but we still were working on it.  Yeah, I

8    guess technically I guess the date that we were told in

9    August would have been the end period.

10       Q.      How would you suggest you prorate your AMIP

11   bonus for that period?

12       A.      Well, I guess you would take the two that I had

13   and then take the salary of the third year, divide it by

14   three and then you would add it and divide it by three

15   and then come up with a figure and I guess it would be

16   half of that.

17       Q.      Why would it be half of that?

18       A.      It's not quite six months.  Whatever that five

19   and whatever percentage months.

20       Q.      The way you're estimating it, the way you just

21   described, there's more than one way to do that, correct?

22       A.      Yes.

23       Q.      You have to estimate because you don't have a

24   worksheet to use to calculate how your AMIP bonus would

Susan M. Pokoiski                    413

1   have been calculated, correct?

2        A.      That's correct.

3        Q.      You don't know what the weightings would have

4   been on that worksheet?

5        A.      No, but I'm sure that wouldn't be hard to find.

6   That information is probably out there.

7        Q.      You don't know what the targets were for that

8   fiscal year '04, either?

9        A.      No, I don't.

10       Q.      You really have no choice but to estimate one

11  way or the other?

12       A.      That's correct.

13       Q.      Other than the prorated AMIP bonus that you're

14  claiming, are you claiming any other damages in this

15  case?

16       A.      No.

17       Q.      You don't know exactly what motivated CSC to

18  remove you from AMIP in fiscal year '04, do you?

19       A.      No, I don't.

20       Q.      It wasn't a personal decision about you, was

21  it?

22       A.      I hope not.

23       Q.      Do you think it was?

24       A.      No, I don't.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1      Q.    CSC removed all people at your level in your

2  group, correct?

3      A.    Well, that's not privy information.  I want to

4  assume that was.  It was below a level 7, but if there's

5  an exception, I would not be aware of that.

6      Q.    So you don't know?

7      A.    No.

8      Q.    But you suspect that probably everyone at your

9  level was removed from AMIP?

10     A.    I'm going to say yes.

11     Q.    Fiscal year 2003 had been a tough year for CSC,

12 hadn't it?

13     A.    Actually what I remember, they all seemed to be

14 tough.  So I don't see 2003 as any tougher than going

15 into this year.

16     Q.    A company has a right to make decisions to save

17 money, correct?

18     A.    That's correct.

19     Q.    And to increase their profits?

20     A.    That's correct.

21     Q.    And the company's entitled to use their

22 business judgment to determine how the best way they

23 should do that is, correct?

24     A.    That's correct.



Susan M. Pokoiski
415

1    Q.    You don't have an overall problem with CSC

2    removing people from AMIP, do you?

3    A.    No.

4    Q.    They have the right to do that, correct?

5    A.    Yes.

6    Q.    You know that the company started planning the

7    fiscal year 2004 early in the year, correct?

8    A.    No, I did not know that.

9    Q.    CSC didn't make a hasty decision to remove

10   people from AMIP, did they?

11   A.    I do know that, when you were on the DuPont

12   account, there was a program for even people that were

13   below AMIP to incentivize them.   DuPont account was known

14   as a representable account.   That was taken away, and, in

15   my opinion, it was just the writing on the wall for other

16   things to be taken away.

17            There was a lot of -- it was hard to move

18   people off the DuPont account because there was programs

19   to incentivize people and if they wanted a good person to

20   go to another account, basically it was sort of like I

21   have this, I know I have it, I really don't want to move.

22   I think it annoyed some people from corporate.   So I

23   want -- I think they wanted to make it nobody gets it

24   because nobody else gets it and make it a level playing

1    field.   That's my opinion.

2        Q.    So you think they were trying to even things

3    out throughout the company?

4        A.    That's correct.

5        Q.    However, everyone is subject to the same

6    standards and receiving the same incentives?

7        A.    That's correct.

8        Q.    You weren't surprised when the DuPont people

9    were taken off their AMIP?

10       A.    No.

11       Q.    You saw it coming?

12       A.    Yes.

13       Q.    Were there rumors about that?

14       A.    I didn't hear it.

15       Q.    CSC never intended for lower-level management

16    employees to receive AMIP bonuses, right?

17       A.    I don't know that.   When you say "lower level,"

18    what do you mean, below 8?

19       Q.    Below level 8 or 7.

20       A.    Actually I don't know that.

21       Q.    Did you receive a discretionary bonus?

22       A.    No, I did not.

23       Q.    Did you receive one ever in your career at CSC?

24       A.    No, I did not.

Susan M. Pokoiski                                      417

1        Q.    You didn't receive one in fiscal year '04?

2        A.    No.

3        Q.    Did you speak to anyone in CSC's Human

4    Resources Department about your removal from the AMIP

5    program?

6        A.    No.

7        Q.    Did you speak to anyone other than Jeannie Maul

8    at that one meeting?

9        A.    Besides the grumbling in the cubicle, the aisle

10   that we're at, no, I didn't talk to anybody.

11       Q.    That was grumbling with your fellow employees?

12       A.    Yes.  Whoever attended the meeting.  No, I did

13   not.

14       Q.    What sort of things were people saying?

15       A.    Sort of like we've already been working on it

16   since January, now what?  Things like that.

17       Q.    Who do you think has personal knowledge of any

18   matter concerning your allegations in this lawsuit?

19       A.    You mean from CSC?  Or anybody?

20       Q.    Anybody.

21       A.    I don't know.  Obviously the folks that are on

22   the lawsuit.  I really don't know.

23       Q.    Is there anyone at CSC who you think might have

24   personal knowledge?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0431

Susan M. Pokoiski
418

1       A.    No.   I guess the folks -- I would assume that

2   whoever I was working with, they might have gotten

3   knowledge that this exists, but I'm in a different group

4   now and I moved from 400, so I don't see anybody.   I'm

5   not with the same organization.

6       Q.    You don't know of anyone in CSC or otherwise

7   who has personal knowledge?

8       A.    No.

9       Q.    Who have you spoken with regarding your

10  lawsuit?

11      A.    The only person I guess I mentioned this to is

12  my husband that I was involved, but he stays out of that.

13      Q.    Other than your husband, nobody else?

14      A.    No.

15      Q.    No one at CSC?

16      A.    No.

17      Q.    None of the plaintiffs?

18      A.    Actually, again, I don't see them.   I'm in a

19  different -- I'm not on the DuPont account anymore, and

20  some of those folks I never met till that January 27th

21  meeting.

