Brian L. Miller                                    470

1   wrong.

2       A.      That is correct, because I was informed when I

3   was hired by CSC, my offer letter says I would

4   participate in that program.    Every year I participated

5   in that program, until somebody told me I wasn't

6   participating in that program, I would assume that I was,

7   yes.

8       Q.      You understood there was no guarantee that you

9   could continue to participate in the program?

10      A.      I believe that I understand that the program is

11  reviewed and individuals who are not to be in the program

12  are informed that they will no longer participate in the

13  program.    Yes.

14      Q.      You understood that the company does not

15  guarantee participation in the program.

16      A.      I do understand they can remove people from the

17  program as they see fit, yes.

18      Q.      You understand that people can be removed from

19  the program midyear?

20      A.      Yes, I do.    I also understand that when that's

21  done, they prorate the payments when that happens.

22      Q.      Are you aware of anybody that's ever had a

23  prorated payment?

24      A.      Yes, I have.



WILCOX & FETZER LTD.
Registered Professional Reporters

Brian L. Miller                                        471

1      Q.      Who's that?

2      A.      There was a guy I know by the name of

3   Steve Quinn who left CSC midyear and received a payment

4   in the same time frame everybody else did, which is

5   approximately the May/June time frame of the following

6   year, after he was gone from CSC for about six months or

7   so.  For the time he was participating in the program.

8      Q.      Is that the only person that you know of that

9   received a prorated payment?

10     A.      That I personally know, yes.

11     Q.      Was there anybody that you know of but not

12  personally?

13     A.      No.  That's the only one I know specifically

14  of.

15     Q.      That's the only name you ever heard of anybody

16  that's ever been prorated, correct?

17     A.      That I personally have heard of, yes, that's

18  correct.

19     Q.      What do you mean that you personally heard of?

20  Are there other people that you heard of?

21     A.      No.  I believe that there have been others in

22  the same situation that have left.  I know there's been a

23  lot of people that were eligible that left that I assume

24  the same thing would have happened, but I don't know that

Brian L. Miller

472

1    personally.

2        Q.    How do you know that Steve Quinn received

3    something after he left?

4        A.    Because I know him personally.  I had lunch

5    with him at some point in time.  He said, "By the way,

6    guess what?"

7        Q.    "I got an AMIP"?

8        A.    Yes.

9        Q.    What did Steve Quinn leave the company to do?

10       A.    I know him with somebody else and we were at

11   lunch with him.  I know him somewhat.  So he went off to

12   do some other things.

13       Q.    He just told you this?

14       A.    We were at lunch with a small group of people.

15       Q.    What was his position while he was at CSC?

16       A.    He was a senior finance person doing

17   finance-pricing-type things for CSC.

18       Q.    In what group?

19       A.    In the pricing -- within the DuPont account,

20   but in the pricing finance area.

21       Q.    What was his level in the company?

22       A.    I don't know exactly.  I believe it was 5 or 6.

23       Q.    Do you know?

24       A.    Not specifically, no, I don't.

Brian L. Miller
473

1     Q.    Do you know if he quit the company or was

2  terminated?

3     A.    I believe he was in part of one of the

4  reduction-of-force programs at CSC.

5     Q.    So he was laid off?

6     A.    So he was laid off, I believe, yes.

7     Q.    Do you know if the company provided prorated

8  payments to people that were laid off, if that was part

9  of the company's practice or policy?

10     A.    I do not know.

11     Q.    There are policies of the company that are

12  published on the Internet, correct?

13     A.    Correct.

14     Q.    Including policies related to the compensation

15  and employee handbooks, correct?

16     A.    Yes, there sure is.

17     Q.    And policies related to the Chemical Group,

18  correct?

19     A.    Yes.

20     Q.    And you had access to all those policies?

21     A.    Yes.

22     Q.    Do you have any of those policies with you

23  today?

24     A.    No, I do not.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1     Q.    When was the last time you reviewed those

2  policies?

3     A.    Possibly in preparation in general for the

4  lawsuit.  There's some stuff around the AMIP's management

5  program.

6     Q.    Some of those policies are on the Internet, but

7  some are distributed in printed form and some are

8  distributed by e-mail and some are distributed via Human

9  Resources?

10     A.    All of the above, yes.

11     Q.    By the way, what position -- maybe you told me

12  this, that you don't know what position Steve held?

13     A.    I don't know.

14     Q.    You said you think he was laid off.  Do you

15  know if he had another position to go to?

16     A.    I do not know.

17     Q.    Do you know how much his AMIP was?

18     A.    I don't know.

19     Q.    How do you know it was prorated?

20     A.    He said he got -- his comment was "I got paid

21  for the time I was there."

22     Q.    Did he say anything about an AMIP?

23     A.    Yes.

24     Q.    What did he say?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller

475

1    A.    That "I got a payout from my AMIP when I was

2    there till I got laid off."

3    Q.    I think I have asked you this, but I want to

4    make sure.  That's the only person that you're aware of

5    that ever received a prorated payment of AMIP, correct?

6    A.    Other than myself?

7    Q.    You mean because you received it for the

8    following year?

9    A.    Right.  Yes.  And everybody that joined from

10   DuPont also received a prorated payment when we joined,

11   too, because of the timing.

12   Q.    Let me just lay this out.  The only person that

13   received a prorated AMIP payment for a portion of a year

14   other than the plaintiffs in this case is Steve Quinn,

15   correct?

16   A.    That I know of, yes.

17   Q.    And the plaintiffs in this case, including

18   yourself, you're saying received prorated AMIP payments

19   when you came into the company from DuPont?

20   A.    Anybody that came from DuPont -- because of the

21   timing of when we came in, the first year was prorated.

22   Q.    The first year the company granted the full

23   year's worth of AMIP credit?

24   A.    No.  They paid us for the proration of when we

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller

476

1    came in.

2        Q.    I'm sorry.

3        A.    The company.  So we did not receive a full

4    year's payment the first year we joined.

5        Q.    For what period of time did you not receive an

6    AMIP payment for?

7        A.    I believe it would be from their April 1st

8    through -- I believe we started the end of May.  It would

9    have been a two-month period.

10       Q.    How do you know that it was prorated in that

11   sense?

12       A.    Again, we had an eligibility percent and it was

13   paid -- the delta there.

14       Q.    Am I correct that you received worksheets every

15   year when your AMIP payment was made?

16       A.    We received worksheets some years.  Not every

17   year.  It was at some point before the payment was made.

18       Q.    Shortly before the payment was made?

19       A.    They got better at it because the HR approach

20   was to try to make sure people understood the incentive

21   at the beginning of the year.  They rarely -- they never

22   achieved setting those objectives out early in the

23   program.

24       Q.    Is it fair to say that for a number of years

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller

1    the AMIP worksheets were sent out between October and

2    December of the year?

3        A.    If they were sent out at all, that's generally

4    when we end up seeing them.

5        Q.    Which years were you not sent an AMIP

6    worksheet?

7        A.    I don't believe the first year we ever got one.

8        Q.    So in fiscal year '98 you did not have an AMIP

9    worksheet?

10       A.    I believe that's correct.  I also believe we

11   didn't receive one the following year.

12       Q.    In fiscal year '99?

13       A.    I'm not 100 percent sure of that, but I believe

14   that's the case.

15       Q.    In fiscal year 2000 through fiscal year 2003,

16   you did receive AMIP worksheets.

17       A.    Yes.

18       Q.    Correct me if I'm wrong, but those worksheets

19   would have how the AMIP would be calculated if it was

20   earned at the end of the year.

