Brian L. Miller

1      A.      $24,106.73.

2      Q.      For 2002, what was your bonus?

3      A.      $23,931.93.

4      Q.      For 2003, what was your AMIP bonus?

5      A.      $22,758.

6      Q.      Are these bonuses reflected in your total

7  earnings?

8      A.      Yes.

9              MR. SEEGULL:    Objection.

10     Q.      During what period of time did you earn these

11  bonuses?

12             MR. SEEGULL:    Objection.

13     A.      I earned these from April 1st of the previous

14  year through March 31st of the year in which they were

15  paid.

16             (Deposition Exhibit No. 32 was marked for

17  identification.)

18  BY MR. WILSON:

19     Q.      The court reporter has given you what's been

20  marked Exhibit 32.  Can you take a minute and look at

21  that, please?

22     A.      Okay.

23     Q.      Can you tell me what that is?

24     A.      This appears to be my personal fiscal year 2003

1   AMIP goal information.

2        Q.     Does this sheet say anything about proration on

3   it?

4        A.     Yes.   In the top right side, about fifth item

5   down, talks about my proration eligible months.   In this

6   case it says 12 months that I would be eligible for the

7   full year.

8        Q.     The other worksheets that you got like this,

9   did they have a box on it indicating proration by months?

10       A.     For the years that I got them, I believe they

11  did, yes.

12       Q.     During your testimony you indicated that the

13  AMIP calculation would change such as the factors, the

14  targets, and the weightings.   If you didn't know what the

15  factors, targets, and weightings were, would that affect

16  the way that you did your job?

17       A.     No.   I worked towards earning the most value

18  for the corporation to achieve good financial results.

19  So the actual interpretation of these specific weighting

20  factors would be how AMIP was paid, but I knew if we did

21  a good financial performance and worked hard towards that

22  throughout the year, that we would meet the objectives

23  set out.

24       Q.     Were the factors, targets, and weightings

Brian L. Miller                                              532

1    similar from year to year?

2        A.    They were similar from year to year, yes.

3        Q.    Were they similar enough so that, if you

4    continued to do your job the same way from year to year,

5    it was likely you would receive your AMIP bonus?

6              MR. SEEGULL:  Objection.

7        A.    Yes.  They're almost always financial-based and

8    would -- with our contributions we would do throughout

9    the year would strive to meet the actual financial

10   performance that would reach a payout for those in the

11   program.

12       Q.    You gave some testimony about salary

13   increases --

14       A.    Yes.

15       Q.    -- while you were at CSC.  Did you consider

16   these large increases?

17             MR. SEEGULL:  Objection.

18       A.    Generally they were low percentages.  One to

19   two percent some years.

20       Q.    Did you have conversations with individuals

21   when you were given your salary increase?

22       A.    Yes.  Usually your manager would give you your

23   salary increase at the appropriate time of the year and

24   often would make comment about how small it is for any

Brian L. Miller

533

1    year, but they always reminded me to look at my total

2    compensation for the year which would include things like

3    the AMIP bonus.

4         Q.    Did they indicate to you that your AMIP bonus

5    was included in your total compensation?

6              MR. SEEGULL:  Objection.

7         A.    Yes.  Every year -- in fact, HR virtually every

8    year reminded us to always look at our total compensation

9    when we considered if we were being properly compensated

10   at CSC which would include things like your actual

11   salary, your bonus, and your benefits.

12        Q.    When you came from DuPont and you got your

13   offer letter, did you view the AMIP portion of that offer

14   letter as part of your total compensation?

15        A.    Yes, I did.

16             MR. SEEGULL:  Objection.

17        Q.    Did you view the AMIP bonus as an incentive to

18   come and work for CSC?

19             MR. SEEGULL:  Objection.

20        A.    Yes.  That was part of my consideration whether

21   I wanted to go to work for CSC or not was the total

22   compensation package including the AMIP.

23        Q.    If the AMIP hadn't been included, would you

24   have still come to CSC?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller                                                534

1          MR. SEEGULL:  Objection.

2      A.    I would have started looking elsewhere.

3      Q.    As far as your testimony about once you

4  discovered that you weren't going to be included in the

5  AMIP, you started doing things differently, do you

6  remember specific things that you didn't do?

7          MR. SEEGULL:  Objection.

8      A.    At this point in time, being so far away, I

9  can't remember specific things off the top of my head,

10  other than some of the things I have described, the types

11  of things that I did before.

12     Q.    Do you have a specific recollection that you

13  did change the way you did your job?

14         MR. SEEGULL:  Objection.

15     A.    Yes.

16     Q.    How was that?

17         MR. SEEGULL:  Objection.

18     A.    In general, as with anything, if you're being

19  compensated for work you're doing and then that changes,

20  the work would change with it.  So up until that time, I

21  was under the understanding that I was eligible for the

22  AMIP program until the September time frame, end of

23  September time frame I was informed I was not and then

24  some of my work habits would change because my

Brian L. Miller

1    compensation was just turned down by the amount of AMIP

2    eligibility.

3        Q.    Prior to being notified that the AMIP was being

4    taken away, did you put forth extra effort?

5        A.    Yes.  I often put forth extra effort.

6                MR. SEEGULL:  Objection.

7                THE WITNESS:  And worked extra hours, did

8    extra things outside the scope of my specific assignment

9    to help ensure that the whole overall account would

10   reach -- assist where I could to reach financial goals

11   above and beyond what my strict assignment was so I would

12   be eligible to receive my full maximum potential here.

13       Q.    After the AMIP bonus was taken away, were your

14   extra efforts scaled back any?

15       A.    Yes, it was.  Significantly.

16               MR. WILSON:  That's all I have.

17   BY MR. SEEGULL:

18       Q.    Mr. Miller, have you ever committed tax fraud?

19       A.    No.

20       Q.    Did you list $22,758 in bonus money as earnings

21   for your 2002 taxes or did you list it as 2003 earnings?

22       A.    This would have been -- this would have been

23   reported as paid to me in that tax year.  That's what I

24   had reported.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Brian L. Miller                                                        536

1          Q.    When did you list it as earnings?  You have to

2     list all your earnings, correct?

3          A.    Yes.  In my taxes you mean?

4          Q.    Your $22,758 bonus, when did you list that had

5     been earned on your tax forms?

6          A.    I would list what CSC gave me as my W-2.  In

7     this case, at the end of calendar year 2003.  I received

8     a W-2 which would include this amount.

9          Q.    So the W-2 reflects when the money was earned?

10         A.    It reflects when the money was paid to me for

11    reporting the taxes, yes.

12         Q.    Doesn't it have a line that says earnings for

13    the year?

14         A.    I believe the title of the thing is called

15    "Earnings."

16         Q.    That's for the year, correct?

17         A.    That would be for the calendar year that they

18    provide it.

19         Q.    So when was the $22,758 earned according to

20    CSC?

21         A.    According to CSC -- there's two questions

22    there, I think.  There is the -- the earnings according

23    to the AMIP's program --

24         Q.    Not the AMIP program.

W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller

1      A.    Can I answer the question?

2      Q.    No.  I'm asking according to the payroll

3  system.

