Kevin R. Keir                                    589

1        A.      Pardon.  Say again.

2        Q.      A preliminary worksheet, a worksheet that was

3    incomplete, did not have the actual numbers filled out.

4        A.      That's what I thought we were talking about.

5    We didn't always receive -- I don't recall that we always

6    received a preliminary worksheet or a final worksheet.

7    Sometimes, when we got the final payout, the manager

8    would say we met our targets, it's 100 percent, you're

9    going to get 22 percent.  But I don't believe that was

10   consistent every single year.  I believe once you just

11   got a check in the mail basically to your bank account.

12       Q.      But when you did receive a preliminary

13   worksheet, it showed the maximum AMIP bonus that you

14   could receive?

15       A.      And the breakdown of how they were going to

16   calculate it that year.

17       Q.      But it didn't show the actual AMIP bonus you

18   would receive?

19       A.      No.  Potential.

20       Q.      Because that amount would be determined after

21   the close of the fiscal year?

22       A.      Correct.

23       Q.      When did you receive a preliminary worksheet?

24   You received that sometime in the fall, late fall time

Kevin R. Keir

590

1    frame?

2        A.    I don't recall.  I believe it was erratic when

3    you would receive it.  It was not a consistent date or

4    time.

5        Q.    So you wouldn't receive the AMIP worksheet

6    until you're well into the fiscal year?

7        A.    I believe one year that was the case.

8              MR. WILSON:  Objection.

9              THE WITNESS:  I believe one year that was

10   the case.  It came quite late.

11       Q.    What year was that?

12       A.    I don't recall.

13       Q.    Do you know when it came?

14       A.    No.  Just that I knew it was well into the

15   year.

16       Q.    There was no scheduled date by which CSC

17   provided a preliminary AMIP worksheet, right?

18       A.    Not that I'm aware of.

19       Q.    You did not expect to receive the worksheet for

20   the fiscal year on the first day of the fiscal year, did

21   you?

22       A.    No.

23       Q.    That never happened even once during all the

24   years you worked at CSC, correct?

Kevin R. Keir                                    591

1        A.     I don't believe so.

2        Q.     In all the years you worked at CSC, you also

3   never received your preliminary AMIP worksheet for the

4   fiscal year in the first month of that fiscal year,

5   right?

6        A.     That I don't recall.

7        Q.     What is the earliest you ever received your

8   AMIP worksheet?

9        A.     That I don't recall.  Goes back to '97, so...

10  I think at the time we were so relieved that they were

11  carrying something on from the DuPont played a big part

12  in our compensation, I may not have paid much attention

13  to the AMIP side of it.

14       Q.     Do you know if any employees who are eligible

15  for AMIP in fiscal year 2006 received their preliminary

16  AMIP worksheets?

17       A.     I don't.  I don't know.

18       Q.     Until you received a preliminary worksheet, you

19  didn't know how your AMIP would be calculated, did you?

20       A.     Correct.

21       Q.     Nothing was official as to how your AMIP would

22  be calculated until and unless you received a preliminary

23  worksheet, correct?

24       A.     Well, there were some years we didn't receive

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0607

1    the worksheet but we still got the bonus.  But we

2    wouldn't know what that was or at least the breakdown of

3    it until either we got the worksheet or the final bonus.

4        Q.    Did you ever receive a preliminary AMIP

5    worksheet in the form of an e-mail or a text?

6        A.    Yes, I believe so.  Or it came as an attachment

7    in an e-mail.

8        Q.    It wasn't necessarily an AMIP worksheet every

9    year; it could have been some other document that laid

10   out what you may have been expected to achieve?

11       A.    I don't recall.  The only ones I remember

12   seeing are a worksheet where they broke down different

13   categories.

14       Q.    You didn't know what your maximum AMIP

15   percentage would be, right?

16       A.    It was 22 percent.

17       Q.    Every year?

18       A.    Of my salary.  Yes.

19       Q.    After the close of the fiscal year, you would

20   receive a completed worksheet that showed your fiscal

21   bonus amount and how it was calculated?

22       A.    I don't recall that they came in hand every

23   year.  I believe one year we just got the money.  I don't

24   remember seeing the worksheet.

Kevin R. Keir                                        593

1      Q.      When did you generally receive a worksheet when

2  you did receive one?

3      A.      As I said, it depends if we're talking about

4  the preliminary ones or the final ones.

5      Q.      The final.

6      A.      A couple of times they were right around the

7  time we were paid it out, and I do believe a manager did

8  once sit down and say -- or present it to me, saying we

9  met the objectives, so you're eligible for the

10  22 percent.

11      Q.      When did you generally receive the AMIP bonus?

12      A.      That I don't remember.  It was, I believe, in

13  April-June time frame.

14      Q.      You wouldn't receive it until you were well

15  into the next fiscal year?

16      A.      After the close of the previous year.

17      Q.      Because it took CSC a while to wrap up its

18  prior fiscal year and close the books, correct?

19      A.      I believe so.

20              MR. RAIMO:  Go off the record.

21              (A recess was taken.)

22  BY MR. RAIMO:

23      Q.      Mr. Keir, you were notified by CSC that you

24  were not eligible for participation in the AMIP program

1    for 2004 fiscal year at some point in September, correct?

2        A.    Right.

3        Q.    At what point in September was this

4    communicated to you?

5        A.    I believe -- the letter I believe was dated

6    September 11th.

7        Q.    How was it sent to you?

8        A.    I believe through the mail.  I could be wrong.

9        Q.    The U.S. mail or e-mail?

10       A.    I don't recall, actually.

11       Q.    Is that how you were first notified by CSC that

12   you were no longer eligible for the AMIP?

13       A.    Yes.

14       Q.    You understood from this communication that you

15   would not be receiving any AMIP bonus at all, correct?

16       A.    I understood we weren't eligible for it

17   anymore.

18       Q.    You wouldn't be receiving an AMIP bonus for

19   FY '04?

20       A.    Seemed to indicate that, yes.

21       Q.    You continued to perform your job after you

22   learned you were no longer eligible for AMIP for FY '04,

23   correct?

24       A.    Correct.



Kevin R. Keir

595

1    Q.    You continued to fulfill your job expectations

2    and duties?

3    A.    Correct.

4    Q.    After you received notice, did your job duties

5    or objections or goals ever change?

6    A.    No.

7    Q.    In your complaint you state that CSC has

8    improperly withheld your AMIP bonus for the period of

9    time between April 1st through and including the time of

10   CSC's notice to you, correct?

11   A.    Correct.

12   Q.    That time frame would have been September 11th,

13   2003?

14   A.    Roughly six months.  Yes.

15   Q.    You were seeking a prorata bonus amount for

16   that period, correct?

17   A.    Correct.

18   Q.    Do you know of anyone who has received a

19   prorata AMIP bonus within CSC?

