Charles D. Folwell, Jr.

1       Q.      During this 1997 period.

2       A.      Anybody else.  I don't recall a conversation

3    with anybody else.

4       Q.      Your offer letter set forth the terms and

5    conditions of your employment with CSC?

6       A.      Okay.

7       Q.      Is that right?

8       A.      Was that a question?

9       Q.      Yes.

10      A.      That's my understanding.

11      Q.      The offer letter didn't say anything about a

12   bonus plan, correct?

13      A.      I do not recall anything mentioned about that.

14      Q.      So that is correct?

15      A.      It could have said you are not eligible for the

16   bonus plan.  I don't recall it saying anything.

17              (Deposition Exhibit No. 39 was marked for

18   identification.)

19   BY MR. SEEGULL:

20      Q.      Mr. Folwell, I'm now showing you what has been

21   marked as Exhibit 39.  Is this the offer letter you

22   received for transitioning from DuPont to CSC?

23      A.      It appears to be.

24      Q.      You received this in March of '97?

Charles D. Folwell, Jr.                                    649

1    A.    Okay.

2    Q.    Is that right?

3    A.    I don't know what day it arrived in my hand.   I

4    see the date at the top of the page.

5    Q.    You signed it on March 27th, 1997, correct?

6    A.    Okay.

7    Q.    Is that right?

8    A.    That's my signature.

9    Q.    That's the date you signed it?

10   A.    Correct.

11   Q.    You did receive it in March of '97?

12   A.    They could have handed me this in February.

13   All I can tell you is that's my signature on March 27th.

14   Q.    That's the day you signed it?

15   A.    That's correct.   I don't know the day I

16   received it.

17   Q.    Do you have any reason to believe it was not in

18   March of '97?

19   A.    No.

20   Q.    Just to review the letter and tell me, does it

21   say anything about any bonus plan at CSC?

22   A.    I don't see anything that says anything about a

23   bonus program.

24   Q.    Do you have any documentation that you would

1    claim supports your right to an AMIP plan or AMIP

2    eligibility or an AMIP bonus?

3         A.    I don't know what the word "right" means.

4         Q.    Do you have any documentation at all that talks

5    about AMIP?

6         A.    I have a book that CSC gave me about all the

7    benefits and compensation programs.  So I might have

8    something in there.

9         Q.    So was it a Chemical guide, Chemical employees

10   guide?

11        A.    That sounds familiar.

12        Q.    That talked not simply about the bonus, but it

13   talked about all kinds of compensation, including the

14   bonus plan?

15        A.    Yes.

16        Q.    Is that the kind of thing that would have been

17   given to you each year?

18        A.    I recall receiving it once.  I don't recall

19   receiving any other copies since then.

20        Q.    When did you receive that?

21        A.    As part of meetings about the transition.

22   These are various documents we received.  I put them all

23   in a binder.

24        Q.    Do you still have that binder?

Charles D. Folwell, Jr.                                                661

1    A.    Yes.

2          MR. SEEGULL:  I don't believe that binder's

3    been produced.  We would ask for that to be produced, as

4    well.  Will you produce that?

5          MR. WILSON:  I don't know if it's been

6    produced or not.  I'll have to check.

7          MR. SEEGULL:  If it's not been produced,

8    will you produce it?

9          MR. WILSON:  I'll look at it and if it's

10   responsive, I'll produce it.

11   BY MR. SEEGULL:

12   Q.    Where is that binder?

13   A.    At home.

14   Q.    Let me take a step back for a moment.  I

15   understand you were provided documents at the time of

16   your transition, as you've just described.  Were you also

17   provided documentation during the course of your

18   employment related to the handbook and policies and

19   procedures?

20   A.    I believe I have received e-mails that tell me

21   where to go on the Internet to read those documents.  I

22   don't think I received paper anymore.

23   Q.    So it's your understanding that, during the

24   course of your employment, documentation regarding

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1 compensation, policies, handbooks, and procedures are

2 posted on an intranet?

3    A.    Correct.

4    Q.    Not the Internet but the intranet or is it the

5 same thing?

6    A.    I haven't cared.  I type it in, I get there.

7 What they want to call it I don't care.

8    Q.    What you're saying is that -- is it Human

9 Resources people that send you e-mails?

10    A.    I believe I go to the library and get to this

11 Web site.  So you will have to tell me whether you want

12 to call that inter or intra.

13    Q.    You mean a public library?

14    A.    Yes.

15    Q.    I don't know.  You're a computer specialist,

16 not me.  I don't know what that would be considered.

17         Maybe it's a secure Web site of some sort?

18    A.    I would agree with that.

19    Q.    In other words, it's not publicly accessible

20 without a password?

21    A.    I would agree with that.

22    Q.    I'm guessing.  I don't know.  I have never done

23 it.

24    A.    It requires a user ID and a password.

Charles D. Folwell, Jr.                                   653

1      Q.     But, in any event, is it Human Resources that

2   would send you e-mails telling you there are policies and

3   procedures out there?

4      A.     Yes.

5      Q.     They would give you the link to go to access

6   those policies and procedures?

7      A.     Yes.

8      Q.     Sometimes you've gone and accessed those

9   policies and procedures and read them?

10      A.     Yes.

11      Q.     You told me that there might be something about

12   the bonus plan in the original compensation documents

13   that you were provided?

14      A.     There might be.  I don't recall specifically.

15      Q.     Might there also be references to the bonus

16   plan in these compensation policies and procedures on the

17   Internet or intranet, whatever it is, if you know?

18      A.     I don't recall seeing that there.  They're more

19   benefit-oriented.

20      Q.     You don't know one way or the other sitting

21   here today?

22      A.     I do not recall reading that on any Web page.

23      Q.     Have you read anything about AMIP at all other

24   than what you received when you first came over as a CSC

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0670

Charles D. Folwell, Jr.

1    employee?

2        A.    I recall receiving a one-page document that

3    said how it was calculated for one particular year.

4        Q.    Let me just see if I understand what you're

5    saying.  You received some kind of documentation at the

6    transition when you came over to CSC that had some kind

7    of language about the bonus plan, correct?

8        A.    I believe so.  I can't specifically tell you

9    about a document that I read.

10       Q.    Do you know what that document said about the

11   bonus plan?

12       A.    I recall it might have told me what the letters

13   stand for, for example.

14       Q.    It named the plan, the AMIP plan?

15       A.    That there is a plan, right.

16       Q.    It called it the AMIP plan?

17       A.    Right.

18       Q.    It told you what each of those letters stood

19   for you think?

20       A.    I think.

21       Q.    Other than that, do you recall it saying

22   anything else?

23       A.    No.

24       Q.    In addition to that, you're saying you received

Charles D. Folwell, Jr.

655

1    a one-page document at some point during your employment

2    that was a worksheet?

3         A.    No.   I wouldn't call it -- was it a worksheet.

4    I don't know what that means.

5         Q.    What was the one-page document you're referring

6    to, then?

7         A.    It was a report of how my bonus was calculated.

8         Q.    You want to call it a report?

9         A.    I don't fill in anything.

10        Q.    Other people fill it in.

11        A.    It came off the computer.   Came off a computer

12   system.

13        Q.    I assume it has boxes with numbers that go into

14   the boxes.

15        A.    Correct.

16        Q.    You didn't fill in those numbers, somebody else

17   did?

18        A.    Somewhere.

19        Q.    Can we call that a worksheet?   Just makes it

20   easier to understand what it is.

21        A.    Yes.

22        Q.    When did you receive that worksheet?

23        A.    I don't recall when I saw it, what year it was.

24   I just recall seeing it.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1      Q.    You have no idea which year it was?

2      A.    I can guess.

3      Q.    What's your best estimate as to when you

4   received that?

5      A.    2001.

6      Q.    Do you know when in 2001?

7      A.    No.

8      Q.    This worksheet that you received, this was a

9   completed worksheet, meaning the numbers for the actual

10  achievement towards the objectives were filled in?

11     A.    Yes.

12     Q.    So this would have been the calculation for how

13  your AMIP bonus was calculated that particular year?

14     A.    Yes.

15     Q.    That's the only time you received one of these

16  worksheets?

17     A.    I only recall receiving one.

18     Q.    You might have received others, you just don't

19  recall?

20     A.    Correct.

21     Q.    Other than that worksheet and maybe other

22  worksheets if they did get sent to you, and other than

23  the one compensation document at the transition stage,

24  are you aware of any other documents that talk about the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.                                    657

1    AMIP plan?

2         A.    I think I also once saw -- the sheet I referred

3    to earlier was the one that had my name at the top that

4    said here's how my bonus was calculated.  I also recall

5    seeing a generic page that said here's how everybody's

6    AMIPs will be calculated this year, the weightings of

7    different categories.

8         Q.    You saw a completed worksheet for yourself?

9         A.    Correct.

10        Q.    You think it was in the year 2001.  And you saw

11   a generic worksheet for which year was that?

12        A.    I do not know.

13        Q.    What's your best estimate?

14        A.    2002.

15        Q.    Again, you think you only saw one of those?

16        A.    That's what I recall.

17        Q.    Are you aware of any other documents or have

18   you seen any other documents that refer or relate to

19   AMIP?

20        A.    Not that I recall.

21        Q.    The reason you think you're entitled to an AMIP

22   payment for that period of time in 2003 that we have

23   talked about is because you had received prior AMIP

24   payments since you came over to CSC.

Charles D. Folwell, Jr.

1     A.    Correct.

2     Q.    That is, you assumed you would continue to

3 remain eligible for any AMIP payment because nobody had

4 told you otherwise.

5     A.    Correct.

6     Q.    You assumed that, if you were no longer

7 eligible, somebody would tell you you're no longer

8 eligible.

9     A.    Correct.

10    Q.    We have been talking about the word "AMIP."

11 AMIP is the bonus plan that we're talking about, correct?

12    A.    Correct.

13    Q.    Do you know what the letters of AMIP stand for?

14    A.    I believe it stands for Annual Management

15 Incentive Program, but I'm not sure.

16    Q.    Tell me how AMIP works.

17    A.    You mean the last time I received it how it

18 worked?

19    Q.    Yes.

20    A.    Because I don't know how it works today.

21    Q.    Right.  During the period that you received it,

22 tell me how AMIP worked.

23    A.    It worked differently different years.

24    Q.    Explain that to me.

Charles D. Folwell, Jr.                                       659

1     A.    My recollection is that first the program

2  worked on a combination of corporate or group goals and

3  personal objectives.  And I can recall having personal

4  objectives and that was on the worksheet I received.  My

5  personal objectives were listed with weights next to them

6  and how much they count towards the bonus.  That's how I

7  believe it started for me.

8           The last year I received it there were no

9  personal objectives anymore.  So it was all corporate or

10  group goals.

11     Q.    If I understand you correctly, what you're

12  saying is the AMIP was a formula each year for how the

13  bonus would be calculated?

14     A.    Yes.

15     Q.    It wasn't a straight percentage, it was a

16  percentage that was calculated based upon different

17  factors?

18     A.    My total was the same, but the weightings

19  within that total would change.

20     Q.    When you say your total, you mean your total

21  maximum bonus percentage?

22     A.    I'm not sure that the word "maximum" would

23  apply because the formulas allowed for you to receive

24  more than that.  So you might call it a target number.

Charles D. Folwell, Jr.

1    Q.    Your target percentage bonus stayed the same

2  year to year?

3    A.    No.

4    Q.    That changed over time?

5    A.    I started at one number and was promoted and

6  raised to another number.

7    Q.    What number did you start at?

8    A.    I started at 10 percent and then I went to

9  22 percent.

10    Q.    When did you go from 10 percent to 22 percent?

11    A.    I will have to guess around 2000.

12    Q.    Why did you go up in percentage?

13    A.    Because my manager told me you are now being

14  promoted to this level and this percentage.

15    Q.    What was the level you were being promoted to?

16    A.    I went from a level 5 to a level 6.

17    Q.    So your target changed in terms of your target

18  percentage, correct?

19    A.    Correct.

20    Q.    In addition to the target changing, the factors

21  of the bonus would change year to year?

22    A.    Correct.

23    Q.    I guess there were three categories of factors.

24  One category was corporate objectives?

Charles D. Folwell, Jr.

1    A.    Could I hear all three --

2    Q.    Was that one category of factors, corporate

3 objectives?

4    A.    Okay.

5    Q.    Yes?

6    A.    I don't know that they're called corporate

7 objectives.

8    Q.    What did you call --

9    A.    Have objectives based on different levels of

10 the organization.  Whether one of them applied to the

11 whole corporation or not, I don't recall.

12    Q.    Weren't some of these things like earnings per

13 share?

14    A.    Yes.

15    Q.    Doesn't that apply to the whole corporation?

16    A.    Again, I don't know what happens in Europe and

17 Asia and Africa, whether that's another corporation.  I

18 don't know that.

19    Q.    CSC has an earnings-per-share figure.  You're

20 aware of that, right?

21    A.    Okay.

22    Q.    You're aware of that, correct?

23    A.    No, I'm not aware of that.

24    Q.    You know CSC has a stock price?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    A.    Yes.

2    Q.    You've reviewed that stock price periodically?

3    A.    Yes.

4    Q.    You understand that that stock price is used to

5    calculate a figure called earnings per share, correct?

6    A.    Okay.

7    Q.    Am I correct or incorrect in that?

8    A.    I do not claim expertise in how these numbers

9    are calculated.  So I can't tell you that you're correct

10   or incorrect.

11   Q.    You don't know how earnings per share is

12   calculated?

13   A.    I do not know exactly how that's calculated.

14   Q.    Do you know generally how it's calculated?

15   A.    Yes.

16   Q.    Take the earnings and you divide it by the

17   number of shares, right, generally?

18   A.    Yes.

19   Q.    That's a corporate objective, right?

20   A.    Yes.  I would call that a corporate objective.

21   Q.    Fair enough.  So that's one category, corporate

22   objectives, right?

23   A.    Right.

24   Q.    Second category might be group objectives?

Charles D. Folwell, Jr.                          663

1       A.      Right.

2       Q.      That group might be for the Chemical Group?

3       A.      Correct.

4       Q.      And then there's a third category, at least for

5   some years, personal objectives, correct?

6       A.      Correct.

7       Q.      Some years there might not be personal

8   objectives, some years there would be personal

9   objectives.

10      A.      It was more like from 1997 till some point

11  there were personal objectives and then after that there

12  weren't any.  It wasn't a year-to-year.  The policy was

13  that and now the policy is this.

14      Q.      When you say "policy," you haven't told me that

15  you have seen any policy.

16      A.      I have seen the sheets that I have told you I

17  saw that showed how the numbers are calculated.

18      Q.      For you, you only saw one sheet is what you

19  said.

20      A.      Correct.

21      Q.      Maybe this is all speculation since you don't

22  know how it was calculated in the other years.  Is that

23  right?

24      A.      I know what my management has told me and that

Charles D. Folwell, Jr.

1    is what they told me.

2        Q.    They told you that some years personal

3    objectives were included, some years they were not

4    included?

5        A.    Correct.

6        Q.    Within each of these categories different

7    factors are used?

8        A.    Yes.

9        Q.    Just as an example, in the corporate

10   objectives, some years earnings per share might be a

11   factor?

12       A.    Yes.

13       Q.    Some years the earnings per share might not be

14   a factor?

15       A.    Could be.

16       Q.    And some years operating income could be a

17   factor?

18       A.    Okay.  I don't know what that is.

19       Q.    Or revenue could be a factor?

20       A.    Okay.

21       Q.    Is that right?

22       A.    Yes.  I have seen these words.

23       Q.    And some years operating expenses could be a

24   factor.

Charles D. Folwell, Jr.                                    665

1       A.      I don't recall that.

2       Q.      Or return on investment, that could be a

3  factor.

4       A.      I definitely recall seeing the letters ROI.

5       Q.      What are some of the other factors from a

6  corporate-objective standpoint that you're aware of?

7       A.      From a corporate standpoint?  I cannot give you

8  any others.

9       Q.      So those factors might change year to year.

10      A.      Yes.

11      Q.      In the group targets, what were some of the

12  group targets, and how did they change year to year?

13      A.      Group objectives would look like we want to

14  achieve CMM level 3.  So as an organization, we want to

15  get certified that we meet these criteria.  There would

16  be some mention of we want to have some measure of

17  business.

18      Q.      Revenue?

19      A.      Revenue.

20      Q.      Market share?

21      A.      No.  It would be more like revenue.  I don't

22  recall anything that looked like market share.

23      Q.      So the group objectives could change year to

24  year?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.

1       A.      Yes.

2       Q.      Some years group revenue might be a factor,

3   some years group revenue might not be a factor?

4       A.      Yes.

5       Q.      And then what were some of the personal

6   objectives year to year for you?

7       A.      Do you want type or examples?

8       Q.      Yes, examples.

9       A.      One example was that I would document a

10  procedure and install it in the knowledge repository.  So

11  this is an example where I would demonstrate that I have

12  learned how to do something or developed a procedure for

13  how to do something, and I would document it and make

14  that documentation available to everybody.

15      Q.      Give me some other examples.

16      A.      I have had objectives that look like I will

17  teach so many courses.  Objectives that read things like

18  I will serve as a mentor to younger employees.  Those are

19  some examples of what I recall.

20      Q.      Those objectives are consistent with your job

21  duties and responsibilities?

22      A.      Yes.

23      Q.      In addition to the objectives changing year to

24  year, I gather the targets would also change; that is,



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.

1   even if revenue was the same factor that was used in 1999

2   as in 2000, the target for revenue one year would be

3   different than the target for revenue the next year.

4       A.    The target would be different each year.

5       Q.    That would be true for all of the factors that

6   were used, whether it be earnings per share, revenue,

7   expenses?

8       A.    Yes.

9       Q.    And then, in addition to the targets changing,

10  the weightings would also change, right?

11      A.    Yes.

12      Q.    How much each of these factors was valued in

13  terms of the overall calculation to achieve the AMIP

14  bonus was changing?

15      A.    Yes.

16      Q.    So sometimes revenue might be worth 10 percent

17  towards the total calculation, other years it might be

18  25 percent.

19      A.    I would say yes, but I wouldn't agree that the

20  numbers would vary that much.

21      Q.    Might be 10 percent or 15 percent?

22      A.    More like 10 versus 11.

23      Q.    Some years personal objectives might be

24  15 percent of the overall calculation, other years they

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    might be 25 percent of the overall calculation.

2        A.    Yes.

3        Q.    The fiscal year ran from April 1 of the year

4    through March 31 of the following year, correct?

5        A.    Correct.

6        Q.    Just so we're clear and just as an example,

7    fiscal year 2002 would be the period of time from

8    April 1, 2001, through March 31, 2002.

9        A.    I believe that's correct.

10       Q.    At some point during that year you would

11   receive some explanation as to how the AMIP would be

12   calculated, correct?

13       A.    I did not always receive an explanation.

14       Q.    Are you saying during the fiscal year you

15   wouldn't receive an explanation or even after the fiscal

16   year when you received your AMIP, you might not receive

17   an explanation?

18       A.    I believe a whole year has gone by and I have

19   gotten a check and never got an explanation of anything.

20       Q.    There is at least one year, maybe multiple

21   years, where the entire fiscal year has occurred, you got

22   to the end of the year, you received a check, and nobody

23   explained to you what that check was for or how it was

24   calculated?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

```
1        A.    Nobody explained it to me formally by handing

2   me a document.

3        Q.    So somebody might have explained it to you

4   verbally?

5        A.    Yes.

6        Q.    How did they explain it to you verbally?

7        A.    They might have made a comment like it's the

8   same as last year would be a comment that would let me

9   know what the objectives were.

10        Q.    Was that during the year or once your check had

11   been cut that they would come to you and say this?

12        A.    I would say it's before the checks are cut.

13        Q.    But after the close of the fiscal year?

14        A.    No.  It would have been during the period --

15        Q.    During the fiscal year?

16        A.    Yes.

17        Q.    Let me ask you:  Were there any years where you

18   received no explanation at all, verbally or in writing,

19   or did you always receive some explanation for how this

20   was going to be calculated?

21        A.    I think I always got some type of explanation.

22        Q.    And sometimes that was in writing through one

23   of these worksheets?

24        A.    Correct.
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1     Q.    And sometimes that was verbally from your

2  manager?

3     A.    Correct.

4     Q.    Who was your manager who would say this to you?

5     A.    Debbie Cebula.

6     Q.    When did she start being your manager?

7     A.    I have to guess around 2000.

8     Q.    Ms. Cebula would typically come to you in this

9  October/November/December time frame and tell you this is

10  how the AMIP is going to be calculated?

11     A.    The typical conversation would be during a

12  performance appraisal.

13     Q.    When are performance appraisals done?   February

14  time frame?

15     A.    We're starting the process right now.   So

16  February/March time frame.

17     Q.    Let's just give an example of, let's say, the

18  fiscal year 2001 -- or 2002.  Let's say 2002.  You said

19  you think you received the worksheet in 2001.  Let's do

20  the 2002 fiscal year just as an example.

21           You think that maybe Ms. Cebula would have

22  come to you in February of 2002 and said this is how the

23  AMIP is going to be calculated this fiscal year, and then

24  that would be during your performance review period.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    A.    Yes.

2    Q.    Then the fiscal year would end a couple of

3 months later?

4    A.    We would be -- if we're discussing this in

5 February or March, it would be for the next fiscal year.

6    Q.    This is before the fiscal year started?

7    A.    Yes.

8    Q.    You would be talking about the expectations

9 regarding how it would be calculated for the following

10 fiscal year?

11    A.    Yes.

12    Q.    How could she do that if the financial results

13 of the company had not yet been -- the books hadn't been

14 closed on that fiscal year?

15    A.    How can she have a general discussion?

16    Q.    I don't know.  What was the discussion like?

17 Was she telling you what the operating income targets

18 would be?

19    A.    The discussion would be I'm asking my manager

20 what do I need to do to receive my bonus next year, and

21 she would give me an answer.

22    Q.    The answer she was giving you was just keep

23 doing the work you're doing?

24    A.    I can recall answers similar to that.  She

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1   would give me a specific answer as she could.

2       Q.      Did she ever get into with you the details of

3   how this would be calculated and the metrics that would

4   be used and the targets?

5       A.      At one point that's why I got paper because I

6   asked the question.

7       Q.      After that did you ever get any more detail

8   from her?

9       A.      At each year's performance appraisal, we would

10  discuss what are the objectives that I need to be aware

11  of for the coming year.

12      Q.      Tell me about those discussions.  What did she

13  tell you other than continue doing what you're doing?

14      A.      I don't recall.

15      Q.      You don't recall anything she said to you at

16  any of these times when she discussed the AMIP with you?

17      A.      I don't recall any more specifics that I can

18  give you.

19      Q.      Other than what?

20      A.      Other than keep doing what we're doing and

21  other objectives will be given to you as we get them.

22      Q.      Then she never gave you any further objectives.

23      A.      I can't say she never did.  I can recall being

24  sent an e-mail about this is our group's objectives and

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    we actually would put them into the system where we're

2    supposed to put objectives.  So I can recall doing that

3    because I received an e-mail from her.

4         Q.    But she never explained how those group

5    objectives related to the AMIP.

6         A.    I do not recall her explaining the detailed it

7    will be this percent of this number.  We did not have

8    those kind of detailed discussions.

9         Q.    Is it fair to say that, each year you received

10   the AMIP other than the year that you received the

11   worksheet, precisely how the AMIP was calculated was not

12   known to you?

13        A.    Correct.

14        Q.    In other words, you didn't know the details of

15   the formula?

16        A.    I did not always know the details of the

17   formula.

18        Q.    Am I correct that the only time you knew that

19   was when you received the worksheet?

20        A.    I received a specific worksheet and I also

21   received a general worksheet, and I don't recall whether

22   they were for the same time period.

23        Q.    And the general worksheet, you don't know if

24   that's how yours was calculated.  Let's say it was a

1  different year.

2      A.     If it was a different year, I have nothing to

3  say that that was actually used.

4      Q.     Who gave you the general worksheet, by the way?

5      A.     I do not recall.

6      Q.     Is it fair to say that nobody received AMIP

7  bonuses during the course of a fiscal year?

8      A.     I do not know that.

9      Q.     Are you aware of anybody that received an AMIP

10  bonus during the course of a fiscal year?

11      A.     I'm not aware of anyone.

12      Q.     As far as you know, AMIP bonuses were always

13  paid out after the close of a fiscal year.

14      A.     That's all I know.

15      Q.     And the reason for that is it takes time for

16  the company to evaluate the financial and other

17  objectives of the company to see whether or not the terms

18  of the AMIP have been met and how much needs to be paid

19  out.

20      A.     That would be my assumption of why it takes

21  that long.

22      Q.     AMIP payments were generally paid out in the

23  May/June time frame?

24      A.     That sounds correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.

1    Q.    And the year that you were removed from AMIP in

2   fiscal year '04, you never received a worksheet that

3   year, correct?

4    A.    I don't recall seeing any sheets.

5    Q.    By the way, are you aware of anybody ever

6   receiving a prorata AMIP bonus?

7    A.    I am not aware of a specific person.  I seem to

8   recall people telling me that that happens.

9    Q.    Who told you that?

10    A.    I don't recall.

11    Q.    I may have asked you this, but what is your

12   current position?

13    A.    I program.

14    Q.    Who is your supervisor currently?

15    A.    My staff manager is still Debbie Cebula.

16    Q.    What does that mean, staff manager?

17    A.    That means the manager responsible for subjects

18   like compensation, but she doesn't get involved in the

19   day-to-day work.

20    Q.    Did you receive salary increases each year you

21   have been with CSC?

22    A.    I think so.  I know there's been years where I

23   didn't get a pay increase, but I'm thinking that was back

24   during DuPont.  So I don't recall exactly which year.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    Q.    The first notification you had that you were no

2    longer eligible for AMIP came in this September 11th,

3    2003, letter, correct?

4    A.    No.

5    Q.    When did the first notification?

6    A.    I got a phone call from Debbie Cebula.

7    Q.    Tell me about that conversation.

8    A.    She said that I was being removed from the AMIP

9    program.

10    Q.    She called you?

11    A.    She called me.

12    Q.    Where is your work location?

13    A.    At Barley Mill Plaza.

14    Q.    Is that where Debbie is?

15    A.    No.

16    Q.    Where is she?

17    A.    She's in -- I think she sits over in New Jersey

18    now.

19    Q.    When did she call you?

20    A.    I would say a day or two before I got the

21    letter.

22    Q.    Did she tell you why you were being removed?

23    A.    Her comment was that everyone below level 8 was

24    being removed.

Charles D. Folwell, Jr.

877

1    Q.    Did she say she was being removed, too?

2    A.    She did not say those words.

3    Q.    Did she tell you anything else?

4    A.    On this subject?

5    Q.    During that conversation.

6    A.    I don't recall anything else being discussed.

7    Q.    Did you say anything to her?

8    A.    Yes.

9    Q.    What did you say?

10    A.    I probably expressed an opinion of

11   disappointment of some type.  I don't recall --

12    Q.    Do you recall what you said?

13    A.    I don't recall the exact words.

14    Q.    But you were clearly disappointed?

15    A.    Yes.

16    Q.    You said this is wrong or I'm disappointed?

17    A.    Yes.

18    Q.    Something to that effect.

19    A.    Yes.

20    Q.    She said what?

21    A.    I don't recall.

22    Q.    Do you recall anything else about the

23   conversation?

24    A.    No.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1      Q.    Did she say you will be getting a letter

2  confirming this?

3      A.    I recall her saying something will follow, yes.

4      Q.    Then shortly thereafter, maybe a day or two,

5  you received a letter?

6      A.    Yes.

7            (Deposition Exhibit No. 40 was marked for

8  identification.)

9  BY MR. SEEGULL:

10     Q.    I'm now showing you what's been marked

11 Exhibit 40.  Do you recognize this?

12     A.    Yes.

13     Q.    This is the letter that we have been talking

14 about?

15     A.    Yes.

16     Q.    This is the letter that was given to you on or

17 about September 11th, 2003, telling you that you were no

18 longer eligible for AMIP, correct?

19     A.    Yes.

20     Q.    Do you know who gave this to you?

21     A.    I don't recall.

22     Q.    Did you receive it in person or through the

23 mail?

24     A.    I don't recall.

Charles D. Folwell, Jr.

1      Q.     You understood from this letter that your AMIP

2   eligibility was terminated as of that moment?

3      A.     I understood that I would not be receiving a

4   check at the end of that fiscal year.

5      Q.     You also were told that you would now be

6   eligible for a discretionary bonus, correct?

7      A.     That's what this letter says.

8      Q.     That's what you understood.

9      A.     I understood that that's what this letter says.

10              MR. SEEGULL:  Can you repeat the question?

11              (The reporter read back as instructed.)

12              THE WITNESS:  Correct.  The letter says

13   that.

14   BY MR. SEEGULL:

15      Q.     That's what you understood, that you would now

16   be eligible --

17      A.     I did not understand that.  I read that.

18      Q.     Were you confused by what the letter said?

19      A.     Correct.

20      Q.     Why were you confused?

21      A.     The letter does not tell me how, when, the

22   criteria for how this bonus will be distributed.

23      Q.     The discretionary bonus?

24      A.     Correct.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    Q.    All it says is it's discretionary.

2    A.    Yes.

3    Q.    But you understood that at least you would have

4    the opportunity to earn a discretionary bonus even if you

5    didn't understand what it would take to earn it?

6    A.    No, I did not believe that.

7    Q.    What do you mean?

8    A.    I don't believe I will ever see a dime of that

9    money.

10    Q.    Why is that?

11    A.    I would say the fact it's now been more than a

12    year and a half since I asked how this program will work

13    and no one will answer the question.

14    Q.    The discretionary bonus program?

15    A.    That's correct.

16    Q.    You understand that there are employees that do

17    get discretionary bonuses, correct?

18    A.    I do not understand that.

19    Q.    You're not aware of anybody that's ever

20    received a discretionary bonus?

21    A.    I have no personal knowledge of that.

22    Q.    In any event, you understood that it's the

23    company's policy that you don't get both a discretionary

24    bonus and an AMIP.  You're eligible for one or the other,

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1   correct?

2       A.    I have no understanding of that.

3       Q.    You don't know one way or the other?

4       A.    I do not know.

5             (Deposition Exhibit No. 41 was marked for

6   identification.)

7   BY MR. SEEGULL:

8       Q.    Mr. Folwell, I'm now showing you what's been

9   marked Exhibit 41.  Do you recognize this?

10      A.    Yes.

11      Q.    What is it?

12      A.    I was asked why I didn't sign the letter, and

13  this is my response.

14      Q.    At first you refused to sign Exhibit 40.

15      A.    Is this 40?  Correct.

16      Q.    And why did you refuse to sign it?

17      A.    If I can read this to you, this is my

18  explanation at the time of why I did not sign it.

19      Q.    Instead of reading it to me, why don't you just

20  tell me in your own words.

21      A.    I would put it as I did not understand what it

22  meant to sign it and there was no instructions on what to

23  do after I signed it.  Who to send it to, for example,

24  what to do with it.

Charles D. Folwell, Jr.

1    Q.    You could have asked somebody.

2    A.    I could have asked somebody, that's correct.

3    Q.    You didn't do that?

4    A.    I did not do that.

5    Q.    Is it true you never signed the letter?

6    A.    That's correct.

7    Q.    But you're not denying that you received it?

8    A.    I'm not denying that I received it.

9    Q.    Who is William Cummings?

10   A.    He was my boss's boss at the time, I believe.

11   Q.    Debbie Cebula's boss?

12   A.    Yes.

13   Q.    You wrote in this e-mail that you sent to

14   Mr. Cummings on December 4th that "There are other issues

15   with the letter that I consider to be at the least

16   misstated, at the most, unethical."

17        Do you see that?

18   A.    Uh-huh.

19   Q.    Yes?

20   A.    Yes.

21   Q.    You wrote that?

22   A.    Yes, I did.

23   Q.    What did you mean by that?

24   A.    The letter says this is to inform you that CSC

Charles B. Folwell, Jr.                                    663

1 has reviewed your eligibility.  I believe that's an

2 incorrect statement.

3      Q.     What do you mean?

4      A.     They did not review my eligibility.  They told

5 me that everybody below this level.  Nobody looked at me

6 personally and said I'm not eligible.

7      Q.     They looked at your level personally.

8      A.     I'm giving you my answer.  Do you want to argue

9 or do you want my answer?  That is my answer.

10     Q.     Isn't it the case that they looked at your

11 level personally?

12     A.     No.

13     Q.     Somebody had to say what level you were, right?

14     A.     I don't know what somebody did.  I don't even

15 know who somebody is.

16     Q.     Your annual performance reviews have nothing to

17 do with this case, correct?

18     A.     I disagree.

19     Q.     What could they have to do with this case?

20     A.     They are related to this case in that your

21 annual performance review would be the mechanism to

22 determine whether you met your personal objectives for

23 the previous period.

24     Q.     But in this case nobody's asserting whether you

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0700

Charles J. Fowell, Jr.

1   did or did not meet personal objectives, correct?

2       A.    I have not heard that.

3       Q.    If that's the case, then your performance

4   reviews have nothing to do with this case, right?

5       A.    They have not yet.

6       Q.    Obviously the reason you were removed from

7   AMIP, as you said, had nothing to do with your

8   performance; it had to do with your level.

9       A.    That's my understanding.

10      Q.    Did you ever report unethical behavior to any

11  company official?

12      A.    Yes.

13      Q.    Who did you report it to?

14      A.    Do you mean specifically to this topic or any

15  topic?

16      Q.    Any topic.

17      A.    On a previous project I was on, I believe two

18  people engaged in unethical behavior and I reported it to

19  their manager.

20      Q.    What kind of unethical behavior?

21      A.    There's a procedure where you're supposed to

22  get programs reviewed and I believe neither one of them

23  looked at what they reviewed and signed a document that

24  said they did.

Charles D. Folwell, Jr.

1       Q.      Have you ever reported any other unethical

2   behavior?

3       A.      Yes.

4       Q.      When was that?

5       A.      2003, 2004.  I don't recall exactly.

6       Q.      What was the unethical behavior that you

7   reported?

8       A.      I reported that the removal of DuPont employees

9   from AMIP's plan was unethical.

10      Q.      Who did you report that to?

11      A.      To the Ethics Help Line.

12      Q.      The hotline?

13      A.      Hotline, yes.

14      Q.      What did you consider to be unethical about

15  that?

16      A.      That the employees were grandfathered access to

17  the bonus program.

18      Q.      That's it?

19      A.      Yes, that's it.

20      Q.      How do you go about reporting to an ethics

21  hotline?

22      A.      You pick up the phone and call them.

23      Q.      Is it a voice recording?

24      A.      A person answers the phone.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0702

Charles D. Folwell

1    Q.    You just tell them your concern and then they

2  take notes?

3    A.    I don't know what they do with it.  They

4  apparently do nothing because I never got a response.

5    Q.    Did you give your name when you reported it?

6    A.    Yes.

7    Q.    You reported your name?

8    A.    Yes.

9    Q.    What name did you use?

10   A.    My name.

11   Q.    Charles Folwell?

12   A.    Correct.

13   Q.    You didn't go by the initials EWD?

14   A.    I called up this phone and I did not go by any

15 initials.  I talked to I think the name was Tom and I

16 told him who I am.

17   Q.    Did you ever submit anything in writing?

18   A.    Yes.

19   Q.    To the ethics hotline?

20   A.    Yes.

21   Q.    When you submitted it in writing, did you do so

22 anonymously?

23   A.    No.

24   Q.    Never used a pseudonym of any sort?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Charles D. Folwell, Jr.

1    A.    No.  I talked to them on the phone and I said I

2  would like to fax it to you and he gave me a fax number

3  and I faxed it to him.

4              (Deposition Exhibit No. 42 was marked for

5  identification.)

6  BY MR. SEEGULL:

7    Q.    Mr. Folwell, I'm now showing you what has been

8  marked Exhibit 42.  Do you recognize this?

9    A.    Yes.

10   Q.    What is it?

11   A.    It's the report I made to the ethics hotline.

12   Q.    Do you see that your name is anywhere on this

13  report?

14   A.    No, I do not see my name in this report.

15   Q.    Do you see on the second page, the first full

16  sentence, it says, "To remain anonymous, I shall go by

17  the initials EWD"?

18   A.    Okay.

19   Q.    Did you write that?

20   A.    I wrote -- yes.

21   Q.    Isn't it true that you did report this

22  anonymously?

23   A.    No, that's not true.

24   Q.    Why is that not true?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Sr.

1        A.      The ethics hotline allows employees -- it's

2   described that you can call this and make anonymous

3   reports.  The person you're talking to knows who you are,

4   but it doesn't necessarily imply that the behavior you're

5   reporting -- that if I'm going to report you for

6   behavior, you won't necessarily know who the report came

7   from.  So I'm not anonymous with the person on the ethics

8   hotline.  I'm following their procedure which says I can

9   make an anonymous report.

10       Q.      That's what you did, you wanted to make an

11  anonymous report?

12       A.      That's correct.  I followed CSC's procedure to

13  do that.

14       Q.      You made this report in May of 2004?

15       A.      That sounds correct.  That's the date on the

16  document, and I would tend to agree with that date.

17       Q.      Is it fair to say you were pretty angry when

18  you wrote this?

19       A.      Yes.

20       Q.      Why did you wait until May of 2004 to write

21  this?

22       A.      I don't recall why I waited.

23       Q.      You also sent an e-mail to Mr. Sperati and

24  Ms. Cebula, correct?

Charles D. Folwell, Jr.                                                689

1     A.    Yes.

2     Q.    And do you remember what that e-mail said?

3     A.    It said something along the lines of I have

4  received a letter about a potential lawsuit and wanted to

5  let them know that this was going on.

6     Q.    So were you soliciting them to join the

7  lawsuit?

8     A.    I was informing them that this was happening.

9  No, I would not use the word "soliciting them to join."

10  I wanted to make sure they were aware.

11     Q.    Did you discuss it with Ms. Cebula at all?

12     A.    No.

13     Q.    You encrypted the e-mail?

14     A.    I believe the computer system encrypts every

15  e-mail.  I didn't do anything special for that e-mail.

16              MR. SEEGULL:  Off the record.

17              (Discussion off the record.)

18  BY MR. SEEGULL:

19     Q.    How much are you claiming in damages in this

20  case?

21     A.    Twenty-two percent of my salary at the time

22  divided by half for half the year, then multiplied by

23  two, in accordance with Delaware law for the penalty,

24  plus expenses.

1    Q.    How much is that in total damages?

2    A.    I don't know.

3    Q.    Put aside any penalties or interest or fees.

4    Just how much are you claiming you're owed in terms of an

5    AMIP bonus?

6    A.    Twenty-two percent of my salary at the time,

7    which was about $112,000 divided by two.

8    Q.    So is it fair to say 11 percent of your salary?

9    A.    Yes.

10    Q.    Your salary at the time you said was how much?

11    A.    I think it was around $112,000.  I have to go

12    back and look.

13    Q.    What's 11 percent of $112,000?

14    A.    Ten percent would be $11,000.  So it's about

15    12 and a half thousand dollars.

16    Q.    In your interrogatory answer you said that you

17    estimate your damages at $12,298.23.  Does that sound

18    correct?

19    A.    That sounds correct.

20    Q.    That is the amount that you claim you're

21    entitled to be paid for the AMIP bonus for April 1, 2003,

22    through September 11th, 2003?

23    A.    Correct.

24    Q.    That's just an estimate?



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0707

1    A.    Correct.

2    Q.    And the reason you have to estimate is because

3    you don't know exactly how much the AMIP would have been?

4    A.    Correct.

5    Q.    You can't know that because you were never

6    provided a worksheet for that year?

7    A.    Correct.

8    Q.    There are other ways you could have estimated

9    the amount of your AMIP bonus, correct?

10   A.    Yes.

11   Q.    You could have taken the average of your AMIP

12   bonuses for prior years.

13   A.    I could have.

14   Q.    Why didn't you do that?

15   A.    I believe I was providing an estimate and the

16   proper thing to do is to find out what the number was and

17   use that.

18   Q.    In your calculation of your damages, you're

19   assuming that the full bonus was paid out, correct?

20   A.    I'm providing an estimate, and I recognize that

21   at the end of the fiscal year the actual number would be

22   known.

23   Q.    But in your estimate you are assuming that the

24   full bonus was paid out?

**W&F**

Charles D. Folwell, Jr.

1    A.    Since the bonus can be more than 22 percent, I

2 don't know the definition of "full."

3    Q.    The full target.

4    A.    The full target, correct.  As an estimate.

5    Q.    Was paid out?

6    A.    Correct.

7    Q.    You would agree that the company is entitled to

8 use its business judgment to determine the best way to

9 save money and increase profits?

10    A.    Generally, yes.

11    Q.    You would agree that the company has the right

12 to make sufficient decisions to save money, including

13 reducing people's bonuses?

14              MR. WILSON:  Object to form.

15    A.    Yes.

16    Q.    You just don't think that you should have been

17 removed from AMIP, correct?

18    A.    I disagree.

19    Q.    You think you should have been removed from

20 AMIP?

21    A.    I think I should have been removed from AMIP in

22 a different way.

23    Q.    You don't have a problem with the company

24 removing you from AMIP.  You have a problem that they

1    didn't pay you for the period that you believe you were

2    eligible during that year?

3         A.    I don't have a legal problem.  That's correct.

4         Q.    Do you know how long it took for the company to

5    make the decision to remove people from AMIP?

6         A.    No.

7         Q.    Do you know why the company made the decision

8    it did to change AMIP eligibility?

9         A.    No.

10        Q.    Have you talked to anybody in Human Resources

11   about this case?

12        A.    I don't believe so.

13        Q.    Have you talked to anybody about your removal

14   from AMIP other than the other plaintiffs that we have

15   talked about and the short conversation you had with

16   Debbie Cebula on the telephone?

17        A.    Yes.

18        Q.    Who else have you spoken to?

19        A.    Friends.

20        Q.    Friends outside of CSC?

21        A.    Yes.

22        Q.    Anybody else?

23        A.    I don't recall anybody else.

24        Q.    The friends that you have spoken to outside of

Charles D. Forney, Jr.

1    CSC, they don't have any personal knowledge about this

2    case.

3        A.    Not that I know of.

4        Q.    Have you received any written statements or

5    have any witnesses given statements in connection with

6    this case, as far as you know?

7        A.    You mean other than the people in the lawsuit?

8        Q.    Other than the plaintiffs.

9        A.    I don't have any knowledge.

10       Q.    Who do you believe has personal knowledge of

11   the facts related to this lawsuit other than the

12   plaintiffs?

13       A.    I guess, for example, obviously somebody told

14   Debbie Cebula that this was happening.  I don't know who

15   told her.  So I assume she has some knowledge of

16   something I don't know.  So I would assume every level of

17   management up from me has some information I don't have.

18       Q.    Anybody else?

19       A.    No.

20       Q.    By the way, who was the head of the Chemical

21   Group during this period of time?

22       A.    I don't recall.

23       Q.    You were in the Chemical Group the entire

24   time --

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

1    A.    Yes.

2    Q.    -- that you have been at CSC?

3    A.    Yes.

4            (Deposition Exhibit No. 43 was marked for

5    identification.)

6    BY MR. SEEGULL:

7    Q.    Mr. Folwell, I'm now showing you what's been

8    marked Exhibit 43.  This is one of the worksheets we were

9    talking about, correct?

10   A.    Correct.

11   Q.    Is this the one that was with your specific

12   information or was this the general one?

13   A.    You're assuming that I ever received this

14   before?

15   Q.    Have you ever received this before?

16   A.    I don't know.

17   Q.    Do you think you ever received this before or

18   you're not sure?

19   A.    I have seen a document that looks like this.

20   I'm not sure I have seen this one for this year, for the

21   year that's stated on here.

22   Q.    I'm sorry.  Can you just repeat that?

23   A.    I have seen a document similar to this, but it

24   may not have been this one because I think I saw it for a

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Charles D. Folwell, Jr.

1    different year.

2        Q.    You think you saw it for fiscal year 2001?

3        A.    That was my guess.

4        Q.    As far as you know, you never saw this document

5    before, Exhibit 43?

6        A.    That's correct.

7        Q.    Do you have any debts at the present time?

8        A.    Yes.

9        Q.    What debts do you have?

10       A.    I have a mortgage on my home.

11       Q.    Anything else?

12       A.    I'm sure at the moment I have a credit card

13   balance.

14       Q.    Do you know how much that would be?

15       A.    About $2,500.

16       Q.    Anything else?

17       A.    No.  I think I owe Sears $100 from the credit

18   card.

19       Q.    How about cars?

20       A.    No, I don't have any car loans.

21       Q.    Are there any outstanding judgments against

22   you?

23       A.    No.

24       Q.    Have you told me everything you know or

Charles Dumer Folwell, Jr

1  remember that forms the basis of your case?

2                MR. WILSON:  Object to form.

3                MR. SEEGULL:  Go ahead, you can answer.

4      A.    I believe I have answered everything I know

5  about your questions.

6      Q.    Was there anything that I haven't asked you

7  that you think is relevant to this case?

8                MR. WILSON:  Same objection.

9      A.    No.

10      Q.    Is there anyone that you have not mentioned who

11  can support your claims?

12      A.    Other than the plaintiffs in the case?

13      Q.    Right.

14      A.    No.

15      Q.    Is there any other information which you have

16  not mentioned which you would consider to be related to

17  the case?

18                MR. WILSON:  Objection to form.

19      A.    No.

20                MR. SEEGULL:  Let me take a brief break.

21                (A recess was taken.)

22                MR. SEEGULL:  I have no further questions

23  at this time, Mr. Folwell.  I think your attorney is

24  going to have some questions for you.

1          (Deposition Exhibit No. 44 was marked for

2    identification.)

3    BY MR. WILSON:

4          Q.    Mr. Folwell, the court reporter has handed you

5    what's been marked Exhibit 44.  Can you take a minute and

6    look at that?  Let me know when you are done.

7          A.    Okay.  I have looked at it.

8          Q.    Are your AMIP bonuses reflected on these

9    sheets?

10         A.    Yes.

11         Q.    Can you tell me for what fiscal years they are

12   for?

13         A.    I believe they're for 2001, 2002, and 2003.

14         Q.    The first sheet --

15         A.    I'm a little confused about -- if I get a check

16   in May 2001 -- what was your earlier definition of the

17   fiscal year?

18              MR. SEEGULL:  I think we all agree that the

19   fiscal year runs from April through the end of March.

20              THE WITNESS:  March 2001 is the end of

21   fiscal year 2001, not fiscal year 2000.

22   BY MR. WILSON:

23         Q.    Let's just do it this way:  What's the pay date

24   on this, the first sheet?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

699

```
 1      A.    The pay date is May 18th, 2001.

 2      Q.    What's the amount of the bonus?

 3      A.    $23,391.30.

 4      Q.    What's the pay date on the second sheet?

 5      A.    5/31/2002.

 6      Q.    What's the amount of bonus on that?

 7      A.    $19,851.57.

 8      Q.    And the pay date on sheet 3?

 9      A.    Is May 30th, 2003.

10      Q.    And the amount of the bonus?

11      A.    Is $21,785.00.

12      Q.    Do these amounts reflect your recollection of

13 what your AMIP bonuses were for those years?

14      A.    Yes.

15      Q.    Did you have to perform certain functions or

16 meet certain objectives to receive these bonuses?

17            MR. SEEGULL:  Objection.

18            MR. WILSON:  You can answer.

19      A.    Yes.

20      Q.    On the first sheet, 2001, what was the time

21 period that you performed these functions or met these

22 objectives?

23            MR. SEEGULL:  Objection.

24      A.    Would have been April 1st to March -- April
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1  1st, 2000, to March 30th, 2001.

2      Q.     For the bonus on the second sheet, for pay date

3  5/31/2002?

4      A.     Would have been April 1st, 2001, to March 30th,

5  2002.

6      Q.     And the same question for page 3?

7      A.     April 1st, 2002, to March 30th, 2003.

8      Q.     Beginning on April 1st, 2003, to

9  September 11th, 2003, did you continue to perform the

10  same functions as you had in these previous years?

11     A.     Yes.

12     Q.     Did CSC gain any benefit from this work?

13            MR. SEEGULL:  Objection.

14     A.     Yes.

15     Q.     Did you earn a bonus from April 1st, 2003, to

16  September 11th, 2003?

17            MR. SEEGULL:  Objection.

18     A.     Yes.

19     Q.     You talked a little bit about your promotion

20  from level 5 to level 6.  I believe you indicated that

21  you got an increase in the percentage of your AMIP bonus?

22     A.     Correct.

23     Q.     Was the increase automatic?

24            MR. SEEGULL:  Objection.  Calls for

Charles D. Folwell, Jr.    701

1    speculation.

2        A.    I don't understand "automatic."

3        Q.    I believe you stated when you were at level 5,

4    you were 10 percent and when you went to level 6, you

5    were at 22 percent.  Upon promotion, was the increase to

6    22 percent automatic?

7                MR. SEEGULL:  Objection.  Calls for

8    speculation.

9        A.    I don't know whether -- I don't know what the

10    rules are.  I just know what I was told and what I was

11    given.

12        Q.    You also indicated that you had conversations

13    in February or March regarding the upcoming year with

14    your supervisor?

15        A.    Correct.

16        Q.    Did this conversation take place prior to

17    fiscal year 2004, which would mean February or March of

18    2003?

19        A.    Yes.

20        Q.    You were given objectives and expectations for

21    the upcoming year?

22                MR. SEEGULL:  Objection.

23        A.    In one form or another.

24        Q.    What do you mean by that?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0718

Charles D. Folwell, Jr.

702

1    A.    In previous years I have received written

2  objectives and in some years I have just had verbal

3  conversations.

4    Q.    Do you recall in that year whether it was oral

5  or written?

6    A.    I would tend to think it was oral.

7    Q.    Do you have any recollection as to what those

8  objectives were?

9    A.    No.

10    Q.    Did you endeavor to meet those objectives?

11    A.    Yes.

12    Q.    You also talked briefly about salary increases.

13  Did you view your AMIP bonus as part of your total

14  compensation?

15    A.    Yes.

16    Q.    As to damages, you stated how you calculated

17  your damages.  If you knew the percentage in 2004 of

18  those who remained eligible in your group, what their

19  percentage was of their AMIP bonus, if you knew that,

20  could you make a more accurate calculation?

21        MR. SEEGULL:  Objection.  Calls for

22  speculation.

23    A.    Yes.

24        MR. WILSON:  That's all I have.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Charles D. Folwell, Jr.

703

1    BY MR. SEEGULL:

2        Q.    Mr. Folwell, turning to Exhibit 44, the bonuses

3    that are listed on each of those three pay stubs, those

4    reflect the earnings that were earned during that pay

5    period?

6                    MR. WILSON:  Objection.

7        A.    No.

8        Q.    Let's look at the different pay stubs.  Look at

9    the first page.  You said you received a bonus of

10   $23,391.30, correct?

11       A.    Yes.

12       Q.    You see where on the bottom it says total

13   earnings for that pay period?

14       A.    Are you pointing --

15       Q.    Yes.

16       A.    Yes.

17       Q.    What does it show as your total earnings for

18   that pay period?

19       A.    $27,500.42.

20       Q.    So in the total earnings for that pay period it

21   does reflect the AMIP bonus, correct?

22       A.    The check that I received in this month

23   reflects the AMIP bonus.

24                    MR. SEEGULL:  Can you read back the

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    question?

2                    (The reporter read back as instructed.)

3                    THE WITNESS:  The line that says "Total

4    earn" does reflect the AMIP's bonus, that's correct.

5        Q.    Your AMIP bonus that was paid during this

6    period is earned in this period, according to this sheet?

7                    MR. WILSON:  Objection.

8        A.    I did not say that.

9        Q.    I'm asking you.

10       A.    No, it does not say that.

11       Q.    It doesn't show that it was earned during this

12   pay period?

13       A.    There's a line on this page that says t-o-t-a-l

14   e-a-r-n and there's a number next to it and that is

15   including the AMIP bonus.

16       Q.    That means earnings.  E-a-r-n stands for

17   earnings?

18       A.    We will have to get into the definition of

19   "earnings."

20       Q.    I didn't ask you to define "earnings."  I'm

21   asking if e-a-r-n means earnings.

22       A.    E-a-r-n I believe on this document stands for

23   the word "earnings."

24       Q.    According to this document, your total earnings

1    for that pay period included your AMIP bonus, correct?

2        A.    According to this document.

3        Q.    And the same would be true for the next page?

4        A.    Correct.

5        Q.    The same would be true for the third page?

6        A.    Correct.

7        Q.    Do you have any other document anywhere in the

8    world that you are aware of that shows that your AMIP

9    bonus was earned in any other pay period?

10            MR. WILSON:  Objection.

11       A.    I don't have a document that has the word

12   "earn" on it.

13       Q.    Is the answer to my question no?

14       A.    Can I hear the question again?

15            (The reporter read back as instructed.)

16            THE WITNESS:  No, I don't have any other

17   documents.

18   BY MR. SEEGULL:

19       Q.    So the only document that exists that reflects

20   when the AMIP bonus is earned is Exhibit 44, correct?

21            MR. WILSON:  Objection.

22       A.    This document exhibits when it was paid to me.

23       Q.    And when it was earned, correct?  We have

24   already been through that.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    No, that's not correct.

2    Q.    It says "earnings," right?

3    A.    That's what the document says.

4    Q.    You said you have no other document that says

5  when it's earned, correct?

6    A.    I do not have any other documents, that's

7  correct.

8    Q.    So the only document that bears at all on when

9  it's earned is Exhibit 44, correct?

10              MR. WILSON:   Objection.

11    A.    No.

12    Q.    What other document bears on when it's earned?

13    A.    There are none.

14    Q.    Exhibit 44 obviously has something to say about

15  it, correct?

16    A.    Yes, it has something to say about it.

17    Q.    There's no other document that has anything to

18  say about it, correct?

19    A.    Not that I have.

20    Q.    I think you testified that there were no

21  personal objectives included in the AMIP calculations for

22  any year after about 2000?

23    A.    If I said about 2000, I could have said that.

24  I would guess it's more like 2001 maybe.  I'm not sure.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Charles D. Folwell, Jr.                707

1    Q.    So that for the years at least for 2002, 2003,

2    there were no personal objectives included in the AMIP

3    calculation?

4    A.    I'm just not sure how many years.  I don't know

5    the exact date.

6    Q.    But it's at least two years?

7    A.    I'm sure it wasn't the last year I received it.

8    Q.    In the years --

9    A.    I'm sure it was three years before that, but I

10   don't know where in between.

11   Q.    In the years for which there were no personal

12   objectives that were used as a factor in calculating the

13   AMIP bonuses, did you do anything to work towards the

14   AMIP bonus other than your normal job?

15   A.    No.

16        MR. SEEGULL:  I have no questions.  Thank

17   you.

18   BY MR. WILSON:

19   Q.    I just have a couple follow-ups.

20        During this pay period on the first sheet

21   here, where it says that you were paid $23,391 for your

22   AMIP bonus, what did you do during that specific pay

23   period to earn that much money?

24        MR. SEEGULL:  Objection.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters