1    A.    I believe I had personal objectives that year.

2    So I suspect that I met those personal objectives that

3    were given to me.  And the other objectives that were not

4    my personal ones, I would have met those requirements

5    where they could be specifically addressed to me as an

6    individual.

7        Q.    Did you work on meeting those requirements

8    throughout the course of the fiscal year?

9            MR. SEEGULL:  Objection.

10   A.    Yes.

11       Q.    What about for the second page?

12           MR. SEEGULL:  Same objection.

13   BY MR. WILSON:

14       Q.    Did you work throughout the fiscal year to meet

15   those objectives in order to earn that bonus?

16           MR. SEEGULL:  Objection.

17   A.    Yes.

18       Q.    For the third page.

19   A.    Yes.

20           MR. SEEGULL:  Objection.

21       Q.    You stated after the personal objectives were

22   taken off or when the AMIP was taken away, I can't

23   remember which it was, that you continued to do your

24   normal job?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1          MR. SEEGULL:   Objection.

2     A.    Yes.

3     Q.    Did you state that?

4     A.    I believe I did.

5     Q.    When you do your normal job, do you strive to

6  meet the requirements of your job?

7     A.    Yes.

8     Q.    Do you strive to go above and beyond?

9     A.    Yes.

10    Q.    Do you go above and beyond?

11    A.    Yes.

12    Q.    Whether or not you were getting the AMIP bonus?

13    A.    Yes.

14    Q.    And why is that?

15    A.    Because that's what's personally important to

16  me.

17          MR. WILSON:   I have nothing further.

18          MR. SEEGULL:   No further questions.

19          (Deposition concluded at 11:10 a.m.)

20                -   -   -   -   -

21

22

23

24



**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0726

1                        T E S T I M O N Y

2

3     DEPONENT:   CHARLES D. FOLWELL, JR.            PAGE

4

5     BY MR. SEEGULL................................ 618
      BY MR. WILSON................................. 698
6     BY MR. SEEGULL............................... 703
      BY MR. WILSON................................ 707

7

8                        E X H I B I T S

9

10    DEPOSITION EXHIBIT NO.                         MARKED

11

12    39 - A letter dated March 7, 1997,
      to Charles D. Folwell, Jr., from
13    Dorothy Eltzroth............................ 648

14    40 - A letter dated September 11, 2003,
      to Charles Folwell, Jr., from Jay Smith....... 678
15
      41 - An e-mail dated 12/4/2003................ 681
16
      42 - A multi-page document entitled,
17    "CSC Open Line Confidential 5/18/04".......... 687

18    43 - A two-page document entitled, "Fiscal
      Year 2003 AMIP"............................... 695
19
      44 - Three documents Bates numbered D-11064,
20    D-11092, and D-11119......................... 698

21

22    ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 711

23

24    CERTIFICATE OF REPORTER                PAGE 712

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



WILCOX & FETZER LTD.
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)

                          )

NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 17th day of February, 2006, the deponent herein, CHARLES D. FOLWELL, JR., who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

      I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

      I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


*Kimberly A. Hurley*

Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)


DATED: _____3/15/06_____


**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0729

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.          )
HAUCK, KEVIN KEIR, ASHBY          )
LINCOLN, KAREN MASINO, ROBERT     )
W. PETERSON, SUSAN M. POKOISKI,)
DAN P. ROLLINS, and WILLIAM       )
SPERATI,                          )
                                  )
    Plaintiffs,               )
                                  )
      v.                    )  C.A. No. 05-10-JJF
                                  )
COMPUTER SCIENCES CORPORATION,    )
                                  )
    Defendant.                )


       Deposition of ASHBY A. LINCOLN, III, taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 12:55 p.m., on Friday,
February 17, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiffs

        LARRY R. SEEGULL, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY US LLP
          6225 Smith Avenue
          Baltimore, Maryland 21209-3600
          for the Defendant



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

B-0730

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0731

1    APPEARANCES (cont'd):

2                    TYLER B. RAIMO, ESQUIRE
                     COMPUTER SCIENCES CORPORATION
3                    3170 Fairview Park Drive
                     Falls Church, Virginia 22042
4                    for the Defendant

5

6                         - - - - -

7

8                    ASHBY A. LINCOLN, III,

9           the witness herein, having first been

10          duly sworn on oath, was examined and

11          testified as follows:

12    BY MR. RAIMO:

13       Q.    Good afternoon, Mr. Lincoln.

14       A.    Good afternoon.

15       Q.    My name is Tyler Raimo.  I'm an attorney for

16    CSC.  That is Computer Sciences Corporation.  With me

17    here is Larry Seegull who's also an attorney for CSC.

18    He's with the law firm of DLA Piper Rudnick.

19            The purpose of this deposition today is to

20    inquire about your allegations forming the basis of your

21    lawsuit against CSC.

22            Could you please state your full name for

23    the record?

24       A.    Ashby Abraham Lincoln, III.

1    Q.    Mr. Lincoln, I'm going to go over some

2  instructions for the deposition and let you know today

3  I'm going to ask you some questions to find out what you

4  know, what facts give rise to your claim.  Obviously all

5  your answers must be verbal, since the court reporter

6  cannot take down head nods or any other expressions.

7  Your answers must be truthful and complete.  You must

8  provide testimony today just as if you were providing

9  testimony in court.

10          If you do not hear a question, say so and I

11  will repeat it.  If you do not understand a question, say

12  so and I'll rephrase it for you.  If you realize that an

13  earlier answer you had given is inaccurate or incomplete,

14  say so and I'll allow you to correct the record.

15          If you want to stop to take a break at any

16  time, let me know and we will do so.

17          If you do not know or do not remember the

18  information necessary to answer a question, please say

19  so.  You cannot talk to your attorney during the

20  deposition or discuss your testimony until the deposition

21  has concluded.  You cannot seek advice from your attorney

22  during the deposition unless it relates to a question of

23  privilege.

24          If you answer the question, I'll assume



1    that you have heard it and understood it and have given

2    me the best recollection you have.

3                Do you understand these instructions?

4        A.    Yes.

5        Q.    Are you taking any medication that could

6    possibly impair your ability to understand any questions

7    that I have for you today?

8        A.    No.

9        Q.    What did you do to prepare for this deposition

10   today?

11       A.    I researched some of the records that I have.

12   I looked at my offer letter that I got from CSC at the

13   time I came to the DuPont account.  I looked at some of

14   the AMIP records that I have.  I looked at my pay stubs.

15   And other documents along those lines.

16       Q.    Let's go back to those documents.  You said

17   your offer letter when you joined the DuPont account?

18       A.    Yes.

19       Q.    CSC's offer letter to you?

20       A.    That is correct.

21       Q.    You said pay stubs?

22       A.    Yes.

23       Q.    What were the other documents?

24       A.    The AMIP form for one of the years that I

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0734

1    received the bonus.

2               MR. WILSON:   That reminds me.   He just gave

3    me that today.   I'll give you a copy of that.   We had not

4    previously produced this.

5               MR. RAIMO:   Off the record.

6               (Discussion off the record.)

7    BY MR. RAIMO:

8       Q.    In addition to the form your attorney had just

9    given us, are there any other documents that you reviewed

10   in preparation for the deposition?

11      A.    Over a period of time, yes.   My house got

12   flooded and a lot of documents that I have don't exist

13   because of that.   But, yes, I looked at each of my AMIP

14   statements.   I looked at the pay stubs.   We always

15   received this bonus the first pay period of June.   I have

16   supplied -- you should have some of those documents.

17   Performance appraisals in researching to see what

18   constituted the bonus that I received in that particular

19   year.

20      Q.    When you said "AMIP statements," what are you

21   referring to?

22      A.    A statement such as that.

23      Q.    A worksheet?

24      A.    Yes, it would be a worksheet.   That's a

Ashby A. Lincoln, III                                      718

1    worksheet that shows what the criteria for the bonus is.

2    Doesn't show what the bonus is actually going to be for

3    that year.

4                   MR. RAIMO:  Could you mark this Exhibit 45?

5                   (Deposition Exhibit No. 45 was marked for

6    identification.)

7    BY MR. RAIMO:

8         Q.    Mr. Lincoln, what you're looking at is

9    Exhibit 45 that the court reporter just handed you.  Can

10   you tell me what this document is?

11        A.    This is a worksheet that was used to calculate

12   the amount of the bonus for the particular year, 2002

13   fiscal year.

14        Q.    So fiscal year 2002?

15        A.    That's correct.

16        Q.    CSC's fiscal year runs between April 1st to

17   March 31st?

18        A.    That's essentially correct.  It runs somewhere

19   around the 1st of April to the end of March.  Depends on

20   which day a Saturday is on.

21        Q.    This would be for fiscal year '02 which would

22   have run between April 1st, 2001, through March 31st,

23   2002?

24        A.    That is correct.

1      Q.      This is a document that your attorney had given

2  us today?

3      A.      Yes.

4      Q.      We both can refer to this as the AMIP

5  worksheet?

6      A.      Yes.

7      Q.      Mr. Lincoln, how did you receive this document?

8      A.      I received this in a meeting that I had with my

9  manager.

10     Q.      Who is your manager?

11     A.      Carlo Rodriguez.

12     Q.      So we're talking about the FY '02 time frame.

13  I'll just back up.

14             What was your position at the time?

15     A.      I was senior manager of Managing Work Services

16  for the DuPont account, CSC.

17     Q.      Where were you, geographically speaking?

18     A.      Newark, Delaware.

19     Q.      What business unit did you support?

20     A.      I supported Network Engineering Services.  No

21  business unit.  It's an internal support.

22     Q.      Was it GIS?

23     A.      It was GIS.

24     Q.      But you were with the business unit GIS?

Ashby A. Lincoln, III                                720

1      A.      That's the CSC business unit, the DuPont

2    account.   Not DuPont business units.

3      Q.      GIS was a business unit, but you were

4    supporting the DuPont account?

5      A.      That's correct.

6      Q.      I'm sorry.   Could you state your manager's name

7    again?

8      A.      Carlos Rodriguez.

9      Q.      What was his title?

10      A.      Director of Network Engineering Services.

11      Q.      You said you were a senior manager?

12      A.      Yes.

13      Q.      Do you know what level you were at the time?

14      A.      SO 6.

15      Q.      When did you receive this document here?

16      A.      My records indicated that I saved it on my

17    computer in January of 2003.

18      Q.      So you saved it, but you would have received it

19    earlier than then, correct?

20      A.      Right.   It could have been on an attachment on

21    an e-mail, but I elected to save it on that date.   So I

22    had it prior to that, but I don't know how much earlier

23    than that.

24      Q.      I see this document is somewhat incomplete,

Ashby A. Lincoln, III                                    721

1   correct, because "Actual" and "Actual Award" is not

2   filled out?

3        A.     That is correct.

4        Q.     So we could refer to this as a preliminary

5   worksheet, AMIP worksheet, rather than a completed AMIP

6   worksheet?

7        A.     The completed AMIP worksheet would have had the

8   actual award on it.  The actual award hadn't been

9   determined, but the criteria for the award was here.

10       Q.     When would CSC have determined the actual AMIP

11  award?

12       A.     It would have been determined after the fourth

13  quarter earnings were announced.  So I would guess that

14  would be mid-May.

15       Q.     You wouldn't receive a completed AMIP worksheet

16  until the end of the fiscal year?

17       A.     It would be after the end of the fiscal year.

18  We would have to do the earnings for the fourth quarter

19  which would take four to six weeks.  Once they were

20  announced, just almost exactly as those earnings were

21  announced, the AMIP worksheet was completed and we

22  received the AMIP bonus the first pay period in June.

23       Q.     So CSC would have to close its books, calculate

24  the numbers to plug into or enter into the AMIP worksheet

1    in order to complete this worksheet which would have been

2    at the end or after the fiscal year?

3        A.    That's correct.  I can't tell you -- I can look

4    at that sheet and see the $2.10 earnings per share budget

5    number, but I don't know whether that was at the end of

6    the third quarter, second quarter.  It's a worksheet.

7        Q.    You're assuming that the earnings per share

8    could have been a quarterly earnings per share, not an

9    annual?

10       A.    That's correct.  The actual earnings would

11   show.  This form does not show that, but it shows that

12   the budget was $2.10 which would have been the projected

13   budget for the year.  I don't know what the actual was,

14   but I know it was in excess of that.

15       Q.    That's because the year is not up and this is a

16   preliminary worksheet?

17       A.    That's right.

18       Q.    This is telling us what the criteria is.  CSC

19   couldn't have filled this out during the middle of the

20   year.

21       A.    No.

22       Q.    When I say "middle," the fiscal year.

23       A.    Correct.  I guess it could, but I don't know

24   whether it would.

Ashby A. Lincoln, III

1    Q.    They wouldn't have the information?

2    A.    That's correct.

3    Q.    Let's go back to talking about this as a

4  preliminary worksheet.  We were just talking about the

5  actual worksheet completed.

6          I know you mentioned before that you said

7  you saw this last saved on your computer I believe in

8  January of 2003.

9    A.    Correct.

10   Q.    Do you know when you received this document,

11  the preliminary worksheet, Exhibit 45?

12   A.    I don't recall exactly when I would have

13  received this document, but memory serves me that we

14  would do this exercise in October or early November.

15   Q.    In this case it would have been October or

16  November calendar year 2001 for fiscal year 2002.

17   A.    Correct.

18   Q.    You stated that your supervisor had given you

19  this document.

20   A.    That is correct.

21   Q.    Was it hand-delivered to you, was it mailed to

22  you, or was it e-mailed to you?

23   A.    No.  We met.  The top part of the form, the

24  financial objectives, were already on the form.  The

Ashby A. Lincoln, III

724

1    comments below under "Team and Individual Objectives"

2    would have been created by he and I.   Primarily me with

3    his concurrence.   That essentially was the same each

4    year.

5        Q.    The team and individual objectives?

6        A.    Yes.

7        Q.    Focusing on team and individual objectives like

8    you just said, what was the name of your team?

9        A.    Network Engineering Services.

10       Q.    That was every year, when you said every year?

11       A.    Every year.   Then it was called Network

12   Engineering Services.   Today it's called Managed Network

13   Services and it's the same.   Both names mean the same

14   thing.

15       Q.    Your overall objectives could have had the same

16   theme to it, but could they have also changed each year

17   about your objectives?

18       A.    Some could, but they would be along the lines

19   of I'm working on project A this year and next year I'm

20   working on project B.   We would have completed the

21   project with whatever the goals for the year were in

22   terms of what the projects were for DuPont.   One of the

23   years would have said complete refresher DuPont network.

24   Another one would have said remote access services for

Ashby A. Lincoln, III

1    entire DuPont globally.  But they are the same type

2    things.  That job was engineering.

3              So to be specific on these goals, these

4    team objectives would have been only customized according

5    to precisely what we were working on that year, but they

6    were the same type things.

7        Q.    Same type things, A and B, but you would have

8    had to go about it differently in accomplishing those

9    goals?

10       A.    No.  They are the same type things.  Network

11   Engineering Services is a very, very specific function.

12   We handle networks for Computer Sciences Corporation.

13   It's essentially we provide the highways that your car is

14   traveling on.  We have to make sure those highways are

15   sufficient to handle that traffic.  You can look at it

16   that way.  So every project we worked on, we're

17   essentially making sure that we had the capacity to

18   handle these in the DuPont account in terms of usage by

19   all our employees.

20       Q.    The DuPont client had different needs every

21   year?

22       A.    If they were going to use DuPont performance

23   coatings, as an example, they may be creating new paint

24   colors and there may be a lot of chemical transactions



Ashby A. Lincoln, III                                726

1    being passed back and forth.  We had to make sure there

2    was capacity to do that.

3              In the legal profession, the same thing.

4    We had to make sure that the attorneys who are handling

5    all the lawsuits that they were participating in were

6    able to handle that traffic.  The cases today with

7    financial systems that comes from Falls Church to Newark,

8    we have to make sure there's the capacity to do that.

9    You're located in Falls Church, so you know the traffic

10   issues we have been having, right?

11        Q.    I have encountered a few.

12              What you do every year would also depend

13   utmost primarily on the client.  If the client's needs

14   have changed, then CSC would have to adapt to bring the

15   proper --

16        A.    That is correct.  We have to customize or

17   create the capacity to handle the needs that -- we had

18   SLAs, service level agreements, that would tell us what

19   we had today in order to keep them happy.

20        Q.    So these could change.

21        A.    Well, yeah, but when you're talking about

22   something like an SLA that's contractually included, it

23   doesn't change.  You please your DuPont customer, yes.

24   That means you're meeting the SLAs.

Ashby A. Lincoln, III                                727

1      Q.    I see that under "Individual" for "Customer

2    satisfaction to the highest degree possible."

3      A.    That is correct.

4      Q.    That's something that may not change all the

5    time.  But, for instance, No. 1 that says under "Team,"

6    "Provide New Technical Statement of Direction on a

7    monthly basis."  I'm not sure what the "new" means, but

8    it may be a new project that you're working on?

9      A.    That would mean that we were looking at

10   industry offerings, we were analyzing what the industry

11   had to offer, new service offerings, new tools, new

12   capabilities, new functionality, and we were charged with

13   doing that research and giving a report to DuPont monthly

14   on what we had seen and what we would recommend be

15   deployed to their environment.  And they could say yes or

16   no to that or thank you very much.

17     Q.    How about the weighting of these averages here?

18   I'm still under "Team and Individual Objectives."  Could

19   that have changed?

20     A.    Yes, that could have changed.

21     Q.    Going up to the financial objectives, "EPS,"

22   "Cost Budget," and "Cost Budget," it looks like under

23   "Measure," could those also have changed?

24     A.    Yes.  What you're looking at there, the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Ashby A. Lincoln, III                                728

1    earnings per share was a projection at the time this

2    document was put together.  At the time the budget was

3    put together for the year, the budgets are put together

4    starting in about November/December for the following

5    year and published about this time of year.  And that

6    will be for the next year.  That would include what we

7    think the earnings per share would be.  That's what this

8    number would be.

9             The regional Americas budget you see,

10   $1.443.2 million, would have been a budget number that

11   would have been part of the budget projection for the

12   year.  And the global number that you are seeing would be

13   a global number that would be supplied.

14             Now, as the accounting department does the

15   quarterly earnings, they would track that and at the end

16   of the year, if we exceeded those three categories, then

17   I would be eligible for 100 percent of the bonus.

18        Q.    But it could change?

19        A.    Sure, it could change, but it -- if we didn't

20   meet one of these, then that percentage would go down.

21   But the percentage was consistent.  If you met the three

22   criteria, that line there, that was 100 percent of the

23   budget.  Those three things, I never knew them to ever

24   change.

Ashby A. Lincoln, III                                                729

1       Q.    When you said "those three things," I want to
2   be sure.    Under the "Description" column --
3       A.    Yes.
4       Q.    -- you see in the "Measure" there, there's sort
5   of an upside-down triangle?
6       A.    Yes.
7       Q.    What does that triangle do?
8       A.    You see the "Cost Budget" by "2," that's a
9   dropdown.    And the reason you see cost budget 2 and 3 is
10  because the dropdown was the same for each of those and
11  "Cost Budget" was selected.
12      Q.    But if you clicked on that icon, it would drop
13  down and give you more options of what measure you could
14  put in there?
15      A.    That is correct.    I don't personally know of
16  those ever changing.    They could, but I don't know that
17  they ever did.
18      Q.    Could have been something like operating income
19  or margin?
20      A.    It could have.    I'm sure it was used on
21  different accounts different ways.    I'm only familiar
22  with what was done on the DuPont account.    I'm only
23  familiar with what was done on the network engineering
24  side of the DuPont account.    I don't know what would have

Ashby A. Lincoln, III                                         730

1    been done with the SDM organization or any other part of

2    the DuPont account.

3        Q.    Your supervisor gave you this preliminary

4    worksheet, correct?

5        A.    Yes, that is correct.

6        Q.    What happened to it after?  Did he give it to

7    you to hold onto?

8        A.    He held onto it.  I have a copy of it for

9    whatever reason.  Then at the end of the year, when I got

10   the award, this would have been filled out.  I did not

11   receive that.

12       Q.    You mean what would have been filled out here?

13       A.    Actual.

14       Q.    After the fiscal year was completed, the actual

15   would have been filled out.

16       A.    Right.  The actual, the achievement percentage,

17   the payout percentage would have been completed and I

18   would have been eligible in that particular line for

19   $3,980.  You may have that information.  I don't

20   personally have that information on a form like this.

21       Q.    You mean the completed worksheet?

22       A.    That's correct.

23       Q.    You were never provided the completed

24   worksheet?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    No.

2    Q.    How were you told what your AMIP bonus would

3  be?

4    A.    Showed up in my paycheck.

5    Q.    Did anyone tell you what the makeup of the AMIP

6  bonus was or what the actuals were?

7    A.    He didn't come back and tell me that he changed

8  or didn't change what the criteria was.  This was the

9  criteria that we had established.  I don't know how he

10  could have changed that without consulting me.

11    Q.    Until you received this preliminary worksheet,

12  you didn't know how your AMIP would be calculated?

13    A.    I didn't know how it would be calculated, but I

14  knew what the percentage would be if the criteria were

15  met.

16    Q.    What the percentage would be placed in the

17  preliminary worksheet or what the percentage would be

18  after the fiscal year ended?

19    A.    On the form it says "Maximum Bonus Potential"

20  up in the upper right-hand column.  I knew that.

21    Q.    That represents the 25 percent.  Is that what

22  you're pointing to?

23    A.    It represents 20 percent.

24    Q.    I'm sorry.  20 percent of your salary.

Ashby A. Lincoln, III                                                732

1       A.      That's right.

2       Q.      I was looking at "Team & Individual,"

3  25 percent.

4       A.      That 25 percent "Team & Individual Goals" goes

5  with the bottom part of the form under "Team and

6  Individual Objectives."

7       Q.      But you didn't know what your maximum AMIP

8  percentage would be until the close of the fiscal year or

9  even before that until you even received this Exhibit 45.

10      A.      I always knew it was 20 percent.

11      Q.      You knew that that was what you could get up

12  to.  That was what you were eligible for, 20 percent of

13  your salary.

14      A.      That's correct.

15      Q.      But that wasn't the maximum.  Excuse me.

16  That's the maximum of what you could get.  Is that what

17  you're saying?

18      A.      That is correct.  That's the maximum I could

19  get, and we always got the maximum.

20      Q.      You always achieved all of your goals?

21      A.      We had 25 percent chance of achieving the goals

22  on the bottom of the form which we met.  The top part,

23  75 percent, which were the financial objectives of the

24  company of which I had no control over, we met those

Ashby A. Lincoln, III                                    733

1    goals; therefore, we got 75 percent of the bonus.  And

2    that was defined in that section of the performance

3    evaluation.

4              The point I'm trying to make is that we

5    always -- I participated in creating the budgets for the

6    fiscal year.  We included the AMIP bonus amounts in the

7    budget.  People who are eligible for an AMIP bonus today

8    for next year, it's being put in the budget now for next

9    year because all budgets are charged to the individual

10   line of service.

11             So if I receive a bonus, it's in my budget.

12   I control the budget -- I control the $30 million budget

13   today.  The bonuses that are going to be received by

14   employees next year are in the bonus today -- in the

15   budget today.

16   Q.    They're budgeting for an AMIP bonus, but it

17   doesn't mean that the employee's guaranteed that bonus.

18   A.    I understand.

19             MR. WILSON:  Object to the form.

20   Q.    Yes or no?

21   A.    No, I don't believe that.  I believe that the

22   time we create the budget we are believing that we're

23   going to pay that budget out.  When we created the AMIP

24   budget amounts for people who reported to me at the time,

Ashby A. Lincoln, III                                    734

1    we fully expected to pay those budgets out and, in fact,

2    I always did.  Before my budget was stopped the year or

3    two before, a change was made to the plan that said

4    people who do not manage people will no longer be

5    eligible for AMIP, and we told the people that at the day

6    they got their bonus.  We told them they would not get

7    another bonus because they were no longer eligible unless

8    they managed people.

9                I had that kind of information.

10        Q.     Let me just parse that out a little bit.  Just

11   backing up to your last statement, you said that you saw

12   an AMIP plan?

13        A.     I'm not sure I understand the question.

14                MR. RAIMO:  Could you repeat his last

15   response to me?

16                (The reporter read back as instructed.)

17   BY MR. RAIMO:

18        Q.     Mr. Lincoln, you mentioned that there were

19   changes made to the plan in your last answer, and what

20   I'm asking you is what plan are you referring to there?

21        A.     When we were called into a meeting to get the

22   information to give the bonus to the people who reported

23   directly to us, simply tell us that the AMIP bonuses were

24   now ready to be paid, please inform these employees that

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Ashby A. Lincoln, III                                735

1   they are getting this bonus this year, that this is the

2   last AMIP bonus they're going to get because the criteria

3   has changed.

4       Q.    When was this meeting?

5       A.    This meeting would have been in May of a year.

6   I can't tell you what year it was.

7       Q.    You're saying there was a meeting among whom?

8       A.    We were called into a meeting --

9       Q.    Who called you into the meeting?

10      A.    My manager, Carlos Rodriguez, called me into a

11  meeting, called a group of us into a meeting who had

12  people reporting to us who were receiving an AMIP bonus.

13      Q.    You were called by your manager to talk to you

14  about people who were reporting to you who had received

15  an AMIP bonus?

16      A.    Yes.

17      Q.    What did he tell you in that meeting?

18      A.    He told us that this would be the last bonus

19  that these people would be receiving because they did not

20  manage people.

21      Q.    When was this particular meeting?  I know you

22  said --

23      A.    Are you asking me for what year that happened?

24  I cannot recall.  I can give you a guess.

1      Q.      Yes.

2      A.      2002.  I subsequently met two or three people

3  that were getting the bonus and told them that they would

4  not get the bonus anymore because they didn't manage

5  people; the criteria had changed.

6      Q.      The criteria had changed in May?

7      A.      That's when I was informed.

8      Q.      That's when you were informed about the

9  criteria.

10     A.      Yes.

11     Q.      When did the change go into effect?

12     A.      We told them it was effective immediately.

13     Q.      So those employees were, then, no longer

14  eligible for AMIP?

15     A.      That is correct.

16     Q.      Was their AMIP prorated?

17     A.      I don't know.

18     Q.      When you managed employees who were eligible

19  for AMIP, did you go through the worksheet process?

20     A.      Yes.  Yes.

21     Q.      When would you give these employees, these

22  AMIP-eligible employees, a preliminary worksheet?

23     A.      In October, early November of the year.

24     Q.      When would they receive their completed

Ashby A. Lincoln, III                          737

1   worksheet?

2        A.    They wouldn't receive a completed worksheet.

3        Q.    Why was that?

4        A.    I don't know.  I never saw -- I have never ever

5   seen a completed worksheet.  I think it's probably

6   because it's called a worksheet.  I was never ever given

7   a completed worksheet on any of my employees.

8        Q.    But did you ever receive a completed worksheet?

9        A.    No.  In fact, I never had the information on

10  exactly what bonus any of those employees got, either.

11       Q.    As a manager, you weren't informed of what they

12  received as an AMIP bonus.

13       A.    No.

14       Q.    We may return to this.

15            I know I was asking you about any other

16  documents you were reviewing for the deposition in this

17  case here.  Were there any others besides this document,

18  Exhibit 45, the pay stubs, and I believe you said --

19       A.    Offer letter.

20       Q.    -- an offer letter.  Are there any other

21  documents in addition to that?

22       A.    I don't believe so.  None that come to mind

23  right now.

24       Q.    I know you said you met with your attorney,

Ashby A. Lincoln, III

738

1  Tim Wilson.  Was there anyone there, anyone else at the

2  meeting with you and Tim?

3      A.    No.

4      Q.    Other than Mr. Wilson, did you speak with

5  anyone else regarding your testimony today?

6      A.    No.

7      Q.    Have you been known by any other name besides

8  Ashby Lincoln?

9      A.    No.

10     Q.    Could I have your Social Security number?

11     A.    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.

12     Q.    Your date and place of birth?

13     A.    November 3rd, 1942, Lynchburg, Virginia.

14     Q.    Your current residence?

15     A.    Lorton, Virginia.

16     Q.    Phone number?

17     A.    703-541-2306.

18     Q.    How long have you lived at that residence?

19     A.    Two years.

20     Q.    Anyone else live with you today there?

21     A.    Yes.

22     Q.    Who?

23     A.    My fiance'.

24     Q.    Have you ever been married?

Ashby A. Lincoln, III                                    739

1      A.    Yes.

2      Q.    Do you have any children?

3      A.    Yes.

4      Q.    How many?

5      A.    Two.

6      Q.    Have you ever been arrested?

7      A.    No.

8      Q.    Any conviction or felony or misdemeanor?

9      A.    I had a herd of speeding tickets.

10     Q.    Reckless driving?

11     A.    No.  Just speeding.  Well, no.  When I was

12     17 years old, I lost my license for six months.  Running

13     from the police at the time.

14     Q.    Running from the police?

15     A.    Back when I was 17, it is different than it is

16     today.  So I lost my license for six months.

17     Q.    Anything else happen to you then?

18     A.    No.

19     Q.    Why were you running from the police?

20     A.    You want to be on the record with this answer?

21     Q.    Yes.

22     A.    Okay.  I was born out in the country.  That's

23     what we did back then.  Seventeen years old.  And the

24     state trooper would see me the next day and say, "One of

Ashby A. Lincoln, III                                    740

1    these days I am going to catch you," but if I got home,

2    they wouldn't come in the driveway and get you.

3              It was just different then.  Today it's a

4    very serious thing.  Back then it was no big deal.

5        Q.    Did you get your license back?

6        A.    Oh, yes.

7        Q.    Did you ever serve in the military?

8        A.    Yes.

9        Q.    What branch?

10       A.    Air Force.

11       Q.    What dates?

12       A.    June of '62 until October '66.

13       Q.    What rank did you have?

14       A.    E-5.

15       Q.    What would that equate to?

16       A.    Staff sergeant.

17       Q.    What duties did you perform?

18       A.    I worked in the officer records section,

19   division.  Stationed in South Carolina, Shaw Air Force

20   Base.

21       Q.    What type of discharge did you have?

22       A.    An honorable discharge.

23       Q.    When did you first contact an attorney to

24   handle your case against CSC?

Ashby A. Lincoln, III                        741

1       A.      I was actually contacted.

2       Q.      By whom?

3       A.      I received a letter asking me whether I want to

4  participate, and I did.

5       Q.      Do you know who authored the letter?

6       A.      No.  Who authored.  It came from here.  It came

7  from his law firm, but I don't know who started the

8  lawsuit.

9       Q.      The letter came from Mr. Wilson's law firm to

10  you?

11      A.      Yes.  As I recall.

12      Q.      Was there a cover letter to the letter?

13      A.      Yes, I'm sure there was.

14      Q.      Mr. Lincoln, I'm showing you what is marked

15  Exhibit 4.

16      A.      Yes.  This could have been it.

17      Q.      Take your time and look at it.

18      A.      This could be the letter that I received,

19  although I don't have any recollection of it.

20      Q.      Do you remember when you received the letter?

21      A.      It says December 5th, 2003, so I would assume

22  that would be about right.

23      Q.      Late 2003?

24      A.      Could have been.  I was living when I received

1    it -- where was I living at the time?  I was in Virginia

2    by that time, by the time I received that letter.  I'm

3    not sure I got that letter.  I know that there was --

4    there's been a problem with me getting the documentation

5    timely or getting the information timely.  So that may

6    not have caught up with me in Delaware.  Says

7    December 3rd, but I was gone from Delaware by that time.

8              So I'm not sure that anyone would have had

9    my current address.  So I'm not sure how I would have

10   gotten that letter.

11       Q.    Do you know how they got your address?

12       A.    No.

13       Q.    But you're saying this letter came from someone

14   in Mr. Wilson's office?

15       A.    I'm not sure of that.  I keep my information on

16   the CSC directory current which a lot of people don't do,

17   but my home address is on there.  So it could have been

18   pulled up by one of the other people involved and found

19   the address.  But I don't recall.  I just don't recall

20   that letter.

21       Q.    This letter acknowledges that CSC had the right

22   to change employees' salaries and bonuses at any time

23   because CSC employees are at-will employees.  Correct?

24   It says in the second paragraph, "Although we were hoping

Ashby A. Lincoln, III                                    743

1    that the Attorneys would find that the removal/reduction

2    of the AMIP participation was in violation of our letters

3    of employment, they indicated to us that Delaware's

4    Employment at Will provisions strongly favor a

5    corporation's right to set salary, bonus, etc. at any

6    time to remain competitive."

7        A.    That's what it says.

8        Q.    The letter simply argues that CSC can't change

9    employee salaries and bonuses retroactively, correct?

10       A.    That's what it says, correct.

11       Q.    You're an at-will employee at CSC, correct?

12       A.    That's correct.

13       Q.    You're not claiming that CSC didn't have the

14   right to change your AMIP bonus at any time, correct?

15                MR. WILSON:  Object to form.  You can

16   answer.

17       A.    At any time?  I'm sure that they could change

18   the terms of the AMIP plan.  I'm not convinced that they

19   can change it retroactively.  I do believe they have a

20   right to run their business and change the plan

21   accordingly, but I do believe there's an obligation to

22   inform the participants that that change is taking place

23   currently, not retroactively.  And I do believe the bonus

24   is earned based on my participation and putting the

1    figures in the budgets and my experience in dealing with

2    people who got bonuses and when they were taken off.

3    This is different.   This was handled totally differently.

4    It was retroactive.

5        Q.    So you're saying your claim only entails the

6    beginning of the fiscal year, April 1st, 2003, through

7    September of 2003.   Some period of time you were notified

8    of the change in 2003.   That time frame of bonus prorated

9    bonus, that's what your claim is about?

10       A.    Yes.

11       Q.    But you do understand that CSC has the right to

12   make a change to its AMIP bonus as a business judgment in

13   order to remain competitive in the marketplace, seek

14   revenue to make profit?

15       A.    Absolutely.

16       Q.    Your annual performance reviews have nothing to

17   do with this case, do they?

18       A.    Not directly they don't.   However, if I had

19   been rated a 4, I would not have been eligible for the

20   bonus, period.   I would have gotten zero.   It does have a

21   play.

22       Q.    How do you know that?   How do you know if you

23   were rated a 4, you wouldn't have been eligible?

24       A.    Because I participated in people -- I had that

1    criteria when people worked for me got the bonus.

2        Q.     Where is that criteria set out?

3        A.     I have to assume it's part of the AMIP plan

4    because I was told that that criteria was --

5        Q.     You have never seen an AMIP plan?

6        A.     No.

7        Q.     But directly your annual performance reviews

8    have nothing to do with this case?

9        A.     That's correct.

10       Q.     You believe that, if you were rated a 4, you

11   would have been ineligible to participate in the plan?

12       A.     Correct.

13       Q.     Have any lawsuits ever been filed against you?

14       A.     No.

15       Q.     Have you ever filed any other lawsuits --

16       A.     No.

17       Q.     -- apart from this one?

18       A.     No.

19       Q.     Have you ever been a witness in a lawsuit?

20       A.     No.

21       Q.     Arbitration?

22       A.     No.

23       Q.     Administrative hearing?

24       A.     No.

Ashby A. Lincoln, III

746

1    Q.    Have you ever filed for bankruptcy?

2    A.    No.

3    Q.    Unemployment?

4    A.    Yes.

5    Q.    When?

6    A.    When I was laid off by CSC.

7    Q.    Could you give me those dates?

8    A.    One month after I received my letter that I was

9    no longer eligible for a bonus anymore, I was RIF'd.

10    Q.    Do you know approximately when that was?

11    A.    November 8, 2003.  And I moved to Falls Church

12    and went back to work for CSC January 26, I believe,

13    2004.

14    Q.    Did you give any testimony at that time for

15    unemployment?

16    A.    No.

17    Q.    How much income did you receive from

18    unemployment compensation?

19    A.    Couple thousand dollars.

20    Q.    Total?

21    A.    Yes.  In around $2,000.  Something like that.

22    Right at $2,000.

23    Q.    Have you ever made a workers' comp. claim?

24    A.    No.

Ashby A. Lincoln, III                747

1    Q.    Workers' compensation benefits or insurance?

2    A.    No.

3    Q.    Have you ever been interviewed or deposed by an

4 attorney in connection with any matter or any lawsuit?

5    A.    No.

6    Q.    I have asked you that before, I believe.

7        Do you have any relatives that work at CSC?

8    A.    No.

9    Q.    I just want to get background on your

10 education.  I guess you could start with high school, if

11 you will.

12    A.    I graduated from Augusta Military Academy in

13 Fort Defiance, Virginia, 1961.  Spent the next five years

14 in the Air Force.  Attended University of South Carolina

15 and American University.  Did not graduate; do not have a

16 degree.

17    Q.    What were you studying at South Carolina?

18    A.    I was studying accounting and I studied

19 history.

20    Q.    That was right after the Air Force?

21    A.    That was still in the Air Force.

22    Q.    You were still in the Air Force?

23    A.    Yes.

24    Q.    When you were discharged from the Air Force --

Ashby A. Lincoln, III                                    748

1      A.    I went to work for First Colony Life Insurance

2  Company in Lynchburg, Virginia.

3      Q.    I'm sorry.  While you were in the Air Force,

4  you also attended American University?

5      A.    Yes.

6      Q.    You didn't complete a degree?

7      A.    No.

8      Q.    You were saying after you left the Air Force,

9  your employer was --

10     A.    First Colony Life Insurance Company.

11     Q.    In addition to your college education, did you

12  receive any other training or specialty courses?

13     A.    No.

14     Q.    Have you ever received any professional or

15  work-related certifications?

16     A.    No.

17     Q.    Immediately before you started working for CSC,

18  where did you work?

19     A.    I was in business for myself.  I retired in

20  1993.  1993, that's correct.  Went into business for

21  myself.  Then that didn't work out, so I went to work for

22  CSC in '98.

23     Q.    What was your business?

24     A.    Restaurant.  Sports bars.  Something I wanted

1  to try.  I don't advise it.

2      Q.    Where was the venture?

3      A.    In Lynchburg, Virginia.

4      Q.    You said you retired.  Where did you retire

5  from?

6      A.    First Colony Life Insurance Company.

7      Q.    You were there --

8      A.    No.  You want a work history?

9      Q.    Yes.

10     A.    I started with First Colony Life as a

11 programmer trainee.  I was the first one they had.  I

12 stayed there for seven years, left there, went to work

13 for EDS.

14         Stayed with EDS for two years and in

15 January 1974 I moved to Westfield Center, Ohio, and went

16 to work for Westfield Companies, which was also

17 insurance.  I was manager of the life insurance

18 operations.  Stayed there for 10 years.

19         I left there in July of 1984 and went to

20 Bankers National Life Insurance Company in New Jersey as

21 vice president and chief information officer.  We were

22 purchased by Conseco, large holding company out of

23 Indianapolis.  I was senior vice president and CIO for

24 Conseco.

Ashby A. Lincoln, III

1          In about 1987, after being gone from First

2    Colony for 19 years, they contacted me and asked me to

3    come back to First Colony and be their CIO.  My dad was

4    dying at the time and I did that.  And I went back and

5    stayed there for another four years.  Hated it, so I

6    retired.  Because Conseco was the most fun job I ever

7    had.  So I retired.  And then you already heard the rest

8    of the history.

9        Q.    At any of these jobs prior to going into the

10   restaurant business, were you eligible for a bonus plan?

11       A.    Yes.

12       Q.    In which jobs?

13       A.    From Westfield all the way through till the

14   time I retired, I got a bonus every year.

15       Q.    So you didn't receive one when you were with

16   EDS?

17       A.    No.

18       Q.    You weren't when you were with --

19       A.    First Colony the first time.  No bonuses up

20   through EDS.  When I went to work for Westfield, then I

21   had a bonus every year from that point on.

22       Q.    Was that three different employers you had

23   bonus plans?

24       A.    Westfield.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Ashby A. Lincoln, III                          751

1    Q.    Bankers National and --

2    A.    Westfield, Bankers National/Conseco, and First

3    Colony.

4    Q.    How did the First Colony bonus plan work?  Was

5    it an annual plan?

6    A.    Yes.

7    Q.    Did you ever see the plan?

8    A.    No.

9    Q.    How were the bonuses calculated?

10   A.    There was a percentage.  If you met the

11   numbers, we got the bonus.  The bonus was about

12   20 percent of the annual salary.

13   Q.    Who was eligible for that bonus?

14   A.    Officers of the company.

15   Q.    Only officers, senior management?

16   A.    No.  Officers.

17   Q.    Not even senior management, just officers of

18   the corporation.

19   A.    That's correct.

20   Q.    You knew you were eligible for that bonus

21   because you were an officer of the company, you were the

22   CIO?

23   A.    Correct.

24   Q.    How much was your last bonus?

Ashby A. Lincoln, III                                    752

1        A.      First Colony?

2        Q.      First Colony.

3        A.      Twenty percent.

4        Q.      What was your salary?

5        A.      One hundred thirty-four thousand dollars.

6        Q.      You received the full bonus?

7        A.      Yes.   That particular year I got the highest

8   rating in the company.   That was less mysterious.   We

9   always knew what those bonuses were going to be.

10       Q.      Bankers National, how was that bonus

11  calculated?

12       A.      I don't know how it was calculated.

13       Q.      But you received --

14       A.      Numerical bonus.   I think making $75,000, I

15  believe, and I got a $10,000 bonus.   In the two-year

16  period with Conseco, I got a $65,000 bonus from Conseco.

17       Q.      With Conseco what was the eligibility

18  requirement there?

19       A.      Same thing.   Officers.   CIO.   Conseco at the

20  time was just making spectacular numbers.   Plus stock

21  options.

22       Q.      You don't know how it was calculated?

23       A.      I don't think it was calculated at Conseco.

24  The board would just meet and decide what the bonus was

Ashby A. Lincoln, III                                      753

1   going to be.

2       Q.    Was that on an annual basis?

3       A.    Yes.

4       Q.    After the end of, say, their fiscal year?

5       A.    Which was December 31st. Bankers, they

6   actually did the bonus in November because they knew what

7   the numbers were going to be by that time. They had

8   already calculated the numbers.

9       Q.    Before the end of their fiscal year?

10      A.    Yes.

11      Q.    They must have estimated --

12      A.    They knew what the numbers were going to be.

13  Only six weeks left in the year. In the insurance

14  industry, you pretty much know what your revenue is going

15  to be. You can reserve what you think your liability is

16  going to be and you can go from there.

17      Q.    Because of premiums being paid into the

18  insurance company?

19      A.    That's correct. You knew what they were going

20  to be.

21      Q.    Doesn't work like a normal operating company?

22      A.    That's right.

23      Q.    A little different.

24            Mr. Lincoln, when did you start working at

W&F

WILCOX & FETZER LTD.

Registered Professional Reporters

1   CSC?

2        A.      October '98.

3        Q.      How did you get the position at CSC?

4        A.      When I had been in the insurance industry, we

5   used Continuum Company software packages and I knew

6   people at CSC, so I called one, told him I was looking

7   for a job.  That's how I got it.

8        Q.      Where was this?

9        A.      Austin, Texas.

10       Q.      What were you doing?

11       A.      Senior manager, property and casualty

12   insurance.

13       Q.      What business unit was that?

14       A.      Financial Services Group.

15       Q.      FSG?

16       A.      FSG.

17       Q.      You mentioned you were a senior manager there?

18       A.      Yes.

19       Q.      What were your duties there?

20       A.      Installing property and casualty systems for

21   insurance companies.

22       Q.      Who was your supervisor?

23       A.      John McCormick.

24       Q.      What was your SO level there as a senior

1    manager?

2         A.    6.  06.

3         Q.    What was your starting salary?

4         A.    Eighty-five thousand, I believe.

5              (Deposition Exhibit No. 46 was marked for

6    identification.)

7    BY MR. RAIMO:

8         Q.    Mr. Lincoln, the court reporter just handed you

9    Exhibit 46.  Do you recognize this document?

10        A.    Yes.

11        Q.    What is it?

12        A.    It's the offer letter dated September the 18th

13   from John McCormick, Computer Scientist.

14        Q.    The letter offers you a specific salary, right?

15        A.    Yes.

16        Q.    You were not made eligible to participate in

17   CSC's Management Incentive Program in this letter,

18   correct?

19        A.    That is correct.

20        Q.    When did you first become eligible to

21   participate in AMIP?

22        A.    When I went to the DuPont account.

23        Q.    When was that?

24        A.    August or September of 2000.  I believe it was

Ashby A. Lincoln, III                                    756

1    2000.  That's about right.

2         Q.    Was that an assignment or a transfer to the

3    DuPont account from your FSG position?

4         A.    That was a transfer.

5         Q.    Was that transfer originated by you or was it

6    done by CSC?

7         A.    Done by me.

8         Q.    Why did you transfer?

9         A.    Wanted to get back on the East Coast.  I don't

10   like Austin, Texas.

11        Q.    When you transferred to Newark, Delaware, who

12   was your supervisor?

13        A.    Carlos Rodriguez.

14        Q.    Do you know why you were not eligible for AMIP

15   when you were at FSG?

16        A.    It was never discussed when I interviewed for

17   the job, so I never knew of the bonus then.

18        Q.    Did you ever ask?

19        A.    No.

20             (Deposition Exhibit No. 47 was marked for

21   identification.)

22   BY MR. RAIMO:

23        Q.    Mr. Lincoln, the court reporter has handed you

24   Exhibit 47.  Do you recognize this document?

Ashby A. Lincoln, III                                    757

1      A.    Yes.

2      Q.    Can you tell me what it is?

3      A.    It's an offer letter from the Chemical Group of

4   CSC for an opportunity in Delaware supporting the DuPont

5   account.

6      Q.    This letter offers you a specific salary,

7   right?

8      A.    That is correct.

9      Q.    It mentions what your biweekly salary will be,

10  correct?

11     A.    That is correct.

12     Q.    You were still an employee at will at this

13  time, correct?

14     A.    Correct.

15     Q.    The text specifically states in this letter

16  that your participation in the AMIP program will be for

17  fiscal year ending March 31st, 2001, correct?

18     A.    Correct.

19     Q.    It doesn't say anything here about your

20  guaranteed eligibility going forward, correct?

21          MR. WILSON:  Object to form.

22     A.    No.

23     Q.    The letter doesn't mention anything about your

24  participation in AMIP after the close of fiscal year

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0775

Ashby A. Lincoln, III                                    758

1    ending 2002, correct?

2         A.    Correct.

3         Q.    The letter states that AMIP bonuses are

4    generally made payable within 45 days of the close of the

5    fiscal year, correct?

6         A.    That is correct.

7         Q.    You never knew how AMIP bonuses would be

8    calculated until later in the fiscal year, right, after

9    the close of the fiscal year?

10        A.    I'm not sure I understand the question.

11        Q.    You wouldn't know what your AMIP bonus would be

12   until after the close of the fiscal year, correct?

13        A.    That is correct.

14        Q.    You were laid off during fiscal year 2004,

15   correct?

16        A.    Correct.

17        Q.    You mentioned that was November 18, 2003?

18        A.    November 6 or 8, something like that.

19        Q.    Do you know why you were laid off?

20        A.    Yes.  Because they were reducing staff because

21   of financial considerations.

22        Q.    CSC was having a poor financial --

23        A.    No, they weren't having anything poor at all.

24   That's just what the letter stated that the reason was.

1    We were getting to have another action and stated

2    earnings are a third higher than the Wall Street

3    projections.  So those layoffs off the DuPont account

4    were not related to the profitability of the company.

5    They may have wanted to reduce costs to get the ROI up,

6    but there were no financial issues at the time.

7        Q.    They were performing work for a DuPont client,

8    correct?

9        A.    Correct.

10       Q.    To perform work at a profitable rate for a

11   client, you want to reduce costs, correct?

12       A.    You want to contain costs.

13       Q.    What do you mean by "contain costs"?

14       A.    You certainly don't want -- you want to perform

15   as budgeted.  In the Chemical Group context, they were

16   constantly trimming budgets and increasing the ROI.

17       Q.    So CSC was making decisions in order to

18   contain --

19       A.    They were squeezing --

20       Q.    Let me finish my question so we don't talk over

21   each other.

22             -- contain costs and continue to operate

23   the business and make legitimate business reasons in

24   order to obtain profit.  Is that correct?

Ashby A. Lincoln, III

760

1    A.    You could say that.

2    Q.    Were others laid off, as well, when you were

3  laid off?

4    A.    Yes.

5    Q.    How many?

6    A.    Probably half a dozen.  From the time I got to

7  the DuPont account in 2001, the numbers went from about

8  300 plus down to about 100.  So there were probably half

9  a dozen of these reductions over the course of time.

10    Q.    Were you rehired?

11    A.    Yes.

12    Q.    When?

13    A.    January 2004 at Falls Church.

14    Q.    To what position?

15    A.    Manager of Network Engineering Services.

16    Q.    What group was that?

17    A.    Federal GIS now.

18    Q.    Were you hired into CSC's federal sector?

19    A.    Yes.

20    Q.    Who is your supervisor currently?

21    A.    Patricia Keener.  Pat Keener.

22    Q.    Were you laid off at any other time during your

23  CSC career?

24    A.    No.

Ashby A. Lincoln, III                          761

1      Q.    Did you participate in any orientations when

2  you first began working at CSC?

3      A.    When I first went to work for CSC, yes, I did.

4      Q.    When was that?

5      A.    October of 1998.

6      Q.    Who conducted that orientation?

7      A.    It was done by a number of people in Austin.

8  It was a three-day introduction to CSC policies and

9  procedures.

10     Q.    Do you contend that any of the documents you

11 received at that orientation support your claim to

12 entitlement of a bonus?

13     A.    No.   That was never the purpose of that

14 orientation.

15     Q.    You weren't eligible for a bonus at that time.

16     A.    That's correct.

17     Q.    Did you go through another orientation when you

18 were rehired at CSC?

19     A.    No.   Let me correct that.   There was an

20 hour-long phone call to go over the handbook, the

21 corporate handbook.

22     Q.    Do you know who conducted that phone call?

23     A.    No, I don't recall.   It was somebody -- I don't

24 know where they were.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0779

Ashby A. Lincoln, III

762

1    Q.    Interactive phone call or just a recording?

2    A.    It was an interactive phone call.

3    Q.    Were AMIP bonuses discussed?

4    A.    No.  It was just an orientation of CSC policies

5    and procedures, tell you CSC sources.  They gave you

6    direction on how to interact with HR, it would explain

7    the medical benefits, that kind of thing.  But it didn't

8    go into any of the customization-type things that would

9    have been outside of that umbrella.

10    Q.    You were rehired in January of 2004, correct?

11    A.    Correct.

12    Q.    During your orientation nothing was discussed

13    regarding AMIP bonuses?

14    A.    No.

15    Q.    You're currently in the AMIP bonus program now?

16    A.    No.

17    Q.    You're not?

18    A.    It's a different bonus program.

19    Q.    What is that?

20    A.    It's referenced in the letter that I have

21    taking me off AMIP bonus, it mentions in that letter that

22    you can be eligible for a $10,000 or $5,000 bonus at the

23    discretion of somebody.  And I am currently receiving

24    that bonus, but I did not receive that bonus the last

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0780

1    year I was at DuPont.

2        Q.    CSC you mean?

3        A.    Yes.  The gentleman that gave me the letter,

4    Tom Saienni, apparently had the option of giving me the

5    bonus, a new bonus, that's outlined in the letter which

6    does not cover the specifics, but he did not do that.

7        Q.    Is that a discretionary bonus, the new bonus?

8        A.    Right.

9        Q.    You were notified that you were no longer

10   eligible for the AMIP bonus in September of 2003,

11   correct?

12       A.    Yes.

13       Q.    Could you say the person's name again?

14       A.    Tom Saienni.

15       Q.    How do you spell that?

16       A.    S-a-i-e-n-n-i.  Something like that.

17       Q.    You continued to perform your job after you

18   learned you were not eligible for an AMIP bonus in

19   FY '04, correct?

20       A.    Right.

21       Q.    You continued to fulfill your job expectations

22   and duties, right?

23       A.    Yes.  Those didn't change.

24                    (Deposition Exhibit No. 48 was marked for



Ashby A. Lincoln, III

764

1    identification.)

2    BY MR. RAIMO:

3        Q.    Mr. Lincoln, the court reporter has provided

4    you with what's been marked Exhibit 48.    Could you tell

5    me what this document is?

6        A.    That is the letter that I received from

7    Tom Saienni that explained to me that I was no longer

8    eligible for the AMIP program retroactive back through

9    April the 1st.

10        Q.    But you were told in this letter also that you

11    were eligible to earn a discretionary bonus.

12        A.    That is correct.

13        Q.    That's what you mentioned before, the same

14    discretionary bonus we talked about a minute ago.

15        A.    That is correct.  In fact, when I got this

16    letter from Tom, he told me I would be getting that

17    bonus, and I didn't get it, so I called Tom and he said,

18    "Oh, no, I didn't recommend that bonus for anybody."

19        Q.    So you didn't receive any discretionary bonus

20    as of that year?

21        A.    No.  I expected to get that one, as well,

22    because he did tell me I was going to get it.

23            MR. RAIMO:  Could we go off the record?

24            (Discussion off the record.)

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Ashby A. Lincoln, III
765

1   BY MR. RAIMO:

2       Q.      Mr. Lincoln, do you know anyone at CSC who

3   received a prorated bonus?

4       A.      Yes.

5       Q.      Who was that?

6       A.      His name -- you want his name?

7       Q.      Yes.

8       A.      Hank Stoklosa, S-t-o-k-l-o-s-a.

9       Q.      Could you tell me why you know he received --

10      A.      He transferred from the Chemical Group to GIS

11  in Fort Worth and he received a prorated bonus based on

12  the number of months he was with Chemical Group for that

13  particular year.

14      Q.      When did that transfer occur?

15      A.      2001 probably.

16      Q.      He was eligible for AMIP at that time?

17      A.      Yes.

18      Q.      He was just doing an intracompany or

19  interbusiness unit, CSC transfer?

20      A.      Yes.

21      Q.      So he remained on AMIP, however, when he went

22  to GIS?

23      A.      No.   When he went to GIS, he was no longer

24  eligible for the AMIP bonus, so he received a prorated

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0783

Ashby A. Lincoln, III

766

1    bonus for the number of months he was on the Chemical

2    account before he transferred.

3         Q.    Do you know what SO level he was?

4         A.    He was a 5.  I believe he was a 5.

5         Q.    Do you know what position that is?

6         A.    He was an engineer, senior engineer.

7         Q.    Do you know why he transferred?

8         A.    He wanted to.

9         Q.    He initiated the transfer?

10        A.    Yes.  He knew the people down in Fort Worth

11   that were doing the things he was doing.  He did an awful

12   lot of work with them anyway, so he wanted to work with

13   them.  He didn't go to Fort Worth.  He just started

14   working with the people from Fort Worth.  He still stayed

15   in Delaware.

16        Q.    How do you know he received a prorated bonus?

17        A.    He worked for me.  I took care of it for him.

18        Q.    How did you do it?

19        A.    He contacted us saying he didn't get his bonus

20   and I went and checked on the eligibility rules and the

21   decision was made that, yes, absolutely, the right thing

22   to do is to give him the bonus, he earned it.

23        Q.    He checked the eligibility rules or you

24   checked?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0784