1        A.      I checked them.   He called and said he didn't

2    get it.

3        Q.      Where were these eligibility rules?

4        A.      I went to my management and said, "Hank is

5    calling me and said that he expects to get his AMIP

6    bonus.   What are the rules?   He said he worked on the

7    Chemical account for nine months.   He's entitled to nine

8    months of his AMIP, he will get it," and he got it.

9        Q.      You didn't look at the rules personally, you

10   called your boss?

11       A.      I went and saw my boss, I talked to my boss.

12   He picked the phone up while I was in his office and

13   talked to someone and said, "Make sure Hank gets put on

14   the bonus plan and gets his bonus for the nine months."

15       Q.      But both of you didn't look at any AMIP rules

16   or any AMIP plan?

17       A.      No.

18       Q.      Do you know who Hank called?

19       A.      Hank called me.   I don't know who my supervisor

20   called.

21       Q.      Anyone else?

22       A.      No.   That's the only one that I personally know

23   of now.

24       Q.      You stated that you managed employees who had

Ashby A. Lincoln, III

768

1   received AMIP bonuses, correct?

2       A.      Correct.

3       Q.      Have you ever removed anyone from AMIP

4   eligibility?

5       A.      No.

6       Q.      Could an employee be eligible for an AMIP bonus

7   at the same time as being eligible for a discretionary

8   bonus?

9       A.      No.

10      Q.      You couldn't receive an AMIP bonus and a

11  discretionary bonus?

12      A.      That's correct.  The rule was if the people

13  were receiving AMIP bonus, there was another

14  DuPont-specific bonus of about 3 percent and people who

15  were getting the AMIP bonus were not eligible for that

16  other bonus.  The rest of the employees were eligible for

17  the 3 percent.

18      Q.      Again, these rules, how did you know about this

19  rule?

20      A.      I just knew that rule existed and we would

21  budget for it.  I never have saw the rules, but I do know

22  that there was a guaranteed 3 percent bonus for

23  employees.  That was a guaranteed bonus.  I believe that

24  that 3 percent bonus is in the DuPont contract with CSC

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   that it had to be paid.  I believe it probably still

2   exists.

3        Q.    Is it a 3 percent salary increase or 3 percent

4   bonus?

5        A.    Bonus on the salary.

6        Q.    So it's not AMIP?

7        A.    It is not AMIP.  It's not an AMIP bonus.  I

8   don't recall what it was called.

9              MR. WILSON:  You're going to have to wait

10  until he finishes his questions.  It gets hard for her to

11  take it down if you're both talking at the same time.

12             THE WITNESS:  Okay.

13       Q.    Mr. Lincoln, if I could direct your attention

14  to Exhibit 48.

15       A.    Okay.

16       Q.    After you received this letter, you knew you

17  were not going to get an AMIP bonus, correct?

18       A.    Correct.

19       Q.    Mr. Lincoln, I want to talk about your damages

20  in this case.  What are your damages?

21       A.    Monetarily?

22       Q.    Yes.

23       A.    Approximately $10,000.

24       Q.    That's it?

Ashby A. Lincoln, III

770

1    A.    Yes.

2    Q.    How did you estimate your damages?

3    A.    I divided the number of days from April 1st --

4    this letter states April 1st, so I used April 1st until

5    September the 11th, the number of days, divided 365 into

6    the 20 percent bonus, and then multiplied the number of

7    days into an answer.  You will get $10,000.  Roughly half

8    a year's bonus.

9         You want me to repeat that?

10   Q.    No.  I'm just thinking about what you divided.

11   From what I understand, you took the number of days

12   between April 1st and I believe September 11th or 10th --

13   A.    Correct.

14   Q.    -- when you received your notice.  You divided

15   that number into what?

16   A.    I divided the bonus, 20 percent bonus, I

17   divided the bonus by 365, got one day's worth of bonus,

18   multiplied that by the number of days.

19   Q.    What bonus were you using?

20   A.    I was using the bonus I got each year,

21   20 percent.

22   Q.    But you were assuming the maximum amount of

23   that bonus that you received --

24   A.    That's what I always got.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Ashby A. Lincoln, III                                   771

1      Q.    This was an estimate, correct?

2      A.    That was an estimate.

3      Q.    The reason you had to estimate it is because

4  you never received an AMIP worksheet for FY '04?

5      A.    Correct.

6      Q.    You don't know what metrics or factors were

7  used in FY '04 to calculate the AMIP bonus?

8      A.    No.

9      Q.    When I say "FY '04," fiscal year '04.

10           There are lots of different ways you could

11  have calculated your AMIP bonus for fiscal year '04,

12  correct?

13      A.    Correct.  If I had the criteria and it were

14  different than the criteria had been in the past, I would

15  have been able to have a different factor.  Since the

16  bonus had always been 20 percent or close to 20 percent,

17  there was no reason for me to use any other factors.

18  There was no reason for me to assume anything else.  If I

19  had that information today, then I could factor it and I

20  suspect I would come up with the same.

21      Q.    Every year you received the same AMIP bonus

22  number amount?

23      A.    Yes.  If memory serves me correctly, I received

24  20 percent.  I'm pretty sure it was 20 percent because --

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Ashby A. Lincoln, III

772

1     one year may have been a little higher than 20 percent.

2     May have been 22.  But I'm not sure of that.  But no less

3     than 20.

4          Q.     Couldn't you have just taken the average of

5     what you received as your actual bonus, your AMIP bonus

6     for each year and then divide into that number the amount

7     of days that you claimed to be prorated?

8          A.     Could have.

9                 MR. WILSON:  Object to form.

10                THE WITNESS:  Come up with the same.

11         Q.     A different formula.  That would be a different

12    formula --

13         A.     Be a different formula.

14         Q.     -- than the one you used.

15                Other than the amount of AMIP bonus that

16    you claimed CSC wrongfully withheld, are you claiming any

17    other damages?

18         A.     Not as part of this suit, no.

19         Q.     You said you received a discretionary bonus for

20    FY '05?

21         A.     Yes.

22         Q.     How much was that?

23         A.     Five thousand.

24         Q.     Is that the max amount for your level?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    I believe the max is 10, but I'm not sure.   The

2  only reason I believe that is because it's in this

3  letter.   So I would assume it's the same.   But I don't

4  know.   I don't even know what the criteria is.

5    Q.    You were told that the discretionary bonus

6  wasn't guaranteed, correct?

7    A.    Well, what I was told when I signed this letter

8  is that I would get a discretionary bonus.   That didn't

9  happen.   But that's what I was told.   I know what

10 discretionary means.

11   Q.    Did you speak to anyone in Human Resources, CSC

12 Human Resources Department, about your removal from the

13 AMIP program?

14   A.    No.

15   Q.    Did you speak with anyone else?

16   A.    Just Tom Saienni.

17   Q.    What did you tell him?

18   A.    I told him I thought he was wrong, I thought

19 this was improper.   He said he had nothing to do with it,

20 that he felt the same way, but he had nothing to do with

21 it, he had no choice.

22   Q.    Who do you contend has personal knowledge of

23 any matter concerning or relating to your allegations or

24 subject matter of your complaint?

1    A.    Certainly the other plaintiffs do.  I don't

2  know who else has knowledge of this.

3    Q.    Have you spoken to them about the matter?

4    A.    Any of them?  Just a couple of them.

5    Q.    What did you guys talk about?

6    A.    Just the common interest in the lawsuit.  We

7  actually spent some time talking about what we thought

8  the damages should be.  But we haven't had any in-depth

9  conversations about it.  Haven't had any in-depth

10  conversations with anybody.  I have talked to people who

11  are not participating in it.

12    Q.    Who are not participating in the lawsuit?

13    A.    Correct.

14    Q.    Who are they?

15    A.    That's several.  By name?

16    Q.    Yes.

17    A.    I spoke with George Altiery.

18    Q.    Anyone else?

19    A.    Anthony Kowal.

20    Q.    Anyone else?

21    A.    Not that I recall.  There probably were others,

22  but I don't recall.

23    Q.    When was the last time you spoke to Terry Kowal

24  about this issue?

1    A.    It's been six months.

2    Q.    What was the nature of your communications with

3    him?

4    A.    Asked him whether he wanted to participate --

5    George wanted to participate and I believe that -- I

6    think he and I decided that it's correct that he wasn't

7    eligible for it because he had left Delaware prior to

8    being removed from the bonus and he was actually in D.C.

9    when he was removed from the AMIP program.  So he

10    wouldn't have sued -- I don't think he would have sued

11    under the Delaware -- as part of the Delaware suit.

12    That's why he didn't participate.

13                Kowal, I don't know why.

14    Q.    Do you have any debts at the present time?

15    A.    No.

16    Q.    Any credit card debt?

17    A.    No.  House payment.

18    Q.    Mortgage?

19    A.    Yes.

20    Q.    Other than what we have already discussed, has

21    there been any written or oral recorded statements given

22    by anyone in connection with this lawsuit?

23    A.    Not that I know of.

24    Q.    Have you now told me everything you know or

Ashby A. Lincoln, III

776

1    remember that forms the basis of your case?

2              MR. WILSON:   Object to form.

3       A.    I think so.

4       Q.    Is there anyone else you have not mentioned who

5    could support your claims?

6       A.    Certainly Tom Saienni can support the claim.

7    He was the one that gave me the letter.  We mentioned

8    him.  Carlos Rodriguez, Pat keener.

9       Q.    Is there any other information which you have

10   not mentioned which is relevant to supporting your

11   claims?

12             MR. WILSON:   Object to form.

13      A.    I think we have covered everything.  I think

14   it's a pretty simple claim.

15      Q.    You said, I understand, you suffered a flooding

16   in your house?

17      A.    That's correct.

18      Q.    You said you gave all the documents to

19   Mr. Wilson that you have?

20      A.    All the documents that I could recover that

21   weren't just totally -- we had a flooding and then mold

22   crept in all these papers and I have just not -- I got

23   rid of that.  I lost some decent papers in that flood.

24      Q.    When did the flooding occur?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    It happened back in the fall.  We had 10 inches

2  of rain and my sump pump quit.  So I ended up with a

3  basement full of water.

4    Q.    Fall of '05?

5    A.    Yes.

6            MR. RAIMO:  Nothing further.

7            (Deposition Exhibit No. 49 was marked for

8  identification.)

9  BY MR. WILSON:

10   Q.    You have been handed what's been marked

11  Exhibit 49.  Could you take a moment and look at that?

12            Do you know what these are?

13   A.    Yes.

14   Q.    Are they pay slips?

15   A.    Yes, they are.

16   Q.    Are your AMIP bonuses reflected on these pay

17  slips?

18   A.    Yes, they are.

19   Q.    Are they from the years 2001, 2002, and 2003?

20   A.    2001, 2002, 2003, yes.

21   Q.    What was your AMIP bonus for 2001?

22   A.    $9,604.04.

23   Q.    2002?

24   A.    $20,391.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Ashby A. Lincoln, III

778

1   Q.    And 2003?

2   A.    $20,623.

3   Q.    Did these amounts reflect your recollection of

4   the AMIP bonuses that you received?

5   A.    That is correct.

6   Q.    Did you have to perform certain functions or

7   meet certain objectives to receive the AMIP bonus?

8   A.    Yes.

9          MR. RAIMO:   Objection.

10  Q.    During what period of time did you perform

11  these functions or meet these objectives for the bonus

12  indicated for 2001?

13  A.    2001 was from about the middle of September

14  until the end of March of 2002.

15  Q.    Was this bonus a prorated bonus for fiscal year

16  2001?

17  A.    Let me correct that first answer.   It was from

18  September of 2000 until March of 2001.

19  Q.    Was this a prorated bonus?

20  A.    Yes, it was.

21  Q.    For 2002, what period of time did you work to

22  earn this bonus?

23  A.    The entire fiscal year.   April till the end of

24  March.

1              MR. RAIMO:   Objection.

2       Q.     Would that be April of 2001 until March of

3    2002?

4       A.     That's correct.

5       Q.     For the third sheet, for fiscal year 2003, what

6    period of time?

7       A.     April of --

8              MR. RAIMO:   Objection.

9              THE WITNESS:   -- 2002 to March of 2003.

10      Q.     Did CSC gain any benefit from the work you

11   performed --

12             MR. RAIMO:   Objection.

13   BY MR. WILSON:

14      Q.     -- during this time?

15      A.     Yes.

16      Q.     From April 1st till September 11, 2003, did you

17   continue to perform functions for which CSC gained a

18   benefit?

19             MR. RAIMO:   Objection.

20      A.     Yes.

21      Q.     Did you perform the same functions as you did

22   in the previous years?

23      A.     Essentially the same functions.

24             MR. RAIMO:   Objection.

Ashby A. Lincoln, III

780

1    Q.    Was your AMIP bonus an earned bonus?

2    A.    Yes.

3         MR. RAIMO:  Objection.

4    Q.    I'd like you to look at Exhibit 45, which is

5    the AMIP worksheet for fiscal year 2002.

6    A.    Okay.

7    Q.    Under "Team and Individual Objectives," does it

8    state:  "Provide New Technical Statement of Direction on

9    a monthly basis"?

10   A.    Correct.

11   Q.    Did you do that on a monthly basis?

12   A.    Yes, we did.

13   Q.    Was that throughout the year?

14   A.    Yes.

15   Q.    The other team and individual objectives, did

16   you work on those on a monthly basis?

17        MR. RAIMO:  Objection.

18   A.    I worked on those on a daily basis.

19   Q.    Throughout the fiscal year?

20   A.    Yes.

21   Q.    What about the financial objectives up top, did

22   you work on those throughout the fiscal year?

23   A.    Yes.

24        MR. RAIMO:  Objection.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Ashby A. Lincoln, III
781

1      Q.     Close to the top on the right-hand side there's

2    a box that's titled, "Proration by eligible months."  Is

3    that correct?

4      A.     Yes.

5      Q.     If you didn't work in this group for the entire

6    12 months, would there be a "12" in there?

7                  MR. RAIMO:  Objection.

8      A.     No.  There will be a different number.

9      Q.     What would that number be?

10     A.     It would be dependent upon the number of months

11   we actually worked in the Chemical Group.

12     Q.     You stated that you helped create budgets for

13   your group.  Is that correct?

14     A.     That is correct.

15     Q.     Did you help create the budget for fiscal year

16   2004?

17     A.     Yes.

18     Q.     You also stated when you helped create the

19   budgets, that the AMIP bonuses were in that budget.  Is

20   that correct?

21     A.     That is correct.

22     Q.     Were the AMIP bonuses for fiscal year 2004

23   factored into that budget?

24     A.     Yes.

Ashby A. Lincoln, III                          782

1      Q.    Was there any indication at that time that

2   people were going to be removed from the AMIP plan?

3             MR. RAIMO:   Objection.

4      A.    Not that particular year.

5      Q.    I'd like you to look at Exhibit 47.

6      A.    Okay.

7      Q.    This is the offer letter for you to come to the

8   Chemical Group?

9      A.    Correct.  That is correct.

10     Q.    Is it correct that you did not participate in

11  AMIP prior to this?

12     A.    That is correct.

13     Q.    When you came to the Chemical Group, did you

14  begin participating in the AMIP program immediately?

15     A.    Yes.

16     Q.    You received an AMIP bonus for fiscal year

17  2001?

18     A.    Yes, I did.

19     Q.    It was prorated, correct?

20     A.    That is correct.

21     Q.    Can you look at Exhibit 48?

22     A.    Okay.

23     Q.    Is this the letter that tells you you are no

24  longer eligible for AMIP?

1      A.    That is correct.

2      Q.    Does it say, "However, you will have the

3   opportunity to earn a discretionary bonus of up to

4   $10,000"?

5      A.    Yes, it does.

6      Q.    Did you know what you needed to do to earn this

7   discretionary bonus?

8      A.    I think I did.  The comment, "upon the

9   achievement of specific measurable Key Result Areas," if

10  those would be the key result areas that would be on my

11  performance appraisal, then I would have known what they

12  were.

13     Q.    Were you told at the beginning of the fiscal

14  year of what the key result areas would be?

15     A.    Yes.  I would have entered them into the

16  performance appraisal that's referred to as GPARS and

17  then my manager would simply go in there and read them

18  and click I accept them and those would become the key

19  result areas for the year.  He could add them, as well.

20          MR. WILSON:  That's all I have.

21  BY MR. RAIMO:

22     Q.    Mr. Lincoln, I just have a few follow-up

23  questions.

24          Exhibit 49, Mr. Lincoln, this document



Ashby A. Lincoln, III

784

1    represents your pay stub for pay period 4/28/01 through

2    5/11/01?

3        A.    Correct.

4        Q.    And there are three columns underneath

5    "Full-time Salaried."  Do you see that?  Description,

6    hours, current, and year-to-date?

7        A.    Yes.  Description, current, year-to-date.

8        Q.    At the bottom of those three columns there's a

9    "Total Earn"?

10       A.    Okay.

11       Q.    See on the bottom?

12       A.    Yes, I see it.

13       Q.    Earn reflects earnings; is that correct?

14       A.    Correct.

15       Q.    The $13,180 is your total earnings for that pay

16   period, correct?

17       A.    Correct.

18       Q.    That amount of money includes your AMIP bonus,

19   correct?

20       A.    That is correct.

21       Q.    This is for not the fiscal year, however, but

22   the calendar year.

23       A.    Correct.

24       Q.    And the year-to-date column represents that?

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0802

Ashby A. Lincoln, III                            785

1        A.      Correct.

2        Q.      You would agree that that is the same structure

3   for the additional two pages which we will go through.

4        A.      Yes.

5        Q.      That being your total earnings was $24,872, for

6   example, for pay period between 5/11/02 and 5/24/02?

7        A.      Correct.

8        Q.      For calendar year 2002.

9        A.      Correct.

10        Q.      And next pay period, I'm looking at the third

11   page, 5/10/03 to 5/23, and your total earnings up till

12   the pay period at that time was $24,558.78.  Excuse me.

13   Your current amount for that pay period was $24,558.78,

14   correct?

15        A.      Correct.

16        Q.      That current pay period included your AMIP

17   bonus, correct?

18        A.      Correct.

19                MR. RAIMO:  That's all I have.

20                (Deposition concluded at 2:52 p.m.)

21                    -   -   -   -   -

22

23

24

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1               T E S T I M O N Y

2

3    DEPONENT:   ASHBY A. LINCOLN, III               PAGE

4

5    BY MR. RAIMO.............................. 714

6    BY MR. WILSON............................. 777

7    BY MR. RAIMO.............................. 783

8

9                 E X H I B I T S

10

11   DEPOSITION EXHIBIT NO.                         MARKED

12

13   45 - A document entitled, "Annual
     Management Incentive Program (AMIP)
14   FY02"..................................... 718

15   46 - A two-page letter dated September 18,
     1998, to Ashby A. Lincoln from Scott North.... 755
16

17   47 - A letter dated August 29, 2000, to
     Ashby A. Lincoln from Marianne Kane.......... 756

18   48 - A letter dated September 10, 2003,
     to Ashby Lincoln from Tom Saienni............. 764
19

20   49 - Three documents Bates numbered D-10985,
     D-11013, and D-11040........................ 777

21

22   ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 787

23

24   CERTIFICATE OF REPORTER                  PAGE 788

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



WILCOX & FETZER LTD.
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)

                    )

NEW CASTLE COUNTY)


          I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 17th day of
February, 2006, the deponent herein, ASHBY A. LINCOLN,
III, who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.

          I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

          I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                    _Kimberly A. Hurley_
                    Kimberly A. Hurley

                    Certification No. 126-RPR
                    (Expires January 31, 2008)


DATED: _____3/15/06_____


**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON, )
CHARLES FOLWELL, DAWN M.           )
HAUCK, KEVIN KEIR, ASHBY           )
LINCOLN, KAREN MASINO, ROBERT      )
W. PETERSON, SUSAN M. POKOISKI,    )
DAN P. ROLLINS, and WILLIAM        )
SPERATI,                           )
                                   )
        Plaintiffs,                )
                                   )
        v.                         )  C.A. No. 05-10-JJF
                                   )
COMPUTER SCIENCES CORPORATION, )
                                   )
        Defendant.                 )

             Deposition of HECTOR L. CALDERON taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, Hercules Plaza, 6th Floor, Wilmington,
Delaware, beginning at 9:40 a.m., on Thursday,
March 2, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.


APPEARANCES:


            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware 19806
               for the Plaintiffs


            LARRY R. SEEGULL, ESQUIRE
            DLA PIPER RUDNICK GRAY CARY US LLP
               6225 Smith Avenue
               Baltimore, Maryland 21209-3600
               for the Defendant


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

B-0807



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0808

                    HECTOR L. CALDERON,

1
2              the witness herein, having first been
3              duly sworn on oath, was examined and
4              testified as follows:
5    BY MR. SEEGULL:
6        Q.    Mr. Calderon, my name is Larry Seegull.  As you
7    know, I'm an attorney representing Computer Sciences
8    Corporation, and for purposes of this deposition, I'm
9    going to refer to Computer Sciences Corporation as CSC.
10   Is that okay?
11       A.    Yes.
12       Q.    Have you ever been deposed before?
13       A.    No.
14       Q.    Let me go over some brief introductions and
15   instructions to the deposition process.
16             I will be asking you questions to find out
17   what it is you know about this lawsuit, and obviously all
18   of your answers have to be verbal because the court
19   reporter can't take down head nods or other body
20   language.
21             You have to answer the questions truthfully
22   and completely just as if you were testifying in court.
23             If you do not hear a question or do not
24   understand a question, say so and I will repeat it.

Hector L. Calderon

791

1          If you realize at any point in time that an

2     earlier answer you gave was incomplete or inaccurate in

3     any way, just say so and you will be allowed to correct

4     or supplement the record.

5          Of course, if you need to stop to use the

6     restroom, that's fine, or to take a break to get a drink

7     or to take a smoke break, whatever, fine.

8          You cannot talk to your attorney during the

9     deposition unless it relates to a question of privilege,

10    and I'll try to avoid questions relating to your

11    communications with your attorneys which are privileged.

12         If you answer the question, then I will

13    assume that you have heard it and understood it and have

14    given me your best recollection.

15         Do you understand the instructions that I

16    have just given you?

17    A.    Yes.

18    Q.    Are you taking any medication today that could

19    impair your ability to understand or answer these

20    questions?

21    A.    No.

22    Q.    You told me you haven't been deposed before.

23    What did you do to prepare for this deposition?

24    A.    I met with my attorney yesterday, I looked at



Hector L. Calderon

792

1   the complaint this morning, and I looked at the amount

2   that I'm claiming last night.  That's all.

3        Q.    How much are you claiming in this lawsuit?

4        A.    Ten thousand.

5        Q.    Is that $10,000 even?

6        A.    Ten thousand even, yes.

7        Q.    Can you tell me briefly how you go about

8   calculating the $10,000?

9        A.    I looked at the four -- the last four payments

10  of the AMIP bonus that I had.  I did not have any records

11  of previous.  So I did have four.  So I took that and I

12  looked at the percentage that was given to me through the

13  four years, and it was between 21 and 23.  So I took the

14  lesser number, 21, and 21 percent of the amount that I

15  made, my annual income in 2003, which was $98,000.

16  That percent came out to be $20,000.  I split it in two

17  because I was claiming six months.  So that's $10,000.

18       Q.    So if I understand you correctly, what you are

19  claiming is that you were entitled to be paid an AMIP

20  bonus for the period of April 1 of 2003 through

21  September 11th of 2003?

22       A.    Correct, yes.

23       Q.    And the reason you are only claiming up until

24  that period is because you were notified on



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

793

1    September 11th, 2003 --

2        A.    Yes.

3        Q.    -- that you were no longer eligible for an AMIP

4    bonus.

5        A.    Yes.

6        Q.    So as of September 11th of 2003, you knew you

7    would not get an AMIP bonus payment at all, correct?

8        A.    After that point, after they told me.

9        Q.    At the point that they told you?

10       A.    Yes.

11       Q.    You knew that you would not be eligible or

12   receive any AMIP bonus.

13       A.    Going forward.

14       Q.    Going forward.

15       A.    Correct.

16       Q.    You also knew that they were not going to be

17   giving you an AMIP bonus for the period of time going

18   backwards.

19       A.    No, I didn't know that.  No.

20       Q.    The letter told you that it was effective as of

21   April 1.

22       A.    The way I understood the letter was that I

23   would not be eligible for future payments.  That's the

24   way I understood it.

Hector L. Calderon

794

1    Q.    At some point you learned that's not what the

2    letter meant.   You have not received --

3    A.    I did not get the checks, so yes.

4    Q.    At what point did you realize that what the

5    letter meant was you were not going to get any AMIP bonus

6    even for a period of time going backwards?

7    A.    Shortly after.   After discussions and asking

8    questions what's going to happen.   That's how I learned.

9    Q.    So maybe sometime within a couple of weeks

10   after September 11th, 2003, you understood you wouldn't

11   even get an AMIP bonus payment for any period of time for

12   fiscal year 2004.

13   A.    Right.   Correct.

14   Q.    By the way, just so we get this out of the way

15   early, when I refer to a fiscal year, you would agree

16   that the fiscal year runs from April 1 through the

17   following March 31?

18   A.    Correct.

19   Q.    So as an example, fiscal year 2004 would be

20   April 1, 2003, through March 31, 2004.

21   A.    Yes.   Correct.

22   Q.    You understood that, at least by the end of

23   September, maybe not the first day that you received the

24   letter, but by the end of September, you understood by



Hector L. Calderon

795

1    the end of September 2004 that you would not receive any

2    AMIP bonus for any of fiscal year 2004.

3        A.    Yes.

4        Q.    What you are calculating now is $10,000, and

5    you're saying that's based upon taking 21 percent times

6    your fiscal year 2004 salary and then dividing it by two?

7        A.    Yes.

8        Q.    So essentially your fiscal year 2004 salary was

9    about $100,000?

10       A.    $98,000.

11       Q.    So really it should be a little bit less than

12   $10,000, right?

13       A.    Yeah, a little bit less.

14       Q.    Do you know how much less?

15       A.    No, I don't.

16       Q.    But to be precise, the way you would calculate

17   your damages if you were doing it down to the penny, it

18   would be to take your annual salary in your mind of

19   $98,000, multiply that by 21 percent, and then divide

20   that by two.

21       A.    Yes.

22       Q.    I haven't done the numbers, so I don't know

23   what that equals.  You don't know what that equals,

24   either?



796

```
 1        A.    I don't know because I had it in my computer
 2  and then I left the computer at work and then I had it
 3  somewhere else and I was copying it.  I didn't copy the
 4  precise numbers.  I just put approximating.  In my one
 5  paper here I put approximate $10,000.
 6        Q.    You said you met with your attorney yesterday.
 7        A.    Correct.
 8        Q.    How long did you meet with him?
 9        A.    About an hour.
10        Q.    Did you meet with him this morning, as well?
11        A.    No.  I got there early because I knew -- I just
12  sat there.
13        Q.    You said you reviewed the complaint?
14        A.    Correct.
15        Q.    Did you review anything else?
16        A.    I looked at very briefly the interrogatories
17  that were sent by you, but it didn't mean anything to me.
18  I put it back in the envelope and closed it.  So I did
19  not review anything else.
20        Q.    Other than your attorney, have you spoken to
21  anybody about your case?
22        A.    My wife knows about it.  At work Kevin Keir, we
23  have spoken briefly twice because he has -- the one time
24  that we had a conference call with our attorney, he was
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0815

Hector L. Calderon

797

1    not present, so he asked me how that went and I told him

2    what we talked about.

3              A second time he asked me -- trying to

4    recall because I don't recall the conversation precisely,

5    but he had not heard anything, whether I had heard

6    something and I said no.  That was it.

7              And I have also discussed it with

8    Dan Rollins, personal friend of mine and he happens to be

9    in the case, also.  So from time to time we had discussed

10   whether we know anything and that's about it.

11       Q.    Other than the discussions you have had with

12   other plaintiffs about wondering what the status is and

13   have you heard anything, that kind of a conversation,

14   have you discussed the substance at all?

15       A.    With Dan Rollins I have discussed the merit of

16   our case, yes.

17       Q.    Tell me about those discussions.

18       A.    Very briefly whether -- we have said to each

19   other that we strongly believe that fair -- that what we

20   are asking is fair.  I think that's been the extent of

21   it.

22       Q.    Have you discussed what you would testify about

23   today?

24       A.    No.



Hector L. Calderon

798

```
 1        Q.    Have you discussed what he should testify to?

 2        A.    No.

 3        Q.    Your claim is a claim, as I understand it, for

 4   wages under the Delaware Wage Payment Act?

 5        A.    I don't know.  I'm not sure about the act or

 6   the law behind it.  I have left everything to our

 7   attorney, and I do not have any information of specific

 8   laws or acts that are involved.

 9        Q.    Can you spell your name for the record?

10        A.    My last name?

11        Q.    Both names.

12        A.    H-e-c-t-o-r.  Calderon, C-a-l-d-e-r-o-n.

13        Q.    Have you ever been known by any other name?

14        A.    No.

15        Q.    What's your Social Security number,

16   Mr. Calderon?

17        A.    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.

18        Q.    What is the date of your birth?

19        A.    January 14th, 1963.

20        Q.    Where were you born?

21        A.    San Juan, Puerto Rico.

22        Q.    Where do you live?

23        A.    Bear, Delaware.

24        Q.    What's your address?
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

799

| | | |
|---|---|---|
| 1 | A. | 7 Iona Court, Bear, Delaware, 19701. |
| 2 | Q. | How long have you lived there? |
| 3 | A. | Nine years. |
| 4 | Q. | What is your home telephone number? |
| 5 | A. | 302-836-1483. |
| 6 | Q. | You said you're married? |
| 7 | A. | Yes. |
| 8 | Q. | How long have you been married? |
| 9 | A. | Ten years. |
| 10 | Q. | Do you have any children? |
| 11 | A. | Three stepchildren.  I don't have any children |

12  of my own.

| 13 | Q. | Those are children that came to the marriage |

14  from your wife?

| 15 | A. | Yes. |
| 16 | Q. | Have you had any other marriages? |
| 17 | A. | No. |
| 18 | Q. | Have you ever been arrested? |
| 19 | A. | No. |
| 20 | Q. | Have you ever been convicted of any crime? |
| 21 | A. | No. |
| 22 | Q. | Have you ever been in the military? |
| 23 | A. | No. |
| 24 | Q. | When did you first contact an attorney to |



Hector L. Calderon

800

1    handle your case against CSC?

2        A.    I did not contact the attorney personally.  I

3    received a letter and after I received that letter,

4    that's when I just waited for things to come to me.  I

5    did not contact -- personally I did not go and -- well,

6    no.  I should correct this because after I got the

7    letter, I did call Tim Wilson's office and I asked what

8    is this about and I understood that we had some rights

9    that I did not know.  So that's when I contacted my

10   attorney.

11       Q.    So was it shortly after you received the

12   letter?

13       A.    Yes, very shortly.  Couple days.

14       Q.    We previously had a document marked as

15   Deposition Exhibit 4.  I just want to show it to you.  Is

16   this the letter that you received?

17       A.    Yes, correct.

18       Q.    Shortly after receiving that letter you

19   contacted Mr. Wilson's office?

20       A.    Correct.

21       Q.    Do you know who sent this letter?

22       A.    No idea.  I lost the letter, so I don't -- I

23   was looking for that, by the way.

24       Q.    That's okay.  We have a copy of it.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0819

Hector L. Calderon

801

1          What is the agreement you have with your

2    lawyer regarding the payment of fees?

3          A.    The agreement is that we will only pay for

4    materials should we lose the case, and should we win the

5    case, I don't remember the percent that he's getting.  If

6    it's 30 percent, I'm not sure.  That's all that I know.

7          Q.    So your attorney will take a percentage of

8    anything you recover?

9          A.    Yes, exactly.

10         Q.    You think that percentage is 30 percent?

11         A.    Correct.

12         Q.    If you do not recover anything in this case,

13    whether through settlement or through a victory, then you

14    only have to pay the costs of the case?

15         A.    Costs of the materials he has used, letters,

16    stamps, and other materials that he has used to

17    communicate with us.

18         Q.    How about the cost of the transcript of this

19    deposition, the cost of the court reporter, who is to pay

20    that?

21         A.    Don't know.

22         Q.    Has there been any discussion about that

23    amongst the plaintiffs?

24         A.    Amongst us?  No.  I have not discussed it.  I



Hector L. Calderon

802

1    have no idea, really.

2        Q.    Have any lawsuits ever been filed against you?

3        A.    No.

4        Q.    Have you ever filed any lawsuits against anyone

5    else?

6        A.    I was involved in a class-action suit against

7    CSC that was settled recently.

8        Q.    How much did you make off of that case?

9        A.    About $1,300, if I remember correctly.

10   Thirteen, fifteen hundred.  Something like that.

11       Q.    Any other lawsuits you have been involved in in

12   any way?

13       A.    No.

14       Q.    Have you ever declared bankruptcy?

15       A.    No.

16       Q.    Have you ever made a claim for unemployment

17   benefits?

18       A.    No.

19       Q.    Have you ever made a claim for workers'

20   compensation benefits?

21       A.    No.

22       Q.    Tell me about your educational history.

23       A.    I went to Clark University in Worcester,

24   Massachusetts, Bachelor's in art with a major in computer



Hector L. Calderon

803

1    science.  And that's the extent.  I got a Bachelor's and

2    that's it.

3        Q.    It was a Bachelor's in what, computer science?

4        A.    B.A. which is a liberal arts school and I

5    majored in computer science.

6        Q.    By the way, when did you come to this country?

7        A.    To permanently live?  Because Puerto Rico is

8    a -- for all intents and purposes, it's like Washington,

9    D.C.  So it's a commonwealth of the U.S.

10       Q.    Sure.

11       A.    I came to the U.S. to live in 1996.

12       Q.    Any other education or training that we haven't

13   spoken about?

14       A.    No.

15       Q.    Have you ever received any professional or

16   work-related certifications?

17       A.    All related to my SAP professional career.  I

18   have received several certificates for courses that I

19   have taken.

20       Q.    What kind of courses are they?  Are they

21   courses that CSC offers?

22       A.    Yes.  Some.  And others that SAP -- the company

23   SAP offers and has been paid by CSC.

24       Q.    Are you certified in something?



Hector L. Calderon

804

1    A.    No, I'm not certified in -- I am one of the few

2    people in the company that know many modules of the

3    integrated system and so I do not look for -- to certify

4    myself because I don't believe in that.

5    Q.    What do you mean?

6    A.    It's just that to me certification doesn't mean

7    anything.  A lot of people that do what I do get

8    certifications because they think that that's going to

9    give them a better career, better incentive, so on and so

10   forth, and I don't think that's the right way to approach

11   my career.  So I don't look for certifications, but like

12   I said, I'm one of the few that know many modules.

13   Q.    You know a lot about SAP, but you're not

14   certified in any way?

15   A.    Correct.

16   Q.    So these other certification programs that you

17   have taken, what were they if they weren't

18   certifications?

19   A.    They're SAP courses which doesn't -- again,

20   doesn't certify anything.  You go to take the course and

21   you learn some functionalities and they give you a

22   certificate that tells you that you were there for a week

23   and you took the course.

24   Q.    How many of those courses have you taken?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

805

```
 1      A.      About five.

 2      Q.      This is over what period of time?

 3      A.      Thirteen years.

 4      Q.      Have you ever received any awards or honors?

 5      A.      No.  Well, award -- I'm sorry.  No honors and

 6   awards.  By the DuPont Company while in my travels in

 7   South America.

 8      Q.      You received from the DuPont Company an award?

 9      A.      Awards, recognition awards, for my work.

10      Q.      Was it more than one?

11      A.      Several, yes.

12      Q.      What was it for exactly?

13      A.      For work that I did in bringing up

14   manufacturing plants up-to-date with what the U.S. was

15   doing.  I was the one that went to South America and did

16   the -- that transformation or conversion to the systems

17   that the U.S. were implementing.

18      Q.      Were there cash components to these awards?

19      A.      No.

20      Q.      What were they, just recognitions?

21      A.      Pieces of paper that to me were important at

22   the time.  Plaques.  That was about it.

23      Q.      Why don't we go through your employment

24   history.  After you graduated -- which is in what year?
```



Hector L. Calderon

806

1      A.     In 1985.

2      Q.     After you graduated, where did you go to work?

3      A.     I went back to Puerto Rico where I lived and I

4 worked for the government of Puerto Rico for one year,

5 Social Services Department, as a computer programmer.

6           Exactly after a year working there the

7 DuPont Company hired me as a systems analyst and I spent

8 nine years working for DuPont in Puerto Rico until they

9 relocated me to Wilmington.

10     Q.     So that was for what period of time that you

11 would have worked for them?

12     A.     So from 1986 to 1995, December 1995.

13     Q.     What did you do for DuPont during that period

14 of time?

15     A.     I was first a systems analyst and then I was

16 supervisor and I was then a consultant.  That's how I got

17 into SAP.  And I traveled for a year and a half between

18 the U.S. and Puerto Rico and Mexico, South America.  I

19 was basically traveling around the world, actually, and

20 when they figured that it -- I asked for it.  They would

21 relocate me.

22     Q.     To Wilmington?

23     A.     Yes.

24     Q.     During the time that you were at DuPont, did

Hector L. Calderon

807

1   you ever get any kind of bonus?

2       A.      In DuPont, the way it works is that, when you

3   reach a certain level, they recognize you with a variable

4   compensation bonus.  It's not only a bonus, several

5   components to variable comp.  So when I reached level 5

6   in DuPont, they gave me -- not 5, I'm sorry.  It was

7   level 4.  They told me I was going to get variable

8   compensation and I started the program.

9       Q.      Did you get that every year at that point?

10      A.      Yes.  In DuPont, unless you do something really

11  bad, you were in that program and you always earn it.

12      Q.      What year did you start to earn variable

13  compensation?

14      A.      It was in my last year in Puerto Rico.  So it

15  must have been -- I can't recall real well, but it must

16  have been the beginning of 1995, the end of 1994.

17      Q.      Would that have just been one year, because you

18  stopped working for DuPont at the end of '95.

19      A.      Well, no.  DuPont Puerto Rico was a subsidiary.

20  So I transferred to U.S.  For all intents and purposes,

21  it was still DuPont, but it was E.I. du Pont.  It was a

22  different company in legal terms.  But my variable comp.

23  transferred just like my seniority did.

24      Q.      So after December of '95 you continued to work



Hector L. Calderon

808

1   for DuPont?

2        A.    Correct.

3        Q.    In Wilmington?

4        A.    Correct.

5        Q.    Prior to that you had just been traveling

6   around?

7        A.    Yes.

8        Q.    And then starting what, January of 1996 --

9        A.    Yes.

10       Q.    -- you worked for DuPont in Wilmington?

11       A.    Yes.

12       Q.    You continued to receive the annual variable

13  compensation bonus?

14       A.    Yes.

15       Q.    You stayed with DuPont until when?

16       A.    I stayed with DuPont until the outsourcing deal

17  happened, which was the summer of 1997.

18       Q.    You would have received variable compensation

19  for the calendar year 1995 and the calendar year 1996 and

20  that's it, correct?

21       A.    Correct.  I'm sorry.  In 1997, before the

22  outsourcing deal happened, I did receive something,

23  because DuPont variable compensation and bonuses happened

24  between March -- I don't know now, but it used to be

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0827

Hector L. Calderon

809

```
1    between March and May.  So I did receive variable comp.

2    that year.

3         Q.    You received the first variable compensation

4    let's say in that March-to-May time frame in 1995 you

5    think?

6         A.    I'm sorry.  Ask again.

7         Q.    The first time you received variable

8    compensation from DuPont, that would have been between

9    March and May of '95, approximately?

10        A.    It's either '95 or '94.  I think it was more

11   1994, at the end of 1994, but I can't recall.

12        Q.    If you received it at the end of 1994, what

13   period of time --

14        A.    I'm saying -- it's either April 1994 or

15   April 1995.

16        Q.    You're not sure?

17        A.    Yeah, I'm not sure.

18        Q.    If you received it April '94, it would have

19   been for the calendar year '93?

20        A.    Yes.

21        Q.    DuPont had a calendar year as their fiscal

22   year?

23        A.    I don't remember.

24        Q.    But if you received it --
```



**WILCOX & FETZER LTD.**

Registered Professional Reporters

Hector L. Calderon

810

1      A.      I don't remember.

2      Q.      If you received it in April of '94, that would

3  have been for the calendar year of '93?

4      A.      Yeah.

5      Q.      If you received it in '95, that would have been

6  for the calendar year '94?

7      A.      Correct, yes.

8      Q.      So you think you may have received it in '95,

9  '96, and '97 for the prior calendar years?

10     A.      Yes.

11     Q.      You may also have received it in '94?

12     A.      Yes.

13     Q.      So at least three times, maybe four times.

14     A.      Yes.

15     Q.      Did you ever see any documents or programs

16  related to the variable compensation?

17     A.      I vaguely recall seeing something, but I don't

18  have it with me.  I don't recall ever having it with me.

19  I just recall when I was told, I recall seeing something

20  from -- actually from Merrill Lynch because Merrill Lynch

21  was the guardian.  So they sent something to me.

22     Q.      Merrill Lynch was what?

23     A.      Merrill Lynch was the -- I don't know the name

24  for that.  The custodian, I guess.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0829

Hector L. Calderon

811

1     Q.    They were the administrator?

2     A.    Yeah, the administrator of the variable comp.

3  plan, because DuPont, most of the variable comp. went in

4  stocks, so they gave you the stocks and put it in what

5  they call a blueprint account.  So Merrill Lynch managed

6  that.  So I remember receiving documentation from Merrill

7  Lynch saying you have a variable comp. program and this

8  is how much you're getting and the way they were managing

9  it, managing the stocks and what my rights were, and

10  that's all I remember seeing.

11     Q.    Tell me about how you transitioned over to CSC.

12  Tell me about that.

13     A.    I learned through people talking about the deal

14  that some of us were going to go to Accenture and some of

15  us were going to go to Computer Sciences Corporation.

16  Because I knew many people in IT for so many years, I

17  think I could have asked to go to either.  But I was

18  offered to go to CSC.  I was told hey, you're going to

19  CSC.  And that's when I received the letter that I have

20  with me and you also have.

21     Q.    Yes.

22     A.    It was a great deal for me because I was --

23  right away I was going to make more money.

24     Q.    Because it was a higher salary?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.      Yes.  Yes, exactly.

2      Q.      The letter, of course, references the AMIP

3 plan?

4      A.      Correct.

5      Q.      Other than the letter, were you provided any

6 other documents about the AMIP plan during the

7 transition?

8      A.      No.  I never saw any.

9      Q.      Other than the letter you received which we

10 will show you -- let me do that now.

11              (Deposition Exhibit No. 50 was marked for

12 identification.)

13 BY MR. SEEGULL:

14      Q.      Mr. Calderon, what we're now showing you as

15 Exhibit 50, do you recognize this?

16      A.      Yes.

17      Q.      What is this?

18      A.      This is the letter offering employment with CSC

19 and telling me the benefits -- not all the benefits, but

20 the information regarding AMIP, which was the most

21 important thing here to me, and other benefits, 401(k)

22 and compensation.  So this was not all of the benefits

23 that I was getting, but these were very important to me

24 at the time.



Hector L. Calderon

813

1     Q.    So Exhibit 50 was the letter we were talking

2  about?

3     A.    Correct, yes.

4     Q.    Other than this letter, have you ever received

5  any other documents or information about AMIP?

6     A.    No.

7     Q.    Did you have any orientation programs or

8  discussions about AMIP during the transition?

9     A.    Not during the transition, no.

10    Q.    Or after you were now CSC employees?

11    A.    After we were employees, we discussed it many

12  times with my manager and my staff manager.  Staff

13  manager is the term CSC uses for middle person between

14  the manager, director, and me.  And we discussed that

15  many times, yes.  My manager was in it.  I was in it.  We

16  discussed it many times, yes.

17    Q.    Tell me about those discussions.

18    A.    Those discussions were always what we're

19  supposed to get, what percent we were supposed to get,

20  and how we came into -- how we came into the equation,

21  what we needed to do to -- what we needed to do to earn

22  that, and in my case, those discussions were very

23  important because we always discussed it once for sure,

24  maybe twice, and it was always discussed during my



Hector L. Calderon

814

1    discussion of contribution.  And for the past four --

2    three or four years before it was taken away, my manager

3    always told me that -- the increases were very low and I

4    was saying well, why am I getting a rating of 2 and 1,

5    which means you're exceeding expectations, and I'm

6    getting a 1, 2 percent, and the answer was well, we're

7    not doing very well as a company, but you're getting this

8    big bonus, so big bonus, you're compensated for that.  I

9    always -- I think that's fair, I'm getting a big bonus, I

10   don't care about the increase.

11              So when they took it away, my thought was

12   okay, what happens with the increases that you never gave

13   me for three or four years, giving me 1 or 2 percent?

14   That's why the discussions were important every year and

15   a couple times -- once and, many times, twice every year.

16   Q.    When would those discussions take place, at the

17   end of the year when the new salaries were being

18   considered?

19   A.    The one time for sure.  Another time during

20   midyear my staff manager and I would discuss it in terms

21   of how are we doing to meet the goals.

22   Q.    Who are the managers that you discussed this

23   with?

24   A.    Mary Lloyd, and she retired and still working

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

815

```
1    for DuPont as a consultant now, and Alan Kronmiller was

2    the one that always gave me -- had the final discussion

3    with me.  He was the one who would tell me exactly what

4    the percent of the increase was or the bonus was.  Again,

5    the discussion happened at the same time the bonus would

6    come.

7         Q.    The bonus would come a few months later?

8         A.    Correct, yes.

9         Q.    Just so I understand what you're talking about,

10   you're saying that performance evaluations are done when,

11   in the April and May time frame?

12        A.    Correct, yes.

13        Q.    Then shortly after that you get the bonus.

14        A.    It always came -- the increase would come in

15   May and the bonus would come in June.

16        Q.    Just as an example, let's say in fiscal year

17   2002 -- let me back up for a moment.

18              Let's say in April of 2002, you would have

19   a performance review discussion about your performance

20   for that April 1, 2001, through March 31, 2002, time

21   period?

22        A.    Yes.

23        Q.    And during that performance discussion about

24   your prior year's performance, you would get information
```



WILCOX & FETZER LTD.
Registered Professional Reporters

1   about what your next year's salary would be?

2       A.    Yes.

3       Q.    And you would get information about what your

4   AMIP bonus was going to be for the prior year.

5       A.    Yes.  Sometimes it happened at that time.  But

6   at times the information came later, so we would have

7   another meeting.  It wasn't always that way.  It would

8   depend on when the company knew what the percentage would

9   be for the AMIP bonus.

10      Q.    I want to make sure what we're talking about is

11  a discussion about the prior year's fiscal bonus?

12      A.    Yes.  It was always for the prior fiscal year.

13      Q.    That you were discussing?

14      A.    Yes.

15      Q.    Because you were saying if I did so well this

16  prior year in terms of salary increase, I should have

17  gotten more, and they're saying well, we're giving you a

18  large bonus --

19      A.    Exactly.

20      Q.    -- in lieu of that salary increase for the

21  prior year.

22      A.    Yes.

23      Q.    Did that happen every year or only some years?

24      A.    Every year.  That happened every year.



817

1  Q.  In addition, some years other conversations

2  took place is what you're saying?

3  A.  Yes.

4  Q.  And the other conversations you say that took

5  place, they took place during the middle part of the

6  year?

7  A.  Yes.

8  Q.  And would those conversations be more along the

9  lines of how the AMIP gets calculated?

10  A.  Never.  I never -- my manager would never know

11  how the AMIP would get calculated.  The director of my

12  group would never know how that got calculated until we

13  got word of what the percent was and then I would be

14  shown a paper that would say in the categories that

15  everyone worked towards and then the percent that we

16  met -- the percent of each category.

17  Q.  Let's go back.  The conversations you had were

18  not about how the AMIP got calculated.  These other

19  conversations that would occur during the middle part of

20  the year would be, again, you're working hard, you will

21  get an AMIP bonus.

22  A.  But it wasn't -- we did not discuss how it

23  would be in terms of how much we would get.  That

24  calculation never took place.  But we did discuss the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0836

Hector L. Calderon

818

1    categories that we would need to meet to get an AMIP

2    bonus.  That took place.

3         Q.    That's the conversations you're talking about?

4         A.    Yes.  Those would be in the middle of the year.

5         Q.    So the conversations that took place at the end

6    of the year were conversations that would take place

7    about why the bonus was going to be paid for the prior

8    year because you weren't getting a larger salary

9    increase.  But the conversations that took place during

10   the middle part of the year were more about the

11   categories of how the bonus was calculated, if not the

12   exact formula.

13        A.    Yes.

14        Q.    Tell me about the conversations during the

15   middle part of the year.  Was this every year that you

16   would have these conversations or only certain years?

17        A.    It wasn't always the same because management in

18   my group changed during that period.  At least 2002, 2004

19   changed every year.  So one manager would come and things

20   will change.  Every year was different.

21        Q.    The formula?

22        A.    Not the formula, but the discussions, and when

23   we would discuss things and what would be going -- what

24   we would discuss, that would be totally different every



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   year.

2       Q.     Do you remember the details of any of those

3   conversations?

4       A.     No, I don't remember the details, actually.

5       Q.     But, generally speaking, sometimes those

6   conversations would occur in September, sometimes they

7   would be October, sometimes November, sometimes December?

8       A.     Correct, yes.

9       Q.     Those conversations would be your manager with

10  you?

11      A.     Yes.

12      Q.     One-on-one conversations?

13      A.     Yes.

14      Q.     Just like the conversations at the end of the

15  year were one-on-one?

16      A.     Yes.

17      Q.     And the manager that you would be discussing

18  this with was Aaron Kronmiller?

19      A.     No.   The manager that I would be discussing

20  that in the middle of the year or, like you said,

21  October, November, December, it would be Mary Lloyd, who

22  was the staff manager.   Again, staff manager was only a

23  person that would -- it was a middle person between the

24  higher manager and you to facilitate the administration



Hector L. Calderon

820

1   details -- and that was it.  Nothing else.  You would not

2   know my performance.

3       Q.    She was not your manager?

4       A.    No.

5       Q.    So she was like an administrative person?

6       A.    It was called my manager, though.  I would

7   report through her.

8       Q.    You did?

9       A.    Yes.

10      Q.    During these conversations with Mary, she would

11  tell you, well, the categories are changing this year, or

12  you didn't discuss categories?

13      A.    We did, and the categories were always the

14  same.  The categories -- and I was looking at that last

15  night because I do have at least two -- it was the same

16  paper every year, same categories, customer satisfaction,

17  business ethics.  There were two of them, but there were

18  five or six.  So the categories would always be the same.

19  Now, how much weight they would give to each one, that

20  would change every year.

21      Q.    But some years different corporate financial

22  objectives were measured, correct?

23      A.    Correct.  And that was one category, financial

24  objective.  That was one category.



Hector L. Calderon

821

1    Q.    The category, that's what you mean by category.

2    A.    In the discussion we would say, hey, we don't

3    have any control over that, just keep doing what you're

4    doing, we don't have nothing to do with that.  If the

5    company as a whole met, then we get 100 percent.  If the

6    company did not meet that, then we get 85 percent of the

7    total, you know, weight of that category.

8    Q.    Within the category of financial performance,

9    there might be different factors that were used.  Some

10   years return on investment was used?

11   A.    I have no idea what went into that formula.

12   Q.    So you don't know the details of how the

13   formula was calculated at all for any of the years?

14   A.    No idea.

15   Q.    Do you know that the factors changed year to

16   year?

17   A.    Yes.

18   Q.    But you just don't know what the factors were?

19   A.    Correct.

20   Q.    That's on the category of financial

21   performance.  There were other categories of individual

22   performance, I gather?

23   A.    Yes.  And those would be --

24   Q.    Or group performance?



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Hector L. Calderon

822

1     A.    Both.

2     Q.    And within those categories, did you know the

3   details or you didn't know the details of those

4   categories, either?

5     A.    Those categories, yes.  Those are very

6   important because those were supposed to go -- supposed

7   to affect my increases.  So those were very important to

8   me.  However, the way CSC filled those categories, they

9   sent a memo.  I have the memo from this week.  It says

10  these are your objectives for last year, copy and paste,

11  and hurry up.  I just got one yesterday for this past

12  year.

13    Q.    In other words, the individual performance

14  objectives or the group performance objectives were just

15  sort of the normal group performance --

16    A.    Yes.

17    Q.    -- that was unique to AMIP about those

18  objectives?

19    A.    Correct.  They were separate.  They were

20  separate.  AMIP was one thing and increase was another.

21    Q.    Let me see if I understand, though.  Give me

22  some examples of what the performance objectives were.

23    A.    My performance objectives would be --

24    Q.    Customer satisfaction?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Yes.  Really stupid.  I'm sorry.  Tell you one

2  example.  It would be put your time on time -- put your

3  time on time every week.

4    Q.    Time entry?

5    A.    Yes.  Okay.  Go to meetings.  Okay.  Like 10 or

6  12 like that.  I did that.

7    Q.    So those were the normal performance objectives

8  that you would have to meet just as part of doing your

9  job?

10    A.    Yes.

11    Q.    And those were the same objectives that were

12  used for the individual performance goals within AMIP?

13    A.    No.  AMIP were totally different.

14    Q.    I'm not talking about the financial objectives.

15  I'm talking about the individual performance objectives.

16    A.    They were different.

17    Q.    Tell me what were the ones for AMIP.

18    A.    The ones I just described were related to my

19  performance for my increases.  That's one thing.  Totally

20  different subject, AMIP.

21         AMIP, we would get a table, looked like a

22  table, and they would have categories, more specific

23  categories, that we as a company would need to meet.

24  Nothing that I had to do specifically.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1       Q.      You're talking about the return on investment?

2       A.      Yes, but there were also customer satisfaction,

3    a category for customer satisfaction and another category

4    for business ethics, and I can't remember the other

5    categories, but there were specific categories that had

6    nothing to do with the other.

7       Q.      Did you get that in writing?

8       A.      Sure.

9       Q.      You would get that at the end of the year or

10   the middle part of the year?

11      A.      Both.

12      Q.      Your manager Mary would give you a written

13   document sometime in this October-to-December time frame

14   with written AMIP objectives.

15      A.      Yes.

16      Q.      And that was every year you would get that?

17      A.      Every year.

18      Q.      Those were specific objectives to AMIP you're

19   saying?

20      A.      Yes.

21      Q.      Apart and on top of your normal objectives?

22      A.      Yes.

23      Q.      And that would be for the fiscal year that you

24   were already in and you would have to work towards those



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0843

1    in order to be eligible for the AMIP?

2        A.    Correct, yes.

3        Q.    I think it's clear, but I want to make sure.

4    The actual payment of the AMIP bonus would occur in what,

5    the June time frame?

6        A.    Yes.

7        Q.    And that would be the June following the close

8    of the fiscal year?

9        A.    Yes -- no.  It would be the same time period,

10   April through March.  It was just that I would get it

11   late.  We would get it a couple months late.

12       Q.    A couple months after the close of the fiscal

13   year?

14       A.    Yes.

15       Q.    Just as an example, you might receive a payment

16   in June 2003 or May 2003 and that payment would be for

17   the AMIP bonus for the prior fiscal year?

18       A.    Yes.

19       Q.    If you receive a payment in May of 2003, that's

20   for the AMIP period of April 1, 2002, through March 31,

21   2003?

22       A.    Yes.

23       Q.    That would be because the company would need

24   time to calculate whether or not it had achieved and

