Hector L. Calderon

826

1    whether or not you had achieved and your group had

2    achieved all the objectives within the AMIP plan?

3        A.    That's what I thought.

4        Q.    It would take time to calculate it and the

5    books would have to close in the company before they

6    could evaluate and analyze the AMIP?

7        A.    Yes.    That's what I thought.

8        Q.    When they paid the AMIP to you, did you receive

9    a completed worksheet showing how it was calculated?

10       A.    Not how it was calculated.    We were told and

11   the document -- same table that we discussed, the same

12   table would have the percentage that was awarded to each

13   category.

14              So, for example, in the category of return

15   on investment, it would be 85 percent.    That's it.

16   That's all we saw on that table, the percentage, and then

17   the header of that document would have my specific

18   information, my salary, my percentage, my previous, my

19   current, my future salary based on my salary plus the

20   AMIP bonus.

21              It was personal information.    No.    That's

22   not it.

23              MR. SEEGULL:  Let's have this marked.

24              (Deposition Exhibit No. 51 was marked for



**WILCOX & FETZER LTD.**
Registered Professional Reporters

827

1   identification.)

2   BY MR. SEEGULL:

3       Q.    I'm now showing you what's been marked as

4   Exhibit 51.  This is a document that you produced to us,

5   I believe, in discovery.  Do you recognize this?

6       A.    Me?  No.

7       Q.    Have you ever seen this document before?

8       A.    This I saw -- I saw yesterday.

9       Q.    Is that the first time you saw it?

10      A.    Yeah.

11      Q.    You're not familiar with this form?

12      A.    No.  I remember seeing it from yesterday.  The

13  reason I was surprised yesterday is because it's the same

14  type of information.  For example, the revenue, OI,

15  margin, DSO, ROI, those were categories in the table and

16  document that I was describing.  The document that I was

17  describing is not this.  This is very pretty.  I wish I

18  had this before.  I never got this.

19      Q.    Let me just see if I understand you correctly.

20  This particular document, Exhibit 51, you've never seen

21  before?

22      A.    Yesterday.

23      Q.    Other than yesterday?

24      A.    I have never seen it before.



828

1    Q.    But the information in this document you had

2    seen in a different format.

3    A.    Yes.

4    Q.    In other words, you had seen the financial

5    goals and the weightings --

6    A.    Yes.

7    Q.    -- of the different factors for calculation of

8    the AMIP.

9    A.    No.  I did not see the factors.

10    Q.    Tell me what was in this table.  I'm trying to

11    understand what was in this table.

12    A.    And the reason --

13    Q.    Maybe you don't remember.

14    A.    Right.  The reason I hesitate is because the

15    whole table, it was a scribbled piece of paper from my

16    manager.

17    Q.    Handwritten?

18    A.    It was an Excel base spreadsheet but with a

19    whole bunch of marks.  This is the percent that they gave

20    this and this is the number that we give you with

21    the percent that they're telling me that you're going to

22    get.  I'm like okay, 22 percent.  Somewhere in the top

23    there was like the same 22 percent.  It was very

24    confusing.  The document was very confusing.  And it had

1    more -- these are -- now that I look at this, these are

2    all the financial goals.

3         Q.    On Exhibit 51 it's only got the financial

4    goals?

5         A.    We have more than financial goals.  In the

6    table I'm describing, the financial goal was only one

7    line.

8         Q.    One section?

9         A.    Exactly, one section.  That was it.

10        Q.    The other sections were I think you said the

11   group goals and the individual goals?

12        A.    Not individual.  It was group -- it would be

13   the same goals for everyone, but it would be related to

14   customer satisfaction, it would be related to business

15   ethics, it would be related to the others I can't

16   remember.

17             So this was only one section.

18        Q.    In the table that you received, it was an Excel

19   spreadsheet with handwriting on it?

20        A.    Yes.  With both, handwriting and the document

21   that came from somewhere.  I don't know who came up with

22   that.

23        Q.    This was presented to you by Mary?

24        A.    Yes.



Hector L. Calderon

830

1          Q.     This was presented to you each year?

2          A.     Yes.

3          Q.     Each year she would go over it with you and

4     explain to you how the AMIP was going to be calculated by

5     CSC?

6          A.     She had no clue.  She was just saying I'm not

7     sure.  This is the numbers Alan gave me and you're

8     getting 22 percent and you did very well,

9     congratulations.  I was like great, 22 percent, I'm

10    happy, let's go.

11         Q.     Is this being done in this October-to-December

12    time frame or is this being done in the May time frame?

13         A.     May time frame.

14         Q.     Were these tables that were shared with you in

15    the October-to-December time frame?

16         A.     Yes.

17         Q.     So in the October-to-December time frame they

18    were shared with you as to what you and the group needed

19    to accomplish?

20         A.     Yes.  It would be empty.  Good point.  The

21    table would be empty.  Only with the categories that we

22    would need to meet but no scribbles.  This is just what

23    we need to work towards.

24         Q.     It didn't show you what you had achieved.  It



831

1    only showed you what the goals were.

2         A.    Yes.

3         Q.    Then in May they would come back with the same

4    table basically showing what had been achieved?

5         A.    Yes.

6         Q.    And then showing the total amount for the AMIP

7    that you were going to get?

8         A.    Yes, correct.

9         Q.    You got that each year you're saying?

10        A.    Yes.

11        Q.    In fiscal year 2004 you didn't get one of

12   those, correct?

13        A.    I'm thinking.  I can't remember.

14        Q.    By the way, the targets for each of these goals

15   changed every year.

16        A.    Yes.

17        Q.    That is, return on investment and operating

18   margins and revenue?

19        A.    Yes.

20        Q.    And customer satisfaction targets, all of those

21   changed each year.

22        A.    Yes.

23        Q.    You said that the weightings also changed each

24   year.



832

1    A.     Yes.  But I would not know the weightings.

2    Q.     That was not something that you knew right

3 away.

4    A.     Correct, yes.

5    Q.     Did you do anything differently as a result of

6 having these discussions or did you just work as hard as

7 you always worked and you didn't change how you worked at

8 all?

9    A.     That's a good question because I -- I was -- at

10 the time I wasn't too excited about my work, so I had

11 interviews with another company.

12   Q.     When is this?

13   A.     In 2004.  Fiscal year 2003.

14   Q.     Do you remember when you had interviews?

15   A.     I can't remember exactly what month, and I

16 tried to find that information, but I can't find it.

17   Q.     How many interviews did you go on?

18   A.     Two -- three.  Two phone and one in person.

19   Q.     This was in the year 2003 you're saying?

20   A.     Yes.

21   Q.     Why do you bring up these interviews?

22   A.     It is important because you asked what I did

23 different, and what I did different was that I did not go

24 to any other company -- to the other company because they



**WILCOX & FETZER LTD.**
Registered Professional Reporters

833

```
1    would not give me my total compensation including the

2    bonus.  They would only match my salary.  And I said I'm

3    making this with my bonus and that bonus I always get.

4    And they said we know about that and we might have

5    something similar; we cannot guarantee that.  And I said

6    well, okay, good-bye.  And I stayed with CSC.

7                  Had I known that, I would have gone to

8    another company.  That's what I would have done

9    different.

10     Q.    But in terms of actually working in your job,

11   you continued to work as hard as you had always worked?

12     A.    Yes, correct.

13     Q.    You didn't change and say I'm not going to work

14   that hard now that I'm not getting the AMIP?

15     A.    No.  I continued to work.  Even if I wanted to,

16   I always do my work.

17     Q.    That's your work ethic?

18     A.    Yes.

19     Q.    That you just work as hard as you can?

20     A.    Yes.  I'm still making a salary and I still

21   need it.

22     Q.    You're trying to do the best you can?

23     A.    Exactly.

24     Q.    Tell me about your positions at CSC.  What
```



B-0852

1    positions have you held?

2        A.    I came to CSC as a -- trying to think.  A

3    computer -- just a scientist, level 4-A.  And then I --

4    after a year in CSC I got a promotion to computer

5    scientist and I have stayed at that level ever since.

6    I'm at the top of that level.  I can't go any more at

7    that level.

8        Q.    What group are you in?

9        A.    In the SAP group.

10       Q.    Is that within the Chemical Group?

11       A.    That's within the Chemical Group.  Now has a

12   different name.  Now I think it's GIS.

13       Q.    Keeps changing names, but it's always the same

14   Chemical Group?

15       A.    Yes.

16       Q.    Who was the head of the Chemical Group in

17   fiscal year 2004?

18       A.    The head of the Chemical Group is

19   Nick Wilkinson.  That would be someone that I would never

20   really see or care about.

21       Q.    You have spoken to Nick Wilkinson about the

22   AMIP program?

23       A.    No.

24       Q.    By the way, other than the conversations you

1    told me about with Mary Lloyd and Aaron Kronmiller, have

2    you spoken to any other managers or employees other than

3    the plaintiffs about the AMIP program?

4        A.    Alan Kronmiller reported to a person with the

5    name of William Cummings, and he was the one who sent the

6    other letter saying that you're not going to receive this

7    anymore.   So that's the only time that we had any --

8        Q.    Communication?

9        A.    Yes.

10       Q.    He sent you a letter?

11       A.    He sent me a letter that I never signed, yes.

12       Q.    You never contacted him or spoke to him?

13       A.    No.

14       Q.    Is it fair to say that you never had any

15   conversations with anybody else from management other

16   than Mary or Aaron about the AMIP program?

17       A.    That's correct.

18       Q.    You never spoke to any other employees about

19   the AMIP program other than the plaintiffs.

20       A.    Correct.   You wouldn't do that because not

21   everyone would get that.   Touchy subject.

22       Q.    I understand.   By the way, is Aaron Kronmiller

23   still with the company?

24       A.    Yes.



Hector L. Calderon

836

1     Q.    Is he still your manager?

2     A.    Yes.

3     Q.    The change that was made to the AMIP plan, that

4 was not something that was made that was personal to you.

5 That was made across the board.  Correct?

6     A.    I don't know that it was across the board.

7     Q.    What's your understanding of how the change --

8     A.    I have no clue.  I have no idea.

9     Q.    You don't know why the change was made or how

10 the change was decided upon?

11    A.    No.

12    Q.    You didn't know that it was based upon level?

13    A.    No.  Like I said, I was asked in a separate

14 memo from William Cummings sign it.  If you don't sign

15 it, tell us why.  I never responded.  I never signed it.

16    Q.    Why not?

17    A.    Because I didn't believe they were doing the

18 right thing.  So I said I'm not going to sign anything, I

19 don't agree with this.

20    Q.    They were asking you to sign it to admit that

21 you received it.

22    A.    Yeah.  I didn't sign it.

23    Q.    You admit that you received it?

24    A.    Sure, yes.  They were sending it through

Hector L. Calderon

837

1    e-mails.   Trying to prove that I received it.

2        Q.    So you didn't need to sign it you're saying?

3        A.    Correct.

4        Q.    You received an AMIP bonus each year you were

5    at CSC?

6        A.    Yes.

7        Q.    Up until fiscal year 2004?

8        A.    Yes.

9        Q.    Your salary you said increased each year --

10       A.    Yes.

11       Q.    -- while you were at CSC?

12       A.    Yes.  Less the cost of living, yes.  But, then

13   again, with the AMIP I would be happy.

14       Q.    What was your position at the time that you

15   were notified in September of 2003 that you were not

16   eligible for AMIP?

17       A.    Same as now, computer scientist.

18       Q.    What functional position were you in?

19       A.    Same as now, consultant.

20       Q.    In the SAP group?

21       A.    Yes.

22       Q.    Doing what kind of work?

23       A.    SAP consulting, it's the kind of work that you

24   learn the system that is used internationally, you help



Hector L. Calderon

838

1   your clients to install it, learn how to use it and

2   maintain it.  So I have done that in many different ways

3   from consulting in terms of helping people manage their

4   project and the past -- well, past few years, maintaining

5   it and also coming up with new solutions to problems.

6       Q.    You understand that CSC had the right to change

7   your eligibility for AMIP, correct?

8       A.    Yes.

9       Q.    You understood that there was no guarantee that

10  you could continue to receive AMIP, correct?

11      A.    Well, totally honest, I never --

12      Q.    You never considered it?

13      A.    Exactly, never considered it.

14      Q.    You never considered whether or not the company

15  had the right to terminate.

16      A.    Yes.

17      Q.    But you understand now that the company did not

18  guarantee that you could continue to receive AMIP every

19  year?

20      A.    I do understand that.

21      Q.    And you understand that the company has the

22  right to make changes to the AMIP program.

23      A.    Yes.

24      Q.    You also understand that you were an at-will



Hector L. Calderon

839

1    employee, correct?

2       A.    Yes.

3       Q.    That means that the company could terminate

4    your employment at any time and you can terminate your

5    employment at any time.

6       A.    Yes.

7       Q.    Does the company have an intranet?

8       A.    Yes.

9       Q.    That's where they post various policies and

10   procedures related to compensation and other policies of

11   the company?

12      A.    Yes.

13      Q.    You've seen those various policies and

14   procedures related to compensation and other matters of

15   the company?

16      A.    When it matters to me and when they're

17   important to look at, I look at it.  It's a mess in

18   there.  There's thousands of documents and so I don't

19   look at any unless I need to look at anything.

20      Q.    Have you looked at any of the policies or

21   programs related to compensation?

22      A.    Yes.

23      Q.    That are posted on the intranet?

24      A.    Yes.



Hector L. Calderon

840

1      Q.    Are there some that are specific to the

2  Chemical Group?

3      A.    I don't know which ones specifically you have

4  been referring to, but all this intranet that you're

5  mentioning and all these postings, this is new.

6      Q.    I'm sorry?

7      A.    This is new.  The documents have not been

8  posted like that like they are today or accessible to us

9  for like it is today.  It was not done in the past.

10     Q.    Other policies and procedures, handbooks,

11  manuals have been distributed to you by e-mail?

12     A.    The handbook was done by e-mail before last

13  year and we will get it once a year, you're correct.  Now

14  it's on the Web, so we can go and get it.

15     Q.    I'm just going to identify this for the record.

16  I don't know that we need to make it an exhibit.

17  Something like this, the Chemical Group Compensation

18  Programs North America Employee's Guide, April 1, 2001,

19  through March 31, 2002?

20     A.    That one, I have never seen it.

21     Q.    But that's the kind of thing that's available

22  on the intranet and distributed by the company?

23     A.    Now it is.

24     Q.    Do you know when this was distributed or how it



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

841

1   was distributed?

2       A.    That, I have never seen it.

3       Q.    Do you know how it was distributed or whether

4   it was distributed?

5       A.    No idea.

6       Q.    The same would be true for the same program

7   guide for the following fiscal year?

8       A.    Never seen it.

9       Q.    So you don't know how it was distributed or

10  whether it was published on the intranet or distributed

11  by e-mail?

12      A.    No.

13      Q.    Or handed out to employees?

14      A.    No.

15      Q.    Or just available in the HR office?

16      A.    We don't have an HR office.

17      Q.    In that period of time.

18      A.    We never had an HR office.  We don't even know

19  where HR is.

20      Q.    Where do you work?

21      A.    In Newark.

22      Q.    Which facility?

23      A.    It's called the mill -- at the mill.  It's

24  Cleveland Avenue and that's where the SAP, several other



WILCOX & FETZER LTD.
Registered Professional Reporters

Hector L. Calderon

842

1   groups are located.

2       Q.      There's no HR office in all of the Newark

3   facilities?

4       A.      There's an HR office in the other Newark

5   office, yes.

6       Q.      That's the HR office that services your

7   building?

8       A.      Yeah.  Never been close to that.

9       Q.      But you know that they have got an HR office?

10      A.      Yeah.  Now that I think of it, there's an HR

11  office there.  Again, we never had any communication with

12  HR.

13      Q.      Am I correct you do not know how the AMIP was

14  calculated year to year?

15      A.      That's correct.

16      Q.      When you were removed from AMIP eligibility in

17  fiscal year 2004, you understood that you would then be

18  eligible for a discretionary bonus, correct?

19      A.      I'm trying to remember what Alan told me at the

20  time.  I think Alan told me that that bonus would

21  really -- would not be accessible to us.  He said -- it

22  says that in the letter, but that's something you will

23  never see.  And those were not precisely his words, but I

24  understood it to mean --



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

843

1    Q.    He gave you the impression that you're not

2  likely to see --

3    A.    Correct.

4    Q.    -- the discretionary bonus being paid.

5    A.    Correct.

6    Q.    He said you are eligible for the discretionary

7  bonus, but it's not a guarantee.

8    A.    He said that that's what the letter says, it's

9  not a guarantee, and he included himself like he was at

10  that time losing his AMIP bonus, too.  So he said we are

11  not going to see that; that's something they put in the

12  letter, but that's not really going to be --

13    Q.    He said we're not going to see that, probably?

14    A.    Right.

15    Q.    He didn't say for sure you will never see it?

16    A.    No.  He didn't know.  At the time Alan didn't

17  know what was going on.

18    Q.    He was just saying that he was upset that he

19  was being removed from AMIP eligibility just like you?

20    A.    Correct.

21    Q.    And he was upset because he didn't think he

22  would get any discretionary bonus just like you.

23    A.    Correct.  Yes, exactly.

24    Q.    So he couldn't predict with absolute certainty,

Hector L. Calderon

844

1    but he thought it was unlikely that either of you would

2    get a discretionary bonus payment?

3        A.    That's correct.

4        Q.    But you understood that you couldn't get both

5    the discretionary bonus and the AMIP; it was one or the

6    other.

7        A.    I did not think about that, because there were

8    times before that I would get two bonuses.

9        Q.    A discretionary bonus?

10       A.    It wasn't called discretionary bonus.  During

11   the years of 2000 -- and I can't remember the specific

12   years, but the SAP group got -- it was called a hot

13   skills bonus.

14       Q.    But that's a different bonus program, correct?

15       A.    Was, yes.

16       Q.    The discretionary bonus is unique, correct?

17   It's separate.

18       A.    I don't know what that is about, really.

19       Q.    Are you aware of anybody that's ever received a

20   discretionary bonus?

21       A.    No, I don't personally know anyone.  Like I

22   said, I don't discuss bonuses with anyone.  The only

23   person, Dan Rollins and I have discussed that.  We're

24   friends and we talk about the -- what is this bonus



Hector L. Calderon

845

1    about, but I don't discuss bonuses with anyone.

2        Q.    You're not sure of whether or not you can

3    receive the discretionary bonus and the AMIP bonus at the

4    same time.

5        A.    No idea.

6        Q.    Are you familiar with anybody who has ever

7    received a prorata bonus?

8        A.    What is that?

9        Q.    Well, what you're seeking is a portion of the

10   bonus?

11       A.    Prorate.  I'm sorry.  I call it prorated.  I'm

12   not aware.

13       Q.    You're not aware of anybody that's ever

14   received a prorated bonus?

15       A.    AMIP bonus?

16       Q.    Yes.

17       A.    Well, I think we did the first year, didn't we?

18   I'm not fully aware, but I think we did receive a

19   prorated bonus our first year in CSC.

20       Q.    Other than that, are you aware of anybody

21   that's ever received a prorated bonus, AMIP bonus?

22       A.    I'm not personally aware of anyone, no.

23            (Deposition Exhibit No. 52 was marked for

24   identification.)



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    BY MR. SEEGULL:

2        Q.    I'm now showing you what's been marked as

3    Exhibit No. 52.  Am I correct that this is the letter

4    that you received notifying you that you would not be

5    eligible for the AMIP bonus for fiscal year 2004?

6        A.    Yes.

7        Q.    This was handed to you or sent to you?

8        A.    Sent to me.

9        Q.    You had said it was sent to you by

10    Mr. Cummings, but I now look at it and it says

11    Jay Smith?

12        A.    Cummings.

13        Q.    I'm sorry.  Mr. Cummings sent it to you?

14        A.    Yes.

15        Q.    How do you know he sent it to you?

16        A.    E-mail.

17        Q.    He e-mailed it to you.  Yes?

18        A.    Yes.

19        Q.    Did it say anything in the cover e-mail?

20        A.    This is it.

21        Q.    All it was was an e-mail address from him to

22    you, the date, and this letter?

23        A.    Yes.

24        Q.    And the letter was an attachment?



Hector L. Calderon

847

```
1       A.     I don't remember.

2       Q.     But there was nothing beyond what was in this

3  letter?

4       A.     No.

5       Q.     Correct?

6       A.     Correct.

7       Q.     Through this letter you were told that you

8  might be eligible --

9       A.     You know, I'm sorry.  I have to go back,

10 because there were notes from -- there were notes from

11 Cummings on that e-mail.  I'm not sure I have it.  I

12 don't think I have it.

13      Q.     Do you remember what the notes said?

14      A.     He said something about I know this is

15 difficult times, I know these are difficult -- something

16 about the effect of this is a difficult time and a

17 difficult subject and something else and then this

18 followed.

19      Q.     That was all in the same e-mail?

20      A.     I can't recall.  I don't remember.

21      Q.     Do you remember him saying anything else in his

22 e-mail?

23      A.     I don't remember the rest of what he said.

24      Q.     You understood from this letter that you might
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0866

Hector L. Calderon

848

1    be eligible for AMIP in the future.

2        A.    I didn't understand it.

3        Q.    If you look on the letter, it says, "If at some

4    future date you should assume a role that is AMIP

5    eligible, your AMIP will be commensurate with the scope

6    of that assignment."

7        A.    Like I said before, it says that there, but

8    because -- you know what, before I said something wasn't

9    totally correct.

10       Q.    Okay.

11       A.    Because before Bill Cummings sent that e-mail,

12   this letter, this specific letter was handed to me by

13   Alan Kronmiller and that's when we had the discussion

14   around this paragraph.

15       Q.    About the discretionary bonus?  Is that about

16   the discretionary bonus?

17       A.    Yes.

18       Q.    So Alan Kronmiller handed you the letter,

19   Exhibit 52, and he told you that you're not getting the

20   AMIP.  I'm not getting the AMIP, either, I guess he said

21   to you?

22       A.    Correct.

23       Q.    And then he said but it says we're going to be

24   eligible for the discretionary bonus, but I don't think

**W&F**

Hector L. Calderon

849

1    we will ever get that?

2        A.    Correct.

3        Q.    Something to that effect.

4        A.    That's exactly what happened, yes.

5        Q.    And that was the end of the conversation.

6        A.    We discussed it more.

7        Q.    What else did you discuss?

8        A.    He went on to say that how people were trying

9    to fight it.  We had a long discussion about this.  I

10   can't remember all the specifics that went into the

11   discussion, but he did say people were trying to fight

12   it.  Our management don't agree with this.  He mentioned

13   higher management, and I don't recall -- I don't recall

14   the names, but I recall him saying higher management

15   doesn't agree with this, but this is what we're being

16   told, and that's when we went on to discuss this

17   paragraph, and you just described what he said.

18       Q.    Do you remember anything else happening during

19   that conversation or anything else being discussed?

20       A.    No.

21       Q.    Then subsequent to this letter being handed to

22   you, you then received an e-mail from Mr. Cummings?

23       A.    Correct.

24       Q.    He attached the letter, as well?



Hector L. Calderon

850

1    A.    Correct.

2    Q.    Mr. Cummings told you in that e-mail that I

3  understand this is difficult times.

4    A.    Yes.

5    Q.    And you don't remember anything else that he

6  said?

7    A.    I don't remember.

8    Q.    Any other conversations about your removal from

9  AMIP eligibility?

10   A.    The next one -- the only other one was when I

11  did not return this because I was never asked to return

12  this.  I received another note from Bill Cummings again

13  saying how sorry he was and difficult times it was but he

14  needed -- HR needed this and if I wasn't going to sign

15  it, I was supposed to explain why.  That was all I got.

16   Q.    You never responded to that e-mail?

17   A.    No.

18   Q.    Correct?

19   A.    Correct.

20   Q.    By the way, the reason you have to estimate

21  your AMIP bonus for that period of time from April 1,

22  2003, through September 11th, 2003, was because you don't

23  know exactly how the AMIP would have been calculated for

24  that period of time.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

851

1        A.      Correct.

2        Q.      You would agree that a company has the right to

3    make decisions to save money and increase profits?

4        A.      Yes.

5        Q.      And a company can use its business judgment to

6    decide what the best way is to do that?

7        A.      Yes.

8        Q.      And you would agree that fiscal year 2003 was a

9    very difficult year for the company financially.

10       A.      I don't have the numbers in front of me to be

11   able to respond to that, so I don't know.

12       Q.      Do you remember at all how the company did in

13   2003?

14       A.      I don't remember.

15       Q.      Do you know how long it took the company to

16   determine whether or not the AMIP program should be

17   changed or how it should be changed?

18       A.      I don't know that.  I don't have that

19   information.

20       Q.      Would you agree that directors have greater

21   responsibilities than senior managers and managers?

22       A.      Yes.

23       Q.      And that directors typically receive higher

24   compensation than senior managers and managers?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

852

1    A.    Yes.

2    Q.    Would you agree that AMIP bonuses can't be

3  calculated midyear; you have to wait until the close of

4  the fiscal year to figure out whether or not the company

5  achieved its objectives?

6    A.    Yes.

7    Q.    Have you told me about all the people who have

8  personal knowledge about this case, as far as you know?

9    A.    Yes.

10    Q.    Do you have any debts at the present time?

11    A.    No.

12    Q.    Have you now told me everything that you know

13  or remember that forms the basis of your case?

14    A.    Yes.

15          MR. WILSON:   Object to the form.

16    Q.    Is there anyone else you have not mentioned who

17  can support your claims?

18          MR. WILSON:   Object to the form.

19    A.    No.   I mentioned all the names I know.

20    Q.    Is there any other information which you have

21  not mentioned which is relevant to supporting your

22  claims?

23          MR. WILSON:   Object to the form.

24    A.    I don't have any other -- no.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

853

```
 1        Q.    You don't have any other information?

 2        A.    No.

 3              MR. SEEGULL:  I think your attorney may

 4   have a few questions for you.

 5   BY MR. WILSON:

 6        Q.    Yes.  Mr. Seegull asked you some questions

 7   about the DuPont variable compensation bonus.  Was this

 8   bonus considered compensation that was calculated into

 9   your pension at DuPont?

10        A.    Not into my pension, no.

11        Q.    When you were talking about your transition to

12   CSC, you stated that it was a higher salary.  Was this a

13   higher base salary or a higher total compensation?

14        A.    It was a higher base salary and it was a total

15   base -- total base and total compensation, both.  So

16   without -- well, yeah, both.

17        Q.    So the base salary was more at CSC?

18        A.    Yes.

19        Q.    Were the bonuses at CSC more than at DuPont?

20        A.    Yes.

21        Q.    Was the AMIP bonus the only bonus that they

22   told you you would get?

23        A.    Yes.

24        Q.    You also testified that the AMIP bonus was the
```



Hector L. Calderon

854

1    most important thing to you when you were talking about

2    the offer letter.

3                MR. SEEGULL:  Objection.

4    BY MR. WILSON:

5        Q.    Why was it the most important thing?

6                MR. SEEGULL:  Objection.

7        A.    Yes.  It was -- the second most important thing

8    behind my salary.  It was a high percentage, and anyone

9    would agree that 22 percent of a close to -- 22 percent

10   of any salary is a lot of money.

11       Q.    You also discussed your increases.  Did you say

12   they were low?

13       A.    Very low.

14       Q.    Are they still low?

15                MR. SEEGULL:  Objection.

16       A.    Yes.

17       Q.    What was your increase last year?

18       A.    Two percent.

19       Q.    Typically, when you were still eligible for

20   AMIP, what were your increases?

21       A.    The year that they took the AMIP away, they

22   gave me zero percent.  So it was a double bad news.

23       Q.    Regarding your yearly conversations with

24   Alan Kronmiller, in those conversations did he indicate



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

855

1    to you that you would be eligible for the AMIP in the

2    coming year?

3                MR. SEEGULL:    Objection.

4        A.    Yes.

5        Q.    Every year?

6        A.    Yes.

7                MR. SEEGULL:    Objection.

8        Q.    Did he communicate that to you prior to fiscal

9    year 2004?

10               MR. SEEGULL:    Objection.

11       A.    Yes.

12       Q.    Do you know when that communication was?

13       A.    It was always during my salary discussions.    So

14   it would have been in May of that fiscal year.

15       Q.    May 2003?

16       A.    Yes.

17       Q.    Prior to September 11th did he ever come to you

18   and indicate that you weren't going to be eligible for

19   the AMIP?

20       A.    No.

21       Q.    I'd like you to look at Exhibit 51 again.

22   Looking at this document, does it reflect any personal or

23   group goals?

24       A.    No.

Hector L. Calderon

856

1     Q.    In fiscal year 2003, were there any personal or

2  group goals?

3             MR. SEEGULL:  Objection.

4     A.    I don't recall.  The only other information I

5  received was the table at the middle of the year that we

6  always got, and I can't recall exactly what was in there.

7     Q.    Do you see where it says "MBO Weighting" in the

8  top portion of the worksheet?

9     A.    Yes, I see it.

10    Q.    What does "MBO Weighting" stand for?

11    A.    No idea.

12    Q.    What does "Financial Weighting" stand for?

13    A.    No idea.

14    Q.    What about "Maximum Bonus Potential"?

15    A.    That's the maximum amount percent that I can

16  get for that fiscal year.

17    Q.    Was your maximum bonus potential always

18  22 percent?

19    A.    Between 21 and 23.  The least amount was 21.

20    Q.    Does this worksheet indicate that the AMIP

21  bonus is eligible for proration?

22             MR. SEEGULL:  Objection.

23    A.    I don't know.

24    Q.    Is there a box titled, "Proration by Eligible

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Hector L. Calderon

857

1  Months"?

2              MR. SEEGULL:  I'm going to object.  He says

3  he's never seen this document before yesterday.  What

4  value is his testimony about this document?

5       A.    I don't see it.

6       Q.    In the column that says potential

7  weight percent, do you know what that is?

8              MR. SEEGULL:  Objection.

9       A.    No.

10      Q.    Could you look at Exhibit 52?  On this document

11  it indicates that the discretionary bonus is an earned

12  bonus, correct?

13      A.    Correct.

14             MR. SEEGULL:  Objection.

15      Q.    Were any bonuses at CSC not earned?

16             MR. SEEGULL:  Objection.

17      A.    No.

18      Q.    Was your AMIP bonus earned?

19             MR. SEEGULL:  Objection.

20      A.    Sure.

21      Q.    Did you have to do something to receive your

22  AMIP bonus?

23      A.    Yes.

24      Q.    Did you have to do something to receive any



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

858

1    bonus at CSC?

2        A.    Yes.

3        Q.    During what time period did you earn your AMIP

4    bonus?

5        A.    During April 1st through March 31 of the next

6    year.

7                    MR. WILSON:    I have nothing further.

8    BY MR. SEEGULL:

9        Q.    You did not earn a bonus for fiscal year 2004,

10   correct?

11                   MR. WILSON:    Objection.

12       A.    I earned it.  I just don't -- didn't receive

13   it.

14       Q.    The conversations you had with Kronmiller that

15   you just answered Mr. Wilson's questions, those were the

16   conversations we discussed, correct?

17       A.    Yes.

18       Q.    That is, Mr. Kronmiller would come to you in

19   May or June of the fiscal year following the close of the

20   prior fiscal year.

21       A.    Yes.

22       Q.    Six weeks or eight weeks following the close of

23   the fiscal year?

24       A.    Yes, but what we would discuss is

Hector L. Calderon

859

1    congratulations, we met, and this is what we're aiming

2    for this year and you're a part of it.

3        Q.    But he wasn't telling you about what you were

4    going to earn next year.  He was telling you about what

5    your bonus was going to be for this past fiscal year

6    because he was saying that's what you're going to get as

7    a result of your performance this past fiscal year?

8        A.    He also said, like I said before, my increases

9    were low he always said and you are going to receive this

10   bonus this coming year.

11       Q.    He didn't guarantee it, did he?

12       A.    His words to me -- he didn't mention the word

13   "guarantee," but he always said you are part of it and

14   you are in it, and so to me he was guaranteeing it, yes.

15   Unless, I'm sorry, I received a letter like this telling

16   me, Hector, you will not receive a bonus, I was working

17   towards that.  That's what he told me I would get.

18       Q.    Is Mr. Kronmiller an honest person?

19             MR. WILSON:  Objection.

20       A.    Yes.

21       Q.    If he testifies that he didn't have that kind

22   of a conversation with you every year, would he be lying?

23       A.    Probably.  Because Alan Kronmiller has right

24   now -- so many has resigned.  He had close to 100 people

Hector L. Calderon

860

1    just reporting to him and he has no clue.  He has a

2    discussion with me -- assignment that he gave yesterday

3    he won't remember.  He can be as honest as he wants, but

4    if he says that it did not happen, he would be lying,

5    yes.

6         Q.    If he says, look, I had a conversation with

7    Mr. Calderon each year about his prior year's performance

8    and during that conversation we would discuss what the

9    AMIP was for that prior fiscal year and I would present

10   that information to him, but I never guaranteed him that

11   he would get the AMIP for the next fiscal year, would he

12   be lying or would that be the truth?

13        A.    That would be true.

14              MR. WILSON:  Objection.

15        Q.    Because he couldn't tell you whether or not you

16   would get the AMIP or not?

17        A.    Well, he did.  The part that I disagree with

18   what you're saying is the word "guarantee."

19        Q.    In other words, he didn't guarantee you whether

20   or not you would get an AMIP?

21              MR. WILSON:  Objection.

22        A.    He did tell me that I would get it.

23        Q.    I'm confused.  He guaranteed you that you would

24   get the AMIP every single year.  Is that your testimony,

Hector L. Calderon

861

1    Mr. Calderon?

2                    MR. WILSON:    Objection.

3        A.    He said that I would get it.    You're putting

4    words in my mouth, because he wasn't guaranteeing.    He

5    didn't say I guarantee that you will get it.    It was

6    always understood that I could -- that this could be

7    taken away.    Actually he told me -- the more I thought --

8    the more I remember his discussions with me that he said

9    this is being discussed as a possibility of being taken

10   away.    So he said but unless we hear differently, you are

11   going to have this.

12       Q.    So what he said to you in this May of 2003 time

13   frame is right now it's being discussed about whether or

14   not we're going to take away your AMIP eligibility?

15       A.    No.    Not we.    He had nothing to do with the

16   decision.

17       Q.    Not we but senior management is discussing

18   taking away your AMIP eligibility?

19       A.    Correct.

20       Q.    No decision has been made yet?    Or did he say a

21   decision had been made?

22       A.    No.    I can't remember exactly.    I shouldn't

23   answer that question because I can't remember exactly how

24   the discussion went.



Hector L. Calderon

862

1      Q.    You don't remember the discussion in May of

2    2003?

3      A.    I remember the discussion, his saying that you

4    will get it because that would happen every year.

5      Q.    But he told you that it was being discussed but

6    no decision had been made.

7      A.    He said that the past two years.  For sure.

8    The past two years.  That year and the year before he

9    said at some point this might -- this is not guaranteed.

10     Q.    What you said was, and I can read it back to

11   you if you want --

12     A.    No.

13     Q.    But what you said was that senior managers were

14   discussing removing you from AMIP eligibility.

15     A.    No, I didn't say that.

16     Q.    That that's what he said.

17     A.    Not removing me.

18     Q.    Removing people at your level from AMIP

19   eligibility, but that no decision had been made.  Unless

20   you say a decision had been made?

21     A.    Again, it might be a waste of time trying to

22   recall something, a conversation that I can't recall

23   fully.  So I don't want to --

24     Q.    If you don't recall the conversation and what



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

863

1  was discussed in the conversation, that's fine.  Just say

2  that and that will be your testimony.  Is that your

3  testimony?

4      A.    Yes.  I don't recall fully.

5      Q.    You either recall the conversation or you

6  don't.

7      A.    I recall parts of it.

8      Q.    Let's be clear about this.  I want you to be

9  absolutely clear because you're testifying under oath.

10      A.    Yes.

11      Q.    If I ask you a question, I expect you to answer

12  it truthfully.

13      A.    Yes.

14      Q.    You do recall that he told you senior

15  management was considering removing people from AMIP.

16      A.    Yes.

17      Q.    And no decision had been made, correct?

18      A.    Yes.

19      Q.    And that once a decision had been made, it

20  would be communicated to you?

21      A.    I wasn't told that.

22      Q.    But he couldn't guarantee that you were going

23  to get AMIP because it was still being considered by

24  senior management, correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

Hector L. Calderon

864

1              MR. WILSON:   Objection.

2      A.    I don't know.

3      Q.    He couldn't guarantee it, correct?

4      A.    That's what you're saying.

5      Q.    Isn't that true?

6      A.    No, that's not true.

7      Q.    Was Mr. Kronmiller a member of senior

8  management?

9      A.    I don't know.

10     Q.    Your understanding is that he was not part of

11  the people that were considering this decision?

12     A.    That's my understanding based on later

13  discussions when he said I have nothing to do with this,

14  Bill told me, Bill being William Cummings.   Right there I

15  understand you're not part of this.

16     Q.    In May when he had this discussion with you and

17  you said it wasn't we are considering this, you said it

18  was other people that were considering this, that's what

19  he said?

20     A.    Yes.

21     Q.    So he was not one of the people in management

22  that was considering making this change.

23     A.    Correct.

24     Q.    And that's what he told you.   He told you it



WILCOX & FETZER LTD.

Registered Professional Reporters

B-0883

Hector L. Calderon

865

1   was others that were considering this.

2       A.    Correct.

3       Q.    More senior people?

4       A.    Correct.

5       Q.    You understood he did not have authority to

6   make that decision for you?

7       A.    Right.

8             MR. WILSON:  Objection.

9       Q.    Because he was not a member of the senior

10  management.

11      A.    Yes.

12      Q.    In fact, the decision that was made with

13  respect to you was also made with respect to him?

14      A.    Yes.

15            MR. SEEGULL:  I have no further questions.

16            MR. WILSON:  I have none.

17            MR. SEEGULL:  Do you want to advise him

18  about the right to read and sign?

19            MR. WILSON:  You have the right to read and

20  sign the transcript.  If you read it, if she makes any

21  typographical errors, you can correct those typographical

22  errors, or you can waive that right and just go with what

23  she has down.  It's completely up to you.

24            THE WITNESS:  Yeah, I don't have any



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Hector L. Calderon

866

1    problems signing it.

2              MR. WILSON:  You want to read and sign?

3              THE WITNESS:  Yes.

4              (Deposition concluded at 11:20 a.m.)

5                  -  -  -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    T E S T I M O N Y

 2

 3    DEPONENT:  HECTOR L. CALDERON                 PAGE

 4

 5    BY MR. SEEGULL................................ 790

 6    BY MR. WILSON................................ 853

 7    BY MR. SEEGULL................................ 858

 8

 9                    E X H I B I T S

10

11    DEPOSITION EXHIBIT NO.                       MARKED

12

13    50 - A letter dated March 7, 1997, to
      Hector L. Calderon from Dorothy
14    Eltzroth................................ 812

15    51 - A two-page document entitled, "Fiscal
      Year 2003 AMIP"................................ 826

16

      52 - A letter dated September 11, 2003,
17    to Hector Calderon from Jay Smith............ 845

18

19    ERRATA SHEET/DEPONENT'S SIGNATURE         PAGE 868

20

21    CERTIFICATE OF REPORTER                   PAGE 869

22

23

24
```

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

868

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0887

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)


         I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 2nd day of
March, 2006, the deponent herein, HECTOR CALDERON, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

         I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

         I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



              Kimberly A. Hurley
              Certification No. 126-RPR
              (Expires January 31, 2008)



DATED:




WILCOX & FETZER LTD.
Registered Professional Reporters