# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIAN MILLER; HECTOR CALDERON;<br>CHARLES FOLWELL; ROLLAND GREEN;<br>DAWN M. HAUCK; KEVIN KEIR;<br>ASHBY LINCOLN; KAREN MASINO;<br>ROBERT W. PETERSON; SUSAN M. POKOISKI;<br>DAN P. ROLLINS; and WILLIAM SPERATI,<br><br>Plaintiffs,<br><br>v.<br><br>COMPUTER SCIENCES CORPORATION,<br>a Delaware Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>: :<br>: C.A. No. 05-010-JJF<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

---

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 3 of 3

---

Dated: June 8, 2006

Timothy J. Wilson, Esquire (DE #4323)
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
Attorney for Plaintiffs

## TABLE OF CONTENTS

**Document**                                                                                   **Page No.**

Transcript of Dawn M. Hauck dated March 2, 2006.........................B-0889 – B-0971

Transcript of Susan J. Eltzroth dated March 31, 2006.....................B-0972 – B-1010

Transcript of James Styles dated April 26, 2006............................B-1011 – B-1082

Transcript of Russell H. Owen dated May 8, 2006.........................B-1083 – B-1154

Transcript of Mary Jo Morris dated May 8, 2006...........................B-1154 – B-1203

Transcript of Nick Wilkinson dated May 19, 2006.........................B-1204 – B-1240

Excerpt from Transcript of Hector L. Calderon dated March 2, 2006 .....B-1241 – B-1253

Defendant's Answer to Complaint..............................................B-1254 – B-1259

CSC's Compensation Programs Employee's Guide for Management.....B-1260 – B-1272

Letters to Plaintiffs from CSC dated September 11, 2003..................B-1273 – B-1282

Annual Management Incentive Plan dated April 2, 1983...................B-1283 – B-1286

Email 1 from Henry Leidemer dated July 9, 2003..........................B-1287

Email  2 from Henry Leidemer dated July 9, 2003.........................B-1288- B-1291

Email from Gus Siekierka dated June 25, 2003.............................B-1303 – B-1305

BlankAMIP Worksheet..........................................................B-1306

Letter from Jeffrey Martin.......................................................B-1307

Letter from Tyler Raimo.........................................................B-1308

Plaintiffs AMIP Worksheets ...................................................B-1309 – B-1325

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
     Plaintiffs,                )
                                )
     v.                         )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
     Defendant.                 )

            Deposition of DAWN M. HAUCK taken pursuant
to notice at the law offices of Potter Anderson &
Corroon, Hercules Plaza, 6th Floor, Wilmington, Delaware,
beginning at 11:30 a.m., on Thursday,
March 2, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware 19806
              for the Plaintiffs

            LARRY R. SEEGULL, ESQUIRE
            DLA PIPER RUDNICK GRAY CARY US LLP
              6225 Smith Avenue
              Baltimore, Maryland 21209-3600
              for the Defendant


            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

COPY

B-0889



WILCOX & FETZER LTD.
Registered Professional Reporters

DAWN M. HAUCK,

the witness herein, having first been

duly sworn on oath, was examined and

testified as follows:

BY MR. SEEGULL:

Q.    Ms. Hauck, my name is Larry Seegull, as you

know.  I'm an attorney representing Computer Sciences

Corporation in connection with your lawsuit.

Have you ever been deposed before?

A.    I have been deposed for insurance-related

measures, but nothing of this fashion.

Q.    Tell me about the cases that you have been

deposed in.

A.    It was a vehicle accident.

Q.    Were you the victim or were you in the accident

for some other reason or were you deposed as a witness?

A.    I was one of the drivers and my car was hit

broadside.  So I was deposed by other parties' insurance

companies to get down what happened in the accident.

Q.    So you were suing?

A.    No.  My insurance company just was going to

them for payment of repair of the vehicle.  There were no

personal injuries.  And so the other insurance company

requested my version of what happened in the accident

Dawn M. Hauck

872

1   because the police officer did not issue any tickets,

2   would not issue any fault of any sort on either party.

3       Q.    How was that case resolved?

4       A.    I never heard.  I never received my deductible

5   back, so I'm assuming it was either a wash -- I have no

6   idea how it was resolved.

7       Q.    Let me just give you some instructions for

8   today's deposition.  I'll, obviously, be asking you

9   questions about the facts forming the basis for your

10  claims, and obviously all of your answers have to be

11  verbal because the court reporter can't take down head

12  nods or other body language.  You are under oath, so you

13  must answer the questions truthfully and completely just

14  as if you are testifying in court.

15            If you do not hear a question, say so and I

16  will repeat it.  If at any point in time you realize that

17  an earlier answer you gave was incomplete or inaccurate

18  in any way, just say so and you will be allowed to

19  correct or supplement the record.

20            Of course, if you need to stop to use the

21  restroom, need to take a break for any reason, just say

22  so and you will be allowed to do so.

23            You cannot talk to your attorney during the

24  deposition unless it relates to a question of privilege;

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0892

Dawn M. Hauck

873

1    that is, unless it relates to a question of your

2    communications with your attorney.  I will try not to ask

3    you about your communications with your attorney since

4    they are privileged.

5                If you answer the question, I will assume

6    that you have heard it and understood it and have given

7    me your best recollection.

8                Do you understand the instructions that I

9    have just given you?

10       A.     Yes.

11       Q.     Are you taking any medication today that could

12   impair your ability to testify?

13       A.     No.

14       Q.     What did you do to prepare for this deposition?

15       A.     I met with my attorney.

16       Q.     When was that?

17       A.     Monday.

18       Q.     Did you do anything else?

19       A.     I reviewed the interrogatories that you had

20   sent and I reviewed the complaint.

21       Q.     Did you review any documents?

22       A.     Documents that were provided with the

23   interrogatories.

24       Q.     Do you remember which documents you reviewed?



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

874

1     A.    I reviewed what was provided to my attorney

2  which would have been AMIP management guides, pay stubs,

3  and program-related communications.

4     Q.    So the AMIP program-related communications, are

5  those policy statements that the company publishes on

6  compensation for the Chemical Group?

7     A.    Somewhere what I would call policy statement,

8  the program, actual program guide.  Other was, for

9  example, this is what you will receive as a payout and

10  how it was broken down for the financial objectives that

11  were met for the course of the year.

12     Q.    Is that a worksheet?

13     A.    Yes.

14     Q.    Is this the kind of thing that you're talking

15  about?

16     A.    Yes.

17            MR. SEEGULL:  Let's have this marked as an

18  exhibit.

19            (Deposition Exhibit No. 53 was marked for

20  identification.)

21  BY MR. SEEGULL:

22     Q.    I'm now showing you what's been marked

23  Exhibit 53, and the title of the document is "Chemical

24  Group Compensation Programs North America Employee's



Dawn M. Hauck

875

1    Guide April 1, 2001 - March 31, 2002," and it's Bates

2    labeled D-10462 through D-10484.

3              You said this was one of the guides that

4    you reviewed in preparation for the deposition?

5        A.    Yes.   The other was specifically the AMIP which

6    is a subset of this.

7        Q.    Let's only focus on Exhibit 53 for a moment.

8    We're not going through the details of this, but

9    Exhibit 53 was a document that you were provided by

10   e-mail or it was on the intranet?   Do you remember how

11   they distributed it?

12       A.    I was provided this guide when I was a managing

13   supervisor for the Chemical Group.

14       Q.    Just so you're clear, this is the employee's

15   guide.   There was also a version for managers?

16       A.    Absolutely.

17       Q.    The manager's guide was provided to you as a

18   manager?

19       A.    Yes.

20       Q.    And the employee's guide was distributed to

21   employees or available on the intranet?

22       A.    It was available to employees.   I personally

23   never received an employee's guide as an employee.   I

24   received the manager's guide and the employee's guide

Dawn M. Hauck

876

1   when I was a supervising manager.

2       Q.      But how did you receive it?

3       A.      I received it in a hard copy.

4       Q.      Just distributed to you by interoffice mail?

5       A.      I don't recall how it was distributed.  I

6   received it in a binder that said the title of what the

7   documents were.  They were tabbed as to where the

8   documents were, whether it was the manager's guide or the

9   employee's guide.

10      Q.      That's how you received Exhibit 53, correct?

11      A.      Correct.

12              (Deposition Exhibit No. 54 was marked for

13  identification.)

14  BY MR. SEEGULL:

15      Q.      I'm now showing you what's been marked as

16  Exhibit 54.  This is a document that's Bates numbered

17  D-10370 through D-10386.  This is another guide for

18  employees.  This is for the following fiscal year of

19  April 1, 2002, through March 31, 2003.  Correct?

20      A.      That's correct.

21      Q.      You would have also received this guide.  Would

22  you have received it by e-mail?

23      A.      I don't recall receiving this guide.

24      Q.      You know you received the guide for 2002?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0896

Dawn M. Hauck

877

1     A.    I received the AMIP guide for '99 -- fiscal

2  year '99, fiscal year 2000, and fiscal year 2001.

3     Q.    An AMIP guide I guess is separate from these?

4     A.    The AMIP guide is a subset of this compensation

5  guide.

6     Q.    Did you receive this overall compensation

7  guide?

8     A.    When I was a manager -- I was a manager in

9  fiscal year '98, '99, and part of 2000.  So I have

10  management guides up through 2000, fiscal year 2000.

11     Q.    Did you receive these compensation guides as an

12  employee?

13     A.    No.

14     Q.    When you were no longer a manager?

15     A.    No.

16     Q.    Were they just available on the intranet, as

17  far as you know?

18     A.    They were available if I went to my supervisor

19  because I was told if my employees came to me, they would

20  be provided, that if I went to my supervisor requesting

21  to see a compensation guide, I would have been provided

22  these guides.

23     Q.    So exhibits 53 and 54 were available to you if

24  you had gone to your supervisor?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0897

Dawn M. Hauck

878

1    A.    To the best of my knowledge.

2    Q.    Or maybe if you had gone to Human Resources,

3    they were available?

4    A.    Correct.  To the best of my knowledge, they

5    would have provided them to me.

6    Q.    These are documents that are kept and

7    maintained by Human Resources and by management?

8    A.    I believe so.

9    Q.    And then you said there was also a separate

10   AMIP guide that was a subset of these guides.

11   A.    It wasn't the total encompassing guide.  It was

12   a smaller -- just around the AMIP program.

13   Q.    It was just the section of AMIP that comes out

14   of these guides?

15   A.    It was approximately six pages in length.

16   Q.    Tell me what page it would have started at and

17   what page it finished at.  There's a Bates number at the

18   bottom of the page.  Would it be starting at

19   page D-10471, "Chemical Group Variable Compensation

20   Programs"?

21   A.    It would have started with D-10474 where it

22   discusses the background of the CSC AMIP program,

23   participant eligibility guidelines.

24   Q.    Going through where?



Dawn M. Hauck

879

1      A.    It did not include premium skills because it

2  was, again, specifically -- did not include PSPP.  But it

3  also then went into -- again, these were guidelines

4  around the current-year program and the future-year

5  program.  So it also discussed how the program was broken

6  out with the financial objectives.

7      Q.    You're talking about the worksheet now?

8      A.    No.  I'm talking about the program guide.

9      Q.    Is that a guide that you still have?

10     A.    I have a hard copy of it, yes.

11     Q.    You have the AMIP guide?

12     A.    Yes, I do.

13           MR. SEEGULL:  Tim, is that a document

14  that's been produced to us?

15           MR. WILSON:  I would imagine so, but I

16  can't say for sure.  If she's given it to us, I'm sure it

17  has been.

18           MR. SEEGULL:  I do not believe that we have

19  a separate guide for AMIP.

20  BY MR. SEEGULL:

21     Q.    Was it just one page?

22     A.    Again, as I said, it was approximately maybe

23  six pages.  It went through the program itself, the

24  background of the program.  It went through how

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

B-0899

Dawn M. Hauck

880

1    eligibility is determined.  It explained how every year

2    the program was an annual program, it was reviewed at the

3    beginning of each fiscal year each participant's

4    eligibility.

5        Q.    You still have a copy of that?

6        A.    I have a copy of that, yes, I do.

7        Q.    Do you have a copy of that with you?

8              MR. WILSON:  Is this what you're talking

9    about?

10             THE WITNESS: No.

11   BY MR. SEEGULL:

12       Q.    Do you have a copy of that with you, Ms. Hauck?

13       A.    No, I don't.

14             MR. SEEGULL:  What was the Bates number of

15   the thing you showed her?

16             MR. WILSON:  There is no Bates number on

17   this.  I'll verify that this has been produced because it

18   concerns me that there is no Bates number on this.

19       Q.    Do you know what the date of this AMIP guide

20   was?

21       A.    Again, I received them in fiscal year '99,

22   fiscal year 2000, and fiscal year 2001.  They were very

23   similar each year.

24             MR. SEEGULL:  Tim, do you know what she's



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

881

1    referring to?

2            MR. WILSON:  No.

3        Q.    When was the last time you saw this guide,

4    Ms. Hauck?

5        A.    The last time it was provided to me or the last

6    time I reviewed it?

7        Q.    Last time you reviewed it.

8        A.    I reviewed it on Monday after I met with my

9    attorney in preparation for today.

10        Q.    Did you review it in your attorney's office?

11        A.    No.

12            MR. SEEGULL:  I'm concerned, Tim, that we

13    don't have that document.  I'm willing to continue with

14    this deposition, I think we should, but obviously I need

15    to see what document that is and I may have to resume

16    this deposition.

17            MR. WILSON:  Understood.

18        Q.    Would it be the same information that was

19    contained on pages D-10474 and D-10382?  Let's do one at

20    a time.

21        A.    10471?

22        Q.    10474?

23        A.    10474, correct.  This talked about the

24    background of the AMIP and its eligibility guidelines.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

882

1       Q.    Let me just do one thing at a time here.  The

2    AMIP guide that you're speaking of contains the same

3    information that is contained on D-10474?

4       A.    Yes, it does.

5       Q.    Does it also contain the same information that

6    is contained on D-10382?

7       A.    Yes.

8       Q.    Just so we're clear, the guide that you're

9    speaking of is a prior-year's version of these guides?

10      A.    Yes.

11      Q.    So these would be the more updated guides to

12   the extent that there are any distinctions or

13   differences.

14      A.    To the best of my knowledge.

15      Q.    And these were provided annually you're saying?

16      A.    I received them annually.

17      Q.    The separate AMIP guide you no longer received

18   after '99?

19      A.    I received three guides:  one for fiscal year

20   '99, fiscal year 2000, and fiscal year 2001.

21      Q.    When would you have received these guides?

22      A.    I don't recall.

23      Q.    You don't recall when in the course of a year?

24      A.    No.

Dawn M. Hauck

883

1    Q.    But you did not receive it after fiscal year

2    2001?

3    A.    To the best of my knowledge, no.  Those are the

4    only three guides I received.

5    Q.    Other than those three separate AMIP guides

6    which contained the same information as what's on D-10382

7    and D-10474, are you aware of any other AMIP plans or

8    guides or policies?

9    A.    Could you clarify that?

10    Q.    Are you aware of any other documents that speak

11    about AMIP?

12    A.    Only what was provided to me at the time of

13    when objectives were discussed or when payout was

14    discussed.

15    Q.    The only other AMIP documents would be the

16    worksheets?

17    A.    Would be the worksheets or any supporting

18    documentation that went with them.  Not in the form of a

19    guide.

20    Q.    But what supporting documentation would go with

21    a worksheet?

22    A.    They may have explained this is how we met the

23    objectives, we met return on investment through blah,

24    blah, blah.



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0903

Dawn M. Hauck

884

1    Q.    There might be a document that might show you

2    return on investment?

3    A.    Or they may have written a small paragraph or a

4    few sentences describing how the corporation did on

5    return on investment or how the group contributed to the

6    return on investment, but not a program guide.

7    Q.    And those attachments would come at the end of

8    the fiscal year, actually after the close of the fiscal

9    year, in connection with the calculation of the AMIP?

10    A.    Correct.

11    Q.    Am I correct that sometime between October and

12    December of each fiscal year you would receive a

13    worksheet that was uncompleted; that is, it didn't have

14    the achievements placed in for the corporate and other

15    goal achievements?

16    A.    At some point in time during the course of the

17    fiscal year, we would receive a worksheet or not -- we

18    would receive a worksheet and it would explicitly say

19    these are the financial objectives that we're working

20    towards for the fiscal year in order to achieve your AMIP

21    bonus.

22    Q.    Can we call those preliminary worksheets?

23    A.    Yes.

24    Q.    In the sense that they don't have the actual



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

885

1    achievement numbers in them.

2        A.    That's correct.

3        Q.    You would receive these preliminary worksheets

4    in sometime between October and December of each year?

5        A.    We would receive them somewhere during the

6    course of the fiscal year.

7        Q.    Do you know when you would receive them?

8        A.    It was never a set time.  We didn't receive

9    them October 1st of every year.  We received them

10   somewhere during the course of the fiscal year with the

11   goals and objectives that we were working toward as a

12   corporation to achieve our bonuses.

13       Q.    Those preliminary worksheets would have the

14   corporate fiscal goals?

15       A.    For the program, yes.

16       Q.    As well as group goals and individual goals?

17       A.    If they pertained to that fiscal year.

18       Q.    Somewhere you might have had personal goals,

19   some years you might not have --

20       A.    Early years we had group goals or what I guess

21   you're referring to as a personal goal.  The later years

22   they were purely financial.

23       Q.    But if a particular year had personal goals or

24   group goals associated with them, they would appear on



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

886

1    that preliminary worksheet?

2        A.    We would add them to the preliminary worksheet.

3    The worksheet would come down from corporate, if you

4    will.  Our group would then determine what our group's

5    goals were, and they may or may not be on the worksheet

6    at the time.  It would depend on whether or not we needed

7    to add anything additional to that worksheet.

8        Q.    Once they were distributed to employees, they

9    would have all of the personal, group, and corporate

10   goals.

11       A.    Correct.

12       Q.    Because these worksheets were given to

13   employees, correct?

14       A.    They were given to us so that we knew what we

15   were working towards for -- for the current financial

16   goals.

17       Q.    By the way, are you speaking now as an employee

18   or when you were a manager?

19       A.    As an employee.  I never personally managed

20   employees on this program.

21       Q.    On AMIP?

22       A.    Correct.

23       Q.    Is it correct that the goals changed year to

24   year?



Dawn M. Hauck

887

1    A.    The targets changed year to year.  There may

2  have been a return-on-investment goal in multiple years

3  of an AMIP program, but the targets certainly changed

4  year to year.

5    Q.    So some years return on investment was a

6  factor, some years was no.

7    A.    Some years return on the investment, the target

8  may have been higher or lower than previous or future

9  years.

10    Q.    But some years return on investment wasn't even

11  a factor?

12    A.    It may not have even been a factor, that's

13  correct.

14    Q.    Same with operating income, some years that

15  might have been a factor, some years not?

16    A.    That's correct.

17    Q.    Or earnings per share?

18    A.    That's correct.

19    Q.    And even if it was a factor year to year, the

20  target for those factors would change?

21    A.    May have changed, correct.

22    Q.    I'm not tying you into these numbers by any

23  stretch of the imagination.  Let's say the target for

24  revenue was $100 million one year.  The next year it

Dawn M. Hauck

888

1    might be $110 million.

2        A.    It could be.

3        Q.    I'm not trying to tie you to those numbers in

4    any way.  I'm just giving you as an example.  Is that

5    correct?

6        A.    Yes.  They changed the percentages on operating

7    income or return on investment.  They changed what their

8    goals were depending upon the corporation's goals.

9        Q.    In addition to changing the targets, they also

10   changed the weightings for each of those goals, correct,

11   how much value the company was placing on each of those

12   goals in any one particular year towards the calculation

13   of the AMIP?

14       A.    They could have changed, as well.

15       Q.    Some years return on investment might have been

16   worth 10 percent.  Other years that might have been worth

17   12 percent towards the AMIP bonus.

18       A.    That's correct.

19       Q.    The same would be true for the personal goals

20   when they were included, that would change the

21   weightings, as well.

22       A.    That could change, as well, depending upon the

23   types of goals that were added by your management.

24       Q.    Give me some examples of different personal

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0908

Dawn M. Hauck

889

1   goals or group goals over the years.

2      A.   It may have been client satisfaction.  Those of

3  us that were in client-facing jobs.

4      Q.   What else?

5      A.   Client satisfaction is a big one.  Again, those

6  of us that are in client-facing jobs, we do several types

7  of surveys.  One is corporation-wide for our client, and

8  that's the one that really sticks in my mind as that.

9      Q.   Those targets could change, as well.  Some

10  years it might be 75 percent client satisfaction.  Maybe

11  other years it may be 82 percent client satisfaction.

12     A.   It could be.  I don't recall as to how they

13  changed the particular personal goals.  As I had

14  mentioned earlier, personal goals, just like the

15  corporation goals, may or may not have changed depending

16  upon what the business unit was driving towards.

17     Q.   The same thing would be true with group goals.

18     A.   Correct.

19     Q.   You were in the Chemical Group?

20     A.   I was in the Chemical Group.

21     Q.   You have been in the Chemical Group the whole

22  time?

23     A.   I have been in the Chemical Group the whole

24  time.  I have been on different accounts within the



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

890

1   Chemical Group.

2       Q.    Not just DuPont?

3       A.    Not just DuPont.

4       Q.    Who was the head of the Chemical Group during

5   the time that you were in the Chemical Group?

6       A.    The first head of the Chemical Group was

7   Michael Beebe.

8       Q.    How about Nick --

9       A.    Nick Wilkinson.

10      Q.    Have you ever discussed with Mr. Wilkinson

11  anything related to AMIP?

12      A.    We had a discussion with Nick sometime early

13  November when the program was modified for us or we were

14  removed from the program.

15      Q.    Tell me about your conversation with him.  Who

16  was there, and what was discussed?

17      A.    It was the what I will call portfolio managers

18  or application delivery managers, my peers, we had

19  scheduled time to meet with him to better understand the

20  reasons for the program being -- we being removed from

21  the program.

22            The course of the discussion was more along

23  the lines of he didn't necessarily agree with what had

24  been done, it was corporate policy, he had done what he

Dawn M. Hauck

891

1    felt he could to justify or substantiate our

2    participation in the program, but it was a wider

3    corporate initiative.

4        Q.    Do you remember anything specific that he said?

5        A.    No.

6        Q.    Your best understanding is that he wasn't the

7    one that made the decision?

8        A.    Correct.

9        Q.    And he wasn't the one that even informed you of

10   the decision?

11       A.    He was not the one who informed me of the

12   decision.

13       Q.    You only went to him because you thought he

14   might be helpful to get the decision reversed?

15       A.    We went to him, again, for a better

16   understanding, clarity, and to substantiate or justify

17   what we believed was the reason why we should still

18   remain part of the program.

19       Q.    You discussed that with him and he said he

20   didn't necessarily agree with the decision, but there was

21   nothing he could do about it.

22       A.    That it was a corporate-wide initiative to look

23   at the program obviously as a whole and also that he

24   provided what substantiation or what justification that



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

892

```
 1    he felt was necessary or that he could provide to

 2    continue to have our involvement in the program.

 3         Q.    But that there was nothing he could do about

 4    it.

 5         A.    Correct.  He had done what he could do.

 6         Q.    Do you remember anything else that he said?

 7         A.    No.  Again, this is a summary of what I

 8    remember from several years back.

 9         Q.    This is more than two years ago.

10         A.    More than two years ago.

11         Q.    Because it would have been November of 2003

12    that you met with him?

13         A.    That's correct.

14         Q.    Other than your attorney, have you spoken to

15    anybody about this case?

16         A.    Just immediate family around the fact that it

17    was a compensation-related case.

18         Q.    How about other plaintiffs in this case, have

19    you spoken to --

20         A.    Brian Miller and Karen Masino.

21         Q.    Tell me about your conversations with them.

22         A.    Just general conversations about the case.

23         Q.    Tell me about your conversations.  What did you

24    discuss with them?
```

Dawn M. Hauck

893

1      A.     We discussed -- for example, we discussed how

2    we thought the mediation went.

3      Q.     What did you discuss about that?

4      A.     Just that we didn't feel that we really had an

5    opportunity to mediate with you.  We had an opportunity

6    to have the judge hear us, but we really didn't have an

7    opportunity to have an ongoing mediation with your

8    counsel.

9      Q.     Anything else discussed?

10     A.     Nothing in specific.  General conversation,

11   when's your deposition, how did your deposition go.

12     Q.     Anything discussed about what they testified in

13   their deposition about?

14     A.     No.  Nothing direct.  Just overview of

15   background information.

16     Q.     How long did it last?

17     A.     How long did it last.

18     Q.     What's your Social Security number?

19     A.     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.

20     Q.     Where were you born?

21     A.     Utica, New York.

22     Q.     What's the date of your birth?

23     A.     8/20/1966.

24     Q.     Where do you live?

Dawn M. Hauck

894

| | | |
|---|---|---|
| 1 | A. | Bear, Delaware. |
| 2 | Q. | What's your address? |
| 3 | A. | 155 Cornwell Drive. |
| 4 | Q. | How long have you lived there? |
| 5 | A. | I have lived there four and a half years. |
| 6 | Q. | Do you rent or own? |
| 7 | A. | I own. |
| 8 | Q. | Does anyone live with you at your present |
| 9 | address? |
| 10 | A. | I was recently married. |
| 11 | Q. | How long have you been married? |
| 12 | A. | Less than a week. |
| 13 | Q. | Congratulations. |
| 14 | A. | Thank you. |
| 15 | Q. | What's your phone number? |
| 16 | A. | 302-834-5652. |
| 17 | Q. | Have you ever had any prior marriages? |
| 18 | A. | Yes. |
| 19 | Q. | How many? |
| 20 | A. | One. |
| 21 | Q. | Are you divorced? |
| 22 | A. | Yes. |
| 23 | Q. | When did you divorce? |
| 24 | A. | I divorced in 2002, November of 2002. |

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

895

1    Q.    How long were you married during that marriage?

2    A.    Twelve years.

3    Q.    Any children through that marriage?

4    A.    No.

5    Q.    Have you ever been arrested?

6    A.    No.

7    Q.    Ever convicted of any crime, felony or

8    misdemeanor?

9    A.    No.

10   Q.    Have you ever served in the military?

11   A.    No.

12   Q.    When did you first contact an attorney to

13   handle your case against CSC?

14   A.    It would have been in the fall of 2003.

15   Fall/winter.

16   Q.    How did you go about contacting an attorney?

17   How did you know who to contact?  Did you call them?

18   A.    I did not call them.  Again, Karen, Brian, and

19   I had spoken when we heard -- we all were notified and

20   decided to seek counsel to just, again, seek counsel to

21   see what our options were.

22   Q.    Who did that?  Who sought counsel?

23   A.    I don't recall if --

24   Q.    It was not you?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

896

```
 1      A.     It was not me.

 2      Q.     It was one of the other two?

 3      A.     Yes.

 4      Q.     Was it Tim Wilson's firm that you contacted?

 5      A.     Yes.

 6      Q.     Have any lawsuits ever been filed against you?

 7      A.     No.

 8      Q.     Have you ever filed any other lawsuits?

 9      A.     No.

10      Q.     Have you ever been involved in any other

11   lawsuits in any way?

12      A.     No.

13      Q.     Were you ever involved in a class-action case?

14      A.     No.

15      Q.     Have you ever declared bankruptcy?

16      A.     No.

17      Q.     Have you ever made a claim for unemployment

18   benefits?

19      A.     No.

20      Q.     Have you ever made a claim for workers'

21   compensation benefits?

22      A.     No.

23      Q.     Tell me about your educational history.

24      A.     I have a Master's degree, M.B.A., which I
```

Dawn M. Hauck

897

```
 1    received from the University of Delaware in '98.  So I'm

 2    schooled up through a Master's.

 3         Q.    Where did you go to undergrad?

 4         A.    Utica College of Syracuse University.

 5         Q.    When did you graduate from there?

 6         A.    I graduated from there in 1988.

 7         Q.    With what degree?

 8         A.    Computer science.

 9         Q.    The next schooling you had was where?

10         A.    University of Delaware.

11         Q.    You got an M.B.A.?

12         A.    Correct.

13         Q.    When did you get that M.B.A.?

14         A.    In May of 1998.

15         Q.    Any other education or training or courses?

16         A.    Miscellaneous courses that I would have taken

17    through working prior -- when I was with DuPont and also

18    with CSC.

19         Q.    Would those be day-long courses that you would

20    take on-site at the employer?

21         A.    Could have been a day-long on-site, may have

22    been a week-long off-site.  Depended upon what type of

23    training was required.

24         Q.    How many of those courses do you estimate that
```



Dawn M. Hauck

898

1    you have taken?

2        A.    Over the course of my employment, two dozen or

3    more.

4        Q.    Really?  That's a lot.  Twenty-four?

5        A.    When I was with DuPont, we took a whole series

6    of technical-related classes that were anywhere from

7    one-day to five-day classes, as well as classes

8    surrounding, say, sexual harassment, discrimination.

9    Again, classes that they would provide to us or allow us

10   to take as we became supervisors and managers.

11       Q.    Any other course work, training?

12       A.    Such as?

13       Q.    Beyond what you have just testified to.

14       A.    Only job-related training.  I haven't gone out

15   and sought out schooling or training outside of my

16   profession.

17       Q.    Outside of your work.

18       A.    Correct.

19       Q.    Have you ever received any professional or

20   work-related certifications?

21       A.    I was certified to teach -- I'm not going to be

22   able to remember the certification -- to teach

23   work-related training classes like for client

24   satisfaction or for -- there was a whole program.



Dawn M. Hauck

899

1    Achieve Global might have been the name.

2        Q.    When was that?

3        A.    That was in 2001.

4        Q.    Any other certifications?

5        A.    Not that I recall, no.

6        Q.    Have you ever received any awards or honors?

7        A.    Through employee recognition programs.

8        Q.    Such as a spot bonus?

9        A.    May have been a cash reward, could have been a

10   night on the town which was not a cash reward, could have

11   been just a certificate saying thanks for doing a great

12   job.

13       Q.    These were while you were at DuPont?

14       A.    Both DuPont and CSC.

15       Q.    How many do you estimate you received at CSC?

16       A.    I couldn't even -- I couldn't even hedge a

17   guess.

18       Q.    Would it be less than five?

19       A.    More than five, less than ten maybe.

20       Q.    These would be one-time recognition --

21       A.    Yes.

22       Q.    -- bonuses?  Could be cash, could be a night

23   out on the town?

24       A.    Could be cash, could be monetary, could be



Dawn M. Hauck

900

1    nonmonetary.

2        Q.    Could be simply a certificate of sorts?

3        A.    Correct.

4        Q.    Or a plaque?

5        A.    Certificate.

6        Q.    Any other awards or honors or any other

7    recognition that you have ever received?

8        A.    Similar type of recognition while I was also a

9    DuPont employee.

10       Q.    Anything else?

11       A.    No.

12       Q.    By the way, when you received the notification

13   that you were no longer eligible for AMIP in September of

14   2003, you knew as of that point in time you would not get

15   any AMIP bonus for fiscal year 2004?

16       A.    That's what the letter read.

17       Q.    That's what you understood?

18       A.    That's what I understood.

19       Q.    That's what happened.  You did not receive any

20   AMIP bonus for that fiscal year, correct?

21       A.    We understood that the program was being

22   retroactively removed dated back to April 1st, which was

23   the beginning of the fiscal year.

24       Q.    Just as you understood, you did not receive any

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

901

1    AMIP bonus for that fiscal year, correct?

2        A.    Correct.

3        Q.    Let's get this out of the way early.  We have

4    been doing this with all the witnesses.  Tim and I are

5    probably bored of it by now.  But the fiscal year runs

6    from April 1 through March 31, correct?

7        A.    Correct.

8        Q.    So as an example, fiscal year 2002 is April 1,

9    2001, through March 31, 2002?

10       A.    Correct.

11       Q.    So you were removed from eligibility for AMIP

12   during fiscal year 2004?

13       A.    Correct.

14       Q.    You were also made eligible, in connection with

15   your removal from the AMIP program, for a discretionary

16   bonus, correct?

17       A.    That is what the letter read, correct.

18       Q.    Have you ever received a discretionary bonus?

19       A.    I received a discretionary bonus last year

20   which is the first time I have ever received it.

21       Q.    And the discretionary bonus was in lieu of the

22   AMIP program, correct?

23       A.    It read that we were being removed from the

24   AMIP program but we would be eligible to earn a



Dawn M. Hauck

902

1  discretionary bonus.

2      Q.    It was not guaranteed, of course, the

3  discretionary bonus?

4      A.    Correct.

5      Q.    That's why they call it discretionary.  But you

6  were not eligible for the discretionary bonus while you

7  were eligible for the AMIP bonus, correct?

8      A.    As I understood from what little I did because

9  we had a very difficult time getting any information

10  about the discretionary bonus, that the discretionary

11  bonus could have been given to any employee at any point

12  in time whether you were on AMIP or not.

13      Q.    Do you know anybody that's ever received a

14  discretionary bonus who was also eligible for AMIP?

15      A.    I didn't know anyone that had ever received a

16  discretionary bonus, period.

17      Q.    Now you do.

18      A.    But now I do.  Again, once they terminated our

19  participation in the AMIP and said that now this was

20  another program that we were eligible for, several of us

21  I'm sure tried to get information.  I can speak for

22  myself.  I asked my own supervision for information on

23  it.

24      Q.    You had not done that previously?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

903

1    A.    No.

2    Q.    Correct?

3    A.    Correct.

4    Q.    Tell me about your employment history prior to

5    coming to CSC. After college did you go to work for

6    DuPont?

7    A.    I went directly from college to DuPont.

8    Q.    What positions did you hold at DuPont?

9    A.    I went into -- I was an analyst for one of

10   their financial groups in an IT function for one of their

11   business units. Still within that same business unit I

12   moved into -- because my background was computer science,

13   I moved into a networking position.

14         From there DuPont started doing some

15   consolidation of their IT-related professionals. So

16   instead of the business unit having their own IT staff,

17   they started consolidating us under Corporate Information

18   Systems. So I was moved into that organization where I

19   held several positions. Escalated support for what they

20   now call midrange, I would have been their file servers,

21   project management, run and maintain support.

22         From there I moved into a position with the

23   corporate help desk or the information systems help desk

24   as a supervisor, and I was currently in that role when we

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

904

1    were merged -- or when CSC assumed the 2,500 employees

2    for support at DuPont.

3        Q.    During what periods of time were you with

4    DuPont?

5        A.    I was with DuPont from March of 1989 through

6    May 31st of 1997.

7        Q.    While you were at DuPont, were you ever

8    eligible to receive any bonus compensation?

9        A.    Yes.  I was part of the DuPont variable

10   compensation program.

11       Q.    For how many years were you eligible for that?

12       A.    I believe I came on that program in 1997.

13       Q.    So the year --

14       A.    It would have been for the work performed.

15       Q.    For the five months?

16       A.    It would have been for the work performed for

17   1996.  It was paid out in '97.

18       Q.    Was DuPont's fiscal year the same as their

19   calendar year?

20       A.    Yes.

21       Q.    So you received a bonus, a variable

22   compensation bonus, at DuPont sometime in 1997, before

23   you were transitioned over to CSC?

24       A.    Right.



W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

905

1      Q.     For work performed from January 1, 1996,

2   through December 31, 1996?

3      A.     Correct.

4      Q.     And you only received such a bonus once while

5   you were at DuPont?

6      A.     I received that bonus twice as it was prorated

7   for the time I was with DuPont and went to CSC.

8      Q.     Does that mean you received a variable

9   compensation bonus from DuPont after you left DuPont?

10     A.     That's correct.

11     Q.     It was prorated you said?

12     A.     That's correct.

13     Q.     How was the variable compensation program

14  administered?

15     A.     The variable compensation program was, again,

16  based on the corporation's performance, and our payout

17  was dependent upon -- had two factors of it.  It was cash

18  payout, as well as a portion that was stock-related.  And

19  depending upon your level in the organization and your --

20  I would say your role in the organization, your variable

21  compensation was different.  So my variable compensation

22  would have been different than, say, my manager's or vice

23  president's or so on and so forth.

24     Q.     Were there formulas that were used --

Dawn M. Hauck

906

1     A.     That I don't know.

2     Q.     -- to calculate the annual bonus?  You don't

3  know?

4     A.     That I don't know.

5     Q.     For CSC there are formulas that are used to

6  calculate AMIP.

7     A.     We received a worksheet.

8     Q.     That translates into a formula.

9     A.     Correct.

10    Q.     By the way, at CSC is it also true that the

11  bonus is paid out after the close of the fiscal year?

12    A.     That's correct.  So they know what earnings or

13  operating income or the measures we achieved.

14    Q.     Against the goals?

15    A.     Correct.

16    Q.     You have to measure the performance against the

17  goals to see whether or not the targets were achieved

18  under the bonus plan?

19    A.     Prior to calculating payment for your

20  performance.

21    Q.     That would take a couple of months after the

22  close of the fiscal year to do those calculations?

23    A.     It was specified in whether it be an offer

24  letter or a program guide that typically within 45 days

Dawn M. Hauck

907

1   of the close of the fiscal year.

2       Q.    Is that typically how it worked?

3       A.    To the best of my knowledge.  I received my

4   payouts usually in mid to end of May which would have

5   been roughly 45 days after the close of the fiscal year.

6       Q.    By the way, are you familiar with anybody at

7   CSC who ever received a prorated AMIP bonus?

8       A.    Yes.

9       Q.    Who is that?

10      A.    Myself when I came into the corporation.  I

11  came in on June 1st, several months after the start of

12  the fiscal year.  And Brian Miller when he was included

13  back onto the program when he changed roles and he was

14  prorated based on the time that he was there for that

15  period in the fiscal year through the close of the fiscal

16  year after his new job changed.

17      Q.    Anybody else that you know that has ever

18  received a prorated AMIP bonus?

19      A.    No.

20      Q.    I just want to have you explain that.  For

21  yourself you received a prorated AMIP bonus for the

22  period of time you were at CSC during fiscal year 1998?

23      A.    Correct.

24      Q.    And Brian Miller, what year did he receive a



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  prorated AMIP bonus?

2      A.    I believe it was last year's.  So it would be

3  fiscal year '05 when he transitioned into a -- he

4  transitioned into a new job, and I don't recall if it was

5  an '05 or '04 fiscal year.

6      Q.    How do you know that he received a prorated

7  AMIP bonus?

8      A.    He told me.  Quite honestly, I asked him.

9      Q.    Why did you ask him?

10      A.    Because of what was going on.

11      Q.    What specifically did you ask him?

12      A.    I specifically asked him if he received --

13  knowing what his current level was and the role that he

14  was going into, I asked him if he was admitted back to

15  the program and if he received a prorated bonus.

16      Q.    You were hired by CSC you said in -- you

17  started in June of '97?

18      A.    Correct.

19      Q.    When you started, you were given an offer

20  letter?

21      A.    Yes.

22      Q.    That offer letter had language in it about

23  AMIP?

24      A.    Yes, it did.



Dawn M. Hauck

909

1     Q.    Were there also orientation sessions?

2     A.    Yes, there were.

3     Q.    Do you recall anything being said about AMIP

4  during those orientation sessions?

5     A.    I don't recall specifics.  I know they

6  discussed in our orientation sessions when CSC was

7  working with DuPont, they were looking to make our

8  compensation comparable to what we were receiving in

9  DuPont in several areas.

10          So those orientation sessions covered if

11  you were on variable compensation, you would be

12  participating in the AMIP plan.  There were several

13  uplifts that they provided to us because the compensation

14  wasn't exactly the same, whether it be disability

15  insurance, healthcare, even participation in the 401(k)

16  plan.

17          So there were several things discussed

18  during those orientation sessions, with AMIP being geared

19  only towards those participating in variable

20  compensation.

21     Q.    Do you remember that orientation session where

22  AMIP was discussed?

23     A.    No.

24     Q.    Do you remember anything specific being



Dawn M. Hauck

910

1    discussed about the AMIP program?

2         A.    That those of us that were on the variable

3    compensation program would be admitted to the CSC AMIP

4    program which was similar to the DuPont variable

5    compensation program in that it was an annual program, it

6    ran for the fiscal year based on corporate objectives.

7    That's the $50,000 view of what I remember on that

8    discussion.

9         Q.    Were you provided any documents related to AMIP

10   at that time?

11        A.    Not that I recall, no, other than what was in

12   our offer letter which was a very small paragraph that

13   said the program ran concurrent with the fiscal year,

14   April 1st through March 31st, that it was paid out at the

15   end of the fiscal year based on, again, after the fiscal

16   year closed out roughly 45 days after.

17             (Deposition Exhibit No. 55 was marked for

18   identification.)

19   BY MR. SEEGULL:

20        Q.    I'm now showing you what has been marked as

21   Exhibit 55.  Is this the offer letter that you received?

22        A.    Yes, it is.

23        Q.    This is the one we have been speaking about?

24        A.    That's correct.



Dawn M. Hauck

911

1    Q.    What positions have you held at CSC?

2    A.    As I stated earlier, when I joined CSC I was a

3    manager at the help desk.

4    Q.    You held that from June of '97 until --

5    A.    I don't recall the dates.

6    Q.    Approximately.

7    A.    I have held several positions between June of

8    '97 and present.

9    Q.    Why don't we just go through the different

10   positions, then.  Manager of the help desk?

11   A.    Supervisor of the help desk.

12   Q.    First you were a supervisor?

13   A.    I was just a supervisor of the help desk.  I

14   then took the position as a regional manager.

15   Q.    Of what?

16   A.    Desktop and telecommunication support personnel

17   for several DuPont plant sites over CSC employees that

18   were located at the plant.  I was there for -- I could

19   tell you I was there approximately two to three years I

20   held the position.

21        From there I took an account management

22   position on a different account.  So I briefly left the

23   DuPont account.  Still in the Chemical Group but left the

24   DuPont account.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

912

1           From there I came back to the DuPont

2    account for a very brief period of time.  I did some work

3    on one of our government accounts just to help get them

4    up and running and started.  They needed to have several

5    hundred employees interviewed, and after two to three

6    months there, I went into the application environment as

7    a portfolio manager or an application delivery manager.

8    I held that role for several years.  The organizations

9    changed, the name changed, still the same job, but couple

10   different titles for it.

11          From there I went into the role I'm

12   currently in which is an account manager.

13      Q.    Did you receive an AMIP bonus for every year up

14   until fiscal year 2004?

15      A.    Yes.

16      Q.    How much were your AMIP bonuses each year?

17   Range, if you don't know specifics.

18      A.    My AMIP bonuses were -- I can tell you what my

19   eligibility was for the different years.

20      Q.    Okay.

21      A.    I was eligible for 20 percent of my salary, my

22   base salary, until 2000 -- until fiscal year -- up

23   through fiscal year 2000.  Fiscal year 2001 to present, I

24   was eligible for 25 percent of my base salary.

Dawn M. Hauck

913

1    Q.    Why did it go up?

2    A.    I took a position on a different account and

3    that was part of the compensation package that they

4    offered me when I took the new job.

5          (Deposition Exhibit No. 56 was marked for

6    identification.)

7    BY MR. SEEGULL:

8    Q.    I'm now showing you what's been marked

9    Exhibit 56.  These are three letters that were produced

10   to us in discovery, and let's just do them in order.

11   A.    Okay.

12   Q.    Chronological order.  Excuse me.  And the last

13   page is a document that's Bates numbered Miller 123 and

14   it's a letter to you from Marianne Kane dated March 10th,

15   2000.  Do you recognize that?

16   A.    Yes.

17   Q.    That's the letter that's offering you a

18   position, a reassignment, to the Chemical Group in the

19   position of senior manager, reporting to David Lewis.

20   Which of the positions you've just described would this

21   be?

22   A.    This is the one when I was going to when I said

23   I left the DuPont account briefly.

24   Q.    So this is the one that your AMIP goes up to

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-0933

Dawn M. Hauck

914

1    25 percent?

2        A.    Twenty-five percent, correct.

3        Q.    And then if you look at I guess that would be

4    the first page, Miller 124, correct, is the Bates stamp?

5    It's a letter to you from Sonia Koplowicz dated

6    September 7th, 2001, and that was offering you a

7    reassignment to the Chemical Group in the position of

8    senior manager in accounting?

9        A.    Yes.    That was the role I held for only a

10   six-to-eight-week period of time when I was helping out

11   on one of our federal accounts just to get folks up and

12   running, reporting to Debbie Krakowski.

13       Q.    You signed this letter on September 7th of

14   2001?

15       A.    Correct.

16       Q.    Then the next transfer which is contained

17   within Miller 125, it's a letter from Sonia Koplowicz to

18   you dated October 12, 2001, correct?

19       A.    Correct.

20       Q.    You signed that letter on October 15th, 2001?

21       A.    Correct.

22       Q.    That was the reassignment to the Chemical Group

23   in the position of senior manager, accounting, reporting

24   to Tim Cholvat?



Dawn M. Hauck

915

1    A.    Correct.

2    Q.    What was that position?

3    A.    That was the position that went into the

4    applications group, portfolio manager/application

5    delivery manager.

6    Q.    Why were you only in the former position for

7    one month?

8    A.    When I left the Quiva account -- back on the

9    last page where it says reporting to David Lewis, he was

10    the account manager on the Quiva account.  He made my

11    offer to be, as you saw in here, a travel assignment.

12    When he left the account, the new account manager came in

13    and wanted all his account managers permanently located

14    in Houston, Texas.  And he knew that my intention was not

15    to relocate.

16    Q.    You looked for another position?

17    A.    I told him I was looking for another position.

18    He told me he would look for a position.  I found an

19    interim position working for Debbie and at the same time

20    I also secured a position working for Tim, but being that

21    I had already made the commitment to help out and try to

22    get done what needed to be done on this other account, I

23    honored that commitment for the six to eight weeks that

24    they asked me to provide the assistance.

1    Q.    You were employed as an at-will employee?

2    A.    Yes.

3    Q.    Meaning that you could terminate your

4    employment at any time or CSC could terminate your

5    employment at any time?

6    A.    Yes.

7    Q.    Do you know how long it took the company to

8    determine whether to change AMIP eligibility and how to

9    change it?

10    A.    I have no idea.

11    Q.    You understand that the changes that were made

12    to AMIP were not particular to you.  They were changes

13    that were made across the board at your level.

14    A.    I understand that the changes were made across

15    the board, evaluating the various levels that were

16    participating in the program.

17    Q.    It wasn't just you that was removed?

18    A.    That's correct.

19    Q.    Anybody at your level that was removed.

20    A.    It wasn't anyone that was at my level because

21    there were individuals at my level that were still

22    receiving AMIP.

23    Q.    Who's that?

24    A.    Bob Carden.



Dawn M. Hauck

917

1    Q.    How do you know he continued to receive AMIP?

2    A.    He's now a higher level, but at the time that

3  he was still continuing to receive it, he was a level 6

4  as I am.

5    Q.    How do you know he was continuing to receive

6  AMIP?

7    A.    More or less discussion amongst ourselves.

8    Q.    It's a rumor?

9    A.    Well, again, discussion amongst ourselves.

10    Q.    What does that mean, "discussion amongst

11  ourselves"?  Who's "ourselves," the plaintiffs?

12    A.    No.  Portfolio managers, the application

13  delivery managers, the ones that met with Nick Wilkinson

14  had had some discussions about who did or did not receive

15  letters.

16          So whether or not Mr. Carden received a

17  letter at a later date, I'm not aware of that.  I know he

18  didn't receive a letter when we all received a letter.

19    Q.    Who told you that?

20    A.    Again, I don't remember exactly who told me

21  that.

22    Q.    Some other employee told you that?

23    A.    Yes.

24    Q.    Anybody else that you know of that continued to

Dawn M. Hauck

918

1    receive AMIP at your level?

2        A.    No.    That was more, again, because we were all

3    peers at the time.

4        Q.    After you were told that you were no longer

5    eligible for AMIP, you continued to do your job, correct?

6        A.    Correct.

7        Q.    Is it your work ethic to do the best job you

8    can?

9        A.    Yes, it is.

10       Q.    And to continue to work as hard as possible to

11   achieve the company's goals?

12       A.    Yes, it is.

13       Q.    How were you first notified that you were no

14   longer eligible for AMIP?  Was it via e-mail?  Was it via

15   the letter on September 11th?

16       A.    We had heard rumors that this was going to

17   occur in early September, so, again, the group of us that

18   worked doing similar jobs, the portfolio managers, got

19   together collectively and drafted a note to our current

20   supervisor which was Robert Tattle.

21       Q.    That was before you had been told you were

22   definitely being removed?

23       A.    That was before any formal notification.  That

24   was before I met with my supervisor at the end



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

919

1  of September.

2      Q.     There had been rumors that the company was

3  considering removing you from AMIP?

4      A.     There was rumors that the company was

5  considering changing or modifying the program.

6      Q.     And modifying it in such a way to remove people

7  from AMIP?

8      A.     Again, we didn't know how we would be affected.

9  We assumed, hearing the rumors, we were the ones being

10  affected.

11      Q.     Was this a big topic of conversation in the

12  workplace?

13      A.     I wouldn't say it was a big topic.  It was a

14  let's get together and draft a letter and present our

15  case so that we feel that we have done what we can to, I

16  guess you could say, protect our interests in the

17  program.  But I wouldn't say it was a big topic in the

18  workplace, no.

19      Q.     You sent that e-mail to whom?

20      A.     To Robert Tattle.

21      Q.     And then Mr. Tattle responded?

22      A.     Yes, he did.

23      Q.     Do you remember what his response was?

24      A.     I don't recall his response off the top of my

Dawn M. Hauck

920

1  head.

2      Q.    I understand you don't remember the verbatim.

3  Do you remember generally what his response was?  First

4  of all, did you ever receive a response only in writing?

5      A.    We received a response from him in writing.

6  It's my recollection that he was sympathetic to our

7  cause, supported where we were coming from, and passed on

8  our feedback to his leadership.  But to the exact content

9  of the e-mail, I don't recall.

10     Q.    This was an e-mail that was sent by the

11  portfolio managers?

12     A.    That's correct.

13     Q.    And Mr. Tattle responded by saying he

14  understood your concerns and he would pass it on.

15     A.    Yes.

16     Q.    Words to that effect.

17     A.    To that effect.

18     Q.    I'm going to show you what's been marked as

19  Exhibit 16.  Tell me if that's the e-mail that you sent

20  along with the response that you received.

21     A.    Yes, it's both the e-mail that we sent, as well

22  as Bob Tattle's response to us.

23     Q.    You did not have a verbal response from him,

24  correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

921

1     A.    Not that I recall.

2     Q.    After sending this e-mail and receiving a

3  response, did you then receive written confirmation that,

4  in fact, you were removed from AMIP?

5     A.    We received a request to meet with Bob

6  regarding the AMIP program.

7     Q.    And Bob who?

8     A.    Tattle.

9     Q.    That was via e-mail that you received that

10 request?

11    A.    We received it via e-mail from his admin.

12 requesting that we make ourselves available to meet with

13 him, and it was at that point in time -- and I met with

14 him the end of September.  It was at that point in time

15 that I was given the letter saying I was being removed

16 from the program.

17    Q.    Did he tell you anything at that point in time

18 or did he just hand you the letter?

19    A.    I don't recall exactly what we discussed.  We

20 may have discussed some of what was already in the e-mail

21 because, again, we sent him that e-mail prior to us

22 receiving the letter.

23    Q.    But you don't remember what was discussed?

24    A.    No, I don't.

Dawn M. Hauck

922

1    Q.    After receiving the letter notifying you that

2    you were no longer eligible, did you have any

3    conversations with anybody else about the changes made to

4    the AMIP program?

5    A.    We then followed up -- we received the letter

6    from Bob.  We then followed that up with a meeting with

7    Nick Wilkinson.

8    Q.    That's the conversation we already talked

9    about?

10    A.    Yes.

11    Q.    Other than that, were there any other

12    conversations with anybody about changes to the AMIP

13    program?

14    A.    Not that I recall.

15            (Deposition Exhibit No. 57 was marked for

16    identification.)

17    BY MR. SEEGULL:

18    Q.    I'm now showing you what's been marked as

19    Exhibit 57.  Is this the letter that you received from

20    Bob Tattle?

21    A.    Yes, it is.

22    Q.    This is the one that tells you that you're no

23    longer eligible for AMIP for fiscal year 2004?

24    A.    Yes.

Dawn M. Hauck

923

1    Q.    You received this on or about September 11th?

2    A.    No.  I received it at the end of September.

3    Q.    Other employees had already received it by the

4 time you received it?

5    A.    That I don't know.  The group of people that I

6 worked with, we were scheduled for meetings with Bob at

7 the end of September to discuss the AMIP program and

8 that's when we received our letter.

9    Q.    Was it a group meeting?

10    A.    Individual.  But the request for a meeting went

11 out individually with here are a bunch of time slots,

12 please make yourself available.

13    Q.    You signed this on October 3rd, 2003?

14    A.    That's correct.

15    Q.    Is that your handwriting above your signature?

16    A.    Yes, it is.

17    Q.    Can you just read for me what you wrote?

18    A.    "Signing of this document" --

19    Q.    You're going to have to read slowly so she can

20 take it down.

21    A.    "Signing of this document does not constitute

22 acceptance or agreement with the change in the signer's

23 total compensation package.  It solely acknowledges

24 receipt of this document.  Signature also assumes current

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Dawn M. Hauck

924

1    year objectives and KRAs will be set accordingly to

2    reflect the signer's resized total compensation package.

3    In addition, it is requested that written criteria be

4    forwarded to the signer for both the AMIP program and for

5    the new discretionary bonus program so that future

6    eligibility for either program is clearly understood."

7        Q.    What is following that?

8        A.    My initials.  I initialed that.

9        Q.    You understood there was no guarantee that you

10   would continue to receive AMIP, correct?

11            MR. WILSON:  Object to the form.

12       A.    Correct.

13       Q.    You understood that CSC has the right to make

14   business decisions as to how to save money?

15       A.    Correct.

16       Q.    And that it can use its own business judgment

17   about the proper ways to make those decisions?

18       A.    Correct.

19       Q.    You never received a worksheet in fiscal year

20   2004, correct?

21       A.    Correct.

22       Q.    What are your damages in this case?

23       A.    The damages that I calculated were $10,510.

24       Q.    How do you arrive at that?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

925

1    A.    I looked at the AMIP bonuses that I received

2  over the previous six years based on what my eligibility

3  was versus what the percentage payout was, I took an

4  average of that to come up with an average of

5  approximately a 92 percent payout, applied that to my

6  currently salary at the time, which was $91,199, and

7  prorated it six months.

8             (Deposition Exhibit No. 58 was marked for

9  identification.)

10 BY MR. SEEGULL:

11   Q.    I'm now showing you what's been marked as

12 Exhibit 58, and do you recognize this?

13   A.    Yes, I do.

14   Q.    What is it?

15   A.    It is the calculation that I used to calculate

16 what I believe was my potential eligibility for 2004

17 prorated over six months.

18   Q.    The first line I understand is your annualized

19 salary for 2004.  What is the next line down?  What's the

20 25 percent?

21   A.    That's my eligibility.

22   Q.    So you took 25 percent times your annual salary

23 to get the $22,800?

24   A.    That would have been the potential payout if

Dawn M. Hauck

926

1    all objectives were achieved and payout would have been

2    at the 25 percent.

3        Q.    So if I understand you correctly, what you're

4    saying is you took the $22,800 and said what's been the

5    average payout against the maximum payout over the past

6    six years?

7        A.    Correct.

8        Q.    And that average payout was 92 percent.  You

9    multiplied the 92 percent by the $22,800?

10       A.    Correct.

11       Q.    Came up with $21,021.41?

12       A.    Correct.

13       Q.    Then you said I'm not entitled to all of that,

14   I'm only entitled to half of that for the April 1, 2003,

15   through the end of September of 2003.

16       A.    Again, this is what I considered to be my loss

17   over the six-month proration.  Not to include any other

18   additional legal allowances that may be allotted with

19   this case.

20       Q.    These are your damages?

21       A.    Correct.

22       Q.    The reason you have to estimate this is because

23   you didn't have a worksheet for fiscal year 2004,

24   correct?



**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters