Dawn M. Hauck

927

1    A.    That I can't tell.

2    Q.    You don't know what was paid out in fiscal year

3    2004?

4    A.    No.

5    Q.    Correct?

6    A.    That's correct.

7    Q.    You would agree that fiscal year 2003 was a

8    tough financial fiscal year for CSC, correct?

9             MR. WILSON:  Object to the form.

10    A.    I would agree with that.

11    Q.    You don't have a problem with CSC removing

12    people from AMIP eligibility, do you?

13             MR. WILSON:  Object to the form.

14    A.    I don't have a problem with CSC modifying their

15    program or evaluating the criteria on an annual basis,

16    removing people or adding people as they see fit.

17    Q.    Has that been a trend at the company, to limit

18    the number of people that are eligible for AMIP?

19    A.    In the time that I have been with CSC, I have

20    not -- I have not heard of people being removed.  I have

21    heard of people being added.  It's not to say that they

22    did not remove people.  It's only been my experience that

23    I have heard of people being added to the program.

24    Q.    Would you agree that directors have greater



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

928

1    responsibility than senior managers and managers?

2              MR. WILSON:  Object to the form.

3        A.    I would agree that they have different

4    responsibilities.

5        Q.    Aren't they more significant responsibilities

6    given that they're directors?

7              MR. WILSON:  Object.

8        A.    I would agree that your responsibilities as you

9    move higher up do increase.

10             (Deposition Exhibit No. 59 was marked for

11   identification.)

12   BY MR. SEEGULL:

13       Q.    I'm now showing you what's been marked as

14   Exhibit 59.  Do you recognize this?

15       A.    Yes, I do.

16       Q.    What is it?

17       A.    This is the worksheet that was provided to me

18   for fiscal year 2003.

19       Q.    This is the completed worksheet, correct?

20       A.    Correct.

21       Q.    This is the one with all the actual information

22   on it.

23       A.    That's correct.

24       Q.    And this was provided to you sometime, let's

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

929

1    say, in May of 2003?

2        A.    May time frame, yes.

3        Q.    This is the type of worksheet that would be

4    provided to you each year after the close of the fiscal

5    year.

6        A.    This is the type of worksheet that was provided

7    to us in later years of my participation in the program

8    at the end of the fiscal year, yes.

9        Q.    You had said previously that this kind of

10   worksheet was provided to you earlier in the fiscal year

11   but without the actuals column being filled out.

12       A.    That's correct.

13             (Deposition Exhibit No. 60 was marked for

14   identification.)

15   BY MR. SEEGULL:

16       Q.    I'm now showing you what's been marked as

17   Exhibit 60.  Do you recognize this?

18       A.    Yes.

19       Q.    What is it?

20       A.    This is a similar worksheet to what was used

21   for the year prior to 2003 for our AMIP worksheet.

22       Q.    This is the fiscal year '02 AMIP worksheet?

23       A.    Correct.

24       Q.    This is, again, the completed worksheet,



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

930

1   correct?

2       A.    Yes, it is.

3       Q.    This has both financial objectives and

4   management objectives and group and personal objectives,

5   correct?

6       A.    That is correct.

7       Q.    Again, this would have been provided to you

8   earlier in the fiscal year without the actuals filled

9   out.

10      A.    It should have been provided.  I don't recall

11  if this exact worksheet was.  I know that '03 was

12  provided earlier in the year.  I can't confirm that '02

13  was.

14      Q.    Who do you contend has personal knowledge of

15  any matter related to this case?

16      A.    Could you clarify that?

17      Q.    Have you told me about all the people that you

18  know of that have any knowledge related to this case?

19      A.    It would be anyone who was invited to join the

20  suit that I'm aware of.

21      Q.    So the plaintiffs.

22      A.    The plaintiffs.

23      Q.    Anybody else?

24      A.    Anyone else that --



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

931

1    Q.    That has any knowledge related to this case.

2    A.    Anyone else that received a letter regarding --

3    inquiring about this case.  I can't speak for anyone else

4    in CSC as to how they may have been notified.

5    Q.    Anybody else that would have knowledge about

6    facts that are relevant to this case?  Obviously you've

7    talked about Nick Wilkinson.  You have talked about

8    Bill Tattle -- Bob Tattle, excuse me.  Anybody else that

9    you can think of that you haven't mentioned already that

10   might have knowledge that would be related to this case?

11   A.    Only individuals such as Human Resources

12   individuals may or may not have information to the case.

13   Q.    I'm only asking about people that you know that

14   do have knowledge.

15   A.    No one that I have spoken to.  I know my

16   supervisor does have knowledge of the case because she

17   reports to Nick Wilkinson.

18   Q.    Who is your supervisor?

19   A.    Christine Lewis.

20   Q.    What knowledge does she have?

21   A.    The only knowledge that I believe she has is

22   that there is a suit, she knows that Nick was requested

23   to be deposed because she said something to me and I gave

24   her no response.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

932

1      Q.     What did she say?

2      A.     She just said Nick is being deposed in the case

3  of the lawsuit that you're in.

4      Q.     Anybody else that you think has knowledge

5  related to the facts of this case?

6      A.     No.

7      Q.     Do you have any debts at the present time?

8      A.     My mortgage.

9      Q.     Anything else?

10     A.     I pay my credit cards in full every month.

11  Just my mortgage.

12     Q.     Have you now told me everything you know or

13  remember that forms the basis for this case?

14            MR. WILSON:   Object to the form.

15     A.     I believe so.

16            (Deposition Exhibit No. 61 was marked for

17  identification.)

18  BY MR. SEEGULL:

19     Q.     I'm now showing you what's been marked as

20  Exhibit 61.  This is an e-mail to you from Van Athanas.

21  Is that correct?

22     A.     Yes.

23     Q.     You received this in December of '02?

24     A.     That's correct.

Dawn M. Hauck

933

1    Q.    What was he attaching?  Was it that worksheet
2  that's contained at Exhibit 60?
3    A.    No.  He was attaching --
4    Q.    59?
5    A.    A blank -- as you were calling the preliminary
6  worksheet for fiscal year 2003.
7    Q.    He was attaching a blank version of Exhibit 59?
8    A.    Yes.  As well as a PowerPoint presentation
9  explaining the various components.
10    Q.    Is there anyone you have not mentioned who can
11  support your claims?
12            MR. WILSON:  Object to the form.
13    A.    No.
14    Q.    Is there any other information which you have
15  not mentioned which is relevant to supporting your
16  claims?
17            MR. WILSON:  Object to the form.
18    A.    Not that I can think of at this time.
19  BY MR. WILSON:
20    Q.    Did you have conversations with any supervisor
21  or superior at CSC regarding your eligibility for AMIP?
22    A.    Not directly, other than the meetings that we
23  had when we joined where they explained that we were part
24  of the program.  And then the last discussion -- let me

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

934

1    step back.

2              We had meetings every year when they

3    discussed our payout.  We did not have any other

4    discussions in terms of my participation as to whether or

5    not it would or would not be continued every year until

6    we were -- I was removed from the program.

7        Q.    Did your participation in the AMIP program

8    continue?

9        A.    Yes.

10              MR. SEEGULL:  Objection.

11        Q.    Even though there were no communications --

12              MR. SEEGULL:  Objection.

13   BY MR. WILSON:

14        Q.    Even though there were no direct communications

15   from your supervisor to you that your participation would

16   continue.

17        A.    Yes.

18              MR. SEEGULL:  Objection.

19        Q.    I'd like you to look at Exhibit 53.  On page 13

20   that's marked D-10474.  In the next-to-last paragraph it

21   states:  "The payments are considered pensionable

22   earnings under the DuPont and Conoco pension plans."

23              Did your DuPont bonuses count toward your

24   DuPont pension?



Dawn M. Hauck

935

1    A.    Yes, they did.

2    Q.    Does your CSC compensation go to a DuPont or

3    CSC pension plan?  Does it go to a DuPont pension plan?

4    A.    I'm eligible for the DuPont pension plan as I

5    came over from DuPont as a former DuPont employee.  It is

6    calculable towards a DuPont pension.

7    Q.    When you were eligible for the AMIP, did that

8    count towards your DuPont pension?

9    A.    Yes, it did.

10    Q.    Was this something that was across the board

11    for all the people that came from DuPont to CSC?

12         MR. SEEGULL:  Objection.  Calls for

13    speculation.

14         MR. WILSON:  You can answer.

15    A.    When we transitioned from DuPont to CSC, as I

16    mentioned earlier, to bring our compensation levels or

17    our total compensation comparable to what it was at

18    DuPont to what we were going to be earning at CSC, one of

19    the things they offered was a transfer of our DuPont

20    pension and continued eligibility in the DuPont pension

21    plan, and our bonuses were considered pensionable

22    earnings with DuPont and they are considered pensionable

23    earnings in the DuPont plan now as we're still part of

24    that plan.

Dawn M. Hauck

936

1    Q.    Did you have the choice between DuPont and

2  CSC's pension plan?

3    A.    I believe we still have that choice.

4    Q.    I believe you testified that you got a

5  discretionary bonus at one point.  Is that correct?

6    A.    That's correct.

7    Q.    When was that, again?

8    A.    That was this past May for fiscal year --

9  excuse me.  It will be a year in May.  It was for fiscal

10  year '04 -- excuse me.  Now I'm being confused with our

11  fiscal year and calendar year.  It was for fiscal year

12  '05.

13    Q.    Did anybody explain to you why you got the

14  discretionary bonus?

15    A.    When we sat down and had our annual review, she

16  went over both participation with the discretionary bonus

17  as to the bonus was given based on performance.  It was

18  not alluded to that it was financial performance or

19  anything, but it was based on my annual performance over

20  the course of the year.  And also discussed at that time

21  was my annual merit.

22    Q.    Is the discretionary bonus an earned bonus?

23    A.    Yes, it is.

24          MR. SEEGULL:  Objection.



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

937

1    Q.    Was the AMIP bonus an earned bonus?

2         MR. SEEGULL:  Objection.

3    A.    Yes, it is.

4    Q.    I believe you also testified that you received

5    a prorated bonus when you first came to CSC.  Is that

6    correct?

7    A.    That's correct.

8    Q.    What was the measure that was used to prorate

9    the bonus?

10   A.    The bonus was calculated based on the financial

11   objectives of the organization and of the corporation and

12   then it was prorated based on the amount of time that I

13   was employed with CSC from June 1st through the end of

14   the fiscal year, March 31st.

15   Q.    By "the amount of time," how was the amount of

16   time measured?

17   A.    It was measured in months.

18   Q.    How many months was your bonus prorated for

19   that year?

20   A.    Nine months.

21   Q.    Did you work for CSC a full nine months?

22   A.    Yes, I did.

23   Q.    Or was it less than nine months?

24        MR. SEEGULL:  Objection.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Dawn M. Hauck

938

1      A.    I worked for CSC for a full nine months,

2  June 1st through March 31st.

3      Q.    I'd like to refer you to Exhibit 56.  These

4  three letters, is there a communication in them that your

5  participation in the AMIP program would continue?

6      A.    Yes, there is.

7      Q.    Did you get a communication similar to this

8  each year that your participation would continue?

9      A.    The only communication that I formally received

10  was in the form of a letter such as this when I changed

11  roles or when we were notified of what the program goals

12  were.

13      Q.    Did you receive annual communications that your

14  participation would continue?

15            MR. SEEGULL:  Objection.

16            MR. WILSON:  You can answer.

17      A.    I did not receive formal communications every

18  year, no.

19      Q.    Did your participation continue despite the

20  lack of this communication?

21            MR. SEEGULL:  Objection.

22      A.    Yes, it did.

23      Q.    I believe you testified earlier that when the

24  AMIP was terminated, that you continued to work as hard



Dawn M. Hauck

939

1    as you could.   Is that correct?

2        A.     I continued to perform my job as to what was

3    expected of my role and for my objectives.

4        Q.     Did anything change after September 11th

5    regarding the performance of your job?

6                    MR. SEEGULL:   Objection.

7        A.     I gave CSC 100 plus percent to do my job.  What

8    changed was the extra 10 or 20 percent that I may have

9    done volunteering or going above and beyond that

10   expectation, whether it be volunteering for different pet

11   projects that needed to be done or special assignments

12   that they needed additional people to work on.   But

13   nothing changed in how I did my day-to-day activities and

14   how I treated my clients and how I performed my job.

15       Q.     Can you look at Exhibit 57?  You stated that

16   that's your handwriting at the bottom, correct?

17       A.     That's correct.

18       Q.     Can you read in the first sentence where it

19   refers to total compensation package?

20       A.     "Signing of this document does not constitute

21   acceptance or agreement with the change in the signer's

22   total compensation package."

23       Q.     What did you mean by "total compensation

24   package"?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

940

1    A.    I meant that total compensation including base

2 salary, as well as bonuses or any other benefit provided

3 by CSC.

4    Q.    Did you consider the AMIP bonus part of your

5 total compensation package?

6    A.    Based on the pensionable earnings, absolutely.

7    Q.    If you skip a sentence, does the next sentence

8 say, "Signature also assumes current year objectives and

9 KRAs will be set accordingly to reflect the signer's

10 revised total compensation package"?  Is that what that

11 reads?

12    A.    Yes, it does.

13    Q.    What are KRAs?

14    A.    Those are areas in which we're measured against

15 our merit performance.

16    Q.    Did those pertain to the AMIP bonus?

17    A.    As we have discussed earlier, sometimes we had

18 personal objectives, sometimes we did not.  We had a very

19 large financial component on the AMIP and occasionally

20 they put our personal objectives in there, as well.

21    Q.    Can you explain what that entire sentence

22 means?

23    A.    The current year objectives that KRAs, that

24 sentence?



Dawn M. Hauck

941

1    Q.    Yes.

2    A.    Every year objectives are set -- objectives and

3    KRAs are set based on what is expected of us and how

4    our -- expected of us and our performance over the course

5    of the year.  For example, and I used it earlier, client

6    satisfaction.  In our personal objectives we may have a

7    financial target.  In the account management role it

8    might be how much new business you bring into the

9    organization.

10            So my expectation was in the total

11   compensation package and also not knowing at the time

12   what the goals were for the AMIP program, as well as how

13   it would transfer over to our -- how our merit objectives

14   would transfer into the AMIP program, my expectation was

15   that based on the fact that they were altering our total

16   compensation package.

17   Q.    Did they?

18   A.    Nothing changed.

19   Q.    Could you look at Exhibit 58?  This is your

20   estimated loss calculation, correct?

21   A.    Correct.

22   Q.    Is there any way you could precisely calculate

23   your damages in this case?

24   A.    If I knew what the financial objectives were



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dawn M. Hauck

942

1    and the distribution of those objectives and then what

2    the payout was in terms of -- and I'll use OI as an

3    example.  If they were looking to receive a certain

4    percentage of OI and what the achievement was and what

5    that percentage was, absolutely, it could be a very

6    precise calculation.  It would fit right into that

7    worksheet format.

8        Q.    "That worksheet format," are you referring to

9    Exhibit 59?

10       A.    That's correct.

11       Q.    Could you look at Exhibit 59?

12              MR. SEEGULL:  Are we done with Exhibit 58?

13              MR. WILSON:  Yes.

14   BY MR. WILSON:

15       Q.    Under the column that says potential

16   weight percent, are those numbers relevant to calculating

17   the AMIP bonus?

18       A.    That's how each component is weighted, revenue,

19   OI, margin, etcetera.

20       Q.    If you had these percentage numbers, could you

21   precisely calculate your damages?

22              MR. SEEGULL:  Objection.

23       A.    I would need the potential weight associated,

24   as well as what was achieved.



Dawn M. Hauck

943

1    Q.    Is what was achieved reflected on this sheet?

2    A.    Yes, it is.

3    Q.    Where is that?

4    A.    That's two columns to the right that says

5    percentage achieved.

6    Q.    What does "MBO Weighting" stand for in the

7    upper part of the exhibit?

8    A.    That I'm not sure of.

9    Q.    Exhibit 61 is an e-mail from Van Athanas.  Who

10   is Van Athanas?

11   A.    He was one of the Human Resources directors, I

12   believe, for TMG.

13   Q.    What's TMG?

14   A.    Technology Management Group.  It's one of the

15   groups or one of the organizations within CSC.

16   Q.    Did you work in that group?

17   A.    Yes.

18          (Deposition Exhibit No. 62 was marked for

19   identification.)

20   BY MR. WILSON:

21   Q.    Could you look at Exhibit 62 and let me know

22   when you're done?

23          On the first page, is your AMIP bonus

24   reflected on this page?



WILCOX & FETZER LTD.
Registered Professional Reporters

Dawn M. Hauck

944

```
1        A.    Yes, it is.

2        Q.    Where is that?

3        A.    It's listed as "Bonus."

4        Q.    Is that $19,362?

5        A.    That's correct.

6        Q.    Does that reflect your recollection of the

7   bonus you received in 2001?

8        A.    Yes.

9        Q.    On the third page, is your AMIP bonus reflected

10  there?

11       A.    It's reflected under the same line item,

12  "Bonus."

13       Q.    Is that $19,972?

14       A.    That's correct.

15       Q.    Does that reflect your recollection of the AMIP

16  bonus you received in 2003?

17       A.    That's my best recollection.

18       Q.    Just one more, then I'll be done.

19             MR. SEEGULL:  Are you looking for a

20  document that was previously marked?

21             MR. WILSON:  I believe I am.  Did you enter

22  her offer letter?

23             MR. SEEGULL:  I'm sure I did.  I think

24  that's Exhibit 55.
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Dawn M. Hauck

945

```
1              MR. WILSON:  Thanks.

2    BY MR. WILSON:

3        Q.     In the paragraph that talks about the AMIP

4    bonus or the management incentive bonus, did you view the

5    availability of this bonus as an incentive to join CSC?

6              MR. SEEGULL:  Objection.

7        A.     I viewed this as CSC matching my current

8    compensation package that I was receiving in DuPont.

9    When CSC took us over, our jobs were transitioned to

10   DuPont.  So we were given the option to find another job

11   or to retain our current positions and join CSC.

12       Q.     Was the availability of the AMIP bonus a factor

13   that you took into consideration when you decided to

14   accept the position at CSC?

15             MR. SEEGULL:  Objection.

16       A.     It was part of my consideration for the whole

17   package, but it did not -- it would not have at the time

18   prevented me from joining CSC as the climate of the job

19   environment, my job was going to CSC whether I went or

20   not.  So this was a consideration for my total

21   compensation.

22             But looking back eight years ago, I can't

23   say whether or not I would have not joined CSC if it

24   wasn't there.  I wasn't out looking for a job at the
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0965

Dawn M. Hauck

946

1    time, if that's what you're asking.  But it would not

2    have dissuaded me from turning a job down and then being

3    without a job.

4        Q.    Was there anybody that worked in your group not

5    removed from the AMIP program at the time you were?

6        A.    As I mentioned earlier when Larry asked the

7    question, I believe there was one individual who was

8    working in my group at the same salary grade who was not

9    removed from the program.

10       Q.    Do you know what percent of his eligibility he

11   received --

12       A.    No, I do not.

13       Q.    -- for fiscal year 2004?

14       A.    No, I do not.

15       Q.    If you had that number available, would you be

16   able to calculate your AMIP bonus?

17                MR. SEEGULL:  Objection.  Speculation.

18       A.    Yes.

19       Q.    For fiscal year 2004?

20       A.    Yes.

21                MR. SEEGULL:  Objection.

22                MR. WILSON:  That's all I have.

23   BY MR. SEEGULL:

24       Q.    Ms. Hauck, how much was your discretionary



Dawn M. Hauck

947

1    bonus that you received for fiscal year '05?

2       A.    I believe it was $10,000.

3             MR. SEEGULL:  Off the record.

4             (Discussion off the record.)

5             MR. SEEGULL:  We had a discussion off the

6    record.  There's at least one document or multiple

7    documents --

8             THE WITNESS:  It's the same document, three

9    separate fiscal years.

10   BY MR. SEEGULL:

11      Q.    Three different versions of this document?

12      A.    Yes.

13      Q.    So there are three different versions of a

14   document that Ms. Hauck has identified as being an AMIP

15   guide?

16      A.    Yes.

17      Q.    For the years 1999, 2000, and 2001?

18      A.    Fiscal years, yes.

19      Q.    For fiscal years '99, 2000, and 2001 that she

20   has in her possession at her house, correct?

21      A.    Correct.

22            MR. SEEGULL:  And I do not believe that's

23   ever been produced to defendant in this case.  Haven't

24   been able to -- I have never seen such a document.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Dawn M. Hauck

948

1              Mr. Wilson tried to figure out whether he

2      had a copy of it and he hasn't identified it yet.  So

3      we're leaving this deposition open at this point solely

4      for the purpose of any inquiry related to that document.

5      And once I see the document, we will evaluate whether or

6      not we need to resume the deposition and how we go about

7      resuming it if we do need to resume.

8              Thank you.

9              (The deposition was adjourned at 1:30 p.m.)

10                        - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24



**WILCOX & FETZER LTD.**

Registered Professional Reporters

949

```
                    T E S T I M O N Y
DEPONENT:  DAWN M. HAUCK                          PAGE
BY MR. SEEGULL................................. 871
BY MR. WILSON.................................. 933
BY MR. SEEGULL................................. 946


                    E X H I B I T S
DEPOSITION EXHIBIT NO.                         MARKED
53 - A multi-page document entitled,
"Chemical Group Compensation Programs North
America"........................................ 874
54 - A multi-page document Bates numbered
D-10370 through D-10386....................... 876

55 - A letter dated March 7, 1997, to
Dawn M. Hauck from Dorothy Eltzroth........... 910
56 - Three letters Bates numbered
Miller 124, 125, and 123...................... 913

57 - A letter dated September 11, 2003,
to Dawn Hauck from Robert Tattle.............. 922
58 - A document entitled, "AMIPs Loss
Calculation for Dawn Hauck.................... 925

59 - A two-page document entitled, "Fiscal
Year 2003 AMIP"............................... 928
60 - A two-page document entitled, "FY02
AMIP Worksheet"............................... 929

61 - A printout of an e-mail dated
12/11/2002 to Dawn M. Hauck from Van Athanas.. 932
62 - Three documents Bates numbered D-11392,
D-11421, and D-11447.......................... 943
ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 950
CERTIFICATE OF REPORTER               PAGE 951
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

CERTIFICATE OF REPORTER

STATE OF DELAWARE)

               )

NEW CASTLE COUNTY)


       I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 2nd day of March, 2006, the deponent herein, DAWN M. HAUCK, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


                    Kimberly A. Hurley
                    Certification No. 126-RPR
                    (Expires January 31, 2008)


DATED:



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,    )
CHARLES FOLWELL, DAWN M.          )
HAUCK, KEVIN KEIR, ASHBY          )
LINCOLN, KAREN MASINO, ROBERT     )
W. PETERSON, SUSAN M. POKOISKI,   )
DAN P. ROLLINS, and WILLIAM       )
SPERATI,                          )
                                  )
       Plaintiffs,                )
                                  )
       v.                         )  C.A. No. 05-10-JJF
                                  )
COMPUTER SCIENCES CORPORATION,    )
                                  )
       Defendant.                 )

          Deposition of SUSAN J. ELTZROTH taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:05 p.m., on Friday, March 31, 2006, before
Kimberly A. Hurley, Registered Merit Reporter and Notary
Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware 19806
             for the Plaintiffs

          LARRY R. SEEGULL, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY US LLP
             6225 Smith Avenue
             Baltimore, Maryland 21209-3600
             for the Defendant

               WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0973

                    DOROTHY J. ELTZROTH,

1

2              the witness herein, having first been

3              duly sworn on oath, was examined and

4              testified as follows:

5    BY MR. WILSON:

6        Q.    Good afternoon, Ms. Eltzroth.  We met prior to

7    the deposition, but I'd like to introduce myself again.

8    My name is Tim Wilson.  I'm the attorney for the

9    plaintiffs in this case, Miller versus Computer Sciences

10   Corporation.  Just initially, I'd like to explain to you

11   that I may refer to Computer Sciences as CSC, and you

12   would understand that that's what I'm referring to?

13       A.    Yes.

14       Q.    There are a couple instructions that are

15   customary prior to a deposition just to kind of let you

16   know how it's going to go.  I'm going to ask you

17   questions pertaining to this lawsuit, and you have to

18   answer verbally.  That's so the court reporter can take

19   your responses down.  Obviously she can't take down head

20   nods and other nonverbal communications.

21             As you know, your testimony is under oath,

22   so you must answer truthfully.

23             If you don't hear a question or don't

24   understand it, let me know and I'll ask it again or I'll

1  explain it.

2          In order to make the record clear, I ask

3  that you wait until I finish asking a question before you

4  start to answer, and I will try to wait until you finish

5  your answer before I ask.  That way, it makes the

6  transcript clean and easily readable.

7          If at any time during the deposition you

8  realize that a statement that you made was inaccurate or

9  incorrect, you're allowed to correct yourself, and I

10 encourage you to do so.

11         You cannot talk or confer with your

12 attorney during the deposition, either in here or during

13 breaks, unless it pertains to a matter of privilege.

14         If you need a break, just let me know.  I

15 understand you have a cold.  If you need a break to go do

16 whatever, it's perfectly fine.  I encourage you don't be

17 afraid to ask me for a break.  That's perfectly fine.

18     A.    Thank you.

19     Q.    Do you understand these instructions?

20     A.    Yes, I do.

21     Q.    I'd like to just get some background

22 information just to get us going.  Where were you born,

23 and what was your birth date?

24     A.    I was born in Corpus Christi, Texas.  My birth



Dorothy J. Eltzroth                                          4

1    date is July 9th, 1953.

2         Q.    Your Social Security number?

3         A.    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.

4         Q.    What is your current address?

5         A.    219 Thomas Jefferson Terrace, Elkton, Maryland,

6    21921.

7         Q.    How long have you lived there?

8         A.    About two years, two and a half years.

9         Q.    Do you own your house?

10        A.    Yes.

11        Q.    Have you ever been arrested?

12        A.    No.

13        Q.    Did you serve in the military?

14        A.    No.

15        Q.    Did you go to college?

16        A.    Yes.

17        Q.    Where did you go to college?

18        A.    University of Houston.

19        Q.    Did you get a degree?

20        A.    Yes.

21        Q.    What was that degree?

22        A.    B.S. degree.

23        Q.    In what course of study?

24        A.    Industrial psychology.

Dorothy J. Eltzroth                                                5

1      Q.    Did you graduate with honors or did you receive

2   any honors?

3      A.    No.

4      Q.    Did you do any postgraduate work?

5      A.    Yes.

6      Q.    Where did you do that?

7      A.    Houston Baptist University.

8      Q.    Did you get a degree?

9      A.    Yes.

10     Q.    What was that?

11     A.    M.S. in human resources management.

12     Q.    Any further graduate work?

13     A.    No.

14     Q.    Have you received any significant on-the-job

15  training since you've been out of college and grad

16  school?

17     A.    You might need to explain "significant."

18     Q.    Well, have you taken any courses say more than

19  a day or two since you've gotten out of grad school?

20     A.    I would say no.  It's just normal business

21  continuous learning when we have an opportunity to do

22  that.

23     Q.    Are you presently employed by CSC?

24     A.    Yes.

Dorothy J. Eltzroth                                     7

1       A.      Yes.

2       Q.      Do you recall what documents those were?

3       A.      There was a description of the CSC AMIP plan I

4   think were three of the documents.

5       Q.      Do you recall any of the others?

6       A.      No.

7       Q.      Did you review any of the deposition

8   transcripts given by the plaintiffs in this lawsuit?

9       A.      No.

10      Q.      Did you talk to anybody other than your

11  attorney to prepare for this deposition?

12      A.      No.

13      Q.      Have you talked to anybody in general about

14  this lawsuit not in preparation for the deposition?

15      A.      I talked with a coworker.

16      Q.      Who was that?

17      A.      Jim Styles.

18      Q.      What was your conversation about?

19      A.      If he was going to be deposed on the same date

20  as I was scheduled to be.

21      Q.      Did you discuss what your testimony might be?

22      A.      No.

23      Q.      When did this occur?

24      A.      The conversation?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0978

1     Q.    What's your job title?

2     A.    Director Human Resources, Shared Services,

3  Employee Relations, and Affirmative Action.

4     Q.    That's a long one.

5     A.    That's a long title.

6     Q.    How long have you held that title?

7     A.    Since 2002.

8     Q.    What did you do before that?

9     A.    I was HR director for the Chemical Group.

10    Q.    How long were you in that position?

11    A.    Since 1997.

12    Q.    How long have you worked for CSC altogether?

13    A.    Since 1991.

14    Q.    What did you do to prepare for today's

15  deposition, if anything?

16    A.    I met with counsel, Larry Seegull, for a few

17  hours.

18    Q.    When was that?

19    A.    Wednesday of this week.

20    Q.    When you say "a few hours," do you mean two,

21  three?

22    A.    I think it was about three hours.  Three or

23  four hours.

24    Q.    Did you review any documents?

1        Q.      Yes.

2        A.      I don't know precisely.  It was probably around

3   the first part of March.

4        Q.      It was just one discussion?

5        A.      Yes.

6        Q.      Are you aware of the lawsuit that is the reason

7   for this deposition; in other words, do you understand

8   what the lawsuit is about?

9        A.      Vaguely.

10       Q.      Can you give me your understanding of what the

11  lawsuit's about?

12       A.      I understand there are multiple individuals and

13  that the basis is around the Annual Management Incentive

14  Plan and that there was a decision made to have these

15  individuals no longer eligible to participate in that

16  plan.

17       Q.      Do you understand that, getting further into

18  it, the basis of their lawsuit is they're contending that

19  the bonus was retroactively taken away from them?  Do you

20  understand that?

21       A.      I hear that.

22       Q.      Do you understand that retroactive in this

23  context means that they were told in September of 2003

24  that they would no longer be receiving their AMIP bonus

1   and their eligibility reverted back to April of 2003?

2              MR. SEEGULL:  Objection.  Mischaracterizes

3   the record.

4              Go ahead, you can answer if you understand

5   his question.

6      A.    I understand.  I understand that to be the

7   claim.  I think that's what you're saying.

8      Q.    Based upon your past couple positions with CSC,

9   you have an understanding of CSC's Human Resources

10  policies, correct?

11     A.    Fair understanding.

12     Q.    You have actually written some of these

13  policies.

14     A.    No, I would not say that I have written the

15  policies.

16     Q.    Have you contributed to writing to them,

17  writing the policies?

18     A.    Some of them.

19     Q.    Do you recall which ones?

20     A.    I am occasionally asked for review and input.

21  I don't recall specifically which ones.

22     Q.    Have you ever reviewed and given input on the

23  AMIP bonus program?

24     A.    No.

Dorothy J. Eltzroth

1    Q.    Do you have an understanding as to how the AMIP

2  program works?

3    A.    Yes.

4    Q.    Can you briefly explain how it works?

5    A.    Yes.  The program is generally reserved for

6  participation by senior-level individuals, meaning people

7  in senior-level titles.  There are financial, as well as

8  individual, objectives.  The program is for -- I should

9  say based on a fiscal -- CSC's fiscal year, and the

10  objectives are measured at the end of the year, and the

11  individual is eligible for potential award based on the

12  achievements of those objectives.

13    Q.    When you say "fiscal year," can you identify

14  what the fiscal year is at CSC?

15    A.    That's April 1 through March 31st.

16    Q.    Is the performance of the individual evaluated

17  throughout the fiscal year in the AMIP program in order

18  to receive his AMIP bonus?

19    A.    No.  The achievement of the objectives is

20  measured at the end of the year.

21    Q.    Those objectives,are they contributed to during

22  the fiscal year, the entire fiscal year?

23    A.    They could be.  Depending upon the objectives

24  and the individual participation.

Dorothy J. Eltzroth                                11

1        Q.    You were involved in the transition of the

2    DuPont employees to CSC in 1997, correct?

3        A.    Yes.

4        Q.    When they transitioned over to CSC, their

5    compensation packages were set up to compensate them

6    roughly the same as when they worked for DuPont, correct?

7        A.    That's a fair statement.

8        Q.    Most of these employees' compensation packages

9    were at least as good at CSC as they were getting at

10   DuPont, correct?

11       A.    We tried to construct that, yes.

12       Q.    You're aware that the DuPont employees received

13   a bonus while they were working for DuPont, correct?

14       A.    Not all of them did, no.

15       Q.    Did some of them?

16       A.    Yes.

17       Q.    Was that bonus the DuPont variable compensation

18   program?

19       A.    I think that that was probably a term referred

20   to in at least one of the bonus programs.  My

21   understanding was that DuPont had several.

22       Q.    When these employees transitioned to CSC, some

23   of them were given the AMIP or were told they were

24   eligible for the AMIP bonus program, correct?

Dorothy J. Eltzroth

1    A.    Some were, yes.

2    Q.    Were these the same individuals that, while

3    they were at DuPont, were eligible for the DuPont

4    variable compensation program?

5    A.    There could have been some employees that were

6    not eligible for bonus with DuPont that we made eligible

7    when they joined CSC.

8    Q.    Were all of the employees that were eligible at

9    DuPont for their bonus program eligible for the AMIP?

10            MR. SEEGULL:   At what point in time?

11            MR. WILSON:   At the transition in 1997.

12    A.    If they moved into a job position that was

13    comparable to the one they had at DuPont and we verified

14    through the records provided to us by DuPont that they

15    were not only eligible but, in fact, had received awards,

16    earnings, then yes, we made them eligible with CSC.

17    Q.    So was the AMIP program given to these

18    individuals to replace the DuPont bonus program that they

19    had at DuPont?

20            MR. SEEGULL:   Objection.   Vague and

21    ambiguous.

22    BY MR. WILSON:

23    Q.    Let me ask it another way.

24            Was the AMIP bonus given to them as a means

Dorothy J. Eltzroth

13

1    to fairly compensate them for their bonus program that

2    they were on at DuPont?

3        A.    We tried to construct a package that was both

4    financial, as well as nonfinancial, that would attract

5    the affected population and encourage them to accept an

6    offer with CSC.

7        Q.    So was the AMIP bonus program used as a means

8    to try to, for lack of a better term, lure these

9    employees to come to CSC?

10            MR. SEEGULL:  Objection.

11   Mischaracterization of the record.

12            MR. WILSON:  You can answer.

13            MR. SEEGULL:  You can answer if you

14   understand the question.

15       A.    Can you repeat it, please?

16       Q.    Was the AMIP bonus program put into the package

17   in an attempt to entice or, to use your word, attract

18   these people to come to CSC from DuPont?

19       A.    If it was put in an individual's offer, then it

20   was an attempt at offering a comparable employment

21   package to what they enjoyed with CSC in most cases.

22       Q.    After the initial transition of these

23   employees, were others added to the AMIP program?

24       A.    I'm sorry.  Could you explain "others"?

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Dorothy J. Eltzroth                                    14

1      Q.    Were other DuPont employees who came over that

2   weren't initially given the AMIP bonus given the AMIP

3   bonus later on?

4      A.    They might have been had they qualified to be

5   eligible for that program.

6      Q.    Are you aware that Karen Masino was added to

7   the AMIP program after the initial transfer?

8      A.    No.

9      Q.    For those people who transitioned from DuPont,

10  the AMIP bonus is calculated into their pensionable

11  earnings, correct?

12     A.    It's a fairly involved response to that.  Under

13  the DuPont pension plan, it's my understanding at the

14  time, 1997, that bonus payouts were pensionable earnings

15  under the DuPont pension plan.  In 1997 similar bonus

16  payouts with CSC are not pensionable earnings with CSC's

17  pension plan.

18          The offer that we made to transitioning

19  employees under contract was that, if they participated

20  in both the DuPont pension and then upon joining CSC

21  participated in CSC's pension plan, at the time when they

22  were to receive pension payments, when they were eligible

23  to receive pension payments, that a calculation would be

24  made first as if they were continued to be part of the

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dorothy J. Eltzroth

1    DuPont pension plan and, second, as if they continued to

2    be part of the CSC pension plan, and those eligible

3    individuals would then receive the higher of the two

4    payments.

5        Q.    Do you know how long CSC has had the AMIP bonus

6    program?

7        A.    No.

8        Q.    Is it fair to say that the AMIP program is an

9    incentive program?

10       A.    Yes.

11       Q.    Can you tell me what it's based on?

12       A.    I can describe the program as I have

13   participated in it and what it was based on.

14            It's based on financial objectives for the

15   corporation and it's based on financial objectives that I

16   personally have responsibility for, as well as

17   nonfinancial objectives that I agree with with my

18   manager.

19       Q.    Would those be characterized as corporate

20   objectives?

21       A.    The financial objectives are corporate

22   objectives, yes.

23       Q.    Are there group objectives?

24       A.    There could be, yes.

Dorothy J. Eltzroth                        16

1        Q.    What are group objectives?

2        A.    Group objectives are generally financial

3    objectives, in my experience.

4        Q.    When you say "financial objectives," what do

5    you mean by that?

6        A.    For example, revenue, operating income, margin,

7    day sales outstanding, perhaps return on investment.

8        Q.    So these different categories, revenue,

9    operating income, are these categories that are

10   contributed to by the business throughout the fiscal

11   year?

12       A.    I think that's a fair characterization.  All of

13   the business units' financials roll up into the corporate

14   financials, yes.

15       Q.    In order to be eligible to receive an AMIP

16   bonus, you would have to be participating in the program

17   during the fiscal year, correct?

18              MR. SEEGULL:  Objection.  Go ahead, you can

19   answer.

20       A.    You'd have to be eligible to participate and

21   you would have to continue to be eligible to participate

22   and be employed with CSC at the time the bonus payouts

23   are calculated and earned and then, in fact, paid out.

24       Q.    So is it your testimony that, if you're removed

Dorothy J. Eltzroth

17

1    from the program prior to the payout, you're not eligible

2    to receive the AMIP bonus?

3        A.    Yes.

4        Q.    For any portion of the year?

5        A.    Yes.

6        Q.    People who are added to the AMIP program during

7    the fiscal year, are they eligible for the AMIP bonus?

8        A.    If they follow the same conditions.  If they

9    continue to be eligible and they're employed at the time

10   the bonus payouts are calculated and then paid out.

11       Q.    If they're only in the program for six months

12   out of the fiscal year, do they get a full AMIP bonus?

13       A.    No.

14       Q.    Or is it prorated?

15       A.    It would be prorated for the time that they

16   joined the program.

17       Q.    But you don't prorate it for people who are

18   removed?

19       A.    No.  Not that I'm aware of.

20       Q.    The AMIP bonuses are prorated based upon the

21   number of months that you're in the program, correct, if

22   it's prorated at all?

23       A.    In my experience, when someone joined and was

24   eligible to participate for a portion of the year, then

Dorothy J. Eltzroth                18

1    yes, it would be based on a monthly participation.

2    That's how the prorata share would be calculated, yes.

3        Q.    Participation in the program is supposed to be

4    evaluated annually, correct?

5        A.    Yes.

6        Q.    When is that evaluation supposed to occur?

7              MR. SEEGULL:  Objection.  Hypothetical.

8    BY MR. WILSON:

9        Q.    According to the policy, when is the evaluation

10   to occur?

11             MR. SEEGULL:  Which policy?

12             MR. WILSON:  The AMIP policy.

13             MR. SEEGULL:  Objection.  Vague and

14   ambiguous.

15             Go ahead, you can answer if you understand

16   the question.

17       A.    There is no AMIP policy.

18       Q.    Is there any policy that states when the

19   evaluations are to take place?

20       A.    If there are written -- if there is a written

21   description of the program, then the written description

22   may describe when the evaluations take place.

23       Q.    We will have to come back to that.

24             If someone is added to the program at any

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0990

Dorothy J. Eltzroth

19

1  point, whether it's to be at the end of the fiscal year

2  or during the fiscal year, they're notified immediately,

3  correct, if they become eligible?

4              MR. SEEGULL:  Objection.  Hypothetical,

5  calls for speculation.

6  BY MR. WILSON:

7      Q.    In your experience at CSC, when people have

8  been added to the AMIP program, were they notified

9  immediately?

10     A.    I think they were added in a reasonable time

11 frame.

12     Q.    Were they notified in a reasonable time frame?

13     A.    Yes.

14     Q.    What would you say a reasonable time frame is?

15     A.    I would say that, upon extending an offer, for

16 example, for employment, the eligibility would be

17 addressed in an offer of employment.  If someone were

18 being considered and selected for a job assignment where

19 that level made them eligible and their manager wanted to

20 make eligible for the program, then they would be advised

21 of that as part of the consideration for the opportunity.

22     Q.    What about when somebody is removed from the

23 program, are they told immediately?

24              MR. SEEGULL:  Objection.  Hypothetical.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Dorothy J. Eltzroth                                    20

1    BY MR. WILSON:

2        Q.    In your experience at CSC, when people have

3    been removed, have they been told within a reasonable

4    time?

5                    MR. SEEGULL:    Objection.    Lack of

6    foundation.

7    BY MR. WILSON:

8        Q.    Have people been removed from the AMIP program

9    during the fiscal year?

10       A.    Yes.

11       Q.    When these people have been removed, have they

12   been told within a reasonable time that they have been

13   removed from the program?

14       A.    Yes.

15       Q.    Once you're deemed eligible, once an employee

16   is deemed eligible for the AMIP bonus, his or her

17   participation continues until they're notified that they

18   are no longer eligible to participate, correct?

19                    MR. SEEGULL:    Objection.

20       A.    No.

21       Q.    Why is that?

22       A.    First of all, the program is based on a fiscal

23   year.  So at any given point in time, if you're eligible

24   to participate and you're aware that you're eligible to

Dorothy J. Eltzroth

1    participate by agreement with your manager, then the

2    understanding is that it's based on that fiscal year

3    objectives.   So there is no opportunity, nor is it

4    reasonable, to think that, if you were a participant in

5    one year, you would continue being a participant in

6    subsequent years.

7         Q.    In general, do the managers go to their

8    employees at the beginning of the fiscal year and say

9    listen, you're in this year or you're not in this year?

10        A.    Yes.

11        Q.    That typically happens?

12        A.    Yes.

13        Q.    At the beginning of the fiscal year?

14        A.    That has been my experience.

15        Q.    Do you believe that the AMIP bonus is an

16   entitlement?

17        A.    No.

18        Q.    Who's William Bancroft?

19        A.    That is a name of a vice president within CSC.

20        Q.    If Mr. Bancroft characterized the AMIP as an

21   entitlement, would that change your mind?

22        A.    No.

23        Q.    Would Mr. Bancroft be in a position to

24   understand the AMIP program and whether or not it was an

1    entitlement?

2              MR. SEEGULL:  Objection.  Calls for

3    speculation as to his understanding.

4              If you know what his understanding is, you

5    can answer, I suppose.

6    BY MR. WILSON:

7       Q.    A person in that position, would they normally

8    have an understanding as to the AMIP program and whether

9    or not it was an entitlement?

10             MR. SEEGULL:  Objection.  Lack of

11   foundation.

12             If you know the answer, you can answer.

13      A.    I would say that, if an individual in CSC is in

14   a vice president position and has people that direct

15   report to him or her, they should be in a position to be

16   aware of the program.

17      Q.    Did Mr. Bancroft have people report to him?

18      A.    To the best of my knowledge, yes.

19      Q.    Do you consider the AMIP bonus a part of the

20   employee's salary?

21      A.    No.

22      Q.    Do you know who Gary Lewis is?

23      A.    I'm familiar with the name.

24      Q.    Do you know what his position at CSC is or was?

Dorothy J. Eltzroth                                23

1      A.    No.

2      Q.    Do you know if Gary Lewis held a position at

3  CSC higher on the corporate ladder than yours?

4              MR. SEEGULL:  Objection.  Asked and

5  answered.

6              MR. WILSON:  I don't think she did answer.

7              MR. SEEGULL:  I thought she said she did

8  not know his position.

9              MR. WILSON:  She could know whether he's

10 higher up than her.

11             MR. SEEGULL:  If you know the answer, you

12 can answer.

13     A.    I don't know.

14     Q.    Are the AMIP bonuses earned by the participants

15 over the course of the fiscal year?

16     A.    No.

17             MR. WILSON:  I'd like to have that marked.

18             (Eltzroth Deposition Exhibit No. 1 was

19 marked for identification.)

20 BY MR. WILSON:

21     Q.    Take your time and look over that document, if

22 you would.  I'm not going to ask you about the entire

23 document, just several pieces of it.

24             Have you ever seen this document before?

24

Dorothy J. Eltzroth

1    A.    Yes.

2    Q.    In what context did you see it?

3    A.    On Wednesday when I met with Larry Seegull.

4    Q.    Had you seen it prior to that?

5    A.    No.

6    Q.    I'd like to direct your attention down on the

7    first page to letter G in that paragraph there.  States:

8    "'Award Year' means the fiscal year of the Company over

9    which the performance of Participants and the Company is

10   measured for the purpose of determining the annual

11   incentive award earned, if any."

12            Is that what that paragraph says?

13   A.    Yes.

14   Q.    Would you agree with this paragraph that the

15   performance of each participant is measured over the

16   course of the entire fiscal year?

17            MR. SEEGULL:  That's not what that says.

18            MR. WILSON:  The performance of the

19   participants and the company is measured in the award

20   year.

21            MR. SEEGULL:  I'm sorry.  I'm not following

22   you.

23            If you understand the question, you can

24   answer.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Dorothy J. Eltzroth

25

1    BY MR. WILSON:

2        Q.    Does this paragraph mean that the performance

3    of each participant is measured over the course of the

4    entire fiscal year or award year?

5                    MR. SEEGULL:  I'm going to object.  She

6    didn't draft this document.  She has never seen this

7    document before other than in preparation for her

8    deposition.  She had no familiarity with the document.

9    It's lack of foundation that she doesn't know who drafted

10   this document or what it was drafted for or what the

11   purpose was or who drafted it.

12                   MR. WILSON:  I'm asking her if she

13   agrees --

14                   MR. SEEGULL:  You can ask her a general

15   question about how performance was measured, if that's

16   what your question is.

17                   MR. WILSON:  I'm asking her if she agrees

18   with the statement in the paragraph.

19                   MR. SEEGULL:  The statement in the

20   paragraph is drafted for its own purpose.  Why don't you

21   ask her generally if she agrees with the notion.  I guess

22   that you want to have her say that awards are earned over

23   the course of the year.  Is that what your point is?

24                   MR. WILSON:  I'm asking her if she agrees



1    with the statement in this CSC document.

2              MR. SEEGULL:  I don't know what that means,

3    agrees with a statement in a document that was drafted in

4    1983.  She wasn't involved at all in drafting the

5    document.

6              If you understand the question, you can

7    answer.

8      A.    The fiscal year is the measurement period for

9    measuring and assessing performance.

10     Q.    And the performance of the eligible

11   participants is evaluated throughout the course of the

12   fiscal year, correct?

13     A.    No.  It's evaluated at the end of the fiscal

14   year.

15     Q.    It's evaluated at the end of the fiscal year,

16   but the performance throughout the fiscal year is what is

17   evaluated.

18             MR. SEEGULL:  Objection.  Asked and

19   answered numerous times now.

20             MR. WILSON:  I don't think it has been.

21             MR. SEEGULL:  I don't think you like the

22   answer, but you have asked it numerous times.  She's

23   answered it.

24             MR. WILSON:  You can answer the question.

1              MR. SEEGULL:  You can answer it again.

2              THE WITNESS:  Would you restate the

3    question?

4    BY MR. WILSON:

5        Q.   You stated that the evaluation took place at

6    the end of the fiscal year, but that evaluation takes

7    into consideration the participant's performance

8    throughout the fiscal year, correct?

9              MR. SEEGULL:  Objection.  Asked and

10   answered.

11             If you understand his question, you can

12   answer.

13       A.   The best way I can answer your question is to

14   say that the objectives are evaluated at the end of the

15   year relative to achievement of those objectives.

16       Q.   And the achievement of the objectives takes

17   place throughout the fiscal year, correct?

18             MR. SEEGULL:  Objection.  Asked and

19   answered.

20             MR. WILSON:  I don't think it has been.

21             MR. SEEGULL:  Let's not go over the same

22   question 20 times.  She's answered it.

23   BY MR. WILSON:

24       Q.   So it's your testimony that the only thing

Dorothy J. Eltzroth                                    28

1    that's evaluated is the person's performance on one day

2    out of the year.   Is that your testimony?

3              MR. SEEGULL:   Objection.   That's

4    mischaracterizing the record, and I think you know that.

5              MR. WILSON:   I don't think it is.   She says

6    it's evaluated at the end of the fiscal year.

7              MR. SEEGULL:   She said the objectives are

8    measured against --

9              MR. WILSON:   Right.   I asked her what fed

10   into those objectives.   Was it performance of the

11   employees that fed into those objectives throughout the

12   fiscal year.

13             MR. SEEGULL:   Why don't you ask about

14   specific performance objectives, specific earnings per

15   share or revenue, whatever objective it is you want to

16   ask about.

17             MR. WILSON:   I don't think I need to,

18   Larry.

19             MR. SEEGULL:   If you understand his

20   question, go ahead and answer.

21        A.   As I understood the question was that

22   essentially an eligible participant would be evaluated on

23   one day, and the answer to that is no.   The objectives

24   that are set forth for the fiscal year are measured at

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dorothy J. Eltzroth                                            29

1    the end of the fiscal year relative to achieving those

2    objectives.

3         Q.    Correct.   But doesn't data go into those

4    objectives throughout the year to determine if the

5    objectives are met at the end of the fiscal year?

6              MR. SEEGULL:   Objection.   Hypothetical,

7    calls for speculation.   It depends on the objectives,

8    depends on the performance, depends upon what it is

9    you're measuring.

10             Go ahead, you can answer if you understand

11   his question.

12             THE WITNESS:   I'm not sure.   I'm not quite

13   sure how to respond to that.   What you said, Larry, was

14   true.   It does depend on the objective.   For example, for

15   financial objectives, obviously, as the revenue is

16   recognized by the company throughout a fiscal year, then

17   that revenue would be measured at the close of the fiscal

18   year against objectives.

19   BY MR. WILSON:

20        Q.    But the monies come in throughout the fiscal

21   year that contributes to that objective.

22        A.    Yes.   In the example I gave with revenue, then

23   revenue would be recognized as appropriate throughout the

24   fiscal year and there would be a set target as part of

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dorothy J. Eltzroth                                    30

1   that objective at the beginning of the fiscal year.  At

2   the close of the fiscal year, once the books are closed

3   for the fiscal year, then that target for the objective

4   would be assessed relative to actual and there would be a

5   determination made either the revenue target was met or

6   it was not.

7       Q.    Can you identify an objective that data does

8   not go into throughout the whole fiscal year, that only

9   part of the fiscal year is measured?

10              MR. SEEGULL:   Objection.   Vague and

11  ambiguous.

12      A.    No.

13      Q.    Is your answer no?

14      A.    My answer is no.

15      Q.    Are you eligible for the AMIP bonus?

16      A.    I am currently eligible for this year, yes.

17      Q.    Have you been eligible in previous years?

18      A.    In some, yes.

19      Q.    Has there been a break in your eligibility; in

20  other words, once you became eligible, was there a year

21  where you stopped being eligible and then it picked up

22  again?

23      A.    No.

24      Q.    How many years have you been eligible?

1    A.    I believe the first time I was eligible was

2    1995, possibly 1994.

3    Q.    Are you told at the beginning of the fiscal

4    year every year that you're eligible?

5    A.    Yes.

6    Q.    Who typically communicates this to you?

7    A.    My manager.

8    Q.    Who's that?

9    A.    Right now it's Jack Farrell.

10    Q.    It always happens at the beginning of the

11    fiscal year?

12    A.    Within that time period, yes.

13    Q.    If you're not told on the first day of the

14    fiscal year that you're eligible, do you think that you

15    are still participating?

16    A.    No.

17    Q.    Do you have any knowledge of the notice that

18    was given to the plaintiffs in this lawsuit about their

19    ineligibility for the AMIP bonus?

20    A.    No.

21    Q.    Do you have any knowledge why it was decided to

22    remove these people from the AMIP program?

23    A.    No.

24    Q.    Do you know who the decision-makers were that

1    made this decision?

2        A.    No.

3        Q.    Are you aware of the CSC ethics policy?

4        A.    Yes.

5        Q.    Did you participate in drafting it?

6        A.    No.

7        Q.    How often is the ethics policy reviewed with

8    CSC employees?

9        A.    Annually.

10       Q.    Is there a specific time of year when that's

11   done?

12       A.    Generally within the fall time frame.

13       Q.    Is there a section in the ethics policy

14   regarding employees?

15             MR. SEEGULL:  I'm going to object to this

16   line of questioning on relevance grounds.

17             Go ahead, you can answer.

18       A.    I actually don't understand the question.

19       Q.    Is there a section in the ethics policy that

20   pertains to being ethical with CSC employees?  I'll tell

21   you what.  I'll show it to you.

22       A.    Okay.

23       Q.    I can kind of direct you to it.

24             MR. SEEGULL:  I would ask for a continuing

Dorothy J. Eltzroth
                                                                    33

1   objection along these lines of questions, if you don't

2   mind, concerning the ethics policy.

3               (Eltzroth Deposition Exhibit No. 2 was

4   marked for identification.)

5               MR. SEEGULL:  Take your time to read it.

6   BY MR. WILSON:

7       Q.    I appreciate you reading the whole thing, but

8   I'd like to refer you to the page that's marked

9   Miller 151 on the bottom.  And the first paragraph at the

10  top there states:  "You must use fairness, honesty, and

11  comply with the law in all business relationships with

12  CSC stockholders, customers, suppliers, employees, and

13  applicants"...  And then it goes on.

14              Would you agree that this paragraph applies

15  to CSC employees?

16      A.    Yes.

17      Q.    To your knowledge, when there were discussions

18  to remove individuals from the AMIP program, did anybody

19  raise any concern that this action might violate the CSC

20  ethics policy?

21      A.    I'm not aware of any conversation to remove

22  people from the program.  I don't know how to answer your

23  question.

24      Q.    You didn't have any knowledge that they were

Dorothy J. Eltzroth                                    34

1    considering removing people from the program?

2        A.    No.

3        Q.    Knowing what you know now, do you believe that

4    the action of retroactively removing these people from

5    the program is consistent with the ethics policy?

6        A.    Yes.

7        Q.    You don't think it violates the policy?

8        A.    No.

9        Q.    Do you have any knowledge of the criteria or

10   the objectives that were used in fiscal year 2003 for the

11   AMIP program in the Chemical Group?

12       A.    No.

13       Q.    Because you were out of the Chemical Group by

14   now, right?

15       A.    That's correct.

16       Q.    That's going to make this quick.

17            Do you know what the payout for the AMIP

18   bonus program for the Chemical Group was in fiscal year

19   2004?

20       A.    No.

21       Q.    I've just got one document I want to show you

22   and then I should be done.

23            MR. SEEGULL:   This is going to be

24   Exhibit 3?