Dorothy J. Eltzroth                               35

1              MR. WILSON:  Yes.

2              (Eltzroth Deposition Exhibit No. 3 was

3    marked for identification.)

4    BY MR. WILSON:

5       Q.    The only page I'm going to ask you questions

6    about is the next-to-last page, but feel free to review

7    the whole document if you would like.

8              MR. SEEGULL:  Why don't you review the

9    whole document.  We're off the record.

10             (Discussion off the record.)

11   BY MR. WILSON:

12      Q.    I'd like to refer you to the next-to-last page

13   of the document.  It's marked D-10065 at the bottom.

14             Have you ever seen this document before?

15      A.    No.

16      Q.    Have you ever seen documents like this before?

17      A.    No.

18             MR. WILSON:  That's all the questions I

19   have for you right now.  Mr. Seegull may have some

20   questions for you.

21             MR. SEEGULL:  No, no questions.

22             (Deposition concluded at 2:10 p.m.)

23             - - - - - -

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

T E S T I M O N Y

DEPONENT:   DOROTHY J. ELTZROTH                    PAGE

BY MR. WILSON................................. 2

E X H I B I T S

ELTZROTH DEPOSITION EXHIBIT NO.                    MARKED

1 - A copy of a four-page document
entitled, "Computer Sciences Corporation
Annual Management Incentive Plan," dated
April 2, 1983................................. 23

2 - A copy of a multi-page document
entitled, "Code of Ethics and Standards
of Conduct".................................. 33

3 - A copy of a five-page document Bates
numbered D-10062 through D-10066............. 35


ERRATA SHEET/DEPONENT'S SIGNATURE          PAGE 37


CERTIFICATE OF REPORTER                    PAGE 38



**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)

                 )

NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 31st day of March, 2006, the deponent herein, DOROTHY J. ELTZROTH, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

        I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

        I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2008)


DATED: _____4/24/06_____


**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

B-1010

ORIGINAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
2
                          - - -
3

      BRIAN MILLER; HECTOR CALDERON;   : Case No.
4     CHARLES FOLWELL; ROLLAND GREEN;    05-010-JJF
      DAWN M. HAUCK; KEVIN KEIR;       :
5     ASHBY LINCOLN; KAREN MASINO;
      ROBERT W. PETERSON; SUSAN M.     :
6     POKOISKI; DAN P. ROLLINS;
      and WILLIAM SPERATI;             :
7
                 Plaintiffs            :
8
           vs                          :
9
      COMPUTER SCIENCES CORPORATION,   :
10    a Delaware Corporation
                                       :
11               Defendants
                                       :
12
13                        - - -

                  Wednesday, April 26, 2006
14                Mount Laurel, New Jersey
                          - - -
15

                      Oral Deposition of JAMES STYLES
16    taken pursuant to Notice, at the Law Office of
      Capehart Scatchard, Laurel Corporate Center, 8000
17    Midlantic Drive, Suite 300, Mount Laurel, New
      Jersey, commencing at approximately 8:47 a.m., on
18    the above date, before Tracey L. Pinsky, CSR, RPR
      and Notary Public.

19
20                        - - -
21

               CLASS ACT REPORTING AGENCY, LLC
22             Registered Professional Reporters
      1420 Walnut Street             133H Gaither Drive
23    Suite 1212                     Mt. Laurel, NJ 08054
      Philadelphia, PA 19103         (856) 235-5108
24    (215) 928-9760

JAMES STYLES

Page 2

```
 1    A P P E A R A N C E S:

 2         TIMOTHY J. WILSON, ESQUIRE

           Of Margolis Edelstein

 3         1509 Gilpin Avenue

           Wilmington, DE 19806

 4         Counsel for the Plaintiffs

 5         JOHN GEANEY, ESQUIRE

           Capehart Scatchard

 6         Laurel Corporate Center, Suite 300

           8000 Midlantic Drive

 7         Mount Laurel, New Jersey 08054

           Counsel for James Styles

 8

           LARRY R. SEEGULL, ESQUIRE

 9         Of DLA Piper, Rudnick, Gray, Cary

           6225 Smith Avenue

10         Baltimore, MD 21209
```

JAMES STYLES

Page 3

1                    I N D E X

2    WITNESS                                          PAGE

3    JAMES STYLES

4         By Mr. Wilson                                4

5         By Mr. Seegull                              67

6

7

                     E X H I B I T S

8

     NUMBER              DESCRIPTION                  PAGE

9

     Styles-1            E-mails                       51

10

     Styles-2            GIS staff - by Grade          64

11

     Styles-3            E-mails                       64

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1              JAMES STYLES, after having been

2      first duly sworn, was examined and testified as

3      follows:

4      EXAMINATION

5      BY MR. WILSON:

6              Q.      Good morning, Mr. Styles.  My name

7      is Tim Wilson, and I'm the attorney for the

8      plaintiffs in the lawsuit Miller versus Computer

9      Sciences Corporation.  Initially, I want to go

10     over a few instructions, prior to starting the

11     deposition, just so the deposition goes smoother

12     and so you understand what's going to happen.

13             A.      Uh-huh.

14             Q.      First, I'm going to be asking you

15     questions pertaining to the lawsuit.  And when you

16     respond, you must do so verbally.  This is so the

17     court reporter can -- can get an accurate record

18     and, you know, it's hard for her to take down

19     nonverbal communications.

20             A.      I understand.

21             Q.      You've just been sworn in.  So, as

22     you know, your testimony is under oath, so you

23     must answer truthfully just as if you were in

24     court.  When I ask you a question and you respond

JAMES STYLES

Page 5

1    to that question, I'm going to assume that you

2    heard and understood it.  If you don't hear a

3    question or don't understand it, please let me

4    know and I'll ask it again or explain it.  Please

5    let me finish asking the question before you

6    answer, and I will extend the same courtesy to

7    you, and that, again, we can have a cleaner

8    transcript.  If, at any time, you come to realize

9    that a statement you made is incorrect or

10   inaccurate, let me know, and you will be permitted

11   to clarify the record.

12            Under Delaware rules, you cannot

13   talk or confer with you attorney during deposition

14   either in here or during breaks, unless it

15   pertains to a matter of privilege, in which case

16   the attorneys will object and instruct you not to

17   answer?

18        A.    What's a matter of privilege?

19        Q.    A matter of privilege is

20   communications between you and your attorneys.

21        A.    Okay.

22        Q.    If, at any time, you need a break to

23   go to the rest room or for any other reason, let

24   me know and we'll take a break.  Okay?

JAMES STYLES

Page 6

```
 1          A.      Un-huh.

 2          Q.      Do you understand these

 3   instructions?

 4          A.      I do.

 5          Q.      Okay.  Just like to get a little

 6   background information before we start.  Where

 7   were you born and what is your birth date?

 8          A.      I was born in Camden, New Jersey.

 9   My birth date is July 27, 1958.

10          Q.      And what is your Social Security

11   number?

12          A.      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.

13          Q.      And your current address?

14          A.      Is 105-D Cherry Parke, P-a-r-k-e, in

15   Cherry Hill, New Jersey.

16          Q.      And how long have you lived there?

17          A.      Two months.

18          Q.      I assume you rent?

19          A.      No, I own.

20          Q.      You own, okay.  Sorry.

21                  Have you ever been arrested?

22          A.      No.

23          Q.      Did you serve in the military?

24          A.      No, I did not.
```

JAMES STYLES

Page 7

```
 1          Q.     Did you go to college?

 2          A.     Yes, I did.

 3          Q.     And where did you go?

 4          A.     La Salle.

 5          Q.     Did you get a degree?

 6          A.     Yes.

 7          Q.     And what's your degree in?

 8          A.     I have a bachelor of science in

 9   business.  I have a MBA in HR and finance.

10          Q.     Is the MBA from --

11          A.     La Salle.

12          Q.     -- La Salle as well?

13          A.     Yes.

14          Q.     Okay.  Did you graduate with any

15   honors?

16          A.     Only my mom's.

17          Q.     Okay.  As I understand it, you are

18   not presently employed by CSC?

19          A.     That is correct.

20          Q.     And when did you stop working for

21   CSC?

22          A.     March 17th, I believe, mid March, on

23   a Friday.

24          Q.     2006?
```

```
 1          A.      That is correct.

 2          Q.      And where do you work now?

 3          A.      With AstraZeneca, it's a

 4   pharmaceutical company.

 5          Q.      Where are you located, where is your

 6   office located?

 7          A.      Wilmington, Delaware.

 8          Q.      Right there on 202?

 9          A.      Uh-huh, yes.

10          Q.      What's your title with AstraZeneca?

11          A.      Director of leadership and team

12   development.

13          Q.      When you did work for CSC, what was

14   your job title, your most recent job title?

15          A.      Director of human resources.

16          Q.      And how long did you hold that

17   title?

18          A.      Started in September of 2002, so

19   that's three-and-a-half years.

20          Q.      And what does the director of human

21   resources do?

22          A.      It's the representative in the

23   conduit for people-related processes.  So

24   processes related to staffing, to communications,
```

Page 9

1   to benefits administration at a local level,

2   succession planning, learning and development,

3   administrating compensation, so.

4        Q.    Who did you report to?

5        A.    I had two people I reported to

6   because CSC is a matrix organization.  I had a

7   solid line to Gus Siekierka, and then most

8   recently to Tom Bailey.  And Tom took over for

9   Gus.  And I had the dotted line to Nick Wilkinson.

10       Q.    What does a solid line mean?

11       A.    When you report to more than one

12  person, you are ultimately accountable to one.  I

13  mean, one person who does the hiring, firing,

14  promotions, is responsible for your performance,

15  for your advancement, those types of things.  And

16  that was -- when I left -- I guess I should just

17  pick a name, I mean.  When I left it was

18  Tom Bailey, for the most part it was

19  Gus Siekierka.

20       Q.    And what does dotted line mean?

21       A.    That you have some level of

22  accountability, but Nick can't order me, for all

23  intents and purposes.  I guess the closest thing

24  to describe it is that Nick would be somewhat of

1    my internal client.  So he can say, Jim, I'd like

2    these things, but ultimately he couldn't make me.

3         Q.    Okay.

4         A.    But he could make my life miserable

5    if he wanted to.

6         Q.    You said CSC is matrix a

7    organization, what does that mean?

8         A.    It's -- God, how do you describe a

9    matrix.  I'll try to describe it by describing a

10   formal organization.  A formal organization is

11   more command and control.  Where it starts from

12   the top and organization spreads down

13   geometrically, like a pyramid.  So -

14        Q.    Okay.

15        A.    -- at the top you are pointing to

16   the next level, the next level.

17             In a -- in a matrix organization,

18   you have some of that, but the people resources

19   are coming from a different direction.  So in our

20   business unit, for instance, technology management

21   group, the accounting -- the account management --

22   the people who do the business strategy and the

23   implementation of the strategy and the growing of

24   the business, sales marketing, finance, HR, all

JAMES STYLES

Page 11

1    those are in TMG.

2              But the people who perform the

3    functions like the network administrators, network

4    architects, the help desk employees, they don't

5    report in that chain.  They're -- they're a pool

6    of resources that come to bare in the client

7    environment.  So you have two organization

8    structures that come together.  So that's the best

9    I can do.  Frankly, it's very confusing, a matrix

10   organization.  In fact, we -- we -- we say that

11   matrix organization is an oxymoron, because it's

12   -- it's -- it's a bit confusing.

13         Q.    Okay.  Prior to becoming director of

14   human resources, did you work for CSC then, as

15   well?

16         A.    Yes.

17         Q.    Okay.  And what was your position

18   then?

19         A.    Senior manager, human resource

20   development.

21         Q.    And how long did you hold that

22   position?

23         A.    I was in that group for 11 years.  I

24   had started as a consultant in -- in that function

JAMES STYLES

Page 12

1   then progressed to senior consultant to manager to

2   senior manager, so.

3        Q.    When -- when you say consultant,

4   what does that mean?

5        A.    It's -- it's really more of a job

6   title.  It's to -- it's to indicate that I was an

7   individual contributor.

8        Q.    Okay.  So you were still a -- a CSC

9   employee when you --

10       A.    Oh, yes.

11       Q.    -- worked as a consultant?

12       A.    Yes, yes.  Yeah, it's more of a

13   title, I was not a consultant to the company, I

14   was as an internal resource.

15       Q.    Okay.  And -- and what year did you

16   start working for CSC?

17       A.    Started working for them in 19 --

18   January of 1989.

19       Q.    '89?

20       A.    '89.

21       Q.    Okay.  What did you do to prepare

22   for today's deposition?

23       A.    Outside of -- of preparation

24   yesterday, nothing really.

JAMES STYLES

Page 13

```
1          Q.     Did you meet with Mr. Seegull --

2          A.     Yes.

3          Q.     -- or your attorney?

4          A.     Yes.

5          Q.     And when did you meet with them?

6          A.     Last night.

7          Q.     Last night.

8                 How long did you meet with them?

9          A.     An hour.  I'm -- I'm guessing on

10    that, sorry.

11         Q.     Did you review any documents?

12         A.     No.

13         Q.     Did you review any deposition

14    transcripts that have been taken in this case?

15         A.     No.

16         Q.     Did you talk to anybody other than

17    your attorneys to prepare for this deposition?

18         A.     No.

19         Q.     You talked to Dorothy Ellsroth about

20    this case, at one point, correct?

21         A.     That is correct.

22         Q.     And what did you discuss?

23         A.     Actually, I don't remember.  Don't

24    remember.  I -- I'm not -- I -- I would believe
```

JAMES STYLES

Page 14

1    that Dot and I talked because I took over for Dot.

2    Dot was the director of human resources for this

3    business unit, and she moved onto something else

4    and I replaced her.  So it wasn't uncommon for Dot

5    and I to talk about, you know, the business -- the

6    business of that space.  We -- we talked about it

7    on a fairly continuous basis.

8             Q.      What business unit are you referring

9    to?

10            A.      Chemical accounts.

11            Q.      Do you recall when you last spoke to

12   Ms. Ellsroth about this case?

13            A.      No.  No.  No.  Sorry, I don't.

14            Q.      Do you recall where you were when

15   you had this conversation?

16            A.      I'd -- I'd assume in our -- in our

17   HR suite.

18            Q.      Have you talked to anybody else in

19   general terms about the lawsuit?

20            A.      No.

21            Q.      Did you -- strike that.

22                    Are you aware of the basis for this

23   lawsuit?

24            A.      Yes, I am.

JAMES STYLES

Page 15

1        Q.     And what's your understanding?

2        A.     That there are 11 people that filed

3   a lawsuit because they felt it was unfair that

4   they were removed from AMIP -- it's an acronym,

5   A-M-I-P, it's a management incentive program --

6   that they were removed from AMIP.  They felt it

7   was unfair, so they're -- they're suing to -- to

8   get what they feel they should have gotten.

9   That's as I understand it.

10        Q.     Do you have an understanding as to

11   why they feel it's unfair?

12        A.     No.

13        Q.     If I represented that they felt they

14   were being removed retroactively, would -- would

15   that -- would that sound correct to you?

16        A.     Could you rephrase that.  I don't

17   quite understand what you mean by that?

18        Q.     If I represented that -- that they

19   allege that they were eligible for the program,

20   then they were formed -- informed that they were

21   ineligible back to a certain date, and their claim

22   is for that period in between, does that sound --

23        A.     I understand.

24              MR. SEEGULL:  Let -- let me just say

JAMES STYLES

Page 16

1   something Tim.   Maybe -- maybe the best thing to

2   do instead of asking about what they have alleged

3   or -- or not, why don't you just ask him what his

4   knowledge is.   Focus on what he knows.

5            MR. WILSON:   Okay.   I -- I -- well,

6   I want to -- I want to -- I'm just trying to give

7   him some guidance to see if -- if he does

8   understand what the -- what the lawsuit is about.

9            MR. SEEGULL:   Well, he's given you

10  his -- his understanding.

11           MR. GEANEY:   I think he said he

12  understands your question.

13  BY MR. WILSON:

14       Q.     Does that sound familiar to you,

15  sir?

16           MR. SEEGULL:   How -- how can it

17  sound familiar?   He hasn't spoken to the

18  plaintiffs, what their understanding is.

19           MR. WILSON:   I'm asking what his

20  understanding is.

21           MR. SEEGULL:   Well, you asked him,

22  does that sound familiar, you didn't ask him what

23  his understanding is.

24  BY MR. WILSON:

JAMES STYLES

Page 17

1          Q.      Is that your understanding, sir?

2          A.      You have to go back to what it is

3   you are asking me to understand, Tim.  I don't

4   mean --

5                  MR. WILSON:  Okay.

6                  THE WITNESS:  -- to be purposely

7   difficult, I -- I want to understand the question.

8   BY MR. WILSON:

9          Q.      I understand.  By retroactive, I

10  mean the plaintiffs were allegedly eligible for

11  the AMIP program.

12         A.      Okay.

13         Q.      They were informed that they were no

14  longer eligible.

15         A.      Uh-huh.

16         Q.      But when they were informed, it

17  reverted back to a previous date, when they

18  considered they were eligible.  Is that your

19  understanding?

20         A.      That makes sense, yes.

21         Q.      When you were employed by CSC, did

22  you participate in the AMIP program?

23         A.      I did.

24         Q.      So you have an understanding as to

JAMES STYLES

1    what the program is?

2         A.    Yes, I do.

3         Q.    Can you tell me what your

4    understanding is?

5         A.    As part, at a certain level in CSC

6    you're rewarded for your contribution to the

7    success of the business above and beyond your

8    salary and merit increases on a yearly basis.

9    There's an incentive compensation program.  And in

10   CSC it's called AMIP.  You're given targets, the

11   targets vary year to year.  For the years that I

12   was in it, it was predominantly how the success of

13   the business, so it was revenue targets, operating

14   income targets, things like that.  And at the end

15   of the year you see how you did against these

16   targets, and that's where your bonus came in.

17        Q.    Okay.  When you say you are rewarded

18   for your contribution, what do you mean by

19   contribution?

20        A.    I believe that the philosophy of

21   AMIP is, and why it's given to people at a higher

22   level, is that your contribution, the contribution

23   that you make, is more apt to have an impact on

24   revenue growth, operating income, health and such.

JAMES STYLES

Page 19

1   So as a way of engaging the -- the mind and the

2   actions of -- of the said employees to a

3   particular outcome, that's -- that's why something

4   like an AMIP exists, that's -- that's what they

5   want you to do.

6          Q.     When does the contribution occur?

7          A.     When I'm saying contribution, I mean

8   my individual contribution as an employee.  It

9   occurs on a daily basis, I mean, every day I show

10  up I'm making a contribution.

11         Q.     Is the AMIP program based on CSC's

12  fiscal year?

13         A.     Yes.

14         Q.     And is the fiscal year from

15  April 1st until March 31st of any particular year?

16         A.     Loosely, yeah.  I mean, it actually

17  isn't literally April 1st, it's -- it's the last

18  week in March.  Sometimes that could be like

19  April 2nd, April 3rd, but its general knowledge is

20  that it's April 1st.  I think that's a fair enough

21  statement.

22         Q.     Okay.  And -- and when you are

23  talking of contribution, does that contribution

24  occur throughout the fiscal year?

JAMES STYLES

Page 20

1        A.      Yes, it does.

2        Q.      Were you involved in the transition

3    of DuPont employees to CSC in 1997?

4        A.      I was not.

5        Q.      Do you know how long CSC has had the

6    AMIP program?

7        A.      For sure, no.  My -- my guess is

8    it's been around since the eighties.  I mean, I

9    joined in '89, I think it was there then.

10       Q.      Have you always been eligible for

11   AMIP?

12       A.      No.

13       Q.      When did you become eligible?

14       A.      AMIP was when I started this -- the

15   job in September of 2002.  I was on another

16   incentive program, it wasn't AMIP, though.  It was

17   more like a discretionary bonus, I guess, for --

18   from '91 to 2002.  Started as a 10 percent and

19   somewhere near the end it switched to 20.

20       Q.      How would you receive the

21   discretionary bonus?

22       A.      Yearly, kind of the same way with

23   AMIP.  And it was -- is an objective-driven bonus,

24   same thing as AMIP.

Page 21

1          Q.      Were the objectives the same as

2     AMIP?

3          A.      No, actually it wasn't.  The -- the

4     objectives for the discretionary bonus that I was

5     in was all towards of -- pretty much my

6     performance.  So there were things that Jim Styles

7     had to accomplish in a given year, and then at the

8     end of year we evaluated my individual performance

9     against the targets and a bonus was -- was given.

10         Q.      So is it fair to say, the

11    discretionary bonus was based more upon your

12    individual objectives as opposed to business

13    objectives with AMIP.

14         A.      That is correct.

15         Q.      When the AMIP bonuses are

16    calculated, they input numbers from the business

17    from the -- the prior fiscal year, correct?

18         A.      Oh, can you ask that again?  I lost

19    you at the end.

20         Q.      The -- the numbers that they use to

21    calculate the AMIP bonuses with respect to the

22    business objectives, those numbers come -- are

23    derived throughout the entire fiscal year,

24    correct?

JAMES STYLES

Page 22

```
 1          A.      It's those numbers that I'm not sure

 2   what you mean.  Do -- can you -- can you

 3   substitute that pronoun with a noun?

 4          Q.      The -- the -- say the earnings, for

 5   example?

 6          A.      Yes.

 7          Q.      Say if earnings for the company are

 8   an objective?

 9          A.      Uh-huh.

10          Q.      Those earnings come from throughout

11   the entire fiscal year, correct?

12          A.      Yeah, they -- the -- the numbers --

13   the targets for the business typically didn't come

14   into the fiscal, well into the fiscal year.  I

15   mean, you didn't start April 1st with your

16   business targets.

17          Q.      Okay.  So when -- are you saying

18   that they didn't start collecting the data to use

19   for their calculations until the targets were

20   established?

21          A.      Correct.

22          Q.      So there was -- if, for example,

23   they used earnings for the company as one of the

24   objectives, the earnings for the entire fiscal
```

1    year would not be calculated into -- into

2    determining if the individuals received their AMIP

3    bonus per that objective?

4        A.    I'm sorry, Tim, I'm kind of losing

5    you.

6        Q.    Yeah.  If -- if income is one of the

7    objectives.

8        A.    Okay.  Operating income.  Okay.

9        Q.    Okay.

10       A.    All right.

11       Q.    Whenever they are at the end of the

12   year, whenever the numbers are calculated, do they

13   start collecting the data at whenever the targets

14   are set, or do they start collecting the data from

15   the beginning of the fiscal year?

16       A.    What data being collected?

17       Q.    The data that would go into the

18   operating income, the final numbers?

19       A.    Well, they'd -- they would collect

20   operating income data on a continuous basis from

21   day one in the fiscal year.  I mean, that's a --

22   that's a continuous financial process.  As it

23   relates to AMIP -- what happens early in the

24   fiscal year with AMIP is they'll determine what

JAMES STYLES

Page 24

1   weight different measurements will take into

2   place.  So let's say, for instance, for the

3   business unit that revenue growth is going to be

4   very important for this coming fiscal year.  We

5   don't know what that revenue growth is in numbers,

6   we just know that it's going to be important.

7        Q.    Un-huh.

8        A.    So hypothetically say, all right,

9   let's say revenue we're going to make 40 percent

10  of 100 percent of a bonus.  So 40 percent of that

11  weight is going to be a revenue, because that's

12  where we want in emphasis.  So they'll --

13  they'll -- in the beginning in AMIP, they'll know

14  what the weighteds are, because they know in a

15  general sense the direction they want to take the

16  business in and what they want to focus on, be it

17  profitability, revenue, growth, whatever.

18              What it takes a while to get and

19  takes a number of months to get is what exactly is

20  the target, what exactly is the revenue number.

21              So, you know, the -- the revenue

22  number for AMIP might be, again, hypothetically

23  speaking, just so you understand in terms of

24  numbers our -- our previously fiscal year could be

JAMES STYLES

Page 25

1    like 1.8 billion in revenue and our new target is

2    2.2 billion.  That specific number doesn't come

3    until months into the fiscal year, because it

4    takes them a while to kind of figure it out.

5         Q.    Okay.  So --

6         A.    But they -- but they know when the

7    fiscal year starts that the weight of average is

8    going to be 40 percent of the weight of that is

9    going to be on revenue.  It's not told until some

10   months go down that they say, well, the target

11   number is 2.2 billion.

12        Q.    So when they are calculating revenue

13   growth to see if you reach 2.2 billion, is that --

14   does that start when the target is established or

15   does that start at the beginning of the fiscal

16   year?

17        A.    You don't know if you reached it

18   until the end of the fiscal year.

19        Q.    I -- I understand that, but whenever

20   they -- whenever they're adding up all the revenue

21   growth to reach the final number, do they add all

22   the numbers from the entire fiscal year?

23        A.    I'm sorry, Tim, I -- I don't

24   understand your question.

Page 26

1          Q.      To arrive at the final number for

2    revenue growth --

3          A.      To see if you got there.

4          Q.      Right.

5          A.      Okay.

6          Q.      They have to input numbers, correct?

7    How -- okay.  Explain to me how you would arrive

8    at -- at the final number for revenue growth?

9                  MR. SEEGULL:  I'm -- I'm going to

10   object.  On the lack of foundation.  I don't think

11   you established whether or not he had any

12   responsibility for calculating AMIPs or coming up

13   with the weightings or targets or anything like

14   that.

15                 MR. WILSON:  Well, he's -- he's

16   explained that -- that he understands the -- how

17   the AMIP program works, and -- and based upon his

18   answer so far, I think he has an understanding.

19                 MR. SEEGULL:  Objection.  Lack of

20   foundation.  I don't think you've established what

21   his role was in any of this.

22   BY MR. WILSON:

23         Q.      Do you understand how the final

24   numbers are calculated in AMIP?

Page 27

1          A.      I'm going to oversimplify it, Tim.

2    I mean, accounting keeps track of revenue dollars.

3    We add it up at the end of the year, and that's

4    what our revenue dollars are.

5          Q.      Okay.

6          A.      I mean, it's an accounting function.

7          Q.      Do you -- when it's added up at the

8    end of the year, do you know whether it's the time

9    period from which the numbers are gathered to add

10   it up?

11         A.      If I'm understanding your question

12   correctly, I believe it takes 45 days for us to

13   close our books.  So at the end of our fiscal year

14   it takes about 45 days to finish the accounting

15   processes, finish accounts payable, accounts

16   receivable, close accounts until you have final --

17   final numbers.

18         Q.      So are you saying the revenue growth

19   only comes from those 45 days?

20         A.      No, no.

21         Q.      What's the time period in which the

22   revenue growth is grown?

23              MR. SEEGULL:  Objection.  This is

24   speculative.  He says he's -- it's an accounting

JAMES STYLES

Page 28

1    function.  He doesn't, isn't in charge of, has --

2    had no responsibilities for measuring revenue.

3                    THE WITNESS:  I think it's a fair

4    observation, Tim.  I mean, I'm telling you

5    accounting principles and I, you know, the -- the

6    revenue growth is what it is, you know, it's -- we

7    generate revenue at the end of year.  And that's

8    about the best I got for you.

9    BY MR. WILSON:

10        Q.    So is it your testimony that -- that

11   you don't under -- that you have no knowledge of

12   the time period in which the data is collected to

13   come up with the final numbers?

14                    MR. SEEGULL:  Objection.  He's given

15   you his knowledge, he's told you what he knows.

16                    MR. WILSON:  You can answer the

17   question.

18                    THE WITNESS:  Can you ask it again,

19   please?

20   BY MR. WILSON:

21        Q.    Okay.  Is it your testimony that you

22   have no knowledge as to the time period that the

23   numbers are collected to come up with the final

24   numbers for the AMIP?

JAMES STYLES

1              MR. SEEGULL:  I'm going to object.

2    He's -- he' s told you what his knowledge is.  Mr.

3    Styles is a former employee, he has a limited

4    amount of time to give to this deposition.  I

5    suggest we just move it along and focus on what

6    his role was.

7              MR. WILSON:  Okay.  You can answer

8    the question.

9              MR. SEEGULL:  What his role was as

10   an HR person in implementation --

11             MR. WILSON:  Larry, you can object

12   to the form.

13             MR. SEEGULL:  -- of this AMIP

14   provisions.  I suggest we just move it along.

15             MR. GEANEY:  You can answer.

16             MR. SEEGULL:  You can answer if you

17   want to answer.  Asked and answered, but go ahead.

18             THE WITNESS:  I'm -- I'm sorry, each

19   time I -- I lose my train of thought.  Can -- can

20   you ask again, even transcribe it.  I had the

21   answer in my head.  I'm losing it.

22             MR. WILSON:  Can -- can you ask --

23   can you read the question back, please.

24                  (Pertinent portion of the record is

JAMES STYLES

1    read as follows:

2                    "QUESTION:  Is it your testimony

3    that you have no knowledge as to the time period

4    that the numbers are collected to come up with the

5    final numbers for the AMIP?")

6                    MR. SEEGULL:  Same objection.

7                    THE WITNESS:  Okay.  No.  I do have

8    knowledge of that, and I -- but I believe that it

9    is 45 days, I don't know for sure, Tim.  I'm not

10   in accounting, I'm not the finance guy.  I'm --

11   I'm the HR guy.  You know, gathering the numbers

12   around what our revenue was and how we ended up

13   the year and all that is not in my domain.  But as

14   an employee of 17, 18 years, you kind of learn

15   things.  So does that --

16   BY MR. WILSON:

17          Q.    Okay.  So it's only 45 days that --

18   that the -- the --

19          A.    I believe.

20          Q.    Okay.  So why is the AMIP program

21   based on a fiscal year?

22                    MR. SEEGULL:  Objection, vague and

23   ambiguous.

24                    THE WITNESS:  I don't quite

Page 31

1    understand, Tim.  It is based on the fiscal year.

2    BY MR. WILSON:

3        Q.    Right.  But -- but you're saying

4    that the data that they use to -- to award the

5    AMIP program only comes from the last 45 days of

6    the fiscal year?

7                MR. SEEGULL:  Objection,

8    mischaracterizes his testimony.

9                THE WITNESS:  Yeah, that's -- that's

10   not true, Tim.

11   BY MR. WILSON:

12       Q.    Okay.  Well, tell me your

13   understanding, then.

14               MR. SEEGULL:  Objection.  He's given

15   his understanding.

16               MR. WILSON:  What his -- what he

17   told me was 45 days.

18               THE WITNESS:  It takes -- it

19   takes forty --

20               MR. SEEGULL:  Objection.  It

21   mischaracterizes his testimony.  Go ahead, you can

22   answer again.

23               THE WITNESS:  It takes 45 days in

24   order to get the final numbers, Tim.  We're not

JAMES STYLES

Page 32

1    measured on those last 45 days.  At the end of the

2    fiscal year, say, March 31st, on March 31st, we

3    don't have all the numbers that says how we did in

4    the year.  There's -- there's still bills to

5    collect.  There's still bills to pay.  There's

6    just processing.  There's closing books in

7    accounting.  And you don't know literally on

8    March 31st, we're not that sophisticated

9    information-technology-wise, nor is, I think, any

10   other company, to be able to say on March 31st,

11   literally here's all our numbers.  It takes

12   literally 45 days to say, all right, let's get it

13   clear.  It's -- in a personal level, it's like

14   writing checks and making deposits on a Friday and

15   you know literally on that Friday where you stand

16   totally financially, I mean, you don't.  I mean,

17   you have to balance your checkbook and you have to

18   call Charles Schwab and get your statements and,

19   you know, do all this stuff.  You don't literally

20   know on that last day.

21           So the AMIP is measured on the

22   fiscal year.  And it's everything that's

23   transpired in the year.  All we're saying about

24   the 45 days is from an accounting standpoint, it

JAMES STYLES

Page 33

1    takes them 45 days to get their stuff together so

2    they can give you an accurate, not only just AMIP,

3    it takes 45 days to close the books, so that they

4    can satisfy what they have to do at the FCC.  You

5    know, we're a publically traded company, so,

6    financially, we have to do that due diligence.

7    That 45 days is something absolutely necessary to

8    give accurate information so we award our

9    earnings.  You know, it's -- it's a necessity.  It

10   has nothing to do with AMIP.

11   BY MR. WILSON:

12          Q.    Do individuals who are participating

13   in the AMIP program, are they required to be in

14   the program during the fiscal year to receive

15   the -- to receive an AMIP bonus?

16          A.    Yes.

17          Q.    And a person who is in the -- who's

18   eligible for the program for six months, would --

19   they wouldn't get a full share for a full fiscal

20   year, correct?

21                MR. SEEGULL:  Objection.

22   BY MR. WILSON:

23          Q.    I'll ask it again.  A person who's

24   in the program for six months wouldn't get an AMIP

JAMES STYLES

1    bonus for the -- calculated on the entire fiscal

2    year, correct?

3                    MR. SEEGULL:  Objection.

4    Speculation.

5                    MR. WILSON:  You can --

6                    MR. SEEGULL:  Are you asking what

7    happened in this particular case with these people

8    that were removed from AMIP?

9                    THE WITNESS:  I could answer the

10   question hypothetically.

11                   MR. WILSON:  You can answer.

12                   THE WITNESS:  If somebody's promoted

13   mid year --

14                   MR. WILSON:  Yes.

15                   THE WITNESS:  -- into an AMIP

16   eligible position and they were promoted into that

17   role six months into the year, they would get a

18   six-month prorated bonus.

19                   Does that answer your question?

20   BY MR. WILSON:

21       Q.      Yes, sir.  Thank you.  And why --

22   why is it that the bonus would be prorated?

23       A.      Because they weren't performing in

24   that particular role for the established number of

JAMES STYLES

Page 35

1    months.

2          Q.      So does that mean they were

3    contributing for six months, therefore, they would

4    receive six months worth of bonus?

5          A.      In that hypothetical situation?

6          Q.      Yes.

7          A.      Yes.

8          Q.      Participation in the program is

9    supposed to be evaluated annually, correct,

10   individual participation?

11         A.      That is policy.

12         Q.      When's the evaluation supposed to

13   occur?

14         A.      I don't know.

15         Q.      If someone is added to the program,

16   are they notified immediately of their

17   eligibility?

18         A.      Immediately, can I have some

19   parameters on that.

20         Q.      Within a couple of weeks?

21         A.      Yes.

22         Q.      When you were -- became eligible for

23   the AMIP program, were you notified within a

24   couple of weeks?

JAMES STYLES

Page 36

1        A.       Yes.

2        Q.       And once you are deemed eligible for

3   the AMIP bonus your participation continues until

4   you are notified that you are no longer eligible

5   for the AMIP program, correct?

6        A.       Correct.

7        Q.       Is the AMIP program an entitlement

8   program?

9        A.       What do you consider an entitlement

10  program?

11       Q.       Is it a -- a program that if you

12  achieve -- strike that.  That's been asked and

13  answered.

14                Is the AMIP bonus part of an

15  individual salary?

16       A.       No.

17       Q.       And what is it, if it's not salary?

18       A.       It's incentive compensation.  It's

19  additional compensation.  It's a -- it's a

20  strategy that the terminology would be a -- a

21  total reward strategy.  A total reward strategy is

22  everything from a remuneration standpoint that's

23  supposed to energize and engage an employee

24  towards the success of the business.  So your

JAMES STYLES

Page 37

1    salary, your merit increases, discretionary bonus,

2    your AMIP bonus, benefits, education assistance,

3    all those types of things, all that is considered

4    total reward strategy.

5         Q.    Who is Gary Lewis?  Do you know?

6         A.    Yeah, I think Gary's in GTS,

7    Global -- the Newark regional center guy, I think.

8         Q.    Does he hold a superior position to

9    you?  Did he when you were employed at CSC?

10        A.    He was in another part of the

11   matrix.  I -- I think he was a director level.  I

12   mean, if you are going by level in the

13   organization, we're the same.  But, you know, I'm

14   the support function in HR and he's in operations,

15   so that operations people typically have more

16   weight than HR function.

17        Q.    Okay.

18        A.    So, sorry, Tim, I don't know how to

19   answer your question cleanly.

20        Q.    You testified that -- that certain

21   objectives had to be meet -- met by the

22   individuals in order to receive the AMIP bonus.

23        A.    Un-huh.

24        Q.    In that regard is -- are AMIP

JAMES STYLES

Page 38

```
 1   bonuses earned by the individuals?

 2               MR. SEEGULL:  Objection.  For what

 3   point in time?

 4               MR. WILSON:  Just in general.

 5               MR. SEEGULL:  Objection.  Calls for

 6   speculation, depends upon what happens.

 7               MR. WILSON:  You can answer the

 8   question.

 9               THE WITNESS:  Can I hear it again,

10   please?

11               MR. WILSON:  Can you read it back,

12   please?

13               (Pertinent portion of the record is

14   read back as follows:

15               "QUESTION:  In that regard are AMIP

16   bonuses earned by the individuals?")

17               MR. SEEGULL:  Same objection.

18               THE WITNESS:  Yeah.

19   BY MR. WILSON:

20        Q.    When you were eligible for the AMIP

21   bonus, was there ever a year that you did not

22   receive it?

23        A.    No.

24        Q.    Were you notified every year that
```

JAMES STYLES

Page 39

1    you were eligible to receive it?

2         A.    No.  Well, read the question again?

3              MR. WILSON:  Can you read it back,

4    please?

5              THE WITNESS:  I don't mind if you

6    read it to me.

7              (Pertinent portion of the record is

8    read back as follows:

9         .     "QUESTION:  Were you notified every

10   year that you were eligible to receive it?")

11             THE WITNESS:  No.

12   MR. WILSON:

13        Q.    Are you aware that on September 11,

14   2003, there were a number of individuals removed

15   from the AMIP program?

16        A.    Yes.

17        Q.    And -- and how were you aware of

18   this?

19        A.    It was something that was being

20   considered at a group level for, my memory's

21   sketchy, I'll say for a number of weeks, maybe

22   even a month or longer.  And there were some

23   dialogue around it, amongst HR people, so we knew

24   it was being considered.

JAMES STYLES

Page 40

1      Q.     Who were the decision makers?

2      A.     I didn't --

3      Q.     On that issue?

4      A.     Yeah, I don't know the decision

5  makers, all of the decision makers for sure.  I

6  know at -- at least one would be Gus.  Anybody

7  else beyond that, I'd be speculating.

8      Q.     What's your understanding as to why

9  the individuals were removed from the program?

10            MR. SEEGULL:  Objection.  Calls for

11  speculation as to what was in Gus' mind.

12            MR. WILSON:  I -- I asked him what

13  his understanding was.

14            MR. SEEGULL:  His understanding of

15  what was in Gus' mind?

16            MR. WILSON:  No, what his

17  understanding as to why they were removed from the

18  program.

19            MR. SEEGULL:  He didn't make the

20  decision to remove them.

21            MR. WILSON:  I'm asking what his

22  understanding was.

23            MR. SEEGULL:  Go ahead, if you can

24  answer.

JAMES STYLES

Page 41

1          THE WITNESS:  My understanding is

2    that they were removed because the AMIP program's

3    original intent was to have people that are at a

4    particular level of contribution in the

5    organization.  And it had gotten to the point

6    where people who didn't meet the criteria for

7    being an AMIP were to be removed.

8    MR. WILSON:

9          Q.     Okay.  Did you receive e-mails on

10   this topic, of the removal of the individuals?

11         A.     I'm going to guess that I did, Tim,

12   but I don't remember.  I don't recall.

13         Q.     Are you aware of anybody raising any

14   concerns about removing these individuals from the

15   program?

16         A.     Yes.

17         Q.     Who?

18         A.     Me.

19         Q.     What was your concern?

20         A.     My concern in general wasn't

21   necessarily for these 11 people, Tim.  My concern

22   in general is that we seemed to be implementing a

23   decision that was geared on the -- the -- purely

24   on the level that somebody had in terms of their

JAMES STYLES

```
 1    salary grade.  So I believe it was salary grade

 2    level six and above, if you were salary grade

 3    level six and above you were in AMIP.  And if you

 4    were salary grade five and below, you were out.

 5    And it was fairly objective.

 6              And my concern in doing that was

 7    that there were -- there were people in the

 8    organization that might not be up to a level six,

 9    but could have a significant impact on the success

10    of the business.  And to remove them from AMIP

11    could dis-energize, disengage these people.  It

12    could tick them off, it could get them to a point

13    where, you know, they're speaking poorly about CSC

14    to our clients.  I mean, there was concerns along

15    those lines.

16         Q.    Did you communicate this concern to

17    anybody?

18         A.    Yes.

19         Q.    To whom?

20         A.    To Gus.

21         Q.    And what was his response?

22         A.    I don't remember his exact response.

23         Q.    Did you communicate that to anybody

24    else?
```

JAMES STYLES

Page 43

```
 1          A.      Yes.

 2          Q.      To whom?

 3          A.      Nick Wilkinson.

 4          Q.      What was Nick's response?

 5          A.      I think Nick, well, I'd be

 6    speculating.  His exact response, I don't

 7    remember.  I'm inclined to believe he shared the

 8    same opinion.

 9          Q.      As you?

10          A.      Correct.

11          Q.      Did anybody else -- did -- strike

12    that.

13                  Did you express the -- this concern

14    to anybody else?

15          A.      Probably.

16          Q.      Do you recall who?

17          A.      No.

18          Q.      To your knowledge, did anybody else

19    raise any concerns?

20          A.      I don't know.

21          Q.      To your knowledge, did anybody raise

22    a concern that the action was being done

23    retroactively?

24          A.      Can you repeat the question, please.
```

JAMES STYLES

Page 44

1        Q.      To your knowledge, did anybody raise

2    a concern that this action was being conducted

3    retroactively?

4        A.      By retroactive, you mean that what?

5        Q.      The -- the people were informed on

6    September 11, 2003.

7        A.      Uh-huh.

8        Q.      Yet the fiscal year started roughly

9    on April 1st?

10       A.      I understand the question.

11       Q.      And they were informed that -- that

12   the action was being taken retroactive to

13   April 1st?

14       A.      Yes.

15       Q.      Did anybody raise a -- an issue or a

16   concern that the actions were being done

17   retroactively?

18       A.      Yes.

19       Q.      And who was that?

20       A.      Me.

21       Q.      What was your concern?

22       A.      My concern was that if we were to

23   remove somebody from a program, that one of two

24   things really should happen.  If you're going to

JAMES STYLES

1    remove them for the year, you tell them in the

2    beginning of year.  If you are going to remove

3    them mid year, then since you didn't tell them in

4    the beginning of the year that they're out, that

5    in fairness to the employees -- even though you

6    are not entitled to necessarily as a company --

7    but in fairness to the employees, you should pay

8    them for the amount that -- that they worked until

9    the point where you told them they're not eligible

10   anymore.

11          Q.     Who did you express this concern to?

12          A.     Gus Siekierka.

13          Q.     Do you recall what his response was?

14          A.     I do not.

15          Q.     Anybody else?

16          A.     Not that I remember.

17          Q.     Did anybody else raise the same

18   concern about the retroactive removal?

19          A.     I don't remember, Tim.  I -- I got

20   to tell you, it was a very hot button, so I'm sure

21   there was a lot of dialogue around it.  I just

22   don't remember who said what and who believed

23   what.

24          Q.     Do you recall anybody raising the

JAMES STYLES

Page 46

1    concern that it may be illegal?

2           A.    No.

3           Q.    Were there any exceptions what --

4    what -- you testified earlier that there was a

5    certain salary grade and below that there was --

6    the people were -- were removed, and you said it

7    was fairly objective.    Were there any

8    exceptions --

9           A.    No.

10          Q.    -- made to this?

11          A.    Not that I'm aware of.

12          Q.    Do you know who Robert Cardin is?

13          A.    I do not.

14          Q.    Do you recall what the final payout

15   percentage for fiscal year 2004 was for the

16   chemical group?

17          A.    I do not.

18          Q.    Did you have a conversation with

19   Karen Masino following the September 11th decision

20   to remove these individuals?

21          A.    I've talked to Karen after that in

22   different context, yes.

23          Q.    But not regarding the AMIP program?

24          A.    If I did, I don't remember.

JAMES STYLES

Page 47

1          Q.      I'd just like to ask you a few

2     questions about some documents.

3          A.      Sure.

4          Q.      When these individuals were notified

5     that they were no longer eligible for the AMIP

6     program, they became eligible for a discretionary

7     bonus program, correct?

8          A.      That is correct.

9          Q.      Can you tell me what that

10    discretionary program -- how that -- how that was

11    calculated for the individuals?

12         A.      It doesn't have the -- the same

13    level of rigor as the AMIP.  It's -- it's

14    literally discretionary, and the discretionary is

15    the emphasis on the manager's or supervisor's

16    discretion of whether they believed an individual

17    is making a contribution that is above and beyond

18    the call of duty, if you will.  And that's what

19    the discretionary in discretionary bonus means.

20                 I think it was a max of ten percent

21    maybe.  No, no.  It was a dollar figure.  Maybe it

22    was 10,000, I -- I'm sorry, I'm losing this.  I

23    think it was 10,000 was the max, Tim.  And you

24    can't receive two, I mean, you can only be in one

JAMES STYLES

Page 48

1    bonus pool.  So if you are in AMIP, you're not

2    entitled to discretionary bonus, and vice versus.

3    So these people were not AMIP, therefore, by

4    default they're entitled to being considered for

5    discretionary bonus.

6         Q.    Was the discretionary bonus based

7    upon key result areas?

8         A.    Correct.

9         Q.    What are key result areas?

10        A.    KRA, key result areas are, for lack

11   of a better term, the objectives that are set for

12   an individual for a coming year.  Specifically,

13   it's meant to quantify as -- as -- as much as

14   possible and -- and make what's subjective

15   objective, so that you can measure at the end of

16   the given year, did this individual make a

17   demonstrative contribution to the success of the

18   business.

19        Q.    Are the KRAs comparable to the

20   objectives in the AMIP program?

21        A.    No.

22        Q.    What's the difference?

23        A.    The objectives in AMIP program, for

24   the most part, typically about 80 percent of your

JAMES STYLES

Page 49

```
 1    bonus, 80 percent of whatever your percentage is.
 2    So the weighted averaged of 80 percent is
 3    typically the -- the business success.  So how --
 4    how did your business do in terms of revenue?  How
 5    did your business do in terms of operating income?
 6    How did it do in terms of margin?  Whatever other
 7    financial drivers are important.  KRAs are more --
 8    I'll personalize it.  So, for me, it might be that
 9    I'm going to implement a town hall meeting and
10    make sure they're run on a quarterly basis.  I'm
11    going to implement a learning and development
12    strategy which increases utilization of our
13    learning tools by 20 percent.  So it's -- it's my
14    specific contribution, it's not how the business
15    does.  But the reason they exist is believed there
16    is a link between me doing my job and the success
17    of the business.
18         Q.    The -- you said that 80 percent of
19    AMIP bonus was -- was business success.  What was
20    the other 20 percent?
21         A.    The personal individual
22    contribution.
23         Q.    So what --
24         A.    So it would be things like I just --
```

JAMES STYLES

1    just mentioned -- strike that.

2              It would be -- it could be things

3    like I just mentioned, could be other things.

4         Q.    What other things?

5         A.    Like, I think, in this year for --

6    for my AMIP, I -- I don't know because I wasn't

7    there long enough to -- to -- to be in it this

8    year -- but I think there was something in there

9    around making HR global because our -- our

10   business unit had -- did business in Europe and

11   Australia and such.  So -- and our -- our business

12   leader, Tom Bailey, felt it was important to make

13   part of our AMIP targets in -- within that 20

14   weighted percentage, how well we're integrating.

15   So he kind of took ownership of what that last

16   20 percent looks like.

17        Q.    Okay.

18        A.    And that is his discretion to do

19   that.

20        Q.    With respect to the 80 percent of

21   the AMIP bonus that is attributable to business

22   success --

23        A.    Un-huh.

24        Q.    -- the -- the individuals that were

Page 51

1    removed on September 11th, during the period

2    from -- from April 1st to September 11, 2003, were

3    they contributing to this business success?

4         A.    Every employee is contributing to

5    the business success, so I'd -- I'd have to answer

6    that question yes, in that context.

7              (Exhibit Styles-1 marked for

8    identification.)

9    BY MR. WILSON:

10         Q.    You've been handed what's been

11    marked as Styles-1, take your time and -- and

12    review that and I have a couple questions

13    regarding this document.

14         A.    Okay.

15         Q.    Mr. Styles, were you currently

16    copied -- strike that.

17              What is this document?

18         A.    The entire thing?

19         Q.    Yes.

20         A.    The first two pages are an e-mail

21    from John Walker.  John Walker is the director of

22    compensation for all of America's outsourcing,

23    that includes the business units, TMG, GIS, and

24    G -- G -- let me do it again.  TMG, GTS, and GIS.

JAMES STYLES

Page 52

1   Those three business units together are what we

2   call America's outsourcing.   John Walker is the

3   director of compensation for America outsourcing.

4   His boss and my boss, at the time, was

5   Gus Siekierka.   So it's an e-mail from John to

6   Gus.

7                John is informing Gus that he sent

8   this e-mail out for wide distribution to one of

9   our three business units which is GIS.   That's

10  infrastructure business, so it's all the help

11  desk, networks, that type of stuff.   The first

12  person on the list is the president of GIS, which

13  is Russ Owen.   And the rest of those people are

14  senior level players in that business unit.

15  They're all from the operations.   The courtesy

16  copies are all HR people.   So these are all folks,

17  for the most part, that support these business

18  folks.   So John's informing Russ Owen, the

19  president of GIS, and Russ' director of courts, it

20  looks like, that the AMIP targets are being

21  established for that year.

22               Q.      Okay.   And you're carbon copied on

23  this e-mail, correct?

24               A.      That is correct.

JAMES STYLES

Page 53

1      Q.    Okay.  Are there -- does the e-mail

2  indicate that there are attachments to the e-mail?

3      A.    I believe so, yes.  Yes.

4      Q.    And are the attachments the third

5  through sixth pages of this exhibit?

6      A.    I'd imagine they are, Tim, yes.

7      Q.    I -- I'd like to direct your

8  attention to the third page.

9      A.    Uh-huh.

10     Q.    Can you tell me what this is?

11     A.    Here's where they determined, start

12  to determine the weighted average of an

13  individual's goals for their AMIP.  The levels

14  mean the levels down in the organization, so I'll

15  explain the rows.  The management level, level

16  two, is one level down from a division president.

17  Level three is the next level down.  Level four is

18  the next level down.  Level five is the next level

19  down.  So it's talking about layers in an

20  organization.  Even though you're at a different

21  level you may have a different function, like

22  direct reports where there is two rows for -- for

23  level two, one is direct reports to group

24  president and line of service leads and staff.

JAMES STYLES

Page 54

1                    And they're separating here for GIS

2        from regional service delivery.  So depending on

3        what specific nature of your role is, they start

4        saying, well, given the nature of your role where

5        should the weight of your targets be.  So if you

6        are taking the first row, the -- the columns that

7        are marked financial targets, that's all the

8        things that are -- are business driving.  EPS is

9        earnings per share.  GIS, global financials, GIS

10       has targets for the year.  ROI is return on

11       investment.  I'm not sure why -- okay, subtotal

12       there, there's regional financial and regional

13       account eagle measures.  Account eagle is an

14       internal reward of CSC.  To earn an eagle means

15       your business unit achieved all its targets.

16                    So what they are doing here is

17       establishing the weighted average.  They don't

18       have the exact numbers yet, here at this point in

19       time, but they have the weighted average.  So they

20       know the management level, level two, that reports

21       to group president and is in line of service lead

22       in staff.  The weighted average of their AMIP is

23       going to be 20 percent on CSC's earnings per

24       share, 50 percent on GIS' global financials,

JAMES STYLES

Page 55

1    10 percent on CSC's -- no, I don't know.  Here I'm

2    not sure whether CSC or GIS is return on

3    investment, and so that' subtotal comes to

4    80 percent.  So the 80 percent is the -- so for an

5    individual in that particular role, 80 percent of

6    their AMIP target is going to be on these

7    financial targets.

8             You move towards the further --

9    further down in terms of columns, now there's your

10   personal goals.  So there is 20 percentage points

11   left, and they're dividing it for someone at this

12   level, 10 percent is going to be team oriented

13   personal goals and 10 percent individual oriented

14   personal goals.

15        Q.    Okay.

16        A.    And that's how you come up with, you

17   know, your full rated average of 100 percent.

18        Q.    Okay.  What are team oriented

19   personal goals?

20        A.    It could be -- it could be anything.

21   I mean, it could be where a -- a business leader

22   says that we're all going to be responsible for

23   landing the air products account.  You know,

24   there's -- there's not necessarily a financial

Page 56

1    target for that, but -- so it falls into something

2    that's more of a personal.  It doesn't necessarily

3    mean the personal person.  It may mean that it's

4    not one of the financial drivers.  But it's

5    important to the success of the business.  So --

6    so a business leader might share that, well, let's

7    say, all right, for 10 percent of the AMIP bonus

8    is going to be contingent on us winning the air

9    products account.

10        Q.    Okay.  Could you briefly describe

11   what individual goal is?

12        A.    It could be the, hypothetically

13   again, let say air products is -- is the target

14   that we're going to win for that year, and it

15   might be that I'm given the responsibility of

16   creating the effective -- an effective proposal on

17   the business and I have to have it done by X date.

18        Q.    Okay.  And at all levels, all the --

19   the weighted averages for all the team personal

20   goals at all levels was 10 percent, correct?

21        A.    That's what it looks like, yes.

22        Q.    And for the individual personal

23   goals, the weighted average was 10 percent?

24        A.    That's what it looks like, yes.