Russell H. Owen

4

1    A.    I have what you might think of as a Blackberry.

2    Q.    I would just ask that you don't utilize that

3  Blackberry as a form of communication for this

4  deposition.  Okay?

5    A.    I'll turn it off as we speak.  Hang on.

6          MR. SEEGULL:  Probably be a good idea

7  anyway.  I'm likely to be interrupted.  All right.

8    Q.  As far as communications with Mr. Seegull and

9  Mr. Raimos goes, now that we have started the deposition,

10  you can't communicate to them about your testimony in any

11  way.  That includes any type of nonverbal communications

12  such as passing notes and nodding of heads and things

13  like that.  And I'm not making an inference that either

14  Tyler or Larry would do that.  It's just that I wanted to

15  make it clear to you.

16          MR. SEEGULL:  Tim, Tyler's last name is

17  Raimo.

18          MR. WILSON:  I was adding the S.  My

19  apologies, Tyler.

20          MR. SEEGULL:  Before we go on, I wanted to

21  get back to you about the Nick Wilkinson affidavit.

22          MR. WILSON:  Yes.

23          MR. SEEGULL:  I saw that you still want to

24  take his deposition.

5

1              MR. WILSON:  Yes.

2              MR. SEEGULL:  On what basis do you want to

3  take his deposition, given what he said in the affidavit

4  about his lack of knowledge?

5              MR. WILSON:  Well, I've run it past my

6  clients and they seem to think that he has more knowledge

7  than he has indicated in the affidavit.

8              MR. SEEGULL:  But this is a business

9  executive, and if this is nothing more than a fishing

10  expedition, it doesn't seem to make a lot of sense.

11              MR. WILSON:  I don't think it's a fishing

12  expedition.  I think it's a deposition and we're entitled

13  to take it and my clients want him to be deposed.

14              MR. SEEGULL:  I don't know what personal

15  knowledge he could have, given what he's already

16  testified to.

17              MR. WILSON:  All I can say is we will take

18  his deposition and I'll bring out some documents and

19  question him on it, and if he doesn't have the knowledge,

20  he doesn't have the knowledge, but I should be entitled

21  to ask him the questions.

22              MR. SEEGULL:  Maybe when we finish with

23  this deposition, you can check your calendar for next

24  week and see what availability you have.



Russell H. Owen

6

```
 1              MR. WILSON:  Okay.
 2              MR. SEEGULL:  Maybe for Friday --
 3              MR. WILSON:  Okay.
 4              MR. SEEGULL:  -- of next week.
 5              MR. WILSON:  All right.
 6              MR. SEEGULL:  Then I can talk about it with
 7    you offline.
 8              MR. WILSON:  Great.
 9    BY MR. WILSON:
10       Q.    Mr. Owen, is your name Owen or Owens?
11       A.    It's Owen.
12       Q.    I'm going to give you some instructions about
13    how the deposition is going to proceed before I actually
14    start asking you questions.  Okay?
15       A.    Okay.
16       Q.    I'm going to be asking you questions pertaining
17    to this lawsuit, and when you respond, you must do so
18    verbally.  Obviously, this is on the telephone, so it
19    makes it a little more difficult for the court reporter.
20              As you know, you have been sworn in and
21    your testimony is under oath.  So you must answer
22    truthfully just as if you were in court.  If you don't
23    hear a question or don't understand it, let me know and I
24    will ask it again or explain it.
```

7

1          Please let me finish asking the question

2     before you answer, and I will let you finish answering

3     before I ask another question.  That way, just makes the

4     transcript cleaner.

5          If at any time you come to realize that a

6     statement you made is incorrect or inaccurate, please let

7     me know and you will be permitted to clarify the record.

8     As I stated, you cannot talk or confer with your

9     attorneys during the deposition either while the

10    deposition is going on or during the breaks if we take

11    any breaks.

12          With respect to breaks, if at any time you

13    need one to use the restroom or to get a drink of water

14    or for any reason, just let me know and we will be glad

15    to oblige you.

16          Do you understand these instructions?

17     A.    Yes.

18     Q.    I want to start with some background

19    information.  Can you tell me where you were born and

20    what your birth date is?

21     A.    I was born in Rahway New Jersey, and my

22    birthday is 6 of May, 1957.

23     Q.    What's your Social Security number?

24     A.    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.

Russell H. Owen

8

1     Q.    Your current address?

2     A.    9501 Atwood, A-t-w-o-o-d, Road, Vienna,

3   Virginia, 22182.

4     Q.    Is that Vienna?

5     A.    V-i-e-n-n-a, yes.  I also spend a good portion

6   of my time in London.  But that is my home mailing

7   address.

8     Q.    Are you in London on business?

9     A.    Yes.  I'm living in a corporate apartment in

10  London.

11     Q.    What's your address in London?

12     A.    1202 Whitehouse, one word, Whitehouse

13  Apartments, 9 Belevedere, B-e-l-v-e-d-e-r-e, Road,

14  London, and the Post Code is SE18YW.

15     Q.    Approximately how much time a year do you spend

16  in London?

17     A.    About eight months out of twelve.

18     Q.    With respect to your Vienna address, how long

19  have you lived there?

20     A.    About three and a half years now.

21     Q.    You own?

22     A.    Yes.

23     Q.    Have you ever been arrested?

24     A.    No.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Russell H. Owen

9

```
1     Q.    Did you serve in the military?

2     A.    No.

3     Q.    Did you go to college?

4     A.    Yes.

5     Q.    Where did you go?

6     A.    Michigan State University.

7     Q.    Did you graduate?

8     A.    Yes.

9     Q.    What was your degree?

10    A.    Bachelor's in mechanical engineering and

11  Master's in mechanical engineering.

12    Q.    Both from Michigan State?

13    A.    That's correct.

14    Q.    Did you graduate with any sort of honors?

15    A.    No.  Dean's list, I guess.  I don't know if

16  that's honors.

17    Q.    Yeah, that's an honor.

18              What year did you get your undergraduate

19  degree?

20    A.    1979.

21    Q.    And your Master's?

22    A.    1981.

23    Q.    Are you presently employed by CSC?

24    A.    Yes.
```

Russell H. Owen

10

1    Q.    What is your job title?

2    A.    Group President and Account Executive for BAE

3    Systems.

4    Q.    What's BAE Systems?

5    A.    That's the name of a company I support.  It

6    used to be formerly known as British Aerospace and

7    Marconi and they go by the name capital B, capital A,

8    capital E Space Systems.

9    Q.    What does that group do?

10    A.    The company itself is a defense electronics and

11    weapons system company similar to Lockheed or General

12    Dynamics, and I'm running the outsourcing engagement we

13    have with them worldwide, and their U.S. headquarters is

14    in Rockville, Maryland, and their U.K. headquarters is in

15    London.

16    Q.    Is this a subsidiary of CSC or is it CSC?

17    A.    BAE Systems is not CSC.  They're a client of

18    CSC's and I'm the account exec. that runs the piece of

19    our business that supports them and does business with

20    them.

21    Q.    I see.  How long have you held this title?

22    A.    A little over a year.

23    Q.    What did you do before that?

24    A.    I was the group president of Global

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Russell H. Owen

11

1    Infrastructure Services for CSC.

2         Q.    Can you tell me what Global Infrastructure

3    does?

4         A.    Global Infrastructure Services provides the

5    services that are resold to each of our clients through

6    account teams like the one I run presently.  And so the

7    people who do what we categorize as infrastructure

8    services, which would be networks, desktop, data center

9    work, midrange systems architectures, all of the

10   infrastructure-related nonapplication services, those

11   employees report to Global Infrastructure Services and

12   are assigned to account teams, and our job is to ensure

13   that they have the tools and the training and the

14   technology they need.  And we run all of what we call

15   leveraged facilities, data centers, help desks, things

16   like that, that are used by multiple clients.  So we are

17   a supplier to the account executives to provide services

18   to our client base.

19        Q.    How long did you hold that position?

20        A.    Three years, roughly.

21        Q.    What did you do before that?

22        A.    I was the president of the Chemical Group.

23        Q.    That's with CSC, as well?

24        A.    That's correct.  At the time it was a separate

12

1    division of CSC in Wilmington, Delaware, that supported

2    all of our chemical and energy accounts.

3        Q.    What do you mean by "supported"?

4        A.    It's the business unit that provides services

5    to those clients.

6        Q.    How long were you in that position?

7        A.    I was two years as the president of the

8    Chemical Group and before that I was in a similar

9    position as the account executive for the DuPont account

10   as a vice president.

11       Q.    When you say vice president for the DuPont

12   account, would there have been an interrelationship with

13   that with the employees that came from DuPont and began

14   working for CSC?

15       A.    The original contract was signed just prior to

16   my coming on board, and Mike Beebe was the president

17   responsible for that at the time.  I joined the account

18   and took it over a year after we signed and brought all

19   the employees over, and I ran it for two years, reporting

20   to Mike Beebe, who was the president of the Chemical

21   Group, and then I replaced him two years later.

22       Q.    So that would have been in about 1998?

23       A.    Roughly, yes.  I'm afraid I'd have to go back

24   and do the math.  That's about right.



Russell H. Owen

13

1    Q.    Are you saying you weren't involved in the

2    transition of the employees?

3    A.    I was not involved in the initial transition.

4    I joined the account about a year later.  I was involved

5    in some subsequent transitions in Europe and some of the

6    fibers employees as we expanded the account, but the

7    large base transfer I believe occurred in '97.

8    Q.    Can you tell me what you did to prepare for

9    today's deposition?

10   A.    I read some of the e-mail traffic and notes and

11   things that were provided to me by my attorney that were

12   the same ones, I believe, that were provided to you.  But

13   that's about it.  I'm afraid I'm very busy.

14   Q.    Did you meet with Mr. Seegull?

15   A.    I spoke with him on the phone in preparation

16   for your previously scheduled deposition and he explained

17   the ground rules to me.

18         MR. SEEGULL:  Don't get involved with what

19   we discussed.

20   Q.    How long did you speak to Mr. Seegull?

21   A.    About an hour.

22   Q.    You haven't had any discussions with him since?

23   A.    Just about 40 minutes in anticipation of this

24   call.  I got into town on Friday and we just sat down and



14

1    again went over the documents that --

2              MR. SEEGULL:  Don't get into what we

3    discussed.

4      Q.   Do you recall what documents you reviewed?

5      A.   Not off the top of my head.  I mean, they're

6    just some e-mails and things like that.

7      Q.   Did you review any of the deposition

8    transcripts given by the plaintiffs in this lawsuit?

9      A.   I have not.

10      Q.   Did you talk to anybody other than Mr. Seegull

11    to prepare for this deposition?

12      A.   I guess briefly to Tyler, but no.

13      Q.   When did you speak to Tyler?

14      A.   This morning.

15      Q.   For how long?

16      A.   Five minutes, I guess.  Say hello, sat down in

17    here.

18      Q.   Have you talked to anybody in general about

19    this lawsuit?  What I mean by "in general," I mean not

20    necessarily in preparation for the deposition.

21      A.   No, I have not.

22      Q.   Mr. Owen, do you have an understanding of what

23    this lawsuit's about?

24      A.   I believe a high-level understanding, yes.

15

1    Q.    Can you give me what your understanding is?

2    A.    I understand that we have some employees who

3  were unhappy about how their individual cases were

4  treated when the AMIP program was updated.

5    Q.    Can you explain what you mean by that they were

6  unhappy with how they were treated?

7    A.    Not really, other than I guess they filed a

8  lawsuit and we're here to discuss that.

9    Q.    Do you understand that they were unhappy

10  because they were removed from the program retroactively?

11    A.    I do know they were removed from the program,

12  yes.

13    Q.    Do you understand that they're upset because it

14  was done retroactively?

15            MR. SEEGULL:  Objection to the

16  characterization as retroactive.

17  BY MR. WILSON:

18    Q.    Do you understand that they're upset because

19  they were notified in September of 2003 but the official

20  start date was April of 2003?

21    A.    I understand that they were upset that they

22  were notified in September, yes.

23    Q.    Are you involved in creating or reviewing any

24  of CSC's Human Resources policies?



Russell H. Owen

16

1      A.    No.   To explain my position --

2            MR. SEEGULL:  You don't need to do that.

3    Wait for the next question.

4            THE WITNESS:  Okay.

5      Q.    Are you familiar with the AMIP program?

6      A.    Yes.

7      Q.    Do you have an understanding as to how it

8    works?

9      A.    I believe so, yes.

10     Q.    Could you explain that to me?

11     A.    Well, we have an annual incentive program for a

12   select number of top employees and it's designed to

13   incentivize employees who are in a position to really

14   uniquely further or contribute to our corporate

15   performance.  It's an incentive program set up around

16   defined objectives, and some of those are directed

17   individually at the employees, some of them are

18   corporate.

19           It's a program that runs through the course

20   of the year.  It's calculated and determined at the end

21   of the year, generally in the May time frame, after we

22   have closed our fiscal year and settled our financials

23   and reported to the street.  It's a compensation program

24   based on a percentage of their salary and a determination

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

17

1  of achievement of their performance against goals at the

2  end of the year.

3      Q.    So am I correct in understanding that, if you

4  meet certain goals, then you get a certain monetary

5  award?

6      A.    If you meet the goals and you are on the

7  payroll at the end of the fiscal year, assuming you are

8  correctly enrolled into the program, yes.

9      Q.    Do you know how long CSC's had the AMIP bonus

10 program?

11     A.    Honestly, no, I don't.  I joined CSC in 1992.

12     Q.    It was in place when you joined?

13     A.    That's correct.

14     Q.    This program follows the CSC fiscal year,

15 correct?

16     A.    Yes.

17     Q.    And that is from roughly April 1st through

18 March 31st, correct?

19     A.    That's correct.

20     Q.    The individuals participating in the program

21 have to be in that program at some point during the

22 fiscal year; is that correct?

23     A.    I'm sorry.  Would you reask your question?

24     Q.    Yes.  An individual has to be in the program

Russell H. Owen

18

1   during that fiscal year to get any sort of a payout,

2   correct?

3       A.   Yes.  They have to be in the program during the

4   fiscal year and they have to be on the payroll when the

5   payout is calculated at the end of the year.

6       Q.   If a person joins during the middle of the

7   year, in other words, if they weren't in the program on

8   April 1st, do they get paid for a full year or is it

9   prorated?

10                  MR. SEEGULL:  April 1st of which year?

11                  MR. WILSON:  Of any year.

12                  MR. SEEGULL:  Objection.  Vague and

13  ambiguous and hypothetical.

14                  MR. WILSON:  You can answer, sir.

15                  MR. SEEGULL:  Go ahead and answer if you

16  can, if you understand the question.

17      A.   For exceptions such as someone we have

18  recruited partway through the year, they would be put on

19  the program, and I think the amount that they had in the

20  program for that fiscal year would be proportional to the

21  number of months they were on the payroll.

22      Q.   It's calculated according to months?

23                  MR. SEEGULL:  Objection.  Mischaracterizes

24  the testimony.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-1101

1   BY MR. WILSON:

2       Q.    Is it calculated based on months?

3                 MR. SEEGULL:  Objection.  Mischaracterizes

4   the testimony, vague and ambiguous, unclear what you mean

5   by "is it calculated."

6                 MR. WILSON:  The AMIP.

7                 MR. SEEGULL:  Vague and ambiguous as to

8   what you mean.

9                 MR. WILSON:  If you understand, sir, you

10  can answer.

11      A.    It's done very rarely.  When an employee joins

12  the company that we have recruited from a competitor in

13  the outside world, for their first year, if we get them

14  on the program and get them properly enrolled and signed

15  up for objectives, their amount of AMIP-eligible bonus

16  award is calculated based on the time of -- their number

17  of months they're on the payroll in that first year.

18  Again, assuming that they're still on the payroll and

19  they have achieved the objectives as measured at the end

20  of the year.

21      Q.    So would the reverse be true?  If, for

22  instance, somebody is removed during the fiscal year,

23  would they be entitled to an AMIP program prorated on the

24  months that they were in the program?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Russell H. Owen

20

1     A.    No, they would not.

2     Q.    Why is that?

3     A.    The rules of the program are that you have got

4  to be -- you have got to be on the payroll at the end

5  when the calculation is made.

6     Q.    But if they are still on the payroll --

7     A.    I guess, hypothetically speaking, I don't have

8  a clear recollection of dealing with that.  Generally

9  people who get enrolled in the program stay on it.  If

10  they're promoted or moved to another job, I would think

11  they would still be on it.  It's a rare circumstance when

12  they're removed.

13     Q.    I think you testified earlier, but I just want

14  to make sure, the employees are compensated through this

15  program based upon their contribution to the corporation.

16  Correct?

17     A.    I'm sorry.  Could you -- it's a program where,

18  based on the level and their ability to contribute,

19  they're invited to it.  It is based on some -- there's a

20  way to allocate performance, individual objectives, and

21  summary financial objectives.  And, generally, their

22  determination for eligibility is based on their ability

23  to contribute.  As you work through the process in the

24  year, you assign specific tasks to them or specific

21

1   variables that their contribution is based on.

2       Q.    An individual's participation or eligibility in

3   the program is supposed to be evaluated annually,

4   correct?

5       A.    Yes, I believe so.

6       Q.    When is that evaluation supposed to occur?

7       A.    There's not generally a set time, but typically

8   it's when the program is established each year.

9       Q.    So would that be at the beginning of the fiscal

10  year?

11      A.    It may or may not be.  It's when the final

12  program structure and design is established and rolled

13  out.  So probably after the beginning of the fiscal year.

14      Q.    Is there a communication made to every employee

15  that he or she is eligible for the year whenever that

16  determination is made?

17      A.    I don't believe there's an eligibility

18  discussion.  I believe that the actual detailed

19  discussion with the employee is when they sign the

20  worksheets and they're countersigned by their

21  supervisors.

22      Q.    So there's no way of an employee knowing until

23  the worksheet comes out as to whether or not he or she is

24  participating?



22

1      A.    I think there are ways on -- an employee can

2    inquire.   There's no formal sort of recommunication,

3    reaffirmation of who's on and who isn't on an annual

4    basis.   But typically you will receive conversations

5    around developing your personal objectives in advance and

6    then in the summertime you will get a worksheet that is

7    filled out to discuss and agree and sign off with your

8    supervisor and that's when you're on the plan.

9      Q.    Typically, once you're put on the plan, do you

10   remain on the plan?

11     A.    I think typically, yes, I think there might be

12   rare instances if someone is laid off or a death in the

13   family, that they might be removed or something like

14   that.

15     Q.    If somebody is removed, are they notified

16   immediately or in relatively short order?

17     A.    I have a hard time speculating on that.   I

18   think if it's around a given instance, I would assume

19   there is communication.   Something like a termination or

20   a layoff.

21            MR. WILSON:   Larry, do you have your

22   documents yet?

23            MR. SEEGULL:   Yes, we do.

24     Q.    Mr. Owen, is the AMIP program an entitlement

Russell H. Owen

23

1  program?

2      A.    No, sir.

3      Q.    What type of program is it?

4      A.    It's an incentive program.  It's subjective and

5  more or less a privilege.  But it is not an entitlement

6  program.

7      Q.    Who is William Bancroft?

8      A.    William Bancroft, or Bill as he's normally

9  called, I believe he's currently the vice president or

10  senior vice president who's responsible for the North

11  American accounts for Global Infrastructure Services.

12      Q.    Would Mr. Bancroft be in a position to know

13  whether it's an entitlement program?

14      A.    I don't honestly know.  When he worked for me,

15  I made it pretty clear to him it was not.

16          MR. WILSON:  Larry, I'd like to show him

17  the document that Maja sent you over that would be

18  document C.

19          MR. SEEGULL:  Hold on a second.  This would

20  be the one that is an e-mail from -- on the bottom is an

21  e-mail from Bill Bancroft to Gus Siekierka?

22          MR. WILSON:  Yes.

23          MR. SEEGULL:  The top is an e-mail from Gus

24  to Russ?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Russell H. Owen

24

1        MR. WILSON:  Yes.  Dated 6/25/03.

2        MR. SEEGULL:  Yes.  It's D-10451 --

3        MR. WILSON:  Yes.

4        MR. SEEGULL:  -- through D-10543?

5        MR. WILSON:  Yes.  I'm going to ask the

6    court reporter to mark this as Owen 1.

7        (Owen Deposition Exhibit No. 1 was marked

8    for identification.)

9        MR. WILSON:  Mr. Owen, take your time and

10   review that document.

11       MR. SEEGULL:  Do you want him to review the

12   last page, as well?

13       MR. WILSON:  I have some questions on the

14   last page.  Mainly it's with Gary Lewis.  The box that

15   says "Gary Lewis," if he can look at that.  But he's

16   certainly entitled to read the whole thing.

17       THE WITNESS:  I'm afraid, Tim, I'm

18   forty-nine and I have a hard time reading the last page

19   here.

20       MR. SEEGULL:  We really can't read the last

21   page.

22       MR. WILSON:  Let's work on the first two

23   pages first and then we will see what we can do with the

24   last page.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-1107

25

1              MR. SEEGULL:  Let him have a chance to read

2    it and once he's done with that, we will let you know.

3              MR. WILSON:  Sure.

4              THE WITNESS:  Okay.

5    BY MR. WILSON:

6       Q.   You were sent the first e-mail on this first

7    page, correct?

8       A.   The top one, Gus Siekierka to me?

9       Q.   Yes.

10      A.   Yes, that's correct.

11      Q.   The bottom one is from William Bancroft to

12   Gus Siekierka, correct?

13      A.   Right.

14      Q.   In the paragraph labeled No. 1 in that second

15   e-mail, four lines down in the middle says, "It is no

16   longer entitlement."  And they're discussing the AMIP

17   program.  Correct?

18      A.   I see the phrase that you're referring to, yes.

19      Q.   Do you believe that he's referring to the AMIP

20   program?

21      A.   I would speculate that he is because it is in

22   that program.  Bill Bancroft joined us from IBM.  He's

23   not particularly --

24              MR. SEEGULL:  He only asked you if you

**W&F**

26

1    think he's referring to AMIP.

2              THE WITNESS:    That would be my assumption,

3    yes.

4        Q.    Does this change your answer regarding whether

5    it's an entitlement?

6        A.    No.

7        Q.    Why not?

8        A.    I think the policy has always been clear and

9    it's a long-standing practice in CSC that this is not an

10   entitlement, that it's earned at the end of the year when

11   objectives are met that you have agreed with your

12   supervisor.  And we have always consistently maintained

13   that we can change the program and put people on and off

14   it throughout the period of time that I have been with

15   CSC.

16       Q.    Does this indicate to you that there may have

17   been some confusion among the CSC employees as to whether

18   it was an entitlement or not?

19       A.    My guess is that Bill misspoke, but I couldn't

20   speak for him.

21       Q.    Have you ever communicated with anybody else at

22   CSC that thought this was an entitlement program?

23       A.    No.

24       Q.    What about salary, is the AMIP bonus program a

27

1   portion of an individual's salary?

2       A.    No.   It's a bonus that is paid -- that is

3   payable at the end of the year and is calculated based on

4   their salary, but it is not part of their salary.

5       Q.    Who is Gary Lewis?

6       A.    Gary Lewis, I actually don't know where he is

7   now.   I know who Gary Lewis is.

8       Q.    Who was Gary Lewis in 2003?

9       A.    I don't recall, honestly.   I believe he was in

10  the data centerpiece of the business, but I don't recall.

11      Q.    Do you know why he would have been involved in

12  discussions on the AMIP program?

13      A.    The thought process that was around the period

14  of time that this e-mail comes from, we were trying to

15  redesign the e-mail program -- I'm sorry.  We were trying

16  to redesign the AMIP program, and Gus Siekierka, on

17  behalf of three divisions in North America, was putting a

18  team of people together to advise us and come up with

19  what they thought would be correct ground rules and a

20  fair approach.  And there was quite an extensive

21  back-and-forth between the various constituencies about

22  how that program should be realigned with the way it is

23  administered in most of the rest of the corporation and

24  what levels to put it down there and things of that

28

 1    nature.

 2                    So I'm speculating from this e-mail that I

 3    believe Bill on behalf of the North American accounts for

 4    GIS probably pulled some people from his team to help him

 5    in that effort, and I would guess so did people from GTS

 6    and from TMG.

 7        Q.    Would Gary Lewis have been in a position to

 8    know whether AMIP was part of an individual's salary?

 9        A.    I can't speak for him.  I don't know.

10        Q.    I understand that you're having difficulty

11    reading this, but there's a box on the second page near

12    the bottom that says "Gary Lewis."

13                    MR. SEEGULL:  You mean the third page?

14                    MR. WILSON:  Third page.  I'm sorry.

15    BY MR. WILSON:

16        Q.    I'm going to represent to you that in there it

17    says, "These are the people who must be energized in

18    order to meet our targets and we will significantly

19    demotivate them if we reduce their salaries in this

20    manner."

21                    Does this change your opinion as to whether

22    it's salary or not?

23        A.    No.  No.  I would assume that Mr. Lewis was

24    speaking loosely, but I can't speak for him.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

29

1    Q.    Does this indicate to you that there may have

2    been some confusion at CSC as to whether the AMIP program

3    was salary?

4    A.    No.

5    Q.    Have you talked to anybody who has indicated

6    that the AMIP is part of salary?

7    A.    No, sir.

8    Q.    Is an individual's AMIP bonus earned by the

9    individual over the course of the fiscal year?

10   A.    No.  It's earned based on the results at the

11   end of the year and based on the calculation that's

12   approved in the spreadsheet.  The employee will take

13   action to ensure that those objectives are achieved at

14   the end of the year presumably throughout the year.

15   Q.    So actions that are taken during the course of

16   the year contribute to the final numbers in the final

17   calculation, correct?

18   A.    I would say they're necessary but not

19   sufficient.

20   Q.    What do you mean by "not sufficient"?

21   A.    You can't have earned your AMIP until the

22   calculation and the numbers come together at the end of

23   the year with the formulas in the spreadsheet.

24   Q.    Right.  But actions that these individuals do

Russell H. Owen

30

1    during the course of the fiscal year contribute to that,

2    correct?

3       A.    It's assumed that they will be doing actions to

4    earn it throughout the year.

5       Q.    Assumed by whom?

6       A.    Well, by the leadership.  The purpose of it is

7    to incentivize them to hit that target at the end of the

8    year.

9       Q.    Without regard to when it's earned, would you

10   agree that it is a bonus that is earned?

11              MR. SEEGULL:  Objection.  Hypothetical,

12   calls for speculation, vague and ambiguous.

13              MR. WILSON:  You can answer, sir.

14      A.    I believe it's earned, yes.  I would believe it

15   is a bonus that is a reward for the performance that's

16   laid out on the spreadsheet, yes.

17      Q.    Are you eligible for the AMIP?

18      A.    Yes.

19      Q.    How long have you been eligible for it?

20      A.    I have been in the program since I joined CSC

21   in 1992.

22      Q.    Have you been informed every year that you're

23   eligible to participate?

24      A.    I have had a worksheet to sign off every year

Russell H. Owen

31

1    since I have been in the program.  Yes.

2        Q.    Does this worksheet come out at the end of the

3    year?

4        A.    No.  The worksheet generally comes in the late

5    summer.

6        Q.    Was there ever a year that you didn't get the

7    worksheet?

8        A.    No.

9        Q.    Do you have employees that work for you that

10   are eligible for this program?

11       A.    Yes, I do.

12       Q.    Do you give them the worksheet every year?

13       A.    Yes, I do.

14       Q.    Is that generally in late summer?

15       A.    Yes.

16       Q.    Has there ever been an employee of yours that

17   you haven't given the worksheet to?

18       A.    Not to my knowledge, no.

19       Q.    From the beginning of the fiscal year until you

20   are given that worksheet, do you think you're still

21   participating in that program?

22       A.    I'm not exactly sure what you mean.  If I don't

23   have a worksheet, I don't have my objectives yet, so I

24   guess I would anticipate it, but I would become

Russell H. Owen

32

1  increasingly concerned if I didn't have objectives set on

2  a worksheet to know what I was shooting for.

3      Q.    Has there ever been a year that you did not

4  receive an AMIP bonus?

5      A.    No.

6      Q.    To your knowledge, were any of the plaintiffs

7  in this lawsuit given notice of their ineligibility for

8  the AMIP program prior to September 2003?

9      A.    I don't know, honestly.

10     Q.    You were aware prior to September 11th, 2003,

11 that some individuals were going to be removed from the

12 AMIP program, correct?

13     A.    That's correct.

14     Q.    When did you first become aware of this?

15     A.    I don't clearly recall.  We started an effort I

16 remember, I think it was in the May -- April/May time

17 frame to review of the changes and some of the budget

18 pressures during that year, and I believe the activity

19 started in the May time frame.

20     Q.    You said "we."  Who is "we"?

21     A.    I was responsible for Global Infrastructure

22 Services at the time, the North American region, which

23 would include Global Infrastructure Services, Technology

24 Management Group, and what was called ASD at the time,



33

1   Application Services Division, would be the "we."

2       Q.    Are there any individuals that you can name

3   that were involved in this process?

4       A.    Well, at my level I would have had the staff

5   work it.  So Marty Leidemer as my CFO would have been

6   involved and Gus Siekierka as my HR director would have

7   been involved.  And they would have pulled together the

8   correct constituents as appropriate to work the issue.

9              MR. WILSON:  Larry, I'd him to look at

10  document G.

11             MR. SEEGULL:  Are you done with Owen

12  Exhibit 1?

13             MR. WILSON:  Yes.  I'm going to ask the

14  court reporter to mark this as Owen Exhibit 2.

15             (Owen Deposition Exhibit No. 2 was marked

16  for identification.)

17             MR. WILSON:  Do you have that in front of

18  you yet, Larry?

19             MR. SEEGULL:  No.

20             MR. WILSON:  Let me know when you do.

21             MR. SEEGULL:  Is this D-10241 through

22  D-10242?

23             MR. WILSON:  Yes.

24             MR. SEEGULL:  Hold on.  Okay.

34

1    MR. WILSON: Specifically, Mr. Owen, I'm

2  going to be asking you about the second e-mail that

3  starts at the bottom of page 1.

4    MR. SEEGULL: He's reading it now.

5    THE WITNESS: It's from Gus Siekierka.

6    MR. WILSON: Yes.

7    MR. SEEGULL: He's reading it now.

8    MR. WILSON: Okay.

9    THE WITNESS: Okay.

10 BY MR. WILSON:

11    Q.    Mr. Owen, this e-mail is an e-mail to you,

12 Mary Jo Morris, and Tony Doyle from Gus Siekierka,

13 correct?

14    A.    Tony Doye, yes.

15    Q.    You said Gus Siekierka worked for you?

16    A.    That's correct.  He also provided HR support to

17 the other two.

18    Q.    Would the leaders of those two groups be

19 Mary Jo Morris and Tony Doyle?

20    A.    That's correct.

21    MR. SEEGULL: Tony Doye, D-o-y-e.

22    THE WITNESS: Mary Jo Morris is the

23 president of GTS, which is Global Transformation

24 Solutions.  Its previous name was ASD, or Application

Russell H. Owen

35

1   Services Division.  Tony Doye is the president of TMG.

2       Q.    And the first line of this e-mail says, "I have

3   spoken with each of you about the need to restructure the

4   AMIP program for FY04 for budget reasons."

5       A.    Right.

6       Q.    Can you explain what that conversation was

7   about, what he said?

8       A.    In fiscal year '04 we had a rather severe

9   budget challenge in terms of decline in revenue from our

10  clients and we had to do cost-cutting.  We were in some

11  rather protracted discussions around layoffs and were

12  working on a number of cost-reduction initiatives that

13  impacted people, mostly around reducing force.

14          And the restructuring of the AMIP program

15  as we were going through many of those discussions, my

16  recollection on my staff was that the anomaly of the AMIP

17  program being applied nonuniformly across North America

18  was a problem area that we felt if we could fix that, we

19  wouldn't need to let as many people go.

20      Q.    The date on this e-mail is June 12, 2003,

21  correct?

22      A.    Correct.

23      Q.    So there had been no decision made as of

24  June 12, 2003, correct?

Russell H. Owen

36

1        A.      I would assume that's correct, yes.

2        Q.      On the second page, in the top paragraph there,

3   five lines down, about halfway across, starting with the

4   word "recognizing," states:  "Recognizing that there may

5   be Senior Managers with significant P & L or cost

6   responsibility, we would grandfather some limited

7   number."

8        A.      Right.

9        Q.      First of all, what is P & L?

10       A.      Profit and loss.

11       Q.      Excuse me.  What was the first word?

12       A.      Profit and loss responsibility.     ·

13       Q.      What's cost responsibility?

14       A.      ·If you have revenue and you subtract all of

15  your costs, the net result is profit.  Some of our

16  managers manage costs to a cost target.  Others are

17  higher in the business and are running what we call a

18  P & L or a division or unit that will actually calculate

19  and generate operating income.

20       Q.      What was Gus saying here?  What was Gus saying

21  here?

22       A.      Well, there was -- I believe I got involved in

23  this debate earlier on in the year.  There was a

24  recognition that some people that were senior managers by

Russell H. Owen

37

1   reason of where they were in our matrix organization had

2   inordinately high levels of responsibility that would

3   make them comparable to a director in another business

4   unit, and we were allowing that there might be a limited

5   number of exceptions in these cases where they would be

6   incentivized as if they were -- well, they would be

7   allowed to remain on the AMIP program.

8       Q.    Were there also some people that would remain

9   eligible that it was wondered whether they should be

10  taken off, if that question makes any sense?

11              MR. SEEGULL:  I'm going to object.  Vague.

12              MR. WILSON:  I'll try to ask it again.

13  BY MR. WILSON:

14      Q.    Were there some people that were directors that

15  the reality of their job responsibilities -- that some

16  thought that they should be taken off the AMIP program?

17      A.    Hypothetically speaking, I would have made them

18  redundant, but I don't recall.  I don't recall specific

19  instances of that, but at the group-president level,

20  those people would have been two or three levels below

21  me, so I would not necessarily have been involved in that

22  transaction.

23      Q.    I'd like you to look down the page to the

24  next-to-last paragraph that starts with "Finally."



38

1    A.    Yes.

2         Q.    It states:  "Finally, we are just talking about

3    North America here as this would be difficult to do in

4    places like Europe due to contractual and legal reasons."

5              Do you have knowledge as to what he's

6    talking about here?

7         A.    Yes.  Global Infrastructure Services had 22,500

8    employees in 64 countries.  In places like Europe, there

9    is heavy trade union involvement and there is work

10   council employment legislation where local law -- local

11   government and trade unions have an active role in all

12   matters of compensation in those countries, and they

13   would require consultation and sort of extensive legal

14   review to make any changes.  Where in the United States

15   we're more on an employment-at-will policy which makes it

16   easier to do.

17        Q.    This cutting across the board at a certain

18   level, was that done in Europe?

19        A.    The AMIP restructuring was not done in Europe,

20   no.

21        Q.    So it was just done in North America?

22        A.    Right.

23              MR. WILSON:  I believe that's all I have

24   for Owen 2, Larry.



Russell H. Owen

39

1    Q.    Mr. Owen, when did you first become aware that

2    there was going to be this restructuring?

3    A.    The restructuring of the AMIP program?

4    Q.    Yes, sir.

5    A.    I would have to say in the probably May time

6    frame.  It was one of many options on the table,

7    including a large-scale reduction in force.

8    Q.    The people that would be affected, were they

9    given notice that there was a possibility they would be

10   taken off?

11   A.    I don't know.  I don't believe so.  I believe

12   there would have been a lot of anxiety at the time

13   because of the budget issues and I believe there were

14   rumors around reduction in force.  So my guess is people

15   were very worried about being laid off.

16   Q.    Is that the reason the communication was not

17   made?

18          MR. SEEGULL:  Objection.

19          MR. WILSON:  You can answer, sir.

20          MR. SEEGULL:  He said he didn't know --

21   A.    I don't know whether or not the communication

22   was made.

23   Q.    How did you first become aware of this

24   possibility?



40

1    A.    I would say Gus Siekierka and Marty Leidemer

2    were probably working up scenario planning around the

3    magnitude of cost reduction that we had to make in North

4    America to meet the challenges of the drop in revenue,

5    and this would have been proposed as an option because it

6    was an anomaly that was discussed in the HR community

7    prior to that.  Because we move employees around between

8    groups, having the most consistent and standard HR

9    approach and policies across the board was advantageous

10   to us.

11          So it would have been something that would

12   naturally have occurred to Gus and been mentioned to me

13   and something that would have been proposed by

14   Marty Leidemer as a viable alternative to getting our

15   costs in line with our bid models and reducing the number

16   of employees that we had to reduce.

17   Q.    You stated that one of the other alternatives

18   was to reduce employees.

19   A.    Correct.

20   Q.    Who made the decision to reduce the AMIP

21   eligibility as opposed to reducing employees?

22   A.    I think we did some of both, and I think the

23   balance was arrived at through these discussions that you

24   reference.



1       Q.     Who made the final decision?

2       A.     I made the final decision for GIS to go with

3    the recommendations presented to me by Gus Siekierka.

4       Q.     Did anybody else participate in making the

5    decision?

6       A.     There was discussion.   I made the decision.   I

7    believe what Gus did is he went between Mary Jo, Tony,

8    and I individually and we made the decision individually.

9       Q.     Who were the discussions with?

10      A.     What Gus would have done is -- referenced in

11   the earlier e-mail that you showed me there was a working

12   group.   From my group it would have been Marty Leidemer

13   and Bill Bancroft and several of his managers.   There

14   would have been comparable teams from GTS for Mary Jo and

15   from TMG for Tony Doye.   Gus worked those teams together

16   which is illustrated in the e-mail traffic that you have

17   shown me.   He came up with a recommendation based on

18   those teams' opinions and views and then that was sent to

19   me for approval and I approved it and I believe Tony and

20   Mary Jo did, as well.

21      Q.     Did anybody raise any concerns about removing

22   these people from the AMIP program?

23      A.     We had concerns about employee morale.   We had

24   concerns about employees who may have done something that



42

1   was above and beyond the call of duty at the end of the

2   year who had been removed and not be appropriately

3   rewarded.  We had discussions around allowing

4   discretionary benefit bonuses in those circumstances.

5   The bulk of the discussion was around employee morale and

6   things like that.

7        Q.    What were the concerns with employee morale?

8        A.    Any time you have a reduction in force or

9   reduction in bonus or things like that, it's not a

10  positive event for the employees, and we tried to make

11  the decisions in the best interest of the company and as

12  fairly as possible across the employee base.  And I think

13  that we did recognize that there would be some managers

14  that were disaffected by this and that we would need to

15  work to keep their morale up and keep them motivated.

16       Q.    Did anybody raise a concern that it may be

17  improper that this was being done retroactively?

18            MR. SEEGULL:  Objection.  Mischaracterizes

19  the testimony.

20  BY MR. WILSON:

21       Q.    Do you understand the question, sir?

22       A.    I do.  I would have relied on HR, Gus Siekierka

23  and others in the HR community, to make sure that we were

24  doing this appropriately and legally.

Russell H. Owen

43

1    Q.    But do you recall anybody raising that concern?

2    A.    No.    The only concern I remember being raised

3    was the one I mentioned around allowing discretionary

4    bonuses which I did.

5    Q.    Did anybody raise the concern that it might be

6    illegal to do it this way?

7    A.    No.

8         MR. WILSON:    Larry, I would like him to

9    look at document E.    It's the Code of Ethics.    Starts

10   Miller 143 through Miller 143.

11        MR. SEEGULL:    I don't think we have that.

12   I think we only had Miller 151.

13        MR. WILSON:    Okay.    That's the only page

14   I'm going to be questioning him on.

15        MR. SEEGULL:    I'm going to tell you right

16   now it's very difficult for him to review it without the

17   context.    Maybe you want to pdf it or see what you can

18   get out of him with just that one page.

19        MR. WILSON:    I can have Maja pdf it real

20   quick and e-mail it to you if that's what you want.

21        MR. SEEGULL:    I think it's only fair to the

22   witness.

23        MR. WILSON:    Okay.    Fair enough.    I'll come

24   back to that.