Russell H. Owen

44

1       MR. SEEGULL:  If you're going to ask him

2   does the company have an ethics policy, I don't think

3   that's disputed, if that's all this is about.

4       MR. WILSON:  I'm going to ask him if it has

5   the ethics policy, I'm going to ask him if he's familiar

6   with it, then I'm just going to ask him about certain

7   little portions there on Miller 151.

8       MR. SEEGULL:  Let me just see if I can cut

9   to the chase, because the document speaks for itself.

10  What is it you intend to ask him, his opinion about

11  things?

12      MR. WILSON:  Yes.

13      MR. SEEGULL:  How is that relevant?  He's

14  not an expert witness.

15      MR. WILSON:  I just want to get his opinion

16  on --

17      MR. SEEGULL:  But he's not an expert

18  witness.

19      MR. WILSON:  I'm not saying he is.

20      MR. SEEGULL:  What value is his opinion on

21  any of this?

22      MR. WILSON:  I think it's of value to me to

23  determine whether this violates the ethics policy.

24      MR. SEEGULL:  Why don't you just ask him

Russell H. Owen

45

1   that.  Ask him that question instead of refaxing another

2   document and making copies and everything.  If your

3   overall question is does he think whether or not the

4   changes made to the AMIP was a violation of the ethics

5   policy of the company, I guess he could give his opinion

6   on that.  Is that what you want?

7            MR. WILSON:  Yes.

8            MR. SEEGULL:  Go ahead and ask the question

9   and then he will be able to answer it.

10            MR. WILSON:  Does he have the document in

11   front of him?

12            MR. SEEGULL:  No.  You can just ask him

13   that question.

14            MR. WILSON:  I'd rather him look at the

15   document.

16            MR. SEEGULL:  All right.  So refax the

17   policy.

18            MR. WILSON:  Okay.

19            MR. SEEGULL:  Or pdf it to me I should say.

20            MR. WILSON:  Do you want to take a quick

21   break?

22            MR. SEEGULL:  Do you have anything else or

23   is this the end of it?

24            MR. WILSON:  I have more.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-1128

Russell H. Owen

46

1          MR. SEEGULL:  Why don't we do what we can.

2   You pdf it in the meantime.

3          MR. WILSON:  Okay.  I've got to go out here

4   and give it to my paralegal.

5          MR. SEEGULL:  Okay.  Tim, I'm just trying

6   to expedite things.  That's fine if you want to pdf me

7   the document.

8          MR. WILSON:  She's working on it right now.

9          MR. SEEGULL:  We should take a break within

10  the next 15 minutes if we can.

11         MR. WILSON:  Do you want to take a break

12  now?

13         MR. SEEGULL:  Let's take a break now.

14         (A recess was taken.)

15         (Owen Deposition Exhibit No. 3 was marked

16  for identification.)

17  BY MR. WILSON:

18     Q.    Mr. Owen, you have been handed what's been

19  marked Owen 3.  Have you had time to review this

20  document?

21     A.    Yes.

22     Q.    What is this document?

23     A.    It's the CSC Code of Ethics and Standards of

24  Conduct.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Russell H. Owen

47

1    Q.    Before we go any further, did you have any

2    conversations regarding your testimony with your

3    attorneys while we were off the record?

4    A.    No.  Actually we discovered we're both Michigan

5    State grads and talked about our football and basketball

6    heritage.

7    Q.    Good enough.

8         MR. SEEGULL:  He was there when Magic

9    Johnson was there.

10        MR. WILSON:  Is that right?

11        MR. SEEGULL:  That was curious to me.

12        MR. WILSON:  What a good time to be there.

13   That was about the time Kurt Gibson was playing football

14   for them too, I think.

15        THE WITNESS:  That's right.  And we won the

16   hockey championship, as well.  We never had a year like

17   that since.

18   BY MR. WILSON:

19   Q.    Mr. Owen, did you participate in drafting this

20   Code of Ethics?

21   A.    No, I did not.

22   Q.    Did you have any input at all?

23   A.    No.

24   Q.    You are familiar with it, correct?



Russell H. Owen

48

1    A.    Yes.   There's a test that they run for all

2  managers that's electronic via e-mail where we run

3  through a series of questions, ethics questions, and we

4  respond to them and get scored and coached and corrected

5  as appropriate.   It's a very strong policy of CSC's.

6    Q.    Is this ethics policy reviewed with all CSC

7  employees every year?

8    A.    I'm not sure what you mean by "reviewed."  It

9  is made available to them and there are annual reminders

10  to adhere to it, that it is our policy, and to go find it

11  and read it.  And for managers, senior managers, there

12  is, as I said, an automated e-mail test that you must go

13  through and they keep score at headquarters about whether

14  or not you have completed yours.  They push for very high

15  levels of compliance.

16    Q.    I'd like to refer you to the page that's marked

17  Miller 151 on the bottom.

18    A.    Yes.

19    Q.    Are you there yet?

20    A.    Yes, I am.

21    Q.    At the very top of this page, it states:

22  "Providing a Proper and Professional Work Environment."

23  And then it goes on:  "You must use fairness, honesty,

24  and comply with the law in all business relationships



Russell H. Owen

49

1    with CSC stockholders, customers, suppliers, employees,

2    and applicants, as well as with local, national and

3    international communities and governments."

4            Is that what it says?

5      A.    Yes.

6      Q.    Then in the next paragraph it says, "You must

7    not take unfair advantage of anyone through manipulation,

8    concealment, abuse of privileged information,

9    misrepresentation of material facts or any other unfair

10   dealing practice."

11           Is that what that says?

12     A.    Yes.

13     Q.    When discussions began to remove individuals

14   from the AMIP program, to your knowledge, did anybody

15   raise any concern that this action might violate the CSC

16   ethics policy?

17     A.    No.

18     Q.    Do you believe the retroactive removal of these

19   individuals violated the ethics policy?

20           MR. SEEGULL:  Objection to

21   characterization.

22     A.    You have to understand, I don't believe it to

23   be retroactive.

24     Q.    Do you believe that the removal of these

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Russell H. Owen

50

1   individuals in September of 2003 with the effective date

2   being April 1st, 2003, violated the ethics policy?

3        A.    No, I do not.

4        Q.    Can you explain why you believe that's an

5   ethical course of action to take?

6        A.    Well, I believe that the process that was

7   followed was fair and unbiased and used a lot of input

8   from affected management.  I believe it was in the

9   context of an array of very difficult actions, and from

10  my way of looking at it, it was a very humane balance

11  between spreading pain across the organization and

12  helping the organization to survive.

13              In my experience with CSC since 1992,

14  there's such a behavioral or a cultural understanding of

15  how this program is run, people will time their

16  retirements, will time their job and assignment changes

17  to occur after the end of the fiscal year because of the

18  eligibility rules around AMIP.  And I think that most

19  people wait for their bonus payments before they retire.

20  Most people wait for their bonus payments before they

21  change jobs.  And there was not any intent to communicate

22  to the employees that this was a pay-as-you-go type of a

23  program.

24              Some of our employees come from other



Russell H. Owen

51

1   employment background such as DuPont or General Dynamics

2   or others and I think sometimes they transpose the rules

3   from their prior engagements to their current ones.

4           But from our perspective, CSC, for all the

5   years I have been a manager at CSC, from director up

6   through group president, we have always understood that,

7   until we have an executed plan and targets to shoot for,

8   we're not in the program and we must be on the payroll

9   and have that plan agreed at the end of the year to get

10  paid.

11          And I would go so far as to say it's my

12  understanding that it's almost entirely discretionary and

13  my boss can alter my compensation based on factors that

14  may or may not be in the plan.

15          So from my perspective, I didn't see this

16  as being unethical in any way.

17      Q.    You said that you're not in the plan until you

18  get your worksheet and your objectives.  Is that correct?

19      A.    And you have executed them.  Yes.

20      Q.    Was this communicated to your employees?

21      A.    I wouldn't know.  I don't know.  I know that we

22  have always had the practice of communicating the

23  worksheets and getting them signed off.  And the reason I

24  know that is that that's also the vehicle on which

Russell H. Owen

52

1    they're paid and you can't make a payment unless you have

2    got those in finance to do the calculations.

3         Q.    So it's your testimony that it was fair to

4    eliminate these people from the program the way that it

5    was done?

6         A.    I believe so, yes.

7         Q.    Let me just look through this document real

8    quick to see if I have any other questions.

9              I think that's it for that document, Larry.

10             MR. SEEGULL:  We're putting it away.

11   BY MR. WILSON:

12        Q.    What was the process used to notify the people

13   who would be impacted by this decision to remove them

14   from the AMIP program?

15        A.    I believe there were -- after that working

16   group I referenced earlier came up with the appropriate

17   rules and they were all signed off by the three

18   presidents, I believe there were briefing presentations

19   prepared by HR for all three divisions and that

20   supervisors went out and gave those presentations to the

21   employees.

22        Q.    Do you know what was discussed at the

23   presentations?

24        A.    I do not.  I just know -- I did see a copy of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Russell H. Owen

53

1    the presentation and went over the content of it with Gus

2    before that was disseminated.  I was not present at any

3    of the presentations.

4        Q.    For fiscal year 2003, the AMIP bonus contained

5    no personal or group objectives, did it?

6        A.    I'm sorry.  I'm not sure what you're referring

7    to.  Could you rephrase, please?

8        Q.    I'll try to, yes.

9              In fiscal year 2003, the only objectives

10   that the AMIP was based upon were corporate and

11   financial, correct?

12       A.    That wouldn't be my recollection, no.  Each

13   employee would have some personal objectives on their

14   worksheet, as well.  It depends on your seniority.  At

15   the very senior levels, it would have been primarily

16   financially oriented.  At the lower level, it would be

17   more individual and group objectives.  Now, the

18   individual objectives may have been financial in nature,

19   if that's what you're saying.

20             MR. WILSON:  Larry, I'd like him to look at

21   document F.

22             MR. SEEGULL:  F, as in Frank?

23             MR. WILSON:  Yes.

24             MR. SEEGULL:  That's the one that is

Russell H. Owen

54

1   D-10615 through D-10618?

2           MR. WILSON:  Yes.  This is Owen 4.

3           (Owen Deposition Exhibit No. 4 was marked

4   for identification.)

5           MR. SEEGULL:  I put it in front of him and

6   he's reading it now.

7           MR. WILSON:  Let me know when you're done,

8   Mr. Owen.

9           THE WITNESS:  Yes, I will.

10          Okay.

11  BY MR. WILSON:

12      Q.    This is an e-mail from Henry Leidemer?

13      A.    That's Henry Leidemer, or Marty Leidemer.  He

14  was my CFO.

15      Q.    You were carbon-copied on this e-mail, correct?

16      A.    Right.

17      Q.    On the third line of this e-mail, they mention

18  measurable key result areas, KRAs.

19      A.    Yes.

20      Q.    Can you explain to me what a KRA is?

21      A.    It can be a variety of things, but typically in

22  a management objective environment there are key result

23  areas set as either financial achievement or specific

24  project achievement or winning of business, things of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-1137

Russell H. Owen

55

1 that nature.  So every area has its own key result areas.

2 Sometimes those are bound into the AMIP program.

3 Sometimes they're just put out as general employee

4 objectives.

5          So when I ran Chemical Group or GIS, for

6 example, I would give presentations saying these are our

7 key objectives for my group, and presumably, all the way

8 down to the lower level of management, each group had set

9 key objectives for themselves.

10     Q.     So the KRAs are objectives, correct?

11     A.     I'm not sure what you mean by the question.

12 They're targets or areas of the business that targets are

13 set for.

14     Q.     But you just referred to them as objectives

15 several times.  Are they objectives?

16     A.     I'm not sure of the meaning of that specific

17 definition.  I used the word "objective."

18     Q.     Are they similar to the AMIP objectives or the

19 AMIP targets?

20     A.     I would say in some cases they are the same.

21 In some cases they're different.  But I use the word

22 "objective" or "key results" or "targets"

23 interchangeably.

24     Q.     A couple lines down, the next-to-the-last line

Russell H. Owen

56

1    starts with "However."  States:  "However, by definition,

2    the discretionary bonus is not an entitlement."

3         A.    Right.

4         Q.    Is that what that says?

5         A.    Yes, it is.

6         Q.    Does this imply that a bonus program that's

7    based upon KRAs or other similar objectives or targets is

8    an entitlement program?

9         A.    I wouldn't read it that way.  I would read this

10   as Marty reinforcing the point that the discretionary

11   program is not an entitlement and people who give the

12   briefing should be very clear in that.

13              It looks to me from the context that my CFO

14   was reviewing the draft documents from John Walker, who

15   worked for Gus Siekierka and was responsible for

16   compensation, to make sure that he had the appropriate

17   wording in the document.

18        Q.    I'm just curious as to why there was this whole

19   discussion of KRAs and then all of a sudden it says it's

20   not an entitlement.  It's not even delineated as a

21   separate paragraph.

22              MR. SEEGULL:  Are you asking him to read

23   into Marty Leidemer's head what Marty was thinking?

24              MR. WILSON:  No.  I'm asking him based upon

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Russell H. Owen

57

1  his understanding of receiving this e-mail whether he was

2  referring to these bonus programs for the KRAs as being

3  an entitlement program.

4            MR. SEEGULL:  He wasn't the one doing the

5  referring.

6            MR. WILSON:  I'm asking him based on his

7  understanding.

8            MR. SEEGULL:  You're asking him what

9  Marty Leidemer was referring to, his understanding of

10  what Marty Leidemer was referring to?

11            MR. WILSON:  Yes.

12            MR. SEEGULL:  If you can answer, go ahead.

13     A.    In the context of the discussion, I read this,

14  as I believe I did originally, that he was reinforcing

15  the point.  I don't think Marty was intending to imply

16  that he was enforcing the point on this one, because it

17  was different than all the others.  I think he was just

18  reinforcing the point knowing Marty as I do.

19     Q.    Can you give me an example of what is an

20  entitlement program at CSC?

21     A.    Salary I think is what I would call an

22  entitlement program.  If your terms and conditions

23  include a salary and it's pensionable and things like

24  that, that you have a higher level of entitlement to



WILCOX & FETZER LTD.
Registered Professional Reporters

Russell H. Owen

58

1    that.   Not that it can't be changed, but I think it has

2    to be dealt with differently than incentive programs,

3    which are largely discretionary.

4        Q.    So whether or not the salary is pensionable is

5    a key aspect to whether it's an entitlement or not?

6        A.    I don't know that that's the test.   I was

7    raising that in that it is something that we would handle

8    a lot more carefully and a lot more -- in my view, that's

9    closer to an employment contract than something that is

10   discretionary, at the manager's discretion.   So I would

11   think that employees are -- they're entitled to their

12   vacation, they're entitled to their sick time, they're

13   entitled to their salary for work performed through the

14   year.

15       Q.    But what does whether it's pensionable or not

16   have anything to do with it?

17            MR. SEEGULL:   I'm going to object.   Calling

18   for a legal conclusion.   This witness is not a lawyer.

19            MR. WILSON:   Larry, he testified that it

20   was pensionable and that was something that was

21   significant to him.   I'm just trying to find out why it's

22   significant.

23            MR. SEEGULL:   I'm going to object.   You're

24   calling for a legal conclusion what the difference is

Russell H. Owen

59

1  between a pensionable --

2          MR. WILSON:  I'm not calling for a legal

3  conclusion.  I'm asking based upon his understanding why

4  he made that statement.

5          MR. SEEGULL:  Tim, just let me finish.

6  You're calling for a legal conclusion.  You're asking him

7  to distinguish between pensionable earnings and

8  nonpensionable earnings.  You're asking him to explain

9  what is meant by an entitlement versus a nonentitlement

10  program.  These are legal terms that you're asking him to

11  explain.  He is not a lawyer.  He's not being offered to

12  give a legal conclusion or legal opinion.

13          Why don't you ask about his personal

14  knowledge and let's move on.  We're almost close to two

15  hours.  Let's just focus on his personal knowledge and

16  what he knows and doesn't know.

17          MR. WILSON:  I'd like to focus on this for

18  a little bit because he brought it up.  I'd like to know

19  why it's significant to him that it's pensionable.

20          MR. SEEGULL:  You can ask him is it

21  significant.

22          MR. WILSON:  Obviously it is because it was

23  one of the two criteria that he brought up.

24          MR. SEEGULL:  Are you testifying, or do you

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Russell H. Owen

60

1   want him to testify?

2          MR. WILSON:  I'm asking him to testify, and

3   if you let him testify, we can get through it.

4          MR. SEEGULL:  Why don't you ask him whether

5   or not --

6          MR. WILSON:  I'll ask him how I want to ask

7   him.

8          MR. SEEGULL:  Let's move it along.  This is

9   a busy executive.

10          MR. WILSON:  Then let's move it along.

11          MR. SEEGULL:  Good.  Let's go.

12          THE WITNESS:  I'm sorry.  Would you ask me

13   the question again.

14          MR. WILSON:  Could you read the question

15   again?

16          (The reporter read back as instructed.)

17          THE WITNESS:  I raise that as an instance.

18   I wasn't raising it as a test, Tim.  I feel like I would

19   make the distinction between things employees are

20   entitled to by law, and, again, this is my opinion as an

21   executive, from things that are discretionary rewards

22   that are provided by the company and they're down to the

23   judgment and discretion of the management team.  That was

24   the purpose for my raising that.  I wasn't meaning to

Russell H. Owen

61

1    imply that that is a litmus test.

2    BY MR. WILSON:

3       Q.    Do you have any recollection as to what

4    the percent payout for the Chemical Group for fiscal year

5    2004 was?

6       A.    No, I really don't off the top of my head.

7            MR. WILSON:  I'm almost done here.  Let me

8    just look at a couple things real quick.

9            Larry, I'd like for him to look at

10   document I.  It's D-10246 at the bottom.

11           MR. SEEGULL:  It's one page?

12           MR. WILSON:  Yes.

13           MR. SEEGULL:  This will be 5?

14           MR. WILSON:  Yes.

15           (Owen Deposition Exhibit No. 5 was marked

16   for identification.)

17           THE WITNESS:  Okay.

18   BY MR. WILSON:

19      Q.    Can you look at that?

20      A.    Yes.

21      Q.    Have you read it?

22      A.    Yes.  Both lines.

23      Q.    This is an e-mail correspondence drafted by

24   you, correct?

Russell H. Owen

62

1      A.    That's correct.  I sent this e-mail to

2    John Walker.

3      Q.    Can you tell me what an RACI test is?

4      A.    I wish I could remember what the acronym stands

5    for.  I think it's Responsibility Authority Control and

6    Influence.  But I could have that incorrect.

7            What I was referring to, you may recall

8    from earlier in my testimony, that, as I was reviewing

9    the fairness of this process, I pointed out to Gus and

10   Bancroft that you might have people who were operating

11   with responsibilities above what their job title would

12   imply and we should make an exception for them.

13           So this was actually the e-mail documenting

14   that thought.  I said, "It seems to me we may have people

15   who ought to be directors skewing the mix."  In other

16   words, not being treated fairly in the matrix.  I

17   suggested that the team, when they went back to work,

18   view the responsibility, authority, and control level of

19   the people that they put in the matrix in terms of

20   eligibility for AMIP, not just go by job title.  And it

21   was actually as a result of this e-mail that they put the

22   rules in their final version that said they would make

23   exceptions for senior managers.

24     Q.    So this was implemented?

Russell H. Owen

63

1    A.    I believe so, because I saw it in the -- I saw

2    it in some of the earlier discussion.

3             MR. WILSON:   That's all I have for you

4    right now, Mr. Owen.   I appreciate you taking the time.

5             MR. SEEGULL:   Tim, let him finish his

6    answer.

7             THE WITNESS:   Let me just clarify.   I was

8    making a suggestion to the team to do this fairly.   When

9    you said this was implemented, I didn't mean to imply

10   that they ran a RACI test on every application and every

11   job title.   I made that a suggestion that they use that

12   in addition to assessing the job title.

13            MR. WILSON:   Okay.   That's all I have for

14   right now.   Mr. Seegull or Mr. Raimo may have some

15   questions for you.

16   BY MR. SEEGULL:

17   Q.    I have got a few questions.

18            Mr. Owen, I think it's clear from your

19   testimony, but I want to make sure that it is.   There was

20   some question about how do you know when AMIP is earned,

21   and you had mentioned something about being on the

22   payroll at the end of the year, assuming you were on the

23   payroll at the end of the year.

24            What did you mean by all of that?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B-1146

Russell H. Owen

64

1    A.    Well, you execute a worksheet that says that

2    you and your supervisor have agreed to the objectives

3    that you will hit, the things you will do to go earn your

4    AMIP, and that has to be executed and you're in the

5    program.  Given that you're in the program at the end of

6    the year, that's when the calculation is actually done.

7    And the reason for that is there are many factors that

8    involve the accomplishment or not of the AMIP that are

9    really unknown until the end of the year, and you really

10   need to have all the information at the end, generally in

11   the May time frame, to know whether an objective has been

12   hit.

13       Q.    You had said you have to be on the payroll at

14   the end of the year.  Did you mean you have to be on the

15   AMIP plan at the end of the year, as well?

16       A.    It's both.  You have to have an active plan and

17   be in the employ of the company, and this is why I

18   mentioned that many people alter their behavior to their

19   kinds of job changes, retirements, or resigning after the

20   AMIP payout in May.

21       Q.    Does that mean that AMIP is not earned -- let's

22   say somebody is removed during the middle of the year.

23   Is AMIP earned at that point in time?

24       A.    It is my belief that it is not.



Russell H. Owen

65

1      Q.      Why is that?

2      A.      Again, there are usually factors at the end of

3      the year, for example, to calculate your financials.  The

4      performance throughout the year is not -- even a good

5      quarter is not an indication of the year.  There are many

6      things that have to be done and completed to do the

7      calculation at the end of the year, and there's really no

8      logical way -- you could make inferences on some

9      variables, but there's no concrete, logical way that you

10     could wind up having accomplished it with a proration

11     methodology.

12     Q.      Is the reason that AMIP is not an entitlement

13     because it's a bonus that depends upon performance at the

14     end of the year?

15     A.      I believe that's correct, yes.  To me the word

16     "bonus" implies discretionary to me.  It may not to all

17     people, but I believe it does.  And it is not earned

18     until the end of the year and it's a way -- if the

19     corporation at the end of the year does well, it's a way

20     that success is shared with the key contributors.

21     Q.      One moment, please.

22             MR. SEEGULL:  I have nothing further.

23  BY MR. WILSON:

24     Q.      I just have a couple very quick follow-ups.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-1148

Russell H. Owen

66

1          You just testified that it would be

2   difficult to make inferences for the proration

3   methodology to give the bonus to somebody who was not a

4   participant at the close of the fiscal year.

5          My question to you is:  Then how is it done

6   for those who join the AMIP program in mid-year and are

7   members of the program at the end of the year?

8      A.    Well, I think there's an algorithm that's used

9   where, if the employee joins in the middle of the year

10  and finishes out the year, they will be there to meet the

11  two tests.  And there's not a proration of

12  accomplishment.  There's a proration of their salary

13  that's available for the test to be applied to.

14     Q.    But couldn't the same thing be done for

15  somebody removed midyear?

16     A.    Theoretically, except they didn't pass the test

17  of being in the program and I guess they didn't pass the

18  two tests.

19     Q.    Are you aware of anybody who was removed from

20  the AMIP program in midyear and continued to work for CSC

21  and still received their AMIP bonus at the end of that

22  fiscal year?

23     A.    No, I'm not.

24          MR. WILSON:  I have nothing further.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1          MR. SEEGULL:  We have nothing further, as

2    well.  The next deposition is set to go at 2:00?

3          MR. WILSON:  Right.

4          (Deposition concluded at 11:50 a.m.)

5               -   -   -   -   -

68

1                    T E S T I M O N Y

2

3    DEPONENT:  RUSSELL H. OWEN                    PAGE

4

5    BY MR. WILSON.................................. 3

     BY MR. SEEGULL............................... 63

6    BY MR. WILSON............................... 65

7

8                    E X H I B I T S

9

10   OWEN DEPOSITION EXHIBIT NO.              MARKED

11

12   1 - A three-page document Bates numbered

     D-10451 through D-10453...................... 24

13

     2 - A two-page document Bates numbered

14   D-10241 and D-10242......................... 33

15   3 - A multi-page document entitled, "Code

     of Ethics and Standards of Conduct".......... 46

16

     4 - A four-page document Bates numbered

17   D-10605 through D-10608..................... 54

18   5 - A document Bates numbered D-10246......... 61

19

20   ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 69

21

22   CERTIFICATE OF REPORTER                  PAGE 70

23

24

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 8th day of May,
2006, the deponent herein, RUSSELL H. OWEN, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                    Kimberly A. Hurley
                    Certification No. 126-RPR
                    (Expires January 31, 2008)


DATED:




**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, HECTOR CALDERON,  )
CHARLES FOLWELL, DAWN M.        )
HAUCK, KEVIN KEIR, ASHBY        )
LINCOLN, KAREN MASINO, ROBERT   )
W. PETERSON, SUSAN M. POKOISKI, )
DAN P. ROLLINS, and WILLIAM     )
SPERATI,                        )
                                )
    Plaintiffs,                 )
                                )
        v.                      )  C.A. No. 05-10-JJF
                                )
COMPUTER SCIENCES CORPORATION,  )
                                )
        Defendant.              )

            Telephonic deposition of MARY JO MORRIS
taken pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 2:10 p.m., on Monday, May 8, 2006, before
Kimberly A. Hurley, Registered Merit Reporter and Notary
Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware 19806
            for the Plaintiffs

        LARRY R. SEEGULL, ESQUIRE (via telephone)
        DLA PIPER RUDNICK GRAY CARY US LLP
            6225 Smith Avenue
            Baltimore, Maryland 21209-3600
            for the Defendant


        WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

B-1154



2

```
 1   APPEARANCES (cont'd):

 2              TYLER B. RAIMO, ESQUIRE (via telephone)

     COMPUTER SCIENCES CORPORATION

 3       3170 Fairview Park Drive

         Falls Church, Virginia 22042

 4       for the Defendant

 5                  - - - -

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1                       MARY JO MORRIS,

 2            the witness herein, having first been

 3            duly sworn on oath, was examined and

 4            testified as follows:

 5   BY MR. WILSON:

 6        Q.    Good afternoon, Ms. Morris.  Once again, my

 7   name is Tim Wilson, and I'm the plaintiffs' attorney in

 8   the case of Miller versus Computer Sciences Corporation.

 9                   I just want to make the record clear we're

10   conducting this deposition by telephone.  Correct?

11        A.    Correct.

12        Q.    Where are you right now?

13        A.    I am in our offices in Falls Church, Virginia.

14        Q.    By "our," you mean CSC's offices?

15        A.    Yes.

16        Q.    Mr. Seegull is with you and Mr. Raimo is with

17   you, correct?

18        A.    Correct.

19        Q.    Is there anybody else there?

20        A.    No.

21        Q.    Do you have any forms of communication

22   available to you such as e-mail or Blackberry?

23        A.    No.

24        Q.    I want to go through some brief instructions
```

Mary Jo Morris

4

1    first before we actually start the questions and answers

2    about the case.

3              I'm going to be asking you questions

4    pertaining to the lawsuit, and when you respond, you must

5    do so verbally.  Obviously this is on the telephone, so

6    the court reporter can't take down any nonverbal

7    communications.

8              As you know, your testimony is under oath,

9    so you must answer truthfully just as if you were in

10   court.

11             If you don't hear one of my questions or

12   you don't understand it, let me know and I'll try to ask

13   it in a way that you do understand and that you do hear.

14             Please let me finish asking the question

15   before you begin to answer.  This is so that the

16   transcript is clear.  And I will extend the same courtesy

17   to you, as well.

18             If at any time you come to realize that a

19   statement you made is incorrect or inaccurate, let me

20   know and you will be permitted to clarify the record.

21             You cannot talk or confer with your

22   attorneys during this deposition either while the

23   deposition is taking place or during breaks, and if you

24   should need a break to go to the restroom or to get a



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mary Jo Morris

5

1   drink of water or for any other reason, just let me know

2   and we will take a break.

3                    Do you understand these instructions?

4        A.    Yes, sir.

5        Q.    When were you born, and what is your birthday?

6        A.    When was I born and -- I'm sorry.

7        Q.    I'm sorry.  Where were you born, and what is

8   your birth date?

9        A.    I was born in San Diego, California, and my

10  birth date is July 20th, 1954.

11       Q.    What is your Social Security number?

12       A.    Do I have to provide that?

13                   MR. SEEGULL:  Do you really need it, Tim?

14                   MR. WILSON:  It's a means of tracking her

15  down if --

16                   THE WITNESS:  I just prefer not -- I have

17  been advised to keep that number very private.  So I try

18  not to give it out.

19                   MR. WILSON:  I understand that.  This

20  number isn't going to be shared with anybody.  The only

21  way we would use it is if you stopped working for CSC and

22  we had to track you down to use you as a witness in a

23  case.

24                   MR. SEEGULL:  I think if you need to track



Mary Jo Morris

6

1    her down, we will be able to track her down.

2            MR. WILSON:  Okay.

3    BY MR. WILSON:

4        Q.    Can you give me your address?

5        A.    I prefer not to.

6            MR. SEEGULL:  Again, I think we can track

7    her down.  We know where she is.  She has no expectation

8    of leaving CSC.

9            MR. WILSON:  I would hate for that to

10   happen, us not be able to get ahold of her to use her for

11   this case.

12           MR. SEEGULL:  I don't think that's going to

13   be a problem.

14           MR. WILSON:  I'll take your representation

15   that you will be able to get ahold of her.

16           MR. SEEGULL:  I think I will be, yes.

17   BY MR. WILSON:

18       Q.    Have you ever been arrested?

19       A.    No, sir.

20       Q.    Did you serve in the military?

21       A.    No, sir.

22       Q.    Did you go to college?

23       A.    Yes.

24       Q.    Where did you go?

Mary Jo Morris

7

1    A.    San Diego State University and Massachusetts
2 Institute of Technology.

3    Q.    Did you graduate from San Diego State?

4    A.    Yes, sir.

5    Q.    With a degree in what?

6    A.    Two degrees.  B.A. in computer science and a
7 Master's in computer science.  And from MIT with a --
8 it's called -- it's essentially an M.B.A., but they call
9 it an M.S. in management.

10    Q.    What years did you get those degrees?

11    A.    '77, I believe, '82, and then '89.

12    Q.    '77 was the B.S. in computer science?

13    A.    Yes.  It was a B.A., actually.

14    Q.    I'm sorry.  And the Master's was in '82?

15    A.    Yes, sir.

16    Q.    And the degree from MIT was '89?

17    A.    '89.

18    Q.    Did you graduate with any honors?

19    A.    I don't remember.

20    Q.    Any other graduate work?

21    A.    No.  I do remember I attended college for a
22 while at the University of California San Diego prior to
23 being at San Diego State University.

24    Q.    How long did you go to school there?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-1161

Mary Jo Morris

8

1       A.    Two years.

2       Q.    So freshman and sophomore year.  No degree from

3   there?

4       A.    No.

5       Q.    Are you presently employed by CSC?

6       A.    Yes, I am.

7       Q.    What is your present job title?

8       A.    President, Global Transformation Solutions.

9       Q.    What do you do in that position?

10      A.    I run a business unit for the corporation that

11  specializes in application-related services.

12      Q.    How long have you held that position?

13      A.    Since May 2003.

14      Q.    Did you work for CSC prior to that?

15      A.    Yes.

16      Q.    What position did you hold then?

17      A.    A variety of positions.  I've worked for CSC

18  since 1991.

19      Q.    What was the most recent to the president of

20  Global --

21      A.    Transformation Solutions?

22      Q.    Yes.  Let's just go back in time.

23      A.    Prior to that I was the executive in charge of

24  our relationship with AT&T Corporation, and prior to that



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

9

1    I was president of our Technology Management Group.

2        Q.    What years were you the executive in charge of

3    AT&T?

4        A.    That was just a year prior to this assignment.

5    So I think it was from like June or July.  That would

6    have been July 2002 until May 2003.

7        Q.    And the position previous to that?

8        A.    Was president of the Technology Management

9    Group.

10       Q.    What were the years you were in that position?

11       A.    I believe it was March 2001 until July 2002.

12       Q.    What about the position prior to that?

13       A.    Prior to that I was president of the

14   Application Services Division.

15       Q.    And the years?

16       A.    You're testing me now.  I think it was -- I

17   think it was 19 -- 1999 or 2000.  I'd have to look at my

18   records.  I'm not absolutely sure.

19       Q.    Were you working for CSC in 1997?

20       A.    Yes, I was.

21       Q.    Do you know what you were doing that year?

22       A.    I was working in some capacity related to

23   application services for CSC.  I was a vice president.

24   I'm sure of that.  And I was, I think, working to help



Mary Jo Morris

10

1    build CSC's capability and application outsourcing.

2        Q.    When did you begin working for CSC, what year?

3        A.    1991.

4        Q.    What did you do to prepare for today's

5    deposition?

6        A.    I have had two briefing sessions with the

7    lawyers here.

8        Q.    When was the first one?

9        A.    Prior to the cancellation which was -- I don't

10   have the date.  It was a few weeks ago.  You cancelled.

11   That was my understanding.

12       Q.    I apologize for that.

13       A.    And then 20 minutes prior to this meeting.

14       Q.    The first briefing schedule, how long did that

15   last?

16       A.    A couple hours.

17       Q.    And the most recent one you said was just for

18   about 20 minutes?

19       A.    Twenty minutes.

20       Q.    Did you review any documents?

21       A.    Yes.

22       Q.    Do you recall what documents you reviewed?

23       A.    I'd have to look at them to recall them.  It

24   was a series of e-mails and some policy documents.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

11

1    Q.    Did you review any deposition transcripts?

2    A.    A small piece of one, yes.

3    Q.    Do you know whose transcript that was?

4    A.    Dot Eltzroth's.

5    Q.    When did you review that?

6    A.    Just now.

7    Q.    What part of it did you review?

8    A.    It was a very small piece of it.  The intent

9    was just --

10              MR. SEEGULL:  Don't say anything about the

11    intent.  Do you remember which piece you reviewed is all

12    he's asking.

13              THE WITNESS:  Actually, I don't.

14    Q.    What was the subject matter, Ms. Morris?

15    A.    You know, I actually don't recall.  I'm

16    embarrassed about that.

17              MR. SEEGULL:  No reason to be embarrassed.

18    Q.    Did you talk to anybody other than your

19    attorney to prepare for this deposition?

20    A.    No, sir, I did not.

21    Q.    Have you had discussions with anybody about

22    this lawsuit?

23    A.    No, sir.

24    Q.    You haven't talked to anybody about the

Mary Jo Morris

12

1   lawsuit?

2        A.    No, sir.  I told a couple of people like my

3   secretary that I was going to be deposed, but that was

4   it.

5        Q.    But you've had no discussions about the

6   substance of the lawsuit?

7        A.    No, sir.

8        Q.    What is your understanding of the lawsuit?

9        A.    My understanding is that it relates to a number

10  of employees who were taken off AMIP I guess back in

11  2003.

12       Q.    Do you understand that their complaint is that

13  they were taken off at a point in time that was prior to

14  when they were notified?

15            MR. SEEGULL:  Objection.  Mischaracterizes

16  the testimony.  But go ahead.

17       A.    I understand that's their complaint.

18       Q.    I'm just trying to get your understanding.  I'm

19  not trying to have you agree with me at this point.

20            Do you have an understanding of CSC's Human

21  Resources' policies?

22       A.    I have an understanding of them, yes.

23       Q.    Have you ever participated in drafting or

24  reviewing any of these policies prior to their



WILCOX & FETZER LTD.
Registered Professional Reporters

Mary Jo Morris

13

1    implementation?

2        A.    No.

3        Q.    What about the AMIP program, do you have an

4    understanding of that program?

5        A.    Yes.

6        Q.    Do you have an understanding as to how it

7    works?

8        A.    Yes.

9        Q.    Can you give me an explanation as to how that

10   plan works?

11       A.    Yes.  Would you like me to do that now?

12       Q.    Yes, please.

13       A.    It's a management incentive program and it's

14   intended to incentivize selected members of the

15   management team to achieve certain performance criteria.

16   It's highly based on financial performance.  So many of

17   the objectives are clearly related to the financial

18   objectives of the company and our shareholders.

19       Q.    When you say "incentive," can you explain what

20   you mean by an incentive program?

21       A.    It's something that's above and beyond our base

22   pay, our normal form of compensation, and it's intended

23   to do just that, to motivate behavior toward a certain

24   set of goals above and beyond what you might ordinarily



Mary Jo Morris

14

1   do as part of your performance.

2       Q.    Has this program been effective, in your

3   opinion?

4       A.    Yeah, I think -- yeah, it certainly has served

5   the corporation to focus on areas from year to year as

6   priorities change.

7       Q.    In your opinion, has the removal of individuals

8   from the program demotivated them?

9       A.    Yeah.  I would say that, if someone has been on

10  the program and they are taken off, depending on the

11  circumstances around that, it certainly could demotivate

12  them.  Sometimes if an employee is changing job

13  assignments, that's something that comes with the

14  different job assignments.  So it might not demotivate in

15  that case.

16      Q.    As far as demotivation goes, would a decline in

17  productivity be considered demotivation, in your opinion?

18              MR. SEEGULL:  Objection.  Hypothetical,

19  calls for speculation.

20              MR. WILSON:  You can answer, ma'am.

21              MR. SEEGULL:  If you can answer that

22  question, go ahead and answer it.

23      A.    I don't know that the two are related.

24      Q.    When you say demotivate the employees, what



WILCOX & FETZER LTD.
Registered Professional Reporters

B-1168

Mary Jo Morris

15

1   would be the possible outcomes, in your opinion, of the

2   demotivation?

3       A.    I think people just aren't as enthusiastic

4   about their jobs as they might have been otherwise.  That

5   doesn't -- depending on the individual, that may or may

6   not translate into something observable in terms of their

7   work behavior.

8       Q.    Fair enough.  Were you involved in the

9   transition of the DuPont employees to CSC in 1997?

10      A.    No.

11      Q.    Were you aware that there was this transition?

12      A.    Yes.

13      Q.    Were you aware of any of the specifics of the

14  transition; in other words -- let me ask a better

15  question.

16            Were you aware of their compensation

17  packages, what the makeup of their compensation packages

18  was?

19      A.    Not in any detail, no.

20      Q.    Are you aware that their compensation packages

21  were set up to roughly mirror how they were being

22  compensated at DuPont?

23      A.    Yes.

24            MR. SEEGULL:  Objection.  Go ahead, you can



WILCOX & FETZER LTD.
Registered Professional Reporters

B-1169

Mary Jo Morris

16

1    answer.

2                    THE WITNESS:  I was aware that it was

3    different than the CSC standard package and it mirrored,

4    to a large extent, what they had received in DuPont.

5        Q.    Are you aware that the awarding of these

6    individuals the AMIP bonus program was to compensate for

7    the bonus program that they had at DuPont?

8                    MR. SEEGULL:  Objection.  Calls for

9    speculation.

10                   MR. WILSON:  You can answer, ma'am.

11       A.    I actually don't know that I made that

12   connection.

13       Q.    Were you aware that these employees were

14   eligible for a bonus at DuPont?

15       A.    I didn't have any visibility -- any individual

16   employees?  I was aware that the DuPont employee base had

17   a different, I guess, bonus scheme than CSC did.  But I

18   really wasn't aware of any details around that.

19       Q.    Were you aware that giving these technical

20   employees the AMIP -- making them eligible for the AMIP

21   bonus program was an exception to the normal parameters

22   of the AMIP program?

23                   MR. SEEGULL:  I'm going to object.  Can you

24   read that again or rephrase it?



WILCOX & FETZER LTD.
Registered Professional Reporters

Mary Jo Morris

17

1          MR. WILSON:  Could you read it back?

2          (The reporter read back as instructed.)

3          MR. SEEGULL:  Objection.  Lack of

4    foundation.  Did you hear the question?

5          THE WITNESS:  Was I -- I think I heard the

6    question.

7          MR. SEEGULL:  You can answer it.

8     A.    I was aware that was different.

9     Q.    How so?

10    A.    I think it's hard to recall way back then, but

11    I was aware that it went deeper in terms of the number of

12    employees who were eligible, and I think I was also aware

13    that the payout was more generous.

14    Q.    Did you know why it went deeper?

15    A.    It was because we were at that time wanting to

16    retain the employees that formerly worked for DuPont.

17    That was around 1994, if I remember right.  '96 or '94.

18    '96.  Must have been '96.  So we were very interested in

19    retaining those employees and so we wanted to make sure

20    we did what we could to do just that.

21    Q.    Is it fair to say that it was used as an

22    incentive to get these employees to accept employment at

23    CSC?

24          MR. SEEGULL:  Objection.  Speculation.  She



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

18

1   already testified she wasn't involved.

2               MR. WILSON:  I'm asking her understanding.

3               MR. SEEGULL:  She said she wasn't involved

4   in the DuPont transition.

5               MR. WILSON:  You can answer the question,

6   ma'am.

7       A.   I was certainly aware and understood that we

8   were trying to retain these employees and that to do that

9   we deviated from the standards of the compensation

10  package.  I was not aware of the specifics or the

11  details.  I had some cursory knowledge of that which I

12  have indicated, but I didn't have a detailed

13  understanding of exactly how it differed.

14      Q.   Are you aware that, for these particular

15  employees from DuPont, their AMIP bonus compensation is

16  calculated into their pensionable earnings?

17      A.   I have no understanding of that.

18      Q.   Do you know how long CSC's had the AMIP

19  program?

20      A.   I don't know.  I know since I joined the

21  company that it existed.

22      Q.   Does the AMIP program follow the CSC fiscal

23  year?

24      A.   Yes, it does.  I should say that the objectives

Mary Jo Morris

19

1   as defined in the program, the performance objectives,

2   are aligned around the performance.

3        Q.    Why is that?

4        A.    Because they're multiply financially based, as

5   I indicated before.  To have an assessment of what the

6   financial performance is, you have to align it around the

7   fiscal year.

8        Q.    Would contributions from each eligible

9   employee -- would contributions from the entire year

10  ultimately contribute to the bottom line as calculated at

11  the end of the year?

12       A.    I don't think -- you mean each --

13              MR. SEEGULL:  You need him to repeat the

14  question?

15              THE WITNESS: Yes.  I don't think I quite

16  understand it.

17       Q.    Let me see if I can ask it in a clearer way.

18              You testified that the AMIP program is

19  based upon the fiscal year because it's financially

20  driven.  The employees who are eligible for the AMIP

21  program, do their contributions throughout the entire

22  fiscal year contribute to the bottom financial

23  calculations at the end of the year?

24       A.    But it's fairly black and white.  At the end of

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Mary Jo Morris

20

1    the fiscal year, if they match the financial criteria set

2    up in their plan, they're paid the bonus, and if they

3    aren't, they may be paid a part or none of the bonus.

4    Depending on the plan that they're on.

5         Q.    Things they do throughout the entire fiscal

6    year contribute to whether they meet their goal or not,

7    correct?

8         A.    Well, all year long they're working towards

9    making that goal, that's correct.  But they don't know --

10   we don't know if they have achieved the goal right until

11   the end of the year.

12        Q.    I understand.  Thank you.

13              An individual who is eligible to receive a

14   bonus at the end of the fiscal year has to be

15   participating in the program during that fiscal year,

16   correct?

17        A.    Correct.

18        Q.    And a person who is only in the program for a

19   portion of that year would have his bonus prorated,

20   correct?

21        A.    Could you repeat that, please?

22        Q.    A person who's only participating in the AMIP

23   program for a portion of the fiscal year would only get a

24   portion of his bonus, correct?  He wouldn't get a full

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Mary Jo Morris

21

1    bonus worth of -- for the whole fiscal year?

2        A.    Yes.   For the period that that employee was

3    participating would be prorated, yes.

4        Q.    That pertains whether the person is added

5    during the fiscal year or removed during the fiscal year,

6    correct?

7        A.    Certainly if they're demoted or added.   And

8    that happens fairly frequently.   Or moved into a position

9    which AMIP eligibility is established and then they would

10   be added or prorated.   If an employee changes assignments

11   during the year, you could have a situation where they

12   were eligible under one AMIP set of objectives for part

13   of the year and another set of objectives for the latter

14   part of the year.   In that sense, it is prorated.

15             Employees removed -- I'm having trouble

16   thinking of too many cases where employees are removed

17   from the program and paid a bonus.

18             MR. WILSON:   Larry, I'd like her to look at

19   a document A that's D-10372 through 10382.

20             MR. SEEGULL:   Are we going to mark this as

21   Morris 1?

22             (Morris Deposition Exhibit No. 1 was marked

23   for identification.)

24             MR. SEEGULL:   I put it in front of her.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Mary Jo Morris

22

1    You want her to focus on something specific?

2              MR. WILSON:  Yes.  Certainly she's entitled

3    to read the whole document, but the part that I'm going

4    to focus on here initially is on page 8 of this document

5    which is D-10379 at the bottom.  The section's entitled,

6    "Eligibility For All Incentive Compensation Programs."

7    Over to the next page where it says "FY2003 Payout

8    Potential for Eligible Employees," I'm going to focus on

9    the area in between those two headings.

10             THE WITNESS:  I have read down to "FY2003."

11   BY MR. WILSON:

12        Q.    You see at the top of that page, page 9, where

13   it says "Payout"?

14        A.    Yes.

15        Q.    Under the second bullet point it says,

16   "Chemical Group employees who transition to any business

17   unit within CSC will receive a pro-rated payout from the

18   Chemical Group at time of award payment based on the time

19   period of contribution to Chemical Group business

20   objectives."

21             Is that what that says?

22        A.    That's what that says.

23        Q.    It doesn't say anywhere in that bullet point or

24   anywhere in this section that the person has to transfer

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

23

1    to another division and remain eligible in the AMIP

2    program, does it?

3                    MR. SEEGULL:  I'm going to object.  It

4    speaks for itself.

5                    MR. WILSON:  You can answer the question,

6    ma'am.

7                    MR. SEEGULL:  Are you asking her to read

8    it?

9                    MR. WILSON:  I'm asking her if it says

10   that.

11                   MR. SEEGULL:  If it says what exactly?

12                   MR. WILSON:  What I just said.

13                   THE WITNESS:  You have to repeat it now.

14                   MR. WILSON:  Can you read that back,

15   please?

16                   (The reporter read back as instructed.)

17                   MR. SEEGULL:  I'm still not following you,

18   Tim.

19                   MR. WILSON:  In order to remain --

20                   MR. SEEGULL:  Let me just finish.  Are you

21   asking her to read whether or not the words you just said

22   are in here?

23                   MR. WILSON:  She testified she wasn't sure

24   what would happen if somebody transferred out and they

Mary Jo Morris

24

1    didn't go to another program and remain AMIP-eligible.

2                    MR. SEEGULL:  I think that mischaracterizes

3    her testimony.  That's not what she said at all.

4    BY MR. WILSON:

5        Q.    Is that what you testified, ma'am?

6        A.    No, I don't remember saying that.

7        Q.    Does an employee have to remain AMIP-eligible

8    to receive the AMIP at the end of the year if he's

9    removed from one AMIP program?

10                    MR. SEEGULL:  Objection.  Vague and

11   ambiguous.

12                    THE WITNESS:  I'm trying to understand what

13   he's asking me.

14   BY MR. WILSON:

15       Q.    I'm trying to find out does the person have to

16   be in the AMIP bonus program at the end of the fiscal

17   year in order to receive an AMIP bonus payout.

18       A.    Yes, they have to be in the program to receive

19   it.

20       Q.    At the end of the fiscal year.

21                    MR. SEEGULL:  Objection.  Asked and

22   answered.  Go ahead, you can answer again.

23                    THE WITNESS:  I'm trying to understand

24   exactly what he's asking me.



Mary Jo Morris

25

1      Are you asking me if there are situations

2   where an employee could be eligible within the year but

3   not in the program at the end of the year and still be

4   paid?

5              MR. WILSON:   Yes.

6              THE WITNESS:   That's what he's asking me?

7              MR. SEEGULL:   That's what he's asking you.

8              THE WITNESS:   There are probably some

9   circumstances where an employee was in the program for

10  part of the year but isn't in the program at the end of

11  the year.  For instance, if an employee retires during

12  the year, they could -- I think there's some opportunity

13  depending on the circumstances.  It's probably not a

14  usual situation.  It's not often that certainly that kind

15  of situation comes across my desk.  And the program

16  really is paid at the end of the year based on -- I guess

17  really based on the pleasure of CSC and their evaluation

18  of how their employee performed against those objectives.

19  BY MR. WILSON:

20      Q.    Is there anything in this section --

21              MR. SEEGULL:   She's not finished her

22  answer.

23              THE WITNESS:   For an employee to be

24  eligible in the program during the year, I mean, there's



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

26

1   a process that we go through so that an employee knows

2   what they're expected to do with respect to the AMIP

3   program.

4   BY MR. WILSON:

5       Q.    Are you finished?

6       A.    It's not just implied.  I can also give you

7   examples where employees have been in the program during

8   some part of the year were not eligible at the end of the

9   year and not get a payment.

10      Q.    Is there anything in that section that says

11  "Payout" that says that you have to be in the program at

12  the end of the fiscal year in order to get your bonus?

13           MR. SEEGULL:  This is where I have a

14  problem.  It's one thing if you ask her about her

15  personal knowledge.  I have no problem with that.  Now

16  you're asking her what the document says.  The only thing

17  she can say is that if she reads the document and says

18  that's what it says.

19           MR. WILSON:  She doesn't have to read it

20  into the record, but she can answer my question.

21           MR. SEEGULL:  I'm not sure if you're

22  asking -- why don't you tell her the exact words you're

23  asking if they're in there.

24           MR. WILSON:  I did ask the question.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   BY MR. WILSON:

2       Q.    Is there anything in this section that says an

3   employee must be in the program at the end of the fiscal

4   year in order to receive his bonus?

5       A.    I'm just reading these things here.  In the

6   following section it says, "All incentive/variable

7   compensation programs are reviewed annually and may be

8   modified or discontinued based on the Chemical Group's

9   financial capability and business requirements."  And

10  also above that it says participation is reviewed each

11  year.

12              I guess it did -- it does kind of get, I

13  think, to the question you were asking.

14      Q.    Are you testifying that it does say that, that

15  you have to be in the program at the end of the fiscal

16  year?

17              MR. SEEGULL:  Tim, she just gave you an

18  answer.

19              MR. WILSON:  I'm not so sure that she did.

20              MR. SEEGULL:  She did.  You may not have

21  liked the answer, but she did give you the answer.

22  BY MR. WILSON:

23      Q.    Is that what your testimony is, that somebody

24  must be in the program at the end of the fiscal year?

Mary Jo Morris

28

1          MR. SEEGULL:  You can answer again.

2    Objection.  Asked and answered.  Go ahead, you can answer

3    again.  You can answer again.

4       A.    I guess not necessarily.  They don't

5    necessarily have to be, but it is -- that is usually the

6    condition.

7       Q.    Do you know where that's stated?  Is there a

8    policy that says that?

9       A.    I do not know.

10      Q.    If an employee is not in the program for the

11   full year, his bonus is prorated, correct?

12      A.    Objection.

13          MR. SEEGULL:  Objection.  Why don't you

14   move on, since we covered this pretty well.

15          MR. WILSON:  Larry, let me conduct the

16   deposition how I want to.  Okay?

17          MR. SEEGULL:  You're mischaracterizing her

18   testimony.

19          MR. WILSON:  I'm not mischaracterizing her

20   testimony.  I'm asking her questions.

21          MR. SEEGULL:  We just spent 25 minute going

22   through that very question and then you try to summarize

23   it with one question that's contrary to what she just

24   testified to.

Mary Jo Morris

29

1          MR. WILSON:  You can answer the question,

2    ma'am.

3          THE WITNESS:  You're going to have to

4    repeat it again.

5          MR. WILSON:  Could you repeat it?

6          THE WITNESS:  I can't remember what it is,

7    either.

8          (The reporter read back as instructed.)

9          MR. SEEGULL:  Objection.  Mischaracterizes

10   the testimony, asked and answered repeatedly.  Go ahead,

11   you can answer again.

12   A.    I guess not under all circumstances.

13   Q.    In the circumstances that it is prorated, what

14   is the basis of the proration?

15   A.    The number of months eligible.

16         MR. WILSON:  I think I'm done with that

17   document.

18   Q.    Ms. Morris, is the participation in the program

19   supposed to be evaluated annually?

20   A.    Yes.

21   Q.    When is the evaluation to occur?

22   A.    My experience is that generally that evaluation

23   occurs between really sometime after the end of the prior

24   fiscal year and that it often extends -- there's kind of

Mary Jo Morris

30

1   no end date, but that evaluation period really can occur

2   any time over the following year, but generally it occurs

3   within the first, I don't know, four, five, six months.

4       Q.    Are managers or directors supposed to have a

5   conversation with their employees as to their eligibility

6   for the program?

7       A.    Yes.  And there should be a signed document,

8   actually, that confirms that eligibility.

9       Q.    When does that take place?

10      A.    As I said before, it's sometime after the start

11  of the new fiscal year and, in my experience, has

12  extended as far out usually four to six months after.

13      Q.    During those four to six months, how are the

14  employees supposed to know they're eligible?

15      A.    I guess they can, say, talk with their

16  management if they have concerns about that to understand

17  exactly what's going on with the program.

18      Q.    If someone's added to the program, are they

19  notified immediately?

20          MR. SEEGULL:  Objection to the phrase

21  "immediately."

22  BY MR. WILSON:

23      Q.    Within a short period of time, in your

24  experience, Ms. Morris?

Mary Jo Morris

31

```
1        A.    If they're added to the program?  Well, often

2   there's a lag there.

3        Q.    What's the cause of the lag?

4              MR. SEEGULL:  Objection.  Speculation,

5   hypothetical.

6              MR. WILSON:  If she knows.

7              MR. SEEGULL:  It depends.  Every situation

8   is different, but go ahead, you can answer.

9              MR. WILSON:  She never testified to that,

10  Larry.

11             MR. SEEGULL:  Go ahead, you can answer.

12       A.    I think it's probably a combination of

13  circumstances.  These things go through an internal

14  approval process and then they have -- they go through

15  corporate, they go through HR, and then they go through

16  the business unit and then they have to flow down to the

17  management team or manager that actually owns the

18  employee.  So often that takes a while.

19       Q.    When somebody's added, are they added at the

20  time that they're notified or are they added at some

21  point prior to their notification?

22             MR. SEEGULL:  Objection.  Hypothetical,

23  calls for speculation.

24             MR. WILSON:  You can answer, ma'am.
```



WILCOX & FETZER LTD.
Registered Professional Reporters

Mary Jo Morris

32

1        A.      Again, I think it depends.  In most cases we --

2    I guess it depends, but in most cases we obviously try to

3    get the timing down so it coincides with the assignment

4    for which they're now AMIP-eligible.

5        Q.      Are you aware of any instance, any specific

6    instance, where a person was notified that he was

7    eligible and his eligibility went back in time?

8        A.      Yeah, I can probably think of some

9    circumstances --

10       Q.      Okay.

11       A.      -- where they were notified four months into

12   the fiscal year and eligibility went back to the start of

13   the fiscal year.

14       Q.      Okay.  Can you name them?

15       A.      Not off the top of my head.

16       Q.      Once an individual is deemed eligible for the

17   AMIP bonus, his or her participation continues until

18   they're notified that they're no longer entitled to

19   participate, correct?

20               MR. SEEGULL:  Objection.  Mischaracterizes

21   the record.

22               MR. WILSON:  You can answer, ma'am.

23       A.      I'd say that is not my understanding of the

24   program; that, in fact, eligibility is reviewed from year

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-1186