Mary Jo Morris

33

1  to year.  So you really can't make an assumption that,

2  because you are in it one year, you are in it the next

3  year.

4      Q.    Are you eligible for the AMIP program?

5      A.    Yes, sir, I am.

6      Q.    At the beginning of the fiscal year prior to

7  getting your worksheet, does it ever cross your mind

8  whether you're going to remain AMIP-eligible?

9      A.    No, not generally.

10      Q.    Why not?

11      A.    I guess I keep in contact with my boss enough

12  that I would understand early on if there were going to

13  be changes to the program or changes in my eligibility,

14  but I think I just communicate enough between corporate

15  HR and my boss that I have pretty good visibility to

16  what's going on with the program, and so from year to

17  year I don't expect a lot of changes from a special

18  standpoint.

19      Q.    Absent that expectation, you would just assume

20  that you're going to remain eligible, correct?

21          MR. SEEGULL:  Objection.

22      A.    I think I'm not so naive to think that I'm

23  entitled to it from year to year, but certainly I have an

24  expectation that, as long as I'm performing, I will be

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Mary Jo Morris

34

1   part of the plan.

2            I also understand that, at any given point

3   in time, the company could completely change the whole

4   program and, in fact, could do away with it at any

5   particular time to take it to an extreme and that the

6   program is basically at their pleasure.

7            So while, yes, I have an expectation around

8   that, I also understand that I am serving the company at

9   their pleasure and they could change it at any time and

10  that would be the way it was.

11       Q.    Do you view the AMIP bonus as part of your

12  salary?

13       A.    No, sir.  It's not part of my base pay.

14       Q.    Do you view it as part of your compensation?

15       A.    Yes, sir, it is part of my total compensation.

16            MR. SEEGULL:  Tim, do you have a lot more?

17            MR. WILSON:  I have a little bit.

18            MR. SEEGULL:  Maybe we should just take a

19  break.  It's been about an hour.

20            MR. WILSON:  Okay.  Ten minutes good?

21            MR. SEEGULL:  That sounds good.

22            (A recess was taken.)

23  BY MR. WILSON:

24       Q.    You ready to start, Ms. Morris?



1      A.     Yes, sir.

2      Q.     To your knowledge, were any of the plaintiffs

3   in this lawsuit given notice of their ineligibility for

4   the AMIP bonus program prior to September 11th, 2003?

5      A.     I guess my recollection around dates is not

6   precise.  So that must have been the date at which these

7   employees were notified.  But I have no reason to think

8   that they were given any notice prior to that.

9      Q.     The letter that was sent out to these employees

10  notifying them, was that the means of notification for

11  these individuals?

12     A.     They should have been spoken to by their

13  manager, as well as the written communication.

14            MR. WILSON:  Larry, I would like her to

15  look at document K.  It's Bates numbered D-10442.

16            MR. SEEGULL:  Yes.  This is going to be

17  Morris 2?

18            MR. WILSON:  Yes.

19            (Morris Deposition Exhibit No. 2 was marked

20  for identification.)

21            MR. SEEGULL:  It's a two-page document,

22  correct?

23            MR. WILSON:  Yes, it is.

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

36

1    BY MR. WILSON:

2        Q.    Could you take a moment and read that?  Let me

3    know when you're done.

4        A.    Okay.

5              Okay.  I finished it.

6        Q.    Have you ever seen this document before?

7        A.    Yes.

8        Q.    When did you see it?

9        A.    I know I must have seen it at the time that we

10   made this change.

11       Q.    Why do you say that?

12       A.    Well, because I looked at all those documents

13   at that time.

14       Q.    In the top left-hand corner it looks like

15   there's some handwriting that may say "Jo."  Is that any

16   reference to you?

17       A.    I have no idea.

18       Q.    In the second bullet point down, it says, "We

19   have come to a point where it is appropriate and fiscally

20   prudent to realign the AMIP to our business and financial

21   climate."

22              Do you have an understanding as to what

23   "appropriate and fiscally prudent" means?

24       A.    Particularly in the business that I run for

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

37

1    CSC, it's all labor-based.  So as we look at how to

2    manage our business, we're looking at how to

3    appropriately manage the labor force.  The best example

4    of this is during the 1990s when we were going through

5    the dot-com boom, we had a different set of market

6    conditions than we had after the year 2000 when we went

7    into an economic recession.

8              As we looked overall at the labor force and

9    what we needed to do to attract appropriate retention and

10   an appropriate skill base, we certainly understood at

11   that time that we were overcompensating, if you would,

12   across the labor force, and this is one of the actions we

13   took to try to get that compensation back in line with

14   market.

15       Q.    Earlier when you said that the employees were

16   supposed to be spoken to by their manager, is this

17   document things that the manager was supposed to cover

18   when speaking with these employees?

19       A.    Yes, sir.

20       Q.    And the first line there, it says, "Key points

21   to cover during the communication of the change."

22   Correct?

23       A.    Right.

24       Q.    Is that what it's referring to?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

38

1    A.    Yes, sir.

2    Q.    At the third bullet point in italics -- let me

3    back up.

4         Did you participate in putting this

5    document together?

6    A.    I reviewed it.  I did not contribute to the

7    composition.

8    Q.    Who did write it, do you know?

9    A.    It would have come from our Human Resources

10   Department.

11   Q.    You say you reviewed it.  Were you required to

12   approve it, as well?

13   A.    No, I don't think I was required to approve it.

14   Q.    In the third bullet point in italics it says,

15   "Participation in AMIP is reviewed each year, and there

16   is no guarantee of continued participation in the AMIP

17   program."

18        Is that what it states?

19   A.    Yes.

20   Q.    Do you have any understanding as to why this

21   part of the document is italicized?

22   A.    I have no idea.

23   Q.    Why was it important to make this communication

24   to these employees?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

39

     A.    Are you referencing the third bullet or the

total document?

     Q.    No, the third bullet.

     A.    I would assume it was just a reminder to

employees that their participation in this program is at

the discretion of the company.

     Q.    Was there any concern that employees may not be

aware that the participation is reviewed each year and

that they may have assumed there was a guarantee of

continued participation?

     A.    I don't remember having any specific concern

about that.

     Q.    When did you first become aware that people

were considering removing some of these employees from

the AMIP program?

     A.    Well, when I took the job in May 2003, it was

shortly after that that I became aware that there had

been a broader discussion around the eligibility of

employees in the AMIP program, and now that I was in the

position, it was appropriate for me to get involved in

that.  So we were trying hard to have consistency across

the three major business lines that operate North

America.  So we had a number of discussions to that

effect to make sure that we did have consistency in how

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

40

1  we went about making these changes and communicating

2  them.

3      Q.    How did you first become aware that this was a

4  consideration?

5      A.    You know, I don't remember exactly.  I can

6  guess that the Human Resources Department began to speak

7  to me about it.

8      Q.    Who made the final decision as to move forward

9  with this?

10     A.    It was a joint decision.

11     Q.    Between whom?

12     A.    It would have been myself and Russell and

13 Tony Doye.

14     Q.    Who is Russell?

15     A.    Russ Owen.

16           MR. SEEGULL:  There's no S on end of his

17 name.

18           MR. WILSON:  So I hear.  At least I said

19 Tony Doye, though.

20           THE WITNESS:  Gus Siekierka was also a --

21 would have been the principal of HR.

22 BY MR. WILSON:

23     Q.    Did you raise any issues regarding any concerns

24 you had over this proposed action?

Mary Jo Morris

41

1    A.    My main concerns were around consistency in

2  making sure that we were consistent across the three

3  groups, and paid a lot of attention to that.

4    Q.    Why was that a concern of yours?

5    A.    Because these employees often -- whether it's

6  Russ Owen's group or my group or Tony's group, they often

7  work in the same locations and so I think it becomes

8  problematic if employees become aware that their

9  compensation is different from group to group.

10    Q.    Did anybody raise concern that there may be

11  people eliminated from the AMIP program who were actually

12  performing functions that, in reality, should make them

13  eligible for AMIP?

14    A.    Yeah, there was certainly some discussion of

15  exceptions to the criteria laid out here.

16    Q.    Is that taken into consideration now or was

17  there an across-the-board cut?

18    A.    I mean, I can speak most knowledgeably about

19  how I specifically implemented the program for my group.

20    Q.    Okay.

21    A.    We followed these criteria specifically with

22  regard to labor-grade eligibility.  There are sometimes I

23  think exceptions with respect to the actual percentage

24  that an employee may be eligible for based on some unique

Mary Jo Morris

42

1    circumstances in their position, but we're pretty

2    consistent.

3        Q.    Were there any other issues raised regarding

4    this proposed action, issues that people were concerned

5    about?

6        A.    Well, I think that part of the program is

7    communication, some of the actions we took.   For

8    instance, making the senior managers potentially eligible

9    for a discretionary bonus.   That was an attempt to kind

10   of bridge the high-performing employees, the financial

11   impact that removal of the program would have.

12       Q.    Did anybody raise a concern over the timing of

13   this action specifically informing the people in

14   September and making the action effective in April?

15       A.    No, sir.   I think it's well-understood that

16   this is -- this program is at the discretion of CSC.

17       Q.    Did anybody raise any concern that this action

18   may be illegal?

19       A.    No, sir.

20       Q.    Do you recall what the payout for fiscal year

21   2004 was in your group?

22       A.    No, sir, I do not.

23            MR. WILSON:   I may be done.   Let me look at

24   some documents here real quick.

Mary Jo Morris

43

1          Ms. Morris, that's all I have at this time.

2   I appreciate you making yourself available.  Mr. Seegull

3   or Mr. Raimo may have some questions for you at this

4   time.

5   BY MR. SEEGULL:

6       Q.   Just a few questions.

7          Ms. Morris, are you aware of any employee

8   by name who was ever given a prorata payment after being

9   removed from the AMIP plan midyear?

10      A.   No, I can't think of one.

11      Q.   You said you could think of some examples of

12  employees not getting AMIP at the end of the year when

13  they were removed during the course of the year.  Is that

14  right?

15      A.   Yeah, I'm aware of circumstances.

16      Q.   Can you tell me some circumstances where that's

17  occurred?

18      A.   I can't think of any specific examples at this

19  time.  I think I'm just generally aware that that has

20  occurred.  I can't think of a specific example.

21      Q.   Even though you can't think of names, can you

22  think of situations, whether it's a demotion,

23  termination, a transition to a different position?

24      A.   Certainly a termination is a good example of

Mary Jo Morris

44

1    where you would not get your payout if you terminated

2    prior to payout.    There are circumstances I think where

3    an employee didn't perform overall at the level that we

4    felt was satisfactory to give them the payout even though

5    they may have technically met the financial criteria.    I

6    remember seeing cases where AMIP was paid minimal or not

7    paid, but I can't give you specific names at this point.

8    I see hundreds and hundreds of these.    In general, if

9    that happens to a person, they don't stay eligible

10   because -- generally, if they're not performing at a good

11   level, it's an indication that they really shouldn't be

12   in the program to begin with.

13        Q.    If you will turn to Morris Exhibit 1, which is

14   the employee total reward guide.    If you will turn to the

15   last page of that document.    You were asked a number of

16   questions about this document.    If you could, could you

17   just read for me the last bullet point in the middle of

18   the page there.

19        A.    Under "Eligibility and payout guidelines."    "In

20   addition, if an employee participating in AMIP accepts

21   transfer or promotion to a position that does not meet

22   the requirements/criteria for AMIP eligibility, the

23   employee will not be eligible to participate in AMIP."

24        Q.    What do you understand that to mean?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

45

1    A.    That, if an employee transfers in the year to a

2  position that's not AMIP eligible, they will no longer be

3  eligible to participate.

4              MR. SEEGULL:  If you will just give me one

5  quick moment, Tim.  I'd like to confer with my colleague

6  and see if I have anything further.

7              MR. WILSON:  Okay.

8              (Discussion off the record.)

9              (A recess was taken.)

10  BY MR. WILSON:

11    Q.    Ms. Morris, when is the AMIP bonus earned?  Is

12  it earned as you go along during the course of the year

13  or is the AMIP bonus only earned at the end of the year

14  when the financial criteria and other criteria are

15  evaluated against performance?

16    A.    It's earned at the end of the year when we

17  understand what the financial performance -- the company

18  understands what its financial performance is.  It's

19  evaluated at the end of the fiscal year when we know what

20  the numbers are, basically.

21              MR. SEEGULL:  I have no further questions.

22  BY MR. WILSON:

23    Q.    Just one quick one.

24              As far as the time at which the bonus is



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mary Jo Morris

46

1   earned, the employee is performing throughout the fiscal

2   year and that performance contributes to the bottom

3   financial line, correct?

4               MR. SEEGULL:  Objection.

5               MR. WILSON:  You can answer, ma'am.

6               MR. SEEGULL:  You can answer.

7       A.    Well, yeah.  It's assumed that the employee is

8   working toward achieving the goal.  So yes, if they're

9   working throughout the year, they should be working

10  toward that goal.

11      Q.    And that's why the bonus is prorated, correct?

12      A.    No, the bonus isn't paid until you reach the

13  goal.

14      Q.    Right.

15      A.    If you reach the goal, then it's paid.  It's

16  not paid before then.

17              MR. WILSON:  Understood.  That's all I

18  have, Larry.

19              MR. SEEGULL:  No further questions.

20              MR. WILSON:  Thank you, Ms. Morris.

21              (Deposition concluded at 3:30 p.m.)

22                  -   -   -   -   -

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1                          T E S T I M O N Y

2

3   DEPONENT:  MARY JO MORRIS                      PAGE

4

5   BY MR. WILSON............................... 3

6   BY MR. SEEGULL............................. 43

7   BY MR. WILSON.............................. 45

8

9                      E X H I B I T S

10

11   MORRIS DEPOSITION EXHIBIT NO.                MARKED

12

13   1 - A multi-page document Bates numbered

14   D-10372 through D-10382...................... 21

15

16   2 - A two-page document entitled,

17   "AMIP Restructure Briefing".................. 35

18

19   ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 48

20

21   CERTIFICATE OF REPORTER                PAGE 49

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT



**WILCOX & FETZER LTD.**
Registered Professional Reporters

## CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 8th day of May, 2006, the deponent herein, MARY JO MORRIS, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

      I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

      I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

                Kimberly A. Hurley
                Certification No. 126-RPR
                (Expires January 31, 2008)

DATED:



WILCOX & FETZER LTD.
Registered Professional Reporters

1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

BRIAN MILLER, HECTOR CALDERON,      )
CHARLES FOLWELL, ROLLAND GREEN,     )
DAWN M. HAUCK, KEVIN KEIR,          )
ASHBY LINCOLN, KAREN MASINO,        ) Civil Action No.
ROBERT W. PETERSON, SUSAN M.        ) 04C-12-127 SCD
POKOISKI, DAN P. ROLLINS, and       )
WILLIAM SPERATI                     )
                                    )
            Plaintiffs;             )
                                    )
v.                                  )
                                    )
COMPUTER SCIENCES CORPORATION,      )
a Delaware corporation,             )
                                    )
            Defendant.              )


           Deposition of NICK WILKINSON taken
pursuant to notice at the Law Offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:00 a.m. on Friday, May 19, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.


              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477

                                    B-1204



WILCOX & FETZER LTD.
Registered Professional Reporters





2

APPEARANCES:

TIMOTHY J. WILSON, Esquire

MARGOLIS EDELSTEIN

  1509 Gilpin Avenue

  Wilmington, Delaware  19806

  on behalf of the Plaintiffs;


LARRY R. SEEGULL, Esquire

DLA PIPER RUDNICK GRAY CARY

  6225 Smith Avenue

  Baltimore, Maryland  21209-3600

TYLER B. RAIMO, Esquire

COMPUTER SCIENCES CORPORATION

  Legal Department

  3170 Fairview Park Drive

  Falls Church, Virginia  22042

  on behalf of the Defendant.

3

                              NICK WILKINSON,

1

2              the witness herein, having first been

3              duly sworn on oath, was examined and

4              testified as follows:

5                              EXAMINATION

6    BY MR. WILSON:

7      Q.    Good morning, Mr. Wilkinson.

8      A.    Good morning.

9      Q.    We just met, but once again my name is Tim

10   Wilson and I'm the attorney for the plaintiffs in the

11   case Miller versus Computer Sciences Corporation.

12              I'd like to go over a few instructions

13   before we start just so you understand what's going to

14   go on and things of that nature.

15     A.    Okay.

16     Q.    I'm going to be asking you questions pertaining

17   to the lawsuit, and when you respond, you must do so

18   verbally.  In other words, we don't want head shakes

19   or mm-hmms or things like that because it's hard for

20   the court reporter to take down.  As you know, you've

21   just been sworn in.  And so you know, your testimony

22   is under oath and you must answer truthfully just as

23   if you were in court.

24              When I ask you a question and you respond

Nick Wilkinson - Wilson

4

1  to that question, I'm going to assume that you heard

2  and understood it.  If you don't hear or understand a

3  question, let me know and I'll ask it again so that

4  you can understand it.

5          Please let me finish asking the question

6  before you answer and I'll let you finish answering

7  before I ask another question that way we can make the

8  transcript clear.

9          If at any time you come to realize that a

10 statement you made was incorrect or inaccurate let me

11 know and you'll be permitted to clarify the record.

12         You cannot talk or confer with your

13 attorneys during the deposition either in here or

14 during breaks unless it pertains to a matter of

15 privilege.

16         If at any time you need a break to go to

17 the rest room or to smoke a cigarette or whatever,

18 just let me know and we'll accommodate you.

19         Do you understand these instructions?

20 A.     I do.

21 Q.     Where were you born?

22 A.     I was born in England, Sutton-in-Ashfield.

23 Q.     What's your birth date?

24 A.     February 17, 1962.

Nick Wilkinson - Wilson

5

1    Q.    And your Social Security number?

2    A.    Is that necessary?

3    Q.    Well, it's not going to be used for any purpose

4    other than if we can't locate you.    It's just a means

5    to locate the --

6                MR. SEEGULL:    I think he'll be easy to

7    locate.

8    Q.    Okay.    What is your address?

9    A.    Four Squirrel Run -- business address or home

10   address?

11   Q.    Home address please.

12   A.    Four Squirrel Run -- Squirrel as in bushy tail

13   creature -- Run, Greenville, Delaware, 19807.

14   Q.    How long have you lived there?

15   A.    Four years in August.

16   Q.    You own?

17   A.    Yes.

18   Q.    Have you ever been arrested?

19   A.    No.

20   Q.    Did you serve in the military?

21   A.    Yes.    British military.

22   Q.    British?

23   A.    The Royal Air Force.

24   Q.    The Royal --

Nick Wilkinson - Wilson

6

1    A.    Royal Air Force.

2    Q.    And when was that?

3    A.    1980 to 1989.

4    Q.    What rank did you hold?

5    A.    Flight lieutenant.

6    Q.    Does the British military have honorable

7    discharges?

8    A.    Yeah.   I finished my engagement, yeah.

9    Q.    Did you go to college?

10    A.    Yes.

11    Q.    Where did you go?

12    A.    Manchester University.

13    Q.    Did you graduate?

14    A.    Yeah.   Yes.   Yes, I did.   With a BA in

15    economics, politics, and philosophy.

16    Q.    What year?

17    A.    1983.

18    Q.    Any honors?

19    A.    Yes BA honors, yes.

20    Q.    Did you do any graduate work?

21    A.    I have an MBA.

22    Q.    From?

23    A.    The Open Business School.

24    Q.    Where is that at?

7

1    A.    It's based in Milton Keynes in the U.K., but

2  it's a distance learning college.

3    Q.    How long are you lived in the United States?

4    A.    Since December 19 -- 1999.

5    Q.    What prompted your move to the United States?

6    A.    I made a company transfer for a new position

7  with CSC.

8    Q.    Are you presently working for CSC?

9    A.    Yes.

10    Q.    What is your job title?

11    A.    It recently changed, and it was on the card

12  that I gave to the lady here.  I can basically -- it

13  is Vice-President Chemicals, Energy, and Natural

14  Resources.

15    Q.    You say that changed recently?

16    A.    It changed from the effect of our -- from

17  April, yes.  Prior to that it was Vice-President and

18  Global Account Executive for Chemicals and Energy.  So

19  it didn't change a lot, but it added natural

20  resources.

21    Q.    And how long did you hold that position?

22    A.    Since July of 2002.

23    Q.    In total how long have you worked for CSC?

24    A.    Since the 2nd of October 1989.  So that's what?



WILCOX & FETZER LTD.
Registered Professional Reporters

Nick Wilkinson - Wilson

8

1    17 years?  16 years, six months.

2    Q.    What did you do to prepare for today's

3    deposition?

4    A.    What did I do to prepare for today's

5    deposition?  I read the paperwork.

6    Q.    What paperwork is that?

7    A.    The case.

8    Q.    The complaint?

9    A.    Yeah.

10   Q.    Okay.  Any other documents?

11   A.    No documents, no.

12   Q.    Did you meet with Mr. Seegull or Mr. Raimo?

13   A.    I did, yes.

14   Q.    When did you meet with them?

15   A.    Monday?  Yes, this Monday.

16   Q.    For approximately how long?

17   A.    Three hours?  Yeah, three hours.

18   Q.    And the complaint was the only document that

19   you looked at?

20   A.    I have to ask a clarification question.  By

21   document, do you mean an actual word document or

22   print-outs of other things?  What do you mean by a

23   document?

24   Q.    Any type of written piece of paper other than

Nick Wilkinson - Wilson

9

1    something that your attorney would have prepared on

2    his own.  Document such as a printed out e-mail --

3        A.    Yes, I did.

4        Q.    -- or a memorandum or things of that nature?

5        A.    Yes.  And I also reviewed my own affidavit.

6        Q.    Do you recall what the other documents were

7    that you looked at?

8        A.    E-mail correspondence between the plaintiffs

9    and people within CSC.

10       Q.    Anything else?

11       A.    Copies of paperwork pertaining to the chemical

12   group incentive compensation plan that described the

13   scheme and how it was to be operated, and that's it.

14       Q.    Did you review any of the deposition

15   transcripts of any of the plaintiffs in this case?

16       A.    No.

17       Q.    Did you talk to anybody other than Mr. Seegull

18   or Mr. Raimo to prepare for the deposition?

19       A.    No.

20       Q.    Have you discussed this lawsuit with anybody in

21   general, not necessarily in preparation for the

22   deposition, just general discussions?

23       A.    I've mentioned to colleagues that I am being

24   deposed, yes.



Nick Wilkinson - Wilson

10

1    Q.    But have you discussed the substance of the

2  lawsuit?

3    A.    No.

4    Q.    What is your understanding of this lawsuit?

5    A.    Can you explain the question?

6    Q.    What do you perceive as the cause of action

7  that the plaintiffs are bringing in this case against

8  CSC?

9    A.    Well, I think I understand that they wish CSC

10 to reinstate their incentive compensation scheme for

11 the period of the financial year in which they -- they

12 claim that they were entitled to it.

13   Q.    Do you understand that they are alleging that

14 the AMIP program was removed retroactively from them?

15          MR. SEEGULL:    Objection.    Lack of

16 foundation.

17   Q.    You can answer.

18   A.    I do understand that that's what they are

19 claiming, yes.

20   Q.    Do you currently participate in the AMIP bonus

21 program?

22   A.    I do, yes.

23   Q.    And so you have an understanding as to what

24 that program is?

**W&F**

1    A.    I do, yes.

2    Q.    Can you tell me what your understanding is?

3    A.    It's more than my understanding.  I get a form

4    that lays out the terms in which I participate.  I

5    have received that for the new fiscal year that we

6    have just started and it basically -- the AMIP program

7    is to incentivize -- you know, the title means annual

8    management incentive program.  It is to incentivize my

9    performance and the performance of people I manage to

10   achieve business results for the company.  If we meet

11   the targets measured on an annual basis, we get more

12   money.

13   Q.    And you say you've already received your sheet?

14   A.    Yes.

15   Q.    That sheet, does that set forth the goals --

16   A.    Yes.

17   Q.    -- that you meet?

18   A.    And the amount of money that, if we meet those

19   goals, that I will get paid at a point in the future,

20   yeah.

21   Q.    And do you always get that sheet at this time

22   of year approximately at the beginning of the fiscal

23   year?

24            MR. SEEGULL:  Objection.  Mischaracterizes

Nick Wilkinson - Wilson

12

1  the record.  Lack of foundation.  Go ahead.

2    Q.   When do you normally get that sheet?

3    A.   It's varied.  Sometimes it's been later in the

4  year in the fall.  Typically I would say maybe --

5  maybe October, November time.  Sometimes it's been in

6  the first quarter.  It's really dependent on how the

7  company -- what else has been going on in the company,

8  how certain the company is of the things that it needs

9  to achieve for the year, and also how early in the

10  year the budget process for the year has been

11  finalized.

12    Q.   Do you have an understanding as to when those

13  goals are supposed to be established under the AMIP

14  program?

15    A.   Well, the goals are something that's CSC's

16  decision.  The company is -- in some cases the goals

17  get adjusted as late as -- you know, late in the year

18  if something new comes up that the company wants to

19  have done.

20          Many of the goals are financial

21  objectives.  But they are things that the company

22  wants us to achieve over the course of the year and

23  achieve by the end of year.  So the logical sequence

24  of events is to set the budget, financially set the

Nick Wilkinson - Wilson

13

1   goals, and then set performance, personal objectives

2   to achieve those goals.  Sometimes those things have

3   to be adjusted during the course of the year as

4   performance varies.

5   Q.   But my question is, to your understanding, is

6   there a policy as to when they are supposed to be

7   established, not actually when it has been in practice

8   but when it's supposed to?

9   A.   I'm not aware that there is a policy of that,

10  no.

11              MR. WILSON:  I'd like to have this marked

12  as Wilkinson 1.

13              (Wilkinson Deposition Exhibit 1 was marked

14  for identification.)

15  BY MR. WILSON:

16  Q.   Mr. Wilkinson, you can take your time to look

17  over this entire document.

18  A.   Okay.

19  Q.   I will tell you that my questioning at this

20  time is going to be on IV on the second page, but you

21  can read the whole thing if you want.

22              MR. SEEGULL:  Why don't you let him read

23  the whole thing?

24              MR. WILSON:  Okay.

14

1    A.    You had a specific question for me on IV?

2    BY MR. WILSON:

3    Q.    Yes. . The first paragraph beside IV states,

4    "Awards shall be based on the achievement if

5    preestablished annual financial and individual

6    performance goals as determined by each participant's

7    immediate supervisor at the beginning of each award

8    year."

9         Is that what that says?

10    A.    Yes.

11    Q.    If you look at the first page, under

12    definitions in G, "'Award year' means fiscal year of

13    the company over which the performance of participants

14    and the company is measured for the purpose of

15    determining the annual incentive award earned, if

16    any."

17    A.    Yeah.  That's what it says.

18    Q.    Reading those two paragraphs together, would

19    that not lead to you believe that the goals are to be

20    established at the beginning of the fiscal year?

21         MR. SEEGULL:  Objection.  You've laid no

22    foundation.  You haven't even asked him whether he's

23    ever seen this document or whether he knows what this

24    document is.

Nick Wilkinson - Wilson

15

Q.    Have you seen the document before?

A.    No.

Q.    Can you answer my previous question?

        MR. SEEGULL:  If he hasn't seen the
document before, how does he know what it is?  What
it's referring to?

        MR. WILSON:  I will represent to him that
this was produced in your document production and it's
Computer Sciences Corporation Annual Management
Incentive Plan.

        MR. SEEGULL:  Dated April 2nd, 1983?

        MR. WILSON:  Yes.

        MR. SEEGULL:  Six years before he got to
the company?

        MR. WILSON:  Yes.

        MR. SEEGULL:  What is it you would like to
ask?

        MR. WILSON:  I'm trying to jog his memory
as to when the goals are to be established.

        MR. SEEGULL:  He's already answered that
question.

        MR. WILSON:  I know.  I'm trying to
refresh his memory.

        MR. SEEGULL:  You are trying to refresh

Nick Wilkinson - Wilson

16

1    his memory on a document that was produced six years

2    before he came to the company?

3                    MR. WILSON:  Yes.

4        A.    I have not seen the document before.

5    BY MR. WILSON:

6        Q.    I don't doubt that, but based on these two

7    paragraphs, does that make you recollect when the

8    goals were established?

9                    MR. SEEGULL:  Are you asking, does this

10   change his answer about when he received the goals?

11                   MR. WILSON:  I'm asking what I'm asking.

12   If he doesn't understand the question, he can tell me

13   he doesn't understand the question.

14                   THE WITNESS:  Okay.

15                   MR. SEEGULL:  I'm going to object again.

16   If you understand his question and if you can answer

17   it or if it changes your answer, go ahead.

18       A.    I think I can answer the question in two ways.

19   The management incentive plan is there to incentivize

20   the employees who participate to get the results out

21   of the fiscal year that the company wants to get.

22                   MR. SEEGULL:  Hold on.  He's asking you --

23                   MR. WILSON:  Larry --

24                   MR. SEEGULL:  -- when you --

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

17

1          MR. WILSON:  You can't coach him.

2          MR. SEEGULL:  I'm not coaching.  You asked

3    him --

4          MR. WILSON:  I think you are.  You are

5    interrupting him when he's answering the question,

6    Larry.  Please let him finish the question.

7          MR. SEEGULL:  Hold on.  He is not

8    answering the question.

9          I would like the question repeated.

10          THE WITNESS:  Okay.  Can you repeat the

11    question, then?

12          MR. WILSON:  Can you read the question

13    back, please?

14          (Record read.)

15          MR. SEEGULL:  I'm going to object.  It

16    calls for speculation as to the interpretation of a

17    document that he did not draft and that he was not

18    present for.  It's an unfair question.  You're asking

19    him to speculate as to what it means.  I think you

20    know that's an unfair question.

21          MR. WILSON:  I'll ask the question again.

22    BY MR. WILSON:

23    Q.   Does reading these two paragraphs make you

24    recollect or jog your memory as to when the goals are

**W&F**

Nick Wilkinson - Wilson

18

1    to be established?

2            MR. SEEGULL:  Well --

3    A.    No.

4    Q.    Okay.  So it's your testimony that the goals

5    are not supposed to be established at the beginning of

6    the fiscal year?

7            MR. SEEGULL:  He's given you his answer.

8    Objection.  Asked and answered.

9            MR. WILSON:  You can answer my question.

10           MR. SEEGULL:  He told you there was no set

11   time.

12           MR. WILSON:  He can answer the question.

13           MR. SEEGULL:  He told --

14           MR. WILSON:  I know what he said.

15           MR. SEEGULL:  Then, if you know what he

16   said, then you don't have to ask it again, Tim.

17           MR. WILSON:  I'm asking a different

18   question.

19           MR. SEEGULL:  No.  I think you are asking

20   the same question again.

21           MR. WILSON:  Larry, let me ask my

22   questions.  Okay?

23           MR. SEEGULL:  Go ahead.  Answer again.

24   A.    The goals that are set -- the AMIP is there to

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Nick Wilkinson - Wilson

19

1  achieve goals that the company wants us to achieve.

2  They vary during the course of the financial year.

3  That -- it says that in here.  The paragraph two

4  down --

5           MR. SEEGULL:  If you've answered the

6  question, you don't need to go on.

7           MR. WILSON:  Larry, you can't stop him in

8  the middle of an answer.

9           MR. SEEGULL:  If he's answered the

10 question -- go on.

11          MR. WILSON:  You cannot stop him in the

12 middle of an answer.

13          MR. SEEGULL:  Go ahead.  Go on.

14 BY MR. WILSON:

15    Q.    Please finish your answer.

16    A.    It says it two down that the goals can vary

17 throughout the course of the year.

18          MR. WILSON:  You know, Larry.  This is

19 wrong.  You can't be interrupting your client in the

20 middle of an answer and telling him what to do.

21          MR. SEEGULL:  I'm not telling the witness

22 what to do.

23          MR. WILSON:  You are.  He was answering.

24          MR. SEEGULL:  I'm asking --

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-1223

Nick Wilkinson - Wilson

20

1              MR. WILSON:  For the record, he was

2    answering.  You grabbed the document out of his hand

3    and put it in the middle of the table.

4              MR. SEEGULL:  I'm asking you to move on.

5    You've asked him again and again.  He has answered

6    your question.  You are asking him to opine on a

7    document that predates him by six years.

8              MR. WILSON:  I am not --

9              MR. SEEGULL:  This is a busy senior

10   executive of the company.  We told you he has no

11   personal knowledge related to this case.  I gave you

12   an affidavit where he testified he had no personal

13   knowledge related to the key facts of this case.  I

14   asked you before this deposition, are you going to ask

15   him important questions related to this case?  I said

16   I don't think you are.  I don't think you're going to

17   cover territory that that's relevant because of what

18   he's already testified to.  You said, no, it's going

19   to be -- I think we need to go ahead with the

20   deposition.  I'm going to keep it pretty narrow.  And

21   now you're asking him to opine on a document that

22   predates his time with the company by six years.

23             MR. WILSON:  I'm asking him of his

24   understanding, and I used the document to try to jog

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Nick Wilkinson - Wilson

21

1    his memory.

2           MR. SEEGULL:  How can a document that he's

3    never seen before jog his memory?

4           MR. WILSON:  Because -- Larry, if he's so

5    busy and you want to get out of here, let him answer

6    the question and we'll move on.

7           MR. SEEGULL:  Ask him about his time at

8    the company.  That's what I'd ask you to do.

9           MR. WILSON:  Larry, I'll ask him whatever

10   I want to ask him.

11          MR. SEEGULL:  If you are going to start

12   asking him about things that predate his time at the

13   company, this is going to be a very short deposition.

14          MR. WILSON:  I'm not asking him about

15   things that predate his time with the company.

16          MR. SEEGULL:  Good, then move on.

17          MR. WILSON:  Could you ask the question

18   again or read back the question again?

19          (Record read.)

20   A.   It's my testimony that the goals are

21   established several times, can be varied several times

22   during the fiscal year depending on what the company

23   wants to achieve.

24

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Nick Wilkinson - Wilson

22

1    BY MR. WILSON:

2      Q.    But to your recollection, there is no set time

3    where they are supposed to be set?

4                MR. SEEGULL:  Objection.  Asked and

5    answered.  Go ahead.  Answer again.

6      A.    No.

7      Q.    And the AMIP program follows CSC's fiscal year,

8    correct?

9      A.    That's correct, yes.

10      Q.    And is that from approximately April 1st

11    through March 31st?

12      A.    It was from exactly April 1st to March 31st.

13      Q.    Can you tell me how AMIP bonuses are

14    calculated?

15                MR. SEEGULL:  Objection, vague and

16    ambiguous.  Go ahead.  You can answer.

17      A.    How they are calculated?  It's a mathematical

18    process in the form of an Excel spread sheet.

19      Q.    Are numbers for different things such as

20    earnings accumulated throughout the year and added up

21    to see if you achieve the goals?

22      A.    No.  It's an annual target.

23      Q.    What do you mean by an annual target?

24      A.    What I mean by an annual target is there an

Nick Wilkinson - Wilson

23

1   annual earnings per share target in my form -- I can't

2   talk for everyone else's form, but I know in my form

3   there's an annual earnings per share target.  And we

4   are measured against that annual target.  There's

5   no -- no build up of that.  It's one number.

6        Q.   But the numbers are accumulated throughout the

7   year, throughout the fiscal year?

8        A.   Not on the AMIP, no.

9        Q.   When are they?

10       A.   Can I add to that by way of illustration for

11  this fiscal year?

12       Q.   Sure.

13       A.   Next week on Tuesday -- I believe it's on

14  Tuesday -- the company will announce its annual

15  earnings for the fiscal year that we finished in

16  March.  At that point, we will then be able to

17  calculate the AMIP amounts against that target for

18  people entitled to the AMIP.

19       Q.   But the earnings come there throughout the

20  fiscal year, correct?

21       A.   The company makes profits throughout the fiscal

22  year.

23       Q.   Okay.

24       A.   But the earnings -- the annual earnings per



Nick Wilkinson - Wilson

24

1    share is an annual earnings per share.

2    Q.    For individuals who are not in the AMIP program

3    for an entire fiscal year, are their AMIP bonuses

4    prorated?

5    A.    No.   I don't believe they are.   If somebody

6    quits, leaves, they are not entitled to anything.

7    Q.    If somebody is added halfway through the year,

8    are they entitled to anything?

9    A.    That is a two-part answer.

10    Q.    Okay.

11    A.    They are entitled to participate in the scheme

12    for the period in which they've been with the company.

13    So if, let's say, they join six months in the way

14    through, the maximum they can earn is 50 percent of

15    the total amount that they could get as AMIP.   The

16    targets against which they are measured are the annual

17    targets that everyone was given.

18    Q.    Why is it you stated that, if you're removed

19    from the program, you're not entitled to anything, why

20    is that?

21    A.    Those are the rules.

22    Q.    And where are the rules?   Have you seen the

23    rules?

24          MR. SEEGULL:   I'm sorry.   I don't know

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    that he finished his answer to the last question.  Did

2    you finish your answer to the last question?

3                    THE WITNESS:  What?  About that's the

4    rules?

5                    MR. SEEGULL:  He asked you where are the

6    rules.

7    A.    The rules are in the documentation around the

8    plans.  The rules are in -- in terms of -- I'm

9    guided -- I ask HR.  So if somebody leaves the

10   scheme -- leaves the company throughout the year, as

11   far as I understand it from my HR professionals, that

12   they don't get anything.

13   Q.    So you haven't actually read anything that

14   actually says that?

15   A.    I don't recall reading it, no.

16   Q.    It's just your understanding?

17   A.    Yes.  We did have an employee left the company

18   midway through the year to see -- who was a

19   participant in the scheme and he walked away.  That's

20   the risk you run if you leave the company in the

21   middle of the year.

22   Q.    Do you have an understanding as to why, if

23   somebody comes in halfway through the year, they only

24   get a portion of the AMIP bonus?

Nick Wilkinson - Wilson

26

1    A.    Because they didn't work for the company up

2    until that point.  How could they have contributed to

3    the whole thing if they weren't working for us?

4    Q.    So it's based on contribution?

5    A.    Based on employment with the company.

6    Q.    And participation in the program is supposed to

7    be evaluated annually, correct?

8    A.    Participation in the program is supposed to

9    be -- yes.

10    Q.    Are you notified every year that you are

11    participating in the program?

12    A.    Yes.

13    Q.    Who notifies you?

14    A.    I receive a letter from the president of the

15    technology management group telling me that I'm a

16    participant in the program and the level and

17    subsequently I achieve -- receive a worksheet

18    detailing the components for me.

19    Q.    When did you normally receive the letter?

20    A.    At the annual -- you know, the leaders

21    conference which takes place a few days after Memorial

22    Day.  So it's typically the last week in May.

23    Q.    So you get a letter like this every year?

24    A.    Yes.

1    Q.    If someone is to be added to the program, are

2    they notified immediately?  For instance, if the

3    person comes in half way through the year?

4    A.    If they are a new recruit, then they are

5    notified as part of their joining activity.

6    Q.    If someone is removed --

7    A.    If they were a promotee, then they'll get told

8    that as part of their paperwork to be promoted.

9    Q.    If someone is removed, are they to be notified

10   immediately?

11   A.    If someone had previously been notified that

12   they were in and now are being told that they're out,

13   yes, they should be notified immediately.

14   Q.    Once you're deemed eligible for AMIP, does your

15   participation continue until you're notified that

16   you're no longer eligible?

17   A.    No.  It's an annual scheme.

18   Q.    People who are not going to be participating

19   for the fiscal year, should they be notified in the

20   same way that the people that are notified that they

21   are going to be participating?

22        MR. SEEGULL:  Objection.  Vague.

23   Ambiguous, speculation.

24   A.    I don't understand your question.



WILCOX & FETZER LTD.
Registered Professional Reporters

Nick Wilkinson - Wilson

28

1    Q.    You stated that you get a letter every year

2    telling you that you're participating.

3    A.    Yes.

4    Q.    If people are removed, do they get a similar

5    letter saying you're not participating this year?

6              MR. SEEGULL:   Objection.   Speculation.

7              MR. WILSON:   It's not speculation.

8    A.    I don't know.   I don't know.   I've never been

9    removed from the program.

10    Q.    Is the AMIP bonus part of your salary?

11    A.    No.

12    Q.    What is it if it's not salary?

13    A.    It's an incentive plan to insure that I produce

14    the best possible results for CSC at the end of the

15    year that I can.

16    Q.    Do you earn the bonus?

17    A.    Do I?

18    Q.    Do you earn it?

19    A.    What do you mean by earn it?   Have I been paid

20    it?

21    Q.    No.   Do you earn it in terms of do you work for

22    it?

23    A.    Yeah.   I work my thingies off for it.

24              It is a -- it's an incentive plan.

**W&F**

Nick Wilkinson - Wilson

29

1    Q.    Did any of the plaintiffs in this lawsuit work

2    for you or work under you?

3    A.    None of them were directly in my organization

4    at the time they made this case.

5    Q.    As of September 11th, 2003, did any of them

6    work for you?

7    A.    Not -- none of them were directly in my

8    organization, no.

9    Q.    Did you feel sympathetic to the people that

10    were being removed from the program?

11            MR. SEEGULL:    Objection.    Vague and

12    ambiguous.

13    A.    I was concerned about the changes, what effect

14    the change would have on my performance, myself, and

15    my team and our relationship with our customers.

16    Q.    What were your concerns?

17    A.    My concerns were around the motivation of those

18    employees, attrition, potential attrition, and the

19    fact that many of them -- several of them had close

20    relationships with our clients and that that -- that

21    the effect on their morale would cause a deterioration

22    in our revenues and in our relationship with our

23    customers.

24    Q.    Did you ever speak to anybody about the

Nick Wilkinson - Wilson

30

1    possibility of creating your own program similar to

2    AMIP or using some of the account money in your

3    department to fund payments made to some of these

4    people that were affected.

5                MR. SEEGULL:  Objection.  Compound

6    question.

7    A.    Can you --

8    Q.    Did you ever speak to anybody about the

9    possibility of creating your own programs similar to

10   the AMIP for the people that were affected?

11   A.    No.

12   Q.    Did you ever consider using some of the account

13   money in your department to fund payments for these

14   people that were affected?

15                MR. SEEGULL:  I'm sorry.  Can you read the

16   question, please?

17                THE WITNESS:  I don't --

18                MR. SEEGULL:  Hold on.  I need to hear the

19   question again.

20                (Record read.)

21   A.    No.

22   Q.    Did you ever have any discussions with anybody

23   about setting up any type of program to compensate

24   these individuals that were affected?

**W&F**

31

1              MR. SEEGULL:  Can you repeat the question,

2    please?

3              (Record read.)

4       A.    Can you define what you mean by these

5    individuals that were affected, please?

6    BY MR. WILSON:

7       Q.    The individuals that had been removed from the

8    AMIP program in the middle of the year.

9       A.    No, I didn't.

10      Q.    Did you think it was fair to remove these

11   individuals in the middle of the year?

12      A.    As I have previously said, I was very concerned

13   about the impact that these changes would have on my

14   relationship with my customers and my revenue.  I

15   wasn't in a position to judge whether it was fair or

16   not.

17      Q.    You didn't participate in the decision to

18   remove these people from the AMIP program, did you?

19      A.    No, I didn't.

20      Q.    Did anybody make any statements to you with any

21   concerns about removing these people in the middle of

22   the fiscal year?

23              MR. SEEGULL:  I'm sorry.  Can you read the

24   question?



Nick Wilkinson - Wilson

32

```
 1              (Record read.)

 2    A.    No.

 3  BY MR. WILSON:

 4    Q.    Did anybody state to you that they thought it

 5  might be illegal?

 6    A.    No.

 7    Q.    Do you recall what the payout for fiscal year

 8  2004 was for the chemical group?

 9    A.    Off the top of my head, no.

10    Q.    Was it greater than 50 percent?

11    A.    Yes.

12    Q.    Greater than 75 percent?

13    A.    Yes.

14    Q.    Greater --

15    A.    I believe it was, but I would have to go back

16  and check.   There isn't -- let me clarify.   There is

17  no such thing as a payout for the chemical group.

18  There's payout on AMIP to the individual performer for

19  individuals who were participants in the scheme.   So I

20  can only really answer on the basis of what my payout

21  was.

22    Q.    So there would be -- some of the objectives

23  would be group-wide and then there are individual

24  objectives that would change the payouts, is that
```

33

1  correct?

2    A.    Indeed.

3    Q.    So the only fluctuations would be in the

4  individual portion of the calculation?

5    A.    No.   In some cases the actual financial matrix

6  varies depending on the activity that an individual is

7  actually responsible for.

8            MR. WILSON:  Mr. Wilkinson, that's all the

9  questions I have for you right now.

10            THE WITNESS:  Okay.

11            MR. WILSON:  I appreciate you coming in.

12  Your attorney may have some questions.

13            MR. SEEGULL:  No.  No questions.  Thank

14  you.

15            You have the right to review the

16  transcript to make sure that it was taken down

17  accurately, or you can waive that right.  It is up to

18  you.  I think you might want to read it.

19            THE WITNESS:  Okay.  Sure.  I would like

20  to do that.

21            (Deposition ended at approximately

22  10:30 a.m.)

23

24



WILCOX & FETZER LTD.
Registered Professional Reporters

34

1                          INDEX TO TESTIMONY

2

3    NICK WILKINSON                                    PAGE

4         Examination by Mr. Wilson                      3

5

                              -----

6

                          INDEX TO EXHIBITS

7

8    WILKINSON DEPOSITION EXHIBIT NO.                  PAGE

9    1  Computer Sciences Corporation Annual

        Management Incentive Plan, April 2,1983     13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

State of Delaware   )
                    )
New Castle County   )

### CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 19th day of May, 2006, the deponent herein, NICK WILKINSON, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

DATED:   May 23, 2006

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Hector L. Calderon

820

1   details -- and that was it.  Nothing else.  You would not

2   know my performance.

3       Q.    She was not your manager?

4       A.    No.

5       Q.    So she was like an administrative person?

6       A.    It was called my manager, though.  I would

7   report through her.

8       Q.    You did?

9       A.    Yes.

10      Q.    During these conversations with Mary, she would

11  tell you, well, the categories are changing this year, or

12  you didn't discuss categories?

13      A.    We did, and the categories were always the

14  same.  The categories -- and I was looking at that last

15  night because I do have at least two -- it was the same

16  paper every year, same categories, customer satisfaction,

17  business ethics.  There were two of them, but there were

18  five or six.  So the categories would always be the same.

19  Now, how much weight they would give to each one, that

20  would change every year.

21      Q.    But some years different corporate financial

22  objectives were measured, correct?

23      A.    Correct.  And that was one category, financial

24  objective.  That was one category.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Hector L. Calderon

821

1    Q.   The category, that's what you mean by category.

2    A.   In the discussion we would say, hey, we don't

3 have any control over that, just keep doing what you're

4 doing, we don't have nothing to do with that.  If the

5 company as a whole met, then we get 100 percent.  If the

6 company did not meet that, then we get 85 percent of the

7 total, you know, weight of that category.

8    Q.   Within the category of financial performance,

9 there might be different factors that were used.  Some

10 years return on investment was used?

11    A.   I have no idea what went into that formula.

12    Q.   So you don't know the details of how the

13 formula was calculated at all for any of the years?

14    A.   No idea.

15    Q.   Do you know that the factors changed year to

16 year?

17    A.   Yes.

18    Q.   But you just don't know what the factors were?

19    A.   Correct.

20    Q.   That's on the category of financial

21 performance.  There were other categories of individual

22 performance, I gather?

23    A.   Yes.  And those would be --

24    Q.   Or group performance?



WILCOX & FETZER LTD.
Registered Professional Reporters

Hector L. Calderon

822

1    A.    Both.

2    Q.    And within those categories, did you know the

3  details or you didn't know the details of those

4  categories, either?

5    A.    Those categories, yes.  Those are very

6  important because those were supposed to go -- supposed

7  to affect my increases.  So those were very important to

8  me.  However, the way CSC filled those categories, they

9  sent a memo.  I have the memo from this week.  It says

10  these are your objectives for last year, copy and paste,

11  and hurry up.  I just got one yesterday for this past

12  year.

13    Q.    In other words, the individual performance

14  objectives or the group performance objectives were just

15  sort of the normal group performance --

16    A.    Yes.

17    Q.    -- that was unique to AMIP about those

18  objectives?

19    A.    Correct.  They were separate.  They were

20  separate.  AMIP was one thing and increase was another.

21    Q.    Let me see if I understand, though.  Give me

22  some examples of what the performance objectives were.

23    A.    My performance objectives would be --

24    Q.    Customer satisfaction?



WILCOX & FETZER LTD.
Registered Professional Reporters

Hector L. Calderon

823

1    A.    Yes.  Really stupid.  I'm sorry.  Tell you one

2    example.  It would be put your time on time -- put your

3    time on time every week.

4    Q.    Time entry?

5    A.    Yes.  Okay.  Go to meetings.  Okay.  Like 10 or

6    12 like that.  I did that.

7    Q.    So those were the normal performance objectives

8    that you would have to meet just as part of doing your

9    job?

10    A.    Yes.

11    Q.    And those were the same objectives that were

12    used for the individual performance goals within AMIP?

13    A.    No.  AMIP were totally different.

14    Q.    I'm not talking about the financial objectives.

15    I'm talking about the individual performance objectives.

16    A.    They were different.

17    Q.    Tell me what were the ones for AMIP.

18    A.    The ones I just described were related to my

19    performance for my increases.  That's one thing.  Totally

20    different subject, AMIP.

21              AMIP, we would get a table, looked like a

22    table, and they would have categories, more specific

23    categories, that we as a company would need to meet.

24    Nothing that I had to do specifically.

824

1      Q.    You're talking about the return on investment?

2      A.    Yes, but there were also customer satisfaction,

3    a category for customer satisfaction and another category

4    for business ethics, and I can't remember the other

5    categories, but there were specific categories that had

6    nothing to do with the other.

7      Q.    Did you get that in writing?

8      A.    Sure.

9      Q.    You would get that at the end of the year or

10   the middle part of the year?

11     A.    Both.

12     Q.    Your manager Mary would give you a written

13   document sometime in this October-to-December time frame

14   with written AMIP objectives.

15     A.    Yes.

16     Q.    And that was every year you would get that?

17     A.    Every year.

18     Q.    Those were specific objectives to AMIP you're

19   saying?

20     A.    Yes.

21     Q.    Apart and on top of your normal objectives?

22     A.    Yes.

23     Q.    And that would be for the fiscal year that you

24   were already in and you would have to work towards those



1    in order to be eligible for the AMIP?

2        A.    Correct, yes.

3        Q.    I think it's clear, but I want to make sure.

4    The actual payment of the AMIP bonus would occur in what,

5    the June time frame?

6        A.    Yes.

7        Q.    And that would be the June following the close

8    of the fiscal year?

9        A.    Yes -- no.  It would be the same time period,

10   April through March.  It was just that I would get it

11   late.  We would get it a couple months late.

12       Q.    A couple months after the close of the fiscal

13   year?

14       A.    Yes.

15       Q.    Just as an example, you might receive a payment

16   in June 2003 or May 2003 and that payment would be for

17   the AMIP bonus for the prior fiscal year?

18       A.    Yes.

19       Q.    If you receive a payment in May of 2003, that's

20   for the AMIP period of April 1, 2002, through March 31,

21   2003?

22       A.    Yes.

23       Q.    That would be because the company would need

24   time to calculate whether or not it had achieved and

