Hector L. Calderon

826

1    whether or not you had achieved and your group had

2    achieved all the objectives within the AMIP plan?

3        A.    That's what I thought.

4        Q.    It would take time to calculate it and the

5    books would have to close in the company before they

6    could evaluate and analyze the AMIP?

7        A.    Yes.    That's what I thought.

8        Q.    When they paid the AMIP to you, did you receive

9    a completed worksheet showing how it was calculated?

10       A.    Not how it was calculated.    We were told and

11   the document -- same table that we discussed, the same

12   table would have the percentage that was awarded to each

13   category.

14            So, for example, in the category of return

15   on investment, it would be 85 percent.    That's it.

16   That's all we saw on that table, the percentage, and then

17   the header of that document would have my specific

18   information, my salary, my percentage, my previous, my

19   current, my future salary based on my salary plus the

20   AMIP bonus.

21            It was personal information.    No.    That's

22   not it.

23            MR. SEEGULL:  Let's have this marked.

24            (Deposition Exhibit No. 51 was marked for



827

1    identification.)

2    BY MR. SEEGULL:

3        Q.    I'm now showing you what's been marked as

4    Exhibit 51.  This is a document that you produced to us,

5    I believe, in discovery.  Do you recognize this?

6        A.    Me?  No.

7        Q.    Have you ever seen this document before?

8        A.    This I saw -- I saw yesterday.

9        Q.    Is that the first time you saw it?

10       A.    Yeah.

11       Q.    You're not familiar with this form?

12       A.    No.  I remember seeing it from yesterday.  The

13   reason I was surprised yesterday is because it's the same

14   type of information.  For example, the revenue, OI,

15   margin, DSO, ROI, those were categories in the table and

16   document that I was describing.  The document that I was

17   describing is not this.  This is very pretty.  I wish I

18   had this before.  I never got this.

19       Q.    Let me just see if I understand you correctly.

20   This particular document, Exhibit 51, you've never seen

21   before?

22       A.    Yesterday.

23       Q.    Other than yesterday?

24       A.    I have never seen it before.



Hector L. Calderon

828

1    Q.    But the information in this document you had

2    seen in a different format.

3    A.    Yes.

4    Q.    In other words, you had seen the financial

5    goals and the weightings --

6    A.    Yes.

7    Q.    -- of the different factors for calculation of

8    the AMIP.

9    A.    No.  I did not see the factors.

10    Q.    Tell me what was in this table.  I'm trying to

11    understand what was in this table.

12    A.    And the reason --

13    Q.    Maybe you don't remember.

14    A.    Right.  The reason I hesitate is because the

15    whole table, it was a scribbled piece of paper from my

16    manager.

17    Q.    Handwritten?

18    A.    It was an Excel base spreadsheet but with a

19    whole bunch of marks.  This is the percent that they gave

20    this and this is the number that we give you with

21    the percent that they're telling me that you're going to

22    get.  I'm like okay, 22 percent.  Somewhere in the top

23    there was like the same 22 percent.  It was very

24    confusing.  The document was very confusing.  And it had

**W&F**

829

1   more -- these are -- now that I look at this, these are

2   all the financial goals.

3       Q.    On Exhibit 51 it's only got the financial

4   goals?

5       A.    We have more than financial goals.  In the

6   table I'm describing, the financial goal was only one

7   line.

8       Q.    One section?

9       A.    Exactly, one section.  That was it.

10      Q.    The other sections were I think you said the

11  group goals and the individual goals?

12      A.    Not individual.  It was group -- it would be

13  the same goals for everyone, but it would be related to

14  customer satisfaction, it would be related to business

15  ethics, it would be related to the others I can't

16  remember.

17            So this was only one section.

18      Q.    In the table that you received, it was an Excel

19  spreadsheet with handwriting on it?

20      A.    Yes.  With both, handwriting and the document

21  that came from somewhere.  I don't know who came up with

22  that.

23      Q.    This was presented to you by Mary?

24      A.    Yes.



Hector L. Calderon

830

1    Q.    This was presented to you each year?

2    A.    Yes.

3    Q.    Each year she would go over it with you and

4    explain to you how the AMIP was going to be calculated by

5    CSC?

6    A.    She had no clue.  She was just saying I'm not

7    sure.  This is the numbers Alan gave me and you're

8    getting 22 percent and you did very well,

9    congratulations.  I was like great, 22 percent, I'm

10   happy, let's go.

11   Q.    Is this being done in this October-to-December

12   time frame or is this being done in the May time frame?

13   A.    May time frame.

14   Q.    Were these tables that were shared with you in

15   the October-to-December time frame?

16   A.    Yes.

17   Q.    So in the October-to-December time frame they

18   were shared with you as to what you and the group needed

19   to accomplish?

20   A.    Yes.  It would be empty.  Good point.  The

21   table would be empty.  Only with the categories that we

22   would need to meet but no scribbles.  This is just what

23   we need to work towards.

24   Q.    It didn't show you what you had achieved.  It

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Hector L. Calderon

831

1    only showed you what the goals were.

2        A.    Yes.

3        Q.    Then in May they would come back with the same

4    table basically showing what had been achieved?

5        A.    Yes.

6        Q.    And then showing the total amount for the AMIP

7    that you were going to get?

8        A.    Yes, correct.

9        Q.    You got that each year you're saying?

10       A.    Yes.

11       Q.    In fiscal year 2004 you didn't get one of

12   those, correct?

13       A.    I'm thinking.  I can't remember.

14       Q.    By the way, the targets for each of these goals

15   changed every year.

16       A.    Yes.

17       Q.    That is, return on investment and operating

18   margins and revenue?

19       A.    Yes.

20       Q.    And customer satisfaction targets, all of those

21   changed each year.

22       A.    Yes.

23       Q.    You said that the weightings also changed each

24   year.

Hector L. Calderon

832

1      A.    Yes.  But I would not know the weightings.

2      Q.    That was not something that you knew right

3   away.

4      A.    Correct, yes.

5      Q.    Did you do anything differently as a result of

6   having these discussions or did you just work as hard as

7   you always worked and you didn't change how you worked at

8   all?

9      A.    That's a good question because I -- I was -- at

10   the time I wasn't too excited about my work, so I had

11   interviews with another company.

12      Q.    When is this?

13      A.    In 2004.  Fiscal year 2003.

14      Q.    Do you remember when you had interviews?

15      A.    I can't remember exactly what month, and I

16   tried to find that information, but I can't find it.

17      Q.    How many interviews did you go on?

18      A.    Two -- three.  Two phone and one in person.

19      Q.    This was in the year 2003 you're saying?

20      A.    Yes.

21      Q.    Why do you bring up these interviews?

22      A.    It is important because you asked what I did

23   different, and what I did different was that I did not go

24   to any other company -- to the other company because they

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, *et al.*,          )
                                 )
        Plaintiffs,              )
                                 )
v.                               )    C.A. No. 05-10
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
        Defendant.               )
_____)

**DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant, Computer Sciences Corporation ("CSC"), by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 12, hereby answers Plaintiffs' Complaint.

Defendant generally denies liability as to all counts and all claims. Each paragraph below corresponds to the numbered paragraphs in the Complaint:

1.    Defendant admits that this is an action by twelve current or former employees of CSC seeking recovery of a bonus. To the extent that this paragraph contains additional factual allegations, Defendant denies the remaining allegations in this paragraph.

2.    Defendant admits that Plaintiff Brian Miller was employed as a Senior Manager at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

3.    Defendant admits that Plaintiff Hector Calderon was employed as a Computer Scientist at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

4.    Defendant admits that Plaintiff Charles Folwell was employed as a Senior Computer Scientist at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

5.    Defendant admits that Plaintiff Rolland Green was employed as a Computer Scientist, Work Effort Lead at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

6.    Defendant admits that Plaintiff Dawn M. Hauck was employed as a Senior Manager at some time during her employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

7.    Defendant admits that Plaintiff Kevin Keir was employed as a Computer Scientist at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

8.    Defendant admits that Plaintiff Ashby Lincoln was employed as a Senior Manager at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

9.    Defendant admits that Plaintiff Karen Masino was employed as a Senior Manager at some time during her employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

10.    Defendant denies the allegations in the first sentence of this paragraph. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

B-1255

11. Defendant denies the allegations in the first sentence of this paragraph. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

12. Defendant denies the allegations in the first sentence of this paragraph. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

13. Defendant admits that Plaintiff William Sperati was employed as a Senior Computer Scientist at some time during his employment with CSC. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

14. Defendant admits that its registered agent for service of process in the State of Delaware is CT Corporation System at 1209 Orange Street, Wilmington, DE 19801. Defendant denies the remaining allegations in this paragraph.

15. Defendant denies the allegations in this paragraph.

16. Defendant denies the allegations in this paragraph.

17. Defendant denies the allegations in this paragraph.

18. Defendant denies the allegations in this paragraph.

19. Defendant denies the allegations in this paragraph.

20. Defendant denies the allegations in this paragraph.

21. Defendant denies the allegations in this paragraph.

22. Defendant denies the allegations in this paragraph.

23. At this time, Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

24. Defendant asserts that the letter speaks for itself.

3

25.    Defendant asserts that the letter speaks for itself.

26.    Defendant admits that no Plaintiff was paid an AMIP bonus on March 31, 2004. Defendant denies the remaining allegations in this paragraph.

27.    Defendant incorporates herein by reference the answers, admissions, and denials to paragraphs 1 through 26, as if fully restated.

28.    This paragraph contains no factual allegations to admit or deny, but rather states conclusions of law to which no response is required under the Federal Rules of Civil Procedure.

29.    This paragraph contains no factual allegations to admit or deny, but rather states conclusions of law to which no response is required under the Federal Rules of Civil Procedure.

30.    Defendant denies the allegations in this paragraph.

The unnumbered prayer for relief paragraph contains no factual allegations to admit or deny.  To the extent that this paragraph contains factual allegations, however, Defendant denies the allegations in this paragraph and avers that Plaintiffs are not entitled to the relief prayed for.

## DEFENSES

1.    The Complaint fails to state a cause of action upon which relief can be granted.

2.    Plaintiffs are not entitled, on the law or the facts, to the damages claimed.

3.    Defendant's actions were taken in good faith, without malice and without intent and without willfulness such that the relief sought is not available.

4.    Defendant objects to Plaintiff's request for a jury trial with respect to any claim, issue or element of relief to which Plaintiff is not entitled to a trial by jury as a matter of law.

5.    No contract(s) and/or promise as averred in the Complaint existed and/or was breached.

4

6.    Some or all of Plaintiff's claims are barred by the doctrine(s) of release, estoppel, consent, waiver and/or laches.

7.    The Company will rely on each and every additional defense that may become known to it through the course of this litigation, including discovery, trial, or otherwise.

Defendant denies that Plaintiffs are entitled to any of the relief prayed for.

Defendant denies any allegation not specifically admitted herein.

Defendant reserves the right to amend this Answer to assert different or additional defenses or to otherwise amend any of its denials or averments.

WHEREFORE, having fully responded to the Complaint, Defendant respectfully requests that the Court dismiss Plaintiffs' claims with prejudice, award Defendant its costs and reasonable attorneys' fees incurred in this lawsuit, and allow Defendant such other and further relief as this Court deems just and proper.

Of Counsel:

Larry R. Seegull
DLA PIPER RUDNICK
GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000

Dated: January 18, 2005
666764

POTTER ANDERSON & CORROON

By: _____
    Erica L. Niezgoda (#3986)
    1313 North Market Street
    6th Floor, P. O. Box 951
    Wilmington, Delaware  19801
    (302) 984-6000

    Counsel for Defendant
    *Computer Sciences Corporation*

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of January, 2005, two copies of the foregoing

Defendant's Answer To Plaintiffs' Complaint were sent by first class mail to:

Jeffrey K. Martin
Timothy J. Wilson
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE 19806
Counsel for Plaintiffs.

_____
Erica L. Niezgoda (#3986)

6

B-1259



**CSC**

DEPOSITION
EXHIBIT
53
KAH 3/2/06

# CHEMICAL GROUP

# COMPENSATION PROGRAMS
# NORTH AMERICA

# EMPLOYEE'S GUIDE

# April1, 2001 – March 31, 2002

THIS DOCUMENT IS INTENDED FOR USE BY CSC <u>CHEMICAL GROUP MANAGEMENT ONLY</u>

<u>Please do not disseminate this document throughout the organization.</u>

THIS DOCUMENT WILL BE REVISED AND PUBLISHED ANNUALLY

CSC PROPRIETARY INFORMATION

B-1260

D- 10462
CONFIDENTIAL

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ 2

1. Total Rewards.................................................................................................................. 4

   A. TOTAL REWARDS STRATEGY ........................................................................................ 4
   B. TOTAL COMPENSATION PHILOSOPHY.............................................................................. 4
   C. COMPONENTS OF TOTAL REWARDS ............................................................................... 4
   D. EVOLUTIONARY PROCESS.............................................................................................. 5
   E. FY2002 KEY INITIATIVES ............................................................................................. 5

2. PURPOSE OF THE MANAGER'S GUIDE ..................................................................... 7

   A. ROLE OF THE LEADER ............................................................ ERROR! BOOKMARK NOT DEFINED.

3. BASE SALARY ............................................................................................................... 8

   A. JOB TITLES AND JOB FAMILIES ...................................................................................... 8
   B. CHEMICAL GROUP FY2002 SALARY RANGES ................................................................. 8
   C. MAKING BASE SALARY DECISIONS ............................................... ERROR! BOOKMARK NOT DEFINED.
   D.  FY2002 MERIT CYCLE ............................................................. ERROR! BOOKMARK NOT DEFINED.
      FY2002 Salary Improvement fund ........................................... Error! Bookmark not defined.
      FY2002 Recommended Matrix Guideline ................................. Error! Bookmark not defined.
      FY2002 Salary Increase Recommendations ............................ Error! Bookmark not defined.
      Using SalMan........................................................................... Error! Bookmark not defined.
      Important Dates To Remember ................................................................................ 8
      Questions ? ?........................................................................... Error! Bookmark not defined.

4. CHEMICAL GROUP VARIABLE COMPENSATION PROGRAMS ......................... 10

   ELIGIBILITY FOR ALL INCENTIVE COMPENSATION PROGRAMS............................................. 10
   FY2002 PAYOUT POTENTIAL FOR ELIGIBLE EMPLOYEES ................................................. 11
   ROLE OF THE LEADER ................................................................. ERROR! BOOKMARK NOT DEFINED.
   A. FY2002 INCENTIVE COMPENSATION PROGRAM OBJECTIVES.......................................... 11
      RATIONALE FOR TARGETED OBJECTIVES ........................................................................ 11
   B. ANNUAL MANAGEMENT INCENTIVE PLAN (AMIP) ......................................................... 13
      Background of CSC AMIP ........................................................................................ 13
      Participant Eligibility Guidelines ............................................................................. 13
      FY2002 Chemical Group AMIP Program Design..................... Error! Bookmark not defined.
      FY2002 Principles and Criteria for Participation: ..................... Error! Bookmark not defined.
      Summary of the Annual Management Incentive Plan II (AMIP 2)Error! Bookmark not defined.
      AMIP 2 EPS Measurement ....................................................... Error! Bookmark not defined.
      FY2002 AMIP Target Potential by Salary Grade ..................... Error! Bookmark not defined.
      FY2002 AMIP Payout Methodology.......................................................................... 13
   C. PREMIUM SKILLS PAY PROGRAM................................................................................ 14
      Role of the Leader ................................................................... Error! Bookmark not defined.
      Premium Skills Pay Program Model.......................................................................... 15
      Payout Model for Performance and Salary Range Penetration Components........................ 16
      PSPP Program Design ............................................................................................. 17
      Administrative and Program Guidelines.................................................................... 19
      Definitions and Guidelines ....................................................................................... 19
      Employee Reassessment Process ............................................................................. 19
      Premium Skills Pay Program Administration ............................ Error! Bookmark not defined.
      APPEAL PROCESS................................................................... Error! Bookmark not defined.
      Premium Skills Pay Program Team .......................................................................... 20
      Skills Listing and Program Model.............................................................................. 20
      Identifying the Experts ............................................................ Error! Bookmark not defined.
      SKILLS Description and DEFINITION ...................................... Error! Bookmark not defined.

B-1261

D- 10463
CONFIDENTIAL

*PSPP Skill Codes..................................................................Error! Bookmark not defined.*

5.  ALL STAR RECOGNITION PROCESS..................................................................20
    INTRODUCTION .......................................................................................... 21
    PURPOSE ................................................................................................. 21
    PRINCIPLES .............................................................................................. 22
    WHAT SHOULD BE RECOGNIZED? ................................................................ 22
    KEY ITEMS TO THINK ABOUT WHEN MAKING A NOMINATION: ........................... 22
    HOW WOULD YOU LIKE TO CELEBRATE THE RECOGNITION? .............................. 23
    AWARD CATEGORIES ................................................................................. 23

6.  ADDITIONAL COMPENSATION......................................ERROR! BOOKMARK NOT DEFINED.

B-1262

D- 10464

# 1. Total Rewards

## A. Total Rewards Strategy

The Chemical & Energy Group's Total Rewards Strategy is to associate all cash and non-cash rewards with the achievement of Business Objectives and individual career goals. The strategy is accomplished by creating programs that reinforce the desired employee behaviors and competencies which support our Mission and Vision, Business Strategies, and High Performance Operating Model. The strategy is depicted in the diagram below:



The TOTAL REWARDS program is a package of reward tools designed with a focus on shifting everyone's orientation around cash compensation from one of entitlement to delivering results. In principle, the program will:

- Tie employee total compensation to business objectives by motivating employees to measurably impact short-term and long-term business results.
- Achieve business results through desired behaviors and competencies.
- Promote and require effective team and individual behavior deemed necessary for future success of the account.
- Provide employees with the opportunity to take part in increasing their own employment value.
- Maintain market competitiveness while balancing total compensation between base salary and variable compensation.
- Attract, develop and retain the skills necessary to meet and/or exceed business objectives.
- Shift the organization to a results-oriented and performance-based pay system.

## B. TOTAL COMPENSATION PHILOSOPHY

Our global total compensation philosophy is to pay above the market average and link employee pay to individual, team and account performance for the purpose of attracting and retaining the resources necessary to meet or exceed business objectives. We will balance the elements of our total compensation program by targeting our base salaries at market average and by supplementing base salaries with variable compensation programs that support our business objectives.

## C. COMPONENTS OF TOTAL REWARDS

TOTAL REWARDS incorporates all forms of compensation including but not limited to:

CSC Proprietary Data

4

D- 10465
CONFIDENTIAL

- Base Pay
- Variable and Incentive Compensation
- Premium Skills Pay Program (PSPP)
- Additional Compensation
- The All-Star Recognition Program
- CSC Benefit Plans
- Benefits embedded in CSC policies (Education Assistance, PC Loan, etc.)
- Non-cash awards in the form of personal and professional development, etc.

Our charter is to offer a cadre of reward programs targeted to meet specific business objectives while ensuring that each employee receives fair and equitable treatment for the value he or she adds to the Chemical & Energy Group.

Accordingly, it becomes the responsibility of our leaders to teach, coach and guide the members of their work group to consider and understand the value of their relationship with this Company in total, not simply in terms of their direct pay.

## D. Evolutionary Process

Although implemented, the design of these programs and processes will remain evergreen. The CG Human Resources organization will continually evaluate our pay practices to ensure industry and market competitiveness. This evolutionary process will allow us to continually monitor our internal needs, business objectives and market changes so that we achieve our overall compensation philosophy. Additionally, we will be able to constantly refine and improve employee support processes, such as pay practices, to ensure a continued focus on rewarding people for meeting and/or exceeding business objectives, delivering results, and demonstrating behaviors that advances excellent people treatment.

In FY99, the introduction of the DuPont Account Incentive Compensation Program marked the beginning of this evolution. Our first step defined a process that included all employees in an incentive compensation program, shifted our focus from individual to team based incentives/rewards, and began to change our compensation "mix" from being fixed (base pay) to one that combines fixed and variable (incentive) rewards.

## E. FY2002 Key Initiatives

Several key initiatives took place in preparation to launch FY2002 incentive programs:

- *Anchored base salaries to the Market*: After a thorough review of the market, we established our position vis-à-vis that market. This led us to adjusting the midpoint of two salary grades in the salaried employee structure: S01 and S05. Consequently, the minimums and maximums or the two ranges were also adjusted.
- *Salary Improvement Fund (SIF)*: Engaged in thorough analysis of current business conditions and projections for the current fiscal year. With full understanding of our competitive position in the labor market and results of the business analysis, the SIF for current Merit Cycle is established at 4.0%.
- *Incentive Compensation Program*: The incentive compensation programs will continue to allow for all eligible employees on the CG payroll and CG employees joining GIS prior to April 5, 1999 to participate in an incentive program. This document will provide more insight into this plan and how it links to FY2002 business objectives.
- *Premium Skills Pay Program* – Attracts and retains employees with strategically important skills and competencies. This year the program will introduce a performance and range penetration perspective in the calculation of payout for eligible employees.
- *All Star Recognition Program* – This employee recognition program allows employees to recognize their peers for outstanding contributions and behaviors that support Chemical Group strategies, objectives, operating model and reflect the Cultural Disciplines. This year, an employee action team has been working

B-1264

D- 10466
CONFIDENTIAL

to enhance the programs' cash and non-cash awards. Once enhanced, the new program will be communicated to all Chemical Group Employees.

D- 10467
CONFIDENTIAL

## 2. PURPOSE OF THE EMPLOYEE'S GUIDE

The purpose of this document is to provide CG employees with a description of all Chemical Group Cash Compensation programs including:

- Base Salary
- Chemical Group Incentive Compensation Program
- Annual Management Incentive Program
- Premium Skill Pay Program
- All Star Recognition Program

As you discuss these programs with your manager, it will serve as a reference tool to help you:

- Understand the purpose of our Cash Compensation Programs and why they are part of our Total Rewards offering.
- Fully understand the concept of our Cash Compensation Programs from a business and employee perspective

This document will be revised and published annually so that you are up-to-date on revisions made to our pay practices.

If you have questions or concerns about these programs, please see your manager.

B-1266

D- 10468
CONFIDENTIAL

# 3. BASE SALARY

The Base Salary program at Chemical Group includes the flexibility to accommodate the varied needs of the business. It allows employees to achieve base pay increases based on individual contribution and performance. The program contains salary grades with wide bands that accommodate different technologies and skills found within each job classification and job family.

## A. Job Titles and Job Families

Every hourly and salaried position is classified into a job titles, job family, and salary range. There are 2 job families for **HOURLY** employees. They are the Technician Family and the Administrative and Clerical Family. Within each job family, there are a variety of job classifications, each in one of eleven different salary grades.

There are 4 job families for **SALARIED** employees. They are the Management, Technical, Engineering, and Professional families. Within each job family, there are a variety of job classifications, each in one of eight different salary grades.

The purpose of this structure is to ensure that every job is classified appropriately to determine the relative worth of the job to the organization. Further the structure serves to develop a rational approach to pay and ensure our competitive position in the market.

## B. Chemical Group FY2002 Salary Ranges

Every year, the Human Resources team conducts a market benchmark to ensure our position in the market relative to average base salaries. Once the analysis is concluded, we compare our findings to current salary ranges, specifically, our midpoints. If our midpoints are below market averages, we adjust the midpoints and the minimums and maximums of the ranges.

## C. Making Base Salary Decisions

Within the employment cycle, there are specific times when a manager will make pay decisions. Those times include time of hire, annual merit cycle, promotion, transfer, reclassification., and adjustments in salary for reasons other than those already mentioned.

The Human Resources team and managers have the responsibility to ensure all employees' salaries are commensurate with the competencies and skills they bring to the business. Components considered at the time of pay decisions include:

- Internal equity: salaries of peers performing in the same position with like skills, knowledge, abilities, experiences and education
- Market equity: comparison to market averages
- Compa-Ratio: employee salary versus salary grade midpoint
- Current salary range penetration
- Employment metrics: Human Resources monitors terminations to ensure minimal turnover resulting from inappropriate salaries
- Matrix guideline (during annual salary review only)
- Current business conditions
- Budget

IMPORTANT DATES TO REMEMBER IN THE CURRENT MERIT CYCLE

D- 10469
CONFIDENTIAL

- May 7 - May 28:  Managers conduct appraisal rating and salary increase discussions with employees

- May 12:  Effective date of pay increases

- June 1 - First paycheck with new salary

D- 10470
CONFIDENTIAL