# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRIAN MILLER, *et al.*,

        Plaintiffs,

    v.

COMPUTER SCIENCES CORPORATION,

        Defendant.

Civil Action No. 05-010-JJF

## APPENDIX TO DEFENDANT'S REPLY BRIEF
## IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware 19801
(302) 984-6000 (general)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com


Of counsel:
Larry R. Seegull
Linda M. Boyd
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

Counsel for Defendant
*Computer Sciences Corporation*

Date: June 15, 2006
737189

## TABLE OF CONTENTS

*Jackson v. Commissioner NJSP*,
    2005 U.S. Dist. LEXIS 36399 (D.N.J. Dec. 27, 2005_____ C01

*Fallon v. Ashcroft*,
    2002 U.S. Dist. LEXIS 12202 (E.D. Pa. Jan. 25, 2002)_____ C12

*Seitz v. The Seigfried Group, LLP*,
    2001 Del. Super. LEXIS 364 (Del Super. Oct. 2, 2001)_____ C24

December 5, 2003 Letter Regarding Potential AMIP Litigation_____ C31

LEXSEE

**ROBERT JACKSON, Plaintiff, v. COMMISSIONER NJSP, et al., Defendants.**

Civ. No. 00-4875

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

2005 U.S. Dist. LEXIS 36399

**December 27, 2005, Decided**
**December 27, 2005, Filed**

NOTICE: [*1] NOT FOR PUBLICATION

SUBSEQUENT HISTORY: Partial summary judgment granted by, On reconsideration by Jackson v. Comm'r NJSP, 2006 U.S. Dist. LEXIS 14598 (D.N.J., Mar. 10, 2006)

COUNSEL: For ROBERT JACKSON, Plaintiff: JOHN J. SULLIVAN, DECHERT PRICE & RHOADS, PRINCETON, NJ; MATTHEW V. DELDUCA, DECHERT PRICE & RHOADS, LAWRENCEVILLE, NJ.

For COMMISSIONER NJSP, CARL A. WILLIAMS, Defendant: GEORGE WRIGHT FISHER, JR., ZUCKERMAN & FISHER, LLC, PRINCETON, NJ; VINCENT J. RIZZO, JR., OFFICE OF THE NJ ATTORNEY GENERAL, RJ HUGHES JUSTICE COMPLEX, TRENTON, NJ.

For JAFCA D. MANDZIUK, (official individual), PATRICK J. CALLAHAN, (official individual), ROBERT FRANCES, (official individual), Defendants: VINCENT J. RIZZO, JR., KENNETH B. GOODMAN, OFFICE OF THE NJ ATTORNEY GENERAL, RJ HUGHES JUSTICE COMPLEX, TRENTON, NJ.

For CARL A. WILLIAMS, Defendant: GEORGE WRIGHT FISHER, JR., ZUCKERMAN & FISHER, LLC, PRINCETON, NJ.

JUDGES: Stanley R. Chesler, U.S.D.J.

OPINIONBY: Stanley R. Chesler

OPINION: CHESLER, District Judge

This matter comes before the Court on the motion of Defendants Jafca D. Mandziuk, Patrick J. Callahan, and

Robert Frances (collectively "Trooper Defendants") for partial summary judgment [docket item # 54]. Defendant Carl A. Williams ("Williams") separately moves to (1) amend his Answer to Plaintiff's Amended Complaint [docket item [*2] # 61], and (2) to dismiss Plaintiff's Complaint for lack of jurisdiction or, in the alternative, for summary judgment [docket item # 63]. For the reasons set forth below, the Court holds: (1) Trooper Defendants Motion for partial summary judgement is denied; (2) Defendant Williams' Motion to Amend his Answer is granted; and (3) Defendant Williams Motion to Dismiss is granted.

**BACKGROUND**

The instant lawsuit arises out of an automobile stop made by the Defendants and the subsequent incidents surrounding Plaintiff's arrest. Many of the critical facts in this case are in dispute. The parties do seem to agree, however, on some preliminary facts.

**I. Undisputed Facts**

On January 6, 1999, Robert Jackson ("Plaintiff") was a passenger in a rental car driven by Gregory McCalop ("McCalop"). (Def. Br. 4; Pl. Br. 5.) Plaintiff and McCalop were traveling in a rented Chevy Lumina on Route 78 in New Jersey at around 9:00 in the evening. (Def. Br. 5; Pl. Br. 5.) At that time, Defendant Troopers Callahan and Mandzuik were conducting stationary radar patrol of vehicles traveling westbound on Route 78. (Def. Br. 5; see Pl. Br. 5.) Defendant Callahan observed the Chevy traveling [*3] westbound and clocked its speed at 72 m.p.h. (Def. Br. 6; Rizzo Decl. Ex. 2.) The legal speed limit on that stretch of Route 78 is 65 m.p.h. (Id.) The troopers pulled off the median and began to pursue the car. (Def. Stat. Mat. Facts. P24; Pl. Stat. Mat. Facts. P24.) While in pursuit of the car on Route 78, the troopers did not employ their overhead lights, spotlights, siren or public address system n1. (Pl.'s Stmt. of Mat Facts P30.)

n1 Defendants allege that despite unsuccessful attempts, because of the short distance between the Chevy and the vehicle traveling directly behind it, they were unable to safely move behind Plaintiff's car. (Def. Stat. Mat. Facts. PP29-30.) Plaintiff, however, contends that Defendants never made any attempt to stop Plaintiffs car, in part, because the decision to pull over Plaintiff's vehicle was not made until Defendants learned the occupants race. (See Pl. Stat. Mat. Facts. PP30-40.)

At Exit 11, the Chevy exited Route 78 and pulled into the parking lot of the Busy Bee [*4] Convenience Store ("Busy Bee"), approximately one-tenth mile from the off ramp. (Id. P32; Def. Stat. Mat. Facts P43.) Before the car exited the highway, Trooper Mandziuk observed that the Chevy had Connecticut license plates. (Id. P36.) Unable to exit the highway when the Chevy pulled off, Defendants accelerated the police car to a point on the highway approximately 50 yards ahead. (Def. Stat Mat. Facts P38, 40.) Defendant Callahan then crossed the grass median of the highway and the eastbound lanes of Route 78, and exited the highway at eastbound Exit 11. (Id. P41.) The motivation for Defendants decision to follow the Chevy off the highway is heavily in dispute n2.

n2 In keeping with our obligations under Forbes v. Township of Lower Merion, this Court will identify all disputed material facts relevant to Defendants' qualified immunity defense separately during the discussion *infra* of Plaintiff's individual claims. 313 F.3d 144, 146 (3d Cir 2002).

The Defendants spotted the [*5] Chevy in the parking lot of the Busy Bee convenience store. (Pl. Br. 8.) Defendant Callahan ran a National Crime Information Center ("N.C.I.C") check on the Chevy and learned that it was neither stolen nor involved in any crime. Defendant Troopers Robert Francis and Trooper Kevin Rowe heard the radio call and arrived at the scene shortly thereafter. (Def. Stat. Mat. Facts. P52-3.) The Troopers then entered the Busy Bee to seek the license and registration of the Chevy's driver. (Id. P51, 57.) When asked his name, McCalop falsely identified himself as Gary Ray Devone. (Id. P61.)

The investigation continued back near the Chevy where Defendant Callahan requested McCalop produce his vehicle registration. (Id. P66.) McCalop produced an Enterprise rental agreement which showed the vehicle rented to John Knight, and which did not provide for other authorized drivers. (Id. 67.) Defendant Callahan then questioned Plaintiff and Mr McCalop about the origin, destination and purpose of their trip. (Id. P70.) McCalop then falsely identified Plaintiff as Aaron Johnson. (Id. P71.)

After the initial questioning of McCalop, Defendant Callahan approached Plaintiff and asked [*6] him his name. (Id. P79.) Plaintiff responded that his name was Robert Jackson and advised the officer that he had identification in the trunk of the car. (Id. P80-1.) Plaintiff produced a State of Connecticut, Department of Corrections, Inmate Identification Card confirming his identity as Robert Jackson. (Pl.'s Stmt. of Mat. Facts P83.)

Defendant Callahan received consent from McCalop to search the vehicle. (Id. P89.) During the search, Defendant Callahan found a wallet containing McCalop's drivers license revealing his true identity as Gregory McCalop and not Gary Ray Devone, and McCalop then admitted the same. (Id. PP90-93.)

Defendant Callahan noticed the zipper on Plaintiff's pants was open and did not believe it had been previously open (Id P96-7.) Callahan approached Plaintiff and conducted a pat frisk. (Id. P98.) The motivation for, and the events during the pat frisk are highly disputed between the parties.

After the pat frisk, Plaintiff began to run towards the end of the parking lot. (Id. P104-08.) Defendants Callahan, Mandzuik and Francis immediately gave chase while Callahan commanded Plaintiff to stop. (Id. P105-06.) During the chase, [*7] Defendant Callahan observed Plaintiff drop a small foil package on the ground. (Id. P108.) Plaintiff continued running until he reached a guardrail at the edge of the parking lot. (Id. P109.) When Plaintiff jumped over the guardrail Callahan followed him and then tacked Plaintiff by grabbing hold of his right leg. (Id. P110-11.) Plaintiff broke free of Callahan's grasp, ran forward, and fell down an embankment. (Id P112-13.) Defendants Callahan, Mandziuk and Francis went down the embankment to retrieve the Plaintiff. (Id. P115.) The events that transpired at the bottom of the embankment are heavily in dispute

After being placed in handcuffs, the Troopers assisted Plaintiff up the embankment, brought him to a Troop car, and read him Miranda warnings. (Id. P119.) Defendant Callahan then retrieved the foil package he earlier saw drop from Plaintiffs person. (Id. P121.) The package contained two small bags of a substance later confirmed to be vegetation laced with PCP. (Id. P122.) Thereafter, Plaintiff and McCalop were transported to the Perryville Station.

## II. Procedural History

On or about October 20, 2000, Plaintiff filed his initial [*8] pro se complaint arising out of the January 6, 1999 incident and named as defendants Troopers Mandziuk, Callahan and Francis, and the position of "Commissioner NJSP." On or about May 14, 2004 Plaintiff filed an Amended Complaint removing "Commissioner NJSP" from the case and adding Carl Williams as a defendant in his individual capacity. Trooper Defendants filed the instant Motion for Partial Summary Judgment on or about June 24, 2005. Defendant Williams filed the instant motions to amend his answer and to dismiss on July 8, 2005, and July 22, 2005 respectively.

The Court will turn first to Trooper Defendants Motion for Partial Summary Judgment, then to Defendant William's Motions to Amend his Answer and to Dismiss.

## TROOPER DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT

### I. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. [*9] " Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202, (1986); Kreschollek v. Southern Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The Supreme Court has stated that in evaluating a defendant's motion for summary judgment:

> the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find [*10] by a preponderance of evidence that the plaintiff is entitled to a verdict . .

Anderson, 477 U.S. at 252. A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. See id.

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metapnysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538; see also Anderson, 477 U.S. at 247-48. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match. item for item, [*11] each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), cert. denied, 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

### II. Discussion

Qualified Immunity as to Plaintiff's Federal Claims

Plaintiff's Amended Complaint alleges that Trooper Defendants engaged in selective enforcement, unreasonable search and seizure, and the use of excessive force in violation of 42 U.S.C. § 1983. (Compl. PP13-14.) To recover under § 1983, a plaintiff must establish that a state actor engaged in conduct that deprived him of "rights, privileges, or immunities" secured by the Constitution or laws of the United States. Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000). In the present Motion for Partial Summary Judgment, the Trooper Defendants argue they are shielded from liability by qualified immunity on all constitutional claims brought against them under § 1983.

The doctrine of qualified immunity shields government officials from civil damages under federal law if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) [*12] To determine whether a defendant is entitled to qualified

Page 3

immunity from a civil rights action, the Supreme Court has directed that trial courts conduct a two-step analysis See Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2155-56, 150 L. Ed. 2d 272 (2001). First, the court must determine whether, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." Id. at 2156. If the answer to this threshold question is no, meaning that no constitutional violation has occurred, then the matter of qualified immunity is obviated, and the Court need not inquire further. If, however, it is possible on the facts presented by a plaintiff that a defendant may have violated the plaintiff's constitutional rights, then the court must reach the second step of the analysis.

Step two requires a court to ask whether the right at issue was clearly established at the time of the incident, taking into consideration the specific context of the case. Id. The Saucier court stressed that to ascertain whether a right was clearly established, it must be identified with sufficient particularity so as [*13] to allow the conclusion that a reasonable official was on notice that his or her behavior would violate that right. See id. at 2156-57; Wilson v. Layne, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999); Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 121 S Ct. at 2156. See also Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002).

Though tailored to the factual scenario presented by the plaintiff, the focus of this step is solely upon determining what the law required. See Bennett, 274 F.3d at 136-37. As the Anderson court explained, the very action in question need not have been held unlawful for the right to be considered clearly established. See Anderson, 483 U.S. at 640. Rather, the "clearly established" inquiry addresses the officer's understanding of the legality or illegality of his behavior at the time of the incident. See Saucier, 121 S Ct. at 2156-57; [*14] Wilson, 526 U.S. at 615. A court analyzing the applicability of qualified immunity must look to cases of controlling authority. See Wilson, 526 U.S. at 617. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." See Saucier, 121 S.Ct. at 2156-57.

Importantly, qualified immunity is not a mere defense from liability; it is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). Accordingly, the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation. See Saucier, 121 S.Ct. at 2156.

The responsibility to decide issues of qualified immunity early in the litigation, however, is often in tension with the need to resolve factual disputes relevant to defendant's conduct. In other words, "the standard for granting or denying a motion for summary judgment does not change in the qualified immunity context." Curley v. Klem, 298 F.3d 271, 282 (3d Cir. 2002). [*15] "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis". Id. at 278. Determining the existence of a clearly established right and the objective reasonableness of the defendant's actions are questions of law for the court to decide, but any disputed issues of historical fact relevant to the courts determination must be submitted to the jury. Id; Mantz v. Chain, 239 F. Supp. 2d 486, 495 (D.N.J. 2002). "Where factual issues relevant to the determination of qualified immunity are in dispute, the Court cannot resolve the matter as a question of law" on a motion for summary judgment. Hill v. Algor, 85 F. Supp. 2d 391, 401 (D.N.J. 2000)

Therefore, for purposes of this motion, Defendants are entitled to summary judgment only if this Court determines, based on the undisputed facts in the record, that Defendants reasonably believed that their conduct was lawful in light of clearly established law and information known to them at the time of the alleged [*16] constitutional violation. This Court can not, however, grant summary judgment to the Defendants if disputed issues of material fact exist relevant to the Court's determination of Defendants "objective reasonableness."

### Section 1983 Claim Against Individual Officers Based on Selective Enforcement

Count One of Plaintiff's Amended Complaint accuses Trooper Defendants of violating his Fourteenth Amendment rights guaranteed by the United States Constitution and the equivalent section of the New Jersey State Constitution by subjecting him to unlawful racial profiling (Am. Compl. P77(a)-(d).) Defendants argue that they are entitled to qualified immunity on this claim. (Def. Br. 47.)

The Equal Protection Clause of the Fourteenth Amendment proscribes selective enforcement of the law based upon race. Whren v. United States, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). In order to establish a selective enforcement claim against an officer, a plaintiff must show that "the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose." Carrasca v. Pomeroy, 313 F.3d 828, 834 (3d Cir. 2002).

Page 4

This Court's first analysis is to consider [*17] whether the facts alleged, viewed in a light most favorable to the party asserting the injury, establishes a violation of a constitutional right. Plaintiff's Amended Complaint alleges that on January 6, 1999, while he was a passenger in a car traveling westbound on Route 78, Defendants Callahan and Mandziuk racially profiled him. (Am. Compl. P35-42.) Specifically, Plaintiff alleges that as the police cruiser passed Plaintiff's car, Defendant Mandziuk "craned his neck" to look at who was inside the vehicle driven by Mr. McCallop. (Pl. Stat. of Mat. Facts P5; Am. Compl. P40.) Plaintiff contends that Defendants did not make any efforts to effectuate a stop until they discovered the race of the vehicle's occupants. (Pl.'s Stmt. of Mat. Facts PP23, 30.) Additionally, Plaintiff alleges that Defendants detained and then searched the Plaintiff based on his race and under circumstances in which similarly situated, non-minority persons would not have been searched. (Am. Compl. P77 (b)-(d); Pl. Stat of Mat. Facts P63.)

For purposes of their motion, Defendants argue that assuming *arguendo* Plaintiff can establish discriminatory effect n3, his claim nonetheless fails because he cannot establish [*18] the discriminatory purpose prong. (Def. Br. 50.) The Supreme Court has held that proving discriminatory intent or purpose "implies that the decision-maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' its adverse effects upon an identifiable group." Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).

> n3 The discriminatory effect prong requires a plaintiff to establish that he or she is a member of a protected class and that similarly situated members of an unprotected class were not prosecuted for the same allegedly unlawful conduct Carrasca, 313 F.3d at 834. This can be proven by naming specific members of an unprotected class not selected for the same search, or by submitting statistical evidence of bias Bradley v. United States, 299 F.3d 197, 206 (3d Cir. 2002). Plaintiff's Amended Complaint contains several allegations of a pattern and practice of racial profiling by members of the New Jersey State Police. (Am. Compl. PP6-34.)

[*19]

The record offers conflicting accounts of when the Troopers recognized Plaintiff's race, whether that was a motivator in the decision to stop, and the events that took place at the Busy Bee. Plaintiff contends that Defendants learned the race of the vehicle occupants before making any effort to effectuate a stop. (Pl. Stat. of Mat. Facts. P37.) In fact, Plaintiff alleges that Defendant Mandziuk had determined that the driver of the Chevy was a black male before deciding to pull the car over. (Id.; Mandziuk Dep. 398:24-400:14, Dec. 23, 2004.) Plaintiff cites to Defendant Mandziuk's deposition testimony which provides:

> Q: Is it fair to say that you were able to -- one of the ways in which you were able to recognize that car is that you were able to -- that the same people exiting that car were the same two people that you saw inside the car when you were driving along Route 78?
> A: Yes.
> Q. You recognized the individuals as the same people who were in the car?
> A. From my vantage point they appeared to be the same. It was the same car and everything else, so, yes I would say it was them.
> Q: What were the features that indicated to you that it was the same individuals?
> A: [*20] Well, the color of the car. I knew the driver of the car was a black male. Other than that, I don't know if I remember recalling at least what the driver's shirt was. It's hard -- I don't recall.

Mandziuk Dep. 398:24-400:14. The Defendants, on the other hand, argue that it is "undisputed" that the Troopers did not know the race of Plaintiff or McCallop when deciding to pull over the car. (Def. Stat. of Mat. Facts. P37.) Likewise, Plaintiff contends that Defendants followed him throughout the Busy Bee in a harassing manner customary of a racially motivated drug stop. (Pl. Br. 8). All of the disputed facts bear on the motivations and justifications of the officials who effected the stop, and are thus material to the alleged violation of Plaintiff's right to equal protection. The issues that remain in dispute are necessary to this Court's determination of whether the Trooper Defendants are entitled to qualified immunity and therefore this Court cannot decide the claim on a motion for summary judgment.

Section 1983 Claim Against Individual Officers Based on Unreasonable Search and Seizure

Count One of Plaintiff's Amended Complaint also alleges the Trooper Defendants violated [*21] his Fourth Amendment rights guaranteed by the United States Constitution and the equivalent section of the New Jersey State Constitution by subjecting him to an unlawful pat

down search and an unlawful strip search. (Am. Compl. P77(e)(f).) Defendants contend they are entitled to qualified immunity. (Def. Br. 28.)

The threshold inquiry for this Court is whether Plaintiff's allegations, if true, establish a constitutional violation. Harlow, 457 U.S. at 818. Plaintiff alleges that after the Troopers had searched the rental car, and after Plaintiff had already been subjected to a search by Officer Mandziuk n4, Officer Callahan conducted an improper pat search of Plaintiff and subjected Plaintiff to an unlawful strip search. (Pl. Stat. of Mat. Facts P97.) Plaintiff further alleges that Officer Callahan grabbed and squeezed Plaintiff's groin area in an attempt to locate drugs and not to look for a weapon as Defendants contend. (Id. P98.) When Defendant Callahan felt a bulge in Plaintiff's pants, he ordered Plaintiff to pull down his pants in the parking lot of the Busy Bee. (Id. P100.) Attempting to comply with Defendants order, Plaintiff exposed his genitals in [*22] an effort to show Officer Callahan that he had nothing hidden in his pants. (Id. 101.) The Defendants again ordered Plaintiff to pull down his pants. (Jackson Dep. 215:19-21.)

> n4 Plaintiff contends that at the direction of Officer Mandziuk he had already emptied his pockets and submitted to a patdown search before Trooper Callahan searched him. (Dep. of Jackson 194:12-16, 196:5-7.) Defendants have not moved to dismiss this claim and so for purposes of this motion, viewing the facts in a light most favorable to Plaintiff, the Court will accept this fact.

"A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation." United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004). During the course of the stop, an officer may subject the occupants to a pat down search only if the officer has a reasonable articulable suspicion that the occupants might be armed and dangerous. Id. at 216. Likewise, an officer must have probable cause to [*23] believe that a person possesses weapons or contraband before he may strip-search that person. DiLoreto v. Borough of Oaklyn, 744 F. Supp. 610, 621 (D.N.J. 1990). Therefore, Plaintiff has satisfied the first step by alleging a deprivation of an actual constitutional right.

The second step of the qualified immunity analysis is to determine whether that right was clearly established at the time of the alleged violation. In Terry v. Ohio, the Supreme Court established a strictly limited exception to the Fourth Amendment's general requirement that both probable cause and a warrant are necessary for a search:

> Where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully [*24] limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him

392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Under Terry, a totality of the circumstances test is applied to determine whether reasonable suspicion existed. Id. at 22-24. The Supreme Court later re-emphasized the need to consider all relevant circumstances when examining reasonable suspicions. United States v. Sokolow, 490 U.S. 1, 9, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Defendants do not brief the clearly established prong of their qualified immunity claim. This Court finds that Terry and its progeny provide sufficient guidance to reasonable officers to make clear that searching Plaintiff would only be permissible under the Fourth Amendment if they had a reasonable suspicion of legal wrongdoing and that Plaintiff was armed and dangerous.

Since the law was clear at the time of the alleged violation, Defendants can be granted qualified immunity only if their conduct in searching Plaintiff, even if a violation of the Fourth Amendment, was a violation a reasonable officer could have committed. See Lee v. Mihalich, 847 F.2d 66, 69 (3d Cir. 1988) [*25] Defendants point to the following circumstances and factors to justify their search of Plaintiff: (1) that Plaintiff appeared nervous and was pacing back and forth during the questioning of McCalop; (2) inconsistencies in the stories given by McCalop and Plaintiff regarding their identities, who rented the vehicle, and the origin, destination, and reason for their trip; and (3) Callahan's observation that Plaintiff's pants zipper was open and had not been open previously.

All of the Defendants purported factors, however, are in dispute. In opposition to the claim that Plaintiff seemed nervous, Plaintiff points to Trooper Callahan's inconsistent deposition testimony describing Plaintiff's demeanor as "calm," and then as nervous and tense. n5

(Callahan Dep. Vol. I at 137:22 to 138:8.) The inconsistencies Defendants describe are also in dispute. First, Plaintiff points out that these inconsistencies came from Mr. McCalop and not from Plaintiff. (Pl. Br. 40.) Plaintiff also contends that there were no inconsistencies as to the identity of the car's renter. Rather, Plaintiff claims, McCalop simply could not identify who had rented the car. (Id.) Likewise, Plaintiff claims that both [*26] Plaintiff and McCalop stated that their destination was North Carolina when asked. (Pl. Br. 40 (citing Def. Br. 13-14).)

> n5 The deposition testimony was as follows:
>
> Q: What was Mr. Jackson's demeanor up until this point?
> A: He was -- both of them were calm. I think Mr. Jackson was, I don't know if edgy could be the word that I would use, nervous, pacing and just kind of wound up, but still polite in his demeanor. Not wound up, other than nervous, exhibiting nervous demeanor, just packing and he just seemed tense.
>
> (Dep. of Callahan 137:22 to 138:8.)

The factual predicate of Plaintiff's claim is vigorously contested. These genuine issues of material fact which are a necessary to the determination of the Troopers' right to qualified immunity are issues of fact for the jury and therefore, summary judgment is denied.

Section 1983 Claim Against Individual Officers Based on Use of Excessive Force

Count One of Plaintiff's Amended Complaint accuses Trooper Defendants of using excessive force in violation [*27] of Plaintiff's Fourth Amendment rights. (Am. Compl. P77(g).) A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable. Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999). Defendants claim they are entitled to qualified immunity.

In determining whether the facts alleged establish a claim for excessive force, the Court must determine whether the Troopers "actions [were] objectively reasonable in light of the facts and circumstances confronting [them], regardless of [their] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Whether the force was reasonable will depend on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting or attempting to evade arrest by flight." Id. at 396.

In the instant case, Plaintiff alleges that after he fell down the embankment, Defendant Troopers Callahan, Mandziuk, and Francis followed him. At the bottom of the embankment, [*28] Plaintiff alleges the Troopers beat him with a baton or some other blunt object. Plaintiff further alleges that the Troopers sprayed him with oleo capsicum (pepper) spray while he was curled in a fetal position offering no resistance. The facts, viewed in the light most favorable to Plaintiff, are sufficient to support a claim of excessive force.

The historical facts pertaining to Plaintiff's claim are disputed by Defendants. Defendants contend that any injuries Plaintiff received were a result of his fall down the embankment. Defendants further claim that none of the Troopers were carrying any blunt objects with them during the events of this case. (Def. Br. 43-45.) These disputed issues of material fact regarding Trooper Defendants' use of force are questions which a jury must resolve before this Court can properly determine whether the Troopers are entitled to qualified immunity. Accordingly, the Court will deny summary judgment with respect to Plaintiff's excessive force claim.

## DEFENDANT WILLIAM'S MOTION TO AMEND ANSWER

This case was originally filed by Plaintiff, acting without counsel, in October 2000. This Court appointed counsel for Plaintiff and granted Plaintiff until [*29] May 14, 2004 to amend his Complaint and join new parties. Accordingly, on or about May 14, 2004, Plaintiff filed his Amended Complaint naming Carl Williams, former Superintendent of the New Jersey State Police, as a Defendant. On or about November 29, 2004 Defendant Williams filed his Answer asserting ten affirmative defenses. Defendant Williams, however, did not include an affirmative defense asserting the bar of the statute of limitations. On or about July 8, 2005, Defendant Williams filed the instant motion [docket item # 61] to Amend his Answer to assert the additional affirmative defense of the statute of limitations.

### I. Standard of Review

Rule 15(a) of the Federal Rules of Civil Procedure provides, "a party may amend its pleadings only by leave of court or written consent of the adverse party; and leave shall be freely given when justice so requires." FED.R.CIV.P. 15(a). The decision to grant leave to amend rests within the sound discretion of the trial court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1970). In the absence of undue delay, bad faith or dilatory motive on

the part of [*30] the movant, leave to amend should be freely given. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). The burden to demonstrate good cause to amend is on the movant. Leased Optical Departments-Montgomery Ward, Inc. v. Opti-Center, Inc., 120 F.R.D. 476, 478 (D.N.J. 1988).

A trial court's discretion to grant leave to amend is tempered by considerations of prejudice to the non-moving party. Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 468 (D.N.J. 1990). "In the absence of substantial or undue prejudice, denial must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." Id. Neither incidental delay nor incidental prejudice are a sufficient basis for denial of an amendment; both must be "undue." Id. Incidental delay will be considered undue where the movant cannot satisfactorily explain the delay. Opti-Center, Inc., 120 F.R.D. at 478. Similarly, incidental prejudice "becomes undue when the opponent shows it would be "unfairly disadvantaged or deprived of the opportunity to present [*31] facts or evidence which it would have offered . . . ." Harrison Beverage Co., 133 F.R.D. at 468 (citations omitted).

## II. Discussion

Plaintiff's original Complaint filed in October of 2000 named "Commissioner NJSP" as a defendant. Neither Defendant Williams nor his attorney were ever served or received a copy of the initial pro se Complaint. In Plaintiff's Amended Complaint, Defendant Williams was personally named as a Defendant and served on or about August 6, 2004. Defendant William's attorney knew that the original pro se Complaint named "Commissioner NJSP" as a Defendant but without any specific information, filed Defendant William's answer without an affirmative defense asserting the bar of the statute of limitations. (Certification of George W. Fisher, Esq. PP6-8.) It was not until preparing Defendant William's final pretrial order that counsel realized he had not asserted a statute of limitations defense (Id. P9.) The lapse in time between Defendant William's Answer and request to amend spanned about eight months.

In opposition to Defendant William's motion to amend his answer, Plaintiff first argues that Defendant Williams waived his [*32] statute of limitations defense by failing to timely assert it. (Pl. Br. 2.) Generally, parties are required to assert any affirmative defenses early in the litigation to avoid surprise or prejudice, and to conserve judicial resources. Robinson v. Johnson, 313 F.3d 128, 134 (3d Cir. 2002). Rule 8(c) of the Federal Rules of Civil Procedure provides that: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of limitations . . . and any other matter consti-

tuting an avoidance or affirmative defense." Fed.R.Civ.P.8(c).

Plaintiff cites to numerous cases from other circuits for the proposition that the statute of limitations, as an affirmative defense, is waived if not pled n6. Plaintiff cites to only one Third Circuit case which held that the statute of limitations should be asserted as early in the litigation as possible and that if not promptly plead, the affirmative defense *could* be waived. Robinson, 313 F.3d at 136. It is well established in this Circuit that failure to raise an affirmative defense does not always result in waiver. [*33] Eddy v. Virgin Islands Water and Power Auth., 256 F.3d 204, 209 (3d Cir. 2001); Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991); see also Pro v. Donatucci, 81 F.3d 1283, 1286 n.2 (3d Cir. 1996). Rule 15(a) allows for an amendment of a responsive pleading at any time by leave of court to include an affirmative defense, and "leave shall be freely given when justice so requires." Eddy, 256 F.3d at 209. Leave to amend will generally be allowed unless such amendment would prejudice the opposing party.

> n6 Plaintiff cites to: Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 11 (1st Cir. 2005) (holding that "affirmative defenses must be pled or they will generally be deemed waived and excluded from the case."); Natl Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc., 392 F.3d 520, 526 (2d Cir. 2004) ("Generally, a failure to plead an affirmative defense results in a waiver."); Horton v. Potter, 369 F.3d 906, 911 (6th Cir. 2004) (holding that responses to pleadings must contain all affirmative defenses and that "failure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense.").

[*34]

Plaintiff argues that he will be prejudiced by allowing amendment in this case. (Pl. Br. 6.) A motion to amend should be denied where the non-moving party will be "deprived of the opportunity to present facts or evidence" to rebut a defense." Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc., 663 F.2d 419, 426 (3d Cir. 1981). Prejudice to the non-moving party "is greater where the tardy amendment will require a reopening of discovery, and it is lessened when the new issue presents solely an issue of law to be determined upon application to the existing facts." Harrison Beverage, 133 F.R.D. at 469.

Since discovery has closed in this case, Plaintiff contends that he will be prejudiced if this Court permits Defendant William's to assert his statute of limitations

defense because his ability to respond to the statute of limitations defense would require further development of the facts. (Pl. Br. 7.) Specifically, Plaintiff claims that discovery is necessary on the issue of whether Defendant Williams had actual or constructive notice of the original pro se Complaint and on the role of the Attorney General's Office and [*35] its relationship to the Defendant at the time the original complaint was filed. (Id. 8.) Plaintiff argues that this discovery is necessary to make a sufficient relation back argument under Rule 15(c)(3) in response to Defendant William's Motion to Dismiss.

Rule 15(c)(3) of the Federal Rules of Civil Procedure permits an Amended Complaint to "relate back" to the filing of an earlier complaint where the following conditions are met:

> the amendment changes the party or the naming of the party against whom a claim is asserted if [subsection (c)(2)] is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c)(3). The certification of Defendants counsel in support of Defendant William's motion to amend provides that Defendant Williams had [*36] no notice, prior to he being served in August 2004, that any action had been filed against him. (Cert. P7.) Further, Defendant William's Motion to Dismiss contained an affidavit of Defendant Williams likewise stating that prior to being served with the Amended Complaint, he had no knowledge of Plaintiff's original complaint, nor did he request the Attorney General's Office to provide him with legal representation in the matter or accept service on his behalf. (Williams Aff. PP5-7.) Together, William's affidavit along with the certification of his attorney provide Plaintiff with sufficient information to oppose the statute of limitations defense.

Furthermore, this Court does not find it necessary to grant Plaintiff further discovery on this issue. Any information regarding the way in which the Attorney General's office handled the pro se complaint and what Defendant William's relationship was with the Attorney Generals office at that time would not advance Plaintiffs

argument. Knowledge on the part of the Attorney General's office does not create actual knowledge on the part of Defendant Williams such that he could expect to be sued in his individual capacity. Plaintiff argues [*37] that Defendant Williams may be chargeable with "constructive notice" of the suit relying on Garvin v. City of Philadelphia, 354 F.3d 215 (3d Cir. 2003). Garvin recognized two instances where a court can impute notice under Rule 15(c). The first is the shared attorney method which applies when the originally named party and the party later sought to be added are represented by the same attorney, the "attorney is likely to have communicated to the latter party that he may very well be joined in the action." Id. at 223 (citing Singletary v. Pennsylvania Dept. of Corrections, 266 F.3d 186, 196 (3d Cir. 2001). The second is an "identity of interest" theory available when the parties are so closely related in business or other activities that the commencement of an action against one "serves to provide notice of the litigation to the other." Id. Neither of these two theories are applicable here. Defendant Williams, as sued in his individual capacity, is not being represented by State counsel. Moreover, Defendant Williams as an individual cannot be said to have interest in this litigation so closely related to the State as to share an identity [*38] of interest.

This Court finds that amendment of Defendant William's answer to assert the affirmative defense of the statute of limitations would not cause any undue prejudice to the Plaintiff. This Court is satisfied that under such circumstances, Defendant William's failure to plead his statute of limitations defense in his initial Answer did not effectively waive the defense. Accordingly, Defendant William's motion to amend is granted.

## DEFENDANT WILLIAM'S MOTION TO DISMISS ON STATUTE OF LIMITATIONS GROUNDS

Count Three of Plaintiffs Amended Complaint alleges that Defendant Williams violated 42 U.S.C. § 1983 by permitting and/or encouraging a pattern and practice of illegal racial profiling within the Division of State Police n7. (Am. Compl. P4.) On or about July 23, 2005, Defendant Williams moved to dismiss Plaintiff's Amended Complaint on the theory that Plaintiff's claims are barred by the applicable statute of limitations. (Def. Br 16.)

> n7 Count Four of Plaintiff's Complaint makes an identical claim based upon the New Jersey Constitution. (Am. Compl. P90-3.)

[*39]

## Discussion

Plaintiff's claims against Defendant Williams arise under 42 U.S.C. § 1983. Section 1983 provides for a federal cause of action but does not provide a statute of limitations to govern accrual. Accordingly, the Supreme Court has held that claims under § 1983 are best denominated as personal injury actions and are therefore controlled by a state's statute of limitations for personal injury actions. Wilson v. Garcia, 471 U.S. 261, 280, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985). In New Jersey, that statute is N.J.S.A. 2A:14-2 which provides that any action "for an injury to the person caused by wrongful act, neglect or default . . . shall be commenced within 2 years next after the cause of any such action shall have accrued." See Cito v. Bridgewater Twp. Police Dep't, 892 F.2d 23, 25 (3d Cir. 1989). Thus, for Plaintiff's claim against Defendant Williams to survive, it must have been commenced within two years after its accrual.

Although state limitations periods are applied in § 1983 cases, accrual of a cause of action under § 1983 is a question of federal law. Albright v. Oliver, 510 U.S. 266, 280 n.6, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994); Michaels v. State of New Jersey, 955 F.Supp. 315, 323 (D.N.J. 1996). [*40] Generally, "the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action." Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998). In the present case, the incident forming the basis of the litigation occurred on January 6, 1999. Accordingly, Plaintiff's claim against Defendant Williams likewise accrued on January 6, 1999.

Plaintiff's original pro se complaint naming "Commissioner NJSP" as a Defendant was timely filed on October 20, 2000. Defendant Williams in his individual capacity, however, was not added as a party until May 14, 2004 when Plaintiff filed his first Amended Complaint. The Amended Complaint was filed over five years after the date Plaintiff's injury accrued and was, therefore, untimely.

In opposition, Plaintiff argues that his claim against Defendant Williams in his individual capacity is timely because the addition of Defendant Williams in the Amended Complaint relates back under Rule 15(c)(3) to the date of his original complaint. This Court disagrees.

The "linchpin" of Rule 15(c) is notice. Schiavone v. Fortune, 477 U.S. 21, 31, 106 S. Ct. 2379, 91 L. Ed 2d 18 (1986). [*41] Williams had no actual notice of Plaintiff's original Complaint naming "Commissioner NJSP" as a defendant. (Williams Aff. P5.) Plaintiff argues that further discovery may reveal that Defendant Williams can be charged with constructive notice of the original

complaint based upon the way in which the Attorney General's Office handled the case. (Pl. Br. 8.) Plaintiff's initial pro se complaint asserted claims against the position of "Commissioner NJSP," making it a suit against the superintendent of the NJSP in his/her official capacity. Plaintiff's Amended Complaint removes "Commissioner NJSP" from the case and added claims against Defendant Williams in his individual capacity. The characterization of "official capacity" versus "individual capacity" is not without its practical significance. A suit against a public servant in his official capacity is a suit against the public entity employing the public servant. The real party in interest is the public entity not the public servant. Hafer v. Melo, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). In contrast, a suit against a public servant in his personal capacity looks to impose personal liability on the servant for actions under color of law [*42] and the real party in interest, therefore, is the public servant. Hafer, 502 U.S. at 25. Consequently, Plaintiff's original pro se complaint was against the position of Superintendent ("Commissioner") of the NJSP and, therefore against the State. This type of claim does not provide Defendant Williams with constructive notice of the lawsuit. Thus, Plaintiff's Amended Complaint does not relate back to the date of the original complaint and the § 1983 claim against Defendant Williams is therefore barred by the two year statute of limitations.

## CONCLUSION

For the aforementioned reasons, the Court holds: (1) Trooper Defendants motion for summary judgment is denied; (2) Defendant Williams motion to amend his answer to assert additional affirmative defenses is granted; and (3) Plaintiff's claims against Defendant Williams are barred by the two year statute of limitations. An appropriate order will follow.

12/27/05

Stanley R. Chesler, U.S.D.J.

## ORDER

THIS MATTER having come before the Court upon Defendants Jafca D. Mandziuk, Patrick J. Callahan, and Robert Frances ("Trooper Defendants") motion for partial summary judgment (Docket Item # 54) and [*43] Defendant Carl A. Williams ("Defendant Williams") motion to amend his answer to assert additional affirmative defenses [Docket Item # 61] and Defendant Williams motion to dismiss [Docket Item # 63]; and the Court having considered the submissions of the parties, for the reasons expressed in the Opinion filed herewith, and for good cause shown;

IT IS this 27th day of December 2005,

2005 U.S. Dist. LEXIS 36399, *

**ORDERED** that Trooper Defendants motion [docket item # 54] is **DENIED;** and it is further

**ORDERED** that Defendant Williams motion to amend [docket item # 61] is **GRANTED;** and it is further

**ORDERED** that Defendant Williams motion to dismiss [docket item # 63] is **GRANTED.**

s/ Stanley R. Chesler

United States District Judge

LEXSEE

### JOSEPH R. FALLON v. JOHN ASHCROFT, et al.

### CIVIL ACTION NO. 00 CV 5258

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2002 U.S. Dist. LEXIS 12202

### January 25, 2002, Decided
### January 25, 2002, Filed; January 28, 2002, Entered

**SUBSEQUENT HISTORY:** Affirmed by Fallon v. Meissner, 2003 U.S. App. LEXIS 8277 (3d Cir. Pa., Apr. 30, 2003)

**DISPOSITION:** [*1] Defendant's Motion For Summary Judgment granted.

**COUNSEL:** For JOSEPH R. FALLON, PLAINTIFF: JACQUELINE M. VIGILANTE, LAW OFFICES OF JACQUELINE M. VIGILANTE, MULLICA HILL, NJ USA.

For JOHN ASHCROFT, ATTORNEY GENERAL, RESPONDENT: STEPHEN J. BRITT, U.S. ATTORNEY'S OFFICE, PHILA, PA USA.

For JOHN ASHCROFT, ATTORNEY GENERAL, RESPONDENT: JAMES G. SHEEHAN, U.S. ATTORNEY'S OFFICE, PHILA, PA USA.

**JUDGES:** R. Barclay Surrick, Judge.

**OPINIONBY:** R. Barclay Surrick

**OPINION:**

#### MEMORANDUM AND ORDER

**SURRICK, J.**

**JANUARY 25, 2002**

Presently before the Court is the Government's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56. (Doc. No. 14) and Plaintiff's response thereto. For the reasons that follow, the Government's motion will be granted.

#### Factual Background

Plaintiff Joseph R. Fallon ("Plaintiff") is a fifty-four year old attorney who is employed by the Department of Justice as an Assistant District Counsel in the New York Office of District Counsel of the Immigration and Naturalization Service ("INS"). Plaintiff has been so employed since July 24, 1995. Although Plaintiff works in New York City, he has chosen to reside in Philadelphia and has commuted to New York [*2] City each business day since 1995. Because Plaintiff travels the distance between his residence and workplace by bus, he is perpetually held hostage to the bus schedule. In addition, Plaintiff suffers from a recurring back problem which limits his movement and has created difficulty in certain aspects of his job. For instance, Plaintiff requires full back and lumbar supports in his office chairs and he experiences discomfort in bending down, which makes it difficult for him to reach items that are located close to the ground.

Since 1996, Plaintiff has sought transfer out of the New York Office of District Counsel by applying for vacant positions in other INS offices, including Boston, Philadelphia, and the Eastern Regional Office in South Burlington, Vermont. Plaintiff was not selected for any of the vacancies for which he applied. In most instances he was not advised of his non-selection. Plaintiff alleges that his non-selection was either the result of his age or physical condition and that in each case, a younger worker was transferred or hired to fill the vacancy.

Plaintiff contends that the failure of the INS to transfer him has resulted in the deprivation of income and opportunities [*3] for promotion. He states that the failure of the INS to transfer him to the Philadelphia District Office deprived him of certain benefits such as decreased commuting costs of more than $ 3,000 per year, the ability to work longer hours and take advantage of an alternative work schedule, and additional promotional opportunities. (Pl.'s Response, at X-12.) Similarly, Plaintiff

contends that the failure of the INS to transfer him to the Eastern Regional Office in South Burlington, Vermont deprived him of the ability to work longer hours and save money that he now spends on commuting to New York. He also contends that a transfer to the Eastern Regional Office would have provided him with greater exposure and broader experience and that this, in turn, would have led to additional promotion opportunities. (Pl.'s Response, at X-13.)

On November 3, 1999, Plaintiff initiated contact with an Equal Employment Opportunity Commission (EEOC) Counselor to discuss his non-selections for transfer and his allegation that Defendants have a practice of denying older workers' transfer requests. Plaintiff subsequently filed a formal Complaint of Discrimination with the INS EEO office with respect to these [*4] allegations on January 10, 2000. n1 It appears that no final decision has yet been made with respect to this Complaint. n2 On December 3, 1999, Plaintiff initiated contact with an EEOC Counselor specifically concerning the failure to transfer to Philadelphia. A formal Complaint of Discrimination was filed on March, 14, 2000. No final decision has been made as to this Complaint. Plaintiff also initiated contact with an EEOC Counselor on December 8, 1999 for the purpose of discussing the denial of his transfer request to the Eastern Regional Office in Vermont. A formal Complaint of Discrimination was thereafter filed and was ultimately dismissed as untimely on July 19, 2000. (See Pl.'s Complaint, Exhibits A, B & C).

n1  The formal Complaint originally contained an allegation of class discrimination. However, Plaintiff withdrew this allegation and elected to pursue the denial of transfer on an individual basis only. The Complaint included specific instances of Plaintiff's non-selection for transfer, including his non-selection of transfer to Philadelphia and Boston. (See Pl.'s Response, X-66, and Pl.'s Complaint Exhibit A).

[*5]

n2  The instant action was filed pursuant to 29 C.F.R. § 1614.407(b), which provides that a complainant who has filed an individual complaint may file a civil action in a United States District Court "after 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued." EEOC Federal Sector Equal Employment Opportunity, 29 C.F.R. § 1614.407(b) (2001).

Plaintiff has brought this action against Attorney General John Ashcroft, n3 the Immigration and Naturalization Service, and INS Commissioner Doris Meissner (collectively, "Defendants") pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"). Plaintiff's Complaint alleges that Defendants engaged in employment discrimination on the basis [*6] of both his age and physical disability.

n3  *Plaintiff's original lawsuit named Attorney General Janet Reno as a defendant in this case. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Attorney General John Ashcroft was substituted for former Attorney General Janet Reno.*

*Count I of Plaintiff's Complaint contains non-specific allegations that Plaintiff has not been selected for transfer to any of the vacancies for which he has applied, and that the denial of his transfer requests was due to age discrimination. Although Count I does not refer to any specific instances of age discrimination, Plaintiff's response to Defendants' interrogatories lists twenty-four different instances where he was denied transfer out of the New York office dating back to 1996. n4 Count I is essentially an aggregation of claims for Defendants' refusal to transfer Plaintiff. Plaintiff further alleges in Count I that nearly all requests to transfer from the New York office of the INS made by workers over the age of forty [*7] have been denied while no one under the age of forty who requested a transfer out of the New York office has been denied. n5*

n4  *In their motion for summary judgment Defendants assume that Count I is a "general litany of allegations of nonselection" (Def.s' Mot. for Summary Judgment) that implicitly incorporates claims for every instance of nonselection for transfer since Plaintiff was hired. Plaintiff confirmed Defendants' assessment of Count I in his response to Defendant's motion for summary judgment." (Pl.'s Response at 12, X-9, X-10).*

n5  *Plaintiff repeatedly refers to Defendants' conduct with regard to transfers as a "pattern and practice" of discrimination. Plaintiff's usage of the term "pattern and practice" is not entirely clear. The term "pattern and practice" is used in several different ways in the employment dis-*

crimination context. First, the term "pattern and practice" may be used to describe a type of claim that may be brought by either the federal government or by a party asserting a class-action against an employer. See Vaszlavik v. Storage Tech Corp., 175 F.R.D. 672, 679 (D. Col. 1997). Under this usage, the federal government or party bringing a class-action may bring suit against an employer claiming that the employer has a pattern and practice of employment discrimination. Second, the term "pattern and practice" may be used to identify the type of evidence that may be presented to demonstrate discrimination. Abrams v. Lightolier Inc., 50 F.3d 1204, 1217 (3d Cir. 1995). Under this usage, an individual may use evidence of a pattern or practice to help prove individual claims of discrimination. Lastly, the term "pattern and practice" may be used when a party seeks to invoke the continuing violations doctrine to defeat an affirmative defense of untimeliness. Dunn v. Hercules, Inc., 1994 U.S. Dist. LEXIS 6445, at *3 n.3 (E.D. Pa. May 12, 1994). Under this usage, a party may be able to avoid the effect of the statute of limitations by showing that the otherwise time-barred claims are part of a pattern and practice of employment discrimination that he has only recently become aware of.

Plaintiff's Complaint does not provide useful clues as to the manner in which he uses the term "pattern and practice." Indeed, we note that Plaintiff does not use the term "pattern and practice" in his Complaint, but instead refers to "practices and policies," a term that we interpret to be substantially synonymous with "pattern and practice." At any rate, the parties have apparently agreed in their submissions that the term "pattern and practice" and, by implication, the term "practices and policies," are used as a means of invoking the continuing violations doctrine so as to defeat Defendants' affirmative defense of untimeliness.

[*8]

Count II of Plaintiff's Complaint is a specific allegation of age discrimination for failure to transfer Plaintiff from the New York office to the Philadelphia office. Count III is a specific allegation of age discrimination for failure to transfer Plaintiff from the New York office to the Eastern Regional Office in South Burlington, Vermont. Count IV is a general allegation of discrimination for denying Plaintiff transfer opportunities, promotional opportunities, assignments, and details based upon a disability.

Defendant's motion for summary judgment requests dismissal of Plaintiff's Complaint for two reasons. First, Defendants argue that all but two of Plaintiff's claims related to non-selection for transfer are barred by the statute of limitations. Second, Defendants contend that Plaintiff's claims fail because Plaintiff has not established a prima facie case of discrimination.

**Legal Standard**

In deciding a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, we must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue [*9] as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). We must take all evidence of the nonmovant as true, and draw all justifiable inferences in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Where the record, taken in its entirety, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

**Discussion**

**I. Timeliness of Plaintiff's Claims in Counts I through III**

In Counts I through III, Plaintiff has asserted claims arising under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., for Defendants' refusal to transfer [*10] him on the basis of his age. As above indicated, Count I is a rather amorphous allegation that Defendants routinely discriminated against persons based on age, and that as a result Plaintiff was denied transfer out of the New York office. Although not specifically pleaded in Count I, counsel agree that based upon Plaintiff's interrogatory answers, this Count includes all failures to transfer Plaintiff out of the New York office dating back to 1996. Although Counts II and III allege specific instances of age discrimination, they are redundant, as these claims of age discrimination are pled, if but vaguely, in Count I. Counts II and III are merely a restatement of claims already included in Count I through the answers to interrogatories. The timeliness of claims included in Count I will ultimately be dispositive of the timeliness of the same claims in Counts II and III.

2002 U.S. Dist. LEXIS 12202, *

*A federal employee complaining of age discrimination has two routes by which he may seek relief. Stevens v. Dep't of Treasury*, 500 U.S. 1, 6, 114 L. Ed. 2d 1, 111 S. Ct. 1562 (1991). An aggrieved individual may either invoke the EEOC's administrative process and then file an action in federal court if [*11] he is not satisfied with the administrative remedies or he may simply decide to litigate the merits of his claim in a federal court in the first instance. 29 U.S.C. § § 633a(b) & (c) (1994 & Supp. V 1999); *Stevens*, 500 U.S. at 5-6. Regardless of whether the aggrieved individual chooses to pursue an administrative remedy or to litigate his claim in federal court, he must he must first consult with a Counselor prior to filing the complaint in an attempt to informally resolve the matter. This initial informal complaint to a counselor must occur within forty-five days of the date of the alleged discrimination. 29 C.F.R. § 1614.105 (2001); n6 *Bohac v. West*, 85 F.3d 306 (7th Cir. 1996) (administrative time limits under ADEA are statutes of limitation); *Robinson v. Dalton*, 107 F.3d 1018 (3d Cir. 1997) (plaintiff must exhaust required administrative remedies before seeking judicial relief); *Arizmendi v. Lawson*, 914 F. Supp. 1157 (E.D. Pa. 1996). n7 After consulting with a Counselor, the aggrieved individual may file an administrative complaint. If there has been no decision after [*12] 180 days from the date the individual filed the administrative complaint, the individual may bring an action in federal district court. 29 C.F.R. § 1614.407. Alternatively, if after consulting with a Counselor the individual decides not to pursue a remedy for alleged age discrimination through the administrative process, he may file a lawsuit under the ADEA. However, he may not commence the civil action until he has given the EEOC not less than thirty days notice of his intent to sue. 29 C.F.R. § § 1614.105(b)(1) & 1614.201(a). This notice must be filed within 180 days after the alleged unlawful practice occurred. 29 U.S.C. § 633a(d).

n6 Section 1614.105 entitled Pre-Complaint Processing provides:

(a) Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.

(1) An aggrieved person must initiate contact with a Counselor

within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of action.

[*13]

n7 The forty-five day period of limitations contained in 29 C.F.R. § 1614.105 also applies to claims under the ADA and Rehabilitation Act. *See Trumbull v. Shalala*, No. AW-99-34-1, 2000 U.S. Dist. LEXIS 20584 at *11 (D. Md. June 21, 2000); *Peterson v. Henderson*, No. 97-75481, 1998 U.S. Dist. LEXIS 18964, at *13-14 (E.D. Mich Nov. 13, 1998); *Miller v. Cohen*, 52 F. Supp. 2d 389 (M.D. PA. 1998).

Defendants contend that with two exceptions, all of the non-selections in Count I, as well as the non-selection alleged in Count III, preceded Plaintiff's informal complaint by more than forty-five days and are therefore barred by the limitations period contained in 29 C.F.R. § 1614.105(a)(1). Defendants concede that the claims in Counts I and II based upon the requested transfers to Boston in 2000 and Philadelphia in 1999 are timely. Defendants first raised the timeliness issue in their motion for summary judgment and did not plead the period of limitations as an affirmative defense in their Answer [*14] to Plaintiff's Complaint.

Plaintiff argues that although he did not comply with the forty-five day limitation period, his claims are not time-barred for the following reasons. First, Plaintiff argues that Defendants have waived their right to raise the period of limitations at this stage of the litigation by not including it as an affirmative defense in their Answer. Second, Plaintiff argues that the INS accepted his Complaint of Discrimination, which included the allegations made in Count I, and thereby made a decision not to dismiss the allegations for failure to comply with the period of limitations. Plaintiff contends that this constitutes a waiver of any potential statute of limitations defense. Third, Plaintiff argues that the doctrine of continuing violation should be applied in this case to render Plaintiff's otherwise untimely allegations timely. Finally, as to Plaintiff's non-selection for transfer to the Eastern Regional Office in Vermont, Plaintiff argues that the doctrine of equitable tolling or equitable estoppel renders this claim timely.

**A. Waiver of the Statute of Limitations Defense by Failure to Plead**

Page 4

Federal Rule of Civil Procedure 8 requires that a [*15] defendant answering a complaint set forth any affirmative defenses such as the statute of limitations. Fed. R. Civ. P. 8(c). The Third Circuit "has taken the position that whether an affirmative defense that must be pleaded in the answer is waived will depend on whether the defense was raised 'at a pragmatically sufficient time' and the plaintiff was prejudiced in the ability to respond." *Pro v. Donatucci*, 81 F.3d 1283, 1286 n.2 (3d Cir. 1996) (quoting *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991)); *see also Turiano v. Schnarrs*, 904 F. Supp. 400, 405-406 (M.D. Pa. 1995) (permitting an affirmative defense of qualified immunity to be raised for the first time in defendant's motion for summary judgment because it was done in a pragmatically sufficient time); *Petock v. Thomas Jefferson Univ.*, No. 84-5937, 1986 U.S. Dist. LEXIS 30246, at *3 (E.D. Pa. Jan. 21, 1986) ("A defendant may raise an affirmative defense for the first time by way of summary judgment and a court so grant only if there are no genuine issues of material fact, if the plaintiff is not prejudiced by the raising of the defense on summary judgment, [*16] and if the defendant is entitled because of the newly raised defense to summary judgment as a matter of law.").

It is apparent that Defendants failed to plead the statute of limitations as an affirmative defense. However, it is equally apparent that Plaintiff has not been prejudiced by Defendants first raising the untimeliness of Plaintiff's claims in their motion for summary judgment. *Compare Regal Indus., Inc v. Genal Strap, Inc*, No. 93-0209, 1994 U.S. Dist. LEXIS 10193 (E.D. Pa. July 26, 1994) (finding waiver of affirmative defense of statute of limitations where it was first asserted after trial on a motion to alter or amend the judgment) *with Harris v. Mercy Health Corp*, No. 97-7802, 2000 U.S. Dist. LEXIS 11228, at *18-19 (E.D. Pa. Aug. 10, 2000) (noting that where plaintiff previously argued against the limitations defense in his brief in response to defendant's motion to dismiss, there was presumably no surprise or prejudice). Defendants have set forth the period of limitations defense in their motion for summary judgment and Plaintiff has had ample opportunity to respond to Defendants' arguments. The lack of prejudice is demonstrated by [*17] the fact that Plaintiff has taken full advantage of the opportunity to present his position on the matter in his response to Defendants' motion. The affirmative defense was therefore raised in a pragmatically sufficient time for Plaintiff to fully and thoughtfully respond. *See Harris,* 2000 U.S. Dist. LEXIS 11228, at *18-19. Under the circumstances, we will deem Defendants' Answer amended to include the affirmative defense of the statute of limitations. *See Aubrey Rogers Agency, Inc v. AIG Life Ins Co.*, 55 F. Supp. 2d 309, 315 (D. Del. 1999); *Pantzer v. Shields Dev. Co.*, 660 F. Supp. 56, 61 (D. Del. 1986).

**B. Waiver of Timeliness Requirement at the Administrative Level**

When the INS accepted Plaintiff's formal Complaint of Discrimination on January 10, 2000, it failed to dismiss the complaint as untimely in accordance with 29 C.F.R. § 1614.107(a)(2). n8 Plaintiff contends that this constituted a decision not to dismiss the allegation for failure to comply with applicable time limits, thereby waiving the statute of limitations as a defense to Plaintiff's claims. This argument is without merit. [*18]

> n8 29 C.F.R. § 1614.107(a)(1) provides that an agency shall dismiss a complaint that "fails to comply with the applicable time limits contained in § § 1614.105, 1614.106 and 1614.204(c), unless the agency extends the time limits in accordance with § 1614.604(c), or that raises a matter that has not been brought to the attention of a Counselor and is not like or related to a matter that has been brought to the attention of a Counselor."

By accepting the complaint, the INS did not waive the timeliness requirement. "An agency does not waive a timeliness defense merely by accepting or investigating a discrimination complaint." *Smith v. Danzig*, No. 00-216-P-H, 2001 U.S. Dist. LEXIS 10262, at *32 (D. Me. July 20, 2001); *see also Ester v. Principi*, 250 F.3d 1068, 1072 n.1 (7th Cir. 2001) ("We do not . . . reject the well-settled rule that agencies do not waive a timeliness defense merely by accepting and investigating a discrimination complaint."). Plaintiff [*19] first contacted a Counselor on November 3, 1999. Plaintiff then proceeded to file the Complaint of Discrimination on January 10, 2000. Plaintiff offers nothing more than the fact that he was permitted to file a formal complaint, that he did file a formal complaint, and that this formal complaint was assigned a particular number. There is no suggestion that the INS ever addressed the merits of the complaint or made an explicit finding with regards to its timeliness. The lack of an explicit finding of timeliness or a decision on the merits compels the conclusion that the timeliness defense was not waived by Defendants. *See Ester,* 250 F.3d at 1071-72.

**C. Doctrine of Continuing Violation**

"Under the continuing violation doctrine, if a plaintiff has expressed a "continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it," *Fitzgerald v. Henderson* 251 F.3d 345 (2d Cir. 2001). The application of the con-

tinuing violation doctrine permits Plaintiff to pursue otherwise time-barred claims if he can demonstrate that the alleged wrongful [*20] conduct is part of an ongoing pattern and practice of discrimination by Defendants. *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 480-81 (3d Cir. 1997). In determining whether Plaintiff has demonstrated a continuing violation, we apply the three factor analysis set forth in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971 (5th Cir. 1983), as approved by the Third Circuit. *See Rush*, 113 F.3d 476 at 481.

> This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, [*21] or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? As noted, the particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula.

*Berry*, 715 F.2d at 981-82 (footnote omitted).

Plaintiff contends that all of the alleged violations at issue involve the same type of discrimination which was of a recurring nature and which lacked the degree of permanence that would have triggered Plaintiff's awareness of his rights. Plaintiff argues that a sufficient degree of permanence is not present because he was not informed that he had not been selected for many of the positions for which he applied, that someone else had been selected, or of the reasons for his non-selection. In other words, Plaintiff argues that because he was not aware that employment decisions had been made by the

INS or the basis for those decisions, he could not have been expected to initiate contact with a counselor in a timely fashion.

We are satisfied that the continuing violation [*22] doctrine has no application in this case. The facts of this case are such that a reasonable person should have been aware of his duty to assert his rights. Although the acts alleged by Plaintiff do concern the same type of discrimination occurring over a period of time, this does not automatically transform the alleged acts into a continuing violation. *See Berry*, 715 F.2d at 981-82. Each denial of a transfer application was a discrete event. Even if Plaintiff was not notified that he was not selected for transfer, the lengthy passage of time was sufficient to put Plaintiff on notice that his various applications had not been approved. It is important to note that Plaintiff was denied transfer out of the New York office on no fewer than nineteen occasions before 1999. Seventeen of these denials occurred before 1998. Surely Plaintiff was aware, or at the very least should have been aware, that he had not been selected for the positions after the lapse of months and years. Even though Plaintiff may not have been informed of his non-selection, the non-selection would certainly have achieved a sufficient degree of permanence over time and should have triggered Plaintiff's [*23] awareness of and duty to assert his rights. *See Rush*, 113 F.3d 476 at 481; *Berry*, 715 F.2d at 981-82. Moreover, given the extensive list of denied transfer requests, Plaintiff should have been aware that he could expect future transfer requests to be denied as well. Indeed, either the sheer volume of denials or the lengthy passage of time should have been sufficient to have put Plaintiff, an attorney, on notice of the duty to assert his rights. [n9] Plaintiff did not initiate the complaint process when he should have been aware of his duty to do so. Under the circumstances, the continuing violation doctrine cannot be applied to resurrect Plaintiff's untimely claims in this case. *See Rush*, 113 F.3d 476 at 481.

> n9 Plaintiff is an attorney with eighteen years experience who is licensed to practice law in five states. He has a Juris Doctorate Degree, Master of Arts Degree in Industrial Relations and a Master of Law Degree in Labor Law from Georgetown University. He has been a supervisor in the litigation department of a major insurance company, has represented both labor and management in arbitration, mediation and collective bargaining and has taught courses in labor management relations, human resources management and collective bargaining.

[*24]

As reflected in the answers to interrogatories, of the twenty-four positions that Plaintiff has applied for since 1996, Plaintiff has sought informal counseling or otherwise made an administrative complaint on three occasions. These occasions are: (1) November 3, 1999, after Plaintiff's application to transfer to Philadelphia was denied on October 6, 1999; (2) December 9, 1999, approximately one year after his application to transfer to Vermont had been denied in December of 1998; and (3) November 13, 2000, after his application to transfer to Boston was denied on or about October 5, 2000. On only two of these occasions -- the November 3, 1999 denial of his application to transfer to Philadelphia and the November 13, 2000 denial of his application to transfer to Boston -- did Plaintiff seek informal counseling within the forty-five day period provided by 29 C.F.R. § 1614.105. Clearly, the only timely claims relate to these two denials.

### D. Doctrine of Equitable Tolling

Plaintiff argues that the doctrine of equitable tolling or equitable estoppel n10 compels a finding that the complaint process was timely initiated with respect to the Assistant [*25] Regional Counsel position at the Eastern Regional Office in Vermont. "Equitable tolling stops the running of the statute of limitations in light of established equitable considerations." *New Castle County v. Halliburton Nus Corp.*, 111 F.3d 1116, 1125 (3d Cir. 1997). Equitable tolling may be appropriate "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994). For equitable tolling to apply, Plaintiff need only show that he could not have discovered essential information bearing on his claim through the exercise of reasonable diligence. 38 F.3d 1390.

> n10 The Third Circuit treats equitable tolling and equitable estoppel as two sides of the same coin. *See Courtney v. La Salle Univ.*, 124 F.3d 499, 505 (3d Cir. 1997).

### [*26]

We are satisfied that the facts proffered by Plaintiff, like the facts in *Oshiver,* do not support the application of equitable tolling. In *Oshiver* the plaintiff brought suit against the defendant law firm claiming, among other things, discriminatory failure to hire. The plaintiff alleged that in May, 1989, she applied for a position as an associate attorney with defendant. The plaintiff was in-

stead hired as an hourly attorney, having been informed by the defendant that there were no salaried positions available at that time. The defendant did advise her, however, that she would be considered for an associate position if one became available. A little over one year later, in April, 1990, the plaintiff was dismissed with the explanation that the firm did not have sufficient work to sustain her position as an hourly employee, but that if additional hourly work or an associate position became available, the defendant would contact her. In May, 1991, plaintiff learned at an unemployment compensation benefits hearing that shortly after her dismissal defendant hired a male attorney to take over her duties as an hourly employee. Nearly six months after learning of this information, [*27] the plaintiff filed an administrative complaint alleging that her dismissal was the product of gender discrimination. Subsequently, in January, 1992, the plaintiff learned that defendant hired a male attorney as an associate in May, 1991, without notifying her that an associate position had become available. The plaintiff then amended her administrative complaint to include a claim of discriminatory failure to hire. In considering whether the plaintiff's claims were time-barred, the Third Circuit concluded that the equitable tolling doctrine was inapplicable to the plaintiff's failure to hire claim. The decision was based squarely upon the fact that nowhere in the plaintiff's complaint did she allege that the defendant misled her, actively or otherwise, with respect to its failure to hire. The court stated that "at most, Oshiver alleges that the firm concealed from her the fact that an associate opening arose. To be activated, equitable tolling requires active misleading on the part of the defendant. The type of concealment Oshiver alleges is ... qualitatively different from taking affirmative steps to mislead." *Oshiver*, 38 F.3d at 1391 n.10.

In the instant case, [*28] we have no concealment or misleading. Plaintiff applied for a transfer to the position of Assistant Regional Counsel in the Eastern Regional Office in South Burlington on or about November 9, 1998. In late December, 1998, Plaintiff was notified that the position had been filled by another INS attorney. On or about January 4, 1999, Plaintiff made inquiries regarding the selected candidate in order to determine whether any discriminatory action had occurred. Plaintiff was advised that the selected candidate was "senior" and "experienced." Although Plaintiff was apparently unsatisfied with the response he did not request additional information through the Freedom of Information Office until October of 1999. On November 3, 1999, Plaintiff received information pursuant to this request revealing that the "senior" and "experienced" person originally selected for the vacancy, Mr. McGrath, had declined the position and that it had then been offered to another candidate, Mr. Muther, who is younger than Plaintiff. n11

After receiving this new information, Plaintiff initiated a claim in November, 1999.

>  n11 This alternate candidate entered duty on March 15, 1999.

[*29]

Plaintiff contends that he had no reason to know of his ADEA claim at the time he was notified of his non-selection in December, 1998. Plaintiff also argues that as of December, 1998, Plaintiff did not have any experience with the filing requirements to perfect a complaint of age discrimination and that this should be a factor in considering whether equitable tolling applies to Count III. n12

>  n12 As mentioned above, Plaintiff is an experienced attorney not an unsophisticated litigant. Nonetheless he contends that because he had no experience or actual or constructive knowledge of the filing requirements, the Court should consider this as a factor in whether equitable tolling applies in this case. We do not believe that we should disregard the period of limitation provided for by federal regulations simply because plaintiffs contend that they have no actual or constructive knowledge of the filing requirements.

We are compelled to conclude that Plaintiff has not shown the requisite "active misleading" on the part [*30] of Defendants necessary to invoke the equitable tolling doctrine. *See Oshiver*, 38 F.3d at 1391 n.10. There is no indication that Plaintiff was being misled when he inquired into the identity of the successful candidate on January 4, 1999. Although Plaintiff was not satisfied with the amount of information that he received from his inquiries, and subsequent information revealed that the position was ultimately awarded to another candidate, there is no indication that McGrath had already declined the position on January 4, 1999. In fact, on January 7, 1999, Muther sent a "cc: mail" to Rachel McCarthy expressing his disappointment that he had not been chosen for the position. Plaintiff has offered no evidence to indicate that McGrath had declined the position as of January 4, 1999 and that Plaintiff had been actively misled. Accordingly, the doctrine of equitable tolling does not apply in this case.

## II. Plaintiff's Prima Facie Case under the ADEA and Rehabilitation Act

The only claims in Plaintiff's Complaint that are not time-barred under the foregoing analysis are the claims related to the denial of transfer to Philadelphia and the claims related to the [*31] denial of transfer to Boston. Defendants argue that Plaintiff has failed to establish a prima facie case of employment discrimination under both the ADEA and the Rehabilitation Act and that they are therefore entitled to summary judgment on these claims. For the reasons hereinafter discussed, we are compelled to conclude that Plaintiff has failed to establish a prima facie case of either age or disability discrimination because he cannot demonstrate that he suffered an adverse employment action, an essential element of both claims.

### A. Prima Facie Case: ADEA

When evaluating a claim under the ADEA, the Third Circuit has applied a "slightly modified version" of the three-step test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). n13 *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). "First, the plaintiff must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case." *Id.* To establish a prima facie case of employment discrimination under the ADEA, Plaintiff must show [*32] that (1) he is a member of a protected class (i.e., that he is over age forty), (2) that he was qualified for the position at issue, (3) that he suffered an adverse employment action, and (4) that he was ultimately replaced, or the position was filled by a younger person. *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973 (3d Cir. 1998). "If the plaintiff offers sufficient proof of these elements, step two is reached. The burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the [act]." *Keller*, 130 F.3d at 1108.

>  n13 We note that although Plaintiff has pled in Count I of his Complaint that Defendants had a policy and practice of discriminating against older employees, this does not entitle Plaintiff to show employment discrimination through the method of proof recognized in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977). *Cooper v. Diversicare Mgmt. Servs. Co.*, 115 F. Supp. 2d 1311, 1322 n.13 (M.D. Ala. 1999) (citing *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760-61 (4th Cir. 1998)).

[*33]

### B. Prima Facie Case: Rehabilitation Act

In Count IV, Plaintiff claims that Defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., by discriminating against Plaintiff on the basis of his perceived disability. n14 Plaintiff contends that this alleged discrimination was manifested in the terms and conditions of his employment, including transfer opportunities, promotional opportunities, assignments, duties, and details. Defendants argue that Plaintiff has failed to establish both the requisite knowledge of his disability on the part of the managers of the offices to which he applied for transfer and that Plaintiff has experienced an adverse employment action by not being selected for transfer.

n14 The ADA prohibits covered entities from discriminating against qualified individuals with a disability because of the disability in regard to the terms, conditions, and privileges of employment, including job application procedures, the hiring, advancement, or discharge of employees, employee compensation, and job training. See 42 U.S.C. § 12112 (1994). Under the provisions of the ADA, the United States is not a covered entity. See 42 U.S.C. §§ 12111(2) & 12111(5)(B)(i) (1994). Therefore, the ADA does not provide Plaintiff with a cause of action and Plaintiff's claim for discriminatory conduct based on his perceived disability is appropriately brought under the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq. Nevertheless, the ADA is an important source of applicable law insofar as the Rehabilitation Act mandates that "the standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111. et seq.) and the provisions of sections 501 though 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment." See 29 U.S.C. § 791(g) (1994 & Supp. V 1999). Thus, while Plaintiff's claim in Count IV is not actionable under the ADA, the ADA provides the applicable law for a claim arising under the Rehabilitation Act.

[*34]

In the absence of direct evidence of discrimination, the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) is applicable to Plaintiff's claims under the Rehabilitation Act and ADA. See Newman v. GHS Os-

teopathic, 60 F.3d 153, 157-58 (3d Cir. 1995). Under the McDonnell Douglas framework, Plaintiff has the initial burden of establishing a prima facie case of discrimination under the ADA. Olson v. GE Aerospace, 101 F.3d 947, 951 (3d Cir. 1996). To establish a prima facie case of discrimination based upon disability under the ADA, Plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is qualified for the essential functions of his job with or without reasonable accommodation, and (3) that he suffered an adverse employment action because of his disability. See Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001) (stating the elements for a prima facie case under the ADA). The term "disability" means (1) having a physical or mental impairment that substantially limits one or more of the major life activities [*35] of such individual, (2) a record of such impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2) (1994). Here, Plaintiff alleges that he was regarded as disabled by Defendants. n15 If Plaintiff succeeds in establishing a prima facie case under the ADA, the burden of production then shifts to Defendants to articulate some legitimate, nondiscriminatory reason for their action. Olson, 101 F.3d at 951.

n15 Although it has not been argued in Defendant's motion for summary judgment and we do not presently decide the issue, we note that it appears unlikely that Plaintiff would be able to establish that he has a "disability" as defined under the ADA. The United States Supreme Court has very recently held that in determining whether a person has a physical impairment that substantially limits one or more of the major life activities of an individual, the court must look to whether the individual is prevented or restricted from performing "tasks that are of central importance to most people's daily lives." Toyota Motor Mfg., Inc v. Williams, 534 U.S. ___, 534 U.S. 184, 151 L. Ed. 2d 615, 122 S. Ct. 681, No. 00-1089, slip op. at 1-2 (Jan. 8, 2002). In the instant case, Plaintiff contends that he is disabled within the meaning of the ADA because his employer is aware of his limitations associated with his bad back and therefore regards him as being disabled. But to be regarded by one's employer as disabled under the terms of the ADA, the employer must regard the person as "having a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). Williams teaches that "terms [such as "substantially limits" and "major life activities"] need to be interpreted strictly to create a demanding standard for qualifying as disabled"

*Williams*, slip op. at 12. Moreover, it appears that this is an objective standard. The inquiry is whether the impairment places "severe restrictions in the activities that are of central importance to *most people's* daily lives." *Id.* at 17 (emphasis added) In the instant case, Plaintiff has merely alleged that he uses lumbar supports in his chairs and that a recurring back problem causes him discomfort when bending over. We doubt whether such impairments are of the type that could objectively be seen as substantially limiting Plaintiff's major life activities.

[*36]

## C. Adverse Employment Action

It is essential to Plaintiff's claims under both the ADEA and the Rehabilitation Act that Plaintiff have suffered an adverse employment action. An adverse employment action is an action by an employer that is serious and tangible enough to alter Plaintiff's compensation, terms, conditions, or privileges of employment, or to deprive him of employment opportunities, or adversely affect his status as an employee. 29 U.S.C. § 623(a) (1994 & Supp. V 1999); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (construing a parallel requirement of adverse employment action in the context of a Title VII case). Although the definition of "adverse employment action" includes job opportunities that are not mere entitlements, there must be some material detriment to the plaintiff. "Mere idiosyncracies of personal preference are not sufficient to state an injury." *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446, 457 (D.C. Cir 1999) (holding that "a plaintiff who is made to undertake or who is denied a lateral transfer -- that is, one in which she suffers no diminution in pay or benefits [*37] -- does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm").

We recognize that an adverse employment action is not limited to loss or reduction of pay or monetary benefits but may include other forms of adversity as well. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id.* Whether Plaintiff has experienced an adverse employment action is an issue of fact and often cannot be resolved on a motion for summary judgment, except where the issue is not fairly contestable. *See Williams v. Bristol-Meyers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996). *Danas v. Chapman Ford Sales, Inc.*, 120 F. Supp. 2d 478, 485 [*38] (E.D. Pa. Oct. 27, 2000) (citing *Williams v. Bristol-Meyers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996)). In the instant case, we conclude that the issue is not fairly contestable and that Plaintiff has not experienced an adverse employment action.

Plaintiff alleges that "the ability to transfer to different District Counsel's office [sic] is a term and condition of employment in which Defendants have discriminated against older workers based upon their age." (Pl.'s Complaint P 24.) In support of this allegation, Plaintiff has stated that prior to being hired, he was informed that the INS "had an awful lot of promotion and transfer opportunities," that "one could expect there was quite a bit of mobility in the INS," and that "the INS is very, very big on transferring people." (Def.s' Mot. for Summary Judgment, Ex. A-8.) Plaintiff has also stated that his understanding at the time he was hired was not that he was assured of transfer, but that his *prospects were excellent* for a transfer anywhere within the system." (Def.'s Mot. for Summary Judgment, Ex. A-13-14.) (emphasis added) Plaintiff argues that he sought and was denied transfer to positions that "offered [*39] Plaintiff a greater opportunity for advancement, to be recognized, to improve skills with a lesser caseload and interact more collegially with his colleagues, the bench and bar." (Pl.'s Response, at 22.)

It is Plaintiff's position that the denials of his transfer requests constituted adverse employment actions because the sought-after transfers were not merely lateral or identical, but would have resulted in a material benefit had Plaintiff been selected. Plaintiff argues that the inability to work longer hours, practice in a particular field of law, or practice in a particular office has had a harmful effect upon his career. In particular, Plaintiff contends that all of the transfers for which he applied "would have resulted in a significant change in the amount of time he travels, a savings in the portion of his income he must devote to his commute and the opportunity to advance his career by being more available to his supervisors and colleagues as a result of not having to run for the bus." n16 (Pl.'s Response, at 19.)

n16 We have noted that Plaintiff has voluntarily chosen to live in Philadelphia and work in New York. We also note that before his present employment, Plaintiff was working in Hanover, Massachusetts while living in Nashua, New Hampshire, seventy miles away. It is unclear how the consequences of Plaintiff's commute could be

related to an adverse employment action when it is a condition that he voluntarily and repeatedly imposes upon himself.

[*40]

We have little doubt that Plaintiff would have experienced a collateral benefit by transferring out of the New York office, although we must admit that this presumes that Plaintiff would not again choose to live 100 miles away from work. It can hardly be doubted that Plaintiff would benefit from not commuting such long distances. However, the question is not whether Plaintiff would be better off working in a city other than New York, but whether the denial of his transfer requests affected his compensation, terms, conditions, or privileges of employment, deprived him of employment opportunities, or adversely affected his status as an employee. In making this determination, we note that the positions for which he applied in Boston and Philadelphia are not substantially different from his present position in New York -- the only significant difference is the location of his workplace and the impact this has upon Plaintiff's commute. The failure of the employer to transfer Plaintiff to a position that is only collaterally beneficial does not, under the circumstances in the instant case, rise to the level of an adverse employment action.

Plaintiff cites the Third Circuit case of *Goosby v. Johnson & Johnson*, 228 F.3d 313 (3d Cir. 2000), [*41] in support of his argument that Defendant's refusal of the desired transfers constituted an adverse employment action. *Goosby* is inapposite. In *Goosby* Plaintiff claimed that after her employer restructured the workforce, she was assigned to a newly created position that was more difficult, less desirable, and only "for employees that the company wanted to get rid of." *Goosby*, 228 F.3d at 317, 319. The court concluded that there existed a genuine issue of material fact concerning whether the position at issue was, in fact, less desirable, and a genuine issue of material fact concerning whether Plaintiff was treated adversely or not. *Goosby*, 228 F.3d at 319. Unlike *Goosby*, there is no allegation in this case that Defendants affirmatively acted to place Plaintiff in a less advantageous position. Rather, Plaintiff's complaint is that Defendants have failed to place him in a position which he perceives to be more advantageous.

Plaintiff also contends that had he been selected for the position of Eastern Regional Counsel in the Eastern Regional Office in South Burlington, Vermont, he would have been able to practice in different substantive [*42] areas of law that have broader based application and which would have allowed Plaintiff to draw upon his labor relations education and thereby further advance his career. Plaintiff argues that this position would have provided him with opportunities that are not as readily available to employees working in other offices. For example, Plaintiff argues that the Deputy Regional Counsel at the Eastern Regional Office obtained her position while she was an Assistant Regional Counsel at the Eastern Regional Office, and that the position was only advertised among the Assistant Regional Counsel staff at the Eastern Regional Office. Plaintiff contends that by not being permitted to transfer to the Eastern Regional Office, he is missing out on similar opportunities.

Even if Plaintiff's claims regarding transfer to Vermont were not time barred, Plaintiff has offered no substantive evidence to support his contention that his career with the INS has been adversely affected by this failure to transfer. His argument invites this Court to speculate on what might have been. In the case of *Weston v. Pennsylvania*, 251 F.3d 420 (3d Cir. 2001), the Third Circuit considered a District [*43] Court's finding of an adverse employment action through the presumed future effect that an employer's actions might have on compensation, terms, conditions, or privileges of employment. In *Weston* plaintiff brought suit against his employer under Title VII for placing written reprimands in his personnel file that were to remain in the file for a period of six months. The trial court held that the written reprimands constituted an adverse employment action because of their "presumed" effect on the compensation, terms, conditions, or privileges of plaintiff's employment. The Third Circuit disagreed, holding that the employer did not take an adverse employment action by placing the reprimands in plaintiff's personnel file because plaintiff failed to show how the reprimands effected a material change in the terms or conditions of his employment. *Weston*, 251 F.3d at 431. The court noted that the plaintiff was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location, did not have his hours or work altered in any way, and was not denied a pay raise or promotion as a result of the reprimands. *Id.* The Third [*44] Circuit refused to speculate as to the presumed effect of a written reprimand.

Similarly, we cannot presume that Plaintiff's nonselection for transfer has effected a material change in the terms, conditions or privileges of his employment. Plaintiff's suggestion that he lacks the ability to advance his career because of Defendants' denial of his transfer requests is sheer speculation. Plaintiff has failed to demonstrate how the failure to transfer did effect a material change in the terms and conditions of his employment. Having failed to establish that he experienced an adverse employment action, Plaintiff has failed to establish a crucial element of his prima facie case of employment discrimination based on age or disability.

**Conclusion**

2002 U.S. Dist. LEXIS 12202, *

For the foregoing reasons Defendant's Motion For Summary Judgment will be granted.

An appropriate Order follows.

**ORDER**

AND NOW, this 25th day of January, 2002, upon consideration of Government's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Docket No. 14) and Plaintiff's response thereto, it is ORDERED that the said Motion be and the same is hereby GRANTED.

BY THE COURT: [*45]

R. Barclay Surrick, Judge

LEXSEE

**PAUL C. SEITZ, Plaintiff, v. THE SIEGFRIED GROUP, LLP, SIEGFRIED & SCHIEFFER, LLP, SIEGFRIED CONSULTING, LLP, and SIEGFRIED RESOURCES, LLP, Defendants.**

C.A. No. 99C-12-025-CHT

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2001 Del. Super. LEXIS 364

March 15, 2001, Submitted
October 2, 2001, Decided

**DISPOSITION:** [*1]

Motion for Partial Summary Judgment on the Complaint and Motion for Summary Judgment on the Partnerships' Counterclaim denied. Partnerships' Motion for Summary Judgment on Their Counterclaim granted in part and denied in part.

**COUNSEL:** David H. Williams, Esquire and Elizabeth A. Brown, Esquire, MORRIS JAMES, HITCHENS & WILLIAMS LLP, Wilmington, DE, Attorneys for the Plaintiff.

Jeffrey M. Weiner, Esquire, Wilmington, DE, Attorney for the Defendants.

**JUDGES:** TOLIVER, JUDGE.

**OPINIONBY:** TOLIVER

**OPINION:**

OPINION AND ORDER

On the Defendants' Motions

for Partial Summary Judgment

and

On the Plaintiff's Motion

for Partial Summary Judgment.

TOLIVER, JUDGE

FACTS

The Plaintiff, Paul C. Seitz, is an accountant and the Defendants n1 are providers of accounting services to various persons and/or entities. On July 1, 1993, the par-

ties entered into an agreement ("Employment Agreement") whereby Seitz would be employed to act as an accountant on behalf of present and future clients of the Partnerships. He was to receive compensation based upon those efforts as defined in that agreement. It was also contemplated that clients previously served by Seitz or whose interests he would subsequently [*2] be retained to represent would become part of the clientele of Partnerships.

> n1 The Siegfried Group, Siegfried & Schieffer, Siegfried Consulting and Siegfried Resources were, at all times relevant to this action, limited liability partnerships registered in the State of Delaware. They shall hereinafter be referred to as the "Partnerships".

On January 4, 1996, Seitz and the Partnerships entered into a series of contracts which altered the manner in which Seitz was to receive compensation for his efforts on behalf of the Partnerships. Also affected were the terms and conditions relating to any termination of the relationship between Seitz and the Partnerships as well as the nature and the consequences of any professional contact between Seitz and clients of the Partnerships following a termination.

Of primary consequence among the aforementioned agreements were the Incentive Compensation Agreement ("ICA") and the Tactical Component Agreement ("TCA"). The ICA provided Seitz with the opportunity to earn compensation [*3] by attaining certain short-term goals and objectives deemed mutually beneficial to both parties as opposed to longer-term business objectives. The TCA, specifically Paragraph 4, defined the mechanism by which the computation of Seitz' compensation would be achieved. It also set out the criteria to be used

Page 1

in evaluating his performance. They included sales, client service and a scoring component, including, but not limited to, new business development, corporate citizenship and other factors as determined by the Partnerships.

There was a limitation, however, on the amount of incentive compensation that Seitz could receive or be paid, as opposed to earn, in any one year. The TCA also defined the maximum amount payable and what became of the amount of incentive compensation earned in excess of that amount. The agreement stated that any monies owed to Seitz, including incentive compensation, but not yet payable, would be deferred and added to the tactical component in future years during which Seitz would be subject to the TCA. n2 In the event that the professional relationship between the parties was terminated, the excess so earned but not paid would be added to a promissory note (the [*4] "Seitz Note") and repaid according to the terms and conditions stated therein. n3

n2 TCA at P4(f).

n3 The Seitz Note was created as a result of an amendment to the Employment Agreement that was entered into by the parties on January 4, 1996. The relevant terms and conditions of the Seitz Note are provided for in P6 of that agreement.

For reasons that are not altogether clear, Seitz tendered his resignation from the Partnerships in a letter dated August 7, 1997. According to Seitz, the final date of their association was to be mutually determined later. On August 8, the resignation was accepted by Robert L. Siegfried, President of the Partnerships, who nominated September 7 as the date when the separation would be effective. However, during the interim, the Partnerships terminated Seitz's employment as of August 11, 1997. n4

n4 Letter from Siegfried to Seitz of August 11, 1997; see Defs' Answer and Countercl. at Ex. N.

[*5]

At least during the month of August, 1997, the record reflects that the parties were attempting to calculate the incentive compensation due Seitz for the Partnerships' fiscal year 1996. n5 Although the final amount due for that period remains in dispute, it appears that Seitz had earned an amount in excess of that to which he could be paid under the TCA. n6 In any event, no further action on this issue was taken prior to the termination of the relationship between the parties.

n5 The reference to the Partnership fiscal years shall hereinafter be designated "FY ___ ".

n6 On August 5, 1997, a draft of a document purportedly from Robert Siegfried was directed to Seitz and calculated total incentive compensation for FY 1996 at $ 461, 461. If that were the case, pursuant to the TCA, the maximum incentive compensation payable would be $ 206,250. The balance, or $ 255,211, would have to be deferred and placed into the Seitz Note. However, while the Partnerships deny that this was the final figure for that year, it does not appear that they dispute that some incentive compensation was to be deferred and added to the Seitz note.

[*6]

On November 19, 1997, Seitz directed correspondence to the Partnerships demanding payment of the Seitz Note. The payments of principal and interest were to begin on May 19, 1999. n7 Nothing else of note transpired until April 9, 1998. On that date, Seitz requested that the Partnerships calculate his incentive compensation for the portion of FY 1997 up to the effective date of his termination. On December 7, 1998, the Partnerships informed Seitz that his incentive compensation FY 1997 prior to his termination was a negative $ 12,758. It was also at that time that Seitz was informed that he was due a total of $ 199,788 as opposed to the $ 461,461 figure referred to in the August 5, 1997 memo, which had not been given final approval n8

n7 According to P3(b) of the Seitz Note:

The first such installment (of the Seitz Note) shall be due and payable: . . . (ii) eighteen (18) months after the date on which Borrower receives Lender's demand for repayment, where Lender (x) is less than 52 years of age at the time Lender demands repayment hereunder, and Lender has voluntarily terminated his employment, or (y) is less than 52 years of age at the time Lender demands repayment hereunder, and Borrower has terminated Lender's employment for cause. . .

See compl. at Ex. F.

[*7]

n8 Letter from Partnerships' counsel to counsel for Seitz of December 7, 1998; see compl. at Ex. G.

No payments were made on the indebtedness due under the Seitz Note following the November 19, 1997 demand for payment. It appears that compensation related to various aspects of his employment relationship with the Partnerships had been advanced to Seitz prior to his termination. The amount of that compensation was unilaterally determined by the Partnerships who began to deduct it monthly following Seitz' termination and the subsequent demand for repayment of the note by Seitz. Although there was no agreement concerning the Partnerships' calculation of this "negative compensation", Seitz did not dispute the right of the Partnerships to offset whatever that amount was determined to be against the deferred incentive compensation.

On December 27, 1999, the Partnerships informed Seitz that they had made what was later determined to be a contribution of $ 9,747.34 to Seitz' 401(k) plan as of September 12, 1997. The contribution was not authorized by Seitz and was credited against the deferred [*8] incentive compensation for 1997. n9

n9 It is not completely clear from the correspondence between the parties that the deduction and subsequent contribution was for FY 1997. However, it is apparent that Seitz did not affirmatively authorize the contribution at the time it was made. In addition, Seitz alleges that the contribution was subject to a forty percent (40%) forfeiture rate and therefore a loss to Seitz of $ 3,898.94. The basis for this claim is not set out in the pleadings but is presumably a reference to 26 U.S.C. § 401 of the Internal Revenue Code.

Seitz instituted this litigation on December 3, 1999. His complaint, as it presently exists, n10 generally alleges that the monies the Partnerships refused to pay him as outlined above constituted "wages" within the meaning of the Delaware Wage Payment and Collection Act, specifically 19 Del. C. § 1101(a)(2). The refusal, he contends violates that law, making the Partnerships liable for damages, including the deferred [*9] incentive compensation, interest, penalties, costs and attorney's fees. Seitz also seeks the return of the "negative compensation" that was incorrectly charged against his incentive compensation for FY 1997 as well as the monies which he for-

feited because of what he claims was the unauthorized 401(k) contribution.

n10 The complaint was amended on January 27, 2000, prior to the filing of answer by the Partnerships pursuant to Superior Court Civil Rule 15(a)

The Partnerships have denied the allegations made by Seitz. In addition, they have raised certain affirmative defenses, which, they allege will bar Seitz from any relief to which he might be entitled even if they acted improperly. Lastly, the Partnerships have filed certain counterclaims alleging that Seitz is in fact liable to them for breaches of the agreements executed by the parties during the course of their professional relationship.

On December 20, 2000, the Partnerships filed two motions seeking the entry of partial summary judgment on their behalf [*10] pursuant to Superior Court Civil Rule 56. The first sought a determination that Seitz was not entitled to any relief under the Delaware Wage Payment and Collection Act and that he failed to state a claim for relief as to the amount of incentive compensation claimed or insofar as the 401(k) contribution was concerned. The second motion requests a ruling from the Court on their counterclaim which sought damages based on the alleged solicitation and/or performance of professional services by Seitz for clients of the Partnerships.

Seitz has opposed those motions and seeks entry of judgment in his favor, also pursuant to Rule 56, as to Counts II thru IV and VI of the Partnerships' counterclaim and the damage claim arising out of the solicitation of two entities claimed as clients of the Partnerships. Specifically, Seitz claims that the aforementioned counts must be submitted to arbitration pursuant to one of the agreements ("Partners' Agreement") entered into by the parties at the start of their relationship. As to the two entities allegedly solicited, Seitz contends that solicitation alone, without engaging in any services for them is not enough to impose liability for damages on him. [*11] For those reasons, he argues that he is entitled to the relief sought.

Oral arguments on the motions were held on March 7, 2001 and March 15, 2001. All briefing having been completed and reviewed, that which follows is the Court's resolution of the issues so presented.

## DISCUSSION

As indicated above, both parties have filed motions seeking partial summary judgment pursuant to Rule 56. The law is well settled in this area. "Summary judgment may be granted only where, considering the facts in a

light most favorable to the non-moving party, there is no material issue of fact and the moving party is entitled to judgment as a matter of law." Pullman, Inc. v. Phoenix Steel Corp., Del. Super., 304 A.2d 334, 334 (1973). If, after viewing the evidence, the court finds that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances, then the court may not grant the motion for summary judgment. Guy v. Judicial Nominating Comm'n., Del. Super., 659 A.2d 777 (1995); and Wilson v. Triangle Oil Co., Del. Super., 566 A.2d 1016 (1989) [*12] It is the movant's burden to demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Borish v. Graham, Del. Super., 655 A.2d 831 (1994). The party opposing that motion must be afforded the opportunity to come forward with evidence showing the existence of a dispute as to an issue of material fact. Phillips v. Del. Power and Light, Del. Super., 59 Del. 179, 216 A.2d 281 (1966). It is with these standards in mind that the Court must review the motions filed by the parties.

**Partnerships' Motion for Partial Summary Judgment on Seitz' Complaint**

**Whether Compensation Deferred Constitutes "Wages"**

The Partnerships' first contention in its motion is that the deferred incentive compensation sought by Seitz is not "wages" for purposes of the Delaware Wage Payment and Collection Act. While the Partnerships do not dispute that any amounts due and payable to Seitz up to the maximum amount permissible under the ICA and the TCA during each of the partnership fiscal years in question here were wages, the Partnerships argue that incentive compensation which was deferred [*13] to be paid in future years, or in the case of termination, to be added to the Seitz Note, did not fall within that term. As a result, Seitz has failed to state a claim upon which relief can be granted under the aforementioned statute as to those monies which he had earned but had not been paid.

In support of this argument, the Partnerships cite Dep't of Labor Ex Rel Commons v. Green Giant Co., Del. Super., 394 A.2d 753 (1978). That case held that wages are funds "ordinarily paid at the end of each period of a certain number of workdays." Id. at 755. The argument that is suggested is that the funds were not subject to payment at the end of a period of a certain number of work days, they are not wages. Defs.' Mot. for Partial Summ. J. Upon Pl.'s Comp. at P3. Seitz responds that this argument is flawed because the amount in question was a year-end bonus or commission based upon Seitz' performance on behalf of the Partnerships and therefore constituted wages according to SOCA Indus.,

Inc. v. Bracken, Del. Supr., 374 A.2d 263 (1977). The Court agrees.

The Delaware Wage Payment and Collection Act defines wages as, "compensation for [*14] labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." 19 Del. C. § 1101(a)(2). Clearly this definition of wages does not limit wages to those amounts included in an employee's normal paycheck. The courts in both Green Giant and SOCA Industries recognized that year-end bonuses or amounts earned on commission are considered wages. Green Giant at 756; and SOCA Indus. at 264. The ICA and TCA provide little assistance in determining whether the amount of incentive compensation that is to be deferred falls within the definition of wages for purposes of the statute in question. However, Paragraph 4(f)(iii) of the TCA makes it abundantly clear that any such excess amount is deemed to have been "earned" by Seitz. These monies are without doubt based upon services Seitz rendered to the Partnerships. As a consequence, the Court finds as a matter of law that the monies in question are wages because they are either a year-end bonus based upon his performance, a commission based upon his performance, or a combination of both.

The finding that Seitz' [*15] deferred incentive compensation constituted "wages", leads the Court to the Partnerships' alternative argument, i.e., that Seitz' claims are barred by the one-year statute of limitations applicable to wage claims set forth in 10 Del. C. § 8111. Because Seitz was terminated on August 11, 1997, the Partnerships contend that the limitations period expired on August 11, 1998. As a result, Seitz' complaint was not timely when it was filed over a year later. Seitz responds that this cause of action did not arise and the limitations period did not begin to run until he received notice on December 7, 1998 of the Partnerships' calculation of the amount of incentive compensation which had been deferred for FY 1996 and 1997.

10 Del. C. § 8111 holds:

> No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with [*16] any such action, shall be brought after the expiration of one *year from the accruing of the cause of action*

on which such action is based. (emphasis added).

In a case very similar to the case sub judice, the United States District Court of the District of Delaware held that the plaintiff's cause of action did not arise until he had actual notice of the amount of his bonus. The Court made this finding despite a provision in the employment agreement that stated that the bonus was due at the closing of a merger. It reasoned that the cause of action did not mature until the bonus check was tendered to the plaintiff, which put him on notice that the amount was in dispute. Compass v. American Mirrex Corp., D. Del., 72 F. Supp. 2d 462, 468 (1999).

In this case, Seitz' cause of action did not arise until December 7, 1998, the date the Partnerships provided Seitz with the amount of deferred incentive compensation which they calculated was due him Seitz under the terms of the ICA and TCA. See Pl.'s Resp. at Ex. 7. As such, the limitations period did not begin to run until that date and would not have been tolled until one year later, on December 7, 1999. Stated [*17] differently, it had not expired when Seitz filed his complaint on December 3, 1999, and the Partnerships' motion in this regard must be denied.

### Calculation of Incentive Compensation

The Partnerships also seek the entry of judgment on their behalf concerning the mechanism used to calculate the incentive compensation for their 1996 fiscal year. To be specific, the Partnerships contend that Seitz erroneously uses a 4.2 scoring component to calculate the amount due for that period of time Seitz 1996 incentive compensation. The factor that should have been used, it is argued, would be adjusted by factoring in aspects of Seitz' performance more fully set out in the TCA. n11 The result would be a scoring component of 3.68. As might be expected, Seitz is equally adamant that the factor he used is correct based upon the agreements between the parties. Moreover, it is consistent with the factor used without by the Partnerships in pre-litigation calculations.

n11 TCA at P4(d).

Viewed in a light most favorable [*18] to the non-moving party, the Court is unable to conclude that the Partnerships are entitled to summary judgement as a matter of law on this issue. There are material facts in dispute and the application of the law to the facts given would not be appropriate at this stage of the proceedings. Guy at 780. Indeed, given the aforementioned disputes of fact and the use of language readily susceptible of differing interpretations, it does not seem likely that this issue

can be resolved summarily and short of a trial on the merits

### Section 401(k) Contribution

Finally, the Partnerships move for summary judgment on Seitz' claim to the funds that were withheld for his 401(k) plan. The Partnerships argue that participation in the plan was mandatory for Seitz and that he is not entitled to the contributions about which he complains as a result. Seitz responds that the Partnerships characterize the amount in question as a profit-sharing contribution they made on his behalf, but that they also subtracted that figure from his deferred incentive compensation calculation for 1997. He argues that it is a breach of the underlying employment agreements to calculate or use it both ways. The [*19] contribution is either a profit-sharing contribution or an employee contribution, but not both.

In this case, it does appear that there is a material dispute of fact concerning whether the Partnerships have categorized and treated these funds as a mandatory 401(k) contribution by Seitz or by the Partnerships on his behalf. Also, there is the legal impact of whatever designation that is deemed to apply, which from the record as it presently stands, is unclear. Further proceedings are therefore necessary to clarify the application of the facts to the law before this issue can be resolved.

In sum, the motion of the Partnerships seeking summary judgment on the Seitz' complaint must denied in all respects.

### Seitz' Motion on the Partnerships' Counterclaim

#### Arbitration of Counts II - IV & VI

Succinctly stated, Seitz argues that the claims set forth in Counts II, III, IV and VI of the Partnerships' counterclaim arise out of the Partners' Agreement and must be submitted to arbitration pursuant Paragraph 15 of that document. The Partnerships counter that the aforementioned claims do not arise out of the Partners' Agreement. More specifically, They contend that the Partners' [*20] Agreement concerns Class A Units of partnership interest and the redemption of those interests, but does not concern the terms and conditions of the partnerships. These issues are dealt within the separately executed limited liability partnership agreements, n12 the Employment Agreement or the common law. As a result, the Partnerships argue that the arbitration clause in the Partners' Agreement does not apply. The Court agrees.

n12 On the same date that the Partners' Agreement was executed, January 4, 1996, three separate limited liability partnership agreements were also executed for Siegfried Schieffer &

Page 5

C 28

Seitz, SSS Strategic Resources and Siegfried Consulting.

Counts II and IV allege breaches of fiduciary duties and contract while Counts III and VI set forth allegations of fraud/misrepresentation. As stated above, the Partners' Agreement deals specifically with the issuance and the redemption of the Class A Units of partnership stock. It does not, in any way, deal with the rights and/or obligations between [*21] Seitz and the Partnerships. The liability partnership agreements on the other hand do in fact define and/or address those relationships. n13 The Court must agree as a result that Counts II, III, IV and VI do not arise from the Partners' Agreement and need not be submitted to arbitration pursuant to the provisions of Paragraph 15 of that agreement.

n13 See Def.'s Resp. to Pl.'s Mot., Ex. A., Siegfried Schieffer & Seitz, LLP Limited Liability Partnership Agreement at PP 1, 11; Ex. B., SSS Strategic Resources, LLP Limited Liability Partnership Agreement at PP 1, 11; and Ex. C., Siegfried Consulting, LLP Limited Liability Partnership Agreement at PP 1, 11.

### Damages for Solicitation of Clients

The second contention raised by Seitz is that the Partnerships' claims for damages relating to his alleged solicitation of business from the DuPont Company and the Elzufon law firm must be dismissed. He argues that even if one were to assume that he solicited business from those two entities, the Employment Agreement [*22] requires that services be performed for those to whom the solicitation was directed. Since the Partnerships allege mere solicitation and not that he provided services, those claims must be dismissed because they do not state a cause of action upon which relief can be granted under the terms of the Employment Agreement.

The Partnerships admit that Paragraph V(C)(3)(b) of the Employment Agreement upon which Seitz relies, relates to the timing of the damages payments should Seitz *provide services* to a client of the Partnerships and that it is silent in that regard where there had been solicitation only. However, they argue that the failure to do so is not fatal to this aspect of their claims because the agreement clearly states that Seitz is prohibited from soliciting Siegfried clients and subjects him to liquidated damages if he violates that restriction.

A review of the Employment Agreement reveals that when read as a whole, it holds Seitz liable for damages for any solicitation without further qualification. Not-

withstanding the provision upon which Seitz relies, Paragraph V(C)(3)(a) states in relevant part:

> In addition, in the event of any breach by Employee of the covenants [*23] contained in subparagraph (V)(D)(1) n14 of this Agreement, Employee shall pay to Employer, with respect to each client of Employer whom Employee solicits or for whom Employee provides Accounting Services, and amount equal to one hundred fifty percent (150%) of the amount of Employer's twelve months average billings to the client . . .

This paragraph clearly demonstrates the parties' intentions that should Seitz solicit a Partnerships client, he would be liable for the specified amount of damages to the Partnerships. That measure of damages is based on the billings from the Partnerships to the client solicited and/or for whom work was performed. Consequently, to be activated, no work need be performed by Seitz and his motion in this regard is without merit.

n14 Paragraph V(C)(1) includes the covenant to not solicit clients.

In light of these conclusions, Seitz' motion seeking summary judgment as to certain counts contained in the counterclaim filed by the Partnerships and as to the solicitation claim [*24] as described above, is denied in its entirety.

### The Partnerships' Motion on Their Counterclaim

#### Solicitation of Clients of the Partnerships

The Partnerships have moved for summary judgement on the issue of Seitz' liability for soliciting and/or performing services for certain partnership clients in violation of the Employment Agreement. The clients were identified as the DuPont Company and the law firms of Elzufon & Austin; Richards, Layton & Finger and Richard R. Wier, Jr., P.A. In support of this claim, the Partnerships cites to evidence that Seitz met with and actively pursued those entities for purposes of soliciting or entering into a business relationship with them. In the case of the Richards and Wier firms, services were actually provided.

Seitz does not deny that he solicited DuPont and Elzufon but argues that since he did not perform any services for them, he did not violate the Employment Agreement. For the reasons discussed in addressing

Seitz' motion for partial summary judgment, n15 the Court disagrees. Again, the Employment Agreement, specifically Paragraph V(C)(1), prohibits solicitation of clients of the Partnerships and that is what the record [*25] reveals Seitz did. Therefore, the Partnerships are entitled a judgment as a matter of law insofar as the issue of whether the solicitation by Seitz, without more, constitutes a breach of the Employment Agreement, and their motion must be granted as it applies to DuPont and Elzufon. n16

> n15 See supra pp. 21-23.

> n16 Given the tangential reference by the parties to the subject, the Court has not decided what, if any, damages might flow from the violation of the prohibition against solicitation contained in Paragraph V(C)(1) or whether the measures of damages provision in Paragraph V(C)(3)(a)(ii) applies and/or is enforceable. Resolution of those issues will require more discussion than that presented thus far.

A different result obtains relative to Richards and Weir. Seitz contends that they were not clients of the Partnerships. n17 Those firms retained his services on behalf of individuals and/or entities who were represented by the firms in legal matters. The services were provided by the Partnerships [*26] to those individuals and/or entities. No relationship involving the provision of services between the Partnerships and the law firms was established while Seitz was professionally associated with the Partnerships. As a result, he could not have violated the Employment Agreement by performing work for either firm.

> n17 Reference is initially made to the Elzufon firm by Seitz in this regard but no further mention is made relative to that entity on the issue. Accordingly, the Court will view it as an inadvertent typographical error. See Seitz' Resp. to Defs.' Mot. Partial Summ. J. on Their Countercl. at 2.

There is no legal authority cited by Seitz in support this contention and there does not appear to be no controlling law in this jurisdiction on this issue. However, even if such authority existed, the Court would still be unable grant summary judgment on this issue in light of the status of the record relative to this issue. Simply put, the factual circumstances surrounding the contacts between Seitz and the law firms in question, as well as the purpose of those meetings, is not altogether clear. Therefore, this is a case where summary judgment is inappropriate because an inquiry into the facts and circumstances of Seitz' contacts with these parties is in order to clarify the application of the law to the circumstances. It would not, as a result, be appropriate to grant summary judgment as requested. [*27]

Given the foregoing discussion, the Partnerships' motion must be granted in part and denied in part as to the issue of the solicitation of clients.

## CONCLUSION

For the reason set for above, the Partnerships' Motion for Partial Summary Judgment on the Complaint and the Seitz' Motion for Summary Judgment on the Partnerships' Counterclaim must be, and hereby are, denied. In addition and also as described above, the Partnerships' Motion for Summary Judgment on Their Counterclaim is **granted in part** and **denied in part**.

**IT IS SO ORDERED.**

**Toliver, Judge**

December 5, 2003,

Dear fellow CSC Employee impacted by recent AMJP Reductions,

You have received this letter because we believe that you are one of the many individuals who were informed in September 2003 that your AMIP participation was either removed or reduced retroactive to April 2003.

We, a small group of fellow CSC employees who were also impacted by CSC's surprise action in the AMIP matter, have sought legal advice with a local Wilmington Attorney's office specializing in Labor Law. Although we were hoping that the Attorneys would find that the removal/reduction of the AMIP participation was in violation of our letters of employment, they indicated to us that Delaware's Employment at Will provisions strongly favor a corporation's right to set salary, bonus, etc. at any time to remain competitive. HOWEVER, the attorneys were concerned by CSC's retroactive actions which allowed all of us to believe we were working towards an AMIP award for 6 months only to have it removed "retroactively" in September.

The Attorneys researched the retroactive issue nationwide, and did, in fact, find legal precedent indicating that a case could be made to return part of the 2003-2004 AMIP that was lost. Our group of fellow CSC Employees believes that it would be worthwhile to pursue a course of action to attempt to recover at least part of this lost compensation.

Now to the point of this letter _ since Attorneys may not solicit business, our group decided to inform others like yourself of the situation and the opportunity to pursue a potential recovery of a portion (up to 6 months) of your AMIP for the 2003-2004 year. The Attorneys have agreed to work on this issue on a contingency basis (they don't get paid if we don't get "paid"), but have recommended that we gather as many additional participants before moving forward (greater power in greater numbers _ we are looking for at least 40 participants). We have sent this to you because we believe you may have been impacted by the recent actions by CSC, and have found your mailing address in public sources.

If you are interested in pursuing this matter as part of a larger group, you must make the initial contact. If interested, please contact the attorneys listed at the end of this letter (via e-mail, telephone, fax or letter) and provide the following information to them by (preferably) December 19, 2003:

- Your interest in the "CSC BONUS Action"
- Your Name
- Home Address
- Home Phone Number
- Personal e-mail address (do not use your CSC Address)
- Current Job Title

Making this initial contact with the Attorneys will not disclose your name to CSC or other participants, but will simply acknowledge your interest in participating with the Attorneys and the greater group in pursuit of a resolution to this matter. Once you have indicated your interest, the Attorneys will be in touch with you in the coming weeks to provide more information on how they plan to move forward in this matter and to formalize your participation (and likely ask some additional questions with regards to your specific situation). Of course if you have questions at any time, the attorneys are more than willing to discuss this with you.

We have sent more than 120 letters to impacted employees such as yourself, but we also know that we didn't make contact with everyone potentially affected by this issue. For your own protection . we recommend you be cautious about discussing this matter at work, and suggest that you:
- Do not make copies of this letter at work
- Don't use your work e-mail, work phone or any CSC resources (ie. Cell Phones) to discuss this matter with co-workers or the attorneys.

**Attorney Contacts**
Jeffrey K Martin     and/or  Timothy A Dillon
imartin(~,ikmpa.com          tdillon@ikmpa.com

1509 Gilpin Avenue
Wilmington, DE 19806
Phone: (302) 777-4680
Fax:    (302) 777-4682

Unless you decide to contact the Attorneys, you will receive no additional correspondence on this matter. Even if you do not choose to participate with us, we hope that contacting you on this matter at least enlightened you on your potential rights in this matter.

Miller
545

C 32

## CERTIFICATE OF SERVICE

I, Sarah E. DiLuzio, hereby certify that on June 15, 2006, I electronically filed true and correct copies of **APPENDIX TO DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using CM/ECF which will send notification of such filing, which is available for viewing and downloading from CM/ECF, to the following counsel of record:

Jeffrey K. Martin, Esq.
Timothy J. Wilson, Esq.
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
jmartin@marolisedelstein.com

Sarah E. DiLuzio (DSB ID No. 4085)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware 19899
Tel: (302) 984-6000
E-mail: sdiluzio@potteranderson.com

737189