22      Q.    Going back to that meeting with Jeannie Maul,

23  as of the date of that meeting, which I believe you said

24  was early August or late August or early September, as of

Susan M. Pokoiski

419

```
1   that date, you were told that you were no longer eligible

2   for AMIP for fiscal year '04.

3               As of that date, you did not believe that

4   you were receiving any amount of money for an AMIP bonus

5   for fiscal year 2004?

6      A.    When we were told, there was a lot of talk in

7   regards to what does that mean.  We had questions.  But

8   when we were told that we were no longer eligible, I

9   believed that the work that we were doing was not going

10  to reap any kind of AMIP money the coming year, the

11  coming April.

12     Q.    So you believed you were completely off the

13  program at that point?

14     A.    Yes.

15     Q.    And wouldn't receive any AMIP bonus for the

16  year?

17     A.    That's right.

18     Q.    Do you have any debts at the present time?

19     A.    Debts?  Mortgage.

20     Q.    Credit card debts?

21     A.    Yes.

22     Q.    Anything else?

23     A.    Car loan.

24     Q.    Anything else?
```

1       A.    That's it.

2       Q.    Earlier you told me of a lawsuit you were

3   involved in against CSC for overtime.

4       A.    Uh-huh.

5       Q.    Was that case called *Gianetto v. CSC*?

6       A.    Yes.

7       Q.    That's a case where you got about approximately

8   $200?

9       A.    Yes.

10      Q.    Other than what we already discussed, have

11  there been any written, oral, or recorded statements

12  given by anyone in connection with this lawsuit?

13      A.    No.

14      Q.    Have you now told me everything you know that

15  forms the basis of your case?

16      A.    Yes.

17            MR. WILSON:  Object to form.

18      Q.    Is there anyone else you have not mentioned who

19  could support your claims?

20      A.    I can't think of anybody.

21      Q.    Is there any other information which you

22  haven't mentioned which is relevant to your claims?

23            MR. WILSON:  Object to form.

24      A.    No.  Whatever I have, I have answered -- I have

Susan M. Pokoiski                                                      421

1    nothing else.

2                    MS. BOYD:   Another short break, please.

3                    (A recess was taken.)

4    BY MS. BOYD:

5        Q.    You were an at-will employee, weren't you,

6    Ms. Pokoiski?

7        A.    Oh, yes.

8        Q.    You didn't have a contract of employment?

9        A.    Yes.

10       Q.    Yes, that's correct?

11       A.    Yes.

12       Q.    You were an at-will employee?

13       A.    Yes.   Sorry.

14       Q.    CSC has an employee handbook; is that correct?

15       A.    Yes.

16       Q.    That is distributed electronically?

17       A.    Yes.

18       Q.    Is it available on the intranet?

19       A.    Yes.

20       Q.    That has various policies and forms within it?

21       A.    Yes.

22       Q.    You can access that from your computer?

23       A.    Yes.

24       Q.    And all CSC employees can access that from

Susan M. Pokoiski                              422

1    their computer?

2        A.    Yes.

3        Q.    Were there any similar policies that were

4    available on the CSC intranet?

5        A.    We have things on the portal in regards to

6    security.

7        Q.    Is there anything you can think of that's

8    available on the intranet?

9        A.    No, nothing comes to mind.

10       Q.    Or anything that's distributed electronically?

11       A.    Stock information.  That's distributed

12   electronically.

13       Q.    Any documents that are distributed

14   electronically?

15       A.    Nothing comes to mind.

16       Q.    You weren't guaranteed an AMIP bonus, were you?

17       A.    Guaranteed.  Nothing is guaranteed.  No, I

18   guess not.

19       Q.    Nothing is guaranteed, right?  You just assumed

20   you'd get it from year to year because you had gotten it

21   the year before, right?

22       A.    Well, you would assume you would get it,

23   especially if you had a personal objective to work on.

24   So that was my go do.  As long as I had this personal

Susan M. Pokoiski                           423

1    objective for the next fiscal year, I assumed that I

2    would get -- I would be eligible for an AMIP.

3        Q.     You assumed, but you weren't guaranteed,

4    correct?

5        A.     That's correct.

6        Q.     Until you actually received the AMIP worksheet

7    at the close of the fiscal year or after the close of the

8    fiscal year, you didn't know exactly how your AMIP would

9    be calculated, correct?

10       A.     There was a meeting I recall with Chris Helme,

11   H-e-l-m-e, where he went into detail around how it would

12   be divied up or how they're expecting to be divied up.  I

13   do remember a meeting.  Don't know the date or the year.

14   So we did have an idea at that point of what was going to

15   happen as we got closer to it, if we were meeting the

16   earnings per share and things like that.  There were a

17   few meetings called.  This is prior to Jeannie Maul.

18       Q.     Prior to Jeannie Maul becoming your supervisor?

19       A.     That's correct.

20       Q.     Were you eligible for AMIP at that point?

21       A.     Yes, I was.

22       Q.     These meetings were to you said divie up --

23       A.     Actually explain where we were at that point to

24   the AMIP program, the weighted average or what the

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski                                                    424

1    earnings per share were.   Just a highlight where we were.

2         Q.    Would this have been fiscal year '02?

3         A.    We're talking about -- here we go again.   It

4    might have been the first one that I received.

5         Q.    So the first one that you said you received,

6    first AMIP bonus you said you received, was for fiscal

7    year '02?

8         A.    So prior to April.

9         Q.    These meetings with Chris Helme took place --

10        A.    In a conference room in Building 200.

11        Q.    About financials for fiscal year '02?

12        A.    That's correct.

13        Q.    He was giving you a status report as to where

14   you were?

15        A.    The whole team.   The whole organization.

16   Wasn't just me.   Face-to-face or if you could attend

17   face-to-face or you could dial in.   Anyone in the 200

18   went in.   Actually I think it was a meeting like after

19   5 o'clock or whatever because he wanted to make sure that

20   we took care of our clients first and we were available

21   for discussion.

22        Q.    He could tell you where you were with regard to

23   hoping to achieve your goals, but he couldn't tell you if

24   you had achieved them at that point, correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski                                                425

1      A.      That's correct.

2      Q.      Because the fiscal year hadn't ended yet,

3  correct?

4      A.      That's correct.

5      Q.      Do you remember any other meetings where such

6  information was discussed?

7      A.      No, not at this moment.

8              MS. BOYD:   That's all we have.

9  BY MR. WILSON:

10     Q.      I just have a couple questions, and the same

11  rules apply.   Oral answers, etcetera.

12              I'd like to have this marked as an exhibit.

13              (Deposition Exhibit No. 27 was marked for

14  identification.)

15  BY MR. WILSON:

16     Q.      In front of you is what's been marked

17  Exhibit 27.   Can you take a second and look at that and

18  let me know when you're finished?

19     A.      Okay.

20     Q.      On the first page of this, is there a pay date

21  indicated?

22     A.      Pay date, June 1, 2001.

23     Q.      Is there a bonus indicated on this page?

24     A.      Yes, there is.   Under description hours, I

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski

426

1   guess it's the sixth item down.

2        Q.    Is there an amount?

3        A.    $2,639.

4        Q.    Is that an AMIP bonus?

5        A.    Yes.

6        Q.    Did you receive an AMIP bonus for fiscal year

7   2000?

8        A.    Yes.

9              MS. BOYD:  Objection.

10       Q.    Is that AMIP bonus included in your total

11   earnings?

12       A.    Yes.

13       Q.    What's the pay period indicated on this sheet?

14       A.    May 12, 2001, through May 25th, 2001.

15       Q.    Did you earn this bonus during that time period

16   specifically?

17       A.    Specifically May -- no.  It was work prior to

18   that.

19       Q.    Do you have a recollection as to the time

20   period in which you did earn the bonus?

21       A.    Again, we would have kickoff and it would be

22   January of '00 and then we probably followed the same

23   suit and we would work from -- kick it off April 1

24   through March 31st, but the goal was to have that

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Susan M. Pokoiski                                    427

1    completed before March 31st.

2         Q.    Could you look at the second page?

3         A.    Yes.

4         Q.    What's the pay date on that?

5         A.    May 11th, 2002, through May 24th, 2002.

6         Q.    What's the pay date?

7         A.    May 31st, 2002.

8         Q.    Just for clarification, the first dates you

9    gave, was that the pay period?

10        A.    That was the pay period.

11        Q.    Is there a bonus indicated on this page?

12        A.    Yes, there is.

13        Q.    Is that your AMIP bonus?

14        A.    Yes, it is.

15        Q.    Is that represented in your total earnings?

16        A.    Yes, it is.

17        Q.    Did you earn that whole bonus during the pay

18   period?

19              MS. BOYD:   Objection.

20        A.    No.   It was work done prior to that.

21        Q.    When would you have earned that bonus?

22        A.    Again, the kick-off would have been April 1

23   through March 31st of the prior year, but we would have

24   gotten together prior to that in January and identified a

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski                                       428

1   charter, etcetera.

2        Q.     Could you look at the third page?

3        A.     Yes.

4        Q.     Can you indicate the pay period?

5        A.     Pay period, May 10, '03, through May 23rd, '03.

6        Q.     And the pay date?

7        A.     Pay date is 5/30/03.

8        Q.     Is there a bonus indicated on there?

9        A.     Yes.

10       Q.     Is that representative of your AMIP bonus?

11       A.     Yes.

12       Q.     Did you earn your AMIP bonus?

13              MS. BOYD:   Objection.

14       A.     Yes.

15       Q.     Did you earn your AMIP bonus during that

16   specific pay period?

17       A.     No.  It was prior to that time.

18       Q.     Could you give us an indication of when you

19   earned it?

20       A.     We decided on objectives or personal items in

21   the January time frame and the goal was to kick it off by

22   April 1 of that year.  That fiscal year I should say.

23   And then complete it by March 31st of that fiscal year.

24       Q.     You testified that you had some oral

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski

429

1    discussions with a Mark Kasab?

2        A.    Mark, yes.

3        Q.    Was he the one that initially told you you

4    would be eligible for the AMIP?

5        A.    Yes.

6        Q.    That was oral, correct?

7        A.    That's right.

8        Q.    Did he ever come to you again in subsequent

9    years and tell you you would be eligible for the AMIP

10   bonus?

11       A.    Actually he went to another assignment and

12   Chris Helme took that position, but no, I was never told

13   again that I was still on it.  You just assumed that you

14   were on it.

15       Q.    Did you receive AMIP bonuses in subsequent

16   years?

17       A.    Yes.

18       Q.    How did you know from year to year that you

19   were eligible?

20       A.    Well, unless you were told you weren't, you

21   could assume that you were on.

22       Q.    I'd like you to look at Exhibit 25.  The

23   objectives on that sheet of paper, were any of those

24   attributable to AMIP?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan M. Pokoiski                              430

1       A.      Yes.

2       Q.      Which ones?

3       A.      Well, actually, if you look at the first two,

4    these were the ones that were everybody's, meet, exceed

5    financial objectives and achieve the 96 -- actually

6    96 percent plus or all SLAs.  So that was included in our

7    personal objective.  And then --

8       Q.      Excuse me for just a second.  You said that

9    that was everybody's.  What do you mean by "everybody"?

10      A.      The goal was that whatever financial objectives

11   that would come from corporate, we were to meet or exceed

12   that.  So that was part of our objectives.

13      Q.      But who specifically?  The people in your group

14   or everybody in the company?

15      A.      The people in our group, the people that were

16   attending this meeting.

17      Q.      Okay.  I'm sorry.  You can continue.

18      A.      Now I'm lost here.

19      Q.      Which ones were attributable to AMIP?

20      A.      I know 9 was.  No. 14 was.

21      Q.      What is 14?

22      A.      Sigma program and design methodology.

23              I know No. 9 was, trying to create a

24   recognition and organization vitality.



Susan M. Pokoiski                                                431

1          Probably No. 5 was, reduce defects in lines

2     of service.

3          I believe No. 4 was, also.

4          That's it that I can remember.  I'm sure

5     that if -- the idea was to get this list to identify them

6     and then come up with a charter.  So I don't have that

7     information, but I believe those were AMIP projects.

8     Q.    On the fifth page, the first page of the chart,

9     it says Miller 393 at the bottom, if you go down to ID

10    No. 30, what does that say?

11    A.    "Start Tracking Improvement WINS/Thought Leader

12    (AMIPS)."

13    Q.    Can you explain to us what that means?

14    A.    Well, I believe the goal was to -- if all these

15    things were achieved, we would see an improvement and

16    this would help with additional WINS.  New business, new

17    revenue opportunities, and things like that.  So that was

18    the goal to do that.  Again, this is a while back, but

19    that's...

20    Q.    Was this put together for fiscal year 2004?

21    A.    Yes.  Yes.  Our goal -- I'm looking at 392.

22    Our goal was business development and revenue generation.

23    We were going to improve our rating through the

24    leadership through the account team and if you increase

Susan M. Pokoiski
432

1    your client satisfaction, the thinking was the client

2    would come back for additional projects or opportunities.

3    And so we thought that was the category would be WINS.

4    That's where that verbiage came from.

5        Q.    So based on this, did you know your AMIP

6    objectives --

7            MS. BOYD:  Objection.

8    BY MR. WILSON:

9        Q.    -- for fiscal year 2004?

10       A.    Yes.

11       Q.    Based on this, did you think you were

12   eligible --

13           MS. BOYD:  Objection.

14   BY MR. WILSON:

15       Q.    -- for an AMIP bonus for fiscal year 2004?

16       A.    Yes.

17       Q.    Did you work to meet the objectives that you

18   indicated were related to AMIP in fiscal year 2004?

19           MS. BOYD:  Objection.

20       A.    Yes.

21       Q.    On the last page of this document, Miller 398,

22   right up close to the top it says, "Close Down Project -

23   March '04."

24       A.    Right.

Susan M. Pokoiski

433

1       Q.    What does that mean?

2       A.    The idea was that we would reconcile what was

3 on the project plan and make sure that before March 31st

4 and as soon as possible, that all the milestones and the

5 items that we marked as deliverables were completed

6 before the end of the fiscal year.

7       Q.    Could you look at Exhibit 26, please?

8       A.    Got it.

9       Q.    Are there personal factors listed on that

10 chart?

11      A.    Personal factors.  Well, the individual

12 objectives would be the personal factors.

13      Q.    Okay.

14      A.    The "GIS Demand Forecast:  Work with SBU/SDM's

15 and account" -- this is one -- this was working with the

16 project management office that I had to come up with a

17 process and a flow so that the PMs would know three to

18 six months ahead of time what projects were coming in so

19 they could staff properly.  That's what that one is.

20      Q.    So for fiscal year 2003 you still had

21 individual objectives?

22      A.    Yes.

23      Q.    In your testimony you indicated that financial

24 objectives would change?



Susan M. Pokoiski

434

1       A.    Yes.

2       Q.    What would change about the financial

3   objectives?

4       A.    Earnings per share I know always changed.

5   Budgets got leaner and tighter.  So that might have

6   changed.  So the percentage would change there.

7   Obviously the revenue.

8       Q.    Did the measure ever change?  For the record,

9   I'm indicating the first column where it's titled

10  "Measure."

11      A.    For the two that I got prior to this date, they

12  were consistent.

13      Q.    So it was the percentage that changed?

14      A.    That's correct.

15      Q.    But not the measure or factor?

16           MS. BOYD:  Objection.

17      A.    That is correct.

18      Q.    From year to year did these measures remain the

19  same?

20      A.    Yes.

21           MS. BOYD:  Objection.

22      Q.    Even if you didn't have these specific

23  percentages in front of you --

24           MS. BOYD:  Objection.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan M. Pokoiski                                                435

1    BY MR. WILSON:

2        Q.    -- would you know what measures you needed to

3    work on for your AMIP bonus?

4        A.    I would know what to do regardless of what the

5    measure or the percentage was, yes.

6        Q.    You indicated sometime in August that you were

7    informed that you were no longer eligible for AMIP.

8        A.    Yes.

9        Q.    Did you continue to work on all of your --

10            MS. BOYD:  Objection.

11   BY MR. WILSON:

12       Q.    -- AMIP objectives?

13       A.    Yes.

14       Q.    Did you ever change anything that you did with

15   your AMIP objectives?

16            MS. BOYD:  Objection.

17       A.    I believe at one of our team meetings, and I

18   don't recall which one, the subject came up shall we

19   continue doing this since we're not eligible for AMIP.

20   It was probably later in October/November.  And we

21   decided that as a group we had other things to do and we

22   decided not to work on this project.  Not this one, but

23   the one that was...

24       Q.    What was the reason for that decision?

Susan M. Pokoiski
436

1      A.    The reason was because if we're not going to

2   be -- we weren't eligible and our workload -- this was

3   over and beyond what we were supposed to be doing.   We

4   had other things that were on our plate.   We decided from

5   a work perspective we were going to concentrate on the

6   other things.

7      Q.    Were you required to do additional work to earn

8   the AMIP bonus?

9            MS. BOYD:   Objection.

10     A.    Say that again.

11     Q.    Were you required to do additional work --

12           MS. BOYD:   Objection.

13  BY MR. WILSON:

14     Q.    -- to earn your AMIP bonus?

15     A.    Yes.   There were different tasks over and

16  beyond my current assignment.

17     Q.    Was the AMIP bonus an earned bonus?

18           MS. BOYD:   Objection.

19     A.    Yes.

20     Q.    Did CSC benefit from the work that you did on

21  your AMIP objectives from April 1st --

22           MS. BOYD:   Objection.

23

24  BY MR. WILSON:

Susan M. Pokoiski

1      Q.      -- 2003 up through the date that you were

2  informed that you were no longer eligible for your AMIP

3  bonus?

4      A.      Yes.

5              MR. WILSON:  I have nothing further.

6  BY MS. BOYD:

7      Q.      I'd like to start with Exhibit 27.  Looking at

8  the first page, you said the pay period was from

9  5/12/2001 to 5/21/2001, correct?

10     A.      Uh-huh.

11     Q.      You testified that the bonus shown is your AMIP

12 bonus; is that correct?

13     A.      That's correct.

14     Q.      You received that money for that pay period,

15 correct?

16     A.      No.

17     Q.      It didn't show up --

18     A.      I mean, I received that money -- yes, I

19 received that money on the pay date 6/1.

20     Q.      This column on the bottom, total earnings,

21 would not have shown up on this paper until that date,

22 correct?

23     A.      That's correct.

24     Q.      Turn to page 2.  You said this was for pay

Susan M. Pokoiski
438

1   period 5/11/02 through 5/24/02?

2       A.      Uh-huh.

3       Q.      You received the bonus listed on the pay date,

4   5/31/2002?

5       A.      Yes.

6       Q.      It would not have shown up in the column total

7   earnings until that date?

8       A.      Yes.

9       Q.      Turn to page 3.  You testified that the pay

10  period for this was 5/10/2003 through 5/23/2003?

11      A.      Correct.

12      Q.      The bonus you received on this pay was received

13  on the pay date 5/30/2003?

14      A.      Yes.

15      Q.      That would not have shown up in your total

16  earnings until that date?

17      A.      Correct.

18      Q.      Returning to Exhibit 25, this first page,

19  Miller 389, you testified this was the list that you

20  developed in January of 2003, correct?

21      A.      No.  I didn't develop this.  This was probably

22  whoever was the scribe.  This is the product for the

23  entire group.  I didn't develop this one.

24      Q.      But this list was made as a result of a meeting

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0452

Susan M. Pokoiski

```
1    in 2003, January 2003?

2        A.    That's correct.

3        Q.    Is the word "AMIP" anywhere on this sheet?

4        A.    I don't see it.  No, I guess not.

5        Q.    Returning to Exhibit 26, the AMIP worksheet.

6    You testified that the measures don't change; is that

7    correct?

8        A.    Yes.

9        Q.    You also testified that this was the only AMIP

10   worksheet you have ever seen, correct?

11       A.    Yes.

12       Q.    So you're unable to say if the measures have

13   ever changed, correct?

14       A.    Unless it was like in that meeting I referred

15   to with Chris Helme basically that the measures were very

16   similar to what's here, earnings per share, the budget,

17   the revenue.

18       Q.    But you don't remember if they were exactly the

19   same?

20       A.    I do not remember if they were exactly the

21   same, you're correct.

22             MS. BOYD:  I think that's everything.

23             (Deposition concluded at 11:15 a.m.)

24
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1                    T E S T I M O N Y

2

3    DEPONENT:  SUSAN M. POKOISKI                    PAGE

4

5    BY MS. BOYD............................... 355

6    BY MR. WILSON............................. 425

7    BY MS. BOYD............................... 437

8

9                    E X H I B I T S

10

11   DEPOSITION EXHIBIT NO.                        MARKED

12

13   24 - A letter dated March 7, 1997,
     to Susan M. Pokoiski from Dorothy Eltzroth.... 373

14

15   25 - A multi-page document Bates numbered
     Miller 389 through Miller 398................. 383

16   26 - A document Bates numbered Miller 399..... 394

17   27 - Three documents Bates numbered
     D-10658, D-10685, and D-10712................. 425

18

19   ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 441

20

21   CERTIFICATE OF REPORTER                 PAGE 442

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



WILCOX & FETZER LTD.
Registered Professional Reporters

<u>CERTIFICATE OF REPORTER</u>

STATE OF DELAWARE)

                  )

NEW CASTLE COUNTY)


       I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 16th day of February, 2006, the deponent herein, SUSAN M. POKOISKI, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


*Kimberly A. Hurley*
Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)


DATED:    3/10/06


**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
          v.                    )   C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
     Defendant.                 )

          Deposition of BRIAN L. MILLER taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 1:00 p.m., on Thursday,
February 16, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          LINDA M. BOYD, ESQUIRE
             DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant

          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0458

```
1   APPEARANCES (cont'd):

2                   TYLER B. RAIMO, ESQUIRE
                    COMPUTER SCIENCES CORPORATION
3                    3170 Fairview Park Drive
                     Falls Church, Virginia 22042
4                    for the Defendant

5                           - - - - -

6

7                       BRIAN L. MILLER,

8           the witness herein, having first been

9           duly sworn on oath, was examined and

10          testified as follows:

11  BY MR. SEEGULL:

12      Q.    Mr. Miller, as you know, my name is

13  Larry Seegull, and I'm an attorney representing Computer

14  Sciences Corporation.  With me today is Linda Boyd from

15  my office, as well as Tyler Raimo, who I think you know.

16  You have met off the record.

17              Have you ever been deposed before?

18      A.    No, I have not.

19      Q.    I'll be asking you questions about the basis

20  for the lawsuit and things you understand and know.

21  Obviously all of your answers have to be verbal because

22  the court reporter can't take down head nods or other

23  body language.

24              You have to answer the questions truthfully
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller

1    just as if you were testifying in court under oath.

2                 If you do not hear a question, say so, I

3    will repeat it.  If at any point in time you realize that

4    an earlier answer you gave was incomplete or inaccurate

5    in any way, just say so and you will be allowed to

6    correct or supplement the record.

7                 Of course, if you need to stop to use the

8    restroom, to take a break, get a drink of water, that's

9    fine, just say so, you will be allowed to do so.

10                 Of course, if you don't know or don't

11   remember information, that's fine.  Just say you don't

12   know or don't remember.

13                 You cannot talk to your attorney during the

14   deposition unless it relates to a question of privilege,

15   and I'll try to avoid any questions of privilege.

16                 If you answer the question, I'll assume

17   that you have heard it and understood it and have given

18   me your best recollection.

19                 Do you understand the instructions that I

20   just have given you?

21        A.    Yes.

22        Q.    Are you taking any medication today that could

23   possibly impair your ability to testify?

24        A.    No.

Brian L. Miller

```
 1      Q.      What did you do to prepare for today's
 2  deposition?
 3      A.      I had a preparatory meeting with Tim.
 4      Q.      When was that?
 5      A.      Just before this session.
 6      Q.      How long was the meeting?
 7      A.      About an hour.
 8      Q.      Did you review any documents in preparation for
 9  the deposition?
10      A.      Not really, no.
11      Q.      Was anyone else present when you met with
12  Mr. Wilson?
13      A.      No.
14      Q.      You say you have not really reviewed any
15  documents?
16      A.      I read through -- the months before this I'm
17  familiar with the documents that I have seen to date, but
18  I didn't specifically review anything for this
19  deposition, no.
20      Q.      During the day today, for instance, you haven't
21  read any documents?
22      A.      No.
23      Q.      That's correct?
24      A.      Well, I take that back.  One thing I did look
```

1  at was my -- what I'm claiming for damages I guess was

2  the only other document.

3       Q.    The actual amount of damages?

4       A.    The actual amount.  I figured that would be a

5  question you would ask.

6       Q.    What's the actual amount of damages?

7       A.    I believe it's 12,600 and something, which is

8  my calculation before any legal thing.  That's my

9  calculation of what I believe I was owed.

10      Q.    How did you arrive at that amount?

11      A.    I used my previous AMIP's rewards and averaged

12 them to arrive at the average over the period of time I

13 was eligible with CSC and took that against what I was

14 eligible for for that year and then divided that by two

15 because of the half year that we have in discussion here.

16      Q.    So first you averaged the amount of AMIP

17 payments you have received over the number of years?

18      A.    Not the amount.  The percentage payout that I

19 received of the maximum allowed.

20      Q.    What was the percentage payout you received

21 during the past few years?

22      A.    I think it averaged out to be 98 percent of

23 what I was eligible for.

24      Q.    Over how many years were you looking?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1      A.      Back to when I came to CSC in '97.

2      Q.      It would have been starting for the fiscal year

3  '98?

4      A.      Yes.  I believe that's correct, yes.

5      Q.      So you looked at a payout percentage for fiscal

6  year '98 through fiscal year 2003?

7      A.      Correct.

8      Q.      You took all those percentages and divided it

9  by that number of years?

10      A.      Yes.

11      Q.      And then you say that percentage you think

12  worked out to be 98 percent?

13      A.      I believe that's correct, yes.

14      Q.      Then you applied that 98 percent against what?

15      A.      Against what I was -- my eligibility was

16  25 percent of my pay.  So I took my pay as of the end of

17  fiscal year 2003, right?

18      Q.      Okay.

19      A.      Took that times 25 percent.

20      Q.      That was your payout percentage?

21      A.      That was my maximum eligible percentage.  Took

22  that times 98 percent, divided basically by two.  Six out

23  of twelve months.

24      Q.      Why did you divide it by two?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller

1        A.    The basis of the lawsuit is we were earning

2   that money through the time that we were told we were no

3   longer eligible for the program.

4        Q.    You're claiming a portion of an AMIP payment

5   from April 1 of 2003 through September 11th, 2003?

6        A.    End of September.  Yes.

7        Q.    Why through the end of September?

8        A.    Because I wasn't really notified -- the letter

9   that I did receive was dated September 11th, I believe,

10  but the discussions and the conversations about it didn't

11  happen until later in September.

12       Q.    So you received the letter on September 11th?

13       A.    No.  I did not receive a letter until I had a

14  meeting with my manager sometime later in September.

15       Q.    Do you know when in September?

16       A.    Exactly I do not know.  It was in the last week

17  or two of September.

18       Q.    What you're claiming is the AMIP for that

19  portion of time, from April 1 through that time of the

20  meetings later in September of 2003?

21       A.    Right.  The six-month period there.  If I did

22  my calculations properly.

23       Q.    Obviously that's an estimate for the amount

24  that you believe you're owed?

Brian L. Miller

450

1    A.    Yes.

2    Q.    There are other ways to estimate it.

3    A.    I don't understand.

4    Q.    You estimated the percentage payout, but you

5    could have also estimated the amount of payment in prior

6    AMIP payments?

7    A.    I suppose I could have.

8    Q.    You could have done it over a period of three

9    years rather than a period of five years?

10   A.    I could have, yes.

11   Q.    There are other statistical ways that you could

12   have estimated the amount of an AMIP payment for that

13   period of time, correct?

14        MR. WILSON:    Object to form.

15   BY MR. SEEGULL:

16   Q.    Is that correct?

17   A.    That's correct.   I also could have estimated it

18   based upon the full 25 percent that I think I would have

19   been due, too.

20   Q.    What do you mean?

21   A.    I believe I was being fair in my estimation to

22   say how was I doing over the period of time.  However, I

23   could have also said that, well, it's the full 25 percent

24   that I was due and not taking it by 98 percent like I

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0465

Brian L. Miller

1    said I did.  I could have said it was a 100 percent of

2    that.  I believe I was being equitable -- of course

3    there's many ways that one could do statistical methods

4    on that, yes.

5         Q.    The reason you have to do an estimate is

6    because you never received a worksheet for that fiscal

7    year, correct?

8         A.    That's correct.

9         Q.    For the fiscal year 2004, you never received an

10   AMIP worksheet to know how it would have been calculated

11   if you had remained eligible?

12        A.    The reason I did the estimate is I was asked to

13   do one for this specific thing.

14        Q.    Right, but the reason you had an estimate is

15   because you didn't have a worksheet to turn to, correct?

16        A.    Yes.  We never received worksheets to do that

17   for.  So I guess yes, to answer your question.

18        Q.    What was the total dollar amount that you

19   estimate you're owed?

20        A.    Approximately.  I don't know exact amount.  I

21   looked at it, but I can't remember.  Twelve thousand six

22   hundred and some change.

23        Q.    Was that something that you placed in your

24   interrogatory answers?



Brian L. Miller

452

1    A.    Yes.    I believe there was a question about

2 that.

3    Q.    Does the number $12,671.02 sound familiar?

4    A.    Probably sounds right.

5    Q.    That's the amount you're claiming you're owed

6 based upon this lawsuit.

7    A.    That's the amount I claim as the missing piece

8 from April to September, end of September.

9    Q.    That's what you're claiming you're owed in this

10 lawsuit, correct?

11    A.    I believe that's the case, yes.    And whatever

12 the other law provides -- I don't understand if that's

13 specifically what I'm asking for or if you're asking me

14 to also talk about what the law may provide.

15    Q.    I'm not asking you to give a legal conclusion.

16    A.    Yes.    That's my specific amount that's listed

17 there.

18    Q.    That you're claiming?

19    A.    Yes.

20    Q.    Your claim is under the Delaware Wage Payment

21 Act?

22    A.    Yes.

23    Q.    What is your Social Security number?

24    A.    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.

Brian L. Miller

1    Q.    What is your date of birth?

2    A.    October 30th, 1964.

3    Q.    Your place of birth?

4    A.    Bellefonte, Pennsylvania.

5    Q.    Where do you currently live?

6    A.    I currently live in Delaware.

7    Q.    How long have you lived there?

8    A.    At this house or in Delaware in general?

9    Q.    Where do you live in Delaware now?

10   A.    It's Riblett Lane, Wilmington, Delaware.

11   Q.    Rivlett?

12   A.    Riblett, R-i-b-l-e-t-t.

13   Q.    How long have you lived there?

14   A.    Approximately five years.

15   Q.    Where did you live before that?

16   A.    Middletown, Delaware.

17   Q.    Where in Middletown?

18   A.    I can't remember the name of the street.  A

19   development right below the canal.  I can't remember the

20   name.

21   Q.    What is your phone number?

22   A.    Home phone number is 302-633-6541.

23   Q.    Do you have a cell phone?

24   A.    Yes, I do.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1    Q.    What's the cell phone number?

2    A.    302-547-9606.

3    Q.    Do you own or rent?

4    A.    I own.

5    Q.    Have you ever been arrested?

6    A.    No.

7    Q.    Have you ever been convicted of any crime?

8    A.    Just parking-type.  Just speeding-type tickets.

9    No official crime.

10    Q.    Moving violations?

11    A.    Moving violations.  Just a speeding ticket.

12    Q.    Have you ever been in the military?

13    A.    No.

14    Q.    Have you ever filed a claim in bankruptcy?

15    A.    No.

16    Q.    Have you ever filed any other lawsuits?

17    A.    No.

18    Q.    Have you ever been a party to any other

19    lawsuits?

20    A.    No.

21    Q.    Have you ever filed a claim under workers'

22    compensation?

23    A.    No.

24    Q.    Have you ever filed any unemployment

Brian L. Miller

1    compensation claims?

2        A.    No.

3        Q.    When did you first contact an attorney to

4    handle your case against CSC?

5        A.    I guess that would be probably in the fall soon

6    after I received the letter, which would have been, I

7    guess -- I'm drawing a blank on years here.  It's been so

8    long.  October 2004?  Yes.

9        Q.    You say soon after you received the letter.

10   What do you mean?

11       A.    The letter talking about the removal from the

12   AMIPs program.

13       Q.    Was it your supervisor that gave you the

14   letter?

15       A.    Yes, my supervisor gave me the letter.  Right.

16       Q.    Is that a he or she?

17       A.    It's a he.

18       Q.    Who is that?

19       A.    Robert Tattle, T-a-t-t-l-e.

20       Q.    Bob Tattle?

21       A.    Bob, yes.

22       Q.    What was his position?

23       A.    His position was director -- application

24   development manager/director on the DuPont account.

Brian L. Miller

1    Q.    He was your supervisor?

2    A.    Correct.

3    Q.    As of September of '03?

4    A.    When we received the letter, right.  Oh, yes.

5    Q.    Is he still your supervisor?

6    A.    No.

7    Q.    What was your position in September of '03?

8    A.    The title was portfolio manager.  My role

9    within CSC was titled senior manager.

10   Q.    Are you still in that position?

11   A.    No, I'm not.

12   Q.    What position are you in now?

13   A.    I'm now a -- it's the next level above that.  I

14   can't remember the title of it.  Computer scientist

15   principal, I believe.

16   Q.    Are you AMIP-eligible now?

17   A.    Yes, I am.

18   Q.    When did you become AMIP-eligible?

19   A.    In September of 2004 I was put back on the

20   program and I received a prorated bonus for fiscal 2005

21   under that program.

22   Q.    That was because you received a promotion?

23   A.    No.  I moved to the new assignment and then my

24   position was reassessed into a new assignment.  Moved to

Brian L. Miller

457

```
1    the assignment first, and a couple months I moved to that

2    assignment, month and a half, my position was

3    reevaluated.  I was placed back on the program and

4    received a prorated bonus for approximately that six

5    months of fiscal year 2005.

6         Q.    When did you move to the new assignment?

7         A.    August/September time frame of 2004.

8         Q.    Is it fair to say that you were --

9         A.    I think my correction of when I contacted them

10   would be 2003.  I'm getting confused on dates.  I

11   contacted them whenever the letter came out.

12        Q.    You contacted an attorney?

13        A.    An attorney.

14        Q.    Shortly after you were told you were no longer

15   eligible for AMIP?

16        A.    Correct.

17        Q.    That would have been in September of '03.  So

18   it would have been shortly thereafter?

19        A.    Correct.

20        Q.    You remained ineligible under AMIP until you

21   were placed in the new position in August and then that

22   position was reevaluated in September or October?

23        A.    That's correct.

24        Q.    Of '04?
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

458

1       A.      Of '05.

2       Q.      '04.

3       A.      '04, you're correct.  Sorry.  Yes, that's

4    correct, '04.

5       Q.      At that point you became AMIP-eligible?

6       A.      Correct.

7       Q.      Then you received an AMIP bonus after the close

8    of fiscal year '05?

9       A.      Correct.

10      Q.      That bonus, AMIP bonus, you said was prorated?

11      A.      Correct.

12      Q.      How do you know it was prorated?

13      A.      Because very specifically on my discussions

14   that would be prorated back to the time -- it was not for

15   the full year that the AMIP program runs.  AMIP program

16   runs generally April 1st through March 31st of the --

17   follows essentially a fiscal year.  I came in in

18   September, I believe, and that payout was made for the

19   six-month period, because I was eligible again for a

20   percentage and my payout I was told would be only half of

21   that since it was only half a year I was on the program.

22      Q.      Did you receive a worksheet showing the

23   breakdown of how it was paid?

24      A.      I did at some point soon after that time frame,

Brian L. Miller

1   yes.

2       Q.    Did the worksheet reflect that it had been

3   prorated?

4       A.    Yes, it did.

5       Q.    Did it reflect a certain number of months?

6       A.    Yes.

7       Q.    How many months did it show proration?

8       A.    I cannot remember.  Very much from the time

9   they told me until that point in time.

10      Q.    Do you maintain that the company should not

11  have prorated you for your fiscal year 2005 AMIP?

12      A.    No.

13      Q.    For fiscal year 2005?

14      A.    That's correct.

15      Q.    You're fine with the company prorating you?

16      A.    Yes.  Because that's -- I believe they informed

17  me I would be on the program, and that I believe would be

18  appropriate.  I was eligible and working towards that

19  bonus for those -- that period of time.

20      Q.    Was the first attorney you contacted

21  Jeff Martin?

22      A.    Yes.

23      Q.    How did you know how to contact Jeff Martin?

24      A.    I have an acquaintance that I worked in some

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

460

1    social things I do who is an attorney and I asked him who

2    he knew that practiced -- specialized in employment law

3    and he passed along Jeff's name.

4        Q.    Who was the acquaintance?

5        A.    Allan Wendelburg.

6        Q.    What is the relationship, the fee relationship,

7    you have with -- it's not Mr. Martin, it's his firm?

8        A.    It's the firm.

9        Q.    What is the fee relationship you have with that

10   firm?

11       A.    As best I can remember, I don't know exact

12   details, but basically that they will receive a third of

13   the settlement or attorneys' fees, whichever is higher,

14   should we be successful in our approach here.   If we're

15   not successful, we are asked to reimburse them just basic

16   expenses.

17       Q.    Do you know how much the expenses will be?

18       A.    Fairly minimal.   Exact number?   No, I do not

19   know.

20       Q.    Do you have an approximation?

21       A.    Not specifically, no.

22       Q.    Do you have a guess?

23       A.    I'm guessing it's under a thousand dollars for

24   filing fees and things like that.   The basic fees.

Brian L. Miller

461

1    Q.    Have you discussed with the other plaintiffs

2  how you will split those fees?

3    A.    Not specifically, no.

4    Q.    Do you have any understanding of how you will

5  pay them?  Will you split them evenly?

6    A.    We haven't really discussed that.

7    Q.    What if it's more than a thousand dollars?

8    A.    Then it's more than a thousand dollars.

9    Q.    Have any lawsuits ever been filed against you?

10   A.    No.

11   Q.    Have you ever been a witness in a lawsuit?

12   A.    No.

13   Q.    Other than this case.

14   A.    No.

15   Q.    When you received notice in September 2003 by

16  Bob Tattle that you were not going to be AMIP-eligible,

17  you understood at that point that you would not receive

18  any AMIP payment, correct?

19   A.    I understood the company was telling me that

20  that would be the case.  Not that I agreed with that

21  situation, but I understood what they were trying to tell

22  me, yes.

23   Q.    I understand you disagreed with that result.

24   A.    Correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1    Q.    But you understood that the result was you were

2  not going to get paid any AMIP payment.

3    A.    I understood that's what they were telling me,

4  yes.

5    Q.    Tell me a little bit about your educational

6  experience.  Where did you go to school?

7    A.    I went to high school in the Harrisburg area,

8  Pennsylvania.  Then I went to Penn State University,

9  earned a Bachelor of Science degree in computer science

10  and math.

11    Q.    When did you graduate?

12    A.    1986.

13    Q.    Did you graduate with honors?

14    A.    Yes.  I had a 3.57 GPA.

15    Q.    Any postgraduate work?

16    A.    No.

17    Q.    I mean education.  Any postgraduate education?

18    A.    No postgraduate formal education, no.  Towards

19  a degree, that is.

20    Q.    Where did you go after school?  Did you start

21  working?

22    A.    I started working at DuPont Corporation in the

23  June time frame of 1986.

24    Q.    Did you ever send out a letter to other

1  employees at CSC seeking to have them join you in a

2  lawsuit?

3      A.     Yes.  Let me clarify that.  Not to join me.  To

4  inform them that they may have some legal rights there

5  and if they were interested in contacting the

6  attorneys -- an attorney, here is one that understands

7  this case.

8      Q.     How did you know who to send it to?

9      A.     Personal information and knowledge about the

10  people who were in the same situation that I was.  I have

11  a lot of colleagues.

12      Q.     So how did you know who to send it to?

13      A.     I came up with a list of names of people who I

14  thought were in a similar situation.  Not 100 percent

15  fact, but I believe they were in a similar situation.

16  And sent the letter.

17      Q.     How did you send it, by e-mail?

18      A.     No.  Via Uncle Sam -- formal mail.

19      Q.     Through the mail?

20      A.     Through the mail.

21      Q.     How did you get their addresses?

22      A.     Public Web sites.  Some places like

23  whitepages.com and other places like that or the phone

24  book.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

464

1     Q.     Who paid for the postage?

2     A.     I did.

3     Q.     Who drafted the letter?

4     A.     I did.

5     Q.     Did you sign it?

6     A.     No.

7     Q.     Why not?

8     A.     Because I didn't think it was necessary for

9  people to understand who it had come from.  I didn't want

10  to bias people with my specific -- knowing that it was

11  me, to have undue influence on what decision they wanted

12  to make.  It was more of an information letter laying out

13  what I believe the facts at the time.

14     Q.     I'm going to show you what's been marked as

15  Deposition Exhibit 4.  Look that over.

16     A.     Okay.

17     Q.     I'm showing you what's been marked Deposition

18  Exhibit 4.  Is this the letter that you sent out?

19     A.     Appears to be, yes.  Appears to be.

20     Q.     You worked for DuPont from the time that you

21  left school until the time that you became a CSC

22  employee?

23     A.     That's correct.

24     Q.     Which positions did you hold?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0479

Brian L. Miller

1      A.      In DuPont?

2      Q.      Yes.

3      A.      In DuPont I came in as a computer systems

4    programmer basically and held various roles with

5    programming, team leadership, and group-supervisor-type

6    roles, until the time where I moved over to CSC.

7      Q.      What was the final position you held at DuPont?

8      A.      I was a level 5 position.  I believe it was

9    considered, I think, computer scientist.  I can't

10   remember the exact title.  It was a supervisory role of a

11   number of people in the technology area.

12     Q.      Have you ever received any professional or

13   work-related certification?

14     A.      You mean public certification or just in

15   general?

16     Q.      Any kind of certification.

17     A.      Not that I call official certifications and

18   things, no.

19     Q.      Any unofficial certifications?

20     A.      Just from courses and things I have done around

21   SIX Sigma or things like that.

22     Q.      Tell me about those.

23     A.      For example, there's a lot of training that we

24   did in the DuPont time frame around SIX Sigma program.

Brian L. Miller                                          466

1      Q.    So company courses?

2      A.    Yes.  SIX Sigma is kind of an industry thing,

3  but yeah, it was company-related courses and training and

4  things.  SAP-type training.  I was working with the SAP

5  group.

6      Q.    You completed various company training

7  programs?

8      A.    Yes.

9      Q.    Would you agree those are fairly nominal, not

10 formal training?

11     A.    It was formal training.  I would say it was

12 formal training for that specific area.  Quite extensive

13 some of them.

14     Q.    Have you ever received any awards or honors?

15     A.    Can I ask you to clarify what types of awards

16 or honors?

17     Q.    Any awards or honors.

18     A.    Certainly.  In CSC times I have been nominated

19 for the -- excuse me, the DuPont time frame I was

20 nominated for the Customer Excellence Award.  In CSC we

21 have --

22     Q.    You said you were nominated.  Did you receive

23 it?

24     A.    No, I did not.  I was one of the nominees two

Brian L. Miller

1    times in DuPont.

2        Q.    And never received it?

3        A.    Never received the actual award.    There's only

4    one group.    There was probably only about less than a

5    handful, 10 nominees, in any given time frame.    This is

6    quite the honor to even be nominated.

7        Q.    Did you receive anything for having been

8    nominated, any cash payment?

9        A.    No cash payment, no.    More of a recognition.

10   Public recognition throughout -- in that case the IT

11   department.    The nominees were all -- I think there was

12   like kind of a little award ceremony type of thing.

13       Q.    What did you receive?

14       A.    A little --

15       Q.    Plaque?

16       A.    Desk-type plaque, yes.

17       Q.    Other than that, have you ever received any

18   other awards or honors?

19       A.    In CSC I was nominated for the Technical

20   Excellence Award.

21       Q.    What's that?

22       A.    That's CSC's annual technology program.    Being

23   a technology company, they look for and recognize

24   outstanding efforts of their employees that further the

Brian L. Miller                                                  468

1    company in various ways.  A bunch of different categories

2    for that.

3                And to be eligible for that, you have to be

4    put forth by a group president for your endeavors.  I was

5    part of a team that I was nominated for for that in 2002,

6    I believe.

7         Q.    Did you receive anything?

8         A.    Just, again, recognition.  We did not actually

9    receive the award.  But we did attend the annual

10   technology conference to give a presentation on what we

11   did, which is attended by CSC employees and clients.

12        Q.    Any other awards or honors?

13        A.    Outside of work I have been awarded -- I work

14   heavily with the Boy Scouts of America.  I was awarded

15   the district Award of Merit for contributions within the

16   district towards the scouting program.

17        Q.    What kind of contributions?

18        A.    Just helping -- basically that's for helping to

19   further the Boy Scout program within the district.

20        Q.    Any others?

21        A.    I was selected as -- again, in the scouting

22   area, for the 2005 National Scout Jamboree, selected as

23   one of the adult leaders to go to the jamboree with the

24   council, which is the whole Delmarva peninsula here.

1    That was an honor to be selected to do that, as well.

2        Q.    Anything else?

3        A.    That's probably the key ones.

4        Q.    If I understand your claim against CSC, it is

5    that you had received the AMIP for a number of years and

6    you assumed you would continue to receive it until you

7    were notified that you wouldn't receive it.

8        A.    I believe the claim is that I was eligible for

9    the AMIP program every year we worked from April 1st to

10   March 31st of every year towards earning -- working

11   towards contributions to the corporation which if they

12   were achieved would result in a bonus to myself for my

13   participation and contributions to the corporation to

14   achieve that.

15            So in this time frame we're speaking of,

16   from April 1st of 2003 through the end of September 2003,

17   we were working towards that, as well, until I was

18   notified that I would not be eligible to receive that

19   bonus.  So it's that period of time where I was working

20   towards that that is in question here.

21       Q.    But if I understand your claim, it's that the

22   reason you believed you were eligible for AMIP is because

23   nobody had told you that you were not eligible for AMIP

24   until September 2003.  Isn't that correct?  Maybe I'm