21       A.    The worksheet laid out the -- how the -- your

22   eligibility.  So, for example, my eligibility is

23   25 percent.  It would have my salary at the top, it would

24   say 25 percent was what I'm eligible for equals this

Brian L. Miller                                    478

1    amount you're eligible for.

2                    That amount was then broken down to say

3    here's the criteria.  Of that 25 percent, here's how

4    we're going to weight that based upon a number of

5    factors, mostly having to do with the corporation's

6    success and the financial things they were trying to

7    meet.  So ROI or revenue or whatever the specific things

8    would be.  And each one of those would have a weighting

9    which added up to 100 percent that would say of that

10   25 percent, here's how it's broken down.  If the company

11   achieved this goal, you would get 100 percent or possibly

12   more or less if they didn't achieve it of that portion of

13   the AMIP.  And then some years there was also some

14   personal goals.  Some years they were not set up.

15       Q.    So the worksheets that you received laid out

16   the formula for how the AMIP would be earned at the end

17   of the fiscal year?

18       A.    How they planned to pay the AMIP at the end of

19   the year.  We all knew for the full year that it was

20   based -- the whole AMIP program is based on the

21   performance of the corporation for that fiscal year.

22   From day one you knew you had to work hard to make sure

23   that you were doing as much as you could to contribute to

24   what you could effect.

Brian L. Miller

1    Q.    You knew that because of your offer letter when

2    you came over from DuPont?

3    A.    That's correct.

4    Q.    The formula for AMIP calculations in this

5    worksheet would change every year, correct?

6    A.    To be clear, the amount that I was eligible

7    for.

8    Q.    The percentage?

9    A.    The percentage that I'm eligible for of my

10    salary would be consistent with what I was told in

11    previous years.

12    Q.    You're saying that was 25 percent?

13    A.    I originally started at 22 percent and was

14    moved to 25 percent somewhere in my career when I got

15    moved to a new position.  I moved from a level 5 position

16    to a level 6 position with CSC to a senior manager

17    position and my AMIP was adjusted at some point to

18    25 percent.  Started out 22 and moved to 25.

19    Q.    When you were a level 5, it was at 22 percent?

20    A.    Yes.

21    Q.    And when you were moved to a level 6 position,

22    it went to 25 percent?

23    A.    Not directly, but sometime after I was a

24    level 6, they adjusted it to 25 percent eligibility.

Brian L. Miller

480

1      Q.    Not right away, but at some point later on they

2  adjusted it to 25 percent?

3      A.    Right.  Back to your question about --

4      Q.    That percentage, whatever it was, that stayed

5  the same year to year while you were in that level.

6      A.    Right.

7      Q.    Other than that percentage, the remainder of

8  the formula would change year to year?

9      A.    The exact -- which factors are going to have

10 more weight and less weight would change year to year,

11 yes.

12     Q.    First of all, the factors themselves would

13 change, correct?

14     A.    Yes.  They could change.

15     Q.    Some years it might be ROI, meaning return on

16 investment; some years it might be earnings per share?

17     A.    Correct.

18     Q.    Some years it might be revenue?

19     A.    Correct.

20     Q.    Some years it might be operating expenses?

21     A.    Correct.  Generally it was a combination of all

22 those things.  Sometimes a couple things were on and off.

23     Q.    So those factors themselves would change?

24     A.    Yes.



Brian L. Miller

481

1      Q.     In addition, the targets would change, correct?

2      A.     Yes.

3      Q.     The amount of return on investment or the

4   amount of earnings per share or the amount of operating

5   expenses or the amount of revenue would change?

6      A.     Correct.   That's true.

7      Q.     In addition, the weightings would change?

8      A.     Yes.

9      Q.     That is, the amount of emphasis that was placed

10  on any one particular factor may vary year to year?

11     A.     Yes, that's true.

12     Q.     Those were corporate goals and objectives that

13  were part of the AMIP formula, correct?

14     A.     That's pretty much the corporate section, yes.

15     Q.     In addition to the corporate section, there

16  were also group or division goals and objectives?

17     A.     Some years there were, some years there were

18  not.

19     Q.     Some years, but not all years, it might be the

20  Chemical Division's objectives that were factored into --

21     A.     Correct.

22     Q.     -- the AMIP calculation.

23     A.     Correct.

24     Q.     Again, they may have factors of expenses,

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Brian L. Miller
482

1    revenue, income only particular to that Chemical Group.

2    Correct?

3        A.    That's correct.

4        Q.    Again, the targets for those objectives would

5    change year to year?

6        A.    That's correct.

7        Q.    And the weightings for those factors would

8    change year to year?

9        A.    That's correct.

10       Q.    And then in addition to the company objectives

11   and the group objectives, some years, but not all years,

12   I gather, there were also individual performance

13   objectives?

14       A.    Correct.

15       Q.    Do you remember which years had individual

16   performance objectives?

17       A.    Not specifically which years.   Probably about

18   two of the years because they started desiring to try to

19   get to some of those things.   Some years they got to

20   that, some years they did not.

21       Q.    So maybe of the six years that you received the

22   AMIP, two years had individual performance objectives?

23       A.    That's what I was going to say if you had asked

24   me about my recollection, about two years.

Brian L. Miller

1     Q.     That's your best estimate?

2     A.     My best estimate, yes.

3     Q.     And those performance objectives, when they

4 were included, had different targets.

5     A.     Yes.  The personal objectives were generally,

6 if I recall, no more than 20 percent of the total -- if

7 everything added to 100 percent, they were a very small

8 portion of the overall way you could achieve.

9     Q.     The personal objectives were, let's say, less

10 than half of the overall weighting?

11     A.     Yes.

12     Q.     Towards the AMIP bonus.

13     A.     Yes.

14     Q.     Maybe one year it was 20 percent and maybe

15 another year it was 25 percent.

16     A.     Yeah.

17     Q.     The weightings changed, but it was less than

18 50 percent?

19     A.     Yes.

20     Q.     In addition to the weightings change, the

21 targets for the personal objectives, the goals for the

22 personal objectives would change?

23     A.     Yes.

24     Q.     What were the personal objectives that you can

1    recall, if you can, that were measured?

2        A.    Things like that would go above and beyond what

3    your normal assignment would be to help out -- generally

4    to help out the corporation, an achievement of those

5    types of things and the financials up top.  Like help do

6    things to gain more revenue in this area or -- having

7    done some of these -- I had a group of people that I had

8    to administer the program, as well.  They were generally

9    keeping your costs down or generating more revenue in a

10   certain area or doing a program that would -- like a SIX

11   Sigma-type program to help understand how you can

12   contribute to the financial -- that's what AMIP is based

13   off of.  That was the biggest part of the thing was to

14   incent the right behavior of the people to help the

15   corporation achieve their financial goals.

16       Q.    The personal objectives might have operational,

17   financial, or other kinds of components to them.

18       A.    Depends on the individual's job.  Yes.

19       Q.    It might be getting a project in on time or

20   completion of a certain project.

21       A.    Generally not those kind of things because

22   those kind of things were more your regular work

23   assignment.  You're expected to do those things.  That's

24   a little different than kind of going above and beyond to

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1    do some things.

2        Q.    Do you have a specific recollection of any

3    specific individual performance objective?

4        A.    Not off the top of my head, no, I can't

5    remember.

6        Q.    So it might be the rollout of a product or a

7    service or achieving a certain service delivery level.

8        A.    Yes.   Could be -- I think there was some

9    objectives around the group ones around those things

10   which a lot of people had to contribute to.   It's hard

11   because individual service level -- an individual can't

12   specifically impact the service level, but as a group you

13   could.

14               Again, this was targeted at those employees

15   in influential positions that contributed to the

16   corporate, financial, and account health and were leading

17   other people in doing those things.   So it was generally

18   objectives around those types of areas.   I can't remember

19   specific ones in that area.

20       Q.    But they would change person to person and year

21   to year?

22       A.    Yes.

23       Q.    Are you a member of any professional

24   associations?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller                                           486

1       A.      No.

2       Q.      You would agree that you are an at-will

3  employee, correct?

4       A.      By Delaware law you mean?

5       Q.      Yes.

6       A.      Yes.  In the fact that I should get paid for

7  the contributions I make to my employer, yes.

8       Q.      Maybe you're not familiar with the

9  term"at-will."

10      A.      At-will means I'm employed at-will between

11 myself and the corporation, I believe.  I either can

12 terminate that employment or change the terms of that

13 employment at will.

14              I also believe that the law states that you

15 should be paid for the work that you do while you're in

16 employment for that corporation.

17      Q.      Understood.  You had no contract of employment,

18 though, correct?

19      A.      No.

20      Q.      Is that correct?

21      A.      Not an official contract.  I have this offer

22 letter.

23      Q.      Other than your offer letter, though?

24      A.      No other official contract, no.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    No other unofficial contract?

2    A.    No.  Correct.  The offer letter was my

3  employment offer.

4    Q.    That's it.  While you were at DuPont, were you

5  eligible for any bonus plan or bonus?

6    A.    I was in DuPont's variable compensation plan.

7    Q.    Is that what it was called, variable

8  compensation plan?

9    A.    It was called variable compensation in DuPont.

10   Q.    Was that abbreviated VCP?

11   A.    VC I think they called it, yes.

12   Q.    Is that considered a bonus?

13   A.    Yes.  It's very similar to this AMIP's program

14 in that it's contributions to DuPont's health and

15 financial health.

16   Q.    Did DuPont have worksheets like AMIP?

17   A.    Again, varied from year to year.  Sometimes

18 yes, you had some objectives against that.  Sometimes

19 they didn't get around to getting them out.  But it's

20 fundamentally tied to the company's performance and your

21 performance within that.

22   Q.    While at CSC the first set of worksheets you

23 would receive in those years that you received them,

24 those worksheets were not filled out because the year had

Brian L. Miller                                    488

1    not completed, correct?  The formula was laid out, but

2    the metrics were not completed.

3        A.    Right.  We received it in the time frame you

4    mentioned.

5        Q.    October through December.

6        A.    We received okay, we finally settled on exactly

7    how the weighting is going to be.

8        Q.    The formulas?

9        A.    Right.  At the end of the year when you

10   actually got your payout in the years they had the thing,

11   you basically got the same form with the actuals filled

12   in and showed the percentages that were actually paid and

13   tied to me, here's your total amount for me.

14       Q.    Let me just see if I understand this.  You

15   would receive, let's say, not a blank worksheet but an

16   uncompleted worksheet in that October-to-December time

17   frame and then the worksheet would be completed after the

18   close of the fiscal year once the financials and other

19   targets and objectives can be measured.

20       A.    It was filled out to the point that said here's

21   the measure.

22       Q.    Here's the formula?

23       A.    Here's the objective, here's the percent

24   weighting, and here's what that would mean to you if we

Brian L. Miller

489

1    meet 100 percent of that.  The next couple of columns

2    said here's the actual, here's the actual objective.

3        Q.    Achievement?

4        A.    Achievement.  Here's the percent that equals

5    which could be anywhere technically from 0 to 150 percent

6    of that payment.  Here's what this means to you.  With a

7    total at the bottom.

8        Q.    So the places on the form, the worksheet form,

9    that had actuals and achievements and how that flowed

10   through in terms of the percentage calculation, those

11   were not filled out until the company could actually

12   report its financials and other objectives and otherwise

13   measure its results?

14       A.    Correct.  Or the group could measure theirs,

15   correct.

16       Q.    That was done after the close of the fiscal

17   year?

18       A.    Correct.

19       Q.    And the fiscal year -- I think we all know

20   this -- so everybody is clear is April 1 through

21   March 31?

22       A.    Of the following, yes, correct.

23       Q.    So that just as an example, the fiscal year for

24   2004 ran from April 1, 2003, through March 31, 2004?



Brian L. Miller                                    490

1       A.      That would be correct.

2       Q.      So after the close of the fiscal year, it would

3   take some time to fill in that last little bit of the

4   worksheet to measure the objectives versus the actuals?

5       A.      Right.

6       Q.      When was that done?

7       A.      Generally it was done after the close of

8   books -- I believe it takes easily about a month to close

9   the financial year books.  That would usually be done in

10  the May time frame and the payouts usually happened -- it

11  varied between late May and mid-June.  Sometime in that

12  time frame.

13      Q.      You would receive the completed worksheets back

14  to you to show you how the AMIP was calculated, correct?

15      A.      To show you what you would see in your paycheck

16  before it came.  Usually they made it before your

17  paycheck came, not always.

18      Q.      What was the amount of VC you received while at

19  DuPont?  What did it range from?

20      A.      At DuPont -- I can't remember my exact salary.

21  22 percent of my salary is what I was eligible for.

22      Q.      What did that range up to?  Do you remember the

23  highest amount of VC you received?

24      A.      Off the top of my head, I do not remember, no.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller
491

1     Q.     Approximately.

2     A.     I'm guessing $20,000. That's a complete guess,

3  though, without looking at the numbers.

4     Q.     You received an offer letter when you came over

5  to CSC, correct?

6     A.     Yes.

7     Q.     It's the offer letter that explained to you

8  what benefits and terms and conditions of employment you

9  were going to receive once you came over?

10     A.     That's correct.

11     Q.     That laid out the AMIP bonus?

12     A.     Yes, it laid out what my eligibility would be

13  in the AMIP program.

14     Q.     Other than that offer letter, you did not

15  receive anything else related to AMIP, correct?

16     A.     At the start of my employment with CSC do you

17  mean?

18     Q.     During this transitional time frame.

19     A.     I believe that is correct.

20     Q.     Did you have any discussions about AMIP with

21  anybody?

22     A.     Yes. There was a number of town hall meetings

23  held by HR on the transition period as CSC usually does

24  when they bring in a new outsourcing arrangement, and

Brian L. Miller                    492

1    there was one -- I believe there's one specifically

2    around the people eligible for the AMIPs to ask questions

3    and stuff about it.

4              Basically it was pretty much the same as

5    DuPont's was treated.  There was financial objectives

6    that would meet and everybody needed to work towards

7    meeting those things to be able to receive the bonus and

8    it was determined at the end of the fiscal year and paid

9    out after the end of the fiscal year in a similar

10   fashion.

11        Q.    Did they explain the worksheets?

12        A.    No, they did not talk about worksheets at all.

13   Again, I don't know this for a fact, but it doesn't seem

14   like the corporation actually had specific worksheets at

15   that time.  I don't know that for a fact, but we didn't

16   receive it for at least two years.

17        Q.    Do you remember anything being said

18   specifically during those town hall meetings?

19        A.    Not specific facts.

20        Q.    Who led them?

21        A.    It was one of the HR persons.  Dot Eltzroth was

22   very heavily involved.  She was the head HR person.  It

23   could have been her or one of the key people working on

24   the transition.  CSC usually puts a transition person in

Brian L. Miller

493

1    with transition employees.  It could have been any number

2    of HR people that would have done that.  I can't remember

3    the specific date or time or specific things discussed.

4        Q.    Other than your offer letter, you weren't given

5    any information about AMIP; is that right?

6        A.    That's correct.  At that time, that's right.

7        Q.    Have you ever seen an AMIP plan other than the

8    worksheets?

9        A.    You mean how the plan's administered?

10       Q.    Yes.

11       A.    Yes, I have.

12       Q.    Where is that?

13       A.    Where have I seen that?

14       Q.    Yes.

15       A.    As a manager of people, I received an AMIP

16   administration plan, for lack of a better term.  How the

17   AMIP is administered.

18       Q.    A chemical-specific --

19       A.    It talked about both the corporate and the

20   chemical-specific application of that for our group.

21       Q.    Is that something that you have in your

22   position?

23       A.    Not right here with me, but yes, I have it in

24   my possession.



WILCOX & FETZER LTD.
Registered Professional Reporters

Brian L. Miller                                    494

1        Q.    Was that produced during the course of

2   discovery?

3        A.    I do not know.  I believe I produced that.  I

4   don't know if it was --

5        Q.    You gave that to your attorney?

6        A.    I believe so.

7              MR. SEEGULL:  Have you produced that?

8              MR. WILSON:  I don't know.  I'd have to

9   look.

10             MR. SEEGULL:  We will have to take a break

11  and talk about that.  I'm not sure if we have it or not.

12  We may.

13  BY MR. SEEGULL:

14       Q.    That's something that all managers have?

15       A.    All managers who would administer the program

16  would have had that.  Should have had that, yes.

17       Q.    Talks about not just AMIP but talks about a lot

18  of compensation plans, salary issues, and other kinds of

19  compensation?

20       A.    The thing I have I believe is specifically on

21  AMIP.  We received a -- there was different

22  communications about different things.  Yes.  There were

23  different -- in the Chemical Group talked about general

24  salary information.  There was information on that.

Brian L. Miller

1    There was information on how to administer the AMIP

2    program.   There's also some other special programs that

3    were run in trial basis in the -- in the Chemical Group I

4    guess it was called.   There's a program that was tried

5    there to incent people on some things.   There's

6    documentation about that.   All those things were separate

7    things.

8        Q.    Weren't they all included in one manager's

9    handbook?

10       A.    Could have been one year.   I'm not sure

11   100 percent.

12       Q.    You received them each year or just certain

13   years or just one year?

14       A.    I believe I have at least -- I believe I got at

15   least two years.   I was in a role of actually

16   administering employees for at least two full years.   I

17   think the third year probably I moved on to a slightly

18   different assignment.   I didn't have employees to

19   administer, so I would not have received a program guide

20   that year.

21                    MR. WILSON:   Could we go off the record?

22                    (Discussion off the record.)

23   BY MR. SEEGULL:

24       Q.    Other than what you received as a manager, did

**W&F**

Brian L. Miller                    496

1    you receive anything else regarding AMIP during your

2    employment with CSC and other than the worksheets?

3        A.    No.

4        Q.    Have you ever seen the AMIP plan itself or the

5    AMIP policy?  Are you aware of any AMIP plan or policy

6    other than what you received as a manager?

7        A.    There's something, I believe, online about the

8    AMIP program.  I'm not sure if I actually received a

9    specific here's the full AMIP plan, corporate-type plan.

10   Most of my knowledge comes from the actual plan summary

11   and application to the Chemical Group.

12       Q.    You have been in the Chemical Group the entire

13   time you have been at CSC?

14       A.    No.  I moved out of the Chemical Group when I

15   took this new assignment that we discussed previously.

16       Q.    What group did you move into at that time?

17       A.    I'm currently in the new business organization

18   of Global Infrastructure Services.

19       Q.    That's separate from Chemical?

20       A.    Completely separate from Chemical Group,

21   correct.

22       Q.    So that would be up until August of 2004 you

23   remained in the Chemical Group?

24       A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1      Q.     Who was the head of the Chemical Group during

2  that period of time?

3      A.     It changed -- when we first came over, it

4  was -- I can't remember the very first guy's name, but

5  basically it was Mike Beebe took over.  Then Russ Owens

6  came in as president of the Chemical Group.  Then after

7  Russ left, the Chemical Group, per se, was moved to a

8  little different organization and they put in

9  Nick Wilkinson, who I believe is still the current leader

10  of that organization.

11      Q.     I'm sorry.  Do you remember when you changed

12  from a level 5 to a level 6, or was it level 4 to

13  level 5?

14      A.     It was 5 to 6.  Within the CSC time frame I

15  can't remember the exact -- I believe it was fairly early

16  on.  I'm going to guess 1998.

17      Q.     You think within that first year?

18      A.     Yeah.  First year, year and a half.  Sometime

19  in that time frame.

20      Q.     Did your salary increase each year you were at

21  CSC?

22      A.     We got increases every year.  Some were more

23  than others.

24      Q.     You received an AMIP bonus each year you were

Brian L. Miller                                498

1    at CSC up until fiscal year 2004?

2        A.    Yes.

3        Q.    You received one for fiscal year 2005?

4        A.    I received a prorated amount for 2005, yes.

5        Q.    How much did you receive for fiscal year 2005?

6        A.    I cannot remember off the top of my head the

7    exact amount.

8        Q.    The company, when it took you out of AMIP

9    eligibility, it replaced that with a discretionary bonus,

10   correct?

11       A.    The letter said that I would be eligible for a

12   discretionary bonus; however, that program itself is

13   eligible to any employee.  That was nothing special, in

14   my mind.  The discretionary bonus could be given to any

15   employee at any time for any reason as long as approved

16   by the vice president.

17       Q.    Isn't it true the discretionary bonus is in

18   lieu of the AMIP?

19       A.    I did not think the letter told me that, no.

20       Q.    Are you aware of anybody that's ever received

21   both an AMIP and a discretionary bonus?

22       A.    I'm not aware of anybody, no, but it would

23   not -- I do not believe the policies prevent that from

24   happening.

Brian L. Miller

1    Q.    Have you ever seen the discretionary bonus

2    policy?

3    A.    I believe I have, but I couldn't cite it, only

4    because they have always asked if there's anybody -- if

5    you want to do this, this is the process to use.  It's

6    basically the communication we have had from HR.

7              Again, in my manager role it was always a

8    tool I could use for employees who did exceptional things

9    to contribute to the company.

10   Q.    Have you ever awarded a discretionary bonus to

11   anybody?

12   A.    I have not, no.

13   Q.    Did you receive a discretionary bonus at any

14   point in time?

15   A.    No, I did not.

16             (Deposition Exhibit No. 28 was marked for

17   identification.)

18   BY MR. SEEGULL:

19   Q.    I'm now showing you what's been marked as

20   Exhibit 28.  Do you recognize this?

21   A.    It appears to be the offer letter.

22   Q.    This is the offer letter that was given to you

23   when you were transitioned from DuPont to CSC, correct?

24   A.    It looks like it, yes.

Brian L. Miller                                    500

1       Q.      You were provided this on March 7th, 1997?

2       A.      That's the date it says there.

3       Q.      You never signed this, did you?

4       A.      Yes, I did.  Sure I did.  I'm sure I did.

5       Q.      Why do you assume that?

6       A.      Because to get employment you had to sign this

7    and turn it in.

8               MR. SEEGULL:  Do you have a signed version

9    of this, Mr. Wilson?

10              MR. WILSON:  All I know is what I have with

11   me, and, no, I don't.  But we may in the file.

12              THE WITNESS:  I can tell you that I know I

13   had to sign this.  To get a paycheck, you had to sign

14   this to accept the offer.

15   BY MR. SEEGULL:

16      Q.      If it's not in your file, that would mean you

17   didn't sign it, correct?

18      A.      I disagree.  I know I signed this and sent it

19   in.

20      Q.      This is the offer letter you were speaking

21   about before, correct?

22      A.      Offer letter to come and work for CSC, yes.

23      Q.      This is the one that you were talking about

24   that referred to the incentive plan?

Brian L. Miller

1    A.    The AMIP program as described in the paragraph

2    here, yes.

3    Q.    The paragraph that starts "In addition"?

4    A.    Correct.

5    Q.    You understood that the changes that were made

6    to remove you from eligibility of the AMIP were not made

7    to you because of anything that you had done personally.

8    A.    You mean the reason I was removed was not

9    because of specifically my performance.  Is that what

10   you're asking me?

11   Q.    Right.

12   A.    Yes.

13   Q.    In other words, it wasn't a personal decision,

14   correct?

15   A.    As far as I know, it was not a personal

16   decision, that's correct.

17   Q.    That was a company decision, correct?

18   A.    The letter implied that it was a reassessment

19   of our role and that it would be -- the role I was in.

20   That I would be removed from the program based upon that

21   assessment.

22   Q.    It wasn't an assessment of your particular

23   role, correct?

24   A.    I don't believe it was.  Not my specific role,

1    no.

2        Q.    The decision that was made to change

3    eligibility to remove you from eligibility, that was made

4    across the board for certain salary levels.

5        A.    I believe it was.  While we're on the subject,

6    I don't believe it was also done consistently.  I am

7    pretty sure, although not a hundred percent sure, that

8    there was at least one individual in my direct work group

9    at the same level who remained on the program with the

10   same role.

11       Q.    You're speculating?

12       A.    Yes.

13       Q.    You're saying somebody received an AMIP but at

14   a lower level?

15       A.    No.  Somebody remained in the AMIP program at

16   the same role --

17       Q.    And their level was raised?

18       A.    No, I do not believe so.

19       Q.    Who is this that you're talking about?

20       A.    Robert Carden.

21       Q.    Bob Carden?

22       A.    Yes.

23       Q.    What level was he at?

24       A.    Same level I was, level 6 at the time.

Brian L. Miller

503

1     Q.    You believe that, even though he was a level 6,

2  he was allowed to remain eligible for AMIP?

3     A.    I believe so, yes.

4     Q.    Why was that?

5     A.    I do not know.

6     Q.    Have you ever discussed that with him?

7     A.    Not with him, no.

8     Q.    Who have you discussed it with?

9     A.    When we first talked about this in general,

10  we'd say is everybody going to be out of here, we believe

11  that he was not removed from the program.

12     Q.    Who told you that?

13     A.    It was never specifically told.

14     Q.    This is really just hearsay and gossip?

15     A.    Yes.  But I believe we could find that

16  information out by pulling that record.  Although it's

17  not my personal knowledge to see Bob's financial payment

18  records, but I believe we could find that it would be

19  true.

20     Q.    It's just hearsay and gossip at this point?

21     A.    Yes, at this point that would be true.

22     Q.    And that has no bearing on your case, correct,

23  Bob Carden's --

24     A.    Not specifically.  You asked if it was done

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Brian L. Miller                                    504

1   equitably and across all roles.  My thing was I don't

2   know that it was.  That's why I answered the way I did.

3       Q.    But the decision was based upon levels,

4   correct?

5       A.    That's what they led us to believe, yes.

6       Q.    That's what you understand happened?

7       A.    That's what I understand happened, yes.

8       Q.    If there was some kind of exception made for an

9   outstanding individual performer, that doesn't mean that

10  the decision was made based upon level, correct?

11      A.    That's probably correct, yes.

12      Q.    You understood that AMIP was reserved for

13  senior-level managers, correct?  That was the intent?

14      A.    I understood that the AMIP program was eligible

15  for senior-level personnel and managers that were

16  contributing to the bottom line of the corporation, yes.

17      Q.    And the intent was to make it consistent across

18  the board, correct?

19      A.    The AMIP program in general?

20      Q.    The change.

21      A.    That's what they said the change was to do,

22  yes.

23      Q.    Explain that.  What did they tell you?  This

24  was Bob Tattle?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

505

1    A.    This was Bob.

2    Q.    Bob Tattle?

3    A.    Yes, Bob Tattle.  During our discussion about

4    being removed, he said the corporation's attempting to

5    make this consistent across the corporation.  So they

6    assessed our role, my role, my pay grade role and what

7    I'm doing and said I'm no longer eligible.

8    Q.    The reason this was done for the Chemical Group

9    was because the Chemical Group had people that had been

10   in AMIP for several years below the level that other

11   groups had as a threshold for AMIP eligibility?

12   A.    I don't know the exact reason why.  I can't say

13   why.

14   Q.    But that's what you were told?

15   A.    I don't think I was ever told that specific

16   thing.

17   Q.    Wasn't the point of this change to make the

18   DuPont account and the Chemical Group more consistent

19   with other sections of the company?

20   A.    That was never specifically said to me.

21   Q.    Nothing like that?

22   A.    Uh-uh.

23   Q.    No?

24   A.    No.  No.  Sorry.

Brian L. Miller

506

1    Q.    You were first notified that you were no longer

2    eligible for AMIP verbally?

3    A.    Well, verbally and with the letter at the same

4    time.

5    Q.    It was at the same time?

6    A.    Yes.

7    Q.    In a meeting?

8    A.    Yes.  In a meeting with myself and Bob Tattle.

9    Q.    Anybody else in that meeting?

10   A.    No.

11   Q.    Tell me everything you remember Bob telling

12   you.

13   A.    Bob told me that the corporation has assessed

14   my eligibility for the AMIP program and I'm no longer

15   eligible and basically asked me to read the letter and he

16   asked me to sign the letter.  And I said, well, I needed

17   some time to think about it, to assess signing the

18   letter.  And that was about the end of the meeting.

19   Q.    Are you saying he really didn't tell you much

20   at all, he just handed you the letter and asked you to

21   read and sign it?

22   A.    He told me that they're trying to balance the

23   program out.  Never specifically said about the Chemical

24   Group, per se.  That's why I said no.  But trying to get



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0521

Brian L. Miller

507

1    the AMIP program changed to put the -- change the level

2    of the things and I would no longer be eligible.

3        Q.    After he did this, did you continue to stay in

4    the same role you were in as you were previously?

5        A.    Yes.

6        Q.    You continued to perform your job duties and

7    responsibilities as you had before?

8        A.    Quite honestly, since I wasn't contributing, I

9    wasn't eligible anymore, I probably did not go the extra

10   mile as I had before to help achieve my part of the bonus

11   because my compensation changed at that point.

12       Q.    So you worked less hard?

13       A.    I guess you could say in certain ways, yes.    I

14   didn't go over and above to help make sure we achieved

15   the financial goals.

16       Q.    Because you no longer considered yourself as

17   having any role to play in achieving company financial

18   goals?

19       A.    I believe now that I was being -- my

20   interpretation of the conversation was I was no longer

21   going to be compensated for work that would contribute to

22   achieving a certain level of compensation and that the

23   work that I did before that time up until that time to

24   contribute towards that goal was no longer necessary for

Brian L. Miller                                    508

1    me to achieve my normal salary.    The recovery and above

2    work.

3        Q.    What did you stop doing?

4        A.    I stopped doing some of the extra programs,

5    some of the extra things, some of the extra hours to

6    analyze things to drive out costs and other things that

7    helped to contribute to some things.

8        Q.    You saw ways to drive out costs, but you

9    figured you wouldn't work to do that?

10       A.    I didn't go that extra mile to do that.    I

11   worked with -- my specific role was working with the

12   client that I was assigned to, which in this case was

13   DuPont Engineering, working with them, making sure we

14   delivered the CSC services to DuPont and help them

15   utilize CSC's service where they could and more.

16           But there was a lot of extra things to help

17   the general group outside of my specific role that, yeah,

18   if I was asked to do something specifically, I would, but

19   I didn't jump the extra mile to go ferret things out at

20   that point.

21       Q.    What did you stop doing?

22           MR. WILSON:    Objection.

23       A.    I stopped -- I did a lot of analysis around our

24   hours, our billing hours, those kind of things, above and

Brian L. Miller
509

1   beyond to see where we could optimize some things or if

2   we were spending too much time here and there to help, in

3   this case, Bob Tattle with some of his optimization of

4   the application group.  Those kind of things.

5        Q.    Anything else?

6        A.    Off the top of my head, a couple years ago, no.

7        Q.    This analysis of hours that you did, you did

8   that before you learned that you were no longer eligible

9   for AMIP bonus?

10       A.    I'm sorry.  Ask the question again.

11       Q.    This analysis of the hours that you did, you

12  only did that before you learned about AMIP eligibility.

13  Is that your testimony?

14       A.    Before I was no longer eligible you mean?

15       Q.    Yes.

16       A.    Yes, I did some of those things.  That's an

17  example of some of the types of things I might have done

18  beforehand I didn't necessarily volunteer the extra time.

19       Q.    I'm confused.  This analysis of the hours, did

20  you do that before September of '03?

21       A.    Yes, I believe I did.

22       Q.    Did you do it after September of '03?

23       A.    I don't think -- I don't think I went about the

24  extra mile to do stuff like that.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Brian L. Miller                                                    510

1       Q.      I'm just asking you, did you do it or not do

2    it?

3       A.      I don't know.

4       Q.      You might have done it after September '03?

5       A.      Might have.

6       Q.      If we pull your computer records to see how

7    many hours you were logged onto your computer before

8    September '03 versus after September '03, do you think

9    there would be a difference?

10      A.      Possibly.

11      Q.      Not possibly?

12      A.      Probably would.

13      Q.      You think there would be?

14      A.      Uh-huh.

15      Q.      How much of a difference do you think there

16   would be?

17      A.      I was probably putting in closer to 50 hours a

18   week before that time.  Probably moved down to closer to

19   40.  I'm not saying exactly.  Just generally.

20      Q.      If that didn't occur, then your testimony would

21   be false about putting in extra hours, correct?

22              MR. WILSON:  Object to the form.

23      A.      Can you ask the question again?

24      Q.      If that didn't occur, then your testimony about

Brian L. Miller

1    putting in extra hours would be false, correct?

2        A.    I don't know that I could make that assessment.

3        Q.    Your computer records would show the answer,

4    right, one way or the other, how many hours you worked?

5        A.    You mean the time my computer was on?

6        Q.    Yes.

7        A.    I might be working with my computer off.  I

8    don't understand where you're trying to drive here.

9        Q.    You would have your computer on and not

10   working?

11       A.    At times.

12       Q.    Logged in?

13       A.    Could be.  Sometimes you leave it on all night

14   when you go home.

15       Q.    Is that what you do?

16       A.    I have done that before.

17       Q.    But not regularly, Mr. Miller.

18       A.    When I had a laptop, no, because I turn it off.

19   But if I had a desktop -- when I had a desktop, yeah.

20       Q.    When did you have a desktop?

21       A.    I don't remember.

22       Q.    I'm confused.  Are you saying you started

23   taking it easier once you were no longer AMIP-eligible

24   and no longer worked as hard?

Brian L. Miller                                    512

1        A.    I started to do what my specific assignment was

2   for what I was being compensated for and --

3        Q.    You didn't work to your best abilities?

4              MR. WILSON:   Object to the form.

5        A.    I worked to the best of my abilities in the

6   role I was assigned, what I believe I was being

7   compensated for at that time after they gave me that

8   information.   I believe CSC could have gotten a lot more

9   out of me had they continued to contribute to the work

10  that I was doing before I was told I was no longer

11  eligible.   I was working and earning towards that bonus.

12             So I was putting all of my capabilities and

13  skills towards that, plus more.   After that it now became

14  I was told I was not going to be compensated anymore for

15  that extra skill that I would have had.

16       Q.    Then you just did the best you could in your

17  job?

18       A.    Yeah, to meet the requirements of the job and

19  the client.

20       Q.    Your performance doesn't have anything to do

21  with this case, correct?

22       A.    You mean my performance --

23       Q.    Your performance, how well you performed in

24  your job.

Brian L. Miller

1    A.    Yeah.  I don't think that's a factor in this

2 specific case, no.

3            (Deposition Exhibit No. 29 was marked for

4 identification.)

5 BY MR. SEEGULL:

6    Q.    I'm now showing you what's been marked

7 Exhibit 29.  Do you recognize this?

8    A.    Yes, I do.

9    Q.    What is it?

10    A.    This is a letter that I was handed by

11 Bob Tattle at the time explaining that I would be no

12 longer eligible for the program.

13    Q.    This is the letter we have been talking about?

14    A.    Yes.

15    Q.    You said you received this sometime in

16 September, but you dated it October 10th, 2003.  Why is

17 that?

18    A.    I received it in late September and Bob asked

19 me to get it back to him and that's when I had a chance

20 to sign it and get it back to him at that point in time.

21    Q.    You signed this saying that you're

22 acknowledging receipt of the letter, not that you agree

23 with the reasons for the change or why they made the

24 change.

Brian L. Miller                                            514

1          A.      Correct.

2          Q.      I want to show you what's been previously

3   marked as Exhibit 16.  Ask you to take a moment to look

4   at that.  It's a series of e-mails.  I guess really just

5   two.  One is from you.

6          A.      Right.

7          Q.      That's starting on the bottom of the first page

8   going over to the second and third page.

9          A.      Yes.

10         Q.      And on the top of the first page is an e-mail

11  to you.

12         A.      Correct.  To myself and other people, yes.

13         Q.      You wrote this e-mail on the bottom starting on

14  the bottom of the first page?

15         A.      Yes, I did.

16         Q.      Did anybody help you write it?

17         A.      Yes.  It was on behalf of all the people listed

18  down here on the bottom of page 2.  As the portfolio

19  managers, I volunteered to write this note after we had

20  all gotten together and talked about this.

21         Q.      You were trying to convince management to keep

22  you on the AMIP program, correct?

23         A.      That's correct.

24         Q.      You were trying to make an argument as to why

Brian L. Miller                                          515

1    you should still be eligible?

2        A.    That's correct.

3        Q.    You understood that CSC could make the decision

4    to remove you from AMIP, but you were hoping to convince

5    them not to do so.

6        A.    With this letter, that's correct.

7        Q.    You thought it would be a mistake to remove you

8    from AMIP?

9        A.    That's correct.

10       Q.    You knew they were making that decision based

11   upon cost, correct?

12       A.    I assumed it was being made on costs, although

13   I never really knew why specifically.

14       Q.    That's what you wrote, correct?

15       A.    Okay.    It says here at the time we understood

16   that they were willing to reduce costs.    I was

17   probably -- there was a lot of rumors going around --

18   what prompted this note specifically was that we had all

19   heard a rumor that they were considering removing people

20   from the program because at this point in time in the

21   company's history, so to speak, they were having cost

22   pressures and we assumed that this was based upon the

23   cost pressures, this action, this possible action.

24       Q.    You understood that it would, in fact, reduce

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller                                      516

1  costs in the short-term, but you thought from a long-term

2  perspective it did not make sense from a cost

3  perspective, correct?

4      A.    That's what I believe the essence of this note

5  is, yes.

6      Q.    There were lots of rumors that this was about

7  to happen, correct?

8      A.    Yeah.  They kind of surfaced about right the

9  week that this note was written, because we got together

10  very quickly to discuss this.

11     Q.    You never stated in this e-mail that removing

12  you from AMIP was illegal in any way, correct?

13     A.    I don't think I said anything like that, no.

14     Q.    You never said anything about the need to

15  prorate you for the period of time that you were in AMIP

16  or for the year.

17     A.    For this note, that's correct because this note

18  was focused more at to continue us on the program and not

19  trying to discuss any other impact of removing us.  It

20  was more that we are a contribution -- this group of

21  people is a direct contribution to CSC corporation and

22  that what we have been doing AND continue to do would be

23  of benefit to them to keep us on.

24     Q.    And Mr. Tattle told you that he would consider

Brian L. Miller                                                517

1    your concerns?

2        A.    His note responded here at the top of this note

3    describing what his perspective was after talking with,

4    looks like, Nick Wilkinson and Chris Weaver, who was his

5    vice president and Mary Joe Morris.

6        Q.    He said he would contact you with the final

7    outcome?

8        A.    Yes.

9        Q.    That's when he spoke to you in September?

10       A.    Right.   I assume he spoke to everybody

11   individually in September.   He spoke to me specifically.

12       Q.    Have you told me about all the communications

13   you had with Mr. Tattle about AMIP?

14       A.    We had, I think, at least one other discussion

15   asking me to sign this letter, but I believe that's

16   pretty much it, yes.   About this specific -- this whole

17   specific area of when I was terminated, yes.

18       Q.    Not terminated, but when you were removed from

19   eligibility?

20       A.    Removed from the program, yes.

21       Q.    You've told me about everything Mr. Tattle and

22   you discussed about the change to the AMIP plan.

23       A.    That I can recollect, yes.

24       Q.    Is there any other way that you would be able

Brian L. Miller                                        518

1   to recollect other conversations?

2        A.    Virtually everything else that is not here

3   would have been verbal.  Unless I can remember it, no.

4        Q.    You can't remember it now?

5        A.    Right.

6        Q.    You won't be able to remember it two months

7   from now, correct?

8              MR. WILSON:  Object to form.

9        A.    I might be able to.  I can't remember right at

10  this moment, no.

11       Q.    Why don't you take your time and take as much

12  time as you need to think about any other conversations

13  you had with Mr. Tattle if there are any.

14       A.    We discussed about signing the letter.  I'm

15  sure I explained my frustrations with that whole problem.

16       Q.    Did he agree with you that the company decision

17  was right or wrong or did he say anything about that?

18       A.    He was doing his role in explaining the

19  situation.  My personal reading of the body language and

20  the way he presented it, he was very uncomfortable having

21  to have the conversation.  I took that to mean

22  personally.  The body language and the way he presented

23  it was that he did not think this was the best and most

24  ethical thing to do, but that he was doing his role to --

Brian L. Miller

1   as my supervisor and I was his employee, he had to do

2   this.

3        Q.    But he didn't say anything about him

4   disagreeing with the decision in any way?

5        A.    He was very careful not to say that.

6        Q.    Other than his body language --

7        A.    Actually he may have said words such that "I'm

8   not saying I agree or disagree with the decision,

9   however" --

10       Q.    This is the decision?

11       A.    -- "this is the decision."

12       Q.    So other than that, he never indicated to you

13   one way or the other whether he agreed or disagreed.

14       A.    Not unless there's something specifically --

15   it's says they're sympathetic to the argument which

16   implies that they didn't necessarily agree with it but

17   they had to carry forth with it.

18       Q.    Other than what's in the e-mail --

19       A.    That's pretty much what he had passed along.

20   Again, I understand the management role.  You have to

21   execute the company programs.

22       Q.    Did you ever talk with Dot Eltzroth about any

23   conversations with Mr. Tattle?

24       A.    I talked to Dot Eltzroth about the specific

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Brian L. Miller                                        520

1    actions because she was in a different role at that time

2    and I knew Dot.

3        Q.    Tell me about your conversation with her.   When

4    was it?  Where was it?  Who was present?

5        A.    It was Dot and I.  It was soon after the letter

6    was given.  I asked Dot specifically around what her

7    advice was with this thing.  I know she had to be

8    careful -- I understood her position.

9              All she recommended to me at the time was

10   to ask your management what has changed with your job

11   assignment such that you're no longer in the program.

12   And I appreciated her -- I didn't want to put her in a

13   bad spot, so I didn't go any further because I didn't

14   want to affect -- it was a very short conversation.  She

15   said, "You need to focus on what has changed in your job

16   that you're no longer eligible."  I did ask those

17   questions.  I probably asked Bob that question and never

18   got an answer to that.

19       Q.    Anything else that Dot said to you?

20       A.    That would have been it.

21       Q.    Any other conversations with Dot about AMIP?

22       A.    No.

23       Q.    Any conversations with anybody else about AMIP?

24       A.    We did have a group conversation with Nick at

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters                      B-0535

Brian L. Miller

1  some point in time.

2      Q.    Nick Wilkinson?  Is it Wilkinson or Wilkerson?

3      A.    Wilkinson.  I think it's spelled properly here,

4  Wilkinson.  And he knows the group of us in this type of

5  role and he explained -- again, it was very careful, but

6  explained his sympathy for the situation; however, this

7  was the action that was being taken.

8      Q.    Anything else that you remember being discussed

9  with Nick?

10     A.    Not really, no.

11     Q.    Did either Nick or Dot say they agreed or

12 disagreed with the decision?

13     A.    Pretty much the same way Bob would have.

14     Q.    Bob didn't say he agreed or disagreed.

15     A.    Right.

16     Q.    That was the same with Nick and Dot.  Is that

17 the same with Nick or Dot, that they didn't say they

18 agreed or disagreed, they just said this is the decision?

19     A.    I don't remember the exact words.

20     Q.    Words to that effect?

21     A.    Words to that effect, yes.

22     Q.    You're aware that CSC didn't make a hasty

23 decision when it decided to remove people from AMIP in

24 fiscal year 2004, correct?

Brian L. Miller

1       A.      I'm not aware of what type of decision they

2   made or how long it took them to make it.  No, I have no

3   idea.

4       Q.      Do you know who made the decision?

5       A.      I do not.

6       Q.      Have you spoken to anybody about this case?

7       A.      Yes.

8       Q.      Who?

9       A.      The other people in the case.

10       Q.      The other plaintiffs?

11       A.      Yes.  Some of the other plaintiffs at various

12   times.

13       Q.      Other than the plaintiffs, have you spoken to

14   anybody else?

15       A.      My spouse.

16       Q.      Anybody else?

17       A.      No.

18       Q.      Tell me what you have discussed with the other

19   plaintiffs.

20       A.      Just about the basic foundation of the case and

21   what the status of things were, basically.  That's about

22   it.

23       Q.      Have you talked about whether or not you're

24   going to win the case?

Brian L. Miller

1      A.     No.  Not directly win the case or not, no.

2      Q.     You haven't talked about that at all with the

3  other plaintiffs?

4      A.     We talked about what we believe our legal

5  grounds are and that we believe it's a fairly strong case

6  we have laid out.  That's about it.  But not anything

7  about when we win, we do this or something like that, no.

8      Q.     Who has personal knowledge about this case or

9  about the facts giving rise to this case?

10      A.     The plaintiffs.

11      Q.     Anybody else?

12      A.     I believe the people we talked about would have

13  some knowledge about that, Nick Wilkinson, Bob Tattle,

14  Dot Eltzroth.  I would expect most of the administration

15  in CSC would have knowledge about the action.  Maybe not

16  about the specific case.

17      Q.     That's your guess?

18      A.     That's my guess.  I don't know that for a fact.

19      Q.     Anybody else have any knowledge that would be

20  relevant to this case?

21      A.     No.

22      Q.     Do you have any debts at the present time?

23      A.     Personal debts you mean?

24      Q.     Any kind of debts.  Yes.

Brian L. Miller

524

1      A.      A mortgage and a car loan.

2      Q.      Anything else?

3      A.      And a home equity loan.

4      Q.      Any credit card debts?

5      A.      Yes.  And credit cards, yes.

6      Q.      How much do you have in credit card debt?

7      A.      Probably right at this moment?  Maybe about

8   $5,000.

9      Q.      How much is your home equity loan for?

10      A.      The current balance is about $8,000.

11      Q.      Has anybody given any statements in connection

12   with this case?

13      A.      Not that I'm aware of, no.

14      Q.      Is there any other information which you have

15   not mentioned which is relevant to supporting your

16   claims?

17      A.      Not that I know of.

18      Q.      Have you told me about all the conversations

19   and things you remember that form the basis for your

20   case?

21      A.      Yes.

22      Q.      Is there anyone else that you have not

23   mentioned who can support your claims?

24      A.      Nothing to think of.

Brian L. Miller

1            MR. SEEGULL:  Just give me a break.

2            (A recess was taken.)

3    BY MR. SEEGULL:

4        Q.    Going back on the record.  We don't have copies

5    of all this stuff, so I'm not going to use it as

6    exhibits.  I want to identify it for the record.  These

7    are Bates numbers that I'm reading in documents that have

8    been produced by Mr. Miller.

9            Miller 092 through Miller 098, Miller 087

10   through 091, Miller 084 through Miller 086, and this one

11   is D-10370 through --

12       A.    I don't know if I have seen that one.  That

13   would be a similar program, yes.

14       Q.    All the documents that I just read to you,

15   those are the documents you were referring to as the

16   programs and policies and procedures --

17       A.    Correct.

18       Q.    -- that you had referenced that you had been

19   given as a manager and had been charged with

20   administering?

21       A.    That's correct.

22            MR. SEEGULL:  I have no further questions.

23   BY MR. WILSON:

24       Q.    Since we were talking about the policies, I'd

Brian L. Miller                    526

1    like you to look at this document here.  I'd like to have

2    that marked.  Just take a minute and look at that.

3              (Deposition Exhibit No. 30 was marked for

4    identification.)

5              THE WITNESS:  Okay.

6    BY MR. WILSON:

7         Q.    Do you recognize that?

8         A.    Yes.

9         Q.    Can you tell me what that is?

10        A.    I believe it's a program description for the

11   AMIP program for fiscal year 1999-2000.

12        Q.    On the third page of this, the one that's

13   marked Miller 086, at paragraph 11, can you read the

14   first sentence in paragraph 11?

15        A.    Yes.  "At the beginning of each fiscal year,

16   all preceding year participants will be evaluated against

17   the participant's contributions as well as evaluated

18   against the AMIP program criteria to validate

19   participation eligibility for the current fiscal year

20   AMIP program."

21        Q.    Is this your understanding as to how the AMIP

22   program worked?

23        A.    Yes.

24        Q.    Did you ever participate in this

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0541

Brian L. Miller

1    decision-making?

2        A.    Yes.  As a manager, at the beginning of each

3    fiscal year, we did exactly this.  We looked at all the

4    current eligible people and made a decision whether they

5    would continue or not and also evaluated proposals for

6    new additions to the program.

7        Q.    Was every single person informed of whether he

8    or she would be participating or not?

9        A.    The people that were continuing participation

10   were not necessarily informed, but anybody that was going

11   to be removed from the program was informed immediately.

12       Q.    "Immediately" meaning?

13       A.    As soon as possible after the decision was

14   made.

15       Q.    The sentence says that it would take place at

16   the beginning of the fiscal year.  Is that when it did,

17   in fact, happen?

18       A.    Yes.  We did these decisions in the March/early

19   April time frame of every year.  That I participated in.

20       Q.    Could you turn to the last page, Miller 090, at

21   paragraph 10.  Is the first sentence in that paragraph

22   essentially the same?

23            MR. SEEGULL:  Objection.

24



WILCOX & FETZER LTD.
Registered Professional Reporters

Brian L. Miller                                        528

1    BY MR. WILSON:

2        Q.    Would you read that sentence, please?

3        A.    Yes.  This is from the 2000 guide, I believe.

4    It says, "At the beginning of each fiscal year, all

5    preceding year participants will be evaluated against the

6    participant's contributions as well as evaluated against

7    the AMIP program criteria to validate participation

8    eligibility for the current fiscal year AMIP program."

9        Q.    In the subsequent years did you have the same

10   meetings at the beginning of the fiscal year?

11       A.    Of the years I participated, yes, they always

12   happened like that.

13       Q.    Were the people that were going to have a

14   change in their AMIP status notified?

15       A.    Yes.  Anybody that was being changed in the

16   program was notified.

17       Q.    When were they notified?

18       A.    As soon as possible after the decision was

19   made.  Generally within a week or two of the decision.

20            MR. SEEGULL:  Go off the record.

21            (Discussion off the record.)

22            (Deposition Exhibit No. 31 was marked for

23   identification.)

24



Brian L. Miller

529

1    BY MR. WILSON:

2        Q.    Can you take a minute and look at that?

3        A.    Are these all the same?

4              MR. WILSON:  Maybe my secretary didn't

5    divide them up.

6              (Discussion off the record.)

7    BY MR. WILSON:

8        Q.    Can you tell us what this is?

9        A.    This appears to be my pay stub from the last

10   pay period -- the pay period in which I received my AMIP

11   bonus for the years 2003, 2002, and 2001.

12       Q.    With respect to the 2001 pay period --

13             MR. SEEGULL:  Can I make a suggestion?  Why

14   don't you do it all as a group?

15             MR. WILSON:  Okay.  I'm not sure if I can.

16             MR. SEEGULL:  Just say is the bonus

17   reflected in the line that says "Bonus" for each of these

18   pay --

19             MR. WILSON:  All right.

20   BY MR. WILSON:

21       Q.    Are your AMIP bonuses reflected on these

22   documents?

23       A.    Yes, it is.

24       Q.    For 2001, what was your AMIP bonus?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0544