4      A.    According to the payroll system, I was paid

5  22 thousand whatever number that was.

6      Q.    That's not what I asked you.

7      A.    Yes, sir.

8      Q.    I think you know what I asked you.

9      A.    Please ask the question again.  I think you're

10 leading me with a question.  I would like to answer

11 properly if I could.

12     Q.    When does CSC reflect that you earned the bonus

13 of $22,758?

14     A.    They reflect in my W-2 that money was paid and,

15 therefore, by definition, earned, I guess, by the

16 government in that tax year.

17     Q.    That would be 2003?

18     A.    Yes.

19     Q.    So CSC reflects your payment of $22,758 as

20 having been earned in 2003, correct?

21     A.    By payroll records, yes.

22     Q.    And CSC reflects that your AMIP bonus of

23 $23,931.93, that that was earned in 2002, correct?

24     A.    That was paid in 2002 and earned through the

Brian L. Miller

538

1    fiscal year previous to that, yes.

2        Q.    Not earned through the fiscal year.

3        A.    Excuse me.  It was earned previous to that

4    because that was the fiscal year AMIP program of which I

5    was eligible to receive that payment.  They were always

6    paid the end of the fiscal year which happens to fall

7    into the next tax year.  Yes.

8        Q.    When was it earned?  When does it reflect that

9    it's earned?

10       A.    The payroll records would show that I was paid

11   that money on work that I did through the CSC fiscal year

12   which ended on March 31st, 2003.  The payment for that

13   work that I did to earn that was made in 2003; therefore,

14   it was reported to the IRS as earnings for tax purposes

15   in 2003.

16       Q.    The same would be true for your $24,106.73

17   payment.  That was reflected, according to CSC's system,

18   as earned in 2001, correct?

19       A.    Reflects a bonus paid in that time frame.

20       Q.    And earned in --

21       A.    It would be earned --

22       Q.    It's reflected as earned in 2001?

23               MR. WILSON:  Objection.

24

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

*B-0553*

Brian L. Miller                                                            539

1    BY MR. SEEGULL:

2        Q.    It's just yes or no.  Is that correct?

3        A.    I believe that is a leading question.

4        Q.    Just yes or no.  Is it correct or it's not

5    correct?

6        A.    It is reflected as earnings in the tax year for

7    the work that I did of the fiscal year prior to that

8    ending March 31st.  In that case 2001.

9        Q.    It's very simple, Mr. Miller.  Let's look at

10   the first sheet.

11              MR. WILSON:  Larry, he's answered your

12   question.

13   BY MR. SEEGULL:

14       Q.    Let's look at the first sheet.  I'm not trying

15   to play games here.  I don't know why you are.  Look at

16   total earnings.  You see total earnings?  There's a line

17   for total earnings?

18       A.    Yes.

19       Q.    You see it says year-to-date total earnings?

20       A.    Yes.

21       Q.    What are the total earnings for that

22   year-to-date?

23       A.    At this point in time it was $66,703.92.

24       Q.    You're looking at the 2003?



Brian L. Miller

540

1    A.    I'm sorry.  I'm looking at 2003.

2    Q.    What year is that?

3    A.    This is year -- in this case year 2003, tax

4   year 2003.

5    Q.    How much does CSC reflect that you had earned

6   as of May 30th, 2003, from January 1, 2003?

7    A.    $66,703.92.

8    Q.    And CSC reflects in that payment a $22,750

9   worth of earnings of an AMIP bonus, correct?

10   A.    That's correct.

11   Q.    And that would be true for the other years, the

12  same methodology, correct?

13   A.    That's correct.  Bonus paid from the previous

14  fiscal year's work, yes.

15   Q.    But the CSC payroll system reflects it as being

16  earned in that year in which it's paid, correct?

17   A.    Yes.  For tax purposes.

18   Q.    Because if you really earned it some other

19  year, you would be committing tax fraud if you didn't

20  report it?

21          MR. WILSON:  Objection to form.

22   A.    I do not believe that's correct.  I didn't

23  actually receive the money.  I can't pay taxes on

24  something I didn't actually receive.

Brian L. Miller                                    541

1      Q.      That's not true.  You can pay estimated tax,

2   correct?

3      A.      But my tax burden for that year had nothing to

4   do with this specific payment because it wasn't received

5   till that tax year.

6      Q.      It wasn't earned till the following year?

7              MR. WILSON:  Objection to form.

8      A.      It wasn't paid till the following year.

9      Q.      Since you have been working for CSC, have you

10  applied for any other jobs outside of CSC?

11     A.      Outside of CSC?  No.

12     Q.      You haven't looked to work anyplace else?

13     A.      I have looked, especially when this AMIP

14  program was taken away, but then I was fortunate enough

15  to find an assignment that made me feel more satisfactory

16  and meet my needs in the time frame we discussed.

17     Q.      But you didn't apply for any jobs outside of

18  CSC?

19     A.      Not outside of CSC, no.

20     Q.      You didn't look for any jobs outside of CSC?

21     A.      I looked but not applied for any.  I looked at

22  a number of places, talked to some people.

23     Q.      Where did you look?

24     A.      I looked at chiefmonster.com.  Followed that

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller                                        542

1    for a while.  Some of the other Web sites.  Checked

2    things.  Local newspaper.

3        Q.    Did you go on any interviews?

4        A.    No, I did not.

5        Q.    Did you send out any resumes?

6        A.    No.  I updated it, but never sent it out.

7        Q.    Have you ever removed anyone from AMIP

8    eligibility?

9        A.    Me personally, no, I did not.

10        Q.    Do you know anybody that's ever been removed

11    from AMIP eligibility?

12        A.    No, I do not.

13        Q.    So when you say every year at the start of the

14    fiscal year you told people if they were removed from

15    AMIP eligibility, the truth is you don't know one person

16    they were ever told they were removed from AMIP

17    eligibility at the start of the fiscal year.  Correct?

18        A.    I can --

19        Q.    Is that correct?

20        A.    No, that's not correct.

21        Q.    Name me a person you know that they were told

22    that they were removed from AMIP eligibility at the start

23    of the fiscal year.

24        A.    I was participating in a number --

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Brian L. Miller                                                            543

1     Q.     Just name the person.

2     A.     I cannot name a specific person.

3     Q.     That's all I asked you.

4     A.     I know there were people that were removed.

5     Q.     No --

6     A.     I do not know the names.  It's too long along.

7     They were not my employees.

8     Q.     Isn't it true that you have never told anybody

9     they were removed from AMIP eligibility at the start of

10    the fiscal year?  Isn't that right?

11    A.     I did not have to, that's correct, because none

12    of my employees were ever removed.

13              MR. SEEGULL:  I have no further questions.

14    BY MR. WILSON:

15    Q.     I want to talk about this sheet a little bit,

16    Exhibit 31.

17              Mr. Miller, what's the pay date on that?

18    A.     The one top sheet here is May 30th, 2003.

19    Q.     What fiscal year is that?

20    A.     The May 30th fiscal year, that would be fiscal

21    year 2004.

22    Q.     And the bonus that's on there, what AMIP bonus

23    does that reflect?

24    A.     That reflects the AMIP bonus for fiscal year

1    2003.

2        Q.    So according to Mr. Seegull's philosophy, the

3    2003 AMIP bonus, was it earned in fiscal year 2004?

4                MR. SEEGULL:    Objection.

5        A.    The AMIP bonus that's reflected here was earned

6    during CSC's fiscal year 2003 which ran from April 1st,

7    2002, through March 31st, 2003.  It was paid according to

8    this on May 30th, 2003.  Earning was done the previous

9    fiscal year, paid on May 30th, 2003, which would be CSC's

10   fiscal year 2004.

11       Q.    What about the other years?

12       A.    Same logic would apply.

13       Q.    Were the AMIP bonuses for those years paid in

14   the subsequent fiscal year?

15       A.    Yes.

16                MR. SEEGULL:    Objection.

17                MR. WILSON:    I have nothing further.

18                MR. SEEGULL:    I have nothing further.

19                (Deposition concluded at 3:10 p.m.)

20                    -    -    -    -    -

21

22

23

24



1            T E S T I M O N Y

2

3    DEPONENT:  BRIAN L. MILLER                    PAGE

4

5    BY MR. SEEGULL................................444

6    BY MR. WILSON................................ 525

7    BY MR. SEEGULL............................... 535

8    BY MR. WILSON................................ .543

9

10              E X H I B I T S

11

12   DEPOSITION EXHIBIT NO.                      MARKED

13

14   28 - A letter dated March 7, 1997,
     to Brian L. Miller from Dorothy Eltzroth...... 499
15
     29 - A letter dated September 11, 2003,
16   to Brian Miller from Robert Tattle............ 513

17   30 - A multi-page document Bates numbered
     Miller 084 through Miller 090................. 526
18
     31 - Three documents Bates numbered D-11529,
19   D-11502, and D-11474......................... 528

20   32 - A two-page document entitled, "Fiscal
     Year 2003 AMIP".............................. 530
21
     ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 546
22
     CERTIFICATE OF REPORTER                  PAGE 547
23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 16th day of
February, 2006, the deponent herein, BRIAN L. MILLER, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

      I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)

DATED: 3/10/06

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0562

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.             )
HAUCK, KEVIN KEIR, ASHBY            )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM      )
SPERATI,                                          )
                                                          )
   Plaintiffs,                          )
                                                          )
    v.                                     )  C.A. No. 05-10-JJF
                                                          )
COMPUTER SCIENCES CORPORATION, )
                                                          )
   Defendant.                          )

       Deposition of KEVIN R. KEIR taken pursuant
to notice at the law offices of Potter Anderson &
Corroon, Hercules Plaza, 6th Floor, Wilmington, Delaware,
beginning at 3:20 p.m., on Thursday, February 16, 2006,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

      TIMOTHY J. WILSON, ESQUIRE
      MARGOLIS EDELSTEIN
        1509 Gilpin Avenue
        Wilmington, Delaware 19806
        for the Plaintiffs

      LARRY R. SEEGULL, ESQUIRE
      LINDA M. BOYD, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY US LLP
        6225 Smith Avenue
        Baltimore, Maryland 21209-3600
        for the Defendant

       WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
         (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



B-0563



```
 1   APPEARANCES (cont'd):

 2              TYLER B. RAIMO, ESQUIRE
             COMPUTER SCIENCES CORPORATION
 3              3170 Fairview Park Drive
             Falls Church, Virginia 22042
 4              for the Defendant

 5                    - - - - -

 6

 7              KEVIN R. KEIR,

 8       the witness herein, having first been

 9       duly sworn on oath, was examined and

10       testified as follows:

11   BY MR. RAIMO:

12       Q.    Good afternoon, Mr. Keir.

13       A.    Hi.

14       Q.    I'm an attorney with CSC, and CSC stands for

15   Computer Sciences Corporation.  With me is Linda Boyd and

16   Larry Seegull from the law firm of Piper Rudnick.

17              The purpose of this deposition is to

18   inquire about allegations forming the basis of your

19   claim.

20              Have you ever been deposed before?

21       A.    I don't believe so.  Not that I'm aware of.

22       Q.    I'm going to go over some instructions for the

23   deposition here just so you know sort of the rules here.

24              Obviously all your answers must be verbal
```

Kevin R. Keir

1    since the court reporter cannot take down head nods,

2    etcetera.   Yes or no.

3              You must answer the questions truthfully

4    and completely.   You must provide testimony today just as

5    if you were testifying in court.

6              If you do not hear a question, say so and

7    I'll repeat it.   If you do not understand a question, say

8    so and I'll rephrase it for you.   If you realize that an

9    earlier answer you had given is inaccurate or incomplete,

10   say so, you can correct or supplement your answer for the

11   record.

12             If you want to stop to use the restroom or

13   to stretch or to get up and get a cup of coffee, water,

14   if you're tired, let me know and we will take a short

15   break.

16             If you do not know or do not remember the

17   information necessary to answer the question, say so.

18   You cannot talk to your attorney during the deposition to

19   discuss your testimony until the deposition is concluded.

20   You cannot seek advice from your attorney during the

21   deposition unless it relates to a question of privilege.

22             If you answer a question, I'll assume that

23   you have heard it and understand it and you have given

24   your best recollection.

Kevin R. Keir

1          Do you understand the instructions I have

2    given you?

3        A.    Yes.

4        Q.    Are you taking any medication today that could

5    possibly impede your testimony?

6        A.    No.

7        Q.    What did you do to prepare for the deposition

8    today?

9        A.    I met with Tim yesterday briefly and I tried to

10    spend a little time last night reviewing the court

11    documents and what papers I had.

12        Q.    Did you meet with anyone besides Tim?

13    Tim Wilson, your attorney?

14        A.    I had a very brief conversation with

15    Bill Sperati today.   That's all.

16        Q.    What did you talk about with Bill?

17        A.    Just if he knew clarification about some of the

18    calculations.

19        Q.    What calculations?

20        A.    Of the AMIPs.

21        Q.    AMIP?

22        A.    AMIP.

23        Q.    Calculations being what, your damages?

24        A.    No.   The percentage people got.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kevin R. Keir

552

1     Q.    Percentage people got?  What else did you talk

2  about?

3     A.    That's pretty much it.

4     Q.    Whose percentages are you talking about?  Other

5  people, who are they?

6     A.    People in the AMIP participation and that's

7  all.

8     Q.    Anyone else did you speak with about AMIP,

9  about this lawsuit?

10     A.    In the mediation we met with -- the mediation

11  last week or the week before, that was the first time I

12  had met a lot of those people.

13     Q.    You said you reviewed some documents to prepare

14  for the deposition.  Can you tell me what those documents

15  were?

16     A.    The legal ones that have been sent by his

17  office.  The actual complaint.  Those kind of things.

18     Q.    Did you bring any documents with you today?

19     A.    I believe Tim did.

20     Q.    Other than Bill Sperati that you spoke to and

21  Tim Wilson, anyone else you have spoken to about this

22  deposition that you're going to give today?

23     A.    Recently for the deposition?

24     Q.    Right.

**W&F**

Kevin R. Keir

553

1    A.    No.  Other than my wife to let her know I'm

2    here.  That's about it.

3    Q.    Your only claim is that CSC violated the

4    Delaware Wage Payment Act, correct?

5    A.    Yes.

6    Q.    What's the basis of the claim?

7    A.    That we had earned income that was taken away.

8    Q.    Earned income taken away?

9    A.    And bonus that was taken away.

10   Q.    During the period between April 1st and a

11   period in September?

12   A.    Yes.

13   Q.    Is that the time frame?

14   A.    I believe so.

15   Q.    2003?

16   A.    Uh-huh.

17   Q.    No other claim besides that?

18   A.    Other than the damages, no.

19   Q.    And those damages relate to that period of time

20   between April 1st --

21   A.    Yes.

22   Q.    -- and September?

23   A.    Correct.

24   Q.    Have you ever been known by any other name?

Kevin R. Keir

554

1    A.    No.

2    Q.    What's your Social Security number?

3    A.    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.

4    Q.    Your date of birth?

5    A.    November 29th, '55.

6    Q.    Place of birth?

7    A.    Calgary, Alberta, Canada.

8          Actually I should clarify the name thing.

9  My birth certificate says Kevin Keir.  When I went to

10  renew it, they sent it as Kavin Keir and I had to do

11  paperwork to change it.

12   Q.    K-a?

13   A.    Yeah.  We had an argument that it was a typo.

14   Q.    Your current address?

15   A.    3315 Heritage Drive, Wilmington, Delaware.

16   Q.    Your phone number?

17   A.    994-2956, area code 302.

18   Q.    What was the length of time at this address and

19  phone number?

20   A.    Since, I believe, '97.  I could be wrong.

21  Around there.

22   Q.    Prior to that?

23   A.    301 Village Road, Wilmington, Delaware.

24   Q.    Do you rent or own currently?

Kevin R. Keir

555

1      A.      Own.

2      Q.      When did you come to the U.S. from Canada?

3      A.      Actually I came from Australia, and that was in

4    '93, 1993.

5      Q.      Did you go from Canada to Australia and then

6    from Australia to the U.S. in '93?

7      A.      Yeah.  I joined DuPont Australia.

8      Q.      When you came to the U.S., you worked for

9    DuPont?

10     A.      Yeah.  I switched internally from DuPont

11   Australia to DuPont U.S.

12     Q.      In 1993?

13     A.      Yes.

14     Q.      So between 1993 and I believe in 1997, you had

15   worked for DuPont?

16     A.      Yes.  And prior that, '83 to '93, in DuPont

17   Australia.

18     Q.      Before that where did you work?

19     A.      Another company in Australia, and then previous

20   to that a company in Canada, Vancouver.

21     Q.      What was the name of the company in Australia?

22     A.      They changed their names.  Campbell & Cook

23   Actuaries, I believe, and they turned to Co-Cam

24   Computers.  Computer actuarial firm.

1       Q.      And Canada, the company in Canada?

2       A.      SunWest Systems.

3       Q.      So '93 came to the U.S.; transferred within

4    DuPont?

5       A.      Yes.

6       Q.      And then 1997 you were employed then by CSC?

7       A.      Correct.

8       Q.      Does anyone live with you at your present

9    address?

10      A.      My wife and three kids.

11      Q.      Have you ever been arrested?

12      A.      No.

13      Q.      Any convictions for a felony or misdemeanor?

14      A.      No.

15      Q.      Ever served in the military?

16      A.      No.

17      Q.      U.S. or otherwise?

18      A.      No.

19      Q.      When did you first contact an attorney to

20   handle your case against CSC?

21      A.      I don't remember.

22      Q.      Did anyone contact you?

23      A.      We received a letter in the mail and said if

24   you're interested, contact the attorneys.  And we did.

Kevin R. Keir

557

1    It was not long after that letter.

2        Q.    Do you know what time frame that was?

3        A.    I think around December/January.    December '03/

4    January.    I could be wrong.

5        Q.    I show the witness Exhibit 4.    Have you ever

6    seen that letter before?

7        A.    Yes.

8        Q.    What is it?

9        A.    It's the letter I received in the mail.

10       Q.    Do you know who sent this to you?

11       A.    No, I actually don't.

12       Q.    Do you know who wrote it?

13       A.    No.

14       Q.    How did you choose your attorney?

15       A.    Listed on the letter here.

16       Q.    And you contacted them directly?

17       A.    Yes.

18       Q.    What is your fee relationship with your

19    attorneys?

20       A.    We pay the costs, they take a percentage of --

21    if it's in our favor, they take a percentage.    If not, we

22    pay the costs.

23       Q.    You mean it will be like --

24       A.    Filing costs, administration costs.

Kevin R. Keir                                                      558

1      Q.      They will take a percentage.  Do you know what
2   that percentage is?

3      A.      Not off the top of my head.  I forget.

4      Q.      Are you seeking attorneys' fees as an element
5   of the damages in this lawsuit?

6      A.      I believe we were.

7      Q.      Have any lawsuits ever been filed against you?

8      A.      No.

9      Q.      Have you ever filed any lawsuits besides this
10  one?

11     A.      Not filed, no.

12     Q.      What do you mean by that?

13     A.      I was in that class action, the one with CSC,
14  *Gianetto*, I believe, last year.

15     Q.      *Gianetto* case?

16     A.      Yes.

17     Q.      What was that about?

18     A.      That was a class action in California, I
19  believe, about classification of job duties, whether it
20  was overtime or not, and just a class action that was
21  settled.

22     Q.      Did you receive any money?

23     A.      Yes.

24     Q.      How much?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0574

Kevin R. Keir                                        559

1        A.    I don't remember.  Around a thousand dollars, I

2    think.

3        Q.    Have you ever been a witness in a lawsuit?

4        A.    No.

5        Q.    An arbitration?

6        A.    Trying to think.  Not that I remember.

7        Q.    Administrative hearing of some sort?

8        A.    No.

9        Q.    Have you ever declared bankruptcy?

10       A.    No.

11       Q.    Have you ever made a claim for unemployment

12   benefits or insurance?

13       A.    No.  Well, car insurance.  That was -- the

14   other person was at fault.  I just had to do the

15   paperwork.

16       Q.    Car accident?

17       A.    Yes.

18       Q.    Have you ever made a claim for workers'

19   compensation benefits or insurance?

20       A.    No.

21       Q.    Do you have any relatives who work or worked at

22   CSC?

23       A.    No.

24       Q.    I want to ask you some questions about your

Kevin R. Keir

560

1    education, training, and background.  What colleges or

2    universities, if any, have you attended?

3        A.    I went to Malaspina College in Nanaimo British

4    Columbia.

5        Q.    Did you graduate from there?

6        A.    No.  It was a 12-month condensed accounting

7    course.  I did 10 months of it and I had to move.  I

8    didn't complete the final two months.

9              And then I did the BCIT, which is the

10   British Columbia Institute of Technology in Vancouver,

11   and that was a two-year computer course, and I only did

12   one year of that because I got a summer job and the

13   gentleman talked me into staying on.

14       Q.    Anything else?

15       A.    No.

16       Q.    No graduate school?

17       A.    No.

18       Q.    Any other training or special courses you have

19   taken besides attending these accounting courses and

20   computer courses?

21       A.    Mostly through DuPont or CSC.  Just personal,

22   private courses like cooking.

23       Q.    Have you ever received any professional or

24   work-related certifications?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Kevin R. Keir

561

1    A.    Just through courses through CSC.  They're

2  small certifications or small graduations.  I work in a

3  computer area called software -- called SAP and we often

4  get sent on SAP courses.

5    Q.    Who paid for this?

6    A.    Usually DuPont or CSC.

7    Q.    So you took those courses when you were at

8  DuPont and you took those courses while you were at CSC,

9  too?

10    A.    Yes.

11    Q.    Both SAP --

12    A.    SAP.  Sometimes other ones, too.

13    Q.    Do you know what those were?

14    A.    Other ones?

15    Q.    Yes.  In addition to the SAP ones.

16    A.    I took a networking communications one once.

17  There was a couple of others.

18    Q.    Paid for by CSC?

19    A.    Or DuPont, yes.

20    Q.    Have you ever received any awards or honors?

21  Let's start with DuPont, while you were at DuPont.

22    A.    I have.  I wouldn't remember them all.

23  Sometimes they're monetary rewards for a project that you

24  were part of a project.  Sometimes it's individual

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0577

Kevin R. Keir

562

1    recognition.  I don't remember the exact numbers or names

2    of the awards or whatever.  I have received some.

3        Q.      Monetary?

4        A.      Sometimes monetary, sometimes

5    plaque-on-the-wall-type thing.

6        Q.      Do you know how much they were, maybe --

7        A.      They ranged anywhere from $25 up to a couple of

8    thousand.

9        Q.      Were they given to individuals or groups?

10       A.      Mostly groups.  Sometimes individuals or

11   individuals within those groups.

12       Q.      Departments or just --

13       A.      No.  Individuals.  Generally the larger ones --

14   like there was one for a thousand, there was one for a

15   couple thousand, you were part of a group working on a

16   project and everyone on that project received something.

17   Wouldn't necessarily know what everybody got.

18               Other individual awards I have done have

19   either been individual -- awards I have gotten have

20   either been individual or part of a group, but they're

21   smaller, like, $25, $50.

22       Q.      Doesn't have an impact on your career success,

23   does it, $25?

24       A.      It's a morale booster.  Motivation.  Someone

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Kevin R. Keir

563

1  recognizes it.

2      Q.     You received also plaques in addition to that?

3  I'm talking about DuPont, too.

4      A.     Yeah.   Usually with the monetary awards you

5  received something.   Sometimes it was even a desk

6  knickknack or something.

7      Q.     How about CSC?

8      A.     Same.

9      Q.     Money?

10      A.     Money, certificate.

11      Q.     What was the largest amount of money you

12  received from CSC as sort of an award?

13      A.     I have to remember if I was with DuPont or CSC.

14  I believe it was a thousand dollars for working on a

15  project for Canada.

16      Q.     When was the last time you received one of

17  these awards from CSC?

18      A.     I'm guessing six months ago.   It was a smaller

19  one.

20      Q.     How much?

21      A.     Fifty dollars, I think.

22      Q.     For what?

23      A.     Getting work for CSC.

24      Q.     What was that work?

1      A.      They were re-siting -- it was for the DuPont

2    DSAP which is their big SAP implementation.  They signed

3    up more paperwork for a bunch more work in the area I do,

4    which is archiving.

5      Q.      Did anyone else receive an award?

6      A.      Not particularly for that one, no.

7      Q.      Just you?

8      A.      Yes.

9      Q.      Do you know the name of that award?

10     A.      No.  It was just a monetary thank-you.

11     Q.      Who gives that award, is it your manager or

12   supervisor or is it the client?

13     A.      If it's from CSC, an internal award like that,

14   it doesn't have to be your direct manager.  It can be

15   another manager on the project you're working on.  I

16   actually have very little interaction with my manager

17   because I'm working on multiple different projects.  So

18   it was a CSC person involved in that project I was on.

19   Or one of the projects I was on.

20     Q.      Any other awards from CSC?

21     A.      Not that I remember.  There's been two or three

22   $50, $25 ones.  There was a thousand-dollar one, I

23   believe, from Canada.  There was a couple of DuPont ones

24   before that.



Kevin R. Keir

565

1      Q.      When you were working at DuPont?

2      A.      DuPont, yes.  DuPont Australia or DuPont U.S.

3      Q.      Does the fact that you received any of these

4  awards support any of your claims today?  I'm sorry, the

5  claims that you're making in your current complaint?

6      A.      I don't believe so.

7      Q.      Do you have any memberships with any

8  professional associations?

9      A.      Only through CSC.  Group memberships, SAP users

10  group, kind of have to apply and get a sign-on for that.

11  But CSC pays for a group membership.

12      Q.      Are those just CSC employees in that

13  membership?

14      A.      No.  It's outside people, too.

15      Q.      When did you first join that group or were you

16  accepted?

17      A.      Years ago.  CSC pays a yearly fee to say we are

18  our company within CSC, so people within our company can

19  join this group.

20      Q.      So CSC is the actual member?

21      A.      Yes.

22      Q.      I want to talk about the prior employment

23  history we touched on earlier.  I guess you said you

24  first began with DuPont in 1993.  Correct?

Kevin R. Keir

566

```
 1        A.     DuPont Australia, '83.

 2        Q.     And then joined DuPont --

 3        A.     U.S.

 4        Q.     When?

 5        A.     '93.

 6        Q.     When did your employment end with DuPont?

 7        A.     In 1997 when we switched with CSC.

 8        Q.     What was your final position at DuPont?

 9        A.     I don't remember.  Computer scientist, senior

10   computer scientist.  Whatever the terminology -- I don't

11   actually remember the actual terminology.

12        Q.     Do you know what level that was within DuPont?

13        A.     I believe it was a 5.

14        Q.     What did your job entail as a computer

15   scientist with DuPont?

16        A.     With DuPont?  It did change over the years.

17   When I left, I believe I was doing a job I'm doing now,

18   which is basically a computer specialist in a certain

19   area.

20        Q.     Is it SAP?

21        A.     SAP but a portion of SAP.  I'm a specialist in

22   the data archiving.

23        Q.     Were you in a bonus program in that job?

24        A.     I was in the DuPont bonus --
```

Kevin R. Keir

567

1    Q.    Program?

2    A.    Right.

3    Q.    What was the name of that?

4    A.    Incentive Comp., compensation, whatever it was.

5    IC.

6    Q.    What documents set forth that bonus program?

7    A.    I don't recall.  I received it a couple of

8    years before we split.  I was told I was eligible for it.

9    Q.    How many years were you in the DuPont bonus

10   program?

11   A.    I believe it was less than two years.  I don't

12   know the exact timing.

13   Q.    How did you join that bonus program?

14   A.    My manager at the time just called me and said

15   congratulations, you're now eligible for this, and I

16   really didn't know how.

17   Q.    You didn't know how you were eligible for it?

18   A.    Right.  Or I wasn't told.  I wasn't told to

19   apply or how to apply or anything else.  They just said

20   you're now eligible, you get it.

21   Q.    Did you ever find out later why you were

22   eligible?

23   A.    No.

24   Q.    How did you learn about that bonus program

Kevin R. Keir

1    while you were at DuPont?

2        A.    I knew that people at a certain level got it.

3    I was not clear how they got it.  It didn't seem to be

4    totally clear that, just because you were at a level, you

5    got the bonus.

6        Q.    Why is that?

7        A.    I don't know.

8        Q.    Were those people managerial-level?

9        A.    No.  I honestly don't know.  From what little I

10    knew about it, it didn't seem to be a consistent thing.

11    It seemed to be you were nominated for it or applied for

12    it or whatever.

13        Q.    You didn't apply?

14        A.    I did not apply.

15        Q.    You were just told you were eligible by your

16    supervisor?

17        A.    Yes.

18        Q.    How is that bonus calculated?

19        A.    I don't recall.

20        Q.    Was it awarded annually?

21        A.    Yes.

22        Q.    Did you meet with your supervisor to sit down

23    to tell you what was expected of you for the bonus?

24        A.    I don't know if it was directly related to the

Kevin R. Keir                                    569

1    bonus.  You'd meet every year anyway to go over your

2    performance and what was kind of expected over the next

3    year.  Indirectly that was part of the bonus, I guess.

4         Q.    When did you first start working at CSC?

5         A.    Whenever everybody else transitioned over,

6    which I believe it was May '97.

7         Q.    What was your first position with CSC?

8         A.    Pretty much the same.  I just kept -- it was

9    very little change from what I was already doing.

10        Q.    What was your title?

11        A.    Again, computer scientist, I believe, or senior

12   computer scientist.  I think it was just computer

13   scientist.  The terminology, the name was slightly

14   different at DuPont.  I don't recall what it was.

15        Q.    When you joined CSC, what group were you in?

16        A.    They started off -- they changed names over the

17   years so many times.  Horizon Initiatives.

18        Q.    That was the initial group?

19        A.    I believe so.  Basically I was working at

20   DuPont in SAP and continued to do the same job.

21        Q.    How did Horizon Initiatives -- is that what you

22   said?

23        A.    I believe that's the first name they started

24   off with, yes.

Kevin R. Keir

1    Q.    How did that fit into the organizational

2  structure of CSC?

3    A.    I believe they built that from scratch

4  deliberately to handle the DuPont take-over and they were

5  planning on kind of using that as a group for all

6  chemical-related companies.   Kind of a new division.

7    Q.    As a computer scientist for CSC, you continued

8  to perform the same duties you were doing while you were

9  at DuPont?

10    A.    Yes.   Except for DuPont as a client now.

11    Q.    Did your manager change?

12    A.    I believe so, yes.

13    Q.    Who was that?

14    A.    I believe the new one was Paula Haldaman.   The

15  old one stayed at DuPont.

16    Q.    Continued to be a DuPont employee?

17    A.    I'm sorry.   Continued to be at DuPont.   Yes.

18    Q.    You stayed at the same location?

19    A.    I don't recall.   We have moved around a lot.

20  Sometimes they have been at DuPont sites.   Sometimes they

21  have been at CSC sites.   I can't remember where we were

22  in '97 exactly.   I think we stayed at a DuPont site for a

23  while.

24    Q.    Do you know where you were before you moved to

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Kevin R. Keir

571

1    CSC, transitioned to CSC?

2        A.    We have been at quite a lot of different

3    locations.  I have been at Barley Mill.  We have been

4    downtown here.  Later on DuPont -- we moved out to

5    Newark, two locations down there.  And mostly Barley

6    Mill.

7        Q.    What was your starting salary at CSC?

8        A.    I don't recall.

9        Q.    Was it the same as when you were at DuPont?

10        A.    I believe there's some adjustments made.  I

11    couldn't tell you the exact number.

12        Q.    Do you know your salary level, your SL number?

13        A.    5.  I don't think that's changed.

14        Q.    Is that what you are now?

15        A.    I believe so, yes.  I'm sorry.  I believe it

16    was the same as now.  I'm a 5 now.

17        Q.    What's your current job function?

18        A.    Pretty much the same.  I'm a specialist in the

19    SAP archiving area.  I have a group of -- it alternates

20    three to four people I'm responsible for.  Most of them

21    are in the same area, SAP archiving.  Like a team lead

22    and also their administrative lead.

23        Q.    When you joined CSC, were you in the AMIP bonus

24    program?

Kevin R. Keir

572

1    A.    Yes.

2    Q.    As a computer scientist, SL 5?

3    A.    Yes.

4    Q.    Did you receive any other types of bonuses when

5 you joined CSC?

6    A.    I don't know if it was right when we joined.

7 There's been a couple over the years.  One was a

8 retention program because SAP was a high-skills area and

9 there were people leaving.  And there was another one

10 called PSPP.  That was like a hot skills.  Only certain

11 areas that were in demand got a bonus, as well.  So there

12 was a couple -- the names came and went over the years.

13    Q.    What does PSPP stand for?

14    A.    I don't know.

15    Q.    You received one of those bonuses?

16    A.    I received both.  Premium skills something,

17 something.

18    Q.    Did you receive that every year?

19    A.    No.  They came and went, and I honestly

20 couldn't tell you how many years or whatever.

21    Q.    Do you know why you didn't receive one after a

22 year you did receive one?

23    A.    It was put in place because of a certain

24 situation where people were leaving because there were

Kevin R. Keir                                              573

1    hot skills in that market.  After a while those skills

2    cooled down or their competition got caught up and they

3    took the program away.

4                (Deposition Exhibit No. 33 was marked for

5    identification.)

6    BY MR. RAIMO:

7        Q.    Do you recognize this Exhibit 33?

8        A.    Yes.

9        Q.    What is it?

10       A.    It was the offer letter to me from CSC.

11       Q.    You received this letter when you transferred

12   from DuPont to CSC, correct?

13       A.    Yes.

14       Q.    You understood from this letter that you would

15   be eligible to participate in AMIP, correct?

16       A.    Correct.

17       Q.    This letter did not guarantee you that you

18   would continue to be eligible to participate in AMIP the

19   rest of your career at CSC, correct?

20               MR. WILSON:  Object to form.  Go ahead.

21       A.    It didn't say either way.

22       Q.    But it didn't guarantee you that you would be

23   eligible to remain in AMIP.

24       A.    Doesn't say either way.  Yes.  It doesn't say

Kevin R. Keir

574

1    that.

2        Q.    Do you see where it does guarantee you that you

3    would be --

4        A.    No.

5        Q.    You're currently employed with CSC as an

6    at-will employee, correct?

7        A.    I'm not sure what that means.

8        Q.    Means you don't have an employment contract

9    with CSC, you could terminate your employment with CSC at

10    any time and CSC can terminate your employment at any

11    time.

12        A.    Correct.

13        Q.    Before you transferred from DuPont to CSC, did

14    DuPont hold any meetings about the transfer?

15        A.    Yes.

16        Q.    When?

17        A.    There was numerous meetings.  It was a

18    traumatic time for a lot of people with not knowing what

19    it meant.  There was meetings to discuss what the plan

20    was, whether some people were possibly going to

21    Accenture, some going to CSC, some might have even stayed

22    at DuPont.  So there was various meetings.

23        Q.    Who conducted those meetings?

24        A.    I don't recall them all.  I know Barry Day was

Kevin R. Keir

1  involved in some.

2      Q.    Who is Barry Day?

3      A.    He was our SAP group leader at the time.

4      Q.    Was he a DuPont employee or CSC employee?

5      A.    He was a DuPont employee, I believe.

6      Q.    So Barry Day conducted --

7      A.    I know he did at least one of them.  There was

8  others.

9      Q.    Anyone at CSC conduct meetings with you?

10     A.    They were probably at some of the meetings, but

11  I don't recall names or faces.

12     Q.    Were benefits discussed during these meetings?

13     A.    Yes.

14     Q.    Salaries?

15     A.    Yes.  Not people's direct salaries.  The whole

16  benefit package of what it means.  Because obviously the

17  DuPont overall package was different than what the CSC

18  package was.  People were curious how that was going to

19  shake out.

20     Q.    Bonus programs, were they discussed during

21  these meetings?

22     A.    Generally not.

23     Q.    What do you mean by that?

24     A.    Only a few people were eligible for AMIP, so

1    generally those topics were not part of the general

2    DuPont-to-CSC switchover.

3        Q.    Was there anything communicated to you about

4    the bonuses?

5        A.    I believe there was e-mails talking about it

6    because people had asked the managers directly and so

7    there were e-mails.  I remember they said they were

8    working on it.  That's what they came up with.

9            (Deposition Exhibit No. 34 was marked for

10   identification.)

11   BY MR. RAIMO:

12       Q.    Do you recognize this document?

13       A.    Yes.

14       Q.    What is it?

15       A.    It's basically what I was just saying, people

16   had asked Barry Day about how were they going to handle

17   AMIP, and this was, I guess, his reply to those people

18   that were eligible at the time.  Or the variable comp. of

19   getting that from DuPont.

20       Q.    Is this a hard-copy letter or is this an

21   e-mail?

22       A.    This was just e-mail.

23       Q.    So DuPont Information Systems would be an

24   electronic sort of mass mailing?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Kevin R. Keir                              577

1      A.    No.    That's the department he's from.    You

2  can't tell from this who he sent it to, but I believe it

3  was just people in his SAP group that were eligible --

4  that were currently getting the DuPont VC.

5      Q.    Did you ever receive any more of these

6  documents from Barry, additional replies?

7      A.    I don't recall.    I believe, if I did, it was

8  just the same sort of thing that they're working on it

9  and they will come up with something.

10      Q.    Did you ever receive any follow-up answer to

11  this or any clarification as to what your bonus would be?

12      A.    Between this letter and the actual offer

13  letter, where we were told, and I don't know how, either

14  verbally or possibly in a letter or e-mail, that CSC was

15  going to bend the rules for the DuPont conversion and

16  allow us to be part of the AMIP.

17      Q.    What do you mean by "bend the rules"?

18      A.    Well, the VC rules and the CSC rules for AMIP

19  were apparently different.

20      Q.    And VC stands for variable compensation?

21      A.    Yes.

22      Q.    In what ways were they different?

23      A.    I don't know, but under whatever CSC rules

24  there were for AMIP -- some of us would not have

**W&F**

1  qualified.  I believe it was at a certain level.

2     Q.    What were the CSC qualifications at that time,

3  in your understanding?

4     A.    I don't recall.

5     Q.    Do you contend that any of the discussions or

6  communications during this period of time of your

7  transition support your claim that you were entitled to a

8  prorated AMIP bonus for fiscal year '04?

9     A.    The offer letter says they're going to prorate

10 it for the actual joining.

11    Q.    But for fiscal year '04.

12    A.    Not through these letters.

13    Q.    Or communications during your transition from

14 DuPont to CSC.

15    A.    Not that I recall.

16    Q.    So after these meetings, you didn't have a

17 clear understanding of how AMIP worked?

18    A.    In CSC realm?

19    Q.    Right.

20    A.    Probably not, no.

21    Q.    You were told that you would be AMIP-eligible?

22    A.    Yes.

23    Q.    Did you understand that you would receive an

24 AMIP worksheet?



Kevin R. Keir                                    579

1        A.    No.

2        Q.    Did you know how AMIP bonuses would be

3    calculated?

4        A.    Not clearly.  It seemed to change over the

5    years how it was calculated.  The percentage makeup

6    changed over the years.

7        Q.    What do you mean by that, the way your AMIP was

8    calculated would change year to year?

9        A.    The makeup -- I was eligible up to 22 percent.

10   They would come up with a calculation based on a bunch of

11   different factors to say whether payout is going to be

12   hundred percent, 80 percent, 110 percent, whatever.  If

13   it's 100 percent, then I would get 22 percent of my

14   salary.  But the makeup of the breakdown, internal

15   breakdown, of how they came up with what that figure was

16   seemed to change over the years.

17       Q.    According to you, what was the makeup?  What

18   did that consist of?

19       A.    I couldn't tell you directly.  It seemed to be

20   a combination of financial figures.  In the beginning

21   years a portion of it was more directly related to your

22   performance.  In later years it just seemed to be

23   division and CSC as a total.  Some of their financial

24   indicators, earnings per share, I think a return on

1    investment, those kind of things.

2        Q.    You're saying that the AMIP bonus essentially

3    was a percentage of your salary?

4        A.    Yes.  I was eligible up to a certain amount for

5    a percentage of my salary.  Whether I got that percentage

6    was the AMIP's calculation.

7        Q.    And that percentage was based on numerous

8    factors?

9        A.    Correct.  Yes.

10        Q.    As you were saying, those factors could include

11    corporate objectives, group objectives?

12        A.    Correct.

13        Q.    Group objectives?

14        A.    At one stage there was personal objectives,

15    too.

16        Q.    And personal objectives.

17        A.    But it changed.  They changed over the years.

18    They changed the mix.

19        Q.    The AMIP was always changing?

20        A.    The mix of how the AMIP was calculated changed.

21        Q.    But that would have an impact on the AMIP you

22    would receive?

23        A.    Potentially, yes.

24        Q.    Because not only factors would change, but

Kevin R. Keir                                581

1    possibly targets for those factors would change, too?

2       A.    Correct.

3       Q.    And the weight that each of those factors were

4    given would also change, too, over the years.

5       A.    They could.  I believe they did.

6       Q.    They did?  And in addition to the financial

7    factors, the nonfinancial factors could change, also; is

8    that correct?

9       A.    Such as?

10      Q.    Personal objectives.

11      A.    Yes.  I believe the last couple of years there

12   really wasn't personal objectives involved in the

13   calculation.  It was more -- other than a group level.

14      Q.    What would a personal objective entail?

15      A.    I believe in the early years your rating would

16   have to be considered high.  Your manager would have to

17   say yes, this part of it was you met this part.

18      Q.    And group objectives?

19      A.    Again, those were -- appeared to be just

20   financial objectives for the group.

21      Q.    For your case, your SAP group, would you

22   consider you SAP group or --

23      A.    We're a part of a large -- again, it's changed

24   so much over the years, the different groups and

Kevin R. Keir

1    divisions we have been in.  The SAP group was in

2    something called ASD.  I forget what -- Application

3    Service Delivery.  They have changed over the years so

4    many times.  But I don't believe the SAP group itself was

5    a factor.  It would be part of a larger group.

6        Q.    More of a business unit rather than SAP

7    subgroup?

8        A.    Yes.

9        Q.    Some of the financial factors were placed into

10   an AMIP worksheet; is that correct?

11       A.    Yes.

12       Q.    As you stated, that would be possibly operating

13   income, margin?

14       A.    Without looking at it, I couldn't tell you.  I

15   remember the acronym was ESP at one stage.  I believe ROI

16   was on there.

17       Q.    DSO?

18       A.    I don't recall.  May or may not have.

19       Q.    And these factors are based on CSC's financial

20   performance during the year.

21       A.    I believe so.  Or the group's performance.

22       Q.    CSC's fiscal year runs between April 1st and

23   March 31st; is that correct?

24       A.    I believe that's correct, yes.

Kevin R. Keir

583

```
 1        Q.      So the factors that I just mentioned before
 2    could change year to year.
 3        A.      Yes.
 4        Q.      Do you know what AMIP stands for?
 5        A.      Annual Management Incentive Plan, I believe.
 6        Q.      How do you know what AMIP is?
 7        A.      I recall seeing that somewhere.  It was rarely
 8    spelled out like that.  It was just always AMIP.
 9        Q.      Can you point to any document where the terms
10    of AMIP are spelled out?
11        A.      No.
12        Q.      Can you point to any document where the
13    eligibility to participate in the AMIP is spelled out?
14        A.      It might be somewhere on the CSC portal, but I
15    don't have --
16        Q.      Do you know what the guiding plan is that
17    controls how CSC implements AMIP?
18        A.      No.
19        Q.      The company distributes its policies regarding
20    compensation electronically, correct, in addition to
21    being on the portal?
22        A.      I believe so.  I don't recall receiving a
23    communication about AMIP other than this.  Sometimes we
24    would receive something in the mail.  We didn't always
```

Kevin R. Keir                                        584

1    get a worksheet.  I think I got a worksheet in the mail

2    once.  But we didn't get one every year.

3        Q.    You said something in the mail.  Hard-copy

4    document in the mail?

5        A.    Yes.

6        Q.    Do you know what that document was?

7        A.    I believe one year it was a worksheet.  Other

8    times it was via e-mail.

9        Q.    The worksheet would come via e-mail or other

10   documents --

11       A.    The worksheet.  The last year I think we got it

12   via e-mail.  Or not the last year.  The 2002.  The 2003

13   year that was via e-mail.

14       Q.    Where did you receive that worksheet from?

15       A.    I don't recall.

16       Q.    Do you know who sent it to you?  Was it your

17   supervisor?

18       A.    No.  The names always seemed to be different.

19       Q.    Have you ever seen a policy on AMIP?

20       A.    I don't recall.

21       Q.    Do you have any e-mails, letters, memoranda, or

22   correspondence which states you're eligible for AMIP for

23   fiscal year 2004?

24       A.    Other than the original one saying I was

Kevin R. Keir

585

1    eligible for it, I didn't receive anything else saying I

2    wasn't eligible for it.

3        Q.    Did you participate in any orientation when you

4    first began working with CSC?

5        A.    Yes.

6        Q.    When was that?

7        A.    As soon as possible after -- right around the

8    time we transitioned.  I know we learned about the

9    telephone test system, that kind of thing.

10        Q.    Who conducted that orientation?

11        A.    I don't recall.  It was a lady that worked for

12    CSC.

13        Q.    Were bonuses discussed during that time?

14        A.    No.

15        Q.    Were you provided with any documents during the

16    orientation?

17        A.    For that one, documents about the time-entry

18    system, certainly.  There may have been other

19    orientations.  I don't recall CSC benefits or anything.

20    Most of us were more concerned for the transition,

21    whether we were going to continue on.

22        Q.    You received AMIP bonuses prior to fiscal year

23    2004, correct?

24        A.    Yes.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Kevin R. Keir

1    Q.    Have you received any AMIP bonuses since fiscal

2  year 2004?

3    A.    No.

4    Q.    Have you received any bonuses at all since

5  fiscal year 2004?

6    A.    Just the small monetary rewards we discussed

7  earlier, like $25, $50.  Couple of those.

8    Q.    In what fiscal years did you receive the AMIP

9  bonus?

10   A.    '98, '99 -- basically up until it was taken

11 away in '04.  Since I joined CSC.

12   Q.    Can you tell me what the amounts were for each

13 year?

14   A.    Not off the top of my head.

15   Q.    What was the average of that?

16   A.    I believe I got the full 22 percent every time.

17   Q.    When did you receive that?

18   A.    At the end of the fiscal year after they came

19 up with the calculation and applied it to our

20 percentages.

21   Q.    Do you know what time of year that was?

22   A.    Between April, June.  Somewhere in there, I

23 believe.

24   Q.    But it was after the fiscal year had ended?

Kevin R. Keir                                    587

1    A.    Yes.   I believe that's correct.

2    Q.    That's because CSC couldn't calculate your AMIP

3    until after the fiscal year had ended, correct?

4    A.    I speculate that's the case because a lot of

5    them were financial objectives.  So they had to close the

6    books to figure out where they were.

7    Q.    So in order to calculate your AMIP, CSC would

8    have to close the books, figure out what factors

9    corresponded with the numbers in order to calculate your

10   AMIP?

11   A.    I believe so, yes.

12   Q.    At the end of the fiscal year.

13         At some point during the year employees

14   always received some explanation on how the AMIP would be

15   calculated, correct?

16   A.    I don't recall getting it every year.

17   Certainly some years there was -- it would be the

18   breakdown of how it was going to be calculated that year.

19   Q.    What years did you receive it?

20   A.    I don't recall.  I believe I certainly had one

21   for '03.  Going through my papers, I don't believe I

22   could find other ones.

23   Q.    But the time of getting that explanation varied

24   from year to year, correct?

Kevin R. Keir                                                    588

1        A.      Correct.

2        Q.      How would you receive the explanation?

3        A.      As I said, I believe once it came in the mail

4   and the other times e-mail.  As it seemed to change so

5   much in the last couple years, the personal objective

6   didn't seem to play much part, I'll be honest, I didn't

7   pay much attention to it.

8        Q.      The personal objectives?

9        A.      No.  The breakdown, because so much of it

10  seemed out of our control other than do a good job for

11  the overall good.

12       Q.      You're saying you couldn't impact the factors

13  that were stated on the AMIP worksheet?

14       A.      You could certainly impact them at a group

15  level, as a group.

16       Q.      But as an individual you couldn't?

17       A.      Seemed to be less of a factor.

18       Q.      When you received your AMIP worksheet in the

19  mail, did you ever meet with your supervisor about it?

20       A.      No.  Not that I recall.

21       Q.      Didn't receive an explanation?

22       A.      Not that I recall.

23       Q.      Prior to receiving a completed AMIP worksheet,

24  you received a preliminary worksheet; is that correct?