20   A.    Other than the first year when they prorated

21   the year because we weren't a full fiscal calendar year,

22   no, I'm not aware.

23   Q.    That first year was somewhat unique because you

24   transitioned --

Kevin R. Keir

596

1     A.     Joined in May.

2     Q.     -- from DuPont to CSC.

3            Do you know anyone who was removed from

4  AMIP?

5     A.     No.  Other than leaving the company.

6     Q.     Were you given an explanation as to why you

7  would not receive an AMIP bonus for FY '04?

8     A.     I believe it's in the letter stating they just

9  reevaluated us and the plan.

10    Q.     Anything in addition to the letter?

11    A.     No.

12    Q.     I'd like to discuss all the communications,

13  including the letter.  I'm going to show you that now.

14            (Deposition Exhibit No. 35 was marked for

15  identification.)

16  BY MR. RAIMO:

17    Q.     Do you recognize this document, Mr. Keir?

18    A.     Yes.

19    Q.     Exhibit 35?

20    A.     Correct.

21    Q.     What is it?

22    A.     It's the letter notifying us that we weren't

23  eligible anymore.

24    Q.     For AMIP?

Kevin R. Keir                                          597

1      A.      For AMIP.

2      Q.      You were told that you were eligible for a

3   discretionary bonus up to $5,000 to $10,000, correct?

4      A.      Yes.

5      Q.      Depending on the circumstances as described in

6   the letter.

7      A.      Correct.

8      Q.      You were also told that you might be eligible

9   for AMIP in the future, correct?

10      A.      Yes.   If you met the CSC guidelines.

11      Q.      I see at the bottom of the letter you had an

12   employee note.   Did you write this note?

13      A.      Yes.

14      Q.      You recognize that the general economic climate

15   had worsened prior to your removal from AMIP, correct, at

16   CSC?

17      A.      There was a general economic downturn in the

18   whole economy, yes, including CSC, yes.

19      Q.      However, it was a bad year for CSC, 2003,

20   correct?

21      A.      As most companies, correct.

22      Q.      You appreciated that CSC needed to take action

23   to address that economic climate, correct?

24      A.      Yes.

Kevin R. Keir

1      Q.      You thought CSC could have appropriately

2   addressed the problem by reducing the percentage received

3   by all people participating in AMIP, right?

4      A.      According to my note there, yes.  I thought

5   that was another option.

6      Q.      You thought it was unfair that only lower-level

7   employees that had previously participated in AMIP were

8   removed from the program, right?

9      A.      Yes.

10     Q.      But aside from what you saw CSC favoring upper

11  management, you recognized that CSC could make a decision

12  to reduce a percentage received by AMIP participants,

13  correct?

14     A.      Yes.

15     Q.      You recognized that CSC could remove employees

16  from AMIP?

17     A.      Yes, I was aware of that.

18     Q.      Your annual performance reviews don't have

19  anything to do with your removal from the AMIP program

20  for the fiscal year 2004, does it?

21     A.      I'm not aware of that being the case.

22     Q.      They don't have anything to do with AMIP at

23  all, correct?

24     A.      I couldn't say that.  As I said, in the early

1    years I think your personal performance was a factor in

2    the AMIP.  So I think you were expected to be a good

3    performer.

4         Q.     But later on?

5         A.     It was not a factor in the calculation, but...

6         Q.     You never received any preliminary AMIP

7    worksheet for fiscal year '04?

8         A.     I don't recall seeing one.

9         Q.     Or receiving one?

10        A.     Or receiving one.  I don't recall.

11        Q.     You never received a completed AMIP worksheet

12   for the fiscal year '04?

13        A.     Correct.

14        Q.     Let's talk about your damages now, Mr. Keir.

15   What are your damages in this case?

16        A.     I calculate it based on an average of the

17   previous three years and prorated it roughly the six

18   months or up to September 11th, added 2 percent interest

19   at the time.

20             (Deposition Exhibit No. 36 was marked for

21   identification.)

22   BY MR. RAIMO:

23        Q.     Do you recognize Exhibit No. 36?

24        A.     Yes.

Kevin R. Keir

1      Q.      What is this?

2      A.      That was my estimate to our lawyers what I

3   believe the damage was.

4      Q.      This is just an estimate, right?  You can't be

5   accurate or precise as to what exactly your AMIP

6   calculation would be?

7      A.      This is the best we could come up with.  If we

8   learned what the percentage payout from CSC was that

9   year, we could apply that to the 22 percent I was

10  eligible for to get a more accurate one.

11     Q.      But you couldn't because you didn't receive an

12  AMIP worksheet that had --

13     A.      Correct.  I personally don't know what that

14  percentage was.

15     Q.      You didn't know the factors, the weightings,

16  etcetera, that would go into calculating your final AMIP?

17     A.      Correct.

18     Q.      In fact, you could have come up or calculated

19  or estimated your AMIP damages in another way, couldn't

20  you?

21     A.      Like I said, if we found out what the

22  percentage was that was paid to every eligible employee,

23  you could apply that to my 22 percent and that would be a

24  much more accurate one.

Kevin R. Keir                                                                    601

1        Q.    The way you did it here, the way you calculated

2   it here, could have taken a mean, couldn't you, rather

3   than the average or the median?

4               MR. WILSON:  Object to the form.

5   BY MR. RAIMO:

6        Q.    Yes?  No?

7        A.    Yes.  You could do it a number of different

8   ways.

9        Q.    You just picked this arbitrary way of

10  calculating your AMIP damages, but they should have been

11  for fiscal year 2004?

12              MR. WILSON:  Object to the form.

13  BY MR. RAIMO:

14       Q.    CSC can't even estimate what your fiscal year

15  2004 AMIP would have been because they don't have the

16  fiscal year 2004 AMIP worksheet, correct?

17       A.    I don't have it.

18       Q.    CSC doesn't have it, either.

19              MR. WILSON:  Object to the form.

20       A.    I don't know.

21       Q.    Other than the amount of the AMIP bonuses that

22  you claim CSC wrongfully withheld, are you seeking to

23  recover any other damages from CSC?

24       A.    Just the penalty per the Delaware law and the

Kevin R. Keir

602

1    lawyer's fees.

2        Q.    So you're seeking more in addition to this

3    $9,288.34 number?

4        A.    Plus the damage according to -- allowed by the

5    statute.

6        Q.    What are your costs so far?

7        A.    I honestly don't know.

8        Q.    Do you have any attorneys' fees thus far?

9        A.    No.    I don't personally.

10       Q.    I'm sorry?

11       A.    I'm not aware of them if there is any at this

12   stage.    I'm sure there are some.

13       Q.    You don't know what exactly motivated CSC to

14   remove you from AMIP for fiscal year 2004, do you?

15       A.    No.

16       Q.    It wasn't a personal decision about you,

17   correct?

18       A.    I don't believe so.

19       Q.    CSC removed all people at your salary level in

20   a group, correct?

21       A.    I don't know if it's accurate, if that is true,

22   that they were all at the same level.

23       Q.    What was your salary level during fiscal year

24   2004?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0618

Kevin R. Keir                                    603

1       A.      I believe it was 5.

2       Q.      The company has a right to make decisions to

3   save money and increase profits, correct?

4       A.      Correct.

5       Q.      And make business judgments in order to carry

6   those out?

7       A.      Correct.

8       Q.      Your problem in this lawsuit is that you don't

9   think that you should have been removed from AMIP because

10  of your contributions to CSC, correct?

11      A.      I'm not against that we were removed

12  necessarily.  I was against that it was done halfway

13  through the year without prorating it.  As I said in the

14  letter there, it seemed to be -- if the assumption was

15  that it was because of a downturn in the economic

16  climate, I thought another way could have been to reduce

17  the percentage for everyone, not just removed you.

18      Q.      When do you think that percentage should have

19  been implemented?

20      A.      It would have been -- if it was an economic

21  downturn, it should have been reflected in the final

22  calculation at the end of the year.

23      Q.      Are you aware that the company started planning

24  the fiscal year 2004 AMIP removal early in the fiscal

1   year?

2       A.    No, I'm not aware.

3       Q.    That it took CSC months to figure out and agree

4   upon exactly how to effectuate the AMIP change?

5       A.    I'm not aware of that.

6       Q.    CSC didn't make a hasty decision to remove

7   people from AMIP in fiscal year '04, did they?

8               MR. WILSON:  Object to the form.

9       A.    I don't know.

10      Q.    CSC spent a long time planning and thinking

11  about the best way to save the company money, correct?

12              MR. WILSON:  Object to the form.  You can

13  answer.

14      A.    Just be speculation.  I don't know.  It was a

15  surprise to us when we got it.

16      Q.    You didn't receive a discretionary bonus for

17  fiscal year 2004, did you?

18      A.    I may have received one of those smaller ones

19  we mentioned earlier, but not the one that was mentioned

20  in the letter.  No, I haven't received any of those.

21      Q.    Did you speak to anyone at CSC's Human

22  Resources Department about your removal from the AMIP

23  program?

24      A.    No.



1    Q.    Who do you contend has personal knowledge of

2  any matter concerning or relating to or referring to the

3  allegations of your complaint?

4    A.    Obviously Jay Smith.  I would believe the HR

5  people in charge at the time.

6    Q.    Jay Smith?

7    A.    The person who sent us the letter.

8    Q.    Have you ever spoken to him?

9    A.    No.

10   Q.    Did you discuss the nature of your complaint

11 with Jay Smith?

12   A.    No.  We had a follow-up letter to a lot of

13 people saying you haven't returned and signed this, so

14 please do it.

15   Q.    Another communication to you?

16   A.    Basically saying they have not received our

17 signed acknowledgment that we received this letter.

18   Q.    Do you have any debts at the present time?

19   A.    No.

20   Q.    Credit cards?

21   A.    Just monthly rollovers.  I don't have any

22 long-term, ongoing debts.

23   Q.    Other than what we have already discussed here,

24 has there been any written, oral, or recorded statements

1    given by anyone in connection with this lawsuit?

2    A.    It was discussed during the mediation amongst

3    ourselves and only between the lawyers and us.  No others

4    that I'm aware of.

5    Q.    You discussed the lawsuit with other

6    plaintiffs?

7    A.    Only at the mediation.  As I said, I work

8    closely with Bill Sperati.  I had a couple of

9    conversations with him.  Very brief one with

10    Hector Calderon once and that's it.

11    Q.    What was that conversation with Hector about?

12    A.    I think it was when we got the letter asking

13    for all the information, it was just like a hallway quick

14    conversation, just how do you think the best way to

15    calculate AMIP.  There's no way we could comply with

16    giving every e-mail we have ever sent to any CSC person,

17    that kind of thing.  It was a very brief conversation.

18    Q.    What do you mean by that?  Are you talking

19    about the discovery responses, requests for documents?

20    A.    Yes.

21    Q.    Are you talking about the documents that you

22    don't have access to?  What did he mean by that

23    statement?

24    A.    I think one of the initial requests was every

Kevin R. Keir

607

1   document you have ever done with any CSC employee.

2   Basically that would be impossible to supply.

3        Q.   Because you didn't have it?

4        A.      It's too many.   Sixteen e-mails a day with CSC

5   people for how many years?

6        Q.      But you responded with any document related to

7   the complaint?

8        A.      I did, yes.   I gave what we could to the

9   lawyers.

10       Q.      Did Hector?

11       A.      I don't know.

12       Q.      Did you have that same discussion with Sperati?

13       A.      If I did, it was very brief.

14       Q.      Have you now told me everything you know or

15  remember that forms the basis of your complaint?

16               MR. WILSON:   Object to the form.   You can

17  answer.

18       A.      I believe so.

19       Q.      Is there anyone else you have not mentioned who

20  can support your claims?

21       A.      I don't know.   There may be.

22       Q.      You want to think about it?

23       A.      I'm not aware of the particular names.

24       Q.      Is there any other information which you

Kevin R. Keir

608

1    haven't mentioned which is relevant to supporting your

2    claims?

3              MR. WILSON:  Object to the form.

4      A.    No.  One of the worksheets had prorated on it

5    as a 12-month figure.  I remember that.

6      Q.    And that 12 months represented one year?

7      A.    Yes.

8              MR. RAIMO:  That's all.

9              THE WITNESS:  May I ask a question to him?

10             MR. WILSON:  I'm going to ask you questions

11   now.

12   BY MR. WILSON:

13     Q.    Let's start off with the damages you were

14   talking about.  Why did you choose to calculate your

15   damages the way you did?

16     A.    We thought it was the best estimate we could

17   come up with.

18     Q.    When you say "best," what do you mean by

19   "best"?

20     A.    We didn't have the figure of the final

21   percentage payout.  But without that, you have to come up

22   with the next best estimate.  It's based on the previous

23   three years' average.

24     Q.    By "best" you mean accurate?

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0624

Kevin R. Keir

609

1     A.    Yes.

2     Q.    In regard to Exhibit 35, which is the

3   September 11th letter to you, down at the bottom you

4   state:  "Instead of salary uplift as our eligible

5   Accenture colleagues that came from Dupont received"...

6   Who were the Accenture colleagues?

7     A.    Well, DuPont IT was split into pretty much

8   either Accenture or CSC or some state at DuPont.  The

9   people that went to Accenture, some of them were also

10  involved in the DuPont variable comp. and they had their

11  own issues about how Accenture was going to handle that,

12  and they handled it by giving a one-time salary uplift.

13    Q.    Was Accenture a different company?

14    A.    Yes.

15    Q.    Were they related in any way to CSC?

16    A.    Not other than sharing the work with DuPont,

17  no.

18    Q.    When you were going over the work sheets, you

19  stated that the factors, the corporate factors, group

20  factors, and personal objectives changed.  When these

21  factors changed, did your job duties change?

22    A.    No.

23    Q.    Could you continue to do your job the same way

24  from one year to the next and continue to earn your AMIP

Kevin.R. Keir
610

1  bonus?

2      A.      Correct.

3              MR. RAIMO:   Objection.

4      Q.      Could you do this even if the objectives

5  weren't communicated to you?

6              MR. RAIMO:   Objection.

7      A.      Yes.

8      Q.      Could you look at Exhibit 33, the offer letter?

9  With regard to the AMIP that it says you're eligible to

10 participate in, did you view participation in this plan

11 as an incentive to have you come to CSC?

12             MR. RAIMO:   Objection.

13     A.      Yes.  It was an important part of a lot of

14 us -- the variable comp. from DuPont was a considerable

15 amount of money.  We didn't want to lose that or at least

16 the option of that.

17     Q.      If it had not been offered, would you have

18 transferred to CSC?

19             MR. RAIMO:   Objection.

20     A.      I couldn't say.  I might not have.

21     Q.      Did you view this AMIP bonus as part of your

22 total compensation?

23     A.      Yes.

24             MR. RAIMO:   Objection.

Kevin R. Keir

611

1      Q.    You mentioned --

2            (Deposition Exhibit No. 37 was marked for

3      identification.)

4      BY MR. WILSON:

5      Q.    Can you take a look at that and let me know

6      when you're done?

7      A.    Uh-huh.

8      Q.    A little earlier you mentioned that on your

9      worksheet there was a box that said something about

10     proration.  Is that on here?

11     A.    Yes.

12     Q.    Is that the box that says "Proration by

13     Eligible Months"?

14     A.    Yes.

15     Q.    Does this indicate to you that the AMIP bonus

16     can be prorated?

17     A.    Yes.

18           (Deposition Exhibit No. 38 was marked for

19     identification.)

20     BY MR. WILSON:

21     Q.    You've been handed what's been marked as

22     Exhibit 38.  Can you tell us what that is?

23     A.    It looks like my pay stub for May '01,

24     May 18th, '01.

**W&F**

Kevin R. Keir                                    612

1        Q.      Are there subsequent years on the next couple

2   pages?

3        A.      Yes.   May 31st, '02, and May 30th, '03.

4        Q.      Are your AMIP bonuses reflected on these pay

5   stubs?

6        A.      Yes.   Appear to be.

7        Q.      Were there certain things that you had to do to

8   get your AMIP bonus?

9        A.      Well, as I said, in the early years, the

10  breakdown sometimes included a personal performance

11  component.   In the latter years, no.   It was just at a

12  group level.   So you had to contribute to the overall

13  financial success of the company, but that's it.

14       Q.      Were your AMIP bonuses earned?

15               MR. RAIMO:   Objection.

16       A.      I believe so.

17       Q.      When did you earn your AMIP bonuses?

18               MR. RAIMO:   Objection.

19       A.      For the full year.

20       Q.      When you say "full year," what do you mean?

21       A.      The full financial year.

22       Q.      What is the full financial year?

23       A.      April to March.

24       Q.      This indicates that you were just paid this in

Kevin R. Keir                                613

1    one lump sum; is that correct?

2        A.    Correct.

3        Q.    But, nevertheless, did you earn it throughout

4    the year?

5              MR. RAIMO:   Objection.

6        A.    I believe so.

7              MR. WILSON:   I have nothing further.

8              MR. RAIMO:   Nothing further.

9              (Deposition concluded at 5:08 p.m.)

10                 -   -   -   -   -

1          T E S T I M O N Y

2

3   DEPONENT:  KEVIN R. KEIR                    PAGE

4

5   BY MR. RAIMO.................................549

6   BY MR. WILSON...............................608

7

8               E X H I B I T S

9

10  DEPOSITION EXHIBIT NO.                      MARKED

11

12  33 - A letter dated March 7, 1997,
    to Kevin R. Keir from Dorothy Eltzroth........ 573
13
    34 - An Interoffice Memorandum dated
14  February 25, 1997............................576

15  35 - A letter dated September 11, 2003,
    to Kevin Keir from Jay Smith..................596
16
    36 - A document dated October 9, 2005,
17  Re:  AMIP Withdrawal - estimate and
    calculation..................................599
18
    37 - A two-page document entitled,
19  "Fiscal Year 2003 AMIP"......................611

20  38 - Three documents Bates numbered D-11228,
    D-11256, and D-11283......................... 611
21
    ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 615
22
    CERTIFICATE OF REPORTER                PAGE 616
23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                  )
NEW CASTLE COUNTY)

     I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 16th day of February, 2006, the deponent herein, KEVIN KEIR, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

     I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

     I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


_Kimberly A. Hurley_
Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)


DATED: _3/10/06_

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
     v.                         )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
     Defendant.                 )

                Deposition of CHARLES D. FOLWELL, JR.,
taken pursuant to notice at the law offices of Potter
Anderson & Corroon, Hercules Plaza, 6th Floor,
Wilmington, Delaware, beginning at 8:55 a.m., on Friday,
February 17, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant

                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

B-0633



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   APPEARANCES (cont'd):

2           TYLER B. RAIMO, ESQUIRE
            COMPUTER SCIENCES CORPORATION
3             3170 Fairview Park Drive
              Falls Church, Virginia 22042
4             for the Defendant

5                   - - - - -

6

7           CHARLES D. FOLWELL, JR.,

8       the witness herein, having first been

9       duly sworn on oath, was examined and

10      testified as follows:

11  BY MR. SEEGULL:

12      Q.    Mr. Folwell, as you know, my name is

13  Larry Seegull.  I'm an attorney for Computer Sciences

14  Corporation.  With me today is Tyler Raimo, who's

15  in-house counsel with CSC.

16          When I say "CSC," you understand I mean

17  Computer Sciences Corporation?

18      A.    Yes.

19      Q.    Have you ever been deposed before?

20      A.    No.

21      Q.    The purpose of this deposition is to inquire

22  about allegations forming the basis for your lawsuit, and

23  I'll be asking you questions to find out what you know

24  about the facts giving rise to your claims.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.

619

1          Obviously all of your answers have to be

2     verbal because the court reporter can't take down head

3     nods or other body language.

4          You have to answer the questions truthfully

5     and completely just as if you were testifying in court.

6          If you don't hear a question, say so and

7     I'll repeat it.  If you don't understand a question, say

8     so and we will explain it.  If at any point in time you

9     realize that an earlier answer you gave was incomplete or

10    inaccurate in any way, just say so and you will be

11    allowed to correct or supplement the record.

12         If you need to take a break to take a drink

13    or just to use the restroom, whatever it may be, just say

14    so and you will be allowed to do so.

15         You cannot talk to your attorney during the

16    deposition unless it relates to a question of privilege.

17    If you do not know or do not remember information, that's

18    fine.  You can just say "I don't know" or "I don't

19    remember."

20         If you answer the question, I will assume

21    that you have heard it and have understood it and have

22    given me your best recollection.

23         Do you understand the instructions that I

24    have just given you?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Charles D. Folwell, Jr.

620

1    A.    Yes.

2    Q.    Are you taking any medication that would impair

3    your ability to testify today?

4    A.    No.

5    Q.    What did you do to prepare for the deposition?

6    A.    I met with my attorney at 8 o'clock this

7    morning and he described the procedure to me.

8    Q.    Don't tell me anything he said.  Did you review

9    any documents?

10    A.    Yes.

11    Q.    Which documents did you review?

12    A.    He showed me some documents that he would be

13    working with today.

14    Q.    Which documents did you review?

15    A.    You want me to describe them?

16    Q.    Just tell me which documents you reviewed.

17    What were the documents?

18    A.    There was a print of an e-mail that I had sent,

19    there were prints of paycheck stubs were the two kinds of

20    documents I recall.

21    Q.    The print of the e-mail that you had sent, did

22    that relate to whether or not you would sign the letter

23    in September of '03 regarding your removal from

24    eligibility of the AMIP?

Charles D. Folwell, Jr.                    621

1       A.      There was no discussion of signing anything in

2   the e-mail.

3       Q.      What was the e-mail about?

4       A.      The e-mail was to understand -- to clarify for

5   me who was removed and who wasn't.

6       Q.      Who did you send that e-mail to?

7       A.      Jay Smith comes to mind.

8       Q.      It wasn't to William Cummings?

9       A.      The e-mail I looked at this morning was not to

10  William Cummings.

11      Q.      Tell me what you remember about that e-mail.

12      A.      From looking at it this morning?

13      Q.      Yes.  It's only a few moments ago that you

14  looked at it.

15      A.      I asked, as I recall, two questions and it was

16  was I personally removed or were there a group of people

17  removed.  I didn't understand exactly what was happening

18  at the time.

19      Q.      That's one question that you asked.

20      A.      I don't recall what the other question was.

21  Now I recall.

22      Q.      Okay.

23      A.      The letter I had received made the comment

24  that, if at some later point you become eligible, you can

Charles D. Folwell, Jr.

1    be put back on AMIP, and I asked the question what does

2    it mean to be eligible, what's the definition of

3    eligible.

4        Q.    This was an e-mail that you sent to Jay Smith?

5        A.    Correct.

6        Q.    Who is Jay Smith?

7        A.    Jay Smith was the person that my manager

8    directed me to send my questions to.

9        Q.    Do you know who he is or who he was?

10       A.    At the time I assume he had something to do

11   with this decision that was being made.  I recall the

12   name.  I don't recall what his job was at the time.

13       Q.    Was he in Human Resources?

14       A.    I would guess that he was, but the most

15   straightforward answer is when I asked these questions to

16   my manager, she said send an e-mail to Jay Smith.

17       Q.    Who is your manager?

18       A.    At that time I think it was still

19   Debbie Cebula.

20       Q.    Did Jay respond to you?

21       A.    I do not recall.  I recall getting an answer to

22   my question.  I don't recall whether it came via e-mail,

23   phone call.  I don't remember how I got the answer.

24       Q.    Was the answer to both questions or just to the

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0639

Charles D. Folwell, Jr.

623

1    first question?

2        A.    To both.

3        Q.    What was the answer?

4        A.    The answer was everybody at level 7 and below

5    was removed.  So that answered the question that I was

6    not singled out, and that answered the question of level

7    8 and above is eligible.  He gave the definition of

8    eligible.

9        Q.    So you understand that the change that was made

10   to the AMIP plan was not directed at you particularly?

11       A.    That's correct.

12       Q.    That it was a company-wide decision that was

13   made to change the eligibility rules?

14       A.    It was a decision not directed at me.  Did that

15   answer the question?

16       Q.    I don't think so.

17              MR. SEEGULL:  Can you read the question

18   back?

19              (The reporter read back as instructed.)

20       A.    I would say I understood it applied to my

21   group.  I did not have any idea what company-wide meant.

22   I don't know what's going on in Europe and other places.

23       Q.    Your group was which group, Chemical?

24       A.    Right.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

624

1    Q.    So you understood that, at least within the

2  Chemical Group, the decision had been made to change

3  eligibility rules across the board and make only those

4  employees at a level 8 and above eligible?

5    A.    Correct.

6    Q.    What was your level?

7    A.    6.

8    Q.    What does 6 stand for?  What is level 6?

9    A.    It's a senior computer scientist.

10    Q.    What's a level 7?

11    A.    I don't know what the word is.

12    Q.    Who do you report to?

13    A.    Debbie Cebula is my staff manager.

14    Q.    She's a level 7?

15    A.    I do not know.

16    Q.    What do you think?  You think she's a level 7?

17         MR. WILSON:  Object to the form.

18    A.    If I had to guess, I would say she's also a 6,

19  but it would just be a guess.  I remember having the

20  impression that she was also removed and that's part why

21  I figure she's a 6 or a 7.

22    Q.    Is a level 7 a director or a level 8 is a

23  director?

24    A.    Those are management titles, and I'm not in

Charles D. Folwell, Jr.                          625

1   management, so I don't know what they are.

2        Q.    The e-mail, I gather, that you sent to

3   Jay Smith was a short e-mail, since it only had those two

4   questions?

5        A.    Yes.  It printed on less than a page.

6        Q.    Must have been substantially less than a page

7   if it only had those two questions.  Is that right?

8        A.    Do you want me to count spacing and empty lines

9   or do you want me to count --

10        Q.    Well, yeah, why don't you.

11        A.    I recall I only printed a page.  It took about

12   eight-tenths of a page because I quoted some -- I had

13   some quotes from the letter that I was referring to.

14        Q.    Quotes from the letter that had been sent to

15   you?

16        A.    Correct.  So I don't think I typed much or

17   added much, but I did quote some paragraphs from the

18   original.

19        Q.    In addition to looking at that e-mail, which

20   was just an e-mail from you to Jay Smith, correct?

21        A.    I don't recall whether I carboned anyone.

22        Q.    But there was no response on this document?

23        A.    I don't recall.

24        Q.    In addition to looking at that document, you

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.

626

1    also said you looked at some payroll documents, pay

2    stubs?

3         A.    This morning?  Yes.  It was copies of my own

4    pay stubs.

5         Q.    Was it three different pay stubs?

6         A.    I believe I saw three different time periods.

7         Q.    Anything else that you looked at, any other

8    documents you looked at in preparation for the

9    deposition?

10        A.    Not this morning.  That's all that I recall

11   this morning.

12        Q.    Are there documents you looked at yesterday or

13   this past week related to this case?

14        A.    I dug out all the correspondence on this case

15   and just flipped through it just to refresh my memory on

16   what's been going on.

17        Q.    Which correspondence are you speaking about?

18        A.    From my attorney.

19        Q.    Is this documentation that involved the

20   underlying facts of the case or are you talking about

21   correspondence related to where the deposition would be?

22        A.    Both.

23        Q.    I don't want to worry about the documentation

24   that related to where the deposition would be, directions

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.                                    627

1    and times and all of that.  What other documents did you

2    look at related to this case?

3        A.    I looked at a copy of the answers I had given

4    to -- I forget what it's called.

5        Q.    Interrogatory answers?

6        A.    Interrogatories, right.

7        Q.    You looked at the interrogatory answers.

8        A.    I guess I would say I just looked at the cover

9    of it and threw it in my briefcase.

10       Q.    What else did you look at?

11       A.    I recall looking at the cover of the document

12   from my attorney that says here's our response -- it was

13   like a group response.  I remember seeing the cover sheet

14   for that, and I threw it in my briefcase.

15       Q.    Anything else?

16       A.    I grabbed a pile of my paycheck stubs that I

17   have in my drawer and threw that in my briefcase.

18            MR. SEEGULL:  Are those paycheck stubs

19   something that's been produced in this case?

20            MR. WILSON:  I don't think so.

21            MR. SEEGULL:  So we would ask for those to

22   be produced.  It's responsive to our document request.

23   BY MR. SEEGULL:

24       Q.    Can you provide those paycheck stubs to your

B-0644

Charles D. Folwell, Jr.

1   attorney so he can produce them to us?

2        A.    I can provide what he asks me for.

3              MR. SEEGULL:  Will you produce those?

4              MR. WILSON:  I think they're as accessible

5   to you as they are to him.

6              MR. SEEGULL:  I don't know what's on them.

7   I haven't seen them.  We're entitled to see them.

8              MR. WILSON:  I think CSC has his pay

9   records and would have a copy of his pay stubs.

10             MR. SEEGULL:  That's not the issue.  We

11  have called for them in our document request and you're

12  required to produce them.  I don't want to have to file

13  any kind of motion with the Court.  You're required to

14  produce them.  It's responsive to our document request.

15  It may have markings on them.  There may be notations on

16  them.  They may have documents that we don't have.  We

17  are entitled to see them.  I think you know that under

18  the rules.

19             MR. WILSON:  I'll look at the request.

20             MR. SEEGULL:  Please look at the request,

21  and I would ask that you provide a response to me by

22  Monday as to whether or not you will produce those.

23  BY MR. SEEGULL:

24        Q.    Those are in your drawer.  Is that where they

Charles D. Folwell, Jr.                                          629

1    are?

2        A.    I have -- they're in my briefcase in my car at

3    the moment.

4                MR. SEEGULL:  So they're easily accessible

5    to you.  You can produce them no later than Monday.  I'll

6    give you till Tuesday.  I'd like to have those produced

7    immediately.  I don't want to re-call Mr. Folwell,

8    either.  I may have to leave the deposition open for that

9    purpose.

10       Q.    Anything else that you reviewed?

11       A.    I don't recall anything else.

12       Q.    Have you spoken to anybody about the

13   deposition?

14       A.    I spoke at the last meeting in the judge's -- I

15   asked a general question about how did it go and how long

16   does it take.

17       Q.    People told you about two hours?

18       A.    I recall three hours being an answer that I

19   received.

20       Q.    That was called the mediation.

21       A.    Okay.

22       Q.    Outside of that mediation, have you spoken to

23   anybody else, whether it be the plaintiffs or anybody

24   else, about this case other than your attorneys?

Charles D. Folwell, Jr.

1      A.    I had to leave early that day and I asked two

2  people what happened after I left.

3      Q.    What did they tell you?

4      A.    They probably gave more detail, but what I

5  recall is that I didn't miss anything.

6      Q.    Your only claim in this case is that CSC

7  violated the Delaware Wage Payment and Collection Act,

8  correct?

9      A.    I believe so.

10     Q.    And the basis of that claim is that you believe

11 you are entitled to receive an AMIP payment for a portion

12 of time from April 1 of 2003 through the date that you

13 were notified that you were no longer eligible for AMIP

14 on September 11th, 2003; is that right?

15     A.    Correct.

16     Q.    So you're not claiming any AMIP payment after

17 September 11th, 2003, correct?

18     A.    Correct.

19     Q.    You understood that the company never

20 guaranteed anybody an AMIP payment, correct?

21     A.    My understanding would have been that we don't

22 guarantee an amount.

23     Q.    Isn't it true that the company doesn't

24 guarantee whether or not it's even going to make an AMIP

Charles D. Folwell, Jr.

1    payment any one particular year?

2            MR. WILSON:  Object to form.

3        A.    I would say that I believe that's possible.  I

4    would not believe that's probable.

5        Q.    I'm not asking you what you think is likely to

6    happen or unlikely to happen.  I'm not asking you whether

7    or not generally AMIP payments were made, since we know

8    generally AMIP payments were made.  I'm asking you

9    whether there was any guarantee that the company would

10   make any payments.

11           Isn't it true that the company never

12   guaranteed you any AMIP payments or any other employee?

13           MR. WILSON:  Object to form.

14       A.    I don't recall ever hearing the word

15   "guaranteed" used for AMIP payments.

16       Q.    Or "promise" or any words to that effect,

17   correct?

18       A.    Correct.

19       Q.    What is your Social Security number?

20       A.    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.

21       Q.    Where were you born?

22       A.    Newport News, Virginia.

23       Q.    What's the date of your birth?

24       A.    9/25/56.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1      Q.    Where do you currently live?

2      A.    Do you want specific --

3      Q.    Your address.

4      A.    2411 Marilyn Drive, M-a-r-i-l-y-n Drive,

5  Wilmington.

6      Q.    How long have you lived there?

7      A.    Since '88.

8      Q.    What's your phone number there?

9      A.    302-475-6317.

10     Q.    Do you rent or own?

11     A.    Own.

12     Q.    Does anyone live with you?

13     A.    My wife and two children.

14     Q.    Have you ever been arrested?

15     A.    No.

16     Q.    Have you ever been convicted of any crime,

17  misdemeanor, felony, or otherwise?

18     A.    No.

19     Q.    Have you ever served in the military?

20     A.    No.

21     Q.    Have you ever filed a claim in bankruptcy?

22     A.    No.

23     Q.    Have you ever filed a claim for unemployment

24  compensation?

Charles D. Folwell, Jr.                                            693

1      A.     No.

2      Q.     Have you ever filed a claim for workmen's

3   compensation?

4      A.     No.

5      Q.     Have you ever filed any other lawsuit besides

6   this lawsuit?

7      A.     I have received checks from class-action suits.

8   Does that count?  I bought a Milli Vanilli CD one time

9   and they sent me a check.

10     Q.     You bought a Milli Vanilli CD and you received

11  a check from a class-action suit against Milli Vanilli?

12     A.     Correct.  The record company.  I forget who it

13  was.

14     Q.     How much was the check for?

15     A.     Like three bucks or something.

16     Q.     Other than that, have you been involved in any

17  other class actions?

18     A.     No.  I don't recall being involved in any

19  others.

20     Q.     So no class actions related to overtime

21  compensation at CSC?

22     A.     I was not involved in that.

23     Q.     Other than what you just discussed, have you

24  filed any other lawsuits or been involved in any other

Charles D. Folwell, Jr.

634

1   lawsuits?

2       A.     Yes.

3       Q.     When did you first contact an attorney to

4   handle your case against CSC?

5       A.     I would say the best answer I could give is

6   within a month or two after the September letter, but I

7   don't recall an exact date.

8       Q.     How did you know who to contact?

9       A.     I received a letter in the mail.

10      Q.     Do you know who sent you that letter?

11      A.     I do not recall, no.

12      Q.     You don't recall at all who sent that letter?

13      A.     I don't recall whose name was on the envelope

14  at the time.   I believe it was associated with this firm,

15  but this firm has changed names.

16      Q.     You think it was one of the lawyers that sent

17  you the letter?

18      A.     I'm not sure.

19      Q.     It may have been an employee?

20      A.     That's what I think might have been who it was

21  from.

22      Q.     Do you know which employee?

23      A.     No.

24      Q.     Do you have a guess as to which employee?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.                                    635

1        A.      No.

2                MR. WILSON:   Object to the form.

3        Q.      Other than your current attorney and his firm,

4    have you been represented by any other counsel?

5        A.      No.

6        Q.      What is the fee relationship you have with your

7    current counsel?

8        A.      One-third of the award amount and then there's

9    some expenses involved, but I don't recall the exact

10   details.

11       Q.      Your understanding is that your attorneys will

12   be paid one-third of whatever it is you recover as a

13   result of this lawsuit?

14       A.      Correct.

15       Q.      If you recover nothing, do you owe your

16   attorneys anything?

17       A.      I may owe them some expenses.

18       Q.      How much are the expenses?

19       A.      I do not know.

20       Q.      Has there been any discussion about the

21   expenses amongst the plaintiffs?

22       A.      Amongst the plaintiffs?  I don't know.  I

23   discussed it with not this attorney, a different

24   attorney, to understand what the definition of the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    word -- what's an expense.

2        Q.    Do you have any sense for how much the expenses

3    will be in this case?

4        A.    No.

5        Q.    Have any lawsuits ever been filed against you?

6        A.    No.

7        Q.    You are an at-will employee for CSC, correct?

8        A.    Correct.

9        Q.    That is, you have no contract of employment,

10   correct?

11       A.    Correct.

12       Q.    Where did you go to school?

13       A.    What level of school?

14       Q.    Why don't we start with high school.   Where did

15   you go to high school?

16       A.    In Newport News, Virginia.

17       Q.    When did you graduate?

18       A.    '74.

19       Q.    Where did you go from there?

20       A.    University of Virginia.

21       Q.    For how long?

22       A.    Six years.

23       Q.    Did you graduate?

24       A.    Yes.

Charles D. Folwell, Jr.

```
1      Q.    What did you graduate with?
2      A.    Bachelor's in mathematics and a Master's in
3   computer science.
4      Q.    So you graduated with your Master's in what
5   year?
6      A.    '80.
7      Q.    Did you then begin work?
8      A.    Correct.
9      Q.    Where did you work?
10      A.    I came here to work for DuPont.
11      Q.    You continued to work for DuPont from 1980
12   through 1997?
13      A.    Correct.
14      Q.    Did you graduate with honors from the
15   University of Virginia?
16      A.    Yes.
17      Q.    What was your grade point average?
18      A.    In graduate school it was a 4.0 and
19   undergraduate 3.7, 3.8.  Just below 3.8 because there was
20   a cutoff.  The highest honor was a 3.8 and above and I
21   just missed it.
22      Q.    Magna Cum Laude was 3.8?
23      A.    Right.
24      Q.    You were Summa Cum Laude or they didn't call it
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1     that?

2        A.     I don't know what they call it, but I was not

3     the top.   It was -- I just missed it.

4        Q.     Have you had any other education or training or

5     courses?

6        A.     Yes.

7        Q.     What have you had?

8        A.     I guess at DuPont and CSC I have taken courses.

9     Is that what you mean?

10       Q.     Would these be courses that would be taken in

11    connection with your job?

12       A.     Correct.

13       Q.     Are these formal education or is this more

14    on-the-job training?

15       A.     I don't understand the definition of "formal."

16    You don't get a grade.

17       Q.     Is it in a classroom setting?

18       A.     Sometimes.

19       Q.     Just tell me about the courses that you have

20    taken since you've been at DuPont and CSC.

21       A.     It's typically to learn about some technology

22    and most often they have been classroom-type settings.   I

23    don't think I understand -- do you want examples of

24    training?

1    Q.    Why don't you give me some examples of the

2    training you have had.

3    A.    I took training on programming in SAP.

4    Q.    How long would that training be?  Would that be

5    a week-long training, seminar?  Would that be two months?

6    A.    Typically closer to a week.  It would be more

7    days -- it would be more courses that take days rather

8    than courses that take an hour.

9    Q.    You did training on SAP.  What else?

10   A.    I've been trained on some what are called CMM

11   procedures.

12   Q.    Which is what?

13   A.    My understanding is this is a set of standards

14   for industry that CSC is trying to meet.  So it's bigger

15   than CSC.

16   Q.    Is that something that, again, took days?

17   A.    That was more in the hours.  Two-hour kind of

18   session.

19   Q.    Anything else?

20   A.    I have also been sent to outside courses.

21   Q.    Which outside courses?

22   A.    They were all related to SAP.  Back in the '80s

23   I went and took courses on a language called Focus,

24   course called Mark IV.



Charles D. Folwell, Jr.

1      Q.     Would these be day-long courses?

2      A.     It would be days.  Multiple days.

3      Q.     Anything else that you can think of?

4      A.     I can recall going to what I would call more

5  soft courses.  You know, working with colleagues or men

6  and women in the workplace-type seminars.

7      Q.     So training sessions on interactions with

8  colleagues, that kind of thing?

9      A.     Right.  Right.

10     Q.     Have you now told me about everything you can

11 recall?

12            MR. WILSON:  Object to form.  You can

13 answer.

14     A.     I'm sure I have not told you about everything I

15 can recall.

16     Q.     Tell me about the other things you can recall.

17            MR. WILSON:  Object to form.

18            MR. SEEGULL:  What's your objection?

19            MR. WILSON:  You're asking open-ended

20 questions.  If you want to know something, ask him, but

21 you can't just say "tell me everything you know."

22            MR. SEEGULL:  I asked about the courses he

23 recalled and you're objecting to that question?

24            MR. WILSON:  You're saying "have you told

Charles D. Folwell, Jr.

641

1   me everything you know."

2            MR. SEEGULL:  That's not the question I

3   asked.

4            MR. WILSON:  Okay.

5            MR. SEEGULL:  I think you know that's not

6   the question I asked.

7   BY MR. SEEGULL:

8       Q.    Tell me about the courses you recall.

9       A.    I'm trying to think what's different than what

10  I have described to you.  Back at DuPont we had a project

11  management system called DPS II.  I remember taking some

12  training on that, how to run projects.

13      Q.    Okay.

14      A.    Otherwise, I guess I'm asking -- if I sit here

15  long enough, I could probably think of some more.

16      Q.    Let me see --

17      A.    They're all about in the same flavor.

18      Q.    They're all about in the same nature of

19  day-long or multiple-day courses involving some new

20  technology or some aspect of the technology you're trying

21  to get up to speed on?

22      A.    Correct.

23      Q.    Have you received any professional or

24  work-related certifications?

Charles D. Folwell, Jr.

1      A.     I have a certification from SAP that I can

2 recall.  That's what it says.

3      Q.     What's that certification called?

4      A.     ABAP Programmers' Certification.

5      Q.     You're going to have to spell it for the court

6 reporter.

7      A.     ABAP is spelled A-B-A-P.

8      Q.     Any other certifications?

9      A.     Not that I recall.

10      Q.     Have you ever received any awards or honors?

11      A.     Yes.

12      Q.     What awards or honors have you received?

13      A.     At various times there had be different

14 award-type programs at work.  Sometimes they would be as

15 simple as somebody would give you a little sticker star

16 and you stick it on the wall.  Other times it would

17 involve somebody you would get a check for something that

18 you had done, some special work that you had done.  I've

19 been nominated in CSC for a Technical Excellence Award

20 program.  I have been nominated for that four times.

21      Q.     Have you received the award?

22      A.     No.

23      Q.     Do you get anything for being nominated?

24      A.     A plaque kind of thing and I think I got paid

Charles W. Folwell, Jr.

1   like a bonus.

2       Q.      How much was the bonus?

3       A.      One year I recall it was $800.  Another one I

4   recall was a thousand.  Those are the two I can recall.

5       Q.      Once you received notification that you were no

6   longer eligible for the AMIP program in September of

7   2003, you understood at that time that you would not get

8   an AMIP payment?

9       A.      Ever again.

10      Q.      Is that what you understood?

11      A.      Correct.

12      Q.      Any other awards or honors?

13      A.      Not that I recall.

14      Q.      Tell me about the positions you have held at

15  DuPont.  I understand you were there for 17 years?

16      A.      Correct.

17      Q.      That probably means you held a variety of

18  different positions; is that right?

19      A.      Correct.

20      Q.      Do your best to just tell me the different

21  positions you have held.

22      A.      I supported and taught a language called

23  Mark IV.  Then I supported and taught a language called

24  Focus.  Then I worked on replacing DuPont's 401(k)

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.

1   system.  We replaced that.  I worked on building what was

2   called a billing information system, some new development

3   for DuPont.

4       Q.     So these are all different projects you worked

5   on?

6       A.     Correct.

7       Q.     What was your position?  Was it computer

8   scientist?

9       A.     Yes.

10      Q.     Computer programmer?

11      A.     Yes.

12      Q.     Are those the same things?

13      A.     Yes.

14      Q.     Did you basically hold the same position

15  throughout your time at DuPont, you just worked on

16  different projects?

17      A.     At one point I was the project leader.  At one

18  point I had some supervisory responsibilities.  There

19  were fluctuations in roles and responsibilities

20  throughout those projects.

21      Q.     How about the final position you held at

22  DuPont, what was that?

23      A.     Final position?  I was the technical leader of

24  the SAP R/2 Basis team.

Charles D. Folwell, Jr.

1    Q.    Were you ever subject to DuPont's bonus plan?

2    A.    No.

3    Q.    Do you know if DuPont had a bonus plan?

4    A.    Yes, I know.

5    Q.    It had one?

6    A.    Yes.

7    Q.    What was it called?

8    A.    I don't recall the formal name.

9    Q.    We have heard various names.  We have heard it

10   called incentive compensation.  We have heard it called

11   variable compensation.

12   A.    Yes.

13   Q.    Which one rings a bell to you?

14   A.    Both.

15   Q.    But you never received any bonus while you were

16   at DuPont?

17   A.    Not through that program.

18   Q.    Through another program?

19   A.    I recall getting bonuses for like at the end of

20   the project, the project was successful, you'd get a

21   check.

22   Q.    What you call spot bonuses?

23   A.    They would be part of a reward program of some

24   name.  So you would be nominated for an award because you

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles Folwell

1   did some outstanding work.

2       Q.    At some point you were transitioned over to

3   CSC.

4       A.    Correct.

5       Q.    And that was in July of '97?

6       A.    Correct.

7       Q.    That was along with all the other DuPont

8   employees that were in this group.

9       A.    I believe it was with the majority.  I don't

10  know what happened to everybody.

11      Q.    Because you were not subject to the DuPont

12  bonus plan, were you told anything about whether CSC had

13  a bonus plan?

14      A.    Yes.

15      Q.    Tell me about those conversations.

16      A.    The conversation I recall is my manager telling

17  me he was going to put me on CSC's bonus program after

18  being transitioned.

19      Q.    Who was that?

20      A.    Bill -- I'll recall his name eventually.  I

21  don't recall it at the moment.

22      Q.    This was your first manager after you started

23  with CSC?

24      A.    He was my manager on the day we transitioned.

Charles D. Folwell, Jr.                647

1      Q.    Was he a DuPont person?

2      A.    Yes.

3      Q.    He remained your manager once you came over to

4   CSC?

5      A.    Correct.

6      Q.    Do you know what his title is?

7      A.    No.

8      Q.    How long did he stay your manager?

9      A.    I recall something like a year after '97.

10     Q.    Did he do what he said he was going to do, get

11  you onto the CSC bonus program?

12     A.    Right.

13     Q.    Did that start immediately once you came over

14  to CSC?

15     A.    I recall it happening fairly quickly.

16     Q.    So he told you that was his intent during this

17  transition period?

18     A.    Correct.

19     Q.    Other than telling you that was his intent, did

20  he tell you anything about CSC's bonus plan?

21     A.    I don't recall a specific conversation.

22     Q.    Did anybody else tell you anything about CSC's

23  bonus plan?

24     A.    In what time frame?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters